STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
TOBACCO COMPLIANCE BUREAU

Christopher K. Leung
Assistant Attorney General
Christopher.Leung@ag.ny.gov

January 5, 2016

*Via ECF*

Hon. Katherine B. Forrest

    Re:    *The State of New York and City of New York v. United Parcel Service, Inc.*,
             Case No. 15-cv-1136 (KBF)

Dear Judge Forrest,

      On behalf of the plaintiffs State and City of New York, I write principally to address why this Court's proposal to bifurcate trial and phase plaintiffs' selected shippers serves the broad interests of this Court and the parties. I also write to address the additional issues raised by UPS's recent correspondence[1], specifically (1) why defendant United Parcel Service, Inc. (UPS) should be directed to produce the nationwide and "pre-2010" documents for cigarette shippers Elliot Enterprises and Native Wholesale Supply, and why such shippers should be included within plaintiffs' first group of shippers; and (2) why the discovery matters raised by UPS's December 18 letter may be set aside at this time.

      In broad outline, this Court's proposal to bifurcate the liability and damages phases for trial will further the convenience of the parties and Court, as well as "expedite and economize" the number of issues for trial, by creating a more manageable case and by reducing the number of issues to be decided at any second trial. A bifurcated liability trial would establish UPS's knowledge generally, as well as its specific knowledge regarding a limited number of shippers selected by plaintiffs, that UPS's customers were shipping unstamped, untaxed cigarettes.

      Such an approach would also significantly reduce the number of documents needed to be reviewed by the New York State Department of Taxation and Finance ("Department" or "Tax Department") thereby allowing the parties to proceed expeditiously to trial and the resolution of

---

[1] Although the State and City's instant letter reply was originally intended to address the more limited scope of this Court's November 19 Order (ECF No. 83), UPS's December 9 and 18 letters (ECF Nos. 103 & 113) raise a number of issues requiring clarification or correction.

their claims.  Furthermore, because Elliot Enterprises and Native Wholesale Supply were among UPS's top-ten largest revenue-generating accounts in the area, including these shippers as part of plaintiffs' first group may pave the way for the eventual settlement of claims concerning plaintiffs' remaining smaller shippers.

As to the whether this Court should include Elliot Enterprises and Native Wholesale Supply within plaintiffs' first group of shippers, it is important to emphasize that the State and City timely and appropriately notified UPS that these UPS customers were "shippers at issue" in this case.  Through various phone conferences and a letter dated September 23, 2015 (*see* attached Ex. A, at 2)—*i.e.*, a date well ahead of the parties' November fact discovery deadline—the State and City asked UPS to supplement its document production to include these shippers, which fell within the "cigarette dealer" catch-all category of plaintiffs' discovery requests.  UPS refused, however, ignoring plaintiffs' several requests and otherwise applying a cramped reading of plaintiffs' complaint that this Court rejected at the parties' November 18 status conference.  Given such facts and plaintiffs' timely November 17 motion to compel, an Order compelling UPS's production of documents as to these shippers is appropriate here, as is Elliot Enterprises and Native Wholesale Supply's inclusion within the State and City's first group of shippers.

Finally, because UPS's proposed motions to compel are untimely and otherwise lack "good cause," the Court may set aside these motions at the pretrial conference.  *See*, *e.g.*, *Gucci Am. v. Guess?*, 790 F. Supp. 2d 136, 139, 142 (S.D.N.Y. May 25, 2011) (denying motion to compel brought after the close of the discovery where the moving party had "'ample opportunity' to obtain the information during the fact discovery period, and failed to raise the issue with the Court at the appropriate time"); *Slomiak v. Bear Stearns & Co.*, 1985 U.S. Dist. LEXIS 21860, *1 (S.D.N.Y. Mar. 12, 1985) (denying a motion to compel filed after the discovery deadline where counsel knew of the witnesses and the arguable need for their testimony well in advance of the fact discovery deadline).  As reiterated by the Court at the parties' November status conference, the deadline for bringing any motions to compel was on or before November 17.  But because UPS chose not to do so, UPS's proposed motions lack good cause and are untimely.  That said, as to the substance of UPS's complaint, the State and City have provided more than enough information to UPS concerning each shipper at issue, including Elliot Enterprises and Native Wholesale Supply.  *See* Order, at 2 (Oct. 20, 2015; ECF No. 67) (declining to allow UPS to obtain "an order of their proof").

