UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                                   :
THE STATE OF NEW YORK and THE CITY OF                              :
NEW YORK,                                                          :
                                                                   :
                                  Plaintiffs,                      :
                                                                   :
                                                                   :
                      -v-                                          :
                                                                   :
UNITED PARCEL SERVICE, INC.,                                       :
                                                                   :
                                  Defendant.                       :
                                                                   :
------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 8, 2016

15-cv-1136 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

    This is a large, complex and vigorously litigated action brought by the City

and State of New York (the "City" and "State", respectively) against United Parcel

Service, Inc. ("UPS"), for various claims relating to UPS's alleged shipping of

contraband cigarettes.  In the instant motion, plaintiffs seek to eliminate a large

number of UPS's defenses from the case—thereby narrowing the issues for trial.[1]

As set forth below, this Court agrees that some narrowing at this stage is

appropriate; certain defenses may not be used with regard to certain claims, or at

all.  But, with limited exceptions, the Court cannot eliminate certain defenses as to

all claims as a matter of law at this stage.

    Plaintiffs assert claims pursuant to the Contraband Cigarette Trafficking

Act, 18 U.S.C. § 2341 et seq. ("CCTA"), the Prevent All Cigarette Trafficking Act, 15

---

[1] The motion was initially cast as a motion to strike affirmative defenses under Rule 12(f); the Court
requested that the parties separately brief whether judgment may be entered as a matter of law with
regard to the same defenses pursuant to Rule 12(c).  Accordingly, this Court reviews this motion
pursuant to both Rules 12(c) and (f) of the Federal Rules of Civil Procedure.

U.S.C. § 375 et seq. ("PACT Act"), New York Executive Law § 63(12) ("N.Y. Exec. Law § 63(12)") and New York Public Health Law § 1399-ll ("N.Y. PHL § 1399-ll"), as well for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and breach of an Assurance of Discontinuance ("AOD") with the New York State Attorney General ("NYAG").  (Second Am. Compl. ¶¶ 2, 95-180, ECF No. 86.)  As available, plaintiffs seek penalties, damages and injunctive relief.

Plaintiffs have framed their motion as primarily seeking to eliminate two swathes of defenses—those which they refer to as the "Government Policy Defenses", and those which they refer to as the "AOD Defenses"—as well as three additional defenses which fall into neither category.  As briefed by plaintiffs, the Government Policy Defenses assert that plaintiffs' conduct or inaction relating to their enforcement of cigarette tax laws bars certain claims or recovery.  These include UPS's Fifth, Sixth, Fourteenth, Sixteenth, and Seventeenth Defenses. According to plaintiffs, each of these defenses is an improper collateral attack on plaintiffs' enforcement decisions, particularly as to timing and targets: the Fifth Defense asserts a failure to mitigate including by failing to pursue claims against shippers/sellers or customers, the Sixth Defense asserts a reduction in damages based on a failure to collect taxes from others including consumers, the Fourteenth Defense asserts excuse from performance of the AOD based on impracticability or frustration arising from plaintiffs' conduct, the Sixteenth Defense asserts a bar to all claims based on plaintiffs' failure to enforce cigarette tax laws, and the

Seventeenth Defense asserts laches, waiver, estoppel and other equitable doctrines based on plaintiffs' alleged knowledge of violations of shippers using UPS's services and failure to notify UPS or to otherwise take appropriate steps to prevent further violations.

As briefed by plaintiffs, the "AOD Defenses" include UPS's Ninth Defense asserting a lack of consideration, the Tenth Defense asserting lack of enforceability based on alleged misrepresentations set forth therein, the Eleventh Defense asserting that the AOD's stipulated damages provision is unenforceable as a matter of law, the  Twelfth Defense asserting that any claim is barred by plaintiffs' own non-performance including breach of the implied covenant of good faith and fair dealing, and the Thirteenth Defense asserting plaintiffs' own inactivity with regard to the AOD and therefore laches, waiver and estoppel and similar doctrines.[2]

The three additional defenses plaintiffs also move against are UPS's Seventh Defense regarding the impact of certain injunctions to § 471 of the New York Tax Law, the Eighth Defense regarding an interpretation of the CCTA, and the Fifteenth Defense, which asserts preemption of some or all claims by the PACT Act and the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 14501, 41713.

UPS disagrees both with how plaintiffs frame their defenses and with whether they can, in any event, be dismissed at this stage.  In particular, UPS argues that plaintiffs' reference to the Government Policy Defenses as solely an

---

[2] Although characterized by plaintiffs as a "Government Policy Defense", the Court believes that the Fourteenth Defense more appropriately falls in the "AOD Defense" category.

attack on law enforcement decision-making is incorrect, and that these defenses relate to consequences which it asserts flowed from such decisions (thus, not whether the decisions should or should not have been taken in the first instance). According to UPS, once an enforcement choice has been made—whether to forbear from certain enforcement efforts (as was the case in New York State for a period of time) or not—plaintiffs are not immune from consequences of those decisions which may impact causation or damages.  (See Def.'s Opp. Br. at 4, ECF No. 111 ("In fact, UPS's defenses simply ask the Court to consider whether, given the choice that plaintiffs made, they have established each of the elements of their asserted claims and whether they are entitled to recover the damages sought.").)  In terms of the AOD Defenses, UPS principally argues that the State lacked the authority to enter into or enforce the AOD and that a factual record is necessary before any conclusion may be reached as to the viability of any particular defense.  UPS similarly vigorously contests that the remaining three defenses may be resolved at this stage in the absence of a factual record.

The Court does not view the issues raised on this motion as best framed as either plaintiffs or UPS has done.  Questions as to what defenses are cognizable are specific both to particular defenses and claims to which they may apply.  As to the Government Policy Defenses, when carefully parsed as to whether there is any set of facts with regard to any claim asserted as to which a defense might be cognizable, only two defenses fail altogether: the Sixth and Sixteenth Defenses.  Only these two defenses are purely and properly cast as seeking redress based solely on a law

enforcement choice.  The Sixth Defense argues for a reduction in damages due to governmental entities' failure to collect taxes from other third parties—an act which is certainly a protected policy choice.  The Sixteenth defense explicitly asserts a defense based on plaintiffs' failure to enforce the tax laws.[3]  Plaintiffs are therefore correct that these defenses are not cognizable as a matter of law.  But here ends the straightforward resolution of the Government Policy Defenses.

As to the Fifth and Fifteenth Defenses, the Court concludes that they are not cognizable as to certain claims, but they are (or may be) as to others.  Thus, the Court does not strike those defenses, but does find that they may not properly be asserted as to certain claims.  In this regard, the claims brought under the CCTA, PACT Act, N.Y. Public Health Law and N.Y. Exec. Law are claims in which the State and City are seeking by this action to enforce certain laws in their traditional public capacity.  Defenses which assert prior enforcement failures or shortcomings are not cognizable defenses against such claims.  Thus, the Fifth and Seventeenth Defenses are not cognizable as to these specific claims.

Whether and how these two defenses—the Fifth Defense, which can be read to assert a general failure to mitigate, and the Seventeenth Defense, which asserts a variety of equitable defenses—may be available to UPS in defending against other claims (namely, the RICO and AOD claims) is a question which can only partially be answered on this motion.

---

[3] To the extent that, by its terms, the Sixteenth Defense purports to be broader than this, it is subsumed within the concepts explicitly contained in the Seventeenth Defense.

In terms of the Fifth Defense, it is not (as explained below) cognizable with regard to plaintiffs' AOD claim, but may be as to the RICO claims.  While the Court certainly appreciates that a defense that touches in any way on enforcement decision-making must be carefully reviewed, it is not prepared at this stage to find as a matter of law that there is no conceivable way in which the result of an enforcement decision (e.g. an asserted increase in trafficked cigarettes based on a forbearance policy or non-enforcement, or knowledge of issues with certain shippers and failure to act) may not be used with regard to plaintiffs' RICO claim (either in the context of the Fifth or Seventeenth Defenses).  In short, a factual record will assist the Court in understanding whether the defense is in the realm of what is out of bounds as attacking an enforcement decision, or within bounds as arguing that whatever the decision, there are consequences that cannot be escaped.  The Court has now carefully reviewed the case law in the area of law enforcement discretion and defenses available (or not) against governmental entities.  There is no case law directly on point.

Similarly, the Seventeenth Defense asserts, among other theories, equitable estoppel, waiver, laches and in pari delicto.  Plaintiffs are not immune from such theories under all fact patterns as a matter of law—though there may be limits to usage based on the development of the record.  It is an open question as to whether, when pursuing certain claims such as a RICO claim, a governmental entity is immune from the impact on third parties (if any) of decisions it has made.

The AOD Defenses must similarly be parsed carefully. Certain of them—the Ninth, Tenth and Eleventh Defenses—are premised on incorrect statements of the law or are implausible based on the facts as alleged. On the other hand, as legal principles governing contract interpretation apply to an agreement such as the AOD (notwithstanding the presence of a governmental entity as a contracting party), the Twelfth Defense for breach of the implied covenant of good faith and fair dealing, the Thirteenth Defense asserting waiver based on inactivity, and the Fourteenth Defense of impracticability or frustration, do not fail as a matter of law. Instead, they require the development of a factual record which would allow the Court to consider them—whether on summary judgment or at trial. While it is clear that plaintiffs believe there is no set of facts UPS will be able to muster with regard to these defenses, that is a question this Court cannot resolve on this motion.

As to the three remaining defenses, the Court concludes that plaintiffs are entitled to judgment as a matter of law as to the Seventh and Eighth Defenses at this stage. UPS's Fifteenth Defenses may not be resolved in the absence of a factual record, and thus cannot be resolved this stage.

Thus, to unravel whether the defenses are viable requires looking at many things from many angles. For the reasons set forth below, plaintiffs' motion is GRANTED IN PART AND DENIED IN PART.

I.     BACKGROUND[4]

On February 18, 2015, the State and City filed their original complaint against UPS (ECF No. 1), and filed an Amended Complaint on May 1, 2015 (ECF No. 14).  The Amended Complaint alleged fourteen causes of action seeking various forms of relief under federal and New York law, including under the CCTA, the PACT Act, RICO, N.Y. Exec. Law § 63(12), N.Y. PHL § 1399-ll, and pursuant to the AOD.  On May 22, 2015, UPS moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6).  (ECF No. 21.)  On September 16, 2015, this Court issued a decision that granted in part and denied in part UPS's motion; specifically, the Court dismissed plaintiffs' claims brought pursuant to the PACT Act and N.Y. PHL § 1399-ll; the Court denied the motion as to the remaining claims.  (ECF No. 49.) UPS filed an Answer to the Amended Complaint on September 30, 2015, asserting, inter alia, the defenses at issue in this motion.  (ECF No. 52.)

On October 21, 2015, plaintiffs moved for leave to file a Second Amended Complaint, seeking to add back the previously dismissed claims brought under the PACT Act and § 1399-ll.  (ECF No. 68.)  The basis for the motion was that plaintiffs had not anticipated the Court's interpretation of the PACT Act, and as a result had not previously had an opportunity to plead these claims in light of that interpretation.  On November 23, 2015, the Court granted plaintiffs' motion (ECF

---

[4] The Court here recounts only that background which is relevant to resolving plaintiffs' pending motion.  The Court also incorporates its prior decision on UPS's motion to dismiss for further background on plaintiffs' allegations.  See New York v. United Parcel Service, Inc. ("UPS I"), No. 15-cv-1136 (KBF), 2015 WL 5474067 (S.D.N.Y. Sept. 16, 2015).

No. 85); plaintiffs filed their Second Amended Complaint on November 30, 2015 (ECF No. 86).[5]

On December 4, 2015, plaintiffs filed the instant motion to strike the Fifth through Seventeenth Defenses stated in UPS's Answer.  (ECF No. 89.)[6]  UPS filed its opposition on December 18, 2015.  (ECF No. 111.)  Plaintiffs filed their reply brief on January 5, 2016.  (ECF No. 122.)  On January 8, 2016, UPS filed a sur-reply letter relating to its Seventh Defense.  (ECF No. 127.)  With leave of the Court, plaintiffs filed a rejoinder to UPS's sur-reply on January 14, 2016.  (ECF No. 134.)

After the parties addressed plaintiffs' motion (among other issues) at the status conference held on January 12, 2016 (see ECF No. 136), on January 13, 2016, the Court issued an Order inquiring as to whether the parties would have had materially different arguments if plaintiffs had brought their motion under Rule 12(c) (ECF No. 131).  The parties responded in letters on January 14, 2016.  (ECF Nos. 132, 133.)  Later that day, the Court ordered UPS to make any further arguments in relation to the Rule 12(c) issue no later than January 20, 2016, and ordered plaintiffs to provide any final response no later than January 22, 2016. (ECF No. 135.)  On January 20, 2016, UPS responded in an 18-page brief that reframed its position as to all of the defenses at issue.  (ECF No. 141.)  In light of

---

[5] Plaintiffs recently moved for leave to file a Third Amended Complaint to conform their pleadings to the proof they intend to offer at trial (ECF No. 148); that motion is not yet fully briefed.

