UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

THE STATE OF NEW YORK and THE CITY OF
NEW YORK,

Plaintiffs,

Case No. 15-cv-1136-KBF

-against-

UNITED PARCEL SERVICE, INC.,

**THIRD AMENDED
COMPLAINT**

Defendant.

-------------------------------------------------------------------- X


Plaintiffs the State of New York ("State") and the City of New York ("City"), by their respective counsel, Eric T. Schneiderman, Attorney General of the State of New York, and Zachary W. Carter, Corporation Counsel of the City of New York, allege the following, with knowledge of their own actions and on information and belief as to the actions of others:

<u>**NATURE OF THE ACTION**</u>

1.      Defendant United Parcel Service, Inc. ("UPS") is a package delivery company that has delivered, and continues to deliver, hundreds of thousands of contraband cigarettes to persons throughout the State and City of New York. UPS pledged to stop this activity in October 2005, when the New York State Attorney General agreed not to file a lawsuit in exchange for UPS's written commitment to specific additional anti-trafficking measures. But UPS's promises turned out to be empty, and instead of acting to eliminate contraband cigarettes from its delivery system, it instead chose to maximize its profits by conspiring with, and becoming enmeshed in the management and operation of, numerous illegal cigarette-trafficking enterprises. This racketeering activity has robbed the State and City of millions of dollars in cigarette-tax revenue, while endangering public welfare.

2.      The State and City accordingly bring this civil action against UPS, for injunctive relief, damages and penalties under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq.* ("CCTA") and the Prevent All Cigarette Trafficking Act, 15 U.S.C. § 375 *et*

*seq.* ("PACT  Act"); treble damages and attorneys' fees under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); damages, restitution, injunctive relief and penalties under New  York Executive Law § 63(12) ("N.Y. Exec. L. § 63(12)") and New  York Public Health Law  section 1399-*ll* ("N.Y. PHL § 1399-*ll*"); and penalties under an Assurance of  Discontinuance  with the New York State Attorney General.

## PARTIES

3.      Plaintiff the State of New York is a sovereign entity that brings this action on behalf of its citizens and residents to protect public health, safety, and welfare, and to enforce federal and state law for that purpose.

4.      Plaintiff the City of New York is a municipal corporation organized under the laws of the State of New York.

5.      Defendant UPS is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 55 Glenlake Parkway, Atlanta, Georgia 30328.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 378(a), 18 U.S.C. §§ 1964(c) and 2346(b), and 28 U.S.C. §§ 1331 and 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### The State and City's Interest in Protecting Public Health

8.      Cigarette smoking is the single leading cause of preventable death in the United States, killing over 400,000 people each year. U.S. Dept. of Health and Human Services, *The Health Consequences of Smoking—50 Years of Progress, A Report of the Surgeon General*, at 11, 678 (2014).  For the millions more living with a smoking-related disease, the health care

costs are substantial. *Id*. Persons living in the State of New York, for example, were recently estimated to spend $10 billion annually on such costs. RTI International, *2012 Independent Evaluation Report of the New York Tobacco Control Program*, at 2–3 (2012).

9.      To combat these harms and to protect the public health of its citizens, the State and City of New York—like the federal government, 49 other states, and District of Columbia— tax the sale and use of tobacco products, such as cigarettes.  *See* N.Y. Tax Law § 470 *et seq.*; N.Y.C. Ad. Code ("Ad. Code") § 11-1302(a)(1); *Surgeon General Rept*. 2014, at 788.

10.      Cigarette taxes are a valuable and effective policy measure, because higher taxes increase public revenues and improve public health by decreasing the consumption of tobacco products, especially cigarettes. *Surgeon General Rept*. 2014, at 788. Indeed, raising cigarette prices "is one of the most effective interventions to prevent and reduce cigarette use." RTI International, *2011 Independent Evaluation Report of the New York Tobacco Control Program*, at 40 (2011) (citation omitted); *see also* Institute of Medicine, *Ending the Tobacco Problem: A Blueprint for the Nation*, at 182 (2007); U.S. Dept. of Health and Human Services, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease*, A Report of the Surgeon General, at 654 (2010) (noting that "increases in the price of cigarettes through excise taxes … are an effective policy intervention to prevent smoking initiation among adolescents and young adults, reduce cigarette consumption, and increase the number of smokers who quit").

11.      For example, a ten-percent increase in cigarette price is estimated to reduce cigarette use among adults by approximately three to five percent. Frank J. Chaloupka & Rosalie Liccardo Pecula, *The Impact of Price on Youth Tobacco Use*, National Cancer Institute Monograph No. 14, at 194 (Nov. 2001).[1] The response of youths to price increases is even greater: a similar ten-percent price increase is estimated to reduce the number of youth smokers

---

[1] *Available at* http://cancercontrol.cancer.gov/tcrb/monographs/14/m14_12.pdf (last visited May 1, 2015).

by at least six or seven percent. *See Prevent All Cigarette Trafficking Act of 2007, and the Smuggled Tobacco Prevention Act of 2008: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, Serial No. 110-47, 52 (May 1, 2008) (Statement of Matthew L. Myers, President, Campaign for Tobacco-Free Kids).

### The State and City's Taxation and Regulation of Cigarettes

12.     To achieve these public health benefits, the State and City have each imposed a separate excise tax on packages (or "packs") of cigarettes (with certain exceptions not relevant here) that are possessed for sale or use within the State or City. *See* N.Y. Tax L. §§ 471, 471-a; Ad. Code § 11-1302(a)(1) and (2).[2] All cigarettes possessed for sale or use are presumed to be taxable, and hence must bear a tax stamp, until the contrary is established, with the burden of proof of non-taxability on the person asserting an exemption from taxation. *See* N.Y. Tax L. § 471; Ad. Code § 11-1302(d).

13.     State and City cigarette excise taxes are pre-paid by "stamping agents," who are usually wholesale cigarette dealers licensed by the State and City of New York to purchase and affix tax stamps. By law, stamping agents serve as the only entry point for cigarettes into the State's stream of commerce. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011) (citing 20 N.Y.C.R.R. § 74.3(a)(1)(iii)).

14.     To indicate that the tax has been pre-paid on cigarettes to which the tax applies, a stamping agent must purchase and affix a cigarette tax stamp to each pack of cigarettes possessed by the agent for sale in the State and/or City, as the case may be.  N.Y. Tax L. § 471;20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-1302(e). All cigarettes possessed for sale or use in New York State and City, with exceptions not relevant to this complaint, must bear tax stamps.  N.Y. Tax L. § 471; 20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-1302(g).

---

[2] The "use" of cigarettes is "any exercise of a right or power, actual or constructive, including but not limited to receipt, storage or any keeping or retention for any length of time."  N.Y. Tax L. § 471-a; Ad. Code § 11-1301(4).

15.     To comply with the foregoing requirements, stamping agents purchase tax stamps from the State and City, the cost of which is nearly equal in cost to the amount of the cigarette tax on a pack of cigarettes. By purchasing the tax stamps, the tax is paid. By law, stamping agents must incorporate the amount of the tax into the price of the cigarettes, thereby passing the tax along to each subsequent purchaser in the distribution chain, and ultimately the consumer, as required by N.Y. Tax L. § 471 and Ad. Code § 11-1302(e) and (h).

16.     At all times relevant to this complaint, the State excise tax has been either $2.75 or $4.35 per pack of cigarettes. *See* N.Y. Tax Law § 471 (noting the July 1, 2010 change in the applicable tax from $2.75 to $4.35). Accordingly, for each carton of cigarettes (which typically contains 10 packs of cigarettes), the State excise tax rate is $27.50 or $43.50 per carton. The New York City excise tax has been $1.50 per pack or $15.00 per carton. Each pack of cigarettes in New York City, furthermore, is required to have affixed to it a joint New York State/New York City tax stamp.

### The Cigarette Dealers Located on New York State Indian Reservations

17.     States and localities establish their own cigarette tax rates so that tax rates vary among jurisdictions.

18.     As differences in state and local taxation have widened, tax evasion practices have increased. *Surgeon General Rept*. 2014, at 789. Such "illicit trade" practices include "individual cross-border, Internet and untaxed purchases on tribal lands"; small-scale organizations bootlegging cigarettes from low-tax jurisdictions for resale in high-tax jurisdictions; and large-scale organizations engaging in "organized smuggling." *Id*.; *see also United States v. Hasan*, 846 F. Supp. 2d 541, 543 (E.D. Va. 2012). In whatever form, these trade practices injure the public health and public fisc. *See Surgeon General Rept*. 2014, at 789. In New York, for example, cigarette tax evasion was recently estimated to cost the State "between $465 million and

$610 million per year in lost tax revenue" (RTI, 2012 Ind. Eval. Rept. at 41)—revenue that could have been used to benefit all New Yorkers.

19.     In New York, the most common and most longstanding form of tax evasion has been the sale of cigarettes by Indian reservation sellers to non-tribal members. Such reservation cigarette sellers have long refused to participate in the tax stamping system for the collection of cigarette taxes. *See*, *e.g.*, N.Y. State Dept. of Health, *First Annual Independent Evaluation of New York's Tobacco Control Program*, at 6–7 (Nov. 24, 2004).[3]

20.     For example, as documented extensively in the media for at least the past decade, the Seneca Nation of Indians has disputed the right of State and local taxing authorities to require on-reservation cigarette dealers to sell packs of cigarettes on which cigarette tax stamps have been affixed, and at prices including amounts attributable to state and local taxes.[4] Seneca reservation cigarette sellers, and those on other New York State reservations, have a long, well-reported history of selling to the public cigarettes on which state and local taxes have not been paid. *See, e.g., Red Earth,* 657 F.3d at 142; *Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154 (2d Cir. 2011); *City of New York v. Golden Feather Smoke Shop, Inc.,* 597 F.3d 115 (2d Cir. 2010).

