# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK,<br><br>         Plaintiffs,<br><br>      -v-<br><br>UNITED PARCEL SERVICE, INC.,<br>         Defendant. | 15 Civ. 1136 (KBF)<br><br>**ECF CASE** |

## DECLARATION OF MOHAMMAD AZAM

MOHAMMAD AZAM, under penalty of perjury, declares as follows:

  1.  I am a Certified Public Accountant (inactive). I currently serve as Vice President — Corporate Internal Audit, Compliance & Ethics at UPS. I have personal knowledge of the facts set forth in this declaration, which I submit as my direct testimony in this case.

**A.  Background**

  2.  As Vice President — Corporate Internal Audit, Compliance & Ethics at UPS, I am responsible for global audit, compliance, and ethics-related activities for UPS, and I oversee the Enterprise Risk Management (ERM) process for UPS. As the Chief Audit Executive of UPS, I report functionally to the Audit Committee of UPS's Board of Directors and administratively to the Chief Financial Officer of UPS.

  3.  I have worked for UPS in various capacities for the last 14 years. I worked as Corporate Controller for UPS Supply Chain Solutions from 2002-2006, Internal Audit — Group Manager at UPS from 2007-2009, Controller — International Region from 2009-2010, Global

sf-3681841

F&A Process Controller in 2011, and I have held my current role as Vice President — Corporate Internal Audit, Compliance & Ethics since 2012.

4. Before working for UPS, I held senior finance positions with several large multi-national organizations including Ford Motor Company, Dole Packaged Foods, and Mellon Bank (now known as Bank of New York Mellon). Before that, I obtained public accounting experience working for KPMG. I earned a Bachelor of Arts degree in accounting and a Master of Business Administration degree in Finance, both from Golden Gate University.

### B.   UPS's Compliance with Tobacco Regulations

5. When I assumed my current post as Vice President — Corporate Internal Audit, Compliance & Ethics in 2012, I reviewed UPS's then- existing approach to various compliance issues, including its approach to complying with tobacco regulations. At the time, UPS's compliance program was based largely on the program that was set out in UPS's Assurance of Discontinuance with the New York Attorney General ("AOD").

6. Based on my review at the time, I concluded that UPS remained in compliance with its obligations under the AOD. I did not see any reason to believe that the program was ineffective: during my review, I learned that between the signing of the AOD in 2005 and the City and State's approach to UPS in the fall of 2013, the State had only identified for UPS two instances of a shipper violating UPS's tobacco policy (in February 2011 and February 2012), and under the AOD we took appropriate action against the shippers at issue. Neither the State of New York nor the City of New York had ever identified any issue suggesting that UPS's compliance program was ineffective.

7. Over the next year, as I settled in to my role as Vice President — Corporate Internal Audit, Compliance & Ethics, I began to focus on customer compliance. By that I mean strengthening UPS's processes concerning customers' compliance with UPS policies, not just for

tobacco shipments but for all regulated goods. Historically, UPS's Tariff and Terms and Conditions have imposed on our customers the obligation to comply with applicable laws governing their shipments. I sought to re-focus our compliance effort to emphasize, to customers at risk of violating UPS policy, the importance of compliance with UPS policy, and to help them comply with it.

8.  My effort to re-focus compliance included enhancing UPS's measures for reinforcing customers' compliance with its tobacco policy. Through my work with the Compliance & Ethics Group and with UPS's Dangerous Goods Group, led by Brad Cook, we developed a series of enhancements that UPS rolled out in 2014 with a further review following in 2016.

C.  **2014 Compliance Enhancements**

9.  The 2014 enhancements to UPS's compliance program focused on the following:

- Tobacco Customer Contracts
- New Account Setup
- Communication & Training
- Customer Analytics
- UPS Help Line Process
- Management Oversight & Internal Audit

10. I detailed this program to counsel for both the State and City of New York in meetings in February 2014 and in October 2014. I am attaching the slide presentations I used in those discussions as Exhibits DX 280 and DX 355, respectively. The presentations include the detail about the enhancements, which I also summarize below.

3

sf-3681841

1. **Customer Contracts**

11. UPS added two key provisions to the existing Tobacco Agreement:

- "Shipper shall develop, implement, and maintain a compliance program ('Shipper Compliance Program') to ensure that Shipper and its consignees are compliant with all laws and regulations that apply to the sale, purchase, shipment, transportation, delivery, receipt, possession, distribution, and importation of Tobacco Products."

- "UPS shall have the right to demand from Shipper evidence that Shipper has complied with all applicable laws and regulations. UPS shall also have the right to audit Shipper at any time and for any reason."

12. UPS distributed a compliance reminder letter to known tobacco shippers in New York. The letter emphasized the customer's responsibility to comply with local, state, and federal laws.

13. The tobacco shipper list was developed from data analytics, and queries to the sales force.

2. **New Account Set Up**

14. UPS distributed a Sales Preclearance Memo to New York Sales and Marketing teams. The memo: explained that preclearance was required prior to opening any tobacco-related account; and provided employees with the UPS Help Line number they could call to share information or concerns.

