# Exhibit 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK,<br><br>                    Plaintiffs,<br><br>            -v-<br><br>UNITED PARCEL SERVICE, INC.,<br>                    Defendant. | 15 Civ. 1136 (KBF)<br><br>ECF CASE |

DECLARATION OF BRADLEY J. COOK

I, BRADLEY J. COOK, under penalty of perjury, declare as follows:

1.　　I am employed by United Parcel Service, Inc. ("UPS") as the Director of

Dangerous Goods, as well as the Director of Package Solutions.  I have been the UPS Director of

Dangerous Goods since 1998.  One of my responsibilities as the Director of Dangerous Goods is

to work to ensure that UPS customers comply with laws and regulations concerning the

transportation of certain goods that are subject to state or federal regulation, such as tobacco

products, firearms and alcoholic beverages.  I have personal knowledge of the facts set forth

below, and when called as a witness, I will affirm under oath that they are true.

**<u>My Background</u>**

2.　　I graduated from the University of Wisconsin-Stout in 1987, with a Bachelor's

degree in Industrial Technology, and a concentration in Packaging.  After I graduated, I became

employed on a full time basis with UPS in June of 1987 as a Package Car Driver.  After two

months I was promoted into management where I spent time in industrial engineering, sales and

operations.

1

3.      In 1992, I was transferred to Danbury, Connecticut as part of UPS Corporate and took over the management of our packaging test labs throughout the country as the Packaging Systems Manager.  I continued in that position through 1997, when our Corporate headquarters relocated to Atlanta, Georgia.

4.      In 1998, UPS developed a comprehensive hazardous materials compliance program and created the position of Director of Dangerous Goods.  The position was created to address customer issues involved with the shipment of hazardous materials (the term "dangerous goods" is used internationally and is synonymous with the term hazardous materials as we use it in the United States).  Since packaging and the prevention of spills and incidents was a primary goal of the compliance program, the organization felt my experience as the Packaging Systems Manager was an appropriate background for the position.  I became Director of Dangerous Goods when the position was created and have held that position since 1998.

5.      When I began the position in 1998 I had one administrative person for support. As the management of our compliance program presented additional challenges, UPS provided me with additional resources to the point that I now have five managers, two supervisors, and one specialist as part of my dangerous goods team.

6.      As Director of Dangerous goods, I have overall responsibility for UPS's policies and procedures regarding the handling of dangerous goods.  The position requires me to work closely with UPS's Corporate Compliance Department and Corporate Legal Department. The position has grown to include certain additional regulated goods as the need to address the shipment of other types of goods has arisen.  At UPS we have used the term "regulated goods" to identify products that may not necessarily be hazardous but have some type of regulatory oversight.  Examples of the types of goods that fall within the ambit of UPS regulated goods are

alcoholic beverages, firearms, ammunition, tobacco products, live animals, pharmaceuticals and biological materials. My group has supported the development of the policies and procedures UPS leverages to prevent the shipment of unlawful goods.

7.      I have been very involved in UPS's efforts to address the unlawful shipment of cigarettes since at least 2003, when several states (including New York) began to enact and enforce statutes prohibiting the shipment of cigarettes to consumers.  I worked closely with a cross-functional team in developing our shipping policy prohibiting the shipment of cigarettes to consumers, in developing the training for our workforce regarding those policies and in the continued enforcement of our policies regarding the shipment of not only cigarettes but also other tobacco products over time as our policy has evolved.

**Summary of Testimony**

8.      I am the UPS employee who has been most directly responsible for UPS's compliance with the Assurance of Discontinuance entered into between UPS and the State of New York on October 21, 2005 (the "AOD").

9.      In 2003, when New York and other states began to regulate the delivery of cigarettes to consumers, UPS asked me to take responsibility for implementing and managing UPS's policy regarding the shipment of tobacco products, including cigarettes.  This was a natural extension of my existing role as Director of Dangerous Goods, because my group already managed the customer compliance program for the shipment of hazardous materials/dangerous goods and alcoholic beverages.

10.      Identifying UPS customers that ship specific commodities is challenged by the fact that no UPS customer informational system captures the type of goods that a customer generally ships.  And with very few exceptions not relevant here, customers do not enter the type

of goods being shipped when they tender specific shipments to UPS (there is no field on a shipping record or in a UPS electronic shipping system to capture this information). Therefore when we created our first tobacco policy in 2003, we did not have a list or any ready way to identify which of our customers nationwide were involved in the shipment of tobacco products.

11.     Accordingly, in 2003 I led an extensive project to try to identify all of our tobacco shippers throughout the United States, through a variety of means including account name searches, use of standard industry codes and inquiry of our employees. In 2003 and then again in 2005 we contacted all of our known tobacco shippers to advise them of our restrictions on the shipment of tobacco products, and in particular on cigarettes to consumers. We also trained our employees, including account executives, drivers, center employees (such as sorters) and customer service representatives regarding our policy against the shipment of cigarettes to consumers. And although we were not required to do so by the AOD, we prohibited shippers from making *any* kind of tobacco shipment to consumers, unless the shipper signed an approved UPS Agreement for the Transportation of Tobacco Products. We felt that that was the best way to identify any new shippers, on an ongoing basis, that intended to ship tobacco products to consumers and to track the universe of shippers tendering packages of tobacco products for shipment to consumers.

12.     We did not prohibit the shipment of all tobacco products when we changed our Tobacco Policy as of the effective date of the AOD, because the AOD did not address any products other than cigarettes. Shippers were still permitted to ship tobacco products other than cigarettes to consumers, including loose tobacco, regular cigars and "little cigars" or "filtered cigars." New York and other states treat cigarettes different than other tobacco products. New York, for example, defines a "cigarette" as tobacco wrapped in paper. Under New York law

(and the law of most states I believe), cigarettes are required at least in some circumstances to bear tax stamps, and are not permitted to be shipped to consumers. Other tobacco products, however, can typically be shipped to consumers, and are not required to bear stamps.

13.     From the time we entered into the AOD with the State of New York until now, we have put an enormous amount of time, effort and expense into complying with the AOD to try to reduce the possibility that cigarettes will be sent through our system to consumers. We added a position in my department specifically to oversee both tobacco and alcohol compliance (wine shipping began to increase significantly in 2005, as a result of a landmark U.S. Supreme Court decision), and created regional positions to help administer our policies on a local basis.

14.     We hired an outside firm to conduct internet searches on a quarterly basis to try to identify any online retailers that might be using UPS to ship cigarettes to consumers. We conducted these searches from November 2005 until July 2010, at least a year longer than required by the AOD and more than two years after the outside firm was able to locate a potential violator. We maintained a dedicated database with all identified tobacco shippers so that we could track our tobacco shippers. We continued to train our employees regarding our Tobacco Policy, and continued to advise all shippers on a nationwide basis that they could not ship cigarettes to consumers under any circumstances. I believe that our policy regarding the shipment of cigarettes is and was extremely well known by our workforce, particularly in the State of New York. We audited where we suspected a potential violation and disciplined or terminated shippers when we discovered an actual violation. We have also continuously enhanced our compliance procedures, as explained further below, based on changes in circumstances, available new technology and "lessons learned."

15.     In addition to all of these efforts, we also made it our highest priority to cooperate with governmental agencies regarding suspected illegal shipments of cigarettes.  Our employees contacted representatives from the City and State of New York on numerous occasions (long before this suit was filed) to advise them of suspected illegal shipments.  In addition, we cooperated fully and promptly *each and every time* any governmental authority contacted us to inquire about or advise us of a suspected unlawful tobacco shipment.  We also started voluntarily complying with the PACT Act non-compliant list in October 2013, at the request of the State of New York.  We continue to believe that cooperation with governmental authorities is by far the most effective way to reduce the potential for unlawful tobacco shipments, given the investigative abilities and resources available to the authorities that we simply do not have.

16.     Because of the nature of our operations and the volume of packages that we deliver, it is not possible to eliminate all unlawful tobacco shipments from our system.  There are many ways to tender packages into our system, and we do not ordinarily receive any indication of package contents from our customers.  It is our experience that there will always be some dishonest shippers who try to take advantage of our network for unlawful purposes.  The AOD recognizes that UPS would take steps to reduce but could not be expected to eliminate all illegal shipments of cigarettes.

17.     As explained in more detail below, it is my belief that UPS's compliance efforts have been overwhelmingly successful in reducing the use of our network for the shipment of cigarettes to consumers.  This seems clear to me even from the shippers that the City and State have claimed are relevant to this case (without even considering the other shippers that have been discouraged or prevented from making illegal shipments because of UPS's efforts).  In October 2013, the City of New York sent a draft complaint to UPS identifying three shippers

(Post Smokes, Indian Smokes and AJ's Cigar) that were, according to the City, illegally shipping cigarettes to consumers via UPS. UPS immediately audited two of the shippers – Post Smokes and AJ's Cigar – and confirmed that each was shipping *"little cigars" or "filtered cigars*," but not cigarettes. UPS was unable to audit the third shipper, Indian Smokes, because a UPS driver had a year earlier, in September 2012, detected the shipment of cigarettes by that shipper in violation of UPS policy. And in accordance with our procedures, UPS promptly terminated all services for Indian Smokes at that time.

