# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK,<br><br>Plaintiffs,<br><br>-v-<br><br>UNITED PARCEL SERVICE, INC.,<br><br>Defendant. | 15 Civ. 1136 (KBF)<br><br>**ECF CASE** |

## DECLARATION OF GERARD FINK

I, Gerard Fink, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Gerard Fink. I live in West Valley, New York. I have personal knowledge of the facts set forth below, and I am submitting this declaration as my direct testimony in this case.

2.      I have been employed by United Parcel Service, Inc. ("UPS") since approximately 1999. I started my career at UPS as a part-time loader at the Buffalo Hub. After approximately one year, I was promoted to an External Technician in UPS's technology support group in Buffalo, New York. As an External Technician, I visited new customers, often with an Account Executive, to install UPS shipping software and train customers on how to use it, and also later helped them with any technical problems. Around 2005, I was promoted to an Account Executive ("AE"), a position I still hold today.

3.      Prior to working at UPS, I worked with my brother running the business side of his automobile customizing shop. Before working with my brother, I worked for IBM in Poughkeepsie, New York for five years helping to manufacture computer chips. Prior to working

at IBM, in or about 1986-87, I earned my Associates Degree in Applied Science from Niagara County Community College.

4.       As an AE, I manage UPS small package customer accounts and try to acquire new business for UPS. I am part of the Buffalo-area sales team. I participate in weekly calls with the sales team and visit the Buffalo sales office approximately every few months. I report to an Area Sales Manager, based in Buffalo. My current Area Sales Manager is Mike Zelasko and I previously reported to Brian Weber.

5.       I am responsible for all small package accounts, which are accounts that ship packages and generate up to $300,000 in revenue annually, in my "Patch of Land"—the territory for which I am responsible. When UPS introduced the Patch of Land concept in late 2010, a significant number of existing accounts, for which I previously had not been responsible, were assigned to me and my account base grew enormously. Since that time, I have had approximately 4,500 accounts within my territory, though that number naturally varies from year to year.

6.       Customers in my territory typically open their own UPS accounts either by calling a UPS 1-800 number or going online to UPS.com. After an account is opened, I may talk with the customer about entering into a Carrier Agreement, which sets agreed upon rates and discounts. This typically occurs if the customer requests a discount on volume shipping or if I notice a new account in my Patch of Land has opened and begun to have significant volume.

7.       Attached as Exhibits[1] are Carrier Agreements between UPS and businesses that sold tobacco products in my territory that are relevant to this case. While I negotiate the Carrier Agreement with the customer, I often do not meet in person with the individual who signs the Carrier Agreement. This occurs frequently when the signor is the owner and not the employee or the primary contact at the customer with whom I negotiate the Carrier Agreement.

[1] DX-057, DX-059, DX-164, DX-168, DX-190, DX-225, DX-284, DX-288.

8.      I forward signed Carrier Agreements to UPS Corporate, do not retain a copy, and have no knowledge of how UPS Corporate maintains the Carrier Agreements. Accordingly, I do not know if Carrier Agreements are missing from UPS's records. (Many of the businesses that sold tobacco products relevant to this case may not have had a Carrier Agreement as they did not ship sufficient volume to warrant any shipping discounts or never asked for a discount.)

9.      My Patch of Land includes four UPS Centers based in Dunkirk, Jamestown, Olean, and Hornell, New York. This is a widely dispersed geographic area. The trip from Dunkirk to Jamestown to Hornell, for example, covers more than 130 miles. And Hornell is approximately 100 miles from my home. Thus, while I attempt to meet in person with as many customers as I can, meeting in person with each one of my accounts each year is not always feasible or practical. I try to call, email, or visit my larger accounts on a quarterly basis. Sometimes I am unable to do so or believe it is not necessary because they have no particular issue that I need to address with them.

10.     The Dunkirk and Olean Centers serve the Seneca Nation, specifically, the Seneca Cattaraugus and the Seneca Allegany Reservations (collectively, the "reservation"). I understand that some of the UPS customers within my Patch of Land or territory relevant to this case are located on the reservation. Within the last six years, a handful of the customers relevant to this case have been among the top 20 accounts within my territory, measured by volume and revenue, several of which I gained in the "Patch of Land" transition.

11.     I know UPS's Tobacco Policy and I understand the importance of enforcing it. I first learned of UPS's Tobacco Policy after I became an AE in or about 2005. At that time, I learned that UPS had signed an agreement with the New York State Attorney General not to ship cigarettes to consumers, called an Assurance of Discontinuance ("AOD"). Under UPS's Tobacco

Policy, customers who violate the Policy typically are terminated, although I understand UPS is permitted to subject them to progressive discipline.

12.     As an AE, I earn a base salary and a bonus, which is called a Sales Incentive Program ("SIP"), although most of my compensation derives from my base salary. My performance (and resulting SIP) is evaluated, in part, against a business plan, which my supervisors develop based on volume and revenue from my current accounts. In general, the higher my volume and revenue compared to the business plan, the higher my SIP. If I lose accounts, my performance and SIP, and thus my compensation, may suffer even when the account is terminated by UPS for violating its policy. As my annual business plan is based on current accounts, I do not want include in that plan any shipper that is likely to violate UPS's Tobacco Policy and subsequently be terminated. Accordingly, I am careful to ensure that my accounts know UPS's Tobacco Policy and comply with it. As part of this effort, I maintain general practices such as frequently reiterating the Tobacco Policy in conversations with my customers.

13.     When I became an Account Executive, I inherited a number of tobacco accounts, some of which later were terminated. When those tobacco accounts were terminated, it hurt my SIP. I also was concerned that the law would change and tobacco products that were permitted to be shipped, such as little cigars and loose tobacco, would become illegal and thus additional tobacco accounts would be terminated. Accordingly, periodically over the years, I have asked my supervisors to remove tobacco accounts from my business plan. While UPS took several steps to mitigate the impact of potential terminations, such as expanding my Patch of Land so that it would include more shippers, I would have preferred that the tobacco accounts had been removed from my business plan. I have no interest in having a noncompliant shipper in my

business plan both because following UPS's policies and the law is not optional and because any subsequent termination can hurt my compensation (the SIP).

14.     In order to ensure that it remained permissible and legal for customers to ship little cigars and other non-cigarette tobacco products, I periodically have asked my supervisors if UPS has any intention of changing its policy regarding shipping such tobacco products. DX-273, and DX-99, and Exhibit DX-274 are examples of those communications. I understand that UPS provides a vital service to businesses on the reservation and has not changed its tobacco policy as the law permits those items to be shipped.

15.     While UPS always emphasizes the need to increase our customer base (grow the business) and to increase the volume and revenue from existing customers, I know that abiding by UPS's policies, including UPS's Tobacco Policy, is essential. UPS frequently makes clear that compliance with company policy, such as the Tobacco Policy, is the first priority. Accordingly, I never kept an account when I believed it was violating UPS's Tobacco Policy. I also never failed to alert my supervisors or UPS Corporate or Dangerous Goods if I had any concerns or suspicions that any of my tobacco accounts might be violating UPS's Tobacco Policy.

