# Exhibit 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK,<br><br>      Plaintiffs,<br><br>      -v-<br><br>UNITED PARCEL SERVICE, INC.,<br><br>      Defendant. | 15 Civ. 1136 (KBF)<br><br>**ECF CASE** |

## DECLARATION OF RYAN KEITH

I, Ryan Keith, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Ryan Keith. I live in Fountain Inn, South Carolina. I have personal knowledge of the facts set forth below, and I am submitting this declaration as my direct testimony in this case.

2. I was born and raised in Nebraska. After I graduated from high school in 1999, I worked at a company called Speedway Transportation, which transports live cattle and hogs.

3. In 2003, I moved to Mobile, Alabama. From 2004-2008, I worked at a company called Southeastern Freight Lines, where I held a number of positions, including Supervisor of both the inbound and outbound operations.

4. From 2008-2012, I worked at a company called World Ship Supply in Theodore, Alabama. My title at World Ship Supply was "buyer" and I was responsible for purchasing supplies, such as food and computers, for vessels that came into port along the Gulf Coast from Louisiana to Florida.

ny-1244025

5.      In 2012, my wife, our children, and I moved to South Carolina to be closer to my family.

6.      I was hired by United Parcel Service, Inc. ("UPS") in October 2012. I started my career at UPS as an Inside Sales Representative ("ISR"). I worked as an ISR until March 2014. In 2014 I was promoted to the role of Product Specialist, during which I was responsible for training other ISRs and assisting them with situations involving priority products, which include Next Day Air, international and freight. I was promoted again in November 2014 to a Sales Lead Representative. In my current role, I have a team of 12 ISRs responsible for working with customers mainly located in the greater Philadelphia area.

7.      When I was an ISR, my job was to win new business, watch over current business, and recover business that had been diverted to a competitor.

8.      During the years I worked as an ISR, I was responsible for approximately 10,000 accounts. My contact with customers, or potential customers, was over the phone or through emails. I did not conduct in-person visits with my accounts.

9.      As an ISR, I recorded my conversations with customers in the TEAMS program, a database that ISRs and Account Executives at UPS use to record their visits and other contacts with customers.

10.     As an ISR, I was responsible for working with customers in a certain geographic region. My region was the Greater Buffalo area in upstate New York (which did not include Buffalo proper, just the surrounding suburbs), the Greater Albany area, and part of Western Massachusetts.

11. I worked with three Account Executives ("AEs") to cover these three geographic areas. I worked with Richard DelBello in the Buffalo area, Fred Orsaia in the Albany area, and Chris Calcasola in Western Massachusetts. The AEs interact with customers and make in-person visits.

12. Taking into consideration the size of the opportunity within the account and the cost of acquisition of the business, including the costs for the AE to visit an account in person and get new business, my AEs and I determined the best strategy to utilize in order to grow our Patch of Land. Ownership of accounts was shared between my AE and me and there were times when I worked collaboratively with my AEs on accounts. However, the majority of accounts we worked independently unless circumstances required our partner's involvement.

**UPS Policy**

13. When I started working at UPS, and approximately annually since, I received a Pre-Work Communication ("PCM") or other written or verbal guidance from UPS regarding the tobacco policy. I understood that tobacco is considered differently than most items shipped. Based on these communications and knowledge I gained from interactions with teammates, I understood that UPS does not deliver cigarettes to consumers at residential addresses. In addition, if the shipper is licensed to ship other tobacco products to consumers, they must sign a Tobacco Agreement. I understood that under no circumstances would UPS ship cigarettes to consumers.

