# EXHIBIT 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                    Plaintiffs,

                -v-

UNITED PARCEL SERVICE, INC.,

                  Defendant.

15 Civ. 1136 (KBF)

**ECF CASE**

## DECLARATION OF AVIV NEVO

I, AVIV NEVO, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Aviv Nevo. I am submitting this declaration as my direct testimony in this case.

2.      I am the George A. Weiss and Lydia Bravo Weiss University Professor, and the 17th Penn Integrates Knowledge University Professor, at the University of Pennsylvania.  My appointments are in the Department of Economics in the School of Arts & Sciences and the Department of Marketing in the Wharton School.

**Background**

3.      Previously, I was the Robert E. and Emily King Professor in Business Institutions in the Department of Economics at Northwestern University and a Professor of Marketing at Northwestern's Kellogg School of Business.  I have also held faculty positions in the Department of Economics at the University of California, Berkeley and at the MIT Sloan School of Business.

4.      In 2013-2014, I served as the Deputy Assistant Attorney General for Economic Analysis at the Antitrust Division of the United States Department of Justice.  As head of the Economic Analysis Group, I supervised the Division's staff of Ph.D. economists and statistical analysts.  The group works alongside the Division's legal staff to investigate the likely competitive impact of proposed mergers and acquisitions, as well as to provide economic analysis on civil enforcement and competition issues.

5.      My main areas of expertise are consumer behavior, empirical industrial organization, antitrust and competition economics, and econometrics.  My research has focused on estimating consumer demand and analyzing how consumers make choices in response to price changes, among other things.  My work has been published in a number of leading economics journals, including the *American Economic Review*, *Econometrica*, and the *RAND Journal of Economics*.  I have also taught doctorate-level courses in my main areas of specialization for almost twenty years.

6.      Over my career, I have served as an editor and referee for peer-reviewed economics journals where I regularly evaluated research on consumer demand.  I am currently serving as the co-editor of the *RAND Journal of Economics*, the leading Industrial Organization journal.

7.      In 2009, I served as a senior member of the arbitration team in the Significant Factor arbitration proceeding between tobacco manufacturers and several states, including the state of New York, to resolve a dispute related to the non-participating manufacturer adjustment of payments related to the Tobacco Master Settlement Agreement.  The main issue in dispute was whether the cost increase imposed on participating manufacturers by the Master Settlement Agreement was a significant factor in the market share increase of the non-participating

manufacturers.  To answer this question, we needed to determine the degree of substitution between cigarettes made by the non-participating manufacturers and those made by the participating manufacturers.  My main duties involved evaluating expert reports and drafting a decision report.

8.      In addition to that proceeding, I have had other tobacco-related engagements.  In 2012, I was retained by a large international tobacco manufacturer and provided an expert opinion in the context of regulatory proceedings in a foreign country.  And in 2015, I served as an outside expert for the Federal Trade Commission in its evaluation of the acquisition of Lorillard by R.J. Reynolds.

9.      Beyond my academic positions and government service, I am a Research Associate at the National Bureau of Economic Research, where I have organized and presented in multiple workshops and conferences.  I am a co-director of the Center for the Study on Industrial Organization, a Senior Distinguished Fellow of Searle Center on Law, Regulation, and Economic Growth, and an International Research Fellow at the Institute for Fiscal Studies in London.  I was elected a Fellow of the Econometric Society in 2013.  I was awarded the Sloan Research Fellowship in 2003 and several research grants from the National Science Foundation, including an Early Career Development grant in 2001.  A copy of my C.V. is attached hereto as Ex. DX-442.

**My Assignment**

10.      I was asked by counsel for defendant United Parcel Service, Inc. ("UPS") to opine, as a matter of economics, on Plaintiffs' damages calculation and the correct approach to compute economic harm, if any, assuming for purposes of the analysis only that Plaintiffs can prove their allegations that UPS shipped to buyers in the State and City of New York cigarettes

sold by Native American tobacco retailers for which the applicable state and city excise taxes had not been collected.

11.      As part of that analysis, I was also asked to opine on the extent to which the alleged actual sales volume of the untaxed cigarettes allegedly shipped by UPS to New York buyers (the "cigarettes at issue") reliably estimates the volume of cigarettes on which the City and State of New York would have collected taxes ("NY-tax-paid cigarettes"), absent UPS's alleged conduct ("the but-for world").

12.      As discussed below, based on my research, analysis and extensive experience in consumer economics, I conclude that diversion from the cigarettes at issue to NY-tax-paid cigarettes (and therefore the actual loss plaintiffs would have incurred) will be very low and possibly zero.

13.      I am being compensated at the rate of $900 per hour for my work in this matter.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on the billings of the staff that support me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent upon or based on the content of my opinion or the outcome of this or any other matter.

**Measuring Cigarette Demand Generally**

14.      Consumers can purchase cigarettes through a variety of different retail outlets or "channels."  All of the cigarettes at issue in this matter were allegedly sold through the mail order channel, which accounts for a very small fraction of U.S. cigarette sales.  Convenience stores, which account for approximately half of all tax-paid cigarettes sales, are the largest channel by volume.  *See* Monica Cornelius et al., "Trends in Cigarette Pricing and Purchasing Patterns in a

Sample of US Smokers: Findings from the ITC US Surveys (2002-2011)," *Tobacco Control* (2014).  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-455.  Cigarettes are differentiated by price with brands typically partitioned into three market segments—premium, discount, and deep discount.  The premium segment includes well-known brands such as Marlboro, Newport, Camel, Kool, and Winston.  Discount cigarettes are generally less expensive than premium cigarettes but still have recognizable brand names, such as Basic, Doral, and Pall Mall.  Deep discount brands are cheaper still, and, while they have brand names, the names are generally less well known.

15.    I understand, based on my review of archived websites of certain Native American retailers at issue, as well as certain merchant mailers, that many of the alleged cigarettes at issue in this matter are deep discount Native American brands, *i.e.*, brands manufactured on Native American reservations and offered for sale by Native American merchants.  Brands offered include Buffalo, Cayuga, Niagara, Seneca, Smokin' Joes, and Skydancers.

