# EXHIBIT 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK, <br><br> Plaintiffs, <br><br> -v- <br><br> UNITED PARCEL SERVICE, INC., <br><br> Defendant. | 15 Civ. 1136 (KBF) <br><br> ECF CASE |

DECLARATION OF DERRICK NIEMI

I, DERRICK NIEMI, under penalty of perjury, declare as follows:

1. I am employed by United Parcel Service, Inc. ("UPS") as Senior Compliance and Ethics manager, in UPS's Compliance and Ethics group. I have personal knowledge of the facts set forth below, and when called as a witness, I will affirm under oath that they are true.

Background

2. I have been employed UPS since August 8, 1988. I worked as a sorter in the local sort at UPS's center in Searcy, Arkansas while I attended college at Harding University, also in Searcy, Arkansas. I graduated from Harding University in 1993, with an undergraduate degree in Business Administration Management. I later obtained a Masters Degree in Business Administration from Webster University, in 2004.

3. I have been employed continuously by UPS since 1988. After graduation from college in 1993, I was promoted to Supervisor of Accounts Receivable and Collections in the Little Rock district office. I was transferred as a Billing Supervisor, then Finance Supervisor and then to promoted to Finance Manager in 1999. I relocated to UPS's Central Texas District in

1

la-1326438

2004, in San Antonio, Texas, and held positions in Revenue Recovery and as Finance Manager. I worked in operations for a year in 2008, and then transferred back to a Finance Manager role. I came to the UPS Corporate Office in Atlanta, Georgia in May 2013 on special assignment in Corporate Compliance. In January 2014 my assignment to Corporate Compliance became permanent. I was promoted to Senior Manager in Compliance and Ethics in February 2016.

4. In my current role I have three general areas of responsibility: customer compliance, records information management and compliance training and development. In the customer compliance area, we support the organization in attempting to ensure compliance with UPS's policies regarding regulated goods, such as the shipment of tobacco products, pharmaceuticals and lithium batteries.

Involvement in UPS Tobacco Compliance

5. In early 2014, I started to get involved, with our Corporate Legal Department and Dangerous Goods, in UPS's efforts to prevent cigarette shipments to consumers, and more broadly on compliance with UPS's Tobacco Policy. I understood that the City and State of New York had threatened a claim against UPS, and had identified one package and three UPS shippers which, they claimed, had shipped cigarettes to consumers via UPS.

6. I reviewed the draft complaint sent by the City's attorney from October 2013, which focused on the sale of unstamped cigarettes by smoke shops from Indian reservations in the State of New York, and specifically by smoke shops of the Seneca Nation of Indians, near Buffalo, New York.

7. As an initial step, I analyzed several accounts that UPS had already cancelled as a result of cigarette shipments, to try to determine whether there were any specific package characteristics that might apply, that might assist in identifying other similar shippers that might

be shipping cigarettes.  For example, if these shippers had typical weights, sizes or used specific services.  Unfortunately, however, I found that the characteristics were not unique, and no package characteristics stood out from the normal UPS customer.  In fact, the shippers I analyzed were relatively close to UPS averages in terms of weight, size and type of service (Ground).

8. In February 2014, I travelled to the area of the Seneca Nation reservations in order to gain a better understanding of the smoke shop shippers, and to visit the UPS centers that served these areas.  I spent several days in the area, along with Gary Deweerd, then a member of our Regulated Goods group.  I participated in several rides alongs with drivers serving the Indian reservations, and just generally observed to see if there was anything out of the ordinary (which there was not), and to try to understand whether the shipment of cigarettes might somehow be obvious as indicated in the City and State's draft complaint (it was not).  I also determined relatively quickly that these shops did not sell only cigarettes, as indicated in the draft complaint.  We already knew that each of the smoke shops identified in the draft complaint that were audited (Post Smokes and AJ's Cigars), as well as the additional ones UPS had identified for audit (e.g., Shipping Services, Native Outlet and Smokes & Spirits) were shipping little cigars and various other products.

9. After taking the trip to Upstate New York, I started to try to identify potential shippers for follow up based on various factors such as zip code, account names, etc., looking to identify tobacco shippers that had the potential of being a cigarette shipper.  But I realized there was no way to determine based on known factors whether a tobacco shipper was shipping legal products such as little cigars or loose tobacco, or whether they were shipping illegal cigarettes.  In approximately May 2014, I ended up with a list of potential shippers for follow up, but we had no reason to believe that any of the shippers on the list were actually in violation of the law or of

3

UPS's Tobacco Policy.  The list included some of the shippers that the City and State ultimately placed at issue in this case, including Cloud & Co., Lake Erie Tobacco, Sweet Seneca Smokes, Big Buffalo, Native Outlet, Native Wholesale and Smokin Joe's.

