# EXHIBIT 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK and THE CITY OF NEW YORK,<br><br>                  Plaintiffs,<br><br>                  -v-<br><br>UNITED PARCEL SERVICE, INC.,<br><br>                  Defendant. | 15 Civ. 1136 (KBF)<br><br>ECF CASE |

**DECLARATION OF JENNIFER PULEO**

JENNIFER PULEO, under penalty of perjury, declares as follows:

      1.      I am employed by United Parcel Service, Inc. ("UPS") as a full-time Supervisor in UPS's Jamestown, New York Center.  I have personal knowledge of the facts set forth below, and if called as a witness, I could and would testify under oath to the matters set forth in this declaration.

      2.      I have been employed by UPS since 2005 at the UPS Jamestown and Dunkirk Centers.  When I started working for UPS in 2005, I was a part-time Supervisor at the Jamestown Center.   In or about May 2013, I was promoted to full-time Supervisor at the Dunkirk Center.  I held that position at the Dunkirk Center until January 2015, when I transferred to the same position at the Jamestown Center.

      3.      In each of my positions, I have reported to now Southwest Business Manager, Mike Shea.

la-1325481

4. Before I worked at UPS, I worked as a waitress and in accounts receivable at a local company near the Jamestown Center that sold copy and facsimile machines. I currently am working toward my associate's degree online at Thomas Edison University.

5. When I was a full-time Supervisor at the Dunkirk Center, I supervised the operations of the Dunkirk Center during the day hours. UPS utilizes a hub and spoke distribution system whereby packages flow between and among larger transportation "hubs" and smaller "centers." Once packages are given by a customer to UPS and brought into an "origin" center, they are sorted by destination and then loaded for transportation longer distances as needed between hubs and centers by, for example, tractor trailers, rail, or airplane. Packages are ultimately taken to their "destination" center, where they are sorted and loaded onto package cars (UPS trucks) for ultimate delivery. UPS has hubs and centers across the country, designed to move packages from origin to destination in the most efficient way possible.

6. At the Dunkirk Center, I was responsible for supervising approximately 32 UPS employees, including part-time supervisors, pre-loaders, local sorters, and drivers.

7. In general, at the Dunkirk Center, I supervised the transfer of inbound sealed packages from UPS's Hubs to the Center. Every morning at approximately 4:30 a.m., a tractor trailer arrives with sealed packages bound for delivery to the geographic area serviced by the Dunkirk Center; the pre-loaders unload the sealed packages from tractor trailer to the conveyor belt and take the sealed packages off the conveyor belt and pack them in the appropriate delivery truck; and after the delivery trucks are packed by approximately 8:30 a.m., the drivers leave the Dunkirk Center to deliver the sealed packages to customers and pick up packages from customers on their respective routes.

8. In May 2013 when I transferred to the Dunkirk Center, I was trained on UPS's Tobacco Policy, as the Dunkirk Center services smoke shops on the Seneca Nation reservation. Among other things, UPS's Tobacco Policy provides that shippers are not permitted to ship cigarettes to residential addresses.

9. While UPS's Tobacco Policy prohibits the shipment of cigarettes to residential addresses, there is no prohibition on the shipment of other tobacco products, such as little cigars and pipe tobacco, both of which UPS is permitted to ship to a residential (or any) address, provided that the shipper complies with applicable regulations governing such shipments.

10. I also am aware that as part of UPS's Tobacco Policy, shippers who ship tobacco products other than cigarettes to consumers were (and still are) required to sign a document called a Tobacco Agreement acknowledging UPS's Tobacco Policy and agreeing to abide by it, although I do not handle these Tobacco Agreements and have never seen one.

11. UPS's Tobacco Policy was widely known at the Dunkirk Center. As part of my job as a Supervisor, I often spoke with the drivers, pre-loaders, and local sorters and those discussions have included UPS's Tobacco Policy.

12. I also gave the UPS drivers their Pre-Morning Communication meeting ("PCM") (given at the beginning of their shift at approximately 8:00 a.m. and sometimes gave the PCM to the pre-loaders and local sorters. I periodically included UPS's Tobacco Policy as part of the PCM that I have given to those employees and have told those employees that if they suspect or know that a customer is shipping cigarettes, then they should notify me or another supervisor immediately, as UPS is not permitted to ship cigarettes to residential addresses.

13. In addition, I have spoken to UPS drivers following audits of packages suspected of containing cigarettes bound for residential addresses to remind them to watch for cigarette

shipments to consumers.  Further, the drivers with routes on the reservation—Ron Logan, Kevin Banach, and Doug Bankoski—each specifically confirmed with me that they understood UPS Tobacco Policy and would inform me if they suspected anything.  I do not recall a driver ever coming to me with suspicions that any customer was shipping cigarettes.

14.     During the time I worked at the Dunkirk Center (May 2013 through January 2015), there was a poster on the bulletin board in the main area reiterating UPS's Tobacco Policy and illustrating warning signs or "red flags" that a package may contain illegal cigarettes.  All of the drivers, pre-loaders, and unloaders have seen the poster and were aware of and knew UPS's Tobacco Policy.

15.     As part of driver training and my responsibilities as a Supervisor, at least once annually, I rode with drivers on their routes, shadowing them so that I walked beside them to drop off and pick up packages. While on drive-alongs on the routes that service the Native American reservation, I visited certain smoke shops that UPS services on the reservation.  As I shadowed the driver, I went into those smoke shops and saw that they sold little cigars and other tobacco products, such as pipe tobacco, as well as cigarettes.

