UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                              Plaintiffs,

              -v-

UNITED PARCEL SERVICE, INC.,
                              Defendant.

15 Civ. 1136 (KBF)

**ECF CASE**

**DEFENDANT UNITED PARCEL SERVICE, INC.'S PRE-TRIAL BRIEF ON
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Pre-Trial Conference:** September 12, 2016, 1:00 PM
**Trial:** September 19-October 3, 2016

Paul T. Friedman (Admitted *Pro Hac Vice*)
Ruth N. Borenstein (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
PFriedman@mofo.com
RBorenstein@mofo.com

Carrie H. Cohen
Jamie A. Levitt
Mark David McPherson
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
CCohen@mofo.com
JLevitt@mofo.com
MMcPherson@mofo.com

Gregory B. Koltun (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Telephone: (213) 892-5200
GKoltun@mofo.com

Deanne E. Maynard (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
Telephone: (202) 887-1500
DMaynard@mofo.com

*Attorneys for Defendant*
United Parcel Service, Inc.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

I.     BACKGROUND CONCERNING UPS ................................................ 3

II.    BACKGROUND CONCERNING NEW YORK STATE AND CITY'S
       TAXATION OF CIGARETTES ........................................................... 5

III.   THE OCTOBER 21, 2005 ASSURANCE OF DISCONTINUANCE BETWEEN
       UPS AND THE ATTORNEY GENERAL........................................... 11

IV.    UPS'S COMPLIANCE WITH THE AOD........................................... 13

       A.     Initial Compliance Effort ..................................................... 13

       B.     Enhanced Compliance ........................................................... 25

V.     FACTS CONCERNING THE SHIPPERS AT ISSUE ...................... 29

       A.     Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs
              Manufacturing/Jacobs Tobacco Company) .......................... 33

       B.     Indian Smokes...................................................................... 42

       C.     Elliot Enterprises and EExpress........................................... 43

       D.     Shipping Services.................................................................. 45

       E.     Bearclaw Unlimited .............................................................. 47

       F.     Smokes & Spirits .................................................................. 48

       G.     Arrowhawk/Hillview Cigars/ Native Gifts/Seneca Cigars/Two Pines
              Enterprises............................................................................ 50

       H.     Native Wholesale/Seneca Promotions ................................. 53

I.     UPS IS ENTITLED TO THE PACT ACT EXEMPTION BASED ON ITS AOD ........ 54

II.    PLAINTIFFS FAIL TO PROVE THE ELEMENTS OF THEIR CCTA CLAIMS........ 57

III.   PLAINTIFFS FAIL TO PROVE THAT UPS KNOWINGLY DELIVERED
       CIGARETTES ON BEHALF OF THE SHIPPERS AT ISSUE ..................................... 59

       A.     Plaintiffs Must Show That UPS Acted With Actual Knowledge That It
              Was Shipping Cigarettes To Satisfy The Knowledge Element Of Their
              Claims .................................................................................... 59

       B.     Knowledge Cannot Be Imputed From Employees From UPS's Claims
              Group Or Customs Brokerage Group ................................... 63

IV.    THE STATE FAILS TO ESTABLISH ANY VIOLATION OF THE AOD ................. 65

V.     PLAINTIFFS' CLAIMS BASED ON SHIPMENTS FROM THE POTSDAM
       SHIPPERS FAIL FOR ADDITIONAL REASONS....................................................... 68

A.  The City Lacks Standing To Assert Any Claims Based On The Potsdam Shippers ........................................................................................... 68

B.  None Of The Potsdam Shippers' Shipments Violated The CCTA Or The AOD Based On The New York Tax Law In Effect At The Time ...................... 69

    1.  Transportation of shipments from the Potsdam Shippers did not violate the CCTA at the time of the shipments ........................................ 69

    2.  Transportation of shipments from the Potsdam Shippers did not violate the AOD at the time of the shipments .......................................... 74

    3.  The State is estopped from arguing that shipments from the Potsdam Shippers violated the CCTA or the AOD ................................ 74

C.  Transportation Of Shipments From The Potsdam Shippers Did Not Violate N.Y. PHL § 1399-*ll* ................................................................. 77

D.  UPS's Cooperation With Law Enforcement Concerning The Potsdam Shippers Immunized UPS From Any Claims Based On Those Shippers ............ 78

E.  UPS Has Already Satisfied The Attorney General That No Penalties Under The AOD Are Appropriate Based On Shipments From The Potsdam Shippers ............................................................................ 81

VI.  UPS'S AFFIRMATIVE DEFENSES ALSO BAR PLAINTIFFS' CLAIMS ................ 82

A.  UPS's Equitable Defenses Bar The State's AOD Claim ..................................... 82

B.  The State's Breach Of The Covenant Of Good Faith And Fair Dealing Bars Its AOD Claim ........................................................................... 84

VII.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF .............................. 87

VIII.  NO DAMAGES OR PENALTIES SHOULD BE AWARDED AT ALL ..................... 89

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abraham Zion Corp. v. Lebow,*
    761 F.2d 93 (2d Cir. 1985).........................................................................................86

*AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC,*
    No. 01 CIV 11448 (JGK)(HPB), 2006 WL 1206333 (S.D.N.Y. May 2, 2006) ...................64

*Apollo Fuel Oil v. United States,*
    195 F.3d 74 (2d Cir. 1999) (*per curiam*) ...............................................................64, 65

*Benjamin Ctr. v. Hampton Affiliates, Inc.,*
    66 N.Y.2d 782 (1985) ...............................................................................................64

*Brown & Williamson Tobacco Corp. v. Pataki,*
    320 F.3d 200 (2d Cir. 2003)........................................................................................11

*Carney v. Newburgh Park Motors,*
    84 A.D.2d 599 (N.Y. App. Div. 3d Dep't 1981) ........................................................83

*Cayuga Indian Nation of N.Y. v. Gould,*
    14 N.Y.3d 614 (N.Y. Ct. App. 2010)........................................................................72

*City of New York v. Milhelm Attea & Bros., Inc.,*
    550 F. Supp. 2d 332 (E.D.N.Y. 2008) ................................................................71, 84

*City of New York v. Milhelm Attea & Bros., Inc.,*
    No. 06-cv-3620 (CBA), 2012 WL 3579568 (E.D.N.Y. Aug. 17, 2012) ...........................7, 68

*Dalton v. Educ. Testing Serv.,*
    87 N.Y.2d 384 (1995) ...............................................................................................86

*Day Wholesale, Inc. v. State of New York*
    856 N.Y.S.2d 808 (N.Y. App. Div. 4th Dep't 2008).............................................6, 7

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006)........................................................................................68

*Dep't of Taxation & Finance of N.Y. v. Milhelm Attea & Bros., Inc.,*
    512 U.S. 61 (1994)......................................................................................................71

*Fowler v. City of Saratoga Springs,*
    215 A.D.2d 819 (N.Y. App. Div. 3d Dep't 1995) ....................................................83

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    563 U.S. 754 (2011).............................................................................................59, 60

iii

*Handschu v. Special Servs. Div.*,
   No. 71 Civ. 2203(CSH), 2007 WL 1711775 (S.D.N.Y. June 13, 2007) ...............................85

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*,
   467 U.S. 51 (1984) .......................................................................................................76

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003).........................................................................................88

*Hexagon Sec. LLC v. Leawood Bancshares, Inc.*,
   No. 13 Civ. 907(JSR), 2014 WL 1303516 (S.D.N.Y. March 14, 2014)................................85

*Idan Computer, LTD v. Intelepix, LLC*,
   No. CV-09-4849(SJF)(ARL), 2010 U.S. Dist. LEXIS 90658 (E.D.N.Y. Aug. 27,
   2010) .......................................................................................................................89

*In re Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011)..........................................................................................76

*In re New York State Urban Dev. Corp.*,
   No. 32741/09, 2010 WL 702319 (Sup. Ct. Kings Cty. Mar. 1, 2010)..................................83

*In re Penn Cent. Transp. Co.*,
   494 F.2d 270 (3d Cir. 1974)..........................................................................................10

*In re Ionosphere Clubs, Inc. v. Ins. Co. of Penn.*,
   85 F.3d 992 (2d Cir. 1996) ...........................................................................................76

*Kapps v. Wing*,
   404 F.3d 105 (2d Cir. 2005)..........................................................................................88

*Koam Produce, Inc. v. DiMare Homestead, Inc.*,
   213 F. Supp. 2d 314 (S.D.N.Y. 2002), *aff'd,* 329 F.3d 123 (2d Cir. 2003)...........................64

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001)..........................................................................................76

*Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*,
   425 U.S. 463 (1976)........................................................................................................6

*Mooney v. City of N.Y.*,
   219 F.3d 123 (2d Cir. 2000) ..........................................................................................84

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004).....................................................................................84, 87

*New York State Motor Truck Ass'n v. Pataki*,
   No. 03 CV 2386 (GBD), 2004 WL 2937803 (S.D.N.Y. Dec. 17, 2004)................................11

iv

*New York v. United Parcel Serv., Inc. ("UPS I"),*
  No. 15-cv-1136 (KBF), 2015 WL 5474067 (S.D.N.Y. Sept. 16, 2015) ...............................54

*Oklahoma Tax Comm'n v. Chickasaw Nation,*
  515 U.S. 450 (1995) ....................................................................................................71

*Oneida Nation of N.Y. v. Cuomo,*
  645 F.3d 154 (2d Cir. 2011) .................................................7, 8, 70, 72, 74, 75, 76

*Oneida Nation of N.Y. v. Paterson,*
  No. 6:10-cv-1071, 2010 WL 4053080 (N.D.N.Y. Oct. 14, 2010), *vacated*, 645 F.3d
  154 (2d Cir. 2011) ..........................................................................................................70

*Petroleum Traders Corp. v. Balt. Cty.,*
  413 F. App'x 588 (4th Cir. 2011) .................................................................................83

*Reino de España v. Am. Bureau of Shipping, Inc.,*
  691 F.3d 461 (2d Cir. 2012) .........................................................................................64

*Republic of Iraq v. ABB AG,*
  768 F.3d 145 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2836 (2015) ...........................84

*Ross v. Bank of Am.*, N.A.,
  524 F.3d 217 (2d Cir. 2008) .........................................................................................68

*Rowe v. N.H. Motor Transp. Ass'n,*
  552 U.S. 364 (2008) .........................................................................................11, 77, 78

*Royal Ins. Co. of Am. v. Comm'rs of State Ins. Fund,*
  289 A.D.2d 807 (N.Y. App. Div. 3d Dep't 2001) ......................................................83

*S.E.C. v. First Jersey Sec., Inc.,*
  101 F.3d 1450 (2d Cir. 1996) .......................................................................................88

*Seneca Nation of Indians v. Paterson,*
  No. 10-CV-687A, 2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ..........................7, 70

*Seneca Nation of Indians v. State of New York,*
  No. 2011-000714, slip op. at 2 (Sup. Ct., Erie Cty. May 10, 2011) .......................7, 70

*Seneca Nation of Indians v. State of New York,*
  Erie Cty. Index No. 2011-000714 (N.Y. App. Div. 4th Dep't June 9, 2011) ........7, 70

*Seneca Nation of Indians v. State of New York,*
  CA 11-01193, slip op. (N.Y. App. Div. 4th Dep't June 21, 2011) .......................7, 8, 38

*St. Regis Mohawk Tribe v. Patterson,*
  No. 10-CV-1026, slip op. at 2 (N.D.N.Y. Sept. 16, 2010) ...................................7, 71

v

*TIG Ins. Co. v. Newmont Mining Corp.*,
   413 F. Supp. 2d 273 (S.D.N.Y. 2005), *aff'd*, 226 F. App'x 49 (2d Cir. 2007).......................86

*U.S. Philips Corp. v. ATI Techs., Inc.*,
   No. 05-Civ. 8176 (LAP), 2008 WL 2073928 (S.D.N.Y. May 8, 2008) ................................64

*United States v. Abcasis*,
   45 F.3d 39 (2d Cir. 1995) ........................................................................................80, 81

*United States v. Bank of New England, N.A.*,
   821 F.2d 844 (1st Cir. 1987)....................................................................................64

*United States v. Burt*,
   410 F.3d 1100 (9th Cir. 2005) .................................................................................80

*United States v. Carson*,
   52 F.3d 1173 (2d Cir. 1995)......................................................................................88

*United States v. Giffen*,
   473 F.3d 30 (2d Cir. 2006)...........................................................................78, 79, 80

*United States v. Morrison*,
   686 F.3d 94 (2d Cir. 2012)........................................................................................71

*United States v. Yonkers Bd. of Educ.*,
   29 F.3d 40 (2d Cir. 1994) ........................................................................................89

*Unkechauge Indian Nation v. Paterson*,
   752 F. Supp. 2d 320 (W.D.N.Y. 2010).................................................................7, 70

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014)..................................................................................59, 60

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015)......................................................................10

*Zamierowski v. Nat'l R.R. Passenger Corp*,
   No. 05 Civ. 9309(WCC), 2006 WL 1816377 (S.D.N.Y. June 28, 2006)..............................86

sf-3681183

## STATUTES

Prevent All Cigarette Trafficking Act, 15 U.S.C. § 375 *et seq*. ("PACT Act") ................... passim
    15 U.S.C. § 376a(a)(3) ................................................................................78
    15 U.S.C. § 376a(e) ....................................................................................43
    15 U.S.C. § 376a(e)(3)(B)(ii)(I) ...........................................................3, 54
    15 U.S.C. § 376a(e)(5)(A) ..........................................................................77
    15 U.S.C. § 376a(e)(5)(B) ..........................................................................77
    15 U.S.C. § 376a(e)(5)(C)(ii) .....................................................................78
    15 U.S.C. § 376a(e)(9)(D) ..........................................................................78
    15 U.S.C. § 378(c)(1)(A) ............................................................................87

18 U.S.C. § 2339B(a)(1) ...............................................................................59

Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq*. ("CCTA") ...................... passim
    18 U.S.C. § 2341(2) ........................................................................58, 70, 74
    18 U.S.C. § 2342 ........................................................................................69

18 U.S.C. § 2346(b)(1) ..................................................................................87

49 U.S.C.
    § 14501(c)(1) .............................................................................................77
    § 41713(b)(4)(A) .......................................................................................77

20 N.Y.C.R.R. § 74.6 ...............................................................................70, 71

N.Y.C. Ad. Code § 11-1302(e) .......................................................................6

N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii) ...................................5

N.Y. Exec. L. § 63(12) ........................................................................1, 87, 88

N.Y. Public Health Law § 1399-*ll* ........................................................ passim

N.Y. Tax Law
    § 470 .........................................................................................................10
    § 471 .................................................................................................. passim
    § 471(1) ...............................................................................................70, 71
    § 471(2) ..........................................................................................70, 71, 73
    § 471(5) ...............................................................................................70, 71
    § 471 (N.Y. Law 2010, ch. 134, pt. D, §§ 2-4) ...........................................7
    § 471-e .......................................................................................7, 8, 70, 71
    § 471-e (2003) .............................................................................................6
    § 471-e (2005) .............................................................................................6
    § 471-e (2009) ...........................................................................................71
    § 471-e (N.Y. Law 2010, ch. 134, pt. D, §§ 6-9) ........................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 53(a)(3)...........................................................................................................89

Fed. R. Civ. P.  26(a)(1)(A)(iii) .......................................................................................89, 90

81 N.Y. JUR. 2d Notice & Notices § 2..................................................................................64

1-3A Modern Federal Jury Instructions-Criminal (2016) ......................................................59, 60

## PRELIMINARY STATEMENT

Plaintiffs allege that UPS violated federal and state law, as well as a prior Assurance of Discontinuance ("AOD") with the New York Attorney General, by virtue of its customers' shipments of sealed packages containing unstamped cigarettes to unauthorized recipients. After the Court dismissed plaintiffs' claims under RICO in its August 9, 2016 Opinion & Order (Dkt. 322), plaintiffs are left with claims under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq*. ("CCTA") (Claims 1-2); the Prevent All Cigarette Trafficking Act, 15 U.S.C. § 375 *et seq*. ("PACT Act") (Claims 7-10); and New York Public Health Law § 1399-*ll* (Claims 11-12, with the State also invoking New York Executive Law § 63(12) in Claim 12). In addition, the State (but not the City) asserts a claim under the AOD (Claim 13). Plaintiffs also assert a claim for "Injunctive Relief and Appointment of a Monitor" (Claim 14). (DX-189.)

Plaintiffs cannot satisfy their burden of proof on any of their remaining claims. While naming 30 shippers or groups of shippers (and 78 total UPS account numbers) that they allege shipped cigarettes through UPS, they cannot prove as a threshold matter that cigarettes were in any of the packages shipped by the vast majority of them. Indeed, most of the account numbers had little or no package volume during the time-frame at issue. Plaintiffs will advance isolated evidence that some of the shippers tendered cigarettes to UPS for shipment to consumers. But the evidence does not satisfy plaintiffs' burden of proving that UPS knowingly shipped cigarettes to unauthorized recipients for any shippers.

To the contrary, the evidence confirms that the great majority of accounts plaintiffs identify were shipping legal products such as little or "filtered" cigars and loose tobacco. Plaintiffs seek to recover for shippers that UPS has audited multiple times, each time finding only filtered cigars and other legal products. Photographic evidence irrefutably proves that while plaintiffs claim these shippers tendered only cigarettes, the shippers were tendering only legal

1

products. Nor did UPS violate the AOD or any law based on the handful of shippers that may have shipped cigarettes. UPS never knowingly accepted cigarettes for shipment to consumers. UPS on its own terminated shippers when it discovered cigarettes shipped to consumers, without any prompting from the City or State. (Remarkably, the City and State are suing UPS on multiple shippers that UPS brought to the City and State's attention, not vice-versa.)

Moreover, for the last decade, when UPS entered into the AOD and established a nationwide policy prohibiting the shipment of cigarettes to consumers, UPS has vigorously enforced its policy. It has searched for and notified tobacco shippers of UPS's policy. It has trained its sales force and other employees to enforce the policy. It has investigated shippers when appropriate, auditing packages when UPS had a reasonable basis to suspect that a shipper was violating UPS policy (even without being prompted to do so by law enforcement), and terminating service to shippers whenever cigarettes were found. And it has continually cooperated with law enforcement to terminate service to shippers when law enforcement has informed UPS of potential violators, even in circumstances in which the AOD did not require termination. Over the years, UPS has continuously worked to improve its measures for blocking illegal cigarette traffickers, and its compliance program today is better than ever due to that evolution. In short, UPS remains committed to complying with the AOD, and it has never knowingly shipped cigarettes to any unauthorized recipient.

Based on these facts, as detailed below, plaintiffs cannot prove that UPS violated the CCTA. Nor can plaintiffs show that UPS violated the AOD. Indeed, by virtue of its AOD, UPS is entitled to the exemption the PACT Act extended UPS by name; plaintiffs cannot meet their burden of proving that UPS no longer honors the AOD nationwide such that UPS is no longer entitled to the PACT Act's exemption of carriers that have entered into a settlement agreement

sf-3681183

with the New York Attorney General, 15 U.S.C. § 376a(e)(3)(B)(ii)(I)—an exemption from both

the PACT Act itself and from Public Health Law § 1399-*ll*. The facts are to the contrary,

demonstrating that UPS continues to honor and enforce its AOD throughout the country.

Thus, plaintiffs have not proven that UPS is liable under any theory of relief. The

following proposed findings of fact and conclusions of law detail the failure of plaintiffs' case.

## PROPOSED FINDINGS OF FACT

### I.      BACKGROUND CONCERNING UPS

1.      UPS is a package delivery company and a provider of global supply chain

management solutions. UPS serves every address in North America and Europe. It has 362,000

employees in the United States, 1.6 million daily pick-up customers, and 8.4 million delivery

customers (recipients). UPS has approximately 1,800 operating facilities, and a delivery fleet of

104,926 package cars, vans, tractors and motorcycles, and 237 company-owned aircraft. (Cook

Decl. ¶ 24.)

2.      UPS's Corporate Headquarters are in Atlanta, Georgia. In the United States, UPS

has two geographic regions and ten geographic districts. UPS operates through a hub and spoke

system. "Hubs" are larger facilities that serve as sorting centers for package feeder operations.

"Centers" are smaller facilities that serve as sorting centers and are the local facilities that

provide pickup and delivery services to UPS customers. (Cook Decl. ¶ 25.)

3.      In providing its package delivery services to customers, UPS offers scheduled

pick-up services for shippers and a variety of other methods to tender packages for shipment (on-

call pick-up, UPS drop box, The UPS store locations, and others). UPS receives packages from

shippers and then transports and delivers packages to the addresses provided by the shippers. The

packages that UPS picks up and delivers are sealed by the shippers. As part of its delivery

services, UPS provides shippers and their consignees means of tracking shipments. UPS also

sf-3681183

offers "value-added services" to its customers, such as specialized pick-up and delivery options, delivery notification, and special handling to meet particular shipper needs. UPS also offers logistics support services and customized solutions. (Cook Decl. ¶¶ 26-27.)

4.      The UPS system is designed to achieve the most efficient delivery of packages to UPS customers nationwide and worldwide. After drivers pick up sealed packages from customers and bring them back to a center (or they are tendered to UPS through other means), they are sorted and typically placed on a feeder trailer along with other packages destined for the same hub or center. When packages flow through a hub, they are then sorted and delivered by feeder trailer to the final destination operating center, where they are sorted and then delivered by package car drivers to the ultimate consignee. (Cook Decl. ¶ 26.)

