UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
THE STATE OF NEW YORK and THE CITY OF :
NEW YORK,                                                    :
                                                             :
                              Plaintiffs,                    :
                                                             :
              -v-                                            :
                                                             :
UNITED PARCEL SERVICE, INC.,                                 :
                                                             :
                              Defendant.                     :
                                                             :
------------------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 10, 2016
```

15-cv-1136 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

A bench trial in this matter is scheduled to commence on September 19, 2016. Before the Court are three Daubert motions pursuant to which defendant seeks to preclude one of plaintiffs' proposed experts, Dr. Christopher P. Erath, and plaintiffs seek to preclude two of defendant's: Dr. Aviv Nevo and Mr. Farrell Delman. (ECF Nos. 323, 329, 326.)

While a court has a gatekeeping role in all trials—bench or jury—certain concerns raised by possible infirmities in testimony from a proposed expert are lessened in the bench trial context. In a bench trial, a court is generally confident of its ability to understand who is and is not an expert, whether his or her testimony is relevant to issues in dispute and whether is it reliable. See Bic Corp. v. Far E. Source Corp., 23 F. App'x 36, 38-39 (2d Cir. 2001) (reasoning, in context of expert testimony, that "the admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences

from his or her own decisional analysis."). A court has experience in making such judgments during the course of the trial—discarding or minimizing that which it finds to be of lesser or no value, and retaining that which might be of use. A court's experience in this regard does not, however, mean that the fact a matter may be tried to the bench signals a "free for all" vis-à-vis expert witnesses. There are obvious efficiency gains in precluding testimony from an individual unqualified to take the stand, or one who is providing testimony that is plainly irrelevant or, if relevant, is based upon unreliable methods. Such testimony is a waste of everyone's time.

But efficiency is not the sole reason for a court to make pre-trial decisions on Daubert motions. Pre-trial rulings in the bench context have important strategic implications as well. An expert may play a unique and critical role in a trial, and precluding such an expert could leave a hole in the proof. Knowing in advance of trial that an expert has been precluded may allow a party to make last-minute adjustments in trial strategy to overcome what might otherwise have been an unforeseen hole in their proof; a party may have compensating testimony it would not otherwise have offered but, in light of preclusion, now will. In short, pre-trial rulings can enhance fairness as well as efficiency by informing sensible trial adjustments. Pre-trial rulings may also enable parties to assess the risk/reward profile of a case on a real-time basis. If a court will preclude an expert, it is generally better to know that sooner rather than later. Simply put, fair warning has value.

The testimony of each of the three experts that are the subjects of the parties' respective motions is primarily directed at damages.  Defendant challenges Dr. Christopher P. Erath, a Director of BLDS, LLC and who received a Ph.D. in Economics from the University of Wisconsin.  (ECF No. 325-1 ("Erath Revised Report") at 2.[1])  He was retained by plaintiffs to conduct a survey that would form the basis of a statistical analysis of shipments to non-reservation consumers by EExpress (or an affiliated company), in order to opine on the percentage of shipments containing unstamped cigarettes.  (Id.)  Defendant challenges Dr. Erath's testimony on the basis that he was unqualified to design the survey and that the survey itself suffers from a number of infirmities; according to defendant, these errors necessarily lead to unreliable conclusions.  (See ECF No. 324.)  For the reasons set forth below, the Court agrees and GRANTS defendant's motion to preclude Erath's testimony.

Plaintiffs challenge Dr. Avi Nevo, an economist from the University of Pennsylvania retained by defendant to rebut plaintiffs' damage theory.  (ECF No. 337-1 ("Nevo Report") ¶¶ 1, 9.)  The dispute between the parties with regard to his testimony is essentially legal in nature:  whether defendant may offer a rebuttal to plaintiffs' damages theory that is based upon a "but-for world" in which UPS does not ship cigarettes to New York buyers.  (See ECF Nos. 336, 351; see also Nevo Report ¶ 12 (defining "but-for-world").)  Dr. Nevo's opinions address whether plaintiffs are correct in assuming their loss (and therefore damages) is the amount

---

[1] Citations are to the ECF pagination or, where applicable, specific paragraph numbers.

of tax that would have been collected assuming that 100% of the unstamped cigarettes the Court ultimately finds UPS transported would have resulted in taxable sales. (Nevo Report ¶¶ 13-14.) Dr. Nevo argues that there is not a one-to-one correlation between UPS's actual shipments of unstamped cigarettes and tax receipts in the but-for world. (Id.) He asserts that various factors would have led to reduced consumption of the taxed cigarettes, including, inter alia, reduced tobacco consumption and alternatives to tobacco. (Id. ¶ 14.) The principal basis of plaintiffs' motion to preclude is that the creation of such a but-for world is not legally cognizable and that it would be dangerous for the Court to recognize such a theory. (ECF No. 336.) Plaintiffs argue that Dr. Nevo's reliance on a but-for world to compute damages is just as problematic as a hypothetical bank robber's argument that damages should be reduced because alternative robbers would have robbed the bank anyway. (Id. at 2.) Because plaintiffs' fundamental criticism of Dr. Nevo is incorrect and a rebuttal based on a but-for world is cognizable, the Court DENIES their motion to preclude Dr. Nevo.[2]

Finally, plaintiffs also seek to preclude Farrell Delman, the president of TMA, a tobacco trade association formerly known as the Tobacco Merchants Association, retained by defendant as an alleged expert in the tobacco industry. (ECF No. 328-1 ("Delman Amended Report") ¶ 1.) Mr. Delman opines on the effect of increased state taxes on the demand for alternatives to taxed cigarettes and on-reservation sales of such alternatives. (Id. ¶ 8.) Plaintiffs assert that his testimony

---

[2] To be clear, in rendering this decision, the Court is making no determination as to the strength of Dr. Nevo's testimony.

