UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                Plaintiffs,

             -v-

UNITED PARCEL SERVICE, INC.,

             Defendant.

------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>September 10, 2016</u>

15-cv-1136 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      Trial in this matter is scheduled to commence in a week.  Pending before the

Court are two motions for summary judgment – one from each side –  which require

that this Court determine, once and for all, legal issues relating to N.Y. Tax Law

§ 471 (2009).  (<u>See</u> ECF Nos. 285, 299.)  The motions became fully briefed as of

September 2, 2016.  While this decision follows closely on the final briefing, the

legal issues in the motions are ones with which this Court has substantial

familiarity.[1]

      Over the course of this litigation, the parties have sought a number of

different rulings regarding legal issues arguably or actually pertinent to § 471.

---

[1] The Court here recounts only that background which is relevant to resolution of the two pending motions for partial summary judgment.  The Court assumes familiarity with the history of this litigation and therefore does not fully set forth that description or the general outlines of plaintiffs' allegations in this decision.  For further background, the Court refers the reader to the Court's prior decisions and the parties' statements of undisputed material facts, submitted under Local Rule 56.1. (<u>See</u> ECF Nos. 301, 311, 344, 347.)

Plaintiffs initially moved to strike certain of United Parcel Service, Inc.'s ("UPS") Affirmative Defenses, including UPS's Seventh Affirmative Defense (which implicates § 471). (ECF No. 89.) The Court granted that motion with respect to UPS's Seventh Affirmative Defense on February 8, 2016. (ECF No. 177 at 7, 47-64.) UPS then moved for reconsideration. (ECF No. 187.) After a great deal of additional briefing and oral argument, the Court determined that, pursuant to the standards applicable to motions to strike, there were potential fact patterns which could result in that defense having applicability; the facts were insufficiently developed on the motion to make that determination fully and finally. The Court therefore vacated its prior determination, bringing UPS's Seventh Affirmative Defense back to life. (ECF No. 258.)

Core legal issues raised by § 471 and the Contraband Cigarettes Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341, 2342, are now squarely before the Court in the two pending motions. In various ways, the parties ask whether unstamped cigarettes transported by UPS to and from Indian reservation retailers constituted contraband under the CCTA during the period when New York State followed a forbearance policy vis-à-vis tax collection from such entities, and when certain injunctions and stays were in place with respect to an amended § 471 and a tax collection scheme under § 471(e). The Court is now prepared to answer that question fully and finally: "Yes."

## I.     A BRIEF RECITATION OF THE PARTIES' POSITIONS

In short, plaintiffs take the following position: § 471 long ago established a stamping requirement for cigarettes; the CCTA provides that transporting contraband cigarettes is a violation punishable by penalties and/or damages; and UPS transported unstamped cigarettes to and from Indian reservation retailers and therefore violate the CCTA.  Plaintiffs assert that neither New York State's forbearance policy nor various judicial injunctions and stays eliminated the stamping requirement or impacted the legality of UPS's actions.

Defendant UPS counters with its Seventh Affirmative Defense.  That defense asserts that various injunctions and stays (including a non-judicial stay by way of New York State's executive forbearance) in place until June 2011, actually or effectively prevented the implementation and enforcement of amended § 471 and § 471-e.[2]  According to UPS, since enforcement was enjoined or stayed – including through the forbearance policy – any cigarettes it may have transported during such time did not constitute "contraband" as defined by the CCTA.  Put differently, in light of executive forbearance as well as judicial injunctions and stays, only the pre-amendment version of § 471 remained in place; according to UPS, that statutory provision did not impose a stamping requirement or tax on shipments to reservation

---

[2] UPS's Seventh Affirmative Defense provides, in full: "Plaintiffs' claims are barred to the extent they are based on deliveries that they were enjoined from restricting, pursuant to orders enjoining the implementation and enforcement of the New York Tax Law §§ 471 & 471-e, pertaining to Native American persons or entities.  See, e.g., Day Wholesale, Inc. v. State of New York, 856 N.Y.S. 2d 808, 811-812 (4th Dep't 2008); Oneida Nation of N.Y. v. Paterson, No. 6:10-CV-1071, 2010 WL 4053080, at *13 (N.D.N.Y. Oct. 14, 2010); Seneca Nation of Indians v Paterson, No. 10-CV-687A, 2010 WL 4027795, at *4 (W.D.N.Y. Oct. 14, 2010); Seneca Nation of Indians v. State of N.Y., 932 N.Y.S.2d 763 (Sup. Ct. N.Y. County 2011)."  (ECF No. 199 at 17, Answer, Defenses and Affirmative Defenses ¶ 7.)

retailers because it could not.  UPS points to Supreme Court precedent and argues that the legality of taxation schemes that may impact Indian tribe members depends in part on who bears the legal incidence of the tax; since under § 471 only a non-tribe member consumer bears the legal incidence, it follows that it was perfectly lawful for reservation retailers to receive shipments of unstamped cigarettes in part because such receipt occurred prior to a taxable event – that is, a sale to a non-reservation consumer.  According to UPS, any other result would mean that the legal incidence of the tax was in fact being imposed on a reservation retailer and such a tax could not pass legal muster.  In short, as with "Schrödinger's cat," UPS posits that whether cigarettes constitute contraband may only be determined when a sale to a consumer has occurred and not before; before that point, the cigarettes retain a potential for being either contraband or non-contraband.

