# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- x

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                              Plaintiffs,

              -against-
                                                    Case No. 1:15-CV-01136-KBF
UNITED PARCEL SERVICE, INC.,

                              Defendant.


----------------------------------------------------------- x


### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
120 Broadway, 3rd Floor
New York, New York 10271
Tel.: 212-416-6389

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street, Room 20-99
New York, New York 10007
Tel.: 212-356-2032

# Table of Contents

PRELIMINARY STATEMENT ..................................................................................................... 2

PROPOSED FACTS .................................................................................................................... 6

   I.    The State and City's Interest in Protecting Public Health ..................................................... 6

      A.    The Harm Caused by Cigarettes .................................................................................... 7

      B.    The Cigarette Dealers Located on New York State Indian Reservations .................................. 13

   II.    The State's Prior and Instant Investigations of UPS's Delivery of Cigarettes ............................... 16

      A.    The Assurance of Discontinuance ................................................................................ 16

      B.    UPS's Knowledge and "Compliance" Measures Following the Assurance ............................. 22

      C.    UPS's Delivery of Cigarettes .................................................................................... 46

PROPOSED CONCLUSIONS OF LAW ......................................................................................... 115

   I.    The State and City are entitled to a judgment as a matter of law on its claims. ........................... 115

      A.    UPS violated the Assurance of Discontinuance ................................................................ 115

      B.    UPS violated the Prevent All Cigarette Trafficking Act. ...................................................... 120

      C.    UPS violated New York Public Health Law § 1399-*ll* ....................................................... 127

      D.    UPS violated the Contraband Cigarette Trafficking Act ....................................................... 129

   II.    UPS's Affirmative Defenses Lack Merit ........................................................................... 134

      A.    UPS's Twelfth defense (breach of the implied covenant of good faith and fair dealing) fails as a matter of law. ............................................................................................................. 134

      B.    UPS's Thirteenth and Seventeenth (equitable) defenses fail as a matter of law. ......................... 139

      C.    UPS's Seventh Defense fails as a matter of law. ................................................................ 159

      D.    UPS has abandoned its Fourteenth Defense. .................................................................... 160

   III.    The State and City's Requested Relief ............................................................................. 161

      A.    Injunctive Relief and the Appointment of a Monitor ............................................................ 162

      B.    Damages and Penalties ............................................................................................. 163

CONCLUSION ......................................................................................................................... 167

## PRELIMINARY STATEMENT

A decade has passed since the October 21, 2005 Assurance of Discontinuance ("AOD"), in which United Parcel Service, Inc. ("UPS") agreed to specific compliance measures to prevent its delivery network from being used for illegal cigarette trafficking in exchange for the State of New York deferring civil action against it based on potential prior violations of New York Public Health Law ("PHL") § 1399-ll ("Unlawful shipment or transport of cigarettes).   UPS has systemically failed to comply with its agreement, and in the process, has become liable not only to the State under the AOD and New York Executive Law ("EL") § 63(12), but also to both the State and the City of New York under PHL § 1399-ll, the Prevent all Cigarette Trafficking ("PACT") Act, 15 U.S.C. §§ 375 *et seq.*, and the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341 *et seq.*.

Under the AOD, UPS was required to: (1) implement a policy banning cigarette shipments to unauthorized recipients in New York; (2) enforce a progressive discipline system for violators; (3) develop and maintain a separate database of known and potential violators, using searches of the internet and its general customer databases; (4) use the discipline and database policies together to prevent the use of new accounts for evasion of shipper discipline; (5) annually train relevant employees to actively look for signs of cigarette shipments to unauthorized recipients; (6) continually train account executives in the AOD's compliance measures; and (7) conduct audits where there was a reasonable basis to believe that a shipper may have been shipping cigarettes to unauthorized recipients.

UPS published a new policy.   But it did virtually none of the other things the AOD mandated in order to make that policy effective.   It failed to discipline shippers or maintain the separate database, which allowed the same known operators to continue to use UPS for trafficking.   It did not train relevant employees to actively look for warning signs, and did not train its account executives in AOD compliance.   It did not comply with the AOD's primary

2

safeguard: the audit requirement.  The AOD holds UPS to a simple negligence standard for failing to inspect packages to determine if they contained cigarettes bound for unauthorized recipients, when there was a reasonable basis for UPS to believe they might.  UPS had that basis as to each of the over a hundred thousand shipments the State claims against here.

UPS knew at the time of the AOD that New York Indian reservation tobacco sellers posed a specific risk to its compliance.  Yet it failed to integrate the knowledge it gained on shippers during the AOD's mandated initial-reporting and follow-on internet-investigation periods into its database, enabling future violations.   UPS then invited more misconduct by allowing its main account executive for the at-risk clients, Gerard Fink, to solicit them to reopen new, preferential accounts immediately after the AOD, based solely on their promises not to sell cigarettes.

Several years into this pattern, UPS was put on notice that its already-failing AOD compliance would be put to an even greater test: months before the enactment of the PACT Act, UPS knew of the legislation and the regularly-updated Non-Compliant Lists ("NCLs") it would mandate be sent to all carriers.  It could have prepared for the diversion of specific shippers from the post office to other prospective carriers by coming into full, active compliance.  Instead, UPS terminated its only then-existing safeguard, its ongoing internet searches, the day before the PACT Act came into force.

UPS knew that the NCLs would provide a "reasonable basis to believe" that customers listed on them might be shipping cigarettes illegally.  But instead of integrating this new information, UPS management consciously tried to avoid it by not seeking out the NCLs when they believed the company was not receiving them.  In fact, UPS did not succeed in preventing actual corporate knowledge of this information.  The NCLs were routinely received by UPS employees with responsibility for screening packages.

After the PACT Act, UPS's continued non-compliance with the AOD, combined with its conscious avoidance of the NCLs, drove a surge of business with known cigarette shippers operating from the reservations, which UPS knew.  Even before the first NCL was distributed in November 2010, a UPS Senior Account Manager emailed that "UPS has gained a lot of tobacco business from the USPS this year due to PACT Act taking effect at the end of June," a message that was forwarded to the Dangerous Goods division.  But UPS did not need an explicit warning. Its own shipping records showed a clear picture:



Each of the eight shipper groups at issue here increase their shipments substantially after the PACT Act, and those who were on the NCL continued and even increased their shipments after they were listed.

Of the eight shipper groups at issue here, Mr. Fink was the UPS Account executive for five.  Four of them, the Elliot Enterprises, Smokes & Spirits, Shipping Services, and Indian Smokes groups, were similar in that they were products of Mr. Fink's "conversion" of cigarette-retailing UPS clients into purportedly non-cigarette retailers after the AOD on the strength of the

shipper's word.   The first three were among Mr. Fink's top accounts, had multiple customer claims for lost or damaged cigarettes and were all terminated for cigarette shipping, but Mr. Fink was allowed to open successor accounts for them that continued the original businesses.  Elliot Enterprises, Smokes & Spirits, and Indian Smokes were also placed on the NCL at or near the inception of their accounts.  Mr. Fink's other account at issue here, Native Wholesale Supply, is different in that UPS allowed it to continue making uninterrupted, unaudited shipments under its original account even after UPS had destroyed more than 500 cases of cigarettes at the behest of the federal government in April 2007, when NWS was discovered illegally shipping them into Oklahoma through its UPS account.

Other shippers were similarly shielded from audits and discipline, despite UPS's reasons to believe they were shipping cigarettes.  The Arrowhawk group operated out of an undisguised smoke shop and adjacent cigarette warehouse facility, and changed names and locations multiple times without getting flagged in UPS's database.   Account executives believed that Arrowhawk's contact person Philip Christ, who had previously asked about shipping cigarettes through UPS, could not be trusted, but no action was taken to audit Arrowhawk's multiple, shifting accounts.   Jacobs Manufacturing was listed as Jacobs Tobacco in UPS's records, operated from a cigarette factory at a location adjacent to other cigarette factories, had a claim for lost or damaged cigarettes, and delivered almost exclusively to smoke shops on Indian reservations on Long Island.  Mohawk Spring Water and Action Race Parts had obvious cover names, were themselves located adjacent to Jacobs Manufacturing, raised immediate suspicions with UPS drivers (who reported those suspicions to no avail), and also shipped their purported "water" and "race parts" exclusively to the same Long Island reservation cigarette retailers as Jacobs.

UPS's compliance with respect to these eight shipper groups demonstrated not just occasional lapses or even a pattern of ordinary negligence, resulting in AOD liability, but rather a course of persistent, illegal conduct that requires the imposition of injunctive remedies under EL § 63(12), including the appointment of a monitor.   It also constituted a wholesale abandonment of the AOD for years at a time, depriving UPS of its statutory exemption under the PACT Act.    And UPS's conscious avoidance of the information it constructively and actually possessed about these shippers rises to a level that meets the standards for actual knowledge under PHL § 1399-ll and the CCTA.

## PROPOSED FACTS

### I.       The State and City's Interest in Protecting Public Health

1.       Plaintiffs the State of New York and the City of New York bring this action to protect the public health, safety, and welfare of their citizens and residents, and to enforce federal and state laws for that purpose.  *See* 3d Am. Compl. (ECF No. 189).

2.       The State of New York is a sovereign entity; the City of New York is a municipal corporation organized under the laws of the State of New York.  UPS Answer (ECF No. 199), at ¶¶ 3, 4.

3.       Defendant United Parcel Service, Inc. ("UPS") is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in Atlanta, Georgia.  UPS Answer, at ¶ 5.

4.       Plaintiffs' operative complaint alleges UPS's knowingly delivered contraband cigarettes in violation of (1) UPS's Assurance of Discontinuance, entered into with the New York State Attorney General's Office on or about October 21, 2005 ("Assurance" or "AOD"); (2) New York Public Health Law  section 1399-*ll* ("PHL § 1399-*ll*"); (3) the Prevent All

6

Cigarette Trafficking Act, 15 U.S.C. § 375–78 ("PACT  Act"); (4) the Contraband Cigarette

Trafficking Act, 18 U.S.C. § 2341–46 ("CCTA"); and (5) the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961–68 ("RICO").  *See* 3d Am. Compl., ¶¶ 110–199 (ECF No.

199).[1]

     5.     For UPS's violation of the Plaintiffs' remaining claims request injunctive relief,

damages, and penalties.  *See* 3d Am. Compl., at pp. 46, 47–48.

     6.     This Court has jurisdiction over the subject matter of this action pursuant to 15

U.S.C. § 378(a), 18 U.S.C. §§ 1964(c) and 2346(b), and 28 U.S.C. §§ 1331 and 1367.

     7.     7. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the

events and omissions giving rise to the claims occurred in this district.

### A.     The Harm Caused by Cigarettes

     8.     Cigarette smoking is the single leading cause of preventable death in the United

States, killing over 480,000 people each year.  **Dr. Sonia Angell Aff.** (Live Test.), ¶ 4 (citing **PX**

**65**[2]).  In New York State, this means that tobacco use kills between 26,000 and 28,000 New

Yorkers each year—a figure that well exceeds the combined number of deaths caused by

alcohol, motor vehicle accidents, firearms, toxic agents, and unsafe sexual behaviors.  **Angell**

**Aff.**, at ¶ 5 (citing **PX 37**[3, 4]).

---

[1] Plaintiffs' RICO (Third, Fourth, Fifth and Sixth) claims were dismissed on August 9, 2016. *See* Order (ECF No. 322).

[2] **PX 65** (U.S. Dept. of Health and Human Services, *The Health Consequences of Smoking, A Report of the Surgeon General* ("Surgeon Gen. Rept."), at 11, 678 (2014), *available* at U.S. Dept. of Health & Human Services, Reports & Publications, Surgeon General's Reports, http://www.surgeongeneral.gov/library/reports/50-years-of-progress/).

[3] **PX 37**, at ¶ 5 (citing Centers for Disease Control and Prevention, Best Practices for Comprehensive Tobacco Control Programs—2014, at 110, *available at* http://www.cdc.gov/tobacco/stateandcommunity/best_practices/pdfs/2014/comprehensive.pdf).

[4] **Angell Aff.**, at ¶ 5 (citing N.Y.S. Dep't of Health, Bureau of Tobacco Control, StatShot Vo. 8, No. 3, *Tobacco is the Leading Cause of Preventable Death* (Apr. 2015), *available at*

9.     And, for the millions more living with a smoking-related disease, the health care

costs are substantial.  **Angell Aff.,** at ¶ 6 (citing **PX 65**, Surgeon Gen. Rept., at 11, 678).  Each

year, tobacco-related health care costs New Yorkers $10.4 billion on tobacco-related health care

costs.  **Angell Aff.,** at ¶ 7 (citing **PX 37**[5]); *see also* **PX 572**, RTI International, 2012 Independent

Evaluation Report of the New York Tobacco Control Program, at 2–3 (2012) (estimating that

New Yorkers spent roughly $10 billion annually on such costs).

10.     To combat these harms and to protect the public health of its citizens, the State

and City of New York—like the federal government, 49 other states, and District of Columbia—

tax the sale and use of tobacco products, such as cigarettes.  *See* N.Y. Tax Law § 470 *et*

*seq.*; N.Y.C. Ad. Code ("Ad. Code") § 11-1302(a)(1); **PX 65** (Surgeon Gen. Rept., at 788).

11.     This is because higher taxes decrease the consumption of tobacco products,

especially cigarettes, thereby improving public health.  **Angell Aff.,** at ¶ 10 (**PX 65**, Surgeon

Gen. Rept., at 788).  Indeed, raising cigarette prices "is one of the most effective

interventions to prevent and reduce cigarette use."  **Angell Aff.,** at ¶ 11[6].

---

https://www.health.ny.gov/prevention/tobacco_control/reports/statshots/volume8/n3_tobacco_leading_cause.pdf).

[5] N.Y.S. Dept. of Health, Smoking and Tobacco Use – Cigarettes and Other Tobacco Products (last revised Nov. 2015), *available* at https://www.health.ny.gov/prevention/tobacco_control/

[6] Citing RTI International, *2011 Independent Evaluation Report of the New York Tobacco Control Program*, at 40 (2011) (citation omitted); *see also* Institute of Medicine, *Ending the Tobacco Problem: A Blueprint for the Nation*, at 182 (2007); U.S. Dept. of Health and Human Services, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease*, A Report of the Surgeon General, at 654 (2010) (noting that "increases in the price of cigarettes through excise taxes … are an effective policy intervention to prevent smoking initiation among adolescents and young adults, reduce cigarette consumption, and increase the number of smokers who quit").

12.     For example, a ten-percent increase in cigarette price is estimated to reduce cigarette use among adults by approximately three to five percent. **Angell Aff.**, at ¶ 12[7]. The response of youths to price increases is even greater: a similar ten-percent price increase is estimated to reduce the number of youth smokers by at least six or seven percent. **Angell Aff.**, at ¶ 12[8].

13.     To achieve these public health benefits, the State and City have each imposed a separate excise tax on packages (or "packs") of cigarettes (with certain exceptions not relevant here) that are possessed for sale or use within the State or City. **Angell Aff.**, at ¶ 13; *see also* N.Y. Tax L. §§ 471, 471-a; Ad. Code § 11-1302(a)(1) and (2).[9]

14.     All cigarettes possessed for sale or use within the State are presumed to be taxable, and hence must bear a tax stamp, until the contrary is established, with the burden of proof of non-taxability on the person asserting an exemption from taxation. *See* N.Y. Tax L. § 471; Ad. Code § 11-1302(d). Notably, this presumption of taxability does not apply when such cigarettes are sold exclusively to a licensed cigarette agent who affixes and cancels the cigarette tax stamps. *See Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011) (citing 20 N.Y. Codes R. & Regs. § 74.3(a)(1)(iii)).

---

[7] Citing Frank J. Chaloupka & Rosalie Liccardo Pecula, *The Impact of Price on Youth Tobacco Use*, National Cancer Institute Monograph No. 14, at 194 (Nov. 2001), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/14/m14_12.pdf (last visited Sept. 2, 2016).

[8] U.S. House of Representatives, Judiciary Committee, *Hearing on H.R. 4081, the "Prevent All Cigarette Trafficking Act of 2007," and H.R. 5689, the " Smuggled Tobacco Prevention Act of 2008": Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, Serial No. 110-47, 52 (May 1, 2008) (Statement of Matthew L. Myers, President, Campaign for Tobacco-Free Kids), *available at* https://judiciary.house.gov/wp-content/uploads/2008/05/Myers080501.pdf (last visited Sept. 2, 2016).

[9] The "use" of cigarettes is "any exercise of a right or power, actual or constructive, including but not limited to receipt, storage or any keeping or retention for any length of time." N.Y. Tax L. § 471-a; Ad. Code § 11-1301(4).

15.     State and City cigarette excise taxes are pre-paid by "stamping agents," who are usually wholesale cigarette dealers licensed by the State and City of New York to purchase and affix tax stamps.  These agents, usually wholesale dealers, pre-pay the State's excise tax by purchasing tax stamps from the State and affixing a stamp to the bottom of each cigarette package (or "pack").  *City of New York v. Golden Feather Smoke Shop, Inc.*, 2013 U.S. Dist. LEXIS 47037, at *7 (E.D.N.Y. Mar. 29, 2013); N.Y. Tax Law § 471(2); 20 N.Y. Codes R. & Regs. §§ 74.2(a), 74.3(a)(2)(i).

16.     As a result, the State's tax is built into the cost of the cigarettes.  *See* N.Y. Tax Law § 471(2); *In re N.Y. Assoc. of Convenience Stores v. Urbach*, 92 N.Y.2d 204, 209 (1998).  And, "[w]hether taxable or tax-free, all [packs of] cigarettes must bear a tax stamp."  *Oneida*, 645 F.3d  at 160 n.8.

17.     State-licensed stamping agents are also the only persons authorized to purchase and affix New York State cigarette tax stamps.  N.Y. Tax Law § 471; 20 N.Y. Codes R. & Regs. §§ 74.3(a)(2), 74.2(c).  And, only state-licensed wholesale dealers of cigarettes may sell cigarettes to a retail dealer or other person for the purpose or resale.  N.Y. Tax Law § 470(8); 20 N.Y. Codes R. & Regs. §§ 70.2(h)(2), 74.4(b).  *See also* N.Y.S. Dept. of Taxation and Finance, Cigarette And Tobacco Products Tax, *available at* http://www.tax.ny.gov/bus/cig/cigidx.htm.

18.     To indicate that the tax has been pre-paid on cigarettes to which the tax applies, a stamping agent must purchase and affix a cigarette tax stamp to each pack of cigarettes possessed by the agent for sale in the State and/or City, as the case may be.  N.Y. Tax L. § 471; 20 N.Y. Codes R. & Regs.  § 76.1(a)(1); Ad. Code § 11-1302(e).  All cigarettes possessed for sale or use in  New York State and City, with exceptions not relevant to this complaint, must bear tax stamps.  N.Y. Tax L. § 471; 20 N.Y. Codes R. & Regs.  § 76.1(a)(1); Ad. Code § 11-1302(g).

10

19.     To comply with the foregoing requirements, stamping agents purchase tax stamps from the State and City, the cost of which is nearly equal in cost to the amount of the cigarette tax on a pack of cigarettes.  20 N.Y. Codes R. & Regs.  § 74.2.  By purchasing the tax stamps, the tax is paid.  *Id*.  By law, stamping agents must incorporate the amount of the tax into the price of the cigarettes, thereby passing the tax along to each subsequent purchaser in the distribution chain, and ultimately the consumer, as required by N.Y. Tax L. § 471 and Ad. Code § 11-1302(e) and (h).

20.     The federal cigarette tax is $1.01 per pack of cigarettes ($10.10 per carton). **Angell Aff.,** at ¶ 14.

21.     At all times relevant (*i.e.*, January 1, 2010 through the present; *see* 3d Am. Compl., ¶ 30), the State excise tax has been either $2.75  or $4.35 per pack of cigarettes.  *See* N.Y. Tax Law § 471(1) (noting the July 1, 2010 change in the  applicable tax from $2.75 to $4.35); **Angell Aff.,** at ¶ 16.  Accordingly, for each carton of cigarettes (which typically contains 10 packs of cigarettes), the State excise tax rate is $27.50 or $43.50 per carton. *S e e*  **Angell Aff.,** at ¶ 16.  The  New York City excise tax has been $1.50 per pack or $15.00 per carton.  **Angell Aff.,** at ¶ 17.  Each pack of cigarettes  in New York City, furthermore, is required to have affixed to it a joint New York State/New  York City tax stamp.  20 N.Y. Codes R. & Regs. § 74.3.

22.     States and localities establish their own cigarette tax rates so that tax rates vary among jurisdictions.  **Angell Aff.,** at ¶ 15; *see*, *e.g.*, N.Y. Tax Law § 471(1) (tax rate eff. July 1, 2010); 20 N.Y. Codes R. & Regs. § 74.1(a)(2); *see also* UPS Answer, ¶ 17.  And today, New York's cigarette tax—$4.35 per pack of cigarettes, see N.Y. Tax Law § 471(1)—is the highest in

the country, nearly $3.00 more than the national average.  **PX 572**[10].  In contrast, the excise tax

imposed by the State of Virginia for cigarettes sold there is only $0.30 per pack or $3.00 per

carton.  Code of Virginia § 58.1-1000 *et seq.*

23.     The revenue generated by such taxes, however, is dwarfed by the actual health

care costs spent by New Yorkers.  **Angell Aff.,** at ¶ 18[11].  In addition, as different levels of state

taxation have widened, tax avoidance and evasion practices have increased.  **Angell Aff.,** at ¶ 19

(**PX 65**, Surgeon Gen. Rept. at 791).  These practices include "cross-border, Internet, and

untaxed purchases on tribal lands"; bootlegging from low tax jurisdictions for resale in high tax

jurisdictions; and large-scale organized smuggling.  **Angell Aff.,** at ¶ 19 (**PX 65**, Surgeon Gen.

Rept. at 791).

24.     In whatever form, these illegal trade practices hurt the public health and public

fisc.  **Angell Aff.,** at ¶ 19 (**PX 65**, Surgeon Gen. Rept. at 789); *see also* N.Y. Pub. Health Law §

1399-*ll* ("Legislative Findings").[12]  In  New York, for example, cigarette tax evasion was

recently estimated to cost the State "between $465 million and $610 million per year in lost tax

---

[10] 2012 RTI Rept., at 5, *available at* N.Y.S. Dept. of Health, Reports, Brochures and Fact Sheets,
http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm.

[11] *Compare* **PX 36**, N.Y.S. Sen. Maj., Fin. Comm., Economic and Revenue Review (for FY 2016), at 7, 8 (Feb. 2015) (identifying roughly $1.3 billion in collected cigarette and tobacco taxes), *available at* N.Y.S. Senate, 2015–16 N.Y.S. Budget,
https://www.nysenate.gov/sites/default/files/articles/attachments/Rev_Forecast_FY_16.pdf, *with* **PX 37**, N.Y.S. Dept. of Health, Smoking and Tobacco Use – Cigarettes and Other Tobacco Products (identifying $10.4 billion spent by New Yorkers on tobacco-related health care costs; last revised Mar. 2016), *available* at https://www.health.ny.gov/prevention/tobacco_control/.

[12] *See also* 2000 N.Y. S.N. 8177, § 1 (enacted Aug. 16, 2000) ("The legislature finds and declares that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety, and welfare, to the funding of health care pursuant to the health care reform act of 2000, and to the economy of the state.  The legislature also finds that when cigarettes are shipped directly to a consumer, adequate proof that the purchaser is of legal age cannot be obtained by the vendor, which enables minors to avoid the provisions of article 13-F of the public health law. … The legislature further finds that existing penalties for cigarette bootlegging are inadequate. Therefore, the bill enhances existing penalties for possession of unstamped or unlawfully stamped cigarettes.").

revenue" (**PX 572**, RTI, 2012 Ind. Eval. Rept. at 41)—revenue that could have been used to benefit all New Yorkers.

25.     Accordingly, Congress on several occasions has sought to assist the states in combatting the sale and delivery of unstamped and untaxed cigarettes.  For example, over 60 years ago Congress enacted the Jenkins Act (15 U.S.C. § 375 *et seq*.), which established certain reporting requirements for out-of-state companies selling cigarettes to citizens of taxing states. Congress later enacted the Contraband Cigarette Trafficking Act (18 U.S.C. § 2341 *et seq*.), as a means to supplement the states' efforts to "combat cigarette bootlegging" and the rise of organized racketeering.  *See* H.R. Rept. No. 95–1778, at 7–8, 13 (1978) (Conf. Rep.), *as reprinted in* 1978 U.S.C.C.A.N. 5535–36, 5541; *United States v. Morrison*, 686 F.3d 94, 106 n. 8 (2d Cir. 2012).  And in 2010, Congress passed the Prevent All Cigarette Trafficking Act to provide the states with yet another tool to combat the illegal trafficking of unstamped, untaxed cigarettes.  *See* 15 U.S.C. § 375 Note, Pub. L. No. 111–154, § 1(b)–(c), 124 Stat. 1087–88 (2010).

### B.     The Cigarette Dealers Located on New York State Indian Reservations

26.     In New York, however, the most common and most longstanding form of tax evasion has been the sale of cigarettes by Indian reservation sellers to non-tribal members. *Compare* N.Y. State Dept. of Health, *First Annual Independent  Evaluation of New York's Tobacco Control Program*, at 6–7 (Nov. 24, 2004) (in 2004, noting that "avoiding New York State and City taxes through … Internet, and American Indian reservation purchases is commonplace") *with* RTI, 2011 Ind. Eval. Rept. at 41 (in 2011, noting that cigarette tax avoidance strategies include "seek[ing] out low- or untaxed sources of cigarettes, such as Indian

reservations and Internet vendors.  Purchasing from Indian reservations, in particular, is common in New York").[13]

27.    For example, as documented extensively in the media for at least the past decade, the Seneca Nation of Indians has disputed the right of State and local taxing authorities to require on-reservation cigarette dealers to sell packs of cigarettes on which cigarette tax stamps have been affixed, and at prices including amounts attributable to state and local taxes. **PX 1**[14]. Seneca reservation cigarette  sellers, and those on other New York State reservations, have a long, well-reported history of  selling to the public cigarettes on which state and local taxes have not been paid. *See, e.g., Red  Earth,* 657 F.3d at 142; *Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154 (2d Cir. 2011); *City of  New York v. Golden Feather Smoke Shop, Inc.,* 597 F.3d 115 (2d Cir. 2010).

28.    Nearly a decade ago, New York State's Department of Health reported that the evasion of the State and City's excise taxes through Indian reservation purchases of unstamped  cigarettes was "commonplace"; that such sales occurred at each of the "10 Indian reservations  located throughout the state"; and that such sales accounted for "the majority of  uncollected taxes." *See* N.Y. State Dept. of Health, *First Annual Independent  Evaluation of New York's Tobacco Control Program,* at 6–7 (Nov. 24, 2004)[15]; N.Y. State Dept. of Health,

---

[13] *See* N.Y. State Dept. of Health, Reports, Brochures and Fact Sheets, (containing links to both reports) *available* at https://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact_sheets.htm. (Such reports are both admissible as public records of official publications.  *See* Fed. R. Evid. 802(8) and 902(5)).)

[14] New York Times, *Ruling Clears New York State to Tax Tribes' Cigarette Sales*, May 9, 2011 (noting that "New York's governors have for years tried, and failed, to collect taxes from tribes for cigarette sales"), *available  at* http://www.nytimes.com/2011/05/10/nyregion/ruling-clears-new-york-to-tax-tribes-cigarette-sales.html.

[15] *Available* at https://www.health.ny.gov/prevention/tobacco_control/reports/docs/nytcp_eval_report_final_11-19-04.pdf.

*Cigarette Purchasing Patterns Among New York  Smokers: Implications For Health Price and Revenue*, at 3, 16 (Mar. 2006)[16].

29.    This method of tax evasion continues.  *See*, *e.g.*, RTI, 2011 Ind. Eval. Rept. at 41[17].  Indian reservation sales of unstamped  cigarettes remain a leading means by which New Yorkers have sought to evade State and City  excise taxes.  *Id*. at 43; *see also* **PX 2**, New York Law Journal, Friedlander, J., *Municipal Law; Promoting Public Health*, Jan. 25, 2010 (noting that "[o]ne of the principal sources of bootleg cigarettes for [New York City] has been the Poospatuck Indian Reservation, located in Mastic, Long Island, where middlemen have taken advantage of the ability of Native Americans to purchase cigarettes for personal consumption free of taxes.  Reservation sellers, most of whom are not Native Americans, have exploited that loophole by purchasing millions of cartons of untaxed cigarettes and re-selling them to bootleggers for transport into the city."); **PX 3**, Daily News, McShane, L.,Video shows ripoffs on Indian reservations, Sept. 17, 2010 (describing cigarette tax evasion on New York Indian reservations and resale of cartons in New York City); **PX 4**, Sovereignty, History and Memory: Mohawk Smuggling as an Act of Sovereignty Within the Making of Mohawk Identity, Busatta, S., Univ. of Wales, Lampeter, at 102 (2009) (depicting billboards on the St. Regis Mohawk Akwesasne Indian reservation with anti-tax messages); **PX 5**, Public Health and Tobacco Policy Center, Tax Evasion in New York State, at 10 (Dec. 2015) (noting tax evasion on New York Indian reservations).

30.    Cigarette dealers on New York State Indian reservations have furthermore not limited  themselves to in-person, on-reservation cigarette sales. Rather, they have sold hundreds of  thousands of cartons via mail order, phone, fax, and the Internet, and shipped

---

[16] *Available* at
https://www.health.ny.gov/prevention/tobacco_control/docs/cigarette_purchasing_patterns.pdf.

[17] *Available* at https://www.health.ny.gov/prevention/tobacco_control/docs/2011-09_independent_evaluation_report.pdf.

such unstamped cigarettes to consumers across the nation, including consumers located throughout the State and City of New York. *See, e.g., Red Earth LLC v. United States*, 657 F.3d 138, 142 (2d Cir. 2011); *Gordon v. Holder*, 632 F.3d 722, 723 (D.C. Cir. 2011); **PX 5**, Public Health and Tobacco Policy Center, Tax Evasion in New York State, at 13 (noting that "[o]nline sales have been a problem with Native American sellers in particular").

31.     Although the courts have repeatedly upheld the applicability of New York's cigarette taxation regime to Indian cigarette sales to the public (*see, e.g.*, *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc*., 512 U.S. 61, 64 (1994); *Oneida Nation*, 645 F.3d at 158), it continues to be well-known that reservation smoke shops and other retail establishments sell cigarettes, including through mail order, telephone, and Internet, without affixing the tax stamps of any of the jurisdictions into which the stores make sales. *See, e.g., Red Earth*, 657 F.3d at 141-42; *Gordon*, 632 F.3d at 723. The refusal of reservation cigarette dealers to affix the cigarette tax stamps of the jurisdictions into which they sell has been publicly acknowledged by the sellers, and openly advocated through lawsuits and through signs posted on the New York State Thruway and individual smoke shops. *See Red Earth*, 657 F.3d at 142; *Gordon*, 632 F.3d at 724.

## II.     The State's Prior and Instant Investigations of UPS's Delivery of Cigarettes

### A.     The Assurance of Discontinuance

32.     In 2004, the New York State Attorney General ("Attorney General") began investigating residential cigarette deliveries made by UPS in violation of N.Y. PHL § 1399-*ll*, which prohibits cigarette deliveries by common carriers other than to licensed cigarette wholesalers and retailers or government officials. *See* UPS Answer, at ¶ 25.

33.     As a result of that investigation, the Attorney General found that UPS had delivered many packages containing cigarettes to persons who were not authorized to receive

them pursuant to Public Health Law section 1399-*ll*.   **PX 14** (Assurance of Discontinuance), at ¶ 8.

34.       UPS denied those allegations, but in lieu of the Attorney General's Office commencing a civil action against UPS for its alleged past violations, the New York State Attorney General entered into an Assurance of Discontinuance on October 21, 2005.  **PX 14**.

35.       Under that Assurance, UPS agreed to take, *inter alia*, the following actions:

   a.   "[C]omply with [Public Health Law section 1399-*ll*(2)]" (**PX 14**, Assurance, at ¶ 17);

   b.   "[A]dhere to UPS's Cigarette Policy described at Paragraph 15 prohibiting the shipment of Cigarettes to Individual Consumers in the United States" (*ibid*.).

36.       UPS furthermore agreed to "develop and maintain a database that include[d] information regarding Cigarette Retailers (the 'Tobacco Shipper Database') with the following minimum components:

   a.   "A record of those shippers UPS has identified as Cigarette Retailers through the procedures implemented pursuant to Paragraphs 21, 22, and 23.  The record shall include the following information, when available, as to the shipper and the shipment: (i) the shipper's name, (ii) known business address(es), (iii) known website address(es), (iv) known pick-up location(s), (v) UPS account number(s), (vi) the name of the contact person for the shipper, and (vii) the UPS account executive responsible for the shipper, if any (collectively, "Shipper Information")" (**PX 14**, Assurance, at ¶ 25.A.);

   b.   Develop and maintain a database of cigarette shippers, compiled from those identified by the Attorney General, UPS's own database (using such words as "cigarette," "smoke," and tobacco"), UPS's knowledge of known cigarette

17

retailers, and Internet searches of cigarette websites (**PX 14**, Assurance, at ¶¶ 21–22).

    c.  Terminate relationships with shippers that unlawfully attempted to use UPS to ship cigarettes to unauthorized recipients and report those shippers to the Attorney General (**PX 14**, Assurance, at ¶ 27);

    d.  Instruct drivers not to deliver packages containing cigarettes to unauthorized recipients (**PX 14**, Assurance, at ¶¶ 34, 36)

37.    UPS also agreed to—

    a.  "[I]ssue a Pre-work Communication Message ('PCM') to UPS drivers, pre-loaders and any other UPS employees who are involved in the compliance measures agreed to in this Assurance of Discontinuance"; and

    b.  "[T]o help ensure that these [UPS] personnel are actively looking for indications that a package contains Cigarettes being shipped to an Individual Consumer, alerting UPS management of such packages and attempting to intercept such packages" (**PX 14**, Assurance, at ¶ 35);

    c.  Promulgate and publicize to its shippers a policy prohibiting cigarette shipments to unauthorized recipients (**PX 14**, Assurance, at ¶ 23).

38.    Significantly, UPS also agreed to "audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so" (**PX 14**, ¶ 24).

39.    UPS and the Attorney General both understood the audit provision to require UPS to open and inspect packages where "there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers." (**DX 121**; **PX 14**, ¶ 24).

40.    Related to this, UPS further agreed to keep and maintain—

18

a. "A record of Cigarette Retailers' non-compliance with the UPS Cigarette Policy, including a list of tracking numbers for shipments of Cigarettes to Individual Consumers intercepted by UPS, available Shipper Information, and the date of the shipment" (**PX 14**, ¶ 25.B.);

b. A record of the results of audits of any Cigarette Retailers performed by UPS" (*id.* ¶ 25.C.); and

c. A record of the discipline taken against any Cigarette Retailers by UPS.  (*id.* ¶ 25.D.).

41.    UPS also agreed to apply a progressive and escalating discipline procedures for those shippers that UPS had a reasonable basis to believe violated UPS's cigarette policy unintentionally, specifically—

a. A first violation required that UPS contact the shipper to: provide notice to the shipper within 5 business days of UPS's discovery of the violation, explain the nature of the violation and UPS's progressive discipline policy, reiterate the policy of not accepting packages containing cigarettes for shipment to individual consumers, and ask the shipper to increase its efforts to comply with the policy. Within 2 business days of the contact, UPS must suspend delivery services for the shipper for a period of 10 days unless and until "a reasonable and verifiable written action plan for compliance with UPS's Policies is provided by the shipper and approved by UPS." UPS must also conduct an audit of the shipper within 90 days of the reinstatement of delivery services to determine if the shipper is complying with UPS's policies;

b. A second violation within 180 days of UPS's contact with the shipper concerning the first violation mandated the same notice requirements of (i), and a suspension

of delivery services for a period of 30 days within two days of UPS's contact with the shipper. UPS had the option of restoring delivery services for products other than cigarettes after at least 10 days of service suspension if UPS received "reasonable and verified assurances from the shipper that the shipper no longer ships Cigarettes via UPS." UPS must also conduct an audit of the shipper within 90 days of the reinstatement of delivery services to determine if the shipper is complying with UPS's policies

c.  A third violation within 180 days of UPS's contact with the shipper concerning the second violation mandated the same notice requirements of (i) and (ii), and a suspension of delivery services for a period of 3 years. UPS had the option of restoring delivery services for products other than cigarettes after at least 6 months of service suspension if UPS received "reasonable and verified assurances from the shipper that the shipper no longer ships Cigarettes via UPS." UPS must also conduct an audit of the shipper within 90 days of the reinstatement of delivery services to determine if the shipper is complying with UPS's policies.