Thus, for all the foregoing reasons, this Court should (1) bifurcate trial and permit plaintiffs' phasing and choosing of shippers, in accordance with the broad interests laid out by Rule 42(b); (2) direct UPS to produce all responsive documents concerning Elliot Enterprises and Native Wholesale Supply; and (3) set aside UPS's discovery requests and proposed motions to compel as untimely and lacking in good cause.

## Background

### I.   The November 18 Conference

As this Court knows, the State and City's complaint alleges that UPS "knowingly delivered enormous quantities of unstamped, untaxed cigarettes to persons throughout the United States, including the State and the City."  Sept. 16 Order, at 11 (ECF No. 49).

In November 2015, the State requested an extension of the discovery deadline to allow the Tax Department additional time to complete its review of roughly 900,000 potentially relevant documents. *See* Nov. 13 State Letter, at 1 (ECF No. 76). To address this request, the Court held a status conference with the parties on November 18 and proposed several options intended to ensure an early summer trial date. *See* Nov. 19 Order, 1 & 4 (ECF No. 83). These options included bifurcating trial into liability and damages phases, and plaintiffs proceeding on a limited number of shippers of their choosing. *See id*. at 1; Tr., at 1–2, 5, 7–8, 24 (Nov. 17, 2015; ECF No. 87). As noted by the Court, proceeding in this manner would likely reduce the significant burden on the Tax Department, set up the parties' trial into more manageable "bite-size" pieces, and potentially assist the parties' settlement discussions. *See* Tr., at 5, 9, 24, 26.[2]

The State and City agreed to proceed in this manner, and this Court indicated its likely preference for doing so. *See* Tr., at 36. At the same time, the State and City further noted that their planned motion to strike UPS's affirmative defenses would, if granted, further reduce the Tax Department's document review and production burden. *Id.* at 21, 22–23.

As a result, this Court then set up a briefing schedule for the parties, and directed plaintiffs to identify which shippers they would proceed to trial on, as well as the estimated savings to the Department if this more limited list of shippers were applied (as measured by number of documents to be reviewed and/or temporarily set aside). *See* Order, at 2–3. The Court further clarified that November 17 was the deadline for the parties to have brought any motions to compel. *See* Tr., at 15.

### A. The State and City's identification of shippers for an initial trial on liability.

Since that conference, the parties have completed their briefing on the State and City's motion to strike, and the plaintiffs have identified eight cigarette shippers for an initial trial on UPS's liability: (1) **Arrowhawk** (aka, *inter alia*, Arrowhawk Cigars, Arrowhawk Smoke Shop, Seneca Cigars, Two Pines Enterprises, Native Gifts, Hillview Cigars); (2) **Smokes & Spirits** (aka Bob Oldro Smokes & Spirits); (3) **Elliot Enterprises** (aka Elliot Enterprise, Native Express and Elliot Industries); (4) **Shipping Services**; (5) **Mohawk Spring Water** (aka Action Race Parts & Fabrication, Action Race Sports, NTC, Native Tobacco Company); (6) **Jacob's Tobacco** (aka Jacob's Manufacturing); (7) **Ohserase** (aka Tarbells, Tarbell Management Group, Mohawk Distribution); and (8) **Native Wholesale Supply** (aka Native Wholesale and Seneca Promotions). *See* State Dec. 4 letter, at 2 (ECF No. 94).[3]

These shippers were drawn from four of the five New York State Indian reservations / UPS centers at issue, and include several of UPS's top-revenue generating accounts, specifically, Elliot Enterprises (since determined to include the alias EExpress) and Native Wholesale Supply. *See* Ex. B (Dec. 3 email), at pdf p. 18.

---

[2] "Frankly, we all know how this works. You show liability on X. We go to damages on X. You get a package on X. Maybe you folks can talk. Maybe you appeal X. We do a 54(b). It might be a way of carving this down." Tr., at 24.

[3] The State's letter also estimated that applying this more limited subset of shippers would result in (1) roughly 171,000 potentially relevant documents for the Department to review, and (2) a completed document production by the first week of February 2016. *See* State Dec. 4 letter, at 2.

### B. UPS's objections and additional discovery requests.

UPS subsequently objected to plaintiffs' inclusion of Elliot Enterprises and Native Wholesale Supply on several grounds; objected to this Court's proposal to bifurcate trial or otherwise permit plaintiffs to proceed on the shippers of their choosing; and objected to the plaintiffs' request[4] to extend in some form the on-going third-party discovery that will be helpful for trial.  *See* UPS Dec. 9 and 18, 2015 letters & Jan. 4, 2016 letter.