[6] UPS filed an Answer to the Second Amended Complaint on December 17, 2015, after plaintiffs filed the instant motion.  (Answer, ECF No. 110.)  That subsequently filed answer asserted the same defenses, and in the same order, as UPS's prior answer.  (See ECF No. 52.)  UPS has acknowledged these facts, and has raised no objection to the Court treating plaintiffs' motion as relating to the operative Answer.  (See Def.'s Opp. Br. at 3 n.1.)

the length of UPS's supplemental brief, the Court granted plaintiffs until January 28, 2016 to respond.  (ECF No. 144.)  Plaintiffs responded on January 28, 2016. (ECF No. 167.)

## II.     STANDARD OF REVIEW

### A.     Motion to Strike under Rule 12(f)

Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike are generally disfavored.  Mayfield v. Asta Funding, Inc., 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015).  To prevail on a motion to strike, the movant must "satisfy a stringent three-pronged test: there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense."  United States v. E. River Hous. Corp., 90 F. Supp. 3d 118, 131 (S.D.N.Y. 2015) (quotation marks omitted); accord Coach, Inc. v. Kmart Corps., 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010); Specialty Minerals, Inc. v. Pluess-Staufer AG, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005).

As to the first and second prongs, a court must "apply the same legal standard as that applicable to a motion to dismiss under Rule 12(b)(6)."  E. River Hous., 90 F. Supp. 3d at 131.  As such, a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the non-moving party's favor.  Id.; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The "moving party has the burden of demonstrating to the Court to a certainty that plaintiff would succeed despite any set of facts which could be proved in support of the defense."  Walsh v.

10

City of New York, 585 F. Supp. 2d 555, 557 (S.D.N.Y. 2008) (quotation marks and alterations omitted); see also Radiancy, Inc. v. Viatek Consumer Products Grp., Inc., No. 13-CV-3767 NSR, 2014 WL 4772340, at *2 (S.D.N.Y. Mar. 28, 2014), as amended (Apr. 1, 2014) ("In assessing the sufficiency of an affirmative defense, the Court 'should construe the pleadings liberally to give the defendant a full opportunity to support its claims at trial, after full discovery has been made.'" (quoting Cartier Int'l AG v. Motion in Time, Inc., No. 12 Civ. 8216(JMF), 2013 WL 1386975, at *3 (S.D.N.Y. Apr. 5, 2013))).  "If the sufficiency of the defense depends upon disputed questions of fact or law, then the motion to strike will be denied." Index Fund, Inc. v. Hagopian, 107 F.R.D. 95, 100 (S.D.N.Y. 1985).

As to the third prong, which requires the moving party to show prejudice, a court may "consider whether inclusion of the legally insufficient defense would needlessly increase the time and expense of trial or duration and expense of litigation."  E. River Hous., 90 F. Supp. 3d at 131 (quotation marks omitted); see Coach, Inc., 756 F. Supp. 2d at 426.  "A conclusory contention, that the allegations sought to be stricken are highly prejudicial, does not satisfy the defendants' burden on the motion to strike."  Freydl v. Meringolo, No. 09 Civ. 07196(BSJ)(KNF), 2011 WL 2566082, at *2 (S.D.N.Y. June 16, 2011) (quotations omitted).

B.     Motion for Judgment on the Pleadings under Rule 12(c)

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Under Rule 12(c), a party is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved and that it is

entitled to judgment as a matter of law." <u>Juster Assocs. v. City of Rutland, Vt.</u>, 901 F.2d 266, 269 (2d Cir. 1990); <u>Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537</u>, 47 F.3d 14, 16 (2d Cir. 1995) ("Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law."); <u>but see</u>, <u>e.g.</u>, <u>Hon Hai Precision Indus. Co., Ltd. v. Wi-LAN, Inc.</u>, No. 12 Civ. 7900(SAS), 2013 WL 2322675, at *9 (S.D.N.Y. May 28, 2013) (concluding that the <u>Twombly</u> pleading standard does not apply to affirmative defenses, but rather the lower standard of Rule 8(c) governs). "The standard for addressing a Rule 12(c) motion . . . is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 521 (2d Cir. 2006); <u>Ziemba v. Wezner</u>, 366 F.3d 161, 163 (2d Cir. 2004) (applying same standard as that applicable to motion under Rule 12(b)(6)). Because motions brought under both Rule 12(c) and Rule 12(f) both apply the same standard as a motion brought under Rule 12(b)(6), the Court's analysis would not differ with respect to its consideration of the merits of plaintiffs' motion under either Rule.  The only difference is that a Rule 12(c) motion does not require a showing of prejudice.

        "Although Rule 12(c) neither specifically authorizes nor prohibits motions for judgment on the pleadings directed to less than the entire complaint or answer . . . it is the practice of many judges to permit partial judgment on the pleadings (e.g. on the first claim for relief, or the third affirmative defense)." <u>Savage v. Council on Am.-Islamic Relations, Inc.</u>, No. C 07-6076 SI, 2008 WL 2951281, at *2 (N.D. Cal.

July 25, 2008) (quotation marks and alterations omitted); see also Bradley v. Fontaine Trailer Co., No. 3:06-CV-62WWE, 2009 WL 763548, at *3 (D. Conn. Mar. 20, 2009) (stating that the "modern view of rule 12(c) is to permit a motion for partial judgment on the pleadings"). Because resolution of plaintiffs' motion would be the same under either Rule 12(c) or Rule 12(f), the Court construes the motion as one under both Rules and addresses the motion on both alternative grounds.

III. IMPACT OF A DENIAL OF THIS MOTION

This is a pre-trial motion. It is necessarily before the Court at a time when the Court lacks the depth of knowledge it will later have regarding this case. Denial of the motion with regard to any defense does not necessarily mean that the Court will ultimately find such defense appropriate or applicable to any particular claim. It means, instead, that at this stage, given its current view of the applicable principles, and without the benefit of a factual record, the Court is unwilling to prevent UPS from pursuing the defense further. The Court may later determine that such defense may not, as a matter of law or fact, be available.

IV. EXECUTIVE DISCRETION AND THE "GOVERNMENT POLICY DEFENSES"

A. The Defenses

What plaintiffs cast as UPS's five Government Policy Defenses are as follows:

> 5. To the extent that Plaintiffs have suffered any damages alleged in the Second Amended Complaint, their claims are barred by their own failure to mitigate or avoid these damages, including by failing to pursue claims against the shippers alleged to have sold untaxed cigarettes or against the customers alleged to have purchased untaxed cigarettes from the shippers.

6. To the extent that Plaintiffs have suffered any damages alleged in the Second Amended Complaint, their claims must be reduced by the amounts they collected or should have collected from third parties, including, <u>inter alia</u>, the consumers who allegedly purchased the untaxed cigarettes.

14. UPS was excused from performance under the AOD on grounds of impracticability and frustration, including such grounds created by the conduct of the State of New York or its agents, employees, or representatives.

16. Plaintiffs' claims are barred or limited by their own conduct, including but not limited to their failure to enforce cigarette tax laws.

17. Plaintiffs' claims, including their request for civil penalties, are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, unclean hands, in pari delicto, and/or similar doctrines and equitable doctrines, in that, among other things, Plaintiffs had reason to know about unlawful cigarette sales by the shippers named in the Second Amended Complaint, yet failed to take appropriate steps as to them or their customers, or to notify UPS.

(Answer, Defenses and Affirmative Defenses ¶¶ 5, 6, 14, 16, 17, ECF No. 110.)

Each defense is premised on an assertion regarding plaintiffs' own conduct or action/inaction in connection with enforcing cigarette tax laws. With the exception of the Fourteenth Defense, which is limited by its terms to the AOD claims (and thus is addressed separately along with the AOD Defenses), each defense is arguably asserted with regard to each of plaintiffs' many claims.

      B.   <u>Law Enforcement Discretion</u>

It is well-established, and both parties on this motion agree, that government actors have broad executive discretion in law enforcement decisions. <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions

over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. The recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement."); Vives v. City of New York, 524 F.3d 346, 354 (2d Cir. 2008) ("An individual who asks a court to direct a local official to enforce a law will likely fail based on the discretion accorded to municipalities and/or individual officers in determining when to enforce state law."). Executive discretion relates both to the decision not to take action, as well as the decision to take action. E.g., Heckler, 470 U.S. at 831.[7]

"It is the settled policy of the courts not to review the exercise of discretion by public officials in the enforcement of State statutes, in the absence of a clear violation of some constitutional mandate." Gaynor v. Rockefeller, 15 N.Y.2d 120, 131 (1965); see also Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 761 (2005) (identifying the "deep-rooted nature of law-enforcement discretion"). As the Supreme Court has explained, an executive agency "is far better equipped than the courts to deal with the many variables involved in the proper ordering of [enforcement] priorities." Heckler, 470 U.S. at 831. This is no less true with respect

---

[7] On a related note, as plaintiffs correctly point out, a tort plaintiff generally need not proceed against all tortfeasors, but rather may proceed against one or some. Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 360 (2d Cir. 2000) ("Since joint tortfeasors are jointly and severally liable, the victim . . . may sue . . . as few of the alleged wrongdoers as he chooses."); see In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1027 (2d Cir. 1992) ("Under the doctrine of joint and several liability, each tortfeasor is liable to the victim for the total damages."); Ferriola v. DiMarzio, 83 A.D.3d 657, 658 (2d Dep't 2011).

to the executive's decision whether to prosecute one party and not another.  Id.;

Wayte v. United States, 470 U.S. 598, 607-08 (1985) ("Examining the basis of a

prosecution delays the criminal proceeding, threatens to chill law enforcement by

subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may

undermine prosecutorial effectiveness by revealing the Government's enforcement

policy.  All these are substantial concerns that make the courts properly hesitant to

examine the decision whether to prosecute.").

    Courts have routinely held that, when acting in a capacity to enforce public

rights in the public interest and discharge statutory responsibilities, government

entities are not subject to all equitable defenses—such as laches or estoppel—that

could ordinarily be invoked against a private actor.  See Utah Power & Light Co. v.

United States, 243 U.S. 389, 409 (1917) ("As a general rule, laches or neglect of duty

on the part of officers of the government is no defense to a suit by it to enforce a

public right or protect a public interest."); see also Nevada v. United States, 463

U.S. 110, 141 (1983) (same); LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester,

40 F.3d 587, 590 (2d Cir. 1994) ("[P]rinciples of laches or estoppel do not bar a

municipality from enforcing ordinances that have been allowed to lie fallow."); City

of New York v. City Civil Serv. Comm'n, 60 N.Y.2d 436, 449 (1983) ("[E]stoppel may

not be applied to preclude a State or municipal agency from discharging its

statutory responsibility."); Matter of Hamptons Hosp. & Med. Ctr. V. Moore, 52

N.Y.2d 88, 93 (1981) ("The doctrine of estoppel is not applicable to the State acting

in a governmental capacity."); Jamestown Lodge 1681 Loyal Order of Moose, Inc. v.

Catherwood, 31 A.D.2d 981, 982 (3d Dep't 1969) ("Laches, waiver, or estoppel may

not be imputed to the State in the absence of statutory authority.").

In support of their arguments regarding executive discretion, plaintiffs cite

numerous cases invoking principles of broad executive discretion.  The common

trait in these cases is that an outside party sought to challenge a government

entity's decision-making as to when and under what circumstances to enforce a

statute, ordinance or court order which that government entity was charged with

enforcing.  The case law in the area of executive discretion generally relates to a

party's attempt to require particular enforcement, or hold a public entity

responsible for lack of or inadequate enforcement.  The cases are generally unlike

the facts here where the question presented is whether a particular enforcement

choice causes consequences cognizable in a separate suit.

For instance, in Wayte, an individual who had been indicted for knowingly

and willfully failing to register with the Selective Service System challenged the

constitutionality of the Government's passive enforcement policy, pursuant to which

it prosecuted only those who reported themselves as having violated the law or who

were reported by others.  470 U.S. at 600-04.  The Supreme Court rejected the

defendant's argument, stating, among other reasons, that the Government's

enforcement priorities, including whether or not to prosecute, generally rests within

its discretion.  Id. at 607.  In Heckler, several prison inmates convicted of capital

offenses and sentenced to death by lethal injection of drugs petitioned the FDA to

take various law enforcement actions to prevent the use of those drugs on the basis

17

that such use violated the Federal Food, Drug, and Cosmetic Act.  470 U.S. at 823.

Relying in part on principles of agency discretion not to prosecute or enforce, the

Supreme Court concluded that the FDA's decision not to take enforcement actions

requested by the inmates was not subject to judicial review under the APA.  Id. at

831, 837-38.  In Town of Castle Rock, a plaintiff sought to require the local police

force to enforce a state-law restraining order that she had previously obtained

against her husband.  545 U.S. at 751.  Relying on the "deep-rooted nature of law-

enforcement discretion," the Supreme Court declined to find that the plaintiff had a

property interest in her restraining order such that the police could be required to

enforce it.  Id. at 761.

Courts have, in numerous other instances, declined to probe into government

actors' decision-making in circumstances where the government was acting in the

sphere of enforcing public rights in the public interest.  E.g., Harrington v. Cnty. of

Suffolk, 607 F.3d 31, 35 (2d Cir. 2010) (failure to investigate plaintiffs' son's death);

Vives, 524 F.3d at 354 (decisions not to enforce certain provisions of state penal

law); Leland v. Moran, 80 F. App'x 133, 135 (2d Cir. 2003) (summary order) (failure

to enforce zoning ordinances); Gaynor, 15 N.Y.2d at 131 (refusing to intervene in

public officials' administration of various public construction projects).