21.     Nearly a decade ago, New York State's Department of Health reported that the evasion of the State and City's excise taxes through Indian reservation purchases of unstamped cigarettes was "commonplace"; that such sales occurred at each of the "10 Indian reservations located throughout the state"; and that such sales accounted for "the majority of uncollected taxes." *Id*.; N.Y. State Dept. of Health, *Cigarette Purchasing Patterns Among New York Smokers: Implications For Health Price and Revenue*, at 3, 16 (Mar. 2006).[5]

---

[3] Available at https://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm (last visited May 1, 2015).
[4] *See, e.g.*, New York Times, *Ruling Clears New York State to Tax Tribes' Cigarette Sales*, May 9, 2011, *available at* http://www.nytimes.com/2011/05/10/nyregion/ruling-clears-new-york-to-tax-tribes-cigarette-sales.html (last visited May 1, 2015).
[5] Available at https://www.health.ny.gov/prevention/tobacco_control/docs/cigarette_purchasing_patterns.pdf (last visited May 1, 2015).

22.     This method of tax evasion continues. *See*, *e.g.*, RTI, 2011 Ind. Eval. Rept. at 41 (noting that smokers, in response to higher taxes or prices, may "seek out low- or untaxed sources of cigarettes, such as Indian reservations and Internet vendors. Purchasing from Indian reservations, in particular, is common in New York"). Indian reservation sales of unstamped cigarettes remain a leading means by which New Yorkers have sought to evade State and City excise taxes. *Id*. at 43.

23.     Cigarette dealers on New York State Indian reservations have furthermore not limited themselves to in-person, on-reservation cigarette sales. Rather, they have sold hundreds of  thousands of cartons via mail order, phone, fax, and the Internet, and shipped such unstamped  cigarettes to consumers across the nation, including consumers located throughout the State and  City of New York. *See, e.g., Red Earth LLC v. United States*, 657 F.3d 138, 142 (2d Cir. 2011);  *Gordon v. Holder*, 632 F.3d 722, 723 (D.C. Cir. 2011).

24.     Although the courts have repeatedly upheld the applicability of New York's cigarette taxation regime to Indian cigarette sales to the public (*see, e.g.*, *Dep't of Taxation & Fin. of N.Y. v. Milhem Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994); *Oneida Nation*, 645 F.3d at 158), it continues to  be  well-known that reservation smoke  shops and other retail establishments sell  cigarettes,  including through mail order, telephone, and Internet, without affixing the tax stamps of  any of  the  jurisdictions into which the stores make sales. *See, e.g., Red Earth*, 657 F.3d at 141-42; *Gordon*,  632 F.3d at 723. The refusal of reservation cigarette dealers to affix the cigarette tax stamps of  the  jurisdictions  into  which  they  sell  has  been  publicly  acknowledged by the sellers, and openly  advocated through lawsuits and through signs posted on the New York State Thruway and  individual smoke shops. *See Red Earth*, 657 F.3d at 142; *Gordon*, 632 F.3d at 724.

## The State's First Investigation of UPS's Cigarette Deliveries

25.     In 2004, the New York State Attorney General ("Attorney General") began

investigating residential cigarette deliveries made by UPS in violation of N.Y. PHL § 1399-*ll*, which prohibits cigarette deliveries by common carriers other than to licensed cigarette wholesalers and retailers or government officials.

26.     At or around this same time, UPS was also indirectly involved in litigation concerning the State of Maine's tobacco delivery laws. Through that litigation, it was revealed that, at many different stages of UPS's delivery process[6], various UPS employees, such as sorters, pre-sorters, and drivers, would visually scan each package's exterior for, *inter alia*, labels indicating prohibited contents (*e.g.*, cigarettes). UPS's pre-loaders (employees who place the packages on the trucks for delivery) in Maine would specifically examine each package to determine if it was marked as containing tobacco or if the name of the addressee or shipper indicated that the package likely contained tobacco.  Similarly, UPS's drivers would check each package for specific delivery information (*e.g.*, the need for age verification or a signature) on a hand-held computer device, known as a DIAD, which was connected to UPS's extensive computer system, estimated to be the second largest in the world. Through each DIAD, UPS was able to provide relevant prompts or "alerts" regarding each package, flag specific delivery addresses or specific consignees to generate an alert, and generate a prompt for a particular shipper in order to direct the driver's behavior.

27.     In New York, the Attorney General's investigation found that UPS regularly delivered unstamped and untaxed cigarettes to New York residential customers in violation of N.Y. PHL § 1399-*ll*. The cigarette deliveries originated principally from sellers located on New York State Indian reservations. Many of these sellers advertised their cigarettes as "tax-free"

---

[6] UPS uses a "hub-and-spoke" system, which consists of an extensive network of sorting facilities throughout the country.  These facilities generally work as follows: the person or entity shipping the package provides delivery information on UPS's shipping form or through an electronic shipping system; the package enters UPS's system through a driver pick-up or through UPS's customer counter; the driver brings the package to a local operating center; the package is unloaded and placed on conveyor belts for sorters to separate based on delivery location and the delivery time commitment; feeder vehicles take the package from the centralized hub to another hub for further sorting, and ultimately to a local center for delivery; and at the local center the package is further sorted and loaded onto a vehicle for delivery based on the recipient's address.

and accepted orders over the Internet or by telephone for later delivery by UPS to residences throughout the State.

28.     Following the Attorney General's investigation, and to avoid a civil action by the Attorney General, UPS agreed to an Assurance of Discontinuance ("AOD") with the Attorney General on October 21, 2005.[7]  In the AOD, UPS agreed, *inter alia*, to—

   a.  Comply with N.Y. PHL § 1399-*ll*, by prohibiting cigarette deliveries to unauthorized recipients in New York State and City (¶ 17);

   b.  Take measures to ensure that UPS's drivers, pre-loaders and other employees were "actively looking" for "indications" that a package might contain cigarettes and alerting "UPS management of such packages and attempting to intercept such packages" (¶ 35);

   c.  Develop and maintain a database of cigarette shippers, compiled from those identified by the Attorney General, UPS's own database (using such words as "cigarette," "smoke," and tobacco"), UPS's knowledge of known cigarette retailers, and Internet searches of cigarette websites (¶¶ 21–22);

   d.  Terminate relationships with shippers that unlawfully attempted to use UPS to ship cigarettes to unauthorized recipients and report those shippers to the Attorney General (¶ 27);

   e.  Instruct drivers not to deliver packages containing cigarettes to unauthorized recipients (¶¶ 34, 36);

   f.  Promulgate and publicize to its shippers a policy prohibiting cigarette shipments to unauthorized recipients (¶ 23); and

   g.  "[A]udit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so." (¶ 24).

29.     UPS furthermore agreed that it would file with the Attorney General a report "setting forth the details of all compliance measures undertaken by UPS." (¶ 49). In UPS's filed report, dated on or around December 20, 2005, UPS confirmed that it—

---

[7] The October 21, 2005 AOD is publicly available at http://www.ag.ny.gov/sites/default/files/press-releases/archived/9tiupsaodfinal.oct.pdf (last visited May 1, 2015).

    a. No longer shipped cigarettes to consumers and was only delivering tobacco products from licensed entities; and

    b. Had issued instructions to its drivers, sorters, and pre-loaders "to help ensure that these personnel are actively looking for indications that a package contains cigarettes being shipped to an [unauthorized recipient], alerting UPS management of such packages and attempting to intercept such packages."

### UPS's Unlawful Cigarette Deliveries

30. Despite this AOD, UPS—from at least 2010 through the present—serviced numerous contraband cigarette enterprises operating out of smoke shops and other locations situated on Indian reservations throughout New York State.

31. UPS did so by, first, knowingly shipping and delivering thousands of cartons of unstamped cigarettes from manufacturers to unlicensed wholesalers and/or retailers (*i.e.*, smoke shops on Indian reservations, not otherwise licensed by the State of New York to possess unstamped cigarettes), and then again, by delivering such cigarettes from smoke shops and other locations to residences in New York City and State, and indeed nationwide.

32. For example, records obtained by plaintiffs indicate that UPS made over 17,000 deliveries to residences for four smoke shops as recently as February 2014:

    a. Commencing in or around November 2010, UPS began delivering cigarettes to residences for a cigarette seller known as "Post Smokes." The residential deliveries continued for the next several years, the latest reported delivery being August 1, 2013.

    b. In April 2011, UPS began making residential cigarette deliveries for another smoke shop, "Indian Smokes"; these deliveries continued until October 2012.

    c. In May 2011, UPS began delivering cigarettes for a smoke shop, "AJ's Cigar," the latest reported delivery being February 21, 2014.

    d. In June 2012, in connection with another investigation, an undercover investigator at the Office of the New York City Sheriff placed an order over the Internet for cigarettes sold at a website entitled "Seneca Cigarettes," which provided a mailing

address in Basom, New York, which is located on the Seneca Indian Nation reservation. The order was delivered by UPS, in a package that bore the return address of "Seneca Cigars," and which did not comply with the PACT Act's requirements for the labeling of packages containing cigarettes, discussed further below. The package did indeed contain the cigarettes ordered by the investigator, which were not affixed with New York State or City cigarette tax stamp. UPS records indicate that UPS made deliveries for Seneca Cigars from January 2012 to at least August 8, 2013.