15. UPS's pre-clearance investigation of potential tobacco accounts in New York now includes: a web search concerning the customer, a review of the customer's website, if any, a review of the customer's own compliance program, and a review of the PACT Act non-compliant list.

4

### 3. Communication and Training

16. UPS distributed a Pre-work Communication Meeting ("PCM") and Memorandum to all of the operations centers in New York. The memos introduced the Tobacco Compliance Program Enhancements detailed above. The PCM also asked drivers and others to look out for "Red Flags," as displayed on a poster that was posted in all New York facilities. The memos also asked employees to call in any suspicious activity to the UPS Help Line.

17. UPS also distributed a Sales Employee Preclearance Memorandum, which provides the sales force with the information set out above concerning UPS's new pre-clearance procedures for opening any potential tobacco account.

18. And UPS distributed an additional communication memo to UPS Management concerning these new enhancements.

### 4. Customer Analytics

19. UPS now completes weekly and monthly data queries concerning potential tobacco accounts, looking at high-risk zip codes, package characteristics (such as size, weight, and volume), a name search for words such as "tobacco," "smoke" and "cig," and web research on potential tobacco accounts (including searches of the customer's name, address, phone number to determine if there are any matches with current or previous tobacco accounts), as well as a review of a customer's social media advertisements.

### 5. UPS Help Line Process

20. As noted, UPS's communications to employees about these enhancements included encouraging employees to share information or concerns through UPS's Help Line. UPS developed a call script to handle any such calls. Any calls are traceable to centers (though employees can choose to remain anonymous). Resolution of any issues or concerns raised through the Help Line is required. Documents concerning any such calls are retained.

5

### 6. Management Oversight and Internal Audit

21. Finally, UPS added more management oversight to its tobacco policy compliance program. A manager in the Compliance & Ethics Group now completes a monthly review of the tobacco policy compliance procedures with me. During that review, I expect a summary of any investigations, and an update on the status of these enhancements.

22. I have also ensured that the Compliance & Ethics Group conducts periodic reviews of the tobacco compliance program, including audits of at-risk areas.

23. In the October 2014 presentation I gave to the City and State, I shared the results of the compliance enhancements in 2014:

- Compliance Letters To Customers — 49
- Communications to Operations — 77
- Data Analytic Evaluations — 200
- Contact Made With Customers Requesting Additional Detail — 18
- Accounts Cancelled — 8

24. Some of the accounts UPS cancelled as a result of these compliance enhancements—about which we told the City and State in our discussions before this lawsuit—were included in the complaint plaintiffs ultimately filed against UPS. These include Big Buffalo, Cloud & Co, Lake Erie Tobacco, EExpress, Two Pines, Fow, Smokes & Spirits, and Shipping Services. (Those shippers were not included in the draft complaint plaintiffs shared with UPS in the fall of 2013, but were later included in the complaint they ultimately filed—after UPS shared information with plaintiffs about those shippers.) In other words, plaintiffs rewarded UPS for enhancing its compliance program and for sharing information with them by seeking further damages from UPS.

D.    **2016 Compliance Review**

25.    In April 2016, UPS's Compliance & Ethics and Dangerous Goods functions conducted a tobacco compliance review in UPS's operations centers in New York. The goal was to ensure that the facilities were following UPS tobacco compliance processes. The review was conducted in UPS's centers in Olean, Syracuse, Rome, Dunkirk, Niagara Falls, Jamestown, Batavia, Buffalo, Potsdam and Lockport, New York—centers we deemed to have a high risk of providing service to potential tobacco shippers.

26.    The review was conducted by Derrick Niemi, Jeff Cantrell, and Sean Devine from the Compliance & Ethics Group, and Brad Cook from the Dangerous Goods group.

27.    As part of their review, Messrs. Niemi, Cantrell, Devine, and Cook focused on the following issues:

- Delivering the PCM concerning UPS's tobacco policy to drivers in each center;

- Training the Center Management Team concerning UPS's tobacco policy;

- Training the sales team in each center concerning UPS's tobacco policy;

- Conducting "ride-alongs" with drivers in each center, to emphasize UPS's training messages and to learn about any potential tobacco shippers on a driver's route;

- Training the PM Operations team (the team that sorts and loads packages for distribution through UPS's network) concerning UPS's tobacco policy;

- Ensuring that UPS's "red flags" tobacco poster was posted in each center in a visible location; and

- Reviewing UPS's customer counters at each center to ensure that the counter clerks understood UPS's tobacco policy and were enforcing it.

28.     Messrs. Niemi, Cantrell, Devine, and Cook reported the results of their review to me in May 2016. As the head of Corporate Internal Audit, Compliance & Ethics for UPS, I was fully satisfied with the results of their review.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: Atlanta, GA
       August 26, 2016

Mohammad Azam

8

sf-3681841