18.    Over the course of this action, the City and State have accused UPS of accepting unlawful cigarette shipments from about 50 different shippers (although I understand there are now fewer shippers involved). Many of those shippers were shippers that UPS first brought to the attention of the City and State (not vice versa), including for example the highest volume shipper in the case, Shipping Services. Nevertheless it is clear that most of the shippers the City and State have placed at issue in the case *were in fact shipping products other than cigarettes,* which were not illegal. Beginning in 2011 and continuing into 2016, UPS conducted 28 audits of the 50 or so shippers that the City and State have claimed in this case were shipping cigarettes with UPS. The results from these 28 audits were as follows:

- 14 Audits: Predominantly or only little/filtered cigars (no cigarettes)

- 4 Audits: No Tobacco products

- 4 Audits: Tobacco products other than little cigars and cigarettes

- 4 Audits: Cigarettes only

- 2 Audits: Mix of little/filtered cigars and cigarettes

The chart I have included as Attachment A shows the detail for each particular audit, correlated to the exhibit that has our audit results for each.

19.     The audits we have conducted reveal that little cigars are in fact sold on a widespread basis from Native American reservations in the State of New York and are shipped to consumers in New York and throughout the country.  The audits found shipments of hundreds of boxes full of cartons of little cigars/filtered cigars made by at least 18 different manufacturers (e.g., Seneca, Warrior, Wrangler, Racer, Smoker's Best, Buffalo, Cherokee, 38 Special, Swisher Sweet), and multiple varieties by most of the manufacturers (e.g., "full flavor," menthol, "lights" and various other flavored filtered/little cigars).

20.     Furthermore, the little cigar packs and cartons are practically indistinguishable from cigarette packs and cartons, and are packaged in the very same way as cigarettes.  There is no way that our drivers or center employees could possibly distinguish the contents of a box containing cigarettes from a box containing little cigars.  The cartons are strikingly similar in appearance, and so are the individual packs (the filtered cigars themselves are also very similar in appearance to cigarettes).  When sealed in a box it is impossible to distinguish between them:

Filtered Cigars:

 

UPS Exhibit DX-244.

Cigarettes:

 

UPS Exhibit DX-244.

21.     It is also very unlikely that there would be markings on the outside of packages that would have alerted our drivers to the presence of cigarettes.  The vast majority of our shippers do not indicate package contents on the outside of the box, and there were no markings identifying contents on any of the packages we audited:



UPS Exhibit DX-244.

9

22.     Based on my review of the allegations made by the City and State before and during this case, it appears that they expected UPS to assume that any smoke shop located on a Native American reservation in the State of New York was engaged in the illegal shipment of cigarettes.  This is not a valid assumption.  The AOD does not single out or even mention Native Americans or Indian reservations.  It does not require UPS to make any different assumption about a smoke shop or other business located on a Native American reservation in Upstate New York than it would make about a smoke shop located on Fifth Avenue in New York City.  It is counter-intuitive to me that we would be expected to treat Native Americans in a different way than we treat others.  The AOD did not, for example, require random audits of smoke shops on Native American reservations (or random audits of *any* shipper or category of shippers).  Because I did not understand the AOD to require special treatment of Native American reservation shippers (or any other group), my approach to achieving compliance with the AOD was to provide uniform training and enforcement on a nationwide basis.  The Tobacco database we have maintained since 2005 reflects that, listing more than 4,000 shippers from 49 different states (not all of which actually ship tobacco products).

23.     Of course when we received the City and State's draft complaint in October 2013, and through subsequent communications with them, the City and State made it very clear to us that they believe our specific focus should be targeted on shippers located on the nine qualified Native American reservations in the State of New York, and that we should assume that any smoke shop located on such a reservation is engaged in illegal activity.  Although I do not accept that premise, UPS nevertheless enhanced its compliance procedures substantially to focus on the areas that the City and State claim are high risk.  We have done this incrementally over time, and I personally travelled to Upstate New York to conduct audits, interviews and "ride-alongs" with

drivers at UPS facilities located near Native American reservations in the State of New York (with several of my colleagues conducting/performing similar procedures at other facilities throughout the State). This process is very costly, and is in my view far beyond what was contemplated or required by the AOD.

**Overview of UPS's Operations**

24.     UPS is the world's largest package delivery company. We deliver an average of over 18 million packages each business day worldwide (almost 16 million in the United States). We serve every address in North America and Europe. We have 362,000 employees in the United States alone. We have 1.6 million daily pick-up customers and 8.4 million delivery customers (recipients). There are millions of other customers that use our service through channels other than a daily pick-up (e.g., occasional pickup, on call pickup, internet shipping, drop boxes, etc.). UPS has approximately 1,800 operating facilities, and a delivery fleet of 104,926 package cars, vans, tractors and motorcycles, and 237 company-owned aircraft.

25.     UPS's Corporate Headquarters are in Atlanta, Georgia. In the United States, UPS has two geographic regions and ten geographic districts. UPS operates through a hub and spoke system. "Hubs" are larger facilities that serve as sorting centers for our package feeder operations. "Centers" are smaller facilities that serve as sorting centers and are the local facilities that provide pickup and delivery services to our customers.

26.     The UPS system is designed to achieve the most efficient delivery of packages to our customers nationwide and worldwide. After our drivers pick up packages from our customers and bring them back to a center, they are sorted and typically placed on a feeder trailer along with other packages destined for the same hub or center. When packages flow through a bub, they are then sorted and delivered by feeder trailer to the final destination center, where they

are sorted and then delivered by package car drivers.  Some of our centers are larger centers

serving metropolitan areas (there are often multiple centers in the same building or in a hub in

larger metropolitan areas).  We also have smaller remote centers that serve less populated areas,

where package car drivers must drive long distances from the center to make deliveries.

27.     Our package car drivers (pickup and delivery drivers) typically begin their day by

delivering the packages that were received into the center the previous afternoon or evening.  In

the afternoon the package car drivers then perform their scheduled pickups, in order to bring

packages back to the center.  Most customers want a pickup time as late as possible so that they

can fulfill orders received late into the day.  We plan our drivers' schedules very carefully with

software known as Orion, which plans the most efficient routing for each of our drivers.  Drivers

are on a very tight schedule in order to make all of their pickups and get back to the center with

all of their packages in time for the evening sort.  For that reason our shippers must have their

packages sealed, ready and labelled by the time our pickup driver arrives.  Our pickup drivers do

not ordinarily scan each package at pick-up.  For our commercial shippers they scan a "barcode"

summary that the shipper has printed out prior to pickup, which contains electronic information

from the processing of the packages.  The driver loads the packages into his or her package car

and brings them back to the center, where they are sorted and placed on feeder trailers unless

they are being sent to an address local to the particular center.

28.     All of UPS's package services are guaranteed for delivery either by the end of a

day (e.g., UPS Ground) or by a specific time on a specific date (e.g., UPS Next Day Air Early

AM).  Our reputation depends to a great extent on delivering on time performance to our

customers.  Our operations are planned around providing on time performance for the highest

possible percentage of packages.

29.     Except in very limited circumstances not applicable here, UPS shippers do not declare or provide us with information regarding the contents of our packages.  The vast majority of shipments (high 90%) are processed on electronic shipping systems, such as UPS Worldship.  The shipper inputs "package level detail" regarding the package, including name and address of the recipient, weight, dimensions, requested service level and any requested "accessorial" services (such as declared value or C.O.D.).  But there is no field for the contents of the shipment.  Once the shipper inputs the package level detail, he or she can then print a bar-coded label to affix to the package.  At the end of the day, the shipper "closes out" the shipping system and prints a summary barcode label to provide to the driver.  The package level detail is then sent electronically to UPS.  The process works in a similar way through other means of shipping, e.g., UPS Internet Shipping, which is an online shipping system.

30.     Most of our shippers (particularly commercial shippers) pack their merchandise for shipment in a plain corrugated box, perhaps with the name and logo of the shipper.  Shippers rarely print the package contents on the outside of the box.  UPS does reserve the right to inspect package contents.  However, unless there is a reason to do so, UPS does not open packages to check contents.  A package would be opened if there is reason to believe that there is something irregular about the package that warrants further attention, for example if there is a reason to think the package contains undeclared hazardous materials, or an unlawful materials of some other type (e.g., cigarettes to consumers, liquor or even illegal drugs).

31.     Accounts with UPS can be opened in various ways.  We have millions of active accounts.  Prospective shippers can open accounts on the internet, at ups.com, they can call 1-800-PICKUPS or they can open an account directly through a member of our sales force.  There are thousands of UPS accounts opened every day.

32.     Our smaller customers are not assigned a UPS sales resource.  Our larger customers have dedicated account executives, typically reporting to the Corporate Office.  Lower volume customers may also be assigned an account executive assigned to a number of UPS operating centers, known as a "Patch of Land."  The Patch of Land Account Executives usually have a large number of accounts, because their accounts tend to be relatively low volume. An even smaller customer may be assigned an "Inside Sales Representative" or "ISR."  ISRs operate out of centralized locations and typically provide support to their customers by phone, and support to the Patch of Land Account Executives.