**UPS's Tobacco Policy**

16.     UPS's Tobacco Policy provides that in order for a shipper to ship tobacco other than cigarettes to a consumer, the shipper must first sign a contract that is called a Tobacco Shipper Agreement ("Tobacco Agreement") in which the shipper agrees to follow UPS's Tobacco Policy. Among other things, the Tobacco Agreement reinforces UPS's Tobacco Policy; the Tobacco Agreement prohibits the shipment of cigarettes to consumers, requires the shippers to comply with UPS's Tobacco Policy, and requires the sharing of the shipper's tobacco

compliance policies with UPS. If a shipper intends to ship tobacco products only to licensed business (not consumers), no Tobacco Agreement is required.

17.     I was an AE at the time UPS signed the AOD and I remember the effort to implement UPS's Tobacco Policy after the AOD was signed. After the AOD went into effect, UPS terminated accounts within my territory that shipped tobacco products to consumers, regardless of the types of tobacco that they shipped. Tobacco shippers only were permitted to open new accounts if they recognized UPS's new Tobacco Policy and agreed to adhere to it by signing a Tobacco Agreement. Accounts that shipped tobacco products only to licensed businesses could remain open and did not need to be terminated. Exhibit DX-027 is an email communication between me and UPS Corporate about this issue.

18.     Attached as Exhibits[2] are the Tobacco Agreements between UPS and the tobacco accounts in my territory that are relevant to this case. Before or at the time I obtained a signed Tobacco Agreement, I explained UPS's Tobacco Policy to make sure the customer was aware and understood it and agreed to abide by it.

19.     When I obtained the signed Tobacco Agreement from my customers in person, I met with the owner or manager signing the Tobacco Agreement or sometimes obtained the already executed Tobacco Agreement from an employee of the business.

20.     When I obtain a signed Tobacco Agreement, I forward it to UPS Corporate or Dangerous Goods. I do not retain a copy of the signed Tobacco Agreement and have no knowledge of how UPS maintains hard copies of the Tobacco Agreements. There have been several instances when UPS could not locate a copy of a signed Tobacco Agreement and I was instructed to obtain a new one from the customer, which I did and then forwarded the new signed Tobacco Agreement to UPS Corporate or Dangerous Goods.

---

[2] DX-051, DX-054, DX-055, DX-056, DX-058, DX-210, DX-281, DX-313, DX-320, DX-535, DX-536, DX-541.

21.     When I started as an AE and UPS's Tobacco Policy went into effect, it was my general practice to talk to my customers who sold tobacco products about what products they intended to ship with UPS. This was my general practice for any account, regardless of the name of the account, and regardless of whether the account existed before the policy change in 2005 or was opened after the 2005 change. If a customer informed me that they ship, or intended to ship, tobacco products other than cigarettes, such as little cigars, pipe tobacco, chewing tobacco, and roll-you-own kits, to consumers, I asked them to sign a Tobacco Agreement. If a customer informed me that they ship, or intended to ship, cigarettes to consumers, I explained that UPS's Tobacco Policy expressly forbids them from doing so, and I refused to service the account unless the customer agreed to comply with UPS's Tobacco Policy (meaning, among other things, that it agreed to sign a Tobacco Agreement and agreed not to ship cigarettes to consumers via UPS).

22.     Beginning in or about 2008, I noticed a trend on the reservation away from selling premium-brand cigarettes to selling Native American brand cigarettes and then to selling little cigars. At that same time, more and more customers told me that they intended to ship or were shipping little cigars. Little cigars are much less expensive than Native American brand cigarettes and significantly less expensive than premium brand cigarettes.

23.     I have seen the kinds of little cigars that tobacco accounts sell and ship. A pack or carton of little cigars is virtually indistinguishable in weight, size, and appearance (except for the writing on the pack or carton indicating "little cigars") from a pack or carton of cigarettes. When cartons of little cigars are boxed up in sealed packages for pick-up by UPS, no one can see the writing on the carton, so a sealed package containing little cigar cartons is indistinguishable from a sealed package containing cigarette cartons.

24.     After UPS signed the AOD in 2005, I was directed to and did review UPS's Tobacco Products Transportation Procedures Manual, a copy of which is attached as Exhibit DX-022. After that, UPS reminded me periodically about UPS's Tobacco Policy, including during weekly sales meetings with my supervisors.

25.     I also have informed, clarified, and reminded other UPS employees about UPS's Tobacco Policy. For example, I have sometimes trained drivers at the Olean and Dunkirk Centers by giving Pre-work Communication meetings ("PCMs") addressing UPS's Tobacco Policy. I also have spoken to drivers and explained to them the difference between little cigars, which UPS customers are permitted to ship to consumers, and cigarettes, which UPS customers are not permitted to ship to consumers.

26.     In September 2011, I received by email and reviewed a "BD Memo" (a Business Development Memorandum) reinforcing UPS's compliance with UPS's Tobacco Policy. The Memo reminded the sales force about the 2005 AOD, referred to a recent ATF investigation of UPS customers who may have been illegally shipping cigarettes, and instructed the sales force to identify customers in New York that ship cigarettes or other tobacco products, and to ensure that any such customers are doing so in compliance with UPS's Tobacco Policy. Exhibit DX-537 is the BD Memo.

27.     In my initial response to the BD Memo, I informed my supervisor at the time, Brian Weber, that, with the exception of one erroneous package sent by a shipper named BearClaw, all of my tobacco accounts were shipping cigars, not cigarettes. I initially thought I did not need to use the web link provided in the BD Memo to identify those customers that shipped cigars because I already had provided a Tobacco Agreement for those customers. An email in which I conveyed this belief is included in Exhibit DX-537.

28.     I later came to understand that I was required to identify *all* tobacco customers through the web link, not just those wholesalers that might be shipping cigarettes to commercial addresses. An email chain regarding my conversations about this issue with Brian Weber and Gary DeWeerd, UPS Security, are attached as Exhibit DX-123. Thereafter, I used the web link provided in the BD Memo to identify customers that ship cigarettes commercially and customers that ship other tobacco products, including cigars. If the customer already was included in the web link as an identified tobacco customer, there was no need for me to add the customer to the list. An email I sent to Brian Weber about this issue is included in Exhibit DX-123.

29.     I then emailed a colleague, Judson Timothy McDowell, Inside Sales Representative, about the identification of tobacco customers on September 28, 2011. That email is attached as Exhibit DX-124. Mr. McDowell was a colleague from "inside sales," a group at UPS that works with Account Executives, such as myself, to support our work with UPS customers and he covered my territory. In my September 28, 2011 email, I asked Mr. McDowell to use the web link provided in the BD Memo to identify customers in New York that ship cigarettes commercially or ship other tobacco products. While I have no specific memory, I believe, based on past experience working with Mr. McDowell, that he would have followed that direction, as he typically followed through with all requests and I never received any indication from anyone that he did not do so in this instance.

30.     During the past years, UPS has enhanced its compliance programs and policies with respect to, among other areas, dangerous goods, which include tobacco products. There now is a 1-800 number to report any suspicions about a shipper violating UPS's Tobacco Policy. In addition, for the past several years, when I obtain a new customer that may be a tobacco shipper, I notify Brad Cook, UPS Dangerous Goods. I cannot enter into a Tobacco Agreement with any

customer before Mr. Cook approves that customer for shipping. In addition, about two years ago, I noticed a new poster displayed prominently on the bulletin board at the Dunkirk and Olean Centers that reminds drivers of UPS's Tobacco Policy, identifies red flags or warning signs that a customer may be illegally shipping cigarettes, and tells drivers to call the 1-800 number if they have any suspicions or concerns.