14. As an ISR, I received a base salary and additional compensation referred to as the Sales Incentive Program ("SIP"). The SIP is calculated using a variety of factors that can change from year to year. One key factor is how revenue in my territory compares to the business plan for my territory created by the Sales Planning and Performance department. In addition to a

3

variety of internal metrics and calculations, the business plan would compare revenue from accounts in my geographic territory from the current year to the previous year. Because my plan was based on revenue from my active accounts, I would not want accounts with shippers likely to violate UPS policy and to subsequently be suspended or cancelled. Suspended or cancelled accounts would affect an ISR's ability to meet his or her plan. A lower percent effective to plan would likely result in a reduced SIP. If I ever learned of, or suspected any problem with a customer, I would seek clarification from my point of contact to ensure full compliance. If doubt were to remain, I would disengage from the customer and report the issue accordingly within UPS.

**Seneca Cigars**

15. The first time I became aware of any account in my geographical region that was shipping tobacco was when I received a voicemail in January 2013 from a man named Phil Christ. He was looking for Craig Foster, a previous ISR for his region. Phil Christ described himself as the general manager for an account called Seneca Cigars. This account, number 71A514, was in my territory because it was located in a zip code for which I was responsible.

16. On January 9, 2013, I returned Phil Christ's call to explain that I was his current Inside Sales Representative. Phil Christ explained that Craig Foster had set up the pricing structure for Seneca Cigars. Phil Christ also mentioned that he and Craig had discussed the possibility that if Seneca Cigars was able to reach significantly increased shipping volumes in six months, then Craig Foster would work with Phil Christ to set up a new, more aggressive but more difficult to achieve, volume-based pricing discount. A TEAMS entry describing this contract is Exhibit DX-511 at line 162.

4

17. Phil Christ asked me to consider moving forward with increasing the volume-based discounts for the Seneca Cigars account.

18. I reviewed the shipping history for the account and saw that the volume had increased. I used our pricing program to create a pricing agreement that had increased incentives contingent upon a sustained increase in volume.

19. I sent the pricing terms to Phil Christ on January 10, 2013. A few days later, he said he was impressed with the potential discount and that putting the agreement in effect would secure UPS as the sole carrier for Seneca Cigars. TEAMS entries describing this discussion are part of Exhibit DX-511 at lines 158, 161.

20. On January 17, 2013, Seneca Cigars signed the Carrier Agreement, effective week ending January 26, 2013, which reflected the pricing discussions I had with Phil Christ. The Carrier Agreement was signed by Dolores J. Bruner-Uebelhoer, who indicated on the document that her position was owner of Seneca Cigars. A copy of the Carrier Agreement is attached as Exhibit DX-177.

**Hillview Cigars**

21. In January 2013, when I was talking to Phil Christ about the Seneca Cigars bid, I noticed that Hillview Cigars, account number 715634, used the same address as Seneca Cigars. Phil Christ was the main contact for both accounts but told me to keep Hillview separate at that time because the owners were not the same.

22. A few months later, on June 10, 2013, Phil Christ contacted me about Hillview Cigars. He told me that this account was now owned by the same ownership group, but different individuals were involved in each company so they kept the entities separate. Mr. Christ was interested, however, in having both accounts on the same pricing agreement, which would allow

them to combine their volume to achieve higher incentives for both while still keeping the accounts separate from a billing standpoint.

23. At the same time Phil Christ asked me for an updated pricing structure in light of the combined volume of Seneca Cigars and Hillview Cigars, he advised me that he would be needing a new account number for a business he said the group would be purchasing. (Exhibit DX-511at lines 145, 149.) It is not uncommon for related accounts with the same majority ownership to seek to be on the same pricing agreement, as increased volume can lead to better pricing incentives.

24. Mr. Christ also mentioned that based on their lawyer's instruction, the accounts would start using the Delivery Confirmation Adult Signature Required ("DCASR") accessorial to get ahead of, and comply with, an upcoming New York law.

25. On June 11, I submitted the proposal to our pricing department and described my efforts to finalize this pricing proposal in several TEAMS entries. Exhibit DX-511at lines 142, 143, 147, 148 (June 11, 12, 17 and 18).