16.    As with most consumer products, the quantity demanded of all cigarettes decreases as price increases.  To measure the degree to which demand responds to price change, economists rely on the price elasticity of demand.  The price elasticity of demand is defined as the absolute value of the percentage change in the quantity demanded in response to a 1% change in price.  *See, e.g.*, Hal R. Varian, *Intermediate Microeconomics:  A Modern Approach*, 4th edition (New York:  W. W. Norton, 1996), p. 265.  A copy of the relevant portion of this textbook, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-523. For example, a 4% decrease in demand following a 2% price increase means that elasticity of demand is computed as | (-4% / 2%) | = 2.  On the other hand, if demand decreased by just 2% for the same

price increase, then the elasticity would be 1.  A larger elasticity indicates that demand is more sensitive to price changes.

17.     Academic studies of demand for all cigarettes report a variety of estimates for price elasticity of demand, centered around 0.4.  This means that a 1% increase in the price of all cigarettes yields a 0.4% decrease in the quantity of cigarettes demanded.

18.     Consumer price sensitivity and purchasing patterns, including purchase location, vary across the three segments of the cigarette market.  Studies show that demand is significantly more elastic – more price sensitive – in the deep discount segment, which includes most of the alleged cigarettes at issue in this matter, than in other segments.  Market shares for discount and deep discount cigarettes are estimated to be three or more times as responsive to price changes as market share for premium brand cigarettes.  John A. Tauras, Richard M. Peck, and Frank J. Chaloupka, "The Role of Retail Prices and Promotions in Determining Cigarette Brand Market Shares," *Review of Industrial Organization* 28, no. 3 (2006), pp. 253-284.  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-508.

19.     Furthermore, consumers are more likely to switch to a brand within the same or an adjacent segment than to a non-adjacent segment in response to a price increase.  Empirical studies show that even sizable changes in the prices of deep discount cigarettes have little impact on the market share of premium cigarettes.  (*See* Ex. DX-508 at p. 279.)  This fact plays a key role in assessing diversion from the cigarettes at issue to other cigarettes.

20.     Before and during the period of UPS's alleged conduct, cigarette consumption declined both nationally and in New York.  Reported consumption declined at a similar rate in the United States and in New York between 1999 and 2014 (approximately 4% and 5% per year, respectively).

21.     With respect to tax paid sales, between 1999 and 2014, tax-paid sales in the United States declined fairly steadily, at a rate of 3% per year.  This decline was driven by several factors, including higher taxes, various restrictions on smoking and promotion of cigarettes, and, more generally, public health campaigns highlighting the dangers of smoking.  ("The Health Consequences of Smoking – 50 Years of Progress:  A Report of the Surgeon General," U.S. Department of Health and Human Services (2014)).  A copy of this report, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-438.  Tax-paid sales in New York also declined over the same period, but much more rapidly than for the United States as a whole (8% per year in NY versus 3% per year in the United States).

22.     The greater decline in New York's tax-paid sales is attributable at least in part to the sharp increase in state and city excise taxes.  By 2011, cigarette taxes in New York were among the highest in the United States.

**New York State Regulation of Native American Cigarette Sales**

23.     Deep discount Native American cigarettes account for many of the alleged cigarettes at issue in this case.  Before 2011, Native American tobacco retailers engaged in tax-free sales of premium brands that were often not manufactured on a Native American reservation. The State permitted licensed cigarette wholesalers to sell untaxed cigarettes to "reservation-based retailers making sales from qualified Indian reservations," and Native American retailers in turn were not required to collect state excise taxes on their sales.  (New York State Department of Taxation and Finance, Advisory Opinion TSB-A-06(2)M, Petition No. M060316A (March 16, 2006), available at https://www.tax.ny.gov/pdf/advisory_opinions/misc/a06_2m.pdf.)  A copy of this document, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-038.

24.     However, the State's policy changed as of June 21, 2011 when the State eliminated provisions of its tax laws that allowed Native American merchants to purchase unstamped cigarettes for resale.  (*See also* New York State Department of Taxation and Finance, Technical Memorandum TSB-M-11(4.2)M, "State Court Ruling Allows Implementation of Tax Law Provisions Related to Cigarettes Sold on Indian Reservations to Go Forward" (June 21, 2011), available at https://www.tax.ny.gov/pdf/memos/multitax/m11_4_2m_7_2s.pdf.)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-082.

25.     I understand that this change significantly reduced sales of premium cigarette brands by reservation merchants, causing the merchants to turn instead to sales of deep discount Native American brands for the bulk of their sales.  *See* David Kesmodel, "Tribes Rolling Out Cigarettes," *Wall Street Journal*, August 17, 2011; "Court Lifts Order Against Indian Cigarette Tax," *The Daily Record*, June 21, 2011.  Copies of these articles, on which I relied in forming my expert opinion, are attached hereto as Exhibits DX-108 and DX-081.

26.     Today, many of the untaxed cigarettes that Native American retailers sell are manufactured on reservations.  I understand that under the law, tax-free sales are permissible only on reservations and, then, only to members of the tribe or the tribe itself.

27.     Plaintiffs allege that UPS shipped approximately 683,000 cartons of untaxed cigarettes over a period of at least five years, or approximately 1.4 million packs per year, from Native American retailers.  Taking this allegation as given, as depicted in Table 1 below, this alleged volume would account for approximately 0.4% of average annual tax-paid sales (343 million packs) in New York from 2010 to 2014.  (See Complaint ¶ 35.)

**Table 1**



Source:  The Tax Burden on Tobacco; BRFSS; NHIS; U.S. Census Bureau
Note:  NY-tax-paid and estimated untaxed sales are calculated as an average of annual values from 2010 to 2014.  Plaintiffs allege that UPS shipped approximately 683,000 cartons of untaxed cigarettes over the 5 years, 2010 through 2014, or roughly 1.4 million packs per year.  This is equivalent to 0.4% of the average annual NY-tax-paid sales volume from 2010 through 2014.  The volume of cigarettes at issue is not shown at true scale.  If shown at true scale, it would not be visible.

## Plaintiffs' Damages Theory is Wrong as a Matter of Economics

28.      Assuming for purposes of my analysis only that Plaintiffs could prove their case, the alleged economic harm, if any, suffered by Plaintiffs would consist of the difference between the tax they actually collected during the period of alleged behavior by UPS and the tax that they *would have* collected in the but-for world in which, by assumption, UPS does not deliver cigarettes to New York buyers.