10.  We did not find cigarette shippers as a result of follow up on any of the shippers on the list I developed in this timeframe.  However, at this time we began to take an additional step, which was to look not only to whether we had evidence that the shipper had tendered cigarettes to consumers (which would warrant immediate termination), but also to try to evaluate whether the shipper had reliable compliance measures in place, for example, to prevent illegal shipments through UPS.  This ultimately resulted in the termination of several shippers even though there was no evidence that the shipper had tendered cigarettes to UPS or otherwise violated the UPS Tobacco Policy.  This included terminations of Cloud & Co., Lake Erie Tobacco and Big Buffalo.

11.  There was one particular shipper in this group, Smokin Joe's, that appeared to have strong compliance controls in place and provided extensive documentation to demonstrate that it was in compliance with state and federal law.  On August 5, 2014, I had a conversation with Smokin Joe's Tax Compliance Manager, Karen Delaney.  I followed up with a request for materials demonstrating compliance with the tax laws regarding new customer setup.  On August 7, 2014, she provided me with new customer setup procedures and forms that suggested to me that Smokin Joe's had reasonable controls in place.  UPS Exhibit DX-340.  On August 15, 2014, I asked Ms. Delaney to provide me with copies of Smokin Joe's licenses to sell tobacco and examples of licenses of some of the customers they ship to, including two customers in Pennsylvania and Arizona. UPS Exhibit DX-341.  She responded with the appropriate documentation on the same day, including licensing information for the two customers.  Id.  On

4

October 6, 2014, I followed up requesting documentation on some additional specific customers, and Ms. Delaney responded with the applicable documentation a few days later. UPS Exhibit DX-352. Smokin Joe's followed up with yet additional documentation on October 22, 2014, in connection with their compliance under the Master Tobacco Settlement Agreement. UPS Exhibit DX-356. In summary, Smoking Joe's provided extensive documentation to us to demonstrate that they were in compliance with state and federal laws, and we had every reason to believe that they were in compliance.

12.     In November and December 2014, however, I was advised that the City and State essentially demanded that we cancel service to Smokin Joe's. They never provided any evidence suggesting that Smokin Joe's had made an illegal shipment through UPS. They insisted, however, that Smokin Joe's had made shipments to unlicensed consignees through other carriers (YRC and FedEx), and therefore insisted that we terminate Smokin Joe's. We ultimately determined that we had no choice but to terminate Smokin Joe's not because it was in violation of our Tobacco Policy, but because of the City and State's threat of legal action. UPS Exhibit DX-360.

September 2014 Compliance Enhancements

13.     As part of my involvement with the Tobacco Policy, UPS's compliance group and I also recommended a series of compliance enhancements, which were put in place in September 2014. UPS Exhibit DX-350. The enhanced compliance program required pre-clearance for all new tobacco accounts in New York, a requirement that remains in effect even today. Sales employees are required to contact the UPS Help Line to gain pre-clearance prior to creating a pricing bid for a tobacco account. We also conducted PCM's (presentations at pre-work communication meetings) throughout the State of New York for sales and operations personnel.

5

la-1326438

Included with the PCM was a poster that indicated potential "red flags" to look for to help identify potential non-complaint tobacco shippers. This poster was required to be posted in the New York operations. In addition, we sent a letter to all known tobacco shippers in New York, reminding them of the UPS Tobacco Policy, and their responsibility to comply with the Tobacco Policy and all applicable state, local and federal laws.

14.     We also review data, weekly and monthly, to try to identify any shippers that might be in violation of the UPS Tobacco Policy. Each month, my staff reviews the results of a query done by our Business Information Analysis group, which attempts to identify any new shippers (on a nationwide basis) with a name suggesting tobacco sales (i.e., name includes word such as smoke, cigar, etc.) that is shipping a significant volume of packages from a low tobacco excise tax jurisdiction (such as Virginia) to a high tobacco excise tax jurisdiction (such as New York). We follow up on results that may suggest a violation of our Policy. Each week we also investigate all new accounts opened in a zip code that includes a Native American reservation in New York, to determine whether it might be a tobacco shipper. Also, weekly we track the volume in accounts in each of 31 [ML] designed "high risk" zip codes, to determine whether there are any indications of a potential violation (for example a spike in volume in a dormant account).