16.     Except for the words on the carton, cartons of cigarettes and cartons of little cigars are identical in shape, size, and weight.  There is no way to distinguish on the face of a sealed package between a package that contains cartons of little cigars verses a package that contains cartons of cigarettes.

17.     As part of enforcing UPS's Tobacco Policy, I did look more carefully at sealed packages that come from shippers who I had learned may have changed names or locations.  On several occasions, UPS drivers have told me on several occasions that a certain smoke shop on their route had closed and shortly thereafter they were picking up packages from a new customer

4

in close proximity to the closed shop. In each such instance, I randomly audited the packages from the new smoke shop shipper to make sure the packages did not contain cigarettes bound for residential addresses. I never found any cigarettes in those packages that I randomly opened, but instead found little cigars or loose (chewing or pipe) tobacco. As UPS is permitted to transport little cigars and loose tobacco to residential addresses, I re-sealed those packages and they were loaded onto the tractor trailer truck for delivery to the appropriate Hub. As I was not specifically instructed to open these packages, I made no record of and did not photograph the packages that I opened, found little cigars or loose tobacco, and resealed for delivery.

18.   I also paid special attention to the contents of packages that would break open at the Dunkirk Center. There was only one instance in which a package that broke open contained cigarettes, which I address in detail below. In all other instances, packages that broke open contained permissible items.

19.   On June 11, 2014, a package shipped by EExpress broke open in the Dunkirk Center. (As described below, we previously had audited packages from EExpress and found only coffee.) The package contained cigarettes. I then opened the other two packages from EExpress that had been tendered for delivery that day and found cigarettes in them as well. In accordance with UPS procedure, I photographed the packages, labels, and contents, held the packages, and contacted by email both my supervisor Mike Shea and Matthew Szelagowski, UPS Security. UPS Exhibit DX-329 is a copy of this email and the resulting email exchange and UPS Exhibit DX-323 are the photographs I took as part of the audit.

20.   The next day, June 12, 2014, Matthew Szelagowski asked me to audit any packages picked up from EExpress. That night, we audited 99 packages and again found

5

cigarettes. I informed my supervisor and Matthew Szelagowski and held these packages at the Dunkirk Center until Bob Sluberski, UPS Security, came and picked them up.

21. While I understand EExpress was terminated as result of the audit, I have no role in terminating accounts.

22. During the time I was the Supervisor at the Dunkirk Center, I periodically was asked by Gary DeWeerd, UPS Regulated Goods, to conduct audits of specific shippers' packages and I, or my part-time supervisor or both of us, would conduct those audits. We typically were not told the reason for the audit although I assumed there was a suspicion that the customer might be shipping cigarettes.

23. For all audits requested by UPS Corporate, we followed the same procedure as set by UPS Security: we looked on the conveyor belt for packages from the designated shipper; if we saw any packages from an audit target, we removed them from the conveyor belt and opened them; we photographed the packages, the labels on the packages, and the contents of the packages; and we forwarded these photographs to UPS Security and awaited further instructions. As detailed below, these audits discovered little cigars or coffee, except for the audit described above of EExpress after a package containing cigarettes broke open at the Dunkirk Center:

   a. On October 23, 2013, Rita Torres, UPS Regulated Goods, forwarded me and the Local Sort Supervisor, Donna Paddock, an email from UPS Director of Dangerous Goods, Brad Cook requesting that we conduct an audit of a shipper known as Native Gifts. The email requested that the Dunkirk Center audit 100% of the packages shipped that day from Native Gifts and hold any packages that contained cigarettes bound for a residential address. UPS Exhibit DX-233 is a copy of this email request and the resulting email exchange. On October 24, 2013, Rita Torres requested a status update on the audit. I informed her that Native

6

Gifts had not shipped anything the prior day and that we would complete the audit the next time the shipper shipped any package. I do not recall whether Native Gifts ever resumed shipping and accordingly if we were able to conduct an audit.

        b.      On May 2, 2014, I received an email from my supervisor Mike Shea requesting that I conduct an audit of a shipper known as EExpress. The email requested that I audit 100% of the packages shipped on the next day they shipped and hold for any packages containing tobacco products. UPS Exhibit DX-312 is a copy of this email and the resulting exchange.  On May 5, 2014, we conducted an audit of the EExpress packages received at the Dunkirk Center that day and the packages contained only coffee.  Pursuant to our procedure, we took photographs of the audited packages, sent the photographs to UPS Security, and awaited further instructions.  UPS Exhibit DX-549.  I do not know the owner or anyone who worked at EExpress and have never visited its location.

        c.      On June 10, 2014, UPS Security requested that the Dunkirk Center audit Sweet Seneca. We conducted the audit and the packages contained only little cigars and chewing tobacco.  Pursuant to our procedure, we took photographs of the audited packages, sent the photographs to UPS Security, and awaited further instructions.  UPS Exhibit DX-550 is a copy of the photographs from the Sweet Seneca audit that revealed little cigars and chewing tobacco and UPS Exhibit DX-551 is a copy of the email exchange with UPS Security about the photographs.

      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: Jamestown, New York
August 24, 2016

_____
Jennifer Puleo