5.      UPS package car drivers (pickup and delivery drivers) typically begin their day by delivering the packages that were received into the center the previous afternoon or evening. In the afternoon the package car drivers then perform their scheduled pickups, in order to bring packages back to the center. Because drivers are on a tight schedule in order to make all of their pickups and get back to the center with all of their packages in time for the evening sort, UPS asks its customers to have their packages sealed, ready, and labelled by the time UPS pickup driver arrives. Drivers are instructed not to wait for packages that are not ready for pick-up. (Cook Decl. ¶ 27.)

6.      All of UPS's package services are guaranteed for delivery either by the end of a day (e.g., UPS Ground) or by a specific time on a specific date (e.g., UPS Next Day Air Early AM). UPS's operations are planned around providing on time performance for the highest possible percentage of packages. (Cook Decl. ¶ 28.)

sf-3681183

7.      Except in very limited circumstances not applicable here, UPS shippers do not declare or provide UPS with information regarding the contents of UPS packages. The vast majority of shipments (more than 90%) are processed on electronic shipping systems, such as UPS Worldship. The shipper inputs "package level detail" regarding the package, including name and address of the recipient, weight, dimensions, requested service level and any requested "accessorial" services (such as declared value or C.O.D.). But there is no field for the contents of the shipment, because package contents have no bearing on the shipping services or charges associated with any given package. Once the shipper inputs the package level detail, he or she can then print a bar-coded label to affix to the package. At the end of the day, the shipper "closes out" the shipping system and prints a summary barcode label to provide to the driver. The package level detail is then sent electronically to UPS. The process works in a similar way through other means of shipping, e.g., UPS Internet Shipping, which is an online shipping system. (Cook Decl. ¶ 29.)

8.      Most of UPS's shippers (particularly commercial shippers) pack their merchandise for shipment in plain corrugated boxes, perhaps with the name and logo of the shipper. Shippers rarely print the package contents on the outside of the box. While UPS reserves the right to inspect package contents, such inspections are conducted only in very rare circumstances, where there is a compelling reason to do so. (Cook Decl. ¶ 30.)

## II.     BACKGROUND CONCERNING NEW YORK STATE AND CITY'S TAXATION OF CIGARETTES

9.      New York imposes a tax on all cigarettes for sale in the state, except where the state "is without power to impose such tax." N.Y. Tax Law § 471. Taxes are paid by purchasing and affixing a tax stamp. *See* N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii) ("§ 74.3").

10.     From June 3, 2008 to July 1, 2010, New York State's excise tax on cigarettes was $2.75 per pack; effective July 1, 2010, New York State's excise tax on cigarettes was raised to $4.35 per pack. *See* N.Y. Tax Law § 471.

11.     Independently, New York City imposes its own excise tax of $1.50 per pack of cigarettes. N.Y.C. Ad. Code § 11-1302(e).

12.     New York State does not have the power to tax cigarettes sold on Native American reservations to registered tribal members. *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 475-76 (1976). The State can, however, tax on-reservation sales to non-Native Americans and non-member Native Americans. *Id.* at 483. As a result, some on-reservation cigarette sales may be subject to tax while others are not. The legislative record makes clear that the State has had difficulty addressing the differing tax status of cigarettes for sale on reservations, because taxes are required to be paid when cigarettes enter the stream of commerce, but the ultimate taxability of cigarettes shipped to reservations is determined at the time of sale to an end user.

13.     In 2005, in a first attempt to address the problem of on-reservation sales, the Legislature added provisions to Section 471-e to establish a statutory mechanism to collect cigarette taxes on Native American reservations. But the 2005 amendments specified that the mechanism would only take effect once the DTF took "any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date." N.Y. Tax Law § 471-e (2005).[1] DTF never promulgated the necessary rules and regulations to implement the

---

[1] The 2005 revised Section 471-e envisioned that "tax exemption coupons [would be given] to Indian nations or tribes based upon a determination by the Department of Taxation and Finance of 'probable demand of the qualified Indians on such nation's or tribe's qualified reservation plus the amount needed for official nation or tribal use.'" *Day Wholesale, Inc. v. State of New York,* 856 N.Y.S.2d 808, 809 (N.Y. App. Div. 4th Dep't 2008). Before that revision, Section 471-e did not include any collection mechanism; it merely instructed the DTF to "promulgate rules and regulations necessary to implement the collection of [taxes]" "where a non-native American purchases . . .

6

revised statute, rendering Section 471-e not in effect. *Day Wholesale, Inc. v. State of New York*

856 N.Y.S.2d 808, 811 (N.Y. App. Div. 4th Dep't 2008). As a result, DTF permitted unstamped

(thus untaxed) cigarettes to continue to be sold to Native American reservation retailers. *See id.*

14.     In 2006, DTF expressly adopted a forbearance policy, declining to enforce the

requirements of Section 471 with regard to on-reservation cigarette sales. *Day Wholesale*, 856

N.Y.S.2d at 809; (DX-038, Advisory Op., Pet. No. M060316A (N.Y. Dep't of Tax. and Fin.

Mar. 16, 2006)).

15.     In June 2010, the Legislature attempted to correct the void left by existing law. It

amended the New York tax law so that, for the first time, it (a) expressly required that stamps be

affixed to all cigarettes sold to reservation businesses and (b) created a statutory mechanism for

ensuring that Native Americans did not have to pay the tax. N.Y. Tax Law §§ 471 and 471-e

(N.Y. Law 2010, ch. 134, pt. D, §§ 2-4, 6-9). These amendments were scheduled to take effect in

September 2010, *City of New York v. Milhelm Attea & Bros.*, *Inc.*, No. 06-cv-3620 (CBA), 2012

WL 3579568, at *5 (E.D.N.Y. Aug. 17, 2012), but they were enjoined by federal and state courts

presiding over multiple court challenges to their constitutionality, including *St. Regis Mohawk*

*Tribe v. Patterson*, No. 10-CV-1026, slip op. at 2 (N.D.N.Y. Sept. 16, 2010), (DX-052); *Seneca*

*Nation of Indians v. Paterson*, No. 10-CV-687A, 2010 WL 4027795, at *4 (W.D.N.Y. Oct. 14,

2010); *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154 (2d Cir. 2011); *Unkechauge Indian Nation*

*v. Paterson*, 752 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) (same); *Seneca Nation of Indians v.*

*State of New York*, No. 2011-000714, slip op. at 2 (Sup. Ct., Erie Cty. May 10, 2011); Order to

Show Cause, *Seneca Nation of Indians v. State of New York*, Erie Cty. Index No. 2011-000714

---

cigarettes . . . from native American nation or tribe land[.]" N.Y. Tax Law § 471-e (2003). The DTF failed to do so.
*Day Wholesale*, 856 N.Y.S.2d at 811.

(N.Y. App. Div. 4th Dep't June 9, 2011); *Seneca Nation of Indians v. State of New York*, CA 11-01193, slip op. at 1 (N.Y. App. Div. 4th Dep't June 21, 2011).

16.     While they were in effect, these injunctions or stays precluded stamping requirements that otherwise would have been imposed by the amended law on reservation-to-reservation sales. (*See* DX-050 (DTF published "Taxpayer Guidance" memoranda stating that, under pre-amendment law, "an Indian nation or tribe or a reservation cigarette seller may purchase tax-exempt packs of cigarettes."); Ernst Dep. Tr.. at 48:15-19 (agreeing that "[w]hile those [TROs] were in place . . . DTF [would] have permitted the shipment of Native American branded cigarettes to a reservation[.]"); DX-389 (DTF investigation report stating after "the lifting of the TRO . . . they should not be shipping untaxed cigarettes to their Native American customers in NYS from this point on."); Dkt. 64 (State acknowledging that "from 2006 to 2011, the State was enjoined from enforcing Tax Law 471-e which would have allowed for implementation of a [collection] mechanism to collect taxes on cigarettes sold from Indian reservations.").) Ultimately, these injunctions and stays on the enforcement of the amendments to Section 471 were lifted, and the new amendments went into effect on June 21, 2011. *Oneida Nation*, 645 F.3d at 154; *Seneca Nation of Indians*, CA 11-01193, slip op. at 1. (N.Y. App. Div. 4th Dep't June 21, 2011) The legal effect of these injunctions is discussed in greater detail in the conclusions of law.

17.     The major increases in federal and state excise taxes in the 2000s, especially in New York, and additional New York City taxes led to increased demand for cheaper alternatives to cigarettes, including little cigars. The base price of little cigars is so much lower than the base price of cigarettes that little cigars are considerably less expensive than cigarettes, regardless of applicable tax rates. Cartons and packs of little cigars are practically indistinguishable from

sf-3681183

cartons and packs of cigarettes, and little cigars are not subject to New York's tax stamping requirement. (Delman Decl. ¶ 27.)

18.     Even after 2010, when little cigars weighing not more than four pounds per thousand were taxed the same as cigarettes in New York, little cigars still remained far cheaper than cigarettes because of little cigars' significantly lower base prices. Little cigars can also be manufactured to weigh slightly more than three or four pounds per thousand so that they are taxed as regular cigars instead, making them even cheaper. (Delman Decl. ¶ 39.) Native American tobacco retailers in New York have responded to the increased demand for little cigars by carrying many varieties of little cigars, as well as other alternative products. (Delman Decl. ¶ 35.)

19.     Demand for less expensive little cigars grew throughout the 2000s as state taxes on cigarettes increased. According to one report by the U.S. Department of Agriculture, almost 6 billion pounds of little cigars were produced in 2007, compared to around 2.4 billion pounds in 2000.[2] The availability of alternative tobacco products, such as little cigars, proliferated in the 2000s as consumers looked for less expensive alternatives to cigarettes. (Delman Decl. ¶ 41.)

20.     Several studies confirm the link between increased taxes and the increased availability of little cigars and other alternative tobacco products, even as cigarette consumption has declined.[3] In fact, the decision by the Food and Drug Administration to bring cigars under the regulation of the Family Smoking Prevention and Tobacco Control Act by its Center for

---

[2] (*See* DX-043, U.S. Dep't of Agriculture, *Economics Research Service. Tobacco Outlook* (Oct 24, 2007), p. 11, Table 9 (available at: http://usda.mannlib.cornell.edu/usda/ers/TBS//2000s/2007/TBS-10-24-2007.pdf).)

[3] (*See* DX-466, Gammon, Doris et al., *Effect of Price Changes in Little Cigars and Cigarettes on Little Cigar Sales: USA, Q42011-Q4 2013*, Tobacco Control (2015); DX-428, Delnevo, C., et al., *Close, but no cigar: certain cigars are pseudo-cigarettes designed to evade regulation*, Tobacco Control (2016).)

Tobacco Products on May 5, 2016, (DX-425) (formally published in the Federal Register of May 10, 2016), is due specifically to FDA's research and acknowledgment that various demographic groups have continued to use cigars even as there has been a broader migration away from cigarettes, especially during the period 2010-2014. (Delman Decl. ¶ 44.)

21.     During the 2009-2010 session, the New York Assembly and New York Senate each considered legislation that would have amended the definition of cigarettes in Tax Law Section 471 to include filtered cigars. *See* An Act to Amend the Tax Law, in Relation to Little Cigars, Assembly Bill A9015 (DX-047); Senate Bill S5984A (DX-553). The Assembly sponsor recognized that "little cigars are practically indistinguishable from cigarettes and are often consumed as less expensive alternatives." (DX-047 at NYUPS00003232.) Accordingly, "[i]t makes sense to level the playing field." (*Id*.) Although the bills are both still active, the Assembly and Senate each referred the proposed legislation to committee in 2010, and there has been no activity since. On January 6, 2015, however, the New York Senate introduced additional legislation, S00702, that will, if enacted, change the definition of cigarette in Tax Law Section 470 to include "any roll for smoking containing tobacco wrapped in a substance containing tobacco that weighs no more than four and a half pounds per thousand unless it is wrapped in whole tobacco leaf and does not have an internal filter." (DX-552 at 1-2.) The last action on S00702 was a referral to the Senate Health Committee on January 7, 2016.[4]

---

[4] Courts routinely take judicial notice actions of state legislatures, and of records reflected on governmental websites. *See, e.g., In re Penn Cent. Transp. Co.*, 494 F.2d 270, 282 (3d Cir. 1974) (taking judicial notice of state legislative solutions under active consideration); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

sf-3681183

### III.   THE OCTOBER 21, 2005 ASSURANCE OF DISCONTINUANCE BETWEEN UPS AND THE ATTORNEY GENERAL

22.     In 2000, New York became the first state to prohibit common carriers from knowingly delivering cigarettes to consumers and other unauthorized consignees. N.Y. PHL § 1399-*ll*.

23.     Most provisions of PHL § 1399-*ll* were originally scheduled to take effect on November 14, 2000; the provision that restricts carriers' services, subdivision (2), was scheduled to take effect on January 1, 2001. But due to litigation brought by cigarette sellers, PHL § 1399-*ll* did not take effect until April 10, 2003, when the Second Circuit issued its mandate in *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003).

24.     On August 6, 2004, the New York Attorney General's Office served a subpoena upon UPS, seeking information concerning UPS's compliance with PHL § 1399-*ll*. (DX-005.) The Attorney General's Office served a second subpoena upon UPS as part of the same investigation in 2005. (DX-014.)

25.     At the time of the investigation, UPS and other carriers had a strong but not yet tested legal defense to the enforcement of PHL § 1399-*ll*, based on the argument that the Federal Aviation Administration Authorization Act preempted the law as applied to carriers. While no court had invalidated laws such as PHL § 1399-*ll* at the time of the Attorney General's investigation of UPS, carrier associations had initiated litigation challenging PHL § 1399-*ll* and a similar law enacted in Maine. Although the carriers voluntarily dismissed the challenge to PHL § 1399-*ll*, the Supreme Court later ruled unanimously that key portions of Maine's law were preempted. *See generally New York State Motor Truck Ass'n v. Pataki*, No. 03 CV 2386 (GBD), 2004 WL 2937803, at *2 (S.D.N.Y. Dec. 17, 2004); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008).

sf-3681183

26.     UPS chose to enter into an Assurance of Discontinuance with the New York
Attorney General despite its position that PHL § 1399-*ll* was preempted by federal law. (DX-
023.) Because UPS had strong legal defenses to the Attorney General's investigation, UPS's
decision was based not on the viability of the Attorney General's allegations that UPS violated
PHL § 1399-*ll*, but on UPS's business decision to enact a uniform, nationwide policy concerning
cigarette shipments and its desire to cooperate with law enforcement to curtail allegedly unlawful
cigarette deliveries. UPS's decision is reflected in various provisions of the AOD, including
paragraph 9 (in which UPS denies the Attorney General's allegations that UPS violated PHL §
1399-*ll*), paragraph 15 (which reflects UPS's business decision to enact a new cigarette policy),
the "whereas" clause on page 5 (which reflects UPS's and the Attorney General's desire to
cooperate to ensure compliance with PHL § 1399-*ll*), and paragraphs 45-47 (which preserve
UPS's right to challenge PHL § 1399-*ll* as preempted by federal law, and which set forth
procedures for the termination of the AOD in the event PHL § 1399-*ll* is held preempted). (DX-
023 ¶¶ 9, 15, 45-47.)

27.     Although UPS offered comments on the Attorney General's draft AOD, the
structure and key provisions of the AOD were drafted by the Attorney General's Office.
(Nocenti Dep. Tr. 39:14—42:22.)

28.     Through the National Association of Attorneys General ("NAAG"), states other
than New York worked with New York to reach an agreement with UPS that included
everything states across the country wanted the agreement to include. NAAG approached UPS in
February 2005, requesting UPS's and other carriers' help in curtailing cigarette delivery sales.
(DX-011 at 1.) UPS ultimately agreed to change its policy to prohibit the delivery of cigarettes to
consumers nationwide, just as NAAG had hoped. (DX-023.) All of the procedures NAAG sought

12

from UPS and other carriers were included in the AOD UPS signed with the New York Attorney

General. (Nocenti Dep. Tr. 93:22-97:25.)

## IV.    UPS'S COMPLIANCE WITH THE AOD

### A.    Initial Compliance Effort

29.    On December 20, 2005, UPS submitted to the New York Attorney General a

Management Report (DX-035, Cook Decl. ¶ 45), certifying its compliance with the AOD. The

Report informed the Attorney General that:

> a.    In compliance with ¶ 18 of the AOD, UPS amended its Terms and Conditions
>
> of Service and its General Tariff Containing the Classifications, Rules and
>
> Practices for the Transportation of Property ("the UPS Tariff") to include its
>
> Cigarette Policy. (DX-035 at Exs. A-B; Cook Decl. ¶ 42.) The relevant
>
> provision of the UPS Tariff was amended to provide:
>
> 464
>
> <u>TOBACCO PRODUCTS</u>
>
> Packages containing tobacco or tobacco products, as those
> terms are variously defined under applicable state law
> ("Tobacco Product Shipments"), are accepted for
> transportation only from shippers who are licensed and
> authorized to ship tobacco and tobacco products pursuant to
> applicable laws. Tobacco Product Shipments shipped to a
> consumer will only be accepted for transportation as a
> contractual service. However, because UPS prohibits
> shipments of cigarettes to consumers under any circumstances,
> UPS does not offer a contractual service for the delivery of
> cigarettes to consumers. To receive service for Tobacco
> Product Shipments shipped to a consumer, the shipper must
> sign and agree to the provisions set forth in an approved UPS
> agreement for the transportation of tobacco products. For all
> other service for Tobacco Product Shipments, the consignee
> must be licensed and authorized to receive tobacco or tobacco
> products pursuant to all applicable federal, state, provincial, or
> local laws or regulations, and the shipment must conform to the
> terms, conditions, restrictions, and prohibitions set forth at

www.ups.com/tobacco at the time of shipping. It is the responsibility of the shipper to ensure that a shipment tendered to UPS, including a Tobacco Product Shipment, does not violate any federal, state, provincial, or local laws or regulations applicable to the shipment.

UPS reserves the right to refuse to accept, transport, or deliver any Tobacco Product Shipment that UPS, in its sole discretion, determines does not comply with UPS requirements for the shipment or any applicable law or regulation, and to discontinue any or all service to any shipper for, among other reasons, tendering such a shipment. UPS reserves the right to dispose of any Tobacco Product Shipment that shippers are prohibited from shipping, that UPS is not authorized to accept, that UPS states that it will not accept, or that UPS has a right to refuse. The shipper agrees to indemnify, defend, and hold harmless UPS, its parent corporation, and affiliated companies, their officers, directors, employees, agents, and their successors and assigns, from all claims, demands, expenses, liabilities, causes of action, enforcement procedures, and suits of any kind or nature brought by a governmental agency or any other person or entity arising from or relating to a Tobacco Product Shipment, or from the shipper's noncompliance with UPS requirements for Tobacco Product Shipments or governmental laws or regulations applicable to the transportation of tobacco or tobacco products. (DX-035 at UPS00087190-91 & Ex. B; Cook Decl. ¶ 39.)

b.  Similar language was included in UPS's Terms and Conditions of Service. (DX-035 at Ex. A.) Both UPS's Terms and Conditions of Service and the UPS Tariff were posted on the UPS website, http://www.ups.com, on November 21, 2005. (DX-035 at UPS00087191 & Exs. A-B; Cook Decl. ¶ 42.)

c.  In compliance with ¶ 18 of the AOD, on November 21, 2005, UPS also incorporated the UPS Cigarette Policy into the addendum of contracts signed by shippers who ship Cigarettes. (DX-035 at UPS00087191 & Ex. C.)

d.  In compliance with ¶ 20 of the AOD, UPS revised its delivery policies and procedures for Cigarettes in accordance with the AOD. In addition to the changes to UPS's Terms and Conditions, the UPS Tariff and the Agreement

14

for Transportation of Tobacco Products, UPS revised its Tobacco Products Transportation Procedures Manual ("the Tobacco Manual"), which provides guidance on UPS's tobacco policies for those UPS employees responsible for implementing and abiding by such policies. (DX-035 at UPS00087192 & Ex. D; Cook Decl. ¶ 55.)

e.   In compliance with ¶ 21 of the AOD, by October 21, 2005, UPS compiled a list that includes UPS customers that UPS believes may be Cigarette Retailers. UPS used the following sources of information to compile the list: (a) sellers and shippers identified on Schedule C of the Attorney General's subpoena duces tecum dated August 6, 2004, for which UPS has identified account numbers; (b) sellers and shippers identified as likely Cigarette Retailers based on UPS's search of names in its customer database for words such as "cigarette," "smoke," and "tobacco;" (c) sellers and shippers identified as likely Cigarette Retailers based on UPS's search of codes in its customer database; and (d) UPS's knowledge of known Cigarette Retailers. (DX-035 at UPS00087192-93 & Ex. E; DX-008; DX-371; Cook Decl. ¶¶ 14, 36, 47, 63-64.)

f.   In compliance with ¶ 22 of the AOD, on November 18, 2005, counsel for UPS performed a Google search to identify additional shippers who list UPS as a carrier for Cigarettes shipped to Individual Consumers. (DX-035 at UPS00087193 & Ex. F; DX-044; Cook Decl. ¶¶ 65-67.)

g.   In compliance with ¶ 23 of the AOD, UPS wrote to Cigarette Retailers it identified through the efforts described above. The letters UPS sent to

identified Cigarette Retailers indicated that UPS no longer transports
Cigarettes to Individual Consumers and does not accept such shipments for
delivery. (DX-035 at UPS00087193 & Ex. G; Cook Decl. ¶ 14.)

h.   In compliance with ¶ 25 of the AOD, UPS began maintaining a database that
includes information regarding Cigarette Retailers. The database includes all
of the information that ¶ 25 of the AOD requires UPS to maintain. As ¶ 41 of
the AOD requires, UPS preserves the information included in the database for
five years. (DX-035 at UPS00087194; Cook Decl. ¶¶ 14, 22, 36, 63-64; DX-
008; DX-371.)

i.   In compliance with ¶ 34 of the AOD, UPS revised its Tobacco Manual, which
provides guidance on UPS's tobacco policies for those UPS employees
responsible for implementing and abiding by such policies. UPS posted the
Tobacco Manual on its internal website, available for exclusive review by
UPS personnel, on or about October 28, 2005. (DX-035 at UPS00087194 &
Ex. D; Cook Decl. ¶ 55; DX-129; DX-203.)

j.   In compliance with ¶ 35 of the AOD, on November 21 and 28, 2005, UPS
issued PCMs to UPS drivers, sorters and pre-loaders to help ensure that these
personnel are actively looking for indications that a package contains
Cigarettes being shipped to an Individual Consumer, alerting UPS
management of such packages and attempting to intercept such packages. In
compliance with ¶ 36 of the AOD, the PCMs also instruct drivers not to
deliver packages that contain Cigarettes being shipped to Individual
Consumers, and to alert UPS management if they know or believe that a

business is engaged in shipping Cigarettes to Individual Consumers. (DX-035 at UPS00087194 & Ex. H; Cook Decl. ¶¶ 52-53; DX-110; DX-157; DX-208; DX-209; DX-348.)

    k.   In compliance with ¶ 37 of the AOD, UPS informed its account executives that UPS's Cigarette Policy has changed, and that UPS revised its Tobacco Manual to reflect that policy. UPS advised its account executives to review the Tobacco Manual in order to understand and assist in the enforcement of UPS's Cigarette Policy. (DX-035 at UPS00087195; Cook Decl. ¶¶ 11, 37, 52-54, 56-59.)