is irrelevant because it fails to address a core liability issue—that is, whether UPS knew that it was shipping untaxed cigarettes.  (ECF No. 327.)  They argue that Mr. Delman's testimony is, instead, directed at the availability of alternatives to cigarettes.  (Id.)  In addition, plaintiffs assert that his methodology, which included (but was not limited to) a series of visits to smoke-shops not at issue in this litigation, is unreliable.  (Id.)  As discussed below, the Court finds that Mr. Delman's testimony does, in fact, go to a fact in issue:  the extent to which tobacco products other than cigarettes were available by mail order from various sellers. Such testimony may go to whether an employee believed a shipper who indicated that its packages contained goods other than cigarettes, or whether such an employee otherwise had a reasonable basis to believe that the packages contained one thing versus another.  It is also possible that Mr. Delman's testimony would be offered to rebut plaintiffs' assertion that it was more likely than not that a particular percentage of the packages shipped from a particular smoke shop contained unstamped cigarettes (versus some other product).  With that said, the Court is not persuaded that Mr. Delman's drive-by review of three on-reservation retailers not at issue in this case forms a particularly strong basis for assessing the types of products different retailers may have offered.  Accordingly, plaintiffs' motion to preclude Mr. Delman is DENIED, though the Court expresses reservations as to any conclusions based primarily on the (three) smoke shops.

Below, the Court walks through the applicable legal standard and then discusses each of the motions pertaining to the three proposed experts.  It is

important to emphasize that the Court is not ruling on the weight any admitted testimony may be given.  Nor is the Court suggesting, through its exclusion of Dr. Erath, that plaintiffs lack alternative proof leading to a similar factual inference as that proffered by Dr. Erath or that such proof would be inadmissible.

## I.   THE DAUBERT STANDARD

"[I]n complex cases . . . expert testimony may help a [trier of fact] understand unfamiliar terms and concepts."  United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  A trial court has an obligation, however, to act as a gatekeeper with respect to expert testimony.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  This is due in large part to the fact that an expert is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  Daubert, 509 U.S. at 592.  "The primary locus of [the court's] obligation is [Federal Rule of Evidence] 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."  Id. at 590.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, this Court's inquiry into whether an expert meets Rule 702's requirements includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact.  See, e.g., Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir.2005); Arista Records LLC v. Lime Grp. LLC, No. 06-cv-5936 (KMW), 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011).

The "overarching subject" of the Rule 702 inquiry is "the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595.  However, even otherwise qualified experts may not simply offer conclusory opinions.  Major League Baseball, 542 F.3d at 311 (citation omitted); Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir.2000).  Conclusory opinions are a form of "ipse dixit", and often provide an insufficient basis upon which to assess reliability.  See, e.g., Nimely, 414 F.3d at 396.

1.  Qualifications

The evaluation of a proposed expert's qualifications is a threshold inquiry that seeks to determine whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify.  See Daubert, 509 U.S. at 592 n.10; Arista Records, 2011 WL 1674796, at *2.  Without the requisite qualifications, the reliability of a proposed expert's testimony may be in serious doubt.

7

Whether a proposed expert is qualified depends on his or her educational background, training and experience in the field relevant to the opinions that he or she seeks to express.  See United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.") (citation omitted); see also Cary Oil Co., Inc. v. MG Refining & Mktg., Inc., No. 99-cv-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003).

In the Second Circuit, courts examine an expert's qualifications in light of the "liberal thrust" of the Federal Rules and the Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony."  See Daubert, 509 U.S. at 588-89; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").  If an expert's training and experience are in a field closely related to the subject matter of the proposed testimony, that showing may, in appropriate circumstances, be sufficient to meet Rule 702's qualification standards.  See Arista Records, 2011 WL 1674796, at *3 (citation omitted); Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04-cv-7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006).

2.  Reliability

The reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.  Among the questions to be answered are whether the theory or methodology can be tested, whether it has been subjected to peer review and publication, whether it has a known or potential rate of error, and whether there is "general acceptance" of the methodology or theory.  Id. at 593-94.

There are, however, limitations that a court can, and indeed sometimes must, place upon even a qualified expert proposing to testify as to otherwise admissible opinions.  For instance, the court may preclude an expert from testifying as to the credibility of other witnesses or evidence.  See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), modified on reh'g, 856 F.2d 5 (2d Cir.1988); In re Blech Secs. Litig., No. 94-cv-7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (citing Scop, 846 F.2d at 142); LinkCo, Inc. v. Fujitsu Ltd., No. 00-cv-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).

Furthermore, an opinion that is speculative or conjectural does not satisfy Rule 702 and should be excluded.  See Daubert, 509 U.S. at 590 (noting that "the word 'knowledge'", as used in Rule 702, "connotes more than subjective belief or unsupported speculation"); see also Major League Baseball, 542 F.3d at 311 (citation omitted).  While the Daubert inquiry is "flexible" and intended to give

9

courts the "discretion needed to ensure that the courtroom door remains closed to junk science", it is also true that, to warrant admissibility, "it is critical that an expert's analysis be reliable at every step." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir.2002).

### 3. <u>Helpfulness</u>

Expert testimony must be helpful to, but not usurp the province of, the trier of fact.[3] <u>Bilzerian</u>, 926 F.2d at 1294; <u>Marx & Co. v. Diners' Club, Inc.</u>, 550 F.2d 505, 512 (2d Cir. 1977). While an expert "may opine on an issue of fact within the [trier of fact's] province, he may not give testimony stating ultimate legal conclusions based on those facts." <u>Bilzerian</u>, 926 F.2d at 1294. That is true both when a matter is tried to a bench as well as a jury.