From their respective positions, the parties ask for the following relief.  Plaintiffs seek summary judgment dismissing UPS's Seventh Affirmative Defense once and for all.  Defendant seeks numerous separate determinations:

1. That States may not impose taxes on tribes or tribal members for activities that take place on their reservations;

2. That New York lacks power to tax any cigarettes sold on a reservation to a tribal member for personal consumption;

3. That neither pre-amendment nor post-amendment § 471 makes a sale of cigarettes to a reservation retailer a taxable event;

4. That pre-amendment § 471 did not require tax stamps for non-taxable cigarettes sold on-reservation to tribe members; due to pre-amendment § 471's lack of a viable mechanism to account for non-taxable on reservation

sales, reservation retailers could not be sanctioned under pre-amendment § 471 for on-reservation sales of unstamped cigarettes;

5. That absent a viable mechanism, New York State could not require tax stamps on any cigarettes sold to consumers on reservations;

6. That the only sanctionable conduct regarding unstamped cigarettes on reservations under pre-amendment § 471 was active participation in large-scale off-reservation sales;

7. That the stamping requirement imposed by the amended § 471 could not be enforced against tribes, including tribal retailers, until the stays and injunctions were lifted on June 22, 2011;

8. That the stays and injunctions that permitted tribes, including tribal retailers, to possess unstamped cigarettes also permitted carriers to deliver unstamped cigarettes to them [e.g. UPS];

9. That the CCTA imposes liability only for unstamped cigarettes that are both taxable and are required to bear stamps; and finally,

10. That UPS is entitled to summary judgment on all of plaintiffs' claims that are based on alleged deliveries of unstamped cigarettes to reservation retailers before June 22, 2011.

This Court views requests Nos. 8 and 10 above as truly focused on UPS; an analysis of whether each of these two determinations is correct is necessary to resolve these motions. The remainder of the determinations defendant seeks are either simply propositions of law as to which there is no particular dispute and which also do not address UPS's own liability under the CCTA, or are otherwise directed at the legal position of the retailers and tribe members, not UPS.

## II. THE STAYS AND INJUNCTIONS

A quick read of UPS's Seventh Affirmative Defense suggests that it relates solely to judicially imposed injunctions and stays. As has been made clear throughout this litigation, however, UPS's Seventh Affirmative Defense has broader

reach.  The defense incorporates a non-judicial stay in place as a result of New York State's forbearance policy with regard to enforcement of § 471 vis-à-vis reservation retailers.  Below, the Court reviews each of the judicially imposed injunctions and stays and then turns to the non-judicial forbearance policy.

A.      Judicially Imposed Injunctions and Stays

The Court's review of the judicially imposed injunctions and stays[3] reveals a few key points, certain of which are so obvious as to hardly need mentioning: (1) UPS was not a party in any of the actions in which the injunctions and stays were issued; (2) UPS is not a reservation retailer or tribe member; and (3) each of the injunctions and stays relate to § 471's tax collection mechanisms with regard to on-reservation sales of cigarettes to non-exempt consumers.

Prior to the effective date of the 2010 amendments to § 471 et seq., various tribes brought actions in federal and state court to enjoin implementation of certain provisions, and successfully obtained injunctions or stays as to the amended law's enforcement pending appeal – these are the judicially imposed injunctions and stays that UPS cites in its Seventh Affirmative Defense.  A primary issue in each of the cases in which an injunction or stay was issued was the extent to which New York State could properly impose certain burdens on tribe members and/or reservation retailers, or the lawfulness of New York's coupon and collection scheme(s) more generally.  None of the injunctions or stays purported to enjoin the

---

[3] The stays and preliminary injunctions at issue were, in relevant part, in effect from September 2010 through June 2011.

imposition of the basic stamping requirement found in § 471, nor did any address instances in which a non-tribal carrier (such as UPS) transported unstamped cigarettes between reservation retailers.  A review of each of these decisions makes it clear that the actions were concerned with tax collection mechanisms, not the foundational stamping requirement in § 471.

In its Seventh Affirmative Defense, UPS first cites Day Wholesale, Inc. v. New York, 856 N.Y.S.2d 808 (4th Dep't 2008).  This decision addressed whether the version of § 471-e enacted in 2005 was "in effect" and could be enforced with regard to reservation retailers.  The basic contention was that the effectiveness of the statute was predicated on the enactment of certain regulations by the New York State Department of Tobacco and Firearms ("DTF"), and that the DTF had failed in this regard.  The Appellate Division concluded that § 471-e was not in effect.  Id. at 810-11.  That decision ultimately led to the 2010 amendments.

The second decision cited in UPS's Seventh Affirmative Defense is Seneca Nation of Indians v. Paterson, No. 10-CV-687A, 2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010).  In that case, the Seneca Nation sought to enjoin the implementation of the 2010 amendments to §§ 471 and 471-e relating to the taxation of cigarettes sold by reservation retailers.  Id. at *1.  Although the district court denied the tribes' motion for a preliminary injunction because it concluded that they failed to show a likelihood of success on the merits as to their argument that the amendments violated tribal sovereignty rights, id., the court granted a "stay of

7

enforcement" of the 2010 amendments to §§ 471 and 471-e pending an interlocutory

appeal, id. at *2, 4.