**PX 14**, at ¶¶ 28-30.

42.     For such violations, the Assurance specified that those violations, and periods of suspension imposed as a result of the violations, must be applied not only to the shipper committing the violation, but to any other shipper "that UPS ha[d] a reasonable basis to believe [wa]s shipping or seeking to ship [c]igarettes (a) from the same location as the suspended shipper, (b) on behalf of a suspended shipper, or (c) with the same account number as the suspended shipper." **PX 14**, at ¶ 31.

43.     In addition, deviations from the progressive discipline procedures would only apply where the violation of UPS's Cigarette Policy was inadvertent and immaterial, and

20

committed by a shipper "who predominantly ships products other than Cigarettes (meaning, shippers whose total UPS shipments of products other than Cigarettes in the previous year exceed ninety (90) percent of the total UPS shipments by such shipper in the previous year)…" Where UPS deviated from the procedures, written notice of its decision to deviate was due the Attorney General's office within five business days of its decision to do so. **PX 14, ¶ 32**.

44.     UPS further agree to revise **and maintain** its delivery policies and procedures for Cigarettes in accordance with the AOD. **PX 14**, at ¶ 20.

45.     The AOD provided for "a stipulated penalty of $1,000 for each and every violation of [the AOD] occurring after the Effective Date; provided…that no penalty should be imposed if (a) the violation involve[d] the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." (**PX 14**, ¶ 42).

46.     The AOD also provide that "evidence of a violation of [the AOD] that involve[d] the shipment of Cigarettes to an Individual Consumer within the State of New York shall also constitute *prima facie* proof of a violation of PHL § 1399-*ll*(2) in any civil action or proceeding that the Attorney General hereafter commences against UPS for violation of PHL § 1399-*ll*(2)." (**PX 14**, ¶ 43).

47.     The rights and remedies of the AOD, including the stipulated penalty of $1,000, are not a substitute for other remedies, but are "cumulative and in addition to any other statutory or other rights that the Attorney General may have at law or equity, including but not limited to any rights and remedies under PHL § 1399-*ll*." (**PX 14**, ¶ 51).

48.     Finally, UPS agreed that it would file with the Attorney General a report "setting forth the details of all compliance measures undertaken by UPS." **PX 14**, Assurance, at ¶ 49.

### B.     UPS's Knowledge and "Compliance" Measures Following the Assurance

49.     This report was later submitted to the State Attorney General's Office on or about December 20, 2005.  **PX 13**.  Within this report, UPS confirmed that it no longer shipped cigarettes to consumers and was only delivering tobacco products from licensed entities; and had issued instructions to its drivers, sorters, and pre-loaders "to help ensure that  these personnel are actively looking for indications that a package contains  cigarettes being shipped to an [unauthorized recipient], alerting UPS management  of such packages and attempting to intercept such packages." **PX 13**.

### 1.     General UPS Knowledge Concerning its Business on New York Indian Reservations

50.     Despite these assurances, at the time the AOD was entered into, UPS knew that any customers who sold tobacco and were located on Indian reservations in New York posed a specific risk of non-compliance with UPS's new tobacco policy.  (**B. Cook Trial Tr.  ____**)

51.     UPS knew that such tobacco sellers sold cigarettes without applying or collecting New York State or New York City sales tax to purchases.  (**B. Cook Trial Tr.  ____**)

52.     UPS knew that such tobacco sellers believed they had a right to ship cigarettes without charging State or City taxes.  (**B. Cook Trial Tr.  ____**)

53.     UPS knew that customers would have an incentive to lie to UPS about the contents of their shipments to evade discipline under the new tobacco policy and the AOD.  (**B. Cook Trial Tr.  ____**)

54.     UPS knew that virtually all of its pick-up accounts located on Indian reservations in New York sold tobacco.

55.     UPS knew that its account executives' compensation was tied to their relative performance compared to pre-established revenue goals.  (**B. Cook Trial Tr.  ____**)

56.     UPS knew that its account executives' incentives to promote revenue-generating business posed a risk to the account executives' compliance with the AOD.  (**B. Cook Trial Tr. ____**)

### 2.     UPS Knowledge Derived from its Smoke-Shop Account Reopening Plan

57.     And as a result of the AOD, effective November 21, 2005, all of UPS's smoke shop accounts were to be cancelled.  **PX 314**, **PX 308**.  If any existing accounts wished to continue shipping tobacco products (other than cigarettes) with UPS, a new account would need to be generated.  **PX 308**, **PX 304**.

58.      For his part, Account Executive Gerard Fink, whose territory covered the Seneca Allegany and Seneca Cattaraugus reservations, equated this to losing "more than 100 good friends in one week."  **G. Fink Trial Test. ___; PX 314**.

59.     UPS's smoke shop volume was expected to drop as a result of this plan.  **PX 303**.

60.     All these shippers were shipping tobacco products to consumers.  **PX 313**.

61.     Many of these shippers had multiple aliases or accounts with UPS.  **PX 309**.

62.     As noted by Fink in an November 21, 2005 spreadsheet, for example, the address—

- 1525 Cayuga Rd. in Irving, New York belonged to Pierce Trading Company, "SENECADIRECT*COM," and "SENECA DIRECT.COM";

- "17 Main" and "17 Main St." in Salamanca, New York, belonged to Deerpathcigs.net and Smoke Cignals;

- 255 Rochester St. in Salamanca, New York was shared by SmartSmoker, BuyCheapCigarettes.Com, Ordersmokedirect, and Injun Enterprises; and

23

- 56 Main St. Salamanca, NY was shared by Trail of Smoke,
  Indian Head Tobacco Tribal Rain, Trail of Smoke.

**PX 309** (further noting that "SMOKES & SPIRITS" had one account number while "Smokes & Spirits" each had a different account number, but the same address).

63.     At the time, Mr. Fink explained to other UPS employees UPS's plan to terminate these accounts pursuant to the new tobacco policy, but at the same time offer these smoke shops a chance to transition to new accounts.  (**G. Fink Trial Test. ___; PX 128; PX 302; PX 306**)

64.     Mr. Fink explained to other UPS employees that these new accounts would be compliant with the new tobacco policy, because the account holders would promise not to ship cigarettes. (**G. Fink Trial Test. ___; PX PX 128; PX 302; PX 306**))

65.     Mr. Fink recruited assistance from other UPS employees to develop a practice of offering these smoke shop customers the chance for an "exception" that would allow their new accounts to retain UPS's customer-support computer hardware.  (**G. Fink Trial Test. ___; PX PX 128; PX 302; PX 306**))

66.     At the time, UPS employees noted that such exceptions would be required because the smoke shops would presumably not be able to maintain the same volume of shipments that had previously qualified them for the customer-support computer hardware program, once they stopped shipping cigarettes. (**G. Fink Trial Test. ___; PX 128; PX 302; PX 306**))

67.     Mr. Fink allowed several previously-known cigarette sellers to continue their business with UPS in this way, including three predecessors to shippers at issue in this case:  (1) Indian Smokes; (2) Seneca Ojibwas (Shipping Services); and (3) Rock Bottom Tobacco (Elliot Enterprises).  (**G. Fink Trial Test. ___; PX 302**)

68.     All three of these accounts were among Mr. Fink's top revenue-generating accounts in the years prior to the AOD.  (**G. Fink Trial Test. ___; PX 302**)

### 3.      UPS Knowledge Derived from its Internet Searches

69.      On or before October 21, 2005, UPS compiled a list that included UPS customers

that UPS "believe[d] may [have] be[en] Cigarette Retailers."  **PX 13** (at ¶ 4).  To compile this

list, UPS used the following sources of information:

> a.  Sellers and shippers identified on Schedule C of the Attorney General's subpoena duces tecum dated August 6, 2004, for which UPS had identified account numbers;
>
> b.  Sellers and shippers identified as likely Cigarette Retailers based on UPS's search of names in its customer database for words such as "cigarette," "smoke," and "tobacco;"
>
> c.  Sellers and shippers identified as likely Cigarette Retailers based on UPS's search of codes in its customers database; and
>
> d.  UPS's knowledge of known Cigarette Retailers.

**PX 13** (at ¶ 4).

70.      A copy of the list was attached as Exhibit E to UPS's December 20, 2005 follow-

up report to its Assurance of Discontinuance.  **PX 13** (at ¶ 4).

2.      On that 2005 list were many of the same shippers at issue in this case, including—

> a.  **Indian Smokes**, 21 Race St., Salamanca, NY 14779;
>
> b.  **Smokes & Spirits**, 501 W. 11th St., Newport, KY 41071;
>
> c.  **Ojibwas**, 1358 Cayuga Rd., Irving, NY 14081 (**Shipping Services Group**);
>
> d.  **Rock Bottom Tobacco**, 1949 Richardson Road, Gowanda, NY 14070 (**Elliot Enterprises Group**);
>
> e.  **Smoke Cignals**, 17 Main St., Salamanca, NY 14779 (**Elliot Enterprises Group**); and
>
> f.  **Hootysapperticker.com**, 852 Bloomingdale Road, Basom, NY 14013 (**Arrowhawk Group**).

**DX 35** (at UPS00087293–95).

71.     On November 18, 2005, UPS counsel also performed a Google search to identify additional shippers who listed UPS as a carrier for Cigarettes shipped to Individual Consumers. **PX 13** (at ¶ 5).

72.     Following these searches described above, UPS then wrote to these Cigarette Retailers and informed them that UPS would no longer transport Cigarettes to Individual Consumers.  **PX 13** (at ¶ 6).

73.     Shortly after conducting these searches, UPS then used outside counsel King and Spalding to identify any online retailers that might be using UPS to ship cigarettes to consumers. Cook Direct Test., ¶ 14.

74.     These searches were to be conducted every 90 days beginning on November 21, 2005.  **PX 384** (at UPS00086993–95); *see also* **PX 292** (spreadsheet identifying dates and findings of each conducted search).

75.     The results of each search were collected and compiled in an excel spreadsheet that was later sent to UPS.  **PX 384** (at UPS00086993–95, UPS00087002); Expected B. Cook Trial Test.

76.     Notably, these searches turned up many of the same shippers and shipper addresses previously identified by UPS counsel and which are the subject of plaintiffs' instant case.  *See* **PX 292**.  For example—

77.     On November 21, 2005, King and Spalding identified and added the following shippers to its compiled list of suspected cigarette shippers:

- **Indian Smokes**, http://reservationsmokes.com, P.O. Box 443, Salamanca, NY 14779; alternate address: 21 Race St., Salamanca, NY 14779; Tel: 866-840-4500; and

- **Smokes-spirits.com**, www.smokes-spirits.com, P.O. Box 394 , Salamanca, NY 14779; alternate name: **Smokes & Spirits**, 501 W. 11th St., Newport, KY 41071; Tel.: 866-247-2447.  **PX 292**.

26

78.     On May 22, 2006, King and Spalding identified and added the following shippers to its compiled list of suspected cigarette shippers:

- **HootySapperTicker**, hootysapperticker.com; alternate name: **Arrowhawk**, Hoot Sapper Ticker Bridge, Tonawanda, NY; Tel.: 866-466-8928; and

- **Indian Smokes Online**, indiansmokesonline.com, P.O. Box 443, Salamanca, NY 14779; info@indiansmokesonline.com; Tel.: 866-840-4500. **PX 292**.

79.     On February 11, 2008, King and Spalding identified and added the following shippers to its compiled list of suspected cigarette shipper:

- Discount Reservation Smoke, reservationsmokes.com, P.O. Box 443, Salamanca, NY 14779 (**Indian Smokes Group**). **PX 292**.

80.     For such retailers, King and Spalding would then request that a private investigator order cigarettes from all such potential retailer sites, and potentially send a letter to the shipper warning such company to refrain from using UPS's trademark in its advertising. **PX 384** (at UPS00086993–95, -86998–701).

81.     On April 12, 2007, however, King and Spalding raised the following alternate method for addressing such cigarette retailers and UPS's compliance with the carrier's Assurance of Discontinuance with the New York State Attorney General's Office:

> "Cease and desist letters to have the website owners … remove the UPS trademarks from their sites have not yet been successful.  As you know, for UPS to be in compliance with the NY Attorney General's settlement, UPS must pursue cigarette retailers who actually ship cigarettes to consumers using UPS delivery services. Rather than incurring additional costs in attempting more cigarette purchases, it would be helpful if UPS could verify whether it provides shipping services to these specific retailers.  If such records exist, please let us know."

**PX 384** (at UPS 870002).  It is unclear how UPS responded to this request.

82.     Between December 16, 2008 and July 28, 2010—the day just preceding the effective date of the Prevent All Cigarette Trafficking Act—King and Spalding did not add any new websites to its compiled list for UPS.  **PX 292**.

83.     The last day of King and Spalding's Internet searches for UPS appears to have ended on July 28, 2010.  **PX 292**.

### 4.     UPSs' Pre-PACT Act Compliance with Database and Audit Requirements Regarding this Information

84.     None of the above information derived from UPS's smoke-shop reopening plan or UPS's internet searches was integrated into the separate database required by the AOD at the time it was collected.   (**B. Cook Trial Tr.  ____**)

85.     UPS did not update any such database with any of this information at any time subsequent to its collection and prior to 2014. (**B. Cook Trial Tr.  ____; D. Niemi Trial Tr.___**)

86.     UPS did not audit any of the shippers identified during the smoke-shop reopening plan in 2005, or during the company's or outside counsel's internet search processes, prior to the PACT Act.  **B. Cook Trial Test. ___**

### 5.     Awareness of Proposed PACT Act

87.     At times Between March 2010 and June 2010, UPS knew that the PACT Act had been passed, and would go into effect on June 30, 2010.  **PX 600**.

88.     UPS also knew at that time that the PACT Act included a requirement that the federal government send UPS the NCLs on a periodic basis.  **PX 600.**

### 6.     UPS's Knowledge Relevant to the Shippers at Issue Resulting from Enactment of the PACT Act and Receipt of the NCLs

89.     On June 30, 2010, the PACT Act went into effect.  15 U.S.C. § 375 *et seq*.  As of that date, UPS knew that the federal government was required to periodically send UPS a list of non-compliant delivery sellers of cigarettes and smokeless tobacco, and that the first such list was due to be sent in September 2010.

90.     On November 10, 2010, the initial PACT Act Non-Compliant List ("NCL") was published. The initial NCL included an entry listing a website entitled "deerpathcigs.com,"

identifying the owner of the website "deerpathcigs.com" as "Elliot Enterprise," identifying the address for Elliot Enterprise as 38 Main Street, Salamanca, NY, and the phone number as (800) 536-7014.  (UPS00144064)

91.    On November 10, 2010 UPS received the initial NCL. (PX 472, UPS00144059 - 00144064).

92.    UPS delivered cigarettes on behalf of smoke shops that were included on the Non-Compliant List and the deliveries were made subsequent to the inclusion of the smoke shops' inclusion on the List.  Such smoke shops include, but are not limited to, the following:

- o  Indian Smokes, PO Box 443, Salamanca, NY; and

- o  Smokes & Spirits, 6665 Route 417, Kill Buck, NY

93.    By email dated November 12, 2010, Melanie Thompson, an executive with UPS's Denied Party Screening Division, distributed the NCL to UPS personnel, including Don Woods. (PX 472, UPS000144059; PX 473 (spreadsheet version of the NCL).  Elliott Enterprise was included on that list.

94.    On February 24, 2012, UPS was notified that Lil Brown Smoke Shack was added to the NCL.  (PX 474 UPS 00144085)

95.    June 21, 2012 email from Melanie Thompson to Don Woods, Re "ATF Non-Compliant List."  States the list should be re-reviewed every 6 months.  Noted that ATF letter states that the NCL will be updated every 4 months "as delivery sellers come into compliance. Attaches NCL dated November 10, 2010.  Elliott Enterprises, 38 Main Street, PO Box 21, Salamanca, NY 14779; and Seneca Stars Cigarettes, 397 Fair Oak Street, Salamanca, NY 14779 are on the list.  (PX 577).

96.     On June 21, 2012, Don Woods emailed Melanie Thompson stating: "Per our discussion, we need to continue screening the ATF list. The letter you attached to your email made it clear the government is soliciting the help of common carriers." (PX 578, UPS00144093)

97.     On July 16, 2012, "Smokes-Spirits.com LLC" was added to the PACT Act Non-compliant list, and UPS received an email on that date from the U.S. Department of Justice specifically identifying this addition to the list.  "Smokes-Spirits.com" was identified as being located at 6665 Route 417, Kill Buck, NY, which is located on the Seneca Allegany Indian reservation.  (PX 475, UPS00144106; PX 476, UPS 00144125; see also PX 579 UPS00144097).

98.     The July 16, 2012 NCL also included Indian Smokes, PO Box 443, Salamanca, NY 14779 (PX 475, 476, 579 UPS001441097).

99.     On August 21, 2012, Melanie Thompson distributed the July 16, 2012 NCL to UPS's Denied Party Division.

100.    However, Brad Cook did not distribute the NCL to the sales force. (PX 818; PX 183; PX 186).

101.    On October 11, 2012, UPS received the October 11, 2012 PACT Act NCL.  Red Earth LLC, DBA Seneca Smokeshop, 12587 Route 438, Irving, NY 14081(PX 477, UPS00144135-144140 (see also, PX 478. UPS00144141-UPS00144147).

102.    Don Woods distributed the October 11, 2012 NCL to UPS employee Melanie Thompson. (PX 481, UPS00144154-14460).  Thompson forwarded the list to UPS's "Denied Party" division. (PX 481 UPS00144163-144164).

103.    On October 19, 2012, Don Wood emailed Moliki Alexander, USDOJ, seeking clarification about the "international" section of the NCL.  On November 7, 2012, David Marshall responded to Wood's email stating that the "companies that are on the International

Non-compliant List are companies that have been identified as sellers of tobacco product, either by internet or other means that have not registered with the ATF." (PX 490 UPS00144211-144217)

104.    On December 12, 2012, UPS outside counsel Mark D. McPherson emailed NY State Assistant AG Marc Konowitz stating that, by incorporating the terms of the AOD, the PACT Act only requires UPS to comply with the terms of the AOD. (PX 206, UPS00037107-37108)

105.    On July 29, 2013, the NYC Law Department issued a subpoena to UPS "seeking to identify UPS deliveries of packages originating from identified cigarette traffickers located on the Seneca Indian Reservation in Salamanca and Irving, New York." (PX 193, UPS00035423-35424).

106.    On August 29, 2013, UPS Counsel Jill Termini emailed David W. Marshall, USDOJ, stating: "I understand that you have been trying to send me the latest PACT Act List of Unregistered and Non-Compliant Sellers . . . and to put me on the distribution list for all subsequent updates to the list." She requested that future copies of the list be sent to her and Brad Cook. (PX 186, UPS00032312; see also PX187 UPS00032312 ).  Marshall sent her the list on August 30, 2013.  (PX 187)

107.    On August 29, 2013, NY AAG Marc Konowitz also contacted Jill Termini regarding getting her the latest PACT Act List. PX 203, UPS00037092-37093)

108.    By letter dated October 2, 2013, ACC Eric Proshansky of the NYC Law Department, responded UPS Counsel Norman Brothers' production of documents responsive to the July 29, 2013 subpoena.  Mr. Proshansky stated that the "City has concluded from the UPS records produced . . . that as recently as August 8, 2013, UPS has been delivering significant quantities of unstamped cigarettes to residential customers in New York City, New York State,

and the rest of the United States.  That conclusion is supported in part by UPS's identification of

the shippers served by your company as 'Indian Smokes,' 'Post Smokes,' and 'AJ's Cigars,'

each well known to the City as a delivery-seller of unstamped cigarettes."  (PX 193,

UPS00035423- 35424)

109.    Mr. Proshansky also noted that "Indian Smokes has been included since May

2011 on ATF's Non-Compliant list of cigarette delivery-sellers under the PACT Act." (PX 193,

UPS00035423- 35424)

110.    In an email dated October 2, 2013, Ken Langston, UPS Sales Operation

Supervisor to Rita Torres, UPS West Region Regulated Goods, stated: "I have sales folks that

are asking about the PACT Act Non-Compliant List that was mentioned in the BD Memo on

9/27.  Do you have any additional details of what if any list is going to be sent out.  One manager

has emailed Gary DeWeerd but has not received a reply.  What have you heard that you can

share?" (PX 181, UPS00032242).

111.    Rita Torres placed responsibility for complying with the NCL on the shipper.  On

October 2, 2013, Torres emailed Langston stating: "Corporate Regulated Goods will have to

obtain the list from Bureau of ATF.  The shipper has to register to make sure they are not on the

Non -Compliant List."  She also cut & paste FAQ from the ATF website. (PX 181,

UPS00032241).

112.    On October 3, 2013, Brad Cook emailed Torres: "Just curious, where did you get

the information you sent to Ken?" (PX 181, UPS 00032241).   Torres responded: "I had not

heard about the PACT Act and went to the ATF site to research so I could gain knowledge about

it."

113.    Brad Cook, UPS's Director of Dangerous Goods, had access to the NCL, but UPS

records show that he did not distribute it to UPS employees.  On September 20, 2013 e-mail UPS

employee Rodney Carter asking: "how do I get a list of the PACT Act-Non-Compliant List."

(PX 186, UPS00032294).

114.    On September 23, 2013, Brad Cook replied: "I will contact any district that has a customer that meets this definition.  It is not a long list.  There are currently only two companies of concern for now.  One in New York and one in California."  (PX 186, UPS00032294).  At that time, Cook knew or should have known that Elliott Enterprises and Indian Smokes were both on the list.

115.    Email chain dated October 2-3, 2013. Scott Smith, UPS Area Sales Manager, sought "to confirm if HCI is on the Federal PACT Non Compliant list or not."  Rita Burke replied she is not familiar with the PACT Non-Compliant list. Brad Cook responded: "The UPS Corporate Dangerous Goods department has access to the list and will be looking for companies that are UPS shippers."  (PX 183, UPS00032250 – UPS00032252).

116.    In August 2013, UPS's Director of Dangerous Goods, Brad Cook, noticed that Smokes & Spirits was listed on the NCL.  At the time he wrote: "Web site states: We ship via UPS, USPS."  [PX106, UPS00003443]

117.    Brad Cook, the UPS executive with primary responsibility for the UPS cigarette policy was not even aware of the PACT Act's non-compliant list of known cigarette shippers to whom common carriers are prohibited from servicing until 2013 at the earliest, and UPS shipped cigarettes for entities on that list. *Cook Tr.* 111:10-19; (iii) UPS never sent its employees the PACT Act list of prohibited cigarette shippers until September 2013, and UPS shipped cigarettes for entities on that list. *Cook Tr.* 82:17-24.

118.    When UPS received information from a source stating that certain of its customers were shipping cigarettes, it did nothing to investigate or cease shipments for those customers. *Cook Tr.* 152:12-20; (ii) UPS's database did not even contain identified cigarettes

shippers contained in the PACT Act non-compliant list until September 2013 at the earliest , and UPS shipped for entities on that list. *Cook Tr.*, 111:10-19.

119.    UPS received the March 10, 2014 NCL, superseding the January 23, 2014.  Indian Smokes, Elliott Enterprises and Seneca Stars Cigarettes were on the list.  PX 246

120.    UPS received the NCL dated January 20, 2015.  Elliott Enterprises and Indian Smokes were on the list.  PX 249

121.

### A.   UPS's Knowledge and Conduct Regarding Relevant Customers Generally After the PACT Act

122.    On September 23, 2010, a UPS Senior Account Manager emailed that "UPS has gained a lot of tobacco business from the USPS this year due to PACT Act taking effect at the end of June."  This email was forwarded to management in the UPS division of Dangerous Goods within four days.  **PX 198**

123.    On June 23, 2011 in connection with the Potsdam seizure, a UPS security employee emailed that New York Indian reservation retailers have been "selling cigarette[s] without paying taxes…This has been an on going situation over the years through out the state with several different reservations doing the same thing." **PX 460**.

124.    UPS knew, at all times after the PACT Act was effective, that virtually all of its pickup accounts on Indian reservations were tobacco sellers, and that Mr. Fink's top accounts in 2011-2014 consisted largely of such sellers. **G. Fink Trial Tr. ____; PX 101; PX 157; PX 176.**

125.    Mr. Fink's testimony that he was unaware of the activities of the shippers at issue assigned to him, that he was uninvolved in the management of their accounts, is not credible.  **G. Fink Trial Tr.___**.

126.    UPS did not begin to actively use the information on the NCL to identify shippers as possible cigarette shippers until August 2013.  **B. Cook Trial Tr._____**.

### B. Compliance with Training Requirements

127.     AOD ¶35 required UPS to train "drivers, preloaders and any other UPS employees who are involved in the compliance measures" of the AOD to "help ensure that these personnel are actively looking for indications that a package contains Cigarettes being shipped to an individual Consumer, alerting UPS management of such packages and attempting to intercept such packages."

128.     Neither Brad Cook, UPS Director of Dangerous Goods, nor his assistant Gary DeWeerd provided any formal training to UPS employees on UPS's tobacco policy.  Cook Testimony; DeWeerd Testimony.

129.     UPS admits it did not train employees, including drivers, to actively look for such indications.  Cook Testimony.

Poospatuck Reservation

130.     UPS driver Louis Cintron ("Cintron"), whose territory has encompassed the Poospatuck Reservation for 14 years, never received training as to how to handle packages that might contain tobacco. Cintron Deposition Transcript at 11:5-7; 44:15-44:17.

131.     Cintron never received any training on what to do if he suspected cigarettes in shipments. Cintron Deposition Transcript at 35:24-36:14.

132.     UPS driver Gregory Rohr ("Rohr"), whose has covered a route including the Poospatuck Reservation, cannot recall having received any training from UPS with regard to tobacco products nor any training on what to do with respect to cigarette deliveries. Rohr Deposition Transcript at 18:14-19:21; 32:1-32:9; 46:8-46:11.

133.     Rohr has never seen the Tobacco Red Flags Poster. (UPS 37777). No one from UPS ever discussed with him that he should be looking for these warning signs. Rohr Deposition Transcript at 76:1-76:20.

St. Regis Mohawk (Akwesasne) Reservation

134.    UPS Driver Candace Sheridan ("Sheridan"), assigned to a route on the St. Regis

Mohawk Reservation, was first trained in the handling of tobacco products or how to handle

tobacco deliveries a few months ago, in 2015. Sheridan Deposition Transcript at 17:4-17:14;

18:5-18:15; 18:22-18:25; 26:18-27:6; 31:12-32:16; 32:1-33:10.

135.    Sheridan does not recall any training prior to a few months ago. Sheridan

Deposition Transcript at 32:1-33:10.

136.    The context of that training was this lawsuit. Steve Talbot, a supervisor at the

Potsdam Center, discussed the lawsuit and made certain the drivers knew that UPS does not pick

up cigarettes. Sheridan Deposition Transcript at 33:5-33:24.

137.    In 2008, Sheridan did not know anything about UPS tobacco policy. In 2008,

Sheridan did not know that drivers were not supposed to pick up or drop off cigarettes. Sheridan

Deposition Transcript at 36:8-37:8.

138.    Sheridan first learned of UPS policy regarding the shipment of cigarettes in 2011.

Sheridan Deposition Transcript at 38:3-38:6.

139.    Sheridan is not aware of the Assurance of Discontinuance signed by UPS and the

State of New York. Sheridan Deposition Transcript at 73.

140.    Sheridan is still confused as to UPS's policy with respect to picking up cigarettes.

Sheridan Deposition Transcript at 73:2-73:13.

141.    The "Red Flags" sign was not posted at the Potsdam Center until 2015. Sheridan

Deposition Transcript at 78:11-24.

142.    Sheridan would have found it useful to have had the "Red Flags" sign posted in

2010-11. Sheridan Deposition Transcript at 79:4-79:22.

143.    UPS Supervisor Steve Talbot told Sheridan that it was "okay" to ship cigarettes

reservation to reservation. Sheridan Deposition Transcript at 119:19-120:8.

144.    UPS Driver Donald Jarvis, assigned to a route on the St. Regis Mohawk (or Akwesasne) Reservation, received no communications concerning tobacco through the various UPS communications mechanisms, such as a posting at the Potsdam Center, the DIAD, or the in-house UPS magazine. Jarvis Deposition Transcript at 42:7-42:15.

145.    Jarvis does not believe Potsdam Center Supervisor Steve Talbot ever provided UPS drivers at the Center with tobacco training. Jarvis Deposition Transcript at 64:17-67:9.

146.    UPS Driver Jarvis's understanding of UPS's tobacco policy at the time Jarvis was picking up cigarettes was "Trust," meaning UPS must trust its account representatives to open proper accounts. Jarvis Deposition Transcript at 82:21-83:9.

147.    UPS does not instruct its employees to actively detect whether customers are shipping cigarettes. Jarvis Deposition Transcript at 85:13-86:19.

148.     At the time of his deposition, Talbot, in a supervisory position at the Potsdam Center, was not exactly sure of UPS's tobacco policy. Talbot knew the generalities of the policy. Talbot Testimony.

## Seneca Allegany Reservation

149.    UPS Driver Lewis Potter, who was assigned to a route including the Salamanca Reservation, for twenty years, did not remember any recent training about tobacco.  Potter Dep. Tr. at 6:7-6:16; 17:16-18:7; 18:11-18:13; 44:16-44:18.

150.    Potter did not recognize the UPS Tobacco Red Flags poster and does not currently look for red flags when picking up or delivering packages, though based on his experience, those red flags would help him identify a shipment of cigarettes.  Potter Dep. Tr. at 39:2-39:18.

## Seneca Cattaraugus Reservation

151.    UPS Driver Doug Bankoski, who has been assigned to a route including parts of the Seneca Cattaraugus Reservation for about five years, remembered receiving morning pre-work communication messages ("PCMs") about tobacco since he started working at UPS in

1994 and does not remember the training ever changing.  Bankoski Deposition Transcript at 9:3-9:8; 26:19-27:10; 38:17-39:3; 48:16-48:19; Logan Dep. Tr. at 25:16-25:23.

152.    A PCM lasts a minimum of three minutes.  Bankoski Deposition Transcript at 40:10-12.

153.    Bankoski could not remember the frequency of the training.  Bankoski Deposition Transcript at 40:5-40:6.

154.    Bankoski believed at one point that UPS tobacco policy was not to transport any kind of tobacco.  Bankoski Deposition Transcript at 59:22-60:2; 68:18-68:22.

155.    Bankoski was not aware of the AOD.  Bankoski Deposition Transcript at 88:6-11.

156.    UPS did not encourage Bankoski to actively look for signs of illegal activity. Bankoski Deposition Transcript at 68:23-69:2.

157.    UPS did not convey to Bankoski that he should actively look for cigarettes. Bankoski Deposition Transcript at 88:12-88:16.

158.    Bankoski did not ask if the packages he picked up contained cigarettes.  Bankoski Dep. Tr. at 99:6-99:24.

159.    UPS Driver Ron Logan, who was assigned to a route including parts of the Seneca Cattaraugus Reservation for 14-15 years, remembered receiving PCMs. Bankoski Deposition Transcript at 30:24-31:15; Logan Dep. Tr. at 10:9-10:22; 18:21-18:24; 25:12-20; 31:19-32:10; 53:17-53:19.

160.    Logan remembered PCMs generally lasting five minutes.  Logan Dep. Tr. at 32:11-32:12.

161.    Logan remembered the yearly tobacco PCM lasting a few minutes.  Logan Dep. Tr. at 75:17-77:5.

162.    Most PCMs are about safety.  Logan Dep. Tr. at 33:22-34:17.

163.    Logan paid attention to the signs advertising cigarettes when UPS picked up cigarettes around 2005 but stopped paying attention after UPS's policy changed.  Logan Dep. Tr. at 60:5-60:22; 62:16-62:22.

164.    Logan to not look for indications there were cigarettes in the packages he was delivering and/or picking up.  Logan Dep. Tr. at 69:11-70:8; 72:19-72:24.

165.    Logan did not recall any posters about cigarettes at his package center.  Logan Dep. Tr. at 127:6-127:9.

Tuscarora Reservation

166.    UPS Driver Jolene Haseley, who has covered a route including parts of the Tuscarora Reservation, remembered receiving PCMs about tobacco, but did not remember what that training contained.  Haseley Dep. Tr. at 9:24-10:1.

167.    Haseley believed that UPS did not ship or deliver tobacco.  Haseley Dep. Tr. at 34:4-34:6.

168.    Haseley did not check packages for indications that they may contain cigarettes. Haseley Dep. Tr. at 34:7-34:12.

169.    Haseley did not remember seeing the UPS Tobacco Red Flags poster or whether she had been told about the red flags it referenced.  Haseley Dep. Tr. at 34:19-35:3.

170.    UPS Driver Wayne Wheaton, who was assigned a route including parts of the Tuscarora Reservation for seven to eight years, did not remember receiving training specific to tobacco after 2005.  Wheaton Dep. Tr. 7:1-7:13; 8:25-9:15.

171.    Wheaton did not look for indications that packages he was picking up or delivering cigarettes.  Wheaton Dep. Tr. 9:16-9:23.

Tonawanda Reservation

39

172.    UPS Driver Vincent Guarino, who was assigned a route on the Tonawanda Reservation for five years, remembered receiving a PCM about tobacco once a year.  Guarino Testimony.

173.    Guarino also remembered being talked to individually because he delivered to the Reservation.  Guarino Testimony.

174.    Guarino's supervisors never told him to look for indications there were cigarettes in the boxes he was picking up and/or delivering.  Guarino Testimony.

### i.        UPS's Failure to Train Claims Employees

175.    UPS also failed to train its claims people as to the AOD's requirements or UPS's cigarette policy.  As explained by UPS counsel at the June 7, 2016 hearing, "To address directly the claims issue, that simply was a disconnect.  There was no ability to talk to the claims people to fire out about and coordinate that with the AOD enforcement at the time.  It's just a simple fact that nobody had thoughts about that."  Tr. of June 7, 2016 Hr'g, at 68:18–23 (ECF No. 271).