### Argument

### I. The Court's proposal to bifurcate trial and phase plaintiffs' selected shippers will assist the parties and Court.

Per Rule 42, "[f]or convenience, to avoid prejudice, or to expedite and economize," a court may order a separate trial on any issue.  Fed. R. Civ. P. 42(b); see *Chevron Corp. v. Donziger*, 800 F.Supp.2d 484, 491 (S.D.N.Y. 2011) (noting that Rule 42 is "sweeping in its terms" and provides a court with broad discretion "to grant a separate trial of any kind of issue in any kind of case").  For example, cases where liability and damages may be effectively separated "often have been held to be proper subjects for bifurcation."  8-42 Moore's Federal Practice – Civil § 42.20[6][b].  Bifurcation may also be appropriate to "defer costly discovery pending resolution of preliminary issues such as liability," *id*. § 42.23[3]; when "the litigation of the first issue might eliminate the need to litigate the second issue," *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999); or "the two phases involve[] different types of evidence," *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984).

In each case, decisions to bifurcate trial are "typically well within" a court's discretion.  *World Trade Farmers Mkt. v. Am. Airlines*, 802 F.3d 314, 339 (2d Cir. 2015).  The presence of a single condition (*e.g.*, "[f]or convenience … or to expedite and economize") is sufficient.  *Ricciuti v. New York City Transit Authority*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992).  And, while bifurcation is "not to be routinely ordered, it is important that it be encouraged where experience has demonstrated its worth."  Fed. R. Civ. P. 42, Adv. Comm. Note (1966 Amendment).

Here, several reasons support this Court's bifurcation and phasing proposal.

*First*, this Court has significant experience concerning the demonstrated value of bifurcation.[5]  Accordingly, bifurcation as proposed by this Court is to "be encouraged."  *See* Fed. R. Civ. P. 42, Adv. Comm. Note (1966 Amendment).

*Second*, the Court's proposal will significantly reduce the discovery burden on the Tax Department, thereby enabling the Court and parties to proceed expeditiously to trial.  As most recently determined by the Tax Department, there are roughly 41,000 documents that are

---

[4] *See* City Letter (Dec. 29, 2015; ECF No. 116).

[5] *See*, *e.g.*, *Regeneron Pharms., Inc. v. Merus B.V.*, 2015 U.S. Dist. LEXIS 106761, at *7 (S.D.N.Y. Aug. 6, 2015) (Forrest, J.) (noting the Court's bifurcation of trial to separately address whether a party's withholding of a reference during a patent prosecution was relevant, and if so, then whether such withholding constituted misconduct requiring a remedy); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 2014 U.S. Dist. LEXIS 66444, at *7 (S.D.N.Y. May 8, 2014) (Forrest, J.) (noting the Court's bifurcation of trial to promote, in part, the parties' settlement efforts).

4

potentially relevant to UPS's liability and plaintiffs' selected shippers at issue.  Of that figure, roughly 2,700 documents concern plaintiffs' selected shippers.  These documents are currently being reviewed and are expected to be produced (to the extent such documents are responsive and non-privileged) by the first week of February.[6]

*Third*, the Court's proposal will effectively eliminate the need to litigate other issues.  *See Amato*, 170 F.3d at 316.  As understood by plaintiffs, the parties' first trial would seek to establish UPS's knowledge (as well as any potential UPS liability that might result from such knowledge), and UPS's liability specifically concerning its largest cigarette shippers in a single trial.  Such knowledge would best be established by drawing from a broad selection of Indian reservations and large UPS accounts, and would further serve the broad purposes of Rule 42(b).  *See* Fed. R. Civ. P. 42(b).[7]

Here, plaintiffs' selected shippers are drawn from among four out of the five Indian reservations / UPS centers at issue, and among the largest volume / revenue–generating accounts held by UPS (*e.g.*, Elliot Enterprises / EExpress and Native Wholesale Supply—among the top ten largest for UPS in that sales region).  Given the enormous volume of packages that UPS picked up and delivered on behalf of these shippers (among the top ten largest for UPS in that sales region), plaintiffs would expect UPS to know—or should have known, but for its willful blindness and/or conscious avoidance to learn—that these shippers / Indian reservation smoke shops sold and shipped cigarettes, and did so with the help of UPS's offered delivery services.  Including these larger accounts may further assist the parties in any future settlement discussions, a permissible factor in a court's consideration of whether to bifurcate any issue or matter for trial.[8]

*Finally*, because UPS's arguments to the contrary lack merit, this Court's bifurcation and phasing proposal is appropriately applied.  To begin, a series of trials organized by Indian reservations or UPS centers will not effectively determine the issue crucial in this case, much less serve the Court's cited interest in carving this case down to more manageable "bite-size" portions.  *See* Tr., at 5 & 24.  As UPS's December 18 map clearly shows, a trial involving two

---

[6] With the exception of any additional third-party discovery that is currently on-going, the State and City have already completed their document production concerning the same issues.  A small number of documents may also be produced during the course of plaintiffs' privilege log review and production process, however.