None of these cases stand for the sweeping proposition that there is no set of

facts pursuant to which an equitable defense might be asserted against a

governmental entity.  There are certainly cases this Court has found in which

estoppel and other equitable defenses may, in fact, be asserted against

governmental entities.  E.g., Inv'rs Research Corp. v. Sec. & Exch. Comm'n, 628

F.2d 168, 174 n.34 (D.C. Cir. 1980) ("The fundamental principle of equitable

estoppel applies to government agencies, as well as private parties."); United States

v. Wharton, 514 F.2d 406, 410-12 (9th Cir. 1975) (explaining that equitable estoppel

may be applied against the government based on government officials' "affirmative

misconduct" where "serious injustice" would otherwise result); see also ATC

Petroleum, Inc. v. Sanders, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (acknowledging

that equitable estoppel could apply against the government but that the case for

estoppel "must be compelling"); 2 Kenneth Culp Davis, Administrative Law Treatise

§ 17.06 (1st ed. 1958) (citing cases applying estoppel against state or local

governments).

  C. The State's Forbearance Policy

   Based upon the briefing on this motion, it appears that, in substantial part,

UPS's Government Policy Defenses will be based on the New York State

Department of Taxation and Finance's ("DTF") public "forbearance" policy, which

was in effect from at least the mid-1990's until February 2010.  UPS appears to

argue that the forbearance policy, pursuant to which the DTF did not enforce tax

regulations governing on-reservation sales of cigarettes to non-Native Americans,

has relevance to the issues of both causation and damages.  In particular, UPS

argues that the forbearance policy may have led to an increase in trafficking, or

have led to a view that forbearing was necessarily accompanied by a tolerance for

methods of such trafficking.

The existence and history of the DTF's forbearance policy has been well-documented in previous cases.  E.g., City of New York v. Milhelm Attea & Bros., 550 F. Supp. 2d 332, 338 (E.D.N.Y. 2008); see also United States v. Morrison, 686 F.3d 94, 99-101 (2d Cir. 2012); Oneida Nation of New York v. Cuomo, 645 F.3d 154, 159 (2d Cir. 2011).  To give proper context to UPS's argument, a brief history of the DTF's forbearance policy follows.

N.Y. Tax Law § 471, first enacted in 1939, imposes a tax on "all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax."  N.Y. Tax Law § 471.  Section 471 is a general taxation requirement applicable to all persons in New York State.  Over the years, various sub-sections have attempted to grapple with the particular issues raised by taxation of sovereign Indian nations and tribes.[8]

Prior to 1988, despite Supreme Court precedent suggesting that states could permissibly tax cigarettes sold on reservations to non-Native Americans, see Washington v. Confederated Tribes of Colville Indian Reservation ("Colville"), 447 U.S. 134, 151 (1980), New York had not attempted to collect taxes on such sales, Morrison, 686 F.3d at 99; City of New York v. Golden Feather Smoke Shop, Inc.,

---

[8] As stated above, N.Y. Tax Law § 471 provides for a general tax on all cigarettes possessed in New York by any person for sale, except where the State is "without power to impose such tax."  N.Y. Tax Law § 471.  Prior to amendments to the statutory scheme enacted in 2010 (which are explained further below in the discussion of UPS's Seventh Defense), § 471 did not contain explicit reference to restrictions on the ability to tax cigarette purchases by Native American tribe members.  See, e.g., N.Y. Tax Law § 471 (McKinney 2002).  The 2010 amendments to § 471 added the language "sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation" as an example of circumstances in which the State is without power to impose a cigarette tax.  N.Y. Tax Law § 471.

597 F.3d 115, 122 (2d Cir. 2010) (stating that the State did not enforce § 471 against Native American vendors until 1988).  In 1988, the DTF made the determination that non-Native Americans were purchasing large quantities of unstamped cigarettes from on-reservation retailers; it estimated that the volume of tax-exempt cigarettes sold on New York reservations in 1987-88 would, if consumed exclusively by tax-immune Native Americans, correspond to a consumption rate 20 times higher than that of the average New York resident.  <u>Dep't of Taxation & Fin. of New York v. Milhelm Attea & Bros., Inc.</u>, 512 U.S. 61, 65 (1994).  Having determined that the State was being deprived of a substantial amount of tax revenue by non-tax exempt cigarette purchases, in 1988 the DTF adopted regulations requiring reservation retailers to pay sales and excise taxes on cigarettes; in order to ensure that exempt purchasers could still obtain cigarettes without having to pay taxes, the DTF's regulations allowed reservation retailers to purchase a limited quantity of untaxed cigarettes based on estimated demand for such cigarettes by tribe members.  <u>Morrison</u>, 686 F.3d at 99; <u>Milhelm Attea</u>, 550 F. Supp. 2d at 338.  This regulation was challenged by reservation wholesalers on the ground that the DTF's regulations were preempted by the federal Indian Trader Statutes, 25 U.S.C. § 261 <u>et seq.</u>, but the regulations were ultimately upheld by the United States Supreme Court.  <u>Milhelm Attea</u>, 512 U.S. at 78.  The DTF, however, did not act to enforce its 1988 regulations following the Supreme Court's decision, instead re-adopting its prior forbearance policy.  <u>Morrison</u>, 686 F.3d at 100.

Although in 1996 Governor George Pataki announced his intention to enforce the DTF's 1988 regulations (which were unenforced but still on the books), he reversed course in 1997 and called for a repeal of the DTF's regulations.  Id. Governor Pataki's announcement was prompted by a "combination of legal barriers presented by tribal immunity and the resistance of New York's Native American population."  Id.  That resistance—sparked by the State's aggressive enforcement strategies including interdiction of cigarette shipments headed onto reservations— included "civil unrest, personal injuries, and significant interference with public transportation on New York highways."  Id.  The DTF's regulations were repealed in April 1998.  Id.; Milhelm Attea, 550 F. Supp. 2d at 338.  In their complaint, plaintiffs allege that reservation sellers have continued to fight tax enforcement efforts by refusing to participate in the tax stamping system for the collection of cigarette taxes.  (Second Am. Compl. ¶¶ 19-24.)

To fill the void left by the State's repeal of the DTF's regulations pertaining to the calculation and collecting of taxes from Native American cigarette retailers, in 2003 the State enacted § 471-e, which directed the DTF to promulgate rules and regulations necessary to implement the collection of sales, excise and use taxes on cigarettes purchased by a non-Native American person from a recognized reservation seller.  N.Y. Tax Law § 471-e (McKinney 2003); see Cayuga Indian Nation of New York v. Gould, 14 N.Y.3d 614, 649 (2010).  Effective March 1, 2006, the State substantially amended § 471-e to require wholesalers to sell only stamped cigarettes to Native American tribes, and provided that the State was to establish a

coupon system to ensure that Native American tribe members could purchase stamped cigarettes on reservations without paying taxes. <u>Milhelm Attea</u>, 550 F. Supp. 2d at 338. The DTF, however, failed to adopt the regulations necessary to implement § 471-e's coupon scheme. <u>Id.</u> Because the DTF failed to adopt the regulations necessary to implement the provisions of § 471-e, enforcement of § 471-e was preliminarily enjoined by the New York State Supreme Court. <u>Id.</u>; <u>see also</u> <u>Day Wholesale, Inc. v. State</u>, 51 A.D.3d 383, 386-88 (4th Dep't 2008) (affirming grant of injunction and concluding, based on the language of § 471-e and legislative intent, that the amended version of § 471-e could not be in effect until the DTF implemented the coupon scheme provided for in the statute). On March 16, 2006, prior to the injunction, the DTF issued an Advisory Opinion in response to a request by Milhelm Attea & Bros., a cigarette wholesaler, in which the DTF referenced its "longstanding policy of allowing untaxed cigarettes to be sold from licensed stamping agents to recognized Indian Nations and reservation-based retailers making sales from qualified Indian reservations" and stated that the DTF had "no intention to alter" its policy of forbearance. <u>Milhelm Attea</u>, 550 F. Supp. 2d at 338; <u>see also</u> <u>Morrison</u>, 686 F.3d at 100. The DTF finally revoked the forbearance policy in February 2010. <u>Oneida Nation</u>, 645 F.3d at 159.

Plaintiffs, principally relying on the Second Circuit's decision in <u>Morrison</u>, argue that the forbearance policy does not excuse UPS's deliveries of the cigarette shipments at issue in this case. (Pls.' Opening Br. at 11, ECF No. 91.) In <u>Morrison</u>, the Second Circuit considered whether the DTF's forbearance policy precluded a

conviction under the CCTA of a smoke shop's managing partner who engaged in frequent, large, wholesale transactions of untaxed cigarettes and knew that customers re-sold the cigarettes at off-reservation locations.  Morrison, 686 F.3d at 96-97.  The Court concluded that the DTF's forbearance policy did not permit the defendant to engage in large-scale cigarette bootlegging conduct, finding that such conduct went far beyond whatever ambiguity existed as to the scope of Native American cigarette retailers' tax liability for on-reservation cigarette sales.  Id. at 105-06 ("New York's decision, for political and practical reasons, to refrain from enforcing [New York's cigarette tax law] did not grant [defendant] leave to sell massive quantities of untaxed cigarettes to non-Native Americans.  New York had the power to impose that tax and state law mandated that the tax be paid.").

According to UPS, the relevance of the DTF's forbearance policy is not limited to that discussed in Morrison.  UPS argues that, rather than challenging the wisdom of the forbearance policy, it seeks only to argue that the State's choice to forbear from enforcing tax laws during certain periods of time and as to certain shipments renders the State causally responsible for certain trafficking, or that the policy is at least relevant to questions of, inter alia, waiver and mitigation.  (Def.'s Opp. Br. at 6.)  UPS further argues that, in light of federal law requiring common carriers to "provide transportation or service on reasonable request," 49 U.S.C. § 14101(a), the forbearance policy raises a substantial legal question as to whether

federal law required UPS to provide service for shipments that the DTF's policy permitted.  (Def.'s Opp. Br. at 6.)[9]

Plaintiffs counter that, as a matter of law, the State's forbearance policy cannot serve as a superseding cause of UPS's own alleged violations of federal and state law.  (Pls.' Reply Br. at 7-8, ECF No. 122); see also Morrison, 686 F.3d at 106 ("'The failure of the executive branch to enforce a law does not result in its modification or repeal.'" (quoting District of Columbia v. John R. Thompson Co., 346 U.S. 100, 113-14 (1953)); see also United States v. Russell, 411 U.S. 423, 435 (1973) ("[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.").

D.    Application of Law Enforcement Discretion to UPS's Defenses

Having reviewed the relevant legal principles, the Court considers each of the so-called Government Policy Defenses against the particular claims that plaintiffs have alleged.  As discussed above, the Court concludes that the Sixth and Sixteenth Defenses fail as to all claims and therefore strikes those defenses from UPS's Answer.  As to the Fifth and Seventeenth Defenses, the Court concludes that they are not cognizable as to certain claims, but do survive at this stage as to others.  Specifically, plaintiffs' Fifth and Seventeenth Defenses may be cognizable as to the

---

[9] In making this argument, however, UPS does not dispute that plaintiffs' cigarette tax laws were valid, and it cites no authority for the proposition that a request to deliver goods contrary to state law can be "reasonable" under § 14101(a).  Further, UPS's § 14101(a) argument is foreclosed by 49 U.S.C. § 80302, which provides that a person may not transport or conceal contraband or facilitate with a vehicle transactions such as the sale or purchase of contraband.  49 U.S.C. § 80302(b).  The statute expressly includes as contraband "a cigarette involved in a violation of [the CCTA]."  49 U.S.C. § 80302(a)(5).

RICO claims; and the Seventeenth Defense may be cognizable as to the AOD claim.[10]

> 1. Sixth and Sixteenth Defenses

UPS's Sixth Defense argues for a reduction in damages due to plaintiffs' failure to collect taxes from third parties.  (Answer, Defenses and Affirmative Defenses ¶ 6.)  The decision whether to collect taxes from third parties constitutes a protected policy choice as to whether and as to whom to take enforcement action.  See, e.g., Levin v. Commerce Energy, Inc., 560 U.S. 413, 421-22 (2010); Abuzaid v. Mattox, 726 F.3d 311, 315-16 (2d Cir. 2013).  This sort of enforcement decision falls in the heartland of a State's broad discretion in the area of law enforcement decision-making.  See, e.g., Heckler, 470 U.S. at 831.

UPS's Sixteenth Defense similarly asserts a defense based on plaintiffs' failure to enforce the tax laws.  (Answer, Defenses and Affirmative Defenses ¶ 16.) As noted above, to the extent this defense can be read as invoking general equitable principles such as waiver and estoppel, the Court deems this defense to be duplicative of the Seventeenth Defense; the Court therefore construes it more narrowly in accordance with its express terms.  Viewing the Sixteenth Defense in its appropriately narrow context, it seeks solely to question plaintiffs' tax enforcement decisions, an area where, again, a government actor is entitled significant broad discretion.  See, e.g., Heckler, 470 U.S. at 831.  Plaintiffs are

---

[10] UPS's Fourteenth Defense, which applies solely to plaintiffs' AOD claim, is separately discussed when the Court addresses the AOD Defenses.

correct that these defenses are never cognizable as a matter of law as to any claim. The Court therefore strikes these two defenses.