33.     In November 2014, plaintiffs obtained additional records showing that, between January 2010 and September 2014, UPS had made over 61,000 additional deliveries to residents throughout the City and State of New York on behalf of several other smoke shops or illegal cigarette distributors located on New York State Indian reservations. These included Lake Erie Tobacco Co., Cloud & Co., EExpress, Smokes & Spirits, and Shipping Services, Big Buffalo, Two Pine Enterprises, and FOW Enterprises.

34.     For example, UPS made a total of over 33,000 deliveries into the City and State on behalf of Shipping Services, over 11,000 deliveries on behalf of Smokes & Spirits, over 11,000 on behalf of EExpress, over 1,700 on behalf of Cloud & Co., and over 500 on behalf of Lake Erie Tobacco Co. UPS entered into "Tobacco Delivery Contracts" with all or most of the entities for which they shipped cigarettes. Most, if not all of the packages contained unstamped cigarettes, and were delivered by UPS to residences located in the State and City of New York or to cigarette enterprises dealing exclusively in unstamped cigarettes.

35.     An analysis of the weights of delivered packages, as provided through UPS's package tracking service at UPS.com, indicates that UPS delivered over 683,000 cartons of unstamped cigarettes in the City and State, which is based on an average package weight of 6 pounds and the fact that a package weight of 1 pound is equal to about 1.4 cartons of cigarettes. This amounts to deliveries by UPS of millions of packs of contraband cigarettes in New York State and New York City.

36.     In light of UPS's unlawful deliveries, the City and State seek in this action:

    a.    to enjoin further deliveries of cigarettes into the City and the State by UPS;

    b.    to require UPS to submit to oversight by a court-appointed Special Master empowered to monitor UPS's tobacco deliveries and assure UPS's compliance with federal and state law governing tobacco deliveries;

    c.    to recover damages under the CCTA and the PACT Act equal to the amount of each jurisdiction's tax stamp that should have been affixed to each pack of unstamped cigarettes that UPS unlawfully shipped, transported, and/or distributed in the City and/or the State;

    d.    to recover civil penalties under the CCTA, the PACT Act, N.Y. Exec. L. § 63(12), and PHL § 1399-*ll*;

    e.    to recover damages under RICO equal to three times the amount of each jurisdiction's tax stamp that should have been affixed to each carton of unstamped cigarettes shipped, transported, or distributed in the City and/or the State;

    f.    to recover penalties of $1,000 per violation of the AOD; and

    g.    to recover the attorneys' fees and costs incurred in bringing this action.

37.     UPS records indicate that the cigarettes were at times delivered directly to residential customers, designated by the drivers as "man," "woman," "girl," and "boy," strongly suggesting that UPS engaged in cigarette deliveries to minors. An excerpt from UPS's records of deliveries is reproduced below:

| 1Z Track Num | Shipper Num | Delivery Date | Delivery Time | Street Number | Street Name | ST Type | City | State | Postal Code | Package Release Location |
|---|---|---|---|---|---|---|---|---|---|---|
| 1ZW98A660391581894 | W98A66 | 2012-02-14 | 17.39.00 | [redacted] | COLUMBINE | LN | KINGS PARK | NY | 11754 | MC BOY |
| 1ZW98A660398950204 | W98A66 | 2012-04-17 | 17.12.00 | [redacted] | SEAMAN | AVE | NEW YORK | NY | 10034 | MC MAN |
| 1Z34850X0396791795 | 34850X | 2012-7-12 | 13.23.00 | [redacted] | STATE HIGHWAY 5S | | PATTERSONVILLE | NY | 12137 | MET CUST MAN |
| 1ZW98A660391958399 | W98A66 | 2012-7-13 | 14.11.00 | [redacted] | MOUNT PLEASANT | RD | DANSVILLE | NY | 14437 | MET CUST WOM |
| 1ZW98A660394427064 | W98A66 | 2012-7-16 | 19.30.00 | [redacted] | 37TH | ST | ASTORIA | NY | 11103 | MET CUST GRL |
| 1ZW98A660394427064 | W98A66 | 2012-7-16 | 19.30.00 | [redacted] | 37TH | ST | ASTORIA | NY | 11103 | MET CUST GRL |
| 1ZW98A660394634956 | W98A66 | 2012-7-20 | 14.23.00 | [redacted] | LABAU | AVE | STATEN ISLAND | NY | 10301 | MET CUST WOM |
| 1Z34850X0390965877 | 34850X | 2012-11-06 | 12.09.00 | [redacted] | E. '33RD | ST | BROOKLYN | NY | 11234 | MET CUST BOY |
| 1Z34850X0399609147 | 34850X | 2012-12-24 | 15.56.00 | [redacted] | BAY 41ST | ST | BROOKLYN | NY | 11214 | MET CUST BOY |
| 1Z34850X0395723039 | 34850X | 2013-04-24 | 16.59.00 | [redacted] | ST LUCILLE | DR | SCHENECTADY | NY | 12306 | MET CUST BOY |
| 1Z34850X0399266599 | 34850X | 2013-06-18 | 18.09.00 | [redacted] | DELAWARE | AVE | DELMAR | NY | 12054 | MET CUST BOY |

**Allegations Related to the CCTA**

38.      The CCTA, 18 U.S.C. § 2341 *et seq*., provides that it is unlawful to knowingly ship, transport, receive, possess, sell, distribute, or purchase "contraband cigarettes," defined as more than 10,000 cigarettes (*i.e.*, more than 50 cartons or 500 packs of cigarettes), lacking tax stamps, and which are found in a jurisdiction requiring such tax stamps to be affixed to each pack of cigarettes ("unstamped cigarettes"). 18 U.S.C. §§ 2341(2) and 2342(a).

39.      Pursuant to certain narrow exemptions in the CCTA intended to permit the transport of unstamped cigarettes from place of manufacture to the approximately 48 separate state cigarette-stamping programs, the only unstamped cigarettes that are not "contraband cigarettes" are those in the possession of a cigarette manufacturer, common carrier or entity licensed to affix cigarette stamps (collectively, "regulated entities"). 18 U.S.C. § 2341(2).

40.      The statutory language of the exemptions from liability contained in the CCTA defines unstamped cigarettes as non-contraband only when "in the possession" of a regulated entity. Thus, even a regulated entity that "receives," "sells," "ships," "transports" or "distributes" unstamped cigarettes has engaged in transactions with "contraband" cigarettes to the extent the cigarettes do not remain in the possession of a regulated entity at all times. For example, if a regulated entity (*e.g.*, a common carrier) receives contraband cigarettes from a non-exempt entity (*e.g.*, an Indian reservation smoke shop, not otherwise licensed or authorized by the State to possess unstamped cigarettes), then the regulated entity has engaged in conduct with contraband cigarettes, having "received" contraband cigarettes. Likewise, a common carrier transferring unstamped, contraband cigarettes to a consumer is not exempt from liability. The cigarettes are contraband in the hands of the consumer, the common carrier is responsible for placing them there, and therefore, has at the least "distributed" contraband cigarettes. *See City of New York v. Gordon,* 2013 U.S. Dist. LEXIS 71953, at *23–27 (S.D.N.Y. May 21, 2013).

41.      UPS knew that the cigarettes it shipped for smoke shops located on New York

State Indian reservations were unstamped because of the widespread public knowledge that such smoke shops deal exclusively in unstamped cigarettes. As one federal court recently stated:

> The problem of public sales of untaxed cigarettes from Native American reservations in New York has been a subject of legislative, executive, and judicial action and debate since the late 1980s." *See, e.g., Milhelm Attea*, 512 U.S. at 64-65 ("In 1988, New York's Department of Taxation and Finance determined that  a large volume of unstamped cigarettes was being purchased by non-Indians from reservation retailers.").

*City of New York v. Milhelm Attea & Bros., Inc*., 2012 U.S. Dist. LEXIS 116533, at *29 (E.D.N.Y. Aug. 17, 2012).

42.     Widespread public knowledge of Indian sales of untaxed cigarettes is evidenced by the prevalence of media stories on the subject. A search of the Lexis database "All English Language News" using the search terms "Indian or Native American or Tribe or Tribal w/25 cigarette or tobacco w/25 tax or taxation" (excluding articles in which the term "India" appears) returns 12,200 articles appearing in national and local newspapers, information reporting services and scholarly journals between 1975 and the present. Although not every article in this search literally reports on sales of untaxed cigarettes by reservation sellers, clearly the issue is well-known.

43.     UPS also knew from visiting, observing, and picking up packages for delivery from the smoke shops located on New York State Indian reservations, that such packages contained unstamped cigarettes, and that the business model of each smoke shop was built around providing unstamped, untaxed cigarettes to non-Indian consumers. For example, when requested by law enforcement, UPS personnel are readily able to identify cigarette shippers and packages containing cigarettes based on, among other things, the shipper's location on an Indian reservation, the shipper's name (*e.g.*, "Indian Smokes"), the return and mailing addresses on the

packages, the frequency and volume of UPS pickups from the shipper, and the size, shape, and weight of the packages. Additionally, UPS personnel are often able to observe unstamped cigarettes in plain view before, during, and after UPS's pickups of packages from cigarette shippers, including but not limited to when the packaging of the cigarettes is or becomes loose or damaged.