**UPS's Shipping Contract and Tobacco Policy Pre-AOD**

33.     UPS has two primary publications setting forth the basic terms of service for small package shipments in the United States:  the "Tariff/Terms and Conditions of Service" (formerly two documents, the "General Tariff" and "Terms and Conditions of Service") and the UPS Rate and Service Guide.  The current version of each document is posted at all times at ups.com and has been since well before 2005.  The Tariff/Terms and the Guide set forth the restrictions on service with UPS, including the prohibition on shipment of regulated goods. Regulated goods are also explained in further detail in dedicated pages at ups.com devoted to each particular regulated good (such as ups.com/tobacco and ups.com/wine).

34.     Prior to 2004, UPS did not have a specific policy about the shipment of tobacco products.  The Guide did, however, advise shippers that "[n]o service shall be rendered by UPS in the transportation of any shipment that is prohibited by law or regulation of any federal, state, provincial, or local government in the origin or destination country."

35.     In about 2003, several states began to adopt and enforce legislation governing the sale and shipment of cigarettes to consumers.  I believe that New York was the first such state, which had enacted Public Health Law § 1399-ll.  As the UPS legal team began to evaluate the activities of these states, they engaged my department in discussions about customers complying with their legal obligations in these states.  Since my team already managed a customer compliance program for hazardous materials shipping we were asked to participate in the discussions.  I then recommended the assembly of a cross-functional team of UPSers to develop a comprehensive program to address the states' concerns regarding cigarette shipments to consumers.

36.     Well in advance of the effective date of New York's law, we began to plan for compliance.  We did not have a list or any other easy way to identify those of our customers that shipped tobacco, so we had to "start from scratch" to try to identify comprehensively all UPS shippers that may be shipping cigarettes.  This was an enormous effort, which we did primarily by (1) searching the central UPS customer database to locate names including terms such as "cigarette," "smoke," and "tobacco," and then conducting internet research to determine whether the shipper did actually sell tobacco products, (2) analyzing shippers based on their "standard industry codes" (SIC) as listed in our customer database that might be tobacco-related (there is no code specific to tobacco sellers) and (3) by reaching out to employees in the field to identify any potential cigarette shippers that might not have been identified through other means.  This search, which was conducted in the Spring of 2003, resulted in the identification of approximately 400 shippers.

37.     Our initial strategy was to adopt and enforce a policy aimed at the few states that had adopted laws prohibiting shipments of cigarettes to consumers.  On June 13, 2003, we wrote

to the approximately 400 shippers we had identified, to notify them of the provisions of New

York PHL § 1399-ll, and advise them that UPS would no longer accept packages containing

cigarettes for delivery to unauthorized recipients in New York. UPS Exhibit DX-003. We also

advised all account executives and other business development personnel of this letter campaign.

We took additional steps to reinforce this policy, including formal training to our employees

regarding Section 1399-ll. UPS Exhibit DX-004. We specifically educated UPS drivers in New

York and pre-loaders about New York's delivery restrictions. We instructed New York drivers

and pre-loaders not to load or deliver packages that they had reason to believe contained

cigarettes to unauthorized recipients in New York.

    38.    We later wrote to the same set of shippers to advise them of similar laws that had

been enacted in Maine and Connecticut. UPS Exhibit DX-004. We advised our workforce

accordingly of the change in law in these other states.

    39.    At the beginning of 2004, we adopted a policy specifically addressed to the illegal

shipment of tobacco products. The policy was introduced in our January 5, 2004 General Tariff,

which included a new item prohibiting the shipment of tobacco products in violation of state or

federal law. In January 2005 we updated the Tariff again, this time to reflect our decision to

require a special tobacco agreement for the shipment of any tobacco products to consumers.

Item 464 of the Tariff was revised to provide that "[p]ackages containing tobacco products

shipped to a consumer will only be accepted as a contractual service." By elevating tobacco

products to a contractual service, we felt that we would have better visibility of our tobacco

shippers. There are very few other services that require a commodity-specific contract at UPS

(hazardous materials and alcoholic beverages being the other categories).

40.     As time passed, it became clear to us that it would be impractical to comply with differing laws on a state-by-state basis.  For example we had no way to ensure that a shipper that shipped cigarettes to a state where it was legal to send cigarettes to consumers was not also sending cigarettes to consumers in states that prohibited such shipments.  We therefore decided in 2005 to prohibit cigarette shipments to consumers altogether on a nationwide basis.

**The 2005 AOD**

41.     On October 21, 2005, UPS entered into an Assurance of Discontinuance ("AOD") with the State of New York, to resolve issues over the alleged delivery of cigarettes to consumers in New York.  UPS Exhibit DX-023.  The AOD had an effective date of November 21, 2005 (30 days after signing).  The AOD acknowledged UPS's business decision to adopt a uniform nationwide policy, and required UPS to maintain that policy on a going forward basis, in the following respects:

1.  UPS does not provide service for shipments of cigarettes to consumers.

and

2.  UPS only accepts shipments of cigarettes for delivery to recipients who are licensed or otherwise authorized by applicable federal, state, provincial or local law or regulation to receive deliveries of cigarettes.

UPS Exhibit DX-023 ¶ 15.

42.     In order to comply with the AOD, UPS posted an updated November 21, 2005 version of its Tariff at ups.com, as well as its updated Terms and Conditions of Service, each of which contained the new tobacco policy (the Tariff and Terms and Conditions were separate documents at the time).  UPS Exhibit DX-035 at Exs. A, B.  The new Tobacco Policy specifically prohibited the shipment of cigarettes to consumers on a nationwide basis.

17

43.    At the same time we also posted our then-newly created Tobacco Policy at a new

page at ups.com, ups.com/tobacco.  UPS Exhibit DX-035 at Exs. A, C.  Since that date our

Tobacco Policy has been posted at all times (as updated) at ups.com/tobacco.  It is the first result

listed when one conducts an internet search at, for example, Google, Yahoo or Bing with the

words "UPS" and "tobacco"; it is also the first result with Yahoo and Bing, and second with

Google (behind only an article about this case) with the words "UPS" and "cigarette."   UPS's

Tobacco Policy is an excellent resource for our shippers and our workforce, or for anyone

interested in UPS's Tobacco Policy.  We also post a list of restricted goods, which advises

shippers that there are restrictions on the shipment of tobacco products.

https://www.ups.com/content/us/en/resources/ ship/prohibited_articles.html.

44.    After entering into the AOD, we once again we wrote to our full list of shippers,

this time advising them that we no longer accept shipments of cigarettes to consumers in any

state.  UPS Exhibit DX-035 at Ex. G.  We reached out to these shippers to determine whether

they intended to ship any tobacco products to consumers.

45.    Under the AOD, UPS was required to submit a report within 30 days of the

effective date describing the manner in which UPS had complied with the initial obligations.  I

was the author and signer of that report, entitled UPS's Report Regarding UPS's Compliance

with the Assurance of Discontinuance ("Management Report"), dated December 20, 2005.  UPS

Exhibit DX-035.

**Ongoing Compliance with the AOD**

46.    On an ongoing basis, UPS has undertaken a variety of efforts to comply with the

AOD, all designed to prevent the shipment of cigarettes to consumers through our network.  We

created a group to manage compliance with our Tobacco Policy and respond to any questions

18

from the field at the Corporate and Region levels, and assigned responsibility to one or more individuals in each District to be the subject matter experts on the Tobacco Policy.

47.     We have trained our employees regarding the Tobacco Policy on a regular basis. We created a database to track those of our shippers that shipped tobacco to consumers. We conducted internet searches to try to identify sellers that might be trying to ship cigarettes via UPS. We conducted audits where we suspected that the shipper may be shipping tobacco products. We terminated shippers we believed were intentionally violating our tobacco policy. And we responded immediately to any concern raised by the State, the City or any other governmental authority regarding a suspected cigarette shipper.

Structure of Regulated Goods Group

48.     As stated earlier the Regulated Goods Group consists of a Director (myself), five Managers, two Supervisors, and one Specialist. One of the managers (until his retirement in June 2016, Gary DeWeerd) is dedicated primarily to managing the tobacco and alcoholic beverage compliance programs. Gary joined the Regulated Goods Group in September of 2003 and was involved to some extent in the tobacco compliance program development at that time. Additional support of the tobacco and wine compliance programs is provided by two Region Regulated Goods Associates, one on the east coast and one on the west coast.

49.     Before his retirement, Mr. DeWeerd was responsible, with my involvement and under my supervision, for our alcoholic beverage and tobacco compliance programs. He (and now his successor) also provided subject matter expertise in a number of other areas that do not necessarily require contracts but do receive a number of specific questions because of the nature of that area like firearms and live animals.

50.     The Region Regulated Goods Associates manage the actual contract process and the customer compliance processes.  They receive, document and file the paper contracts for wine and tobacco shipping.  They follow up with customers that tender non-compliant shipments to UPS and also provide subject matter expertise to the sales force.  They frequently coordinate with the security and operations personnel in the districts to facilitate the completion of audits and provide the results of those audits to Gary and myself.  They utilize the contract databases to document new contracts, customer discrepancies, and corrective actions (including terminations) taken with shippers.

51.     We also have District Regulated Goods Coordinators at UPS.  These are primarily management personnel that are hazardous materials subject matter experts in the Plant Engineering function in the Districts.  The majority of their time is spent ensuring that UPS personnel comply with all UPS and regulatory requirements specific to the transportation of hazardous materials.  In addition they are subject matter experts for alcohol and tobacco supporting internal UPS operations personnel.