**Smokes & Spirits**

31.     Smokes & Spirits was a former account in my Patch of Land. It was a warehouse located at 270 Rochester Street, Salamanca, New York 14779 on the reservation. Its primary account number was W9476E. The account was opened on or about August 26, 2010 and terminated by UPS on or about January 24, 2015 when cigarettes were found during UPS's audit of its packages.

32.     At the time Smokes & Spirits opened its account in late August 2010, I spoke to Bob Oldro, whom I believed to be the owner of Smokes & Spirits. Mr. Oldro informed me that he was moving to New York from another state to take advantage of the growth in New York's little cigar market by opening up a new business to ship little cigars. As Smokes & Spirits intended to ship tobacco products, I explained UPS's Tobacco Policy to him and he signed a Tobacco Agreement on behalf of Smokes & Spirits. A copy of the signed Tobacco Agreement dated October 11, 2010 is attached as Exhibit DX-055.

33.     Within a few months after Smokes & Spirits opened its account and after it signed the Tobacco Agreement, on November 11, 2010, I received an email from Scott Winkley, UPS Business Manager, attaching a letter purportedly faxed to the Jamestown Center from an entity called the Tobacco Watchdog Group. A copy of that email and letter is attached as Exhibit DX-062.

34.     I had never heard of and still have no idea what the Tobacco Watchdog Group is or if it is affiliated with any individual, group, or entity. The Tobacco Watchdog Group letter alleged that UPS salespeople were encouraging shipments of cigarettes from a number of shippers. The shippers specifically identified in the letter included a shipper named "Smokes & Spirits." I believed that this letter was based on the Tobacco Watchdog Group's misunderstanding of the difference between little cigars and cigarettes.

35.     After receiving the Tobacco Watchdog Group letter, I quickly followed up with Smokes & Spirits in person and spoke with one or both of the women who worked there. They both reiterated to me that Smokes & Spirits was only shipping little cigars. I also reiterated UPS's Tobacco Policy, once again. Thereafter, I followed up with Mr. Oldro in person and had the same conversation.

36.     Based on my discussion with Smokes & Spirits at the time its account was opened, its signing of the Tobacco Agreement, and my subsequent conversations with it after I received the Tobacco Watchdog Group letter, I believed that Smokes & Spirits was shipping little cigars in conformance with UPS's Tobacco Policy.

37.     There are records in the TEAMS database—a database that AEs and other sales employees at UPS use to record their visits and other contacts with UPS customers—of some of my visits to Smokes & Spirits. Those records reflect that Smokes & Spirits's business plan to ship little cigars remained the same over time. Those records are attached as Exhibit DX-526, ("In Person Details," lines 3257-58).

38.     I may have had additional conversations with Mr. Oldro or the two women who worked at Smokes & Spirits again reiterating UPS's Tobacco Policy, as it was my practice to periodically remind tobacco shippers of UPS's Tobacco Policy when I visited them or spoke

with them the phone or communicated with them by email. I have no specific recollection of those conversations and there are no notes in the TEAMS database about any such conversations, but I generally would not note in TEAMS of standard-type conversation, like my reiterating UPS's Tobacco Policy to a customer.

39.     On January 13, 2014, during one of my check-in calls with customers, I spoke with Mr. Oldro on the phone and he reiterated that Smokes & Spirits was shipping primarily little cigars and not shipping cigarettes. I made notes of that call in the TEAMS database and that excerpt is attached as Exhibit DX-511, line 250. Less than two weeks later, I was surprised to learn that UPS had audited Smokes & Spirits (meaning that UPS had opened a package(s) shipped by Smokes & Spirits) and found cigarettes in its packages as described below.

40.     On January 24, 2014, I was informed by Mr. Cook that UPS had audited Smokes & Spirits and that cigarettes were found in its packages addressed to consumers. As a result, UPS had terminated the account effective immediately. A copy of the email informing me of the audit and termination is attached as Exhibit DX-260.

41.     The audit of Smokes & Spirits and resulting discovery of cigarettes came as a surprise to me: as noted above, I had spoken to Mr. Oldro only a couple of weeks earlier, on January 13, 2014, and he assured me that Smokes & Spirits was shipping only little cigars, which was consistent with all my prior discussions with him, including why he decided to move to New York and open Smokes & Spirits, as well as my discussions with the two women who worked at Smokes & Spirits.

42.     As with all audits conducted by UPS, I had no involvement in the actual audit itself, no discussions with UPS Corporate or Dangerous Goods or anyone at the Centers about the fact that an audit was going to take place, and thus had no advanced knowledge that any

particular audit would occur. I did not participate in UPS's decision to terminate Smokes &
Spirits's (or any other) account.

43.     Following UPS's termination of Smokes & Spirits's account, I sent an email to
Mr. McDowell, the inside salesman who also covered customers in my region, expressing my
hope that Smokes & Spirits would be removed from my plan, and thus not hurt my volume and
revenue and therefore my SIP. In this email, attached as Exhibit DX-258, I expressed my
frustration regarding having tobacco accounts on my plan. I felt I was taking all precautions but
still potentially having my SIP compensation negatively affected.

44.     As an AE, I do not typically receive information about calls to a UPS 1-800
number inquiring about the status of packages or claims for lost or damaged packages sent from
my customers. When I have become involved with a customer's claim for a lost or damaged
package, it is because the customer has had the claim denied twice and then asked me, as the AE,
for help. I do not recall ever having been involved in, or even hearing about, any inquires or
claims about any Smokes & Spirits's packages made to UPS's 1-800 number.

**Shipping Services**

45.     Shipping Services was a former account in my Patch of Land. The account was a
store front located at 13113 Route 438, Gowanda, New York 14070 on the reservation. Its
account number was 03E04E. The account was opened on November 22, 2005 and terminated by
UPS on January 13, 2014 when cigarettes were found during UPS's audit of its packages.

46.     Shipping Services was opened after UPS terminated the account of Seneca
Ojibwa Trading Company in November 2005, when the AOD went into effect. I was not the AE
on the Seneca Ojibwa account and never helped it as an External Technician.

47.     Shipping Services intended to ship tobacco products and it signed a Tobacco Agreement, but I do not recall being involved in the signing of that Agreement. Shipping Services's Tobacco Agreement was signed on behalf of UPS by Tina Mahon, who held the title Sales Support Representative and who handled smaller accounts in what is now my territory, following the Patch of Land transition. (A copy of Shipping Services's Tobacco Agreement dated August 4, 2010 is attached as Exhibit DX-051.

48.     As I do not recall being involved with the signing of Shipping Services's Tobacco Agreement, I do not know why it was completed under the name "Cayuga Rd Trading," but Robert [Bulls], who signed it on behalf of the customer, was my primary contact at Shipping Services.

49.     For the first several years, Shipping Services had virtually no shipping volume and thus I had no contact with that customer. (There was no need for me to visit an account that was essentially inactive, given the thousands of other accounts in my territory.)

50.     In accordance with my general practice, I visited Shipping Services between 2010 when its shipping volume began to pick up, when UPS terminated its account in 2014, as well as spoke to it on the telephone at least once a quarter. When I visited Shipping Services, I saw little cigars but not cigarettes.