26. At the request of Pricing, on June 12, 2013, I completed a UPS worksheet called Account Strategy Planning Tool ("ASPT") about Seneca Cigars and Hillview Cigars. The ASPT is attached as Exhibit DX-532; Exhibit DX-511at line 146. In that document I explained that the companies were shipping tobacco products. I was aware that the companies *sold* a variety of tobacco products, including cigarettes, but Phil Christ had told me that these entities were *shipping* cigars and I had no reason to believe otherwise. The accounts I worked with were Seneca Cigars and Hillview Cigars and the companies eventually signed Tobacco Agreements, which forbid the shipment of cigarettes to consumers.

6

ny-1244025

27. We were not able to offer the exact pricing terms that Phil Christ requested because some requests were amended by our pricing group to ensure appropriate profitability standards would be met. For example, Phil Christ requested a 67% reduction in the DCASR, but we offered a 25% reduction. A TEAMS entry describing the terms is attached as Exhibit DX-511 at line 143. I sent the Carrier Agreement with the new pricing proposal and tobacco agreements for Seneca Cigars and Hillview Cigars to Phil Christ on June 18, 2013 (Exhibit DX-511 at line 142).

28. I had become aware during the pricing discussion that Seneca Cigars and Hillview Cigars did not have Tobacco Agreements on file. I had assumed that these agreements had been completed when the accounts were originally opened, prior to my tenure as an ISR. As soon as I learned that these companies did not have them on file, I emailed the Tobacco Agreements for both companies to Phil Christ at the same time I sent him the new Carrier Agreement.

29. Mr. Christ told me the owners were happy with the pricing terms and on June 20, 2013, the Carrier Agreement for Seneca Cigars was executed on June 20, 2013, effective week-ending June 29, 2013, to include Hillview Cigars and the new pricing terms. The updated Carrier Agreement is attached as Exhibit DX-189.

30. Also on June 20, 2013, the owner of Seneca Cigars and Hillview Cigars signed the Tobacco Agreements. Executed versions of these Tobacco Agreements are attached as Exhibit DX-188 and Exhibit DX-179. I received the Tobacco Agreements on June 20, 2013. Exhibit DX-511 at line 139.

**Two Pine Enterprises**

31. As part of the June Seneca Cigars and Hillview Cigars pricing discussion, Phil Christ informed me that the companies were going to purchase a separate entity and open

another account. I asked for updates on this new account several times over that month. On July 9, 2013, Phil Christ informed me that the owners had purchased the new entity previously discussed. This company had been shipping with a rival carrier, but Phil Christ wanted to move that volume to UPS, again combining the volume of all entities to maximize their incentives. A TEAMS entry describing this email with Phil Christ is attached as Exhibit DX-511 at line 266. I created a new account (number YA5535) for the new entity, Two Pine Enterprises, and added them to the pricing for Seneca Cigars and Hillview Cigars. Exhibit DX-511 at line 277.

32. Phil Christ said that the owners had decided to keep the name Two Pine Enterprises after the acquisition to help customers recognize the company. Phil Christ told me that Two Pine Enterprises was shipping cigars, just like Seneca Cigars and Hillview Cigars. A July 9, 2013 email between Phil Christ and me discussing the creation of the Two Pine Enterprises account is attached as Exhibit DX-193.

33. That same day, on July 9, 2013, the Carrier Agreement for Seneca Cigars was updated to include Two Pine Enterprises. A copy of the Carrier Agreement is attached as Exhibit DX-447. Signature was not required simply to add an account to an existing Carrier Agreement.

34. There was an oversight in the paperwork, and I did not send Two Pine Enterprises a Tobacco Agreement at the time the Carrier Agreement was updated. I take responsibility for my mistake. When I learned of my oversight from UPS's Dangerous Goods group on October 22, 2013, I immediately made pickup for the account inactive and sent a Tobacco Agreement for Two Pines to Phil Christ to arrange signature. An email discussing this situation, dated October 22, 2013 is attached as Exhibit DX-227.