29.      Estimating the economic harm suffered by Plaintiffs thus requires estimating the diversion of sales from the alleged cigarettes at issue to tax-paid cigarettes, other untaxed cigarettes, and tobacco and nicotine substitutes.

30.      Economists have standard tools to measure diversion between products. Diversion is typically measured in response to a price increase.  In the but-for world here, a

segment of the market (cigarettes purchased by mail order and allegedly delivered by UPS) is eliminated entirely.  From an economic point of view, elimination of an option is equivalent to a large price increase, hence the standard tools used to measure diversion in response to a price increase can be used here.

31.     Plaintiffs' proposed calculation simply assumes that absent UPS's alleged conduct, all of the cigarettes at issue would have been sold instead as NY-tax-paid cigarettes.  But their proposed method for computing damages fails to address the question of diversion. It is my opinion, therefore, that as a matter of economics, Plaintiffs' theory of damages is wrong.

32.     Plaintiffs' proposed damages computation would make sense only if all sales of the cigarettes at issue are diverted to NY-tax-paid cigarettes.  But a large body of data and academic studies demonstrates that this clearly would not be the case.  The data show that untaxed cigarettes comprise a large fraction of cigarette consumption in New York and that, in response to regulation of certain untaxed cigarettes, smokers switch to other untaxed cigarettes, non-cigarette tobacco products, or non-tobacco nicotine replacement products, or stop using nicotine products of any kind.

33.     Indeed, the State has explicitly acknowledged the negative relationship between cigarette prices and demand in Department of Health statements regarding tobacco control policy, in the pleadings in this matter, and in the deposition testimony I have reviewed in this matter. The Tobacco Control Program operated by the New York State Department of Health states that it "maintain[s] the highest state tobacco taxes in the nation to keep the price of tobacco high" in order to pursue its goal of a "tobacco-free society for all New Yorkers."  (*See* https://www.health.ny.gov/prevention/tobacco_control/program_components.htm.)  Plaintiffs' Third Amended Complaint also concedes that demand for cigarettes decreases as price increases,

noting that academic studies estimate demand for cigarettes decreases by 3% to 5% in response to a 10% increase in prices across all cigarettes.  (Complaint ¶ 11.)  Finally, Dr. Sonia Angell, a witness for the City of New York knowledgeable about the impact of taxes on consumption of tobacco products, testified that it has been scientifically proven that "a very strong body of evidence . . .  shows that an increase in price reduces the demand [for] tobacco."  (Angell Tr. 23:8-10.)

34.    But when contemplating the question of damages, Plaintiffs contradict themselves.  Plaintiffs acknowledge in the Third Amended Complaint that price plays an important role in smoking behavior, yet their proposed method for computing damages ignores the role of price in determining the substitute products to which demand will be diverted. Instead, Plaintiffs simply assume that sales of all the cigarettes at issue would not decrease but would instead be fully diverted in the but-for world to sales of NY-tax-paid cigarettes.

35.    Plaintiffs' proposed calculation is clearly wrong as a matter of economics.  The academic and policy literature clearly demonstrate that the quantity of NY-tax-paid cigarettes purchased in the but-for world by buyers of the alleged cigarettes at issue would be substantially lower than actual sales of such cigarettes.  Plaintiffs never grapple with the key question of how much of the sales of the cigarettes at issue would be replaced by sales of NY-tax-paid cigarettes.

**Overview of My Opinion on Diversion from Cigarettes at Issue**

36.    An economically correct estimate of the economic harm attributable to UPS's alleged conduct must quantify the extent to which sales of the cigarettes at issue would be replaced in the but-for world by NY-tax-paid sales of cigarettes as opposed to other tobacco and nicotine products.

37.     I conclude based on my research, analysis and extensive experience in consumer economics that diversion from the cigarettes at issue to NY-tax-paid cigarettes (and therefore the actual loss plaintiffs would have incurred) will be very low and possibly zero.

38.     If one assumes, overly conservatively, that diversion from the cigarettes at issue to NY-tax-paid cigarettes is equal to the share of NY-tax-paid cigarettes in total cigarette consumption, at most, 56% of sales of the cigarettes at issue would be diverted to sales of NY-tax-paid cigarettes in the but-for world.

39.     But an assumption that diversion is proportional to share of consumption overstates diversion to NY-tax-paid cigarettes.  This assumption is plausible in some circumstances, and it provides an upper bound in this matter, but it is unrealistic in the current context, because it assigns to buyers of the cigarettes at issue the preferences of an average consumer, when, in fact, the buyers of the cigarettes at issue have revealed that they are less brand loyal, more price sensitive, and, therefore, far more likely to purchase untaxed cigarettes or other, lower cost non-cigarette tobacco products than an average consumer.  The academic literature provides more realistic estimates for this consumer type and allows me to reasonably infer that diversion to NY-tax-paid cigarettes would be minimal.

40.     Further, published academic studies demonstrate that some consumers exit the cigarette category entirely in response to tax increases and switch to alternate tobacco products, such as little cigars, and non-tobacco products such as nicotine gum, or simply quit.  Table 2 below depicts my opinion on the estimated diversion in response to the fact that, in the but-for world, UPS does not, as alleged, transport cigarettes.  I will describe these categories of diversion below.

**Table 2**

## Estimated Diversion from Alleged UPS-Shipped Cigarettes at Issue to Substitute Products



**Actual World**          **Diversion in But-For World**

Note:  The chart depicts estimated diversion from the alleged cigarettes at issue to substitute products.  Untaxed cigarettes are those for which New York and New York City taxes have not been paid, including Native American cigarettes other than those allegedly at issue in this matter and cigarettes for which taxes were paid in another jurisdiction.  The non-cigarette tobacco products category includes little cigars, cigars, roll-your-own, pipe tobacco, and snuff.  The exit category includes non-tobacco products (e.g., e-cigarettes and nicotine replacement products) and quitting smoking.  Consistent with my estimate of diversion, NY-tax-paid and untaxed cigarettes account for 5% and 95%, respectively, of the demand for the cigarettes at issue that is diverted to cigarettes in the but-for world.  Non-cigarette and non-tobacco products represented by areas [B] and [D] are not shown to scale.