15.     In addition, we do a review of claims data on a monthly basis to determine whether claims data will reveal any prohibited shipments. Primarily this consists of evaluating each and every claim submitted that identifies package contents as a "cigarette," and conducting follow up to determine whether the shipment was against Policy (because not all cigarette shipments violate UPS Tobacco Policy). So far we have found a few isolated violations, but not with any repetitive shippers.

Annual Center Visits

16. In addition to what I have explained above, in April 2016 we also conducted the first of what will be an annual process of in person "audits" of all of the UPS centers that provide pickup or delivery service to any of the qualified and non-qualified Indian reservations located in the State of New York. In April 2016, I personally conducted audits of four of the centers: North Central, Syracuse East, Potsdam and Rome. I spoke with the Patch of Land account executives assigned to each facility, as well as the assigned Customer Counter Clerks. I personally gave the Tobacco Policy PCM at each facility. I interviewed center management and drivers that serve the reservations, and spoke with other appropriate personal to make sure that employees are keeping an eye open for signs of shipment of cigarettes to consumers. At the centers I audited, I did not identify the shipment of any tobacco products, let alone shipments in violation of our Policy. Audits of the other centers in the state were conducted by our Director of Dangerous Goods (Brad Cook) and by other members of my staff. We did not identify a shipment in violation of our Tobacco Policy in any of the visits this year.

Inactive or Low/No Volume Accounts Identified by Plaintiffs

17. I understand that the City and State have provided our counsel with a list of shipper names and shipper numbers that they claim are at issue in this case. UPS Exhibit DX-545. I have reviewed this list and searched the accounts in UPS's systems to identify accounts that had no shipping activity at all (this is a frequent occurrence, i.e., accounts are opened but never used), were cancelled in 2005 or had no shipping activity after 2007. The accounts falling into these categories include: Arrowhawk Smoke Shop (71564Y), Bear Track Tobacco (7W759A), Big Indian Smoke Shop (01W165), DeerPathCigs.com (10Y52Y), DeerPathCigs.com (54Y59Y), Hooty Sapper Ticker (TT6739), Indian Smokes (55AE29), Native

Distribution & Sales (03E1R8), NWS (8W842W), Pierce Trading (W286A), RJE-Seneca Smoke (RA0614), RJE – Ltd (997W43), Rock Bottom Tobacco (74R5V5), Seneca Commerce (W11A25), Seneca Ojibwas Trading Post (170A2X), Seneca Direct (F41F10), Smokes & Spirits (A996X1) and Wholesale Direct (475T6T).  There was one account on the City and State's list, 7GT-1SUF, which I could not locate.  Based on the format this does not appear to be a UPS account number (for any type of UPS service).

UPS Revenues and Profit for Shippers At Issue

18.     I have also been asked to provide the UPS revenue attributable to the accounts identified by the City and State (on UPS Exhibit DX-545) that had volume and revenue after January 1, 2010, and to put that in the context of UPS's overall domestic U.S. small package revenue, and small package revenue from accounts located in the State of New York.  My research has shown that for all packages shipped by the accounts listed by Plaintiffs on UPS Exhibit DX-545 from 2010 to 2014, including packages shipped to locations outside the State of New York, the total revenue UPS received was approximately $5.2 million.  That was a very small fraction (.003%) of UPS's total domestic small package revenue for the same period, as shown in this chart (total small package revenue based on publicly reported data):



"At Issue" Shippers: $5.2 Million

UPS Domestic Small Package Revenue: $164 Billion

la-1326438

19. It was also a very small fraction (.05%) of the total revenue UPS received from New York-based accounts. The following chart compares the revenue from accounts listed by Plaintiffs to total estimated UPS domestic small package revenue from accounts located in the State of New York (for 2010 through 2014). The estimate of total New York small package revenue is based on publicly available UPS domestic small package revenue, apportioned to New York based on percentage of the U.S. population residing in New York:



Again, the revenue figure I used for the "at issue" shippers is actually larger than what is at issue in this case, because it includes revenue from all shipments, not just those to New York addresses. The revenue from packages at issue in this case would obviously be much lower (and corresponding percentages lower).

20. I have also calculated the estimated profit that UPS earned from shipments made the shippers identified on DX-545 during the same time period, from 2010 through 2014 (again, including all packages, not just those sent to recipients in the State of New York.) Based on an operating ratio derived again from publicly available figures in each year, I estimate that UPS's EBITDA earnings on all such packages during this time period was approximately $475,000, which is again inflated in the context of this case because it includes shipments to recipients outside of New York.

9

la-1326438

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: Atlanta, Georgia
       August 26, 2016

_____
Derrick Niemi