30.    Since entering into the AOD, UPS continues to administer and enforce a nationwide policy prohibiting the shipment of cigarettes to consumers (the "Cigarette Policy"). UPS administers and enforces its Cigarette Policy in multiple ways, including:

    a.   In 2005 and 2006, the Tariff and the Terms and Conditions were separate documents; after 2007, the documents were combined. But since 2005, UPS has set forth substantially the same Cigarette Policy, as required by the AOD. (Cook Decl. ¶¶ 33, 42; DX-035 at Exs. A-B; DX-049.)

    b.   In addition, in 2013, UPS agreed with the New York Attorney General to voluntarily follow the PACT Act Non-Compliant List, and to refuse service to entities on the List. Accordingly, UPS added in its 2013 Tariff/Terms and Conditions of Service that it "does not provide pick-up service from any person or entity included in the Bureau of Alcohol, Tobacco, Firearms and Explosives PACT Act - Non-Compliant List." (DX-242 ¶ 3.16.; Cook Decl. ¶¶ 102-103; DX-200; DX-201; DX-205.)

17

c.  Shippers who ship tobacco products to consumers via UPS must comply with the Agreement for Transportation of Tobacco Products ("Tobacco Agreement"). UPS incorporates the Cigarette Policy into the Tobacco Agreement, which states that "UPS does not provide service for shipments of cigarettes to consumers." (DX-521 at 4; Cook Decl. ¶ 39.)

d.  UPS notifies shippers it believes to be cigarette retailers of its Cigarette Policy. (DX-035 at G.)

e.  UPS has conducted audits of shippers any time it had a reasonable belief that the shippers may be delivering cigarettes to consumers. (Cook Decl. ¶¶ 68-140.) When UPS's audits have uncovered evidence that a shipper was tendering packages containing cigarettes to UPS in violation of UPS's Cigarette Policy, UPS has terminated service to the shipper. (Dkt. 174 ¶ 6g.) The following table illustrates the audits of shippers that plaintiffs have put at issue in this case that UPS has conducted pursuant to the AOD or otherwise (not including audits of other shippers concerning which plaintiffs have not sought recovery in this case):

| | # | DATE | SHIPPER | RESULT | TRIAL EXHIBIT |
|---|---|---|---|---|---|
| **No tobacco** | 1 | 04/02/14 | Fow[5] | Toy car | DX-287 |
| | 2 | 05/05/14 | EExpress | Coffee | DX-303 |
| | 3 | 05/06/14 | EExpress | Coffee | DX-311 |
| | 4 | 01/14/14 | Seneca Promotions | No tobacco | DX-363 |
| **Other tobacco products (no cigarettes** | 5 | 09/15/11 | American Thrust | Loose tobacco, empty cigarette tubes | DX-121 |
| | 6 | 05/21/14 | Big Buffalo | Pipe tobacco | DX-315 |
| | 7 | 05/22/14 | Big Buffalo | Pipe tobacco | DX-316-317 |

---

[5] While many of these shippers are no longer at issue in the case (because the City and State have abandoned their claims as to such shippers), plaintiffs nevertheless continue to pursue recovery for shippers that UPS has audited repeatedly and found only little cigars and other tobacco products (e.g., Sweet Seneca Smokes and Native Outlet).

18

| | | | | | |
|---|---|---|---|---|---|
| **or little cigars)** | 8 | 06/12/14 | Lake Erie | Pipe tobacco, chewing tobacco and e-cigarettes to businesses/consumers | DX-366 |
| **Little cigars (exclusively or with other tobacco products)** | 9 | 07/10/13 | Native Outlet | Filtered cigars | DX-194 |
| | 10 | 10/08/13 | AJ's Cigar | Filtered cigars | DX-129 |
| | 11 | 10/08/13 | Post Smokes | Little cigars | DX-221-222 |
| | 12 | 01/08/14 | Native Outlet | Little cigars | DX-244 |
| | 13 | 01/28/14 | Wholesale Direct | Cigars, filtered cigars, potato chips and candy | DX-263 |
| | 14 | 01/28/14 | RJESS | Little cigars | DX-265 |
| | 15 | 01/30/14 | RJESS | Little cigars | DX-264 |
| | 16 | 04/03/14 | Fow | Swisher Sweets and filters | DX-287 |
| | 17 | 06/11/14 | Sweet Seneca Smokes | Little cigars | DX-327 |
| | 18 | 10/06/15 | Native Outlet | Little cigars | DX-375 |
| | 19 | 01/14/16 | Native Outlet | Little cigars, tobacco leaf wrapper | DX-363 |
| | 20 | 04/27/16 | Native Outlet | Little cigars | DX-421 |
| | 21 | 04/27/16 | Sweet Seneca Smokes | Assorted tobacco products, no cigarettes | DX-422 |
| | 22 | 07/10/16 | Sweet Seneca Smokes | Assorted tobacco products, mainly filtered cigars | DX-429 |
| **TERMINATED (mix of little cigars and cigarettes)** | 23 | 01/08/14 | Shipping Services | Filtered cigars and cigarettes – TERMINATED | DX-244 |
| | 24 | 01/22/14 | Smokes & Spirits | Cigarettes, chewing tobacco and cigars – TERMINATED | DX-257 |
| **TERMINATED (cigarettes only)** | 25 | 09/21/12 | Indian Smokes | Cigarettes – TERMINATED | DX-161 |
| | 26 | 09/21/12 | Bearclaw | Cigarettes – TERMINATED | DX-165 |
| | 27 | 04/17/14 | Two Pine | Cigarettes – TERMINATED | DX-293-297 |
| | 28 | 06/12/14 | EExpress | Cigarettes – TERMINATED | DX-326 |

f.   UPS maintains a database that includes information regarding cigarette
    retailers. (DX-008; DX-371; Cook Decl. ¶¶ 14, 22, 36, 47, 63-64.)

g.   UPS continues to maintain its Tobacco Manual, which provides, among other
    things, that "[s]hipments of cigarettes to end consumers are not accepted
    under any circumstances." (DX-022.)

h.   UPS continues to issue Prework Communications Meetings ("PCM") to
    employees, including UPS drivers, sorters and pre-loaders, to ensure that they

understand and follow the UPS Cigarette Policy. (DX-035 at UPS00087194 & Ex. H; Cook Decl. ¶¶ 52-53; DX-110; DX-157; DX-208; DX-209; DX-348.) Testimony from UPS drivers demonstrates that UPS's training was effective. Even if not every driver could recite UPS's Policy verbatim or remember exactly when they received the PCM, the drivers understood that UPS could not accept cigarettes. (Potter Dep. Tr. 9:13-10:3; Cintron Dep. Tr. 43:21-25; Haseley Dep. Tr. 34:4-6; Guarino Dep. Tr. 44:23-45:2; Logan Dep. Tr. 67:14-17; Sheridan Dep. Tr. 33:5-10.) Drivers' terminations of service to Indian Smokes and Elliot Enterprises (discussed *infra*, at ¶¶ 84, 86, 88) also show that drivers understood the policy at the time.

 i. UPS continues to train its Account Executives and other employees to ensure that they understand and follow the UPS Cigarette Policy. Testimony from UPS Account Executives and Inside Sales Representations demonstrates that UPS's training was effective. (Keith Decl. ¶¶ 13-14; Fink Decl. ¶¶ 16-25, 30; DelBello Decl. ¶¶ 13-17.) The sales team understood UPS's policy and explained UPS's policy to their customers. (Cook Decl. ¶¶ 57, 58, 60.)

 31. UPS's AOD remains active; UPS has never renounced it or limited its policies and practices designed to curtail cigarette deliveries to consumers by eliminating certain states or jurisdictions from the scope of UPS's policies and practices. The AOD applies nationwide, and UPS applies policies to block cigarette deliveries nationwide. (Cook Decl. ¶¶ 13-15.)

 32. No state has ever contended that the AOD is no longer active or does not have a nationwide scope. (Dkt. 206 at 8.)

33.     Since agreeing to the AOD, UPS has continued to cooperate with law enforcement authorities to curtail the shipment of cigarettes to consumers. For example:

a.  At least six times since 2010, UPS informed the City about suspicious packages that turned out to be unstamped cigarettes. (*See* Grayson Dep. Tr. 99:6-19.)

b.  On numerous occasions, UPS notified the State about packages containing cigarettes, only to be told to complete the shipment. Between 2008 and 2011, UPS security personnel met with investigators from New York State's Department of Taxation and Finance concerning cigarette shipments—including Arrow brand cigarettes, which plaintiffs claim the shipper Mohawk Spring Water was shipping. (DX-392.) UPS contacted DTF about these shipments, and DTF instructed UPS to complete the shipments.

c.  In January 2011, UPS corporate security contacted DTF about Smokers Club, Inc., located in Salamanca, NY, and offered to work with DTF agents to curtail the shipper's shipments through UPS. (DX-393.)

d.  In April 2011, UPS contacted New York State Trooper Al Nitti concerning shippers near UPS's facility in Potsdam, NY. (This incident is described in more detail below.) (Terranova Decl. ¶ 5-7.)

e.  On February 15, 2011, the New York Attorney General's Office contacted UPS concerning the shipment of one package containing cigarettes to a New York residential address. (DX-066; Loewenson Decl. ¶ 8.) UPS investigated, and then informed the Attorney General's Office that the shipment was the result of a cigarette retailer shipping a package containing cigarettes through

The UPS Store #1338 ("the Center"), located in Blasdell, NY. The retailer lied to the Center clerk, telling him that the package contained personalized mugs. After learning about the incident, UPS immediately terminated service to the cigarette retailer, whether he attempted to ship packages through UPS directly or through the Center. UPS took other action to ensure that neither the retailer nor the Center nor any other The UPS Store in NY ship packages containing cigarettes in the future. On February 23, 2011, The UPS Store franchisees in New York were informed that they may not provide service to the particular cigarette retailer, through a notation in an electronic database of shippers who have used the Center in the past. UPS, through its subsidiary Mail Boxes Etc., Inc. ("MBE"), discussed this violation with the owner and employees of the Center, learned how the violation occurred, re-emphasized UPS's policy prohibiting the shipment of cigarettes to consumers, and asked the Center employees to be alert for customers who may be attempting to violate UPS policy. UPS also audited the Center. None of the packages UPS audited contained cigarettes or other tobacco products. (DX-069; Loewenson Decl. ¶ 9.)

f.  On February 13, 2012, the New York Attorney General's Office contacted UPS, and alleged that UPS delivered a package containing cigarettes to a California resident on behalf of a shipper named Don Doctor. (DX-133; Loewenson Decl. ¶ 11.) After investigating the incident, UPS informed the Attorney General's Office that the shipment at issue was delivered on May 17, 2011. Although the package showed a return address for an individual named

Don Doctor (7 Lincoln Ave., Silver Creek, NY 14136), the package was shipped using the account number for Evans Emergency Equipment Inc. (8542 Erie Rd., Angola, NY 14006-9612). A UPS account executive verified that Evans Emergency Equipment is not in the business of shipping cigarettes or other tobacco products. Apparently, Mr. Doctor tendered the shipment to Evans Emergency Equipment, which shipped the package using its own UPS account number. Evans Emergency Equipment did not know, and had no reason to know, that the package contained cigarettes. Nevertheless, UPS terminated service to Evans Emergency Equipment for violating UPS's Terms and Conditions of Service, which prohibit shippers from permitting third parties to use their UPS account number to ship packages. (DX-138; Loewenson Decl. ¶ 12.)

34.     Had plaintiffs shared more information with UPS, UPS could have done even more in identifying and terminating service to other shippers. While UPS had no reason to know or suspect the shippers at issue of violating UPS policy, the City and State have investigative resources unavailable to UPS (such as the subpoena power and trained investigators from law enforcement agencies). As a result, the City and State learned that some of the shippers at issue may have been violating UPS policy, but plaintiffs chose not to share that information with UPS:

a.   **AJ's Cigars:** The City claims it became aware of illegal shipments sometime after July 2010. (DX-383 at 4.) It did not share the information with UPS until October 2013, as it was preparing to file this litigation. (DX-216.)

b. **Elliot Enterprises:** The State claims it became aware of illegal shipments in November 2010. (Jerry Dep. Tr. 45:13-24.) It never shared the information with UPS. (*See id.* at 67:3-19.)

c. **EExpress:** The State claims it became aware of illegal shipments in April 2014. (Jerry Dep. Tr. 47:7-12.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City claims it became aware of illegal shipments at the same time (DX-383 at 4), but did not inform UPS. (*See id.* at 5-6.)

d. **Indian Smokes:** The State claims it became aware of illegal shipments in July 2011. (Jerry Dep. Tr. 49:7-14.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City also claims it became aware of illegal shipments in July 2011. (DX-383 at 4.) It did not share the information with UPS until October 2013, as it was preparing to file this litigation. (DX-216.)

e. **Seneca Cigars:** The City conducted a "controlled buy" from Seneca Cigars in May or June of 2012, supposedly resulting in three cartons of unstamped cigarettes being delivered by UPS. (*See* DX-147 at 1 (evidence card showing delivery of unstamped cigarettes).) Yet the City did nothing to halt Seneca Cigars' shipments, or to inform UPS of the alleged illegal trafficking.

f. **Smokes & Spirits:** The State claims it became aware of illegal shipments in February of 2012. (Jerry Dep. Tr. 52:16-23.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City claims it "was generally aware of Smokes & Spirits' shipments of untaxed cigarettes through other litigation prior to the relevant time period" (DX-383 at 4), but did not inform UPS. (*See id.* at 5-6.)

B.      **Enhanced Compliance**

35.     UPS developed a series of enhancements to its compliance program that it rolled out in 2014 with a further review following in 2016. The enhancements stemmed from improvements that Mohammad Azam, UPS's Vice President of Corporate Internal Audit, Compliance & Ethics, sought to make, to strengthen UPS's processes concerning customers' compliance with UPS policies, not just for tobacco shipments but for all regulated goods. (Azam Decl. ¶¶ 7-8.)

36.     The 2014 enhancements to UPS's compliance program focused on the following:

a.  Tobacco Customer Contracts

b.  New Account Setup

c.  Communication & Training

d.  Customer Analytics

e.  UPS Help Line Process

f.  Management Oversight & Internal Audit (Azam Decl. ¶¶ 9-24; Niemi Decl. ¶ 13; DX-280; DX-350; DX-355.)

37.     UPS added two key provisions to the existing Tobacco Agreement:

a.  "Shipper shall develop, implement, and maintain a compliance program ('Shipper Compliance Program') to ensure that Shipper and its consignees are compliant with all laws and regulations that apply to the sale, purchase, shipment, transportation, delivery, receipt, possession, distribution, and importation of Tobacco Products." (Azam Decl. ¶ 11; DX-440 ¶ 4.)

b.  "UPS shall have the right to demand from Shipper evidence that Shipper has complied with all applicable laws and regulations. UPS shall also have the

sf-3681183

right to audit Shipper at any time and for any reason." (Azam Decl. ¶ 11; DX-440 ¶ 7.)

38.     UPS distributed a compliance reminder letter to known tobacco shippers in New York. The letter emphasized the customer's responsibility to comply with local, state, and federal laws. (Azam Decl. ¶ 12; *see, e.g.*, DX-347.)

39.     The tobacco shipper list was developed from data analytics, and queries to the sales force. (Azam Decl. ¶ 13; Cook Decl. ¶¶ 36, 63-64; DX-008; DX-371.)

40.     UPS distributed a Sales Preclearance Memo to New York Sales and Marketing teams. The memo: explained that preclearance was required prior to opening any tobacco-related account; provided employees with the UPS Help Line number they could call to share information or concerns; and provided links to tobacco procedures. (Azam Decl. ¶ 14; Niemi Decl. ¶ 13; DX-351.)

41.     UPS's pre-clearance investigation of potential tobacco accounts now includes: a web search concerning the customer, a review of the customer's website, if any, a review of the customer's own compliance program, and a review of the PACT Act non-compliant list. (Azam Decl. ¶ 15.)

42.     UPS distributed a Pre-work Communication Meeting and Memorandum to all of the operations centers in New York. The memos introduced the Tobacco Compliance Program Enhancements detailed above. The PCM also asked drivers and others to look out for "Red Flags," as displayed on a poster that was posted in all New York facilities. The memos also asked employees to call in any suspicious activity to the UPS Help Line. (Azam Decl. ¶ 16; Niemi Decl. ¶ 13; DX-208; DX-430.)

43.     UPS also distributed a Sales Employee Preclearance Memorandum, which provides the sales force with the information set out above concerning UPS's new pre-clearance procedures for opening any potential tobacco account. (Azam Decl. ¶ 17; DX-351.)

44.     And UPS distributed an additional communication memo to UPS Management concerning these new enhancements. (Azam Decl. ¶ 18; Niemi Decl. ¶ 13; DX-350.)

45.     UPS now completes quarterly data queries concerning potential tobacco accounts, looking at high-risk zip codes, package characteristics (such as size, weight, and volume), a name search for words such as "tobacco," "smoke" and "cig," and web research on potential tobacco accounts (including searches of the customer's name, address, phone numbers to determine if there are any matches with current or previous tobacco accounts), as well as a review of a customer's social media advertisements. (Azam Decl. ¶ 19.)

46.     UPS's communications to employees about these enhancements included encouraging employees to share information or concerns through UPS's Help Line. UPS developed a call script to handle any such calls. Any calls are traceable to centers (though employees can choose to remain anonymous). Resolution of any issues or concerns raised through the Help Line is required. Documents concerning any such calls are retained. (Azam Decl. ¶ 20.)

47.     Finally, UPS added more management oversight to its tobacco policy compliance program. A Group Manager in the Audit Group now completes a monthly review of the tobacco policy compliance procedures with the Vice President of Corporate Internal Audit, Compliance & Ethics. (Azam Decl. ¶ 21.)

48.     The Internal Audit Group conducts periodic reviews of the tobacco compliance program, including audits of at-risk areas. (Azam Decl. ¶ 22.)

49.     In April 2016, UPS's Compliance & Ethics and Dangerous Goods functions conducted a tobacco compliance review in UPS's operations centers in New York. The goal was to ensure that the facilities were following UPS tobacco compliance processes. The review was conducted in UPS's centers in Olean, Syracuse, Rome, Dunkirk, Niagara Falls, Jamestown, Batavia, Buffalo, Potsdam and Lockport, New York—centers deemed to have potential tobacco shippers. (Azam Decl. ¶¶ 25-28.)

50.     The review was conducted by Derrick Niemi from the Compliance & Ethics group, and Jeff Cantrell and Brad Cook from the Dangerous Goods group. (Azam Decl. ¶ 26.)

51.     As part of their review, Messrs. Niemi, Cantrell, and Cook focused on the following issues:

   a.   Delivering the PCM concerning UPS's tobacco policy to drivers in each center;

   b.   Training the Center Management Team concerning UPS's tobacco policy;

   c.   Training the sales team in each center concerning UPS's tobacco policy;

   d.   Conducting "ride-alongs" with drivers in each center, to emphasize UPS's training messages and to learn about any potential tobacco shippers on a driver's route;

   e.   Training the PM Operations team (the team that sorts and loads packages for distribution through UPS's network) concerning UPS's tobacco policy;

   f.   Ensuring that UPS's "red flags" tobacco poster was posted in each center in a visible location; and

g.  Reviewing UPS's customer counters at each center to ensure that the counter

clerks understood UPS's tobacco policy and were enforcing it. (Azam Decl.

¶ 27.)