## II. THE PROPOSED EXPERTS

### A. <u>Dr. Christopher P. Erath</u>

Dr. Erath holds a Ph.D. in Economics from the University of Wisconsin "where [his] fields of interest include labor economics, econometrics, and industrial organization", and his professional career "has involved a number of cases where data was obtained through the use of a survey." (Erath Revised Report at 2.) Dr. Erath's report spans four pages. He describes his assignment in this case as follows: "I have been asked by the State and City of New York . . . to assist in determination of the percent of shipments sent by EExpress via UPS to addresses within New York that contained cigarettes." (<u>Id.</u>) In connection with this

---

[3] As with all evidence, expert testimony must be relevant, Fed. R. Evid. 401, and non-prejudicial, Fed. R. Evid. 403.

assignment, he obtained a spreadsheet from plaintiffs that showed shipments from EExpress conveyed by UPS over a period from September 21, 2012 to June 25, 2014. (Id.) During this period, there were 11,195 shipments sent to 896 unique addresses. (Id.) From this list Dr. Erath culled a subset of "500 randomly selected shipments" that covered 328 unique addresses. (Id.) He then designed a consumer survey that would query the recipients of the packages as to their contents using an interview script. (Id.)

Dr. Erath stated that "the question of interest for survey respondents was simply if cigarettes were contained in this package." (Id. at 3.) He added that "as some time has elapsed since these packages were received, questions were included in the survey to test the respondent's memory such as the brand of cigarettes ordered." (Id.)

Dr. Erath described his script as designed to "learn the contents of that shipment." (Id.) He used staff from the New York State Attorney General's Office as investigators to conduct the survey. (Id.) Dr. Erath instructed the survey investigators to inform respondents that an investigation was being conducted into shipping practices but "they personally were not being investigated." (Id.) After verifying that a respondent lived at an indicated address at the time of the shipment in question, the respondent was then asked "if [he/she] had received a packed from EExpress or its DBAs ["doing-business-as"]." (Id.) The survey then proceeded as follows:

> [I]f the response was ["yes"], [respondents] were queried as to the contents of the package and if the response was ["cigarettes"] whether anything else had

been ordered from that company.  If the respondent did not recognize the company names, they were asked if they had ever received a shipment of tobacco products and if so what the product was.  In both case[s], those who answered that they had ordered cigarettes were asked for the brand.

Respondents who denied receiving a shipment from EExpress or a DBA and who denied receiving tobacco shipments were asked if someone else living at that address might have placed such an order. . . .

(Id. at 3.)  Dr. Erath reported that the survey investigators were able to make contact with 52 individuals (out of the randomly selected group of 328 unique addresses corresponding to 500 shipments, and against a denominator of over 11,000 shipments).  (Id. at 4.)  Dr. Erath reported that of the 52 individuals, 20 denied ever receiving any packages from EExpress or its DBAs.  (Id.)  He discarded these 20 contacts, leaving a base of 32 respondents for the survey.  (Id.)

Dr. Erath broke these 32 respondents into several categories:  (1) "clean" responses in which the respondent stated that he/she had purchased tobacco products and that he/she had purchased no other tobacco products from that seller; (2) instances in which the respondent stated that he/she had received cigarettes from EExpress but the survey investigator failed to ask whether the respondent had received any other products from EExpress; and (3) instances in which the survey investigator did not follow the prepared script.  (Id.)

Dr. Erath based his conclusions on these survey results.  (Id.)  He determined that out of the first category described above, 19 respondents accounted for 30 shipments.  (Id.)  Of the 19, 17 responded that they had received only cigarettes; the remaining two orders were for cigars.  (Id.)  Based upon this information, using only this group as a data set, Dr. Erath concluded he was "95 percent confident that the

true population percentage of shipments containing cigarettes falls between 81 and 100 percent." (Id.)

Dr. Erath then added in the second category. Using the combination of groups 1 and 2, he determined that between 85 and 100 percent of the shipments contained cigarettes. (Id.) When the third category was included, he determined that the percentage increased to between 89 and 100 percent. (Id.) Dr. Erath then reported these ranges as one numerical average—with the average for the first group at 90 percent and for the second and third groups combined as 93 percent. (Id.)

Defendants have proffered two experts in rebuttal to Dr. Erath's survey and conclusions, Kent D. Van Liere and Faten Sabry. (ECF No. 325-8 ("Van Liere Report"); ECF No. 325-7 ("Sabry Report").) Dr. Van Liere holds a Ph.D in Sociology with a specialization in research methods and statistics from Washington State University. (Van Liere Report at 24.) He is currently the practice chair of the Survey Research, Design and Analysis Group for NERA Economic Consulting, Inc. ('NERA"). (Id. ¶ 1.) Prior to joining NERA, he was a principal at a firms HBRS, Inc. Hagler Bailly, Inc., and CEO of Primen, a market intelligence firm. (Id. ¶ 4.) He has regularly used surveys, sampling, statistics and market research in a variety of litigation and commercial contexts. (Id. ¶ 1.) Over the course of three decades, he has personally designed and analyzed hundreds of surveys including, inter alia, consumer decision-making. (Id. ¶ 2.) In addition, he has substantial

experience designing, conducting and using surveys to measure consumer opinions and behaviors.  (Id. ¶ 3.)