The third decision cited in the Seventh Affirmative Defense is Oneida Nation

of New York v. Paterson, No. 6:10-CV-1071, 2010 WL 4053080 (N.D.N.Y. Oct. 14,

2010). In that case, the Oneida Nation also sought to enjoin enforcement of the 2010

amendments to §§ 471 and 471-e.  In contrast to the decision in Seneca Nation

(which was released on the same day), the district court in Oneida Nation granted a

broad preliminary injunction, as follows:

> Defendants, their agents, servants, employees, and attorneys, as
> well as all other persons who are in active concert or participation with
> any of the foregoing persons, are PRELIMINARILY ENJOINED and
> PROHIBITED as against the Oneida Nation of New York, or against
> any wholesalers, suppliers, stamping agents or others providing to the
> Oneida Nation cigarettes that do not bear a State of New York tax
> stamp, from enforcing the State of New York's cigarette taxing statutes
> and regulations, including Tax Law §§ 471 & 471–e (as amended) and
> the Department of Taxation and Finance's emergency regulations
> issued June 22, 2010, and published in the New York State Register on
> July 7, 2010, and readopted on September 13, 2010; and from
> restricting in any manner, with respect to the Oneida Nation and
> wholesalers, suppliers, and stamping agents who supply the Oneida
> Nation, the Oneida Nation's purchase, acquisition, sale, distribution,
> transportation, or possession of cigarettes not bearing a New York tax
> stamp.

Oneida Nation, 2010 WL 4053080 at *13.

The Seneca Nation and Oneida Nation cases were consolidated for purposes

of appeal to the Second Circuit.[4]  See Oneida Nation, 645 F.3d 154, 163 (2d Cir.

---

[4] A third case, Unkechauge Indian Nation v. Paterson, 752 F. Supp. 2d 320 (W.D.N.Y. 2010), was also
consolidated for review.  See Oneida Nation, 645 F.3d at 163.

2001).  The Second Circuit affirmed the district court's finding that the various tribes had failed to demonstrate a likelihood of success on the merits as to their arguments that the pre-collection scheme impermissibly imposed a direct tax or undue economic burden on tribal retailers and that the coupon and prior approval systems interfered with their rights of self-government and rights to purchase cigarettes free from state taxation.  Id. at 175.  The Second Circuit therefore vacated the preliminary injunction issued by the district court in Oneida Nation and vacated the stay of enforcement that had been issued by the district court in Seneca Nation.[5]  Id. at 175-76.

The final decision cited in the Seventh Affirmative Defense is Seneca Nation of Indians v. State of New York, 31 Misc.3d 1242(A), 932 N.Y.2d 763 (table), 2011 WL 2436815 (Sup. Ct. Erie Cty. June 8, 2011).  There, the Seneca Nation sought to enjoin the DTF from enforcing Rule 20 N.Y.C.R.R. § 74.6, published in the State Register on November 10, 2010, which implemented the 2010 amendments to §§ 471 and 471-e, on the ground that DTF violated certain procedural requirements of the State Administrative Procedure Act, thus rendering the Rule invalid.  Id. at *1. Although the New York State Supreme Court had initially issued a temporary restraining order on May 10, 2011, that restrained and enjoined "implementation and enforcement of N.Y. Tax Law § 471(1)(2)(5) and 20 N.Y.C.R.R. § 74.6," id. at *2, the court ultimately concluded that procedural requirements were adequately met

---

[5] The Second Circuit also vacated the stay that had been issued in Unkechauge Indian Nation. Oneida Nation, 645 F.3d at 175-76.

and rejected the Seneca Nation's request for permanent injunctive relief and lifted the stay of enforcement, id. at *6.  The New York State Appellate Division affirmed that conclusion on appeal.  Seneca Nation of Indians v. State, 933 N.Y.S.2d 500, 502 (4th Dep't 2011).

Notably, the only provisions implicated by any of the judicially imposed injunctions or stays were the newly added § 471(5), § 471(6), and the amended § 471-e – all part of the tax collection mechanism in the 2010 amendments to § 471. None of the judicially imposed injunctions and stays impacted the pre-amendment text of § 471 or the other provisions of the 2010 amendments.  Simply put, no court ever enjoined or stayed the underlying stamping requirement and no court ever enjoined or stayed the fundamental imposition of a tax on all cigarettes sold by reservation retailers to non-tribal members.

A review of each of the decisions cited in UPS's Seventh Affirmative Defense demonstrates their inapplicability for another reason: UPS was not a party in any of those actions or identified as an intended beneficiary.  As a matter of law, UPS lacked entitlement to protections afforded by those injunctions or stays.  See Price v. City of Stockton, 390 F.3d 1105, 1117 (9th Cir. 2004); Packard Instrument Co. v. ANS, Inc., 416 F.2d 943, 945 (2d Cir. 1969); see also Edgar v. MITE Corp., 457 U.S. 624, 649 (Stevens, J., concurring in part).  Thus, to the extent UPS's Seventh Affirmative Defense asserts that judicially imposed injunctions and stays prevented enforcement of § 471 as to UPS, that position is incorrect.

B.      Non-Judicial Forbearance Policy

There is a variation of this applicability argument: that the forbearance policy demonstrated a broader application of the injunction and stays in fact, and that UPS was entitled to legal protections as a result of this broader application. UPS casts this argument in the form of estoppel.  It asserts that because the State took the position that it was barred from enforcing the amended law at all, and officials from the DTF told UPS that the State could not enforce the amended law (and instructed UPS to continue to transport packages), plaintiffs should be equitably estopped from asserting a narrower view of the injunctions and stays. This argument also fails.  First, a decision by the executive branch to act in a manner broader than the injunctions or stays required did not expand the literal scope of the injunctions and stays; the executive branch, by its actions alone, did not alter the terms of the injunctions and stays or the parties to whom they applied as a legal matter.  By the same token, the application of a forbearance policy generally did not eliminate the stamping and taxing requirement in § 471.[6]

The lack of direct applicability of the judicially imposed injunctions and stays to UPS does not itself, however, dispose of UPS's Seventh Affirmative Defense entirely.  Indeed, resolving direct applicability to UPS is the easy part of this