176.    As shown here, UPS failure resulted in numerous submissions for lost or damaged cigarettes, which UPS presumably acted on:

| Shipper Group | Date | Description of Contents | Destination | PX - ___ | Other Notes |
|---|---|---|---|---|---|
| **Elliot Enterprises** | 3/8/2011 | CARTONS OF KENT ULL KING SOFT | Residence, New Jersey | **PX 191**<br>(UPS 34698) | * Added to PACT Act Non-Compliant List on Nov. 10, 2010<br><br>* Last shipment March 23, 2013 |
| | 5/26/2011 | CARTONS OF CIGARETTES | Residence, New Jersey | | |
| | 12/15/2011 | CIGARETTES/PDMM | Residence, Texas | | |
| | 3/23/2012 | 5 OF 5 SENECA ULTRA LIGHT 100; 6 OF 6 SENECA LIGHT 120 CARTON | Residence, Ohio | **PX 211**<br>(UPS 37870) | |
| **Eexpress** | 4/25/2013 | 1 OF 1 BOX OF CIGARETTES | Residence, Massachusetts | **PX 405**<br>(UPS 91789) | (Elliot Enter. Shipper Group)<br><br>* Last shipment June 19, 2014 |
| | 4/25/2013 | 1 OF 1 BOX OF CIGARETTES | Residence, Massachusetts | | |
| | 4/25/2013 | 1 OF 1 BOX OF CIGARETTES | Residence, Massachusetts | | |
| | 4/25/2013 | 1 OF 1 BOX OF CIGARETTES | Residence, Rhode Island | | |
| | 4/25/2013 | 1 OF 1 BOX OF CIGARETTES | Residence, Massachusetts | | |
| | 6/6/2013 | 4 OF 4 SENECA MENTHOL LIGHT 100 SOFT 4 PKS | Residence, Massachusetts | | |

| | | | | | |
|---|---|---|---|---|---|
| | 12/26/2013 | 1 QUANTITY OF CIGARETTES | Residence, New Jersey | **PX 211**<br>(*see above*) | |
| | 1/20/2014 | 10 OF 10 SENECA ULTRA LIGHT 100 SOFT | Residence, Michigan | | |
| | 5/23/2014 | 4 CARTON CIGARETTES | Residence, New York | | |
| **Bearclaw Unlimited** | 1/18/2011 | MARLBORO CIGARETTE CARTONS | Residence, New York | **PX 191**<br>(*see above*) | (Elliot Enter. Group)<br>* Last shipment May 26, 2012 |
| **Jacobs Tobacco** | 2/22/2011 | 42 lbs. NATIONS BEST FULL FLAVOR CIGARETTES | MESKWAKI TRADING POST, Iowa | **PX 468**<br>(UPS 143948) | <mark>* Potsdam seizure of cigarettes on June 22, 2011</mark> |
| | 2/22/2011 | 42 lbs., NATION'S BEST AMERICAN FULL, 100 SOFTPK/EA. | MESKWAKI TRADING POST, Iowa | | |
| **Shipping Services** | 9/8/2011 | 4 Seneca FF Box | Residence New York | **PX 212**<br>(UPS  37879) | * Last shipment April 28, 2015 |
| | 7/22/2011 | 30 PACKS OF SENCA [sic] CIGARETTES | Unk[18] | **PX 550**<br>(UPS 147643) | |
| | 9/30/2011 | 8 Seneca FF 100 Box | Residence New York | **PX 587**<br>(UPS 36721) | |
| | 11/30/2011 | 4 Seneca FF Box | Unk | **PX 550**<br>(*see above*) | |
| **Smokes-Spirits** | 12/15/2010 | 1 OF 6 WARRIOR MENTHOL | Unk[19] | **PX 550** | <mark>* Added to PACT</mark> |

[18] *See* **PX 81** (identifying Shipping Services as a UPS "Residential Common Carrier").

[19] *See* **PX 81** (identifying Smokes & Spirits as a UPS "Residential Common Carrier").

42

| | | FILTERED CIGARETTES | | (*see above*) | Act Non-Compliant List on Feb. 15, 2012 |
|---|---|---|---|---|---|
| | 10/19/2011 | 1 OF 10 1 PACK OUT OF A CARTON OF 10 WAS CRUSHED | Residence, Arizona | **PX 213** (UPS 37912) | * Last shipment April 8, 2015 (other shippers within group cont'd shipping until May 30, 2015) |
| | 12/19/2011 | 1 CIGARETTES | unk | **PX 550** | |
| | 12/30/2011 | 1 SENECA | Unk | (*see above*) | |
| | 4/26/2012 | 6 OF 6 [cigarettes] | Residence, Ohio | **PX 211** | |
| | 9/6/2012 | 2 OF 7 SIGNAL MENTHOL BOX 100S/ 7 CARTONS ("Prohibited item sent to consumer") | Residence, New York | (*see above*) | |
| | 9/12/2013 | 10 OF 10 SANDS SILVER ULTRA LOIGHT 100 [sic] | Residence, Wisconsin | **PX 113** (UPS 3792) | |
| **Native Gifts** | 6/26/2014 | 8 CARTONS OF CIGARETTES, SENECA ULTRALIGHTS | Residence, New York | **PX 211** (*see above*) | (Arrowhawk Group) * Shipments between Aug. 4, 2006 – July 5, 2014 |
| **Other Submitted Claims for Cigarettes** | | | | | |
| **Shipper** | **Date** | **Description of Contents** | **Destination** | **PX - ___** | **Other Notes** |
| Seneca Mfg. Co. Inc. | 6/18/2012 | 7 OF 7 cartons of cigarettes | PRAIRIE BAND CASINO & RESORT, Kansas | **PX 211** (*see above*) | * Because these shippers were not part of Plaintiffs' identified Shipper Groups for trial, no complete set of |
| Fow Enterprises | 4/19/2013 | 4 of 10 cigarette cartons | Unk[20] | **PX 550** (*see above*) | |

---

[20] *See* **PX 81** (identifying Fow Enterprises as a UPS "Residential Common Carrier").

| Mail Order Club | 12/31/4444 [sic] | 20 OF 300 BUFFALO CIGARETES [sic] | Mail Center Club, Salamanca, New York | **PX 191** (*see above*) | delivery records and last shipment dates has been obtained. |

177.    UPS also knew that the relative market size for cigarettes was much larger than the size for little cigars.  As measured by the

federal Tobacco Trade Bureau, the volume of cigarettes consumed, well exceeds the amount of both little and large cigars:



**PX 11** (U.S. Dept. of Treasury, Alcohol and Tobacco Tax and Trade Bureau, TTB.gov; Tobacco Statistics, *available* at https://www.ttb.gov/tobacco/tobacco-stats.shtml) (need to cite to affidavit to explain how collected).

178.   The same information above, is provided in a numerical format as follows:

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Cigarettes - Small** | 380,991,925,030 | 380,680,700,635 | 361,652,753,552 | 346,419,016,272 | 317,975,097,551 | 300,489,210,443 |
| **Cigars - Small** | 3,968,440,266 | 4,463,394,807 | 5,081,428,873 | 5,880,829,642 | 2,342,544,736 | 976,563,614 |
| Cigars - Large | 4,150,212,635 | 4,935,799,524 | 5,552,031,489 | 5,658,598,635 | 9,795,164,026 | 12,418,695,416 |
| Snuff | 80,239,192 | 86,636,620 | 88,367,787 | 94,818,548 | 95,054,726 | 99,888,829 |
| Chewing Tobacco | 39,199,204 | 39,097,823 | 35,304,042 | 33,450,239 | 30,457,164 | 27,614,984 |
| Pipe Tobacco | 4,921,046 | 4,907,816 | 5,004,276 | 5,277,574 | 12,876,840 | 26,266,567 |
| Roll-Your-Own Tobacco | 17,546,471 | 17,635,370 | 18,955,170 | 21,778,321 | 12,199,276 | 6,497,483 |
| **All Tobacco Products** | **389,252,483,844** | **390,228,172,595** | **372,433,845,189** | **358,113,769,231** | **330,263,394,319** | **314,044,737,336** |

| | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| **Cigarettes - Small** | 292,769,057,560 | 287,486,457,382 | 273,787,372,153 | 262,703,967,303 | 267,830,970,391 |
| **Cigars - Small** | 798,185,095 | 754,215,891 | 659,444,169 | 563,857,493 | 530,704,256 |
| Cigars - Large | 12,930,545,269 | 13,036,568,766 | 12,502,724,499 | 12,878,778,789 | 11,744,484,420 |
| Snuff | 103,561,706 | 108,205,345 | 115,750,102 | 114,367,770 | 117,571,804 |
| Chewing Tobacco | 24,800,613 | 24,145,994 | 22,439,653 | 21,965,411 | 20,211,121 |
| Pipe Tobacco | 35,468,983 | 38,976,650 | 42,273,574 | 41,226,368 | 40,336,635 |
| Roll-Your-Own Tobacco | 5,325,105 | 4,549,732 | 3,852,995 | 3,237,495 | 3,664,804 |
| **All Tobacco Products** | **306,666,944,331** | **301,453,119,760** | **287,133,857,145** | **276,327,400,629** | **280,287,943,431** |

*Id.*; *see also* **PX 15** (Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR), Consumption of Cigarettes and Combustible Tobacco – United States, 2000–2001 (Aug., 3, 2012 / 61(30); 565–569), *available* at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6130a1.htm#tab1).

### C.   UPS's Delivery of Cigarettes

179.   In short, UPS failed to adequately implement an enforceable Cigarette Policy, failed to adequately train its employees, failed to share any relevant information between other divisions within UPS, and failed to audit such cigarette shippers when UPS possessed a reasonable basis for auditing such shippers.  As a result, UPS knowingly permitted hundreds of thousands of packages containing cigarettes to be shipped throughout the United States, including the State and City of New York.

180.   The following tables show the volume, weight, and average package weight of shipments delivered by UPS to addresses within the State of New York, the City of New York, and outside the State of New York:

| Shipper Group | UPS acct no. | UPS Customer Name | Start | End | No. of Packages | Billed Weight (lbs.) | Avg. Package wt. (lbs.) |
|---|---|---|---|---|---|---|---|
| Elliot Enterprises Group[21] | 8T74T8 | Eexpress | 9/24/2012 | 6/13/2014 | 11,186 | 59,069 | 5.3 |
| | R2W088 | Bearclaw Unlimited | 2/26/2011 | 5/12/2012 | 5,249 | 18,630 | 3.5 |
| | X1X635 | Elliot Enterprises | 10/4/2010 | 9/28/2012 | 12,512 | 56,693 | 4.5 |
| Shipping Services Group[22] | 03E04E | Shipping Services | 7/1/2010 | 2/17/2014 | 31,253 | 150,790 | 4.8 |
| | 157YW3 | Morningstar Crafts & Gifts | 2/8/2014 | 5/17/2014 | 283 | 1,543 | 5.5 |
| Smokes & Spirits Group[23] | 34850X | AJ's Cigar | 7/30/2010 | 2/21/2014 | 7,824 | 35,652 | 4.6 |
| | V2W459 | Sweet Seneca Smokes | 2/22/2014 | 2/21/2015 | 1,175 | 7,046 | 6.0 |
| | W3Y624 | R J E S S | 7/1/2010 | 5/30/2015 | 284 | 3,057 | 10.8 |
| | W9476E | Smokes & Spirits | 9/3/2010 | 2/5/2014 | 10,171 | 65,785 | 6.5 |
| | X29128 | Native Outlet | 10/23/2010 | 2/21/2015 | 6,033 | 35,388 | 5.9 |
| Native Wholesale Supply[24] | RA0610 | Native Wholesale Supply | 7/1/2010 | 5/22/2014 | 2,006 | 3,459 | 1.7 |
| | RX4828 | Seneca Promotions | 7/1/2013 | 2/28/2015 | 199 | 1,936 | 9.7 |

[21] Shipment information for the Elliot Enterprises Group was compiled from the following exhibits: PX 67, PX 77, PX 411, PX 416, PX 433, PX 439, PX 552, and PX 559.

[22] Shipment information for the Shipping Services Group was compiled from the following exhibits: PX 67, PX 70, PX 73, PX 220, PX 221, PX 222, PX 223, PX 227, PX 409, PX 426, PX 433, and PX 551.

[23] Shipment information for the Smokes & Spirits Group was compiled from the following exhibits: PX 67, PX 70, PX 76, PX 78, PX 188, PX 194, PX 195, PX 220, PX 221, PX 222, PX 224, PX 227, PX 254, PX 415, PX 418, PX 423, PX 431, PX 433, PX 557, PX 558, and PX 560.

[24] Shipment information for the Native Wholesale Supply Group was compiled from the following exhibits: PX 194, PX 195, PX 254, PX412, PX 414, PX 428, PX 429, PX 430, PX 437, PX 438, PX 553, PX 555, and PX 556.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Indian Smokes Group[25] | W98A66 | Indian Smokes | 4/25/2011 | 10/20/2012 | 2,393 | 24,282 | 10.1 |
| Arrowhawk Group[26] | 71A514 | Seneca Cigars Llc | 1/11/2012 | 8/17/2013 | 6,828 | 32,012 | 4.7 |
| | 1238XA | Seneca Cigars Llc | 12/31/2011 | 1/7/2012 | 7 | 98 | 14.0 |
| | 715634 | Arrowhawk Cigars | 2/11/2012 | 8/24/2013 | 1,396 | 6,183 | 4.4 |
| | R17756 | Native Gifts | 10/8/2013 | 6/30/2014 | 513 | 0 | 0.0[27] |
| | YA5535 | Two Pine Enterprises | 7/23/2013 | 4/19/2014 | 1,112 | 7,902 | 7.1 |
| Jacob's Tobacco[28] | 249VY7 | Jacobs Manufacturing | 7/2/2010 | 7/16/2011 | 2,196 | 44,922 | 20.5 |
| Mohawk Spring Water Group[29] | 2.99E+05 | Action Race Parts And Fab | 8/4/2010 | 12/7/2010 | 8 | | 0.0 |
| | 299000 | Action Race Parts And Fab | 7/31/2010 | 6/7/2014 | 2,425 | 153,244 | 63.2 |
| | 299400 | Action Race Parts And Fab | 8/2/2010 | 12/7/2010 | 15 | | 0.0 |
| | X4Y360 | Mohawk Spring Water | 11/10/2010 | 7/2/2011 | 4,409 | 92,548 | 21.0 |

**Total (State)**  109,470  800,205  7.3

---

[25] Shipment information for the Indian Smokes Group was compiled from the following exhibits: PX 68, PX 70, PX 79, PX 220, PX 221, PX 222, PX 225, and PX 227.

[26] Shipment information for the Arrowhawk was compiled from the following exhibits: PX 67, PX 70, PX 80, PX 220, PX 221, PX 222, PX 227, PX 413, PX 420, PX 422, PX 433, PX 435, and PX 436

[27] In some instances, UPS's own records appear to show packages being delivered, but no recorded weight.

[28] Shipment information for the Jacob's Tobacco Group was compiled from the following exhibits: PX 69, PX 71, PX 74, PX 276, PX 277, PX 278, PX 410, PX 417, PX 427, PX 434 and PX 440.

[29] Shipment information for the Mohawk was compiled from the following exhibits: PX 69, PX 71, PX 75, PX 276, PX 277, PX 278, PX 419, PX 421, PX 434, and PX 435.

| Shipper Group | UPS acct no. | UPS Customer Name | Start | End | No. of Packages | Billed Weight (lbs.) | Avg. Package wt. (lbs.) |
|---|---|---|---|---|---|---|---|
| Elliot Enterprises Group | 8T74T8 | Eexpress | 9/25/2012 | 6/13/2014 | 7,552 | 40,437 | 5.4 |
| | R2W088 | Bearclaw Unlimited | 2/26/2011 | 5/12/2012 | 1,694 | 6,460 | 3.8 |
| | X1X635 | Elliot Enterprises | 10/6/2010 | 9/24/2012 | 8,443 | 38,462 | 4.6 |
| Native Wholesale Supply | RA0610 | Native Wholesale Supply | 8/25/2010 | 9/28/2013 | 47 | 123 | 2.6 |
| | RX4828 | Seneca Promotions | 9/12/2013 | 12/14/2013 | 2 | 10 | 5.0 |
| Shipping Services Group | 03E04E | Shipping Services | 7/1/2010 | 2/17/2014 | 17,252 | 85,651 | 5.0 |
| | 157YW3 | Morningstar Crafts & Gifts | 2/8/2014 | 5/17/2014 | 163 | 925 | 5.7 |
| Arrowhawk Group | 71A514 | Seneca Cigars Llc | 1/18/2012 | 7/16/2013 | 1,380 | 6,911 | 5.0 |
| | | | 2/11/2012 | 7/13/2013 | 439 | 1,854 | 4.2 |
| | R17756 | Native Gifts | 10/9/2013 | 6/30/2014 | 40 | 0 | 0.0 |
| | YA5535 | Two Pine Enterprises | 8/14/2013 | 12/4/2013 | 3 | 34 | 11.3 |
| Indian Smokes Group | W98A66 | Indian Smokes | 5/7/2011 | 10/20/2012 | 669 | 8,068 | 12.1 |
| Smokes & Spirits Group | 34850X | Aj's Cigar | 8/11/2010 | 2/11/2014 | 2,301 | 10,357 | 4.5 |
| | V2W459 | Sweet Seneca Smokes | 3/1/2014 | 2/21/2015 | 353 | 2,247 | 6.4 |
| | W3Y624 | R J E S S | 8/2/2010 | 5/23/2015 | 112 | 1,244 | 11.1 |
| | W9476E | Smokes & Spirits | 9/7/2010 | 1/29/2014 | 3,085 | 20,466 | 6.6 |
| | X29128 | Native Outlet | 10/23/2010 | 2/21/2015 | 1,381 | 8,229 | 6.0 |
| Jacob's Tobacco | 249VY7 | Jacobs Manufacturing | 6/4/2011 | 6/4/2011 | 1 | 18 | 18.0 |
| **Total (NYC)** | | | | | **44,917** | **231,496** | **5.2** |

49

| Shipper Group | UPS acct no. | UPS Customer Name | Start | End | No. of Packages | Billed Weight (lbs.) | Avg. Package wt. (lbs.) |
|---|---|---|---|---|---|---|---|
| Elliot Enterprises Group | 8T74T8 | EEXPRESS | 9/24/2012 | 6/13/2014 | 29,246 | 114,680 | 3.9 |
| | R2W088 | BEARCLAW UNLIMITED | 2/26/2011 | 5/12/2012 | 4,786 | 19,464 | 4.1 |
| | X1X635 | ELLIOT ENTERPRISES | 10/4/2010 | 9/28/2012 | 40,064 | 213,607 | 5.3 |
| Shipping Services Group | 03E04E | SHIPPING SERVICES | 7/1/2010 | 2/17/2014 | 28,290 | 136,646 | 4.8 |
| Smokes & Spirits Group | X3X475 | SMOKES & SPIRITS | 4/8/2015 | 4/8/2015 | 8 | 0 | 0.0 |
| | V2W459 | SWEET SENECA SMOKES | 2/22/2014 | 2/21/2015 | 8,480 | 61,369 | 7.2 |
| | W9476E | SMOKES & SPIRITS | 9/3/2010 | 2/5/2014 | 43,624 | 264,752 | 6.1 |
| | X29128 | NATIVE OUTLET | 10/23/2010 | 2/21/2015 | 31,884 | 199,929 | 6.3 |
| Native Wholesale Supply | RA0610 | NATIVE WHOLESALE SUPPLY | 7/1/2010 | 5/22/2014 | 4,131 | 85,960 | 20.8 |
| | RX4828 | SENECA PROMOTIONS | 7/1/2013 | 2/28/2015 | 1,888 | 65,111 | 34.5 |
| | A590X8 | NATIVE WHOLESALE | 2/7/2011 | 3/22/2014 | 16 | 114 | 7.1 |
| Indian Smokes Group | W98A66 | INDIAN SMOKES | 4/25/2011 | 10/20/2012 | 3,603 | 23,701 | 6.6 |
| Arrowhawk Group | 71A514 | SENECA CIGARS LLC | 1/11/2012 | 8/17/2013 | 8,256 | 45,165 | 5.5 |
| | 1238XA | SENECA CIGARS LLC | 12/31/2011 | 1/7/2012 | 10 | 140 | 14.0 |
| | 715634 | ARROWHAWK CIGARS | 2/11/2012 | 8/24/2013 | 3,559 | 17,476 | 4.9 |
| | R17756 | NATIVE GIFTS | 10/8/2013 | 6/30/2014 | 1,007 | 20 | 0.0 |
| | YA5535 | TWO PINE ENTERPRISES | 7/23/2013 | 4/19/2014 | 1,974 | 12,061 | 6.1 |
| Jacob's Tobacco | 249VY7 | JACOBS MANUFACTURING | 7/2/2010 | 7/16/2011 | 2,978 | 113,249 | 38.0 |
| Mohawk Spring Water Group | 299000 | ACTION RACE PARTS AND FAB | 7/31/2010 | 6/7/2014 | 22 | 821 | 37.3 |
| | 299400 | ACTION RACE PARTS AND FAB | 8/2/2010 | 12/7/2010 | 19 | 0 | 0.0 |
| | X4Y360 | MOHAWK SPRING WATER | 11/10/2010 | 7/2/2011 | 9 | 164 | 18.2 |
| **Total (Out of State)** | | | | | **213,854** | **1,374,429** | **6.4** |

181.    The preponderance of plaintiffs' evidence concerning each of the following eight

Shipper Groups further shows that each of these above referenced deliveries occurring on or after

July 1, 2010 should have been audited and contained cigarettes:

### 1.    The Elliot Enterprises Group

182.    The Elliot Enterprises Group is comprised of numerous predecessor companies,

and later incarnations that are the subject of plaintiffs' damages and penalties case in chief:

### i.    Predecessor Shipper Companies

183.    UPS Account Executive Gerard Fink handled several accounts that were

predecessors to the Elliot Enterprises group of shippers.  **G. Fink Trial Tr. _____.**

184.    None of the information relating to these accounts was integrated into any

separate database of likely cigarette shippers.  **B. Cook Trial Tr. _____**

### (a)    Rock Bottom Tobacco

185.    On or about April 7, 2005, UPS opened account number 74R5V5 for a customer

named "Rock Bottom Tobacco" located at 1949 Richardson Road, Gowanda, NY, which is

located on the Seneca Cattaraugus Reservation.  (UPS00087065)

186.    The contact person listed in UPS's records for Rock Bottom Tobacco was Aaron

Elliott. (UPS00087065)

187.    The UPS account executive for Rock Bottom Tobacco was Gerard Fink.

(UPS00087065)

188.    The target revenue listed in UPS's records for the five-month period between its

inception and September 10, 2005 from the Rock Bottom Tobacco account was $159,726.

(UPS0062535)

189.    The actual revenue for that period is listed in UPS's records as $65,094.

(UPS0062535)

190.     On or about October 27, 2005, Gerard Fink included the Rock Bottom Tobacco account as a known smoke shop account he wanted UPS to consider offering an exception to in terms of the revenue required to justify the provision of UPS's CTP computer hardware systems, given the expectation that Rock Bottom Tobacco's shipping volume would decline after UPS changed its policy to stop accepting cigarettes for delivery to individual consumers pursuant to the AOD.  (UPS0062534-35)

191.     UPS only produced shipping records relating to shipments for Rock Bottom Tobacco between October 22, 2005 and November 26, 2005, and the columns in those records relating to the consignee names and addresses, the weight of the packages, and the billed amounts are all blank.  (UPS00147632)

192.     UPS cancelled the Rock Bottom Tobacco account on March 12, 2008.  UPS's documents do not explain the basis for this cancellation, or whether any successor accounts were created. (UPS00087065)

**(b)      deerpathcigs.com/deerpathcigs.net**

193.     At an unknown time prior to March 7, 2008, UPS opened accounts for customers named "deerpathcigs.com" and "deerpathcigs.net," with respective account numbers 10Y52Y and 54Y59Y, and located respectively at 41 Erie Street and 17 Main Street, Salamanca, NY which are both located on the Seneca Allegany Reservation. (UPS00062900)

194.     The UPS account executive for both of these accounts was Gerard Fink. (UPS00062900)

195.     The contact person listed in UPS's records for both of these accounts was Toni Oldshield. (UPS00062900)

196.     The telephone number listed in UPS's records for deerpathcigs.net was (716) 945-5554.  (UPS00062902)

197.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, either of these accounts.

198.    At an unknown time prior to March 7, 2008, UPS cancelled both of these accounts.   UPS's documents do not explain the basis for these cancellations or whether any successor accounts were created. (UPS00062900)

### (c)    Smoke Cignals

199.    On or about March 29, 2005, UPS opened an account for a customer named "Smoke Cignals" with the account number E09W07 located at 17 Main Street, Salamanca, NY, located on the Seneca Allegany Reservation.  (UPS00046111)

200.    The UPS account executive for Smoke Cignals was Gerard Fink. (UPS00046111)

201.    UPS cancelled Smoke Cignals' account on March 12, 2008, and listed the explanation for termination as "Account shows as cancelled in CRIS - per self audit." (UPS00046111)  UPS has produced no documents indicating the reason for, or results of, the purported audit that led to the termination of Smoke Cignals' account.  (UPS document production generally; Expected B. Cook Trial Testimony)

202.    Smoke Cignals operated from the same location as Deerpathcigs.net, 17 Main Street, Salamanca, NY.  (UPS00046111;  UPS00062900)

203.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, the Smoke Cignals account.

204.    UPS's accounts for Smoke Cignals and Rock Bottom Tobacco were cancelled on the same day, March 12, 2008. (UPS0004611;UPS00087065)

### (d)  Smoke Signals

205.    At an unknown time prior to March 7, 2008, UPS opened an account for a customer named "Smoke Signals" with account number F3618Y, located at 17 Main Street, Salamanca, NY which is located on the Seneca Allegany Reservation. (UPS00062900)

206.    The telephone number listed in UPS's records for Smoke Signals was (716) 945-5554. (UPS00062900)

207.    The UPS account executive for Smoke Signals was Gerard Fink. (UPS00062900)

208.    At an unknown time prior to March 7, 2008, UPS cancelled the Smoke Signals aacount.   UPS's documents do not explain the basis for this cancellation or whether any successor accounts were created. (UPS00062900)

209.    Smoke Signals operated from the same location as Deerpathcigs.net and Smoke Cignals, 17 Main Street, Salamanca, NY, and shared the same phone number as Deerpathcigs.net, (716) 945-5554. (UPS00062900; UPS00062902)

### (e)  Oldshield Smokes

210.    On or about April 3, 2000, UPS opened an account for a customer named "Oldshield Smokes" with account number 8AR318, located at 41 Erie Street, Salamanca, NY which is located on the Seneca Allegany Reservation. (UPS00021452)

211.    The account executive listed in UPS's records for Oldshield Smokes was Gerard Fink. (UPS0062900)

212.    Oldshield Smokes operated from the same location as Deerpathcigs.com, 41 Erie Street, Salamanca, NY. (UPS00021452; UPS00062900)

213.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, the Oldshield Smokes account.

214.    At an unknown time prior to June 2, 2011, UPS cancelled the Oldshield Smokes account.   UPS's documents do not explain the basis for this cancellation or whether any successor accounts were created. (UPS00021452).

### ii.        Shipper Group Companies at Issue

215.    The shipper groups at issue in this case are Elliot Enterprises, Bearclaw Unliminted (AFIA), and EExpress:

### 2.        The Elliot Enterprises Group

216.    The Elliot Enterprises Group is comprised of numerous predecessor companies, and later incarnations that are the subject of plaintiffs' damages and penalties case in chief:

### i.        Predecessor Shipper Companies

217.    UPS Account Executive Gerard Fink handled several accounts that were predecessors to the Elliot Enterprises group of shippers. **G. Fink Expected Trial Tr.**.

218.    None of the information relating to these accounts was integrated into any separate database of likely cigarette shippers. **B. Cook Expected Trial Tr.**.

### (a)        Rock Bottom Tobacco

219.    On or about April 7, 2005, UPS opened account number 74R5V5 for a customer named "Rock Bottom Tobacco" located at 1949 Richardson Road, Gowanda, NY, which is located on the Seneca Cattaraugus Reservation.  PX 389.

220.    The contact person listed in UPS's records for Rock Bottom Tobacco was Aaron Elliott. PX 389.

221.    The UPS account executive for Rock Bottom Tobacco was Gerard Fink. PX 389.

222.    The target revenue listed in UPS's records for the five-month period between its inception and September 10, 2005 from the Rock Bottom Tobacco account was $159,726.  PX 302.

223.    The actual revenue for that period is listed in UPS's records as $65,094. PX 302.

224.    On or about October 27, 2005, Gerard Fink included the Rock Bottom Tobacco account as a known smoke shop account he wanted UPS to consider offering an exception to in terms of the revenue required to justify the provision of UPS's CTP computer hardware systems, given the expectation that Rock Bottom Tobacco's shipping volume would decline after UPS changed its policy to stop accepting cigarettes for delivery to individual consumers pursuant to the AOD.  PX 301, PX 302.

225.    UPS only produced shipping records relating to shipments for Rock Bottom Tobacco between October 22, 2005 and November 26, 2005, and the columns in those records relating to the consignee names and addresses, the weight of the packages, and the billed amounts are all blank.  UPS00147632[30]

226.    UPS cancelled the Rock Bottom Tobacco account on March 12, 2008.  UPS's documents do not explain the basis for this cancellation, or whether any successor accounts were created. PX 389.

### (b)      deerpathcigs.com/deerpathcigs.net

227.    At an unknown time prior to March 7, 2008, UPS opened accounts for customers named "deerpathcigs.com" and "deerpathcigs.net," with respective account numbers 10Y52Y and 54Y59Y, and located respectively at 41 Erie Street and 17 Main Street, Salamanca, NY which are both located on the Seneca Allegany Reservation. PX 316.

228.    The UPS account executive for both of these accounts was Gerard Fink. PX 316.

229.    The contact person listed in UPS's records for both of these accounts was Toni Oldshield. PX 316.

---

[30] Subject to Plaintiffs' motion to supplement the exhibit list.

230.    The telephone number listed in UPS's records for deerpathcigs.net was (716) 945-5554.  PX 586.

231.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, either of these accounts.

232.    At an unknown time prior to March 7, 2008, UPS cancelled both of these accounts.   UPS's documents do not explain the basis for these cancellations or whether any successor accounts were created. PX 316.

### (c)    Smoke Cignals

233.    On or about March 29, 2005, UPS opened an account for a customer named "Smoke Cignals" with the account number E09W07 located at 17 Main Street, Salamanca, NY, located on the Seneca Allegany Reservation.  PX 241.

234.    The UPS account executive for Smoke Cignals was Gerard Fink. PX 241.

235.    UPS cancelled Smoke Cignals' account on March 12, 2008, and listed the explanation for termination as "Account shows as cancelled in CRIS - per self audit."  PX 241. UPS has produced no documents indicating the reason for, or results of, the purported audit that led to the termination of Smoke Cignals' account.  (UPS document production generally; Expected B. Cook Trial Testimony)

236.    Smoke Cignals operated from the same location as Deerpathcigs.net, 17 Main Street, Salamanca, NY.  PX 241,  PX 316.

237.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, the Smoke Cignals account.

238.    UPS's accounts for Smoke Cignals and Rock Bottom Tobacco were cancelled on the same day, March 12, 2008. PX 241, PX 389.

### (d)     Smoke Signals

239.    At an unknown time prior to March 7, 2008, UPS opened an account for a customer named "Smoke Signals" with account number F3618Y, located at 17 Main Street, Salamanca, NY which is located on the Seneca Allegany Reservation. PX 316.

240.    The telephone number listed in UPS's records for Smoke Signals was (716) 945-5554. PX 316.

241.    The UPS account executive for Smoke Signals was Gerard Fink. PX 316.

242.    At an unknown time prior to March 7, 2008, UPS cancelled the Smoke Signals aacount.   UPS's documents do not explain the basis for this cancellation or whether any successor accounts were created. PX 316.

243.    Smoke Signals operated from the same location as Deerpathcigs.net and Smoke Cignals, 17 Main Street, Salamanca, NY, and shared the same phone number as Deerpathcigs.net, (716) 945-5554. PX 316, PX 586.

### (e)     Oldshield Smokes

244.    On or about April 3, 2000, UPS opened an account for a customer named "Oldshield Smokes" with account number 8AR318, located at 41 Erie Street, Salamanca, NY which is located on the Seneca Allegany Reservation. UPS00021452.[31]

245.    The account executive listed in UPS's records for Oldshield Smokes was Gerard Fink. PX 316.

246.    Oldshield Smokes operated from the same location as Deerpathcigs.com, 41 Erie Street, Salamanca, NY. UPS00021452[32], PX 316.

247.    UPS has produced no documents reflecting any expected or actual revenue from, or any records of any shipments for, the Oldshield Smokes account.

---

[31] Subject to Plaintiffs' motion to supplement the exhibit list.
[32] Subject to Plaintiffs' motion to supplement the exhibit list.

248.    At an unknown time prior to June 2, 2011, UPS cancelled the Oldshield Smokes account.   UPS's documents do not explain the basis for this cancellation or whether any successor accounts were created. UPS00021452.[33]

## ii.    Shipper Group Companies at Issue

249.    The shipper groups at issue in this case are Elliot Enterprises, Bearclaw Unlimited (AFIA), and EExpress:

## (a)    Elliot Enterprises/Elliott Enterprise

250.    On or about September 28, 2010, UPS opened an account for a customer named "Elliot Enterprises" with account number X1X635, located at 38 Main Street, Salamanca, NY, which is located on the Seneca Allegany Reservation.  PX 316.

251.    The account executive listed in UPS's records for Elliot Enterprises was Gerard Fink. PX 316.

252.    The Elliot Enterprises location at 38 Main Street, Salamanca, NY was a commercial address, consisting of a retail storefront housing a smoke shop.  G. Fink Testimony Decl. at ¶ 58; Expected G. Fink Trial Testimony; PX 172.

253.    UPS's shipping records for Elliot Enterprises' account number X1X635 reflect entries stating "A.Elliott Elliot Enterprise" and  "A.Elliott" in the columns entitled "Sender" and "S-Name," beginning with shipments picked up on October 9, 2010 and repeating with respect to virtually all subsequent shipments.  PX 559.

254.    UPS's CRIS computer system records the contact name for Elliot Enterprises as "Aaron Elliot."  UPS00092245

255.    UPS began shipping packages for Elliot Enterprises on October 9, 2010.  PX 559.

---

[33] Subject to Plaintiffs' motion to supplement the exhibit list.

256.    On October 11, 2010, Gerard Fink made a 30-minute in-person visit to Elliot Enterprises.  This visit was recorded on a spreadsheet relating to the prospective conversion of competing carriers' customers to regular pick-up accounts through UPS. PX 459.

257.    On November 10, 2010, the initial PACT Act Non-Compliant List ("NCL") was published.  The initial NCL included an entry listing a website entitled "deerpathcigs.com," identifying the owner of the website "deerpathcigs.com" as "Elliot Enterprise," identifying the address for Elliot Enterprise as 38 Main Street, Salamanca, NY, and the phone number as (800) 536-7014.   PX 472.

258.    UPS received the initial NCL on or about the date of its November 10, 2100 publication. PX 472.

259.    Also on November 10, 2010, UPS's Jamestown Service Center received a letter from Jim Erlich of an entity calling itself "Tobacco Watchdog Group."  In the letter, Mr. Erlich warned UPS that "Elliot Industries" located at 38 Main Street, Salamanca NY was making "illegal contraband cigarette shipments to residential consumers."  PX 346.

260.    Gerard Fink admits that he received a copy of the Tobacco Watchdog Group letter on November 11, 2010.  G. Fink Testimony Decl. ¶ 33.

261.    By the end of November 2010, the volume of UPS's shipments for Elliot Enterprises account had grown to nearly 1,000 shipments during that month alone, or approximately 50 packages per day.  PX 559.

262.    By the end of December 2010, that volume had nearly doubled, to almost 2,000 packages during that month, or approximately 100 packages per day.  PX 559.

263.    By the end of January 2010, that volume had increased even more, to more than 2,500 packages during that month, or approximately 150 packages per day.  PX 559.  For the

remaining duration of the account, monthly package volumes would remain between 2,000 and 2,500, or 100 to 150 packages per day.  PX 559.

264.    On February 4, 2011, Gerard Fink made a 35-minute in-person visit to Elliot Enterprises.  In his notes recorded in UPS's computer system relating to this visit, Fink identified a discrepancy between high volume and low billing entries for the account.  He further stated that he "[b]elieve[d] that the shift has been made to cigars.  Need to clarify owners and primary contacts."  PX 397.

265.    On March 8, 2011, UPS received a claim for a lost or damaged shipment from Elliot Enterprises to a residential customer, with the contents of the package listed in UPS's claims records as "Cartons of Kent [F]ull King Soft."  PX 191.

266.    On May 26, 2011, UPS received a claim for a lost or damaged shipment from Elliot Enterprises to a residential customer, with the contents of the package listed in UPS's claims records as "Cartons of Cigarettes."  PX 191.

267.    On December 15, 2011, UPS received a claim for a lost or damaged shipment from Elliot Enterprises to a residential customer, with the contents of the package listed in UPS's claims records as "Cigarettes/PDMM."  PX 191.