[7] Rule 16(c) furthermore empowers this Court with broad authority to "facilitat[e] … the just speedy, and inexpensive disposition of the action."  Fed. R. Civ. P. 16(c)(2)(P).  For example, a court "at any pretrial conference" may "consider and take appropriate action" in "formulating and simplifying the issues, and eliminating frivolous claims or defenses"; "adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues … or unusual proof problems;" "ordering a separate trial under Rule 42(b) of a claim … or particular issue;" and "ordering the presentation of evidence early in the trial on a manageable issue that might, on the evidence, be the basis for a judgment as a matter of law under Rule 50(a) or judgment on partial findings under Rule 52(c)[.]"  Fed. R. Civ. P. 16(c)(2)(A), (L)–(N).

[8] *See* Manual for Complex Litigation, Fourth, § 11.422 (2004) (noting that a discovery plan may call for limited discovery to lay the foundation for early settlement discussions, to facilitate settlement negotiations, or to provide the foundation for a dispositive motion); Fed. R. Civ. P. 16(c) Adv. Comm. Notes (1983 Amendment) ("Since [settlement] obviously eases crowded court dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible").

5

UPS centers (as UPS has suggested) may potentially involve up to 26 shippers, an amount far exceeding the number initially proposed by this Court.

In addition, UPS's cited cases are simply inapt. For example, UPS reliance on *Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 202 (N.D.N.Y. 2008), *aff'd*, 332 Fed. App'x 641 (2d Cir. 2009), is misplaced where it is the Court that has proposed bifurcation, and not the State or City. *See* 8-42 Moore's Federal Practice – Civil § 42.20[5][a]; Fed. R. Civ. P. 16(c)(2)(M) & (P) (noting that a court may act *sua sponte* in bifurcating any issue for trial). The facts of *Ramirez v. Ellahi*, 2014 U.S. Dist. LEXIS 55414 (S.D.N.Y. Apr. 21, 2014), are dramatically different than the ones found here. And UPS's remaining cases concerning potentially overlapping evidence fail to consider the Court's tools and abilities to "manage and, if necessary, reduce or eliminate duplication of efforts in any second trial that might occur." *Chevron*, 800 F. Supp. 2d at 493 (holding that the court's application of its cited case management tools would result in "little or no risk of prejudice" and that the court's determination favoring bifurcation could be revised later if necessary).

Significantly, there is nothing in the Court's proposal that would seek to bar UPS from presenting its own evidence concerning what it knew or did know. *See*, *e.g.*, *Crown Cork & Seal*, 288 F.R.D. 335, 339 (S.D.N.Y. 2013) (holding that bifurcation would not prejudice Credit Suisse's defense at trial, because the company would be entitled to demonstrate during the first phase of the trial that plaintiffs did not rely on the alleged misrepresentations by the company, *i.e.*, a causation-related issue). Moreover, to the extent UPS is continuing to contemplate retaining damages and industry experts for trial (*see* UPS proposed scheduling order, dated Mar. 30, 2015; ECF No. 9–2), UPS's position also favors the Court's bifurcation proposal.[9]

In sum, because the Court's bifurcation and phasing proposal serves the broad interests of this Court and the parties (*i.e.*, for convenience, and to expedite and economize, etc.), Rule 42(b) bifurcation and phasing of plaintiffs' selected shippers is appropriate here.

    **II.**    **UPS should be directed to produce responsive documents concerning Elliot Enterprises and Native Wholesale Supply.**

For many reasons, this Court should direct UPS's production of responsive documents concerning Elliot Enterprises and Native Wholesale Supply. *See* Order, at 2 (Dec. 11, 2015; ECF No. 107) (granting plaintiffs' motion to compel in part, but reserving decision on whether UPS would be required to produce documents concerning Elliot Enterprises and Native Wholesale Supply).