2.    Fifth and Seventeenth Defenses

The Court's analysis as to the Fifth and Seventeenth Defenses is more complicated.  The Fifth Defense argues that plaintiffs' claims must be barred (or their damages reduced) by their failure to mitigate by not pursuing claims against shippers who allegedly sold untaxed cigarettes or consumers who allegedly purchased them.  (Answer, Defenses and Affirmative Defenses ¶ 5.)

The law imposes a duty, as to certain types of claims, upon a party subjected to injury to make reasonable exertions to minimize its injury.  Holy Properties Ltd., L.P. v. Kenneth Cole Prods., Inc., 87 N.Y.2d 130, 133 (1995); see also Borger v. Yamaha Int'l Corp., 625 F.2d 390, 399 (2d Cir. 1980).  This is known as the duty to mitigate.  This duty is generally understood to apply in the context of claims sounding in breach of contract and negligence.  Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publ'g Ass'n, 226 N.Y. 1, 9 (1919) (drawing a distinction, as to application of duty to mitigate damages, between claims for breach of contract and negligence on the one hand and malicious or willful intent to injure on the other); Trepel v. Dippold, No. 04 Civ. 8310(DLC), 2006 WL 3054336, at *7 (S.D.N.Y. Oct. 27, 2006) (recognizing that "the duty to mitigate does not apply to intentional injuries where there is malice and willful intent to injure"); see also Sands v. Runyon, 28 F.3d 1323, 1329 (2d Cir. 1994) ("[A] victim of employment discrimination has the same duty to mitigate his damages as any victim of a tort or breach of contract."); Fed. Deposit Ins. Corp. v. Ornstein, 73 F. Supp. 2d 277, 287

(E.D.N.Y. 1999) (applying duty to mitigate in negligence action brought by FDIC where FDIC was acting in capacity as receiver of failed bank).  Notably, UPS cites no case in which a court determined that it would be proper to reduce a government entity's damages for failure to mitigate where that government entity was acting in a public enforcement role.

The Seventeenth Defense argues that plaintiffs' claims are barred, at least in part, under the equitable doctrines of waiver, estoppel, laches, unclean hands and in pari delicto because they knowingly failed to take steps to prevent or limit the shipment of untaxed cigarettes, including by notifying UPS of ongoing violations. (Answer, Defenses and Affirmative Defenses ¶ 17.)

Waiver is defined as "the intentional relinquishment of a known right." United States v. RePass, 688 F.2d 154, 158 (2d Cir. 1982); see also Jordan v. Can You Imagine, Inc., 485 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) ("Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.  Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right." (citations omitted)). Equitable estoppel applies when a party, by its conduct, including language, acts or silence, knowingly makes a representation or conceals material facts which it intends or expects will be acted upon by the other party.  United States v. Wynshaw, 697 F.2d 85, 87 (2d Cir. 1983); see also ATC Petroleum, 860 F.2d at 1111 (Equitable estoppel "is a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that

28

litigant's conduct.").  Laches "is an equitable defense that bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant."  Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998).  "A party asserting laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  Id.  The defense of "unclean hands" is premised on the maxim that a party "who has acted fraudulently, or who by deceit or any unfair means has gained an advantage" is not entitled to obtain equitable relief.  PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004).  Finally, the doctrine of in pari delicto may bay a claim where the plaintiff bears at least substantially equally responsibility for its injury; the defense rests on the principles that "courts should not lend their good offices to mediating disputes among wrongdoers" and that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."  Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-07 (1985).

As to the Fifth and Seventeenth Defenses, the Court must segregate its analysis as to the CCTA, PACT Act, N.Y. Exec. Law § 63(12), and N.Y. PHL § 1399-ll claims on the one hand ("Group 1" claims), from plaintiffs' RICO and AOD claims on the other ("Group 2" claims).

a)      Group 1 Claims

The CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes . . . ."  18 U.S.C. § 2342(a).  The CCTA defines "contraband cigarettes" as "a quantity

29

in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found . . . and which are in the possession of" a non-exempt person.  18 U.S.C. § 2341(2). The CCTA provides that a State or local government may bring a civil action in federal court to "restrain violations" of the CCTA and "obtain any other appropriate relief . . . including civil penalties, money damages, and injunctive or other equitable relief."  18 U.S.C. § 2346(b); see also City of New York v. Milhelm Attea & Bros., Inc., No. 06-CV-3620, 2012 WL 3579568, at *27 (E.D.N.Y. Aug. 17, 2012) (observing that "the CCTA does not specify a penalty amount for violations of its core prohibition on transacting in contraband cigarettes").  Congress enacted the CCTA "with the aim of reducing evasion of state cigarette taxes."  Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 129 (2d Cir. 2001). Plaintiffs here seek damages under the CCTA of "no less than the total value of each [State or City] excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported, and/or distributed in or into" the State or City.  (Second Am. Compl. ¶¶ 97, 100.)  Courts have approved this damages calculation method in CCTA claims.  See City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-03966 CBA JMA, 2013 WL 3187049, at *33 (E.D.N.Y. June 20, 2013).  Neither party cites any precedent indicating whether the legal concept of mitigation should apply to a claim for damages assessed in this manner, nor has the Court identified any such precedent.

The PACT Act provides that "no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the [ATF Non-Compliance] list."  15 U.S.C. § 376a(e)(2)(A).  The PACT Act provides that a common carrier violator shall be subject to a civil penalty of $2,500 in the case of a first violation, or $5,000 for any violation within 1 year of a prior violation.  15 U.S.C. § 377(b)(1)(B).  The PACT Act provides that a State or local government may bring an action in federal court to "prevent and restrain violations . . . by any person or . . . obtain any other appropriate relief . . ., including civil penalties, money damages, and injunctive or other equitable relief."  15 U.S.C. § 378(c)(1)(A).  Plaintiffs seek civil penalties under the PACT Act (Second Am. Compl. ¶¶ 139, 146), as well as damages of "no less than the total value of each [State or City] excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported, and/or distributed in or into" the State or City (Second Am. Compl. ¶¶ 153, 160).

N.Y. PHL § 1399-ll makes it unlawful "for any common or contract carrier to knowingly transport cigarettes to any person in [New York] reasonably believed by such carrier to be other than a person described in [§ 1399-ll(1)]."  N.Y. PHL § 1399-ll(2).  As amended in 2013, § 1399-ll provides that the NYAG "may bring an action to recover the civil penalties provided by [§ 1399-ll(5)] and for such other relief as may be deemed necessary" and that "the corporation counsel of any political subdivision that imposes a tax on cigarettes may bring an action to recover the civil

penalties provided by [§ 1399-<u>ll</u>(5)] and for such other relief as may be deemed necessary with respect to any cigarettes shipped . . . in violation of this section to any person located within such political subdivision."  N.Y. PHL § 1399-<u>ll</u>(6).  The City seeks civil penalties of $5,000 per delivery (as provided for in § 1399-<u>ll</u>(5)) of cigarettes made by UPS to unauthorized recipients within the City.  (Second Am. Compl. ¶ 165.)

Under, N.Y. Exec. Law § 63(12), the NYAG has authority to initiate an action in New York State Supreme Court to seek injunctive relief or "restitution and damages" against any person engaging in "repeated fraudulent or illegal acts" or otherwise "demonstrat[ing] persistent fraud or illegality in the carrying on, conducting or transaction of business."  N.Y. Exec. Law § 63(12).  Based on violations of N.Y. PHL § 1399-<u>ll</u>, the State seeks civil penalties of $5,000 per delivery of cigarettes made by UPS to unauthorized recipients within the State. (Second Am. Compl. ¶ 171.)

With regard to the Group 1 claims, the Court concludes that UPS's Fifth and Seventeenth Defenses are not viable as a matter of law.  In the context of these statutes, the State and City are acting in a law enforcement capacity in their roles as government entities.  As explained above, the claims they assert may exclusively be pursued by local government entities, and not by private parties.  In other words, as to these claims, plaintiffs are decidedly not acting in a capacity akin to that of a private entity.  Rather, plaintiffs are acting in a law enforcement capacity as to which they have broad discretion, and for which ordinarily applicable equitable

defenses do not apply.  E.g., Utah Power, 243 U.S. at 409; LaTrieste Rest., 40 F.3d at 590; see also United States v. Philip Morris Inc., 300 F. Supp. 2d 61, 75 (D.D.C. 2004).  In addition and in significant part, plaintiffs seek civil penalties authorized by statute as to these claims.  This Court has found no case law applying the concepts of mitigation or the asserted equitable defenses in relation to a claim seeking such relief.[11]  Given the nature of these claims, UPS's Fifth and Seventeenth Defenses, which assert prior enforcement failures or shortcomings in enforcement decisions, are not cognizable as a matter of law.

   b)  Group 2 Claims

   As to plaintiffs' RICO and AOD claims, however, the Court is not convinced that, at this stage, the same reasoning applies.  The RICO and AOD claims must be distinguished because, as to these claims, plaintiffs are acting in a role that is more akin to that of a private actor, rather than in the role of a public enforcer of the public interest.

   "RICO provides a private cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter.'"  Hemi Grp., LLC v. City of New York, 559 U.S. 1, 6 (2010) (quoting 18 U.S.C. § 1964(c)); see Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 151 (1987) (analogizing civil RICO to Clayton Act and stating that both are "designed to remedy economic injury" and "bring to bear the pressure of 'private attorneys

---

[11] UPS argues that equitable defenses are relevant to the imposition of injunctive relief.  That is true—but does not require the assertion of the Seventeenth Defense.  A Court's determination as to the balance of the equities is an element as to which seeking injunctive relief bears the burden of proof.  See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  A separate defense is not required as the concept is already embedded in the concept of the requested relief itself.

general'").  A plaintiff may recover treble damages, costs, and attorney's fees.  18 U.S.C. § 1964(c).  This civil provision, which may be invoked by any private entity, is in contrast to RICO's criminal penalties, which are recoverable only by the United States.  See 18 U.S.C. § 1963.  Importantly, it is the civil RICO provision— available to any aggrieved private party (or local governmental entity) who meets standing (and other) requirements—pursuant to which plaintiffs have brought their claims here.  (See Second Am. Compl. ¶¶ 107, 114, 123, 132.)

As set forth in further detail below, the AOD is a contract between the State and UPS.  While the AOD would not have been entered into absent the State's investigation and ability to bring an enforcement action against UPS under state law, the State's position in asserting its AOD claim is akin to that of a private contracting party.  Perry v. United States, 294 U.S. 330, 352 (1935) ("When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments."); see also United States v. Winstar Corp., 518 U.S. 839, 912 (1996).  In its AOD claim, the State seeks stipulated damages of $1,000 for each violation of the AOD, as provided for in the AOD.  (Second Am. Compl. ¶ 174.)  As a claim subject to stipulated damages, the concept of mitigation in the Fifth Defense appears inapplicable to this claim.  While the State's AOD claim seeks to enforce contractual obligations and not a statutory violation, the damages provision is not amenable to mitigation—it is a binary issue—either there is a violation, in which case the amount is established by contract, or not.  There is no contractual basis for

reduction.  Thus, for different reasons than those recited above as to the Group 1 claims, the Fifth Defense is not applicable to the AOD claim.

As to plaintiffs' RICO claims, the Court certainly appreciates that to a certain extent, these claims involve enforcement decision-making.  However, the Court is not prepared at this stage to find as a matter of law that there is no conceivable way in which the consequences of an enforcement decision may not be asserted defensively as to these claims.  In short, the Court needs to better understand the factual record to understand whether the proffered use of this defense vis-à-vis the RICO claims is in the realm of what is out of bounds as attacking an enforcement decision, or within bounds as arguing that whatever the decision, there are consequences that cannot be escaped and for which UPS should not be liable.[12]

With respect to the use of the Seventeenth Defense as to the RICO and AOD claims, the question posed on a motion to strike or for judgment on the pleadings is whether plaintiffs are immune from theories such as equitable estoppel, waiver and in pari delicto as a matter of law when plaintiffs are acting in a role akin to that of a private actor, rather than as an enforcer of public rights or protector of a public

---

[12] Although the parties cite no precedent clearly showing whether the duty to mitigate applies in the context of a civil RICO claim, the nature of the damages recoverable under that statute suggests that such a duty may apply in certain contexts based on the predicate acts underlying the RICO violation. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985) ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.").  For instance, in In re U.S. Foodservice Inc. Pricing Litigation, where the plaintiffs asserted a RICO claim based on allegations that the defendant devised a scheme to defraud its customers and caused injury by making customers pay more than they were contractually obligated to, damages were calculated such as to "place the injured parties in the same position they would have been but for the illegal conduct."  729 F.3d 108, 122 (2d Cir. 2013).  This measure of damages is the same as that applicable to a breach of contract claim.  Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 384 (2d Cir. 2006) ("[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.").  Logic dictates that principles affecting damages in the breach of contract context, such as the duty to mitigate, may well apply equally to this sort of RICO claim.

interest.  See Inv'rs Research Corp, 628 F.2d at 174 n.34; Wharton, 514 F.2d at 410-11.[13]  The Court observes, however, that there may be limits to usage of these equitable defenses based on the development of the record.  Nevertheless, it is an open question as to whether, when pursuing certain claims such as a RICO claim, a governmental entity is immune from the impact on third parties (if any) of decisions it has made.  This applies equally to plaintiffs' AOD claim, which, as discussed above, is, effectively, an ordinary breach of contract claim.