44.     UPS also knew that its customers named herein, and other customers, were shipping unstamped cigarettes because UPS's strategy is to enmesh itself deeply in its customers' businesses. According to UPS's initial disclosures, numerous UPS sales executives likely have knowledge concerning the shippers named in this complaint. Generally, the duty and responsibility of each UPS sales executive is to learn everything about each customer's business, to visit and talk with stakeholders, and to work with each customer to help solve that customer's business problems. *See*, *e.g.*, UPS jobs, Katie: Sales Account Executive, available at https://www.youtube.com/watch?v=K3vOoYEYW9c ("The goal is really to be a consultant to your customers."). In fact, the *primary focus* of each UPS sales executive is "to conduct face-to-face customer sales calls. The Account Executive travels to customer sites to hold meetings and gather information." UPS, Sales Account Executive (Buffalo, New York) Job ID posting no. 79069, available at http://jobs-ups.com/buffalo/sales/jobid7438378-sales-account-executive-jobs. UPS sales employees are furthermore deeply motivated to delve into each customer's business because employees are paid a quarterly commission based on business generated. *See id.* at Related Content: Lulu (also available at UPSjobs, Lulu: UPS Inside Sales Representative, https://www.youtube.com/watch?v=3fPiiedk7bY).

45.     In the course of "conduct[ing] face-to-face customer sales calls" and "travel[ling] to customer sites to hold meetings and gather information," UPS sales executives would have

observed, for example, that its customer Cloud and Company advertised "Discount Cigarettes":



46.   UPS would have further observed that its customer Indian Smokes advertised

itself as a "smoke shop":



47.   Likewise, UPS drivers picking up packages from its customer Seneca Cigarettes

in Basom, New York would have observed that the location advertised itself as "Arrowhawk

Smoke Shop":



48.     UPS also understood the business model of the reservation smoke shops, and knew, as a result of its lengthy negotiations with the Attorney General in connection with UPS's AOD, that the purpose of mail order businesses such as the smoke shops located on New York State Indian reservations is to deliver unstamped cigarettes to consumers to evade payment of required taxes.

49.     Indeed, businesses for which UPS delivered cigarettes have been the subject of federal criminal prosecution for trafficking in contraband cigarettes. On August 13, 2013, AJ's Candy & Tobacco, LLC, an alter-ego of AJ's Cigar operating out of the same address on the Seneca reservation in Irving, New York, was indicted in a $17 million multi-state conspiracy to transport hundreds of thousands of cartons of contraband cigarettes from Kansas City, Missouri to be sold on New York Indian reservations. Previously, in October 2012, AJ's Candy had a civil forfeiture order entered against $3.5 million worth of its property and proceeds involved in this scheme, and in February 2014, AJ's Candy pled guilty in the District Court for the Western

District of Missouri to participating in a conspiracy to commit wire fraud and traffic in contraband cigarettes from June 2010 to January 2012. UPS nonetheless continued to deliver cigarettes for AJ's Cigar from May 2011 until February 2014.

50.     Similarly, on January 18, 2013, Jody Swamp and Robert C. Oliver, the owners of an unlicensed cigarette manufacturing business known as "Native Tobacco Company" or "Smokin' Arrows" on the Akwesasne reservation in Hogansburg, New York, pled guilty to cigarette trafficking offenses in the District Court for the Northern District of New York. They agreed to forfeit $5 million in proceeds from their illegal cigarette business. In their plea agreements, Swamp and Oliver stated that, between at least November 2010 and June 2011, UPS shipped tens of thousands of cartons of contraband cigarettes on their behalf, including to other locations in New York State.

51.     UPS also made deliveries for other unlicensed cigarette businesses on the Akwesasne reservation, including but not limited to "Jacob's Tobacco," "Tarbells," and "Action Race Parts" (unlicensed manufacturers of "Chief" brand cigarettes).

52.     UPS also knew that the reservation smoke shops sold unstamped  cigarettes, having participated in the several years of congressional debate and lobbying by the package-delivery industry that accompanied the enactment of both N.Y. PHL § 1399-*ll* and the PACT Act.

53.     UPS also knew that the reservation smoke shops sold only unstamped cigarettes because throughout the period of time that UPS was effecting its deliveries for such smoke shops (*e.g.*, Indian Smokes, Post Smokes, and AJ's Cigar), a trade association of smoke shops publicly contested the provision of the PACT Act that required smoke shops to affix tax stamps.

54.     UPS also knew that its customers located on Indian reservations who shipped large volumes of packages from locations that were not obviously smoke shops were contraband cigarette

dealers, notwithstanding the fact that those locations may not have displayed any external indications of cigarette sales. UPS knew this from a combination of the above-referenced information regarding the prevalence of untaxed cigarette sales on Indian reservations, its knowledge from its own business that no other businesses on Indian reservations supported large volumes of package shipments, its knowledge from its own business that Indian reservation cigarette dealers frequently used non-tobacco-related aliases to camouflage contraband cigarette trafficking, and the particular circumstances of such non-smoke-shop entities it cultivated as customers.

55.     For example, between October 2012 and June 2014, UPS picked up over 11,000 packages from an entity called EExpress, which had no retail smoke shop location. Instead, UPS picked these packages up from a shed located next to a residence on the Seneca Cattaraugus reservation. UPS knew that the owner of EExpress was the same individual who owned another entity, Elliot Enterprises, which had previously operated out of a smoke shop location elsewhere on the same reservation, and which had been terminated as a UPS customer prior to January 2013 due to the inadvertent discovery of cigarettes in its shipments. The same UPS account executive who opened the Elliott Enterprises account also opened the EExpress account. UPS therefore knew, based on the volume of packages, the pickup location, and UPS's close and continuing relationship with its customer, that EExpress was a cigarette dealer, notwithstanding its lack of a physical retail smoke shop.

56.     UPS has admitted that it directly contacted Indian reservation cigarette dealers in the 2005-2006 time frame, and that those dealers explicitly told UPS that the dealers believed they had a right to ship tax-free cigarettes through UPS.

57.     UPS has admitted that it knew there was a risk that customers would ship

cigarettes illegally through UPS notwithstanding any agreement they made with UPS not to do so.

58.     Accordingly, UPS's receipt, shipment, transport and/or distribution of hundreds of thousands of cartons of unstamped cigarettes in the aggregate, violate the CCTA, the terms of which do not require the receipt, shipment, transport and/or distribution of such cigarettes (*i.e.*, a quantity "in excess" of 50 cartons) to occur in a single transaction or at the same time.

59.     Alternatively, UPS's individual transactions with unstamped cigarettes (*i.e.*, UPS's receipt, shipment, transport and/or distribution of unstamped cigarettes), for example by a single vehicle, by multiple vehicles on a given day, or within a single UPS facility on a given day, involve more than fifty cartons in each transaction.

60.     By receiving, shipping, transporting, and/or distributing more than fifty cartons of cigarettes in New York City and State on which New York State and City tax stamps had not been affixed, UPS violated the CCTA.

### Allegations Related to RICO

61.     The RICO statute, 18 U.S.C. § 1962(c) and (d), provides a civil cause of action to persons injured in their business or property as a result of the operation of, or the conspiracy to operate, an enterprise through a pattern of racketeering acts.

62.     CCTA violations are "racketeering acts" under the RICO statute. The thousands of deliveries of unstamped cigarettes made by UPS over the past several years, amounting to multiple CCTA violations, constitute a pattern of racketeering activity. UPS thereby conducts the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity, or has agreed that the affairs of the enterprise will be conducted in that manner, and has thereby violated and/or conspired to violate RICO.

### The Enterprises

63.     Each cigarette dealer for which UPS delivered unstamped cigarettes constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4), in that each cigarette dealer is or

was a corporation, a limited liability company, or a sole proprietorship with several employees and/or associates.

a. In the alternative, the owners and/or employees of each cigarette dealer for which UPS delivered unstamped cigarettes constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The purpose of each enterprise was to generate money through the sale of unstamped cigarettes for each associate of the enterprise. This purpose was implemented by the enterprise associates through various legal and illegal activities, but principally through the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes in interstate commerce. Each of the associates of each enterprise had relationships with the other associates of the enterprise, in that each enterprise associate was involved in the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes for the benefit of the enterprise. Each enterprise and its activities continued for at least two years and/or could have continued to engage in sales of unstamped cigarettes indefinitely if its activities had not been terminated by law enforcement.

b. In the alternative, each cigarette dealer for which UPS delivered unstamped cigarettes or its owners and/or employees, and UPS, constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The purpose of each enterprise was to generate money through the sale of unstamped cigarettes for each associate of the enterprise. This purpose was implemented by the enterprise associates through various legal and illegal activities, but principally through the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes in interstate commerce. Each of the associates of each enterprise had relationships with the other associates of the enterprise, in that each enterprise associate was involved in the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes for the benefit of the enterprise. Each enterprise and its activities continued for at least two years and/or could have continued to engage in sales of unstamped cigarettes indefinitely if its activities had not been terminated by law enforcement.

c. The three alternative enterprises referred to in this paragraph and its subparagraphs, corresponding to each cigarette dealer for which UPS delivered unstamped cigarettes, are hereafter referred to collectively as a "Cigarette Dealer Enterprise."