<u>Training</u>

52.     In the AOD, UPS agreed "periodically to train its drivers and pre-loaders and other relevant UPS employees about UPS's Cigarette Policy and the compliance measures agreed to in this Assurance of Discontinuance."  UPS Exhibit DX-023.  We agreed that within 90 days of the effective date of the AOD, and annually thereafter, we would "issue a Pre-work Communication Message ("PCM") to UPS drivers, preloaders and any other UPS employees who are involved in the compliance measures agreed to in this Assurance of Discontinuance to help ensure that these personnel are actively looking for indications that a package contains Cigarettes being shipped to an individual Consumer, alerting UPS management of such packages

20

and attempting to intercept such packages." *Id*.  Since the date of the AOD, we have fulfilled

this obligation in a number of ways, including through PCMs and other training materials.

       53.    <u>Driver and Center Employee Training:</u>  We provided the PCM to the drivers and

center employees on a nationwide basis on November 21, 2005, in accordance with the AOD.

UPS Exhibit DX-035 at Ex. H.  A "PCM" is a "pre-work communication" meeting that takes

place every morning among center employees in advance of their work day, where various work-

related topics are addressed.  A PCM regarding our Tobacco Policy is delivered by our center

management on an annual basis.  UPS Exhibits DX-110; DX-157; DX-208-209; DX-348.  We

do not expect our drivers to be private investigators, however, we advise them that they should

be alert for signs of cigarette shipments and let their supervisors know if they have suspicions:

"If a driver suspects that any package contains cigarettes or any other tobacco products and is not

compliant with the UPS Tobacco Policy, the driver must contact his/her supervisor and not make

delivery on the package in question." UPS Exhibit DX-157.

       54.    In April 2016, as a result of advances in our technological capabilities, we

introduced a DIAD-based Tobacco Policy training for drivers.  DIADs (Delivery Information

Acquisition Devices) are the driver's hand-held computers.  This allows us to ensure that each

driver has taken the required training individually on an annual basis.  The first DIAD-based

tobacco policy training occurred by April 4, 2016, and will happen on an annual basis going

forward.

55.     Tobacco Transportation Procedures Manual:  We also created and distributed our Tobacco Transportation Procedures Manual broadly throughout our nationwide operations.  UPS Exhibits DX-129; DX-203.  The Tobacco Transportation Procedure Manual is the initial resource in determining how to deal with a tobacco shipment that violates UPS's Tobacco Policy. We distribute the manual throughout the organization when it is updated, but it is also available at all times on our employee intranet. http://pe.inside.ups.com/pe/content/RegGoods/manuals/  It is also posted at "Scout," our sales resource page (described further below).

56.     Sales Training:  We train our sales force regarding the Tobacco Policy in a number of ways.  First, every sales employee is trained on the Tariff/Terms and Conditions of Service and the UPS Rate and Service Guide, and are very well aware that they together contain official guidance on what can be shipped through UPS.  As a practical matter these documents are likely to be the first resource that an account executive or other sales employee would consult if he or she had a question about our Tobacco Policy.

57.     We also train our sales force specifically on our Tobacco Policy and our policies regarding hazardous materials and other regulated goods.  As part of initial training, all new sales employees receive training on policies regarding regulated goods, including tobacco.  The current form of training requires new account executives to review our policies on the Regulated Goods "Scout" intranet page (Scout is an internal resource we use to provide information to our sales force regarding important topics in the company).  Our Scout intranet page contains links to our Tobacco Policy and our Tobacco Transportation Procedures Manual (among other things), and identifies the "subject matter expert" to contact with more detailed questions:



UPS Exhibit DX-494.

58.     We have also communicated directly with our sales force each time we have changed our Tobacco Policy from 2003 to the present, and at other times simply to reinforce the importance of adhering to the Tobacco Policy.  This included multiple communications in the 2003 to 2005 timeframe when we initially developed our Tobacco Policy (UPS Exhibits DX-003; DX-004; DX-029), as well as:

- A specific communication on September 16, 2011 to our entire New York sales force, to reinforce the importance of identifying tobacco shippers and ensuring compliance with our Tobacco Policy.  UPS Exhibit DX-120.

- We updated our sales force in September 2013, when we changed the Tobacco Policy to prohibit service to shippers on the PACT Act non-compliant list.  UPS Exhibits DX-211-213.

- We also communicated directly with all customer-facing employees, including account executives, in September 2014 when we enhanced our compliance program in the State of New York.  UPS Exhibits DX-347-348; DX-350-351.

59.    <u>Customer Service Training</u>:  We also train our customer service representatives (CSRs) regarding our Tobacco Policy, in the event that customers call 1-800-PICKUPS about the ability to ship tobacco products.  CSRs are trained on and refer to materials contained in a system known as "IRIS" when they need information on a specific shipping topic.  IRIS is a resource for our "Inside Sales Representatives" as well, who tend to deal with our smaller customers. My staff and I review and update the IRIS regulated goods pages on an annual basis, including the IRIS page explaining our Tobacco Policy.  UPS Exhibit DX-046.

60.    In my experience our workforce is very well aware of our policy against the shipment of cigarettes to consumers, and has been very well aware of many years.  Through all of my interactions with account executives, drivers and other UPS employees regarding tobacco shippers, I have never encountered an employee who has indicated he or she was not aware of the policy against the shipment of cigarettes to consumers.  We do get other questions from time-to-time regarding relates issues, for example the legality of shipping little cigars, e-cigarettes or "roll your own" tobacco.  But the policy against shipment of cigarettes to consumers is very well known.

<u>Account Opening</u>

61.     We have also long had procedures in place designed to flag tobacco shippers whenever they open an account through our various account-opening channels.  Most of our accounts are opened through the internet, at ups.com.  When a prospective shipper attempts to open an account at ups.com, the first step asks the customer to explain the reason for the account (business or personal), and then to indicate whether it will ship any of the most significant restricted items that we need to identify from the outset:



If the prospective shipper indicates that it will ship tobacco products, it will not be allowed to open an account through the internet, but will instead be instructed to call the UPS 800 number:



62.     Furthermore, our CSRs will not themselves open an account for a prospective shipper when they respond that they intend to ship tobacco products to a consumer.  The CSR is

trained to ask the same questions that appear at ups.com, about the shipment of regulated goods including tobacco.  If the CSR identifies the prospective shipper as a tobacco shipper, he or she will send the prospective shipper to our new account opening group.  The new account opening group will question the shipper about the products it intends to ship and, if applicable, generate a request for follow up by an account executive or Inside Sales Representative if the shipper intends to ship tobacco products to consumers.

Tobacco Database

63.     To comply with the AOD, we also created a database application to track activity with our tobacco shippers.   The tobacco database has fields for entry of shipper name, account number and other activity relevant to the shipper's status as a tobacco shipper.  It also has the capability to attach notes regarding compliance measures and other materials such as photos of tobacco audits.  UPS Exhibit DX-008.

64.     We have maintained the tobacco database on a continuous basis since 2005.  The current database has a total of 4,000 shippers from 49 different states.

Google Searches

65.     In the AOD we also agreed to "use an appropriate internet search engine to identify additional shippers who list UPS as a carrier for Cigarettes shipped to Individual Consumers," and then "investigate shippers who use the Cigarette Websites identified by the search engine to determine whether these shippers in fact ship Cigarettes to Individual Consumers via UPS, and conduct audits of such shippers to the extent required by Paragraph 24 of the Assurance of Discontinuance."  If the internet searches did not "uncover any shippers identified through such searches that ha[d] tendered Cigarettes to UPS for delivery to Individual Consumers," then our obligation to perform the searches came to an end.  UPS Exhibit DX-023.

26

66.     UPS hired an outside law firm to conduct these internet searches on a quarterly basis from November 21, 2005 until July 28, 2010.  UPS Exhibit DX-044.  When the Google searches identified a potential shipper, I would then research the company in our databases to try to determine if it had an account.  If I could not find the account through a name search, I would attempt to identify the address that the internet site was supposedly operate their business from, and then use the address to try to identify an account in our system.  There were several times when we could not find a name or address of an account in our system, where we used a private investigator to make a purchase to see whether the shipment would come via UPS.  If we determined that the account was in violation of our Tobacco Policy, we terminated it.

67.     The last "hit" of any kind that we had from performing the internet searches was on September 18, 2008, although this search did not identify cigarette sellers (only cigars and other products).  UPS Exhibit DX-044 at Tab September 18, 2008.  Our outside counsel continued conducting the searches until July 28, 2010, and did not identify any additional potential cigarette shippers in that last almost two year period.  I did the same query informally from time-to-time after our last formal search, but did not identify any potential UPS cigarette shippers.

**Enforcement Efforts From 2011 to Present**

68.     From 2005 to early 2011, aside from the work we did in connection with the internet searches, we did not identify any significant cigarette shipment activity in violation of our Tobacco Policy.  In 2011, however, we started to see some activity in the tobacco area.  This included the following:

69.     On January 21, 2011, we had issues with a cigarette shipper attempting to ship cigarettes through an unusual method in Salamanca, New York.  From my experience in regulated goods, I have seen shippers that are either denied service or terminated by UPS, who then attempt to tender packages to UPS through anonymous means to avoid our policies.  A shipper known as "Smoker's Club" was one such shipper.  Because it could not tender cigarettes directly to UPS, it advised its customers to open their own UPS accounts, and then ask for a "pickup" of their package at the Smoker's Club address.  In this way, apparently, they thought the local UPS center (Olean) would not learn about the cigarette shipments.  However our center in Olean identified the activity and contacted Corporate Security, which then contacted the State Department of Taxation and Finance to report this activity. UPS Exhibit DX-393.