51.     Based on my general practice, during any visits and the quarterly calls, I often reiterated UPS's Tobacco Policy to Shipping Services and was assured that Shipping Services still was only shipping non-cigarette tobacco products, such as little cigars, to consumers in conformance with UPS's Tobacco Policy. As I explained above, there are no notes in the TEAMS database about any such conversations because I generally would not make a note in TEAMS of standard-type conversation, like my reiterating UPS's Tobacco Policy.

52.     Beginning in 2011, I had repeated contact with Shipping Services regarding its potential for expanding its business and shipping volume. For example, I visited Shipping Services on January 11, 2011 and again in March 2011. During those visits, Robert [Bulls] informed me that Shipping Services's volume would likely remain consistent because it was retaining the same customer base and did not intend to grow its business. Attached as Exhibit DX-526 ("In Person Details," lines 3255-56), is an excerpt from the TEAMS database of those visits.

53.     Around 2012, a year or so after Shipping Services's shipping volume had begun to increase, its volume started to decline, and I periodically raised this decline with Robert [Bulls] and discussed it with my supervisor at the time. Attached as Exhibit DX-132 is the email thread with my supervisor about Shipping Services's decline in shipping volume dated February 6, 2012. During my discussions with [Robert] Bulls, both in person and on the phone, he told me Shipping Services intended to keep shipping the same products to the same customer base. After I raised the declining business issue with Shipping Services several times, Robert [Bulls] told me, essentially, that I was bothering him and to stop reminding him that the business was declining. A copy of my TEAMS entries regarding these interactions are attached as Exhibit DX-511, lines 185, 189, and 190.

54.     Nevertheless, I continued, as was my practice, to check-in with Shipping Services on the phone, and I attributed the decline in its shipping volume to the economy. During one such call with Shipping Service on February 5, 2013, Robert [Bulls] told me the business was considering moving out of New York due to some unspecified issues with New York State (which I took to mean general issues between the Seneca Nation and New York State) but had no

definitive plans to do so. A copy of my TEAMS entry regarding this discussion is attached as Exhibit DX-511, line 181.

55.     In January 2014, I was informed by Mr. Cook that UPS had conducted an audit of Shipping Services, that cigarettes had been discovered, and that the account needed to be terminated effectively immediately. Attached as Exhibit DX-246 is a copy of emails between Mr. Cook and me (and others) about the audit of Shipping Services and the need to terminate its account. An additional email thread about the audit and termination between Mr. Cook, my supervisors, and me is attached as Exhibit DX-250. Like with all audits, I did not participate in the audit, was not informed of the audit before it happened, and did not participate in UPS's decision to terminate the account, although I informed Shipping Services of the decision.

56.     When Shipping Services's account was terminated, I was disappointed to lose the volume and expressed my disappointment in an email to Mr. McDowell, the Inside Sales Representative who also covered my territory. Attached as Exhibit DX-247 is a copy of that email. While I always was disappointed when an account was terminated, because it might affect my SIP, I understood and agreed with UPS's decision that a shipper that failed to abide by UPS's policies, including UPS's Tobacco Policy, and/or the law should be terminated immediately (except that I understand and agree that BearClaw, as described below, was given a second chance, as permitted by the AOD).

57.     I do not recall ever having been involved in, or even hearing about, any inquires or claims about any Shipping Services's packages made to UPS's 1-800 number.

**Elliot Enterprises**

58.     Elliot Enterprises was a former account in my Patch of Land. The account was located at a store front located at 38 Main Street, Salamanca, NY 14779 on the reservation. I have attached pictures of the location as DX-490. Its primary account number was X1X635. Elliot Enterprise's account was opened on October 4, 2010 and terminated by UPS on February 14, 2012 although I do not know the reason for termination.

59.     At least in the beginning, I did not have regular interaction with Elliott Enterprises because it was a low volume shipper (meaning it did not ship a lot of packages with UPS) that was handled by Tina Mahon, the Sales Support Representative, who back then worked with smaller accounts in my territory. ~~I have reviewed UPS's Carrier Agreement with Elliot Enterprises and it was signed by Ms. Mahon before Elliot was assigned to me in the Patch of Land transition.~~     *JMY*

60.     After Elliot Enterprises was assigned to me I noticed, based on my TEAMS entry, a discrepancy in certain UPS reports regarding its volume and revenue. Exhibit DX-526 ("In Person Details," line 3194), is a copy of this TEAMS database entry. Accordingly, and as it was an account with which I was not familiar, I visited Elliot Enterprises on February 4, 2011, as reflected in the attached TEAMS database entry. I do not recall with whom I spoke at Elliot Enterprises but, I know it was not Adrian—a woman I knew from a prior shipper that I helped when I was an External Technician and would encounter later on at EExpress, as explained below. As reflected in my TEAMS entry notes, I believed Elliot Enterprises was shipping little cigars with UPS and I needed to find out who owned Elliot Enterprises or who would be my primary contact for the account. The notation "Tina had p" probably refers to the fact that Ms. Mahon ~~had entered into the~~ Carrier Agreement and may have known the primary contact.

" Wouo Have Dealt W Hhltny"

*JMY*

17

61.     While I may have spoken to Elliot Enterprises after February 2011, I have no memory of those conversations. As Elliot Enterprises indicated it intended to ship little cigars during my February 2011 visit, either during that visit and maybe also during any subsequent conversations, I probably informed Elliot Enterprises of UPS's Tobacco Policy, but I have no specific recollection of those conversations. I also do not recall if I ever got a primary contact for Elliot Enterprises or had it enter into a Tobacco Agreement.

62.     The November 11, 2010 letter faxed to the Jamestown Center from an entity called the Tobacco Watchdog Group included a shipper named "Elliot Industries." (*See* Exhibit DX-062) When I reviewed the letter back in 2010, however, I did not associate Elliott Industries with Elliot Enterprises as many businesses have similar names (for example, at that time, I had 21 different accounts with "Industries" in the name), I had not yet visited it, and Ms. Mahon primarily had handled the account up to that point in time.

63.     I do not know the specific facts surrounding the termination of Elliot Enterprises, but I do recall that UPS cancelled its account sometime in September 2012 because a driver suspected that it might be shipping cigarettes.

64.     I do not recall ever having been involved in, or even hearing about, any inquires or claims about any Elliot Enterprises's packages made to UPS's 1-800 number.

**EExpress**

65.     EExpress was a former account in my Patch of Land. The account was located at a residential house at 11074 Indian Hill Road, Perrysburg, New York 14129 on the reservation. Its primary account number was 8T74T8. The account was open on September 20, 2012 and UPS terminated it on June 13, 2014 when cigarettes were found during UPS's audit of its packages.

66.     For EExpress, I dealt exclusively with a woman named Adrian. At some point, I learned Adrian's last name was Elliot because it appears that way in my cellphone, but I remember her only as Adrian. I first met Adrian back in 2004-05 when I was an External Technician for UPS and she worked at a smoke shop called LouAnn's Smoke Shop. I helped install UPS shipping software and shipping equipment at LouAnn's Smoke Shop and dealt with Adrian as well as LouAnn when they needed technical help.