35. Mr. Christ explained that the ownership group had fractured and he was no longer handling Two Pine Enterprises and could not send back a Tobacco Agreement for them. A

TEAMS entry describing this contact is attached as Exhibit DX-511 at line 263. I attempted, but was unable to reach, Two Pines myself so I sent an email to the Account Executive Richard DelBello to explain the situation and get the Tobacco Agreement signed. Exhibit DX-227; Exhibit DX-228.

36. Pick up service for the Two Pine Enterprises account was immediately suspended while we waited for the executed Tobacco Agreement.

37. On October 23, 2013, Richard DelBello told me that he would attempt to contact the owner of Two Pine Enterprises and obtain a signed Tobacco Agreement. A TEAMS entry describing this conversation is attached as Exhibit DX-511 at line 275.

38. Mr. DelBello spoke to Dolores Uebelhoer, the owner of Two Pines, on October 24, 2013 and obtained a signed Tobacco Agreement from her on October 25, 2013. A TEAMS entry describing this contact is attached as Exhibit DX-511 at line 285. Richard DelBello forwarded the executed Tobacco Agreement for Two Pine Enterprises to me on October 25, 2013. The email from Richard DelBello, including his discussion with Dolores Uebelhoer, is attached as Exhibit DX-234.

39. Once the Tobacco Agreement was signed, the Two Pine Enterprises account was permitted to resume shipping legal tobacco products pursuant to its Tobacco Agreement with UPS.

**Native Gifts**

40. On September 23, 2013, Phil Christ requested a new account be opened called Native Gifts (account number R17756). He told me that he needed this new account because Two Pine Enterprises' warehouse had been damaged in a fire at the location next door. The new temporary location was in Irving, New York, which was outside of my geographic region. A

9

TEAMS entry describing this conversation with Phil Christ is attached as Exhibit DX-511 at line 271.

41. During that September 23, 2013 discussion, Phil Christ asked that I send a pricing agreement that included Native Gifts as well as a tobacco agreement so the new ownership group could sign. Exhibit DX-511 at line 271. I also followed up with a colleague to confirm the need for a tobacco agreement for a temporary account. My September 24, 2013 emails regarding the need for a Tobacco Agreement for this cigar account is attached as Exhibit DX-533.

42. On September 24, 2013, I opened the account (number R17756), created a Tobacco Agreement for it, and sent both the updated account agreement and the Tobacco Agreement to Phil Christ to obtain signatures. The TEAMS entry regarding the opening of the new account number and creation of the Tobacco Agreement for Native Gifts is Exhibit DX-511 at line 256.

43. When Phil Christ asked to open a new, but temporary, account, I exchanged emails with Richard DelBello to discuss the account during which he noted the need for a new tobacco agreement. Richard had been curious why Native Gifts needed a new name and account number for a temporary move. He said that it sounded "fishy." I interpreted Richard DelBello's email as him being curious as to why the new account needed a new name. A copy of the email correspondence with Richard DelBello is attached as Exhibit DX-215.

44. On October 22, 2013, when I learned of the oversight with the Two Pines Enterprises Tobacco agreement mentioned above, I was also told that we did not have a Tobacco Agreement for Native Gifts on file. I told Phil Christ that day that I would need the Native Gifts Tobacco Agreement immediately to avoid interruption in pick-up service. I had sent Phil Christ the Tobacco Agreement on September 24, and Phil Christ told me he believed that his controller

10
ny-1244025

had previously returned the Tobacco Agreement, but said he would resend. A TEAMS entry describing this communication is attached as Exhibit DX-511 at line 288.

45. Phil Christ immediately forwarded a signed copy of the executed Tobacco Agreement for Native Gifts, which makes clear the UPS policy forbidding shipment of cigarettes to consumers. A TEAMS entry noting my receipt of the Native Gifts Tobacco Agreement on October 22, 2013 is at Exhibit DX-511 at line 263.