### There Would Be Significant Diversion from Untaxed Cigarettes to Categories Other than NY-Tax-Paid Cigarettes

41.     I began my diversion analysis by looking at market share in New York for taxed and untaxed cigarettes, although, as I explained earlier, in my opinion diversion according to market share overstates diversion to NY tax paid cigarettes, because the consumers who purchased the cigarettes at issue here have revealed themselves to be different from the average consumer based on how and what they purchased. Nonetheless, this calculation provides an upper bound and starting point for estimation of the diversion to NY-tax-paid cigarettes.

42.     Studies of tobacco sales and consumption in New York and my own analysis demonstrate that consumption of untaxed cigarettes among New York smokers is high.  I rely on

a widely used method to compute the untaxed share of cigarette consumption.  (See, e.g.,

*Understanding the U.S. Illicit Tobacco Market:  Characteristics, Policy Context, and Lessons*

*from International Experiences*, National Research Council and Institute of Medicine

(Washington, DC:  The National Academies Press, 2015), pp. 78-111.)  A copy of this article, on

which I relied in forming my expert opinion, is attached hereto as Exhibit DX-522.

43.     Specifically, I compute the untaxed share of cigarette consumption from 1999 to

2014 in New York as the difference between (a) an estimate of total cigarette consumption, based

on data from the BRFSS ("Behavioral Risk Factor Surveillance System") and NHIS ("National

Health Interview Survey") surveys, adjusted to account for under-reporting, and (b) the number of

cigarettes NY state reports as tax-paid sales.  BRFSS is a telephone survey supported by the

Centers for Disease Control.  The survey collects data regarding health-related risk behaviors,

chronic health conditions, and use of preventive services.  BRFSS completes more than 400,000

adult interviews each year.  NHIS is a health survey sponsored by the CDC and administered by

the U.S. Census Bureau.

44.     Based on this analysis, and as reflected in Table 3 below, I estimate that sales of

untaxed cigarettes accounted for an average of 44% of total cigarette consumption in New York

from 2010 to 2014 and more than 50% of consumption in 2011.  It follows that sales of NY-tax-

paid cigarettes accounted for only 56% of total cigarette consumption in New York from 2010 to

2014.

**Table 3**



### Estimated Untaxed Share of Cigarette Consumption
New York State, 2010 – 2014

Source:  The Tax Burden on Tobacco; NHIS; BRFSS; U.S. Census Bureau
Note:  Untaxed share is calculated as the difference between estimated total NY consumption and NY-tax-paid sales.  Consumption estimates are based on New York prevalence data (i.e., number of everyday smokers) from the BRFSS survey and usage data from the NHIS and BRFSS surveys.  Cigarette consumption has been scaled to correct for underreporting following a method used in the 2015 National Research Council report "Understanding the U.S. Illicit Tobacco Market."  Alleged sales of the cigarettes at issue from 2010 to 2014 would account for just 0.2% of estimated total NY cigarette consumption.

45.     The consumption and tax-paid sales data for New York establish that the share of untaxed cigarette consumption has increased over time.  From 1999 to 2014, cigarette consumption declined at 5% annually in New York, but NY-tax-paid sales declined at 8% annually.  The difference in the rate at which consumption and sales of NY-tax-paid cigarettes have declined over time demonstrates that demand for untaxed cigarettes is different from demand for taxed cigarettes.  The different rates of change over time are due, at least in part, to diversion of demand from taxed cigarettes to untaxed cigarettes.

46.     The trend in New York cigarette taxes explains much, if not all, of this growth in demand for untaxed cigarettes.  As depicted in Table 4 below, from 1999 to 2014, combined state and city cigarette taxes increased dramatically, from $0.64 to $5.85 per pack, and the average price of a pack of NY-tax-paid cigarettes increased threefold, from $3.27 to $10.07.  Over the

same period, the share of cigarette consumption accounted for by untaxed cigarettes grew from

3.6% to 38%, with a peak of 51% in 2011 and an average of 44% from 2010-2014.

**Table 4**



**The Share of Untaxed Cigarette Consumption in NY Increased as New York City and State Cigarette Taxes Increased, 1999 – 2014**

Source:  The Tax Burden on Tobacco; NHIS; BRFSS; U.S. Census Bureau
Note:  Untaxed share is calculated as the difference between estimated total NY consumption and NY-tax-paid sales.  Consumption estimates are based on New York prevalence data (i.e., number of everyday smokers) from the BRFSS survey and usage data from the NHIS and BRFSS surveys.  Cigarette consumption has been scaled to correct for underreporting following a method used in the 2015 National Research Council report "Understanding the U.S. Illicit Tobacco Market."

47.    The State's own survey research in the New York Adult Tobacco Survey

("NYATS") also establishes that a growing fraction of New York smokers purchase untaxed

cigarettes.  The NYATS results demonstrate that self-reported purchasing from all low-tax and

untaxed sources has increased since 2010.  For example, the proportion of smokers who report

purchasing from any low-tax or untaxed source "all the time" increased from 10% in 2010 Q1 to

21% in 2015 Q1.  Similarly, the proportion of smokers who report purchasing from any low tax

source at least once in the last twelve months increased from 38% in 2010 Q1 to 50% in 2015 Q1.

48.     Thus, if I assume that buyers of the cigarettes at issue have tastes that are consistent with market-wide averages, approximately 56% of demand for the cigarettes at issue would divert in the but-for world to NY-tax-paid cigarettes.  But, as I show below, this estimate grossly overstates diversion, because the assumption it relies on is incorrect.  Buyers of the cigarettes at issue have systematically different tastes than "average" consumers and have a much greater propensity to purchase untaxed cigarettes than has an "average" consumer.

**Buyers of the Cigarettes at Issue Are More Likely to Purchase Other Untaxed Cigarettes than an Average Tobacco Consumer**

49.     The allegation that the consumers at issue are buyers of untaxed cigarettes indicates that they are *not* average buyers, and their preferences are not average.