## V.   FACTS CONCERNING THE SHIPPERS AT ISSUE

52.   The City and State of New York filed this lawsuit on February 15, 2015. Plaintiffs

allege that UPS transported and delivered unstamped (untaxed) cigarettes to unauthorized

recipients in New York, in violation of various federal and state laws and in breach of the AOD.

53.   In their original complaint, plaintiffs identified 13 shippers at issue. In response to

the Court's order requiring the City and State to identify the shippers for which they seek

recovery (Dkt. 67), the City and State identified as many as 55 shippers at issue. (DX-383; DX-

384.)

54.   Plaintiffs have abandoned their claims as to many of the shippers they identified

in response to the Court's October 20, 2015 Order (Dkt. 67), including, for example, Cloud &

Co. (featured in paragraph 45 of the Third Amended Complaint), Post Smokes (*id*. ¶ 32(a)), and

Lake Erie Tobacco Co., Big Buffalo and FOW Enterprises (*id*. ¶ 33).

55.   On August 1, 2016, plaintiffs served their list of shippers for which they allege

UPS transported cigarettes in violation of state and federal law. Plaintiffs listed 30 shippers or

groups of shippers and corresponding UPS account numbers in DX-545. Some of the 30 shippers

had multiple UPS account numbers (most of the additional account numbers had little or no

activity). The 30 shippers plaintiffs have identified for trial on DX-545 are:

a.   Elliot Enterprise(s)

b.   EExpress

c.   Rock Bottom Tobacco

d.   Deerpathcigs.com

29

e.      Bearclaw Unlimited

f.      Shipping Services

g.      Seneca Ojibwas Trading Post

h.      Morningstar Crafts & Gifts

i.      Smokes & Spirits

j.      Sweet Seneca Smokes

k.      Wholesale Direct

l.      AJ's Cigar

m.      Native Outlet

n.      Big Indian Smoke Shop

o.      Pierce Trading

p.      Seneca Commerce

q.      Seneca Direct

r.      Iroquois Tobacco Direct

s.      R J E S S

t.      Native Distribution & Sales

u.      Bear Track Tobacco

v.      RJE-Seneca Smoke

w.      RJE-Ltd

x.      Arrowhawk Smoke Shop/Hillview Cigars/Seneca Cigars LLC

y.      Two Pine Enterprises

z.      Native Gifts

aa.      Hooty Sapper Ticker

30

      bb.    Native Wholesale/Seneca Promotions

      cc.    Potsdam shippers (Mohawk Spring Water/Action Race Parts and Fabrication/Jacobs Manufacturing)

      dd.    Indian Smokes

56.    Of the 30 shippers plaintiffs identified, there are 13 shippers for which UPS either never provided service, or last provided service long before September 18, 2010, the earliest date on which plaintiffs can base any claims due to statutes of limitations. These entities are Rock Bottom Tobacco, Deerpathcigs.com, Seneca Ojibwas Trading Post, Big Indian Smoke Shop, Pierce Trading, Seneca Commerce, Seneca Direct, Iroquois Tobacco Direct, Native Distribution & Sales, Bear Track Tobacco, RJE-Seneca Smoke, RJE-Ltd, and Hooty Sapper Ticker. (*See* Niemi Decl. ¶ 17.) For example, UPS did not provide service to Rock Bottom Tobacco, Deeparthcigs.com, or Seneca Ojibwas Trading Post after 2005 (their accounts were cancelled in connection with the AOD). (*Id.*) Plaintiffs cannot seek recovery for shipments prior to the effective date of the AOD, since the State released any such claims in the AOD and any such claims by the City would be time-barred.

57.    On Exhibit DX-545, plaintiffs have also identified a new shipper, "Wholesale Direct," located in Kentucky, that they did not previously identify in response to the Court's October 20, 2015 order requiring plaintiffs to identify the shippers at issue (Dkt. 67). (*See* DX-383; DX-384.) Plaintiffs first identified Wholesale Direct as a shipper at issue in the case on Exhibit DX-545, which they first provided to UPS on August 1, 2016. For that reason, UPS objects to any claim at trial based on Wholesale Direct. In any event, UPS audited Wholesale Direct in 2014, and identified only shipments of candy and filtered cigars. (*See* Cook Decl. ¶

110; DX-263.) There is no evidence whatsoever that Wholesale Direct shipped any cigarettes via UPS.

58.     Of the remaining 16 shippers plaintiffs have identified on Exhibit DX-545 (other than Wholesale Direct and the 13 for which UPS did not provide service during the relevant timeframe), there are five shippers for which plaintiffs have offered no evidence whatsoever of any cigarette shipments via UPS. The evidence shows that these shippers shipped products other than cigarettes, such as little cigars, other tobacco products, or non-tobacco products. (*See supra* ¶ 30.) These shippers are:

    a.    AJ's Cigar

    b.    Morningstar Crafts & Gifts

    c.    Native Outlet

    d.    R J E S S

    e.    Sweet Seneca Smokes

59.     UPS audited AJ's Cigar, and identified only filtered cigars and other tobacco products, no cigarettes. (Cook Decl. ¶ 80; DX-219.) There is no evidence of any cigarette shipments via UPS by AJ's Cigar. Nor is there any evidence that Morningstar Crafts & Gifts shipped cigarettes via UPS. UPS has audited Sweet Seneca Smokes three times, each time finding only little cigars and other tobacco products (no cigarettes). (Cook Decl. ¶¶ 135-37.) UPS audited Native Outlet five times, finding only little cigars each time. (*Id.* ¶¶ 86-91.) UPS also audited RJESS twice and found only little cigars. (*Id.* ¶ 111.)

60.     Only as to the following shippers or alleged groups of shippers have plaintiffs offered any evidence at all that the shippers may have shipped some packages containing

cigarettes via UPS (though the sufficiency of that evidence is discussed in further detail below, *see infra* at ¶¶ 61-115):

      a.     Potsdam Shippers (Mohawk Spring Water, Action Race Parts & Fabrication, Jacobs Manufacturing/Jacobs Tobacco Company)

      b.     Indian Smokes

      c.     Elliot Enterprises and EExpress

      d.     Shipping Services

      e.     Bearclaw Unlimited

      f.     Smokes + Spirits

      g.     Arrowhawk/Hillview Cigars/ Native Gifts/Seneca Cigars/Two Pines Enterprises

      h.     Native Wholesale/Seneca Promotions

**A.    Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs Manufacturing/Jacobs Tobacco Company)**

61.    Plaintiffs allege that a group of shippers to which UPS provided service from its Potsdam facility—Jacob's Manufacturing (which plaintiffs dub Jacob's Tobacco"), Action Race Parts, and Mohawk Spring Water—were illegally shipping cigarettes to unauthorized recipients, beginning in 2010 and continuing into 2011. As UPS has explained, however, UPS reasonably believed that any shipments from these shippers were legally authorized at the time of the shipments. (*See* Dkt. 355 at 7-8 (summarizing UPS's position and evidence).)

62.    For example, as UPS understood it, Action Race Parts is (or was) an automotive store specializing in racing parts, owned by Louis Jackson, whose family is known for their involvement in auto racing. (*See* Jarvis Dep. Tr. 45:22-46:7; Sheridan Dep. Tr. 108:2-16.) Based on the names of Action Race Parts and its consignees, UPS Drivers that picked up at the store

did not believe Action Race Parts shipped cigarettes. (*See* Sheridan Dep. Tr. 108:8-11; Jarvis

Dep. Tr. 45:22-46:7.)

63.     Although plaintiffs allege a connection between Action Race Parts and Mohawk

Spring Water, there is no evidence of any connection between them: the two entities had separate

UPS accounts, separate addresses, and separate ownership. (*See* Jarvis Dep. Tr. 45:22-46:7

(Louis Jackson owns Action Race Parts).)

64.     UPS did not have any reason to suspect the Potsdam Shippers of shipping

cigarettes before mid- to late-2010. By that time, UPS drivers and supervisors understood that it

was legal to ship cigarettes to a business located on an Indian reservation, as the Potsdam

Shippers were apparently doing. After Mohawk Spring Water opened in November 2010, UPS

driver Candace Sheridan visited the location and grew concerned about the shipments, even

though she did not see cigarettes. (*See* Sheridan Dep. Tr. 114:14-18, 42:12-17.) Sheridan

ultimately spoke to another driver, Donald Jarvis, who told her that "it was legal to ship

cigarettes from reservation to reservation." (*See id*. 41:4-10, 46:16-19.) This understanding of the

law was common in the UPS Potsdam center. Sheridan recalled Potsdam center manager Steven

Talbot telling drivers, at one point, that "it was ok to ship between reservation to reservation."

(*See id*. 120:11-16.) Jarvis also testified that his understanding, at the time, was that reservation-

to-reservation shipments were legal. (*See* Jarvis Dep. Tr. 90:3-12.)

65.     Based on their understanding of the law, Sheridan made it a point to "look at

addresses" to ensure the shipments were going to other reservations. (*See* Sheridan Dep. Tr.

46:13-19.) Jarvis did the same. (*See* Jarvis Dep. Tr. 54:18-22.)

66.     The State shared UPS drivers' understanding of the law. The New York DTF also

believed that cigarette shipments to reservation retailers were permissible before the State

34

became authorized to enforce the amended version of N.Y. Tax Law § 471 after June 21, 2011. Indeed, DTF's entire operations and practices regarding cigarette shipments were premised on that understanding. When pre-amendment law was in effect, DTF published "Taxpayer Guidance" memoranda that explicitly recognized that "an Indian nation or tribe or a reservation cigarette seller may purchase tax-exempt packs of cigarettes." (*See* DX-050 at 5.) Accordingly, "wholesalers were allowed to ship in unstamped product to the reservations." (Connolly Dep. Tr. 99:8-19.)

67.    DTF understood that the wholesale shipment of unstamped cigarettes to reservations remained legal until "one of the TROs was lifted in June of 2011," at which point "the Native American reservations could no longer purchase cigarettes without New York tax stamps . . . ." (*See* Connolly Dep. Tr. 83:11-18.) In other words, as a result of "the lifting of the TRO," carriers should "not be shipping untaxed cigarettes to their Native American customers in NYS from this point on." (*See* DX-389 at NYUPS00002410 (DTF investigation report addressing TRO's effect on carriers) (emphasis added).) Former Deputy Commissioner of Criminal Enforcement Richard Ernst also confirmed this understanding, agreeing that "[w]hile those [TROs] were in place . . . DTF [would] have permitted the shipment of Native American branded cigarettes to a reservation[.]" (Ernst Dep. Tr. 48:15-19.)

68.    Even though UPS drivers shared DTF's understanding that shippers were permitted to ship cigarettes—even untaxed cigarettes—to businesses located on Indian reservations, the drivers became concerned as the Potsdam Shippers' volume increased. Sheridan testified that "the more I covered the routes, you know, the more suspicious I became, the more questions I started to ask." (Sheridan Dep. Tr. 67:18-20.) This included questioning her colleague, Jarvis, on his understanding of the law. (*id.* 41:9-13.) Sheridan's concerns and the

sf-3681183

increased volume prompted Jarvis to tell the Potsdam Center Manager, Steve Talbot that

Mohawk Spring Water and Jacobs Manufacturing were shipping cigarettes; Jarvis asked Talbot

to confirm his understanding of the legality of those shipments. (Jarvis Dep. Tr. 63:17-64:2;

Talbot Decl. ¶ 5.)

69.     This was the first time that a UPS supervisor (Talbot) learned that the Potsdam

Shippers might be shipping cigarettes. (Talbot Decl. ¶ 5; Jarvis Dep. Tr. 63:17-64-9; Sheridan

Dep. Tr. 58:23-25.) He immediately emailed the responsible UPS account executive, Cheryl

Claflin, stating: "Cheryl, PLEASE call the center asap. We have a potential issue with the

Hogansburg p/u of cigarettes." (Talbot Decl. ¶ 6; DX-074.) Talbot also contacted a UPS Security

representative, Jim Terranova, to ask whether UPS should continue picking up from the shippers.

(Talbot Decl. ¶ 7; Terranova Decl. ¶ 6.) Terranova said he would inquire and let Talbot know.

(Terranova Decl. ¶ 6.)

70.     In order to confirm the legality of the shipments, Terranova contacted New York

State Trooper Alfonse Nitti. (*See* Terranova Decl. ¶ 6.) Terranova had worked with Trooper Nitti

in the past on other UPS Security issues (*See* Terranova Decl. ¶ 4.) Terranova explained to

Trooper Nitti that there were shippers on the Mohawk/St. Regis reservation that might be

shipping cigarettes in bulk. (Terranova Decl. ¶ 7.) In response, Trooper Nitti informed Terranova

that there was an "ongoing investigation" regarding cigarette shipments from the Mohawk/St.

Regis reservation and that UPS should remain "business as usual" for the time being. (*Id*.

(emphasis added).)

71.     Testimony from plaintiffs' witnesses confirms Terranova's account of his

discussion with Trooper Nitti. For example, former Deputy Commissioner Ernst testified that he

"knew that UPS notified us that—about the cigarettes." (Ernst Dep. Tr. 82:9-12.) Likewise, DTF

Chief Investigator Connolly testified that a member of the New York State Police reported to him that "UPS Security" had informed them that "cigarettes were moving through the UPS facility at Potsdam coming from the Akwesasne Mohawk reservation." (*See* Connolly Dep. Tr. 129:21-24, 130:14-23; *see also* Ernst Dep. Tr. 78:3-7 (DTF worked with Trooper Nitti).)

72.     UPS's contact with state law enforcement and Trooper Nitti's instruction to UPS were not unusual. UPS regularly cooperated with law enforcement regarding suspicious activity by UPS shippers, and often did so regarding cigarettes. (*See* Talbot Decl. ¶ 8; *see also, e.g.,* DX-393 (DTF investigation report detailing UPS cooperation regarding potential cigarette shippers); *id.* DX-122 (emails between Terranova and DTF regarding potential cigarette shippers); *id.* DX-094 (Chief Investigator Richard Ernst stating "UPS just called and at their Long Island center they have a large delivery of cigarettes.").) UPS often terminated shippers as directed by law enforcement, but cooperation sometimes required making deliveries at the State's request. For example, UPS had previously cooperated by shipping "Arrow Brand" cigarettes to Long Island based on explicit direction from the State. (*See id* DX-392 at NYUPS00002516.)

73.     Following his conversation with Trooper Nitti, Terranova told Talbot that he had spoken to a contact in law enforcement, and was instructed that UPS should continue to do "business as usual" with the Potsdam Shippers due to an ongoing investigation by the authorities. (Terranova Decl. ¶ 8; Talbot Decl. ¶ 8.) Talbot, in turn, relayed this instruction to the drivers, asking them to continue picking up from the Potsdam Shippers as usual until law enforcement told UPS otherwise. (Talbot Decl. ¶¶ 8-9.) Jarvis remembers being told that the issue "was in security's hands and continue doing it until we are directed otherwise to tell you what to do." (Jarvis Dep. Tr. 64:22-25.) Jarvis estimated that roughly "80 percent" of the drivers continued to

sf-3681183

raise the issue with Talbot, who assured them that he had escalated the issue to UPS Security. (*See id.* 65:16-66:20.) Sheridan, who remained uncomfortable with the pickups, contacted UPS management and the union. (*See* Sheridan Dep. Tr. 67:18-21, 42:2-17.) She, too, was assured that UPS had escalated the issue in the appropriate way—that "[w]e are going to continue to pick up at these locations, that it is all under investigation" and that UPS would "cooperate" by "contin[uing] to—to pick up at these locations." (*See id.* at 43:23-44:1, 44:25-45:5.)

74.     Trooper Nitti's instruction to UPS reflected the State's recognition that it could not interfere with shipments of cigarettes to businesses located on Indian reservations until the amendments to § 471 became effective. As former Deputy Commissioner Ernst testified, the State understood that it was prohibited from interfering with such shipments until the last of the stays and injunctions barring enforcement of the amended law was lifted. (*See* Ernst Dep. Tr. 48:15-19.)

75.     DTF planned to enforce § 471 immediately after it was permitted to do so. The DTF "commissioner, the executive deputy commissioners, [and deputy commissioner Ernst] decided that once the TROs were lifted, [DTF] would go out and visit common carriers and stamping agents" "to advise them of the lifting of the TRO and to let them know that they should not be shipping untaxed cigarettes to their Native American customers in NYS from this point on." (*See* Ernst Dep. Tr. 86:23-87:4; DX-389 at NYUPS00002410-11 (DTF investigation report).) The final injunction barring enforcement of the amended tax law was lifted on June 21, 2011. *Seneca Nation of Indians v. State of New York*, No. CA 11-01193, slip op. at 1 (N.Y. App. Div. 4th Dep't June 21, 2011). The next day, on June 22, 2011, DTF Chief Investigator John Connolly and another DTF investigator visited the UPS Potsdam terminal "to see whether [the

UPS tip] was valid information and also to explain that the TRO was lifted." (Connolly Dep. Tr. 132:7-9.)

76.     When Connolly and the other DTF investigator arrived at the terminal and announced that they "were here to talk about cigarettes . . . [Talbot] indicated that he had been waiting for [DTF] to show up." (DX-389 (DTF investigation report regarding Potsdam seizure).) Talbot recounted to them that, once he had been made aware of the cigarettes, he "contacted Jim [Terranova] at the UPS security office in Syracuse"; "he believed Jim [Terranova] then contacted a NYSP contact in Syracuse who told UPS to keep picking up the cigarettes until they could work out what to do about it." (*Id*. at NYUPS00002411.) Talbot then informed the DTF investigators that a driver was currently out picking up from Mohawk Spring Water, Jacobs Manufacturing, and Action Race Parts, and that any cigarettes would be in the terminal that night. (*Id*.; Talbot Decl. ¶ 10.)

77.     DTF officials relayed the information they obtained from Talbot to the ATF, which had an "ongoing investigation related to . . . the Robert Oliver crew," who operated Mohawk Spring Water. (*See* DX-389 at NYUPS00002412 (DTF investigation report stating DTF notified ATF to handle seizure)) While DTF refused to seize the packages, preferring that the ATF seize them instead (*See* DX-083 (email chain stating the Governor's Office did "not want [DTF] to seize [the] cigarettes" and requesting ATF seize them instead)), UPS agreed to hold the packages until the ATF seized them. (Talbot Decl. ¶ 10.) Five days after the visit from Connolly, after discovering additional packages from Action Race Parts at the Farmingville Center, UPS again contacted DTF; those packages were also seized by the ATF. (*See* DX-090 (email from DTF Investigator Christopher Lannon to Chief Investigator Connolly stating "Farmingville UPS contacted RCS 3 Lannon and advised receipt of 51 cases . . . shipped from Action Race Parts").)

39

78.     Following the seizures, UPS ceased picking up from the Potsdam Shippers and terminated their accounts. (*See* Talbot Decl. ¶ 10; Terranova Decl. ¶¶ 10-11; Dkt. 302-49 – Dkt. 302-52 (UPS account records).) Jarvis testified that Talbot told the drivers, "There was an investigation going on and it's done and we're not picking up cigarettes anymore." (Jarvis Dep. Tr. 78:10-14.)

79.     UPS briefed the State concerning the Potsdam Shippers in August 2011, after the State sought penalties under the AOD for the Potsdam Shippers. On June 24, 2011, Dana Biberman, on behalf of the New York Attorney General, wrote a letter to Norman Brothers, UPS's then in-house counsel, concerning the packages that had been seized at the UPS Potsdam facility on June 22, and the packages that UPS was holding at its Farmingville facility (which the ATF later seized on June 27). (*See* Loewenson Decl. ¶ 14; DX-089.) The letter specifically requested that "UPS pay a stipulated penalty of $1,000 for each and every violation of the AOD, unless UPS establishes that it 'did not know and had no reason to know that the shipment was a Prohibited Shipment.'" (*Id*.)

80.     On August 9, 2011, counsel for UPS (Carl H. Loewenson, Jr., Mark David McPherson, and Natalie Fleming Nolen of Morrison & Foerster LLP) met with Ms. Biberman and her colleague regarding the seizures. (Loewenson Decl. ¶¶ 14-17.) At that meeting, counsel for UPS addressed UPS's commitment to cooperating with the State in its investigation of the Potsdam Shippers, and explained why they believed no penalty was warranted under the October 21, 2005 AOD. (*Id*.at ¶¶ 17-18.) UPS's counsel further explained, among other things, that: UPS discovered in April 2011, that the three shippers at issue were potentially shipping cigarettes; Jim Terranova, a UPS security department employee, contacted New York State Trooper Al Nitti for guidance; Trooper Nitti informed Terranova that there was an ongoing investigation of these

sf-3681183

shippers and instructed UPS to continue picking up packages from the three shippers; and UPS

complied with Trooper Nitti's request. (*Id*. ¶ 17.)

81.     Following the meeting, Ms. Biberman requested delivery data from UPS

regarding the three shippers (plus another shipper that UPS told the State might be affiliated with

one of the Potsdam Shippers) beginning October 21, 2005. (*See* Loewenson Decl. ¶ 19; DX-

109.) On September 29, 2011, UPS counsel provided the State with delivery data and billing

information regarding the shippers and with further information regarding Jim Terranova's

contact with law enforcement regarding potential cigarette shipments. (*See* Loewenson Decl.