Dr. Van Liere was retained by UPS to review and opine on the reliability of the report submitted by Dr. Erath.  (Id. ¶ 10.)  Dr. Van Liere's analysis spans fifteen pages.  Based on his experience and review of Dr. Erath's report, Dr. Van Liere opines that Dr. Erath's survey and conclusions suffer from serious flaws regarding "design and implementation", as well as "sampling, representativeness, sample size and analysis".  (Id. ¶ 12.)  Among the major criticisms Dr. Van Liere discusses is Dr. Erath's failure to reduce bias in the survey results.  (Id. ¶¶ 15-22.)  One way of avoiding or minimizing such bias is by conducting surveys using a double-blind methodology—that is, hiding the purpose of the study from both the subjects and the interviewers/investigators; he asserts that this is standard practice. (Id. ¶¶ 15=18.)[4]  In the absence of a double-blind survey, respondents or interviewers may wittingly or unwittingly alter their behavior, and thus their responses, based on information they may have.  (Id. ¶ 18.)[5]  Dr. Van Liere states that by stating the organization behind the survey and the survey's purpose, the survey investigator may have affected the respondent's willingness to participate in the survey.  (Id. ¶ 20.)  In addition, because the survey investigators were from the Office of the New York State Attorney General, Dr. Van Liere infers they likely

---

[4] Dr. Van Liere cites a number of treatises, cases and other literature in support of this conclusion.

[5] Dr. Van Liere cites the scripted introductory language for the survey investigators in which they announced that they were calling from the Office of the New York State Attorney General and "researching shipping practices within the State."  (Id. ¶ 19.)

knew the desired outcome of the survey and may have knowingly or unknowingly leading respondents to desired responses.  (Id. ¶ 20.)[6]

In addition to observing a potential for bias, Dr. Van Liere found it significant that the staff who conducted the interviews were not trained and that the interviews were not accurately scripted.  (Id. ¶¶ 23, 26-27.)  According to Dr. Van Liere, a well-trained interviewer asks questions consistently, phrased exactly as they are written, and records the answers verbatim.  (Id. ¶ 24.)  This was apparently not done.  (Id.; see also Erath Revised Report at 4 (describing third category).)

Dr. Van Liere also asserts that the survey questions suffered from a number of deficiencies.  (Id. ¶¶ 28-31.)  Among the deficiencies are the failure to identify an individual shipment about which the interviewer was asking questions, instead asking the respondents if they had ever ordered anything from the listed set of companies. (Id. ¶ 30(a).)  The survey also failed to specify a time period in which these shipments may have taken place such that the questions addressed all shipments at all times.  (Id. ¶ 30(b).)  In addition, while some respondents received more than one package, they were never asked specifically asked the percentage of shipments that may have included cigarettes.  (Id. ¶ 30(c).)[7]

The second proposed expert UPS proffers to rebut the conclusions set forth in Dr. Erath's report is Faten Sabry.  Dr. Sabry holds a Ph.D in Business from the

---

[6] Dr. Van Liere distinguishes this case from one in which there are specific reasons or requirements for informing respondents of the identity of the survey sponsor.  (Id. ¶ 21.)

[7] Dr. Van Liere also cites a number of additional deficiencies in the survey that are not recited here in full; the reader is referred to his report.  (See generally ECF No. 325-7.)

Stanford Business School and a Masters in Economics from the American University in Cairo.  (Sabry Report ¶ 1.)  He is now an economist and Senior Vice President in the securities and mass torts practices at NERA.  (Id.)  Dr. Sabry has extensive experience in analyzing large databases as well as designing and analyzing sampling methods.  (Id. ¶ 3.)  He has used surveys in various publications and consulting assignments.  (Id.)  He has also personally designed surveys and conducted statistical analyses of shipping data.  (See generally id. ¶ 3-5.)

Like Dr. Van Liere, Dr. Sabry was retained by UPS to review and respond to the opinions of Dr. Erath.  (Id. ¶ 7.)  Dr. Sabry's analysis spans 24 pages.[8]  Based on Dr. Sabry's experience and his review of Dr. Erath's analysis, he opines that the estimates based on Dr. Erath's data are incorrect and unreliable.[9]  (Id. ¶ 19.)  As an initial matter, he believes Dr. Erath has not established that the sample of 32 respondents was sufficiently representative, and therefore, any conclusions based on that sample would be incorrect and unreliable.  (Id. ¶¶ 23-49.)  Dr. Sabry first states that the exclusion of 20 respondents from the group of 52 was improper and therefore significantly skewed the results.  (Id. ¶¶ 24-27.)[10]  He also finds that Dr.

[8] The Court does not recite the full detailed analysis set forth in Dr. Sabry's report here but refers the reader to that report for its contents.  (See generally ECF No. 325-7.)

[9] Dr. Sabry also concludes that there are several problems with the Dr. Erath's survey and sampling design and implementation.  (Id.)  However, he states that he "do[es] not include those points in [his] report" because he "reviewed the report of Kent Van Liere submitted by UPS in this matter", and "agree[s] with his conclusions".  (Id.)

[10] Dr. Sabry determined that the exclusion was improper based in part on his attempt to replicate Dr. Erath's analysis.  (Id. ¶ 23; see also id. ¶¶ 70-72.)  Rather than excluding respondents who denied having received packages from EExpress, Dr. Sabry states that Dr. Erath should have reported them as in a category of "those who did not receive cigarettes from EExpress."  (Id. ¶ 25.)

16

Erath overstated the share of the 32 respondents who said they had only ordered cigarettes from EExpress and that when the misclassification was corrected, the percentage of respondents who stated that they had purchased cigarettes and no other products could be as low as 29%.[11]  (Id. ¶ 41.)  He further finds that Dr. Erath's estimates are flawed because he used an incorrect formula to compute his confidence intervals.  (Id. ¶¶ 42-49.)  When Dr. Sabry includes the 20 respondents he alleges were improperly excluded, the results and confidence level change significantly.  (Id. ¶ 20(c).)  Finally, he opines that Dr. Erath failed to assess the impact of several forms of potential statistical biases, including selection bias and nonresponse bias.  (Id. ¶¶ 50-69.)