---

[6] Defendant further errs in relying on judicial estoppel.  According to defendant, plaintiffs represented to the Second Circuit that they had been "blocked from implementing a new tax law affecting millions of cigarette transactions and hundreds of millions of dollars in revenue."  (UPS's Mem. in Opp. to Pls.' Mot. for Summ. J. at 20.)  As discussed throughout this opinion, the forbearance policy addressed collection, it did not address the underlying fundamental taxation and stamping requirement.  Plaintiffs' statement to the Second Circuit is simply not in tension with its position here that (and as discussed below) even during the period of forbearance, the tax and stamping requirements continued to exist as a matter of law.

decision.  The more difficult issue is UPS's argument outlined earlier in this decision: that the cigarettes failed to meet the definition of contraband based on the fact that whether cigarettes may be taxed depends on the identity of the ultimate purchaser from the retailer.  Thus, the argument goes, cigarettes delivered to a reservation retailer who may resell them to reservation consumers are not subject to tax.  UPS argues that such cigarettes need not therefore be stamped because a stamp is not required unless the cigarettes are taxable.  This is where the textual limitations of pre-amendment § 471 and the forbearance policy come into play: during the period in which the injunctions, stays, and forbearance were in place, there was no way to tell the status of the cigarettes in transit, i.e., they resembled "Schrödinger's cat."  From New York State's perspective, the box was never opened.  Thus, in transporting cigarettes to reservation retailers, UPS was transporting cigarettes before any sale to any consumer had occurred, and the cigarettes remained in a state of suspension, neither taxable nor exempt.  UPS would argue that even beyond the moment of pre-sale transportation, forbearance and the lack of collection mechanisms in the statute meant that the legal status of those cigarettes would be unknown.  This, according to UPS, makes it both logically and legally impossible for it to have been transporting "contraband."

This Court initially viewed these arguments as presenting difficult issues. Articulating them in a manner that does justice to UPS's arguments is, in fact, challenging.  However, after spending significant time on these issues, the Court has determined that the arguments are fundamentally flawed.  Below, the Court

walks through the CCTA and § 471 in some detail.  But as a preview, the following points dispose of UPS's position.  To start, the CCTA imposes liability on conduct of persons who may engage in any one of the steps of trafficking in contraband cigarettes: shipping, transporting, receiving, distributing, or purchasing. 18 U.S.C. § 2342.  The liability of a person at one stage is not made dependent on the liability of another.  Thus, the liability (or non-liability) of the shipper, receiver, or seller may be different from that of the transporter.  UPS makes a core mistake when it assumes that its status is derivative of those in the chain ahead of it or behind it.  Nothing in the statute supports this position.

To explain why, it is necessary to discuss the CCTA generally and the elements that are necessary to establish a violation, and then to address some of the additional legal reasons why UPS's arguments do not work.  The same is true for the legal status of the cigarettes.  There is no textual reason why cigarettes which UPS is transporting cannot be contraband when in UPS's possession and non-contraband when they reach the retailer if the retailer in fact sells them to exempt reservation purchasers.  In short, neither the status of the cigarettes nor the status of UPS is derivative of the tax status of the receiver (the retailer) or the ultimate purchaser.  It is simpler than that.  UPS must look to whether cigarettes were required to bear a stamp during the relevant time; they were.  Pre-amendment § 471 instructed the world to proceed with caution, that taxability would be presumed, and that the possessor of the cigarettes would bear the burden of proving the opposite.  During the period of transport, UPS was just that person in

13

possession.[7]  The structure of the statute behooved UPS to transport only cigarettes bearing stamps since the law presumed taxability and UPS was apparently not in a position to prove exemption at that time.[8]

III.    CERTAIN LEGAL PRINCIPLES AND ARGUMENTS[9]

A.    The CCTA

The above analysis leads to the following pertinent question:  Were the unstamped cigarettes that UPS was transporting "contraband" under the CCTA?  If the cigarettes that UPS was transporting did not constitute contraband, then such transportation did not violate the CCTA.  UPS answers this question in the negative.  But UPS's logic is fundamentally flawed.

---

[7] UPS argues that, as a carrier, it could not be the person in "possession" of the cigarettes under the statute.  (UPS's Mem. In Supp. of UPS's Mot. for Summ. J. at 18; UPS's Reply Mem. In Supp. at 10.)  That is incorrect.  Section 471 and the CCTA must be read together.  The CCTA anticipates that one who "transports" cigarettes may violate the CCTA.  The only way that could happen is if that person – in the act of transporting – was in possession of the cigarettes.  If carriers such as UPS could never be "in possession" by the act of transporting, that provision of the statute would be superfluous and make no sense.  The law disfavors such an outcome.

[8] The Court notes that it is certainly neither logically nor practically impossible for UPS to have obtained assurance from the reservation shipper as to the ultimate destination of at least some of the cigarettes, thereby establishing the cigarettes' status.  For instance, it may have been possible for the retailer to have provided paperwork indicating that certain shipments were destined for resale to reservation consumers.  And, it may similarly have been possible for a reservation retailer to have informed UPS if they were not.  UPS assumed a risk when it transported cigarettes as to which it had no such information.  UPS took a business risk.  It may be that the reservation retailer had little motivation to provide any such information – the retailers were cloaked with the benefits of forbearance, but given the tortured history of enforcement in New York, who knew what the future might hold?  There might be a legitimate concern that paperwork provided to UPS could form the basis for future liability.  But the fact that the reservation retailers lacked such motivation, and UPS lacked pertinent information as a result, does not mean that UPS's conduct was immunized.