268.    On March 23, 2012, UPS received a claim for a lost or damaged shipment from Elliot Enterprises to a residential customer, with the contents of the package listed in UPS's claims records as "5 of 5 Seneca Ultra Light 100; 6 of 6 Seneca Light 100 Carton."  PX 211.

269.    On or about September 29, 2012, UPS cancelled the Elliot Enterprises account numbered X1X635 because a driver reported that Elliot Enterprises was shipping cigarettes. UPS has not produced any document specifying the actual date on which the driver purportedly made this report. PX 559, PX 172.

270.    Subsequent to the opening of the original account numbered XIX635, UPS apparently created five additional accounts for Elliot Enterprises, numbered 31T10V, 3TB245, 47T53V, 48F3T4, and T6Y301.  These accounts differed from the original account in that they used the shipper name "Elliott Enterprise," with an extra "t" in the first name and without an "s" at the end of "Enterprise".  UPS's records indicate that these accounts were open for 33, 12, 6, 22, and 30 months, respectively.  UPS's records indicate that UPS had no "data" relating to these accounts as of January 14, 2016.  PX 432.

271.    UPS has produced no shipping records relating to these subsequently-opened accounts.  UPS document production generally; Expected B. Cook Trial Testimony.

272.    UPS did not conduct any audits of any of the Elliot Enterprises/Elliott Enterprise accounts at any time.   UPS document production generally; Expected B. Cook Trial Testimony.

273.    UPS never had a Tobacco Contract with Elliot Enterprises, notwithstanding Mr. Fink's description of Elliot Enterprises as a "smoke shop".  UPS document production generally; Expected B. Cook Trial Testimony; PX 172.

274.    The Elliot Enterprises account numbered X1X635 was Gerard Fink's highest net-revenue-generating account in 2011, generating $320,139 in net revenue for UPS that year.  PX 104.

275.    The Elliot Enterprises account numbered X1X635 was Gerard Fink's sixth-highest net-revenue-generating account in 2012, generating $220,375 in net revenue for UPS that year, even though the account was only open for three-quarters of that year, having been cancelled on September 29, 2012.  PX 102, PX 553, PX 172.

### (b)    Bearclaw Unlimited/"AFIA"

276.    On or about October 2, 2010, UPS opened an account for a customer named "Bearclaw Unlimited" with account number T27T95, located at 4888 Klawater Road, Great

Valley, NY, which is located approximately 3.5 miles from the Seneca Allegany Reservation. UPS00147348.[34]

277.    Gerard Fink is listed in UPS's records as the account executive for Bearclaw Unlimited.  PX 389.

278.    The Bearclaw Unlimited location at 4888 Klawater Road, Great Valley, NY is a residential address, consisting of a single-family house.   Expected G. Fink Trial Testimony.

279.    The phone number listed in UPS's records for Bearclaw Unlimited is (800) 536-7014, the same phone number listed on the NCL for Elliot Enterprises. PX 389, PX 472.

280.    Between approximately October 12, 2010, and December 27, 2010, UPS opened an additional 14 accounts for Bearclaw Unlimited at the same address.  UPS00147333-335; UPS00147338-344; UPS00147346; UPS00147634-336[35]

281.    Bearclaw Unlimited stopped using its original account, and the subsequent 14 accounts, on or before January 20, 2011.  UPS00147333-335; UPS00147338-344; UPS00147346; UPS00147348; UPS00147634-336.[36]

282.    On January 8, 2011, UPS opened a sixteenth account for a Bearclaw Unlimited at the same address, with account number 6TG514.   UPS00147637.[37]

283.    On or about January 24, 2011, UPS received a claim for a lost or damaged shipment from Bearclaw Unlimited to a residential customer using account number 6TG514, with the contents of the package listed in UPS's claims records as "Marlboro Cigarette Cartons" with a listed weight for the package of 5 pounds.  PX 213.

---

[34] Subject to Plaintiffs' motion to supplement the exhibit list.
[35] Subject to Plaintiffs' motion to supplement the exhibit list.
[36] Subject to Plaintiffs' motion to supplement the exhibit list.
[37] Subject to Plaintiffs' motion to supplement the exhibit list.

284.    On or about February 26, 2011, Bearclaw Unlimited stopped using the account number 6TG514 to make shipments through UPS. UPS00147637.[38]

285.    On or about February 24, 2011, UPS opened a seventeenth account for Bearclaw Unlimited at the same address, using account number R2W088. UPS00147637.[39]

286.    On or about August 26, 2011, UPS discovered 12 cartons of cigarettes in a shipment tendered by Bearclaw Unlimited under account number R2W088 for delivery to a residential address in Arizona.  PX 333, UPS00147347.[40]

287.    At that time, UPS noted in its records that Bearclaw Unlimited did not have a Tobacco Contract with UPS.  PX 333.

288.    On August 30, 2011,UPS's Dangerous Goods department instructed UPS security not to contact Bearclaw Unlimited, because the assigned account executive would be contacting the shipper to address the issue.  UPS00036301.[41]

289.    On the same day, UPS's Dangerous Goods department instructed Gerard Fink to contact Bearclaw Unlimited to review UPS's cigarette policy with management and obtain a letter of corrective action.  PX 200.

290.    Gerard Fink made email contact with Arnold Cooper of Bearclaw Unlimited in connection with this violation on September 6, 2011, which was more than 5 business days after UPS discovered the violation of its tobacco policy by Bearclaw Unlimited.  In his email, Mr. Fink stated that UPS would suspend Bearclaw Unlimited's service if a written statement was not received by UPS by September 7, 2011.  UPS00099052-053.[42]

---

[38] Subject to Plaintiffs' motion to supplement the exhibit list.
[39] Subject to Plaintiffs' motion to supplement the exhibit list.
[40] Subject to Plaintiffs' motion to supplement the exhibit list.
[41] Subject to Plaintiffs' motion to supplement the exhibit list.
[42] Subject to Plaintiffs' motion to supplement the exhibit list.

291.    On September 14, 2011, Gerard Fink emailed the Dangerous Goods department, attaching a letter purporting to be from Arnold Cooper, which stated, in full: "Gerry Fink has reviewed the UPS tobacco policy with me.  I understand the policy and will adhere to it by not shipping cigarettes to unlicensed retailers and/or consumers."  Mr. Cooper's purported signature is dated September 4, 2011.  Mr. Fink's purported countersignature is dated September 14, 2011. PX 441, PX 333.

292.    UPS did not suspend Bearclaw Unlimited's service for a period of ten days when it did not receive its purported "written action plan" within two business days of UPS's contacting Bearclaw Unlimited in connection with this violation.  UPS00147347.[43]

293.    UPS did not conduct an audit of Bearclaw Unlimited within 90 days of the violation, its contact with Bearclaw Unlimited regarding the violation, or Bearclaw Unlimited's delivery of its purported "written action plan."  UPS document production generally; Expected B. Cook Trial Testimony.

294.    Bearclaw Unlimited stopped tendering packages to UPS using the account numbered R2W088 on or about May 9, 2012. UPS00147347.[44]

295.    On May 8, 2012, UPS opened an eighteenth account for Bearclaw Unlimited, account number 7A793E, at the same address.  For this account, Bearclaw provided an alias, "AFIA," as the shipper name, but it was located at the same address as Bearclaw Unlimited, 4888 Klawater Road, Great Valley, NY.  PX 174.

296.    The contact person listed for the Bearclaw Unlimited "AFIA" alias account numbered 7A793E was Toni Oldshield, and the phone number listed was (716) 378-1968.   PX 174.

---

[43] Subject to Plaintiffs' motion to supplement the exhibit list.
[44] Subject to Plaintiffs' motion to supplement the exhibit list.

297.    Toni Oldshield was the contact person listed for the previously-cancelled UPS accounts issued to deerpathcigs.com and deerpathcigs.net.  PX 316.

298.    The Bearclaw Unlimited "AFIA" alias account was opened approximately 18 months after deerepathcigs.com/Elliot Enterprises was listed on the NCL published by the ATF and received by UPS on November 10, 2010.  PX 472.

299.    On September 19, 2012, UPS Account Executives Gerard Fink and Judson Timothy McDowell received an email from an employee in UPS's Harlingen Center in Texas. This employee informed Fink that a customer had placed an order from account number 7A793E and had paid for the merchandise ordered, but had not received her package from the shipper. The Texas employee asked if the customer was still in business.  UPS00146735-737.[45]

300.    The same day, McDowell responded to the email, saying that the customer was still in business, and asked the Texas employee to have the customer contact the shipper at (716) 378-1968.  UPS00146735-737.[46]

301.    The next day, September 20, 2012, the Texas employee emailed McDowell to report that the customer had "tried calling [(716) 378-1968] repeatedly, it has a strange ringtone, not one you would use for a business and the mailbox is full."  UPS00146735-737.[47]

302.    Later that day, McDowell responded by email, saying that he had "FINALLY track[ed] down a number for the warehouse…That number is 800 536 7014."  UPS00146735-737.[48]

303.    The warehouse phone number related by McDowell in this email is the same phone number listed for Elliot Enterprises on the first NCL.  PX 472.

---

[45] Subject to Plaintiffs' motion to supplement the exhibit list.
[46] Subject to Plaintiffs' motion to supplement the exhibit list.
[47] Subject to Plaintiffs' motion to supplement the exhibit list.
[48] Subject to Plaintiffs' motion to supplement the exhibit list.

304.     On or about September 21, 2012, UPS purportedly conducted an audit of account number 7A793E, and referred to this audit in emails as "AUDIT – Bearclaw 4888 Klawater Rd Great Valley NY 14741".  PX 531.

305.     UPS's Director of Dangerous Goods, Brad Cook, has separately confirmed that UPS knew the account purportedly audited that day, 7A793E, belonged to Bearclaw Unlimited. B. Cook Testimony Declaration ¶ 75; Expected B. Cook Trial Testimony.

306.     The purported audit of account 7A793E revealed that Bearclaw Unlimited was shipping cigarettes through that account.  B. Cook Testimony Declaration ¶ 75; Expected B. Cook Trial Testimony.

307.     On September 21, 2012, UPS Security instructed the UPS Olean center to suspend Bearclaw Unlimited's service under account number 7A793E as of that date.  Although one UPS Security employee asked whether "we have to contact law enforcement with info?," UPS Security employee Bobby Slubersky indicated that he had not done so for another account also recently terminated for shipping cigarettes, and there are no UPS documents reflecting further discussion of any such prospective communication with law enforcement.  PX 531.

308.     Apart from emails referencing the purported audit of account number 7A793E, UPS has produced no documents relating to such an audit, such as an audit report or photographs of the contents of the packages, or any other information allowing a determination of how many packages were audited and what their specific contents were. UPS has also produced no documents explaining any connection between the customer complaint received on September 19, 2012 regarding this account and the purported audit of that account two days later.  UPS Document Production Generally; Expected B. Cook Trial Testimony.

309.     UPS's records indicate that the Bearclaw Unlimited "AFIA" alias account number 7A793E was cancelled in UPS's computer system on or about October 23, 2012.  PX 174.

67

310.     Prior to the audit purportedly conducted on September 21, 2012, UPS did not conduct any audits of any of the 18 accounts it opened for Bearclaw Unlimited. UPS Document Production Generally; Expected B. Cook Trial Testimony.

311.     The Bearclaw Unlimited account numbered R2W088 was Gerard Fink's 22nd highest net-revenue-generating account in 2011 (putting it in the top 2% of Fink's 1,414 total accounts with net revenue), generating $79,291 in net revenue for UPS that year.  PX 104.

312.     The Bearclaw Unlimited account numbered R2W088 was Gerard Fink's 101st highest net-revenue-generating account in 2012 (putting it in the top 8% of Fink's 1,390 total accounts with net revenue), generating $20,183 in net revenue for UPS that year, despite the account being used for less than five months during that year, with shipments ending on or about May 9, 2012.  PX 102, UPS00147347.[49]

313.     The Bearclaw Unlimited "AFIA" alias account numbered 7A793E was Gerard Fink's 143rd highest net-revenue-generating account in 2012 (putting it in the top 11% of Fink's 1,390 total accounts with net revenue), generating $14,429 in net revenue for UPS that year, despite the account being used for less than five months during that year, with shipments beginning no earlier than May 9, 2012 and ending on September 21, 2012.  PX 104, PX 174, PX 531.

314.     UPS did not produce any shipping records for the Bearclaw Unlimited "AFIA" alias account number 7A793E opened on May 8, 2012 and closed on September 21, 2012.  UPS Document Production Generally; Expected B. Cook Trial Testimony.

315.     However, UPS did produce records showing total shipment volume and revenue figures for the Bearclaw Unlimited "AFIA" alias account number 7A793E during the period July 1, 2012 through September 30, 2012.  These records show that UPS shipped 931 packages for

---

[49] Subject to Plaintiffs' motion to supplement the exhibit list.

this account during those three months, but they do not include any information on the consignee addresses or package weights.  PX 174.

### (c)  EExpress

316.    On September 26, 2012, UPS opened an account for a customer named "EExpress" with account number 8T74T8, located at 11074 Indian Hill Road, Perrysburg, NY, which is located on the Seneca Cattaraugus Reservation.  PX 128.

317.    The EExpress location at 11074 Indian Hill Road, Perrysburg, NY is a residential address, consisting of a single-family house with a detached shed.  Logan Dep. Testimony at pp. 82-84.

318.    On that date, UPS executed a Carrier Agreement with EExpress.  Gerard Fink signed the Carrier Agreement on behalf of UPS, identifying himself as the Account Manager. Aaron Elliot signed the Carrier Agreement on behalf of EExpress, identifying himself as its owner.  PX 128.

319.    The Carrier Agreement between UPS and EExpress was executed three days before the Elliot Enterprises account was cancelled in UPS's system due to a prior report by a driver of cigarettes in that shipper's shipments, and five days after the audit of the Bearclaw Unlimited "AFIA" alias account discovered cigarettes in that shipper's shipments.  PX 128, PX 531, PX 559, PX 172.


320.    During October 2012, the first full month the EExpress account was open, UPS shipped approximately 2,500 packages, or 150 packages per day.  PX 559,.  With only one exception, monthly volumes would remain above 2,000 packages, or 100 packages per day, for the duration of the account.  PX 559.

69

321.    On April 1, 2013, Mark Piazza, UPS's Director of Sales for the Northeast District, emailed UPS Senior Account Manager Michael Zelasko, noting that entries in UPS's computer system for EExpress were "not accurate," and asking Zelasko: "Is this a winback that we do not know about?  Ask Gerry Fink to go look and secure this business." PX 115.

322.    Approximately two hours later, Zelasko forwarded Piazza's email to Gerard Fink, noting that the "request [is] coming from the big man.  Please do this today so that I can report that it was updated."  PX 115.

323.    Less than 20 minutes later, Fink responded to Zelasko, copying UPS Finance Manager Brian Weber, stating: "EEXPRESS is a cigar shop that I won last year.  They picked up when a couple of other businesses moved or closed."  PX 115.

324.    On April 25, 2013, UPS received five separate claims for lost or damaged shipments from EExpress to residential customers, with the contents of the package listed for each of these five shipments in UPS's claims records as "1 of 1 Box of Cigarettes."  These five shipments were recorded as weighing 2, 11, 3, 3, and 3 pounds, respectively. PX 405.

325.    On June 6, 2013, UPS received a claim for a lost or damaged shipment from EExpress to a residential customer, with the contents of the package listed in UPS's claims records as "4 of 4 Seneca Menthol Light 100 Soft 4 Pks."  This shipment was recorded as weighing 3 pounds.  PX 405.

326.    On December 26, 2013, UPS received a claim for a lost or damaged shipment from EExpress to a residential customer, with the contents of the package listed in UPS's claims records as "1 Quantity of Cigarettes."  This shipment was recorded as weighing 3 pounds.  PX 211.

327.    On January 20, 2014, UPS received a claim for a lost or damaged shipment from EExpress to a residential customer, with the contents of the package listed in UPS's claims

70

records as "10 of 10 Seneca Ultra Light 100 Soft."  This shipment was recorded as weighing 7 pounds.  PX 211.

328.    On May 2, 2014, UPS's Dangerous Goods division instructed UPS Security to conduct an audit of EExpress.  The audit was conducted on May 6, 2014, and the packages that were opened contained one-pound bags of Tim Hortons brand coffee.  PX 257.

329.    On May 6, 2014, Gerard Fink emailed UPS Sales Manager Mike Zelasko, stating that he "helped Shelly forward the photos from the EEXPRESS AUDIT performed last night. All the packages contained coffee (mostly, but not all Tim Horton's coffee). ☺"  PX 569.

330.    Later that day, Zelasko forwarded Fink's email to UPS Finance Manager Brian Weber, with a note stating: "The audit for E-Express came back as coffee!! Dodged a bullet" PX 569.

331.    Weber responded to Zelasko the same day, asking: "Why did you assume they shipped cigarettes; Gerry said he didn't know what they shipped."  PX 569.

332.    UPS did not conduct any follow-up audits, and permitted EExpress to continue shipping through UPS after this audit.  PX 552.

333.    On May 23, 2014, UPS received a claim for a lost or damaged shipment from EExpress to a residential customer, with the contents of the package listed in UPS's claims records as "4 Carton Cigarettes."  This shipment was recorded as weighing 4 pounds.  PX 211.

334.    On June 12, 2014, three packages tendered by EExpress came open in the UPS Dunkirk center, revealing that they all contained cigarettes.  Later that day, EExpress tendered another 99 packages, and when UPS opened those packages, they were all found to also contain cigarettes.  PX 369, B. Cook Direct Trial Testimony at ¶ 123.

335.    On February 10, 2016, Matt Szelagowski of UPS Security sent an email to Gary DeWeerd of UPS's Dangerous Goods division.  In that email, he said he was "reminded…of a

situation in 2014 when an audit was being requested.  In that case we believe the shipper was

tipped off and for the audit period all they shipped was coffee, if I remember it was Tim Horton

Coffee.  A few weeks went by and the center team conducted their own audit and found

cigarettes to consumers."  PX 536.

336.    Dr. Christopher Erath, an expert retained by Plaintiffs, analyzed results of

telephone calls made to 52 individuals identified in UPS's shipping records as having received

packages from UPS.  Of the 32 individuals who remembered receiving such packages, 30 stated

that the packages contained cigarettes.  (C. Erath Direct Trial Testimony at ¶¶___)

337.    UPS never had a Tobacco Contract with EExpress, despite Gerard Fink's April 1,

2013 email stating that EExpress was a "cigar shop."  (UPS document production generally;

Expected B. Cook Trial Testimony; PX 115.

338.    Over the duration of the EExpress account, more than 87% of its consignments

were sent to addresses that were also addresses to which Elliot Enterprises shipments were sent.

During the first three months of the account, this overlap in consignee addresses between

EExpress and Elliot Enterprises was over 94%.  PX 552; PX 559**.**

339.    The EExpress account numbered 8T74T8 was Gerard Fink's 27th highest net-

revenue-generating account in 2012 (putting it in the top 2% of Fink's 1,390 total accounts with

net revenue), generating $69,487 in net revenue for UPS that year, despite the account being

used for less than four months during that year, with the account having been opened on

September 26, 2012.  PX 102, PX 128.

340.    The EExpress account numbered 8T74T8 was Gerard Fink's highest net-revenue-

generating account in 2013.  PX 584.

341.     The EExpress account numbered 8T74T8 was Gerard Fink's highest net-revenue-generating account in 2014 for that year through the date the account was cancelled on June 12, 2014.  PX 143.

### 3.     The Shipping Services Group

342.     The Shipping Services Group is comprised of Shipping Services, Seneca Ojibwas Trading Post, and Morningstar Crafts & Gifts.

343.     Seneca Ojibwas Trading Post (a predecessor to Shipping Services) began its account with UPS on April 20, 2002.  DX 299.  The company was located at 1358 Cayuga Road, Irving, New York.  PX 309.

344.     The company's account manager was Gerry Fink, and he knew that Seneca Ojibwa shipped tobacco products.  PX 301, PX 306.

345.     After UPS entered into the AOD, UPS informed the owner of Seneca Ojibwas that his account would be canceled as of November 21, 2005.  PX 452.

346.     To continue shipping with UPS, a new account would need to set up, and UPS specifically requested that a different primary contact name be supplied to avoid confusion.  PX 452.

347.     A new account was established for Seneca Ojibwas, called Shipping Services. PX 304.  This "new" account began on November 22, 2005.  PX 581.

348.     A new primary contact and address (13113 Route 438, Gowanda New York 14070) were added, but the UPS account executive (Gerry Fink) remained the same.  PX 581 (at UPS 1, 4).

349.     In January 2011, Fink noted that Shipping Services business was doing well: "Rock-N-Roll... Still retaining same customer base, and not even allowing new people to place orders. Locked-In majority to keep the reships rolling."  PX 235.

73

350.    By March 2011, Fink noted that Shipping Services' business was "CRAZY …

way over the top"  PX 235.[50]

351.    In January 2012, UPS had identified Shipping Services—together with Native

Outlet and Smokes and Spirits—as Fink's "must keep" accounts.  PX 137, PX 138[51].

352.    "Must Keep" accounts were those "largest sites in each salesperson's Patch of

Land.  PX 137.

353.    These accounts "typically represent a high percentage of the revenue in a Patch of

Land territory"; accordingly, UPS's efforts to "[r]etaining and growing these sites [would]

greatly influence 2012 sales plan results[.]"  PX 137 (further identifying Fink as a "key account

executive").

354.    On February 6, 2012, Brian Weber asked Fink why Shipping Services volume

was down nearly 40%.   Fink responded that he could stop in and see if there was "anything

special going on."  He then noted that the company was actually not interested in new customers

and the company in 2010 had previously attempted to market a switch to cigars.  Weber reacted

with some surprise that Shipping Services was a cigar retailer.  PX 89.

355.    On March 5, 2012, Shipping Services was still identified as one of Fink's largest

accounts, generating hundreds in thousands of dollars for UPS:

---

[50] Around the same time, Fink also noted that in Mar. 2011 for Smokes & Spirits, "Still rockin' -
No news on any NYS changes, still retaining same customer base, do not really need more
growth - just maintaining existing  keeps us all very busy"  PX 235.  Later in May 2011, Smokes
& Spirits' business was still "shipping like crazy[.]"  PX 235.

[51] Interestingly, Native Outlet was identified as being part of the "Hobby, Toy, and Game Stores"
industry, while Smokes & Spirits, a New York company, was identified as being part of the
"Tobacco Farming" industry.  PX 137.

| Company Name | Account | Total Rev |
|---|---|---|
| ELLIOT ENTERPRISES | X1X635 | $311,001.81 |
| SHIPPING SERVICES | 03E04E | $202,744.99 |
| HEIDENHAIN CORPORATION | 128902 | $262,660.87 |
| KOIKE ARONSON INC | 117992 | $219,223.93 |
| NATIVE WHOLESALE SUPPLY | RA0610 | $208,961.45 |
| ASCION, LLC | A5R044 | $198,207.84 |
| SMOKES & SPIRITS | W9476E | $196,476.16 |
| NATIVE OUTLET | X29128 | $185,658.33 |
| CONEWANGO PRODUCTS CORP | 123533 | $182,250.06 |
| STEEL & OBRIEN MFG | 14360E | $175,073.98 |
| CLASSIC BRASS INC | X6X925 | $143,249.87 |
| PRESTOLITE ELECTRIC INC | 14X330 | $139,177.88 |
| LIFESTYLE SPORTS | 8AR449 | $109,453.11 |
| AJ'S CIGAR | 34850X | $104,160.40 |

PX 568.

356.    On April 25, 2012, Fink asserted to Brian Weber again that Shipping Services

was "a cigar shop" and that its decline "ha[d] nothing to do with diversion."  Attached to Fink's

email was a UPS pitch presentation to gather more of Shipping Services' business and further

encourage the company's shipment of packages through UPS. PX 122.

357.    In May 2012, UPS inquired into Shipping Services' volume decline and the

possibility of any new product lines.  According to Fink, Shipping Services reported that no new

product lines were being planned, but the customer base was being retained.  PX 83

358.     By February 2013, Shipping Services was still showing declines in both shipping

and sales.   UPS further noted that the company was "[s]till considering [a] move out of NY due

to state issues[.]"  UPS then observed that potential hurdles facing Shipping Services' business:

"most money could Still be saved with reduction of resi-comm errors but all shipping costs sent

to receiver so not as Big of an issue as whet we have going on with NYS and changing rules for

the native americans[.]"  PX 83 (at UPS 183).

359.     On April 18, 2013, Fink noted that Shipping Services was a smoke shop and that its business was down to $345/day.  PX 233 (noting further that Elliot Enterprises had been doing $1229/day).

360.     By July 2013, Shipping Services' business still appeared to be in decline.  PX 83 (at UPS 183).

361.     On November 21, 2013, UPS then ordered audits for three shippers, including Shipping Services.  PX 260 (also identifying Native Outlet and Smokes & Spirits for audits). Those audits were looking for cigarettes going to consumers.  PX 260.

362.     On January 2, 2014, UPS Director of Dangerous Goods Brad Cook then ordered another audit of the Shipping Services (together with Native Outlet and Smokes & Spirits).  PX 272.  In his email, Cook noted that the City of New York had sued FedEx for the delivery of cigarettes to residences.  PX 272.  Shipping Services was shipping on average 42 packages per day.  PX 272 (Smokes and Spirits was shipping 70 packages per day, while Native Outlet was shipping over 20 packages per day).  ADV means packages shipped per day.  PX 272.

363.     On January 8, 2014, a UPS audit of Shipping Services revealed that two packages were found to contain Seneca brand cigarettes going to consumers.  PX 360, PX 269.

364.     These cigarettes were then later destroyed by UPS.  PX 373.

365.      On January 10, 2014, Cook requested that Shipping Services account be canceled.  PX 360.

366.     On January 13, 2014, UPS sent a letter to Shipping Services noting that it was terminating its account with UPS.  PX 110.

367.     Fink also canceled Shipping Services' account that same day.  PX 374.

368.     At the time, Shipping Services was "an $80K account."  PX 362.

76

369.    On January 17, 2014, Fink noted that UPS's cancellation of Shipping Services' bid would put the company out of business.  PX 362.

370.    One week later on January 21, 2014, however, Fink had already opened a new account for Morningstar Crafts & Gifts.  PX 582 (at UPS 147291 and 147294).

371.    The address for Morningstar was 13113 Route 438, Gowanda New York—the same as Shipping Services'.  PX 582, PX 226.



PX 574 (Morning Star Crafts, Gifts, & Discount Cigarettes, 13113 Route 438, Gowanda, New York)

372.    Shortly thereafter, on January 28, 2014, Fink reported a new bid for Morningstar Crafts & Gifts, at 13113 Route 438, Gowanda New York.  PX 226.

373.    The Morningstar account would use UPS's "Residential Common Carrier" product.  PX 226.

374.    On February 17, 2014, Fink noted the termination of his Shipping Services account "for shipping cigarettes" (as well as the termination of his Smokes And Spirits account "for shipping cigarettes" and his AJ's Cigar account, due to "buying and selling contra[band] cigarettes").  PX 160.

375.    Even after an account was suspended, UPS would still shippers continuing to use UPS's delivery services, thereby earning UPS additional fees and monies.  *See*, *e.g.*, PX 168 (noting that Shipping Services' account was suspended on January 13, 2014, but that since February 2, 2014, the company had continued to use UPS's delivery services, thereby earning UPS $2,615.32 since the company's suspension).

376.    By February 18, 2014, a new sales lead was entered in for Morningstar Crafts, located at the same address: 13113 Route 138 Gowanda New York 11070.  PX 145 (also showing sales leads for UPS driver Ron Logan (employee ID 006804) for the following shipper companies at issue for trial: Native Wholesale, 11037 Old Logan Road, Perrysburg, New York 14129, and Eexpress, 11074 Indian Hill Road, Perrysburg, New York 14129).

377.    By October 2014, however, Morningstar Crafts had been suspended by UPS.  PX 226.

### 4.    Indian Smokes

378.    Indian Smokes account with UPS began on May 14, 2001.  PX 318.  The company was owned by Mark Jonathan, and was located at 21 Race St. Salamanca, New York. PX 317, PX 318.  On November 23, 2005, UPS cancelled the company's account.  PX 318.

379.    And as of October 27, 2005, the company was still shipping its packages with UPS.  PX 299.  Gerry Fink was the company's account manager, and he knew that Indian Smokes shipped tobacco products.  PX 301, PX 306.

380.    Lewis Potter appears to have made a specialty out of targeting cigarette smoke shops, more often than not, by providing different names for the same business address.  PX 152. For example, for 21 W. Race St., Salamanca NY 14779, Potter alternately listed "Mark Jonathan" (Sept. 22, 2010), "India Smokes" (Feb. 10, 2011), and "Indian Smokes" (Sept. 14, 2012).

381.    On March 21, 2011, UPS began following up with Indian Smokes about starting up an account with UPS.  PX 82.

382.    On April 27, 2011, Indian Smokes owner Mark Jonathan signed a carrier and incentive agreement with UPS.  PX 216.  Essentially, the more packages that Indian Smokes sent through UPS, the greater the discount UPS applied to Indian Smokes' account.  PX 216. Similarly, the heavier the packages that Indian Smokes sent through UPS, the greater discount applied by the carrier.  PX 216.  The address for Indian Smokes was listed as 21 W. Race St., Salamanca, New York 14779.  PX 216.

383.    Timothy McDowell was the bid contract account executive.  PX 274.  The annualized yearly revenue generated by Indian Smokes was over $56,000. PX 274.

384.    On January 16, 2012, UPS notes indicate that Indian Smokes would have a new product line of cigars, "as long as NYS has nothing to say about cigars over cigarettes."  PX 82.

385.    Following that "new product line," Indian Smokes business "spike[d] due to backlog orders, not new opportunity."  PX 82.

386.    In an entry for January 25, 2012, Mark stated "NO CIGARETTES."  PX 347.

387.    On January 30, 2012, Fink noted the following as part of Brian Weber's Top 5 Targets report, "New product line, marketed during holidays expected to ramp up more through Q2, Producing."  PX 141 (*see also* PX 140).  Fink further noted that the "% win probability" would be 90%.  PX 141.

388.     By April 11, 2012, UPS further noted the following concerning Indian Smokes'

business: "[V]olume sustaining unexpectedly.  Producing opp for increase."  PX 82.

389.     By January 11, 2013, Fink reported that as to Indian Smokes, the local UPS center

"ha[d] stopped pickups due to report from driver that they were shipping cigarettes[.]"  PX 172

(also noting that Elliot Enterprises had "stopped pickups due to report from driver that they were

shipping cigarettes).  On that point, Fink further asked Brian Weber, "shouldn't smoke shops get

removed from my plan?"  PX 172.  (Weber does not appear to have responded to Fink's

question.)

390.     On January 31, 2013, UPS notes that "driver, Lou Potter, told him that he would

no longer pick up because they were shipping cigarettes."  PX 82.

391.     As a result, Timothy McDowell called the Olean Center that same day.  PX 82.

392.     McDowell spoke with "Chris at Olean," who expressed his impression that Indian

Smokes was not under a Tobacco Agreement.  PX 82.  He recommended that McDowell contact

Mike Shea, a UPS business manager.  PX 82.  At the same time, McDowell also noted that he

had not yet found a tobacco contract for Indian Smokes.  PX 82.

393.     The next day (February 1, 2013), a tobacco contract was sent to Indian Smokes.

PX 82.  McDowell spoke with Mike Shea who was "willing to give [Indian Smokes] another

chance."  PX 82.  McDowell also spoke with Chris (from the UPS Olean center) who was "also

fine with restoring service to [Indian Smokes] so long as they do not ship cigarettes."  PX 82.

McDowell then informed Indian Smokes that service would be restored.  PX 82.

394.     On February 26, 2013, Fink asked McDowell whether Indian Smokes was still

using its UPS account to ship packages.  PX 162.  In response, McDowell noted that Indian

Smokes was "concerned that we [UPS] are going to open all of their packages."  PX 162.  Fink

then asked whether UPS should close the account, but McDowell responded, "Not if it were up to me.  At least, not yet anyway."  PX 162.

395.    On April 18, 2013, however, McDowell noted that Indian Smokes would not be using the account any longer. PX 82.

396.    On May 7, 2013, Brian Weber requested that Indian Smokes' account be canceled, effectively June 8, 2013.  PX 170.  In UPS's letter to Indian Smokes, however, UPS noted that it was only cancelling the incentive portion of its agreement with the company (effective June 8, 2013), and that UPS would still "continue to provide service on [Indian Smokes'] packages after this time."  PX 171.

397.    Indian Smokes account was then canceled in May 2013.  PX 82; PX 150 (noting cancellation of Indian Smokes bid by at least May 7, 2013).

398.    On July 5, 2013, McDowell noted in a final entry that "Customer diverted due to cigarette issue."  PX 82.

399.    On July 29, 2013, the City of New York served a subpoena on UPS concerning a number suspected cigarette dealers, including Indian Smokes.  PX 248.

### 5.    The Smokes & Spirits Group

400.    The Smokes & Spirits Shipper Group is comprised of Smokes & Spirits, Native Outlet, AJ's Cigar, Sweet Seneca Smokes, and RJESS.



PX 573 (Smokes & Spirits Group, 1525 Cayuga Road, Irving (Buffalo), New York 14081 [address found at PX 102])

401.    On or about August 26, 2010, UPS opened an account for a customer named "Smokes & Spirits" with account number W9476E, located at 270 Rochester Street, Salamanca, NY, which is located on the Seneca Allegany Reservation.  PX 70, G. Fink Test. Decl. ¶ 31.

402.    The Smokes & Spirits location at 270 Rochester Street, Salamanca, NY was a commercial address consisting of a large warehouse.  G. Fink Test. Decl. ¶ 31.

403.    The Account Executive for Smokes & Spirits was Gerard Fink. PX 326, G. Fink Test. Decl. ¶ 31-9.

404.    Smokes & Spirits is listed in a UPS database as a residential common carrier. PX 81.

405.    Smokes & Spirits shipped more than 1,000 packages to residential addresses via UPS during September 2010, the first full month of the account's activity.  This amounted to approximately 50 packages a day.  By November 2010, that volume had nearly doubled, to almost 2,000 packages shipped that month, or 100 packages a day.  PX 67, PX 70, PX 78, PX 415, PX 418, PX 431, PX 433.

406.    On November 10, 2010, Gerard Fink received a copy of the Tobacco Watchdog Group letter, which warned UPS that "Smokes & Spirits" located at 270 Rochester Street, Salamanca, NY was making "illegal contraband cigarette shipments to residential consumers." G. Fink Test. Decl. ¶ 33, DX 62, PX 345, PX 346.

407.    On December 15, 2010, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a customer, with the contents of the package listed in UPS's claims records as "1 of 6 Warrior Menthol Filtered Cigarettes."  PX 550.

408.    On October 19, 2011, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a residential customer, with the contents of the package listed in UPS's claims records as "1 of10 1 Pack out of a Carton of 10 Was Crushed."  PX 213.

409.    On December 19, 2011, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a customer, with the contents of the package listed in UPS's claims records as "1 Cigarettes."  PX 550.

410.    On December 30, 2011, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a customer, with the contents of the package listed in UPS's claims records as "1 Seneca."  PX 550.

411.    On February 15, 2012, "Smokes & Spirits" was added to the PACT Act Non-compliant list.  "Smokes & Spirits" was identified as being located at 6665 Route 417, Kill Buck, NY, which is located on the Seneca Allegany Indian reservation.  PX 450.

412.    In May 2012, Gerard Fink sent an email in which he stated : "We have won all of [Smokes & Spirits] new business, and the account is still growing." PX 121.

413.    On June 20, 2012 the NYC Sherriff's Office purchased untaxed cigarettes for mail-order delivery from Smokes & Spirits, and received them via a delivery from UPS. PX 45.

414.    On July 16, 2012, "Smokes-Spirits.com LLC" was added to the PACT Act Non-compliant list, and UPS received an email on that date from the U.S. Department of Justice specifically identifying this addition to the list.  "Smokes-Spirits.com" was identified as being located at 6665 Route 417, Kill Buck, NY, which is located on the Seneca Allegany Indian reservation.  PX 475.