*First*, a fair reading of the State and City's complaint reveals that plaintiffs' claims and requested relief are directed at UPS's practices generally, and not UPS's specific treatment of certain shippers named in the complaint.[10] *See* Fed. R. Civ. P. 8(e) (requiring plaintiffs'

---

[9] *See* 8-42 Moore's Federal Practice – Civil § 42.24[3] (noting that bifurcation may be appropriate when the damages determination is "complex" or "extensive discovery [is] necessary to prove the nature and extent of those damages"; "[v]oluminous documents are needed to resolve damages issues"; or even when "[t]here is a probability that the defendant will prevail on the [liability] issue, thereby eliminating the need to address the issue of damages").

[10] *See*, *e.g.*, 2d Am. Compl., ¶¶ 30–36 (seeking relief concerning UPS's general lack of compliance with the various state and federal laws, as well as UPS's Assurance of Discontinuance, governing the transportation of cigarettes; and

6

complaint to be construed in a manner "so as to do justice").[11]  As a result, this Court correctly noted that plaintiffs' claims were not limited to those shippers identified by way of example in plaintiffs' complaint. *See* Tr., at 10 (noting that "[plaintiffs] are not going to be limited to the only shippers in the world … set forth in their complaint, … because there is language in the complaint that seems to be broader than that").

*Second*, contrary to UPS's suggestion, there was no agreed-upon list of shippers at issue. *See* UPS Dec. 9 letter, at 1 (referring to a pre-October 20 list of "settled" shippers at issue, but failing to include any correspondence or documents reflecting this purported joint understanding).[12]  Rather, consistent with this Court's reading of plaintiffs' complaint, the plaintiffs' discovery requests included a catch-all category of "cigarette dealers" that was left open to include other cigarette shippers "at issue," later discovered by the plaintiffs. *See*, *e.g.*, Ex. C, at 2–5 (Pl.s' 1st Req. For Prod. Of Docs.).

Notably, when plaintiffs (over several phone conferences) sought to clarify whether UPS was applying this catch-all category to plaintiffs' discovery requests, UPS hedged.  And, when plaintiffs specifically asked UPS in writing to apply this catch-all category to Elliot Enterprises and Native Wholesale Supply (among others), UPS simply ignored plaintiffs' request and their September 23 letter. *See* Ex. A, at 2.[13]  As a result, plaintiffs sought relief from this Court and specifically highlighted UPS's refusal to specifically search for specific, additional shippers at issue that fell within plaintiffs' catch-all category. *See* State Nov. 17 letter, at 2–3 (ECF No. 81).

That said, even after this Court's November 18 determination that plaintiffs would not be limited to the specific shippers identified in their complaint), UPS simply refused to address plaintiffs' December 3 follow-up request that UPS supplement its document production to include Elliot Enterprises and Native Wholesale Supply. *See* Ex. B (Dec. 3, 2015 email to UPS

---

identifying certain cigarette shippers together with such terms as "for example" and "included"—words normally read as being non-exhaustive); *see also Fed. Land Bank of St. Paul v. Bismark Lumber Co.*, 314 U.S. 95, 100 (1941) ("the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle").

[11] "[Rule 8(e)] is not simply a precatory statement but reflects one of the basic philosophies of practice under the federal rules.  One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn." *Arar v. Ashcroft*, 585 F.3d 559, 594 n. 19 (2d Cir. 2009) (citation omitted; quoting 5 Charles A. Wright & Arthur R. Miller, *Fed. Prac. And Prod.* § 1286 (3 ed. 2004)).

[12] What UPS may be referring to are certain objections put forward by the State and City in letters dated September 25 and September 29.  *See* UPS Dec. 9 letter, at 1.  If this is the case, UPS's purported reliance on this "list" would still not explain, however, UPS's assertion that it used and relied on this September "list" to produce the thousands of documents that it produced in May, June, July, and August of this year.  In short, plaintiffs are at a loss to determine what UPS is referring to.  Furthermore, UPS has not provided plaintiffs with a copy of this "list," much less met and conferred with plaintiffs over this "list."