V.      THE AOD AND THE "AOD DEFENSES"

    A.    The Defenses

    UPS has asserted five defenses which are specifically directed by their terms to plaintiffs' AOD claim—the Fourteenth Defense (set forth above) is cast by plaintiffs as a "Government Policy Defense", but is also by its terms directed solely at the AOD and properly included within this section as well:

> 9. The AOD is unenforceable due to a failure of consideration, including because the State had no viable legal claims under N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll at the time it entered into the AOD and/or because any promises made by the State were illusory.
>
> 10. The AOD is unenforceable due to misrepresentations by the State. . . . The statements made by the Attorney General's Office were intended to

---

[13] It is unclear the extent to which the equitable doctrine of laches may apply against a governmental actor, although case law suggests that this defense may be available in certain contexts.  E.g., N.L.R.B. v. P*I*E Nationwide, Inc., 894 F.2d 887, 894 (7th Cir. 1990); United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 816 F. Supp. 864, 871 (S.D.N.Y. 1992) aff'd, 986 F.2d 15 (2d Cir. 1993); but see United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 793 F. Supp. 1114, 1152 (E.D.N.Y. 1992) (stating that laches does not apply in civil RICO action brought by the United States); United States v. Bonanno Organized Crime Family of La Cosa Nostra, 683 F. Supp. 1411, 1458 (E.D.N.Y. 1988) aff'd, 879 F.2d 20 (2d Cir. 1989) (same). At this stage, without a factual record, the Court cannot conclude as a matter of law that a laches defense is unavailable as to the RICO and AOD claims.  Moreover, the Court believes that the various equitable doctrines asserted in the Seventeenth Defense should rise and/or fall together for purposes of this motion.

induce reliance by UPS and did induce such reliance, through UPS's execution of the AOD.  UPS would not have entered into the AOD if it had known that the statements made by the Attorney General's Office were false and that this Office had admitted elsewhere its lack of civil enforcement authority under N.Y. PHL § 1399-ll.  By entering into an unenforceable contract that, among other things, exposed UPS to a penalty provision, while receiving nothing in exchange, UPS was harmed by its reliance upon the State's misrepresentations.

11. The penalty provision of the AOD is unenforceable, as it is beyond the permissible scope of relief in an Assurance under Executive Law § 63 and/or New York contract law.

12. The State's claim for violation of the AOD is barred, in whole or in part, by its breach of or nonperformance with respect to the AOD, including but not limited to any covenants implied therein, such as the implied covenant of good faith and fair dealing.

13. The State's own inactivity under the AOD, and with respect to cigarette tax laws more generally, bars, estops, or otherwise precludes it from complaining of, or seeking relief based on, UPS's alleged performance and/or nonperformance under the AOD, including, but not limited to, under principles of laches, waiver, estoppel, and similar doctrines.

14. UPS was excused from performance under the AOD on grounds of impracticability and frustration, including such grounds created by the conduct of the State of New York or its agents, employees, or representatives.

(Answer, Defenses and Affirmative Defenses ¶¶ 9-14.)

    B.    <u>The AOD</u>

On October 21, 2005, the New York State Attorney General and UPS entered into the AOD.  (Second Am. Compl. ¶¶ 25, 28-29; Answer ¶¶ 25, 28-29.)  Under that agreement, UPS agreed, <u>inter alia</u>, to comply with N.Y. PHL § 1399-<u>ll</u> by prohibiting cigarette deliveries to unauthorized recipients in the State and undertaking measures to ensure compliance among its employees.  (Second Am. Compl. ¶ 28; see McPherson Decl. Ex. 1 ("AOD"), ECF No. 23-1.).)  In return for UPS's agreement to abide by the provisions of the AOD, the State agreed not to

37

pursue an enforcement proceeding as to the alleged prior conduct that had been the subject of its investigation.  (AOD at 5 ("WHEREAS, the Attorney General accepts the following assurances from UPS pursuant to Executive Law § 63(15) in lieu of commencing a civil action against UPS for the Alleged Past Violations.").)

The AOD is, essentially, a contract between the State and UPS in which each party agreed to take, or forbear from taking, certain actions.  For its part, UPS agreed, inter alia, to comply with N.Y. PHL § 1399-ll by prohibiting cigarette deliveries to unauthorized recipients in the State and undertaking measures to ensure compliance among its employees.  (Second Am. Compl. ¶ 28.)  The AOD subjects UPS to a $1,000 stipulated damages amount for each violation of its terms, provided that no such damages would be imposed if: (a) the violation involved the shipment of cigarettes to a person, located within the State of New York, who was not otherwise authorized to possess such unstamped cigarettes, and (b) UPS established to the reasonable satisfaction of the NYAG that UPS did not know and had no reason to know that the shipment was prohibited.  (See AOD ¶ 42, ECF No. 23-1.)  In the AOD, UPS also represented that in June 2003 it informed approximately 400 shippers having accounts with UPS that it would no longer accept packages containing cigarettes for delivery to unauthorized recipients in the State.  (Id. ¶ 12.)  As a result of the AOD, the NYAG, for its part, declined to commence a civil action against UPS for its alleged past violations of § 1399-ll.  (Id. ¶ 15.)  In a report to the NYAG dated on or around December 20, 2005, UPS confirmed that it would give nationwide effect to the AOD and that it no longer

shipped cigarettes to consumers and would only deliver tobacco products from licensed entities.  (Second Am. Compl. ¶ 29.)

      C.      <u>Defenses Relating to Formation of AOD</u>

Plaintiffs argue that UPS may not defend itself on the bases that the NYAG failed to provide consideration for the AOD (Ninth Defense), that the NYAG lacked enforcement authority and thus misrepresented facts when entering into the AOD (Tenth Defense), and that the AOD is beyond the permissible scope of N.Y. Exec. Law § 63(12) (Eleventh Defense).  They are correct.  Each of these defenses fails as a matter of law.

N.Y. PHL § 1399-<u>ll</u> makes it unlawful "for any common or contract carrier to knowingly transport cigarettes to any person in [New York] reasonably believed by such carrier to be other than a person described in [§ 1399-<u>ll</u>(1)]."  N.Y. PHL § 1399-<u>ll</u>(2).  Section 1399-<u>ll</u>(1) lists categories of persons to whom cigarettes may lawfully be shipped, including persons licensed as a cigarette tax agent or wholesale dealer, export warehouse proprietors, and persons who are officers, employees, or agents of the United States government or New York State (or a political subdivision thereof) acting in accordance with their official duties.  <u>Id.</u> § 1399-<u>ll</u>(1).

When it first became effective in 2003, § 1399-<u>ll</u> authorized New York's Commissioner of Health to impose a civil penalty for each violation of the statute.  <u>See</u> N.Y. PHL § 1399-<u>ll</u>(5) (McKinney 2001).  On September 27, 2013, the statute was amended in two significant respects.  First, § 1399-<u>ll</u> was amended to increase the amount of civil penalties recoverable under the statute.  <u>See</u> N.Y. PHL § 1399-<u>ll</u>(5).  Second, the statute was amended to explicitly provide that "[t]he attorney

general may bring an action to recover the civil penalties provided by [§ 1399-<u>ll</u>(5)] and for such other relief as may be deemed necessary" and that "the corporation counsel of any political subdivision that imposes a tax on cigarettes may bring an action to recover the civil penalties provided by [§ 1399-<u>ll</u>(5)] and for such other relief as may be deemed necessary with respect to any cigarettes shipped . . . in violation of this section to any person located within such political subdivision." N.Y. PHL § 1399-<u>ll</u>(6).

N.Y. Exec. Law § 63(12) confers authority on the NYAG to initiate an action in New York State Supreme Court to seek injunctive relief or "restitution and damages" against any person engaging in "repeated fraudulent or illegal acts" or otherwise "demonstrat[ing] persistent fraud or illegality in the carrying on, conducting or transaction of business."  N.Y. Exec. Law § 63(12).  The scope of authority conferred on the NYAG by § 63(12) has been described as "broad."  <u>New York v. Feldman</u>, 210 F. Supp. 2d 294, 299-300 (S.D.N.Y. 2002); <u>Brown v. Metro-North Commuter R.R.</u>, No. 89 Civ. 7170–A (WK), 1992 WL 84894, at *4 (S.D.N.Y. Apr. 10, 1992); <u>Roemer v. Cuomo</u>, 67 A.D.3d 1169, 1171 (3d Dep't 2009).  New York State courts have, on numerous occasions, recognized the State's authority to pursue civil penalties in a proceeding brought pursuant to § 63(12).  <u>See</u>, <u>e.g.</u>, <u>State v. Applied Card Sys., Inc.</u>, 11 N.Y.3d 105, 112 (2008) (affirming award of $1.3 million in restitution and damages and $7.9 million in penalties in a § 63(12) action under N.Y. Gen. Bus. L. §§ 349, 350); <u>People ex rel. Cuomo v. Nationwide Asset Servs., Inc.</u>, 26 Misc. 3d 258, 284 (N.Y. Sup. Ct. 2009).

40

The NYAG's authority to enter into an Assurance in lieu of pursuing an enforcement action derives from Exec. Law § 63(15), which provides that an AOD is authorized "[i]n any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state." N.Y. Exec. Law § 63(15).  Courts have recognized that the NYAG may enter into an Assurance of Discontinuance that includes provisions for stipulated damages in lieu of pursuing an enforcement action.  See MBIA Inc. v. Fed. Ins. Co., 652 F.3d 152, 157 (2d Cir. 2011); Poughkeepsie Chevrolet, Inc. v. Jeff Weaver's 96 Hour Super Sale, Inc., 8 A.D.3d 575, 575 (2d Dep't 2004).  An Assurance of Discontinuance "is a stipulation of settlement, which binds the parties [and] will not be set aside or departed from absent a showing of such good cause as would invalidate a contract." People v. Condor Pontiac, Cadillac, Buick & GMC Trucks, Inc., No. 02-1020, 2003 WL 21649689, at *5 (N.Y. Sup. Ct. July 2, 2003); see also E.E.O.C. v. Fed. Express Corp., 268 F. Supp. 2d 192, 206 (E.D.N.Y. 2003) ("It is well settled that consent decrees are construed primarily as contracts and derive their legal force largely from the parties' voluntary agreement.").

In its Ninth Defense, UPS argues that the AOD is void for lack of consideration because the State did not have any viable legal claims under N.Y. Exec. Law § 63(12) and N.Y. PHL § 1399-ll at the time that the AOD was executed (i.e. in October 2005).  This defense is premised on the assertion that the NYAG lacked authority to institute a civil action under § 1399-ll to obtain civil penalties

before that statute was amended in 2013.  See City of New York v. FedEx Ground

Package Sys., No. 13-cv-9173, 2015 WL 1013386, at *11 (S.D.N.Y. Mar. 9, 2015).

Even if UPS is correct that the NYAG did not in fact have the authority to

bring an enforcement action for penalties against UPS under N.Y. PHL § 1399-ll in

2005, UPS has nonetheless failed to raise a substantial legal question as to the

presence of consideration and the resulting enforceability of the AOD.  First, as

stated above, numerous courts have upheld the NYAG's authority to pursue civil

penalties under Exec. Law § 63(12).  See, e.g., Applied Card Sys., 11 N.Y.3d at 112.

Second, the AOD did not purport to specify an exhaustive list of the legal remedies

that the NYAG might have relied upon in a theoretical enforcement proceeding that

the NYAG might have brought if the parties had not entered into the AOD.  Rather,

the AOD merely stated that the NYAG's inquiry was made into certain business

practices related to § 1399-ll.  (AOD at 1.)  Notably, UPS does not directly state

anywhere in its opposition papers that the NYAG could not pursue any remedies in

relation to New York's cigarette laws.  In fact, UPS concedes that Exec. Law §

63(12) allowed the NYAG to pursue certain relief (for injunctive relief, restitution or

damages), even in 2005.  (See Def.'s Opp. Br. 23-24.)  Furthermore, while UPS

challenges the NYAG's authority to proceed with an enforcement action pursuant to

Exec. Law § 63(12) and PHL § 1399-ll, UPS has failed to cite any authority for the

proposition that an AOD, or any other kind of deferred-prosecution type agreement,

must expressly provide for only those specific penalties or other remedies that

would been the end result of a successful enforcement action.  Such an

42

understanding would defeat the purpose of a bargained-for exchange in lieu of litigation.