64.     At all times relevant to this complaint, each Cigarette Dealer Enterprise has been an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Each Cigarette Dealer Enterprise, which  operated in, and delivered cigarettes to, the Southern District of New York and elsewhere, was  engaged in, and its activities affected interstate and foreign commerce. Each Cigarette Dealer Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for many years, with the common purpose of receiving income from the sale, shipment, distribution and delivery of contraband cigarettes.

65.     At all times relevant to this complaint, UPS has been associated with each individual Cigarette Dealer Enterprise, providing delivery services, package tracking services, customer relations services; seeking to increase customer shipments; and generally facilitating each smoke shop's deliveries of contraband cigarettes.

### The Purposes, Methods, and Means of the Enterprises

66.     The principal purpose of each Cigarette Dealer Enterprise was for each person associated with the enterprise to profit from the purchase, sale, shipment, transport, and/or distribution of contraband cigarettes to consumers. Enterprise associates implemented this purpose through various legal and illegal activities, but principally through the shipment, transport, receipt, possession, sale, and/or distribution of contraband cigarettes in interstate commerce.

67.     At all times relevant to this complaint, each Cigarette Dealer Enterprise has conducted its affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B), consisting principally of thousands of instances of contraband cigarette trafficking,  in violation of 18 U.S.C. § 2341 *et seq*.

**Role of the Enterprise Associates: UPS**

68.     At all times relevant to this complaint, UPS participated in the leadership, management and operation of each Cigarette Dealer Enterprise by controlling the pick-up and delivery of unstamped cigarettes from each smoke shop and delivering those cigarettes nationwide, and specifically (a) receiving unstamped cigarettes from each Cigarette Dealer Enterprise for ultimate distribution to consumers; (b) using instructions provided to UPS by each Cigarette Dealer Enterprise, transporting and distributing the cigarettes to consumers that had ordered cigarettes from each Cigarette Dealer Enterprise; (c) allowing each Cigarette Dealer Enterprise access to UPS's package tracking system; (d) allowing the customers of each Cigarette Dealer Enterprise access to that system; and (e) providing other logistics and delivery support services to each Cigarette Dealer Enterprise. UPS participated in the conduct of the affairs of each Cigarette Dealer Enterprise by the nationwide shipping, transporting, receiving, and/or distributing of cigarettes that did not bear tax stamps. In this manner UPS performed a critical function for each Cigarette Dealer Enterprise, which otherwise would have been unable to provide smoke shop customers with the unstamped cigarettes purchased from the stores.

69.     From at least 2010 through the present, within the Southern District of New York and elsewhere, UPS knowingly and intentionally shipped, transported, and/or distributed cigarettes lacking valid New York City and State tax stamps to City and State residents in violation of 18 U.S.C. § 2342(a).

70.     At all times relevant to this complaint, UPS conducted the management and operation of the affairs of each Cigarette Dealer Enterprise directly or indirectly through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), in violation of 18 U.S.C. § 1962(c), by committing multiple and continuing acts of

23

contraband cigarette trafficking in violation of 18 U.S.C. § 2341 *et seq*., through, *inter alia*, the shipment, transport, and/or distribution of unstamped cigarettes to City and State residents.

71.     At all times relevant to this complaint, UPS also conspired with each Cigarette Dealer Enterprise to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by agreeing to further endeavors of each Cigarette Dealer Enterprise that, when completed, amounted to contraband cigarette trafficking, in violation of the CCTA, 18 U.S.C. § 2341 *et seq*., and by agreeing that the affairs of each Cigarette Dealer Enterprise would be conducted through a pattern of racketeering activity.

72.     At all times relevant to this complaint, UPS agreed to a plan with each Cigarette Dealer Enterprise whereby each Cigarette Dealer Enterprise would receive, possess, sell, ship, and/or distribute contraband cigarettes to City and State residents and elsewhere and UPS would ship, transport, and/or distribute those unstamped cigarettes to the customers of each Cigarette Dealer Enterprise in New York State and New York City and elsewhere, in violation of the CCTA.

73.     UPS recognized that an essential element of this plan consisted of multiple violations of 18 U.S.C. § 2341 *et seq*. UPS agreed that certain conspirators, including itself and other associates of each Cigarette Dealer Enterprise, would commit CCTA violations, while other associates of the Cigarette Dealer Enterprises, including UPS, would engage in conduct intended to support and facilitate the violations of the CCTA.

74.     Since at least 2010 through the present, within the Southern District of New York and elsewhere, UPS, together with others, being persons employed by or associated with each Cigarette Dealer Enterprise, enterprises that engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate 18 U.S.C. §

1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of each Cigarette Dealer Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C.§§ 1961(1) and (5). UPS agreed that one or more associates of each Cigarette Dealer Enterprise would commit thousands of racketeering acts in conducting the affairs of the Enterprise.

75.     UPS departed from its usual business practices in participating in and facilitating each Cigarette Dealer Enterprise's unlawful sale of unstamped cigarettes to residential customers. For example, on information and belief, UPS has a procedure for identifying, rejecting, and returning attempted shipments of any prohibited materials such as tobacco. In the ordinary course of business, UPS would issue a warning to the offending customer regarding the prohibited shipment and ultimately, if prohibited shipments continued, terminate its business relationship with the customer. Although UPS recognized that each Cigarette Dealer Enterprise was selling unstamped cigarettes, UPS decided, contrary to its usual practice, to continue the lucrative business of providing delivery services to each Cigarette Dealer Enterprise.

76.     On information and belief, it is also UPS's normal practice to monitor the U.S. Attorney General's "Non-Compliant List," described in paragraph 77 below, and to reject as customers those shippers appearing on the list. Recognizing that each Cigarette Dealer Enterprise was selling unstamped cigarettes, UPS decided, contrary to its usual practice (*e.g.*, in the case of Indian Smokes and Smokes-Spirits, which were on the Non-Compliant List), to continue the lucrative business of providing delivery services to each Cigarette Dealer Enterprise.

77.     UPS also departed from its normal practices in that UPS publicly states that its policy is to decline to ship cigarettes to consumers, and yet UPS's own delivery reports documenting the UPS deliveries for many smoke shops contain notations describing the "package release location" as "residential," or "front porch" or "FD [front door] mat,"

78.     All of UPS's departures from its normal business practices are evidence that UPS intended to, and did in fact, actively facilitate the contraband cigarette trafficking of each Cigarette Dealer Enterprise.

**Allegations Related to the PACT Act**

79.     With exceptions not relevant here, the PACT Act provides that:

> For any shipping package containing cigarettes or smokeless tobacco, the delivery seller shall include on the bill of lading, if any, and on the outside of the shipping package, on the same surface as the delivery address, a clear and conspicuous statement providing as follows: "CIGARETTES/SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPLIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS".

15 U.S.C. § 376a(b)(1).

> Any shipping package … that is not labeled in accordance with that paragraph shall be treated as nondeliverable matter by a common carrier or other delivery service, if the common carrier or other delivery service knows or should know the package contains cigarettes or smokeless tobacco.

15 U.S.C. § 376a (b) (2).

80.     On information and belief, the packages delivered by UPS were not labeled as required by the PACT Act, and UPS knew or should have known that they contained cigarettes.

81.     By delivering packages of cigarettes for smoke shops located on New York State Indian reservations that do not comply with the labeling requirements of the PACT Act, despite the fact that UPS knows (or should know) that the packages contain cigarettes, UPS violated the PACT Act.

82.     The PACT Act also requires that the U.S. Attorney General maintain a "List of unregistered or noncompliant delivery sellers" ("Non-Compliant List") and that such list is shared with common carriers, such as UPS:

(1) In general.

(A) Initial list. Not later than 90 days after this subsection goes into effect under the Prevent All Cigarette Trafficking Act of 2009, the Attorney General of the United States shall compile a list of delivery sellers of cigarettes or smokeless tobacco that have not registered with the Attorney General of the United States pursuant to section 2(a) [15 USCS § 376(a)], or that are otherwise not in compliance with this Act [15 USCS §§ 375 *et seq*.], and--

(i) distribute the list to –

* * *

(ii) common carriers and other persons that deliver small packages to consumers in interstate commerce ....

15 U.S.C. § 376a(e)(1). Based on the presumption that public officials fulfill their duties, UPS received the Non-Compliant List.

83.     The PACT Act further provides that:

[N]o person who receives the [Non-Compliant] list .... and no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the list, unless [exceptions not relevant here].

15 U.S.C. § 376a(e)(2).

84.     The PACT Act contains a conditional exemption for common carriers, although that exemption is inapplicable here.  The PACT Act provides that the delivery prohibition of § 376a(e) shall not apply to a common carrier that, *inter alia*, is subject to certain settlement agreements, including "the Assurance of Discontinuance entered into by the Attorney General of New York and United Parcel Service, Inc. on or about October 21, 2005" (the "AOD") if that agreement "is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." 15 U.S.C. § 376a(e)(3)(B)(ii)(I).

85.     This Court has held that that this language ("honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers") means that the AOD must be "recognized" throughout the United States. The phrase "is honored throughout the United States" means "recognized by" all states in the nation. *New York v. UPS, Inc.*, 15-cv-1136 (KBF), 2015 U.S. Dist. LEXIS 123771, at *17-29 (S.D.N.Y. Sept. 16, 2015).