70.     In the Spring of 2011, we learned that several shippers out of our Potsdam center, located on the Mohawk/St. Regis reservation near Potsdam, New York, were shipping cigarettes to other Indian reservations in the State of New York.  I understand that our local employees contacted the State authorities directly.  We also learned that the ATF ultimately seized packages from our Potsdam center from these shippers on June 22, 2011.  Because law enforcement was involved, we assisted our local security in preparing termination letters for each of these shippers, which were delivered shortly after the ATF seizure.  UPS Exhibit DX-008 at UPS00087128-144.

71.     On August 17, 2011, our lawyers received correspondence from the New York Attorney General's office indicating that a shipper named "American Thrust" had shipped cigarettes to a consumer in California. UPS Exhibit DX-109.  Although the documentation provided by the Attorney General's office did not support that claim (the order reflected on the materials they provided reflected pipe tobacco) we requested and received an audit of American Thrust's packages on August 19, 2011, and found no cigarettes at all.  UPS Exhibit DX-121. And a previous review of American Thrust's website indicated that it did not even sell cigarettes. UPS Exhibit DX-044 at Tab September 18, 2008.

72.     On August 22, 2011, our Potsdam center intercepted cigarette shipments from a shipper called "Seneca-Cayuga," located in Oklahoma, which were destined for recipients on the Mohawk/St. Regis reservation.  Our lawyers advised the New York Attorney General's office about these packages on August 23, 2011, and indicated that we would put that shipper through the progressive discipline structure set forth in the AOD.  UPS Exhibit DX-110.  However, Seneca-Cayuga provided us with a document apparently authored by the State Department of Taxation and Finance indicating that shipments to New York reservations would not be seized. UPS Exhibit DX-101.  We nevertheless terminated service to this shipper.  UPS Exhibit DX-118.

73.     On August 30, 2011, we learned from a Regulated Goods Associate in our Desert Mountain District (in Arizona) that a shipper called Bearclaw Unlimited had shipped a package of cigarettes to a consumer in the State of Arizona.  My colleague, Gary DeWeerd, worked with the account executive to obtain a "corrective action plan" for this shipper, which was executed on September 9, 2011. UPS Exhibits DX-115; DX-119.

74.     On September 18, 2012, our center in Olean, New York conducted an audit of a shipper named Mail Order Club, and located cigarettes tendered to us for shipment to consumers. UPS Exhibit DX-160.  They terminated service to that shipper at that time.  On September 19, 2012, Bobby Sluberski, the UPS Security department representative assigned to that facility, e-mailed pictures to me of the audit they had conducted, which showed cigarettes.  UPS Exhibit DX-548.

75.     On September 20, 2012, the Olean center confirmed that they had cancelled this account, and indicated that there "[m]ight be others."  UPS Exhibit DX-160.  In fact there were at least three other accounts terminated at that time.  The Olean center conducted audits of two other shippers, Bearclaw and Indian Smokes, and identified several packages of cigarettes addressed to consumers. UPS Exhibits DX-161; DX-165.  Note that even though the subject line of DX-161 refers only to Bearclaw, in fact the Olean center also audited packages shipped on the "Indian Smokes" account, which was shipper number W98A66 (the shipper number appears in the six characters after the 1z).  UPS's sales contact database correspondingly reflects that a driver in the Olean center, Lou Potter, discovered Indian Smokes shipping cigarettes and that account was therefore terminated. UPS Exhibit DX-515.

76.     I understand that another shipper served out of the Olean center, Elliot Enterprises, was terminated in this same timeframe, after a driver discovered the shipment of cigarettes.  Our billing records reflect that the last pickup from Elliot Enterprises took place on about September 18, 2012.

**77.**     Accordingly, I believe that in September 2012, we terminated at least four different shippers served from the Olean center for the shipment of cigarettes to consumers.

30

**2013 Letter to UPS from New York City and State**

78.    On October 2, 2013, our Corporate Legal Department received a letter from the City of New York contending that three Indian reservation sellers, "Post Smokes," "AJ's Cigars" and "lndian Smokes" were shipping cigarettes to consumers in New York via UPS. UPS Exhibit DX-216.  I received the letter shortly after and began to investigate.

Post Smokes

79.    I determined that Post Smokes was an active UPS shipper, and requested an audit of its packages.  We received the results of the audit on October 8, 2013.  The audit reflected that Post Smokes was shipping "filtered cigars" and empty cigarette tubes, but no cigarettes.



UPS Exhibit DX-221.



UPS Exhibit DX-221.  Initially our Security Supervisor thought that some of the packages contained cigarettes, but these proved to be empty cigarette tubes.  UPS Exhibit DX-222.

<u>AJ's Cigar</u>

80.     We also asked for an audit of AJ's Cigars, which was also an active shipper.  We received the results of that audit also on October 8, 2013. UPS Exhibit DX-219.  The audit reflected that AJ's Cigar was also shipping filtered cigars, and no cigarettes.  Examples of photos taken during the audit are as follows:



UPS Exhibit DX-219.



UPS Exhibit DX-129.

81.     A few months later, in February 2014, our Corporate Legal Department learned from a news report that an entity known as AJ's Candy had recently pleaded guilty to cigarette trafficking. UPS Exhibit DX-270.  We did not know how this entity related to our shipper, AJ's Cigars, but given the possible association we were not willing to continue to do business with AJ's Cigar.  Accordingly, I sent a letter on February 10, 2014 terminating all UPS service to AJ's Cigar.   UPS Exhibit DX-272.  To this day we have no information that AJ's Cigar violated our Tobacco Policy.

Indian Smokes

82.     I determined that Indian Smokes had been a UPS shipper, but was terminated in September 2012, after the driver discovered that it was shipping cigarettes (see paragraph 75 above).  Our records reflect that the last pickup for Indian Smokes was made in September 2012. The sales contact system (TEAMS) entry for this former shipper reflects that "the driver, Lou Potter, [stated] that he would no longer pick up because they were shipping cigarettes."  UPS Exhibit DX-510 at line 11.

**UPS Steps to Identify Additional Shippers October/November 2013**

83.     After we investigated the three shippers identified in the City's October 2, 2013 demand letter, we decided to take some additional due diligence steps to determine whether we could identify any potential active cigarette shippers.  We did not suspect or have reason to believe that there were active shippers sending cigarettes to consumers by UPS, but given the City's letter, we wanted to go above and beyond the requirements of the AOD.

84.     As a first step in the process, we asked our outside counsel to conduct an investigation based on available information regarding the over 540 active shippers logged into UPS's tobacco database.  Our lawyers returned a list of 30 shippers that might be worth looking

further into even though there was no evidence of cigarette shipments.  I then analyzed the list of

30 shippers and identified six shippers for potential follow up, including three shippers that the

plaintiffs have placed at issue in this case:  Native Outlet, Smokes & Spirits and Shipping

Services.

85.     On January 2, 2014, I requested that the origin centers conduct audits of the

shipments made by these three shippers.

Native Outlet

86.     On January 2, 2014, we received the results of the audit of Native Outlet's

packages from the Dunkirk, New York center.  The center audited six packages, which also had

no identifying markings of package contents:



UPS Exhibit DX-244.

87.   All six of the Native Outlet packages contained filtered cigars:



UPS Exhibit DX-244.

88.   On September 14, 2015, after UPS had produced documents in this case reflecting the work we had done in relation to Native Outlet, the City and State served UPS with a deposition notice that identified Native Outlet (among other shippers) as the subject of additional discovery.  We thus requested additional audits on Native Outlet and on October 6, 2015, we received the results.  The Dunkirk center audited 30 Native Outlet packages, two of which did not contain any tobacco products.  The remaining 28 packages all contained little cigars:



UPS Exhibit DX-375.

89.     On January 14, 2016, we received the results of another Native Outlet audit.  The Dunkirk center this time audited 13 packages, which contained little cigars and tobacco leaf wrapper.  UPS Exhibit DX-363.

90.     On April 27, 2016, I personally travelled to Upstate New York to conduct further diligence regarding compliance with our Tobacco Policy.  I audited all packages shipped out of the Dunkirk, New York Center (the center that picks up Native Outlet), including all ten packages shipped that day by Native Outlet.  They all contained filtered cigars:

 



UPS Exhibit DX-421.

91.     In addition, it so happens that on July 10, 2013, we also previously intercepted and audited another Native Outlet package (due to a concern that the package might contain a

shipment of wine to the State of Massachusetts).  Like other Native Outlet packages we have
audited, it contained filtered cigars:



UPS Exhibit DX-194.

Shipping Services

92.    On January 8, 2014, we received the results of the audit of Shipping Services.
The Dunkirk center audited five packages, which were all plain-boxed packages with no
markings of the package contents:



UPS Exhibit DX-244.