67.     Five days after EExpress opened its account, I spoke to it about entering into a Carrier Agreement and recognized the voice as belonging to Adrian. As reflected in my TEAMs database entry attached as Exhibit DX-511, line 40, Adrian told me she needed to review the Carrier Agreement with her business partner and would get back to me. I did not know and she did not mention the name of her business partner. Shortly thereafter, I received a signed Carrier Agreement from Adrian, which was signed by Aaron Elliot although I did not know who Aaron Elliot was or if he was her business partner and I do not believe I ever met him. When I first spoke with Adrian right after the account opened, she told me EExpress did not need to sign a Tobacco Agreement because it would not be shipping any tobacco products. I asked but Adrian was not willing to share with me what products she intended to ship through EExpress; she said she wanted to keep her business model confidential to avoid competition from others on the reservation. As Adrian promised me EExpress was not shipping tobacco products and there was no indication from the name of the business or its location at a residence that it sold tobacco products, I had no reason to require EExpress to sign a Tobacco Agreement.

68.     I have reviewed an email thread from April 2013 in which I, in one email, referred to EExpress as a "cigar shop." That was a careless error and misstatement by me as I never knew EExpress to be a tobacco shipper or a cigar shop and I must not have been paying

careful attention to which account was being discussed in that email when I sent my response. A copy of the email is attached as Exhibit DX-184. In a later email before the account was terminated, my supervisor refers to the true fact that I always told him EExpress was not a tobacco shipper. That email is attached as Exhibit DX-305.

69.     As was my general practice, I spoke to Adrian on the phone approximately each quarter about EExpress's shipping needs and she always told me she was shipping a product no one else on the reservation was shipping and that it was not a tobacco product. I knew that EExpress was shipping a lot of packages, which I referred to in a TEAMs entry soon after the account opened as "shipping great guns (for now)." A copy of this TEAMS entry dated October 5, 2012 is attached as Exhibit DX-511, line 44.

70.     In May 2014, UPS audited EExpress and found Tim Hortons coffee (a popular brand in Buffalo) inside the packages. I was not informed about this audit before it occurred and do not know what prompted UPS to conduct the audit.

71.     I learned about the audit of EExpress the next morning when I was at the Dunkirk Center for my routine weekly visit, which I typically did on a Tuesday, and a colleague, Shelly St. George, asked me for help sending photographs of the audit to UPS Security, which help I provided. Exhibit DX-309 is an email referencing this help. I believe Mrs. St. George asked for my assistance because she is not particularly skilled at using computers and knows of my background as a technician and with computers.

72.     On June 13, 2014, I was informed that an audit the day before of EExpress packages had found cigarettes and thus UPS had terminated the account effective immediately. A copy of this June 13, 2014 notification is attached as Exhibit DX- 330.

73.     As with all audits including the prior EExpress audit that found coffee, I was not informed about the June 12, 2014 audit of EExpress before it occurred. I also did not participate in the decision to terminate EExpress's account.

74.     After the EExpress account was terminated, I spoke with my supervisor about my surprise that EExpress was shipping cigarettes, especially because it knew it could be audited as it had been notified of the coffee audit. I do not recall why I believed that EExpress knew that an audit of its packages had discovered coffee but it may have known because the delivery of the package was delayed by the audit although and it also is possible that I discussed the audit with Adrian after-the-fact. This discussion with my supervisor is reflected in a June 16, 2014 TEAMS database attached as Exhibit DX-511.

75.     In my June 16, 2014 TEAMS entry about the termination of EExpress, I refer to a "secondary contact," which was Adrian, attached as DX-511, line 47. I used the phrase secondary contact for Adrian because she had told me she had a business partner and I knew she had not signed the Carrier Agreement so probably did not own the business and was not the ultimate decision maker. Even though I referred to Adrian as a secondary contact, I do not recall speaking to anyone else at EExpress.

76.     Thereafter, on June 17, 2014, I spoke with Adrian at EExpress to inform her that UPS had terminated EExpress's account as a result of the audit and express my surprise that she had shipped cigarettes despite my express warnings to her that she could not ship cigarettes and her repeated representations to me that she would not do so. Adrian told me she had made the shipments of cigarettes on behalf of a friend and implied she had no idea cigarettes were in those packages. I told her UPS does not permit the reselling of UPS's services and, in any event, she was responsible for the products shipped under her account. She also claimed that UPS's audit of

EExpress was discriminatory, presumably because she was Native American and/or the business was on the reservation. A copy of an email I sent to my supervisor and Mr. Cook recounting this conversation is attached as Exhibit DX-334.

77.     I do not recall ever having been involved in, or even hearing about, any inquires or claims about any EExpress's packages made to UPS's 1-800 number.

78.     I understand that there is a claim that Elliot Enterprises and EExpress were related entities, both owned by an individual named Aaron Elliot. I never had any reason to believe this. Whereas Elliot Enterprises was a retail store, EExpress was operated out of a residential house on a different reservation from Elliot Enterprises, approximately 33 miles apart. I had different contacts at each entity. Further, I do not know an individual named Aaron Elliot and so believe I have never met him. I know from this litigation that Aaron Elliot's name appears on a Tobacco Agreement with EExpress but I do not know who he is or if he was affiliated with Elliot Enterprises in any way.

**Native Wholesale Supply and Seneca Promotions**

79.     Native Wholesale Supply was a former account in my Patch of Land. This account was located on a residential property at 11037 Old Logan Rd, Perrysburg, New York 14129 on the reservation. Native Wholesale Supply had an account with UPS beginning in 2002, before I became an AE, although at some point it had a bankruptcy issue and that account was closed, and a new account opened under account number A590X8 in October 2013. That account was cancelled this year but it had been an inactive account, meaning it basically did not ship anything with UPS.

80.     Seneca Promotions still is an account in my Patch of Land. Seneca Promotions has a corporate office at 464 Franklin Street, Buffalo, New York 14202, but is in my Patch of Land because it has a business that operates from a residential property located at 10955 Logan Road, Perrysburg, New York 14129 on the reservation.

81.     My primary contact at Native Wholesale Supply and Seneca Promotions was Tricia Thomas. Based on having the same primary contact (and being located in the same town), I believe these two companies had some affiliation but I do not know how or if they are affiliated.

82.     Neither Native Wholesale Supply nor Seneca Promotions shipped tobacco products. Rather, as I repeatedly was told by Ms. Thomas, the accounts shipped promotional and advertising materials for tobacco products (although based on the name, prior to my time before 2005, Native Wholesale Supply may have shipped cigarettes to retailers).

83.     On at least two occasions, UPS Dangerous Goods has asked me about these accounts and what they shipped. Although I knew from my conversations with Ms. Thomas that Native Wholesale Supply and Seneca Promotions only shipped promotional and advertising materials for tobacco products, I confirmed that again with Ms. Thomas in response to these inquiries. A copy of my October 16, 2015 email to my supervisors about one such inquiry is attached as Exhibit DX-381.

84.     As was my general practice, I spoke to Ms. Thomas approximately every quarter; she was easy to reach, always calling or emailing me back quickly. I visited Ms. Thomas once when she worked at Native Wholesale Supply's residential property but then she began to work out of Seneca Promotion's corporate office in Buffalo so I spoke to her on the phone or communicated with her through email.

85.     I understand that UPS conducted an audit of Seneca Promotions on January 14, 2014. No tobacco products of any kind were found in the audit. I was not told about the audit in advance and had no involvement in the audit.