46. A copy of the Native Gifts Tobacco Agreement is attached as Exhibit DX-210.

47. The Native Gifts account was in ISR Judson McDowell's geographic region, not mine. On October 25, 2013, Richard DelBello provided Gerry Fink, who was responsible for the Patch of Land where Native Gifts was located, information related to Native Gifts, including the Carrier Agreement and contact for the account, Phil Christ. The email communication between Richard DelBello, Gerry Fink and me is attached as Exhibit DX-530.

**My Belief that Entities Were Shipping Cigars**

48. I believed, based on my discussions with Phil Christ and the Tobacco Agreements his accounts signed, that these accounts were shipping cigars only, and not cigarettes. I had no information or evidence that this was not the case.

49. One example stands out in my memory. Starting around July 2013, the Seneca Cigars and Hillview Cigars shipping volume had declined and in September 2013, the accounts were in cancelled status.

50. I tried to reach Mr. Christ to discuss this issue in September and October, 2013. My attempts to reach Mr. Christ are at Exhibit DX-511 at lines 124, 125, 129 and 130. On October 17, 2013, I spoke to Phil Christ about the cancellation of these two accounts because his pricing was based on aggregating volume from all three accounts. Phil Christ told me that he was

11

ny-1244025

unaware that the Seneca Cigars and Hillview Cigars accounts had been cancelled, and he assumed that his accountant had closed them. A TEAMS entry describing this contact with Phil Christ is attached as Exhibit DX-511 at line 289.

51.     I was trying to contact Phil Christ because I was concerned he was planning to cancel all his accounts with UPS in light of the closure of Seneca Cigars and Hillview Cigars, not using Seneca and Hillview accounts, and due to the fact that it had been difficult to contact him in September and October 2013 regarding the Seneca and Hillview accounts. Phil Christ told me his daughter was a gymnast in college and that she had been injured at a competition and was in the hospital. He told me he had been out for two weeks for that reason, which I understood was why he had been temporarily hard to contact. A TEAMS entry describing this contact is attached as Exhibit DX-511 at line 289.

52.     During that conversation in October 2013, Phil Christ reinforced to me that everything he ships is considered a cigar. He even noted that he had a legal question about a product that was their version of Swisher Sweets, which were flavored cigar tobacco wrapped in cigarette paper. He said that he would speak with his attorney about this issue. A TEAMS entry describing this contact is attached as Exhibit DX-511 at line 289.

53.     In March 2014, I was promoted to the position of Product Specialist.

54.     In September 2015 during my deposition for this case, I learned from the Plaintiffs' counsel for the first time that in April 2014, after I left the ISR position, a UPS audit had been conducted on Two Pine Enterprises. I was informed during my deposition that UPS had discovered that the packages contained cigarettes, not the little cigars Phil Christ had informed me were being shipped.

12

ny-1244025

55. I did not know at the time I was an ISR that Two Pine Enterprises had violated its Tobacco Agreement. In hindsight, I recognize that there were times when it was difficult to contact the owner of Two Pine Enterprises, but my primary contact was Phil Christ. In all my interactions with Phil Christ, he always seemed interested in following the letter of the law. At the time that I was working as an ISR, I did not know that Two Pine Enterprises or any of the other tobacco accounts in my territory ever shipped cigarettes, nor did I suspect it.

56. At all times that I was an ISR, from October 2012 to March 2014, I believed that Seneca Cigars, Hillview Cigars, Two Pine Enterprises and Native Gift were shipping cigars. To my knowledge, these companies sold cigars and other legal tobacco products as well as cigarettes, and I always understood them to be shipping cigars. All of these accounts signed Tobacco Agreements, forbidding the shipment of cigarettes to consumers, and Phil Christ told me that these accounts were shipping cigars and I had no reason to doubt what he told me. There was no benefit for me to let a customer violate UPS policy or the agreements it had with UPS, and I did not know of any violations when I was an ISR.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Greenville, South Carolina

Dated: August 25, 2016

                                                     Ryan Keith