50.     An example describes the point.  Suppose that a consumer is considering purchasing a Mercedes but discovers that the price of the vehicle has increased and begins looking for an alternate vehicle.  Assuming proportional diversion in this circumstance (i.e., diversion to other vehicles in proportion to their market share) leads to the implausible conclusion that the consumer is more likely to purchase a Toyota Camry (a top-selling vehicle in the United States) than another luxury sedan (e.g., a BMW), simply because the Camry holds a larger market share than a close substitute for the Mercedes.  In reality, the fact that the consumer was about to purchase a Mercedes contains information that this consumer is more likely to purchase another luxury car than the average consumer.  In other words, among consumers considering purchasing a Mercedes vehicle, the diversion to other luxury sedans will be higher than the market share of those vehicles, and, in some cases, much higher.  Assumption of proportional diversion fails to incorporate revealed information about consumer preferences and produces implausible conclusions about diversion to substitute products.  (*See* Steven Berry, James Levinsohn, and Ariel Pakes, "Automobile Prices in Market Equilibrium," *Econometrica* 63, no. 4 (1995), pp. 841-

890, at p. 847; Aviv Nevo, "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand," *Journal of Economics & Management Strategy* 9, no. 4 (2000), pp. 513-548, at p. 523.).  Copies of these articles, on which I relied in forming my expert opinion, are attached hereto as Exhibits DX-443 and DX-479.

51.     In the instant matter, the preferences of consumers who purchased the alleged cigarettes at issue are revealed by their purchases of discount cigarettes by mail order.  When faced with a price increase, buyers in this group are more likely than an average buyer to purchase other low-priced, untaxed cigarettes.

52.     Data from the NYATS confirm that consumers who purchase the cigarettes at issue are different in some important ways than other smokers.  According to NYATS response data for 2010-2015, respondents most comparable to the buyers at issue with respect to purchasing behavior, *i.e.*, those who report purchasing by mail order, differ from all other smokers who responded to the survey in their smoking habits, price sensitivity, purchasing behavior, and the actual price they pay for cigarettes.

53.     In particular, those who frequently purchase by mail order are (i) almost twice as likely as other smokers to report that they make "special efforts" to obtain low-priced cigarettes (83% vs. 47%), (ii) are more than four times as likely as other smokers to report that the price of cigarettes influenced their use of other, non-cigarette tobacco products, such as little cigars (49% vs. 12%), (iii) are approximately half as likely as other smokers to report that they attempted to quit smoking within the last 12 months (32% vs. 62%), and (iv) pay lower prices ($7.37 vs. $7.98).

54.     Among NYATS smokers who reported purchasing cigarettes by mail order in the previous 12 months, 37% also reported that they purchased cigarettes from an Indian reservation.

The same figure for all other smokers is 29%, or eight percentage points less than for smokers who purchased by mail order.  Thus in proportional terms, NYATS smokers most similar to the buyers at issue in this matter were 28% more likely to purchase cigarettes from an Native American reservation.

55.     Among NYATS smokers who reported purchasing by mail order in the previous 12 months, 58% also reported purchasing out-of-state/country cigarettes.  Among all other smokers, this figure is just 25%, or 33 percentage points less than for smokers who purchased by mail order.  In proportional terms, NYATS smokers most similar to the buyers at issue in this matter were 132% more likely to purchase cigarettes from an out-of-state or out-of-country supplier.

**Table 5**

**Differences in Purchasing Behavior**
Mail Order Purchasers vs. All Other Smokers

Compared to all other smokers, mail order purchasers are...

➢ 76% more likely to make a special effort to obtain low-priced cigarettes

➢ 308% more likely to report that cigarette prices influenced their use of other non-cigarette tobacco products

➢ 28% more likely to purchase cigarettes from a Native American reservation

➢ 132% more likely to purchase cigarettes from an out-of-state or out-of-country supplier

➢ 52% as likely to attempt quitting in preceding 12 months

56.     These results, as summarized above in Table 5, demonstrate that the preferences of the buyers at issue, as estimated by the preferences of NYATS respondents who purchase cigarettes by mail order, are different from the preferences of all other smokers, and that the buyers at issue are less likely than an average consumer to purchase NY-tax-paid cigarettes.  It follows that the assumption of diversion according to share will overstate the diversion to NY-

tax-paid cigarettes among the buyers at issue.  Thus as I explain below, I further analyzed diversion beyond the overly conservative diversion by share.

**Academic Studies Show Diversion to Taxed Cigarettes in Response to a Tax Increase Is Very Low**

57.    Academic studies of tax-paid cigarette sales in a variety of circumstances confirm that once taxes are imposed, there is high diversion of cigarette purchases to low-tax jurisdictions. Although these studies focus on the efficacy of taxation as an instrument for reducing smoking, the implication for the current matter is clear: diversion in the but-for world from the untaxed cigarettes at issue to NY-tax-paid cigarettes would be very small.

58.    One study I reviewed looked at the impact of a policy change on the prevalence of untaxed cigarettes in the South Bronx.  (Marin Kurti, Klaus von Lampe, and Jacqueline Johnson, "The Intended and Unintended Consequences of a Legal Measure to Cut the Flow of Illegal Cigarettes Into New York City:  The Case of the South Bronx," *American Journal of Public Health* 105, no. 4 (2015), pp. 750-756 ("Kurti").)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-472.

59.    The policy change eliminated the ability of Native American retailers in New York to purchase unstamped (untaxed) premium brand cigarettes for resale, and thereby eliminated the primary supply source for untaxed non-tribal cigarettes in the South Bronx.  The authors collected discarded cigarette packs in 30 randomized South Bronx locations before and after the amended tax law took effect in 2011, examined the tax stamps on the collected packs, and determined the fraction of cigarettes that came from different untaxed and NY-tax-paid sources before and after the change in tax policy.

60.    Because the study directly measures the change in consumption of untaxed cigarettes following a change in supply conditions, the results are directly relevant to and provide

a plausible estimate of the diversion relevant in this matter, namely, diversion from the untaxed cigarettes at issue in response to a hypothetical change in supply conditions.

61.     The Kurti study concluded that the policy change had no statistically significant impact on sales of NY-tax-paid cigarettes and that "the supply of contraband cigarettes appears to have quickly shifted from one lower-priced jurisdiction to another *without a change in the overall prevalence of contraband cigarettes*."  (Ex. DX-472 at p. 750.)