¶ 21; DX-125.) The delivery and billing information included all shipments from Action Race

Parts, Jacob's Manufacturing, and Mohawk Spring Water to New York addresses from October

21, 2005, to August 31, 2011. (*See* Loewenson Decl. ¶ 22; DX-126.) The information was

contained in a spreadsheet with 7,601 total entries ranging between May 4, 2007 and July 11,

2011. (*Id*.) For Action Race Parts, it contained 2,372 entries between June 18, 2009 and June 21,

2011. (*Id*.) For Jacob's Manufacturing, it contained 817 entries between May 4, 2007 and June

16, 2011. (*Id*.) For Mohawk Spring Water, it contained 4,410 entries between November 11,

2010 and July 1, 2011. (*Id*.) That information was comprehensive; plaintiffs identify no

shipments from the Potsdam Shippers for which UPS failed to provide information.

82.     After UPS provided the requested information, the State did not request any

further information from UPS regarding the Potsdam Shippers, and it did not continue to seek the

penalties (or any other relief) that the AG initially sought in Ms. Biberman's June 24, 2011 letter.

(Loewenson Decl. ¶ 24.) Indeed, the State took no further action seeking either information or

penalties from UPS in relation to Action Race Parts, Jacob's Manufacturing, or Mohawk Spring

Water, until it filed this lawsuit nearly four years later and added allegations regarding those shippers in plaintiffs' Amended Complaint, filed on May 1, 2015. (Loewenson Decl. ¶ 25.)

83.     The State admits that it decided in 2011 not to retain any documents about any UPS shipments by the Potsdam Shippers. (Ernst Dep. Tr. 178:6-9; DX-426.)

**B.     Indian Smokes**

84.     Plaintiffs offered no evidence suggesting that UPS knowingly delivered cigarettes for Indian Smokes; rather, UPS terminated service to the shipper as soon as a driver became suspicious that the account was shipping cigarettes. (Blauvelt Decl. ¶ 11; Shea Decl. ¶ 14; Potter Dep. Tr. 10:7-21.)

85.     Indian Smokes opened an account with UPS on September 3, 2010. UPS records of its sales representative's interaction with Indian Smokes suggests that there was no reason for UPS to have known that Indian Smokes was shipping cigarettes. For example, on March 21, 2011, UPS Account Executive Judson McDowell contacted Mr. Jonathan, who assured UPS's AE that Indian Smokes was shipping only cigars, not cigarettes. Again on January 25, 2012, Mr. Jonathan assured UPS that Indian Smokes was shipping only cigars, not cigarettes. (Cook Decl. ¶¶ 75, 82; Cook Decl. Attachment A; Blauvelt Decl. ¶ 11.)

86.     A UPS driver, Lou Potter, became suspicious that Indian Smokes was shipping cigarettes, not just cigars, and the driver stopped providing service to the shipper. Mr. Potter did not provide service to Indian Smokes after he became suspicious about their shipment of cigarettes. UPS stopped picking up the Indian Smokes account in September 2012. UPS formally terminated the account on April 18, 2013. (Cook Decl. ¶¶ 15-17.)

87.     Plaintiffs argue that UPS should have been aware that Indian Smokes was shipping cigarettes due to the inclusion of the shipper on the PACT Act's list of non-compliant shippers, a list prepared by the Department of Justice and distributed to carriers and law

enforcement authorities pursuant to the PACT Act. 15 U.S.C. § 376a(e). Plaintiffs argue that because Indian Smokes appeared on the Non-Compliant List beginning on May 6, 2011, and that UPS received the List on July 25, 2011, UPS should have been aware, or should have conducted due diligence to determine whether, (Woods Decl. ¶ 17.) Indian Smokes was shipping cigarettes through UPS. But UPS did not receive the Non-Compliant List pursuant to the PACT Act. Neither the Department of Justice, nor any other law enforcement agency, properly served UPS's Legal Department or agent for service of process with the List. Instead, at most, individuals in UPS's Customs Brokerage Group received the Non-Compliant List sporadically, and sometimes from the Department of Justice, while other times from a carrier association. Yet the Customs Brokerage Group does not have responsibility touching in any way on UPS's domestic operations. The Customs Brokerage Group used the Non-Compliant List simply to screen against international shipments, as it does for other government-prepared lists of individuals or entities that U.S. corporations are prohibited from doing business with. Plaintiffs presented no evidence that anyone in UPS's domestic operations received the Non-Compliant List at the time that Indian Smokes was on the List and UPS was providing service to it. (Woods Decl. ¶ 14.)

### C.   Elliot Enterprises and EExpress

88.    Plaintiffs argue that Elliot Enterprises and EExpress were operated by the same individual, Aaron Elliot, but the evidence shows that UPS terminated service to Elliot Enterprises when it first became suspicious that the shipper was shipping cigarettes. (Fink Decl. ¶ 63.) A driver stopped providing service after he suspected they were shipping cigarettes. Elliot Enterprises last shipment with UPS came on September 18, 2012. (*Id.*)

89.    UPS did not know of any relationship between the two when it opened EExpress, UPS Account Executive Gerry Fink did not believe EExpress was shipping tobacco products at all, UPS audited EExpress three times, and only in the last audit did UPS find cigarettes.

43

Immediately upon finding cigarettes in EExpress's packages, UPS terminated service to the shipper. (Fink Decl. ¶ 78.)

90.     Plaintiffs argue that UPS should have been aware that Elliot Enterprises was shipping cigarettes due to the inclusion of the shipper on the PACT Act Non-Compliant List. Plaintiffs argue that because Elliot Enterprises appeared on the Non-Compliant List beginning on November 10, 2010, and that UPS received the List on November 12, 2010, UPS should have been aware, or should have conducted due diligence to determine whether, Elliot Enterprises was shipping cigarettes through UPS. But as detailed above, UPS did not receive the Non-Compliant List pursuant to the PACT Act. (Woods Decl. ¶ 17.) Plaintiffs presented no evidence that anyone in UPS's domestic operations received the Non-Compliant List at the time that Elliot Enterprises was on the List and UPS was providing service to it. (Woods Decl. ¶ 14.)

91.     Plaintiffs also argue that UPS received a letter from the Tobacco Watchdog Group on November 11, 2010, which identified "Elliot Industries" as a business that was illegally shipping cigarettes via UPS. They argue that because of the letter from the Tobacco Watchdog Group, UPS should have been aware, or should have conducted due diligence to determine whether, Elliot Enterprises was shipping cigarettes through UPS. But neither plaintiffs nor any UPS employee has been able to explain who the Tobacco Watchdog Group is, who they are sponsored by, what work they perform, or what their goals are; nor have plaintiffs corroborated any of the allegations made by the Group's letter. More fundamentally, the Tobacco Watchdog Group letter was faxed to UPS's center in Jamestown, New York, a center that does not provide service to any of the entities at issue in this case; the letter was not sent to UPS's Legal Department or the Dangerous Goods Department at UPS's corporate headquarters. As a result, only a few UPS employees even saw the letter, and those who did see the letter did not draw any

44

sf-3681183

connection between Elliot Industries, a shipper identified in the letter, and Elliot Enterprises, one of the accounts at issue in this case. For these reasons, the letter from the Tobacco Watchdog Group is both unreliable and irrelevant. (Fink Decl. ¶¶ 33, 62; DX-062.)

92.     Plaintiffs also argue that Elliot Enterprises filed claims for lost or damaged packages (which disclosed the contents of packages as cigarettes) that should have made UPS aware, or should have prompted UPS to conduct due diligence to determine whether, Elliot Enterprises was shipping cigarettes through UPS. What plaintiffs refer to as claims from Elliot Enterprises were actually just "tracers" entered into UPS's system for packages that never resulted in an actual claim. In any event, at the time of the tracers from Elliot Enterprises, UPS was not using tracers or claims as a research tool to determine whether a shipper might be violating UPS policy. To the extent that any individuals at UPS actually evaluated the tracers Elliot Enterprises submitted, they were not required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (Cook Decl. ¶¶ 149-150; DX-500.)

       **D.     Shipping Services**

93.     Shipping Services opened a UPS account on November 22, 2005. (Fink Decl. ¶ 45.) For the first several years, of its account, Shipping Services shipped very low volume with UPS. (*Id.* ¶ 49.) Shipping Services signed a Tobacco Agreement on August 4, 2010, when its shipping began to increase. (*Id.* ¶ 47.) Between signing the Agreement in 2010 and early 2014, Shipping Services assured UPS that it was shipping cigars or other tobacco products, not cigarettes. UPS Account Executive Gerry Fink therefore believed that the shipper was only shipping non-cigarette tobacco products, such as little cigars. (*Id.* ¶ 51.)

94.     UPS audited Shipping Services in January 2014, as part of its investigation into shippers that UPS itself identified as potentially high risk. (*Id.* ¶ 55; DX-246.) At that time,

UPS's audit found that Shipping Services was shipping both filtered cigars and cigarettes. (Fink Decl. ¶ 55; Cook Decl. ¶ 93; DX-244.) UPS terminated service to Shipping Services on January 13, 2014. (Cook Decl. Attachment A; Cook Decl. ¶ 94.)

95.     Plaintiffs also argue that Shipping Services filed claims for lost or damages packages (which disclosed the contents of packages as cigarettes) that should have made UPS aware, or should have prompted UPS to conduct due diligence to determine whether, Shipping Services was shipping cigarettes through UPS. Again, the claims to which plaintiffs refer from Shipping Services were actually just "tracers" entered into UPS's system for packages that never resulted in an actual claim. It is unclear whether any of the tracers were for cigarettes. (DX-499 (Package Details Tab for Account 03E04E).) Almost all are for filtered cigars, suggesting that this is what Shipping Services predominantly shipped. In any event, at the time of the tracers from Shipping Services, UPS was not using tracers as a research tool to determine whether a shipper might be violating UPS policy. To the extent that any individuals at UPS actually evaluated the tracers Shipping Services submitted, they were not required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (Cook Decl. ¶¶ 149-150; DX-500.)

96.     Plaintiffs also argue that Shipping Services should not have been permitted to even open an account because, they allege, the account was opened as a successor to a shipper called Seneca Ojibwas Trading Post, which plaintiffs allege was terminated as a result of the AOD. But the AOD did not require UPS to terminate all suspected tobacco shippers or to refuse service to any shippers, even those that may have been affiliated with tobacco shippers. Instead, the AOD required UPS to identify "Cigarette Retailers," and to notify those it identified of

UPS's tobacco policy. (DX-23 at ¶¶ 21-23.) UPS did so, and plaintiffs have not alleged otherwise. (*See supra*, at 29(e)(-(g).)

### E.    Bearclaw Unlimited

97.     Bearclaw Unlimited opened a UPS account in early October 2010 (Fink Decl. ¶ 142.) Arnold Cooper, the primary contact, told Account Executive Gerry Fink that Bear Claw Unlimited was an eBay retailer selling items such as screen printed shirts. (Fink Decl. ¶ 144; DX-077.) There was no indication whatsoever that Bear Claw intended to ship cigarettes.

98.     On August 30, 2011, a UPS Regulated Goods Associate in UPS's Desert Mountain District (in Arizona) notified Corporate Dangerous Goods that Bearclaw Unlimited had shipped a single package of cigarettes to a consumer in the State of Arizona. Gary DeWeerd of UPS Corporate Dangerous Goods contacted Mr. Fink to address the violation of UPS policy. Mr. DeWeerd instructed Mr. Fink to meet with a management employee of the shipper to address the violation and review UPS's policy against the shipment of cigarettes to consumers, and to obtain a corrective action plan. If the shipper would not sign a corrective action plan, the account would be suspended. Mr. Fink met with Arnold Cooper and reviewed UPS's policy and obtained a corrective action plan on September 9, 2011. (Cook Decl. ¶ 73; DX-115; DX-119.) Mr. Cooper represented that he "underst[ood] the policy and [would] adhere to it by not shipping cigarettes to unlicensed retailers or consumers." (DX-119.) He stated that he had gone "over it with my staff and [would] not let it happen again." (*Id*.)

99.     In September 2012, the Olean center conducted an audit of Bearclaw Unlimited and identified two packages of cigarettes addressed to consumers. (Cook Decl. ¶ 75; DX-161.) The account was terminated immediately, and no further shipments took place on that account.

47

F.    **Smokes & Spirits**

100.    Smokes & Spirits opened a UPS account in late August 2010, and signed a Tobacco Agreement on October 11, 2010. (Fink Decl. ¶ 31; DX-062.) Bob Oldro, the principal of Smokes & Spirits, informed UPS that he was moving to New York from another state to take advantage of the growth in New York's little cigar market by opening up a new business to ship little cigars. (Fink Decl. ¶¶ 32, 41.) Over the life of the account, Mr. Oldro or his colleagues continued to assure UPS that the business was only shipping cigars or other tobacco products, not cigarettes. (Fink Decl. ¶¶ 32, 36; DX-055.)

101.    The driver who provided service to Smokes & Spirits, Lou Potter, did not recall anything about the contents of the shipper's packages. The fact that Mr. Potter developed suspicions about, and terminated service to, a different shipper (Indian Smokes) suggests that he would have terminated service to Smokes & Spirits had he become aware that the shipper was tendering packages containing cigarettes to UPS. (Potter Dep. Tr. 10:7-21, 34:20-35:16.)

102.    UPS audited Smokes & Spirits in January 2014, as part of its investigation into shippers identified as potentially high risk. (Cook Decl. ¶ 84; Fink Decl. ¶¶ 31, 39.) UPS's audit found that Smokes & Spirits was shipping little cigars, cigarettes, and other tobacco products. (Fink Decl. ¶ 39.) UPS terminated service to Smokes & Spirits on January 22, 2014. (Fink Decl. ¶ 40; Cook Decl. Attachment A; DX-260.)

103.    Plaintiffs argue that UPS should have been aware that Smokes & Spirits was shipping cigarettes due to the inclusion of the shipper on the PACT Act Non-Compliant List. Plaintiffs argue that because Smokes & Spirits appeared on the Non-Compliant List beginning on February 15, 2012, and that UPS received the List on February 16, 2012, UPS should have been aware, or should have conducted due diligence to determine whether, Smokes & Spirits was shipping cigarettes through UPS. (Woods Decl. ¶ 17.) But as detailed above, UPS did not receive

48

the Non-Compliant List pursuant to the PACT Act. Plaintiffs presented no evidence that anyone in UPS's domestic operations received the Non-Compliant List at the time that Smokes & Spirits was on the List and UPS was providing service to it. (Woods Decl. ¶ 14.)

104.    Plaintiffs also argue that UPS received a letter from the Tobacco Watchdog Group on November 11, 2010, which identified Smokes & Spirits as a business that was illegally shipping cigarettes via UPS. (Fink Decl. ¶ 33; DX-062.) They argue that because of the letter from the Tobacco Watchdog Group, UPS should have been aware, or should have conducted due diligence to determine whether, Smokes & Spirits was shipping cigarettes through UPS. But there is no evidence that Smokes & Spirits shipped cigarettes during this timeframe. Furthermore, as noted above, the letter from the Tobacco Watchdog Group is both unreliable and irrelevant. In any event, one of the employees who reviewed the letter, AE Gerry Fink, followed up with Smokes & Spirits after reviewing the letter; he was again told that Smokes & Spirits only ships cigars. (Fink Decl. ¶¶ 35, 36, 38.) Because of those representations and the fact that Smokes & Spirits had signed a Tobacco Agreement (in which it agreed to abide by UPS's Cigarette Policy and agreed to indemnify UPS if it failed to do so), the AE was satisfied that Smokes & Spirits was not shipping cigarettes, as the Tobacco Watchdog Group letter alleged. (*Id.*)

105.    Plaintiffs also argue that Smokes & Spirits filed claims for lost or damages packages (which disclosed the contents of packages as cigarettes) that should have made UPS aware, or should have prompted UPS to conduct due diligence to determine whether, Smokes & Spirits was shipping cigarettes through UPS. But all but one of the tracers/claims for Smokes & Spirits were for filtered cigars and other tobacco products, indicating that Smokes & Spirits predominantly shipped legal products. (DX-500, Package Details Tab for Account W9476E.) It

is also clear from the tracer/claim information for Smokes & Spirits that filtered cigars are sometimes described as "cigarettes," even though they are not legally classified as such (the tracer for 1ZW9476E0340799286 is described as "1 OF 6 WARRIOR MENTHOL FILTERED CIGARETTES," even though Warrior Menthol Filtered refers to a brand of little cigars). (DX-500; DX-264 (Warrior Menthol Filtered Cigars).) In any event, all but one of the claims to which plaintiffs refer from Smokes & Spirits were actually just "tracers" entered into UPS's system for packages that never resulted in an actual claim. In any event, at the time of the claim or tracers from Smokes & Spirits, UPS was not using tracers or claims as a research tool to determine whether a shipper might be violating UPS policy. To the extent that any individuals at UPS actually evaluated the claim or tracers Smokes & Spirits submitted, they were not required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (Cook Decl. ¶¶ 149-150; DX-500.)

### G. Arrowhawk/Hillview Cigars/ Native Gifts/Seneca Cigars/Two Pines Enterprises

106.    Plaintiffs assert that a group of shippers—Arrowhawk, Hillview Cigars, Seneca Cigars, Native Gifts, and Two Pines Enterprises—shipped cigarettes through UPS. While the City offers evidence that it made two "controlled purchases" of cigarettes from Seneca Cigars in June 2012, the City chose not to share this information with UPS until it provided UPS with a draft complaint in October 2013. (DX-147 at 1.) Had the City provided this information to UPS, any shipments of cigarettes from the shipper or its alleged affiliates via UPS could have been stopped as early as June 2012.

107.    Moreover, while UPS Account Executive Rich DelBello and Inside Sales Representative Ryan Keith may have understood that these shippers were affiliated either through common ownership or otherwise, neither Mr. DelBello nor Mr. Keith believed or had

reason to believe that the shippers were shipping cigarettes. (DelBello Decl. ¶¶ 48, 53; Keith Decl. ¶¶ 48, 56.) As they explained:

    a.  With the exception of Arrowhawk (which changed its name to Hillview Cigars), the shippers all signed Tobacco Agreements with UPS. (DelBello Decl. ¶ 34; Keith Decl. ¶¶ 30, 38, 45-46; DX-179; DX-188; DX-210; DX-232; DX-511.)

    b.  Both Mr. DelBello and Mr. Keith had in-person meetings or telephone conversations with Phil Christ, a consultant who purported to work with these shippers at some point. Mr. DelBello and Mr. Keith informed Mr. Christ of UPS's Cigarette Policy, and Mr. Christ assured them that he was not shipping cigarettes, but only cigars or other tobacco products. (DelBello Decl. ¶¶ 23, 48; Keith Decl. ¶¶ 48, 52.)

    c.  Both Mr. DelBello and Mr. Keith were told and believed that Two Pines, as an affiliate of the other shippers, was also not shipping cigarettes, but only cigars or other tobacco products. (DelBello Decl. ¶ 42; Keith Decl. ¶¶ 54, 56.)

    d.  Both Mr. DelBello and Mr. Keith were informed by Mr. Christ that Native Gifts was opened as a temporary account due to a fire, and they were informed by Mr. Christ that Native Gifts, like the other accounts, would be shipping cigars or other tobacco products but would not be shipping cigarettes. (DelBello Decl. ¶ 45-46; Keith Decl. ¶¶ 40-41.)

    e.  Native Gifts was opened at a location that was outside of Mr. DelBello and Mr. Keith's area of responsibility. (DelBello Decl. ¶ 49; Keith Decl. ¶ 40.)

108.     In addition, the driver who provided service to Seneca Cigars and Hillview Cigars, Vince Guarino, did not ever suspect that the shippers were shipping cigarettes. (Guarino Decl. ¶¶ 9-12.) As he did to Messrs. DelBello and Keith, Mr. Christ assured Mr. Guarino that the shippers were shipping little cigars and other tobacco products. Mr. Guarino did not see any packages containing cigarettes from the shippers, nor did he suspect as much. (Guarino Decl. ¶¶ 11-12.)

109.     Arrowhawk became Hillview in February 2013; Hillview's last UPS shipment was on July 25, 2013; Seneca Cigars' last UPS shipment was on August 7, 2013. (DelBello Decl. ¶¶ 20, 31; Guarino Decl. ¶ 13.)

110.     Mr. Guarino also provided service to Two Pines Enterprises, which was at a different location than Seneca Cigars and Hillview. (Guarino Decl.¶ 14.) He also did not see any packages containing cigarettes from Two Pines, nor did he suspect as much. (*Id.* ¶ 15.)

111.     On April 15, 2014, a clerk in a UPS center in Philadelphia reported that a package from Two Pine Enterprises had broken open on a conveyor belt, revealing cigarettes. The clerk followed UPS's process and contacted Regulated Goods, documenting the Tobacco Policy violation. (Cook Decl. ¶ 116; DX-290.) Based on the information from the clerk in Philadelphia, Corporate Dangerous Goods requested an audit of Two Pine Enterprises, which took place on April 17, 2014. UPS terminated the account for Two Pines immediately after the audit finding cigarettes. (Cook Decl. ¶ 117; DelBello Decl. ¶¶ 38-40; Palombaro Decl. ¶¶ 19-20; Guarino Decl. ¶ 21; DX-293-297; DX-299; DX-528.)

112.     Native Gifts was not served out of the same center as Seneca Cigars, Hillview or Two Pine; it was located in Irving, New York. (Delbello Decl. ¶ 44.) Its last shipment with UPS was at the beginning of July 2014. (*Id.*)

###### H.      Native Wholesale/Seneca Promotions

113.      Native Wholesale's last UPS shipment was on October 17, 2013. (Fink Decl. ¶ 79; Cook Decl. ¶ 139.) Plaintiffs allege that UPS knew or should have known that Native Wholesale—and an alleged affiliate, Seneca Promotions—was shipping cigarettes through UPS. (Fink Decl. ¶ 79; Cook Decl. ¶ 140.)