Based upon the information currently available to the Court, it appears that Dr. Erath lacks the qualifications to design and conduct the survey that forms the basis of his report.  At a deposition taken by the defendant, Dr. Erath testified that his primary experience as an expert is in providing opinions regarding damages in employment cases, and he has previously testified for plaintiffs on at least seven occasions.  (ECF No. 325-2 at 10:17-21, 25:12-17.)  Dr. Erath further conceded that he has never before designed a consumer survey (see e.g., id. at 29:20-30:10), personally interviewed survey respondents (id. 31:5-9), or hired or trained interviewers or supervised them while conducting a survey (id. 31:9-12, 74:9-75:17).

---

[11] Dr. Sabry finds that Dr. Erath improperly assumed that if a respondent received one package containing cigarettes from EExpress, he then assumed that every package that he/she received from EExpress contained cigarettes.  (Id. ¶ 29.)  Dr. Sabry performed a detailed analysis of the survey responses and determined that because questions were not asked as to individual shipments, Mr. Erath's assumption is without basis.  (Id.  ¶¶ 28-41.)  In particular, he criticizes the question "have you ever ordered anything from one of the following (EExpress) companies as failing to address respondents' individual shipments.

Dr. Erath also lacks any apparent training in survey design methods or experience in survey design more generally.  Dr. Erath's overall lack of survey experience undermines his ability to design and implement a survey according to a method that will best ensure reliable results.  In sum, Dr. Erath's training and experience fall well short of the basic requirements set forth in Daubert to assist the Court in assessing reliability.  See, e.g., Nimely, 414 F.3d at 396-97; S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).[12]

In addition to lacking the requisite qualifications to testify in this particular matter,[13] Dr. Erath has also rendered opinions that are demonstrably unreliable. Some of the most obvious flaws in the survey design are the most damning to Dr. Erath's analysis.  Setting aside the myriad issues with Dr. Erath's interpretation of the survey's results raised by Drs. Van Liere and Sabrym, the questions themselves cannot form a reliable basis upon which to make any generalizations regarding the contents of shipped packages.  As an initial matter, the failure to clarify a time period relevant to this case is a major flaw (see Van Liere Report ¶ 30(b)); but so too is the failure to identify whether a precise shipment contained cigarettes and whether if the respondent received multiple shipments that contents differed

---

[12] Plaintiffs bear the burden of demonstrating that their proffered expert is qualified; they must carry this burden by a preponderance of the evidence.  Daubert, 509 U.S. at 592 n.10 (discussing Federal Rule of Evidence 104(a)) (quotation marks and citation omitted); see also R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010) (citations omitted).  Here, a deposition was taken in which Dr. Erath's lack of qualifications was clearly established.  The Court therefore finds no reason to hold an additional hearing and in their opposition to this motion plaintiffs have not sought such a hearing.

[13] The Court emphasizes that it may well be that Dr. Erath is eminently qualified to testify in other types of matters; the Court here is concerned solely with specific qualifications relevant to testimony in this matter.

(id. ¶ 30(c)).  It is clear that if a respondent received more than one package and only one of the two in fact contained cigarettes, the second package should not have been assumed to have contained cigarettes, yet it was.  Of course, the questions asked in a survey are in many ways the most fundamental component of a survey, and any flaws in the questions will permeate throughout any analysis performed on the survey.

Unlike Dr. Erath, Drs. Van Liere and Sabry have extensive qualifications in consumer survey design and analysis.  (Van Liere Report ¶¶ 1-3; Sabry Report ¶¶ 1-3.)  The Court credits their extensive and directly relevant experience.  The detailed reports of these individuals provide compelling confirmation of the rather obvious points the Court has recited above as well as additional compelling reasons as to risk of unreliability.  The Court also credits the conclusions of Drs. Van Liere and Sabry.[14]  As a result, the Court finds Dr. Erath's survey design, how it was conducted and the conclusions he drew from it unreliable.  The Court therefore GRANTS defendant's motion to preclude his testimony.

B.   Dr. Aviv Nevo

Plaintiffs do not challenge Dr. Nevo's qualifications.  (ECF No. 330 at 4.)  His credentials are, nonetheless, important to this Court's assessment of the reliability of his testimony, as a highly qualified expert is more likely to have used a reliable

---

[14] The parties did not submit replies in connection with the Daubert motions.  If, however, plaintiffs have any information suggesting that Drs. Van Liere or Sabry are not qualified or that their opinions are incorrect, they are invited to submit it to the Court forthwith.  The Court notes, however, that separate and apart from Drs. Sabry's and Van Liere's substantive criticisms of Dr. Erath, Dr. Erath's lack of qualifications forms an independent basis for his preclusion.  Consequently, any such submissions will not alter the outcome of the Court's ruling herein as to Dr. Erath.

methodology.  Dr. Nevo has undisputed expertise in the areas of consumer behavior, empirical industrial organization, antitrust and competition economics and econometrics.  (Nevo Report ¶ 2.)  His research has focused on estimating consumer demand and analyzing how consumers make choices in response to price changes, among other things.  (Id.)  His work has been published in a number of leading economics journals.  (Id.)  He has taught in his areas of expertise for more almost two decades.  (Id.)  And he has served as both an arbitrator and an expert in proceedings involving the tobacco industry.  (Id. ¶¶ 3-4.)

Dr. Nevo was retained by UPS to address "as a matter of economics, not legal theory, what the correct approach would be to compute economic harm (if any) under the assumption that the alleged behavior has been proven."  (Id. ¶ 9.)  UPS also asked Dr. Nevo to address:

> the extent to which the alleged actual sales volume of the untaxed cigarettes allegedly shipped by UPS to New York buyers (the 'cigarettes at issue') reliably estimates the volume of cigarettes on which the City and State of New York would have collected taxes ('NY-tax-paid cigarettes'), absent UPS's alleged conduct ('the but-for world').