[9] Both motions before the Court are brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Both motions seek resolution of what are largely legal – not factual – issues.  The Court has applied the well-known standard applicable to summary judgment motions in this Circuit.

UPS views the legality of its status (either as a transporter of contraband or non-contraband) as necessarily dependent on the status of the reservation retailer (a receiver and seller of contraband or non-contraband) to whom it transported the goods. This is incorrect. The statute provides for individual liability for any one of the persons who have engaged in an enumerated act. The liability of one does not depend on the liability of another. The fundamental and most pertinent questions for UPS were therefore whether there was a stamping requirement and whether the cigarettes it transported to the reservations retailers were legally required to bear such a stamp, irrespective of whether any State executive authority was going to hold a reservation retailer to such requirement. Analysis of the CCTA and § 471 inexorably leads to the conclusion that there was a stamping requirement and that the cigarettes UPS transported to reservations were legally required to bear such a stamp.

The CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes . . . ." 18 U.S.C. § 2342(a). It is undisputed that UPS is in the business of "transport[ing]" packages. Thus, we know that UPS engages in a business which could potentially expose it to CCTA liability.[10]

The next step in the analysis is the definition of contraband. The CCTA defines "contraband cigarettes" as:

---

[10] The volume of any shipments UPS may have made of packages containing cigarettes is a question for trial.

a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other than [exempt individuals and entities, including permit-holding tobacco product manufacturers or warehouse operators, common carriers transporting cigarettes under a proper bill of lading, State license-holders, and government officers or employees acting in their official duties].

18 U.S.C. § 2341(2).  Thus, a violation of the CCTA requires the following elements:

(1) a person must knowingly ship, transport, received, possess, sell, distribute, or

purchase; (2) more than 10,000 cigarettes; (3) that do not bear evidence of the

payment of applicable taxes; (4) under circumstances in which state or local tax law

requires that such cigarettes bear evidence of the payment of applicable taxes.

18 U.S.C. §§ 2341, 2342.

It is undisputed that UPS transported at least some cigarettes to reservation

retailers that did not bear evidence of stamps.  But this does not fully resolve the

question of whether such cigarettes were in fact contraband.  The Court must next

ask whether the State "required" a stamp on such cigarettes.  Below, the Court

discusses § 471 of the New York Tax Law, which resolves this question.  To focus

the reader on the argument, and as discussed above, UPS's position is that whether

the circumstances "required" a stamp is necessarily dependent on the identity of the

ultimate consumer-purchaser; as the State may only tax non-reservation

consumers, one cannot know the answer as to whether a stamp is required prior to

knowing the purchaser.  UPS posits that if the law required all cigarettes to be

stamped, or otherwise required reservation retailers to sort out how to distinguish

between who was exempt or not, and pre-amendment § 471 provided no mechanism for this, the result would then be that the State would be improperly imposing a tax directly on a reservation retailer, which it cannot do.

> B.    New York Tax Law § 471 and §471-e

The cigarette stamping requirement is contained in § 471 of the New York Tax Law.  Section 471 was first passed in 1939, imposing a tax "'on all cigarettes possessed in the state by any person for sale' except when the 'state is without power to impose such tax.'"  City of N.Y. v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 122 (2d Cir. 2010) ("Golden Feather II") (quoting N.Y. Tax Law § 471).  Section 471 has been amended numerous times, but has been continuously in place in some form.  During the period relevant to this discussion, § 471 has always required the affixation of tax stamps with regard to cigarettes sold by Indian reservation retailers to non-tribal members.  City of New York v. Milhelm Attea & Bros., No. 06-CV-3620 CBA, 2012 WL 3579568, at *19 (E.D.N.Y. Aug. 17, 2012).

Prior to amendments enacted in June 2010 (i.e., the amendments at issue in this case), § 471 read as follows:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax or sold to the United States or sold to or by a voluntary unincorporated organization of the armed forces of the United States operating a place for the sale of goods pursuant to regulations promulgated by the appropriate executive agency of the United States, to the extent provided in such regulations and policy statements of such an agency applicable to such sales. . . . It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. Tax Law § 471(1) (2009).  As explained above, the provision imposing a tax on cigarettes in § 471 was never itself enjoined or stayed.  Prior to the 2010 amendments, § 471-e called for the implementation of a coupon system to allow Native Americans to purchase cigarettes without having to pay the otherwise applicable tax.  In pertinent part, that sub-section read as follows:

> Notwithstanding any provision of this article to the contrary qualified Indians may purchase cigarettes for such qualified Indians' own use or consumption exempt from cigarette tax on their nations' or tribes' qualified reservations.  However, such qualified Indians purchasing cigarettes off their reservations or on another nation's or tribe's reservation, and non-Indians making cigarette purchases on an Indian reservation shall not be exempt from paying the cigarette tax when purchasing cigarettes within this state.  Accordingly, all cigarettes sold on an Indian reservation to non-members of the nation or tribe or to non-Indians shall be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp.
>
> In order to ensure an adequate quantity of cigarettes on Indian reservations which may be purchased by qualified Indians exempt from the cigarette tax, the department shall provide Indian nations and tribes within this state with Indian tax exemption coupons as set forth in this section.  A reservation cigarette seller shall be able to present such Indian tax exemption coupons to a wholesale dealer licensed pursuant to this article in order to purchase stamped cigarettes exempt from the imposition of the cigarette tax.  Qualified Indians may purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp.

N.Y. Tax Law § 471-e (2006).  Sub-section 471-e does not itself impose a cigarette tax; that is accomplished by § 471.  Thus, it is clear that § 471 has a scope well beyond that of § 471-e.