415.    On September 6, 2012, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a residential customer in New York State, with the contents of the package listed in UPS's claims records as "2 of 7 Signal Menthol Box 100s/7 Cartons."    UPS's claims

records for this claim specifically note "PROHIBITED ITEM SENT TO CONSUMER." PX 550.

416.    In August 2013, UPS's Director of Dangerous Goods, Brad Cook, noticed that Smokes & Spirits was listed on the NCL.  At the time he wrote: "Web site states: We ship via UPS, USPS."  PX106.

417.    On September 12, 2013, UPS received a claim for a lost or damaged shipment from Smokes & Spirits to a residential customer, with the contents of the package listed in UPS's claims records as "10 of 10 Sands Silver Ultra Loight 100."  PX 550.

418.    On December 20, 2013, New York City sent an email to UPS identifying Smokes & Spirits as a possible cigarette shipper.  B. Cook Test. Decl. ¶ 96.

419.    UPS did not audit Smokes & Spirits until January 21, 2014.  During that audit, UPS discovered cigarettes in 9 of the 15 packages it opened.  B. Cook Test. Decl. ¶ 97, DX 257.

420.    UPS cancelled the Smokes & Spirits account on January 24, 2014.  PX 228.

421.    The Smokes & Spirits account numbered W9476E was Gerard Fink's seventh highest net-revenue-generating account in 2011, generating $202,879 in net revenue for UPS that year.  PX 104.

422.    The Smokes & Spirits account numbered W9476E was Gerard Fink's third highest net-revenue-generating account in 2012, generating $230,364 in net revenue for UPS that year.  PX 102.

423.    The Smokes & Spirits account numbered W9476E generated $232,484 in net revenue for UPS in 2013. PX 176

424.    Invoices and other shipping documents obtained from Smokes & Spirits show that from January 3, 2011 through November 11, 2013, that shipper tendered packages to UPS using

84

account number W9476E containing a total of 130,048 cartons of cigarettes, 109,016 cartons of which were delivered to addresses in New York State.  PX 55.

425.    The records obtained from Smokes & Spirits match the shipping records produced by UPS with respect to the date and consignee of each of the shipments.  PX55, PX 70

### i.        Native Outlet

426.    On or about October 18, 2010, UPS opened an account for a company named "Native Outlet" with account number X29128, located at 11157 Lakeshore Road, Irving, New York, which is located on the Seneca Allegany Reservation. G. Fink Test. Decl. ¶ 129.

427.    The Native Outlet location at 11157 Lakeshore Road, Irving, New York was a commercial address consisting of a large warehouse. G. Fink Test. Decl. ¶ 129, DX 490.

428.    The Account Executive for Native Outlet is Gerard Fink. PX 101.

429.    The contact person for the Native Outlet account is John Waterman. PX 86.

430.    The Native Outlet account numbered X29128 was Gerard Fink's eighth highest net-revenue-generating account in 2011, generating $190,083 in net revenue for UPS that year. PX 104.

431.    In January, 2012 UPS identified Native Outlet as one of Gerard Fink's "must keep" accounts. PX 137, PX 138.

432.    The Native Outlet account numbered X29128 was Gerard Fink's eleventh highest net-revenue-generating account in 2012, generating $148,593 in net revenue for UPS that year. PX 102.

433.    On March 21, 2013, UPS was contacted by ATF with a request that UPS investigate possible bulk shipments of cigarettes from a list of suspected names and addresses. One of the names on the list was John Waterman, Native Outlet's contact person for UPS.  PX 530.

434.     Native Outlet was once again identified by UPS as a "must keep" account on April 9, 2013. PX 168, PX 169.

435.     The Native Outlet account numbered X29128 was Gerard Fink's thirteenth highest net-revenue-generating account in 2014, generating $86,626.15 in net revenue for UPS that year. PX 98.

### ii.     AJ's Cigar

436.     On or around September 2010, UPS opened an account for a company named "AJ's Cigar" with account number 34850X, located at 12587 Route 438, Irving, NY, 14081, which is located on the Seneca Cattaraugus Reservation. G. Fink Test. Decl. ¶ 87, PX 70.

437.     AJ's Cigar is listed in a UPS database as a residential common carrier. PX 81.

438.     The Account Executive for AJ's Cigar was Gerard Fink, and he knew that the company shipped tobacco products. PX 101.

439.     The contact person for the AJ's Cigar account was Andrew Wright. PX 86.

440.     The AJ's Cigar account numbered 34850X was Gerard Fink's fourteenth highest net-revenue-generating account in 2011, generating $107,410 in net revenue for UPS that year. PX 104.

441.     The AJ's Cigar account numbered 34850X was Gerard Fink's seventeenth highest net-revenue-generating account in 2012, generating $112,483 in net revenue for UPS that year. PX 102.

442.     On June 4, 2013, an entry in the UPS TEAMS report from Timothy Mcdowell (employee ID GYZ0VFR) stated "Called Jackie…per request from Craig Morrish regarding their desire for freight acct. TT Jackie, states that they have a shipment each week of cigarettes that goes to another Indian reservation. I am checking to see if USPF will allow cigarettes." PX 83.

443.     Tom Carey, UPS's Sales Operations Manager (Northeast District) sent an e-mail to Brian Weber on November 14, 2013 emphasizing the need for in-person visits, especially with regard to the attached Top 25 List of accounts.  The e-mail emphasized that "Your compensation is higher when you sell new business while holding on to the business you currently own[.]"  PX 177.  The AJ's Cigar account was included in the attached list of Top 25 Gerard Fink accounts. PX 177, PX 178.

444.     On February 17, 2014, Gerald Fink sent an e-mail to Michael Zelasko stating that the AJ's Cigar account was terminated in February 2014 "due to 'bad press' (Shipper pleaded guilty to buying and selling contra banned [sic] cigarettes…)." PX 160.

445.     In 2014 and 2015, the New York City Department of Finance conducted telephone surveys of people within New York City who were listed on UPS records as having received packages via UPS from AJ's Cigar, among other tobacco shippers. Some of the people called recalled receiving cigarettes in the deliveries from AJ's Cigars. M. Kokkeas Test. Decl. ¶ 8.

### iii.     Sweet Seneca Smokes

446.     On or around February 14, 2014, UPS opened an account for a company named "Sweet Seneca Smokes" with account number V2W459, located at 14411 Route 438, Gowanda, New York, which is located on the Seneca Cattaraugus Reservation. G. Fink Test. Decl. ¶ 122.

447.     The Account Executive for Sweet Seneca Smokes is Gerard Fink, who knew that the company shipped tobacco products. G. Fink Test. Decl. ¶ 122, 123.

448.     The contact person for the Sweet Seneca Smokes account is Jim Phillips. G. Fink Test. Decl. ¶ 123, PX 86.

449.     On February, 14, 2014, Timothy McDowell e-mailed Gerard Fink about the Sweet Seneca Smokes account, asking if Fink knew anything about this company, because

McDowell "get[s] the feeling this is AJs trying to get back in. The contacts for this company are Bob Oldrow/Oldsrow, Veronica Halftown Stevens, and Jim Phillips." DX 276.

450.    A review of the addresses shipped to by UPS on behalf of Sweet Seneca Smokes reveals that 62% of Sweet Seneca Smokes customers were former customers of Smokes & Spirits. PX 194, PX 195, PX 254, PX 557.

### iv.    RJESS

451.    On or around April 7, 2005, UPS opened an account for a company called RJESS ("Ross John Enterprises Smoke Shop") with account number W3Y624, located at 6665 Route 417, Killbuck, New York.  G. Fink Test. Decl. ¶¶ 106, 108.

452.    The Account Executive for RJESS was Gerard Fink, and the contact person for the account was Ray Turner. PX 86.

453.    The address listed for RJESS in UPS's records was the same address reported on the NCL for Smokes & Spirits in February and July 2012. PX 450, PX 86.

### 6.    The Arrowhawk Group

454.    The Seneca Cigars account began January 9, 2012.  Delbello Direct Testimony Declaration ¶ 20.

455.    Seneca Cigarettes/Cigars, Hillview Cigars, and Two Pine Enterprises were all affiliated entities that used the same address at 852 Bloomingdale Road, Basom, New York.  PX 232; PX 95; PX 340; PX 149); PX 83; PX 154; PX 344; Testimony of Phil Christ; Testimony of Vincent Guarino; Delbello Direct Testimony Declaration ¶¶ 19, 20, 31, 45.

456.    Arrowhawk Smoke Shop and Two Eagles Smoke Shop shared the same address at 852 Bloomingdale Road, Basom, New York on the Tonawanda Reservation.  PX 59 (Picture of Arrowhawk Smoke Shop); PX 60 (Picture of Two Eagles Smoke Shop); Testimony of Phil Christ.



**PX 59** (Arrowhawk Smoke Shop, 852 Bloomingdale Road, Basom, New York).



**PX 60** (Two Eagles Smoke Shop, 852 Bloomingdale Road, Basom, New York 14013).

457.    UPS had a daily pick-up at 852 Bloomingdale Road.  Testimony of Vincent Guarino.

458.    Phil Christ was an employee of or consultant for each of the Arrowhawk entities. Testimony of Phil Christ; PX 335.

459.   Native Gifts was another UPS shipping account started by Phil Christ.  Delbello Direct Testimony Declaration ¶¶ 44-49; Keith Direct Testimony ¶¶ 40-47; Declaration PX 153; PX 154.

460.   Richard Delbello, the Account Executive for the Arrowhawk entities, wrote that another account representative set Phil Christ up with an account despite the fact that he expressed interest in shipping cigarettes years prior.  PX 335.

461.   Delbello stated that it is his practice "to ask [his] customers about their business as well as what products they ship."  Delbello Direct Testimony Declaration, ¶ 12.

462.   In March 2012, Richard Delbello visited Philip Christ about the Seneca account at the Arrowhawk/Two Eagles address, 852 Bloomingdale Road.  PX 125.

463.   UPS drivers regularly entered the warehouse at 852 Bloomingdale Road and saw cases of cigarettes.  Testimony of Phil Christ.

464.   UPS returned opened packages of unstamped cigarettes to the Arrowhawk entities.  Testimony of Phil Christ.

465.   At some point in 2012-13, Seneca Cigars and Hillview Cigars began using 7238 Meadville Road in Basom, New York as their addresses for UPS pick-up.  PX 157, PX 124.

466.   UPS knew that the companies "ship[ped] under 2 different names" and noted that Phil Christ was the "main contact for both."  PX 124.

467.   UPS knew that the account it labeled "Seneca Cigars and Hillview Cigars" used the web address www.senecacigarettes.com.  PX 95.

468.   Each of the boxes shipped by Arrowhawk was designed for the shipment of cigarettes and indicated the number of cartons for which it was designed.  PX 9 (AHAWK00011225 – AHAWK00011241 - Photos of Shipping Boxes from Arrowhawk Smoke Shop); Testimony of P. Christ.

90

469.    UPS noted that one of the "business challenges" for the Seneca Cigarettes/Cigars and Hillview Cigars accounts was "[c]omplying with government regulations."  PX 95.

470.    Essentially all of the packages shipped by the Arrowhawk entities through UPS contained unstamped cigarettes.  Testimony of Phil Christ.

471.    UPS's notes for the Seneca Cigarettes/Cigars and Hillview Cigars accounts indicated that the "100% of outbound shipments go via UPS.  The majority of shipments go to Residential customers via ground service."  PX 95.

472.    Two Pine Enterprises also used 7238 Meadville Road in Basom, New York as its addresses for UPS pick-up.  PX 242.

473.    7238 Meadville Road is a residential address.  PX 340, PX 58 (Picture of 7238 Meadville Road, Basom, New York).



**PX 58** (Seneca Cigars, 7238 Meadville Road, Basom, New York)

474.     There was a daily pick-up of around 40 packages a day from 7238 Meadville Road.  Testimony of Vincent Guarino.

475.     The UPS driver assigned to the route containing the Arrowhawk entities, Vincent Guarino, was suspicious of the change in location to a residential address.  Testimony of Vincent Guarino.

476.     After Vincent Guarino reported his suspicions to his supervisors, he was told they would be investigated but was never told the results of that investigation.  Testimony of Vincent Guarino.

477.      Arrowhawk invoices show that between January 11, 2012 and October 31, 2012, Arrowhawk shipped 14,731 cartons of cigarettes through UPS within the state, 2,773 of which came into the City.  PX 8; Testimony of Phil Christ.

478.     In the same time period, Arrowhawk shipped 26,403 cartons of cigarettes through UPS to destinations outside of New York State.  PX 8; Testimony of Phil Christ.

479.     On May 10, 2012, the First Deputy Sheriff of the New York City Sheriff's Office, Maureen Kokeas, received an email from Seneca Cigarettes advertising "Your orders shipe (sic) UPS as soon as your check clears!"  PX 592; Kokeas Testimony.

480.     In May 2012, the New York City Sheriff's Office purchased three cartons of unstamped cigarettes from www.senecacigarettes.com and received the cigarettes via UPS.  PX 43, Kokeas Testimony.

481.     UPS, "at the request of Seneca Cigars," sent the New York City Sheriff's Office a notification when the cigarettes had been shipped.  PX 43; Kokeas Testimony.

482.     In June 2012, the New York City Sherrift's Office purchased three cartons of unstamped cigarettes from www.senecacigarettes.com and received the cigarettes via UPS.  PX 40; Kokeas Testimony.

483.    In documenting a conversation with Phil Christ about the Seneca/Hillview/Two Pines account, a UPS employee said, "We talked about their current process, and a number of ways that UPS was already a benefit.  This included the driver adapting to their schedule and making sure they were taken care of on a day to day basis."  PX 344.

484.    UPS "always let Phil know that [they were] expecting 100% of the business" and "was willing to offer a more aggressive agreement in exchange for 100% of the current and new business."  PX 344.

485.    UPS "made Phil aware that UPS would require growth for the desired incentives to be achieved."  PX 344.

486.    Prior to the June 29, 2010 effective date of the PACT Act, the Arrowhawk entities shipped 3,247 packages, seven of which were sent within New York State and five of which were sent into New York City.  PX 67, PX 70, PX 80, PX 220, PX 221, PX 222, PX 227, PX 413, PX 420, PX 422, PX 433, PX 435, and PX 436.

487.    On or after the June 29, 2010 effective date of the PACT Act, the Arrowhawk entities shipped 24,220 packages, 9,856 of which were sent within New York State and 1,862 of which were sent into New York City.  PX 67, PX 70, PX 80, PX 220, PX 221, PX 222, PX 227, PX 413, PX 420, PX 422, PX 433, PX 435, and PX 436.

488.    At one point in or after July 2012, the Seneca Cigarettes/Cigars and Hillview Cigars accounts were generating $4,995 a week in revenue.  PX 95.

489.    $3,844 of that $4,995 in weekly revenue was derived from UPS ground service to residential customers.  PX 95.

490.    In 2012, UPS's gross revenue for the Seneca Cigars Account was $5,391,320.  PX 157.

93

491.    In 2012, UPS's gross revenue for the Hillview Cigars Account was $2,808,503. PX 157.

492.    In January 2013, UPS noted that the Seneca Cigarettes/Cigars account had a 1000% increase in volume from the previous year.  PX 124.

493.    That same month, UPS noted that it was Seneca/Hillview's "sole carrier."  PX 83.

494.    UPS checked in with Phil Christ regularly and he "raved about his driver and the partnership they have with UPS," "said UPS could not be better," and "loves [UPS's] operation and driver."  PX 83.

495.    On June 11, 2013, Seneca Cigars and Hillview Cigars executed tobacco agreements with UPS.  PX 342, PX 343.

496.    In September 2013, Phil Christ opened a new account for Native Gifts, and UPS Account Executive Richard Delbello stated, "This is starting to sound fishy."  PX 153.

497.    On October 8, 2013, Account Executive Richard Delbello, in discussing the Hillview Cigars and Two Pine Enterprises accounts, relayed that:

> All of these accts were set up by Phil Christ, who is some sort of "consultant", and who only answers his phone or responds when he needs something. He contacted me a few years ago about shipping cigarettes but I backed off. Eventually he hooked up with our inside sales group and got set up to ship cigars. It seems like every 6-9 months, the company names and ownership groups change as they previously shipped under Seneca Cigars and Arrowhawk Smoke Shop.

PX 340.

498.    On October 22, 2013, UPS held a call about "a new law about cigarettes."  During the call, Seneca Cigarettes/Cigars, Hillview Cigars, and Two Pine Enterprises were discussed. PX 232.

499.    That day, UPS contacted Phil Christ about a missing tobacco agreement for Two Pine Enterprises.  Notes from a UPS employee say that "I also let him know that I needed to speak with him about the product clarification we discussed yesterday."  PX 83.

500.    On October 25, 2013, four months after Seneca Cigars and Hillview Cigars did so, Two Pine Enterprises, which also shipped from the same address, signed a tobacco agreement.  PX 149.

501.    The same day, after "legal" became involved, UPS continued to make pick-ups for the Arrowhawk entities.  PX 339.

502.    No later than November 5, 2013, the City of New York alerted UPS that it believed that Seneca Cigarettes/Cigars was shipping cigarettes.  PX  112.

503.    In March 2014, UPS discovered that the owner of Two Pine Enterprises was dropping packages off for shipment from a UPS store.  PX 338 , Delbello Direct Testimony Declaration ¶ 36; Palombaro Direct Testimony Declaration ¶¶ 11-13.

504.    The Account Executive, Richard Delbello, stated that he did not believe the reason given for the shipments being dropped off at UPS stores.  PX 338, Delbello Direct Testimony Declaration ¶ 37.

505.    UPS instructed her to ship only from the address on her account, 7238 Meadville Road in Basom, New York.  PX 338.

506.    On April 4, 2014, UPS noted that it was the "exclusive carrier" for Two Pine Enterprises.  PX 83.

507.    On April 10, 2014, UPS offered Seneca Cigars additional incentives.  The email address the agreement was mailed to was senecacigarette@gmail.com.  PX 231.

508.    On April 17, 2014, UPS audited Two Pine Enterprises.  PX 244 , Palombaro Direct Testimony Declaration ¶ 19.

509.     During the audit of Two Pine Enterprises, UPS opened 42 packages, all 42 of which contained cigarettes.  PX 336 , PX 244 , PX 365.

510.     Jeff Palombaro told Vincent Guarino that the audit was conducted because "a package had broken open in a different UPS center from Two Pine Enterprises, and that cigarettes were discovered in the package."  Guarino Direct Testimony Declaration, ¶ 20.

511.     UPS cancelled the Two Pine Enterprises account after the audit.  PX 242 , PX 365.

512.     UPS employees acknowledged that the account was "pretty sizable."  PX 365.

513.     UPS employees also discussed the personal financial impact of the account termination.  PX 365, PX 366.

514.     After the audit of Two Pine Enterprises, UPS Account Executive Richard DelBello instructed another UPS employee, "OK – going forward, be extremely hesitant and let me know about anyone who approaches you about shipping any tobacco products. They typically are all liars."  PX 336.

515.     In July 2014, a claim was submitted for a lost or damaged package from the Native Gifts account also opened by Phil Christ.  The contents were listed as "8 CARTONS OF CIGARETTES, SENECA ULTRALIGHTS."  PX 406.

### 7.     The Native Wholesale Supply Group

516.     The Native Wholesale Supply Group is comprised of Native Wholesale Supply and Seneca Promotions.

### i.     Native Wholesale Supply

517.     At some time prior to October 19, 2005, UPS opened an account for a customer named "Native Wholesale Supply" with account number RA0610, located at 11037 Old Logan Road, Perysburg, NY, which is located on the Seneca Cattaraugus Reservation.  PX 549.

518.     At all times subsequent to the effective date of the AOD, October 21, 2005, the UPS Account Executive assigned to Native Wholesale Supply was Gerard Fink.  Expected G. Fink Trial Testimony.

519.     Native Wholesale Supply is located at 11037 Old Logan Road, Perrysburg, NY, a residential address that consists of a single-family house with a detached warehouse.  (Logan Dep. Testimony at pp. 105-110; G. Fink Direct Testimony Decl. at ¶ 79).



PX 576 (Native Wholesale Supply, 11037 Old Logan Road, Perrysburg, New York 14129).

520.     Native Wholesale Supply is a well-known cigarette wholesaler, which imports native-made Seneca brand cigarettes from a tribal manufacturer in Canada and distributed them in the United States.  PX 565.

521.     On September 3, 2008, the Office of the Attorney General of the State of Oklahoma served a Civil Investigative Demand on UPS seeking documents relating to the shipment of cigarettes by Native Wholesale Supply into the state of Oklahoma via UPS on or after August 1, 2006.  PX 566.

522.    On September 16, 2008, UPS responded to the Oklahoma Attorney General's office with a letter enclosing documents responsive to the September 3, 2008 "subpoena."  PX 567.

523.    The documents enclosed by UPS included records showing that on or about May 31, 2007, UPS had surrendered 568 cases of cigarettes (approximately 28,400 cartons) shipped by Native Wholesale Supply, identified as having an address at PO Box 214, Gowanda, NY, into Oklahoma via UPS to a waste disposal service for destruction at the instruction of federal authorities.  .PX 567.

524.    Gowanda, NY is a municipality immediately adjacent to the Seneca Cattaraugus Indian reservation on which Native Wholesale Supply's warehouse is located.  Expected G. Fink Trial Testimony; Judicial Notice of Google Maps.

525.    On November 26, 2011, UPS delivered a Delivery Service Invoice to Native Wholesale Supply for account number RA0610 at PO Box 214, Gowanda, NY, the same address listed for Native Wholesale Supply in the documents given by UPS to the Oklahoma Attorney General's Office in 2008.  PX 400, PX 567.

526.    The November 26, 2011 Delivery Service Invoice for Native Wholesale Supply's account numbered RA0610 listed an amount due for that invoice of $93,474.63.  It also stated that Native Wholesale Supply had a weekly payment plan, and listed amounts charged on the five previous weeks' invoices: $2,249.50, $2464.50, $1,417.83, $,168.94, and $2,006.94.  PX 400.

527.    Seven of the deliveries listed in the November 26, 2011 Delivery Service Invoice were to consignees that explicitly identified themselves as smoke shops in the name of their businesses.  PX 400.

528.    Native Wholesale Supply ceased tendering packages to UPS using the account number RA0610 on or about August 26, 2014.  PX 555.

529.    UPS never audited the Native Wholesale Supply account numbered RA0610.  B. Cook Direct Trial Testimony ¶ 139; Expected B. Cook Trial Testimony.

530.    The Native Wholesale Supply account numbered RA0610 was Gerard Fink's fifth-highest net-revenue-generating account in 2011, generating $215,382 in net revenue for UPS that year.  PX 104.

531.    The Native Wholesale Supply account numbered RA0610 was Gerard Fink's 257th highest net-revenue-generating account in 2012, (putting it in the top 20% of Fink's 1,390 total accounts with net revenue), generating $12,704 in net revenue for UPS that year.  PX 104.

### ii.        Seneca Promotions

532.    On or about May 30, 2013, UPS opened an account for a customer named "Seneca Promotions" with account number RX4828, located at 10955 Old Logan Road, Perrysburg, NY, which is located on the Seneca Cattaraugus Reservation.  PX 557.



**PX 575** (Native Wholesale Supply / Seneca Promotions, 10955 Logan Road, Perrysburg, New York 14129).

533.    The UPS Account Executive assigned to the Seneca Promotions account from its inception was Gerard Fink.  Expected G. Fink Trial Testimony.

534.    The location of the Seneca Promotions account, 10955 Old Logan Road, Perrysburg, NY, is at the same location as the address for Native Wholesale Supply, 11037 Old Logan Road, Perrysburg, NY, despite the two having different mailing addresses.  Logan Dep. Testimony at pp. 105-110; B. Cook Direct Trial Testimony ¶ 140.

535.    Gerard Fink's contact for the Seneca Promotions account, Tricia Thomas, was the same as his contact for the Native Wholesale Supply account.  G. Fink Direct Trial Testimony ¶ 81.

536.    UPS did not conduct any audits of Seneca Promotions until January 14, 2016, after this litigation had already commenced.  B. Cook Direct Trial Testimony ¶ 140.

### 8.    The Mohawk Spring Water Group

537.    The Mohawk Spring Water Group is comprised of Mohawk Spring Water and Action Race Parts.

### i.    Mohawk Spring Water

538.    On or about November 1, 2010, UPS opened the Mohawk Spring Water account, with account number X4Y360, located at 263 Frogtown Road, Hogansburg, New York, which is located on the St. Regis Mohawk reservation . PX 281, PX 329.

539.    UPS records also associate this account number with a company called "NTC," or "Native Tobacco Company," which is also located at 263 Frogtown Road in Hogansburg. The pick-ups with that designation began in January 2011. PX 71.

540.    UPS documents showing pick-ups for NTC and NTC's address indicate that the shipper is "Mohawk Spring Water." PX 71, PX 591.

541.    In November 2010, the first month the Mohawk Spring Water/NTC account operated, UPS picked up 568 packages at Mohawk Spring Water. PX 281.

100

542.    Between November 2010 and June 2011, eight different UPS drivers, in 192 visits, had picked up 4,405 packages from Mohawk Spring Water. PX 281, PX 589.

543.    In 2010, Robert Oliver ("Oliver") was partners in a tobacco business with an individual named Jody Swamp ("Swamp"), a member of the St. Regis Tribe. PX 26, ¶ 2.

544.    Mr. Swamp owned a business known as Mohawk Spring Water, located at 263 Frogtown Road, Hogansburg, New York. Px 26, ¶ 4; PX 329.

545.    Between July 2010 and mid-October 2011, Oliver and Swamp manufactured cigarettes on the Akwesasne Reservation. Oliver and Swamp created and marketed their own brand of cigarettes, which they named "Smokin' Arrows." PX 26, ¶ 3; PX 49, ¶ 6 (a); PX 49.

546.    The "Smokin' Arrows" cigarettes were manufactured at 263 Frogtown Road, Hogansburg, New York, on the Akwesasne Reservation. PX 26, ¶ 3.

547.    Swamp never manufactured "little cigars" or "filtered cigars." PX 26, ¶ 3.

548.    In 2010, Swamp opened a UPS shipping account under the name "Mohawk Spring Water." PX 281, PX 26, ¶ 5.

549.    Oliver was present when an individual named "Carmine" from UPS came to 263 Frogtown Road to open the account. PX 26, ¶ 5.

550.    UPS records show that "Carmine Della Serra" was an account executive at UPS in 2010, with Mohawk Spring Water as one of his accounts. PX 588.

551.    While the account was being opened Oliver stated to Carmine, "You know those boxes contain cigarettes." PX 26, ¶ 6.

552.    Carmine threw up his hands and said words to the effect of "I don't want to hear that," and proceeded to open the account. PX 26, ¶ 6.

553.    A UPS driver named Don regularly picked up packages from Mohawk Spring Water. **PX 26, ¶ 7**.

101

554.    UPS Driver Donald Jarvis picked up packages at Mohawk Spring Water on twenty-nine (29) occasions prior to June 22, 2011.  **PX 419**.

555.    On one occasion when UPS Driver Donald Jarvis was picking up packages from Mohawk Spring Water, Oliver observed boxes of cigarettes inside of Jarvis's UPS vehicle, including "Chiefs," manufactured by Chief Manufacturing, "Signals," manufactured by the Tarbell Management Group, "Tomahawks" and "222's," both manufactured by T&D, Inc. PX 26, ¶ 7.

556.    Oliver was able to tell that the packages contained those cigarette brands because the brand names were either printed or written in marker pen on the outside of the boxes. **PX 26, ¶ 7**.

557.    UPS Driver Jarvis visited Mohawk Spring Water every day or nearly every day to make pick-ups of from 100 to 400 packages per pick-up.  D. Jarvis Dep. Tr. at 55-56.

558.    Jarvis knew that "Mohawk Spring Water was an outfit that was shipping to Long Island with the cheap knockoff cigarettes." D. Jarvis Dep. Tr. at 54.

559.    According to Jarvis, the people at Mohawk Spring Water call the cigarettes they manufacture "rollies." The cigarettes are packaged in clear plastic bags. D. Jarvis Dep. Tr. at 55-56.

560.    The people at Mohawk Spring Water told Jarvis that Mohawk Spring Water shipped to a reservation on Long Island.  D. Jarvis Dep. Tr. at 54-55.

561.    Jarvis knew that Mohawk Spring Water was shipping cigarettes because he would see people at Mohawk Spring Water packaging them while he was loading his UPS vehicle. "I'm loading and they are trying to get their last minute shipment out, so it gets on the truck and you see them loading and taking them and putting the label on them and tossing it to me." D. Jarvis Dep. Tr. at 56.

562.     Jarvis saw packages from Swamps/Mohawk Spring Water at the Potsdam Center that had broken open and which contained cigarettes. D. Jarvis Dep. Tr. at 70.

563.     Between November 2010 and June 2011, Oliver and Swamp shipped cigarettes via UPS from the manufacturing facility on Frogtown Road on the Akwesasne Reservation to other locations, including in New York State, Florida, and Maine**.** PX 49, ¶6 (b).

564.     According to prosecutors, UPS records establish that Oliver and Swamp shipped approximately 2,556 cases of cigarettes, each containing thirty (30) cartons of cigarettes, from Swamp's Frogtown Road property between November 2010 and June 2011. PX 49, ¶6 (c).

565.     UPS Driver Candace Sheridan ("Sheridan") picked up packages at 263 Frogtown Road, Hogansburg, NY, which she refers to as "Swamp's" because that is how the regular route driver Donald Jarvis referred to the location. C. Sheridan Dep. Tr. at 38, 49-50.

566.     "Mohawk Spring Water" is what she referred to as "Swamps," 263 Frogtown Road. C. Sheridan Dep. Tr. at 49-50, 106-07.

567.     The packages that Sheridan picked up at 263 Frogtown Road smelled like tobacco. C. Sheridan Dep. Tr. at 38.

568.     When Sheridan picked up from "Swamps," 263 Frogtown Road, with a UPS driver supervisor, Larry Allen, the boxes smelled like tobacco.  C. Sheridan Dep. Tr. at 59-61.

569.     After picking up packages at Swamps, Sheridan informed her Potsdam Center supervisor Terry Foster that she did not want to make those pick-ups again because Sheridan assumed that the packages contained untaxed cigarettes. C. Sheridan Dep. Tr. at 39-40.

570.     Sheridan's supervisor, Terry Foster agreed that she did not like the fact that the pick-ups were presumably of untaxed cigarettes. C. Sheridan Dep. Tr. at 39-40.

571.    Sheridan complained to her union representative about the pick-ups at Swamps and said she would not pick-up untaxed cigarettes. C. Sheridan Dep. Tr. at 42-44.

572.    Sheridan was subsequently informed by her union representative that the top authority in the Potsdam center, Roger Bosquet, stated that the drivers were to keep picking up cigarettes. C. Sheridan Dep. Tr. at 43.

573.    Sheridan's union representative told her that UPS drivers would continue to make pickups at the locations that Sheridan believed were shipping untaxed cigarettes. C. Sheridan Dep. Tr. at 45.

574.    Sheridan continued to pick up cigarettes at 263 Frogtown Road after having reported her concerns to her supervisor and union representative in the spring of 2011.  C. Sheridan Dep. Tr. at 46.

575.    Other UPS drivers picked up packages at cigarette factories on the Akwesasne Reservation, including Jacobs Tobacco and Native Trading, located at 1046 State Highway.  C. Sheridan Dep. Tr. at 52-53.

576.    During a June 2011 visit to UPS's Potsdam Center by Chief Investigator John Connolly of the New York State Department of Taxation and Finance ("Connolly"), UPS Potsdam Center supervisor Steve Talbot informed Connolly that UPS has a weekly route that picks up packages from the Akwesasne Reservation, that there are four accounts on the reservation that the Potsdam Center services, two of which, "NTS/Mohawk Spring Water" and "Action Race Parts," were shipping cigarettes through UPS, and that UPS had become aware at the first or second pick-up from these locations of the cigarette shipments because several boxes were not sealed properly and UPS employees could observe the packages of cigarettes in plain view. The employees brought this matter to Talbot's attention and Talbot himself observed the cigarettes in the boxes. PX 39.

577.    On June 22, 2011, the date on which Connolly spoke with Talbot at the Potsdam Center, UPS Driver Donald Jarvis picked up from Mohawk Spring Water, 263 Frogtown Road, Hogansburg, NY 13665, 225 cases of "Smokin' Arrow" brand cigarettes. The cigarettes were to be delivered to Ronnie Bell, 130 Poospatuck Lane, Mastic NY. Each case contained 30 cartons of Smokin Arrow cigarettes. PX 39.

578.    Cintron has delivered to 130 Poospatuck Lane, Flaming Arrow Smoke Shop. Cintron has been inside that location and has seen an inventory consisting largely of cigarettes, and has seen signs advertising discount cigarettes out front. L. Cintron Dep. Tr. at 22:10 –23:15.

579.    Ronald Bell is the owner of Flaming Arrow Smoke Shop, 130 Poospatuck Lane, a smoke shop on the Poospatuck Indian Reservation in Mastic, New York.  PX 29, ¶ 2.

580.    UPS delivered packages to Flaming Arrow Smoke Shop between December 3, 2010 and March 29, 2011. The package shipper was Mohawk Spring Water, 263 Frogtown Road, Hogansburg, NY. PX 29, ¶ 4. An individual named Robert Oliver was associated with Mohawk Spring Water. PX 29, ¶ 4.

581.    All of the packages shipped to Flaming Arrow contained "Smokin Arrow" brand cigarettes that did not bear New York State tax stamps. PX 29, ¶¶ 5-6. The cigarettes were manufactured on the Akwesasne Reservation of the St. Regis-Mohawk Tribe. PX 29, ¶¶ 5-6.

582.    UPS Driver Louis Cintron has been inside Flaming Arrow Smoke Shop at 130 Poospatuck Lane and has seen the store's stock, which consists mostly of cigarettes. PX 29, ¶ 8.

583.    Between June 1, 2011 and August 31, 2011, Harry Wallace's business, the Poospatuck Smoke Shop, received a number of shipments via UPS. PX 18, ¶ 1.

584.    The shipments were sent by Mohawk Spring Water and Action Race Parts from Akwesasne, NY. PX 18, ¶ 2.

585.    These UPS shipments contained cigarettes known as "Chiefs" and "Hawks" manufactured by a Company known as Chiefs Tobacco Outlet and Gas, located at 397 Route 37, Hogansburg, NY 13655. **PX 18, ¶ 3**.

586.    The shipments from Mohawk Spring Water and Action Race Parts also contained cigarettes known as "Arrows." PX 18, ¶ 4.

587.    On June 22, 2011, the date on which New York DTF Chief Investigator John Connolly arrived at the Potsdam center, UPS Driver Donald Jarvis picked up from Action Race Sports, 1552 State Route 37, Hogansburg, NY 13665, 40 cases of "Chiefs" brand cigarettes. The cigarettes were to be delivered by UPS to the Poospatuck Smoke Shop, 207 Poospatuck Lane, Mastic, NY.  PX 69.

588.    Brian Bess is the owner of BNB tobacco, on the Shinnecock Indian Reservation in Southampton, New York.  PX 16, ¶ 2.

589.    UPS delivered packages to BNB Tobacco on April 18, 2011. The packages were signed for by "Bess." The package shipper was "Mohawk Spring Water, 263 Frogtown Road, Hogansburg, NY."  PX 69.

590.    All of the packages contained "Smokin Arrow" brand cigarettes that did not bear New York State tax stamps.  PX 16, ¶ 5.

### ii.        Action Race Parts

591.    On or around May 11, 2009, UPS opened an account for a company called Action Race Parts with account number 2994E2, located at 1552 State Road 37, Hogansburg, New York. PX 281, PX 279.

592.    Regular UPS pickups for Action Race Parts began in February 2011. PX 75.

593.    In February 2011, UPS picked up 585 packages at Action Race Parts. PX 281.

594.     Between February 21, 2011 and June 2011, UPS had picked up 2,368 packages from Action Race Parts. PX281.

595.     Pickups from Action Race Parts were made by several different UPS drivers, including Donald Jarvis, Amanda Donaldson, and Gregory Labrake. PX 590.