[13] The following is a list of catch-all companies that plaintiffs specifically requested UPS to supplement its document production on:  Elliot Enterprises (UPS acct. no. X1X635); Native Gifts (R17756); Native Outlet (X29128); Native Wholesale (A590X8); Native Wholesale Supply (RA0610); RJESS (W3Y624); Seneca Promotions (04874096 – KK; 10060304 – KK; 0000RX4828 – 01); Seneca Manufacturing (8347WF); and Sweet Seneca Smokes (V2W459).  *See* Ex. A, at 2.

counsel).[14]  In short, UPS's long-standing refusal to apply the catch-all category, and plaintiffs' timely inclusion of Elliot Enterprises and Native Wholesale Supply, should effectively discard UPS's arguments here.[15]

*Third*, as to Native Wholesale Supply[16] specifically, UPS has known of this company's cigarette-trafficking activities for years, and should have known from the inception of this case that plaintiffs would seek, and be entitled to, discovery of UPS's dealings with that company   In 2007, for example, UPS apparently destroyed 568 cases of cigarettes belonging to NWS, held at a UPS Supply Chain Solutions location in Oklahoma.  *See* Ex. B, pdf pp. 3–14.  Nevertheless, in 2008, UPS Account Executive Gerard Fink took on Native Wholesale Supply as a UPS customer / client, within his territory on the Seneca Cattaraugus Reservation.  *See id.* at pdf pp. 16–17.  And by 2012, NWS was one of Mr. Fink's top accounts, generating over $200,000 in revenue.  *See* UPS00000220.  Given this course of conduct by UPS, along with the fact that NWS was a notorious cigarette dealer that had been forced into bankruptcy proceedings in 2011 by trafficking-enforcement actions in other states (*see id.* at pdf. pp. 19–20), UPS's attempt to avoid full discovery of its relationship cannot be justified by its more recent, implicit claim of being surprised by plaintiffs' interest.

*Fourth,* with respect to Elliott Enterprises ("Elliott"), UPS has had similar reasons to expect plaintiffs' interest, and full discovery of UPS's relationship with Elliott is further justified by the likelihood that Elliott is actually a predecessor *alter ego* of EExpress, one of the shippers that *was* specifically named in the complaint.  *See* 2d Am. Comp., ¶¶ 32, 33.  Specifically, plaintiffs have determined that Elliott was a UPS customer in 2011, that Mr. Fink was the account executive, and that Elliott was Mr. Fink's largest account that year, generating in excess of $300,000 in revenue.  *See* Ex. B.  Plaintiffs have further determined that the storefront location of Elliott on the Seneca Cattaraugus reservation was the former storefront of a business called Deer Path Cigarettes, that Elliott was operated by a person known to Mr. Fink as Aaron Elliott, and that Elliott was terminated as a UPS customer some time prior to January 2013 because it was found to be shipping cigarettes.

Plaintiffs have also since determined that EExpress began shipping through UPS in October 2012, with Mr. Fink as the account executive, and with Aaron Elliott again listed as the

---

[14] Significantly, it should also be noted that at no point up until UPS's December 18 letter, did UPS address plaintiffs' requests, much less raise or rely on its now cited September 25 and September 29 letters as a reason for refusing to apply plaintiffs' catch-all category.  Rather, UPS simply sat on its hands.  At a minimum, UPS should have searched for and produced records of all cigarette shippers that UPS audited for cigarettes, that UPS terminated accounts for because of violations of UPS's Cigarette Policy, that submitted claims to UPS for damaged deliveries of cigarettes, that were reported by UPS drivers as tendering cigarettes for delivery by UPS, and/or that sold cigarettes from a New York State Indian reservation.  Indeed, if UPS truly felt that plaintiffs' claims and discovery requests made it impossible for UPS to prepare its defense, then UPS should have reached out to plaintiffs and failing that, moved for a protective order.  But, given UPS's decision not to do so, this Court should be disinclined to help UPS now.

[15] As to UPS's mistaken reading of its obligations under the Assurance of Discontinuance, the State and City look forward to briefing this matter.  At this stage, however, UPS's legal arguments do not justify its improper withholding of discovery from plaintiffs.

[16] Plaintiffs include, within their definition of NWS, any other entities sharing its address, including, but not limited to, Native Wholesale and Seneca Promotions.

owner of the company.  By the end of 2013, EExpress had become Mr. Fink's largest account.  EExpress did not operate from the storefront Elliott used.  Rather, EExpress' average shipment of 15 packages a day was picked up by UPS drivers from inside an unattended shed next to a residence on the Seneca Cattaraugus reservation.  Plaintiffs' analysis of EExpress' shipment records shows that it sent packages to a regular mailing list of assisted-living facilities, YMCA dorms, and other residential addresses throughout New York, until some of its packages broke open in 2014, revealing cigarettes, leading to the termination of its UPS account.