Upon review of the provisions of the AOD, UPS cannot succeed in arguing, under any factual scenario, that the State failed to provide consideration in the agreement.  Under New York law, consideration "consists of either a benefit to the promisor or a detriment to the promisee."  Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464 (1982); Anand v. Wilson, 32 A.D.3d 808, 809 (2d Dep't 2006) (same).  The AOD was, effectively, a settlement of a pending investigation by the NYAG.  In the AOD, UPS clearly received the benefit of the State's agreement to forego a potential enforcement action for what the State believed to be UPS's prior violations of state law.  (See AOD at 5.)  There is nothing novel about this sort of settlement with a government entity—individuals and private entities routinely enter into agreements with government agencies in which the primary consideration is the agency's agreement to forego enforcement action of whatever type the agency deems appropriate.  The purpose of the AOD—for both sides—was to forego the risks of litigation in exchange for UPS's agreement to conform its conduct to certain requirements and the NYAG's agreement to forego any sort of enforcement action for perceived past violations.  The bargain struck was that UPS agreed to pay stipulated damages of $1,000 for each breach of the AOD, which covered a broader range of conduct than PHL § 1399-ll but imposed a different penalty than that available under PHL § 1399-ll.  UPS argues that the State's promise was illusory,

but UPS received adequate consideration as a matter of law even if all relevant allegations are construed in UPS's favor.

In its Tenth Defense, UPS argues that the State's misrepresentation that it had the authority to commence a civil action under Exec. Law § 63(12) and PHL § 1399-ll renders the AOD unenforceable.  For the same reasons stated as to the Ninth Defense, this defense is unavailing as a matter of law.  The NYAG had the authority to commence an action for certain specified forms of relief under Exec. Law § 63(12) in relation to repeated violations of PHL § 1399-ll; as discussed above with respect to UPS's Ninth Defense, the AOD contains no representation to the contrary.  UPS therefore cannot show, as a matter of law, that the purported representations it has raised in its Answer and opposition papers were false.

UPS's Eleventh Defense—that the AOD is unenforceable because it is beyond the permissible scope of an Assurance under Exec. Law § 63 and/or New York contract law—also fails.  It is largely repetitive of UPS's Ninth Defense.  As explained above, Exec. Law § 63(12) clearly empowers the NYAG to seek penalties where an underlying statute, such as PHL § 1399-ll, provides for such penalties. See, e.g., Applied Card Sys., 11 N.Y.3d 105.  Exec. Law § 63(15) authorizes the NYAG to enter into an Assurance whenever it has the authority "to institute a civil action or proceeding in connection with the enforcement of a law of this state."  N.Y. Exec. Law § 63(15).  Because the NYAG had the power to pursue action against UPS under Exec. Law § 63(12), and the NYAG could properly enter into the AOD in

lieu of such enforcement action under Exec. Law § 63(15), UPS's Eleventh Defense is untenable as a matter of law.[14]

### D.   Defenses Relating to Performance under the AOD

Plaintiffs' challenge to UPS's three other AOD Defenses—the Twelfth, Thirteen and Fourteenth Defenses—must be analyzed differently.  These three defenses relate to questions regarding the State's performance under the AOD.  In its Twelfth Defense, UPS argues that the State's breach or non-performance of the AOD, including under the implied covenant of good faith and fair dealing, bars plaintiffs' AOD-based claims.  (Answer, Defenses and Affirmative Defenses ¶ 12.) In its Thirteenth Defense, UPS argues that a variety of equitable doctrines (including laches, waiver, estoppel, etc.) precludes the AOD claim based on the State's own inactivity under the AOD.  (Answer, Defenses and Affirmative Defenses ¶ 13.)  Finally, in its Fourteenth Defense (which, as discussed above, may be characterized as either a Government Policy Defense or AOD Defense), UPS argues

---

[14] UPS also argues that the AOD is unenforceable to the extent that it imposes damages of $1,000 per violation, because that provision constitutes an impermissible penalty.  (Def.s' Opp. Br. at 27.) This argument lacks merit.  First, the Court has serious doubts that this liquidated damages rule applies to a deferred-prosecution agreement like the AOD, which is distinguishable in important respects from an ordinary commercial contract.  UPS does not cite a single case in which such a stipulated damages provision was held unenforceable.  Second, even assuming that ordinary liquidated damages principles apply to the AOD, New York law provides that "a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not plainly disproportionate to the possible loss."  U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 70 (2d Cir. 2004) (quotation marks omitted). Damages would have been difficult to ascertain in light of UPS's various agreements contained in the AOD, and UPS cannot show that the stipulated per-violation damages amount is disproportionate to the possible loss to the extent that would be required to render this provision unenforceable under New York law.  See GFI Brokers, LLC v. Santana, No. 06 CIV. 3988 (GEL), 2009 WL 2482130, at *2 (S.D.N.Y. Aug. 13, 2009) ("Reasonableness enjoys wide latitude; the standard against which it is measured is plain or gross disproportionality.  Only where the amount fixed is plainly or grossly disproportionate to the probable loss, is the provision deemed an unenforceable penalty." (quotation marks omitted)).

that the State's conduct excused UPS's performance on grounds of impracticability and frustration.  (Answer, Defenses and Affirmative Defenses ¶ 14.)

These three defenses cannot be eliminated at this stage.  First, as a matter of law, plaintiffs are—even as governmental actors—subject to basic requirements of contract law.  As to the Twelfth Defense, even governmental entities are subject to the implied covenant of good faith and fair dealing.  E.g., Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir.) modified, 857 F.2d 787 (Fed. Cir. 1988); United States v. Harris, 188 F. Supp. 2d 294 (W.D.N.Y. 2001) ("The point is, though, that the Government had a contractual relationship with Harris which required it to act in good faith."); Neal & Co. v. United States, 36 Fed. Cl. 600, 631 (1996) ("Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing."); see also United States v. Stathakis, No. 04CR790(CBA)(CLP), 2007 WL 3124703, at *5 (E.D.N.Y. Oct. 24, 2007); United States v. Epstein, 27 F. Supp. 2d 404, 410 (S.D.N.Y. 1998).  It is a question of fact as to whether plaintiffs fulfilled that duty.  The Court cannot rule on this issue as a matter of law at this stage.

As to the Thirteenth Defense, the Court has already previously explained that plaintiffs are similarly not immune from general equitable doctrines such as estoppel, waiver or in pari delicto.  E.g., Inv'rs Research Corp., 628 F.2d at 174 n.34.  Whether laches may be asserted against a governmental actor is a more complicated question that the Court does not resolve at this stage.  As noted above,

the Court believes that these equitable defenses to a contract should rise and fall together on this motion.

Finally, as to the Fourteenth Defense, plaintiffs have failed to show that ordinary principles of excuse for breach of a contract, including impracticability and frustration, do not apply to government actors.  The Court believes that these principles may fairly apply to a government actor asserting a breach of contract claim, just as the implied covenant of good faith and fair dealing applies to such an entity.  Cf. Perry, 294 U.S. at 352.  The Court thus cannot conclude that this defense is unavailable as a matter of law at this stage in the absence of a factual record.

## VI.    OTHER DEFENSES

### A.    UPS's Seventh Defense

Plaintiffs seek to strike UPS's Seventh Defense, which is as follows:

> 7. Plaintiffs' claims are barred to the extent they are based on deliveries that they were enjoined from restricting, pursuant to orders enjoining the implementation and enforcement of the New York Tax Law §§ 471 & 471-e, pertaining to Native American persons or entities.  See, e.g., Day Wholesale, Inc. v. State of New York, 856 N.Y.S. 2d 808, 811-812 (4th Dep't 2008); Oneida Nation of N.Y. v. Paterson, No. 6:10-CV-1071, 2010 WL 4053080, at *13 (N.D.N.Y. Oct. 14, 2010); Seneca Nation of Indians v Paterson, No. 10-CV-687A, 2010 WL 4027795, at *4 (W.D.N.Y. Oct. 14, 2010); Seneca Nation of Indians v. State of N.Y., 932 N.Y.S.2d 763 (Sup. Ct. N.Y. County 2011).

(Answer, Defenses and Affirmative Defenses ¶ 7.)  Thus, the Seventh Defense asserts that plaintiffs may not hold UPS liable for certain deliveries that it made during the period when a number of federal district courts and New York State

courts had enjoined the State from enforcing amendments to New York State's cigarette tax laws.  The stays and preliminary injunctions at issue—which were, in relevant part, in effect from September 2010 through June 2011—barred enforcement of amendments to §§ 471 & 471-e pertaining to the collection and calculation of taxes for on-reservation Native American cigarette sales.  See, e.g., Oneida Nation of N.Y. v. Paterson, No. 6:19-CV-1071, 2010 WL 4053080, at *13 (N.D.N.Y. Oct. 14, 2010) vacated sub nom. Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154 (2d Cir. 2011); see also Cayuga Indian Nation, 14 N.Y.3d at 629 ("[A]t present, there is no enforceable statutory or regulatory scheme specifically addressing the calculation or collection of taxes arising from the on-reservation retail sale of cigarettes.").

Plaintiffs argue that this defense should be stricken as infirm as a matter of law because the stays of enforcement and preliminary injunctions cited by UPS do not bar plaintiffs from holding UPS liable for transporting unstamped cigarettes during the period when those injunctions were in effect.  (Pls.' Opening Br. at 20-22.)  Although much background is needed to properly understand the issues raised by the Seventh Defense, in the end the analysis is quite simple.  For the reasons set forth below, the Court grants plaintiffs' motion to strike UPS's Seventh Defense.[15]

---

[15] As an initial matter, the Court notes that UPS's defense is not viable as a matter of law as to plaintiffs' claims arising under the PACT ACT, the AOD and § 1399-ll, as those claims do not depend on the State's ability to implement and enforce New York Tax Law §§ 471 & 471-e.  UPS does not appear to dispute this point.  As a result, the Court's analysis focuses on whether the Seventh Defense is viable as to plaintiffs' claims arising under the CCTA, as liability under that statute does depend on whether transported cigarettes constitute "contraband", which in turn depends on state law tax requirements.

1.   <u>Background</u>

As discussed above, the CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes . . . ."  18 U.S.C. § 2342(a).  The CCTA defines "contraband cigarettes" as:

> a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other than [exempt individuals and entities, including permit-holding tobacco product manufacturers or warehouse operators, common carriers transporting cigarettes under a proper bill of lading, State license-holders, and government officers or employees acting in their official duties].

18 U.S.C. § 2341(2).  Thus, a violation of the CCTA requires the following elements: (1) a person must knowingly ship, transport, received, possess, sell, distribute or purchase, (2) more than 10,000 cigarettes, (3) that do not bear evidence of the payment of applicable taxes, (4) under circumstances in which state or local tax law requires that such cigarettes bear evidence of the payment of applicable taxes.  18 U.S.C. §§ 2341-42; <u>see also</u> <u>UPS I</u>, 2015 WL 5474067, at *4.

N.Y. Tax Law § 471 was first passed in 1939, imposing a tax "'on all cigarettes possessed in the state by any person for sale' except when the 'state is without power to impose such tax.'"  <u>Golden Feather Smoke Shop</u>, 597 F.3d at 122 (quoting N.Y. Tax Law § 471).  It has been amended numerous times since, but has been continuously in place in some form.  During the period relevant to this

discussion, § 471 has always required the affixation of tax stamps with regard to cigarettes sold by Indian reservation sellers to non-tribal members.  <u>Milhelm Attea</u>, 2012 WL 3579568, at *19.[16]

Under Supreme Court precedent, states lack the power to tax cigarettes sold on Native American reservations to registered tribal members, <u>Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation</u>, 425 U.S. 463, 475-76 (1976), but may tax on-reservation cigarette sales to persons other than members of the reservation's tribe, <u>Colville</u>, 447 U.S. at 160-61.  The complexity of §§ 471 & 471-e is with regard to on-reservation sales between Native Americans; a certain volume of such sales (corresponding with personal use) are exempt from the taxation requirement.  No portion of §§ 471 or 471-e ever exempted a non-Native American third party from the taxation requirement.

Prior to amendments enacted in June 2010 (i.e. the amendments at issue in this case), § 471 read as follows:

> <u>There is hereby imposed and shall be paid a tax on all</u>
> <u>cigarettes possessed in the state by any person for sale</u>,
> except that no tax shall be imposed on cigarettes sold
> under such circumstances that this state is without power
> to impose such tax or sold to the United States or sold to
> or by a voluntary unincorporated organization of the
> armed forces of the United States operating a place for
> the sale of goods pursuant to regulations promulgated by
> the appropriate executive agency of the United States, to
> the extent provided in such regulations and policy
> statements of such an agency applicable to such sales. . . .
> <u>It shall be presumed that all cigarettes within the state</u>

---

[16] The <u>Milhelm Attea</u> decision thoroughly details the amendments to § 471 at issue here and the injunctions that underlie UPS's Seventh Defense.  <u>See</u> <u>Milhelm Attea</u>, 2012 WL 3579568, at *1-7. The Court summarizes that background to the extent necessary here, but refers to that decision for additional background.

> are subject to tax until the contrary is established, and
> the burden of proof that any cigarettes are not taxable
> hereunder shall be upon the person in possession thereof.

N.Y. Tax Law § 471 (McKinney 2009) (emphasis added).  As explained below, the

provision imposing a tax on cigarettes in § 471 was never itself enjoined or stayed.

The stays/injunctions discussed below related only to certain regulations relating to

enforcement mechanisms.  For Indian-to-Indian sales, UPS is not an "Indian" as

defined by state law, see N.Y. Indian Law § 2, nor has it advanced any sort of

agency argument.