86.     On information and belief, the AOD is not recognized by all states in the nation. Moreover, the AOD is not recognized by all states in the nation "to block illegal deliveries of cigarettes to consumers." This is because the AOD (i) does not provide any other state with a right to enforce the AOD, and (ii) does not provide any other state with a right to obtain any penalty for an illegal cigarette delivery into that state. As provided by the AOD—

   a. This "Assurance of Discontinuance shall not grant any rights or privileges to any person or entity who is not a party to this Assurance of Discontinuance, nor shall this Assurance of Discontinuance affect or limit in any way the rights of any such third-party."  AOD ¶ 52.

   b. And, "UPS shall pay a stipulated penalty to the State of New York of $1000 for each and every violation of this Assurance of Discontinuance occurring after the effective date; provided, however, that no penalty shall be imposed if (a) the violation involves a shipment of Cigarettes to an Individual Consumer outside the State of New York…." AOD ¶ 42.

87.     On information and belief, the AOD is not recognized by states in the nation that have a "delivery ban" statute, *i.e.*, a state law prohibiting the delivery of cigarettes or other tobacco products to individual consumers or personal residences. *See*, *e.g.*, A.R.S. § 36–798.06 (Arizona, 2012); Conn. Gen. Stat. § 12–285c (Connecticut, 2003); Ind. Code § 24–3–5–4.5

(Indiana, 2003); 22 M.R.S. § 1555–D (Maine, 2009); Ohio Rev. Code 2927.023 (Ohio, 2005); S.D. Codified Laws § 10–50–99 (South Dakota, 2009); 7 V.S.A. § 1010 (Vermont, 2007); Rev. Code Wash. § 70.155.140 (Washington, 2009).

88.     This is because a state considering whether to recognize the AOD to block illegal deliveries of cigarettes to consumers would, under the terms of 15 U.S.C. § 376a(e)(5)(C), surrender that state's ability to enforce its own delivery ban statute, much less obtain any available damages, costs, penalties, or other relief available under such statute. As a result, many delivery ban states would be unlikely to "recognize" the AOD.

89.     Accordingly, the AOD is not recognized by all states in the nation, and UPS is not entitled to an exemption from liability the PACT Act, nor does the PACT Act preempt N.Y. PHL§ 1399-*ll*.

90.     Alternatively, it is self-evident from the facts alleged in this Second Amended Complaint that UPS does not "honor" its agreement throughout the United States to block illegal deliveries of cigarettes to consumers. That is, UPS does not comply with the terms of the AOD because UPS delivers cigarettes to consumers and entities unlicensed to deal in cigarettes, all in violation of the AOD. The exemption from penalty provisions of the PACT Act is accordingly inapplicable.

91.     On information and belief, UPS delivered cigarettes on behalf of smoke shops that were included on the Non-Compliant List and the deliveries were made subsequent to the inclusion of the smoke shops' inclusion on the List. Such smoke shops include, but are not limited to, the following:

     a.   Indian Smokes, PO Box 443, Salamanca, NY; and

     b.   Smokes & Spirits, 6665 Route 417, Kill Buck, NY

92.     By delivering cigarettes for cigarette dealers located on New York State Indian reservations, despite the fact that UPS knows (or should know) that such cigarette dealers are on the Non-Compliant list, UPS violated the PACT Act.

## Allegations Related to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-*ll*

93.     Pursuant to N.Y. Exec. L. § 63(12), the Attorney General is authorized to seek injunctive relief, restitution, damages and costs against any person or business entity that has engaged in repeated fraudulent or illegal acts or otherwise engaged in persistent fraud or illegality in the conduct of business.

94.     Violation of any state law or regulation constitutes "illegality" within the meaning of N.Y. Exec. L. § 63(12) and is actionable thereunder.

95.     UPS's repeated and persistent violations of N.Y. PHL § 1399-*ll* are actionable under N.Y. Exec. L. § 63(12).

96.     New York Public Health Law section 1399-*ll* (1) provides that, in New York State, cigarettes may be shipped only to (a) licensed cigarette tax agents, licensed wholesale dealers, or registered retail dealers, (b) export warehouse proprietors or customs bonded warehouse operators, or (c) agents of the federal or state government. Section 1399-*ll* (2)  provides, in turn:

> It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in [§ 1399-*ll*(1)]. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in [§ 1399-*ll*(1)]….

97.     UPS knew that it was transporting cigarettes to homes or residences as reflected in the "package release location" of its delivery reports for the smoke shops, describing the drop-off points as "residential," "front porch," or "side porch."

98.     By knowingly transporting cigarettes to persons other than those designated as permissible recipients of cigarette deliveries, UPS repeatedly violated N.Y. PHL § 1399-*ll*.

99.     Such violations constitute repeated and persistent illegality in violation of N.Y. Exec. L. § 63(12).

### Allegations Related to the AOD

100.    Pursuant to the AOD, UPS agreed not to violate N.Y. PHL § 1399-*ll*.  (AOD ¶ 17)

101.    Pursuant to the AOD, UPS agreed to "audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so." (AOD ¶ 24)

102.    In this context, "audit" means, at the least, to open and inspect the contents of the next package(s) proffered by a shipper that UPS had a reasonable basis to believe may have been tendering Cigarettes for delivery to Individual Consumers.

103.    Pursuant to the AOD, UPS agreed to maintain a "Tobacco Shipper Database" with specified components. (AOD ¶ 25)

104.    Pursuant to the AOD, UPS agreed to provide continuing compliance training, with specified components, to various types of its employees.  (AOD ¶¶ 34-37)

105.    As set forth above, UPS violated N.Y. PHL § 1399-*ll* tens of thousands of times subsequent to the AOD.

106.    As set forth above, subsequent to the AOD, UPS made tens of thousands of individual shipments for shippers it had a reasonable basis to believe may have been tendering Cigarettes for delivery to Individual Consumers, without conducting the required audit prior to delivering each such shipment.

107.     Subsequent to the AOD, UPS repeatedly failed to provide accurate, updated, and timely supplementation required to maintain the required Tobacco Shipper Database.

108.     Subsequent to the AOD, UPS repeatedly failed to provide accurate, updated, and timely compliance training to its employees.

109.     Each of these instances constitutes a separate violation of the AOD.

**FIRST CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 2341** *et seq.*

110.     The City realleges paragraphs 1 through 109 above as if fully set forth herein.

111.     At all times relevant to this complaint, by providing delivery services to each smoke shop and other delivery sellers whose identity is not known to the City at this time, defendant UPS knowingly received, shipped, transported, and/or distributed more than 10,000 cigarettes that were found in New York City not bearing the New York State and City cigarette tax stamps required by Ad. Code § 11-1302(e), all in violation of 18 U.S.C. § 2342(a).

112.     As a direct result of the foregoing violations of the CCTA, the City has suffered damages in an amount to be determined at trial, but no less than the total value of each $1.50 City excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York City.

**SECOND CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 2341** *et seq.*

113.     The State realleges paragraphs 1 through 109 above as if fully set forth herein.

114.     At all times relevant to this complaint, by providing delivery services to each smoke shop and other delivery sellers whose identity is not known to the State at this time, defendant UPS knowingly received, shipped, transported, and/or distributed more than 10,000 cigarettes that were found in New York State not bearing the New York State cigarette tax

stamps required by N.Y. Tax L. § 471 all in violation of 18 U.S.C. § 2342(a).

115.     As a direct result of the foregoing violations of the CCTA, the State has suffered damages in an amount to be determined at trial, but no less than the total value of each State excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York State.

### THIRD CLAIM FOR RELIEF

### Violation of § 1962(c)

116.     The City realleges paragraphs 1 through 109 above as if fully set forth herein.

117.     New York City is a "person" as defined in 18 U.S.C. § 1961(3).

118.     UPS is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

119.     Each Cigarette Dealer Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and each enterprise engages in and its activities have an effect on interstate commerce.

120.     UPS is associated with each Cigarette Dealer Enterprise and has participated directly and indirectly in the conduct of the affairs of each enterprise through a pattern of racketeering activity, in the form of multiple, related acts of contraband cigarette trafficking, in violation of 18

 U.S.C. § 2341 *et seq.*

121.     The predicate acts of contraband cigarette trafficking constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B). Each Cigarette Dealer Enterprise engaged in thousands of instances of contraband cigarette trafficking of the type identified in paragraphs 31-35 herein. The Enterprise's acts are connected to one another as part of a scheme to accomplish a uniform purpose, *i.e.*, profiting from the sale and delivery of unstamped cigarettes into New York City and elsewhere. The repeated nature of the conduct during the period of the scheme makes the acts continuous.

122.    The City of New York has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than the total value of each $1.50 City excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York City.

## FOURTH CLAIM FOR RELIEF

### Violation of § 1962(c)

123.    The State realleges paragraphs 1 through 109 above as if fully set forth herein.

124.    New York State is a "person" as defined in 18 U.S.C. § 1961(3).

125.    UPS is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

126.    Each Cigarette Dealer Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and each enterprise engages in and its activities have an effect on  interstate commerce.

127.    UPS is associated with each Cigarette Dealer Enterprise and has participated directly  and  indirectly  in  the  conduct  of  the  affairs  of  each  enterprise  through  a  pattern  of racketeering  activity, in the form of multiple, related acts of contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq*.