37

93.     The audit of Shipping Services' package contents found three packages with filtered cigars, and two packages with cigarettes (although none were to New York residents). The filtered cigars and cigarettes looked remarkably similar, both in and outside of the packaging:



UPS Exhibit DX-244.



UPS Exhibit DX-244.

94.     Based on the discovery of the shipment of cigarettes to consumers, we terminated all service to Shipping Services immediately. UPS Exhibit DX-244.

95.    I understand that the City and State contend that UPS shipper Morningstar Crafts & Gifts, located at Shipping Services' former address, tendered cigarettes to UPS for delivery to consumers.  We were consulted in connection with the opening of that account, however, and learned from our account executive that this was a bona fide craft and gift store that had no relation to Shipping Services, with a different, unrelated owner.  I understood that in addition to the shipment of non-tobacco products, Morningstar intended to ship tobacco products other than cigarettes pursuant to the Tobacco Agreement it executed with UPS.  I was never given any reason to believe that Morningstar shipped cigarettes via UPS.  It was a small account that stopped shipping with UPS in 2014.

Smokes & Spirits

96.    In addition to identifying Smokes & Spirits for potential follow up as a result of our comprehensive review of the Tobacco Database, Smokes & Spirits also came to my attention as a result of my review of the first "PACT Act non-compliant" list that I received (see paragraphs 109-112 below), and a December 20, 2013 e-mail from the City's counsel, identifying Smokes & Spirits as a possible UPS cigarette shipper.

97.    On January 22, 2014, we received the results of the audit of Smokes & Spirits packages conducted by our Olean, New York center.  The center audited 15 packages.  Of those 15 packages, nine contained cigarettes, while the rest contained chewing tobacco and filtered cigars.

Cigarettes:



UPS Exhibit DX-257.

Filtered Cigars:



UPS Exhibit DX-257.

98.     Immediately upon receiving the results of the Smokes & Spirits audit, we

terminated its account.  UPS Exhibit DX-256.

99.     In addition to the three accounts I just described, I had identified three other

accounts for audit as a result of our comprehensive review of shippers in the Tobacco Database:

one in Oregon, one in Nevada and one in Nebraska.  None of these audits identified any

shipments in violation of the UPS Tobacco Policy.

40

**The PACT Act Non-Compliant List**

100.     I understand that the City and State have asserted in this case that UPS should have abided by the PACT Act "non-compliant list" ("NCL") as early as 2010, or at least should have consulted the NCL pursuant to the AOD to determine whether to audit shippers.  However, the NCL is not a public list, and neither my group nor anyone in the UPS Corporate office to my knowledge had the NCL at that point in time.  I did not receive the NCL until 2013.

Receipt of the NCL

101.     I understand that the City and State contend that someone at UPS did receive the NCL on a semi-regular basis beginning at some point in 2010, and therefore that UPS should have used it in its compliance efforts.  However, I did not see any of those e-mails or the lists sent with those e-mails until long after this litigation was filed, and was not aware that another UPS employee received them.  The UPS employees who apparently received the list are employed in UPS's international brokerage operation in Louisville, Kentucky.  They do not have any involvement in domestic tobacco compliance.

102.     In 2012 or 2013, the State asked UPS to amend the AOD to require UPS to follow the NCL.  I was not directly involved in negotiations, but I was involved in the decision that we made to begin voluntarily complying with the NCL.

103.     As a first step, we needed to obtain the NCL.  Our counsel corresponded with the State and with the ATF in order to have us placed on the official distribution list.  We ultimately received the August 26, 2013 version of the NCL, as a result of a request by our outside counsel.  UPS Exhibits DX 200-201.  Jill Termini of our Corporate Legal Department then asked that she and I be placed on the distribution list, which took place effective with the first list circulated after the August 26, 2013 version.  UPS Exhibit DX-205.

41

Termination of Service Based on August 26, 2013 NCL

104.     I believe that I received the August 26, 2013 version of the NCL in early September 2013.  When we received the list: (1) we terminated service to shippers matched to the NCL, (2) we amended our Tobacco Policy, on a voluntary basis, to prohibit service (of any type) to any entity on the PACT Act NCL on a going-forward basis and (3) I used the NCL as an investigative tool to try to identify other potential cigarette shippers even if not direct match to the entity on the NCL.

105.     The PACT Act provides that a carrier required to abide by the NCL cannot deliver to "any person whose name and address are on the list."  When I received the August 26, 2013 NCL, I searched each of the names and addresses in our customer database to determine whether there were any name and address matches.  There were about 40 names on the list.  The name and address matches to our customer database included American Thrust and Elliot Enterprises. I terminated service to American Thrust (even though we had audited American Thrust previously, and it did not appear to be shipping cigarettes via UPS).  I determined that Elliot Enterprises, had stopped shipping about a year earlier and its account had been cancelled (as explained above in paragraph 75).  I also terminated a group of shippers in Nebraska

106.     In addition, the NCL listed an entity known as "Indian Smokes" in Salamanca, New York, but did not have an address (just a P.O. Box).  I did identify an account by the same name in Salamanca, New York, but this account had also stopped shipping some time ago (and was cancelled), as explained in paragraph 76 above.

Voluntary Update of UPS Tobacco Policy Re NCL

107.     On September 15, 2013, we updated our Tobacco Policy at ups.com/tobacco, to reflect that "UPS does not provide pick-up service from any person or entity included in the Bureau of Alcohol, Tobacco, Firearms and Explosives PACT Act - Non-Compliant List."  UPS

Exhibit DX-207.  On September 27, 2013, we also communicated with our sales force to let them know above the change to our Tobacco Policy (even though we were not permitted to share the actual list with our sales force).  UPS Exhibits DX-211-213.

108.    I have received each new version of the NCL directly from the ATF, starting with the version following the August 26, 2013 NCL.  As soon as I receive each new version of the NCL, we review the list and check our customer databases to determine whether there are name and/or address matches (and terminate service if warranted).

Use of the NCL as an Investigative Tool

109.    I also used the August 26, 2013 NCL as a tool to try to identify other possible cigarette shippers, even without a direct name and address match.  I conducted this research over the course of a few months, following leads to determine whether we could identify any shippers that appeared to be in violation of our Tobacco Policy.  I documented most of my analysis in an excel spreadsheet I created based on the August 26, 2013 NCL.  UPS Exhibit DX-202. UPS Exhibit

110.    I spent quite a bit of time conducting research regarding an entity listed as "Smokes & Spirits.com" on the NCL.  I did an internet search to try to locate the physical address, and found that it was located in Kentucky.  I searched our account database for shippers by the name of "Smokes & Spirits" in Kentucky, and found that we had two inactive accounts, which were located at 501 W. 11th Street, Newport, Kentucky (Account numbers A969F3 and YY1245).  These accounts had stopped shipping years ago, so I conducted a search for current accounts at that address, and found an account by the name of "Wholesale Direct," Account No. XF6000.  I requested an audit of packages from this account, and the results showed that of 15

total packages, there were two packages with candy and potato chips, and 13 packages with

cigars or filtered cigars:

 

UPS Exhibit DX-263.

RJESS

111.    I also investigated the address listed on the NCL for Smokes & Spirits, which was

listed at 6665 Route 417, Kill Buck, NY 14748.  Although there was no Smokes & Spirits at that

address, I found an account in the name of RJESS.  I requested and received two audits of the

packages shipped by this account on January 28 and 30, 2014.  Both audits identified only

filtered cigars:



UPS Exhibit DX-265.



UPS Exhibit DX-264.

112.    I also identified several accounts by the name of Smokes & Spirits in Salamanca, New York, only one of which had any activity at all (account no. W9476E).  But we had also identified this account for follow up through other means, and cancelled it as described in paragraphs 96-98 above.

**Seneca Cigars**

113.    October 21, 2013, an attorney for the City of New York e-mailed a draft complaint against UPS to our outside counsel, which I reviewed to try to determine whether it identified any shippers using UPS to ship cigarettes to consumers.  The draft complaint listed the same three shippers identified in the City's October 2, 2013 e-mail (Post Smokes, AJ's Cigars and Indian Smokes), but also alleged that an agent of the City had made an undercover purchase of cigarettes from an entity in Basom, New York in June 2012 (15 months earlier), which was delivered to him via UPS with a return label indicating that the sender was "Seneca Cigars."

114.    This was the first time that Seneca Cigars came to my attention in any way (the City had not advised us about the June 2012 purchase until the draft complaint).  I searched our account database, and learned that we did have an account known as Seneca Cigars, located at 852 Bloomingdale Road, in Basom, New York, and another account at the same address by the name of Hillview Cigars.  Each account had executed a Tobacco Agreement, effective as of June 11, 2013.  However, both accounts had been cancelled; Seneca Cigars on September 11, 2013 and Hillview Cigars on September 13, 2013.

115.    There were two other accounts that were related to Seneca Cigars and Hillview, at least through the pricing "bid" for those two accounts, although they were at different locations (Two Pine Enterprises and Native Gifts).  We noticed that there were not tobacco agreements on file for these accounts, and asked the Sales Representative to make sure that agreements were on file before these accounts could continue to ship.  We did receive copies of the signed Tobacco Agreements within days.