86.     In October 2015, UPS Corporate told me UPS had attempted to conduct audits of Native Wholesale Supply and Seneca Promotions but that neither had shipped any packages recently so I was asked to visit these accounts and encourage them to ship packages. In my response email I incorrectly referred to Native Outlet, another shipper in my territory discussed below, rather than Native Wholesale Supply. This email chain is attached as Exhibit DX-381. While I believe I followed up on the request by called Ms. Thomas, I no specific memory of the conversation.

**AJ's Cigars**

87.     AJ's Cigars was an account in my Patch of Land. It was located in a large building at 12587 Route 438, Irving, New York on or near the reservation. The account number for AJ's Cigars was 34850X. The account was opened in September 2010 and was terminated by UPS, out of caution, in February 2014 when another company with a similar name pled guilty to illegal cigarette trafficking.

88.     My primary contact at AJ's Cigars was Andrew J. ("AJ") Wright.

89.     When AJ's Cigars opened its account, I visited it and saw that it only sold cigars, both the traditional, larger cigars and little cigars, and a variety of other non-tobacco products. Accordingly, on or about September 14, 2010, I had AJ's Cigars sign a Tobacco Agreement.

90.     In accordance with my general practice, I visited AJ's Cigars periodically, and probably spoke to Mr. Wright on the telephone at least once a quarter. Based on my general practice, during any visits and the quarterly calls, I often would have reiterated UPS's Tobacco

Policy to AJ's Cigars and been assured that AJ's Cigars shipped only little cigars in conformance with UPS's Tobacco Policy. There are no notes in TEAMS about any such conversations as I generally would not make a record of a standard-type conversation, like my reiterating UPS's Tobacco Policy.

91.     In early October 2013, UPS audited packages sent from AJ's Cigars. All of the packages contained only little cigars; no cigarettes were found. I had no knowledge of the audit in advance, did not participate in it in any way, do not know what prompted the audit, and was only informed about it after it had occurred. A copy of the email dated October 10, 2013 from Mr. Cook informing me of the audit of AJ's Cigars is attached as Exhibit DX-223.

92.     Following UPS's audit of AJ's Cigars, on October 10, 2013, I also received an email from Mr. Cook informing me that UPS had misplaced the physical Tobacco Agreement for AJ's Cigars and that I needed to obtain a new one. Rita Torres, UPS Corporate, informed me that AJ's Cigars's Tobacco Agreement likely was misplaced when UPS transitioned its file locations in November 2010. I have attached a copy of this email exchange as Exhibit DX-230.

93.     On October 24, 2013, I took a Tobacco Agreement to AJ's Cigars. I waited in reception while an employee took it upstairs and returned it to me signed. A copy of the new Tobacco Agreement for AJ's Cigars is attached as Exhibit DX-357. The Tobacco Agreement was signed by John Rupp who I do not know and never met.

94.     I understand that UPS terminated AJ's Cigar's account in February 2014 because an allegedly affiliated organization—AJ's Candy & Tobacco—pleaded guilty to trafficking contraband cigarettes. I did not participate in UPS's decision to terminate the account and do not know whether AJ's Cigars and AJ's Candy & Tobacco are affiliated in any way. I only know that UPS terminated the account for AJ's Cigars in an abundance of caution, not because it had

any knowledge that AJ's Cigars was shipping cigarettes to consumers. To my knowledge, AJ's Cigars never shipped cigarettes via UPS.

**Big Buffalo**

95.    Big Buffalo was an account on my Patch of Land. It was located at a store front at 11318 Route 20, Irving, New York on or near the reservation. Its account number was E561F1. Big Buffalo opened an account with UPS on February 20, 2014 and UPS terminated it in September 2014 because it refused to provide UPS with certain tax documents as required by the Tobacco Agreement.

96.    I understood that Big Buffalo was owned by Bill Segar, but my primary contact was Terry LaVigne who I understood ran the business.

97.    When Big Buffalo opened its account, I visited it and saw that it sold all types of tobacco products, including cigarettes, e-cigarettes, cigars, little cigars, pipe tobacco, and loose tobacco. I explained UPS's Tobacco Policy to Mr. LaVigne and he told me that Big Buffalo only intended to ship little cigars. Accordingly, five days after the account was opened, Big Buffalo by Mr. LaVigne signed a Tobacco Agreement. A copy of Big Buffalo's Tobacco Agreement is attached as Exhibit DX-281.

98.    Big Buffalo was a low volume account, meaning that it did not ship many packages.

99.    I know that in May 2014, UPS audited Big Buffalo and did not find any cigarettes in its packages. Beyond those details, I have no knowledge regarding the audit, do not know what if anything prompted it, did not know it was happening in advance, and had no involvement in it.

100.    In August 2014, Big Buffalo filed a claim for a package that had been returned to Big Buffalo as water damaged. The package contained tobacco products, but not cigarettes. UPS denied the claim because the customer service representative handling the claim mistakenly thought Big Buffalo had not signed a Tobacco Agreement. I attempted to help Big Buffalo appeal the denial by supplying the customer service representative with the signed Tobacco Agreement. A copy of an email exchange addressing this incident is attached as Exhibit DX-339.

101.    In September 2014, UPS terminated Big Buffalo's account because Big Buffalo refused to give UPS a copy of certain tax documents, as required under the Tobacco Agreement. I did not participate in UPS's decision to terminate Big Buffalo's account.

**Lake Erie Tobacco**

102.    Lake Erie Tobacco was an account in my Patch of Land. It was located at a warehouse at 6564 Route 417, Killbuck, New York. Its account number was 2W765W. Lake Erie Tobacco opened its account on May 9, 2006 and UPS terminated its account in September 2014 because Lake Erie Tobacco refused to give UPS a copy of certain tax documents, as required under the Tobacco Agreement.

103.    When I saw the account had been opened, because of its name, I contacted Lake Erie Tobacco to advise it of UPS's Tobacco Policy and, if required, to sign a Tobacco Agreement. I spoke on the phone with a woman, who I believe was Laura Wick, who told me that Lake Erie Tobacco did not intend to ship tobacco products to residences and it was a wholesaler that shipped only to retailers. Lake Erie Tobacco thus did not need to sign a Tobacco Agreement. Nevertheless, in an abundance of caution, I asked Ms. Wicks to have Lake Erie Tobacco sign a Tobacco Agreement, which I obtained through email. A copy of Lake Erie Tobacco's Tobacco Agreement dated May 28, 2014 is attached as Exhibit DX-319.

104.     I am aware that in June 2014, UPS audited Lake Erie Tobacco and that the audit did not reveal cigarettes. I have no knowledge of the circumstances surrounding the audit, did not participate in it, and had no advanced knowledge that it would take place.

105.     In September 2014, UPS terminated Lake Erie Tobacco's account because it refused to provide UPS with proof that it paid taxes on cigarettes it sold in New York, as required pursuant to its Tobacco Agreement. I did not participate in UPS's decision to terminate Lake Erie Tobacco's account.

**R J E S S**

106.     Ross John Enterprises Smoke Shop ("RJESS") was an account on my Patch of Land. It was located at a warehouse behind a gas station at 6665 Route 417, Killbuck, New York 14748 on or near the reservation. I have attached pictures of the location as DX-490. Its account number was W3Y62A.

107.     RJESS previously had an account called Iroquois Tobacco Direct with UPS that was terminated in 2005 when UPS terminated a number of smoke shops accounts, pursuant to the AOD.