62.     Indeed, as depicted in Table 6 below, 58% of discarded cigarette packs collected in the South Bronx had no tax stamp or bore a counterfeit tax stamp before the tax amendment. After the amendment took effect, the percentage of such cigarette packs declined sharply to 17%, a reduction of 41 percentage points, or nearly 71% in proportional terms.  The loss of this source of untaxed cigarettes did not trigger diversion to NY-tax-paid cigarettes.  Instead, the percentage of packs with tax stamps from Virginia rose dramatically, from 9.1% to 48.6%, an increase of 39.5 percentage points.   Virginia's cigarette tax in 2012 was $0.30 per pack, as compared to the New York tax of $4.35 per pack.  And while consumers switched from one low cost option to another, the authors conclude that "the percentage of packs with a combined New York State and New York City tax stamp *did not change* after the tax amendment."  This means the proportion of discarded packs bearing either New York State or New York State and New York City tax stamps increased by just 2.2 percentage points, from 22% of all collected packs in March 2011 to 24% in 2012, and then fell to 21% of collected packs in 2013.

**Table 6**

### Demand Diverted to Low-Tax Virginia Cigarettes after a 2010 NY Cigarette Tax Amendment



Source:  Kurti et al., 2015 (Table 2)
Note:  The chart shows the results of a survey of discarded packs collected in the South Bronx in March 2011 (shown in red), March 2012 (shown in dark blue), and March 2013 (shown in light blue).  A 2010 amendment to New York cigarette taxes that took effect in June 2011 eliminated the ability of Native American retailers in New York to sell unstamped (untaxed) cigarettes.  Despite the change, the percentage of NY-tax-paid packs collected in discarded pack surveys in March 2012 and March 2013 did not increase over pre-amendment (March 2011) levels.

63.     The Kurti study allows direct measurement of diversion from untaxed cigarettes to NY-tax-paid cigarettes in response to a change in supply conditions.  Based on the results reported by Kurti, I find that it is likely that the diversion ratio from untaxed packs to NY-tax-paid packs—*i.e.*, the increase in NY-tax-paid packs as a fraction of the decline in untaxed packs from March 2011 to March 2013—would be between 0% to 5.4%.

64.     To compute the diversion ratio for 2012, I divide the increase in NY-tax-paid packs from 2011 to 2012 by the decrease in unstamped or counterfeit packs from 2011 to 2012. From 2011 to 2012, the proportion of discarded packs collected with no tax stamp or a counterfeit stamp fell by 41.1 percentage points (from 57.9% to 16.8%), and the proportion of discarded packs collected that bore either a NY State tax stamp or NY State and NYC tax stamps increased

by 2.2 percentage points (from 21.7% to 23.9%).  The diversion ratio is therefore (2.2 / 41.1), or 5.4%.

65.     Performing the same computation for 2013, I find that the diversion ratio is zero. From 2011 to 2013, the proportion of discarded packs collected with no tax stamp or a counterfeit stamp declined by 44.8 percentage points, but over the same period the proportion of NY-tax-paid packs also declined (from 21.7% to 21.3%).  This means that there was no diversion to NY-tax-paid packs.

66.     I note that the results in Kurti provide a plausible estimate of diversion in this matter despite the fact that the South Bronx differs from New York City and New York State in several ways relating to smoking and tax avoidance, including income level, smoking prevalence, brand preference, proximity to lower-tax jurisdictions, and the prevalence of untaxed cigarettes. However, because diversion is measured as the change in packs collected before and after the tax policy change, the impact of the differences noted above should be minimal.  For example, suppose that the prevalence of untaxed cigarettes is 10% higher in the South Bronx due to the higher poverty rate.  Because the higher poverty rate affects packs collected both before and after the policy change, both values should be 10% higher than elsewhere. Hence if we compute the change in untaxed packs by subtracting one value from the other, the 10% increase will have no impact because it appears in both values.

67.     Another academic study finds that, on average, all of the reduction in home-state cigarette purchases following a tax increase is offset by cross-border purchases in lower-tax jurisdictions.  (Michael F. Lovenheim, "How Far to the Border?:  The Extent and Impact of Cross-Border Casual Cigarette Smuggling," *National Tax Journal* 61, no. 1 (2008) ("Lovenheim"), pp. 7-33.)  A copy of this article, on which I relied in forming my expert opinion,

is attached hereto as Exhibit DX-477.  The Lovenheim study combines a national sample of

individual survey responses from the Tobacco Use Supplement of the Current Population Survey

with geographic information on proximity to lower-tax jurisdictions and estimates a model of

cigarette demand that incorporates the decision whether to purchase across a state or Native

American reservation border.

68.     Lovenheim finds that the consumption in response to a change in home-state

price, on average, is statistically equivalent to zero when casual smuggling from out of state (i.e.,

individual purchases in nearby lower-priced jurisdictions) is present.  In other words, in response

to a tax increase, the demand for in-state tax-paid cigarettes falls, and all of the change in demand

diverts to out-of-state purchases resulting in no change in overall consumption.  (*See* Ex. DX-477

at p. 23.)  The implication of these results for this case is that when faced with a price increase, as

would be the case in the but-for world, consumers who have the ability to divert purchases to

other untaxed or low taxed options do so in overwhelming numbers.

69.     A third study estimates that tax avoidance accounts for 85% of the decline in

tax-paid cigarette sales in response to an increase in cigarette taxes, while reduced consumption

accounts for just 15%.  (Mark Stehr, "Cigarette Tax Avoidance and Evasion," *Journal of Health

Economics* 24, no. 2 (2005) ("Stehr"), pp. 277-297.)  A copy of this article, on which I relied in

forming my expert opinion, is attached hereto as Exhibit DX-505.  The study's estimate is based

on an analysis of tax-paid cigarette sales and cigarette consumption across all 50 states from 1985

to 2001.  (*Id.* p. 281.)