114.      But plaintiffs presented no evidence that Native Wholesale or Seneca Promotions was shipping cigarettes to consumers through UPS, and that UPS knew as much. (Fink Decl. ¶¶ 82-83; DX-381.)

115.      And while plaintiffs claim that Native Wholesale later began shipping with UPS using the name Seneca Promotions, UPS audited Seneca Promotions on January 16, 2016. (Cook Decl. ¶ 140.) UPS's audit revealed no tobacco products of any kind, consistent with the testimony of UPS Account Executive Gerry Fink, who testified that he understood that Native Wholesale and Seneca Promotions did not ship tobacco products. (Fink Decl. ¶¶ 85-86; Cook Decl. ¶ 140; DX-363; DX-381.)

## PROPOSED CONCLUSIONS OF LAW

The Court previously rejected UPS's arguments that (a) plaintiffs' CCTA claims require them to prove that UPS participated in any single transaction in which it shipped more than 10,000 unstamped cigarettes, as the CCTA's definition of "contraband cigarettes" requires, *see* Dkt. 49; and (b) until September 27, 2013, the City and the Attorney General had no standing to enforce § 1399-*ll*, and they therefore cannot recover civil penalties based on any alleged delivery made before that date, *see* Dkt. 252. The Court also previously struck UPS's affirmative defenses based on plaintiffs' failure to collect taxes from the parties that owe them (Defense 6), the State's forbearance policy (Defense 16), lack of enforceability of the AOD (Defenses 10-11), and lack of consideration of the AOD (Defense 9), *see* Dkt. 177. The Court also struck UPS's affirmative

defenses based on plaintiffs' failure to mitigate damages (Defense 5) and equitable defenses (Defense 17) as applied to plaintiffs' claims under the CCTA, the PACT Act, and N.Y. PHL 1399-*ll*. *See id*. UPS continues to assert its previous positions on all these motions and defenses, and preserves them for appeal. Given this Court's legal rulings, however, UPS explains here why it prevails under those rulings, as well.

## I.   UPS IS ENTITLED TO THE PACT ACT EXEMPTION BASED ON ITS AOD

116.    The PACT Act provides that a carrier is exempt both from the requirements of the PACT Act itself and from state laws restricting the delivery of cigarettes, such as PHL § 1399-*ll*, based on the Assurance of Discontinuance ("AOD") that it entered into with the New York State Attorney General ("NYAG") on October 21, 2005 "if [that] agreement[ ] is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." 15 U.S.C. § 376a(e)(3)(B)(ii)(I).

117.    The Court has interpreted § 376a(e)(3)(B)(ii)(I) to mean that UPS is exempt if the AOD has appropriate breadth (i.e. nationwide effect), explaining that Congress merely sought to codify the status quo with respect to UPS and other common carriers who had already agreed to curb illegal cigarette deliveries by instituting nationwide policies. *New York v. United Parcel Serv., Inc. ("UPS I")*, No. 15-cv-1136 (KBF), 2015 WL 5474067, at *7-9 (S.D.N.Y. Sept. 16, 2015).

118.    The Court later concluded that "Congress intended that UPS be exempt from PACT Act claims as of the date of statutory enactment and based on facts then in existence." (Dkt. 206 at 4.) "It follows that the conditions in existence at the time the statute was passed were sufficient to make UPS exempt." (*Id*. at 21.)

119.    As a result, to prove that UPS is not entitled to the PACT Act exemption—and thus subject to the requirements of the PACT Act and of PHL § 1399-*ll*—plaintiffs must prove

that the "factual basis for the exemption has changed, thereby altering UPS's entitlement to the exemption." (*Id*. at 4.)

120.    "UPS could lose its exemption based on a material change in circumstances, either by UPS no longer giving nationwide effect to the AOD or states no longer recognizing its active existence." (*Id*. at 22.)

121.    The Court has already ruled that plaintiffs' evidence concerning states alleged non-recognition of the AOD failed even to raise genuine issue of material fact that the AOD no longer has nationwide effect.

a.    "[D]eclarations from the state attorneys general do not raise a genuine issue of material fact because none demonstrate that these states do not recognize the existence of the AOD or that UPS no longer gives nationwide effect to it." (*Id*. at 40.)

b.    "The declarations also do not suggest in any way that between the date that the AOD was signed and the PACT Act was implemented, there had been a change in the status quo vis-à-vis any state's position with respect to the AOD, or in UPS's policy of giving nationwide effect to the obligations imposed by it." (*Id*.)

c.    "None [of the declarations] demonstrate that these states do not recognize the existence of the AOD or that UPS no longer gives nationwide effect to it." (*Id*.) No declarants assert that their state "does not recognize the AOD's existence or that UPS does not maintain a policy of giving nationwide effect to the requirements imposed in the AOD." (*Id*.) "All that is required is that the

55

AOD's existence is recognized throughout the United States and that UPS continue to give the AOD nationwide effect." (*Id*. at 41.)

    d.   Neither in their presentation concerning the PACT Act exemption on June 7, 2016, nor at trial, have plaintiffs presented any additional evidence that states do not recognize the AOD. Thus, plaintiffs have failed to show that states no longer recognize the AOD's active existence, sufficient to defeat UPS's entitlement to the PACT Act Exemption Provision.

122.    Concerning whether UPS has maintained the AOD nationwide, again the Court has already ruled that the AOD Exemption Provision "does not require that a carrier's policies be 100% effective at preventing the shipment of cigarettes to consumers." (*Id*. at 44.) The Court reiterated that exemption "does not itself reach questions of compliance or non-compliance with obligations assumed under any particular agreement," i.e., "[the] provision does not mean that if the AOD is, on a shipment-by-shipment (or incident-based) review, not fully and always in fact complied with, that UPS loses its exemption." (*Id*. at 20.)

123.    Yet the Court also ruled that "UPS may not retain the exemption simply by maintaining the requisite policies nationwide in name only. Put otherwise, if plaintiffs could present evidence creating an inference that the effectiveness of UPS's policies is so compromised that these policies are not in fact in place, that would be sufficient to raise a genuine issue of fact for trial." (*Id*. at 44-45.) The Court suggested two ways plaintiffs might satisfy that standard:

    a.   "[P]laintiffs could present evidence of a sufficiently large number of instances of shipments of contraband cigarettes that it suggests that UPS is, overall, turning a blind eye towards such unlawful shipments." (*Id*. at 45.)

b. "[P]laintiffs could present a triable issue by submitting evidence showing that UPS policymakers have in fact turned a blind eye to shipments of contraband cigarettes." (*Id*.)

124. While the Court ruled that plaintiffs raised a triable issue of fact concerning whether UPS is turning a blind eye toward unlawful shipments, the Court concludes that plaintiffs failed to prove as much at trial.

125. At trial, plaintiffs offered no evidence concerning UPS policymakers, focusing instead on how the policies, which they concede UPS adopted, were implemented by the employees responsible for policy execution (as opposed to policy-making). That focus reinforces that plaintiffs question the effectiveness of UPS policy, not UPS's overall commitment to the AOD and its policies.

126. Plaintiffs' challenge to the effectiveness of UPS policies failed to prove that UPS turned a blind eye to its obligations under the AOD. Even accepting that UPS delivered some packages containing cigarettes to unauthorized recipients, the overwhelming evidence remains that UPS not only has the nationwide policies initiated by the AOD, but UPS has continually enhanced its policies as new issues have come to light. (Cook Decl. ¶¶ 13-14, 125-45; Azam Decl. ¶¶ 9-28.) UPS's implementation of and enhancements to its policies are wholly inconsistent with the notion that UPS turned a blind eye to its obligations under the AOD.

127. As a result, UPS is exempt both from plaintiffs' claims under the PACT Act and from plaintiffs' claims under PHL § 1399-*ll*.

## II.   PLAINTIFFS FAIL TO PROVE THE ELEMENTS OF THEIR CCTA CLAIMS

128. To recover under Claims 1-2, asserting claims under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 et seq. ("CCTA"), plaintiffs must prove that UPS:

a.   Knowingly;

sf-3681183

    b.   Ships, transports, receives, possesses, sells, distributes, or purchases;

    c.   Contraband cigarettes.

    d.   Contraband cigarettes are defined as cigarettes that do not bear a tax stamp and both exceed a quantity of 10,000 and are "in the possession" of a non-exempt person. 18 U.S.C. § 2341(2).

129.    In its September 16, 2015 Order (Dkt. 49), the Court rejected UPS's argument "that plaintiffs' CCTA claims fail because the "Amended Complaint does not allege that UPS participated in any single transaction in which it shipped more than 10,000 unstamped cigarettes," finding that "the plain language of the CCTA … imposes no single transaction requirement." (Dkt. 49 at 12.)

130.    Even assuming aggregation is permissible,[6] plaintiffs failed to prove that UPS delivered more than 10,000 unstamped cigarettes for the following shippers:

    a.   Indian Smokes

    b.   Elliot Enterprises/EExpress

    c.   Shipping Services

    d.   And the other shippers mentioned above (*see* ¶¶ 56-59), for which plaintiffs offered no evidence of any cigarette shipments at all.

131.    Plaintiffs only proved that UPS delivered more than 10,000 unstamped cigarettes, assuming aggregation of independent shipments is permitted under the CCTA, for Smokes & Spirits, Seneca Cigars/Arrowhawk Cigars/Hillview Cigars/Two Pine Enterprises, and the Potsdam Shippers (Mohawk Spring Water, Action Race Parts & Fabrication, Jacobs Manufacturing/Jacobs Tobacco Company).

---

[6] UPS preserves for appeal its legal argument that plaintiffs fail to prove that UPS participated in any single transaction in which it shipped more than 10,000 unstamped cigarettes, as the CCTA's definition of "contraband cigarettes" requires.

sf-3681183

132.    Deliveries from the Potsdam Shippers are unique because for reasons detailed in section V below. For Smokes & Spirits and Seneca Cigars/Arrowhawk Cigars/Hillview Cigars/Two Pine Enterprises (and the rest of the shippers, as well), plaintiffs failed to establish that UPS *knowingly* transported contraband cigarettes, for the reasons detailed in section III below.

### III.    PLAINTIFFS FAIL TO PROVE THAT UPS KNOWINGLY DELIVERED CIGARETTES ON BEHALF OF THE SHIPPERS AT ISSUE

#### A.    Plaintiffs Must Show That UPS Acted With Actual Knowledge That It Was Shipping Cigarettes To Satisfy The Knowledge Element Of Their Claims

133.    Although no case precisely defines the term "knowingly" under the CCTA, the term "knowingly" generally means actual knowledge or conscious avoidance. *See* 1-3A Modern Federal Jury Instructions-Criminal P 3A.01(hereinafter "JI") 3A-1 and 3A-2 (2016); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) (knowledge for purposes of 18 U.S.C. § 2339B(a)(1) can be established "if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity").

134.    "A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness." JI 3A-1. A lower scienter standard is inappropriate. *See* JI 3A-1 (excluding "ignorance, mistake, accident, or carelessness" from definition of "knowingly"); JI 3A-2 ("guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken"); *accord Global-Tech*, 563 U.S. 769 (standard for willful blindness "surpasses recklessness and negligence").

135.    While plaintiffs argue that UPS can be liable under the CCTA based on the notion of conscious avoidance, they can only establish conscious avoidance by showing that UPS was aware of a high probability of a fact and acted with deliberate disregard of the facts. JI 3A-2; *see*

*also Global-Tech*, 563 U.S. 769 (willful blindness has "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact"); *Weiss*, 768 F.3d at 208 ("A defendant exhibits deliberate indifference if it 'knows there is a substantial probability that the organization engages in terrorism but … does not care.'"). Conscious avoidance cannot be established if UPS actually believed that the fact did not exist. JI 3A-2.

136.    Here, plaintiffs failed to prove that UPS knew, or consciously avoided knowing, that any of the shippers for which there is evidence of cigarette shipments were shipping cigarettes via UPS.

a.  **Indian Smokes:** The evidence shows that Indian Smokes' representative informed UPS that they were shipping only cigars, not cigarettes. UPS employees actually believed that Indian Smokes was not shipping cigarettes. Plaintiffs point to no facts concerning Indian Smokes that UPS employees consciously avoided. To the contrary, as soon as a UPS driver became suspicious that Indian Smokes was shipping cigarettes, UPS terminated service to the shipper. (Potter Dep. Tr. 10:7-21.)

b.  **Elliot Enterprises and EExpress:** UPS employees actually believed that Elliot Enterprises was not shipping cigarettes. Plaintiffs point to no facts concerning Elliot Enterprises that UPS employees consciously avoided. To the contrary, as soon as a UPS driver became suspicious that Elliot Enterprises was shipping cigarettes, UPS terminated service to the shipper. And while plaintiffs allege that the two shippers were somehow related, UPS did not know of any relationship between them when EExpress opened its account.

60

sf-3681183

UPS audited EExpress twice and found no cigarettes; when UPS audited EExpress a third time, this time finding cigarettes, UPS terminated service to the shipper. (Cook Decl. ¶¶ 121-124; Fink Decl. ¶¶ 58, 63, 65, 72; DX-330.)

c. **Shipping Services:** The evidence shows that Shipping Services' representative informed UPS that they were shipping only cigars or other tobacco products, not cigarettes. UPS employees actually believed that Shipping Services was not shipping cigarettes. Plaintiffs point to no facts concerning Shipping Services that UPS employees consciously avoided. To the contrary, after UPS audited Shipping Services and found a mix of cigars and cigarettes in its packages, UPS terminated service to the shipper. (Cook Decl. ¶¶ 92-95; Fink Decl. ¶¶ 45, 50, 55; DX-250.)

d. **Bearclaw**: The evidence shows that Bearclaw's representative informed UPS that they were not shipping any tobacco products at all. (Fink Decl. ¶ 144.) Later, after a single package was found to violate UPS policy, the shipper agreed to a corrective action plan, assuring UPS that they would not tender packages containing cigarettes in violation of UPS policy. (Cook Decl. ¶ 73; DX-115; DX-119.) UPS therefore actually believed that Bearclaw was not shipping cigarettes. Plaintiffs point to no facts concerning Bearclaw that UPS employees consciously avoided. To the contrary, after UPS audited Bearclaw and found cigarettes in its packages, UPS terminated service to the shipper. (Cook Decl. ¶ 75; DX-161.)

e. **Smokes & Spirits:** The evidence shows that Smokes & Spirits' representative informed UPS that they were shipping only cigars or other tobacco products,

61

not cigarettes. UPS employees actually believed that Smokes & Spirits was not shipping cigarettes. Plaintiffs point to no facts concerning Smokes & Spirits that UPS employees consciously avoided. To the contrary, after UPS audited Smokes & Spirits and found a mix of cigarettes and other tobacco products in its packages, UPS terminated service to the shipper. (Cook Decl. ¶¶ 96-99; Fink Decl. ¶¶ 31, 36, 39-41; DX-260; DX-511.)

f.  **Arrowhawk/Hillview Cigars/Native Gifts/Seneca Cigars/Two Pines Enterprises:** The evidence shows that Phil Christ, a consultant for Arrowhawk/Hillview Cigars/Seneca Cigars, repeatedly informed UPS that they were shipping only cigars, not cigarettes. UPS employees actually believed that Arrowhawk/Hillview Cigars/Seneca Cigars were not shipping cigarettes. Plaintiffs point to no facts concerning Arrowhawk/Hillview Cigars/Seneca Cigars that UPS employees consciously avoided. Those shippers stopped shipping with UPS by August 2013 or earlier, and UPS had no reason to believe that any of those accounts were shipping cigarettes while they were actively shipping packages with UPS. Likewise, Two Pines' representative informed UPS that they were shipping only cigars, not cigarettes. UPS employees actually believed that Two Pines was not shipping cigarettes. Plaintiffs point to no facts concerning Two Pines that UPS employees consciously avoided. To the contrary, after UPS audited Two Pines and found cigarettes in its packages, UPS terminated service to the shipper. (Cook Decl. ¶¶ 113-117.)

g. **Native Wholesale/Seneca Promotions:** Plaintiffs have not even established that these accounts were shipping cigarettes through UPS, much less that UPS knew as much. Plaintiffs allege that UPS knew or should have known that Native Wholesale was shipping cigarettes through UPS based on records from Native Wholesale's bankruptcy, but there is no indication that UPS saw or should have seen Native Wholesale's bankruptcy records, and in any event, those records did not show any shipments to consumers via UPS. In addition, UPS audited Seneca Promotions on January 14, 2016. UPS's audit revealed no tobacco products of any kind, consistent with the testimony of UPS Account Executive Gerry Fink, who testified that he understood that Native Wholesale and Seneca Promotions did not ship tobacco products. (Cook Decl. ¶¶ 139-140; Fink Decl. ¶¶ 79, 82-83, 85; DX-381.)

h. **Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs Manufacturing/Jacobs Tobacco Company):** As detailed above (*see supra* at ¶¶ 61-65), UPS drivers believed that the Potsdam shippers were shipping cigarettes, but they believed that they were doing so only to retailers on other Indian reservations, which was permissible at the time of the shipments. As explained further below (*see infra*, at § V), plaintiffs cannot establish liability based on shipments from the Potsdam Shippers given the unique facts associated with those shipments.

**B.   Knowledge Cannot Be Imputed From Employees From UPS's Claims Group Or Customs Brokerage Group**

137.   As a general rule, because "[c]orporations can only act through their officers and employees, … in a proper case the acts and knowledge of the employee are imputed to the

corporation." *Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003). To be imputed to the corporation, an employee's knowledge must be acquired "within the actual or apparent scope of [the employee's] authority and … concern[] a matter to which [his or her] authority extends." 81 N.Y. JUR. 2d Notice & Notices § 2. An agent has a duty to disclose "to his principal 'all the material facts coming to his knowledge with reference to the subject of his agency.'" *Benjamin Ctr. v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985); *accord Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) (*per curiam*) ("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal."); *see also United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) ("The acts of a corporation are, after all, simply the acts of all of its employees operating within the scope of their employment.").

138.    Accordingly, knowledge that is not material to an employee's duties cannot be imputed to the employer. *See U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05-Civ. 8176 (LAP), 2008 WL 2073928, at *3 (S.D.N.Y. May 8, 2008) (refusing to impute employee's knowledge of defendant's infringing activity to plaintiff-employer because employee was an engineer and had no "duties relating to the enforcement or licensing of [plaintiff's] patent rights"); *AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*, No. 01 CIV 11448 (JGK)(HPB), 2006 WL 1206333, at *2-3 (S.D.N.Y. May 2, 2006) (citing cases); *Reino de España v. Am. Bureau of Shipping, Inc.*, 691 F.3d 461, 473 (2d Cir. 2012) (for knowledge of an agent to be imputed to principal, "the information at issue . . . went to matters within the scope of the agency"); *Apollo Fuel Oil*, 195 F.3d at 76 ("In general, when an agent is employed to perform certain duties for

his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal").

139.   Thus, while plaintiffs seek to establish UPS's knowledge based on claims/tracers submitted by three shippers (Elliot Enterprises, Shipping Services, and Smokes & Spirits), or on shippers' appearance on the PACT Act Non-Compliant Lists (Indian Smokes, Elliot Enterprises, and Smokes & Spirits), such knowledge cannot be imputed to UPS as a whole. As UPS has shown, any employees who would have reviewed the claims or tracers submitted by a shipper would not have had a duty to use any knowledge gained in the course of such a review to enforce UPS's Cigarette Policy. Likewise, the Customs Brokerage Group, the only employees at UPS who received a PACT Act Non-Compliant List before August 2013, had no duties concerning domestic shipments whatsoever, and therefore had no duty to use any knowledge gained in the course of reviewing a PACT Act Non-Compliant List to enforce UPS's Cigarette Policy.

## IV.   THE STATE FAILS TO ESTABLISH ANY VIOLATION OF THE AOD

140.   Only the State has asserted such a claim under the AOD in the complaint; the City has not. (Dkt. 189.) And the City has conceded that it has no standing to enforce the AOD. (Dkt. 45 at 3 n.4 (conceding the AOD "[does] not grant any rights or privileges to any person or entity who is not a party to this [Assurance].").)

141.   To prove its claim under Count 13 (the Assurance of Discontinuance—Breach of Contract), the State must prove that:

      a.   UPS knowingly or with reason to know;

      b.   Delivered cigarettes;

      c.   To individual consumers. (The AOD defines "individual consumer" as any person or entity other than an "authorized recipient," which in turn is defined as "tobacco manufacturers; licensed wholesalers, tax agents, retailers, and

export warehouses; government employees acting in accordance with their

official duties; or any other person or entity to whom cigarettes may be

lawfully transported pursuant to federal law and the law of the state in which

delivery is made, including those persons described in PHL § 1399-*ll*(1) with

respect to the State of New York.")

142.    In the Third Amended Complaint, the State alleges that UPS is liable for "a

$1,000 penalty for each instance of the following violations": "(1) prohibited shipments of

cigarettes to individual customers; (2) shipments made, without audit, for customers that UPS

had 'reasonable basis to believe…may [have been] tendering Cigarettes for delivery to

Individual Customers'; (3) failures to maintain a Tobacco Shipper Database; and (4) failures to

provide continuing compliance training." (Dkt. 189 ¶ 195.)