(Id.)  According to Dr. Nevo, the economic harm, if any, suffered by plaintiffs consists of the difference between the tax they actually collected during the period of alleged behavior by UPS and the tax that they would have collected in the but-for world in which, by assumption, UPS does not ship cigarettes to New York buyers.  (Id. ¶ 12.)  The central focus of Dr. Nevo's economic analysis is determining whether buyers of the cigarettes at issue would have likely switched to alternatives in the but-for world, and if so, which ones.

Dr. Nevo opines that as a matter of basic economics, it is incorrect to assume that, absent UPS's alleged conduct, sales of NY-tax-paid cigarettes would have increased by the number of cigarettes at issue.  (Id. ¶ 13.)  He further opines that such a position would be correct economically only if, in the but-for world, all customers diverted their sales from the alleged illegal shipments to NY-tax-paid cigarettes did not purchase other products that carry no tax or a lower New York tax, including untaxed Native American cigarettes, other non-cigarette tobacco products and non-tobacco nicotine replacement products.  (Id.)  In addition, he posits that diversion to NY-tax-paid cigarettes would be far from complete and that at most, a small fraction of sales of the cigarettes at issue would be diverted in the but-for world to sales of NY-tax-paid cigarettes.  (Id. ¶ 14.)  He therefore concludes that the lost tax revenue that plaintiffs seek to recover as damages is not reasonably tied to UPS's alleged conduct.[15]  (Id.)

---

[15] The various steps in Dr. Nevo's analysis are not critical to the outcome of this motion.  However, to understand his argument it is helpful to outline them.  Dr. Nevo begins with an "overly conservative" assumption that diversion from the cigarettes at issue to NY-tax-paid cigarettes is represented by the share of NY-tax-paid cigarettes out of total cigarette consumption from 2010 to 2015. (Id. ¶ 14(a).)  Using standard methods to compute the share of untaxed cigarettes, he concludes that a "diversion-by-share" assumption implies that, at most, 56% of sales of the cigarettes at issue would be diverted in the but-for world to sales of NY-tax-paid cigarettes.  (Id.)  He further concludes that this diversion by share is not the most appropriate way to measure true diversion—but that it does provide an upper bound.  (Id. ¶ 14(b).)  He next examines the academic literature to obtain what he characterizes as "more realistic estimates of the relevant diversion".  (Id. ¶ 14(c).)  He points to several academic papers that he argues show that diversion from tax-paid cigarettes to untaxed cigarettes comprises a very large fraction of the response to increased cigarette taxes.  (Id.)  One study examines the impact of a change in NY tax policy on the availability of Native American cigarettes and finds that diversion from untaxed cigarettes to NY-tax-paid cigarettes in response to this change was on the order of 5%.  (Id.)  A second study, which estimates the impact of tax increases in a number of states on the diversion from tax-paid cigarettes to untaxed cigarettes (i.e., diversion to cigarettes purchased in a different, presumably lower tax jurisdiction), suggests that diversion to NY-tax-paid cigarettes would be at most on the order of 17%.  (Id.)  Based on this research, he concludes that diversion from the cigarettes at issue to NY-tax-paid cigarettes would be minimal.  (Id.)  Finally, Dr. Nevo opines that the diversion from the cigarettes at issue to NY-tax-

Plaintiffs argue that, as a matter of law, their damages theory cannot be rebutted with testimony concerning a theoretical but-for world in which the alleged harm would have occurred by different means. (ECF No. 330 at 9-12.) That is, plaintiffs submit that defendant may not seek to reduce its damage exposure by suggesting that even if the cigarettes had been taxed, that plaintiffs still would not have received the tax receipts they now claim as damages. (Id.) According to plaintiffs (and as described above), this is the equivalent of arguing that since a bank was likely to be robbed by either the actual robber or a different individual, the actual robbers should not be held responsible for the entirety of the loss. (Id. at 5.) This is a colorful, but inapposite, analogy.[16]

The principal case that plaintiffs cite in support of their rejection of defendant's proffer of a but-for world is In re Elec. Books Antitrust Litig., No. 11-md-2293 (DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014). However, the facts and theories of liability in that complex antitrust case are entirely different from those here, and the legal reasoning arises in the procedural context of, and is confined to, class certification. See 2014 WL 1282293, at *1 (discussing motion for

---

paid cigarettes would be lower still if one accounted for the "fact" that some demand is diverted outside the cigarette category entirely in response to tax increases. (Id. ¶ 14(d).) Some buyers of the cigarettes at issue would switch in the but-for world to non-cigarette tobacco products such as cigars, little cigars, and snuff, others would switch to non-tobacco products such as nicotine gum, patches, and e-cigarettes, and others would quit using all such products. (Id.)

[16] It is worth noting that defendant does not stand in the shoes analogous to those of a bank robber; that would be the retailer who may make taxable sales and tax collection. Rather, another possible analogy would be that of a yellow cab driver awaiting a fare at a taxi stand: the robbers who are most directly responsible for the loss to the bank jump in one waiting cab versus another; had the cab just behind been chosen, it is possible that a similar result would have occurred (e.g., there may or may not be factors brought to bear as to whether a driver might reject the fare, declining involvement, or whether there were reasons why such a declination could not occur with regard to either driver one or two.)

class certification before the court).