Under the scheme envisioned in the pre-2010 version of § 471-e, tax stamps were required to be affixed to all cigarettes sold on reservations, but qualifying Native American consumers would have the opportunity to purchase cigarettes

18

exempt from the tax.  <u>Milhelm Attea</u>, 2012 WL 3579568, at *3.  The DTF, however, failed to implement the coupon system outlined in § 471-e, and instead publicly adhered generally to the "forbearance" policy discussed previously.  <u>Id.</u>  Confusion thus arose about whether sections 471 and 471-e were "in effect."[11]

In a May 2010 decision, the New York Court of Appeals made several important rulings and provided an important review of the history of § 471 in <u>Cayuga Indian Nation of New York v. Gould</u>, 14 N.Y.3d 614 (N.Y. 2010) ("<u>Cayuga II</u>").  The court directly addressed the question of whether – during the same time period relevant to the case before this Court – on-reservation retailers could be prosecuted for the possession and sale of untaxed cigarettes given the peculiar history of § 471.  <u>Id.</u> at 646-53.

The Court started its analysis by noting that § 471 had provided for a cigarette taxation scheme since 1939.  <u>Id.</u> at 622.  It then reviewed the history of New York State's forbearance policy, <u>id.</u> at 627-28, but found that despite that policy "[t]here is no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in New York."  <u>Id.</u> at 647.  The Court further stated: "The issue here is not whether Tax Law § 471(1) 'imposes' a sales tax – or, as the dissent might

---

[11] In <u>Cayuga Indian Nation of New York v. Gould</u>, 884 N.Y.S.2d 510, 517 (4th Dep't 2009) ("<u>Cayuga I</u>"), the Fourth Department found that section 471(e) was not in effect and that section 471 alone could not support a criminal prosecution for "possession or sales of untaxed cigarettes on qualified reservations."  In <u>City of New York v. Golden Feather Smoke Shop, Inc.</u>, No. 08-cv-3966, 2009 WL 2612345 (E.D.N.Y. Aug. 25, 2009) ("<u>Golden Feather I</u>"), the district court granted the City's motion for a preliminary injunction under the CCTA.  <u>Id.</u> at *1.  In doing so, the <u>Golden Feather I</u> court determined that "the New York Court of Appeals would reject the majority's reasoning in <u>Cayuga[I]</u> and conclude that § 471 imposes a tax on reservation sales of cigarettes to non-Tribe members."  <u>Id.</u> at *29.

frame it, whether the State has the power to tax cigarette sales to non-Indians. Rather, the question is how the tax is to be assessed and collected in the unique retail context presented here and from whom." Id.  The Court reiterated that "the issue in this case is not whether sales taxes are due when non-Indian consumers purchase cigarettes from Indian retailers – they are." Id. at 647-48.  The Court then addressed a separate question particular to the case before it: "The issue [of] whether Indian retailers can be criminally prosecuted for failing to collect sales taxes from consumers and forward them to the [DTF]." Id. at 648.  The Court found that "[i]n the absence of a methodology developed by the State that respects the federally protected right to sell untaxed cigarettes to member of the Nation while at the same time providing for the calculation and collection of the tax relating to retail sales to non-Indian consumers, we answer this question in the negative." Id. The Court reaffirmed the point that the repeal of a collection mechanism does not eliminate the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt individuals. Id.  Thus, while non-Indian consumers remained obligated to pay the tax, the repeal of collection regulations resulted in the "annulment of an authorized method for calculating and collecting that tax from Indian retailers." Id.  The Court of Appeals noted with approval the Second Circuit's determination in United States v. Kaid, 241 F. App'x 747, 750 (2d Cir. 2007), that a policy of forbearance did not equate with the elimination of tax applicable to non-reservation consumers.  Cayuga II, 14 N.Y.3d at 652-53.

20

Shortly following the New York Court of Appeal's decision in <u>Cayuga II</u>, in June 2010, the State enacted the previously referenced amendments to both N.Y. Tax Law §§ 471 and 471-e, with an effective date of September 1, 2010.  <u>Milhelm Attea</u>, 2012 WL 3579568, at *2.  As amended, § 471 reads, in pertinent part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation . . . .  The tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by means of an affixed cigarette tax stamp. Indian nations or tribes may elect to participate in the Indian tax exemption coupon system established in section four hundred seventy-one-e of this article . . .

N.Y. Tax Law § 471.  As is clear from a comparison of the pre and post amendment versions of § 471, both contain the same initial language broadly imposing a taxation requirement.  As amended, § 471 requires the affixation of tax stamps to all cigarettes sold on reservations to non-tribe members.  <u>See Milhelm Attea</u>, 2012 WL 3579568, at *3.[12]

In 2012, the Second Circuit decided what is perhaps the most important case in this area, <u>United States v. Morrison</u>, 686 F.3d 94 (2d Cir. 2012).  <u>Morrison</u>

---

[12] The 2010 amendments added sections which established three different systems by which reservation dealers could sell cigarettes to Native Americans for their own use and consumption without need for payment of generally applicable cigarette taxes: (1) a coupon system created by § 471-e (as that provision was amended pursuant to the 2010 amendments); (2) a default "prior approval" system pursuant to § 471(5); and (3) the option to enter into voluntary tax agreements with the State pursuant to § 471(6).  <u>Oneida Nation</u>, 645 F.3d at 161 & n.10; <u>Milhelm Attea</u>, 2012 WL 3579568, at *6.  Although the scheme was structured in a way to ensure that Native Americans could make qualifying purchases without having to bear the cost of the tax, the scheme required that all cigarettes nonetheless bear a tax stamp.  N.Y. Tax Law § 471-e.

involved the prosecution of Rodney Morrison, the principal of reservation retailer
Peace Pipe Smoke Shop, which sold cigarettes on the Unkechauge Indian Nation's
Poospatuck Reservation in Mastic, New York.  Id. at 96.  Over a period from 1996-
2004, Morrison made large sales of untaxed cigarettes to "Big Customers."  Id. at
97.  A grand jury returned a superseding indictment against him on July 11, 2006,
charging him with, inter alia, participating in a RICO conspiracy, the predicate acts
of which were violations of the CCTA.  Id.  The case proceeded to trial and Morrison
was convicted.  He subsequently moved to vacate his RICO conviction on the basis
that certification of two questions by the Second Circuit to the New York Court of
Appeals in Golden Feather II regarding §§ 471 and 471-e[13] necessitated a finding
that the statute was void for vagueness.  Id. at 98.