596.     Packages from Action Race Parts were delivered almost entirely to three reservation consignees, Shinnecock Indian Outpost, Poospatuck Smoke Shop, and Da Rez Smoke Shop. PX 75.

597.     The Action Race Parts packages were delivered to the above smoke shops by more than forty (40) different UPS drivers.  PX 421.

598.     On June 23, 2011 NY State Tax Revenue Crimes Specialist Davis Whelpley Went to UPS's Farmingdale terminal after DTF received reports that UPS trucks had been seen making deliveries to the Poospatuck Reservation. PX 39, ¶ 5.

599.     Upon arriving at the UPS terminal in Farmingville, NY, 980 Horseblock Road, Farmingville, NY 11738, Whelpley spoke with terminal manager, Cecil Decoteau about the upcoming cigarette tax enforcement effort. PX 39, ¶ 6.

600.     Decoteau stated to Whelpley that UPS does in fact have a weekly pick up route that picks up from the reservation.  Decoteau stated that there are packages of cigarettes on the dock right now that came from Action Race Parts, 1552 State Rt. 37, Hogansburg, NY. PX 39, ¶ 6.

601.     Decoteau stated that there were fifty-one (51) parcels from Action Race Parts to be delivered to Harry Wallace, d/b/a The Poospatuck Smoke Shop, 207 Poospatuck Lane, Mastic, NY 11950. PX 39, ¶ 7.

602.     Several of the boxes were not sealed properly and Whelpley could observe packages of cigarettes in plain view. PX 39, ¶ 8. The cigarettes were "Chiefs" brand. PX 39.

603.     UPS employees consulted extensively with the shippers to facilitate avoidance of the legal and regulatory issues that threatened to undermine their joint activities.  *See*, *e.g.*, PX 264.

### iii.     Termination of Mohawk Spring Water and Action Race Parts

604.     On April 26, 2011, UPS Potsdam facility supervisor Steve Talbot emailed account executive Claflin saying "PLEASE call the center asap.  We have a potential issue with the Hogansburg p/u of cigarettes."  DX 74.

605.     On June 22, 2011, ATF and a State Investigator Connolly visited the UPS Potsdam facility.  PX 39.

606.     At that time, UPS Potsdam facility supervisor Steve Talbot stated that the Potsdam facility had four accounts on the reservation from which UPS drivers picked up packages from:  Jacobs Tobacco, Tarbells, Action Race Sports, and NTC / Mohawk Spring Water.  PX 39.

607.     Talbot further stated that "UPS is aware that each of these locations is shipping cigarettes.  UPS became aware that the loads were in fact cigarettes from the first or second time they were picked up.  Talbot stated that several of the boxes were not sealed properly and the employees could observe the packages of cigarettes in plain view.  These employees brought this matter to Talbot's attention and Talbot has even observed the cigarettes in the boxes."  PX 39.

608.     Packages then picked up by UPS from Mohawk Spring Water, Action Race Sports, and Jacobs Tobacco revealed several dozen cartons of contraband cigarettes, and were then seized.  PX 39.

108

609.     On June 23, 2011, ATF then seized several dozen cartons of contraband cigarettes from UPS's Farmingville, New York facility.  PX 39.

610.     On June 28, 2011, UPS wrote to inform Mohawk Spring Water and Action Race Parts & Fabrication that UPS would no longer accept packages from those companies.  PX 330, PX 331.

### 9.     The Jacob's Tobacco Group

611.     Jacobs Tobacco opened an account with UPS On July 26, 2006.  (PX 281)

612.     Jacobs Tobacco Company was a Native American owned cigarette manufacturer located on the St. Regis Mohawk Reservation, also known as the Akwesasne Reservation, in New York State, with an address of 344 Frogtown Road, Hogansburg, New York 13655. (Declaration of Rosalie Jacobs, ¶¶ 1-3)("Jacobs Dec.")

613.     From April 18, 2007 to June 22, 2011, Rosalie A. Jacobs ("Jacobs") was the owner and CEO of Jacobs.  Jacobs Dec. ¶¶ 1-3.

614.     Jacobs Tobacco Company was in the business of manufacturing cigarettes. Jacobs Tobacco Company's cigarettes were sold under the brand names "Nations Best," "disCOUNT," and "Turquoise."  Jacobs Dec. ¶ 4; PX 100.

615.     Jacobs Tobacco described the company's business as the production and sale of cigarettes and other tobacco products.  PX 100.

616.     In its sales circular, Jacobs states that, "since introducing our disCOUNT brand in November 2006, sales have increased by 800%."   The circular includes photos of the disCOUNT brand flavors including Full Flavor, Lights and Menthols and the size of the cigarettes (Kings or 100s).  PX 100.

617.     The only tobacco products that Jacobs Tobacco Company sold were tobacco products manufactured by Jacobs Tobacco.  Jacobs Dec. ¶ 6.

618.     Although Jacobs Tobacco Company manufactured and sold a product known as "little cigars," Jacobs Tobacco Company sold "little cigars" for resale on the St. Regis Mohawk Reservation only.  Rosalie Jacobs conducted a diligent search of the company's records and found no records that showed the shipment of "little cigars" off the St. Regis Reservation. Jacobs Dec. ¶ 5.

619.     A UPS spreadsheet lists package pick-ups made by UPS from Jacobs Tobacco Company and delivered to Jacob's Tobacco Company's customers.  All of the packages UPS shipped for delivery to Jacobs Tobacco customers contained cigarettes.  The boxes for the orders recorded on the spreadsheet were imprinted with the brand name of the cigarettes contained in the boxes.  Each box stated on it "Premium Class A Cigarettes," the size of the cigarettes ("Kings" or "100's"), and number of cartons, packs and "sticks."[52]  PX 281.

620.     The box was also imprinted with the flavor of the cigarettes, such as full flavor ("FF"), Lights ("LTS"), or menthol ("M"). Jacobs Supplemental Production dated November 5, 2015/Jacobs 2009 Quickbook Vendor Report for UPS PX 33; Jacobs Dec. ¶8.

621.     Ms. Jacobs avers that UPS drivers who regularly picked up packages from the Jacobs Manufacturing facility knew that the packages contained cigarettes.  Her belief is based on the fact that the boxes for shipping were clearly labeled with the brand name, noting the flavor, that is whether full flavor (FF), Lights (LTS), menthol (M), etc. Each case clearly stated "Premium Class A Cigarettes," the size of the cigarettes ("Kings" or "100's"), number of cartons, packs and sticks.   There was no wrapper covering the boxes when UPS picked up them up at the Jacobs Tobacco manufacturing facility.  The words and symbols on the outside of the box described exactly what was inside the box.  Jacobs Dec. ¶ 8; PX 57.

---

[52] The term "sticks" refers to individual cigarettes.

622.    UPS' Delivery Invoices for Jacobs Tobacco all clearly describe cigarette shipments. .PX Exhibits 87, 90, 92, 93, & 96.

623.    UPS drivers began picking up packages from Jacobs Tobacco in or about July 26, 2006. The number of packages and pickups increased markedly in June and July of 2010, just prior to and after the June 29, 2010 effective date of the PACT Act, which prohibited the Postal Service from carrying cigarettes through the mails. PX 410, PX 434.

624.    Jacobs quickly became such a large and valued customer that UPS upgraded the account and lowered their shipping rates.  The September 11, 2007 letter from UPS to Jacobs Manufacturing says that "based on your recent shipping activity, you now qualify for an upgrade from Retail Rates to Daily Rates.  This means your rates for domestic UPS Air Services, UPS 3 Day Select, and UPS Ground shipments have been underlined reduced." (emphasis in original) PX 66.

625.    UPS's shipment records for Jacobs Tobacco – maker of "DisCount" and "Nations Best" cigarettes – contain entries for each delivery that provide "AB SP 100 DIS MEN," "AB SP 100 DIS FF," "AB NB SP 100s ULTs," "AB SP 100s DIS ULTs," "AB SP 100s NB MEN," "AB DIS 100s HB GOLD." PX 371.

626.    By the end of 2010, UPS had picked up more than 2200 packages from Jacobs Tobacco.  Between the opening of the Jacobs Tobacco account in July 2006 and June 22, 2011, UPS had picked up 3971 packages from Jacobs Tobacco.  PX 281.

627.    Between 2010-2015, at least six different UPS drivers made at least 100 visits to Jacobs Tobacco. PX 394.

### *UPS Driver Donald Jarvis*

628.    UPS Driver Donald Jarvis ("Jarvis") understood Jacobs Tobacco to be in the business of manufacturing and selling cigarettes. Jacobs Tobacco manufactured the DisCOUNT brand of cigarettes (D. Jarvis Tran. at 51, 53.

629.    UPS Driver Jarvis picked up from or dropped packages off at Jacobs Tobacco 27 times through 2008 and 2009. PX 434.

630.    In the Jacobs Tobacco warehouse, UPS Driver Jarvis saw "pallets and cases of cigarettes palletized.  The side of the cases said 'disCOUNTS,'" *i.e.*, "disCOUNT" cigarettes. Jarvis Trans. at 53:24-54:6.

### UPS Driver Candace Sheridan

631.    UPS Driver Candace Sheridan (Sheridan") picked up packages on the Akwesasne Reservation and observed packages picked up from Jacobs Tobacco at the Potsdam Center. Sheridan Trans. at 50.

632.    Based on her observations, Sheridan believed that UPS was shipping cigarettes for Jacobs Tobacco because the packages had been picked up at a cigarette factory and the packages Sheridan observed in the Potsdam Center smelled of tobacco.  Sheridan Trans. at 51.

633.    Packages picked up by UPS from Jacobs Tobacco were delivered to a limited number of consignees, nearly all on Indian reservations, including Monique's Smoke Shop and Smoke Warehouse on the Poospatuck Reservation, Da Rez Smoke Shop on the Tonawanda Reservation, Randy's Smoke Shop on the Tuscarora Reservation, the Western Mohican Tribe and Nation, the Onondaga Smoke Shop, 301 State Route 11A, Nedrow, NY 13120, on the Onondaga Reservation. PX 410, PX 434, PX 71.

### Smoke Shop Owners Received Jacobs Tobacco Shipments via UPS

634.    Jesse Watkins, Jr. has for many years operated retail convenience stores located on the Poospatuck Indian Reservation in Mastic, New York, on Long Island. The stores sell primarily cigarettes and other tobacco products.

635.    One such store was Monique's Smoke Shop, (now closed), located at 108 Poospatuck Lane, Mastic, New York.   Watkins Dec. at ¶ 1.

112

636.     A second store, Smoke Warehouse, is still in business and is located at 108 Poospatuck Lane, Mastic, New York. Watkins Dec. at ¶ 1.

637.     Since approximately 2010, all or most of the cigarettes sold by Smoke Warehouse have been "native brand" cigarettes.  Watkins Dec. at ¶ 2.

638.     UPS delivered packages to Monique's and Smoke Warehouse between July 2010 and September 2010. The packagers were shipped from the Jacobs Tobacco Company, located in Hogansburg, New York, on the Akwesasne Indian Reservation.  Watkins Dec. at 3; PX 434; PX 69**.**

639.     Packages from Jacobs Tobacco have been delivered to Monique's/Smoke Warehouse by UPS Driver Louis Cintron and signed for by "J. Watkins."  At least three other UPS drivers made deliveries from Jacobs Tobacco to Monique's/Smoke Warehouse at 108 Poospatuck Lane, UPS Drivers Jeremiah Trimble, Raymond Licata, and Aron Hershkowitz.  PX 410.

640.     UPS delivery invoice dated September 4, 2010, describing cigarette shipments from Jacobs Tobacco Company to Jesse Watkins, Smoke Warehouse, 108 Poospatuck Lane, Mastic NY.  The package descriptions on the invoice are "DIS AB HB FF," "DIS AB SP FF 100," and "DIS AB HB MEN," all cigarette brands manufactured by Jacobs.  PX 93, PX 96.

641.     Between July 2010 and September 2010, UPS made deliveries from Jacobs Tobacco to Monique's/Smoke Warehouse at 108 Poospatuck Lane approximately three times a month. Watkins Dec. at 3.

642.     The packages delivered by UPS to Monique's/Smoke Warehouse contained cigarettes manufactured by Jacobs Tobacco Company, either "DisCOUNT" brand or "Nations Best" brand cigarettes.  Watkins Dec. at 4.

***Jacobs Tobacco Products Were Seized at UPS Potsdam***

643.    In February 2011, Jacobs Tobacco filed claims for lost packages with UPS, indicating that the package contents were "CARTON, NATION'S BEST AMERICAN FULL, 100 SOFTPK/EA" and "NATIONS BEST FULL FLAVOR CIGARETTES."  Both packages were destined for the Meskwaki Trading Post, Tomo Iowa. PX 468.

644.    During a June 2011 visit to UPS's Potsdam Center by Chief Investigator John Connolly of the New York State Department of Taxation and Finance ("Connolly"), UPS supervisor Steve Talbot informed Connolly that UPS had a weekly route that picks up packages from the Akwesasne Reservation.  PX 39 at ¶ 9.

645.    Talbot informed Connolly that there are four accounts that the Potsdam Center services, Jacobs Tobacco, 344 Frogtown Road, "NTS/Mohawk Spring Water," 263 Frogtown Road, "Action Race Parts," 1552 State Rt. 37 and "Tabell's," 1046 State Rt. 37.  PX  39 at ¶ 9.

646.    Talbot informed Connolly that UPS was aware that each of the four locations shipped cigarettes through UPS. PX 39 at ¶ 11.

647.    Talbot stated that UPS became aware from the first or second time UPS made pick-ups that the loads its drivers picked up were cigarettes. Talbot stated that several of the boxes were not sealed properly and UPS employees observed packages of cigarettes in plain view in the boxes. The UPS employees brought this matter to Talbot's attention and Talbot himself observed the cigarettes in the boxes. PX 39 at ¶11.

On the day Talbot spoke with Connolly, June 22, 2011, UPS had picked up 5 cases plus 10 more cartons of DisCOUNT brand cigarettes from Jacobs Tobacco.  The cigarettes were to be delivered to the Rez Smoke Shop, 986 Bloomingdale Rd, Basom, New York, on the Tonawanda Reservation. PX 39 at ¶15.

## PROPOSED CONCLUSIONS OF LAW

**I.     The State and City are entitled to a judgment as a matter of law on its claims.**

648.     As previously noted, Plaintiffs' complaint alleges that UPS's actions violate (1)

UPS's 2005 Assurance of Discontinuance; (2) New York Public Health Law section 1399-*ll*;

(3) the Prevent All Cigarette Trafficking Act, 15 U.S.C. § 375 *et seq*. ("PACT Act"); and (4) the

Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq*. ("CCTA").  *See* 3d Am. Compl.

(ECF No. 189).[53]

### A.     UPS violated the Assurance of Discontinuance

649.     UPS failed to enforce almost all of the compliance measures in the AOD, by

failing to: (1) enforce a policy banning cigarette shipments to unauthorized recipients in New

York; (2) enforce a progressive discipline system for violators; (3) develop and maintain a

separate database of known and potential violators, using searches of the internet and its general

customer databases; (4) use the discipline and database policies together to prevent the use of

new accounts for evasion of shipper discipline; (5) annually train relevant employees to actively

look for signs of cigarette shipments to unauthorized recipients; (6) continually train account

executives in the AOD's compliance measures; and (7) conduct audits where there was a

reasonable basis to believe that a shipper may have been shipping cigarettes to unauthorized

recipients.  PX 14.

650.     All of these requirements are unambiguious, but they must be read together to

inform the meaning and purpose of each of the separate provisions.  *See Schlaifer Nance & Co.*

*v. Estate of Warhol*, 119 F.3d 91, 100 (2d Cir. 1997) ("well-established principles of contract

---

[53] As noted above, this Court previously dismissed Plaintiffs' RICO-related claims.  *See* Order
(Aug. 9, 2016; ECF No. 322).

interpretation…require that all provisions of a contract be read together as a harmonious whole").

651.    Here, reading the AOD's compliance measures as a whole reveals an interlocking and mutually-reinforcing set of requirements that UPS actively seek out available information relating to possible cigarette shipments by its customers, integrate that information with any acquired passively in the company's general consumer database into a separate reference database, continually update that database with new information, use that database to determine when audits are required, and closely monitor any shippers known to have violated UPS's tobacco policies, including potential successor entities.

652.    UPS failed to substantively comply with this overall mandate.  It failed to train its employees to maximize the information It failed to integrate information gained prior to the PACT Act into a database for use in the discipline and audit functions, and then ceased its only active efforts to look for cigarette shippers using its system right before the PACT Act became effective.  It attempted to consciously avoid the PACT Act NCL's, but received them anyway, and in any event, took no action with respect to updating its database, disciplining or auditing shippers in response to the information they contained.  After the PACT Act, despite knowing of a large influx of business from tobacco shippers located on Indian reservations, UPS continued to disregard information relating to those entities' connections with prior, concurrent, or successor cigarette-dealing accounts, resulting in UPS shipping large volumes of packages for known likely cigarette sellers without auditing or disciplining them for months or years, and then only when prompted by law enforcement tips or accidental discoveries.

653.    While UPS's other violations of the AOD expose it to liability, the main practical remedy under the AOD for Plaintiffs under these circumstances is the audit-requirement provision and related penalties.

654.    UPS was required by that provision to "audit shippers where there is a reasonable basis to believe such shippers may be tendering Cigarettes to Individual Consumers in order to determine whether the shippers are in fact doing so."  (PX 14 ¶24 )

655.    Every time UPS accepted a packager from a shipper and did not audit it, when there was a "reasonable basis" triggering the audit requirement, UPS became liable for a $1,000 penalty.

656.    The audit requirement unambiguously required UPS to take the specified action (auditing shippers) whenever UPS had corporate knowledge of information that provided an objective, reasonable basis to believe shippers "may" have been violating the UPS tobacco policies separately required by the AOD.

657.    The AOD's of the phrase "UPS shall audit" clearly identifies the mandatory nature of UPS's obligation.  Its use of the phrase "where there is a reasonable basis to believe" likewise clearly identifies an objective determination of a condition of fact regarding available information about the shippers' businesses (as opposed to some subjective belief actually articulated by UPS) as the triggering event for that obligation.  And the nature of the information subject to that objective determination is likewise unambiguous—information indicating that "the shippers may be tendering Cigarettes for delivery to Individual Consumers".[54]

---

[54] The Audit Provision's reference to such deliveries being made to "Individual Consumers" encompasses deliveries to any unauthorized recipient of cigarettes, including the unlicensed reservation smoke shops serviced by the Mohawk Shippers and UPS here, notwithstanding those recipients being retail businesses.  *See* PX 14 ¶ 16.

658.   "In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal." *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999), citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958).   "This presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors[]" *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc*., 821 F.3d 297 (2d Cir. 2016) (dissenting op.)(*citing N.Y. Univ. v. First Fin Ins. Co*., 322 F.3d 750, 753 & n.2 (2d Cir. 2002)).

659.   In addition, "[t]he principle is elementary that everyone is presumed to know the law of the land, both common law and statutory law, and that one's ignorance of it furnishes no exemption." *Hamburg-Am. Steam Packet Co. v. United States*, 250 F. 747, 756 (2d Cir. 1918).

660.   Requirements that a party take certain actions based on constructive knowledge are a standard feature not only of insurance policies and other contracts, *see, e.g*., *Olin Corp. v. Ins. Co. of N. Am*., 966 F.2d 718, 723 (2d Cir. 1992), but also of the rules governing the accrual of claims for civil-rights violations, *see*, *e.g. Singh v. Wells*, 445 F. App'x 373, 377 (2d Cir. 2011), and of the standards applied in determining liability for personal injuries resulting from dangerous conditions. *See*, *e.g*., *Johnson v. Bon-Ton Dep't Stores, Inc.*, 278 F. App'x 56, 58 (2d Cir. 2008).

661.   Here, the evidence shows that UPS's agents obtained and recorded facts in the course of their duties that provided a reasonable basis for UPS to believe that all of the shippers in issue may have been shipping cigarettes to unauthorized recipients from the date of the inception of their accounts.

662.   These included:

118

- Facts concerning the risks of relying solely on promises by tobacco sellers located on Indian reservations that they would not ship cigarettes;

- Facts concerning UPS's pre-AOD accounts with tobacco sellers located on Indian reservations;

- Facts derived during the compilation of UPS's AOD compliance report and its follow-up internet searches;

- Facts concerning the information listed on the NCL's;

- Facts concerning the shift in business to Indian-reservation tobacco sellers after the enactment of the PACT Act;

- Facts concerning the individuals, locations, and other identifying information relating to each of the shippers at issue and their succession of or affiliation with each other;

- Facts concerning the relative volumes, weights, and frequency of UPS's shipments for the shippers at issue;

- Facts concerning the financial performance of the accounts assigned to the shippers at issue, and the nature of those shippers' businesses.

663.   UPS also independently had constructive corporate knowledge of the contents of the PACT Act from the day it became effective, including its provisions describing the contents of the NCLs and requiring their to common carriers such as UPS.

664.   Thus, UPS is liable for a $1,000 penalty for each instance in which it accepted a package from one of the shippers at issue and did not perform an audit.  The total number of such violations and the total damages, measured by the resulting penalties, are specified in [TABLE _]

665.   In addition, the evidence shows that the contents of virtually all of the packages delivered for each of shippers at issue were, in fact, cigarettes.  This means that in addition to the penalty remedies applicable to the audit-provision violations, Plaintiffs are entitled to the presumption that each of those deliveries constituted a violation of PHL § 1399-ll.  **PX 14 ¶ 43.**

119

### B.      UPS violated the Prevent All Cigarette Trafficking Act.

666.    UPS has also violated the Prevent All Cigarette Trafficking Act of 2009, 15 U.S.C. § 375–78 (111 P.L. 154, 124 Stat. 1087 (enacted Mar. 31, 2010, in at least two ways—(1) by delivering packages that UPS knew, or had reason to know, contained cigarettes, in violation of 15 U.S.C. § 376a(b)(2); and (2) by delivering packages from delivery sellers identified by the U.S. Attorney General's Non-Compliant Delivery Seller List, in violation of 15 U.S.C. § 376a(e)(2)(A).[55]

667.    The PACT Act defines a "cigarette" as follows:

a.   "any roll of tobacco wrapped in paper or in any substance not containing tobacco" (15 U.S.C. § 375(2)(A)(i) (defining a "cigarette" by reference to 18 U.S.C. § 2341));

b.   "any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette" (*id.*); and

c.   "roll-your-own tobacco," which means "any tobacco which, because of its appearance, type, packaging, or labeling, is suitable for use and likely to be offered to, or purchased by, consumers as tobacco for making cigarettes or cigars, or for use as wrappers thereof" (15 U.S.C. § 375(2)(A)(ii) (defining "roll-your-own tobacco" by reference to Internal Rev. Code § 5702)).

---

[55] The PACT Act became effective on June 29, 2010—*i.e.*, 90 days after the date the PACT Act was enacted (*i.e.*, Mar. 31, 2010; *see* The Prevent All Cigarette Trafficking Act of 2009, 111 P.L. 154, 124 Stat. 1087, 1110, Sec. 6).  *See also* ATF, Bureau of Alcohol, Tobacco, Firearms and Explosives, Prevent All Cigarette Trafficking Act (PACT) of 2009, *available at* https://www.atf.gov/alcohol-tobacco/prevent-all-cigarette-trafficking-act-pact-2009.

### 1.   UPS's delivery of cigarettes in violation of Subsection (b)(2).

668.   The PACT Act provides, *inter alia*, that "[f]or any shipping package containing cigarettes or smokeless tobacco, the delivery seller shall include on the bill of lading, if any, and on the outside of the shipping package, on the same surface as the delivery address, a clear and conspicuous statement providing as follows: 'CIGARETTES/SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS'." 15 U.S.C. § 376a(b)(1).

669.   Accordingly, for any package that is not labeled in accordance with 15 U.S.C. § 376a(b)(1)) (*see* above), a "common carrier or other delivery service" shall treat such package "as nondeliverable matter … if the common carrier or other delivery service knows or should know the package contains cigarettes or smokeless tobacco." *Id*. § 376a(b)(2).

670.   If a common carrier or other delivery service believes a package is being submitted for delivery in violation of the PACT Act's labeling requirements (*i.e.*, 15 U.S.C. § 376a(b)(1)), the carrier or other delivery service "may require the person submitting the package for delivery to establish that it is not being sent in violation of [the PACT Act's labeling requirements, *id*.] before accepting the package for delivery." *Id*. § 376a(b)(2).

### 2.   UPS's delivery of packages for persons on the Non-Compliant Delivery Seller List in violation Subsection (e)(2)(A).

671.   The PACT Act further directs the Attorney General for the United States to compile a list of cigarette and smokeless tobacco delivery sellers that have (a) not registered with the Attorney General, pursuant to 15 U.S.C. § 376(a); or (b) "are otherwise not in compliance with this Act[.]" 15 U.S.C. § 376a(e)(1)(A).

672.     For each delivery seller, the list would include to the extent known, "all names the delivery seller uses or has used in the transaction of its business or on packages delivered to customers; all addresses from which the delivery seller does or has done business, or ships or has shipped cigarettes or smokeless tobacco; the website addresses, primary e-mail address, and phone number of the delivery seller; and any other information the U.S. Attorney General may have that "would facilitate compliance by the recipients of the list."  15 U.S.C. § 376a(e)(1)(B)

673.     The Non-Compliant Delivery Seller List is then distributed to the attorney general and tax administrator of every State; common carriers and other persons that deliver small packages to consumers in interstate commerce, and other persons that the U.S. Attorney General may determine can "promote the effective enforcement of this Act.  15 U.S.C. § 376a(e)(1)(A)(i).

674.     The U.S. Attorney General may also make the list available to any other person engaged in the business of interstate deliveries or who delivers cigarettes or smokeless tobacco in or into any State.  15 U.S.C. § 376a(e)(1)(A)(ii).

675.     The U.S. Attorney General periodically updates and distributes such updated lists "at least once every 4 months[.]"  15 U.S.C. § 376a(e)(1)(C).

676.     "Nothing in this section shall prohibit a common carrier … or any other person receiving the list from discussing with a listed delivery seller the inclusion of the delivery seller on the list and the resulting effects on any services requested by the listed delivery seller."  15 U.S.C. § 376a(e)(1)(F).

## Prohibitions on Delivery

677.     Sixty days after the U.S. Attorney General's distribution of its first list, "no person who receives the list … and no person who delivers cigarettes or smokeless tobacco to

consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the list, unless (i) the person making the delivery "knows or believes in good faith that the item does not include cigarettes or smokeless tobacco; (ii) the delivery is made to "a person lawfully engaged in the business of manufacturing, distributing, or selling cigarettes or smokeless tobacco;" or (iii) the package being delivered "weighs more than 100 pounds and the person making the delivery does not know or have reasonable cause to believe that the package contains cigarettes or smokeless tobacco." 15 U.S.C. § 376a(e)(2)(A).

678.    Thirty days after any updates to the list have been distributed or made available, "all recipients and all common carriers or other persons that deliver cigarettes or smokeless tobacco to consumers shall be subject to [the prohibitions on delivery, described at] subparagraph (A) in regard to the corrections or updates." 15 U.S.C. § 376a(e)(2)(B).

679.    If it happens that a common carrier or other delivery service "delays or interrupts the delivery of a package in the possession of the common carrier or delivery service because the common carrier or delivery service determines or has reason to believe that the person ordering the delivery is on [the Non-Compliant Delivery Seller List, 15 U.S.C. § 376a(e)(1)(A)] and that [none of the three enumerated exceptions apply, *id.* § 376a(e)(2)(A)(i)–(iii),]" then—

680.    The person ordering the delivery is obligated to pay "(I) the common carrier or other delivery service as if the delivery of the package had been timely completed"; and "(II)  if the package is not deliverable, any reasonable additional fee or charge levied by the common carrier or other delivery service to cover any extra costs and inconvenience and to serve as a disincentive against such noncomplying delivery orders" (*id*. § 376a(e)(4)(A)(i)(I)–(II)); and

123

681.    If the package is "determined not to be deliverable, the common carrier or other delivery service shall offer to provide the package and its contents to a Federal, State, or local law enforcement agency." *Id*. § 376a(e)(4)(A)(ii).

682.    A common carrier or other delivery service is required to maintain for a period of five years, "any records kept in the ordinary course of business relating to any delivery interrupted [pursuant to the PACT Act, *see* 15 U.S.C. § 376a(e)(4)] and provide that information, upon request, to … the attorney general or chief law enforcement official or tax administrator of any State, local … government." *Id*. § 376a(e)(4)(B).

683.    Some additional considerations and limitations to liability under the PACT Act:

   a.    A common carrier or other person making a delivery subject to subsection (e), 15 U.S.C. §  376a(e), is not required or otherwise obligated to "(i) determine whether any list distributed or made available … is complete, accurate, or up-to-date; (ii) determine whether a person ordering a delivery is in compliance with [the] Act; or (iii) open or inspect, pursuant to [the] Act, any package being delivered to determine its contents."  15 U.S.C. § 376a(e)(9)(A).

   b.    A common carrier or other person making a delivery subject to subsection (e), 15 U.S.C. §  376a(e), is also not required "to make inquiries or otherwise determine whether a person ordering a delivery is a delivery seller on the list describe in paragraph (1)(A) who is using a different name or address in order to evade the related delivery restrictions[.]"  15 U.S.C. § 376a(e)(9)(B)(i).

684.    That said, any common carrier or other person making a delivery subject to subsection (e), 15 U.S.C. §  376a(e), "shall not knowingly delivery any package to consumers for any delivery seller on the list described in paragraph (1)(A) who the common carrier or other

delivery service knows is a delivery seller who is on the list and is using a different name or address to evade the delivery restrictions of paragraph (1)."  15 U.S.C. § 376a(e)(9)(B)(ii).

685.    The PACT Act further provides that "[n]o common carrier or independent delivery service shall be subject to civil penalties … for a violation of section 2A(e) [15 U.S.C. § 376a(e)] if (i) the common carrier … has implemented and enforces effective policies and practices for complying with that section; or (ii) the violation consists of an employee of the common carrier … who physically receives and processes orders, picks up packages, processes packages, or makes deliveries, taking actions that are outside the scope of employment of the employee, or that violate the implemented and enforced policies of the common carrier … described in clause (i)."  15 U.S.C.S. § 377(b)(3)(B).

686.    The PACT Act further provides the following general exemptions:  "Subsection (b)(2) and any requirements or restrictions placed directly on common carriers under this subsection, including subparagraphs (A) and (B) of paragraph (2), shall not apply to a common carrier that" (i) is "subject to a settlement agreement" like the one entered into by UPS and the Attorney General of New York on or about October 21, 2005 (15 U.S.C. § 376a(e)(3)(A)(i)), and (b) that agreement "is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers" (*id*. § 376a(e)(3)(B)(ii)(I)); or (ii) if that settlement agreement was terminated or otherwise became inactive, the common carrier is "administering and enforcing policies and practices throughout the United States that are at least as stringent as the agreement."  *Id*. § 376a(e)(3)(A).

687.    Here, UPS is not entitled to the exemption contained in 15 U.S.C.S. § 377(b)(3)(B) because it abandoned its compliance obligations under the AOD to the extent that "the effectiveness of UPS's policies [was] so compromised that those polices [were] not in fact

in place," meaning, consequently, that UPS did not "honor" the AOD "throughout the United States."  **ECF 206 pp. 44-45.**

### i.        The Elliot Enterprises Group

688.    On November 10, 2010, the Bureau of Alcohol, Tobacco, Firearms and Explosives added "Elliott Enterprise" to the PACT Act – Non-Compliant List.  **PX 472.**

689.    Because this company was added to ATF's Non-Compliant List, UPS had sixty days from ATF's distribution of the list before subsection (e)(2)'s delivery prohibitions under the PACT Act would take effect for that company.  15  U.S.C.  §  376a(e)(2)(A).

690.    ATF distributed its first list on November 10, 2010.

691.    Accordingly, UPS became liable for PACT Act penalties for all shipments for Elliott Enterprises occurring after January 9, 2011 .

692.    The total number of such PACT Act violations are specified in **[TABLE]**

### ii.        The Smokes & Spirits Group

693.    On February 15, 2012, the Bureau of Alcohol, Tobacco, Firearms and Explosives added "Smokes & Spirits" to the PACT Act – Non-Compliant List.  **\***

694.    On July 16, 2012, "Smokes-Spirits.com LLC" was added to the PACT Act Non-compliant list, and UPS received an email on that date from the U.S. Department of Justice specifically identifying this addition to the list. **PX 475.**

695.    Because this company was added to ATF's Non-Compliant List, UPS had sixty days from ATF's distribution of the list before subsection (e)(2)'s delivery prohibitions under the PACT Act would take effect for that company.  15  U.S.C.  §  376a(e)(2)(A).

696.

697.     ATF distributed the first list that included Smokes & Spirits on February 15, 2012.

698.     Accordingly, UPS became liable for PACT Act penalties for all shipments for Elliott Enterprises occurring after April 12, 2012

699.     The total number of such PACT Act violations are specified in **[TABLE]**

### iii.      Indian Smokes

700.     On May 6, 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives added "Indian Smokes" to the PACT Act – Non-Compliant List.*

701.     Because this company was added to ATF's Non-Compliant List, UPS had sixty days from ATF's distribution of the list before subsection (e)(2)'s delivery prohibitions under the PACT Act would take effect for that company.  15 U.S.C.  §  376a(e)(2)(A).

702.     ATF distributed its first list on May 6, 2011.

703.     Accordingly, UPS became liable for PACT Act penalties for all shipments for Elliott Enterprises occurring after July 6, 2011.

704.     The total number of such PACT Act violations are specified in **[TABLE]**

### C.      UPS violated New York Public Health Law § 1399-*ll*

705.     Pursuant to Section 1399-*ll* of the New York Public Health Law, it is unlawful for "any common or contract carrier to knowingly transport cigarettes to any person" in New York State "reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this section."  N.Y. Pub. Health Law § 1399-*ll*(2).  Paragraph (a), (b) and (c) of Section 1399-*ll*(1) identifies the following persons who may lawfully ship or cause to be shipped cigarettes in this State:

         (a) a person licensed as a cigarette tax agent or wholesale dealer
         under article twenty of the tax law or registered retail dealer under

127

> section four hundred eighty-a of the tax law; (b) an export
> warehouse proprietor pursuant to chapter 52 of the internal revenue
> code or an operator of a customs bonded warehouse pursuant to
> section 1311 or 1555 of title 19 of the United States Code; or (c) a
> person who is an officer, employee or agent of the United States
> government, this state or a department, agency, instrumentality or
> political subdivision of the United States or this state and presents
> himself or herself as such, when such person is acting in
> accordance with his or her official duties.

*Id*. § 1399-*ll*(1).  For purposes of this subdivision, a person is a licensed or registered agent or

dealer described in paragraph (a) of this subdivision if his or her name appears on a list of

licensed or registered agents or dealers published by the department of taxation and finance, or if

such person is licensed or registered as an agent or dealer under article twenty of the tax law.

*Id*.[56]

706.    And significantly, for purposes of Section 1399-*ll*(2), if a common or contract

carrier knowingly transports cigarettes "to a home or residence, it shall be presumed that the

common or contract carrier knew that such person was not a person described in paragraph (a),

(b) or (c) of subdivision one of this section."  N.Y. Pub. Health Law § 1399-*ll*(2).

---

[56] Although Article 13-F does not define the term "cigarettes" directly, the Article's definition section (N.Y. Pub. Health Law § 1399-aa) defines the term "tobacco products" as meaning "one or more cigarettes or cigars, bidis, chewing tobacco, powdered tobacco, nicotine water or any other tobacco products."  *Id*. § 1399-aa(5).  Accordingly, it appears that a "cigarette" is something different than a cigar, bidis, chewing tobacco, powdered tobacco, nicotine water, etc. New York Tax Law section 470 (which forms part of the basis of New York's AOD w/ UPS) further defines a "cigarette" to mean "[a]ny roll for smoking made wholly or in part of tobacco or of any other substance, irrespective of size or shape and whether or not such tobacco or substance is flavored, adulterated or mixed with any other ingredient, the wrapper or cover of which is made of paper or any other substance or material but is not made in whole or in part of tobacco."  N.Y. Tax Law § 470(1).