Neither Elliott nor EExpress have had any corporate existences apart from their UPS accounts as far as Plaintiffs can determine.  Neither was ever registered with New York or any other state as business entities, and neither have operated websites, conducted internet advertising, or were ever listed in any telephone directories.   Both companies appear to be *alter egos* for Aaron Elliott, and given the timing of Elliott's termination by UPS and the near simultaneous emergence of EExpress, a natural conclusion is that one simply picked up where the other left off.  Discovery of UPS's delivery records (which could show a continuity in customer lists) and of Mr. Fink's dealings with Elliott, could provide conclusive evidence in that regard, and could affect Plaintiffs' decision to seek to include EExpress in an initial phase of trial.

*Finally*, it is important that discovery be permitted as to *both* Native Wholesale Supply and Elliott because there are some indications that there may be a connection between the two, especially when EExpress is also considered.  Specifically, plaintiffs have determined that NWS was spending in excess of $200,000 per year on UPS shipments as of 2011, but that over the course of the next three years, those payments dwindled to almost nothing, even though NWS was reporting to the bankruptcy court that its sales volume was holding steady.  At the same time, Elliott, and then EExpress, successively grew to become Mr. Fink's biggest accounts.  In addition, the roadside shed that served as EExpress' "shipment center" was located less than 200 yards from NWS's large-scale warehouse operation on the Seneca Cattaraugus reservation.  Discovery of both NWS and Elliott records, when combined with the EExpress records Plaintiffs already possess, may allow Plaintiffs to determine whether NWS passed on its mail-order business to Elliott and/or EExpress, or was otherwise connected to those entities, which, like an Elliott-EExpress transition, would in turn directly affect Plaintiffs' case regarding UPS's knowledge of its customers' activities.

### III.    UPS's discovery requests and proposed motions are moot or untimely.

This Court may also set aside UPS's discovery requests and proposed motions to compel.  *See* UPS Dec. 18 letter, at 5–6.[17]  But because these requests and proposed motions are moot, will soon be moot, or are otherwise untimely, this Court may set aside UPS's instant discovery demands and proposed motion practice.

---

[17] UPS seeks an Order directing the parties to produce within 45 days, all documents concerning (1) the shippers at issue, (2) UPS's non-shipper document requests, (3) the PACT Act, and (4) the St. Regis Mohawk / Akwesasne shippers; and within 90 days, (5) all documents concerning the remaining shippers who are not included within plaintiffs' selected first group at issue.  *See* UPS Dec. 18 letter, at 5–6.  UPS further proposes filing motions to compel for UPS's first set of interrogatories and converted Rule 30(b)(6) interrogatories.  *See id*. at 6.

### A. The requested documents have been produced or will be soon.

To begin, the State Attorney General's Office and City have already produced UPS's requested documents ahead of the November 17 fact discovery deadline (*see* Scheduling Order; ECF No. 12). Plaintiffs will, of course, supplement their existing production in accordance with Rule 26(e). But to date, UPS has not raised any specific short-comings with the Attorney General's or City's production.

As to the Tax Department's production, the agency is expected to produce documents concerning UPS's liability and the more limited subset of shippers at issue (including the St. Regis Mohawk / Akwesasne shippers) by the first week of February, if not sooner.

As to the shippers not included within plaintiffs' selected first group, however, the Tax Department will likely require additional time to review and produce such documents. Since the parties' last status conference, the court in *City of New York and State of New York v. FedEx Ground Package System*, Case No. 1:14-cv-08985 (ER) (S.D.N.Y.) (*FedEx II*), has directed the Department to complete its production of documents by March 14, 2016. And in a related case, *City of New York and State of New York v. FedEx Ground Package System*, Case No. 1:13-cv-09173 (ER)(KNF) (S.D.N.Y.) (*FedEx I*), the same court has directed the Department to make an initial production by March 1, 2016, and continue such production on a rolling basis. *See* FedEx II, Minute Entry (Dec. 16, 2015) & Scheduling Order (ECF No. 55).

In short, these competing discovery demands will likely place additional burdens and delays in the Department's review and production in this case. Given these circumstances, it would likely serve the interests of the parties and this Court to proceed with the Court's bifurcation and phasing proposal. *See* Fed. R. Civ. P. 1, 16(c)(P) & 42(b).