Prior to the 2010 amendments, § 471-e called for the implementation of a

coupon system to allow Native Americans to purchase cigarettes without having to

pay the otherwise applicable tax.  In pertinent part, that sub-section read as

follows:

> Notwithstanding any provision of this article to the
> contrary qualified Indians may purchase cigarettes for
> such qualified Indians' own use or consumption exempt
> from cigarette tax on their nations' or tribes' qualified
> reservations.  However, such qualified Indians purchasing
> cigarettes off their reservations or on another nation's or
> tribe's reservation, and non-Indians making cigarette
> purchases on an Indian reservation shall not be exempt
> from paying the cigarette tax when purchasing cigarettes
> within this state.  Accordingly, all cigarettes sold on an
> Indian reservation to non-members of the nation or tribe
> or to non-Indians shall be taxed, and evidence of such tax
> will be by means of an affixed cigarette tax stamp.
>
> In order to ensure an adequate quantity of cigarettes on
> Indian reservations which may be purchased by qualified
> Indians exempt from the cigarette tax, the department
> shall provide Indian nations and tribes within this state
> with Indian tax exemption coupons as set forth in this
> section.  A reservation cigarette seller shall be able to
> present such Indian tax exemption coupons to a wholesale
> dealer licensed pursuant to this article in order to

> purchase stamped cigarettes exempt from the imposition
> of the cigarette tax.  Qualified Indians may purchase
> cigarettes from a reservation cigarette seller exempt from
> the cigarette tax even though such cigarettes will have an
> affixed cigarette tax stamp.

N.Y. Tax Law § 471-e (McKinney 2006).[17]  Sub-section 471-e does not itself <u>impose</u> the cigarette tax; that is accomplished by § 471.  Section 471 is therefore the locus for the general taxation requirement applicable to all non-Native Americans in New York State.  Section 471-e is directed at mechanisms pursuant to which qualified Native Americans may purchase cigarettes exempt from the taxation requirement.  Thus, it is clear that § 471 has a scope well beyond that in § 471-e.

Under the scheme envisioned in this pre-2010 version of § 471-e, tax stamps were required to be affixed to all cigarettes sold on reservations, but qualifying Native American consumers would have the opportunity to purchase cigarettes exempt from the tax.  <u>See</u> <u>Milhelm Attea</u>, 2012 WL 3579568, at *3.  The DTF, however, failed to implement the coupon system outlined in § 471-e, and instead publicly adhered generally to the "forbearance" policy discussed previously.  <u>Id.</u>  As a result, New York courts held that § 471-e was without effect.  <u>Day Wholesale</u>, 51 A.D.3d at 385-88; <u>see also</u> <u>Milhelm Attea</u>, 2012 WL 3579568, at *3.

Subsequently, in May 2010, the New York Court of Appeals held that the general tax provision contained in § 471 could not provide the basis for a criminal enforcement action against Native American retailers; there needed to be some

---

[17] As explained above in the Court's discussion of the DTF's forbearance policy, § 471-e was originally enacted in 2003.  In its initial iteration, § 471-e directed the DTF to promulgate rules and regulations necessary to implement the collection of sales, excise and use taxes on cigarettes purchased by a non-Native American person from a recognized reservation seller.  <u>See</u> N.Y. Tax Law § 471-e (McKinney 2003).

mechanism to enable sellers to appropriately calculate and collect taxes that would not be "unduly burdensome."  Cayuga Indian Nation, 14 N.Y.3d at 649-51.  In its analysis, the New York Court of Appeals distinguished the circumstances that the Court was addressing in that case (the collection of sales taxes from Native American retailers based on sales to individual consumers) from the general enforceability of § 471's stamping requirement pursuant to the CCTA against cigarette sellers who made bulk sales to parties intending to resell the cigarettes off of a reservation.  Id. at 653.[18]

Shortly following the New York Court of Appeals' decision in Cayuga Indian Nation, in June 2010, the State enacted the previously referenced amendments to both N.Y. Tax Law §§ 471 & 471-e, with the effective date being September 1, 2010. Milhelm Attea, 2012 WL 3579568, at *2.  As amended, § 471 reads, in pertinent part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation . . . .  The tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by means of an affixed cigarette tax stamp.  Indian nations or tribes may elect to participate in the Indian tax exemption coupon

---

[18] Relying in part on the distinction drawn by the New York Court of Appeals in Cayuga Indian Nation, in United States v. Morrison, the Second Circuit affirmed a criminal defendant's RICO conviction predicated on violations of the CCTA and § 471, finding that neither the Cayuga Indian Nation decision nor the DTF's forbearance policy gave the defendant leave to sell massive quantities of untaxed cigarettes to non-Native Americans.  686 F.3d at 105-06.

system established in section four hundred seventy-one-e
of this article . . .

N.Y. Tax Law § 471.  As is clear from a comparison of the two versions of § 471, both

contain the same initial language broadly imposing a taxation requirement.  As

amended, § 471 contains an explicit exception for sales of cigarettes by or between

Native Americans or retailers on Native American reservations, and to require the

affixation of tax stamps to all cigarettes sold on reservations to non-tribe members.

See Milhelm Attea, 2012 WL 3579568, at *3.  To repeat the key point, at no time

between 1939 and the effective date of the 2010 amendments was a basic taxing

requirement not in place.

The 2010 amendments added sections which established three different

systems by which reservation dealers could sell cigarettes to Native Americans for

their own use and consumption without need for payment of generally applicable

cigarette taxes: (1) a coupon system created by § 471-e (as that provision was

amended pursuant to the 2010 amendments), (2) a default "prior approval" system

pursuant to § 471(5), and (3) the option to enter into voluntary tax agreements with

the State pursuant to § 471(6).  Oneida Nation, 645 F.3d at 161 & n.10; Milhelm

Attea, 2012 WL 3579568, at *6.  Although the scheme was structured in a way to

ensure that Native Americans could make qualifying purchases without having to

bear the cost of the tax, the scheme required that all cigarettes nonetheless bear a

tax stamp.  N.Y. Tax Law § 471-e.

Prior to the effective date of the 2010 amendments, various tribes brought

actions in federal and state court to enjoin their implementation, and successfully

obtained stays as to the amended law's enforcement pending appeal—these are the injunctions that UPS cites in its Answer.  These actions were concerned with mechanisms to impose tax on certain Native American sales.

UPS first cites Day Wholesale, Inc. v. State of New York, 51 A.D.3d 383 (4th Dep't 2008), a decision which, as discussed above, addressed whether the version of § 471-e enacted in 2005 was in effect and could be enforced in light of the DTF's failure to implement the coupon scheme provided for in that provision.  As discussed previously, the Appellate Division concluded, based on the language of that version of § 471-e and legislative intent, that § 471-e could not be in effect until the DTF implemented the coupon scheme provided for in that provision.  Id. at 386-88.  That decision ultimately led to the 2010 amendments.

In Seneca Nation of Indians v Paterson, No. 10-CV-687A, 2010 WL 4027795, (W.D.N.Y. Oct. 14, 2010), the Seneca Nation sought a preliminary injunction to enjoin the implementation of the 2010 amendments to §§ 471 & 471-e relating to the taxation of cigarettes sold by reservation retailers.  Id. at *1.[19]  Although the district court denied the tribes' motion for a preliminary injunction because it concluded that they failed to show a likelihood of success on the merits as to their argument that the amendments violated tribal sovereignty rights, see Seneca Nation of Indians v Paterson, No. 10-CV-687A, 2010 WL 4027796, at *17 (W.D.N.Y. Oct. 14, 2010), the court granted a "stay of enforcement" of the 2010 amendments to §§ 471 & 471-e pending an interlocutory appeal in light of the irreparable injury

---

[19] The Cayuga Indian Nation was granted permission to intervene in the action and joined in the Seneca Nation's motion.  Id.

that the tribes would suffer from an adverse decision, <u>Seneca Nation of Indians</u>, 2010 WL 4027795, at *2, 4.

In <u>Oneida Nation of N.Y. v. Paterson</u>, No. 6:10-CV-1071, 2010 WL 4053080 (N.D.N.Y. Oct. 14, 2010), the Oneida Nation sought a preliminary injunction to enjoin enforcement of the 2010 amendments to §§ 471 & 471-e.  In contrast to the decision in the <u>Seneca Nation</u> case (which was released on the same day), the district court granted a preliminary injunction, as follows:

> Defendants, their agents, servants, employees, and attorneys, as well as all other persons who are in active concert or participation with any of the foregoing persons, are PRELIMINARILY ENJOINED and PROHIBITED as against the Oneida Nation of New York, or against any wholesalers, suppliers, stamping agents or others providing to the Oneida Nation cigarettes that do not bear a State of New York tax stamp, from enforcing the State of New York's cigarette taxing statutes and regulations, including Tax Law §§ 471 & 471–e (as amended) and the Department of Taxation and Finance's emergency regulations issued June 22, 2010, and published in the New York State Register on July 7, 2010, and readopted on September 13, 2010; and from restricting in any manner, with respect to the Oneida Nation and wholesalers, suppliers, and stamping agents who supply the Oneida Nation, the Oneida Nation's purchase, acquisition, sale, distribution, transportation, or possession of cigarettes not bearing a New York tax stamp.

<u>Id.</u> at *13.

The <u>Seneca Nation</u> and <u>Oneida Nation</u> cases were consolidated for purposes of appeal at the Second Circuit.  <u>See Oneida Nation</u>, 645 F.3d at 163.[20]  The Second

---

[20] A third case, <u>Unkechauge Indian Nation v. Paterson</u>, 752 F. Supp. 2d 320 (W.D.N.Y. 2010), in which the district court denied the St. Regis Mohawk Tribe's and the Unkechauge Tribe's motions for preliminary injunctions, but granted a stay pending appeal, <u>id.</u> at 328, was also consolidated for appeal, <u>see Oneida Nation</u>, 645 F.3d at 163.  The <u>Unkechauge Indian Nation</u> decision relied on the

Circuit determined that the various tribes failed to demonstrate a likelihood of success on the merits as to their arguments that the pre-collection scheme impermissibly imposed a direct tax or undue economic burden on tribal retailers and that the coupon and prior approval systems interfered with their rights of self-government and rights to purchase cigarettes free from state taxation.  Oneida Nation, 645 F.3d at 175.  The Court therefore vacated the preliminary injunction issued in the Oneida Nation case, and vacated the stays of enforcement that had been issued in Seneca Nation and Unkechauge Indian Nation.  Id. at 175-76.

Finally, in Seneca Nation of Indians v. State of N.Y., 932 N.Y.S.2d 763 (N.Y. Sup. Ct. June 8, 2011) (table), the Seneca Nation sought to enjoin the DTF from enforcing Rule 20 N.Y.C.R.R. § 74 .6, published in the State Register on November 10, 2010, which implemented the 2010 amendments to §§ 471 & 471-e, on the ground that DTF violated certain procedural requirements of the State Administrative Procedure Act, thus rendering the Rule invalid as a matter of law. Id. at *1.  Although the New York State Supreme Court had issued a temporary restraining order on May 10, 2011 that restrained and enjoined "implementation and enforcement of N.Y. Tax Law § 471(1)(2)(5) and 20 N.Y.C.R.R. § 74.6", id., it concluded that procedural requirements were adequately met and rejected the Seneca Nation's request for permanent injunctive relief and lifted the stay of enforcement, id. at *5.  The New York State Appellate Division affirmed that

---

reasoning in the Seneca Nation decision, and was decided by the same judge, the Hon. Richard J. Arcara.  See Unkechauge Indian Nation, 752 F. Supp. 2d at 328.

decision on appeal.  See Seneca Nation of Indians v. State, 89 A.D.3d 1536, 1538 (4th Dep't 2011).[21]

## 2.   The Parties' Positions on the Seventh Defense

The parties' positions with regard to the Seventh Defense have shifted over the course of their various filings.[22]  UPS now argues that, as a result of the stays of enforcement of the 2010 amendments, the pre-amendment version of § 471 remained in effect, a view that it argues is consistent with the reasoning of Milhelm Attea, 2012 WL 3579568.  (Def.s' Supp. Br. at 4, ECF No. 141.)  According to UPS, under the pre-2010 version of § 471, commercial shipments between wholesalers and retailers on or between qualified reservations, as opposed to shipments to consumers, did not require tax stamps.  See Oneida Nation, 645 F.3d at 168 (explaining that New York's tax law places the legal incidence of the tax on the consumer, not the wholesaler or retailer); Cayuga Indian Nation, 14 N.Y.3d at 653 ("[T]he absence of an appropriate legislative or regulatory scheme governing the calculation and collection of cigarette sales taxes that distinguishes between federally exempt retail sales to Indians occurring on a 'qualified reservation' and non-exempt sales to other consumers precludes reliance on Tax Law § 471" to impose sanctions for unstamped cigarettes sold on a qualified reservation).  UPS argues that the Seventh Defense is addressed to shipments by tobacco wholesalers

---

[21] The Appellate Division had previously denied the Seneca Nation's request to re-impose the stay pending the appeal.  See Milhelm Attea, 2012 WL 3579568, at *7 (stating that all temporary injunctive relief in state court had been lifted by the Appellate Division as of June 21, 2011).

[22] As discussed in the Background section, the parties have addressed UPS's Seventh Defense in each of the seven briefs filed in relation to the pending motion to strike.  The Court here focuses on the parties' latest filings, which best reflect their current positions.

to retailers—and not shipments to consumers—located on qualified reservations. (Def.'s Supp. Br. at 9-10.)