128.    The  predicate  acts  of  contraband  cigarette  trafficking  constitute  a  pattern  of unlawful  activity  within  the  meaning  of  18  U.S.C. § 1961(1)(B). Each Cigarette Dealer Enterprise  engaged  in  thousands  of  instances  of  contraband  cigarette  trafficking  of  the  type identified in  paragraphs 31-35 herein. The Enterprise's acts are connected to one another as part of  a  scheme  to  accomplish  a  uniform  purpose,  *i.e*.,  profiting  from  the  sale  and  delivery  of unstamped  cigarettes  into  New  York  State  and  elsewhere.  The  repeated  nature  of  the  conduct during  the  period of the scheme makes the acts continuous.

129.   New York State has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than the total value of each State excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York State.

## FIFTH CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1962(d)

130.   The City realleges paragraphs 1 through 109 above as if fully set forth herein.

131.   New York City is a "person" as defined in 18 U.S.C. § 1961(3).

132.   UPS is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(d).

133.   Each Cigarette Dealer Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and each enterprise engages in and its activities have an effect on interstate commerce.

134.   UPS is associated with each Enterprise and agreed that the affairs of each Enterprise would be conducted through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), to wit, multiple and repeated acts of contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq.*

135.   UPS and the associates of each Cigarette Dealer Enterprise conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) in that these Enterprise associates agreed among themselves to conduct the affairs of each Enterprise through a pattern of racketeering activity by furthering or facilitating endeavors of the Enterprise that, when completed, would satisfy all of the elements of a criminal offense, to wit, contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq.*

136.     With knowledge that each Cigarette Dealer Enterprise engaged in multiple and repeated acts of contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq.*, UPS agreed with Enterprise associates to conduct the affairs of each Enterprise in a manner that would facilitate the acts of each Cigarette Dealer Enterprise, by providing delivery and package  tracking services to the Cigarette Dealer Enterprise, and lead to the success of the scheme to traffic  contraband cigarettes into New York City and elsewhere.

137.     The scheme to traffic contraband cigarettes into New York City and elsewhere constitutes a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B). The predicate acts are both related and continuous. The acts are connected to one another as part of a scheme to accomplish a uniform purpose, which is profiting from the sale of unstamped  cigarettes in New York City and elsewhere. The repeated nature of the conduct during the period  of the scheme makes the acts continuous.

138.     The City of New York has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but no less than the total value of each $1.50 City excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York City.

## SIXTH CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1962(d)

139.     The State realleges paragraphs 1 through 109 above as if fully set forth herein.

140.     New York State is a "person" as defined in 18 U.S.C. § 1961(3).

141.     UPS is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(d).

142.    Each smoke shop is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and each enterprise engages in and its activities have an effect on interstate commerce.

143.    UPS is associated with each Enterprise and agreed that the affairs of each Enterprise would be conducted through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5 and 1962(c), to wit, multiple and repeated acts of  contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq.*

144.    UPS and the associates of each Cigarette Dealer Enterprise conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) in that these Enterprise associates agreed among themselves to conduct the affairs of each Enterprise through a pattern of racketeering activity by furthering or facilitating endeavors of the Enterprise that, when completed, would satisfy all of the elements of a criminal offense, to wit, contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq*.

145.    With knowledge that each Cigarette Dealer Enterprise engaged in multiple and repeated acts of contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq.*, UPS agreed with Enterprise associates to conduct the affairs of each Enterprise in a manner that would facilitate the acts of each Cigarette Dealer Enterprise, by providing delivery and package tracking services to the Cigarette Dealer Enterprise, and lead to the success of the scheme to traffic  contraband cigarettes into New York State and elsewhere.

146.    The scheme to traffic contraband cigarettes into New York State and elsewhere constitutes a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B). The predicate acts are both related and continuous. The acts are connected to one another as part of a scheme to accomplish a uniform purpose, which is profiting from the sale of unstamped

cigarettes in New York State and elsewhere. The repeated nature of the conduct during the period of the scheme makes the acts continuous.

147.     New York State has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but no less than the total value of each State excise tax stamp that was required to have been affixed to every carton of cigarettes that defendant UPS shipped, transported and/or distributed in or into New York State.

## SEVENTH CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 376a(e)(2) – Civil Penalties

148.     The City realleges paragraphs 1 through 109 above as if fully set forth herein.

149.     The AOD is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

150.     Pursuant to 15 U.S.C. § 376a(e)(2)(A), "no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the [ATF Non-Compliant list]," with exceptions not relevant here.

151.     Since 2010, the ATF has maintained a list of non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits.

152.     Since 2010, UPS has delivered thousands of packs of cigarettes on behalf of non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, in violation of the PACT Act.

153.     UPS knew or should have known that such non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, were listed on the ATF's Non-Compliant List.

154.     For each such delivery made in violation of the PACT Act, UPS is liable to the  City for civil penalties in the amount of $2,500 in the case of a first violation, and $5,000 for any  violation within one year of a prior violation.

## EIGHTH CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 376a(e)(2) – Civil Penalties

155.     The State realleges paragraphs 1 through 109 above as if fully set forth herein.

156.     The AOD is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

157.     Pursuant to 15 U.S.C. § 376a(e)(2)(A), "no person who delivers cigarettes or  smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete  its portion of a delivery of any package for any person whose name and address are on the [ATF  Non-Compliant list]," with exceptions not relevant here.

158.     Since 2010, the ATF has maintained a list of non-compliant PACT Act delivery  sellers, such as Indian Smokes and Smokes-Spirits.

159.     Since 2010, UPS has delivered thousands of packs of cigarettes on behalf of non-  compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, in violation of  the PACT Act.

160.     UPS knew or should have known that such non-compliant PACT Act delivery  sellers, such as Indian Smokes and Smokes-Spirits, were listed on the ATF's Non-Compliant  List.

161.     For each such delivery made in violation of the PACT Act, UPS is liable to the  State for civil penalties in the amount of $2,500 in the case of a first violation, and $5,000 for  any violation within one year of a prior violation.

## NINTH CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 376a(e)(2) – Damages

162.     The City realleges paragraphs 1 through 109 above as if fully set forth herein.

163.     The AOD is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

164.     Pursuant to 15 U.S.C. § 376a(e)(2) "no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the [ATF Non-Compliant list], with exceptions not relevant here.

165.     Since 2010, the ATF has maintained a list of non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits.

166.     Since 2010, UPS has delivered thousands of packs of cigarettes on behalf of non- compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, in violation of  the PACT Act.

167.     UPS knew or should have known that such non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, were listed on the ATF's Non-Compliant  List.

168.        As a direct result of the foregoing violations of the PACT Act, specifically UPS's  failure to comply with 15 U.S.C. § 376a(e)(2), the City has suffered damages in an amount to be  determined at trial, but no less than the total value of each $1.50 City excise tax stamp that was  required to have been affixed to each pack of cigarettes that defendant UPS unlawfully  distributed in or into New York City.

## TENTH CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 376a(e)(2) – Damages

169.    The State realleges paragraphs 1 through 109 above as if fully set forth herein.

170.    The AOD is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

171.    Pursuant to 15 U.S.C. § 376a(e)(2) "no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the [ATF Non-Compliant list], with exceptions not relevant here.

172.    Since 2010, the ATF has maintained a list of non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits.

173.    Since 2010, UPS has delivered thousands of packs of cigarettes in New York State on behalf of non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, in violation of the PACT Act.

174.    UPS knew or should have known that such non-compliant PACT Act delivery sellers, such as Indian Smokes and Smokes-Spirits, were listed on the ATF's Non-Compliant List.

175.    As a direct result of the foregoing violations of the PACT Act, specifically UPS's failure to comply with 15 U.S.C. § 376a(e)(2), the State has suffered damages in an amount to be determined at trial, but no less than the total value of each State excise tax stamp that was required to have been affixed to each pack of cigarettes that defendant UPS unlawfully distributed in or into New York State.

## ELEVENTH CLAIM FOR RELIEF

### Violation of N.Y. PHL § 1399-ll

176.     The City realleges paragraphs 1 through 109 above as if fully set forth herein.

177.     The AOD is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

178.     N.Y. PHL § 1399-*ll* provides that it "shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be [an unauthorized recipient]," with the presumption that the deliveries are known to be to an unauthorized recipient when made to a home or residence.

179.     Since 2010, UPS has knowingly made tens of thousands of deliveries of cigarettes  to unauthorized recipients, including to homes and residences, in New York City, in violation of N.Y. PHL § 1399-*ll*. A person who violates the provisions of §1399-*ll* "shall be subject to a civil  penalty not to exceed the greater of (a) five thousand dollars for each such violation or (b) one  hundred dollars for each pack of cigarettes shipped, caused to be shipped  or transported in  violation of such subdivision."

180.     For each such delivery of cigarettes made by UPS to an unauthorized recipient,  including to a home or residence, in New York City, UPS is liable to the City for a civil penalty  of five thousand dollars per delivery.

## TWELFTH CLAIM FOR RELIEF

### Violation of N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll

181.     The State realleges paragraphs 1 through 109 above as if fully set forth herein.

182.     The AOD is not recognized throughout the United States to block illegal  deliveries of cigarettes or smokeless tobacco to consumers.