116.    However, on April 15, 2014, a clerk in one of our Philadelphia centers reported that a package from Two Pine Enterprises had broken open on a conveyor belt, revealing cigarettes.  The clerk followed our process and contacted Regulated Goods, and completed and sent us the relevant form documenting the Tobacco Policy violation. UPS Exhibit DX-290. Based on this information, we requested an audit of Two Pine Enterprises, which took place on April 17, 2014.  The audit showed that all 42 packages tendered by Two Pine that day contained cigarettes:



UPS Exhibits DX-293-297.

117.    We terminated the Two Pine account immediately.  UPS Exhibit DX-299.

**Amended FedEx Complaint/Fow**

118.    As part of our efforts to identify potentially non-compliant shippers, we also tracked litigation filed by the City or State against other parties.  On March 30, 2014, the City and State filed an amended complaint against Federal Express, identifying a number of shippers. One shipper identified in the amended complaint was Fow Enterprises, in Kentucky.

119.    On April 2, 2014, after I identified Fow Enterprises as an active UPS shipper, I requested an audit on Fow's packages.  The first audit was of a single package, containing a toy car.  UPS Exhibit DX-287.  The second audit, on April 3, 2014, identified the shipment of two packages with little cigars and filters:



UPS Exhibit DX-287.

120.    Although these shipments were not illegal, they were against UPS's Tobacco Policy because Fow Enterprises had not executed a Tobacco Agreement.  Furthermore, when we contacted Fow Enterprises as part of our investigation of shippers in 2005 or before (described above in paragraph 44), Fow Enterprises had advised us that it did not intend to ship tobacco products to consumers (as indicated in our Tobacco Database).  Based on our prior contact with Fow Enterprises, I felt that they must have known that UPS's Tobacco Policy required a Tobacco Contract for such shipments, and therefore viewed this as an intentional violation of our Policy and terminated the Fow Enterprises account.

**EExpress**

121.    At the beginning of May 2014, I learned that attorneys for the City and State advised our outside counsel that they suspected a shipper named "Native Express," located at 11074 Indian Hill Rd in Perrysburg, New York, was shipping cigarettes to consumers via UPS. This was the first time I or anyone in my group had any reason to suspect that a shipper at that location or by that name might be shipping cigarettes.

122.    Our account search showed a shipper by the name of "EExpress" at this address (but not Native Express).  We requested an audit of that account, which took place on May 5, 2014.  We received the results on May 6, 2014, including pictures, which reflected that this shipper was shipping "Tim Horton's" brand coffee products to various locations in the country. The audit conducted on May 6, 2014 also revealed Tim Horton's coffee products:



UPS Exhibit DX-303.

123.    On June 12, 2014, however, the same group of individuals that conducted the May 5-6, 2014 audits for us reported that three packages had broken open in the Dunkirk center, and all had contained cigarettes:



UPS Exhibit DX-326.  We asked for an audit of all packages picked up that day.  There were 102 packages in all (including the three break-opens), and they all contained cigarettes.  We terminated this account immediately.  UPS Exhibit DX-328.

124.    I understand that the City and State contend that the EExpress account was a continuation of the Elliot Enterprises account described above in paragraph 76.  I had never made any connection.  Their locations are approximately 30 miles apart, and they are served by different UPS centers.  I have never compared the customer base of one shipper to the customer base of another shipper, to determine whether the shippers serve the same customer base (something I understand the City and State claim that we could have done with "a push of the button").  I certainly had no means of comparing customer bases of shippers, even if I had suspected that EExpress was somehow related to Elliot Enterprises. But I never suspected any relation.  And I had never even heard of EExpress before we first audited it.

**Additional Compliance Efforts**

125.    In early 2014, Derrick Niemi, a member of our internal compliance group with quantitative research skills, joined our efforts to identify potential cigarette shippers.  We understood by then that the City and State were focused on Native American reservations located in Upstate New York.  Mr. Niemi thus travelled with Gary DeWeerd to Upstate New York in

February 2014 to visit the centers and reservations on which the City and State were focused to try to get a better "on the ground" understanding of these shippers.

126.    Furthermore, Mr. Niemi attempted to perform data analytics to identify tobacco shippers that could potentially present a higher risk of non-compliance.  He indicated, however, that it was not possible to identify tobacco shippers based on shipment characteristics, because the shipment characteristics of tobacco shippers were not uniform and were not unique.  In fact, to the extent there were typical characteristics, those characteristics were very hard to distinguish from average UPS shippers in terms of weights, sizes and other shipping characteristics.

127.    Without a way to identify tobacco shippers through shipment characteristics, Mr. Niemi tried to identify shippers for potential follow up primarily based on geographic area, shipper name and package volume.  In May 2014, Mr. Niemi produced a list of shippers for potential follow up that included a number of shippers that the City and State ultimately put at issue in this case (perhaps as a result of our production of materials in this case), including Sweet Seneca Smokes, Smokin Joe's, Cloud & Co., Lake Erie Tobacco, Big Buffalo and Native Wholesale.  Again, we had no reason to believe that any of these shippers was in violation of our Tobacco Policy; we were simply attempting to do whatever was reasonably possible, even if not required by the AOD, to identify potential non-compliant shippers.

128.    Although we terminated several of these shippers (either because the City and State insisted that we do so or because we were not comfortable with their compliance programs), our investigation did not show that any of these shippers was in violation of UPS's Tobacco Policy in any respect.

Smokin Joe's

129.   "Smokin Joe's" was a significant commercial tobacco shipper located in Sanborn, New York (served out of our Niagara center).  From August to October 2014, Mr. Niemi worked with Smokin Joe's to request licensing and approval information not only for itself but also for a number of its consignees (on a test basis).  Smokin Joe's complied with all of our requests, and provided detailed information demonstrating not only that it was appropriately licensed on a state and federal level, but also that its consignees were licensed where needed.  Furthermore, Smokin Joe's was extremely cooperative in this process and provided the information we needed quickly and comprehensively.  We had no reason whatsoever to expect that Smokin Joe's was in violation of any laws or our Tobacco Policy; in fact the opposite.

130.   In November and December of 2014, however, counsel for the City and State contacted our outside counsel to advise us that Smokin Joe's had used a different carrier to transport cigarettes to unlicensed recipients (not individual consumers).  Although this account appeared to be compliant in every respect, we felt that we had no choice from risk standpoint given the City and State's position than to terminate Smokin Joe's, which is what we did.  UPS Exhibit DX-360.  I understand that the City and State did seek relief from us in relation to Smokin Joe's, but have now dropped that contention.

Lake Erie

131.   We received the results of an audit of the packages of Lake Erie Tobacco on June 12, 2014.  The audit found pipe, chewing tobacco and e-cigarettes, but no cigarettes:



UPS Exhibit DX-366.

132.    In addition to audits, however, in this timeframe we decided to look beyond package contents, and to try to assess whether, even if the shipper had not shipped cigarettes, it posed a risk of violation because it did not have a reasonable compliance program in place to ensure that no future violations took place.  Although we never had information that Lake Erie violated our Tobacco Policy, we terminated service to it in any event, because we were not comfortable with its compliance program.

Big Buffalo

133.    On our own and with no reason to suspect illegal shipments of cigarettes, we also audited a shipper known as Big Buffalo on May 22 and May 23, 2014.  The audits found pipe tobacco sent to consumers, but no cigarettes:



UPS Exhibits DX-316-317.

134.    Although we did not identify any violations by Big Buffalo, once again we terminated service because we were not comfortable with the compliance program it had in place.

<u>Sweet Seneca Smokes</u>

135.    We have audited Sweet Seneca Smokes three times, each time finding many packages of little/filtered cigars and other tobacco products, but never any cigarettes.  We received the results of the first audit on June 11, 2014, which consisted predominantly of filtered cigars but also some other tobacco products (e.g., chewing tobacco):

54



UPS Exhibit DX-327.

136.    On April 27, 2016, I personally audited all 71 packages tendered by Sweet Seneca

Smokes that day, during my visit to the Dunkirk, New York center.  When I opened the packages

I found little cigars, chew and other tobacco products, but no cigarettes:

 

UPS Exhibit DX-422.

 

UPS Exhibit DX-422.

 

UPS Exhibit DX-422.

137.    We also audited Sweet Seneca Smokes' packages by happenstance on July 10,

2016.  Our "Designated Responders" for hazardous materials in the District segregated and

inspected the contents of these Sweet Seneca Smokes packages because chocolate syrup had

leaked on each package in the load (apparently not being certain that it was only chocolate).

UPS Exhibit DX-429.  The District photographed the package contents and sent them to us after

discovering tobacco products.  Consistent with prior audits on Sweet Seneca Smokes, the

packages contained filtered cigars, loose tobacco and chewing tobacco:



UPS Exhibit DX-429.



UPS Exhibit DX-429.

Cloud & Co.

138.    We also investigated a shipper known as Cloud & Co., located in Salamanca,
New York, as a result of the work performed by Mr. Niemi.  Once again we had (and still have)
no reason to believe that this shipper violated our policies.  However, through our own
investigation we learned that the City had filed a lawsuit against Cloud & Co. for the alleged
shipment of cigarettes.  We terminated this shipper as a result. UPS Exhibit DX-345.

Native Wholesale

139.    We also investigated a shipper known as Native Wholesale, located in Perrysburg,
New York.  However this shipper had stopped shipping with us in October 2013 (it was not a
continuing shipper at the time of our investigation).  We did however note that the delivery
addresses were all or virtually all commercial, and would therefore have not been within the
ambit of our Tobacco Database.