108.     RJESS opened an account with UPS on April 7, 2005. Its account number was W3Y624.

109.     The owner of RJESS was Ross John, a college professor, but the business was run by Ray Turner who was my primary contact.

110.     On January 28 and 30, 2014, UPS audited RJESS. I do not know the circumstances surrounding the audits and had no advanced knowledge of them, but I know they did not reveal cigarettes.

111.    After the audits, UPS informed me that it did not have copy of RJESS's physical Tobacco Agreement and asked me to obtain a new one. A copy of this email exchange is attached as Exhibit DX-277.

112.    I contacted RJESS and obtained a new Tobacco Agreement signed by Mr. Turner. I also reminded it of UPS's Tobacco Policy. A copy of my TEAMS database entries reflecting these discussions with RJESS is attached as Exhibit DX-520 line 167-169. A copy of RJESS's new signed Tobacco Agreement dated May 16, 2014 is attached as Exhibit DX-313 and my email forwarding it to UPS Corporate and Dangerous Goods that same day is attached as Exhibit DX-542.

113.    I know UPS eventually terminated the RJESS account, but I do not know why and did not participate in that decision.

**Cloud & Co.**

114.    Cloud & Co. was an account in my Patch of Land. It is located at a storefront at 6646 Route 415, Killbuck, New York. Its account number was X17V20. Cloud & Co. opened an account with UPS on October 13, 2010 and UPS terminated it in September 2014 because it would not give UPS a copy of certain tax documents as required by the Tobacco Agreement.

115.    I know Cloud & Co. had a prior UPS account sometime before 2005 because I had worked with the account when I was an External Technician, installing shipping equipment and I believe, back then, it shipped cigarettes.

116.    Tina Mahon, an Inside Sales Representative who handled smaller package accounts in my area prior to the Patch of Land transition, primarily handled this account when it was opened. Ms. Mahon obtained a Tobacco Agreement signed by Ms. Boon on behalf of Cloud & Co. and by Ms. Mahon on behalf of UPS dated October 13, 2010, the same day the account

was opened. Cloud & Co.'s Tobacco Agreement is attached as Exhibit DX-056. Less than a

week later, on October 19, 2010, Ms. Mahon on behalf of UPS and Ms. Boon on behalf of Cloud

& Co. signed a Carrier Agreement. Attached as Exhibit DX-057 is Cloud & Co.'s Carrier

Agreement.

117.    Like with Elliot Enterprises, when Patch of Land was introduced, Cloud & Co.

was assigned to me. My primary contact at Cloud & Co. both when I was an External Technician

or later as an AE was Ms. Boon.

118.    As was my general practice, I spoke to Ms. Boon on an approximately quarterly

basis and she told me that Cloud & Co. only intended to ship little cigars with UPS and that they

would not ship exclusively through UPS because UPS would not accept cigarettes. I have seen in

a July 2011 TEAMS entry that Cloud & Co. conveyed this same information to Stephanie Lane

(who I believe I know as Stephanie Bresola who was a Sales Support Representative in Buffalo).

A copy this TEAMS report is attached as Exhibit DX-511, line 85.

119.    In accordance with my general practice, when I visited Cloud & Co. periodically

and communicated with it by phone or email. I often would have reiterated UPS's Tobacco

Policy and been assured that Cloud & Co. shipped only little cigars in conformance with UPS's

Tobacco Policy. There are no notes in TEAMS about any such conversations as I generally

would not make a record of a standard-type conversation, like my reiterating UPS's Tobacco

Policy.

120.    In May 2014, I learned that UPS Corporate could not locate Cloud & Co.'s

physical Tobacco Agreement and asked me to obtain a new one. Attached as Exhibit DX-540 is

an email to me about the need to obtain a new Tobacco Agreement. Accordingly, on May 28,

2014, I contacted Ms. Boon, reminded her of UPS's Tobacco Policy and asked that she sign a

new Tobacco Agreement. My email exchange with Ms. Boon is attached as Exhibit DX-539. That same day, May 28, 2014, Cloud & Co. by Ms. Boon signed and returned to me a new Tobacco Agreement with UPS. Attached is copy of Cloud & Co.'s new Tobacco Agreement as Exhibit DX-056.

121.    In September 2014, UPS terminated Cloud & Co.'s account because it refused to provide UPS with certain tax documents as required by the Tobacco Agreement. I did not participate in UPS's decision to terminate the account.

**Sweet Seneca Smokes**

122.    Sweet Seneca Smokes is a current UPS account in my Patch of Land. Sweet Seneca Smokes is located at a residence at 14411 Route 438, Gowanda, New York. Sweet Seneca Smokes's account number is V2W459. Sweet Seneca Smokes opened its UPS account on February 14, 2014 and it remains an active account.

123.    When I noticed the account had been opened, I contacted Sweet Seneca Smokes because of its name to find out what it intended to ship, advise it of UPS's Tobacco Policy, and, if needed, obtain a Tobacco Agreement. I spoke with a man named James Phillips at Sweet Seneca Smokes, who became my primary contact. Mr. Phillips told me, as did Mr. McDowell, the Inside Sales Representative for my territory, that Sweet Seneca Smokes intended to ship only little cigars. Attached as Exhibit DX-274 is an email from Mr. McDowell reflecting that information. Accordingly, I advised Mr. Phillips about UPS's Tobacco Policy and had Sweet Seneca Smokes sign a Tobacco Agreement, which it did, signed by Mr. Phillips. Attached as Exhibit DX-527 is Sweet Seneca Smokes's Tobacco Agreement. My email transmitting the new signed Tobacco Agreement for Sweet Seneca Smokes to UPS Corporate is attached as Exhibit DX-274.

124.     At the time Sweet Seneca Smokes opened its account, there was considerable discussion between UPS Dangerous Goods, my supervisors, and me related to our efforts to confirm that Sweet Seneca Smokes would not violate the Tobacco Agreement. Copies of email exchanges regarding these efforts discussions are attached as Exhibit DX-274. For example, we considered whether it might be related to previously terminated shippers but found no such evidence. I have reviewed emails sent to me by Mr. McDowell who had a "feeling" Sweet Seneca Smokes was connected to, among others, Shipping Services, AJ's Cigars, and "Bob Oldrow/Oldsrow" (a similar name to Bob Oldro who was my primary contact at Smokes & Spirits). Attached as Exhibit DX-276 is a copy of that email and Exhibit DX-274 reflects the same conversation. I have no idea why Mr. McDowell had that feeling as we never found anything to suggest Sweet Seneca Smokes had any such connections.

125.     In June 2014, UPS audited Sweet Seneca Smokes. I do not know the circumstances surrounding the audit and did not participate in it but know that it did not reveal cigarettes.

**Native Gifts**

126.     Native Gifts is an account in Basom, New York, which is located in the Patch of Land of another Account Executive, Richard Delbello.

127.     In October 2013, Native Gifts temporarily re-located to Irving, New York, which is in my Patch of Land. Native Gifts told me it temporarily relocated because a flood had damaged its building in Basom, New York, which had to be rebuilt. Copies of my TEAMS entries about Native Gifts's temporary relocation including entries by Keith Ryan Keith, who I presume was an Inside Sales Representative whose territory included Basom, New York are attached as Exhibit DX-520.