70.     This study compares the price sensitivity of cigarette consumption with the price

sensitivity of tax-paid cigarette sales and finds that the tax-paid sales are systematically more

affected by price changes than consumption.  (Ex. DX-505 at p. 287.)  In other words, for a given

increase in prices, tax-paid sales decrease by a larger amount than consumption.  This implies that many smokers divert from tax-paid cigarettes to untaxed cigarettes in response to a price increase.

71.     The implication of the Stehr study's findings for this matter is that Stehr's results suggest that approximately 83% of demand for the cigarettes at issue would divert to another source of untaxed cigarettes.  This is because diversion from the cigarettes at issue to untaxed sources should be at least as high as diversion from taxed sources to untaxed sources.  (The 85% figure that Stehr reports in his paper is a ratio of elasticities. The 83% figure I use is a diversion ratio.  An algebraic expression can be used to translate Stehr's elasticity ratio to the diversion ratio that I use in my analysis.)

72.     It follows that no more than 17% of demand would divert to all of the other options available to buyers in the but-for world, *i.e.*, tax-paid cigarettes, non-cigarette tobacco products, non-tobacco nicotine products, and quitting.  Therefore, an estimate that the remaining 17% of demand that is not diverted to untaxed cigarettes instead diverts to tax-paid cigarettes is an upper-bound estimate, given that it does not consider the possibility of additional diversion to non-cigarette tobacco products and non-tobacco nicotine products.

73.     As between the three studies, I believe that the Kurti study is most applicable to this matter and provides the best estimate of diversion from the cigarettes at issue to NY-tax-paid cigarettes.  This is so, because in addition to focusing on consumers in New York State, it studies those consumers' responses to having the option of purchasing unstamped cigarettes removed due to a tax policy change directly relevant to this litigation.  Thus, in my opinion, based on my analysis of the academic studies and my consumer market experience, diversion to other NY-tax-paid cigarettes by the consumers of the cigarettes at issues would be between zero and 5.4%.  The

remainder would be diverted to other untaxed or low taxed cigarettes, or other tobacco and nicotine products, as I discuss below.

74.     The academic studies that I rely on above in drawing my conclusions used generally accepted methods of economic, scientific and statistical analysis, and were published in peer-reviewed academic publications.  Well established scientific methods allow scientists to make inferences about a population of interest based on results from other samples. Indeed, this is the basis for using scientific research to inform public policy.  Because I followed this well-established scientific method in reviewing and analyzing these articles, I am able to use the conclusions of these articles to make inferences about the behavior of the purchasers of the cigarettes at issue in the but-for world, even if I have not independently tested the conclusions of these articles against the actual purchasers of the cigarettes at issue.

**Diversion to Other Tobacco Products and Non-Tobacco Nicotine Products**

75.     Of course, diversion within the cigarette category is not the only documented response to increases in cigarette prices.  Academic and policy studies have found that some consumers switch out of the cigarette category entirely in response to price changes.  Some purchase substitute non-cigarette products such as cigars, little cigars, snuff, and roll your own tobacco, while others quit smoking and switch to non-tobacco nicotine replacement therapies ("NRT"), such as nicotine gum, patches, and e-cigarettes.  More broadly, consumers of tobacco products react in predictable ways to changes in taxation or price.

76.     I note that the evidence from academic studies is not precise enough for me to offer an exact diversion ratio.  Academic studies of diversion to non-cigarette products typically examine diversion in response to an increase in the price of all cigarettes.  In this matter, the price increase is not uniform.  It affects only a small segment of the market for cigarettes (i.e., the

cigarettes at issue).  No available study examines diversion from a small segment of the cigarette

market to other cigarettes, non-cigarette tobacco products, and non-tobacco products.  I can

however, based on my review of academic and policy studies and other information, conclude

that there will be a potentially substantial diversion to this category of cigarette substitutes.

77.     The NYATS data show that a significant share of New York smokers use non-

cigarette tobacco products and e-cigarettes, and that NYATS smokers who purchase by mail

order, a proxy for the consumers of the cigarettes at issue, are more likely than all other smokers

to use non-cigarette tobacco products.  Diversion to non-cigarette tobacco products among the

buyers at issue is likely higher than among all cigarette buyers.

78.     Diversion to alternative tobacco products could potentially be substantial, given

that sales of non-cigarette tobacco products are equivalent to approximately 38% of cigarette unit

sales nationwide.  ("Tobacco Taxes:  Large Disparities in Rates for Smoking Products Trigger

Significant Market Shifts to Avoid Higher Taxes," United States Government Accountability

Office, Report GAO-12-475 (April 2012), p. 51, available at

http://www.gao.gov/assets/600/590192.pdf); ("Smokeless Tobacco Report for 2011," Federal

Trade Commission (2013), Table 1A, available at

https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-smokeless-

tobacco-report-2011/130521smokelesstobaccoreport.pdf.)  Copies of these reports, on which I

relied in forming my expert opinion, are attached hereto as Exhibits DX-439 and DX-436.

79.     Studies of combustible tobacco products other than cigarettes (i.e., premium

cigars, cigarillos, little cigars, RYO, and pipe tobacco) suggest that over time, demand has

diverted to these products from cigarettes in response to increasing cigarette taxes.  A Centers for

Disease Control ("CDC") study of tobacco consumption based on excise tax data for 2000-2011

concludes that "the data suggest that certain smokers have switched from cigarettes to other combustible tobacco products, most notably since a 2009 increase in the federal tobacco excise tax that created tax disparities between product types."  ("Consumption of Cigarettes and Combustible Tobacco – United States, 2000-2011," Centers for Disease Control and Prevention Morbidity and Mortality Weekly Report 61, no. 30 (2012).)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-434.  The CDC study notes that while consumption of cigarettes decreased 32.8% from 2000 to 2011, consumption of loose tobacco and cigars increased 123.1% over the same period, from 3.4% to 10.4% of total combustible tobacco consumption.

80.     Another study reviewed the period 2000 to 2007 and found that sales of non-cigarette tobacco products, including small cigars, RYO, and moist snuff increased by an amount (measured in "cigarette pack equivalents") equal to 30% of the decline in cigarette sales over the same period.  (Gregory N. Connolly and Hillel R. Alpert, "Trends in the Use of Cigarettes and Other Tobacco Products, 2000-2007," *JAMA* 299, no. 22 (2008), pp. 2629-2630.)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-453. The authors conclude that the offsetting increase in sales of non-cigarette tobacco products "could be a reflection of cigarette price increases associated with . . . stricter tax policies applied to cigarettes."  (*Id.* at 2629-2630.)