143.    Plaintiffs have not proven that UPS failed to conduct audits for customers that

UPS had a reasonable basis to believe may have been tendering Cigarettes for delivery to

Individual Consumers. As explained, UPS conducted numerous audits of shippers, most of

which found that the shippers were tendering packages containing items other than cigarettes to

UPS. Plaintiffs have not identified any shipper for which UPS should have conducted an audit

sooner based on its reasonable beliefs about the shippers.

144.    Nor have plaintiffs proven that UPS failed to maintain Tobacco Shipper Database

or failed to provide continuing compliance training. As explained, UPS continues to maintain its

Tobacco Shipper Database, and UPS has continuously provided the requisite training to UPS

employees. Indeed, UPS has further enhanced the training in the last two years, going beyond

what the AOD requires.

sf-3681183

145.     Finally, plaintiffs cannot prove that UPS violated the AOD by completing prohibited shipments of cigarettes to individual customers. Plaintiffs argue the AOD provides that for UPS to avoid the imposition of a penalty for such shipments, it must establish that it had no "reason to know" that "the shipment contained cigarettes for delivery to unauthorized recipients." But the AOD does not provide as much. The AOD provides: "UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every violation of this Assurance of Discontinuance occurring after the Effective Date; provided, however, that no penalty shall be imposed if (a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that *UPS did not know and had no reason to know that the shipment was a Prohibited Shipment*." (DX-023 ¶ 42 (emphasis added).)

146.     In other words, the AOD provides that UPS must establish that it had no "reason to know that the shipment was a Prohibited Shipment" (DX-023 ¶ 42) to avoid being penalized for a violation involving a Prohibited Shipment to New York. Prohibited Shipment is a defined term. It means "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate Public Health Law § 1399-*ll*." (DX-023 ¶ 16(H).) And a shipment or delivery only violates § 1399-*ll* if UPS "knowingly" delivered it to an unauthorized recipient. Thus, the provision, read as a whole, simply incorporates the knowledge standard from § 1399-*ll* by using the defined term Prohibited Shipment.

147.     Because plaintiffs have not proven that UPS knowingly delivered cigarettes to unauthorized recipients, as detailed above, they fail to prove their claims under the AOD based on allegations that UPS delivered cigarettes in violation of the AOD.

sf-3681183

148.    And, even if the Court were to interpret the AOD as imposing penalties upon UPS for a less stringent "reason to know" standard, plaintiffs have also failed to prove that UPS had reason to know that shippers were violating UPS policy. As detailed above, the shippers at issue represented to UPS that they were not shipping cigarettes or that they were not shipping tobacco products at all. Those who did represent that they were shipping tobacco products other than cigarettes signed a Tobacco Agreement, agreeing to abide by UPS's Cigarette Policy. And again, plaintiffs have not identified any shipper for which UPS should have conducted an audit sooner based on its reasonable beliefs about the shippers.

## V.    PLAINTIFFS' CLAIMS BASED ON SHIPMENTS FROM THE POTSDAM SHIPPERS FAIL FOR ADDITIONAL REASONS

### A.    The City Lacks Standing To Assert Any Claims Based On The Potsdam Shippers

149.    To have standing under Article III to recover for UPS's alleged deliveries that are the subject of its Seventh Defense—alleged deliveries of unstamped cigarettes to reservation retailers—the City must be able to prove a concrete, injury-in-fact from those deliveries. *See, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006); *Ross v. Bank of Am.*, N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008). In order to show harm from cigarette deliveries, the City must show that "those cigarettes actually entered and harmed the City in the ordinary course." *City of New York v. Milhelm Attea & Bros., Inc.*, No. 06-CV-3620 (CBA), 2012 WL 3579568, at *18 (E.D.N.Y. Aug. 17, 2012) (City lacked standing to pursue CCTA and Cigarette Marketing Standards Act claims based merely on evidence that "cigarettes were capable of entering the City" and evidence of post-litigation controlled purchases). *Id.*

150.    The City lacks the required evidence to establish standing for its claims. Plaintiffs have offered no evidence that the reservations that allegedly received deliveries of unstamped cigarettes from UPS are located in New York City (none are). Nor have they even attempted to

produce evidence about what happened to those cigarettes, including that any entered the City in the ordinary course. As a result, the City cannot establish that it has standing to assert claims; indeed, this Court lacks jurisdiction over those claims by the City.

**B.     None Of The Potsdam Shippers' Shipments Violated The CCTA Or The AOD Based On The New York Tax Law In Effect At The Time**

**1.     Transportation of shipments from the Potsdam Shippers did not violate the CCTA at the time of the shipments**

151.    Plaintiffs concede that the Potsdam Shippers only shipped cigarettes to retailers (not individual consumers) located on Indian reservations, and there is no evidence that UPS transported any packages for the Potsdam Shippers after June 21, 2011. That date is crucial because that was the date that the last stay or injunction barring the enforcement of amended N.Y. Tax Law § 471 was lifted, permitting the State for the first time to enforce the 2010 amendments to that law. For the following reasons, the fact that the Potsdam Shippers were only shipping cigarettes to retailers located on Indian reservations, and that UPS only transported those packages when amended § 471 was enjoined, means that those shipments cannot form the basis for liability under the CCTA.

152.    As noted, the elements of a violation of the CCTA are: "(1) a person must knowingly ship, transport, receive[], possess, sell, distribute or purchase, (2) more than 10,000 cigarettes, (3) that do not bear evidence of the payment of applicable taxes, (4) under circumstances in which state or local tax law requires that such cigarettes bear evidence of the payment of applicable taxes." (Dkt. 177 at 49 (citing 18 U.S.C. §§ 2341-42)); *see* 18 U.S.C. § 2341; 18 U.S.C. § 2341(2). To be considered "contraband," unstamped cigarettes must be taxable (subject to "applicable taxes") under state law. 18 U.S.C. § 2341(2). (*See* Dkt. 198 at 17 ("The CCTA applies when *unstamped but taxable* cigarettes are found in a state that uses a stamping system to verify that the tax has been paid.") (emphasis added).) To be considered

69

contraband, cigarettes must also be required to bear a stamp ("evidence of the payment of applicable taxes") under state law. 18 U.S.C. § 2341(2).

153.    The pre-amendment version of § 471 applies to all shipments prior to June 22, 2011, because the State was enjoined until that date from enforcing the amendments to § 471—including the amended version of § 471(2), which for the first time required tax stamps on all cigarettes (regardless of their ultimate taxability) sold to Indian Nations or Tribes in New York. The amendments were scheduled to take effect on September 1, 2010, but did not become effective because of a variety of stays and injunctions issued by state and federal courts, the last of which was vacated on June 21, 2011. *See, e.g.*, *Seneca Nation of Indians v. Paterson*, No. 10-CV-687A, 2010 WL 4027795, at *4 (W.D.N.Y. Oct. 14, 2010) (staying "enforcement of the New York tax law amendments."); *Unkechauge Indian Nation v. Paterson*, 752 F. Supp. 2d 320, 328 (W.D.N.Y. 2010);  *Seneca Nation of Indians v. State of New York*, No. 2011-000714, slip op. at 2 (Sup. Ct., Erie Cty. May 10, 2011); Order to Show Cause, *Seneca Nation of Indians v. State of New York*, No. Erie Cty. Index No. 2011-000714 (N.Y. App. Div. 4th Dep't June 9, 2011) (enjoining "NY Tax Law §§ 471(1)(2)(5) and 20 N.Y.C.R.R. § 74.6 relate[d] to the taxation of cigarettes on Indian territory."); *Oneida Nation of N.Y. v. Paterson*, No. 6:10-cv-1071, 2010 WL 4053080, at *13 (N.D.N.Y. Oct. 14, 2010) (enjoining the State "from enforcing the State of New York's cigarette taxing statutes and regulations, including Tax Law §§ 471 & 471-e (as amended) and the Department of Taxation and Finance's emergency regulations."), *vacated*, 645 F.3d 154 (2d Cir. 2011); *St. Regis Mohawk Tribe v. Paterson*, No. 10-CV-1026, slip op. at 2 (N.D.N.Y. Sept. 16, 2010) (DX-052) ("Defendants along with their agents, employees and all other persons acting in concert or cooperation therewith, are temporarily restrained and enjoined from implementing, administering, and enforcing N.Y. Tax Law §§

sf-3681183

471(1), (2), (5), N.Y. Tax Law § 471-e, and 20 N.Y.C.R.R. § 74.6, pending further order of this Court.").

154.    The pre-amendment version of § 471 did not require tax stamps for non-taxable cigarettes. Pre-amendment § 471 (as now) imposed a tax on all cigarettes except those "sold under such circumstances that the state is without power to impose such tax." N.Y. Tax Law § 471 (2009). Under pre-amendment § 471, the state's method for collecting taxes on cigarettes "that the state has the power to tax" was the "tax stamp mechanism," pursuant to which taxes were pre-collected on all cigarettes that bore stamps and the cost passed down to the ultimate consumer purchaser who was liable for the tax. *United States v. Morrison*, 686 F.3d 94, 99 (2d Cir. 2012). As a result, pre-amendment § 471 imposed no stamping obligation on cigarettes that the state lacked power to tax. *Id.*; *see also City of New York v. Milhem Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 346 (E.D.N.Y. 2008).

155.    New York lacks power to tax any cigarettes sold on a reservation to a tribal member for personal consumption. It is "settled law" that a state tax "is unenforceable if its legal incidence falls on a Tribe or its members for sales made within Indian country." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 453 (1995). Both versions of § 471 place "the ultimate incidence of and liability for the tax shall be upon the consumer." N.Y. Tax Law § 471. Accordingly, the Supreme Court has specifically held that "New York lacks authority to tax cigarettes sold to tribal members for their own consumption" on their reservations. *Dep't of Taxation & Finance of N.Y. v. Milhem Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994); *accord Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011) ("Federal law prohibits New York from taxing cigarette sales to enrolled tribal members on their own reservations for personal use."). Because the State has no power to tax on-reservation sales of cigarettes to Tribal

71

members for consumption on their reservation, pre-amendment § 471 did not require stamps on those cigarettes.

156. In order to require a stamp on cigarettes sold on a reservation to non-Tribal members, the State must have a taxation method "that respects the federally protected right to sell untaxed cigarettes to members of the Nation while at the same time providing for the calculation and collection of the tax relating to retail sales to non-Indian consumers." *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 648 (N.Y. Ct. App. 2010). Pre-amendment § 471, however, lacked a viable mechanism to account for non-taxable, on-reservation sales because it contained no mechanism to "untax" the pre-collected tax that is paid on cigarettes whenever they are stamped. Thus, when pre-amendment § 471 was in effect, requiring tax stamps on all cigarettes sold on-reservation by reservation retailers to consumers for personal use would fail to respect the Tribe's "federally protected right to sell untaxed cigarettes to members of the Nation." *Cayuga*, 14 N.Y.3d at 648.

157. Because pre-amendment § 471 lacked such a mechanism, reservation retailers could not be compelled to collect taxes with respect to any consumer sales made on the reservations when that version of the law was in effect. Because the stamping requirement was the means by which the state collected such taxes, reservation retailers were thus permitted to possess and sell unstamped cigarettes to consumers on their reservations, even to non-Tribal members. *Cayuga*, 14 N.Y.3d at 653. As this Court noted, *Cayuga* held:

> "'[T]he absence of an appropriate legislative or regulatory scheme governing the calculation and collection of cigarette sales taxes that distinguishes between federally exempt retail sales to Indians occurring on a 'qualified reservation' and non-exempt sales to other consumers precludes reliance on Tax Law § 471' to impose sanctions for unstamped cigarettes sold on a qualified reservation."

(Dkt. 177 at 58 (quoting *Cayuga*, 14 N.Y.3d at 653).)

158.    Thus, the amendments to § 471, including the requirement that all cigarettes sold on reservations bear tax stamps, were not enforceable against Tribal retailers until the stays and injunctions barring their enforcement were lifted on June 22, 2011, and Tribal retailers were entitled to receive shipments of unstamped cigarettes. And because any cigarettes ultimately destined for on-reservation sales could not be required to bear stamps, UPS cannot be held liable for transporting them to the Tribal retailers who were entitled to receive them. All of the alleged deliveries of unstamped cigarettes at issue in this motion were to Tribal retailers and were therefore subject to pre-amendment § 471: every consignee that plaintiffs identified as receiving deliveries from the Potsdam Shippers was a member of, or was operating on, reservations owned by an Indian Tribe. (Dkt. 275 ¶¶ 26, 33, 44, 88, 93, 104, 110.)

159.    Because every consignee that plaintiffs identified as receiving deliveries from the Potsdam Shippers was a member of, or was operating on, reservations owned by an Indian Tribe, none of the cigarettes were required to bear a tax stamp. There is no evidence that UPS was an active participant in large-scale, off-reservation sales of unstamped cigarettes delivered to reservation retailers, which is the only circumstance in which sanctions have been held permissible under pre-amendment § 471. Thus, none of the cigarettes was shipped in violation of the CCTA.

160.    Indeed, even if post-amendment § 471 applied to these shipments, the shipments from the Potsdam Shippers would *still* not support liability under the CCTA. Under amended § 471(2), all cigarettes were required to bear stamps. But to constitute "contraband" under the CCTA, cigarettes must be both required to bear a stamp *and* subject to an applicable tax. 18 U.S.C. § 2341(2). And cigarettes sold on-reservation to Tribal members remain exempt from taxation under amended § 471 (as they must under federal law). As the Second Circuit has

explained, under the new system "[T]ribal members . . . purchase stamped, *albeit tax-free,*

cigarettes for personal use." *Oneida Nation*, 645 F.3d at 160 (emphasis added). The § 471 tax

itself "*does not apply* to cigarettes sold 'to qualified Indians for their own use and consumption

on their nations' or tribes' qualified reservation.'" *Id.* at 160 (quoting § 471(1) (emphasis

added).) Because there was thus no applicable tax on any cigarettes sold to Tribe members on-

reservation regardless of which version of § 471 applied to these alleged shipments, and because

plaintiffs concede they have no evidence that any of the cigarettes were not sold in this manner,

their claims necessarily fail.

**2.      Transportation of shipments from the Potsdam Shippers did not
violate the AOD at the time of the shipments**

161.     Plaintiffs also cannot establish claims for violations of the AOD based on

shipments from the Potsdam Shippers. These claims are based on UPS's alleged deliveries of

cigarettes to consignees they reasonably believed to be unauthorized persons. (Dkt. 189 at

¶¶ 176-186; 187-195.) As shown above, however, reservation retailers were entitled to receive

and sell unstamped cigarettes for on-reservation sales when pre-amendment law was in effect.

Thus, the consignees were authorized persons for purposes of the AOD.

**3.      The State is estopped from arguing that shipments from the Potsdam
Shippers violated the CCTA or the AOD**

162.     Plaintiffs' claim that shipments from the Potsdam Shippers violated the CCTA or

the AOD turn largely on their interpretation of the stays and injunctions as only affecting the

Tribes who were parties to those orders, or as not allowing UPS to make deliveries to reservation

retailers. (*See generally* Dkt. 287.) But even if the Court adopted such an interpretation, that

would not foreclose UPS's defenses to claims based on the Potsdam Shippers. As noted, the

State took the position that it was barred from enforcing the amended law at all. (*See supra* at

¶¶ 67, 75.) That position was expressed in court documents, DTF publications, and

sf-3681183

communications to UPS. (*See id*.; DX-065 at 25-26.) Officials from DTF told UPS that the State could not enforce the amended law and instructed UPS to continue to transport packages for the shippers at issue. (*See supra* at ¶¶ 70-78.) For the following reasons, UPS cannot now face liability, damages, and penalties based on a narrow view of the stays and injunctions that contradicts the State's interpretation of those orders when they were in effect.

163.    First, judicial estoppel bars the State from now contradicting its representations to the Second Circuit in its successful appeal of the injunctions at issue in *Oneida Nation*. The State represented to the Second Circuit that it had been "blocked from implementing a new tax law affecting millions of cigarette transactions and hundreds of millions of dollars in revenue." (DX-065 at 25-26; *see id*. at 25 (injunctions prevented State "from implementing a duly enacted law for the past five months, depriving the State of . . . nearly $500,000 a day in revenues").) And the Second Circuit understood that the State was indeed blocked from enforcing that new law. *See Oneida Nation*, 645 F.3d at 160, 173 n.20, 174. But if all shipments to reservations under pre-amendment law were in fact required to bear tax stamps, as plaintiffs now assert, there would have been no such loss of revenue when the stays and injunctions were in place.

164.    The doctrine of judicial estoppel applies here because the State has previously persuaded a prior court to adopt a position inconsistent with the one it now asserts in this Court, leading to an unfair advantage over UPS, which reasonably interpreted the scope of the injunctions in a manner consistent with the position the State had taken previously. *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011) ("Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking

estoppel." (quotation marks omitted)). Courts evaluating judicial estoppel "must focus on the conduct of the party to be estopped, not the party seeking estoppel. . . . [I]t is [an] unfair *advantage* to the potentially prejudiced party's adversary that is the touchstone of the doctrine." *Id.* at 698-99. Having won its appeal in *Oneida Nation* based in part on its broad representations that it had been blocked from implementing the amended tax law, the State is now barred from asking this Court to hold UPS liable based on a far more narrow interpretation of the stays and injunctions.

165.    Second, having repeatedly informed the public in general and UPS in particular that the State was barred from enforcing the amended tax laws while any of the stays and injunctions were in place, the State is equitably estopped from asserting a contrary position in this litigation. The doctrine of equitable estoppel is properly invoked where "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (citing *In re Ionosphere Clubs, Inc. v. Ins. Co. of Penn.*, 85 F.3d 992, 999 (2d Cir. 1996)). The doctrine applies where the party to be estopped has made a misrepresentation of fact with reason to believe the other party will rely upon it, and the other party both reasonably relies on it and suffers a detriment. *Id.* (citing *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 59 (1984)). The doctrine applies regardless of whether the party making the misrepresentation had the intent to deceive. *Id*. at 726. Here, the State repeatedly conveyed that reservation-to-reservation shipments of unstamped cigarettes were permissible, and it was reasonable for UPS to rely on the State's statements. Accordingly, the State is now equitably estopped from penalizing UPS based on a contradictory position as to the law in effect when the stays and injunctions were in place. (*See also* Dkt. 355 at 11-12.)

166.    Third, the State's current position also is barred by the doctrine of estoppel by entrapment, discussed below in the context of UPS's public authority defense. (*See infra*, at § V(D); *see also* Dkt. 355 at 11-12.)

**C.    Transportation Of Shipments From The Potsdam Shippers Did Not Violate N.Y. PHL § 1399-*ll***

167.    N.Y. PHL § 1399-*ll*(2) makes it unlawful for any carrier "to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than" a person authorized to receive cigarettes. Plaintiffs have not shown that UPS reasonably believed that the consignees of the Potsdam Shippers' packages were not authorized; to the contrary, the evidence shows that UPS believed they were.

168.    To the extent that plaintiffs contend that UPS failed to verify whether the consignees of the Potsdam Shippers' packages were authorized, any such requirement would be preempted by the Federal Aviation Administration Authorization Act, which provides that States and their subdivisions "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1); *see also* 49 U.S.C. § 41713(b)(4)(A); 15 U.S.C. § 376a(e)(5)(A)-(B). In *Rowe*, the Supreme Court held preempted a Maine law that "impose[d] civil liability upon the carrier, not simply for its knowing transport of (unlicensed) tobacco, but for the carrier's failure sufficiently to examine every package," which "thus require[d] the carrier to check each shipment for certain markings and to compare it against the Maine attorney general's list of proscribed shippers." 552 U.S. at 372–73. The Court found such regulation to "directly regulate[] a significant aspect of the motor carrier's package pickup and delivery service," which "creates the kind of state-mandated regulation that the federal Act pre-empts." *Id*. at 373.

169.    The PACT Act also precludes carriers from any obligation to assume the functions assigned to sellers, such as verification of compliance with excise tax, licensing, or tax-stamping requirements, recipient-verification, or any other compliance functions regarding cigarettes. *See* 15 U.S.C. §§ 376a(a)(3), (e)(9)(D).

170.    While the PACT Act includes a savings clause, protecting certain state laws from the preemptive force of the PACT Act or other federal, nothing in that savings provision, 15 U.S.C. § 376a(e)(5)(C)(ii), applies to plaintiffs' claims based on shipments from the Potsdam Shippers. Section (e)(5)(C)(ii) does not save from preemption state laws regulating deliveries of cigarettes to businesses. Instead, it pertains only to laws restricting deliveries to "individual consumers or personal residences." *Id*. Because plaintiffs concede that shipments from the Potsdam Shippers were delivered exclusively to retail businesses, any claim against UPS based on N.Y. PHL § 1399-*ll*.

### D.    UPS's Cooperation With Law Enforcement Concerning The Potsdam Shippers Immunized UPS From Any Claims Based On Those Shippers

171.    UPS has asserted two related two public authority defenses that defeat plaintiffs' motion: "actual public authority" and "entrapment by estoppel." The first is a defense "where a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity." *United States v. Giffen*, 473 F.3d 30, 39 (2d Cir. 2006). The second is a defense "when the government, by its own actions, induced [the defendant] to do those acts and led him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization." *Id*. at 41. UPS's public authority defenses thus turn on the common-sense notion that the State cannot recover penalties for packages the State itself instructed UPS to deliver.