It is certainly clear that the use of but-for worlds is commonplace in assessing damages in many different scenarios.  For example, use of a but-for world is appropriate when the appropriate measure of damages is the difference between the loss a plaintiff would have suffered (if any) in the absence of offending conduct versus what he/she in fact suffered.  See, e.g., Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995) ("The general rule for measuring damages for breach of contract has long been settled.  It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.") (internal quotation marks, alterations and citations omitted) (emphasis added); World of Boxing, LLC v. King, 634 F. App'x 1, 3 (2d Cir. 2015) ("Under New York law, a plaintiff may recover damages based on his reliance interest, including expenditures made in preparation or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.") (internal quotation marks and citations omitted) (emphasis added); Kinek v. Gulf & W., Inc., 817 F. Supp. 353, 356 (S.D.N.Y. 1993), aff'd sub nom. Kinek v. Paramount Commc'ns, Inc., 22 F.3d 503 (2d Cir. 1994) (describing measure of damages in ERISA action as "what amount it would take to put the plaintiffs in the position they would have been in but for the defendant's breach.") (emphasis added).

The rationale for basing damages on a but-for world analysis is that in most cases—with the exception of cases involving punitive and treble damages—

plaintiffs are not entitled to recoup windfalls, i.e., damages beyond the harm suffered.  See, e.g., Indu Craft, Inc., 47 F.3d at 498 (declining to award damages amounting to a "windfall" that would place plaintiff "in a better economic position than it would otherwise have occupied"); Topps Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 261–62 (S.D.N.Y. 2005) (explaining that damages awards for breach of contract cannot "put the non-breaching party in a better financial position that they would have occupied but for the breach.") (citation omitted) (emphasis in original).  That is, damages are not intended to place a plaintiff in a position better than he/she would have been in the absence of the alleged conduct.

Here, if defendants prove that had the cigarettes been stamped, plaintiffs would nevertheless not have collected as much taxable revenue as they now seek, and this is certainly relevant to any ultimate damages recovery.[17]  Of course, whether there is indeed a but-for world that reduces plaintiffs' a damage claim in fact is a question for the trier of fact.  It is enough that, at this juncture, there is no legal basis for this Court to reject normal propositions pertinent to the calculation of civil damages.  The Court therefore finds that Dr. Nevo's testimony meets the basic requirement of relevance necessary for admissibility.  See Fed. R. Evid. 401.

---

[17] The Court notes that plaintiffs have also made claims pursuant to the federal Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 et. seq., and other statutory schemes in which penalties may be available.  The Court is unaware of legal support suggesting that penalty imposition is amenable to a but-for analysis.  Thus, it is possible that at best Dr. Nevo's "but-for" world is applicable only to plaintiffs' claim for compensatory damages.

C.  Farrell Delman

Farrell Delman is the current president of TMA, an organization formerly

known as the Tobacco Merchants Association.  (Delman Amended Report ¶ 1.)   He

has held that position since 1981.  (Id.)  TMA is a trade association that prepares

and supplies its members with factual information "about the global tobacco and e-

vapor industry."[18]  (Id. ¶ 2.)  It also provides, inter alia, non-member organizations

such as the World Health Organization, the Food and Drug Administration, the

United States Tax and Trade Bureau and state revenue departments with similar

information.  (Id.)  Among other things, Mr. Delman oversees TMA's regular

production of bulletins tracking tax, policy and market developments relating to

tobacco products in 50 states and 180 countries.  (Id. ¶ 3.)  In his report, Mr.

Delman states that he was retained by UPS to:

> opine, based on my extensive knowledge of and experience with the tobacco
> industry, on the effect of increased cigarette excise taxes on the demand for
> alternatives to taxed cigarettes, including little cigars, cigars, and roll your
> own tobacco. In addition, I have been asked to explain many kinds of
> products sold by Native American tobacco retailers in the State to meet the
> demand for lower cost tobacco alternatives.

(Id. at 3.)

Mr. Delman's report spans 13 pages.  (Id.)  Mr. Delman opines that, in sum,

federal and state taxes on cigarettes increased during the 2000s, including in New

York State and New York City, and, during that time, New York State had the

highest state increase in taxes.  (Id. ¶ 10.)  Mr. Delman draws a direct linkage

---

[18] TMA employs a staff of 29 in three locations:  Princeton, New Jersey, Paris, France and
Hyderabad, India.  (Id.)

between these tax increases and the increased demand for, and the proliferation of, "cheaper alternative tobacco products." (Id.)  Mr. Delman further asserts that these alternative products garnered lower taxes than cigarettes—some alternatives were simply taxed at a lower rate than cigarettes, and others were taxed at a higher rate, but were priced less than cigarettes, resulting in lesser revenue overall.  (Id.)  Mr. Delman further opines that the types of retailers at issue in this litigation met the demand for alternative tobacco products by selling not only cigarettes, but also little cigars, roll your own tobacco, snuff, snus and the liquid used in e-cigarettes. (Id. ¶ 11.)

Mr. Delman's primary opinions break into two separate pieces:  first, that there is a linkage between increased taxes on cigarettes and consumer demand for cheaper alternatives, and secondly, that the types of smoke shops at issue in this litigation carried products that attempted to meet that demand.  (Id. ¶¶ 10-11.)  The methodology Mr. Delman uses to make his first point differs in obvious ways from that used to establish his second point.  With regard to his first point, Mr. Delman discusses tax law increases, the nature, legal and tax history of "little cigars", a comparison of the tax structure with regard to regular cigars, and comparisons of tax changes among various tobacco products.  (Id. ¶¶ 12-29.)  He then cites a variety of studies undergirding his asserted link between cigarette tax increases and an increase in consumer demand for little cigars and other alternative tobacco products.  (Id. ¶¶ 30-32.)

Mr. Delman uses an entirely different and more anecdotal methodology to make his second point.  Specifically, he states that he has spoken with distributors and visited three Native American tobacco retailers in New York State and, based the information obtained from these sources, he concludes that Native American tobacco retailers sell a wide range of alternative tobacco products, "especially little cigars."  (Id. ¶ 33; see also id. ¶¶ 34-44.)  None of the retailers he visited are among those with shipments at issue in this litigation.  (See id. ¶¶ 34-44.)