    The legal question in Morrison was whether procedurally the fact of
certification required the finding of vagueness.  In answering that question "no," the
Second Circuit thoroughly reviewed the CCTA and the impact of the long and

---

[13] On appeal from Golden Feather I, the Second Circuit in Golden Feather II certified the following
two questions to the New York Court of Appeals:

> (1) Does N.Y. Tax Law § 471–e, either by itself or in combination with the provisions of §
> 471, impose a tax on cigarettes sold on Native American reservations when some or all of
> those cigarettes may be sold to persons other than members of the reservation's nation or
> tribe?

> (2) If the answer to Question 1 is 'no,' does N.Y. Tax Law § 471 alone impose a tax on
> cigarettes sold on Native American reservations when some or all of those cigarettes may
> be sold to persons other than members of the reservation's nation or tribe?

597 F.3d at 127-28.  In Golden Feather II, the Second Circuit "predicted—correctly, as it turns
out—that the New York Court of Appeals would decide differently from the Fourth Department
in Cayuga I."  Morrison, 686 F.3d at 103.  The Second Circuit recalled as moot the questions it
had certified on August 20, 2010, in light of the Court of Appeals' decision in Cayuga II and
intervening amendments to the New York cigarette tax laws.  See Order, City of New York v.
Golden Feather Smoke Shop, No. 09-3942-cv, 2010 WL 9593680 (2d Cir. Aug. 20, 2010).

tortured history of §471 and the forbearance policy in New York.  The Court noted

that the U.S. Supreme Court had reviewed and approved the lawfulness of § 471

specifically in <u>Department of Taxation & Finance of New York v. Milhelm Attea &</u>

<u>Bros., Inc.</u>, 512 U.S. 61, 78 (1994).  <u>Morrison</u>, 686 F.3d at 100.  The Court further

noted that despite that ruling, New York chose to follow a policy of forbearance as to

enforcement – that is, the DTF "did not enforce its regulations governing on-

reservation sales to non-Native Americans."  <u>Id.</u>  Nevertheless, "Section 471's

prohibition on unstamped cigarette sales remained in effect."  <u>Id.</u>  The Court

reviewed its prior decision in <u>Golden Feather II</u> and cited the "strong sense" that it

conveyed that the "plain language of Section 471 gave the State of New York the

power to prosecute cigarette vendors for the on-reservation sale of unstamped

cigarettes to non-tribal members."  <u>Id.</u> at 104.  The Court then rejected Morrison's

position that he "could not be validly convicted under the CCTA . . . in view of the

fact that New York was refraining from enforcing taxes on on-reservation sales at

the time of the conduct at issue," <u>id.</u> at 105, and held that "the CCTA, in conjunction

with New York Tax Law § 471, justified Morrison's conviction in this case."  <u>Id.</u>

"New York had the power to impose that tax and state law mandated that the tax

be paid.  New York's forbearance policy did not free him to engage in conduct that

the law forbade[.]"  <u>Id.</u> at 106.  The court recited the U.S. Supreme Court's

statement: "The failure of the executive branch to enforce a law does not result in

its modification or repeal."  <u>Id.</u> (citing <u>District of Columbia v. John R. Thompson</u>

<u>Co.</u>, 346 U.S. 100, 113-14 (1953)).  The Second Circuit additionally held that "the

23

forbearance policy in no way signaled New York's choice not to enforce its tax laws when such enforcement would be possible . . . ." Id. at 107.

One key issue that bears re-emphasizing is that pre-amendment § 471 contained a presumption of taxability and allocated the burden of proof on taxability to the possessor of any cigarettes.  UPS was subject to both of these statutory provisions.  UPS argues that federal law preempts the enforcement of the § 471 presumption as to a carrier such as it.  According to UPS, the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") bars enforcement of a state law related to a "price, route, or service" of carriers of that transport property.  49 U.S.C. §§ 14501(c)(1) (motor carriers); 41713(b)(4) (air and intermodal air/ground carriers).  UPS cites Rowe v. New Hampshire Motor Transport Ass'n, 552 U.S. 364, 372-73 (2008), for the proposition that the FAAAA preempts enforcement of a state-law presumption that carriers had knowledge that a shipment contained tobacco when it was sent from certain types of shippers; there, the Court reasoned that the law required the carriers to investigate each package and thus "directly regulate[d] a significant aspect of the motor carriers' package pickup and delivery service."  (UPS's Mem. In Supp. of UPS's Mot. for Summ. J. at 19.)  UPS argues that the § 471 presumption would require UPS to alter its services for any packages destined for a reservation that potentially contained taxable cigarettes.  (Id.)  UPS's argument is misplaced.

First, the CCTA, a federal law, and not state law, imposes the prohibition on UPS transporting contraband.  State law, § 471, provides certain definitions that

underlie the implementation of the federal law contained in the CCTA.  The FAAAA is directed at state law imposed prohibitions; the CCTA is simply not one.