707.    "No State may enforce against a common carrier a law prohibiting the delivery of cigarettes or other tobacco products to individual consumers or personal residences without proof that the common carrier is not exempt under paragraph (3) of this subsection [*i.e.*, "is subject to a settlement agreement" such as the one UPS entered into and that such agreement is "honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers[.]"] 15 U.S.C. § 376a(e)(5)(C)(ii).

708.    UPS recorded in its delivery records when it delivered packages from the shippers at issue to residential addresses, and so UPS is presumed to have known the recipients were unauthorized as to all of those deliveries.

709.    However, even as to its deliveries to commercial addresses, UPS could only have believed that the recipients were authorized to receive cigarettes if it possessed documents complying with relevant New York State regulations identifying the specific contents of the packages and the licensure of the recipient.  UPS has produced no such documents.

710.    The total number of PHL § 1399 violations and the total damages, measured by the resulting penalties, are specified in **[TABLE _]**

### D.    UPS violated the Contraband Cigarette Trafficking Act

711.    Under the Contraband Cigarette Trafficking Act, it is unlawful for any person knowingly to ship, transport, sell, or distribute "contraband cigarettes."  18 U.S.C. § 2342(a); *City of New York v. FedEx Ground Package Sys.*, 91 F. Supp. 3d 512, 519 (S.D.N.Y. 2015).  "Contraband cigarettes" are defined as follows:[57]

---

[57] A "cigarette" is defined as follows:  "(A) any roll of tobacco wrapped in paper or in any substance not containing tobacco; and (B) any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by consumers as a cigarette described in subparagraph (A)[.]"  18 U.S.C. § 2341(1).

> [A] quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable State … cigarette taxes in the State … where such cigarettes are found, if the State … requires a stamp, impression, or other indication to be placed on the packages … of cigarettes to evidence of cigarette taxes, and which are in the possession of any person other than—(A) a … manufacturer of tobacco products … (C) a person … who is licensed or otherwise authorized by the State … to account for and pay cigarette taxes imposed by such State … or (D) an … agent of the United States or a State ….

18 U.S.C. § 2341(2); *FedEx*, 91 F. Supp. 3d at 519–20 (footnote omitted).

712.    Together, these provisions establish four elements:  "that a party (1) knowingly ship, transport, receive, possess, sell, distribute or purchase (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps."  *FedEx*, 91 F. Supp. 3d at 520.

713.    Notably, courts within this Circuit have consistently held that the Act permits the aggregation of deliveries.  Order, at 12–13 (Sept. 16, 2015; ECF No. 49) (citing cases).

714.    Each element is met here:

**1.    The preponderance of the evidence shows that UPS shipped, transported, received, and possessed over 10,000 cigarettes.**

715.    In this case, the total number of packages containing cigarettes delivered by UPS, and the average weights of those packages, when applied to the known weight of a carton of cigarettes (.6 pounds), demonstrates that the total volume of cigarettes underlying Plaintiffs' claims far exceed 10,000 cigarettes (50cartons).  **[TABLE]**

**2.    The preponderance of the evidence shows that the packs of cigarettes delivered by UPS were unstamped.**

716.    The evidence shows that the shippers at issue operated on or near Indian reservations in New York, and that they did so to take advantage of a unique practical immunity from prosecution for selling unstamped cigarettes in New York State.  The evidence shows that

the entire business model of the shippers at issue was to sell unstamped cigarettes.  The evidence also shows that UPS knew, at all relevant, times, that any cigarettes shipped from an Indian reservation in New York were presumptively unstamped.

> **3.      The preponderance of the evidence shows that the unstamped packs of cigarettes that UPS delivered were required to have affixed tax stamps pursuant to State and Local law.**

717.    New York law creates a presumption that all cigarettes are taxable, and are all therefore required to be stamped.  N.Y. Tax Law § 471 *et seq.*; *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 159 (2d Cir. 2011).

> **4.      The preponderance of the evidence shows that UPS knowingly shipped, transported, received, and possessed such contraband cigarettes.**

718.    To show a defendant's knowledge, all that a defendant is required to "know" is "the physical nature of what he possessed, *i.e.*, cigarettes without stamps, not that the actions engaged in violate the law."  City of New York v. Milhelm Attea & Bros., 2012 U.S. Dist. LEXIS 116533, *73 (E.D.N.Y. Aug. 17, 2012) (internal quotation marks and citation omitted; citing cases).

719.    (A common carrier "transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source, and destination of such cigarettes" is not subject to CCTA liability.  23 U.S.C. § 2341(2).)

720.    UPS knew and/or exhibited "conscious avoidance" that its delivered packages may have contained unstamped, untaxed packs of cigarettes:

721.    "A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact."  United States v. Fofanah, 765 F.3d 141, 144 (2d Cir. 2014); see also

United States v. Svoboda, 347 F.3d 471, 477–78 (2d Cir. 2003)[58, 59]; *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069 (2011) (holding that the doctrine of "willful blindness" could be applied in the civil context, and citing as an example, *United States v. Svoboda*, 347 F.3d 471, 477–78 (2d Cir. 2003)).[60]

722.    This test has two prongs:  "First, the defendant must assert the lack of some specific aspect of knowledge required for conviction.  Second, there must be an appropriate factual predicate for the charge … i.e., the evidence [shows] … that the defendant [a] was aware

---

[58] "The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.  In such circumstances, a conscious avoidance instruction to the jury permits a finding of knowledge even where there is no evidence that the defendant possessed actual knowledge."  *Svoboda*, 347 F.3d at 477–78 (citations and internal quotation marks omitted).

[59] "A conscious avoidance instruction may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction … and (2) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion … that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.  The second prong of this test thus has two components – there must be evidence that the defendant (1) was aware of a high probability of the disputed fact and (2) deliberately avoided confirming that fact.  Of course, the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct.  Moreover, the second prong may be established where, a defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge."  *Svoboda*, 347 F.3d at 480 (citations, internal quotation marks, and brackets omitted) (emphasis in original); *see also Fofanah*, 765 F.3d at 153–54 (Leval, J., concurring).

[60] Conscious avoidance is different than recklessness and negligence: "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.  By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not[.]"  *Global-Tech Appliances*, 131 S. Ct. at 2070–71 (citations omitted); *see also Fofanah*, 765 F.3d at 154 (Leval, J., concurring) (noting that the Supreme Court's formulation of willful blindness and conscious avoidance is essentially the same).

of a high probability of the fact in dispute and [b] consciously avoided confirming that fact."

*Fofanah*, 765 F.3d at 144–45 (citations and internal quotation markets omitted).

723.    Per Fofanah's concurrence (Leval, J., concurring): "What is determinative is not whether there is evidence in the record of actual knowledge.  It is rather whether the evidence can support a finding that the defendant was aware of so high a probability of the incriminating facts that the defendant either knew the truth, or if not, it was because the defendant consciously decided to act without confirming the highly probable incriminating truth.  *See Svoboda*, 347 F.3d at 480–81."  *Fofanah*, 765 F.3d at 152 (Leval, J., concurring).

724.    An "affirmative act" is not required.  *Fofanah*, 765 F.3d at 150–51 (Leval, J., concurring).

725.    And, the "suspicious circumstances" must have been apparent to the defendant. *Fofanah*, 765 F.3d at 153 n. 3 (Leval, J., concurring).

## II.     UPS's Affirmative Defenses Lack Merit

726.     UPS's affirmative defenses also fail as a matter of law.

727.     Previously, this Court, *inter alia*, struck UPS's Sixth, Seventh, Eighth, Ninth,

Tenth, Eleventh, and Sixteenth defenses.  Order, 66–67 (dated Feb. 8, 2016; ECF No. 177)

("Feb. 8 Order").  At the same time, this Court preserved for trial UPS's Twelfth, Thirteenth, and

Seventeenth defenses concerning the State's claim under the Assurance of Discontinuance.  *See*

*also* Order, 2 & n.2 (dated Aug. 23, 2016; ECF No. 258) (noting also that UPS had also

abandoned its Fourteenth Defense). This Court also later granted UPS's motion for

reconsideration of its Seventh Defense as applied to plaintiffs' claims under the Contraband

Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq*. and the State's claim under the Assurance.

Order (dated June 21, 2016).

728.     But as detailed by plaintiffs' briefing[61] and reiterated here, these defenses fail as a

matter of law:

### A.     UPS's Twelfth defense (breach of the implied covenant of good faith and fair dealing) fails as a matter of law.

729.     This Court previously it doubts as to the viability of UPS's Twelfth Affirmative

Defense.  Order, at 10 (dated Aug. 23, 2016).

730.     As explained by plaintiffs' prior briefing (*see* Pls.' Mem. Of Law ISO Mot. For

Summ. J. (ECF No. 264) and Pls.' Reply Br. (ECF No. 313), those doubts are well founded:

731.     UPS's "cooperation" defense is, at bottom, grounded on (a) a misreading of

paragraphs 39 and 40 of UPS's Assurance of Discontinuance[62]; (b) a "whereas" clause that has

---

[61] As to UPS's Twelfth Defense, please see ECF Nos. 264 (Mem. Of Law ISO Pls.' Mot. For
Summ. J.), 313 (Reply Br.).  As to UPS's Thirteenth and Seventeenth defenses, please see ECF
Nos. 264, 313, and 381 (Mem. Of Law ISO Pls.' Mot. For Reconsideration).  And for UPS's
Seventh Defense, please see ECF Nos. 287, 343, and 384.

no legal effect; and (c) a misunderstanding of the scope and limits of the implied covenant of good faith and fair dealing.  *See* UPS Opp. at 16–19 (ECF No. 290).

732.    Turning first to paragraphs 39 and 40, nothing in these provisions suggests that the State intended to obligate itself (or any referenced "governmental authority," *e.g.*, the City) to share information with UPS.  UPS Assurance, ¶¶ 39–40; *see also* Pls.' Br. at 21–22 (ECF No. 264).  Rather, these provisions (*i.e.*, "If the Attorney General or any other governmental authority …") simply describe a condition—something "very clearly different in character" from a promise to undertake a legal obligation.  8-30 Corbin on Contracts § 30.12.[63]  A condition "creates no right or duty and is merely a limiting or modifying factor."  *Id*.  And significantly, the non-occurrence or non-performance of a condition "is not a breach of contract **unless** the

---

[62] These paragraphs state the following:

> 39.  If the Attorney General or any other governmental authority provides UPS with evidence that a UPS customer is shipping Cigarettes to Individual Consumers, UPS shall discipline such shipper pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance.

> 40.  If the Attorney General or any other governmental authority represents to UPS that a UPS customer is shipping Cigarettes to Individual Consumers, but does not provide evidence of such shipments, UPS shall conduct an audit of that shipper.  UPS shall discipline, pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance, shippers found to be shipping Cigarettes to Individual Consumers.

UPS Assurance, ¶¶ 39–40 (*available at* http://www.ag.ny.gov/sites/default/files/press-releases/archived/9tiupsaodfinal.oct.pdf).

[63] "[A] condition is a fact or an event and is not an expression of intention or an assurance.  A promise in a contract creates a legal duty in the promisor and a right in the promisee; the fact or event constituting a condition creates no right or duty and is merely a limiting or modifying factor."  8-30 Corbin on Contracts § 30.12; *see id*. § 30.6 n.13 (noting that historically, a condition was not considered a part of a contract's terms, but instead a "contingency, an event not certain to occur").

person promised to render the performance—to perform the condition." *Id.* § 30.13 (emphasis added).[64]

733.    Here, neither the State nor any other referenced "governmental authority" promised to share information with UPS. *See* UPS Assurance, ¶¶ 39–40.  So, even accepting *arguendo* UPS's characterization of the State's inaction, such "facts" only show the non-performance of a condition—not a breach of the Assurance.

734.    As a result, UPS's implied covenant defense fails.  This is because under New York law, "[a] claim for breach of the implied covenant of good faith and fair dealing cannot substitute for an unsustainable breach of contract claim." *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (1st Dep't 2003); *George Town Assocs. S.A. v. Abakan, Inc.*, 2015 U.S. Dist. LEXIS 108935, at *23 (S.D.N.Y. Aug. 18, 2015) (quoting *Skillgames*).  Or stated differently, because UPS cannot show a breach of the Assurance, the carrier cannot bootstrap a claim under the implied covenant.

735.    To try and salvage this defense, UPS relies on a "whereas" clause[65] that purportedly shows the parties' intention to cooperate with each other.  UPS Opp. at 18 (ECF No. 290).  At most, however, this clause only shows **UPS's intention** to enter into the agreement—

---

[64] "Breach of contract is always the non-performance of some duty created by a promise.  In the sense adopted herein, a condition should not be described as 'broken.'  The condition merely does not exist or does not occur.  If the condition consists of a personal action, it may properly be said not to be performed; but non-performance is not a breach of contract unless the person promised to render the performance—to perform the condition.  … If an insurance company issues a unilateral policy contract to pay loss sixty days after a fire and proof made, a fire and making proof are conditions of the company's duty; but nobody has promised to perform them.  The non-occurrence of a fire is not a "breach of condition" or a breach of contract; nor is the non-performance by the insured of the act of making proof."  8-30 Corbin on Contracts § 30.13.

[65] "WHEREAS, UPS offers this Assurance of Discontinuance in settlement of the Alleged Past Violations asserted by the Attorney General, and intending that this Assurance of Discontinuance will promote further and ongoing cooperation between UPS and the Attorney General concerning UPS's compliance with [Public Health Law] § 1399-*ll*[.]"  UPS Assurance, at 5.

not the State's.  *See* UPS Assurance, at 5; Pls.' Br. at 22–23 (noting additional arguments).

Furthermore, because UPS fails to identify any ambiguous operative clause within the

Assurance, UPS's cited provision is appropriately treated as a recital that "cannot create any

right beyond those arising from the operative terms of the document[.]"  *Grand Manor Health*

*Related Facility, Inc. v. Hamilton Equities Inc.*, 885 N.Y.S.2d 255, 256 (N.Y. App. Div. 2009);

*see also Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103–04 (2d Cir. 1985).[66]

736.    Finally, to the extent UPS suggests that the State's exercise of its prosecutorial

discretion frustrated a fundamental purpose of the Assurance and up-ended UPS's "reasonable"

expectations (UPS Opp. at 17–18; ECF No. 290), UPS's argument misunderstands the scope and

limits of the implied covenant.

737.    In New York, the implied covenant "is in aid and furtherance of other terms of the

agreement of the parties."  *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).

To that end, the implied covenant "can only impose an obligation consistent with other mutually

agreed upon terms in the contract.  It does not add to the contract a substantive provision not

included by the parties."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005)

(citation omitted); *Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003) (noting that

---

[66] UPS also asserts that cases applying principles of statutory construction to federal statutes are inapt here.  UPS Opp. at 18 n.9 (ECF No. 290).  UPS fails to acknowledge, however, that the Assurance has been incorporated by reference into the Prevent All Cigarette Trafficking Act, 15 U.S.C. § 375–78 (*see id*. § 376a(e)(3)(B)(ii)(I); Pls.' Br. at 16), and that it is not uncommon for courts interpreting contracts to rely on the same principles that guide statutory construction, *Rockland Exposition, Inc. v. Great Am. Assur. Co.*, 746 F. Supp. 2d 528, 537 n.8 (S.D.N.Y. 2010) (citing cases).  As a result, this Court's reliance on cases interpreting federal statutes is appropriate here.  *See*, *e.g.*, Pls.' Br. (ECF No. 264) at 23 (citing *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009) (noting that "whereas" clauses in federal legislation have no operative effect); *Yazoo & Mississippi Valley R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) ("the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up.")).

implied covenant cannot be used to impose "supplementary obligations … even to fulfill the purposes more effectively").

738.    And as a consequence, the implied covenant "does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (citation omitted); *see also M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136–37 (2d Cir. 1990) (holding that a party to a contract did not violate the implied covenant of good faith and fair dealing when it advanced its legitimate business interests in an unrelated transaction in such a way as to destroy the other party's expected benefit).  As emphasized by *George Town Assocs.*—

> The implied covenant of good faith and fair dealing cannot be used to bootstrap an obligation into a contract that was not contemplated by the parties and is not in furtherance of the obligations explicitly assumed by the parties.  Moreover, it is black-letter law that an implied covenant cannot be used to prevent a party to a contract acting in its own interests or from taking an action in a separate transaction that serves its legitimate interests even if that action deprives the other party to the contract of the benefit of its bargain.

2015 U.S. Dist. LEXIS 108935, at *24–25 (citing *M/A-COM*, 904 F.2d at 136–37); *see Sec. Plans*, 769 F.3d at 817 (implied covenant will be breached "only in a narrow range of cases").

739.    Here, UPS essentially seeks to use the implied covenant to change a "condition" into a "promise."  It cannot.  *See Sec. Plans*, 769 F.3d at 818 n.10 (noting that implied covenant cannot be used to "avoid the express terms of the contract").  At the time the parties entered into the Assurance, the parties specifically chose not to impose a legal obligation on the State or other referenced third-party, "governmental authorit[ies]."  *See* UPS Assurance at ¶¶ 39–40.  Indeed, other language in the Assurance makes clear that the agreement would not affect or limit "in any way the rights" of such third-parties.  *Id.* at ¶ 52.

138

740.     Furthermore, it would be unreasonable to believe that the State—after having purportedly found UPS in repeated violation of Public Health Law section 1399-*ll* and Executive Law section 63(12), *see* Assurance at ¶ 8—would inexplicably agree to limit its broad prosecutorial authority and discretion by agreeing to obligate itself (and other unspecified third-party "governmental authorit[ies]") to share information with UPS.  It similarly beggars belief that UPS could reasonably believe that the carrier's unilateral expression of cooperation contained in a "whereas" statement could be used to impose an affirmative obligation on the State.

741.     In any event, by entering into the Assurance, UPS obtained the "fruits of its contract," namely the benefit of avoiding a civil action from the State for its past alleged violations of Section 1399-*ll*.  And, because the State and City's sharing of information was not essential to UPS's performance under the Assurance, plaintiffs' purported inaction cannot be said to have destroyed the value of UPS's Assurance.  *See* UPS PACT Act briefing, generally (ECF Nos. 172–76, arguing that UPS's maintenance of certain nationwide policies was sufficient to bar plaintiffs' PACT Act claims); UPS Opp. at 1 n.1 (abandoning UPS's impracticability and frustration of purpose defenses).

742.     In sum, UPS's contention that the State and City breached the Assurance or its implied covenant of good faith and fair dealing is unsupported by the evidence, and furthermore fails to create a genuine dispute.

### B.     UPS's Thirteenth and Seventeenth (equitable) defenses fail as a matter of law.

743.     These defenses apply to the State's claim under the Assurance.

744.     Accordingly, when viewing UPS's equitable defenses through the lens of New York case law, this Court should set these defenses aside.  Nowhere does UPS suggest that it has suffered prejudice rising to a constitutional level.

### 1.     The State's claim under the Assurance is held to a different standard than a private litigant.

745.     The role and function of a government, as well as the "great public policy" underpinning the courts' well-founded hesitation to apply any equitable defense to a sovereign that is acting to enforce and protect a public right.  As many courts have recognized, "the operation of government is neither a commercial activity not a competitive one."  *Sheppard v. Lee*, 929 F.2d 496, 499 (9th Cir. 1991).  Such operations may include "tamper[ing] with free markets, correcting their failures and aiding their victims."  *Fisher v. Berkley*, 475 U.S. 260, 264 (1986).

746.     Given these broad functions and responsibilities, courts have long recognized that the limitations and challenges facing a government entity.[67]  Accordingly, courts have sparingly applied such equitable principles as estoppel, laches, and unclean hands when dealing with a government party seeking to enforce a public right.  *See*, *e.g.*, *Guar. Tr. Co. v. United States*, 304 U.S. 126, 132 (1938) (explaining that laches generally does not apply to a sovereign, in order to support "the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers."); *Heckler v. Community Health Services*, 467 U.S. 51, 60 (1984) (noting that the government "may not be estopped on the same terms as any other litigant," because "when the Government is unable to enforce the law because the

---

[67] "The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions.  It would, in effect, work a repeal of all its securities."  *United States v. Kirkpatrick*, 22 U.S. (9 Wheat.) 720, 735–36 (1824).

conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined").[68]  Indeed, the Supreme Court has previously noted that it has reversed every finding of equitable estoppel against the government that it had reviewed.  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990).

747.    Thus, when considering UPS's equitable defenses within the context of the larger public policy goals at work and the backdrop of controlling precedent, it becomes apparent that, to the extent a government actor seeking to enforce a public right may ever be required to mitigate its damages, a defendant must first show (1) egregious and affirmative misconduct by the government, which (2) results in prejudice arising to a constitutional level.  *See SEC v. Durante*, 2016 U.S. App. LEXIS 4283, *9 (2d Cir. Mar. 8, 2016) (noting that only "egregious" government misconduct resulting "in prejudice that rises to a constitutional level" would ever support, if applicable, an unclean hands defense); *Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 279 (2d Cir. 2005), *cert. denied*, 547 U.S. 1128 (2006) (noting that a laches defense may apply in only "the most egregious instances"); *Rojas-Reyes v. INS*, 235 F.3d 115, 126 (2d Cir. 2000) (estoppel defense is unavailable against the government "except in the most serious circumstances … Specifically, estoppel will only be applied upon a showing of affirmative misconduct by the government").  *See also Republic of Iraq v. ABB AG*, 768 F.3d 145, 168 (2d Cir. 2014) (noting generally that "egregious" means misconduct that "shock[s] the moral sensibilities").

---

[68] *See also United States v. Boccanfuso*, 882 F.2d 666, 669 (2d Cir. 1989) ("The principle of equitable estoppel is not applied to the Government on the same terms as it is to private citizens. …  The different standard for estoppel of the Government springs from the tenet that estoppel would frustrate the Government's ability to enforce the law and, in turn, undermine the public interest in full enforcement of the law.").

i.      **The purpose of the Assurance was to protect a public right and the State's quasi-sovereign interests.**

748.    it would be unreasonable to believe that the State—after having purportedly found UPS in repeated violation of Public Health Law section 1399-*ll* and Executive Law section 63(12), *see* Assurance at ¶ 8

749.    the Assurance's stated purposes, namely—

750.    To ensure UPS's compliance with New York Public Health Law section 1399-*ll*, a statute prohibiting the delivery of cigarettes to any person not licensed as a cigarette tax agent, export warehouse proprietor, customs bonded warehouse, or government employee acting in accordance with his or her official duties (*see* UPS Assurance, ¶¶ 17 ("Restrictions"), 42–43 ("Enforcement, Penalties and Costs")); and

751.    To ensure UPS's compliance with its Cigarette Policy, which prohibits the shipment of Cigarettes to Individual Consumers in the United States, "while still permitting the lawful shipment of cigarettes to *licensed* tobacco businesses and other persons *legally authorized* to receive shipments of cigarettes," *id.* at ¶ 15 (emphasis added); *see id*. at ¶¶ 17, 42–43.

752.    Nor did the Order attempt to square its (mis)reading with UPS's Cigarette Policy, which exclusively defines such recipients of cigarettes by reference to persons "who are *licensed* or otherwise *authorized by applicable federal, state, provincial or local law or regulation*[.]" *Id*. at ¶ 15 (emphasis added).

753.

ii.     **The State's enforcement claim under the Assurance is brought to protect a public right.**

754.    The State's claim under the Assurance is properly viewed as the State's enforcement of a public, and not private, right

142

755.

756.

757.    Furthermore, and as this Court has already recognized, the State's enforcement of New York Public Health Law section 1399-*ll* and Executive Law section 63(12) is being made "in a law enforcement capacity in their role[] as [a] government entit[y]."  Feb. 8, 2016 Order (ECF No. 177), at 32.  In this "law enforcement capacity," plaintiffs "have broad discretion" and as a result, the "ordinarily applicable equitable defenses do not apply."  *Id.* (citing cases).  This law enforcement discretion "is deserved, in part, because the Executive Branch—exercising its responsibility to take care that the laws be faithfully executed—must take a variety of factors into consideration. 'Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.'"  *United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 27 (D.D.C. 2015) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

758.    Notably, these law enforcement considerations are also reflected in a State's decision to not prosecute a particular action and instead enter into an Assurance of Discontinuance.  *See*, *e.g.*, *Interstate Commerce Comm'n v. Bd. Of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) (noting that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review"); *Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see the faithful execution of the laws").  And, as both this Court and the Second Circuit have already recognized, an Assurance of Discontinuance "is a regulatory mechanism, similar to a deferred-prosecution agreement[.]"  *Whitehaven S.F., LLC v. Spangler*,

143

633 F. App'x 544, 546 (2d Cir. 2015); Feb. 8, 2016 Order (ECF No. 177), at 42, 45 n.14 (describing the Assurance as a "deferred prosecution type agreement" and "deferred-prosecution agreement").

759.    Thus, while it is true that the Assurance is certainly "a contract" (*see* Order, at 7, 11), it more than just a document that reflects an ordinary sale of goods or exchange of services between two private parties.  Rather, it is a specific type of contract available only to the State acting to enforce a public right, and that more significantly, embodies the broad prosecutorial discretion and authority held by the State.[69]

760.    As noted previously by plaintiffs, the State's authority to enter into an Assurance is governed by Executive Law section 63, a statute that (a) private parties may not use or exercise, (b) that specifically authorizes the Attorney General's Office to enter into an Assurance to settle alleged violations of "persistent fraud or illegality in the carrying on, conducting or transaction of [a] business"; (c) requires any collected penalties obtained from the enforcement of such an Assurance to be deposited in the first instance with the State, and (d) prevents the Attorney General from representing any private (as opposed to public) rights or interests.  *See* Pls.' Mem. Of Law (ECF No. 274), at 14 (citing authorities); *see also* N.Y. Exec. Law § 63(12), (15).[70]

761.    The Assurance furthermore did not create any third-party rights or beneficiaries.[71]

---

[69] *See Saena Tech Corp.*, 140 F. Supp. 3d at 287 (noting that the "institutional concerns," *e.g.*, between the judiciary and executive branches, "must shape any analysis of [a] Court's role in reviewing the government's decision to offer a defendant a deferred-prosecution agreement").

[70] As also noted in earlier briefing, this same agreement plays a key part in the federal Prevent All Cigarette Trafficking Act, by providing UPS with a purported exemption to liability.  Pls.' Mem. Of Law (ECF No. 274), at 16; *see also* 15 U.S.C. 377 (providing civil and criminal penalties for knowing violations of the PACT Act).

[71] "This Assurance of Discontinuance shall not grant any rights or privileges to any person or entity who is not a party to this Assurance of Discontinuance, nor shall this Assurance of Discontinuance affect or limit in any way the

762.    And significantly, the Assurance provides that "evidence of a violation of this this Assurance of Discontinuance that involves the shipment of Cigarettes to an Individual Consumer within the State of New York shall also constitute prima facie proof of a violation of [Public Health Law] § 1399-*ll*(2) in any civil action or proceeding that the Attorney General hereafter commences against UPS for violation of [Public Health Law] § 1399-*ll*(2)."  UPS Assurance, at ¶ 43; *see also* N.Y. Exec. Law § 63(15) (authorizing the same).  This provision is significant because any person who violates Section 1399-*ll*(2) "shall be guilty of a class A misdemeanor and for a second or subsequent violation shall be guilty of a class E felony."  N.Y. Pub. Health Law § 1399-*ll*(5).

763.    Thus, because any violation by UPS of its Assurance carries with it the potential for criminal (as well as civil) penalties, the State's enforcement of UPS's Assurance is properly viewed as an agreement to enforce and protect public rights.  Indeed, this same agreement plays a key part in the federal Prevent All Trafficking Act, by providing UPS with a purported exemption to liability.  UPS Answer, at 21 (Twenty-third defense); see also 15 U.S.C. 377 (providing civil and criminal penalties for knowing violations of the PACT Act).

764.    Finally, the purpose of the Attorney General and UPS's Assurance, furthermore, was to ensure the carrier's compliance with Public Health Law section 1399-*ll*, as well the carrier's compliance with UPS's Cigarette Policy—a policy that prohibited the shipment of Cigarettes to Individual Consumers in the United States, "while still permitting the lawful shipment of cigarettes to licensed tobacco businesses and other persons legally authorized to

---

rights of any such third party."  UPS Assurance, at ¶ 52.  The inclusion of this disclaimer precludes third-parties from enforcing the terms of this Assurance.  *See Morse / Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988) ("Under New York law, where a provision in a contract expressly negates enforcement by third parties, that provision is controlling."); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44 n.2 (1985) (noting that intent to create third-party beneficiaries "can be negated by express agreement").

receive [such] shipments of cigarettes[.]"  Assurance, at ¶ 15.  In other words, the Assurance was not some private contract for the exchange of services, but rather a deferred prosecution agreement aimed at ensuring UPS's compliance with the relevant federal and state laws concerning cigarette shipments—the essence of a law enforcement action seeking to protect a public right.  *See* UPS Assurance, at ¶¶ 15 (identifying UPS's Cigarette Policy), 17 ("Restrictions"), 42–43 (Enforcement).

765.

### iii.  The State's claim under the Assurance is brought to protect the quasi-sovereign interests of the State.

766.     Plaintiffs' action is furthermore brought to protect the quasi-sovereign interests of the State, namely the health and well-being of its residents and the protection of the State's general economy, the State and City's RICO action is properly viewed as a suit brought under the State's *parens patriae* standing—a role reserved to the State as sovereign.[72]  Here, the State's

---

[72] A State's federal lawsuit generally falls into one of three categories: (1) a "proprietary suit," where the State sues "much like a private party suffering a direct, tangible injury"; (2) a "sovereignty suit," where the State requests, *e.g.*, an adjudication of a boundary dispute or water right against another State; or (3) a "*parens patriae* suit," where the States sues to protect "quasi-sovereign interests."  *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013) (internal citations omitted).  *Parens patriae* is an ancient common law prerogative that "is inherent in the supreme power of every state … [and is] often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves."  *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 334 (2d Cir. 2009) (quoting *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 57 (1890)).  (The City of New York may not assert *parens patriae* standing.  *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53–54 (1982).)

Two elements are required to show *parens patriae* standing:  *First*, a State must articulate a "quasi-sovereign interest" distinct "from the interests of particular private parties," such as an "interest in the health and well-being—both physical and economic—of its residents in general."  *Purdue*, 704 F.3d at 215 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)).  This interest may be shown by alleging an "injury to a sufficiently substantial segment of its population."  *Id.*[72]  Conversely, "if the State is only a nominal party without a real interest of its own—then it will not have standing under the *parens patriae* doctrine."  *Purdue*, 704 F.3d at 215 (quoting *Snapp*, 458 U.S. at 600); *see, e.g.*, *People by Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987) (declining to find *parens patriae* standing where the State sought only to recover damages for injuries suffered by citizen-consumers, and not any "quasi-sovereign interest of the state itself—for example, an injury to the general economy of the state.  In that case, common law *parens patriae* standing would undoubtedly exist."); *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 71–72 (1996) (declining to find *parens patriae* standing where the damages awarded to the State were to be directed to, and represented the damages suffered by, certain private parties).

instant action seeks to protect the health and well-being of its citizens as well as the economy of the State. 3d Am. Compl., at ¶¶ 3, 8–29. Each year in New York, over 28,000 people die a smoking-related death.[73] And for the tens of thousands more living with a smoking-related disease, the health care costs are substantial. In 2012, for example, New Yorkers spent nearly $10.4 billion on smoking-related health care costs.[74] To combat these harms and protect the public health of its citizens, the State of New York taxes the sale and use of cigarettes. *See* N.Y. Tax Law § 470 *et seq*.; U.S. Dept. of Health and Human Services, *The Health Consequences of Smoking, A Report of the Surgeon General* ("S. Gen. Rept."), at 788, 790 (2014).[75] This is because higher taxes decrease the consumption of tobacco products, especially cigarettes, thereby improving public health. S. Gen. Rept. at 788.[76] Today, New York's cigarette tax— $4.35 per pack of cigarettes[77]—is the highest in the country, nearly $3.00 more than the national

---

Notably, in determining the "real party in interest" (*i.e.*, determining whether a State is suing to protect quasi-sovereign interests), a court looks to "the essential nature and effect of the proceeding," and "the nature of the case as presented *by the whole record*." *Purdue*, 704 F.3d at 218 (citations and internal quotation marks omitted; emphasis added by *Perdue*).

*Second*, a State must show that "the individuals [upon whose behalf the state is suing] could not obtain complete relief through a private suit." *Am. Elec. Power*, 582 F.3d at 336 (finding *parens patriae* standing where the State possessed an interest in protecting its citizens from injuries resulting from carbon dioxide emissions, and where it was doubtful that individual plaintiffs filing a private suit could achieve complete relief).

[73] Centers for Disease Control and Prevention, *Best Practices for Comprehensive Tobacco Control Programs—2014*, at 110, a*vailable at* http://www.cdc.gov/tobacco/stateandcommunity/best_practices/pdfs/2014/comprehensive.pdf. In fact, more people die from tobacco use in New York than from alcohol, toxic agents, car crashes, firearms, and unsafe sexual behaviors—combined. N.Y.s Dep't of Health, Bureau of Tobacco Control, StatShot Vo. 8, No. 3, *Tobacco is the Leading Cause of Preventable Death* (Apr. 2015), *available at* https://www.health.ny.gov/prevention/tobacco_control/reports/statshots/volume8/n3_tobacco_leading_cause.pdf.

[74] *Id.*; *see also* 2012 RTI Int'l. Rept. at 50, *available* at N.Y.S. Dept. of Health, Reports, Brochures and Fact Sheets, http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact_sheets.htm.

[75] *Available* at U.S. Dept. of Health & Human Services, Reports & Publications, Surgeon General's Reports, http://www.surgeongeneral.gov/library/reports/50-years-of-progress/.

[76] *See also* S. Gen. Rept. at 789 (noting that "a 10% increase in cigarette price will result in [an estimated] 3–5% reduction in overall cigarettes consumed" and that "both youth and young adults [appear] to be two to three times as responsive to changes in price as adults."); 2011 RTI Int'l. Rept., at 40 (2011), *available at* N.Y.S. Dept. of Health, Reports, Brochures and Fact Sheets http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm.

[77] *See* N.Y. Tax Law § 471(1) (tax rate eff. July 1, 2010); 20 N.Y. Codes R. & Regs. § 74.1(a)(2).

average.[78]  But, as different levels of state taxation have widened, tax avoidance and evasion

practices have increased.  S. Gen. Rept. at 791.  These practices include "cross-border, Internet,

and untaxed purchases on tribal lands"; bootlegging from low tax jurisdictions for resale in high

tax jurisdictions; and large-scale organized smuggling.  *Ibid.*  In whatever form, these illegal

trade practices hurt the public health and public fisc.  *Id.* at 789; *see* RTI Rept. 2012 at 41

(estimating "between $465 million and $610 million per year in lost [New York State] tax

revenue"); N.Y. Pub. Health Law § 1399-*ll* ("Legislative Findings").[79]

767.    Accordingly, the State's action here against UPS will help enforce the State and

City's tax laws, thereby promoting and protecting the health and well-being of its citizens and

the economy of the State.  In addition, because the State and City are seeking both penalties and

injunctive relief (3d Am. Compl., at 46–48), there is "no doubt" that the State is suing in its

*parens patriae* capacity and has a concrete interest in the litigation.  *See In re Std. & Poor's

Rating Agency Litig.*, 23 F. Supp. 3d 378, 405 (S.D.N.Y. June 3, 2014) (noting that a state's

claim for civil penalties "add only to the state's coffers rather than any individual's bank

account" and that a claim for injunctive relief "goes beyond addressing the claims of previously

injured organizations or individuals.  It is aimed at securing an honest marketplace, promoting

proper business practices, protecting [State] consumers, and advancing [the State's] interest in

the economic well-being of its residents.").  Thus, because the State's citizens could not obtain

---

[78] 2012 RTI Rept., at 5, *available at* N.Y.S. Dept. of Health, Reports, Brochures and Fact Sheets, http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm.