### B. UPS's proposed motions are untimely and lack good cause.

In any case, UPS's proposed motions to compel are untimely and fail to show "good cause." Per *Gucci Am. v. Guess?*, 790 F. Supp. 2d 136, 139 (S.D.N.Y. May 25, 2011), a party seeking to file a motion to compel after the close of discovery, must first establish "good cause" under Rule 16(b). And, where a party is "aware of the existence of documents or other information before the close of discovery and propounds requests [*e.g.*, via a motion to compel] after the deadline has passed, those requests should be denied." *Id*. at 140.[18]

Here, UPS's proposed discovery motion practice is untimely and lacks the good cause necessary to modify the Scheduling Order. As to its first set of interrogatories, UPS served these requests on October 14, 2015, clearly anticipating that plaintiffs' responses would be due on the parties' fact discovery deadline, November 17. Given that UPS could have served these interrogatories at any point following the parties' April Scheduling Order, and yet, chose to give

---

[18] For example, in *Gucci Am.*, the court denied a party's motion to compel brought after the close of the discovery where the party had "'ample opportunity' to obtain the information during the fact discovery period, and failed to raise the issue with the Court at the appropriate time." 790 F. Supp. 2d at 142. Similarly, in *Slomiak v. Bear Stearns & Co.*, 1985 U.S. Dist. LEXIS 21860, *1 (S.D.N.Y. Mar. 12, 1985), the court denied a party's motion to compel filed after the discovery deadline where counsel knew of the witnesses and the arguable need for their testimony well in advance of the fact discovery deadline.

itself little or no time to follow up on plaintiffs' responses, the Court should deem this proposed motion as untimely.

Similarly, with respect to UPS's converted Rule 30(b)(6) interrogatories, the State and City filed their responses with the Court and served UPS on November 6—*i.e.*, again well before the parties' November 17 discovery deadline. And yet, UPS waited after the discovery deadline (*i.e.*, until November 24) before contacting plaintiffs about the sufficiency of their responses. Such actions fail to suggest good cause. Certainly, the State and City have made every effort to abide by the Court's discovery deadlines. On November 17, for example, State's counsel defended two depositions of state witnesses in upstate and western New York, returned to the New York City area that afternoon to serve the State's responses and objections to UPS's interrogatories, and then filed two motions to compel—one that afternoon and another later that evening at 11:59 p.m.

Of course, the State and City will supplement their responses in accordance with Rule 26(e) or any direction given by this Court. But given UPS's prior understanding at the November conference that the time for additional motions to compel had passed (Tr., at 15[19]), the State and City should not be subject to additional motion practice from UPS where the company simply sat on its hands. [20]

In short, given UPS's failure to identify any good cause to bring such motion to compel, much bring such motions, this Court should set aside UPS's planned motions as being untimely and lacking good cause.

\*   \*   \*   \*   \*

Given all of the above, the State and City note that UPS has not yet provided the nationwide and "pre-2010" documents that were the subject of this Court's December 11 Order (much less a time frame for beginning or completing such production); that the State and City are

---

[19] "Mr. McPherson: I thought, your Honor, that yesterday [November 17] was the deadline for us [UPS] to take discovery of the plaintiffs."

"The Court: It was. Bur certain third party discovery can occur up to and including. And then whatever the outstanding motions are they are. There was a motion served at 11:59 last night. That counts, right, in under the nick of time. [¶] So, in my view, we are talking about whatever discovery does or does not fall out of the motions to compel that were submitted, plus the department discovery, and then any other third party discovery has to occur between now and December. So the real extension is the department discovery. And if some of the motion to compel slops over a little bit because we are going to extend department discovery, then so be it. But the department discovery is all that's driving this right now. Am I right about that?"

"Mr. McPherson: That's certainly our goal, your Honor."

Tr., at 15.

[20] A final note: Although the parties did confer on December 2 to discuss the sufficiency of plaintiffs' responses to UPS's converted Rule 30(b)(6) interrogatories, did not raise any purported deficiency with the plaintiffs' interrogatory responses. In addition, by conferring in good faith with UPS, plaintiffs certainly did not agree to waive their timeliness objection. *See* Local Civil Rule 26.4(a) (requiring all counsel to be courteous in their dealings with each other, including in matters relating to scheduling and timing of various discovery procedures). Thus, given this late stage and UPS's ample opportunity to file or raise this proposed motion (*e.g.*, at the parties' November conference), UPS's request here may be denied as untimely and lacking in good cause.

continuing to obtain needed third-party discovery relevant to the claims and defenses in this action; and that the goals of efficiency and economy should be adequately balanced "against the need to develop an adequate record for summary judgment or trial." Manual for Complex Litigation, Fourth, § 11.422 (2004).

In short, the State and City look forward to discussing with this Court the several issues left outstanding at the January 12 status conference.

                                            Respectfully submitted,

                                            /s/  Christopher K. Leung