Responding to UPS's more limited argument than that advanced on the face of UPS's defense (and in its initial briefing), plaintiffs offer several reasons as to why UPS's Seventh Defense nonetheless still fails.

First, plaintiffs argue that there was never a time that § 471 was not in effect, and that the post-amendment version of § 471 remained in effect notwithstanding the stays of enforcement.  See Morrison, 686 F.3d at 105. According to plaintiffs, stays relating to enforcement did not affect the legislatively enacted requirements of a tax.  See Milhelm Attea, 2012 WL 3579568, at *26 ("[A] stay of enforcement of the amended collection mechanism could not remove this tax liability."); see also Edgar v. MITE Corp., 457 U.S. 624, 653 (1982) ("There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law.") (Stevens, J., concurring in part).

Second, plaintiffs argue that, regardless of whether the Court concludes that the pre-amendment or post-amendment version of § 471 was in effect, the reservation-to-reservation shipments at issue—i.e. commercial shipments from one Native American reservation to another—were taxable as a matter of law because the Native American exemption applies only to sales to tribe members on their own reservation.  Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 122-23 (2005) ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state

law otherwise applicable to all citizens of the State."); see also Cayuga Indian

Nation, 14 N.Y.3d at 653.  Plaintiffs contend this is so regardless of who ultimately

buys the cigarettes at their final destination; while the ultimate tax burden is

passed along to the consumer, the tax is paid and the stamp is affixed by stamping

agents.

Third, plaintiffs argue that UPS cannot rely on the stays of enforcement to

the amendments to §§ 471 & 471-e as a defense to its own liability because

preliminary injunctive relief is intended to preserve the status quo as to the

particular parties named in the injunction, and not to third parties not so named.

See Edgar, 457 U.S. at 649 (An injunction's "effect is normally limited to the parties

named in the instrument.") (Stevens, J., concurring in part); Price v. City of

Stockton, 390 F.3d 1105, 1117 (9th Cir. 2004) ("[A]n injunction must be narrowly

tailored to affect only those persons over which it has power, and to remedy only the

specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of

the law." (quotation marks omitted)).  Here, the stays of enforcement applied to

particular Native American tribes while they challenged the constitutionality of

New York's tax statutes on the basis of tribal sovereignty.  See, e.g., Seneca Nation,

2010 WL 4027795, at *1-2.  Plaintiffs argue that UPS cannot rely on those stays

because it is neither a tribe nor a sovereign, and was not intended to be protected

against CCTA liability as a result of that preliminary injunctive relief.

        3.    Analysis

Having reviewed the parties' arguments and the history of N.Y. Tax Law §§

471 & 471-e, the Court concludes that UPS's Seventh Defense fails as a matter of

law.  Each of plaintiffs' three asserted grounds provides an alternative basis for this determination.

First, the Court agrees that, regardless of the federal court stays imposed in Seneca Nation, 2010 WL 4027796, and Unkechauge Indian Nation, 752 F. Supp. 2d 320, and the preliminary injunction imposed in Oneida Nation, 2010 WL 4053080, or the state court temporary restraining order imposed in Seneca Nation, 932 N.Y.S.2d 763, it is clear that the generally applicable 2010 amendments to § 471—imposing a tax on all cigarettes sold on Native American reservations to non-members of the nation or tribe and requiring that tax stamps be affixed to such cigarettes—were unaffected by the stays and remained in effect throughout the entire period at issue.  The only provisions implicated by the stays were the newly added § 471(5), § 471(6), and the amended § 471(e), as those were the particular provisions as to which the tribes sought injunctive relief.  As discussed above, the provisions that were stayed concerned methods by which the State sought to ensure that qualifying Native American purchasers could avoid paying cigarette taxes and to minimize tax collection burdens on reservation sellers.

UPS is neither a Native American tribe member nor a reservation wholesaler or retailer; the provisions at issue in the stays are therefore entirely inapposite to its liability under the CCTA.  UPS has not sought to argue that these provisions may apply because it was acting as an agent of exempt Native American purchasers and sellers; in any event, it cites no authority for the proposition that even such agency status would exempt it from the requirements of § 471.  The injunctive relief

at issue did not affect the legislatively enacted tax on cigarettes or the requirement that the payment of such tax had to be evidenced by means of a tax stamp.  As such, unstamped cigarettes shipped by UPS qualified as "contraband" under the CCTA, notwithstanding the stays of enforcement and injunctive relief identified by UPS in the Seventh Defense.

Second, regardless of whether the pre-amendment or post-amendment version of § 471 was in effect during the stays, commercial reservation-to-reservation shipments of cigarettes were taxable as a matter of law and were required to bear tax stamps.  Such reservation-to-reservation transactions are distinct from the "on-reservation retail sale of cigarettes" discussed in Cayuga Indian Nation.  14 N.Y.3d at 629.  The 2010 amendments to §§ 471 & 471-e were geared toward on-reservation sales to tribe members purchasing cigarettes on their own reservations, as that is the full extent to which the tax exemption applies under Supreme Court precedent.  See Wagnon, 546 U.S. at 122-23.  In other words, the amendments to §§ 471 & 471-e that were the subject of the stays of enforcement and injunctive relief are irrelevant to the reservation-to-reservation shipments that plaintiffs allege UPS made in this case.[23]  Therefore, any reservation-to-reservation shipments made by UPS were required to bear tax stamps under any version of § 471, and thus cigarettes transported by UPS between reservations constitute "contraband" under the CCTA.

_____

[23] The Court notes that a more challenging question as to UPS's liability could be raised to the extent that plaintiffs seek to rely on shipments that UPS made on or within the boundaries of a single reservation between qualifying Native American sellers and tribe members.  Because neither party has argued that any such entirely intra-reservation shipments are at issue here, the Court need not consider that hypothetical scenario.

Finally, as demonstrated by the Court's description of the stays and preliminary injunctive relief upon which UPS seeks to rely in support of this defense, UPS was not a party in any of those actions, nor was it (or any other shipper) expressly or implicitly identified as an intended beneficiary or participant in any of those decisions.  There is therefore no basis upon which UPS can claim that it is entitled to benefit from that preliminary relief.  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." (emphasis added)); Packard Instrument Co. v. ANS, Inc., 416 F.2d 943, 945 (2d Cir. 1969) ("The decision to grant or to deny a preliminary injunction depends in part on a flexible interplay between the likelihood of irreparable harm to the movant and the court's belief that there is a 'reasonable certainty' that the movant will succeed on the merits at a final hearing." (emphasis added)); see also Edgar, 457 U.S. at 649 (Stevens, J., concurring in part).  Moreover, as the 2010 amendments to §§ 471 & 471-e that were the subjects of the stays pertain only to obligations imposed on reservation sellers and Native American purchasers of cigarettes—two categories to which UPS is not a member—it is hard to conceive of a way in which UPS could have been the beneficiary of such stays as to those provisions.[24]  Because UPS never itself obtained a stay of enforcement of any of the

---

[24] The Court observes that the preliminary injunction issued in Oneida Nation enjoined the State from "restricting in any manner . . . the Oneida Nation's purchase, acquisition, sale, distribution, transportation, or possession of cigarettes not bearing a New York tax stamp," Oneida Nation, 2010 WL 4053080, at *13, and that this language, at first glance, could be read broadly to bar the State from enforcing the tax laws against an entity providing shipping services to sellers from the Oneida Nation while that injunction was in effect.  The Court concludes that UPS cannot rely on that language for the reservation-to-reservation shipments at issue in this case because such shipments

cigarette tax laws as to it, and the stays and injunctive relief that were issued did not apply to UPS, the Seventh Defense fails as a matter of law.

>    B.    UPS's Eighth Defense

Finally, plaintiffs' challenge UPS's Eighth Defense, which is as follows:

>    8. Plaintiffs' CCTA-based claims are barred, in whole or in part, to the extent they are not based on separate violations, each involving more than 10,000 unstamped cigarettes.

(Answer, Defenses and Affirmative Defenses ¶ 8.)  Plaintiffs argue that this defense should be stricken because numerous district courts have rejected UPS's interpretation that the CCTA requires that each discrete transaction involves more than 10,000 cigarettes.  (Pls.' Opening Br. at 23.)

This defense again raises the argument—previously rejected by this Court in relation to UPS's motion to dismiss—that plaintiffs' CCTA claims can only arise from discrete violations in the form of discrete transactions in which UPS shipped more than 10,000 unstamped cigarettes.  See UPS I, 2015 WL 5474067, at *6.  As stated above, the CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes . . . ."  18 U.S.C. § 2342(a).  The CCTA defines "contraband cigarettes" as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found . . . and which are in the possession of" a non-exempt person.  18 U.S.C. § 2341(2).

---

were required to bear tax stamps under the general provisions of § 471 that were not at issue—and thus not enjoined—in the Oneida Nation case.

Although UPS is correct that no controlling Second Circuit or Supreme Court authority has foreclosed UPS's statutory interpretation, as this Court previously noted, every district court in this Circuit that has taken up this question has concluded that this argument conflicts with the plain language of the CCTA. UPS I, 2015 WL 5474067, at *6.  The Court adheres to that interpretation of the CCTA, and concludes that there are no questions of fact or substantial questions of law that could allow UPS to prevail on this defense.  Plaintiffs are therefore entitled to strike it from UPS's Answer.  The Court notes UPS's objection to the Court's reading of the statute; UPS's rights are preserved should it wish to take the issue up on appeal.

C.   UPS's Fifteenth Defense

Plaintiffs seek to strike UPS's Fifteenth Defense, which asserts that certain of plaintiffs' claims are preempted by federal law provisions that impose duties on common carriers.  In full, UPS's Fifteenth Defense is as follows:

> 15. Plaintiffs' claims are barred and/or preempted, in whole or in part, by federal law pertaining to the transportation industry, including the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 14501, 41713, and any other applicable provisions of Title 49 of the United States Code, Title 49 of the Code of Federal Regulations, and related provisions, federal common law, or other federal law pertaining to the industry or the duties of common carriers.

(Answer, Defenses and Affirmative Defenses ¶ 15.)  While UPS's Answer does not identify the specific claims to which this defense is addressed, UPS has clarified in its opposition papers that this defense relates to plaintiffs' state law claims under PHL § 1399-ll.  (Def.'s Opp. Br. at 31-32.)

In opposing plaintiffs' motion, UPS correctly observes that, in their opening brief, plaintiffs simply lump the Fifteenth Defense into their general arguments relating to the AOD Defenses and do not actually offer any argument in support of striking this defense in particular.  (Def.'s Opp. Br. at 31 n.20; see Pls.' Opening Br. at 14-20.)  UPS further contends that the Fifteenth Defense remains viable on two grounds, first because plaintiffs' § 1399-ll claim is preempted if UPS is able to prove that it qualifies for exemption under the PACT Act, see UPS I, 2015 WL 5474067, at *9, and second because the Federal Aviation Administration Authorization Act ("FAAAA") preempts plaintiffs' § 1399-ll claim as to shipments made to businesses, see 49 U.S.C. § 14501(c)(1).  This Court cannot resolve the question of the availability of this defense at this stage; further presentation of a factual record is necessary.  While this defense may be capable of resolution on a motion for summary judgment, the issue is not ripe at this stage.[25]  Plaintiffs' motion as to this defense is denied.

## VII.   PREJUDICE

Having determined that no questions of fact or substantial questions of law exist as to UPS's Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Sixteenth Defenses, the remaining question under Rule 12(f) is whether plaintiffs would suffer any prejudice by the inclusion of these defenses.[26]  The Court has little difficulty in concluding that as to these defenses this Court deems legally non-cognizable as to

---

[25] UPS has recently filed a motion for partial summary judgment addressing this very issue.  (ECF No. 172.)  Briefing of that motion is currently ongoing.

[26] As set forth above, the Court has also determined that the Fifth and Seventeenth Defenses are not viable as to certain claims.

66

any or only certain claims, plaintiffs would be prejudiced if the defenses remained in the case.  As stated above, in determining whether inclusion of a defense is prejudicial, a court may consider whether inclusion would "needlessly increase the time and expense of trial or duration and expense of litigation."  E. River Hous., 90 F. Supp. 3d at 131.

As plaintiffs have argued, and as was made clear on the record at the January 12, 2016 status conference and in numerous letters filed by the parties, there remains outstanding significant discovery—some of which may be unnecessary in light of the Court's rulings.  (E.g., Jan. 12, 2016 Status Conf. Tr. at 29, ECF No. 136; Pls.' Nov. 13, 2015 letter motion, ECF No. 76.)

## VIII.  CONCLUSION

For the reasons and as set forth above, plaintiffs' motion to strike is GRANTED IN PART AND DENIED IN PART.  The Court strikes UPS's Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Sixteenth Defenses, but denies plaintiffs' motion as to the remaining defenses.  As set forth in this decision, the Fifth and Seventeenth Defenses are unavailable as a matter of law as to certain of plaintiffs' claims.

The Clerk of Court is directed to terminate the motion at ECF No. 89.

SO ORDERED.

Dated:      New York, New York
            February 8, 2016

_____
            KATHERINE B. FORREST
            United States District Judge