183.     N.Y. PHL § 1399-*ll* provides that it "shall be unlawful for any  common or

contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be [an unauthorized recipient]," with the presumption that the deliveries are known to be to unauthorized recipients when made to a home or residence.

184.    Since 2010, UPS has knowingly made tens of thousands of deliveries of cigarettes to unauthorized recipients, including to homes or residences, in New York State, in violation of N.Y. PHL § 1399-*ll*. A person who violates the provisions of §1399-*ll* "shall be subject to a civil penalty not to exceed the greater of (a) five thousand dollars for each such violation or (b) one hundred dollars for each pack of cigarettes shipped, caused to be shipped or transported in violation of such subdivision."

185.    By shipping and transporting cigarettes to persons within New York State, UPS has repeatedly and persistently violated N.Y. PHL 1399-*ll*, and thus has engaged in repeated and persistent illegality in violation of N.Y. Executive Law § 63(12).

186.    For each such delivery of cigarettes made by UPS to an unauthorized recipient, including to a home or residence, in New York State, UPS is liable to the State for a civil penalty of five thousand dollars per delivery.

## THIRTEENTH CLAIM FOR RELIEF

### Violation of the AOD

187.    The State realleges paragraphs 1 through 109 above as if fully set forth herein.

188.    On October 21, 2005, UPS entered into an AOD, which required UPS among other things, to: (1) comply with N.Y. PHL § 1399-*ll*, which prohibits delivery of cigarettes except to specific authorized persons, by ceasing all such deliveries; (2) audit any shipper it had a "reasonable basis to believe…may [have been] tendering Cigarettes for delivery to Individual Consumers"; (3) maintain a "Tobacco Shipper Database" with specified components; and (4) provide continuing compliance training, with specified components, to various types of its

employees.

189.     Per the AOD, UPS agreed to pay the State a stipulated penalty of $1,000 for each and every later violation of the AOD, provided, however, that no penalty would be imposed if i)  the violation involved a shipment of cigarettes to an unauthorized recipient outside the State of New York, or ii) the violation involved the shipment of cigarettes to an unauthorized recipient  within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a prohibited shipment.

190.     Following the effective date of the AOD, UPS nonetheless proceeded to make thousands of shipments of cigarettes to unauthorized recipients within the State of New York, in violation of the AOD.

191.     UPS has furthermore failed to establish to the Attorney General's reasonable satisfaction that UPS did not know, and had no reason to know, that these shipments were prohibited.

192.     Following the effective date of the AOD, UPS also accepted tens of thousands of packages for delivery from shippers it had a "reasonable basis to believe…may [have been] tendering Cigarettes for delivery to Individual Consumers," without conducting audits of those shippers prior to accepting and delivering said packages.

193.     Following the effective date of the AOD, UPS failed to maintain a Tobacco Shipper Database that included accurate and timely information relating to the components identified in the AOD.

194.     Following the effective date of the AOD, UPS failed to provide continuing compliance training as called for by the AOD.

195.     UPS is liable to pay the State a $1,000 penalty for each instance of the following violations of the AOD: (1) prohibited shipments of cigarettes to individual consumers; (2) shipments made, without audit, for customers that UPS had "reasonable basis to believe…may [have been] tendering Cigarettes for delivery to Individual Consumers"; (3) failures to maintain a Tobacco Shipper Database; and (4) failures to provide continuing compliance training.

## FOURTEENTH CLAIM FOR RELIEF

### Injunctive Relief and Appointment of a Monitor

196.     The City and State reallege paragraphs 1 through 109 above as if fully set forth herein.

197.     The City and State are likely to succeed on the merits of their claims that UPS is  in violation of the CCTA, the PACT Act, N.Y. Exec. L. § 63(12), and N.Y. PHL § 1399-*ll*.

198.     The City and State have no adequate remedy at law, in that UPS has shown itself  unable or unwilling to comply voluntarily with the AOD entered into with the Attorney General,  and  has  been unable  or  unwilling  to cease  conduct  that  injures  the  health  and safety  of  a  considerable  number  of  persons,  and  accordingly cannot  be  remedied  by  the payment of money  damages.

199.     The Court should accordingly i) enjoin UPS pursuant to 18 U.S.C. § 2346(b)(1)  from  knowingly  shipping,  transporting,  receiving,  possessing,  or  distributing contraband  cigarettes as that term is  defined in the CCTA; (ii) enjoin UPS pursuant to 15 U.S.C. § 378(c)(1)(A) from shipping any cigarettes that do not comply with the PACT Act's labeling

requirement and from shipping for any shipper listed on the ATF's list of non-compliant delivery-sellers; iii) enjoin UPS pursuant to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-*ll* from delivering any cigarettes to any unauthorized recipient within the State of New York; and iv)

appoint a Special Master to assure UPS's compliance with each of the above statutes, and with the AOD entered into by UPS with the Attorney General, and to provide training and monitoring to UPS to ensure compliance.

**WHEREFORE**, the State and City respectfully pray that the Court grant judgment against defendant as follows:

a.  On the First Claim For Relief, award the City—

    i.  Damages in an amount equal to the cost of a City tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York City in violation of 18 U.S.C. § 2341 *et seq*.;

    ii.  Civil penalties against UPS, as provided for in 18 U.S.C. § 2341 *et seq*., as measured by the penalty amount specified in 15 U.S.C. § 377(b)(1)(b);

b.  On the Second Claim For Relief, award the State—

    i.  Damages in an amount equal to the cost of a State tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York State in violation of 18 U.S.C. § 2341 *et seq*.;

    ii.  Civil penalties against UPS, as provided for in 18 U.S.C. § 2341 *et seq*., as measured by the penalty amount specified in 15 U.S.C. § 377(b)(1)(b);

c.  On the Third and Fifth Claims For Relief, award the City treble damages, measured by the cost of a City tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York City in violation of 18 U.S.C. § 1962(c) and (d);

d.      On the Fourth and Sixth Claims For Relief, award the State treble damages, measured by the cost of a State tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York State in violation of 18 U.S.C. § 1962(c) and (d);

e.      On the Seventh Claim for Relief, award the City a civil penalty, as specified in 15 U.S.C. § 377(b)(1)(b), for UPS's violation of 15 U.S.C. § 376a(e)(2);

f.      On the Eighth Claim for Relief, award the State a civil penalty, as specified in 15 U.S.C. § 377(b)(1)(b), for UPS's violation of 15 U.S.C. § 376a(e)(2);

g.      On the Ninth Claim for Relief, award the City damages in an amount equal to the cost of a City tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York City in violation of 15 U.S.C. § 376a(e)(2);

h.      On the Tenth Claim for Relief, award the State damages in an amount equal to the cost of a State tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York State in violation of 15 U.S.C. § 376a(e)(2);

i.      On the Eleventh Claim for Relief, award the City a civil penalty under New York Public Health Law section 1399-*ll* in the amount of $5,000 for each UPS delivery of cigarettes made in the City in violation of that section;

j.      On the Twelfth Claim for Relief, award the State a civil penalty under New York Executive Law section 63(12) and New York Public Health Law section 1399-*ll* in the amount of $5,000 for each UPS delivery of cigarettes made in the State in violation of that section;

47

k.      On the Thirteenth Claim for Relief, award stipulated penalties to the State in the amount of $1,000 for each violation of the AOD;

l.      On the Fourteenth Claim for Relief, issue an injunction pursuant to 15 U.S.C. § 378(c)(1)(A), 18 U.S.C. § 2346(b)(1) and New York Executive Law section 63(12) and New York Public Health Law section 1399-*ll*, enjoining and restraining UPS from shipping any unstamped packs of cigarettes, and/or from shipping any packs of cigarettes to any unauthorized recipient in the State of New York, and/or from delivering any cigarettes in which the packages are not labeled in compliance with the PACT Act or for shippers that are listed on the ATF's list of non-compliant delivery-sellers, and appointing a Special Master to provide training and monitoring to ensure compliance with these statutes;

m.      Award the City its attorneys' fee, pursuant to 18 U.S.C. § 1964(c);

n.      Award the State its attorneys' fees, pursuant to 18 U.S.C§ 1964(c); and

o.      Award such other and further relief as the Court may deem appropriate.

Dated:    New York, New York
          February 24, 2016

                                        ERIC T. SCHNEIDERMAN
                                        Attorney General of the State of New York


                                        By: _____/s/_____

                                                Dana Biberman (DB 9878)
                                                 Chief, Tobacco Compliance Bureau
                                                Christopher K. Leung (CL 1688)
                                                John Oleske (JO 0995)
                                                Assistant Attorneys General
                                                120 Broadway, 3rd Floor
                                                New York, New York 10271
                                                Tel.: 212-416-6699
                                                Dana.Biberman@ag.ny.gov
                                                Christopher.Leung@ag.ny.gov
                                                John.Oleske@ag.ny.gov

                                        *Attorneys for Plaintiff State of New York*


                                        ZACHARY W. CARTER
                                        Corporation Counsel of the City of New York


                                        By: _____/s/_____

                                                Eric Proshansky (EP 1777)
                                                Lilia Toson (LT 4727)
                                                Assistant Corporation Counsel
                                                100 Church Street, Room 20-99
                                                New York, New York 10007
                                                Tel.: 212-356-2032
                                                EProshan@law.nyc.gov
                                                LToson@law.nyc.gov

                                        *Attorneys for Plaintiff City of New York*