Seneca Promotions

140.    Finally, as a result of the list Mr. Niemi created, we also investigated a shipper
named Seneca Promotions, a low-volume commercial shipper (just a few packages each day)

listed at the same address as Native Wholesale.  We received the results of an audit of Seneca

Promotions on January 15, 2016, which reflected a single package that did not contain any

tobacco products.  UPS Exhibit DX-363.

**Our Current Compliance Efforts**

141.    The City and State appear to have stopped cooperating with us in any respect in

our efforts to prevent the use of our system for the shipment of cigarettes to consumers.  They

have not provided us with information regarding suspected cigarette shippers on a cooperative

basis for almost four years.  Furthermore, the arguments made by the City and the State both in

communications prior to this litigation (e.g., in the draft complaint) and in the litigation itself

have made it clear to us that the City and State's focus is almost entirely (if not entirely) on

preventing the shipment of tobacco products from Native American reservations.

142.    In response to this focus we have, accordingly, had to focus our compliance

efforts directly on service to Native American reservations.  I do not believe that any of these

measures are required by the AOD; these efforts are above and beyond the AOD and in response

to the more focused demands the City and State have made since October 2013.  These efforts

include the following:

143.    In Person Corporate Audits:  In April 2016, Corporate Compliance and Regulated

Goods representatives did in-person, comprehensive "audits "of each and every UPS center in

the State of New York that picks up or delivers packages to addresses on a Native American

reservation.  I personally conducted audits of our Dunkirk, Olean and Jamestown centers.  I

personally delivered the Tobacco Policy PCM at each center.  I interviewed the center

management at each center, and the "Patch of Land" and Sales Representative assigned to these

centers.  I "rode along" with the driver primarily assigned to pick-up or deliveries at the center.  I

also conducted comprehensive audits of all of the packages picked up by each center, and documented (through photographs) any packages of tobacco picked up by each center (these included the April 27, 2016 audits of Native Outlet and Sweet Seneca Smokes described above in paragraphs 90 and 136). I found no Tobacco Policy violations in any of the three centers I audited (the results of the overall audits I conducted are at UPS Exhibits DX-415, DX-419 and DX-420). Other members of our Corporate Compliance Group (Derrick Niemi, Sean Devine and Jeff Cantrell) followed the same protocol to conduct similar audits in other centers in New York serving Native American reservations. They also found no violations.

144.    New Account Opening:  In September 2014, we changed our account opening process in the State of New York for tobacco shippers, in order to provide enhanced screening for any such account opened in the State of New York. Mr. Niemi's group also evaluates each and every account opened on a Native American reservation (opened through any channel, and regardless of whether they have been identified as a tobacco shipper) to investigate whether the shipper might be shipping tobacco products. UPS Exhibit DX-351.

145.    Existing Account Monitoring and New Account Analysis:  In addition, on a weekly basis, Derrick Niemi and his group monitor volume tendered by shippers located on Indian reservations, to determine whether there are any red flags in terms of volume patterns.

**UPS Tracer and Claims Documentation**

146.    I understand that the City and State have asserted that UPS should have been alerted to the possibility that some of the shippers involved in this case were using UPS to ship cigarettes to consumers, based on loss or damage claims submitted by certain of the shippers for packages containing cigarettes.

147.     First, I agree that analysis of claims information can be a useful tool in detecting

the shipment of prohibited goods, including not only cigarettes to consumers but also other types

of prohibited products (such as liquor).  However, before this case, we did not review claims

information and it had not occurred to us to incorporate that into our compliance processes.  So I

was not aware that any of these shippers had submitted a claim for cigarettes, and had not

coordinated with our claims group to provide us with that information.  After the City and State

served UPS with a set of document requests in this case asking for the production of claims

material, we recognized that this information could be useful, and have now established a

process (based on keywords) where we receive and analyze information from the claims group

regarding potential violations of our Tobacco Policy and other prohibited goods.

148.     Second, I have reviewed the documentation produced by UPS in this case relating

to claims made by the shippers involved in this case.  The documentation reflects that there was

only one claim submitted by any of these shippers for the shipment of cigarettes to a consumer.

This was a claim submitted by Smokes & Spirits, on September 14, 2012 and denied September

26, 2012.  UPS Exhibit DX-500.

149.     The information produced by UPS in these two spreadsheets (UPS Exhibits DX-

499-500) consists not only of claims data, but also of data regarding "tracers" that were entered

into UPS's system for packages that never resulted in an actual claim.  A tracer can be generated,

for example, if the consignee/recipient calls UPS to report that he or she has not received a

package.  At that time a tracer is entered into the system in the event that the package needs to be

located, including tracking number and package contents (just in case the contents have become

separated from the package).  In most cases a tracer does not result in a claim, because the

package is ultimately delivered.  If the package is not located, or if it is damaged, however, the

shipper may submit a claim.  UPS's records will reflect that a claim has been submitted when the shipper "bills" UPS for the claim (submits the claims documentation requesting payment).  The Smokes & Spirits package described above is the only such claim that appears to involve cigarettes.

150.    With that said, the tracers and claims contained on the two spreadsheets overwhelmingly reflect the shipment of little cigars, other tobacco products and non-tobacco products such as candles, promotional materials and office products.  The highest volume shipper involved in this case, for example, Shipping Services, had 29 different tracers/claims, almost all of which identify the package contents as little cigars.  UPS Exhibit DX-500.

Conclusion

151.    We take our responsibilities under the AOD very seriously, and have no interest

whatsoever in allowing unlawful shipments of cigarettes to enter our system.  We have taken

extensive measures to try to prevent the shipment of cigarettes to consumers through UPS.  We

have also responded quickly and thoroughly whenever the City, State or any other governmental

authority that has a concern over potential unlawful cigarette shipments, and will continue to

make it the highest priority to respond to any such concerns. Our goal is to prevent the use of our

network for unlawful cigarette shipments to consumers to the extent reasonably possible.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

Dated: Atlanta, Georgia
        August 26, 2016

Bradley J. Cook

Attachment A

UPS Audits of Shippers Put at Issue by City and State

| | # | DATE | SHIPPER | RESULT | TRIAL EXHIBIT |
|---|---|---|---|---|---|
| **TERMINATED (cigarettes only)** | 1 | 09/21/12 | Indian Smokes | Cigarettes – TERMINATED | DX-161 |
| | 2 | 09/21/12 | Bearclaw | Cigarettes – TERMINATED | DX-165 |
| | 3 | 04/17/14 | Two Pine | Cigarettes – TERMINATED | DX-293-297 |
| | 4 | 06/12/14 | EExpress | Cigarettes – TERMINATED | DX-326 |
| **TERMINATED (mix of little cigars and cigarettes)** | 5 | 01/08/14 | Shipping Services | Filtered cigars and cigarettes – TERMINATED | DX-244 |
| | 6 | 01/22/14 | Smokes & Spirits | Cigarettes, chewing tobacco and cigars – TERMINATED | DX-257 |
| **Little cigars (exclusively or with other tobacco products)** | 7 | 07/10/13 | Native Outlet | Filtered cigars | DX-194 |
| | 8 | 10/08/13 | AJ's Cigar | Filtered cigars | DX-129 |
| | 9 | 10/08/13 | Post Smokes | Little cigars | DX-221-222 |
| | 10 | 01/08/14 | Native Outlet | Little cigars | DX-244 |
| | 11 | 01/28/14 | Wholesale Direct | Cigars, filtered cigars, potato chips and candy | DX-263 |
| | 12 | 01/28/14 | RJESS | Little cigars | DX-265 |
| | 13 | 01/30/14 | RJESS | Little cigars | DX-264 |
| | 14 | 04/03/14 | Fow | Swisher Sweets and filters | DX-287 |
| | 15 | 06/11/14 | Sweet Seneca Smokes | Little cigars | DX-327 |
| | 16 | 10/06/15 | Native Outlet | Little cigars | DX-375 |
| | 17 | 01/14/16 | Native Outlet | Little cigars, tobacco leaf wrapper | DX-363 |
| | 18 | 04/27/16 | Native Outlet | Little cigars | DX-421 |
| | 19 | 04/27/16 | Sweet Seneca Smokes | Assorted tobacco products, no cigarettes | DX-422 |
| | 20 | 07/10/16 | Sweet Seneca Smokes | Assorted tobacco products, mainly filtered cigars | DX-429 |
| **Other tobacco products (no cigarettes or little cigars)** | 21 | 09/15/11 | American Thrust | Loose tobacco, empty cigarette tubes | DX-121 |
| | 22 | 05/21/14 | Big Buffalo | Pipe tobacco | DX-315 |
| | 23 | 05/22/14 | Big Buffalo | Pipe tobacco | DX-316-317 |
| | 24 | 06/12/14 | Lake Erie | Pipe tobacco, chewing tobacco and e-cigarettes to businesses/consumers | DX-366 |
| **No tobacco** | 25 | 04/02/14 | Fow | Toy car | DX-287 |
| | 26 | 05/05/14 | EExpress | Coffee | DX-303 |
| | 27 | 05/06/14 | EExpress | Coffee | DX-311 |
| | 28 | 01/14/14 | Seneca Promotions | No tobacco | DX-363 |