128.    I knew Native Gifts was a tobacco shipper and I may have discussed this account with Mr. Delbello prior to its temporary re-location to my Patch of Land as Mr. Delbello sometimes asked me for advice about smoke shops accounts because I handled many more such accounts than he did.

**Native Outlet**

129.    Native Outlet is an account in my Patch of Land. Native Outlet is located in a building at 11157 Lakeshore Road, Irving, New York. I have attached pictures of the location as DX-490. Its account number is X29128. Native Outlet opened an account with UPS on October 18, 2010 and remains an active account.

130.    My primary contact at Native Outlet was a woman who I knew as "Sis."

131.    When it opened, Native Outlet informed me it was a tobacco shipper and intended to ship cigars so I required it to sign a Tobacco Agreement, which it did on October 19, 2010. A copy of this Agreement, signed by John Waterman, who I do not know and never met, is attached as Exhibit DX-058.

132.    In accordance with my general practice, I visited Native Outlet periodically, as well as probably spoke to Sis on the telephone at least once a quarter. Based on my general practice, during any visits and the quarterly calls, I often would have reiterated UPS's Tobacco Policy and been assured that Native Outlet shipped only little cigars in conformance with UPS's Tobacco Policy. There are no notes in TEAMS about any such conversations as I generally would not make a record of a standard-type conversation, like my reiterating UPS's Tobacco Policy.

133.    In July 2013, UPS Security audited a Native Outlet package because UPS suspected it contained alcohol. The package, however, contained only cigars. A copy of an email conveying this information to me is attached as Exhibit DX-195.

134.    I understand that UPS audited Native Outlet on four separate occasions: January 8, 2014, October 6, 2015, January 14, 2016, and April 27, 2016. I understand that in each audit, no cigarettes were found, only little cigars or other tobacco products. I did not participate in any way in these audits and had no advanced knowledge the audits were happening.

**Post Smokes**

135.    Post Smokes was an account located in my Patch of Land. I do not recall many details regarding Post Smokes although I do recall it was a tobacco account. This is due in part to the fact that Post Smokes was a low volume shipper and the account primarily was handled by the Inside Sales Representative, Mr. McDowell. I believe Post Smokes opened its UPS account in September 2010 and UPS terminated it in August 2014 although I do not know why and did not participate in UPS's decision to terminate the account.

136.    In early October 2013, UPS audited Post Smokes. All of the packages contained little cigars, not cigarettes. I had no knowledge of the audit beforehand and did not participate in the audit in any way. A copy of the email informing me of the results of the audit is attached as Exhibit DX-223.

137.    I do not know why UPS terminated Post Smokes and did not participate in UPS's decision to terminate the account. I never tried to reopen the account.

**Morningstar Crafts and Gifts**

138.    Morningstar Crafts and Gifts was an account in my Patch of Land. Morningstar Crafts and Gifts is located at a storefront at 13113 Route 438, Gowanda, New York. Its account number is 157YW3. Morningstar Crafts and Gifts was opened on January 21, 2014 and the account was cancelled in October 2015 but I do not know why it was cancelled.

139.    My contact person at Morningstar Crafts and Gifts was a woman named Mona. When Morningstar Crafts and Gifts opened its account, Mona told me that she intended to ship only gifts and little cigars. Because Morningstar Crafts and Gifts intended to ship little cigars, I advised Mona of UPS's Tobacco Policy and obtained a Tobacco Agreement on January 27, 2014 from Morningstar Crafts and Gifts signed by Ramona Bennett (who I knew as Mona). Attached as Exhibit DX-262 is a copy of Morningstar Crafts and Gifts's Tobacco Agreement. I submitted the signed Morningstar Crafts and Gifts's Tobacco Agreement to Rita Torres, UPS Corporate, on May 6, 2014, attached as Exhibit DX-310.

140.    I did not have any concern that Morningstar Crafts and Gifts operated out of the same location as Shipping Services. Shipping Services had operated out of a trailer parked in front of Morningstar Crafts and Gifts's property. Shipping Services also was run by a man, Robert, who I never saw at Morningstar Crafts and Gifts.

141.    **Bear Claw Unlimited**

142.    Bear Claw Unlimited was an account on my Patch of Land. It was located at a residence at 4888 Klawitter Road, Great Valley, New York. It had various account numbers, including R2W088. The account was opened on October 8, 2010 and UPS terminated it in June 2012, but I do not know why it was terminated and did not participate in UPS's decision to terminate the account.

143.    Arnold Cooper was my primary contact at Bear Claw Unlimited.

144.    When it opened, Mr. Cooper told me that Bear Claw Unlimited was an eBay retailer selling items such as screen printed shirts. Because Bear Claw Unlimited did not intend to ship tobacco, I did not have it sign a Tobacco Agreement.

145.    As was my general practice, I visited Bear Claw Unlimited in person and spoke with them on the phone at least quarter. While I do no recall the specifics of those visits or conversations, according to my TEAMs entry for May 2011, I visited Bear Claw Unlimited on May 23, 2011 to try to increase its shipping volume and Mr. Cooper me that "some marketing products are taking off well, while others are not."   A copy of this TEAMS entry is attached as Exhibit DX-526 ("In Person Details," line 3183).

146.    In the beginning of September 2011, I was notified by UPS Dangerous Goods that Bear Claw Unlimited had sent a prohibited shipment of cigarettes to a consignee in Arizona. I contacted Mr. Cooper to inform him that Bear Claw Unlimited was not permitted to ship cigarettes to consumers and that its account was in jeopardy of being terminated. Mr. Cooper responded that it had been an oversight and that he would personally make sure it did not happen again.

147.    I coordinated with Gary DeWeerd, UPS Dangerous Goods, and we determined that Bear Claw Unlimited was reliable and could keep shipping so long as it signed a guarantee that it would not ship any tobacco products. A copy of this email chain and the signed letter from Bear Claw Unlimited are attached as Exhibit DX-119.

148.    I understand UPS terminated Bear Claw Unlimited following an audit in June 2012, but I do not know the circumstances surrounding the audit or the results and had no involvement in it.

**Bear Tracks**

149.     On March 20, 2014, I helped open Bear Tracks, which was a small package and freight account in my Patch of Land. Bear Tracks was located at 1970 West Perimeter Road, Steamburg, New York.

150.     Before Bear Tracks shipped any volume, Bear Tracks told me it wanted to ship little cigars. As Bear Tracks was a tobacco shipper, I informed Bear Tracks of UPS's Tobacco Policy and had it sign a Tobacco Agreement in May 2014, before they shipped any volume. Bear Tracks's Tobacco Agreement is attached as Exhibit DX-536. A copy of my email transmitting Bear Track's signed Tobacco Agreement and stating that it was a new account that had not yet shipped is attached as Exhibit DX-542.

151.     Bear Tracks was a low volume shipper. Steven Block was my primary contact for the account. At some point in 2014, UPS informed me it wanted to audit Bear Tracks but Bear Tracks had not shipped any packages so UPS asked me to call Bear Tracks and try to get it to ship a package.

152.     Accordingly, I called Mr. Block to inquire why he had a UPS account if he did not use it. He told me that he helped a friend by shipping for him.

153.    Bear Tracks last shipped with UPS in July 2015.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.


Dated:  West Valley, New York
        August 24, 2016                          _____
                                                 Gerard Fink