81.     A number of academic studies also suggest that buyers of the cigarettes at issue would divert in the but-for world to little cigars.  These studies show that some consumers use both cigarettes and little cigars and that an increase in the price of cigarettes is directly associated with an increase in sales of little cigars.  A study by Doris Gammon, et al. from 2015 estimated a demand model using state-level retail scanner data for cigarettes and little cigars collected from

convenience stores and food-drug-mass merchandisers from 2011 to 2013.  (Gammon, D. G.,

Loomis, B. R., Dench, D. L., King, B. A., Fulmer, E. B., & Rogers, T., "Effect of Price Changes

in Little Cigars and Cigarettes on Little Cigar Sales:  USA, Q4 2011–Q4 2013," *Tobacco Control*

(2015).)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto

as Exhibit DX-466.  The Gammon study found that sales of little cigars in convenience stores and

food-drug-mass market stores increased by 27% following a 10% increase in cigarette prices.

82.      The Gammon study concludes that some smokers seek to avoid "disproportionate

tobacco excise taxes, which directly affect purchase price" by switching to lower-priced little

cigars.  In particular, Gammon explained that "during 2000–2011, cigarette consumption

decreased by 32.8%, while large cigar consumption increased by 233% and little cigar

consumption decreased by 65%," but "[t]he decrease in little cigar sales and increase in large

cigar sales following CHIPRA was most likely not because consumers changed preferences, but

rather the result of manufacturers manipulating the weight of little cigars so they would qualify as

large cigars for tax purposes."  (DX-466.)

83.      Another study reviewed cigar usage data from the 2012-2013 National Adult

Tobacco Survey and found usage patterns entirely consistent with diversion from cigarettes to

little cigars.  (Corey, C. G., King, B. A., Coleman, B. N., Delnevo, C. D., Husten, C. G.,

Ambrose, B. K., "Little Filtered Cigar, Cigarillo, and Premium Cigar Smoking Among Adults —

United States, 2012–2013," Centers for Disease Control and Prevention Morbidity and Mortality

Weekly Report 63, no. 30 (2014).)  A copy of this article, on which I relied in forming my expert

opinion, is attached hereto as Exhibit DX-454.  This study found that more than 80% of survey

respondents who report smoking "little filtered cigars" are current or former cigarette smokers.

84.     Other sources, including NYATS survey data and deposition testimony from the New York City Department of Health witness, Dr. Angell, also confirm that some smokers switch to little cigars in response to increases in the price of cigarettes.  (Angell Tr. 27:15-30:11.) Finally, legislation proposed (but not passed) by the New York State Assembly in 2009 affirmed the same point, as it sought to tax little cigars at the same rate as cigarettes, noting that "little cigars are practically indistinguishable from cigarettes and are often consumed as less expensive cigarette alternatives."  (New York State Assembly Memorandum in Support of Legislation, "An Act to Amend the Tax Law, in Relation to Little Cigars," June 19, 2009, NYUPS00003231-3 at 2.)  A copy of this document, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-047.

85.     With respect to smokeless tobacco, a study looking at state-level prevalence data for 1985 combined with state excise taxes estimates the effect of tobacco excise taxes on smokeless tobacco use and concludes that a 10% increase in the cigarette excise tax rate would be expected to result in a 4% to 6% increase in snuff use rates and a 4% to 5% increase in chewing tobacco.  (Robert L. Ohsfeldt and Raymond G. Boyle, "Tobacco Excise Taxes and Rates of Smokeless Tobacco Use in the US:  An Exploratory Ecological Analysis," *Tobacco Control* 3, no. 4 (1994), pp. 316-323.)  A copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit DX-483.

86.     A more recent study estimates a similar model with 1993 data and finds that a 10% increase in the cigarette excise tax rate results in an approximately 10% increase in snuff use rates among young males.  (Robert L. Ohsfeldt, Raymond G. Boyle, and Eli I. Capilouto, "Tobacco Taxes, Smoking Restrictions, and Tobacco Use," in *The Economic Analysis of Substance Use and Abuse:  An Integration of Econometric and Behavioral Economic Research*,

eds. Frank J. Chaloupka et al. (Chicago and London:  University of Chicago Press, 1999).)  A

copy of this article, on which I relied in forming my expert opinion, is attached hereto as Exhibit

DX-484.

87.    Finally, another academic study estimates that a 10% increase in cigarette prices

will result in a 7.7% increase in the demand for nicotine replacement therapy ("NRT") products,

such as Nicorette nicotine gum and Nicoderm CQ nicotine patches.  (John A. Tauras and Frank J.

Chaloupka, "The Demand for Nicotine Replacement Therapies," *Nicotine & Tobacco Research* 5,

no. 2 (2003), pp. 237-243.)  A copy of this article, on which I relied in forming my expert

opinion, is attached hereto as Exhibit DX-507.

88.    In sum, I believe that zero to five percent of sales of the cigarettes at issue would

be diverted to NY-tax-paid cigarettes in the but-for world, while the remainder would be diverted

to other untaxed or lower taxed cigarettes, lower cost tobacco alternatives, such as little cigars and

chewing tobacco, or non-tobacco alternatives.  Some smokers would also quit entirely.  While I

do not have the data to assign exact diversion percentages to non-cigarette products, for the

reasons I explained above, I am confident that there will be diversion to each category given the

peer-reviewed, scientifically sound academic studies that I reviewed.

**My Conclusions**

89.    In conclusion, it is my opinion that Plaintiffs' theory of damages is wrong as a

matter of economics because it assumes that every smoker of the cigarettes at issue would have

diverted to NY-tax-paid cigarettes in the but-for world.  The academic literature shows that

diversion to NY-tax-paid cigarettes would instead be between zero and 5.4%.  In addition, I

conclude that there will be a potentially substantial diversion to other tobacco products and non-

tobacco cigarette substitutes.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

August 25, 2016
Philadelphia, Pennsylvania

_____
Aviv Nevo, Ph.D.