172.    The facts that UPS notified the State about the Potsdam Shippers and the State authorized UPS to continue providing service to the Shippers are uncontrovertibly supported by the record.

173.    In order for either public authority defense to apply, the Defendant must have disclosed the full scope of the crime and been instructed to continue. *Giffen*, 473 F.3d at 39-41. UPS did so. Security Supervisor Jim Terranova disclosed to Trooper Nitti that "large amounts of cigarettes … were moving through the UPS facility at Potsdam coming from the Akwesasne Mohawk reservation." (*See* Terranova Decl. ¶ 7; Connolly Dep. Tr. 129:21-24, 130:14-23.)

174.    The State did, in fact, authorize UPS to continue providing service to the Potsdam Shippers. After hearing the information provided by Terranova, Trooper Nitti told Terranova that there was an "ongoing investigation" regarding cigarette shipments from the Mohawk/St. Regis reservation and that UPS should remain "business as usual" for the time being. (Terranova Decl. ¶ 7.) That Nitti was a State Trooper establishes his instruction as actual authorization, and his active assistance in both the DTF and the ATF in the investigation—relaying the exact information provided by UPS—underscores the legitimacy of his instruction. (*See* NYCUPS00000015-17 (ATF report crediting Trooper Nitti as the source of information.); Connolly Dep. Tr. 129:21-129:24 (crediting a State law enforcement officer with supplying information on the Potsdam shippers); ); Ernst Dep. Tr. 78:3-6 (testifying DTF worked with Trooper Nitti).)

175.    The State's authorization establishes a complete defense to plaintiffs' claims based on the Potsdam Shippers. *Giffen*, 473 F.3d at 39; *United States v. Burt*, 410 F.3d 1100, 1104 (9th Cir. 2005) (assurance that actions would not be illegal while gathering information,

even with "no instruction on how [the defendant should] conduct herself", was sufficient to establish public authority defense to the defendant's conspiracy to transport illegal aliens).

176.     The defense of estoppel by entrapment provides an independent basis to defeat plaintiffs' motion. This defense immunizes UPS's conduct if the State "led [UPS] to rely reasonably on [its] belief that [its] actions would be lawful by reason of the government's *seeming* authorization." *Giffen*, 473 F.3d at 41 (emphasis in original). "[F]or a defendant's reliance to be reasonable, the jury must conclude that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries." *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995) (internal quotations and citation omitted).

177.     Here, UPS reasonably relied on its belief that Trooper Nitti was authorizing it to continue providing service to the Potsdam Shippers. Terranova contacted Trooper Nitti with the express purpose of determining what should be done about the shipments. (Terranova Decl. ¶ 6.) Trooper Nitti was a New York State Trooper actively working with both ATF and DTF on the investigation (*See* Connolly Dep. Tr. 129:21-24.) and his instruction was given with DTF's knowledge (*id.*) Terranova had no reason distrust Trooper Nitti, not only because of Trooper Nitti's position but also because they had worked together in the past. (Terranova Decl. ¶ 4.) And at no point did Trooper Nitti, DTF or the ATF give UPS any indication that Trooper Nitti's instruction was in error or unauthorized. To the contrary, when DTF visited the Potsdam terminal on June 21, 2011, it notified UPS of changed circumstances that would effectively revoke the instruction going forward.

178.     Trooper Nitti's instruction also was consistent with prior directives given to UPS by the DTF. For example, in 2008, on at least 14 different occasions UPS made shipments of

"Arrow Brand" cigarettes to Long Island under direct DTF instruction. In other instances, where no such instruction was made, UPS terminated the shipper. (*See* DX-285 (DTF Activity Report stating UPS discovered, reported, and refused to deliver cigarettes).) Indeed, UPS continued shipping at the State's instruction despite driver complaints. (Jarvis Dep. Tr. 65:16-24, 66:1-20; Sheridan Dep. Tr. 43:23-44:1, 45:4-46:7.)

179.    UPS's previous cooperation with the State confirms that UPS was "sincerely desirous of obeying the law." *Abcasis*, 45 F.3d at 44. Had the State not instructed UPS to continue providing service to the Potsdam Shippers, it would have simply terminated them, as it terminated other shippers before. Only because it reasonably believed it had been instructed to do so, did UPS continue to provide the service for which the State is now seeking recovery.

E.    **UPS Has Already Satisfied The Attorney General That No Penalties Under The AOD Are Appropriate Based On Shipments From The Potsdam Shippers**

180.    The AOD provides that "no penalty shall be imposed" on UPS if "UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." (DX-023 ¶ 42.)

181.    As detailed above (*see supra*, at ¶¶ 79-83), the AG sought penalties under the AOD in connection with the Potsdam Shippers in 2011, but dropped its request after UPS explained its position and provided information about the shipments. The State did not even seek penalties under the AOD for the Potsdam Shippers in its original complaint in this case. (Dkt. 1.) It added a request for penalties as to Potsdam shipments only in the Amended Complaint filed in May 2015—nearly four years after UPS met with the AG's Office and showed that UPS had no reason to know that the Potsdam Shippers were shipping to unauthorized recipients.

182.    The State cannot now reverse that decision, and seek penalties for the Potsdam Shippers under the AOD. To do so would not only depart from the plain language of the AOD,

(*see* DX-023 ¶ 42), but would also prejudice UPS. The State has conceded that neither the AG's Office nor the DTF preserved documents concerning their 2011 communications with UPS concerning the Potsdam Shippers. In the absence of a final determination to not pursue penalties, lawyers for the AG and the State would have been obligated to preserve those documents in anticipation of litigation. The State's failure to do so confirms that UPS had, in fact, satisfied the AG that no penalties were appropriate in 2011. And the State's failure to retain documents deprives UPS of the ability to adequately defend itself, as it cannot obtain documents establishing that UPS had satisfied the AG that no penalties were appropriate in 2011 (among other relevant facts).

## VI.    UPS'S AFFIRMATIVE DEFENSES ALSO BAR PLAINTIFFS' CLAIMS

### A.    UPS's Equitable Defenses Bar The State's AOD Claim

183.    Apart from defenses unique to the Potsdam Shippers, UPS's Thirteenth and Seventeenth Defenses contend that plaintiffs are barred from recovery, in whole or in part, based on several equitable defenses, including estoppel, unclean hands/*in pari delicto*, and waiver. UPS's defenses are based on the fact that plaintiffs knew about many of the shippers at issue but failed to notify UPS about the shippers, as well as on the State's forbearance policy. While plaintiffs contend that equitable defenses are subject to special standards based on their status as governmental entities, as the Court has already found, "plaintiffs are acting in a role akin to that of a private actor" in pursing their RICO and AOD claims. (Dkt. 177 at 35.) For that reason, UPS's equitable defenses are not subject to any heightened standards.

184.    For example, the standards applicable to the State's AOD claim are derived from state, not federal, law. *See, e.g., Petroleum Traders Corp. v. Balt. Cty.*, 413 F. App'x 588, 593 (4th Cir. 2011) (applying Maryland's standard for equitable estoppel in a contract case). Under New York law, no heightened requirements for estoppel are required where, as here, a

government entity is acting in a private or proprietary capacity. "While laches cannot generally be imputed to the sovereignty, the defense is available in cases where the government acts in its private or proprietary capacity. A similar rule applies [] to estoppel against a governmental body." *Carney v. Newburgh Park Motors*, 84 A.D.2d 599, 600 (N.Y. App. Div. 3d Dep't 1981) (citations omitted); *accord Fowler v. City of Saratoga Springs*, 215 A.D.2d 819, 820 (N.Y. App. Div. 3d Dep't 1995); *see also Royal Ins. Co. of Am. v. Comm'rs of State Ins. Fund*, 289 A.D.2d 807, 808 (N.Y. App. Div. 3d Dep't 2001) (estopping state insurance fund from denying the existence of an implied contract). No egregious act or constitutional issue is required. *See id.* Because this Court has already ruled that plaintiffs are acting in a role "akin to that of a private actor," these defenses are available to UPS here. (*See* Dkt. 177 at 35.)

185.    Likewise, relevant New York state case law, which governs the State's AOD claim, indicates that no higher standard is required for UPS's unclean hands defense. *Cf. In re New York State Urban Dev. Corp.*, No. 32741/09, 2010 WL 702319, at *9, *28 (Sup. Ct. Kings Cty. Mar. 1, 2010) (finding that unclean hands was not a valid defense in "limited and circumscribed" proceeding regarding review of eminent domain scheme, but failing to note any heightened standard when the defense is raised against the government). As detailed above, plaintiffs were aware, by their own admission, of several shippers illegally trafficking in untaxed cigarettes via UPS, but took no steps to inform UPS so that it could investigate the shipments and discipline the shippers under Paragraphs 39 and 40 of the AOD. (*See* Jerry Dep. Tr. 44:3-15, 45:2-55:12 (discussing when the State became aware of individual shippers); *id.* at 67:3-19 (explaining that the State was unaware of ever informing UPS about illegal shipments, with the exception of three incidents mentioned in interrogatory responses); DX-383 at 4-5 (discussing when the City became aware of individual shippers); *id.* at 5-6 (refusing to answer whether the

sf-3681183

City ever shared that information with UPS).) UPS meanwhile acted in good faith, implementing a cigarette policy to combat illegal cigarette trafficking (*see generally* Decl. of Bradley Cook, Dkt. 174 (outlining UPS's Cigarette Policy and compliance with the AOD)), and repeatedly informing State and City authorities when it discovered illegal shipments. (*See supra* ¶ 33.) Because UPS's failure to stop alleged shipments of untaxed cigarettes was the result of plaintiffs' own negligence or intentional action, the *in pari delicto* defense should apply. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2836 (2015).

186.    Plaintiffs do not address UPS's waiver argument, as based on the State's forbearance policy. They have argued that UPS's waiver defense cannot apply because in order to constitute a waiver, the action at issue "must be clear and unequivocal" rather than the product of "[m]ere negligence, oversight, or thoughtlessness." (Dkt. 274 at 18 (quoting *Mooney v. City of N.Y.*, 219 F.3d 123, 131 (2d Cir. 2000).) The State's forbearance policy meets this standard, as DTF's public announcement that it would permit untaxed cigarettes to be sold by reservation retailers was both clear and unequivocal. *See Milhelm Attea & Bros.,* 550 F. Supp. 2d at 338.

**B.      The State's Breach Of The Covenant Of Good Faith And Fair Dealing Bars Its AOD Claim**

187.    New York law establishes that every contract is subject to an implied covenant of good faith and fair dealing, which comprises "any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract]." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (quotation marks and citation omitted). This covenant applies both in the context of an assurance of discontinuance and where the party at issue is a governmental entity. *See Handschu v. Special Servs. Div.*, No. 71 Civ. 2203(CSH), 2007 WL 1711775, at *10 n.10 (S.D.N.Y. June 13, 2007)

(noting that the NYPD was subject to the covenant of good faith and fair dealing where it was party to a consent decree).

188.    The State breached the covenant when it allegedly discovered certain shippers sending untaxed cigarettes via UPS, decided not to inform UPS, allowed the shipments to proceed for years, and then sued UPS for damages based on the shipments it was aware of but did nothing to stop. Two provisions of the AOD prove that the State's conduct constitutes a breach of the duty of good faith and fair dealing. First, paragraphs 39 and 40 lay out a specific procedure by which UPS and the State are to deal with suspected illegal shipments:

> 39. If the Attorney General or any other governmental authority provides UPS with evidence that a UPS customer is shipping Cigarettes to Individual Consumers, UPS shall discipline such shipper pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance.

> 40. If the Attorney General or any other governmental authority represents to UPS that a UPS customer is shipping Cigarettes to Individual Consumers, but does not provide evidence of such shipments, UPS shall conduct an audit of that shipper. UPS shall discipline, pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance, shippers found to be shipping Cigarettes to Individual Consumers.

(DX-023 at ¶¶ 39, 40.) Implicit in this language, setting out the process by which UPS will investigate and punish shippers after receiving information from the State, is the expectation that the State will actually share such information. *Cf. Hexagon Sec. LLC v. Leawood Bancshares, Inc.*, No. 13 Civ. 907(JSR), 2014 WL 1303516, at *5 (S.D.N.Y. March 14, 2014) (finding that good faith and fair dealing covenant gave rise to a duty to share information to avoid injuring the contracting party's "right to receive 'the fruits of the contract.'").

189.    Plaintiffs argue that Paragraphs 39 and 40 use permissive language, applicable only "if" the Attorney General shares information, and conclude that they therefore do not impose a "mandatory obligation on the Attorney General." (Dkt. 274 at 22.) But even if the State's cooperation with UPS is discretionary, the implied covenant of good faith and fair

85

dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *TIG Ins. Co. v. Newmont Mining Corp.*, 413 F. Supp. 2d 273, 281 (S.D.N.Y. 2005) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)), *aff'd*, 226 F. App'x 49 (2d Cir. 2007). Thus, even if the State were not required to share with UPS information regarding *every* illegal shipment, good faith precludes it from withholding *all* cooperation, permitting damages to mount over a period of years, and then suing UPS under the contract it decided not to implement. *See id.* ("One party's discretion cannot go so far as to enable the party to eviscerate a term of the contract and frustrate a fundamental purpose underlying the agreement." (quotation marks and citation omitted)).

190.    Second, the AOD expressly provides that the agreement is intended to "promote further and ongoing cooperation between UPS and the Attorney General concerning UPS's compliance with [State law]." (DX-023 at 5.) Plaintiffs dismiss that clause by denigrating it as a meaningless "whereas clause," but such clauses cannot be ignored. Preliminary clauses are "useful interpretational aids," which may help a reviewing court to understand the parties' intent in agreeing on the specific contractual provisions that follow. *Zamierowski v. Nat'l R.R. Passenger Corp*, No. 05 Civ. 9309(WCC), 2006 WL 1816377, at *5 (S.D.N.Y. June 28, 2006) (using whereas clauses to "reveal an underlying assumption" that Metro-North would in fact install safety devices); *see also Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985) (noting that "a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract."). Thus, any ambiguity in paragraphs 39 and 40, calling for cooperation in dealing with illegal shipments, is resolved by language in the whereas clause regarding "ongoing cooperation between UPS and the Attorney General."

191.    At a bare minimum, the whereas clause demonstrates that UPS expected that the State would cooperate with it, and that the state was aware of UPS's expectation. That knowledge is relevant to the question of the "promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract," *National Market Share*, 392 F.3d at 525, and thus to the scope of the AOD's covenant of good faith and fair dealing.

192.    For these reasons, even if the State could demonstrate that UPS violated the AOD in any way, the State's own breach of the covenant of good faith and fair dealing would preclude any finding of liability by UPS.

## VII.    PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

193.    Plaintiffs' Fourteenth Claim for Relief asks the Court to "i) enjoin UPS pursuant to 18 U.S.C. § 2346(b)(1) from knowingly shipping, transporting, receiving, possessing, or distributing contraband cigarettes as that term is defined in the CCTA; (ii) enjoin UPS pursuant to 15 U.S.C. § 378(c)(1)(A) from shipping any cigarettes that do not comply with the PACT Act's labeling requirement and from shipping for any shipper listed on the ATF's list of non-compliant delivery-sellers; iii) enjoin UPS pursuant to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-*ll* from delivering any cigarettes to any unauthorized recipient within the State of New York; and iv) appoint a Special Master to assure UPS's compliance with each of the above statutes, and with the AOD entered into by UPS with the Attorney General, and to provide training and monitoring to UPS to ensure compliance." (Dkt. 189 ¶ 199.) No such injunction is appropriate here.

194.    To begin, the PACT Act's Exemption Provision exempts UPS from both the PACT Act and N.Y. PHL § 1399-*ll* (*see supra*, at § I); thus, no injunctive relief is appropriate

87

sf-3681183

under either the PACT Act or N.Y. Exec. L. § 63(12) (which is merely the vehicle through which the Attorney General seeks redress for its claims under N.Y. PHL § 1399-*ll*).

195.    That leaves only plaintiffs' CCTA claims as the remaining basis for any claim for injunctive relief. As detailed above, however, plaintiffs failed to prove that UPS committed any CCTA violations. (*See supra*, at §§ I, II.)

196.    Even if plaintiffs could establish a CCTA violation, no injunctive relief, much less the extreme remedy of appointing a special master, would be warranted. "An injunction prohibiting a party from violating statutory provisions" is only "appropriate where there is a likelihood that, unless enjoined, the violations will continue." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996); *United States v. Carson*, 52 F.3d 1173, 1183-84 (2d Cir. 1995) (a permanent injunction requires "a reasonable likelihood that the wrong will be repeated."). Whether a defendant will be undeterred by a finding of liability turns on the "defendant's degree of culpability" and requires "systematic wrongdoing," as indicated by a "history of legal violations." *First Jersey*, 101 F.3d at 1477; *Kapps v. Wing*, 404 F.3d 105, 122-23 (2d Cir. 2005); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003) (same).

197.    Here, however, plaintiffs cannot show (assuming the Court even found single violation of the CCTA) any reasonable likelihood that any violations of the CCTA would be repeated. As detailed above, UPS has terminated service to all of the shippers that plaintiffs claim were shipping cigarettes in violation of UPS's Cigarette Policy. (Dkt. 322 at 19-20.) Moreover, UPS has further enhanced its compliance program in substantial ways, going well above the requirements of federal law, New York law, or the AOD. Among other steps toward enhanced compliance, UPS has strengthened its due diligence of shippers before and shortly after a shipper opens a UPS account, strengthened its training of its sales force and its other

88

employees that play any role in providing service to potential tobacco shippers, and completes weekly and monthly data analytics to find and weed out potential high-risk tobacco shippers. (*See supra*, at ¶¶ 35-51.) Plaintiffs have failed to establish that these steps have been ineffective. Accordingly, there is no reasonable likelihood that UPS will violate the CCTA in the future, making injunctive relief inappropriate here.

198.    And, even if the Court granted some form of injunctive relief, the facts do not support the use of a special master, an even more extreme form of relief. "The appointment of a special master is the exception, not the rule." *Idan Computer, LTD v. Intelepix, LLC*, No. CV-09-4849(SJF)(ARL), 2010 U.S. Dist. LEXIS 90658, at *8 (E.D.N.Y. Aug. 27, 2010). Indeed, "external monitors have been found to be appropriate" only where other "remedial orders are unreliable or where a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question." *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994). And, even where such a circumstance may exist, the court still "must consider the fairness of imposing the likely expense on the parties and must protect against unreasonable expense[.]" Fed. R. Civ. P. Rule 53(a)(3). Here, plaintiffs have failed to show that UPS willfully violated the law or any court order, as required to justify the appointment of a special master.

## VIII.   NO DAMAGES OR PENALTIES SHOULD BE AWARDED AT ALL

Because plaintiffs have not established that UPS is liable under any theory of relief they have advanced, they are not entitled to any damages or penalties.

Even if plaintiffs could establish UPS's liability, moreover, UPS has filed a motion in limine seeking to preclude plaintiffs from offering at trial any damages evidence that was not specified in their Initial or final Supplemental Disclosures under Rule 26(a)(1)(A)(iii)—which means no damages evidence at all. (Dkt. 366.) UPS's motion is based on plaintiffs' failure to disclose:

89

sf-3681183

- the amount of damages and penalties plaintiffs are seeking to recover,

- the number of sealed boxes UPS delivered that plaintiffs contend contained unstamped cigarettes, and the bases for plaintiffs' contentions, and

- how many packs or cartons of unstamped cigarettes were supposedly contained in those sealed boxes, and the bases for those numbers.

Without any such disclosures throughout the length of this litigation, UPS is unfairly prejudiced, and cannot even predict, much less defend itself against, whatever measure of damages plaintiffs might seek at trial.

For the same reasons, UPS cannot propose findings of fact or conclusions of law concerning whatever damages or penalties plaintiffs seek. If the Court denies UPS's motion in limine, UPS respectfully requests permission to supplement this set of Proposed Findings of Fact and Conclusions of Law to address the damages and penalties plaintiffs seek.

## **CONCLUSION**

Thus, based on the facts that will be introduced at trial, and the legal principles governing plaintiffs' claims, plaintiffs cannot satisfy their burden of proof on any of their claims. Judgment should be issued for UPS on all of plaintiffs' claims.

90

sf-3681183

Dated:  New York, New York                  By: /s/ Carrie H. Cohen
        September 9, 2016


Paul T. Friedman (Admitted *Pro Hac Vice*)     Carrie H. Cohen
Ruth N. Borenstein (Admitted *Pro Hac Vice*)   Jamie A. Levitt
MORRISON & FOERSTER LLP                         Mark David McPherson
425 Market Street                               MORRISON & FOERSTER LLP
San Francisco, CA 94105                         250 West 55th Street
Telephone: (415) 268-7000                       New York, NY 10019
PFriedman@mofo.com                              Telephone: (212) 468-8000
RBorenstein@mofo.com                            CCohen@mofo.com
                                                JLevitt@mofo.com
                                                MMcPherson@mofo.com


Gregory B. Koltun (Admitted *Pro Hac Vice*)    Deanne E. Maynard (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP                         MORRISON & FOERSTER LLP
707 Wilshire Boulevard                          2000 Pennsylvania Avenue, NW
Los Angeles, CA 90017-3543                      Suite 6000
Telephone: (213) 892-5200                       Washington, DC 20006-1888
GKoltun@mofo.com                                Telephone: (202) 887-1500
                                                DMaynard@mofo.com

                                                *Attorneys for Defendant*
                                                United Parcel Service, Inc.

91