Based upon the analysis underlying these two main opinions, Mr. Delman concludes with a third:  that plaintiffs' assumption that Native American tobacco retailers must have shipped cigarettes is not reasonable.  (Id. at 13.)  Mr. Delman bases this opinion on anecdotal information gleaned from the conversations and site visits described above, as well as his years of industry experience.  (Id. ¶¶ 45-47.)  He opines that cigarettes are but one of many products sold by tobacco retailers.  Specifically, he argues that virtually all tobacco retailers, whether on a Native American reservation or not, tend to sell an array of tobacco and non-tobacco products, including not cigarettes but also large cigars, little cigars, roll-your-own tobacco and, increasingly, e-vapor products, including liquids and devices. (Id. ¶ 46.)

Plaintiffs seek to preclude Mr. Delman on the basis that his testimony is both irrelevant and unreliable.  (ECF No. 327 at 5.)  Their relevancy argument is quickly disposed of.  Plaintiffs' position in this case asserts that most if not all of the packages that UPS transported from Native American reservations contained

unstamped cigarettes.  Based upon the pre-trial submissions of which the Court is aware, none of the parties purport to have evidence demonstrating the contents of all of the packages were with any precision.  Consequently, circumstantial evidence and inference will likely play a significant role in making any final determination in that regard.  Accordingly, if Mr. Delman can, based on reliable evidence including his experience, support an inference that the packages contained goods other than unstamped cigarettes, such testimony is plainly relevant to a fact in issue.  See Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence.")  Thus, plaintiffs' claim that testimony regarding "little cigars" is irrelevant is incorrect.

Plaintiffs also assert that Mr. Delman's conclusions are unreliable because they are based on three studies and visits to reservation smoke shops not here at issue.[19]  (ECF No. 327 at 10.)  After a careful review of Mr. Delman's report and plaintiffs' criticisms, the Court concludes that although there are certain issues with the strength of Mr. Delman's conclusions, those reservations go to weight and not admissibility.  The basic proposition that Mr. Delman discusses—that increased taxes on cigarettes led to increased consumer demand for alternatives, and what those alternatives were—is one that he is eminently qualified to discuss.  Mr. Delman, as president of TMA, certainly has sufficient background in the industry to

---

[19] The Court focuses it discussion on Mr. Delman's conclusions regarding the existence and prevalence of non-cigarette alternatives available in the marketplace.  It does not allow Mr. Delman's conclusion regarding the reasonableness of plaintiffs' assumption regarding the prevalence of cigarette shipments, as this is an opinion on an ultimate fact issue that invades the province of the Court.  See Bilzerian, 926 F.2d at 1294; Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 512 (2d Cir. 1977).

understand market trends.  (Delman Amended Report ¶¶ 1, 3.)  Moreover, there is no fault found with his discussion of tax increases.  (See id. ¶¶ 12-29.)  It may be that Mr. Delman overstates the impact of tax increases on consumer behavior, or not.  That will be an issue for trial.

Plaintiffs criticize Mr. Delman for never having written an article or published an academic paper in his area of expertise.  (ECF No. 327 at 9.)  That is of course not required, particularly when an individual's proffered expertise is based on hands-on experience.  Emig v. Electrolux Home Prod. Inc., No. 06-CV-4791 (KMK), 2008 WL 4200988, at *4 (S.D.N.Y. Sept. 11, 2008) (finding expert to testify on assembly instructions for refrigerator door handles "based primarily on [his] twenty-seven years of experience in industrial engineering", and even though expert had "not published any literature or lectured on consumer instructions or warnings"); Adesina v. Aladan Corp., 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006) (finding ear, nose and throat doctor qualified to opine on latex allergies even though he "never published any articles on latex allergy or any other medical subject").  Plaintiffs also criticize Mr. Delman for not opining on consumer strategies for tax avoidance.  (ECF No. 327 at 11-15.)  However, such an opinion would have almost certainly been subject to other vulnerabilities, such as an anecdotal basis for the information, potential criminal or civil exposure for any subjects who formed the basis for a more rigorous analysis, and the like.

Plaintiffs also argue with more persuasiveness that a three-day trip to what were apparently conveniently located but random smoke shops is an insufficient

basis upon which to opine on the contents of reservation smoke shops more generally.  (Id. at 16-18.)  The Court agrees.  However, that fact does not undermine Mr. Delman's testimony concerning the availability of alternatives to cigarettes for those seeking tobacco products or alternatives, which occupies the bulk of his report.  In fact, Mr. Delman's visits to the smoke shops may corroborate (or not) other views he has based on his more general industry experience.  Defense counsel is cautioned that the Court will not accept that the visit to three unrelated smoke shops provides a sufficient basis for an opinion as to the content of all smoke shops.[20]

In sum, Mr. Delman has sufficient qualifications and a sufficient basis to offer testimony in this matter.  Plaintiffs' motion to preclude his testimony is therefore DENIED.

---

[20] The Court assumes that neither defendant nor plaintiffs will proffer evidence that all smoke shops had the same wares; if that assumption is incorrect, then Mr. Delman's three-shop visit would take on increased significance.

CONCLUSION

For the reasons set forth above, defendant's motion to preclude plaintiffs' proposed expert Dr. Erath is GRANTED, and plaintiffs' motions to preclude UPS's proposed experts Dr. Nevo and Mr. Delman are DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 323, 329 and 326.


SO ORDERED.

Dated:         New York, New York
               September 10, 2016


_____
     KATHERINE B. FORREST
     United States District Judge