Second, the presumption contained in § 471 is not one of knowledge but rather one of fact.  Section 471 is not directed at carriage and the presumption is not as to a person's knowledge.  It is a presumption as to factual status by establishing the category of cigarettes within New York subject to tax.  The CCTA anticipates state law defining what constitutes contraband and similarly anticipates that certain common carriers may be caught within the net of such definition.  It addresses this scenario by way of a carve out in the CCTA from the definition of contraband for "a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source and destination of such cigarettes." 18 U.S.C. § 2341(2)(B).

    C.    <u>Final Analysis of the Parties' Positions</u>

The fundamental reason why plaintiffs are entitled to summary judgment and defendant is not is that when UPS was transporting unstamped cigarettes (how many is "TBD"), it was transporting contraband.  Pre-amendment § 471 confirms that stamps were required, that taxability was presumed, and that the burden of proving otherwise was on UPS.  UPS has not carried this burden.  UPS is not entitled to rely on the judicially imposed injunctions or stays of enforcement obtained by Indian tribes, nor is it entitled to rely upon forbearance.  It is also of no moment that there were difficulties in determining when tax was required to be paid or not, and it is also of no moment that the State had stood down on collection

from reservation retailers altogether.  At the end of the day, the situation – which may have advantaged reservation retailers – placed UPS in a precarious position; without its own statutory exemption or legal assurance, and in the absence of information as to ultimately taxability of the cigarettes they were shipping, transporting shipments was a risky business indeed.  But this was a business risk. UPS could choose to undertake such risk or not.  One thing has always been clear: UPS has never had exemption from the CCTA.

A number of UPS's arguments on these motions – and many of its requests for relief – rely upon UPS's interpretation of Supreme Court precedent, and UPS's application of those cases to this case.  In large part, the principles cited by UPS are non-controversial and the rulings it seeks are merely a recitation of known legal principles: that states lack the power to tax cigarettes sold on Native American reservations to registered tribal members, Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 475-82 (1976); that states may tax on-reservation cigarette sales to persons other than members of the reservation's tribe, Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 160-61 (1980); that certain taxes imposed directly on reservation retailers may be unlawful; and that the frequently dispositive question in Indian tax cases is who bears the legal incidence of the tax, Oklahoma Tax Commission v. Chickasaw Nation, 515 U.S. 450, 458-59 (1995).

UPS's error is in the application of these precedents to its own actions.  UPS is not a member of an Indian tribe, nor is it a reservation retailer.  UPS is a non-

Indian third-party.  Ultimately, UPS seeks to use these Supreme Court cases to
build an argument described above: that if a reservation retailer cannot be taxed –
because the legal incidence of the tax in New York is on a reservation consumer, see
Moe, 425 U.S. at 475-82; Chickasaw Nation, 515 U.S. at 458-59 – then that retailer
must be able to receive unstamped cigarettes and UPS must be able to be the
shipper of those cigarettes without incurring separate liability.  The flaw in this
argument is one of omission and logic.

The basic question in regards to the CCTA violation alleged by plaintiffs here
is quite simple and requires little of the discussion in which UPS engages (and on
which this Court has dwelled for some time).  Simply put: there is a stamping
requirement in both the pre-amendment and post amendment versions of § 471.
The U.S. Supreme Court reviewed § 471 and found that it passed muster.  See
Milhelm Attea, 512 U.S. at 78.  Morrison and Cayuga II teach us that the
forbearance policy never eliminated that requirement.  Section 471 "presume[s] that
all cigarettes within the state are subject to tax until the contrary is established,
and the burden of proof that any cigarettes are not taxable hereunder shall be upon
the person in possession thereof."  N.Y. Tax Law § 471(1).  Thus, any cigarettes
shipped by UPS were presumed taxable; and if UPS possessed those cigarettes, it
bears the burden of demonstrating the opposite.  The CCTA carries this obligation,
the presumption, and the burden of proof forward.  It provides that if a stamp is
required (and we know that it is under New York law), then cigarettes that fail to
bear evidence of such stamp are contraband; one who transports contraband is

liable under the CCTA.  This legal reality requires a determination of these motions in plaintiffs' favor and a corresponding denial of UPS's motion.

        D.    <u>Equitable Defenses or Other Arguments</u>

UPS argues that in all events there are equitable reasons why plaintiffs should not be able to recover for violations of the CCTA.  This is not an issue relevant to resolution of plaintiffs' motion for summary judgment – to resolve that motion the Court is not required to resort to general principles of estoppel at all. Similarly, the Court is able to deny UPS's summary judgment motion because the Court is not ruling in UPS's favor as a matter of law on the lawfulness of its actions. In the context of the CCTA, the Court will be interested in hearing from the parties as to whether the type of arguments supporting "estoppel" are relevant to the amount of any penalty imposed.

CONCLUSION[14]

For the reasons set forth above, plaintiffs' motion for summary judgment dismissing UPS's Seventh Affirmative Defense is GRANTED, and defendant's motion for summary judgment on plaintiffs' claims based on shipments to reservation retailers is DENIED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 285 and 299.

SO ORDERED.

Dated:      New York, New York
            September 10, 2016

_____
KATHERINE B. FORREST
United States District Judge

---

[14] At the conclusion of its memorandum in opposition to plaintiffs' motion for summary judgment, UPS argues that plaintiffs lack standing to recover for deliveries to reservation retailers.  Resolution of this question is unnecessary to resolution of plaintiffs' motion for summary judgment and the Court therefore declines to reach it.