[79] "The legislature finds and declares that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety, and welfare, to the funding of health care pursuant to the health care reform act of 2000, and to the economy of the state.  The legislature also finds that when cigarettes are shipped directly to a consumer, adequate proof that the purchaser is of legal age cannot be obtained by the vendor, which enables minors to avoid the provisions of article 13-F of the public health law.  …  The legislature further finds that existing penalties for cigarette bootlegging are inadequate. Therefore, the bill enhances existing penalties for possession of unstamped or unlawfully stamped cigarettes."  2000 N.Y. S.N. 8177, § 1 (enacted Aug. 16, 2000).

such "complete relief" on their own through a private suit, much less assert the State and City's

specific RICO action, the State and City's standing under RICO is *not* appropriately viewed as

simply as a typical private plaintiff seeking to bring suit against another private party (*see* Feb. 8

Order, at 34), but rather as a government actor suing in its sovereign law enforcement capacity

seeking to protect and enforce a public right.

### iv.     The State may not be estopped on the same terms as a private litigant.

768.    Consistent with this standard, a defendant may not rely on the conduct or

statements of government agents that are contrary to law.  *Heckler v. Cmty. Health Servs.*, 467

U.S. 51, 63 (1984).  This is because persons dealing with the government (like UPS) are

expected to know the law.  *Id.*  In addition, a court will not find affirmative misconduct on the

basis of a government actor's mere delay or shared misinformation.  *See*, *e.g.*, *Schweiker v.*

*Hansen*, 450 U.S. 785, 789 (1981) (per curiam) (rejecting argument that oral misstatement by

Social Security official created estoppel); *Santiago Hernandez v. Holder*, 327 F. App'x 310, 312

(2d Cir. 2009) (13-year delay in processing application did not amount to affirmative

misconduct).[80]

769.    And as to the State's claim under UPS's Assurance of Discontinuance, such cases

are persuasive examples of why courts are hesitant to apply equitable defenses to a sovereign

---

[80] *See also Gray v. Keisler*, 253 F. App'x 78, 80 (2d Cir. 2007) ("unexplained delay in processing" does not give rise to affirmative misconduct); *Goldberg v. Weinberger*, 546 F.2d 477, 481 (2d Cir. 1976) (misinformation given by an apparently authorized government agent does not excuse claimant's failure to meet statutory and regulatory qualifications to obtain benefits), *cert. denied*, 431 U.S. 937 (1977); *Long Island Radio Co. v. NLRB*, 841 F.2d 474, 478 (2d Cir. 1988) (noting that a government official's ignorance of a statutory limitation did not amount to affirmative misconduct); *Cors v. United States*, 2013 U.S. Dist. LEXIS 180416, at *17–18 (S.D.N.Y. Dec. 23, 2013) (holding that a government employee's ignorance of an unidentified international statute did not rise to the level of affirmative misconduct); *See also SEC v. KPMG*, 2003 U.S. Dist. LEXIS 14301, * 11 (S.D.N.Y. Aug. 20, 2003) (noting the general principle that "estoppel cannot be asserted against the Government 'on the basis of … oral advice'"); *United States v. Boccanfuso*, 882 F.2d 666, 670 (2d Cir. 1989) (noting that oral statements by government employees are not accorded the same weight as written ones); *SEC v. Durante*, 2013 U.S. Dist. LEXIS 178351, at *45 (S.D.N.Y. Dec. 19, 2013) (noting that a 10-year "delay" in enforcement is not "egregious.").

acting to enforce and protect a public right.  *See* Pls.' Br. at 6–7; *Guaranty Trust Co. v. United States*, 304 U.S. 126, 132 (1938) (noting the "great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers.  And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation, or exception, introduced for the public benefit, and equally applicable to all governments.").  Indeed, New York courts often rely on federal cases when considering the application of equitable defenses against the government, and apply virtually the same stringent standards as those used by federal courts.[81]  In *State of N.Y. v. Trump Entrepreneur Initiative LLC*, 2014 N.Y. Misc. LEXIS 4533, *47 (Sup. Ct., N.Y. Co., Oct. 8, 2014), for example, the state court applied the Second Circuit's formulation of the unclean hands doctrine (*id.*, citing *Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998)), and further noted that the doctrine "like other equitable defenses, may be raised against the government where the 'agency's misconduct [was] egregious and the resulting prejudice to the defendant r[o]se to a constitutional level.'"  *Trump*,

---

[81]  *See, e.g.*, *State of N.Y. v. Trump Entrepreneur Initiative LLC*, 2014 N.Y. Misc. LEXIS 4533, *47 (Sup. Ct., N.Y. Co., Oct. 8, 2014) (noting that "[e]quitable defenses against government agencies are strictly limited" and citing *SEC v. Elec. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd* 891 F.2d 457 (2d Cir. 1989)); *N.Y. State Med. Transp. Ass'n v. Perales*, 77 N.Y.2d 126, 130 (1990) (noting that "estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties.  …  While we have not absolutely precluded the possibility of estoppel against a governmental agency, our decisions have made clear that it is foreclosed 'in all but the rarest of cases'"; citations omitted); *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 490 N.Y.S.2d 190, 193 (N.Y. App. Div. 1985) (estoppel requires an actual misrepresentation of material fact or "some other affirmative wrongdoing"); *Capruso v. Village of Kings Point*, 23 N.Y.3d 631, 641–42 (2014) (noting that "It is settled that the equitable doctrine of laches may not be interposed as a defense against the State when acting in a governmental capacity to enforce a public right or protect a public interest …  Moreover, the doctrine of laches has no application when plaintiffs allege a continuing wrong"; citation omitted); *Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 968 (1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed"); *U.S. Bank Nat'l Assoc. v. Fields*, 2012 N.Y. Misc. LEXIS 4025, *35 (N.Y. Sup. Ct. Aug. 14, 2012) ("Vague and unsubstantiated allegations of the conduct constituting the alleged waiver, however, are not sufficient," citing *Manufacturers and Traders Trust Co. v David G. Schlosser & Assocs.*, 242 A.D.2d 943, 665 N.Y.S.2d 949 (4th Dep't 1997)).

2014 N.Y. Misc. LEXIS 4533, at *47 (quoting *SEC v. Elec. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd* 891 F.2d 457 (2d Cir. 1989)).

770.

## 2.     The equitable estoppel defense does not apply.

771.     The defense of equitable estoppel, for example, is unavailable against the government "except in the most serious of circumstances and is applied with the utmost caution and restraint.  Specifically, estoppel will only be applied upon a showing of affirmative misconduct by the government." *Rojas-Reyes*, 235 F.3d at 126 (internal quotation marks and citations omitted); *see also Richmond*, 496 U.S. at 422 (observing that the Supreme Court had reversed every finding of estoppel against the government that it had reviewed).

772.     Here, UPS's predicate facts simply fail to suggest affirmative misconduct by the State, or even "the most serious of circumstances."  New York courts have already held that the State's adherence to the forbearance policy was rational.  *See*, *e.g.*, *N.Y. Assoc. of Convenience Stores v. Urbach*, 275 A.D.2d 520, 522–23 (3d Dept. 2000).  Government delay and inaction does not arise to affirmative misconduct.  *See*, *e.g.*, *Santiago Hernandez v. Holder*, 327 F. App'x 310, 312 (2d Cir. 2009) (13-year delay in processing did not amount to affirmative misconduct).[82]  And to hold otherwise would improperly invade the State's prosecutorial discretion.

## 3.     The laches defense does not apply.

773.     UPS's laches defense fares no better.  As used against the government, the doctrine of laches will only apply in (1) "the most egregious instances"; (2) where "there is no

---

[82] *See also Gray*, 253 F. App'x at 80 ("unexplained delay in processing" does not give rise to affirmative misconduct); *Durante*, 2013 U.S. Dist. LEXIS 178351, at *45 (noting that a 10-year "delay" in enforcement is not "egregious.").

statute of limitations"; or (3) where the government "is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights[.]" *Cayuga Indian*, 413 F.3d at 279.  In each instance, however, the prejudice suffered by the defendant must "rise to a constitutional level." *Solis v. Beacon Assocs. Mgmt.*, 2011 U.S. Dist. LEXIS 90292, at *16 (S.D.N.Y. Aug. 10, 2011).

774.    Here, UPS's asserted harm fails to suggest any prejudice rising to a constitutional level.  *See* UPS Answer, at 20; UPS Mem. Of Law in Opp. to Pls.' Mot. To Strike Aff. Defenses, 3, 4.  Plaintiffs' claims for damages extend to January 1, 2010—*i.e.*, well within the statute of limitations for their asserted claims.  *U.S. v. Repass*, 688 F.2d 154, 158 (2d Cir. 1982) (laches is not a defense to an action filed within the applicable statute of limitations).  In addition, the State's claim under the Assurance is properly viewed as the State's enforcement of a public, and not private, right.

### 4.    The unclean hands defense does not apply.

775.    Similarly, to the extent an "unclean hands" defense may ever apply against the government, UPS must show "egregious" government misconduct resulting "in prejudice that rises to a constitutional level." *SEC v. Durante*, 2016 U.S. App. LEXIS 4283, *9 (2d Cir. Mar. 8, 2016); *Republic of Iraq*, 768 F.3d at 168 (noting that "egregious" misconduct "must 'shock the moral sensibilities," quoting *Art Metal Works, Inc. v. Abraham & Straus, Inc.*, 70 F.2d 641, 646 (2d Cir. 1934) (L. Hand, J., dissenting)); *see also Solis v. Beacon Mgmt.*, 2011 U.S. Dist. LEXIS 90292, at *16 (S.D.N.Y. Aug. 11, 2011).

776.    Again, UPS's collection of evidence is insufficient.  The State's forbearance policy does not suggest "egregious" government misconduct, but a "rational" path of conduct. *Urbach*, 275 A.D.2d at 522–23.  The cited instances where the State failed to act or inform UPS

of every potential violation of the Assurance do not appear to suggest any prejudice to UPS rising to the level of a constitutional harm.  *See*, *e.g.*, *SEC v. Durante*, 2013 U.S. Dist. LEXIS 178351, at *45 (S.D.N.Y. Dec. 19, 2013) (noting that a 10-year "delay" in enforcement is not "egregious").  Finally, the State's decision to inform UPS of every potential violation pursuant to UPS's erroneous reading of the Assurance fails to suggest a constitutional level of harm to UPS.

### 5.      The *in pari delicto* defense does not apply.

777.    The doctrine of *in pari delicto* reflects the principle that "a plaintiff who has participated in wrongdoing equally with another person" may not recover damages from that other person resulting from the wrongdoing.  *Republic of Iraq*, 768 F.3d at 160.  To prove this defense, a defendant must show that, "as a direct result of the plaintiff's affirmative wrongdoing, the plaintiff bears at least substantially equal responsibility, for the [same] violations of which it complains."  *Id.* at 168–69 (citations and internal quotations omitted).  In other words, "[n]ot only must the plaintiff 'be an active, voluntary participant in the unlawful activity that is the subject of the suit,' but it is necessary that 'the degrees of fault [be] essentially indistinguishable or the plaintiff's responsibility [be] clearly greater.'"  *Id.* at 162 (quoting *Pinter v. Dahl*, 486 U.S. 622, 633 (1988)).  This is because "[p]laintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant."  *Pinter*, 486 U.S. at 636; *see also Republic of Iraq*, 768 F.3d at 168.

778.    Here, UPS's relied on facts fail to suggest that the State or City affirmatively engaged in the knowing delivery of contraband cigarettes to consumers throughout the United States.  Thus, UPS's defense here is inapt.

### 6.      The waiver defense does not apply.

779.     Waiver is the intentional relinquishment of a known right.  *U.S. D.I.D. Corp. v. Windstream Communs., Inc.*, 775 F.3d 128, 136 (2d Cir. 2014).  Conduct said to constitute a waiver "must be clear and unequivocal, as waivers are never to be lightly inferred."  *Id.* (quoting *Mooney v. City of N.Y.*, 219 F.3d 123, 131 (2d Cir. 2000)).  Accordingly, courts will only infer a waiver "where the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them.  Mere negligence, oversight, or thoughtlessness does not create a waiver." *Id.* (internal citations and quotation marks omitted).

780.     For this defense, UPS's facts fail to suggest that the State somehow agreed to waive its right to bring an enforcement action or pursue penalties under UPS's Assurance.  At most, it suggests that the State had an incomplete picture of UPS's conduct and the scope of the shipments.  And certainly, the State's later inaction or oral statements concerning those four shippers would not have waived or otherwise modified the State's later right to pursue such shippers at a later date.  *See* UPS Assurance, at ¶ 54 (providing that the Assurance "may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever, except by a writing duly executed by the parties or their authorized representatives.").

### 7.     The public authority defenses fail as a matter of law

781.     On August 23, 2016, this Court specifically addressed and imported UPS's public authority and entrapment by estoppel defenses.

782.     As explained by plaintiffs' motion for reconsideration, these specific criminal law defenses do not appear to exist within the civil law sphere, and furthermore, fail as a matter of law.  *See* Pls.' Mot. For Reconsideration (ECF. No. 381).

783.     At bottom, because UPS employee Terranova did not reveal to Investigator Nitti the full extent of UPS's criminal or illegal acts—*i.e.*, UPS's delivery of cigarettes to individual

consumers—Investigator Nitti could not have "authorized" UPS's bulk shipments of untaxed cigarettes to such persons.  For the same reason, UPS's other cited evidence is unavailing (*e.g.*, the Department's forbearance policy, various court injunctions, and the testimony of certain Department employees).  This is because UPS failed to disclose to the State—either before or at the time of such events—the full extent and scope of UPS's illegal conduct.[83]  In light of such undisputed facts then, the Order erred by denying plaintiffs' AOD motion and by failing to dismiss such criminal law defenses.

       **i.**       **The public authority defense does not appear to exist outside the criminal law context.**

784.    In addressing plaintiffs' motions, the August Order imported what appeared to be a strictly criminal law defense—*i.e.*, the public authority defense and its related entrapment by estoppel defense—into a civil law action.  *See* Order, at 8, 11.[84]  But these defenses appear to exist only within the limited confines of a criminal action—something that UPS acknowledges this case is not, *see* UPS Aug. 30, 2016 Letter, at 2 (ECF No. 370) ("Recognizing that this case is

---

[83] Indeed, as plaintiffs had previously noted in the moving papers of their equitable defenses motion, the Department's forbearance policy existed at the time UPS entered into the Assurance. Pls.' Mem. Of Law (ECF No. 274), at 18–19.  Accordingly, this fact cannot form the basis for UPS's asserted actual public authority defense.  *See United States v. Morrison*, 686 F.3d 94, 107 (2d Cir. 2012).  Similarly, because UPS never disclosed the criminal or illegal nature of its misconduct ahead of the court injunctions, the depositions of the Tax Department witnesses, or the Department's investigative report, UPS and the August Order's reliance on such evidence is in error.

[84] As *United States v. Giffen*, 473 F.3d 30 (2d Cir. 2006) explains, the "public authority" defense is actually comprised of two closely-related, but slightly different, forms.  "One, sometimes described as actual public authority, depends on the proposition that the defendant's actions, although ostensibly in violation of some statute, were in fact lawful because he was authorized by the government to do those acts.  The second version, usually described by the name entrapment by estoppel, or simply estoppel, depends on the proposition that the government is estopped from prosecuting the defendant where the government procured the defendant's commission of the illegal acts by leading him to reasonably believe he was authorized to commit them."  *Id*. at 39.

not a criminal case …").  For example, each case relied on by the Order dealt with a government

actor seeking to enforce a criminal statute or else the requirements of Federal Rule of *Criminal*

Procedure 12.3.[85]  The Second Circuit's recitation of the defenses' elements furthermore

presumes a criminal law action.[86]  Indeed, as far as plaintiffs' counsel can determine, such

defenses have never been imported into the civil context, much less a government enforcement

action purportedly brought in a proprietary or contractual capacity.[87]  Similarly, no court or

treatise on contracts (*e.g.*, Corbin on Contracts) appears to have considered these criminal law

defenses as "part and parcel of" the equitable defenses available to a defendant in civil contract

action.  *See* Order, at 9.

785.    But even assuming *arguendo* that UPS's criminal law defenses could be imported

into a civil law dispute, such defenses would still fail as a matter of law.  This is because UPS

never revealed to the State the illegal or criminal aspects of its actions, much less a violation of

the Assurance—namely, the delivery of unstamped cigarettes to persons not authorized under

federal or state law to receive such cigarettes.

---

[85] *See* Order, at 8 (citing *United States v. Giffen*, 473 F.3d 30 (2d Cir. 2006) (addressing, *inter alia*, Fed. R. of Crim. Proc. 12.3, which governs the notice requirement for a defendant's assertion of a public authority defense; and defendant's criminal indictment for violations of several federal statutes); *Cox v. State of Louisiana*, 379 U.S. 559 (1965) (addressing criminal conviction under Louisiana state law); *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 991) (addressing defendants' appeal of their convictions from criminal violations of the RICO Act among other federal statutes)).

[86] *See*, *e.g.*, *Giffen*, 473 F.3d at 39 (noting that a public authority defense exists "where a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity"); *United States v. Gil*, 297 F.3d 93, 107 (2d Cir. 2002) (describing the entrapment by estoppel defense as arising "where a government agent authorizes a defendant 'to engage in otherwise criminal conduct …'"); *United States v. Miles*, 748 F.3d 485, 489 (2d Cir. 2014) (same); *United States v. Mergen*, 764 F.3d 199, 205 (2d Cir. 2014) (same).

[87] As detailed further below, the State disputes that its enforcement of the Assurance of Discontinuance is in a proprietary or contractual—as opposed to a quasi-sovereign—capacity.

ii.      UPS's actual public authority defense is unsupported
         and fails as a matter of law.

786.     As the Second Circuit has explained, to assert an actual public authority defense, a defendant must show that his illegal activity has in fact been authorized by the government— *i.e.*, "the defendant's conduct was, in fact, legitimized by government action." *Giffen*, 473 F.3d at 39 (footnote omitted); *see also United States v. Morrison*, 596 F. Supp. 2d 661, 720 (E.D.N.Y. 2009) (finding no factual predicate supporting defendant's assertion that a state official authorized the defendant to sell unstamped cigarettes in violation of New York Tax Law § 471).

787.     Significantly, however, a defendant must also reveal to the government the full extent of the defendant's criminal acts or illegal conduct. *Giffen*, 473 F.3d 30, 40 n.9 (noting that "[b]ecause neither Giffen nor the defendants in *Schwartz* revealed their criminal acts, in neither case could governmental authorization to do the acts revealed constitute authorization to do the illegal acts that were not revealed"), 41 n.10 (noting that "in order to establish authorization of criminal conduct through the approval by government officials of the acts he described, Giffen must have reasonably clearly revealed the criminal aspect of those acts—not merely raised a suspicion about it"). Simply raising a "reasonable suspicion" is insufficient. *Id*.

788.     Accordingly, because UPS employee Terranova never disclosed to Investigator Nitti the unlawful or criminal nature of UPS's deliveries—*i.e.*, that UPS's bulk shipments were being delivered by UPS to persons that were not licensed or authorized pursuant to federal or state law to possess such cigarettes—Investigator Nitti could not have "authorized" UPS's continued pick-up and delivery of contraband cigarettes. *See id*. In other words, it was simply not enough for Mr. Terranova to reveal that UPS may have been picking up bulk shipments of cigarettes from the St. Regis Mohawk Akwesasne Indian reservation. Rather, for UPS to

actually have obtained Investigator Nitti's authorization[88], Mr. Terranova would have needed to further reveal that (a) such cigarettes were being sent to non-Indians, unlicensed cigarette retailers, or other persons not authorized under federal or state law to possess such unstamped cigarettes, and (b) that UPS had no reason to believe that such sales were tax-exempt.

789.    Thus, because Mr. Terranova's proffer failed to identify the full extent of UPS's criminal misconduct, UPS cannot take advantage of the actual public authority defense and such defense should be appropriately stricken ahead of trial.

### iii.    UPS's entrapment by estoppel defense is unsupported and fails as a matter of law.

790.    UPS's entrapment by estoppel defense fares no better.  For this defense, a defendant must show that "he reasonably relied on the statement or conduct of a government official when he engaged in the conduct with which he is charged."  *United States v. Tonawanda Coke Corp.*, 2013 U.S. Dist. LEXIS 25398, at *9 (W.D.N.Y. Feb. 22, 2013); *see also United States v. Miles*, 2012 U.S. Dist. LEXIS 135055, at *8 (S.D.N.Y. Sep. 20, 2012).  There must also be "'an affirmative representation' that the proscribed conduct 'was or would be legal,' not an affirmative representation that the proscribed conduct was against the law."  *Miles*, 2012 U.S. Dist. LEXIS 135055, at *10.

791.    Perhaps most importantly, the defendant must further show "that he reasonably disclosed the conduct alleged in the indictment to the government before or at the time of

---

[88] The State further notes that because the Assurance of Discontinuance may only be enforced by the New York State Attorney General's Office pursuant to Executive Law section 63 (a statute enforceable only by the Attorney General's Office), Investigator Nitti could not have validly authorized UPS's violation of the Assurance.  *See United States v. Miles*, 748 F.3d 485, 489 (2d Cir. 2014) (holding that a defendant seeking to invoke an entrapment by estoppel defense could not rely on a state or local official's "authorization" to violate a federal statute).  Thus, the State's argument here assumes *arguendo* that Investigator Nitti could somehow have properly authorized a violation of the Assurance.

authorization.  That is, the disclosure and authorization must be linked." *Tonawanda Coke*, 2013 U.S. Dist. LEXIS 25398, at *9 (citing cases); *see also Giffen*, 473 F.3d at 42 (rejecting defendant's entrapment by estoppel defense where "Giffen failed to apprise the government officials that he was engaged in bribery and fraud, [accordingly,] we do not see how Giffen could have reasonably understood the officials' response as authorization to engage in bribery and fraud").

792.    Here, Terranova at most revealed that UPS ***may have*** been picking up bulk shipments of cigarettes from the Mohawk shippers.  Terranova Decl., at ¶ 7.  At no point did he reveal, however, whether such cigarettes were stamped or unstamped.  *See id*.  Nor did he reveal that UPS was transporting cigarettes to persons in violation of Public Health Law section 1399-*ll* or UPS's Cigarette Policy—*i.e.*, delivering unstamped cigarettes to persons not authorized under federal or state law to possess or receive such unstamped cigarettes.  *See id*.  Given such undisputed facts, UPS cannot prove up this criminal law defense and the August Order erred by permitting UPS's importation of such an unsupported defense.

## C.    UPS's Seventh Defense fails as a matter of law.

793.    As noted above, this Court granted UPS's motion for reconsideration of its Seventh Defense as applied to plaintiffs' claims under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq*. ("CCTA") and the State's claim under the Assurance.  Order (dated June 21, 2016).

794.    But for the reasons already expressed by the Court in its February Order, UPS's defense fails as a matter of law.  *See* Feb. 8, 2016 Order, 60–64 (ECF 177).  Namely, (1) the generally applicable 2010 amendments to New York Tax Law section 471 were unaffected by the stays and remained in effect throughout the entire period at issue; (2) sales of reservation to

reservation shipments of cigarettes were taxable as a matter of law and were required to bear tax

stamps; and (3) UPS was not a party to any of the actions in which a stay was issued, nor was it

expressly or implicitly identified as an intended beneficiary or participant in any of those

decisions.  *See id.*

795.    Similarly, for the additional reasons and facts set forth by plaintiffs' additional

briefing on this issue (*i.e.*, in response to the Court's June 21 Order granting UPS's motion for

reconsideration), UPS's unsupported defense fails as a matter of law.  *See* ECF No. 287 (Pls.'

Mot. For Summ. J. on UPS's Seventh Def.), 343 (Pls.' Opp to UPS's Mot. For Summ. J. on Pls'

CCTA claim), and 384 (Pls.' Reply ISO Mot. For Summ. J. on UPS's Seventh Def.).  As

explained there, UPS fails to identify any facts showing its prior reliance on the stays at issue or

that its conduct came within the scope of the stays' prohibition.

### D.    UPS has abandoned its Fourteenth Defense

796.    As previously noted, UPS has abandoned its Fourteenth Defense of impossibility

and frustration of purpose.  *See also* UPS Opp. Br., at 1 n.1 (ECF No. 290); Order, 2 & n.2

(dated Aug. 23, 2016; ECF No. 258).

797.    Accordingly, UPS's evidence—including its prior reliance on the Department of

Taxation and Finance's "forbearance" policy—cannot be used to support this defense.

798.    Under the doctrine of impossibility, a defendant may be excused from a

contractual obligation where its performance is impossible due to "the destruction of the means

of performance by an act of God, vis major, or by law."  *Ebert v. Holiday Inn*, 628 F. App'x 21,

23 (2d Cir. 2015) (quoting *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275,

281 (1968)).  Economic hardship, even to the extent of bankruptcy or insolvency, will not excuse

performance.  *Id.* at 23 (citing cases).  Furthermore, a party's inability to perform "must be

produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Id*. at 24 (affirming district court's order rejecting defendant's impossibility defense where foreclosure was a foreseeable risk).

799.     To establish a defense of frustration of purpose, a party must show, *inter alia*, that a supervening event substantially frustrated a principal purpose of the agreement. *Lavin v. Emery Air Freight Corp.*, 1998 U.S. App. LEXIS 2691, at *3–4 (2d Cir. Feb. 19, 1998). Such supervening events are limited to "instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974) (cited with approval by *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 277 (2d Cir. 2015) (Sack, C.J., concurring *dubitante*)). Events that are foreseeable are insufficient. *Ebert*, 628 F. App'x at 24 n.1.

800.     Thus, because the State's forbearance policy was a foreseeable risk and existing circumstance at the time UPS entered into its Assurance of Discontinuance with the Attorney General's Office in 2005, such evidence is appropriately excluded from consideration here. *See Urbach*, 275 A.D.2d at 522–23 (holding that the Department of Taxation and Finance's policy of forbearance to be rational); see also Feb. 8 Order, at 19 (noting that the Department's policy of forbearance "was in effect from at least the mid-1990's until February 2010").

## III.    The State and City's Requested Relief

801.     In light of UPS's unlawful deliveries, the State and City seek to—

    a.   Enjoin UPS's further deliveries of cigarettes into the City and the State;

    b.   Require UPS to submit to oversight by a court-appointed Special Master empowered to monitor UPS's tobacco deliveries and assure UPS's compliance with federal and state law governing tobacco deliveries;

    c.   Recover damages under the CCTA and the PACT Act equal to the amount of each jurisdiction's tax stamp that should have been affixed to each pack of unstamped cigarettes that UPS unlawfully shipped, transported, and/or distributed in the City and/or the State;

    d.   Recover civil penalties under the CCTA, the PACT Act, N.Y. Executive Law section 63(12), and Public Health Law section 1399-*ll*;

    e.   Recover stipulated penalties of $1,000 per violation of UPS's Assurance; and

    f.   Recover the attorneys' fees and costs incurred in bringing this action.

*See* 3d Am. Compl. (ECF No. 189).

## A.    Injunctive Relief and the Appointment of a Monitor

802.    Pursuant to the State and City's claims under the Contraband Cigarette Trafficking Act, the Prevent All Cigarette Trafficking Act, New York Executive Law section 63(12) and New York Public Health Law section 1399-ll, the Plaintiffs

803.    The City and State have no adequate remedy at law, in that UPS has shown itself unable or unwilling to comply voluntarily with the AOD entered into with the Attorney General, and has been unable or unwilling to cease conduct that injures the health and safety of a considerable number of persons, and accordingly cannot be remedied by the payment of money damages.

804.    The Court should accordingly (i) enjoin UPS pursuant to 18 U.S.C. § 2346(b)(1) from knowingly shipping, transporting, receiving, possessing, or distributing contraband cigarettes as that term is defined in the CCTA; (ii) enjoin UPS pursuant to 15 U.S.C. § 378(c)(1)(A) from shipping any cigarettes that do not comply with the PACT Act's labeling requirement and from shipping for any shipper listed on the ATF's list of non-compliant

delivery-sellers; (iii) enjoin UPS pursuant to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll from delivering any cigarettes to any unauthorized recipient within the State of New York; and (iv) appoint a Special Master to assure UPS's compliance with each of the above statutes, and with  the AOD entered into by UPS with the Attorney General, and to provide training and monitoring  to UPS to ensure compliance.

### B.     Damages and Penalties

#### 1.        The Assurance of Discontinuance

805.    For violations of UPS's Assurance of Discontinuance, the common carrier agreed to a "stipulated penalty of $1,000 for each and every violation" of the Assurance, provided that no penalty will be imposed if (a) the violation involved the shipment of Cigarettes to a person in New York State and who was not otherwise authorized to possess such unstamped cigarettes, or (b) UPS established to the reasonable satisfaction of the Attorney General that UPS "did not know and had no reason to know that the shipment was a Prohibited Shipment."  UPS Assurance, ¶ 42; see id. at ¶ 16.H. (defining a "Prohibited Shipment" as "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate Public Health Law § 1399-ll").

806.    The rights and remedies in the Assurance are furthermore cumulative and in addition to any other statutory or other rights that the Attorney General might have at law or equity, including and not limited to any rights or remedies under the Public Health Law section 1399-ll.  UPS Assurance, ¶ 51.

807.    For UPS's violation of the Assurance, the State is requesting an award of stipulated penalties to the State in the  amount of $1,000 for each violation of the Assurance.  3d Am. Compl., ¶¶ 187-199 (Thirteenth Claim for Relief).  **[TABLE]**

## 2.     New York Public Health Law section 1399-*ll*

808.     For violations of New York Public Health Law section 1399-*ll*, the statute

provides that any person who violates this statute "shall be guilty of a class A misdemeanor and

for a second or subsequent violation shall be guilty of a class E felony."  N.Y. Pub. Health Law §

1399-ll(5).

809.     The statute further provides that such violators of § 1399-ll "shall be subject to a

civil penalty not to exceed the greater of (a) five thousand dollars for each such violation; or (b)

one hundred dollars for each pack of cigarettes shipped, caused to be shipped or transported in

violation of such subdivision."  *Id*.

810.     These civil penalties are recoverable by the State and City (N.Y. Pub. Health Law

§ 1399-ll(6)).  The State may furthermore recover "such other relief as may be deemed

necessary."  *Id*.  The City's corporation counsel may likewise recover "such other relief as may

be deemed necessary with respect to any cigarettes shipped, caused to be shipped or transported"

in violation of Section 1399-ll to any person located within the City.  *Id*.   That said, "no person

shall be required to pay civil penalties to both the state and a political subdivision with respect to

the same violation of this section."  *Id*.

811.     The State and City each request a civil penalty be awarded in the amount of

$5,000 for each UPS delivery of cigarettes made in violation of this statute.  3d Am. Compl., ¶¶

176-186. (Eleventh and Twelfth Claims for Relief). **[TABLE]**

## 3.     The Prevent All Cigarettes Trafficking Act

812.     Under the PACT Act, a common carrier who violates the statute subject to a civil

penalty not to exceed $2,500 for a first violation, and $5,000 for any violation within one year of

a prior violation.   15 U.S.C. § 377(b)(1).

813.     This civil penalty "shall be imposed in addition to … any other damages, equitable relief, or injunctive relief awarded by the court, including the payment of any unpaid taxes to the appropriate Federal, State, local, or tribal governments."  15 U.S.C. § 377(b)(2).

814.     That said, a common carrier will not be subject to civil penalties for violating 15 U.S.C. § 376a(e) (i.e., transporting packages for persons listed on the ATF's Non-Compliant Delivery Sellers List) if either—

   a.   The common carrier or independent delivery service "has implemented and enforces effective policies and practices for complying with that [requirement, i.e., 15 U.S.C. § 376a(e)]" (15 U.S.C. § 377(b)(3)(B)(i)); or

   b.   The violation consists of "an employee of the common carrier … who physically receives and processes orders, picks up packages, processes packages, or makes deliveries, taking actions that are outside the scope of employment of the employee, or that violate the implemented and enforced policies of the common carrier … described in clause (i)" (15 U.S.C. § 377(b)(3)(B)(ii)).

815.     The State requests damages in in an amount equal to the cost of a State tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York State in violation of 15 U.S.C. § 376a(e)(2). **[TABLE]**

816.     The City requests damages in an amount equal to the cost of a City tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York City in violation of 15 U.S.C. § 376a(e)(2). **[TABLE]**

817.     The State and City also request civil penalties, as specified in 15 U.S.C. § 377(b)(1)(b), for UPS's violation of 15 U.S.C. § 376a(e)(2). **[TABLE]**

### 4.        The Contraband Cigarette Trafficking Act

165

818.    Under the Contraband Cigarette Trafficking Act, a State or City bringing a civil action may obtain "any other appropriate relief" for violations of the statute, including "civil penalties, money damages, and injunctive or other equitable relief."  18 U.S.C. § 2346(b)(2).

819.    Such remedies are in addition to any other remedies available under Federal, State, local, or other law.  18 U.S.C. § 2346(b)(3).

820.    The State requests damages in in an amount equal to the cost of a State tax stamp multiplied by the total number of packs of cigarettes that UPS shipped, transported, and/or distributed in or into New York State in violation of 18 U.S.C. § 2346(b)(2). **[TABLE]**

821.    The City requests damages in an amount equal to the  cost of a City tax stamp multiplied by the total number of packs of cigarettes that  UPS shipped, transported, and/or distributed in or into New York City in violation  of 18 U.S.C. § 2346(b)(2). **[TABLE]**

822.    Pursuant to the State and City's claims under the Contraband Cigarette Trafficking Act, the Prevent All Cigarette Trafficking Act, New York Executive Law section 63(12) and New York Public Health Law section 1399-*ll*, the Plaintiffs

823.    The City and State have no adequate remedy at law, in that UPS has shown itself unable or unwilling to comply voluntarily with the AOD entered into with the Attorney General, and has been unable or unwilling to cease conduct that injures the health and safety of a considerable number of persons, and accordingly cannot be remedied by the payment of money damages.

824.    The Court should accordingly (i) enjoin UPS pursuant to 18 U.S.C. § 2346(b)(1) from knowingly shipping, transporting, receiving, possessing, or distributing contraband  cigarettes as that term is defined in the CCTA; (ii) enjoin UPS pursuant to 15 U.S.C. § 378(c)(1)(A) from shipping any cigarettes that do not comply with the PACT Act's

labeling requirement and from shipping for any shipper listed on the ATF's list of non-compliant delivery-sellers; (iii) enjoin UPS pursuant to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-*ll* from delivering any cigarettes to any unauthorized recipient within the State of New York; and (iv) appoint a Special Master to assure UPS's compliance with each of the above statutes, and with the AOD entered into by UPS with the Attorney General, and to provide training and monitoring to UPS to ensure compliance.

## CONCLUSION

For the reasons set forth above, the State and City should be granted judgment on their claims and awarded damages and penalties in the amounts set forth herein, injunctive relief as described herein, and other relief the Court deems just and proper.

Dated:     New York, New York          ERIC T. SCHNEIDERMAN
           September 9, 2016           Attorney General of the State of New York

                                       By: ____/s/ Dana Biberman_____

                                       Dana Biberman (DB 9878)
                                         Chief, Tobacco Compliance Bureau
                                       Christopher K. Leung (CL 6030)
                                       John Oleske (JO 0995)
                                       Kevin Lynch (*pro hace vice*)
                                         Assistant Attorneys General
                                       120 Broadway, 3rd Floor
                                       New York, New York 10271
                                       Tel.: 212-416-6343

                                       *Attorneys for Plaintiff State of New York*

ZACHARY W. CARTER
Corporation Counsel of the City of New York

By: __/s/ Eric Proshansky_____

Eric Proshansky (EP 1777)
Lilia Toson (LT 4727)
Tonya Jenerette (TJ 7276)
  Assistant Corporation Counsel
100 Church Street, Room 20-99
New York, New York 10007
Tel.:  (212) 356-2032

*Attorneys for Plaintiff the City of New York*

168