UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                        Plaintiffs,

            -v-

UNITED PARCEL SERVICE, INC.,

                        Defendant.

15 Civ. 1136 (KBF)

**ECF CASE**

## DEFENDANT UNITED PARCEL SERVICE, INC.'S POST-TRIAL BRIEF ON PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Paul T. Friedman (Admitted *Pro Hac Vice*)
Ruth N. Borenstein (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
PFriedman@mofo.com
RBorenstein@mofo.com

Carrie H. Cohen
Jamie A. Levitt
Mark David McPherson
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
CCohen@mofo.com
JLevitt@mofo.com
MMcPherson@mofo.com

Gregory B. Koltun (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Telephone: (213) 892-5200
GKoltun@mofo.com

Deanne E. Maynard (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
Telephone: (202) 887-1500
DMaynard@mofo.com

*Attorneys for Defendant*
United Parcel Service, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... viii

PRELIMINARY STATEMENT ......................................................................................... 1

    A.    UPS Did Not Knowingly Deliver Cigarettes To Individual Consumers. .............. 3

        1.    UPS Complied With The AOD, Its Tobacco Policy, And Applicable Law. ...................................................................................... 3

        2.    Plaintiffs Seek The Retroactive Imposition Of New Obligations............ 5

    B.    Plaintiffs Are Not Entitled To Any Monetary Or Injunctive Remedy.................. 7

PROPOSED FINDINGS OF FACT .............................................................................. 11

I.      BACKGROUND CONCERNING UPS. ............................................................. 11

II.     BACKGROUND CONCERNING THE TAXATION OF CIGARETTES AND LITTLE CIGARS. ................................................................................ 13

III.    THE OCTOBER 21, 2005 ASSURANCE OF DISCONTINUANCE BETWEEN UPS AND THE ATTORNEY GENERAL....................................... 21

IV.    UPS HAS COMPLIED FULLY WITH THE AOD. ........................................ 23

    A.    UPS Immediately Complied With Its Initial Obligations Under The AOD. ....... 23

    B.    UPS Has Continued To Comply With The AOD Without Interruption Since 2005......................................................................................... 25

    C.    UPS Has Also Adopted Enhanced Compliance Measures Going Above And Beyond The AOD's Requirements. ..................................................... 32

V.     FACTS CONCERNING THE SHIPPERS AT ISSUE. ................................... 36

    A.    UPS Account Executives Or Inside Sales Representatives Worked With Shippers To Ensure Compliance With UPS Policy. ........................... 36

    B.    Plaintiffs Presented No Evidence Of Any Cigarette Shipments For All But Six Shippers Or Alleged Shipper "Groups."...................................... 38

    C.    UPS Did Not Knowingly Transport Cigarettes To Unauthorized Recipients For Any Of The Remaining Six Shippers Or Alleged Shipper "Groups." .................................................................................... 44

        1.    Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes To Unauthorized Recipients For The Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs Manufacturing/Jacobs Tobacco Company). ........................................... 44

            a.    UPS Understood That Shipments From The Potsdam Shippers To Retailers On Other Native American Reservations Were Authorized By The State. ............................ 45

b.     The State Instructed UPS To Continue To Pick Up Packages From The Potsdam Shippers To Protect An Ongoing Law Enforcement Investigation. ................................... 46

c.     UPS Detailed The Facts Concerning The Potsdam Shippers For The State In August 2011. ..................................................... 51

2.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Shipping Services/Morningstar Crafts And Gifts. ........... 53

a.     Shipping Services ......................................................................... 53

b.     Morningstar Crafts & Gifts ......................................................... 56

3.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For AJ's Cigar/Sweet Seneca Smokes/RJESS/Smokes & Spirits/Native Outlet. ................................................................. 57

a.     AJs Cigars ................................................................................... 57

b.     Sweet Seneca Smokes ................................................................. 58

c.     RJESS .......................................................................................... 61

d.     Native Outlet .............................................................................. 63

e.     Smokes & Spirits ....................................................................... 64

4.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Native Wholesale Supply/Seneca Promotions. ................ 67

5.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Indian Smokes. ..................................................... 69

6.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Elliot Enterprises/EExpress/Bearclaw Unlimited. ........... 72

a.     Elliot Enterprises ........................................................................ 72

b.     EExpress ...................................................................................... 75

c.     Bearclaw Unlimited .................................................................... 78

7.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Arrowhawk/Hillview Cigars/Seneca Cigars/Two Pines Enterprises. ................................................................... 81

a.     Arrowhawk Smoke Shop ............................................................. 81

b.     Seneca Cigars and Hillview Cigars ............................................. 82

c.     Two Pine Enterprises .................................................................. 85

d.     Native Gifts ................................................................................ 87

e.     Tobacco Agreements .................................................................. 88

f.     UPS Employees Had No Motive To Allow Shippers To Violate UPS Policy ..................................................................... 89

g.      Mr. Christ's Testimony Was Not Credible ................................. 90

D.     UPS Earned Minimal Profit From The Shippers. ................................. 94

E.     Plaintiffs Presented No Evidence That UPS Failed To Heed Signs Of Possible Illegal Shipping .......................................................... 95

     1.     The PACT Act Lists Did Not Provide UPS With Any Warning Of Possible Illegal Shipments. ........................................ 95

     2.     Claims And Tracers Concerning Lost Or Damaged Packages Did Not Provide UPS With Any Warning Of Possible Illegal Shipments ............................................................................ 97

     3.     A Letter From The Anonymous "Tobacco Watchdog Group" Did Not Provide UPS With Any Warning Of Possible Illegal Shipments ............................................................................ 98

F.     Plaintiffs Failed To Cooperate With UPS To Identify And Terminate Unlawful Shippers. ...................................................... 101

PROPOSED CONCLUSIONS OF LAW ...................................................... 103

I.     THE STATE FAILED TO ESTABLISH ANY BREACH OF THE AOD .................. 103

A.     The Term "Violation" In The AOD Refers Only To Deliveries Of Cigarettes To Consumers. ...................................................... 106

B.     The State Failed To Prove That UPS Violated The AOD's Requirement Concerning Deliveries Of Cigarettes To Consumers ......................... 110

     1.     "Know Or Reason To Know" Must Be Defined Within The Context Of The AOD As A Whole, Which Requires A Knowledge Standard. ...................................................... 110

     2.     Even Under The State's Erroneous Interpretation Of The AOD, UPS Had No Reason To Know That It Was Delivering Cigarettes To Consumers. ...................................................... 113

C.     The State Failed To Prove That UPS Breached The AOD's Training Requirement. ...................................................... 113

D.     The State Failed To Prove That UPS Breached The AOD's Record-Keeping Requirements. ...................................................... 115

E.     The State Failed To Prove That UPS Breached The AOD's Audit Requirement. ...................................................... 116

     1.     UPS Audited All Shippers It Had A Reason To Believe Were Violating UPS Policy. ...................................................... 117

     2.     The Audit Provision Does Not Require UPS To Use The PACT Act List To Investigate Shippers ...................................................... 121

     3.     The Audit Provision Does Not Require UPS To Investigate Possible Connections Between Shippers. ................................. 124

4.      Even If UPS Had Failed To Audit A Shipper Where A Reasonable Belief Existed, The Audit Provision Would Not Have Required UPS To Audit Every Package Thereafter Tendered By That Shipper. ........................................................... 126

a.      The State's Theory Impermissibly Requires Rewriting The AOD Audit Provision, In Violation Of Federal Preemption And Contract Principles. ........................................................ 128

b.      The State's Interpretation Of The Audit Provision Is Inconsistent With The AOD's Provision Governing Discipline Of Shippers. ............................................... 132

c.      The State's Interpretation Of The Audit Provision Is Inconsistent With The Delivery Restriction Provision. ............ 132

d.      The State's Interpretation Of The Audit Provision Is Inconsistent With The AOD's Purpose. .................................... 133

e.      Even If The Court Concludes That The AOD Required UPS To Conduct Multiple Audits, The Court Should Limit The Requirement To Changed Circumstances. ........................ 136

II.     PLAINTIFFS FAILED TO PROVE THAT UPS KNOWINGLY DELIVERED CIGARETTES ON BEHALF OF THE SHIPPERS AT ISSUE. ................................. 137

A.      All Of Plaintiffs' Claims Require Proof That UPS Knowingly Shipped Cigarettes To Unauthorized Recipients. ........................................... 138

B.      A Showing Of Constructive Knowledge Is Not Sufficient To Hold UPS Liable For Any Of Plaintiffs' Claims. ................................................. 139

C.      Knowledge Cannot Be Imputed From Employees In UPS's Claims Group Or Customs Brokerage Group. ......................................................... 140

D.      UPS Did Not Knowingly Deliver Cigarettes For The Shippers at Issue. .......... 142

III.    PLAINTIFFS FAILED TO PROVE ADDITIONAL ELEMENTS UNIQUE TO THEIR CCTA CLAIMS. .................................................................. 150

A.      The CCTA Requires A Single Transaction In Which A Carrier Transported More Than 10,000 Cigarettes. ...................................................... 151

B.      Even Assuming Aggregation Is Permissible To Satisfy The CCTA's 10,000 Cigarettes Threshold, Plaintiffs Failed To Prove That UPS Shipped 10,000 Cigarettes For All But Three Shippers Or Shipper "Groups." ............... 151

C.      For All Of The Shippers, Plaintiffs Failed To Prove That UPS Knowingly Transported More Than 10,000 Cigarettes. ..................................................... 153

IV.     EVEN WERE THE COURT TO FIND THAT INDIVIDUAL EMPLOYEES AT UPS KNEW ABOUT SOME SHIPPERS' ILLEGAL ACTIVITY, UPS WOULD NOT BE BOUND BY THEIR KNOWLEDGE. ........................................................ 154

V.      UPS IS ENTITLED TO THE PACT ACT EXEMPTION BASED ON ITS AOD. ..... 156

A.      UPS Has Always Honored The AOD Throughout The United States. ............. 159

B.      The PACT Act Cannot Be Read To Apply To UPS Retroactively, As Plaintiffs Seek To Do. ........................................................................................ 161

C.      The City Is Not Entitled To Pursue Claims Under Section 1399-*ll*, Any More Than The State Is Entitled To Do.......................................................... 163

VI.      EVEN ASSUMING UPS WERE SUBJECT TO THE PACT ACT, PLAINTIFFS FAILED TO PROVE THAT UPS VIOLATED THE ACT. ......................................... 166

A.      Plaintiffs Failed To Prove That UPS Received The PACT Act List, As Required By The Act, And That UPS Knowingly Provided Service To Shippers On The List. ........................................................................................ 166

B.      Deliveries For Smokes & Spirits Or For Alleged Affiliates Of Shippers On the PACT Act List Did Not Violate The PACT Act, Even Were UPS Deemed To Have Properly Received The List. ................................................ 168

VII.      PLAINTIFFS FAILED TO PROVE CLAIMS BASED ON SHIPMENTS FROM THE POTSDAM SHIPPERS FOR ADDITIONAL REASONS. ................................. 170

A.      The City Lacks Standing To Assert Any Claims Based On The Potsdam Shippers.............................................................................................................. 171

B.      None Of The Potsdam Shippers' Shipments Violated The CCTA Or The AOD Based On The New York Tax Law In Effect At The Time. .................... 172

C.      Transportation Of Shipments From The Potsdam Shippers Did Not Violate the AOD. ...................................................................................................... 174

     1.      UPS Had No Reason To Believe That The Consignees Of The Potsdam Shippers' Shipments Were Not Authorized Recipients Of Cigarettes. ................................................................................................ 174

     2.      UPS Has Already Satisfied The Attorney General That No Penalties Under The AOD Are Appropriate Based On Shipments From The Potsdam Shippers.................................................................... 178

D.      Transportation Of Shipments From The Potsdam Shippers Did Not Violate N.Y. PHL § 1399-*ll*................................................................................. 180

E.      UPS Cannot Be Held Liable For Shipments Made In Good Faith Reliance On Instructions From New York State Police. .................................................. 182

VIII.      UPS'S AFFIRMATIVE DEFENSES BAR PLAINTIFFS' CLAIMS. ........................ 186

A.      UPS's Equitable Defenses Bar The State's AOD Claim.................................. 186

B.      The State's Breach Of The Covenant Of Good Faith And Fair Dealing Bars Its AOD Claim.................................................................................................. 188

IX.      PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF............................. 192

X.      NO DAMAGES OR PENALTIES SHOULD BE AWARDED AT ALL. ................... 194

A.     The Court Should Not Even Reach The Issue Of Damages And Penalties, Due To Plaintiffs' Failure To Satisfy Rule 26 Obligations. ............................ 194

B.     In Any Event, Plaintiffs Failed To Satisfy Their Burden Of Proving Any Damages Or The Basis For Any Penalties. ......................................................... 202

    1.     Court Exhibit 1 Lacks Foundation And Is Inadmissible. ...................... 204

    2.     UPS Was Denied Its Rights To Confrontation And Cross-Examination. ......................................................................................... 205

    3.     Court Exhibit 1 Should Be Excluded As An Untimely Expert Report, Prepared By An Undisclosed Expert. ....................................... 209

    4.     Court Exhibit 1 Is Also Inadmissible Because It Lacks Authenticity. ..................................................................................... 211

    5.     Court Exhibit 1 Is Inaccurate And Unreliable And Thus Inadmissible, As It Could Be Given No Weight. .................................. 212

    6.     Plaintiffs Have Not Proved Actual Damages. ...................................... 216

    7.     Plaintiffs Failed To Prove Any Damages Based On Shipments From The Potsdam Shippers, In Particular. .......................................... 216

    8.     Plaintiffs Have Not Proved The Basis For Any Penalties. ................... 218

C.     Plaintiffs Cannot Recover More Than Zero-to-Five Percent Of Tax Losses, Assuming Any Such Losses Are Proven. ............................................. 218

D.     Given UPS's Good Faith Attempt To Prevent The Shipment Of Cigarettes, No Penalties Should Be Awarded. ................................................................... 224

    1.     Relevant Penalty Provisions. ............................................................. 224

    2.     The Court Should Consider UPS's Good Faith And Plaintiffs' Own Conduct In Assessing Whether Penalties  Should Be Awarded. ........................................................................................... 226

        a.     UPS's Good Faith Compliance With The AOD And Other Laws. .................................................................................... 227

        b.     Plaintiffs' Failure To Cooperate With UPS In Enforcing The AOD. ................................................................................. 228

        c.     UPS's Enhanced Compliance Measures Also Weigh Against Awarding Any Penalties. ................................................ 229

    3.     The Actions Of Drivers And/Or Account Executives Are Not A Basis For Civil Penalties Against UPS. ................................................. 229

E.     Any Penalties Awarded Under The AOD Must Be Strictly Limited To The Text Of The AOD; The State Is Not Entitled To $1,000 Per Package. ............. 232

    1.     The Audit Provision, On Which Plaintiffs Rely, Does Not Support The Per-Package Penalty The State Seeks. ............................................ 232

|   |   | 2. | Principles Of Construction Preclude The State's Attempt To Re-Write The Audit Provision To Include A Per-Package Penalty. | 234 |

       2.     Principles Of Construction Preclude The State's Attempt To Re-Write The Audit Provision To Include A Per-Package Penalty. ........... 234

            a.     Interpreted As A Private Agreement, The AOD's Penalty Cannot Be Applied As The State Seeks To Impose It. .............. 234

            b.     If The AOD Were Interpreted As A Deferred Prosecution Agreement, The Rule Of Lenity Would Preclude The AOD's Penalty From Being Applied As The State Seeks To Impose It. ................................................................................ 237

  F.     Penalties, If Any, Cannot Be Disproportionate To The Alleged Harm. ............ 238

       1.     Plaintiffs' Claimed Penalties Are Excessive Under The Eighth Amendment. ........................................................................................ 239

            a.     Penalties Are Excessive When They Are Disproportionate To The Harm Suffered. ................................................................ 239

            b.     Plaintiffs' Requested Penalties Far Exceed Any Harm They Have Suffered Or Any Benefit To UPS. ......................... 241

       2.     Plaintiffs' Requested Penalties Also Are "Grossly Excessive" Under The Due Process Clause Of The Fifth Amendment .................. 242

       3.     The Court Should Also Reject Plaintiffs' Effort To "Stack" Penalties On The Same Alleged Deliveries. ........................................... 246

  G.     Damages And Penalties, If Any, Must Be Limited To Applicable Statutory Limitations Periods. ............................................................................ 247

CONCLUSION ................................................................................................................ 251

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abraham Zion Corp. v. Lebow,*
    761 F.2d 93 (2d Cir. 1985).............................................................................192

*Agence France Presse v. Morel,*
    293 F.R.D. 682 (S.D.N.Y. 2013) ................................................................196

*AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC,*
    No. 01 Civ. 11448 (JGK)(HPB), 2006 WL 1206333 (S.D.N.Y. May 2, 2006) ...................142

*Allen v. WestPoint-Pepperell, Inc.,*
    No. 89 CIV. 2016 (SAS), 1996 WL 2004 (S.D.N.Y. Jan. 3, 1996).....................................134

*American Airlines, Inc. v. Wolens,*
    513 U.S. 219 (1995).......................................................................................130

*Anderson Grp., LLC v. City of Saratoga Springs,*
    805 F.3d 34 (2d Cir. 2015)............................................................................204

*Apollo Fuel Oil v. United States,*
    195 F.3d 74 (2d Cir. 1999) (*per curiam*) ..........................................141, 142

*Arizona v. United States,*
    132 S. Ct. 2492 (2012)..................................................................................166

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991)......................................................................................123

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.,*
    821 F.3d 297 (2d Cir. 2016)..........................................................................161

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.,*
    596 F.3d 357 (6th Cir. 2010) ........................................................................203

*Brown & Williamson Tobacco Corp. v. Pataki,*
    320 F.3d 200 (2d Cir. 2003)............................................................................21

*C.P. Apparel Mfg. Corp. v. Microfibres, Inc.,*
    210 F. Supp. 2d 272 (S.D.N.Y. 2000).................................................136, 137

*Cann v. Ford Motor Co.,*
    658 F.2d 54 (2d Cir. 1981)............................................................................115

*Carney v. Newburgh Park Motors,*
    84 A.D.2d 599 (N.Y. App. Div. 3d Dep't 1981) ..........................................188

*Cayuga Indian Nation of New York v. Gould*,
  14 N.Y.3d 614 (2010) ...................................................................................173

*Center v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782 (1985) ...................................................................................141

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012)...........................................................................162, 163

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002)...............................................................................165, 166

*City of New York v. Fedex Ground Package Sys., Inc.*,
  No. 14 Civ. 9895, 2016 WL 1322454 (S.D.N.Y. Mar. 31, 2016) ...............129, 166

*City of New York v. Milhelm Attea & Bros., Inc.*,
  550 F. Supp. 2d 332 (E.D.N.Y. 2008) ...........................................................189

*City of New York v. Milhelm Attea & Bros., Inc.*,
  No. 06-CV-3620 (CBA), 2012 WL 3579568 (E.D.N.Y. Aug. 17, 2012)............172

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
  532 U.S. 424 (2001)......................................................................................204

*CQ, Inc. v. TXU Mining Co.*,
  565 F.3d 268 (5th Cir. 2009) .......................................................................203

*Croce v. Kurnit*,
  737 F.2d 229 (2d Cir. 1984)..........................................................................124

*Crowell v. Benson*,
  285 U.S. 22 (1932).......................................................................................162

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................................198, 201

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)..........................................................................172

*Dep't of Taxation & Fin. of of New York v. Milhelm Attea & Bros., Inc.*,
  512 U.S. 61 (1994)........................................................................................173

*Design Strategy, Inc. v. Davis*,
  469 F.3d 284 (2d Cir. 2006)....................................................................196, 197

*Dumont v. United States*,
  98 U.S. 142 (1878).......................................................................................179

*Energy Transp., Ltd. v. M.V. San Sebastian*,
348 F. Supp. 2d 186 (S.D.N.Y. 2004) ...............................................................132

*Environmental Encapsulating Corp. v. City of New York*,
855 F.2d 48 (2d Cir. 1988) ..............................................................................165

*Estate of Jaquez v. Flores*, No. 10 Civ. 2881 (KBF),
2016 WL 1060841 (S.D.N.Y. Mar. 17, 2016) (Forrest, J.) ........................196, 198

*F.C.C. v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012) ..............................................................................162, 163

*Ferring B.V. v. Allergan, Inc.*,
4 F. Supp. 3d 612 (S.D.N.Y. 2014) ..................................................................180

*Fowler v. City of Saratoga Springs*,
215 A.D.2d 819 (N.Y. App. Div. 3d Dep't 1995) ..............................................188

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .........................................................................................140

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .........................................................................................163

*Hadden v. Consol. Edison Co. of. N.Y.*,
34 N.Y.2d 88 (1974) ........................................................................................161

*Handschu v. Special Servs. Div.*,
No. 71 Civ. 2203(CSH), 2007 WL 1711775 (S.D.N.Y. June 13, 2007) ..............189

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
230 F.3d 549 (2d Cir. 2000) .............................................................................134

*Hexagon Sec. LLC v. Leawood Bancshares, Inc.*,
No. 13 Civ. 907(JSR), 2014 WL 1303516 (S.D.N.Y. Mar. 14, 2014) ................191

*Hoffman v. Const. Protective Servs., Inc.*,
541 F.3d 1175 (9th Cir. 2008) ..........................................................................203

*IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp.*,
26 F.3d 370 (2d Cir. 1994) ...............................................................................124

*Idan Computer, LTD v. Intelepix, LLC*,
No. CV-09-4849(SJF)(ARL), 2010 U.S. Dist. LEXIS 90658
(E.D.N.Y. Aug. 27, 2010) ................................................................................194

*In re New York State Urban Dev. Corp.*,
907 N.Y.S.2d 438 (Sup. Ct. Kings Cty. 2010)..................................................188

*In re Penn Cent. Transp. Co.*,
    494 F.2d 270 (3d Cir. 1974)...............................................................................19

*J. Aron & Co. v. The Askvin*,
    267 F.2d 276 (2d Cir. 1959)..............................................................................134

*Kinek v. Paramount Commc'n, Inc.*,
    22 F.3d 503 (2d Cir. 1994)................................................................................132

*Koam Produce, Inc. v. DiMare Homestead, Inc.*,
    213 F. Supp. 2d 314 (S.D.N.Y. 2002),
    *aff'd*, 329 F.3d 123 (2d Cir. 2003) .................................................................141

*Kodak Graphic Commc'ns Can. Co. v. E.I. Du Pont de Nemours & Co.*,
    No. 08-CV-6553-FPG, 2013 WL 5739041 (W.D.N.Y. Oct. 22, 2013)................203

*Lanier v. Bats Exch., Inc.*,
    No. 15-1683, __ F.3d __, 2016 WL 5335022
    (2d Cir. Sept. 23, 2016)....................................................................................106

*Lee v. Marvel Enters., Inc.*,
    386 F. Supp. 2d 235 (S.D.N.Y. 2005)..............................................................136

*Liparota v. United States*,
    471 U.S. 419 (1985)..........................................................................................154

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011)................................................................................131

*Lopez v. City of New York*,
    No. 11-CV-2607 (CBA)(RER), 2012 WL 2250713
    (E.D.N.Y. June 15, 2012) .................................................................................196

*Max Impact, LLC v. Sherwood Grp., Inc.*,
    No. 09 Civ. 902 (JGK)(HPB), 2014 WL 902649
    (S.D.N.Y. Mar. 7, 2014) ...................................................................................197

*Merrill Lynch & Co. v. Alleghany Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)..............................................................................161

*Morrissette v. United States*,
    342 U.S. 246 (1952)..........................................................................................154

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004).....................................................................189, 193

*New York State Motor Truck Ass'n v. Pataki*,
 No. 03 CV 2386 (GBD), 2004 WL 2937803
 (S.D.N.Y. Dec. 17, 2004)...........................................................21, 22

*New York v. United Parcel Serv., Inc.*,
 131 F. Supp. 3d 132 (S.D.N.Y. 2015).......................................164, 165

*Norcia v. Dieber's Castle Tavern, Ltd.*,
 980 F. Supp. 2d 492 (S.D.N.Y. 2013).............................................203

*Norfolk S. Ry. Co. v. City of Alexandria*,
 608 F.3d 150 (4th Cir. 2010) .........................................................165

*Oneida Nation of New York v. Cuomo*,
 645 F.3d 154 (2d Cir. 2011)............................................................174

*Orange Cty. Choppers, Inc. v. Olaes Enters.*,
 497 F. Supp. 2d 541 (S.D.N.Y. 2007)..............................................106

*People v. Goetz*,
 68 N.Y.2d 96 (1986) .......................................................................181

*Petroleum Traders Corp. v. Balt. Cty.*,
 413 F. App'x 588 (4th Cir. 2011) ...................................................187

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
 No. 15-1177, 2016 WL 5898801 (D.C. Cir. Oct. 11, 2016) ........................163, 164, 183, 184

*Raishevich v. Foster*,
 9 F. Supp. 2d 415 (S.D.N.Y. 1998) ................................................203

*Reino de España v. Am. Bureau of Shipping, Inc.*,
 691 F.3d 461 (2d Cir. 2012)....................................................142, 155

*Republic of Iraq v. ABB AG*,
 768 F.3d 145 (2d Cir. 2014),
 *cert. denied*, 135 S. Ct. 2836 (2015) .............................................189

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
 13 N.Y.3d 398 (2009) .....................................................................131

*Rockwood v. City of Burlington*,
 21 F. Supp. 2d 411 (D. Vt. 1998)....................................................166

*Ross v. Bank of Am., N.A.*,
 524 F.3d 217 (2d Cir. 2008)............................................................172

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008)..............................................................22, 130, 182

*Royal Ins. Co. of Am. v. Comm'rs of State Ins. Fund*,
    289 A.D.2d 807 (N.Y. App. Div. 3d Dep't 2001) ................................188

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996).............................................................194

*S.E.C. v. Misner*,
    No. 07-CV-01640-REB-MEH, 2007 WL 3232132
    (D. Colo. Oct. 30, 2007) ...................................................................196

*S.E.C. v. Pardue*,
    367 F. Supp. 2d 773 (E.D. Pa. 2005) .................................................196

*Seneca Nation of Indians v. State of New York*,
    No. CA 11-01193, slip op. at 1 (N.Y. App. Div. 4th Dep't June 21, 2011) ..........................50

*Silicon Knights, Inc. v. Epic Games, Inc.*,
    No. 5:07-CV-275-D, 2012 WL 1596722 (E.D.N.C. May 7, 2012) ......................203

*Spinelli v. NFL*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ....................................................106

*Staples v. United States*,
    511 U.S. 600 (1994)...........................................................................154

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)...........................................................................195

*State Mut. Life Assur. Co. v. Heine*,
    49 F. Supp. 786 (W.D. Ky. 1943), *aff'd*, 141 F.2d 741
    (6th Cir. 1944)...................................................................................179

*Thompson v. Jamaica Hosp. Med. Ctr.*,
    13 Civ. 1896, 2015 WL 7430806 (S.D.N.Y. Nov. 20, 2015) ..................197

*TIG Ins. Co. v. Newmont Mining Corp.*,
    413 F. Supp. 2d 273 (S.D.N.Y. 2005), *aff'd*, 226 F. App'x 49
    (2d Cir. 2007)....................................................................................192

*U.S. Philips Corp. v. ATI Techs., Inc.*,
    No. 05 Civ. 8176 (LAP), 2008 WL 2073928
    (S.D.N.Y. May 8, 2008)....................................................................142

*UMB Bank, N.A. v. Sanofi*,
  No. 15 Civ. 8725(GDB), 2016 U.S. Dist. LEXIS 128324
  (S.D.N.Y. Sep.8, 2016) ...................................................................................106

*United States v. Abcasis*,
  45 F.3d 39 (2d Cir. 1995)...............................................................185, 186, 187

*United States v. Apple*,
  992 F. Supp. 2d 263 (S.D.N.Y. 2014),
  *aff'd*, 787 F.3d 131 (2d Cir. 2015) .................................................................195

*United States v. Bank of New England, N.A.*,
  821 F.2d 844 (1st Cir. 1987) ...........................................................................141

*United States v. Burt*,
  410 F.3d 1100 (9th Cir. 2005) .........................................................................185

*United States v. Carson*,
  52 F.3d 1173 (2d Cir. 1995)..............................................................................194

*United States v. Fofanah*,
  765 F.3d 141 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1449 (2015) ....................141

*United States v. Garcia*,
  519 F.2d 1343 (9th Cir. 1975) .........................................................................190

*United States v. Giffen*,
  473 F.3d 30 (2d Cir. 2006)...............................................................184, 185, 186

*United States v. Incorporated Village of Island Park*,
  888 F. Supp. 419 (E.D.N.Y. 1995) ..................................................................155

*United States v. Morrison*,
  686 F.3d 94 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 955 (2013) ..................154, 173

*United States v. President and Fellows of Harvard College*,
  323 F. Supp. 2d 151 (D. Mass. 2004) ..............................................................155

*United States v. Vaval*,
  404 F.3d 144 (2d Cir. 2005)..............................................................................190

*United States v. X-Citement Video, Inc.*,
  513 U.S. 64 (1994)............................................................................................154

*Uniwire Trading LLC v. M/V Wladslaw Orkan*,
  622 F. Supp. 2d 15 (S.D.N.Y. 2008)................................................................133

*Ward v. New York*,
291 F. Supp. 2d 188 & 210 (W.D.N.Y. 2003) ..................................................139

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014)..............................................................................140

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 ...........................................................................................19

*Wisconsin Pub. Intervenor v. Mortier*,
501 U.S. 597 (1991) (Scalia, J., concurring) ............................................165, 166

*Wolff v. Rare Medium, Inc.*,
210 F. Supp. 2d 490 (S.D.N.Y. 2002),
*aff'd*, 65 F. App'x 736 (2d Cir. 2003)................................................................106

*XChange Telecom Corp. v. Sprint Spectrum L.P.*,
No. 14-cv-54, 2015 WL 773752 (N.D.N.Y. Feb. 24, 2015).................................197

*Zamierowski v. Nat'l R.R. Passenger Corp*,
No. 05 Civ. 9309(WCC), 2006 WL 1816377 (S.D.N.Y. June 28, 2006)..............192

## STATUTES AND RULES

15 U.S.C. § 376a .......95, 96, 121, 122, 138, 156, 157, 164, 166, 167, 168, 169, 170, 181, 182,189

18 U.S.C.
§ 2339B(a)(1)...................................................................................................140
§ 2341 *et seq.* ......................................45, 103, 138, 150, 138, 151, 153, 172, 178
§ 2342 .........................................................................................138, 151, 154
§ 2346(b)(1) .....................................................................................................193

49 U.S.C.
§ 14501(c)(1) ...........................................................................................130, 182
§ 41713(b)(4)(A)......................................................................................130, 182

Federal Aviation Administration Authorization Act of 1994 ............................130, 131

Fed. R. Civ. P. 26 *et. seq.*......................................7, 194, 195, 196, 197, 200, 201, 202

Fed. R. Civ. P. 53(a)(3)......................................................................................195

Fed. R. Evid. 407 ...............................................................................................115

N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii)....................................13, 14

N.Y. Pub. Health L. § 1399-*ll*.................21, 22, 103, 104, 106, 107, 108, 109, 110, 111, 112, 132,
134, 135, 139, 156, 157, 158, 159, 161, 163, 164, 171, 175, 176, 177, 180, 182, 192

N.Y. Sess. Laws, Ch. 262, § 13 ...........................................................21

Cigarette Marketing Standards Act, N.Y. Tax Law §§ 483-489 ............................15, 16

N.Y. Tax Law
    § 470..................................................................................20
    § 471..................................................13, 49, 172, 173, 176, 217

**OTHER AUTHORITIES**

14 Williston on Contracts § 44:52 (4th ed.).............................................160

155 Cong. Rec. S5822-01, 2009 WL 1423723 (May 21, 2009)...............................123

81 N.Y. JUR. 2d Notice and Notices § 2 ...............................................141

Children's Health Insurance Program Reauthorization Act,
    Pub. L. 111-3, Section 703(b) (2009) ...........................................14, 15

Restatement (Third) of Agency § 5.03 ..................................................168

Seventh Circuit Pattern Criminal Jury Instructions § 5.03 (2012)........................155

Third Circuit Model Criminal Jury Instructions § 7.06 (2014) ..........................155

## PRELIMINARY STATEMENT

United Parcel Service, Inc. is a common carrier, obligated to offer its delivery services and to accept packages for transport without discrimination. In the Assurance of Discontinuance ("AOD") at the heart of this case, the New York Attorney General and UPS reached a detailed and comprehensive agreement that carefully balances these common carrier obligations with the interest in reducing the delivery of cigarettes to individual consumers. The balance achieved in this landmark contract was specifically endorsed by Congress in the PACT Act.

Now, however, the State and City of New York ask this Court to reweigh the balance struck in the AOD, and to rewrite the parties' contractual agreement to impose on UPS, retrospectively, obligations that are not in the AOD—and then penalize UPS for not complying with those non-existent obligations. At its core, plaintiffs' suit seeks to hold UPS liable, based entirely on hindsight, for not doing "more" to enforce UPS's policy of not accepting cigarettes for delivery to individual consumers. But the AOD did not require UPS to take any of the various additional steps plaintiffs claim UPS should have taken—such as investigating connections between shippers or conducting other data analytics. Nor were these additional steps required by any federal or state law. In the absence of any contractual or statutory duty to take such steps, UPS cannot be held liable for not taking them. Certainly the Court cannot impose monetary penalties against UPS for its supposed transgression of such non-existent obligations.

This Court should decline plaintiffs' invitation to make up new rules on the fly. Instead, the Court should measure UPS's conduct against the actual terms of the AOD and the statutes that plaintiffs invoke. The evidence at trial overwhelmingly demonstrates that UPS complied with every requirement of the AOD as well as applicable federal and state laws. Indeed, UPS did more than it was legally required to do to prevent shipment of cigarettes to individual consumers. No liability—and no punishment—can be imposed on this record.

UPS's compliance with the contract and applicable statutes is vividly illustrated by the course of this litigation itself. During discovery, plaintiffs contended that UPS knowingly transported unstamped cigarettes for as many as 66 shippers. Shortly before trial, plaintiffs, without explanation, dropped about 30 of those shippers and alleged shipper "groups" from their list. At trial, plaintiffs presented evidence as to only seven shippers or shipper "groups"—and as to only three of those was there any actual evidence of shipments that contained cigarettes. Accordingly, far from proving plaintiffs' theory that UPS abandoned its obligations under the AOD and federal or state law, plaintiffs' focus on an ever-narrowing set of shippers—at most seven out of the 1.6 *million* shippers UPS serves daily throughout the country—confirms UPS's overall adherence to, and enforcement of, its tobacco policy.

Moreover, even assuming plaintiffs' evidence could demonstrate that UPS did not fulfill certain obligations with respect to the small group of shippers addressed at trial, it cannot possibly support the award of penalties and damages that plaintiffs seek. At most, UPS derived total revenue of $5.2 million over five years, and profits of only $475,000, from the seven shippers/shipper "groups" on which plaintiffs focused at trial. Yet plaintiffs ask the Court to award $38 million in damages and $834 million in penalties in connection with these same shippers. The sum of these requests is approximately 168 times greater than the revenue UPS generated, and more than 1,800 times greater than the profits UPS received, from these accounts.

Plaintiffs have not demonstrated that UPS's conduct justifies the imposition of any damages or penalties at all; certainly, they have not proved that it warrants such an exorbitant (and unconstitutional) pecuniary exaction. This Court should reject their attempt to convert UPS's good-faith compliance with the express contractual terms of the AOD—terms to which the State and UPS agreed—into a nearly billion-dollar windfall for plaintiffs.

**A.      UPS Did Not Knowingly Deliver Cigarettes To Individual Consumers.**

After eight days of trial, the evidence showed conclusively that UPS complied with all applicable contractual and statutory requirements concerning tobacco shipments and, indeed, took numerous, deliberate actions well beyond what was required by the AOD to interdict prohibited shipments. Plaintiffs, with all the resources and tools available to law enforcement, have presented not a shred of evidence to the contrary. They should be held to their burden of proof.

**1.      UPS Complied With The AOD, Its Tobacco Policy, And Applicable Law.**

UPS satisfied *all* of its obligations designed to limit the transport of cigarettes, as set forth in the AOD as well as the UPS tobacco policy and applicable federal and state statutes, and plaintiffs failed to prove otherwise at trial. At trial, each of the 20 UPS employees who testified live or by deposition explained that UPS does not accept packages containing cigarettes for delivery to consumers and that the UPS employees themselves took active steps to prevent UPS from doing so. Specifically, UPS account executives and other members of the sales team detailed how they worked directly with customers to explain UPS's policy and to ensure the shippers complied with it. Similarly, UPS drivers testified that they actively looked for potential cigarette shipments, raising concerns with their supervisors whenever they suspected any shipper of shipping cigarettes. Likewise, supervisors and other employees responsible for enforcing UPS's tobacco policy testified that they conducted 24 audits and countless other spot checks to determine whether shippers were violating UPS policy. It is undisputed that every single time UPS identified a shipper that was shipping cigarettes to New York recipients, it either terminated service immediately or (in the case of the Potsdam Shippers) contacted a State law enforcement officer and followed the State's instructions.

Altogether, the testimony of these 20 witnesses, which was buttressed by hundreds of documents, demonstrated that UPS diligently followed the requirements of the AOD. For years, UPS investigated potential violators of its policy, notified shippers of the policy, trained employees on the policy, cooperated with the State and City concerning potential violators, and audited shippers when UPS suspected a shipper was in violation or when the State contacted UPS with a concern. Then, beginning in 2014, UPS further enhanced its compliance measures, implementing a state-of-the art program using improved capabilities for data analytics, as well as more extensive background research on new accounts, reinforced training messages, and more.

Attempting to counter this ample evidence of UPS's compliance, plaintiffs rely on the testimony of four non-UPS witnesses. Each of these witnesses has been convicted of federal crimes, and each was testifying in cooperation with the City and State in exchange for reduced sentences or early release, or to avoid additional civil claims and criminal prosecution. But even if their testimony were nevertheless credited, these four witnesses established at most that *three* of the seven shippers/shipper "groups" actually shipped cigarettes. And, even for two of those shippers, plaintiffs presented no evidence that UPS itself *knew* of any cigarette shipments. The third was the Potsdam "group," from which UPS continued to accept deliveries pursuant to the State's express instructions. For the remaining four shippers/shipper "groups," the sole evidence of actual cigarette shipments comes from UPS's own audits of those shippers. But the record also demonstrates that UPS terminated these shippers immediately upon discovering their activities.

Plaintiffs have attacked the credibility of one UPS account executive, Mr. Fink, regarding some of these shippers. The evidence shows, however, that Mr. Fink discussed UPS's tobacco policy with the shippers at issue and was assured that they were complying. It also shows that these shippers were not in fact shipping cigarettes at the times of these conversations.

Accordingly, plaintiffs cannot use Mr. Fink's testimony to carry their burden of proving either that pre-audit packages contained cigarettes or that any particular number of packages contained cigarettes. Nor, in any event, could any knowledge on the part of Mr. Fink be attributed to UPS to the extent he departed from UPS policy.

Thus, plaintiffs are left (at best) with the hope of convincing the Court that a few shippers may have succeeded in evading UPS policy through what plaintiffs' witness Philip Christ described as a "cat and mouse game." But of course, the very point of this "game" was to ensure that UPS (and, for that matter, governmental authorities) had no knowledge of unauthorized shipments. As Mr. Christ's own testimony showed, shippers understood UPS's tobacco policy because UPS employees understood it, explained it to them, and enforced it. Only by trying to trick UPS—by changing account names, or by using a shipper name suggesting that the shipper does not ship cigarettes, or by not including the shipper name on their packages, or by outright lying to UPS about the contents of their packages—were any of the identified shippers able to transport cigarettes via UPS. Plaintiffs have accordingly introduced no evidence that might contradict the testimony of the 20 UPS employees and the hundreds of documents all showing conclusively that UPS remains committed to the tobacco policy embodied in the AOD.

### 2. Plaintiffs Seek The Retroactive Imposition Of New Obligations.

Bereft of legally sufficient evidence that UPS committed *any* violation of the actual terms of the AOD or applicable statutes, plaintiffs instead seek to impose on UPS, retrospectively, wholly new obligations. Their case turns entirely on additional compliance steps that plaintiffs posit, after the fact, UPS *could* have taken to identify those shippers that evaded its policies. But these steps were not included in the AOD that the State negotiated with UPS. Nor were they imposed by any statute. As a matter of contract law, federal preemption, and basic principles of

due process, UPS cannot be said to have violated obligations that did not exist, or to which it was not subject, at the time it acted.

For example, plaintiffs blame UPS for not using the PACT Act List. That List identifies shippers designated as having violated the PACT Act's restrictions on cigarette sellers, and it is sent by the U.S. Attorney General to all carriers subject to the PACT Act. But the PACT Act expressly exempted UPS from its requirements, and UPS did not begin receiving the List until August 2013. The New York Attorney General ("AG") was fully aware of that fact, as UPS repeatedly requested that the AG forward the List to UPS. And as the AG acknowledged during the parties' discussions of the obligations imposed by the AOD, UPS was not required to follow the List. For plaintiffs now to suggest that this Court should impose liability on UPS for not using the List is an unauthorized exercise in revisionist history.

Similarly, plaintiffs fault UPS for not making supposed connections between shippers—connections plaintiffs themselves could not make without the benefit of their own investigatory efforts and 18 months of litigation. Yet plaintiffs point to no AOD requirement that UPS disregarded when it failed to identify these purported connections among shippers. Likewise, plaintiffs identify no statutory requirement that UPS might have contravened in this regard. Indeed, even the PACT Act (from which UPS is exempt) explicitly relieves non-exempt carriers from any duty to investigate whether a delivery seller on the PACT Act List is using a different name or address to evade delivery restrictions.

Ultimately, plaintiffs ask this Court to impose on UPS a retroactive obligation to treat with suspicion shippers from Native American reservations, or perhaps to refuse service altogether to so-called Indian "smoke shops." While such state-sponsored discrimination would be troubling in any circumstance, plaintiffs' request can and should be denied here for the more

straightforward reason that neither the AOD as written, nor the statutory provisions plaintiffs invoke (to the extent applicable to UPS), require or even permit UPS to refuse to serve businesses just because they are located on Tribal land. To the contrary, federal law *requires* UPS to provide service upon reasonable request, and it cannot now be held liable for discharging this basic statutory obligation in harmony with the obligations actually set forth in the AOD.

**B.     Plaintiffs Are Not Entitled To Any Monetary Or Injunctive Remedy.**

On top of their failure to prove UPS's violation of the AOD or any law, plaintiffs have utterly failed to prove they are entitled to a single dollar of damages or penalties, or to any form of injunctive relief.

Plaintiffs violated their Rule 26 obligations to disclose both their computations of claimed damages and penalties and how they derived those computations. Plaintiffs did exactly what Rule 26 was designed to prevent: they sandbagged UPS by failing to disclose until the first day of trial even the amounts that they intended to seek—and still did not then provide a coherent explanation of how these amounts were calculated. Plaintiffs' shifting trial presentations confirmed that their damages and penalties assessments involved far more than "simple multiplication." UPS could not possibly have derived plaintiffs' calculations on its own. Plaintiffs' flouting of Rule 26 severely prejudiced UPS's ability to prepare a complete defense to plaintiffs' request for monetary remedies and precludes them from recovering any damages or penalties.

Plaintiffs' request for nearly a *billion dollars* in damages and penalties also fails for a more fundamental reason: They failed to adduce competent, admissible, and reliable evidence of their claimed damages and penalties. This record does not contain legally sufficient evidence from which the Court could find the *fact* of compensable injury, let alone the *amount* of damages and/or penalties that could lawfully and constitutionally be imposed against UPS.

Plaintiffs' "evidence" in this respect consists entirely of Court Exhibit 1, which purports to summarize the number and weight of packages shipped by UPS from certain accounts during certain time periods. Yet this summary chart lacks any foundation whatsoever. Plaintiffs supplied only an "attorney proffer" regarding the chart, purporting to describe its contents (while at the same time acknowledging some of its inaccuracies). But plaintiffs offered no witness with personal knowledge to explain how the chart was prepared—not even the unnamed "technical research employee" who, plaintiffs claimed, actually created the chart. Nor, for that matter, did any expert testify regarding plaintiffs' claimed damages and penalties or explain how they were derived. Thus, plaintiffs' entire damages and penalties case rests on an unauthenticated summary chart that both lacks foundation and for which UPS was deprived of the opportunity to subject *anyone* to cross-examination. Indeed, UPS's inability to test the creation, methodologies, contents, or errors and omissions of that chart in the crucible of the adversarial process violates fundamental due process guarantees.

Plaintiffs' damages case suffers from additional fatal flaws. Plaintiffs have presented evidence of actual cigarette shipments with respect to only a limited subset of even the seven shippers or shipper "groups" on which their case now focuses. Trying to cover this deficiency, plaintiffs seek to treat evidence that pertains only to specific shippers as though it were also evidence regarding the other shippers' practices. But plaintiffs cannot substitute evidence as to one shipper as proof against entirely distinct shippers—separate shippers as to which they did not timely seek comparable evidence. As a matter of law, such sheer speculation cannot suffice to demonstrate, as plaintiffs must, UPS's actual transport of packages containing cigarettes for those separate shippers.

Regardless, even if the Court were to consider the improper "evidence" plaintiffs offered regarding the packages of cigarettes UPS supposedly shipped, plaintiffs did not prove the extent of any harm they suffered as a result. Based on his research and years of experience, Dr. Aviv Nevo testified that only between zero and 5.4% of the purchasers of the cigarettes at issue would have purchased NY-tax-paid cigarettes. Plaintiffs, however, offered absolutely nothing to counter this evidence. Nor could they. That destroys their claim for actual "damages" in the form of lost tax revenues.

Plaintiffs' case for penalties is no more tethered to reality than their damages claim. Plaintiffs advance the astounding contention that the State is entitled to penalties for every package UPS accepted from a shipper if UPS has a reasonable basis to believe the shipper might be tendering cigarettes to consumers—even if the packages did not (or could not) contain cigarettes at all. The AOD, however, authorizes a $1,000 penalty only for "violations"—which, as the agreement makes clear, are limited to *knowing* deliveries of cigarettes to individual consumers. The State's effort to expand this provision to cover every package shipped by UPS from specified accounts, regardless of their contents and regardless of UPS's knowledge, would require a wholesale rewriting of the AOD beyond this Court's authority. The Court must enforce the agreement the parties actually signed.

Moreover, the penalties sought by plaintiffs are unconstitutionally excessive and grossly disproportionate to the conduct put in issue at trial. Plaintiffs' entire case rests on a handful of accounts handled by three UPS account executives. The allegedly unlawful shipments earned UPS a mere $5.2 million in total revenue and less than $500,000 in profit. But plaintiffs seek more than $834 *million* in penalties for these shipments. Even if this Court were to conclude that plaintiffs proved that UPS failed to comply with the AOD and/or applicable statutory provisions

*and* that they proved that this failure caused actual damages to plaintiffs, the Court could not order the punitive exaction requested by plaintiffs. It is not authorized by the AOD or any statute, and it would violate constitutional prohibitions on excessive and disproportionate punishment in any event.

Plaintiffs' quest to punish UPS for complying with the parties' contractual agreement is galling in its own right, and unconscionable in light of their own complicity in the conduct about which they now complain. As they do not dispute, plaintiffs sat on information concerning many of the shippers at issue—even though every single time the State or City contacted UPS about possible illegal shipments, UPS immediately investigated and terminated the shipper when unlawful activity was discovered. Plaintiffs, it would appear, preferred to see their ostensible claims for damages and penalties grow in value rather than work with UPS to actually stop any unlawful shipments of cigarettes to individual consumers. They should not now be rewarded for such conduct.

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.      BACKGROUND CONCERNING UPS.**

1.      UPS is the world's largest package delivery company, serving every address in North America and Europe. It has 362,000 employees in the United States, 1.6 million daily pick-up customers, and 8.4 million delivery customers (recipients). UPS has approximately 1,800 operating facilities, and a delivery fleet of 104,926 package cars, vans, tractors and motorcycles, and 237 company-owned aircraft. (DX-600 ¶ 24.)

2.      Thousands of UPS accounts are opened every day for customers, in any of three ways: prospective shippers can open accounts on the internet, at ups.com, they can call 1-800-PICKUPS or they can open an account directly through a member of the UPS sales force. (DX-600 ¶ 31.)

3.      UPS's Corporate Headquarters are in Atlanta, Georgia. In the United States, UPS has two geographic regions and ten geographic districts. UPS operates through a hub and spoke system. "Hubs" are larger facilities that serve as sorting centers for package feeder operations. "Centers" are smaller facilities that serve as sorting centers and are the local facilities that provide pick-up and delivery services to UPS customers. (DX-600 ¶ 25.)

4.      In providing its package delivery services to customers, UPS offers scheduled pick-up services for shippers and a variety of other methods to tender packages for shipment (including on-call pick-up, UPS drop box, The UPS store locations, and others).

5.      UPS receives packages from shippers and then transports and delivers packages to the addresses the shippers provide. The UPS system is designed to achieve the most efficient delivery of packages to customers nationwide and worldwide. After drivers pick up sealed packages from customers and bring them back to a center (or after packages are tendered to UPS through other means), they are sorted and typically placed on a feeder trailer along with other

packages destined for the same hub or center. When packages flow through a hub, they are then sorted and delivered by feeder trailer to the final destination operating center, where they are sorted and then delivered by package car drivers to the ultimate consignee. (DX-600 ¶ 26.)

6.     UPS package car drivers (pick-up and delivery drivers) typically begin their day by delivering the packages that were received into the center the previous afternoon or evening. In the afternoon the package car drivers then perform their scheduled pick-ups, in order to bring packages back to the center. Because drivers are on a tight schedule in order to make all of their pick-ups and get back to the center with all of their packages in time for the evening sort, UPS asks its customers to have their packages sealed, ready, and labelled by the time the UPS pick-up driver arrives. (DX-600 ¶ 27.)

7.     All of UPS's package services are guaranteed for delivery either by the end of a day (e.g., UPS Ground) or by a specific time on a specific date (e.g., UPS Next Day Air Early AM). UPS's operations are planned around providing on-time performance for the highest possible percentage of packages. (DX-600 ¶ 28.)

8.     Except in very limited circumstances not applicable here, UPS shippers do not declare or provide UPS with information regarding the contents of packages. The vast majority of shipments (more than 90%) are processed on electronic shipping systems, such as UPS Worldship, which UPS provides to customers. The shipper inputs "package level detail" regarding the package, including the name and address of the recipient, package weight, package dimensions, requested service level and any requested "accessorial" services (such as declared value or C.O.D.). But there is no field for the contents of the shipment, because package contents have no bearing on the shipping services or charges associated with any given package. Once the shipper inputs the package level detail, he or she can then print a bar-coded label to affix to the

package. UPS customers with sufficient volume may obtain a UPS printer for this purpose. At the end of the day, the shipper "closes out" the shipping system and prints a summary barcode label to provide to the driver. The package level detail is then sent electronically to UPS. The process works in a similar way through other means of shipping, such as UPS Internet Shipping, which is an online shipping system. (DX-600 ¶ 29; Trial Tr. 488:11-18.)

9.      Most of UPS's shippers (particularly commercial shippers) pack their merchandise for shipment in plain corrugated boxes, perhaps with the name and logo of the shipper. Shippers rarely print the package contents on the outside of the box. While UPS reserves the right to inspect package contents, such inspections are conducted only in very rare circumstances, where there is a compelling reason to do so (such as a legal requirement, including UPS's commitments under the AOD). (DX-600 ¶ 30.)

## II.   BACKGROUND CONCERNING THE TAXATION OF CIGARETTES AND LITTLE CIGARS.

10.      New York imposes a tax on all cigarettes for sale in the state, except where the state "is without power to impose such tax." N.Y. Tax Law § 471. Taxes are paid by purchasing and affixing a tax stamp. *See* N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii) ("§ 74.3").

11.      New York's cigarette excise taxes increased significantly in the 2000s. (DX-611 ¶ 17.) On March 3, 2000, New York increased its cigarette tax to $1.11 per pack from 56 cents per pack. (*Id.* ¶ 18.) On April 3, 2002, the State increased the excise tax on cigarettes again, this time to $1.50, where it remained until June 3, 2008, at which time it was increased to $2.75 per pack. (*Id.* ¶ 19.) On July 1, 2010, the State's excise tax on cigarettes was raised to $4.35 per pack, where the tax remains today. (*Id.* ¶ 20 (citing N.Y. Tax Law § 471).) By 2015, New York's cigarette excise tax was $2.72 more than the national average for state cigarette excise taxes. (*Id.*)

12.     For its part, New York City imposed an eight-cents-per-pack tax on cigarettes until July 2002, at which time the city's excise tax was raised to $1.50 per pack, where it remains today. (DX-611 ¶ 21 (citing N.Y.C. Ad. Code § 11-1302(e)).)

13.     Federal excise taxes on cigarettes increased also significantly during the 2000s, leading to an increase in the cost of cigarettes for consumers. (DX-611 ¶ 14.) The federal excise tax on cigarettes increased from 24 cents per pack to 34 cents per pack on January 1, 2000, and then to 39 cents per pack on January 1, 2002. (*Id.* ¶ 15.) Following passage of the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), Pub. L. 111-3, in 2009, the federal excise tax on cigarettes increased from 39 cents per pack to $1.01 per pack effective April 1, 2009, where the tax remains today. (*Id.* ¶ 16 (citing Pub. L. 111-3, Section 703(b)).)

14.     These increases in state, city, and federal cigarette taxes meant that by July 2010, the combined taxes on a pack of cigarettes in New York were $5.36 and in New York City $6.86, a level that is $5.23 more than in the vast majority of locations across the United States, which have neither city nor county taxes. (DX-611 ¶ 22.) Only cigarette consumers in Chicago face a higher tax rate. (*Id.*)

15.     The spike in cigarette taxes for New York consumers undermines the correlation plaintiffs aim to draw between the passage of the PACT Act in 2010 and a supposed increase in shipping from smoke shops. Plaintiffs argue that the PACT Act "drove a surge of business with known cigarette shippers operating from the reservations, which UPS knew." (ECF No. 414-1 at 4, ¶¶ 122-126.) Plaintiffs argue that because the PACT Act barred the U.S. Postal Service from shipping cigarettes, UPS must have known that this "surge of business" from the smoke shops was in the form of cigarettes. (*Id.* at 4, ¶ 623.) But plaintiffs' theory ignores that New York tax rates jumped considerably at nearly the same time as the PACT Act's enactment, driving

Native American tobacco retailers in New York to react to the increased demand for cheaper alternatives to cigarettes by offering a wide range of tobacco products, especially little cigars (DX-611 ¶ 45), which are a less expensive alternative to cigarettes (*id.* ¶ 29 (citing DX-47)). UPS had no reason to doubt assurances it was receiving from Native American smoke shops in New York (as detailed below, *see infra*, FOF, § V(C)) that they were supplying this increased demand for little cigars and other cigarette alternatives.

16.     Little cigars are rolls of tobacco wrapped in leaf tobacco or any substance containing tobacco that resemble cigarettes in size, shape, packaging and an integrated filter. (DX-611 ¶ 24; *see also* Trial Tr. 1584:16-25 ("I can tell you [little cigars] are the most appropriate, easy-to-consume substitute for a cigarette smoker. They look like a cigarette, they feel like a cigarette, they light like a cigarette. They're not a smokeless tobacco product that you put in your mouth and start chewing on leaves of tobacco. No, it's not that. It is in a similar pack, same size, fits in the same pocket, comes out the same way, it's lit the same way, smoked the same way, delivers the same throat hit. . . . It is a total substitute.").)

17.     Like cigarettes, little cigars are sold 20 to a pack and 10 packs to a carton. (DX-611 ¶ 25.) Little cigars also are considerably cheaper than cigarettes, given their much lower manufacturer's cost of production. (*Id.*) The average base price of little cigars is $12 per carton versus $33 per carton on average for discount/non-premium cigarettes and $55 per carton on average for premium brand cigarettes. (*Id.* ¶ 35.)

18.     Additionally, the Cigarette Marketing Standards Act ("CMSA"), N.Y. Tax Law §§ 483-489, mandates a minimum margin that wholesalers must charge retailers on top of the base price for cigarettes, amounting to 3.875% of the base price plus 20 cents per carton of 10 cigarette packs. (DX-611 ¶ 23.) The CMSA also mandates that cigarette retail prices be at least

7% above those wholesale prices. (*Id.*) These CMSA cost additions do not apply to little cigars. (*Id.* ¶ 26.)

19.     Because of their low prices, little cigars proliferated in popularity as cigarette taxes rose in the 2000s and people began seeking cheaper alternatives to taxed cigarettes. (DX-611 ¶¶ 40-42 (citing DX-43 at 11).) Several studies confirm the link between increased taxes and the increased availability of little cigars and other alternative tobacco products, even as cigarette consumption has declined.[1]   In fact, the decision by the Food and Drug Administration to bring cigars under the regulation of the Family Smoking Prevention and Tobacco Control Act by its Center for Tobacco Products on May 5, 2016, (DX-425) (formally published in the Federal Register of May 10, 2016), is due specifically to FDA's research and acknowledgment that various demographic groups continued to use cigars even when there was a broader migration away from cigarettes, especially during the period 2010-2014. ( DX-611 ¶ 44.) And Dr. Sonia Angell, the Deputy Commissioner of the New York City Department of Health and Mental Hygiene, testified that if little cigars cost less than cigarettes, they are one product that cigarette consumers might turn to as an alternative. (Trial Tr. 1363:1-4; *see also* DX-613 ¶¶ 76-84 (concluding that diversion to "non-cigarette products," including little cigars, would be "substantial").)

20.     Before 2009, little cigars were taxed at four cents pack federally and at 46% of the wholesale price in New York, which made them an attractive low-cost alternative to cigarette smokers facing increased cigarette taxes. (DX-611 ¶¶ 31, 32, 41.) In 2009, following the passage of CHIPRA, the federal government began taxing little cigars weighing less than three pounds per thousand as cigarettes. (*Id.* ¶ 31.) In 2010, New York began taxing little cigars weighing

---

[1] *See* DX-466, Gammon, Doris et al., *Effect of price changes in little cigars and cigarettes on little cigar sales: USA, Q42011-Q4 2013*, Tobacco Control (2015); DX-428, Delnevo, C., et al., *Close, but no cigar: certain cigars are pseudo-cigarettes designed to evade regulation*, Tobacco Control (2016).

under 4 pounds per thousand the same as cigarettes, although no tax stamp is required for little cigars, and they are not subject to an additional tax in New York City. (*Id.* ¶¶ 32, 38.)

21.     As confirmed by UPS's unrebutted tobacco market expert, Farrell Delman, and several other eminent researchers, manufacturers of little cigars responded to these tax increases by adding a small amount of weight to their little cigars so that they would qualify as large cigars for tax purposes. (DX-611 ¶ 33; DX-466 at 1; DX-428 at 1; DX-434 at 567.) For example, researcher Doris Gammon explained that "during 2000–2011, cigarette consumption decreased by 32.8%, while large cigar consumption increased by 233% and little cigar consumption decreased by 65%," but "[t]he decrease in little cigar sales and increase in large cigar sales following CHIPRA was most likely not because consumers changed preferences, but rather the result of manufacturers manipulating the weight of little cigars so they would qualify as large cigars for tax purposes." (DX-466 at 1.)

22.     In addition to lower taxes, little cigars are also not subject to the minimum price requirements of the CMSA. (DX-611 ¶ 26.) Noting the popularity of little cigars, New York City has mandated, since 2014, that little cigars be sold in packs containing at least 20 little cigars for a minimum price of at least $10.50 per pack. (*Id.*) But this New York City price floor was not in effect before 2014. (Trial Tr. 1362:11-14.) Thus, given the lower base price and lack of any price floor requirements before 2014, even if little cigars are taxed the same as cigarettes (and they often are not), they are still much cheaper than cigarettes. (DX-611 ¶ 35.) In addition, little cigars are not required to bear tax stamps. (*Id.* ¶ 27.)

23.     The cross elasticity of cigarettes and little cigars is evident in the academic and government literature. (*See* DX-613 ¶¶ 79-81 (citing DX-434, DX-453 and DX-466).) Although there is no New York-specific data measuring the consumption of little cigars, data from the

Centers for Disease Control ("CDC") shows that, as cigarette use declined, the consumption of little cigars, including large "little cigars" after CHIPRA, increased. (*See* DX-434 at 567.) In particular, CDC data reviewed by Dr. Aviv Nevo, UPS's economics expert, shows that cigarette usage declined from about 435 billion units in 2000 to about 293 billion units in 2011, or almost 33%. (*Id.* at 567, Table 1.) Over the same period, little cigar consumption increased from about 2.2 billion units in 2000 to about 5.9 units in 2008, or by 159%, before dropping off precipitously after CHIPRA. (*Id.* at 567, Table 2.) Beginning in 2009, consumption of large cigars, most of which were really just reformulated slightly heavier little cigars, jumped by 73%, from about 5.6 billion units in 2008 to about 9.8 billion units in 2009, the year CHIPRA was enacted, to about 13 billion units in 2011. (*Id.*) In total, the consumption of little cigars and large cigars, many of which were reformulated little cigars after 2008, increased from 2.2 billion in 2000 to 13.7 billion in 2011, a 522 % rise, as consumption of cigarettes correspondingly decreased. (*Id.*)

24.     In addition, the Gammon study referenced above found that sales of little cigars in convenience stores and food drug mass market stores increased by 27% following a 10% increase in cigarette prices. (DX-613 ¶ 81 (citing DX-466 at 3).) And the 2012-2013 National Adult Tobacco Survey, also reviewed by Dr. Nevo, found usage patterns entirely consistent with diversion from cigarettes to little cigars. (*Id.* ¶ 83 (citing DX-454).) This study found that more than 80% of survey respondents who report smoking "little filtered cigars" are current or former cigarette smokers. (*Id.*)

25.     Indeed, even the New York legislature and public health officials have recognized and responded to the increased popularity of little cigars. During the 2009-2010 session, the New York Assembly and New York Senate each considered legislation that would have amended the

definition of cigarettes in Tax Law Section 471 to include filtered cigars. *See* An Act to Amend the Tax Law, in Relation to Little Cigars, Assembly Bill A9015 (DX-47); Senate Bill S5984A (DX-553). The Assembly sponsor recognized that "little cigars are practically indistinguishable from cigarettes and are often consumed as less expensive alternatives." (DX-47 at NYUPS00003232.) Accordingly, "[i]t makes sense to level the playing field." (*Id.*) Although the bills are both still active, the Assembly and Senate each referred the proposed legislation to committee in 2010, and there has been no activity since. On January 6, 2015, however, the New York Senate introduced additional legislation, S00702; if enacted, the legislation would change the definition of cigarette in Tax Law Section 470 to include "any roll for smoking containing tobacco wrapped in a substance containing tobacco that weighs no more than four and a half pounds per thousand unless it is wrapped in whole tobacco leaf and does not have an internal filter." (DX-552 at 1-2.) The last action on S00702 was a referral to the Senate Health Committee on January 7, 2016.[2]

26. For its part, as explained above, New York City has mandated, since 2014, that little cigars be sold in packs containing at least 20 little cigars for a minimum price of at least $10.50 per pack. (DX-611 ¶ 26.) Dr. Angell, the City's Deputy Commissioner of the Department of Health and Mental Hygiene, testified that this price floor was enacted because the City was "concerned about any low-price products in the marketplace" and was "look[ing] for ways to decrease use, and increasing the cost of those products is a way to do that." (Trial Tr. 1364:5-12, 18-24.) In 2013, the City also added a question about little cigars to its annual survey that asks people what tobacco products they use. (*Id.* 1364:25-1365:8.) Dr. Angell testified that little

---

[2] Courts routinely take judicial notice actions of state legislatures and of records reflected on governmental websites. *See, e.g., In re Penn Cent. Transp. Co.*, 494 F.2d 270, 282 (3d Cir. 1974) (taking judicial notice of state legislative solutions under active consideration); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

cigars were added to the survey because the City "recognize[d] [little cigars] as a product people use on the marketplace." (*Id.* 1365:15-21.)

27.     Given that (i) little cigar use proliferated in the 2000s as cigarette taxes skyrocketed, especially in 2009 and 2010 after the passage of CHIPRA and amended New York Tax Law § 470, and (ii) Native Americans responded by offering filtered cigars and other alternative tobacco products for sale, it is simply not reasonable to conclude, as plaintiffs do, that UPS must have known that the Native American tobacco retailers must have been shipping illegal cigarettes after the enactment of the PACT Act in March 2010. (DX-611 ¶ 53.) To the contrary, given the extreme similarity of little cigars and cigarettes, the documented growing popularity of little cigars as the price of cigarettes rose and demand for cigarettes decreased, it was more than reasonable for UPS to believe Native American retailers when they told UPS they were shipping little cigars. (*Id.*; *see generally infra*, FOF, § V(C).)

28.     It is also not reasonable to conclude, as plaintiffs do, that consumers would have switched entirely to other NY-tax-paid cigarettes if UPS had never shipped the cigarettes at issue. As explained below (*see infra*, ¶¶ 527-535), Dr. Nevo concluded, based on his research and years of experience, that only between zero and 5.4% of the purchasers of the cigarettes at issue would have purchased NY-tax-paid cigarettes. Dr. Nevo further concluded that diversion from the cigarettes at issue to NY-tax-paid cigarettes could be even lower because demand may also be substantially diverted to (i) non-cigarette tobacco products including cigars, little cigars, roll your own tobacco and snuff; (ii) non-tobacco nicotine products such as gum, patches, and e-cigarettes; or (iii) some consumers will quit using all such products. (DX-613 ¶ 75.)

### III.    THE OCTOBER 21, 2005 ASSURANCE OF DISCONTINUANCE BETWEEN UPS AND THE ATTORNEY GENERAL.

29.    In 2000, New York prohibited common carriers from knowingly delivering cigarettes to consumers and other unauthorized consignees. N.Y. Pub. Health L. ("PHL") § 1399-*ll*.

30.    Most provisions of PHL § 1399-*ll* were originally scheduled to take effect on November 14, 2000; the provision that restricts carriers' services, subdivision (2), was scheduled to take effect on January 1, 2001. *See* 2000 N.Y. Sess. Laws, Ch. 262, § 13. But due to litigation brought by cigarette sellers, PHL § 1399-*ll* did not take effect until April 10, 2003, when the Second Circuit issued its mandate in *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003). (*See* DX-23 ¶ 4.) *See also New York State Motor Truck Ass'n v. Pataki*, No. 03 CV 2386 (GBD), 2004 WL 2937803, at *2 (S.D.N.Y. Dec. 17, 2004).

31.    On August 6, 2004, the New York Attorney General's Office served a subpoena upon UPS, seeking information concerning UPS's compliance with PHL § 1399-*ll*. (DX-5.) The Attorney General's Office served a second subpoena upon UPS as part of the same investigation in 2005. (DX-14.)

32.    At the time of the investigation, UPS and other carriers had a strong but not yet tested legal defense to the enforcement of PHL § 1399-*ll*, based on the argument that the Federal Aviation Administration Authorization Act preempted the law as applied to carriers. While no court had invalidated laws such as PHL § 1399-*ll* at the time of the Attorney General's investigation of UPS, carrier associations had initiated litigation challenging PHL § 1399-*ll* and a similar law enacted in Maine. Although the carriers voluntarily dismissed the challenge to PHL § 1399-*ll*, the Supreme Court later ruled unanimously that key portions of Maine's law were

preempted. *See generally New York State Motor Truck Ass'n*, 2004 WL 2937803, at *2; *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008).

33.    UPS chose to enter into an Assurance of Discontinuance (DX-23) with the New York Attorney General despite its position that PHL § 1399-*ll* was preempted by federal law. Because UPS had strong legal defenses to the Attorney General's investigation, UPS's decision was based not on the viability of the Attorney General's allegations that UPS violated PHL § 1399-*ll*, but on UPS's business decision to enact a uniform, nationwide policy concerning cigarette shipments and its desire to cooperate with law enforcement to curtail allegedly unlawful cigarette deliveries. UPS's decision is reflected in various provisions of the AOD, including paragraph 9 (in which UPS denies the Attorney General's allegations that UPS violated PHL § 1399-*ll*), paragraph 15 (which reflects UPS's business decision to enact a new tobacco policy), the "whereas" clause on page 5 (which reflects UPS's and the Attorney General's desire to cooperate to ensure compliance with PHL § 1399-*ll*), and paragraphs 45-47 (which preserve UPS's right to challenge PHL § 1399-*ll* as preempted by federal law, and which set forth procedures for the termination of the AOD in the event PHL § 1399-*ll* is found to be preempted). (DX-23 ¶¶ 9, 15, 45-47.)

34.    Through the National Association of Attorneys General ("NAAG"), states other than New York worked to reach an agreement with UPS that included everything states across the country wanted the agreement to include. NAAG approached UPS in February 2005, requesting UPS's and other carriers' help in curtailing cigarette delivery sales. (DX-11 at 1.) UPS ultimately agreed to change its policy to prohibit the delivery of cigarettes to consumers nationwide, just as NAAG had hoped. (DX-23.) Substantially all of the procedures NAAG

sought from UPS and other carriers were included in the AOD UPS signed with the New York Attorney General. (*See* DX-15.)

## IV.     UPS HAS COMPLIED FULLY WITH THE AOD.

### A.     UPS Immediately Complied With Its Initial Obligations Under The AOD.

35.     In compliance with ¶ 18 of the AOD, UPS amended its Terms and Conditions of Service and its General Tariff Containing the Classifications, Rules and Practices for the Transportation of Property ("the UPS Tariff") to include its tobacco policy. (DX-35 at Exs. A-B; DX-600 ¶ 42.) Similar language was included in UPS's Terms and Conditions of Service. (DX-35 at Ex. A.) Both UPS's Terms and Conditions of Service and the UPS Tariff were posted on the UPS website, http://www.ups.com, on November 21, 2005. (DX-35 at UPS00087191 & Exs. A-B; DX-600 ¶ 42.)

36.     In compliance with ¶ 20 of the AOD, UPS revised its delivery policies and procedures for Cigarettes in accordance with the AOD. In addition to the changes to UPS's Terms and Conditions, the UPS Tariff and the Agreement for Transportation of Tobacco Products, UPS revised its Tobacco Products Transportation Procedures Manual ("the Tobacco Manual"), which provides guidance on UPS's tobacco policies for those UPS employees responsible for implementing and abiding by such policies. (DX-35 at UPS00087192 & Ex. D; DX-600 ¶ 55.)

37.     In compliance with ¶ 21 of the AOD, by October 21, 2005, UPS compiled a list that includes UPS customers that UPS believes may be Cigarette Retailers. (DX-35 at UPS00087192-93 & Ex. E; DX-8; DX-371; DX-600 ¶¶ 14, 36, 47, 63-64.) In compliance with ¶ 22 of the AOD, on November 18, 2005, counsel for UPS performed a Google search to identify additional shippers who list UPS as a carrier for Cigarettes shipped to Individual Consumers. (DX-35 at UPS00087193 & Ex. F; DX-44; DX-600 ¶¶ 65-67.) UPS thereafter engaged the law

firm King & Spalding to conduct the same kind of Google searches to identify additional shippers who list UPS as a carrier for Cigarettes shipped to Individual Consumers. (Trial Tr. 299:2-24.) King & Spalding conducted such searches until 2010, more than a year after UPS's obligation to conduct such searches expired under the AOD. (DX-600 ¶¶ 65-67.)

38.     In compliance with ¶ 23 of the AOD, UPS wrote to Cigarette Retailers it identified through the efforts described above. The letters UPS sent to identified Cigarette Retailers indicated that UPS no longer transports Cigarettes to Individual Consumers and does not accept such shipments for delivery. (DX-35 at UPS00087193 & Ex. G; DX-600 ¶ 14.)

39.     In compliance with ¶ 25 of the AOD, UPS began maintaining a database that includes information regarding Cigarette Retailers. The database includes all of the information that ¶ 25 of the AOD requires UPS to maintain. As ¶ 41 of the AOD requires, UPS preserves the information included in the database for five years. (DX-35 at UPS00087194; DX-600 ¶¶ 14, 22, 36, 63-64; DX-8; DX-371.)

40.     In compliance with ¶ 34 of the AOD, UPS revised its Tobacco Manual, which provides guidance on UPS's tobacco policies for those UPS employees responsible for implementing and abiding by such policies. UPS posted the Tobacco Manual on its internal website, available for exclusive review by UPS personnel, on or about October 28, 2005. (DX-35 at UPS00087194 & Ex. D; DX-600 ¶ 55; DX-129; DX-203.)

41.     In compliance with ¶ 35 of the AOD, on November 21 and 28, 2005, UPS issued PCMs to UPS drivers, sorters and pre-loaders to help ensure that these personnel are actively looking for indications that a package contains Cigarettes being shipped to an Individual Consumer, alerting UPS management of such packages and attempting to intercept such packages. The PCMs also instruct drivers not to deliver packages that contain Cigarettes being

shipped to Individual Consumers, and to alert UPS management if they know or believe that a business is engaged in shipping Cigarettes to Individual Consumers. (DX-35 at UPS00087194 & Ex. H; DX-600 ¶¶ 52-53; DX-110; DX-157; DX-208; DX-209; DX-348.)

42. In compliance with ¶ 37 the AOD, UPS also informed its account executives that UPS's tobacco policy has changed, and that UPS revised its Tobacco Manual to reflect that policy. UPS advised its account executives to review the Tobacco Manual in order to understand and assist in the enforcement of UPS's tobacco policy. (DX-35 at UPS00087195; DX-600 ¶¶ 11, 37, 52-54, 56-59.)

**B.      UPS Has Continued To Comply With The AOD Without Interruption Since 2005.**

43. Since entering into the AOD, UPS continues to administer and enforce a nationwide policy prohibiting the shipment of cigarettes to consumers. UPS administers and enforces its tobacco policy in multiple ways, including:

a.   Since 2005, UPS has set forth substantially the same tobacco policy, as required by the AOD. (DX-600 ¶¶ 33, 42; DX-35 at Exs. A-B; DX-49.)

b.   Shippers who ship tobacco products to consumers via UPS must comply with the Agreement for Transportation of Tobacco Products ("Tobacco Agreement"). UPS incorporates the tobacco policy into the Tobacco Agreement, which states that "UPS does not provide service for shipments of cigarettes to consumers." (DX-521 at 4; DX-600 ¶ 39.) *This aspect of UPS policy is not required by the AOD*. While the AOD requires that UPS include the tobacco policy in agreements signed by shippers who ship cigarettes (DX-23 ¶ 18), UPS does so (DX-521 at 4; DX-600 ¶ 39), nothing in the AOD requires any particular shipper, whether of cigarettes or other tobacco

25

products, to sign a Tobacco Agreement. Instead, it was UPS's choice to require Tobacco Agreements for all shippers who shipped tobacco products to consumers, and to make such shipments a contract-only service.

c. UPS notifies shippers it believes to be cigarette retailers of its tobacco policy. (DX-35 at Ex. G.)

d. In addition, in 2013, UPS agreed to voluntarily follow the PACT Act List, and to refuse service to entities on the List. (DX-810.) Accordingly, UPS added in its 2013 Tariff/Terms and Conditions of Service that it "does not provide pick-up service from any person or entity included in the Bureau of Alcohol, Tobacco, Firearms and Explosives PACT Act - Non-Compliant List." (DX-242 ¶ 3.16.; DX-600 ¶¶ 102-103; DX-200; DX-201; DX-205.) As with UPS's use of Tobacco Agreements, *this aspect of UPS policy is not required by the AOD*.

44. UPS has also conducted audits of shippers any time it had a reasonable belief that the shippers may be delivering cigarettes to consumers. (DX-600 ¶¶ 68-140.) Of the 28 audits UPS conducted, 22 found no cigarettes at all. (*Id*.) In the few times that UPS's audits did uncover evidence that a shipper was tendering packages containing cigarettes to UPS in violation of UPS's tobacco policy, UPS terminated service to the shipper. (*Id*.) The following table illustrates the audits of those shippers that plaintiffs have put at issue in this case that UPS conducted pursuant to the AOD or otherwise:

## Tobacco-Related Audits Conducted

| | # | DATE | SHIPPER | RESULT | TRIAL EXHIBIT |
|---|---|---|---|---|---|
| **No tobacco** | 1 | 04/02/14 | Fow[3] | Toy car | DX-287 |
| | 2 | 05/05/14 | EExpress | Coffee | DX-303 |
| | 3 | 05/06/14 | EExpress | Coffee | DX-311 |
| | 4 | 01/14/14 | Seneca Promotions | No tobacco | DX-363 |
| **Other tobacco products (no cigarettes or little cigars)** | 5 | 09/15/11 | American Thrust | Loose tobacco, empty cigarette tubes | DX-121 |
| | 6 | 05/21/14 | Big Buffalo | Pipe tobacco | DX-315 |
| | 7 | 05/22/14 | Big Buffalo | Pipe tobacco | DX-316-317 |
| | 8 | 06/12/14 | Lake Erie | Pipe tobacco, chewing tobacco and e-cigarettes to businesses/consumers | DX-366 |
| **Little cigars (exclusively or with other tobacco products)** | 9 | 07/10/13 | Native Outlet | Filtered cigars | DX-194 |
| | 10 | 10/08/13 | AJ's Cigar | Filtered cigars | DX-219 |
| | 11 | 10/08/13 | Post Smokes | Little cigars | DX-221-222 |
| | 12 | 01/08/14 | Native Outlet | Little cigars | DX-244 |
| | 13 | 01/28/14 | Wholesale Direct | Cigars, filtered cigars, potato chips and candy | DX-263 |
| | 14 | 01/28/14 | RJESS | Little cigars | DX-265 |
| | 15 | 01/30/14 | RJESS | Little cigars | DX-264 |
| | 16 | 04/03/14 | Fow | Swisher Sweets and filters | DX-287 |
| | 17 | 06/11/14 | Sweet Seneca Smokes | Little cigars | DX-327 |
| | 18 | 10/06/15 | Native Outlet | Little cigars | DX-375 |
| | 19 | 01/14/16 | Native Outlet | Little cigars, tobacco leaf wrapper | DX-363 |
| | 20 | 04/27/16 | Native Outlet | Little cigars | DX-421 |
| | 21 | 04/27/16 | Sweet Seneca Smokes | Assorted tobacco products, no cigarettes | DX-422 |
| | 22 | 07/10/16 | Sweet Seneca Smokes | Assorted tobacco products, mainly filtered cigars | DX-429 |
| **TERMINATED (mix of little cigars and cigarettes)** | 23 | 01/08/14 | Shipping Services | Filtered cigars and cigarettes – TERMINATED | DX-244 |
| | 24 | 01/22/14 | Smokes & Spirits | Cigarettes, chewing tobacco and cigars – TERMINATED | DX-257 |
| **TERMINATED (cigarettes only)** | 25 | 09/21/12 | Indian Smokes | Cigarettes – TERMINATED | DX-161 |
| | 26 | 09/21/12 | Bearclaw | Cigarettes – TERMINATED | DX-165 |

[3] While many of these shippers are no longer at issue in the case (because the City and State have abandoned their claims as to such shippers), plaintiffs nevertheless continue to pursue recovery for shippers that UPS has audited repeatedly and found only little cigars and other tobacco products (e.g., Sweet Seneca Smokes and Native Outlet).

| # | DATE | SHIPPER | RESULT | TRIAL EXHIBIT |
|---|------|---------|--------|---------------|
| 27 | 04/17/14 | Two Pine | Cigarettes – TERMINATED | DX-293-297 |
| 28 | 06/12/14 | EExpress | Cigarettes – TERMINATED | DX-326 |

45.     UPS continues to maintain a database that includes information regarding potential cigarette retailers. (DX-8; DX-371; DX-600 ¶¶ 14, 22, 36, 47, 63-64.)

46.     UPS continues to maintain its Tobacco Manual, which provides, among other things, that "[s]hipments of cigarettes to end consumers are not accepted under any circumstances." (DX-22 at 1.)

47.     UPS also continues to issue Prework Communications Meetings ("PCM") to employees, including UPS drivers, sorters and pre-loaders, to ensure that they understand and follow the UPS tobacco policy. (DX-35 at UPS00087194 & Ex. H; DX-600 ¶¶ 52-53; DX-110; DX-157; DX-208; DX-209; DX-348.) This is precisely the format specified in the AOD. Before 2016, the PCM was delivered personally by each center management team on at least an annual basis. (Trial Tr. 247-248; 733; 1382-83; 1430-31.) The tobacco PCM is now delivered on an annual basis to drivers via their hand-held DIADs. (Trial Tr. 248.)

48.     UPS drivers understood that UPS could not accept cigarettes. (Potter Tr. 9:13-10:3; Cintron Tr. 43:21-25; Haseley Tr. 34:4-6; Logan Tr. 67:14-17; Sheridan Tr. 33:5-10.)

49.     UPS continues to train its account executives and other employees to ensure that they understand and follow the UPS tobacco policy. This included enhanced training to account executives from 2011 to 2014 that reinforced UPS's prohibition on the shipment of cigarettes to consumers. (DX-120 (September 16, 2011 memorandum to New York account executives); DX-211-213 (September 2013 nationwide memorandum regarding tobacco policy and PACT Act); DX-347-348; DX-350-351 (September 2014 enhanced procedures in New York).) Testimony from UPS account executives and Inside Sales Representations demonstrates that

UPS's training was effective. (DX-603 ¶¶ 13-14; DX-602 ¶¶ 16-25, 30; DX-604 ¶¶ 13-17.) The sales team understood UPS's policy and explained UPS's policy to their customers. (DX-600 ¶¶ 57, 58, 60.)

50.      UPS's AOD remains active; UPS has never renounced it or limited its policies and practices designed to curtail cigarette deliveries to consumers by eliminating certain states or jurisdictions from the scope of UPS's policies and practices. The AOD applies nationwide, and UPS applies policies to block cigarette deliveries nationwide. (DX-600 ¶¶ 13-15.)

51.      UPS has also continued to cooperate with law enforcement authorities to curtail the shipment of cigarettes to consumers. Plaintiffs have not identified any instance in which UPS did not cooperate with a request from any governmental entity regarding alleged illegal cigarette shipments. Examples of cooperation include:

    a.  At least six times since 2010, UPS informed the City about suspicious packages that turned out to be unstamped cigarettes. (*See* Grayson Tr. 99:6-19.)

    b.  On numerous occasions, UPS notified the State about packages containing cigarettes, only to be told to complete the shipment. Between 2008 and 2011, UPS security personnel met with investigators from New York State's Department of Taxation and Finance concerning cigarette shipments—including Arrow brand cigarettes, which plaintiffs claim the shipper Mohawk Spring Water was shipping. (DX-392.) UPS contacted DTF about these shipments, and DTF instructed UPS to complete the shipments. (*Id*.)

c. In January 2011, UPS corporate security contacted DTF about Smokers Club, Inc., located in Salamanca, NY, and offered to work with DTF agents to curtail the shipper's shipments through UPS. (DX-393.)

d. In April 2011, UPS contacted New York State Trooper Al Nitti concerning shippers near UPS's facility in Potsdam, NY. (This incident is described in more detail below.) (DX-612 ¶¶ 5-7.)

e. On February 15, 2011, the New York Attorney General's Office contacted UPS concerning the shipment of one package containing cigarettes to a New York residential address. (DX-66; DX-605 ¶ 8.) UPS investigated, and then informed the Attorney General's Office that the shipment was the result of a cigarette retailer shipping a package containing cigarettes through The UPS Store #1338 ("the Center"), located in Blasdell, NY. The retailer lied to the Center clerk, telling him that the package contained personalized mugs. After learning about the incident, UPS immediately terminated service to the cigarette retailer, whether he attempted to ship packages through UPS directly or through the Center. UPS took other action to ensure that neither the retailer nor the Center nor any other The UPS Store in NY ship packages containing cigarettes in the future. On February 23, 2011, The UPS Store franchisees in New York were informed that they may not provide service to the particular cigarette retailer, through a notation in an electronic database of shippers who have used the Center in the past. UPS, through its subsidiary Mail Boxes Etc., Inc. ("MBE"), discussed this violation with the owner and employees of the Center, learned how the violation occurred, re-emphasized UPS's policy

prohibiting the shipment of cigarettes to consumers, and asked the Center employees to be alert for customers who may be attempting to violate UPS policy. UPS also audited the Center. None of the packages UPS audited contained cigarettes or other tobacco products. (DX-69; DX-605 ¶ 9.)

f.   On February 13, 2012, the New York Attorney General's Office contacted UPS, and alleged that UPS delivered a package containing cigarettes to a California resident on behalf of a shipper named Don Doctor. (DX-133; DX-605 ¶ 11.) After investigating the incident, UPS informed the Attorney General's Office that the shipment at issue was delivered on May 17, 2011. Although the package showed a return address for an individual named Don Doctor (7 Lincoln Ave., Silver Creek, NY 14136), the package was shipped using the account number for Evans Emergency Equipment Inc. (8542 Erie Rd., Angola, NY 14006-9612). A UPS account executive verified that Evans Emergency Equipment is not in the business of shipping cigarettes or other tobacco products. Apparently, Mr. Doctor tendered the shipment to Evans Emergency Equipment, which shipped the package using its own UPS account number. Evans Emergency Equipment did not know, and had no reason to know, that the package contained cigarettes. Nevertheless, UPS terminated service to Evans Emergency Equipment for violating UPS's Terms and Conditions of Service, which prohibit shippers from permitting third parties to use their UPS account number to ship packages. (DX-138; DX-605 ¶ 12.)

g.  In August 2011, the NY AG notified UPS about American Thrust Tobacco, a
shipper that was on the PACT Act List, unbeknownst to UPS. (DX-109.) In
response to the notice from the NY AG, UPS audited American Thrust,
discovered that the shipper was not shipping cigarettes, and explained as much
to the NY AG. (Trial Tr. Trial Tr. at 1057:10-1060:3; DX-109; DX-110.)

**C.  UPS Has Also Adopted Enhanced Compliance Measures Going Above And
Beyond The AOD's Requirements.**

52.  UPS also enhanced its compliance program substantially in 2014 and in 2016,
going above and beyond the AOD's requirements. (DX-600 ¶¶ 141-144.)

53.  The 2014 enhancements to UPS's compliance program focused on seven areas:
Employee Training, New Account Setup, Customer Requirements, Data Analytics, the UPS Help
Line, Investigation, and Monitoring & Auditing. The components were designed based on input
from employees in Internal Audit, Compliance, and Ethics and its Dangerous Goods groups.
(DX-347 at 1.)

54.  As part of the 2014 compliance enhancements, each new tobacco account is now
subject to pre-cleared review. Sales employees are required to contact the UPS Help Line
regarding each new account, initiating a review by a Dangerous Goods manager who looks at the
company's account information, its internal tobacco compliance program, the existence of
required licenses, a review of the potential customer's website (and any social media accounts), a
check for any FDA warning letters or other issues with a government agency, and a comparison
with the PACT Act List. (DX-351 at 2; DX-347 at 1-2; DX-355 at 5; DX-600 ¶ 144; DX-601
¶ 13.)

55.  UPS also began conducting a data analytics review, on a weekly and monthly
basis, to try to identify any shippers that might be in violation of the UPS tobacco policy. As part

of the review, UPS employees review the results of a nationwide data query that attempts to pull any new shippers with a name suggesting tobacco sales, or that is shipping a significant volume of packages from a low tobacco tax jurisdiction (such as Virginia) to a high tobacco tax jurisdiction (such as New York). The employees also investigate all new accounts opened in a zip code that includes a Native American reservation in New York to determine if it is a tobacco shipper. UPS conducts a similar process regarding all accounts in 31 "high risk" zip codes. (DX-601 ¶ 14.)

56. UPS has also increased its review of existing tobacco accounts. UPS added two key provisions to the existing Tobacco Agreement:

    a. "Shipper shall develop, implement, and maintain a compliance program ('Shipper Compliance Program') to ensure that Shipper and its consignees are compliant with all laws and regulations that apply to the sale, purchase, shipment, transportation, delivery, receipt, possession, distribution, and importation of Tobacco Products." (DX-347 at 2; DX-440 ¶ 4.)

    b. "UPS shall have the right to demand from Shipper evidence that Shipper has complied with all applicable laws and regulations. UPS shall also have the right to audit Shipper at any time and for any reason." (DX-347 at 2; DX-440 ¶ 7.)

57. UPS distributed a compliance reminder letter to known tobacco shippers in New York. The letter emphasized the customer's responsibility to comply with local, state, and federal laws. (DX-601 ¶ 13.)

58. The compliance reminder letter was sent to a list of tobacco shippers developed from data analytics and queries to the sales force. (DX-600 ¶¶ 36, 63-64; DX-8; DX-371.)

59.     UPS's compliance team now does a monthly review of claims data to determine whether there is any indication of prohibited shipments, particularly anything identified as a cigarette. So far, the review has found only a few isolated violations. (DX-601 ¶ 15.)

60.     The compliance team also runs quarterly data queries of accounts in "high risk" zip codes, attempting to validate package characteristics and searching for any names containing "tobacco," "smoke," or "cig." All accounts located within zip codes containing a Native American reservation were pulled and package characteristics were individually reviewed to spot any potential to ship tobacco. The team also did searches based on the PACT Act list. (DX-355 at 10.)

61.     UPS distributed a Pre-work Communication Meeting and Memorandum to all of its operations centers in New York. The memos introduced the Tobacco Compliance Program Enhancements detailed above. The PCM also asked drivers and others to look out for "Red Flags," as displayed on a poster that was posted in all New York facilities. The memos also asked employees to call in any suspicious activity to the UPS Help Line. (DX-601 ¶ 13; DX-347 at 1; DX-208; DX-430.)

62.     UPS also distributed a Sales Employee Pre-clearance Memorandum, which provides the sales force with the information set out above concerning UPS's new pre-clearance procedures for opening any potential tobacco account. ((DX-601 ¶ 13; DX-347 at 1; DX-351.) And UPS had telephone discussions with Region Managers, District Managers, Directors of Sales, and Directors of Marketing to ensure that they were aware of the compliance enhancements. (DX-355 at 7.)

63.     UPS's communications to employees about these enhancements included encouraging employees to share information or concerns through UPS's Help Line. Any calls are

traceable to centers (though employees can choose to remain anonymous). Resolution of any issues or concerns raised through the Help Line is required. Documents concerning any such calls are retained. (DX-355 at 12.)

64.     Finally, UPS added more management oversight to its tobacco policy compliance program. A Group Manager in the Audit Group now completes a monthly review of the tobacco policy compliance procedures with the Vice President of Corporate Internal Audit, Compliance & Ethics. (DX-355 at 13.)

65.     These enhanced compliance programs resulted in the discovery and termination of several shippers that the plaintiffs initially included in this lawsuit, but later dropped. (*Compare* DX-384 at 3 n.1 (November 2015 State interrogatory response listing Big Buffalo, Cloud & Co., and Lake Erie Tobacco Co. as shippers about which it was suing) *with* DX-355 at 15 (noting that all three accounts had been discovered by UPS's data analytics and terminated in September 2014).)

66.     In April 2016, UPS's Compliance & Ethics and Dangerous Goods functions conducted an in-person tobacco compliance review at UPS's operations centers in Upstate New York. The goal was to ensure that the facilities were following UPS tobacco compliance processes. The review was conducted in UPS's centers in Olean, Syracuse, Rome, Dunkirk, Niagara Falls, Jamestown, Batavia, Buffalo, Potsdam and Lockport, New York—centers that serve Indian reservations in New York State. (*See* DX-600 ¶ 143; DX-601 ¶ 16.)

67.     The review was conducted by Derrick Niemi and Sean Devine from the Internal Audit, Compliance, and Ethics group, and Jeff Cantrell and Brad Cook from the Dangerous Goods group. (DX-600 ¶ 143; DX-601 ¶ 16.)

68. The procedures conducted by Niemi, Cantrell, Devine, and Cook included the following:

   a. Personally delivering the PCM concerning UPS's tobacco policy to drivers in each center;

   b. Training the Center Management Team concerning UPS's tobacco policy;

   c. Training the sales team in each center concerning UPS's tobacco policy;

   d. Conducting "ride-alongs" with drivers in each center, to emphasize UPS's training messages and to learn about any potential tobacco shippers on a driver's route;

   e. Conducting comprehensive audits of packages picked up by the center and documenting any that contained tobacco. (DX-600 ¶ 143; DX-601 ¶ 16.)

69. These in-person compliance reviews are intended to be an annual process going forward. (DX-601 ¶ 16.)

## V. FACTS CONCERNING THE SHIPPERS AT ISSUE.

### A. UPS Account Executives Or Inside Sales Representatives Worked With Shippers To Ensure Compliance With UPS Policy.

70. The UPS customers at issue were located on one of four Native American Reservations in Upstate New York: the Seneca Cattaraugus Reservation, the Seneca Allegany Reservation, the Tonawanda Reservation, and the Mohawk/St. Regis Reservation. The accounts were serviced by the UPS Dunkirk, Olean, Batavia, and Potsdam Centers, respectively.

71. Each of the shippers was assigned a "patch-of-land" account executive or an inside sales representative, based on the geographic territory in which a shipper is located. Under the patch-of-land system, which was implemented in late 2010, patch-of-land account executives were assigned to UPS Centers and became responsible for lower volume accounts (those with

under $300,000 in annual revenue) located in the geographical areas served by those UPS Centers. Patch-of-land account executives typically were assigned a large number of accounts because of the relatively low volume of each individual account. Some of the accounts were also assigned inside sales representatives. Inside sales representatives operate out of centralized locations and typically provide support to their customers by phone, and support to the patch-of-land account executives. (DX-600 ¶ 34; DX-602 ¶ 5.)

72.     As detailed below, the account executives or inside sales representatives assigned to work with the shippers consistently explained to the shippers UPS's cigarette policy and worked to ensure that the shippers complied with it. (*See generally infra*, FOF, § V(C).)

73.     UPS account executives and inside sales representatives did not have a motive to allow accounts to ship cigarettes; the opening or closing of any one account was unlikely to impact their compensation and would not be worth risking their job or pension. (Trial Tr. 776:1-5.) Approximately 85-90% of a sales representative's compensation is guaranteed base pay, unaffected by cancelations, volume, or revenue. (Trial Tr. 466:19-21.) The other 10-15% is derived from their Sales Incentive Program ("SIP"), which measures the total revenue generated by all of their accounts in a given year. (DX-602 ¶ 12; Trial Tr. 467:5-8.) By design, account executives and inside sales representatives have a large number of small accounts—upwards of 4,500 generating no more than $300,000 per year in revenue. (DX-602 ¶ 5.) Thus, the loss of any individual account is unlikely to have a material impact on their SIP. (Trial Tr. 776:1-5.) For example, the combined Arrowhawk accounts, which were among Mr. Keith's largest, combined to generate only 2% of the daily revenue in his plan—$635 of $28,000. (Trial Tr. 778:6-12; PX-344.) Most individual accounts were even smaller. Mr. DelBello's request to have the Two Pines account removed from his plan was rejected because it only accounted for less

than half of one percent of his overall plan: it was too small to be removed. (Trial Tr. 863:19-21; DX-604 ¶ 41; PX-365.) Thus, the loss of an account would have no impact on 85-90% of an account executive's or inside sales representative's compensation and only a negligible impact on the remaining 10-15% of their SIP.

### B. Plaintiffs Presented No Evidence Of Any Cigarette Shipments For All But Six Shippers Or Alleged Shipper "Groups."

74.     The number of shippers at issue in this case has been a constantly moving target, beginning with 13 in the original complaint and growing to 54 during discovery. On August 1, 2016, as the parties were preparing for trial, plaintiffs narrowed the list of shippers at issue to fewer than 40 shippers or alleged "groups" of shippers, and at trial, they presented evidence concerning only six shippers or shipper "groups." Since there was not complete overlap between the various populations of shippers plaintiffs identified, over time, plaintiffs have identified as many as 66 shippers.

75.     In their original complaint, plaintiffs identified 13 shippers at issue. In response to the Court's October 20, 2015 Order (ECF No. 67), requiring the City and State to identify the shippers for which they seek recovery, the City and State identified as many as 54 shippers at issue. (DX-383; DX-384.)

76.     Plaintiffs have abandoned their claims as to many of the shippers they identified in response to the Court's Order (ECF No. 67), including, for example, Cloud & Co. (featured in paragraph 45 of the Third Amended Complaint (ECF No. 189)), Post Smokes (*id.* ¶ 32(a)), Lake Erie Tobacco Co., Big Buffalo and FOW Enterprises (*id.* ¶ 33).

77.     On August 1, 2016, plaintiffs served their list of shippers concerning which they would pursue their claims at trial. Plaintiffs listed fewer than 40 shippers or alleged "groups" of shippers and corresponding UPS account numbers in DX-545. Some of the shippers or alleged

shipper "groups" had multiple UPS account numbers (most of the additional account numbers had little or no activity). The shippers or alleged shipper "groups" plaintiffs identified for trial on DX-545 are:

**Shippers for which UPS either never provided service, or last provided service long before September 18, 2010 (*see* ¶ 78)**

Bear Track Tobacco
Big Indian Smoke Shop
Deerpathcigs.com
Hooty Sapper Ticker
Iroquois Tobacco Direct
Native Distribution & Sales
Native Wholesale
Pierce Trading
RJE-Ltd
RJE-Seneca Smoke
Rock Bottom Tobacco
Seneca Commerce
Seneca Direct
Seneca Ojibwas Trading Post

**Shippers for which plaintiffs presented no evidence of any cigarette shipments (see ¶ 79)**

AJ's Cigar
Morningstar Crafts & Gifts
Native Gifts
Native Outlet
Native Wholesale Supply/Seneca Promotions
R J E S S
Sweet Seneca Smokes
Wholesale Direct[4]

---

[4] Plaintiffs included Native Distribution & Sales, Native Wholesale (as distinct from Native Wholesale Supply), and Wholesale Direct on their list of shippers for trial, but they seem to have abandoned any claim based on those shippers, as they did not include them on the proposed exhibit showing deliveries for which they seek damages (Court Ex. 1). In any event, plaintiffs introduced no evidence at trial that these shippers ever shipped cigarettes, and UPS's audit of Wholesale Direct identified only non-cigarette tobacco products and non-tobacco products. (DX-600 ¶ 110.)

**Shippers on which plaintiffs focused at trial (see ¶¶ 81-225)**

    Arrowhawk Smoke Shop/Hillview Cigars/Seneca Cigars LLC/Two Pine Enterprises
    Bearclaw Unlimited/EExpress/ Elliot Enterprise(s)
    Indian Smokes
    Potsdam shippers (Mohawk Spring Water/Action Race Parts and Fabrication/Jacobs
    Manufacturing)
    Shipping Services
    Smokes & Spirits

78.    Of the shippers or alleged shipper "groups" plaintiffs identified, there are 13 shippers for which UPS either never provided service, or last provided service long before September 18, 2010, the earliest date on which plaintiffs can base any claims due to statutes of limitations (*see infra*, COL, § X(G)). These entities are Rock Bottom Tobacco, Deerpathcigs.com, Seneca Ojibwas Trading Post, Big Indian Smoke Shop, Pierce Trading, Seneca Commerce, Seneca Direct, Iroquois Tobacco Direct, Native Distribution & Sales, Bear Track Tobacco, RJE-Seneca Smoke, RJE-Ltd, and Hooty Sapper Ticker. (*See* DX-601 ¶ 17.) For example, UPS did not provide service to Rock Bottom Tobacco, Deeparthcigs.com, or Seneca Ojibwas Trading Post after 2005 (their accounts were cancelled in connection with the AOD). (*Id.*) Plaintiffs cannot seek recovery for shipments prior to the effective date of the AOD, since the State released any such claims in the AOD and any such claims by the City would be time-barred.

79.    Plaintiffs also seek recovery for nine additional shippers for which there is no evidence at all that such shippers ever shipped cigarettes via UPS.

    a.  **AJ's Cigar:** Plaintiffs offered no evidence that AJ's Cigar shipped cigarettes via UPS. UPS audited packages shipped by AJ's Cigar on October 8, 2013, after the City advised UPS of its belief that AJ's Cigar may be shipping cigarettes. (DX-600 ¶ 80.) That audit reflected that AJ's Cigars was shipping filtered cigars via UPS. (DX-219.)

b.  **Morningstar Crafts & Gifts:** Plaintiffs offered no evidence that Morningstar Crafts & Gifts shipped cigarettes via UPS.

c.  **Native Gifts:** Plaintiffs apparently contend that Native Gifts was affiliated in some manner with Phil Christ, and that it may have shipped cigarettes via UPS. But plaintiffs did not question Mr. Christ about Native Gifts, and there is no evidence in the record as to what Native Gifts shipped via UPS.

d.  **Native Outlet:** Plaintiffs offered no evidence that Native Outlet shipped cigarettes via UPS. UPS conducted audits of Native Outlet packages four different times, on January 2, 2014, September 14, 2015, January 14, 2016 and April 27, 2016. (DX-600 ¶¶ 86-90; DX-244; DX-375; DX-363; DX-421.) Mr. Cook conducted the April 27, 2016 audit personally in the UPS Dunkirk center. Each audit identified only little cigars or other tobacco products, but no cigarettes. In addition, UPS inspected and photographed another package shipped by Native Outlet on July 10, 2013, in connection with its alcoholic beverage compliance efforts. (DX-600 ¶ 91.) That package contained little cigars only. Plaintiffs have failed to carry their burden of establishing that Native Outlet shipped cigarettes via UPS.

e.  **Native Wholesale Supply:** Plaintiffs offered no evidence that Native Wholesale Supply shipped cigarettes via UPS. In their proposed Findings of Fact and Conclusions of Law filed in advance of trial, plaintiffs asserted that "UPS had surrendered 568 cases of cigarettes (approximately 28,400 cartons) shipped by Native Wholesale Supply . . . into Oklahoma via UPS to a waste disposal service for destruction at the instruction of federal authorities." (ECF

No. 399 ¶ 523.) But plaintiffs did not introduce any facts to prove this. UPS introduced evidence (DX-41) that (1) the 568 cases consisted primarily of cigars (412 cases of cigars and 156 cases of "Opals", (*see* DX-41 at UPS00092358)), (2) the 568 cases were not shipped transported by UPS, they were warehoused by UPS Supply Chain Solutions ("UPS-SCS") (DX-41 at UPS00092311) and (3) the cases were not seized, they were voluntarily destroyed by Native Wholesale Supply in order to avoid the need to pay importation duties after UPS-SCS provided notice that it intended to close its warehouse. (*Id.*) Plaintiffs have not proved that Native Wholesale Supply shipped cigarettes via UPS.

f.   **RJESS:** Plaintiffs offered no evidence that RJESS shipped cigarettes via UPS. In contrast, UPS offered evidence that it conducted audits of RJESS's packages on January 28 and 30, 2014. (DX-600 ¶ 111; DX-264; DX-265.) These audits identified only little cigars in RJESS's packages, no cigarettes.

g.   **Seneca Promotions:** Plaintiffs also failed to offer evidence that Seneca Promotions shipped cigarettes via UPS. UPS audited the only package shipped by Seneca Promotions on January 15, 2016. (DX-600 ¶ 140; DX-363.) The package did not contain tobacco products.

h.   **Sweet Seneca Smokes:** Plaintiffs offered no evidence that Sweet Seneca Smokes shipped cigarettes via UPS. UPS audited packages shipped by Sweet Seneca Smokes three times, each time finding filtered cigars or other tobacco products (never cigarettes). (DX-600 ¶¶ 135-137; DX-327; DX-422; DX-429.) Mr. Cook personally audited all 71 packages shipped by Sweet

Seneca Smokes on April 27, 2016, finding no cigarettes. (DX-600 ¶ 136; DX-422.) UPS also inspected and photographed Sweet Seneca Smokes' packages in connection with a suspected hazardous material incident on July 10, 2016. (DX-600 ¶ 137.) These packages also contained little cigars and other tobacco products, but no cigarettes. (DX-429.)

i. **Wholesale Direct:** Plaintiffs offered no evidence that Wholesale Direct shipped cigarettes via UPS. (DX-600 ¶ 110; DX-264; DX-265.) UPS audited 15 packages shipped by Wholesale Direct, and identified two packages with candy and potato chips, and 13 packages with only little cigars. (DX-600 ¶ 110.)

80. Only as to the following six shippers or alleged "groups" of shippers have plaintiffs offered any evidence at all that the shippers may have shipped some packages containing cigarettes via UPS (though the sufficiency of that evidence is discussed in further detail below, *see infra*, ¶¶ 81-225):

a. Potsdam Shippers (Mohawk Spring Water, Action Race Parts & Fabrication, Jacobs Manufacturing/Jacobs Tobacco Company)

b. Shipping Services

c. Smokes + Spirits

d. Indian Smokes

e. Elliot Enterprises/EExpress/Bearclaw

f. Arrowhawk/Hillview Cigars/Seneca Cigars/Two Pine Enterprises

### C. UPS Did Not Knowingly Transport Cigarettes To Unauthorized Recipients For Any Of The Remaining Six Shippers Or Alleged Shipper "Groups."[5]

#### 1. Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes To Unauthorized Recipients For The Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs Manufacturing/Jacobs Tobacco Company).[6]

81.     The Potsdam Shippers are the only shippers for which plaintiffs offered any direct evidence that a UPS employee knew a shipper was shipping cigarettes via UPS. UPS drivers Don Jarvis and Candace Sheridan frankly admitted during their depositions that they knew or suspected that two of the shippers—Jacobs Manufacturing and Mohawk Spring Water—were tendering packages containing cigarettes to UPS. (Jarvis Tr. 53:8-10, 54:18-22; Sheridan Tr. 50:20-51:2, 94:5-9.) But it is undisputed that through official guidance issued by the Department of Taxation and Finance, through discussions with DTF representatives, and through its awareness of various stays and injunctions barring New York State from enforcing its amended tax laws against Native American reservations until June 22, 2011, UPS understood that shipments from the Potsdam Shippers to retailers on other Native American reservations were authorized by the State. (*See infra*, ¶¶ 82-83.) It is also undisputed that in April 2011, UPS contacted New York State Police to ask for guidance on whether to continue to pick up packages from the Potsdam Shippers, and was instructed by State Police to continue picking up at the Mohawk/St. Regis reservation in light of an ongoing law enforcement investigation. (*See infra*,

---

[5] As noted, the six shippers or shipper "groups" plaintiffs offered any evidence at all that the shippers may have shipped some packages containing cigarettes via UPS are: Arrowhawk Smoke Shop/Hillview Cigars/Seneca Cigars LLC/Two Pine Enterprises; Bearclaw Unlimited/EExpress/ Elliot Enterprise(s); Indian Smokes; Potsdam shippers (Mohawk Spring Water/Action Race Parts and Fabrication/Jacobs Manufacturing); Shipping Services; and Smokes & Spirits. In addition to those shippers, UPS addresses in more detail plaintiffs' allegations concerning Native Wholesale Supply and Seneca Promotions in this section, because they focused on those two shippers at trial and included them in Court Exhibit 1, even though they provided no evidence at all that either shipper shipped packages containing cigarettes via UPS (*see* ¶ 79).

[6] These shippers are addressed in the same section solely based on the unique legal issues they present. Plaintiffs presented no evidence that there was any legal affiliation among these particular shippers.

¶¶ 84-96.) Plaintiffs dispute the legal significance of these facts (and plaintiffs' position on the legal significance of the facts is addressed below in COL, § VII(E)), but plaintiffs presented no evidence at trial to dispute these basic facts about the Potsdam Shippers.

> **a.  UPS Understood That Shipments From The Potsdam Shippers To Retailers On Other Native American Reservations Were Authorized By The State.**

82.  Before June 22, 2011, UPS understood that shipments from the Potsdam Shippers to retailers on other Native American reservations were authorized by the State. Until then, DTF's published guidance indicated that unstamped cigarettes could lawfully be delivered to retailers on Native American reservations. (DX-38.) New York amended its tax laws in 2010 to require all cigarettes to bear stamps, but even that amended law was not effective immediately, due to stays and injunctions barring the enforcement of the law. Although the Court has previously ruled that the stays and injunctions may not have precluded unstamped cigarettes destined for Native American retailers from being considered "contraband cigarettes" for purposes of the CCTA (ECF No. 406), plaintiffs do not dispute that the DTF was not enforcing the amended tax laws until June 22, 2011.

83.  Documents admitted at trial and testimony of the State's own witness, Richard Ernst (the Former Deputy Commissioner of the DTF), conclusively establish that fact. (DX-38 (announcing DTF's adherence to forbearance policy, permitting untaxed cigarettes to be sold to Native American retailers); DX-082 (announcing implementation of amended tax laws requiring all cigarettes to bear tax stamps, including those sold to Native American retailers, beginning on June 22, 2011, after stays and injunctions against tax laws were lifted); Ernst Tr. 48:15-19 (DTF permitted shipment of unstamped cigarettes to Native American retailers while injunctions and stays were in place); DX-389 (announcing that beginning on June 22, 2011, DTF would instruct common carriers that they "should not be shipping untaxed cigarettes to their Native American

customers in NYS *from this point on*.") (emphasis added).) Again, while plaintiffs dispute the legal significance of these facts, they do not dispute the facts themselves.

> **b.** **The State Instructed UPS To Continue To Pick Up Packages From The Potsdam Shippers To Protect An Ongoing Law Enforcement Investigation.**

84. Beyond relying on general guidance from the DTF, UPS also relied on specific instructions from a law enforcement officer, State Trooper Alfonse Nitti, that UPS should continue to provide service to the Potsdam Shippers pending resolution of the State's and the federal government's investigations of the shippers. UPS obtained such guidance after drivers escalated their concerns about the Potsdam Shippers to their supervisor, Steve Talbot, who contacted a Security Supervisor in Syracuse, Jim Terranova, who in turn contacted Trooper Nitti. (DX-606 ¶¶ 5, 8; DX-612 ¶¶ 6-8.)

85. As Mr. Talbot testified, his conversation with Mr. Jarvis was the first time he learned that the Potsdam Shippers might be shipping cigarettes. (Trial Tr. 1267:15-22; DX-606 ¶ 5; Jarvis Tr. 63:17-64-9; Sheridan Tr. 58:23-25.) Mr. Talbot testified that after this conversation, he immediately emailed the responsible UPS account executive, Cheryl Claflin, on April 26, 2011, stating: "Cheryl, PLEASE call the center asap. We have a potential issue with the Hogansburg p/u of cigarettes." (DX-606 ¶ 6; DX-74.)

86. At the same time, Mr. Talbot also contacted the UPS Security representative assigned to the Potsdam center, Jim Terranova, to ask for guidance. While Mr. Terranova is not a high-ranking UPS employee, he was the highest ranking (and only) UPS Security Department member assigned to the Potsdam center. It was therefore appropriate for Mr. Talbot to contact Mr. Terranova to ask for guidance. Mr. Terranova indicated to Mr. Talbot that he knew someone in law enforcement that dealt with tobacco issues, and that he was going to reach out to his law enforcement contact to ask how these shipments should be addressed. (DX-612 ¶ 6.)

87.     Mr. Terranova had prior dealings with several members of the New York State Police, including Trooper Nitti, a criminal investigator of the New York State Police based in Syracuse, New York. (DX-612 ¶¶ 3-4.) Trooper Nitti had requested assistance from UPS through Mr. Terranova on April 13, 2011, in connection with a counterfeiting case. (DX-71.) Terranova explained to Trooper Nitti that there were shippers on the Mohawk/St. Regis reservation that might be shipping cigarettes in bulk. (DX-612 ¶ 7.) Mr. Terranova testified at trial that he "immediately called Trooper Nitti and told him what Steve Talbot had told me, that there was a suspicion that there were pickup accounts at the [Mohawk/St. Regis] reservation that were shipping cigarettes." (Trial Tr. 1530:4-24.) Trooper Nitti told Mr. Terranova that "there is an active investigation going on up there." (*Id.*) Mr. Terranova asked Trooper Nitti if he wanted the UPS "Potsdam center to look further into this and assist you in any way, maybe open packages or go to try to confirm that this was actually happening." Trooper Nitti did not accept this offer of assistance. (*Id.*) Mr. Terranova asked twice whether UPS should continue "picking up packages and proceed business as usual," and Trooper Nitti said yes. (*Id.*) Mr. Terranova asked Trooper Nitti to contact him if he needed any assistance from UPS. (*Id.*)

88.     The evidence—including testimony from the Sate's own witnesses—overwhelmingly confirms Mr. Terranova's account of his conversation with Trooper Nitti. DTF Chief Investigator Connolly testified that a member of the New York State Police reported to him that "UPS Security" had informed them that "cigarettes . . . were moving through the UPS facility at Potsdam coming from the Akwesasne Mohawk reservation." (*See* Connolly Tr. 129:21-24, 130:14-23; *see also* Ernst Tr. 78:3-6 (DTF worked with Trooper Nitti).) Indeed, Chief Investigator Connolly testified that that was the reason why he visited the UPS Potsdam center on June 22, 2011—as a result of the tip that UPS had provided. Former Deputy

Commissioner Ernst also testified that he "knew that UPS notified us that—about the cigarettes." (Ernst Tr. 82:9-12.) The State could have easily addressed any doubt about the conversation Mr. Terranova had with Trooper Nitti, or any limitations the State wanted to clarify about the conversation, by calling Trooper Nitti as a witness in this matter, either in person or through his deposition testimony. Yet the State chose not to do so, leaving uncontroverted Mr. Terranova's testimony, as confirmed by the State's other witnesses.

89.    Mr. Talbot testified that Mr. Terranova got back to him either the same day or within a day or two after he initially contacted Mr. Terranova about cigarette shipments from the reservation. Mr. Terranova relayed what Trooper Nitti had told him—that there was an active investigation going on regarding cigarettes on the reservation, and that UPS should continue business as usual until told otherwise by State Police. (Trial Tr. 1270:2-7; DX-612 ¶ 8; DX-606 ¶ 8.)

90.    Talbot, in turn, relayed this instruction to the drivers, asking them to continue picking up from the Potsdam Shippers as usual until law enforcement told UPS otherwise. (DX-606 ¶¶ 8-9.) Talbot testified that he told the drivers that would do pick-ups on those routes "the same thing, that we were to continue picking up those packages, as usual, until we heard otherwise" from law enforcement. (Trial Tr. 1251:22-24.) Talbot gave this instruction in reliance on Terranova's conversation with Trooper Nitti. Because UPS was "told [by law enforcement] to continue picking up, we would pick up." (Trial Tr. 1271:22-23.)

91.    Jarvis remembers being told that the issue "was in security's hands and continue doing it until we are directed otherwise to tell you what to do." (Jarvis Tr. 64:22-25.) Jarvis estimated that roughly "80 percent" of the drivers continued to raise the issue with Talbot, who assured them that he had escalated the issue to UPS Security. (*See id.* 65:16-66:20.) Sheridan,

who remained uncomfortable with the pick-ups after learning of the ongoing criminal investigation, contacted UPS management and the union. (*See* Sheridan Tr. 42:2-17, 67:18-22.) She, too, was assured that UPS had escalated the issue in the appropriate way—that "[w]e are going to continue to pick up at these locations, that it is all under investigation" and that UPS would "cooperate" by "contin[uing] to—to pick up at these locations." (*See id.* 43:23-44:1, 44:25-45:5.)

92.  It is therefore undisputed both that UPS contacted New York State Police in April 2013 to ask for guidance on how to deal with suspected cigarette shippers on the Mohawk/St. Regis reservation, and that a detective in the special investigations unit at New York State Police advised UPS to continue making pick-ups due to the ongoing criminal investigation.

93.  UPS stopped making pick-ups from the Potsdam Shippers as soon as Chief Investigator Connolly from the DTF visited the UPS Potsdam center on June 22, 2011. (*See* DX-606 ¶ 10; DX-612 ¶¶ 10-11; ECF No. 302-49 – ECF No. 302-52 (UPS account records).) Even though Mr. Terranova sent the termination letters to those shippers some days later, in fact UPS terminated service to those shippers immediately.

94.  Investigators from the DTF visited the UPS Potsdam center on June 22, 2011 because DTF had planned to enforce § 471 immediately after it was permitted to do so. The DTF "commissioner, the executive deputy commissioners, [and deputy commissioner Ernst] decided that once the TROs were lifted, [DTF] would go out and visit common carriers and stamping agents" "to advise them of the lifting of the TRO and to let them know that they should not be shipping untaxed cigarettes to their Native American customers in NYS from this point on." (*See* Ernst Tr. 86:23-87:4; DX-389 at NYUPS00002410-11 (DTF investigation report).) The final injunction barring enforcement of the amended tax law was lifted on June 21, 2011. *Seneca*

*Nation of Indians v. State of New York*, No. CA 11-01193, slip op. at 1 (N.Y. App. Div. 4th Dep't June 21, 2011). The next day, on June 22, 2011, DTF Chief Investigator John Connolly and another DTF investigator visited the UPS Potsdam terminal "to see whether [the UPS tip] was valid information and also to explain that the TRO was lifted." (Connolly Tr. 132:7-9.)

95.     When Connolly and the other DTF investigator arrived at the terminal and announced that they "were here to talk about cigarettes . . . [Talbot] indicated that he had been waiting for [DTF] to show up." (DX-389 at NYUPS00002411 (DTF investigation report regarding Potsdam seizure).) Talbot's prior consistent statement bolsters his credibility. According to a DTF memo, Talbot recounted to them that, once he had been made aware of the cigarettes, he "contacted Jim [Terranova] at the UPS security office in Syracuse"; "he believed Jim [Terranova] then contacted a NYSP contact in Syracuse who told UPS to keep picking up the cigarettes until they could work out what to do about it." (*Id.*) Talbot then informed the DTF investigators that a driver was currently out picking up from Mohawk Spring Water, Jacobs Manufacturing, and Action Race Parts, and that any cigarettes would be in the terminal that night. (*Id.*; DX-606 ¶ 10.)

96.     DTF officials relayed the information they obtained from Talbot to the ATF, which had an ongoing investigation related to the Robert Oliver crew, who operated Mohawk Spring Water. (*See* DX-389 at NYUPS00002412 (DTF investigation report stating DTF notified ATF to handle seizure).) While DTF refused to seize the packages, preferring that the ATF seize them instead (*see* DX-83 (email chain stating the Governor's Office did "not want [DTF] to seize [the] cigarettes" and requesting ATF seize them instead)), UPS agreed to hold the packages until the ATF seized them. (DX-606 ¶ 10.) Five days after the visit from Connolly, after discovering additional packages from Action Race Parts at the Farmingville Center, UPS again contacted

DTF; those packages were also seized by the ATF. (*See* DX-90 (email from DTF Investigator Christopher Lannon to Chief Investigator Connolly stating "Farmingville UPS contacted RCS 3 Lannon and advised receipt of 51 cases . . . shipped from Action Race Parts").)

        **c.**      **UPS Detailed The Facts Concerning The Potsdam Shippers For The State In August 2011.**

      97.      All of these facts were known to plaintiffs long before they even initiated this lawsuit. UPS briefed the State concerning the Potsdam Shippers in August 2011, after the State sought penalties under the AOD for the Potsdam Shippers. On June 24, 2011, Dana Biberman, on behalf of the New York Attorney General, wrote a letter to Norman Brothers, UPS's then in-house counsel, concerning the packages that had been seized at the UPS Potsdam facility on June 22, and the packages that UPS was holding at its Farmingville facility (which the ATF later seized on June 27). (*See* DX-605 ¶ 14; DX-89.) The letter specifically requested that "UPS pay a stipulated penalty of $1,000 for each and every violation of the AOD, unless UPS establishes that it 'did not know and had no reason to know that the shipment was a Prohibited Shipment.'" (DX-89 at NYS-057343.)

      98.      On August 9, 2011, counsel for UPS (Carl H. Loewenson, Jr., Mark David McPherson, and Natalie Fleming Nolen of Morrison & Foerster LLP) met with Ms. Biberman and her colleague regarding the seizures. (DX-605 ¶¶ 14-17.) At that meeting, counsel for UPS addressed UPS's commitment to cooperating with the State in its investigation of the Potsdam Shippers, and explained why they believed no penalty was warranted under the October 21, 2005 AOD. (*Id.* ¶¶ 17-18.) UPS's counsel further explained, among other things, that: UPS discovered in April 2011, that the three shippers at issue were potentially shipping cigarettes; Jim Terranova, a UPS security department employee, contacted New York State Trooper Al Nitti for guidance; Trooper Nitti informed Terranova that there was an ongoing investigation of these shippers and

instructed UPS to continue picking up packages from the three shippers; and UPS complied with Trooper Nitti's request. (*Id.* ¶ 17.)

99.     Following the meeting, Ms. Biberman requested delivery data from UPS regarding the three shippers (plus another shipper that UPS told the State might be affiliated with one of the Potsdam Shippers) beginning October 21, 2005. (*See* DX-605 ¶ 19; DX-109.) On September 29, 2011, UPS counsel provided the State with delivery data and billing information regarding the shippers and with further information regarding Jim Terranova's contact with law enforcement regarding potential cigarette shipments. (*See* DX-605 ¶ 21; DX-125.) The delivery and billing information included all shipments from Action Race Parts, Jacob's Manufacturing, and Mohawk Spring Water to New York addresses from October 21, 2005, to August 31, 2011. (*See* DX-605 ¶ 22; DX-126.) The information was contained in a spreadsheet with 7,601 total entries ranging between May 4, 2007 and July 11, 2011. (DX-126.) For Action Race Parts, it contained 2,372 entries between June 18, 2009 and June 21, 2011. (*Id.*) For Jacob's Manufacturing, it contained 817 entries between May 4, 2007 and June 16, 2011. (*Id.*) For Mohawk Spring Water, it contained 4,410 entries between November 11, 2010 and July 1, 2011. (*Id.*) That information was comprehensive; plaintiffs identify no shipments from the Potsdam Shippers for which UPS failed to provide information.

100.     After UPS provided the requested information, the State did not request any further information from UPS regarding the Potsdam Shippers, and it did not continue to seek the penalties (or any other relief) that the AG initially sought in Ms. Biberman's June 24, 2011 letter. (DX-605 ¶ 24.) Indeed, the State took no further action seeking either information or penalties from UPS in relation to Action Race Parts, Jacob's Manufacturing, or Mohawk Spring Water,

until it filed this lawsuit nearly four years later and added allegations regarding those shippers in plaintiffs' Amended Complaint, filed on May 1, 2015. (*Id.* ¶ 25.)

101.    The State admits that it decided in 2011 not to retain any documents about any UPS shipments by the Potsdam Shippers. (Trial Tr. 1854:13-19.)

### 2.    Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Shipping Services/Morningstar Crafts And Gifts.[7]

#### a.    Shipping Services

102.    Plaintiffs argue that shippers Shipping Services and Morningstar Crafts and Gifts were successors to or otherwise related to a shipper named Seneca Ojibwas. Seneca Ojibwas had opened an account with UPS in 2002. (PX-299-1.) In 2005, with the implementation of UPS's new tobacco policy, Seneca Ojibwas signed a Tobacco Agreement on March 14, 2005, committing to not ship cigarettes to consumers. (DX-371, line 1324.)

103.    In November 2005, UPS account executive Jayne Dejonghe informed Seneca Ojibwas that they would be required to open a new account to continue shipping tobacco products other than cigarettes. (PX-452.). The requirement was part of a broader plan requiring all smoke shops in the area to open new accounts in order to ensure that UPS had an opportunity to vet the shipper and ensure their compliance before allowing the shipper to open another account. (Trial Tr. 200:6-14; 499:22-500:3.) From the time Seneca Ojibwas opened the account in March 2005 through November 2005, when UPS's new tobacco policy became effective, Seneca Ojibwas did not violate its Tobacco Agreement with UPS; as a result, no violation or discipline was recorded under its account name in the Tobacco Database. (Trial Tr. 207:3-7; DX-371, line 1324.)

---

[7] Shipping Services and Morningstar Crafts and Gifts are addressed together based solely on plaintiffs' grouping of the two shippers. There is no evidence that these particular shippers had any legal affiliation; as addressed in paragraph 112, the owner of Shipping Services closed his business and moved out of state before Morningstar ever began shipping.

104.     On November 22, 2005, Seneca Ojibwas opened a new account under the name Shipping Services. (DX-602 ¶ 45; Trial Tr. 579:7-9, 630:21-23.) Shipping Services shipped insignificant volume and was therefore handled by UPS Sales Support Representative Tina Mahon. (Trial Tr. 493:25-494:3; DX-602 ¶ 47.) In 2010, Ms. Mahon obtained a second Tobacco Agreement, confirming that Shipping Services would not ship cigarettes to consumers. (DX-51.) Plaintiffs presented no evidence that Shipping Services was shipping cigarettes through UPS or that UPS knew of or turned a blind eye to any suspicions of illegal shipping by Shipping Services from 2005 through 2010.

105.     In late 2010, account executive Gerry Fink was assigned Shipping Services as part of UPS's transition to the patch-of-land system for assigning account executives to particular accounts. Under the patch-of-land concept, account executives such as Mr. Fink were assigned to distinct geographic areas of responsibility. (DX-602 ¶ 58.) As an account executive, Mr. Fink is responsible for small package accounts with less than $300,000 in annual revenue. (*Id.*)

106.     Shipping Services' volume thereafter increased, but began to decrease again in mid-2011. (DX-511, line 163; DX-602 ¶¶ 49-50.) From both the Tobacco Agreement that Shipping Services signed and from prior interactions, Mr. Fink understood that Shipping Services shipped little cigars. Mr. Fink questioned whether Shipping Services' decline in volume in mid-2011 was attributable to other smoke shops having "figured out how to market cigars"—thus cutting into Shipping Services business—but determined this was not the case as the other smoke shops (such as Smokes & Spirits) had already begun shipping little cigars by 2010. (DX-602 ¶ 132; PX-122; PX-136.) The email exchange, which was focused on account volume and not package contents, reliably demonstrates Mr. Fink's belief that both Shipping Services'

volume and the general increase in other smoke shops' volume in 2010 consisted of little cigars. Plaintiffs presented no proof to the contrary and Mr. Fink's testimony, corroborated by his contemporaneous TEAMS entries and emails, was uncontested.

107.     In early 2013, Shipping Services informed Mr. Fink that it was considering moving out of New York due to issues with the State, potentially referring to the proposed legislation to tax little cigars at the same rate as cigarettes. (DX-511.)

108.     In late 2013, UPS Director of Dangerous Goods Brad Cook asked outside counsel to conduct an investigation of more than 540 shippers in the Tobacco Database. Counsel highlighted 30 shippers potentially warranting further investigation; based on volume activity and other facts, Mr. Cook identified six of those shippers for potential follow up, including Shipping Services, and he requested an audit of the account on January 2, 2014. (DX-600 ¶¶ 83-85.)

109.     On January 2, 2014, UPS conducted an audit of five packages sent by Shipping Services. The audit of the five plain boxes with no markings that were sent by Shipping Services revealed three boxes that contained little cigars and two boxes that contained cigarettes; none of the packages containing cigarettes were addressed to New York residents. (DX-600 ¶¶ 92-93.) Upon learning of the audit, Mr. Fink agreed that termination rather than progressive discipline for Shipping Services' violation of the tobacco policy was appropriate because they had been shipping little cigars for years and fully understood the legal distinction between little cigars and cigarettes. (PX-363.) UPS promptly terminated service to Shipping Services on January 13, 2014. (DX-600 Attachment A; DX-600 ¶ 94; PX-360; PX-373; PX-363.) Following the termination, Shipping Services closed its business and the owner moved to Colorado. (PX-160; DX-250.) Again, plaintiffs presented no evidence that UPS or Mr. Fink knew that Shipping

Services had ever shipped cigarettes prior to the January 2014 audit or that UPS or Mr. Fink turned a blind eye or otherwise knew that Shipping Services was doing so from the time the account was assigned to Mr. Fink in or about end of 2010 through the audit in early 2014. Plaintiffs did not present any evidence of any cigarette shipments to New York by Shipping Services.

110.    "Tracers" entered into UPS's system (described below, *see infra*, ¶¶ 233-35) confirm UPS's belief that Shipping Services shipped little cigars: 28 of the 29 tracers for Shipping Services were for packages containing little cigars. (DX-499 (Package Details Tab for Account 03E04E); DX-600 ¶¶ 18, 150.) Even though there was one reported shipment of cigarettes in the tracers, UPS had no knowledge of that tracer nor did Mr. Fink ever see such a tracer. The AOD did not require and the State never thought that tracers could be used by UPS as a research tool to identify a shipper that might be violating UPS tobacco policy. To the extent that any individuals at UPS may have  evaluated the tracers Shipping Services submitted—and there was no evidence that any such evaluation ever occurred—they were not required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (DX-600 ¶¶ 149-150; DX-500.) Accordingly, the one tracer claiming cigarettes in a lost or damaged package cannot be the basis for UPS's knowledge that Shipping Services was shipping cigarettes through UPS.

**b.    Morningstar Crafts & Gifts**

111.    Morningstar Crafts & Gifts opened a UPS account on January 21, 2014. It was located at 13113 Route 438, Gowanda, New York. (DX-602 ¶ 138.) Morningstar Crafts & Gifts operated out of a permanent storefront and was owned by Ramona Bennet. (DX-602 ¶ 139; Logan Tr. 86:12-18; 88:24-89:5; DX-371, line 3649.) The store sold Native American crafts, gifts and little cigars. (DX-602 ¶ 139; Logan Tr. 85:5.) In accordance with UPS tobacco policy,

Mr. Fink had the account enter into a Tobacco Agreement, signed by Ramona Bennet, on May 6, 2014. (DX-262; DX-310; DX-602 ¶ 139.) Mr. Fink forwarded that Tobacco Agreement to UPS; the Agreement was approved and entered into the tobacco database by Mr. Szelagowski. (DX-371, line 3649.)

112.     There is no evidence in the record that Morningstar Crafts & Gifts ever shipped cigarettes through UPS or that UPS ever suspected it was doing so. Plaintiffs claim that Morningstar Crafts & Gifts somehow was related to Shipping Services because they share an address, but there is no evidence that Morningstar Crafts & Gifts was related Shipping Services. In fact, the uncontested evidence is to the contrary. While the two accounts shared the same address, Shipping Services operated out of a separate trailer parked in front of the location where Morningstar Crafts & Gifts later opened. Also undisputed was that Shipping Services had a different owner, Robert Burrs, and plaintiffs presented no evidence of any connection between Ms. Bennet and Mr. Burrs. (DX-602 ¶ 140; DX-371, line 3024.) Following UPS's termination of Shipping Services, Mr. Burrs closed his business and moved out of State. (PX-160; DX-250.) Thereafter, Ms. Bennet opened her account.

**3.     Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For AJ's Cigar/Sweet Seneca Smokes/RJESS/Smokes & Spirits/Native Outlet.[8]**

**a.     AJs Cigars**

113.     AJ's Cigars opened a UPS account in September 2010. (DX-602 ¶ 87.) The account was assigned to Mr. Fink and AJ's Cigars informed Mr. Fink that it only sold cigars—both the traditional, larger cigars and little cigars—and a variety of other non-tobacco products.

---

[8] These shippers are addressed in the same section based solely on plaintiffs' grouping of the shippers. There is no evidence that these particular shippers had any legal affiliation. None of the shippers contained any overlapping information in the Tobacco Database and, as addressed in paragraphs 116-140, the disparate facts regarding Sweet Seneca Smokes, RJESS, and Smokes & Spirits fail to establish any such affiliation.

(*Id.* ¶ 89.) Accordingly, Mr. Fink conveyed the tobacco policy to AJ's Cigars and on September 14, 2010, he obtained a signed Tobacco Agreement from AJ's Cigars. (*Id.* ¶ 87; DX-230.) Mr. Fink obtained a second agreement from AJ's Cigars on October 24, 2013, after UPS's corporate office could not locate a hard copy of the original. (DX-602 ¶¶ 92-93; DX-230; DX-357; DX-371, line 3030.)

114.    In early February 2014, UPS learned from a news report that an entity known as AJ's Candy had pleaded guilty to cigarette trafficking. (DX-600 ¶ 81; DX-270.) Despite having no evidence that the two entities were related to each other or that AJ's Cigars had shipped cigarettes, UPS terminated AJ's Cigars on February 10, 2014. (DX-600 ¶ 81; DX-272; PX-160.) There was no evidence at trial that AJ's Cigars ever shipped cigarettes through UPS; indeed, all evidence presented at trial showed that AJ's Cigars was shipping little cigars.

115.    Plaintiffs contend that AJ's Cigars was shipping illegal cigarettes through UPS since sometime after July 2010. (DX-383 at 4; DX-216; DX-600 ¶ 78.) The evidence in the record, however, shows that AJ's Cigars abided by the Tobacco Agreement. An audit of AJ's Cigars, conducted by UPS on October 2, 2013, identified only filtered cigars and other tobacco products. (DX-600 ¶ 80; DX-219.) And each of the nine tracer inquiries into lost or damaged packages reported little or full sized cigars. (DX-499, lines 105, 113, 137, 144, 149, 196, 198, 208, 220.) Accordingly, there is no evidence that UPS knew AJ's Cigars was shipping cigarettes or that any package transported by UPS for AJ's Cigars contained cigarettes.

### b.    Sweet Seneca Smokes

116.    Sweet Seneca Smokes opened its UPS account on February 14, 2014, and remains an active account. (DX-602 ¶ 122.) When the account was opened, UPS inside sales representative Timothy McDowell first contacted Jim Phillips at the account. (*Id.* ¶ 123.) Following his general practice, Mr. McDowell discussed Sweet Seneca Smoke's business with

Mr. Phillips, learned that Sweet Seneca Smokes intended to ship only little cigars, and informed it of UPS's tobacco policy. (Trial Tr. 667:1-17; DX-602 ¶ 123; DX-371, line 3650.)

117.    Mr. McDowell, in an effort to ensure Sweet Seneca Smokes was not shipping on behalf of a terminated account, contacted Mr. Fink to determine whether Sweet Seneca Smokes might be connected to Shipping Services or AJ's Cigars. (DX-274; DX-276; DX-602 ¶ 124.) None of the three shippers shipped from the same address, had the same contacts, or shared any other overlapping information. (DX-371, lines 3024, 3030, 3650.) One of contact names Mr. McDowell considered, "Bob Oldrow/Oldsdrow" is close to the name of Mr. Fink's contact at Smokes & Spirits. (DX-276; DX 602 ¶ 32; *cf* DX-371, line 1285.) Mr. Fink, however, had no reason to connect Mr. Oldro to Shipping Services or AJ's Cigars, and Mr. McDowell would not have recognized the contact name at all, as he had no contact with Smokes & Spirits. (Trial Tr. 668:20-669:3, 670:25-671:13, 672:7-9.) Mr. McDowell ultimately found no evidence connecting Sweet Seneca Smokes to either shipper.

118.    Mr. McDowell then conducted further investigation into Sweet Seneca Smokes, researching their website and product line and requesting photos of their cigars. (DX-274.) Mr. Fink then followed up with Jim Phillips in person, again conveyed the tobacco policy, and obtained a Tobacco Agreement him. (DX-602 ¶ 123; DX-527.)

119.    Plaintiffs presented no evidence that cigarettes were shipped through UPS by Sweet Seneca Smokes. Indeed, three separate audits conducted by UPS confirmed that Sweet Seneca Smokes shipped only little cigars and other tobacco products through UPS. (DX-600 ¶¶ 135-37; DX-327; DX-422; DX-429.)

120.    In May 2014, data analytics, used as part of UPS's advanced compliance efforts, identified Sweet Seneca Smokes as a shipper at risk of non-compliance. (DX-600 ¶¶ 125-27;

DX-601 ¶ 9.) Based on this identification, UPS followed its standard audit procedure. Mr. DeWeerd asked Mathew Szelagowski to arrange for an audit. (Trial Tr. 711:17-21; DX-314.) Mr. Szelagowski called the Dunkirk Center Manager, Mike Shea, to advise him of the audit and provide him with instructions. (Trial Tr. 709:11-22.) Mr. Szelagowski then emailed formal audit instructions to Mr. Shea and Center Supervisor Jennifer Puleo. (Trial Tr. 709:23-710:11, 711:17-712:24; DX-608 ¶ 23(c); DX-314.) Ms. Puleo and Mr. Shea were instructed, in part, to open "100% … of all packages pick[ed] up" over the next three days and to maintain the confidentiality of the audit. (DX-314; Trial Tr. 710:12-712:24, 1404:3-8.) The audit Ms. Puleo performed revealed predominantly filtered cigars but also some other tobacco products (*e.g.*, chewing tobacco). (DX-600 ¶ 135; DX-327; DX-550; DX-551; DX-608 ¶ 23(c).) There was no evidence contradicting or challenging the validity of the audit.

121.    On April 27, 2016, UPS Director of Dangerous Goods, Brad Cook, personally audited all of the packages shipped out of the Dunkirk Center, including 71 packages shipped by Sweet Seneca Smokes. (DX-600 ¶¶ 90, 136; Trial Tr. 359:23-360:16; DX-422.) Each of the packages contained cigars, chew, or other tobacco products, but no cigarettes. (DX-600 ¶ 136; DX-422.)

122.    UPS audited Sweet Seneca Smokes a third time on July 10, 2016, when the "Designated Responders" for hazardous materials in the District segregated and inspected the contents of these Sweet Seneca Smokes packages because an unknown substance—later identified as chocolate syrup—had leaked on each package in the load. (DX-600 ¶ 137; DX-429.) Consistent with prior audits, the packages contained filtered cigars, loose tobacco, and chewing tobacco. (*Id.*)

123.     Thus, all the evidence demonstrates conclusively that Sweet Seneca Cigars never shipped cigarettes through UPS.

### c.     RJESS

124.     Ross John Enterprises first opened an account with UPS before 2005, under the name Ross John Enterprises - Iroquois Tobacco Direct ("RJE-ITD"). (DX-602 ¶ 107; DX-371, line 1344.) In 2005, with the implementation of the new tobacco policy, RJE-ITD signed a Tobacco Agreement on March 25, 2005, indicating that it would not ship cigarettes to consumers. (DX-371, line 1344.) In November 2005, as part of the broader plan requiring all smoke shops in the area to open new accounts with Tobacco Agreements, the RJE-ITD account was canceled. (DX-602 ¶¶ 106-07; Trial Tr. 200:6-14, 499:22-500:3.) From March 2005 through November 2005, RJE-ITD never violated the Tobacco Agreement; as a result, no violation or discipline was recorded under its account name in the Tobacco Database. (Trial Tr. 207:3-7; DX-371, line 1344.)[9]

125.     The Owner of RJE-ITD, Ross John, a college professor, then opened a new account under the name Ross John Enterprises Smoke Shop ("RJESS"). (DX-602 ¶¶ 106-07, 109; Trial Tr. 200:6-14, 499:22-500:3.) Both RJE-ITD and RJESS were located in a warehouse behind a gas station at 6665 Route 417, Killbuck, New York. (DX-602 ¶ 106; DX-490 at 4; DX-371, lines 1344, 3619.) Mr. Fink, pursuant to UPS policy, obtained a Tobacco Agreement for RJESS. (DX-520, lines 167-171; DX-542; Trial Tr. 640:16-21.) In 2014, Mr. Fink obtained another signed Tobacco Agreement from RJESS after UPS Corporate misplaced or could not find its original Tobacco Agreement. (DX-313; DX-520, lines 167-171; DX-542; Trial Tr.

---

[9] The "Comments" field of the Tobacco Database states the account was canceled "per self-audit." (DX-371, line 1344.) This entry indicates during the March 12, 2008 audit of the Tobacco Database, it was discovered that the account already had been canceled. (DX-371, line 1344; Trail Tr. 374:14-375:12.) The field does not indicate the account remained active until March 2008.

640:16-21.) While obtaining the new Tobacco Agreement, Mr. Fink again emphasized the tobacco policy and was informed that RJESS was not shipping cigarettes. (DX-520, lines 167-171; DX-542.)

126.    There is no evidence that RJESS ever violated the Tobacco Agreement or shipped cigarettes through UPS. UPS conducted formal audits of RJESS on January 28 and 30, 2014, after Mr. Cook identified their address—but not their name—on the PACT Act List. (DX-600 ¶ 111.) The packages, audited by UPS Night Center Supervisor Debra Blauvelt, contained only little cigars. (DX-600 ¶ 111; DX-609 ¶ 17(b); DX-264; DX-265.) Ms. Blauvelt also conducted a number of spot audits of RJESS packages and never found cigarettes. (DX-609 ¶ 12; Trial Tr. 1422:2-5.)

127.    While the address for RJESS on the PACT Act List is the same as the address for Smokes & Spirits on that List, there was no other evidence connecting the two accounts and no evidence that UPS knew of the overlap in addresses at the time. (Trial Tr. 634:20-635:5.) There are no overlapping addresses or contacts in UPS's databases. (DX-371, lines 3619, 1285.) The two accounts had different owners, and Ross John had no involvement in Smokes & Spirits. (DX-371, lines 3619, 1285; DX-602 ¶¶ 38, 109; Trail Tr. 1190:20-1191:3.) And RJESS was an active account of its own the entire time Smokes & Spirits was in operation. Lastly, both RJE-ITD and RJESS were located at 6665 Route 417, Killbuck, New York, while Smokes & Spirits shipped from 270 Rochester Street, Salamanca, New York 14779. (DX-602 ¶¶ 31, 106; DX-490; DX-371, lines 1344, 3619.) In other words, nothing in UPS records provides any basis to connect the two accounts.

#### d.     Native Outlet

128.     Native Outlet opened an account with UPS on October 18, 2010. (DX-602 ¶ 129) The account is located in a building at 11157 Lakeshore Road, Irving, New York. (*Id.*; DX-490.) Upon its opening, Mr. Fink met with a woman at Native Outlet, learned the shipper intended to ship cigars, informed her of the tobacco policy, and provided a Tobacco Agreement to be signed. (DX-602 ¶ 131.) The agreement was returned signed by John Waterman at 1525 Cayuga Road, and is reflected as such in the Tobacco Database. (*Id.*; DX-58; DX-371, line 3062.)

129.     All of the evidence shows Native Outlet complied with the Tobacco Agreement and shipped only little cigars through UPS. UPS audited Native Outlet five times and found only little cigars each time. (DX-600 ¶¶ 86-91; DX-244; DX-421; DX-363; DX-375; DX-194.)

130.     In July 10, 2013, UPS intercepted and audited a Native Outlet package (due to a concern that the package might contain a shipment of wine to the State of Massachusetts), and found it contained filtered cigars. (DX-600 ¶ 91; DX-194; DX-195.)

131.     In late 2013, UPS Director of Dangerous Goods Brad Cook asked outside counsel to conduct an investigation of more than 540 shippers in the Tobacco Database. Counsel highlighted 30 shippers potentially warranting further investigation; based on account activity and other facts, Mr. Cook identified six of those shippers for potential follow up, including Native Outlet, so he requested an audit of the account on January 2, 2014. (DX-600 ¶¶ 83-85.) The Dunkirk, New York center audited six packages, which had no identifying markings of package contents, and each of the six contained filtered cigars. (DX-600 ¶ 86; DX-244; PX-373.)

132.     On September 14, 2015, after UPS produced documents in this case reflecting the work UPS had done in relation to Native Outlet, the City and State served UPS with a deposition notice that identified Native Outlet (among other shippers) as the subject of additional discovery. Mr. Cook therefore requested additional audits on Native Outlet. On October 6, 2015, the

Dunkirk center audited 30 Native Outlet packages, two of which did not contain any tobacco products. The remaining 28 packages all contained little cigars. (DX-600 ¶ 88; DX-375; DX-363.)

133.    On April 27, 2016, Mr. Cook personally audited all of the packages shipped out of the Dunkirk Center, including packages shipped by Native Outlet. (DX-600 ¶¶ 90, 136; DX-422; Trial Tr. 359:23-360:16.) Each of the packages contained cigars, chew, or other tobacco products, but no cigarettes. (DX-600 ¶ 136; DX-421.)

134.    In April 2013, the Bureau of Alcohol Tobacco & Firearms contacted UPS Security, asking UPS to "search for dispatch records for [bulk] pickups on Cayuga Road in Irving." (PX-530 at 2.) The email specifically required UPS to look for accounts at 33, 1356, 1358, or 1525 Cayuga Road with potential account names of OTDirect, Seneca Direct, Sovereign Seneca, or Smoke Signals and potential account contacts of Nicki Seneca, Emory Williams, Bob Burns, Eric White and John Waterman. (PX-530.) Native Outlet was not identified in UPS's cooperation with the ATF because the account address was not located on Cayuga Road and was not one of the account names listed. (PX-530; PX-455; DX-520.)

### e.    Smokes & Spirits

135.    Smokes & Spirits opened a UPS account in late August 2010, and signed a Tobacco Agreement on October 11, 2010. (DX-602 ¶¶ 31, 32; DX-55; DX-371.) Bob Oldro, the principal of Smokes & Spirits, informed Mr. Fink that he was moving to New York from another state to take advantage of the growth in New York's little cigar market by opening up a new business to ship little cigars. (DX-602 ¶ 372; Trial Tr. 626:23-627:4.) This representation is corroborated by Mr. Fink's notes following an in-person visit with the account on March 4, 2011, indicating a concern regarding proposed changes to the New York tax law regarding little cigars. (DX-526, 'In Person Visit Details' tab, line 3257; An Act to Amend the Tax Law, in

Relation to Little Cigars, Assembly Bill A9015 (DX-47); Senate Bill S5984A (DX-553).) Over the life of the account, Mr. Oldro or his colleagues continued to assure Mr. Fink that the business was only shipping cigars or other tobacco products, not cigarettes. (DX-602 ¶¶ 32, 36; DX-55.)

136.    The driver who provided service to Smokes & Spirits, Lou Potter, did not recall anything about the contents of the shipper's packages. The fact that Mr. Potter developed suspicions about, and terminated service to, a different shipper (Indian Smokes) suggests that he would have terminated service to Smokes & Spirits had he become aware that the shipper was tendering packages containing cigarettes to UPS. (Potter Tr. 10:7-21, 34:20-35:16.)

137.    In late 2013, UPS Director of Dangerous Goods asked outside counsel to conduct an investigation into over 540 shippers in the Tobacco Database; despite no evidence of cigarette shipments, counsel highlighted 30 shippers potentially warranting further investigation. (DX-600 ¶¶ 83-84.) Mr. Cook identified six shippers for potential follow up, including Smokes & Spirits, so he requested an audit. (DX-600 ¶¶ 83-85.) The Dunkirk Center audited 15 packages. Of those 15 packages, nine contained cigarettes, while the rest contained chewing tobacco and filtered cigars. (DX-600 ¶ 97; DX-257; DX-602 ¶ 39.) UPS terminated service to Smokes & Spirits on January 22, 2014. (DX-602 ¶ 40; DX-600 Attachment A; DX-260; DX-256.)

138.    Evidence shows Smokes & Spirits shipped primarily little cigars and other tobacco products. In addition to the chewing tobacco and filtered cigars found in the audit, cooperating witness Bergal Mitchell testified that Smokes & Spirits also shipped candy, flowers, and other tobacco products. (Trial Tr. 1191:6-16.) UPS Night Center Supervisor Debra Blauvelt testified that she would have conducted spot audits of Smokes & Spirits packages, but found only permissible products. (DX-609 ¶ 12; Trial Tr. 1419:23-1420:1.) Smokes & Spirits invoices also indicated a large portion of the volume consisted of little cigars; indeed, the invoices show

that when the account began the volume was almost exclusively little cigars, consistent with the shipper's representations to UPS. (PX-54.)[10]

139.     Plaintiffs argue that UPS should have been aware that Smokes & Spirits was shipping cigarettes due to its inclusion on the PACT Act List beginning on February 15, 2012. But as detailed below, UPS did not have the PACT Act List at the time it was providing service to Smokes & Spirits. By the time UPS received the PACT Act List in September 2013, it had already identified Smokes & Spirits for an audit. (DX-600 ¶¶ 96, 99-100.) Nevertheless, UPS conducted extensive research into Smokes & Spirits and its potential connections to other shippers. (DX-600 ¶¶ 109-111; Trial Tr. 363:8-368:19, 1421:8-24.)

140.     Plaintiffs also argue that there were tracers for lost or damaged Smokes & Spirits packages, which disclosed the contents of packages as cigarettes, and that such tracers should have prompted UPS to conduct due diligence to determine whether Smokes & Spirits was shipping cigarettes through UPS. But all but one of the tracers for Smokes & Spirits were for filtered cigars and other tobacco products, indicating that Smokes & Spirits predominantly shipped legal products. (DX-500, 'Package Details' Tab for Account W9476E.) It is also clear from the tracers information for Smokes & Spirits that filtered cigars are sometimes described as "cigarettes," even though they are not legally classified as such (the tracer for 1ZW9476E0340799286 is described as "1 OF 6 WARRIOR MENTHOL FILTERED

---

[10] Invoices for these non-cigarette products were not requested by plaintiffs or included in the Smokes & Spirits production. (PX-55; Trial Tr. 1222:13-21, 1223:7-9.) When confronted on the stand with PX-54, a spreadsheet created by Mr. Oldro from the records of Smokes and Spirits, which lists orders for cigars, other tobacco products and cigarettes, Mr. Mitchell admitted that he did not know if entire categories of orders were missing from PX-55, including orders for cigars and other tobacco products. (Trial Tr. 1222:13-24.) The spreadsheet created by Mr. Oldro for Smokes and Spirits shows no cigarettes shipped by Smokes and Spirits in most of January 2011, but rather shipments of cigars or other tobacco products (DX-1002.) Additionally, included in the listing of "cigarettes" were e-cigarettes, and neither PX-55 or PX-54 excluded e-cigarettes. (Trial Tr. 1217:11-1220:14; PX-55 at SS008.) PX-54 is not limited to UPS shipments; Mr. Mitchell also testified that Smokes and Spirits use "several" carriers, and at least one entry on PX-54 does not appear to be a UPS tracking number (Trial Tr. 1235:12-21.)

CIGARETTES," even though Warrior Menthol Filtered refers to a brand of little cigars). (DX-500, 'Package Details' Tab, line 13; DX-264 at UPS00043431 (Warrior Menthol Filtered Cigars).)

### 4. Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Native Wholesale Supply/Seneca Promotions.

141. There is no evidence in the record that Native Wholesale Supply or Seneca Promotions ever shipped cigarettes through UPS. Native Wholesale Supply opened an account with UPS in 2002 and last shipped on October 17, 2013. (DX-600 ¶ 139; DX-602 ¶¶ 79, 82.) In 2013, when Native Wholesale Supply last shipped, a new UPS account was opened for Seneca Promotions, identified as being at the same location as was Native Wholesale Supply. (DX-600 ¶ 140; DX-602 ¶ 81.) The new Seneca Promotions account, like Native Wholesale Supply before it, repeatedly informed Mr. Fink, the assigned account executive, that they shipped only promotional materials for tobacco products. (DX-600 ¶ 140; DX-602 ¶¶ 79, 82; Trial Tr. 640:7-12; DX-381; PX-467.) There is nothing in the record to suggest that Mr. Fink knew or took deliberate actions to prevent learning otherwise. Both accounts shipped packages that varied in size and never smelled like tobacco. (Logan Tr. 108:10-17.) An audit of Seneca Promotions in January 2016 confirmed the account did not ship tobacco. (DX-600 ¶ 140.)

142. The record also shows UPS complied with the tobacco policy regarding these accounts, and plaintiffs did not present any evidence that UPS breached the AOD in any way with respect to either shipper. Because neither account shipped tobacco and shipped almost entirely to commercial addresses—not individual consumers—neither required a Tobacco Agreement or entry into the Tobacco Database. (DX-602¶ 82; DX-600 ¶¶ 139, 140.) Further, over two weeks UPS attempted multiple audits of the accounts to confirm the package contents, but neither shipper was shipping sufficient volume for UPS to conduct an audit. (DX-381.)

Accordingly, Mr. Fink contacted the shippers directly to once again reconfirm they shipped only promotional materials with UPS. (DX-381; PX-459; PX-467; Trial Tr. 704:11-17.) When there was sufficient volume for an audit, UPS audited Seneca Promotions and found no tobacco. (DX-600 ¶ 140.)

143. The testimony of cooperating witness, Philip Christ, provides no evidence that UPS shipped cigarettes for Native Wholesale Supply. Mr. Christ testified that a native brand cigarette wholesaler named USTW, located in Salamanca, New York, acquired its supply of cigarettes from Native Wholesale Supply sometime before 2008. (Trial Tr. 905:10-20, 906:18-19.) Mr. Christ's testimony, however, does not establish a link between the supplier of USTW's cigarettes and the Native Wholesale Supply for which UPS had an account.

144. Mr. Christ's testimony is also contradicted by documentary evidence. Mr. Christ provided neither the address of USTW nor of its supplier, but UPS shipping records show only 19 shipments from Native Wholesale Supply to Salamanca, New York with no more than four shipments to any one consignee. (PX-414.) This volume is too insubstantial to have supported the "40 million a year" in USTW cigarette sales to which Mr. Christ testified. (Trial Tr. 905:21-22.) Similarly, the UPS account location was not a cigarette factory, but rather a residence and small warehouse incapable of producing the volume to which Mr. Christ testified. (PX-576; Logan Tr. 108:10-11, 109:20-22.)

145. Similarly, the fact that in 2007, UPS Supply Chain Solutions held 412 cases of cigars and 156 cases of "Opals" at a warehouse located at 5445 N. Bird Creek Ave., Catoosa OK 74015, does not establish either that Native Wholesale Supply was the source of the tobacco products or that UPS had shipped them. (DX-41 at UPS00092311-12.) UPS shipping records show one package shipped from Native Wholesale Supply to the warehouse address in 2006.

(PX-555.) Moreover, Native Wholesale Supply voluntarily destroyed the products rather than pay the import duties, indicating the tobacco products did not come from the New York-based UPS account. (DX-41 at UPS00092311-12.) Nothing regarding the warehousing of these cigars suggests the New York-based Native Wholesale Supply account shipped cigarettes.

### 5. Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Indian Smokes.

146. Plaintiffs offered no evidence suggesting that UPS knowingly delivered cigarettes for Indian Smokes; to the contrary, UPS terminated service to the shipper as soon as a driver became suspicious that the account was shipping cigarettes. (DX-609 ¶ 11; Potter Tr. 10:7-21.)

147. Indian Smokes first opened an account with UPS prior to 2005. That account was identified as a potential cigarette retailer in 2005 based on the AOD's requirement that UPS identify all shippers with the word "smoke" in their name. (DX-35, Ex. E at UPS00087293; DX-23, ¶ 21; Trial Tr. 304:10-22.) Accordingly, the account was canceled as part of a broader plan requiring all smoke shops in the area to open new accounts in order to ensure UPS had an opportunity to vet the shipper and ensure their compliance before allowing the shipper to open another account. (Trial Tr. 200:6-14, 499:22-500:3; PX-306; PX-307; Trial Tr. 508:1-509:3.) Indian Smokes was entered into the Tobacco Database, but because the account never violated the tobacco policy, it has no violations or disciplinary measures noted in the Database.[11] (Trial Tr. 207:3-7; DX-371, line 14.)

148. Indian Smokes opened a new account with UPS on September 3, 2010, but did not begin shipping any volume until late April 2011. Following the patch-of-land transition, the account was assigned to Mr. McDowell, who handled the account thereafter. (Trial Tr. 664:4-5,

---

[11] As with RJESS, discussed below, the "Comments" field of the Tobacco Database states the account was canceled "per self-audit." (DX-371, line 1344.) This entry indicates during the March 12, 2008 audit of the Tobacco Database, it was discovered that the account already had been canceled. (DX-371, line 1344; Trail Tr. 374:14-375:12.) The field does not indicate the account remained active until March 2008.

671:5-6; DX-510, line 2.) Eleven days after receiving the account, Mr. McDowell contacted Indian Smokes and obtained a Tobacco Agreement on February 22, 2011. (DX-68; DX-8 at UPS00087088; DX-371, line 3053.) In accordance with his general practice, Mr. McDowell, at that time, would have made Indian Smokes aware that UPS did not ship cigarettes and confirmed the shipper was shipping only permissible tobacco products. (Trial Tr. 666:19-667:17.)

149.    A month later, when Indian Smokes still had not begun shipping, Mr. McDowell contacted Indian Smokes to again confirm they were selling cigars and to determine why they had not yet shipped anything. (DX-510, line 36.) After Indian Smokes began shipping, UPS account executive Gerry Fink—though not involved with the account—confirmed the new volume was cigars, and Mr. McDowell thereafter further confirmed that Indian Smokes knew it was not permitted to ship cigarettes. (DX-510, line 30; Trial Tr. 633:4-11, 640:4-6; PX-347, line 29.) Mr. McDowell handled Indian Smokes' account in compliance with UPS tobacco policy, and there was no indication that the account would ship cigarettes.

150.    The record also shows that UPS drivers and operations personnel handled the account according to the UPS tobacco policy and terminated the account when they became suspicious that it was shipping cigarettes. In 2012, UPS Driver, Lou Potter, in accordance with the training he received from UPS, reported to management that he suspected Indian Smokes potentially was shipping cigarettes. (Potter Tr. 9:13-10:15; DX-609 ¶ 11.) Even though UPS had no actual knowledge that Indian Smokes was shipping cigarettes, UPS stopped picking up packages from the Indian Smokes account in September 2012 and formally terminated the account on April 18, 2013. (DX-600 ¶¶ 15-17, 75, 82; DX-600 Attachment A.)

151.    The fact that Mr. McDowell, aware that the tobacco policy contained steps for progressive discipline, contacted Indian Smokes to determine whether they would agree to

comply with the tobacco policy and ship only their cigar volume through UPS is not proof of any breach of the AOD. In any event, it is immaterial, as Indian Smokes never reopened its account. (Trial Tr. 678:12-679:1; DX-22 at UPS00087278.) As Mr. McDowell explained, Indian Smokes knew that UPS would continue to audit their packages and thus no longer wanted to ship via UPS and therefore did not reopen their account. (PX-162.) In accordance with the AOD, had Indian Smokes been interested in UPS's progressive discipline policy under the AOD, Gary DeWeerd and Brad Cook would have decided whether the progressive discipline plan contemplated by the AOD and contained in the tobacco policy was appropriate for Indian Smokes. (DX-22 at UPS00087278; Trial Tr. 716:25-717:9.)

152.    Unbeknownst to UPS, the State had reason to believe Indian Smokes might be shipping cigarettes in or about July 2011, as an entity called Indian Smokes was included on the PACT Act List for the first time in May 2011. (DX-478.) The May 2011 PACT Act List included an Indian Smokes with a P.O. Box in Salamanca, New York. (PX-471.) But UPS had not received the PACT Act List, and the State did not inform UPS that one of its shippers appeared to be included on such List. (DX-600 ¶ 100; *see infra*, ¶¶ 227-231.) Plaintiffs, via the City, first notified UPS regarding Indian Smokes ten months after UPS terminated the account, on July 29, 2014. (PX-248.)

6.    **Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Elliot Enterprises/EExpress/Bearclaw Unlimited.**[12]

a.    **Elliot Enterprises**

153.    Elliot Enterprises opened a UPS account on October 4, 2010. The shipper operated from a store front on 38 Main Street, Salamanca, NY 14779, on the Seneca Allegany reservation. (DX-602 ¶ 58; DX-490 at 2.)

154.    UPS account executive Gerry Fink was assigned to the Elliot Enterprises account around the time UPS introduced its "patch-of-land" concept for dividing responsibility among its account executives. (DX-602 ¶ 58.) Following the patch-of-land transition, Mr. Fink's territory grew from approximately 250 such accounts to include the approximately 4,500 such accounts served by the UPS Centers in Dunkirk, Jamestown, Olean, and Hornell, New York. (DX-602 ¶¶ 5, 9; Trial Tr. 644:11-21.)

155.    Mr. Fink's early notes concerning the Elliot Enterprises account show that he was able to learn little about the account. Tina Mahon, who handled lower volume accounts assigned to Mr. Fink, assisted with the account. (DX-602 ¶ 59.) Shortly after the account opened, on October 11, 2010, Mr. Fink visited Elliot Enterprises and attempted to meet with someone there, but was unsuccessful in doing so. (Trial Tr. 609:12-610:14; PX-602.) Mr. Fink contemporaneously memorialized this visit in a sales activity spreadsheet, under the "Activity Comment" field. In that field, Mr. Fink entered only "#X1X635 #9455556"—Elliot Enterprises' account number and phone number and not any detail about the contact person and business

---

[12] These shippers are addressed in the same section based on plaintiffs' grouping of the shippers. While Aaron Elliot may have been involved with both Elliot Enterprises and EExpress, as explained in paragraphs 177-178, there is no evidence that Bearclaw Unlimited had any legal or factual affiliation with either shipper. Aaron Elliot had no affiliation with the account, which had different ownership and was a competitor of the other two shippers. Even as to Elliot Enterprises and EExpress, plaintiffs failed to show that Aaron Elliot was listed as the contact person for Elliot Enterprises, or that any other information that would have been included in the database would have tied the two shippers together.

(PX-602, 'kinney' tab, line 12); Mr. Fink typically would have entered such additional detail if he had met with anyone at the business (*see e.g.* PX-602, 'kinney' tab, line 33). The comparative lack of detail for Elliot Enterprises corroborates Mr. Fink's memory that after the account opened, he visited the account, but he failed to meet with anyone there. Further corroborating Mr. Fink's testimony is his Activity Comment on February 4, 2011, stating that he still "Need[ed] to clarify owners & primary contacts" of Elliot Enterprises, which he believed Ms. Mahon may have had. (DX-526, 'In Person Visit Details' tab, line 3218; DX-602 ¶ 62.)

156. Mr. Fink thus admittedly had little contact with Elliot Enterprises and therefore little basis for his note indicating that he "believe[d]" that Elliot Enterprises opened its account because it had made the same transition to little cigars that other smoke shops in his area were making at that time. (DX-526, line 3218*;* PX-136.) While Mr. Fink assumed at the time that Elliot Enterprises was shipping tobacco products—specifically, little cigars—he admittedly never spoke to anyone at Elliot Enterprises, nor did he obtain a Tobacco Agreement, in contravention of UPS's tobacco policy. (Trial Tr. 600:14-22, 591:15-592:7.)

157. While Mr. Fink arguably could have been more persistent in contacting Elliot Enterprises, his inability to follow-up with Elliot Enterprises is understandable given that Mr. Fink gained approximately 4,000 new accounts at the time Elliot Enterprises opened and began shipping. (Trial Tr. 644:11-21.) Moreover, as Tina Mahon also was assigned the account, it was reasonable for Mr. Fink to assume that Ms. Mahon would have informed Elliot Enterprises of the tobacco policy, as she was trained to do so and had previously obtained Tobacco Agreements. (*See e.g.*, Trial Tr. 646:8-16, 647:12-22.) Nothing about the standard storefront and range of tobacco products—common to the majority of Mr. Fink's tobacco accounts—would have

indicated that Elliot Enterprises was willing to violate New York law and ship cigarettes to consumers. (Trial Tr. 590:19-591:3.)

158. Elliot Enterprises was ultimately terminated on or about September 18, 2012 after a driver discovered the shipment of cigarettes. (DX-600 ¶ 76; DX-602 ¶ 63; PX-172.) Accordingly, once anyone at UPS had actual knowledge of Elliot Enterprises, UPS fulfilled its obligations under the AOD and the law by terminating the shipper.

159. Plaintiffs argue that UPS should have been aware that Elliot Enterprises was shipping cigarettes due to the inclusion of the shipper on the PACT Act List. Plaintiffs argue that because Elliot Enterprises appeared on the PACT Act List beginning on November 10, 2010, and that UPS received the List on November 12, 2010, UPS should have been aware, or should have conducted due diligence to determine whether, Elliot Enterprises was shipping cigarettes through UPS. As detailed below, however (*see infra*, ¶¶ 227-231), no one in UPS's domestic operations received the PACT Act List before August 2013, and the State did not inform UPS that one of its shippers appeared to be included on such list. (DX-600 ¶ 100.)

160. Plaintiffs also argue that Elliot Enterprises submitted "claims" to UPS for lost or damaged packages, and that since the "claims" disclosed the contents of packages as cigarettes, UPS should have conducted additional due diligence to determine whether Elliot Enterprises was shipping cigarettes through UPS. What plaintiffs refer to as claims from Elliot Enterprises actually were "tracers"—calls to a 1-800 customer service representative or an online report entered into UPS's system for packages that never resulted in an actual claim. In any event, at the time of the tracers from Elliot Enterprises, UPS was not using tracers or claims as a research tool to determine whether a shipper might be violating UPS policy. To the extent that any individuals at UPS actually evaluated the tracers Elliot Enterprises submitted, they were not

required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (DX-600 ¶¶ 149-150; DX-500.) Thus, the existence of tracers cannot be imputed as UPS's knowledge. (*See also infra*, ¶¶ 233-235.)

161.    While the remainder of plaintiffs' argument concerning Elliot Enterprises turns on Mr. Fink knowing Aaron Elliot, the putative owner of Elliot Enterprises, Mr. Fink testified that he never met Aaron Elliot, did not know him, and never knew he had any connection to Elliot Enterprises. (DX-602 ¶ 67.) There is no evidence in the record to the contrary. Indeed, Mr. Fink would have had no incentive to hide Mr. Elliot's involvement with Elliot Enterprises. The entry in the Tobacco Database for Mr. Elliot's prior account, Rock Bottom Tobacco, shows the account never violated the Tobacco Agreement it signed on April 7, 2005. (Trial Tr. 207:3-7; DX-371, line 472.) Rather, the account was canceled as part of the broader plan requiring all smoke shops in the area to establish new accounts with new Tobacco Agreements. (DX-23 ¶ 21; Trial Tr. 200:6-14, 499:22-500:3.) Because Rock Bottom Tobacco never violated the tobacco policy, Mr. Elliot would have been permitted to open a new account. (Trial Tr. 200:6-14, 499:22-500:3.) Thus, there would have been no reason for Mr. Fink to hide Mr. Elliot's involvement with Elliot Enterprises, had he known of it (and the record is devoid of any such evidence).

### b.    EExpress

162.    EExpress opened an account with UPS on September 20, 2012. (DX-602 ¶ 65.) The account operated from a residential house at 11074 Indian Hill Road, Perrysburg, New York 14129 on the Seneca Cattaraugus reservation. (*Id.*; Logan Tr. 82:4-19.)

163.    On September 25, 2012, Mr. Fink called EExpress and spoke to a woman named Adrian, whom he remembered from her prior employment at a smoke shop called LouAnn's Smoke Shop. (DX-602 ¶¶ 66, 67; DX-511, line 40.) Adrian informed Mr. Fink that EExpress was not shipping tobacco, but she would not disclose exactly what they were shipping; she said

that EExpress wanted to maintain the confidentiality of its business model in order to avoid competition from others on the reservation. (DX-602 ¶ 67.) Based upon the account name, residential location, and assurance that they did not ship tobacco, Mr. Fink did not obtain a Tobacco Agreement from EExpress. (*Id*.) Consistent with this understanding, Mr. Fink informed his supervisors EExpress was not a tobacco shipper. (DX-184.)

164.    Mr. Fink testified that his reference to EExpress as a "cigar shop," in an email to Senior Sales Manager Mike Zelasko (DX-184), was a mistake. (Trial Tr. 637:5-15.) Either way, though, the email would not have given Mr. Zelasko, or anyone else at UPS, reason to believe EExpress was shipping cigarettes. Mr. Fink's 4,500 accounts included a number of cigar shops and at that time, only two had been terminated for shipping cigarettes. (DX-600 Attachment A; DX-602 ¶¶ 5, 13.)

165.    Mr. Fink later provided Adrian with a Carrier Agreement, which she returned signed by her business partner, Aaron Elliot. (DX-602 ¶ 67.) Mr. Fink, having never met Mr. Elliot at Elliot Enterprises, did not recognize the name and made no connection to the prior account. (DX-602 ¶¶ 67, 75.) Indeed, as with Elliot Enterprises, Mr. Fink never interacted with Mr. Elliot at EExpress. (*Id.* ¶ 67.)

166.    UPS first suspected EExpress might be shipping cigarettes in May 2014, when attorneys for the City and State identified a shipper named Native Express, located at 11074 Indian Hill Road. (DX-600 ¶ 121.) While UPS did not have an account for Native Express, UPS identified EExpress as being located at the address in question and so requested an audit. (*Id.* ¶ 122.)

167.    Following standard protocol, Mr. DeWeerd asked Mathew Szelagowski to arrange for an audit. (Trial Tr. 709:2-25.) Mr. Szelagowski called the Dunkirk Center Manager,

Mike Shea, instructed him to have his center conduct the audit, and provided him with instructions. (Trial Tr. 709:11-22, 714:2-25.) Mr. Szelagowski then provided formal audit instructions to Mr. Shea and Center Supervisor Jennifer Puleo. (Trial Tr. 709:23-710:11, 714:2-25; DX-608 ¶ 23(b); DX-300.) As with all other audit requests, Ms. Puleo and Mr. Shea were instructed to open "100% … of all packages pick[ed] up" over the next three days and to maintain the confidentiality of the audit. (DX-300; DX-312; Trial Tr. 710:12-712:24, 714:2-25, 1404:3-8.)

168.    Ms. Puleo conducted the audit on Monday May 5, 2014 and found Tim Horton's coffee, a popular brand in the Buffalo area. (DX-600 ¶ 122; DX-549; DX-608 ¶ 23(b); DX-602 ¶ 70.) The following morning, Tuesday May 6, Ms. Puleo asked Shelly St. George to forward the pictures of the audit to Dangerous Goods. (DX-602 ¶ 71.) Mr. Fink, who was at the Dunkirk Center as part of his regular weekly routine of visiting that Center on Tuesdays, helped Ms. St. George upload the pictures from the camera. (Bankoski Tr. 29:23-30:5; Logan Tr. 16:20-25.)

169.    Approximately one month later, on June 11, 2014, an Elliot Enterprises package broke open in the Dunkirk Center, revealing cigarettes. (DX-600 ¶ 123; DX-608 ¶ 19; DX-326.) Ms. Puleo contacted Mr. Szelagowski who instructed her to audit the other packages shipped that same day. (DX-608 ¶ 20; DX-329.) That audit revealed cigarettes and UPS promptly terminated the account. (DX-600 ¶ 123; DX-323; DX-326; DX-328; DX-334.)

170.    After the second audit, Mr. Szelagowski and Mr. DeWeerd "thought it was unusual that [the audit] found coffee the first time and cigarettes the second time." (Trial Tr. 693:5-14.) They questioned whether it was possible EExpress had learned of the first audit, but ultimately determined the audit could not have been compromised. (Trial Tr. 693:5-14, 714:2-25.) In an email about an unrelated shipper nearly two years after the audit, Mr.

Szelagowski alluded to the possibility that EExpress might have been tipped off before the audit that revealed coffee in its packages. (PX-536.) Mr. Szelagowski reiterated, however, that he and Mr. DeWeerd ultimately concluded that the audit had not been compromised. (Trial Tr. 692:20-693:21.) As Mr. Szelagowski explained, he had provided Mr. Shea and Ms. Puleo with the standard instructions on audit protocol, consistent with the procedures set forth in the Tobacco Manual. (Trial Tr. 716:5-18; DX-22, page 29-30; DX-300; DX-314.) Mr. Shea and Ms. Puleo knew the audit was to remain confidential, so the driver, the account executive, and the customer were not to be informed. (Trial Tr. 693:5-14, 714:2-25, 1404:3-11.) Further, Mr. Shea and Ms. Puleo proved themselves trustworthy with prior audits and when they reported EExpress for shipping cigarettes only a month later.

171.    UPS did not know of any relationship between Elliot Enterprises and EExpress. Elliot Enterprises was a retail store and EExpress was operated out of a residential house. The two shippers were located more than 30 miles apart, on different reservations. There is also no evidence that Mr. Fink's only contact at EExpress, Adrian, had ever had any association with Elliot Enterprises. The only alleged link between the two accounts was Aaron Elliot, but Mr. Fink did not know of Mr. Elliot's involvement in Elliot Enterprises. (DX-602 ¶ 78.) Nor did Mr. Cook have any reason to compare the two accounts. (DX-600 ¶ 124.)

### c.    Bearclaw Unlimited

172.    Bearclaw Unlimited opened a UPS account in early October 2010 (DX-602 ¶ 142.) Arnold Cooper, the primary contact, told Mr. Fink that Bearclaw Unlimited was an eBay retailer selling items such as screen printed shirts. (DX-602 ¶¶ 143-144; DX-77.) There was no indication that Bearclaw intended to ship cigarettes.

173.    On August 30, 2011, a UPS Regulated Goods Associate in UPS's Desert Mountain District in Arizona notified Corporate Dangerous Goods that Bearclaw Unlimited had

shipped a single package of cigarettes to a consumer in the State of Arizona. (DX-600 ¶ 73.)

Gary DeWeerd of UPS Corporate Dangerous Goods contacted Mr. Fink; he instructed Mr. Fink

to meet with a management employee of Bearclaw to address the violation, to review UPS's

policy against the shipment of cigarettes to consumers, and to obtain a corrective action plan, all

of which was permissible under the progressive discipline procedure set forth in the AOD.

(DX-23 ¶ 28.) Mr. Fink met with Mr. Cooper, reviewed UPS's policy with him, and obtained a

corrective action plan on September 9, 2011. (DX-600 ¶ 73; DX-115; DX-119.) Mr. Cooper

signed a letter in which he represented that he "underst[ood] the policy and [would] adhere to it

by not shipping cigarettes to unlicensed retailers and/or consumers." (DX-119.) He also stated

that he had gone "over this with my staff and [would] not let it happen again." (*Id*.)

174.    In September 2012, the Olean Center conducted an audit of Bearclaw Unlimited

and identified two packages of cigarettes addressed to consumers. (DX-600 ¶ 75; DX-161.) The

account was terminated immediately, and no further shipments were made. (DX-161; DX-165;

PX-531; PX-532.)

175.    Plaintiffs point to Bearclaw having opened eighteen different accounts at the 4888

Klawitter Road address, including an account named "AFIA." This fact, however, has no bearing

on the contents of Bearclaw's packages or UPS's knowledge. Shippers have the ability to open

their own accounts online at any time, for any reason. (Trial Tr. 496:12-13, 617:6-16.) There is

no evidence that Bearclaw shipped any packages through the majority of these accounts.

176.    "Tracers" entered into UPS's system (as described below, *see infra*, ¶¶ 233-235)

show one claim for cigarettes in a lost or damaged Bearclaw package on January 24, 2011. Even

though there was one reported shipment of cigarettes in the tracers, UPS had no knowledge of

that tracer nor did Mr. Fink ever see such a tracer. The AOD did not require and the State never

thought that tracers could be used by UPS as a research tool to identify a shipper that might be violating UPS tobacco policy. To the extent that any individuals at UPS may have  evaluated the tracers Bearclaw submitted—and there was no evidence that any such evaluation ever occurred—they were not required as part of their job duties to relay such information to UPS's Dangerous Goods department or the sales team handling the account. (DX-600 ¶¶ 149-150; DX-500.) Accordingly, the one tracer claiming cigarettes in a lost or damaged package cannot be the basis for UPS's knowledge that Bearclaw was shipping cigarettes through UPS.

177.     Plaintiffs claim Bearclaw is related to Elliot Enterprises and EExpress on the basis that the contact for one of the 18 Bearclaw accounts overlapped with the contact for DeerPathCigs, an account closed in 2005, and the PACT Act List identified DeerPathCigs.com as the website for Elliot Enterprises. (ECF No. 399 ¶¶ 223, 245, 263.) As an initial matter, UPS did not have the PACT Act List at that time and, as addressed below (*see* ¶ 305), had no reason to trace any connection through DeerPathCigs, as that account had never violated the Tobacco Policy. (DX-371, line 261.)

178.     But more to the point, nothing in the record establishes an actual connection between Bearclaw and the two alleged Aaron Elliot shippers. Bearclaw and the Elliot accounts had different owners and different primary contacts. (DX-602 ¶ 143; PX-128.) The accounts were located at different addresses. (DX-602 ¶¶ 58, 65, 142.) And Bearclaw shipped at the same time as the other two accounts, suggesting it was a competing smoke shop, not a related entity. (*Id*.) That a contact person for one account worked at another account seven years prior—and is not alleged to have owned either—establishes only that the person changed jobs, not that the accounts were related.

### 7. Plaintiffs Failed To Prove That UPS Knowingly Transported Cigarettes For Arrowhawk/Hillview Cigars/Seneca Cigars/Two Pines Enterprises.

179.     Plaintiffs assert that a "group" of shippers—Arrowhawk Smoke Shop, Hillview Cigars, Seneca Cigars, Native Gifts, and Two Pines Enterprises[13]—shipped cigarettes through UPS. While the City offers evidence that it made two "controlled purchases" of cigarettes from Seneca Cigars in June 2012, the City chose not to share this information with UPS until it provided UPS with a draft complaint in October 2013, 16 months later. (DX-147 at 1.) Had the City provided this information to UPS, any shipments of cigarettes from the shipper or its alleged affiliates via UPS could have been stopped as early as June 2012.

180.     UPS account executive Rich DelBello and inside sales representative Ryan Keith and UPS driver Vincent Guarino gave credible testimony that while they understood that these shippers were affiliated either through common ownership or otherwise, none of them believed or had reason to believe that the shippers were shipping cigarettes. (DX-604 ¶¶ 48, 53; DX-603 ¶¶ 48, 56; DX-607 ¶¶ 10-11, 15.) Mr. Keith, Mr. DelBello and Mr. Guarino were all told, some of them repeatedly, that these accounts were shipping cigars. (Trial Tr. 741:4-8, 741:22-25, 849:2-11, 1348:4-6.)

#### a. Arrowhawk Smoke Shop

181.     The Arrowhawk Smoke Shop account was opened on January 12, 2012. One year later, in February 2013, Arrowhawk Smoke Shop became Hillview Cigars. (DX-604 ¶¶ 18-19.) The Hillview Cigars account closed in September 2013 (DX-603 ¶ 49.)

---

[13] These shippers are addressed in the same section based solely on Mr. Christ's alleged work as an independent contractor for each shipper.

### b.     Seneca Cigars and Hillview Cigars

182.     The Seneca Cigars account was opened on January 9, 2012 and closed on September 13, 2013. (DX-604 ¶ 20; DX-603 ¶ 49.)

183.     In February 2012, Mr. DelBello had his first conversation with Mr. Christ, a consultant for these accounts. (Trial Tr. 884:3-4.) Mr. Christ told Mr. DelBello that he had been informed by legal counsel that companies could legally ship cigarettes to consumers. (*Id*. 884:10-18.) Mr. Christ claimed that he could open 20 accounts with large shipping volume if UPS would permit him to ship cigarettes. Mr. DelBello knew that UPS policy prohibited the shipment of cigarettes to consumers in New York, and confirmed with his manager Tricia Piccirilli and another account representative, that cigarette shipments were prohibited to consumers nationwide. (*Id*. 884:19-885:7.) Mr. DelBello informed Mr. Christ of UPS policy, and told him that he could not open an account to ship cigarettes. (*Id*. 849:2-11, 885:8-13.)

184.     On March 9, 2012, Mr. DelBello met with Mr. Christ in person about the Seneca Cigars account. (Trial Tr. 839:15-23; DX-128) Mr. Christ, along with two other people involved with the company, assured Mr. DelBello that Seneca Cigars would be shipping cigars. (Trial Tr. 837:23-838:14.) Mr. DelBello again informed Mr. Christ of UPS Policy, and reiterated that accounts were prohibited from shipping cigarettes to consumers; Mr. Christ responded that the Seneca Cigars account would be shipping cigars. (*Id*. 886:13-17.)

185.     Mr. DelBello believed Mr. Christ when he told him that Seneca Cigars would be shipping cigars for several reasons: Mr. Christ had been informed of UPS policy and told Mr. DelBello that the account would be shipping cigars; Mr. Christ had originally told Mr. DelBello that he could open 20 accounts or more to ship cigarettes, but when he could only ship cigars the number of account dropped to one or two accounts; and Mr. DelBello was aware that cigar smoking had become more popular at the time. (Trial Tr. 886:24-887:13.) Mr. DelBello had no

reason to disbelieve Mr. Christ when he said he was shipping cigars; Mr. Christ was candid in his first conversation with Mr. DelBello and asked to ship cigarettes, and when he was told that he could not ship cigarettes, he opened companies with the word "cigars" in the title. (DX-604 ¶ 23.)

186.     Plaintiffs cite to two emails where Mr. DelBello noted that he refused to open an account for Mr. Christ to ship cigarettes, but then an inside sales representative worked with Mr. Christ. (DX-531[14]; DX-335.) These emails do not support an inference that the sales representative knew that Mr. Christ was shipping cigarettes; to the contrary, DX-531 notes expressly that the inside sales representative set up accounts for Mr. Christ to ship *cigars*. (DX-531; Trial Tr. 848:18-849:11.)

187.     The inside sales representative referred to in the emails is Craig Foster. In March 2012, after Mr. DelBello visited Seneca Cigars, Mr. DelBello emailed with Mr. Foster, confirming that he had visited Seneca Cigars, that it was a legal business, and noted that UPS would be able to increase volume if they agreed to ship cigarettes, but that it was a violation of UPS policy to ship cigarettes. (DX-604 ¶ 24; DX-140.) Mr. DelBello explained that his comment about the potential increase in volume if UPS agreed to ship cigarettes was based on the fact that Mr. Christ had originally promised a large volume of shipments from 20 accounts, which never materialized when he opened four accounts over two years to ship cigars. (Trial Tr. 843:14-844:11.)

188.     Mr. Christ also told Mr. Keith that Seneca Cigars and Hillview Cigars were shipping cigars. (DX-603 ¶ 26.) Mr. Keith had no reason not to believe what Mr. Christ told him. Mr. Keith had several telephone conversations with Phil Christ, beginning in January 2013 about

---

[14] DX-531 is the same document as PX-340.

Seneca Cigars and Hillview Cigars. During these conversations, Mr. Christ discussed his interest in complying with regulations and laws. (Trial Tr. 765:21-766:3.)

189.    In June 2013, Mr. Christ asked for revised pricing in part to help defray the cost of adult signature fees. (Trial Tr. 738:16-739:4.) Mr. Christ told Mr. Keith that he believed that a new law was potentially going to require adult signatures for the cigars that Seneca Cigars and Hillview Cigars were shipping. (*Id*. 740:19-741:3, 785:6-13.) At the request of the pricing group at UPS, Mr. Keith filled out an Account Strategy Planning Tool ("ASPT") in June 2013. (DX-603 ¶ 26; DX-532.) To fill out this ASPT, Mr. Keith visited Seneca Cigars website, and Mr. Keith focused on the section of the webpage for cigars and other tobacco products. (Trial Tr. 783:2-12.) Mr. Keith was aware that the company *sold* cigarettes but was assured by Mr. Christ, and believed, that the companies would only use UPS to *ship* cigars. (DX-603 ¶ 26.) Mr. Keith believed Seneca Cigars and Hillview Cigars were law-abiding companies; he noted in the ASPT that one of the concerns for Seneca Cigars and Hillview Cigars was "complying with government regulations" and that an underlying need to the businesses was to find a "[c]ost-effective way to ensure complete compliance with all applicable state and federal mandates." (DX-532.)

190.    In October 2013, Mr. Keith's contemporaneous notes in his TEAMS report states that Mr. Christ told him that "everything he ships is considered a cigar," that his only question was a product called Swisher Sweets, and that he would check with his lawyer on the legality to ship that product. (Trial Tr. 789:13-790:4; DX-511, line 289 at UPS00000189.) Mr. Keith had no reason to believe Mr. Christ would violate UPS policy or the law. (Trial Tr. 779:15-20.)

191.    PX-344, to which plaintiffs refer as evidence that Mr. Keith had knowledge that the Arrowhawk accounts were shipping cigarettes, does not support such an inference. (PX-344.)

The document does not mention anything about cigarettes; it is instead merely a description of the pricing negotiations between Mr. Keith and Mr. Christ.

192.    The driver who provided service to Seneca Cigars and Hillview Cigars, Mr. Guarino, did not ever suspect that the shippers were shipping cigarettes. (DX-607 ¶¶ 9-12.) As he did to Messrs. DelBello and Keith, Mr. Christ assured Mr. Guarino that the shippers were shipping little cigars and other tobacco products. Mr. Guarino did not see any packages containing cigarettes from the shippers, nor did he suspect as much. (DX-607 ¶¶ 11-12.)

193.    When Mr. Guarino picked up packages from the Seneca Cigars and Arrowhawk/Hillview Cigars location, he could not see inside the warehouse. (Trial Tr. 1345:14-22.) On one occasion, Mr. Guarino observed Mr. Christ taping up a box that appeared to have cartons inside. (*Id*. 1348:1-3.) Mr. Guarino asked Mr. Christ what he was shipping, because he knew that UPS policy prohibited the shipment of cigarettes to consumers. Mr. Christ told him that he was shipping little cigars, and Mr. Guarino believed him. (*Id*. 1348:4-6; 1349:8-16.) Mr. Guarino checked with his supervisor to make sure that little cigars were permitted to be shipped, and was told that little cigars were permitted. (*Id*. 1351:15-25.)

### c.    Two Pine Enterprises

194.    Two Pine Enterprises was opened on July 9, 2013, and terminated on April 18, 2014. (DX-603 ¶ 31, DX-604 ¶ 39.) Mr. Christ informed Mr. Keith in June 2013, when they were negotiating the pricing for Seneca Cigars and Hillview Cigars, that the owners of the companies were planning to purchase a new company, which had been shipping with a competing carrier but would move its business to UPS. (DX-603 ¶ 31; DX-511, line 266 at UPS00000187.)

195.    Both Mr. DelBello and Mr. Keith were told and believed that Two Pines, as an affiliate of the other shippers, was also not shipping cigarettes, but only cigars or other tobacco products. (DX-604 ¶ 42; DX-603 ¶¶ 54, 56.)

196.    Mr. Guarino also provided service to Two Pines Enterprises, which was at a different location than Seneca Cigars and Hillview Cigars. (DX-607 ¶ 14.) He also did not see any packages containing cigarettes from Two Pines, nor did he suspect as much. (*Id.* ¶ 15.)

197.    In March 2014, Two Pine Enterprises was found to be dropping packages at a location that was not its regular pickup location; at the time, Ms. Uebelhoer, the owner of Two Pine, said she was doing so because of the time of UPS's daily pick-up for the account. (DX-529.) Mr. DelBello noted that he did not believe Ms. Uebelhoer's explanation, but only because he believed that it may have been a matter of convenience for her to drop the packages at the UPS Store rather than wait for the UPS driver. (Trial Tr. 882:18-883:11; DX-529.) Mr. DelBello had no suspicion that Two Pine Enterprises might be shipping cigarettes. (Trial Tr. 883:12-18.) Mr. DelBello informed Ms. Uebelhoer that she had to resume pick-up service for her account. (DX-604 ¶ 37.)

198.    At this time, in March 2014, Mr. Guarino had not picked up from that account for some time. (Trial Tr. 1351:2-7.) When he resumed picking up from the Two Pine Enterprises location, Mr. Guarino noted that Ms. Uebelhoer had become less friendly toward him, and he reported this unfriendliness to his supervisor. (DX-607 ¶ 18.)

199.    Shortly thereafter, on April 15, 2014, a clerk in a UPS center in Philadelphia reported that a package from Two Pine Enterprises had broken open on a conveyor belt, revealing cigarettes. The clerk followed UPS's process and contacted Regulated Goods, documenting the tobacco policy violation. (DX-600 ¶ 116; DX-290.) Based on the information

from the clerk in Philadelphia, Corporate Dangerous Goods requested an audit of Two Pine Enterprises, which took place on April 17, 2014. UPS terminated the account for Two Pines immediately after the audit finding cigarettes. (DX-600 ¶¶ 116-117; DX-604 ¶¶ 38-40; DX-607 ¶ 21; DX-299; DX-528.)

200.    Plaintiffs misleadingly focus on two emails from Mr. DelBello referring to Mr. Christ and Ms. Uebelhoer (also associated with these accounts) as "liars." Both of these emails are dated *after* the audit of Two Pine Enterprises on April 17, 2014; DX-335 is dated June 26, 2014, and PX-336 is dated April 23, 2014. Once the audit revealed cigarettes, Mr. DelBello realized that Mr. Christ and Ms. Uebelhoer had lied to him about shipping cigars, but before the audit he had no reason to believe that they were lying about shipping cigars. (Trial Tr. 860:25-861:11, 887:20-889:10.) Mr. DelBello refused to do business with Mr. Christ after the Two Pine audit. (DX-604 ¶ 43.)

### d.    Native Gifts

201.    Native Gifts was opened on September 23, 2013 at a location that was outside of Mr. DelBello and Mr. Keith's area of responsibility. (DX-604 ¶ 49; DX-603 ¶ 40.) Both Mr. DelBello and Mr. Keith were informed that Native Gifts was opened as a temporary account due to a fire, and they were informed by Mr. Christ that Native Gifts, like the other accounts, would be shipping cigars or other tobacco products but would not be shipping cigarettes. (DX-604 ¶¶ 45-46; DX-603 ¶¶ 40-41.)

202.    During his testimony Mr. Christ never mentioned Native Gifts. Plaintiffs have failed to provide any evidence of what Native Gifts was shipping. The only evidence of any cigarettes shipped by Native Gifts is a tracer filed in July 2014, *after* the account had stopped shipping. (PX-406, line 9601.)

203.     Mr. DelBello never suspected that Seneca Cigars, Hillview Cigars, Two Pine

Enterprises or Native Gifts was shipping cigarettes. Plaintiffs focused on two emails from Mr.

DelBello, from late September and early October 2013, when the Native Gifts account was first

opened. Mr. DelBello explained that he had concerns about the ownership issues of the related

entities and considered the shifting names to be "odd" (DX-531), which he once described in an

email as "fishy."(DX-215). Mr. DelBello noted that the changing names and addresses created

questions about ownership of the companies. (Trial Tr. 857:7-11.) The phrases odd and fishy had

nothing to do with the commodity that was being shipped, and Mr. DelBello did not suspect that

these entities were shipping cigarettes. (Trial Tr. 855:18-22, 890:15-892:10.)

### e.     Tobacco Agreements

204.     With the exception of Arrowhawk (which changed its name to Hillview Cigars),

the shippers within this alleged shipper "group" all signed Tobacco Agreements with UPS.

(DX-604 ¶ 34; DX-603 ¶¶ 30, 38, 45-46; DX-179; DX-188; DX-210; DX-232; DX-511, lines

39, 263, 285.)

205.     Mr. Keith realized in June 2013, when discussing a pricing agreement for Seneca

Cigars and Hillview Cigars, that the accounts did not have Tobacco Agreements on file. Once

Mr. Keith came to that realization, he immediately obtained signatures for the Tobacco

Agreements (Trial Tr. 742:1-11, 743:3-744:4, 757:23-759:2.) Due to oversight in the paperwork,

Mr. Keith did not obtain an executed copy of Tobacco Agreements for Two Pine Enterprises

immediately upon the opening of the account in July 2013, but obtained one in October 2013.

(Trial Tr. 754:6-14; DX-228.) Mr. Keith immediately sent a Tobacco Agreement to Mr. Christ

for the Native Gifts account, and the agreement was returned about four weeks later. (Trial Tr.

761:3-7.) Plaintiffs' cooperating witness, Mr. Christ, testified that all four companies had

Tobacco Agreements. (Trial Tr. 921:15-17.) The Tobacco Agreement says that "UPS does not provide service for shipments of cigarettes to consumers." (DX-210 at UPS00012298.)

### f. UPS Employees Had No Motive To Allow Shippers To Violate UPS Policy

206.    UPS employees did not have a motive to allow these allegedly affiliated accounts to ship cigarettes.

207.    While the accounts were among Mr. Keith's larger accounts, they accounted for approximately $635 a day in revenue, out of the approximately $28,000 a day for which he was responsible. (Trial Tr. 778:6-12; PX-344.) The termination of any one account was unlikely to have any impact on Mr. Keith's Sales Incentive Program portion of his compensation (Trial Tr. 776:1-5.)

208.    When the Two Pine Enterprises account was terminated, Mr. DelBello asked if the account could be removed from his revenue plan. This request was rejected because the account only accounted for less than half of one percent of the revenue of his overall plan, and was too small to be removed from his plan. (Trial Tr. 863:19-21; DX-604 ¶ 41; PX-365.)

209.    At the time Mr. Guarino began picking up from these accounts in 2012, he had been working for UPS for 28 years and was three years away from retirement; he retired in 2015 after 31 years at UPS. (Trial Tr. 1338:14-22.) There is no basis for the inference that Mr. Guarino would risk his job and his pension by allowing these accounts to ship cigarettes in violation of UPS policy.

210.    Mr. Guarino became friendly with Mr. Christ and Ms. Uebelhoer. Ms. Uebelhoer occasionally gave Mr. Guarino gifts, such as a box of cigars. (Trial Tr. 1346:1-7.) Mr. Christ had season tickets to football and hockey events and Mr. Christ occasionally gave Mr. Guarino tickets. (*Id*. 937:6-12, 1346:12-15.) Mr. Christ also, on one occasion, gave Mr. Guarino an iPad

as a gift. (*Id*. 1346:8-9.) Mr. Guarino often received gifts from customers, and in his experience gifts were not uncommon for UPS drivers, although an iPad was especially generous. (*Id*. 1352:1-7, 1353:12-14.)

211.    Mr. Guarino was not asked to do anything in exchange for any of the gifts he received from Mr. Christ or Ms. Uebelhoer, other than provide good service, be on time for pick-ups and provide customer service. (Trial Tr. 1352:8-14.)

212.    A document relied on by Plaintiffs, PX-157, includes dramatically inflated revenue numbers for Seneca Cigars and Hillview Cigars, listing the revenue for Seneca Cigars for 2012 as $4.9 million, and the 2012 revenue for Hillview Cigars as $2.6 million. This document, PX-157, was corrected within hours of being sent (*compare,* DX-555 and DX-556), and the corrected version, DX-556 has the correct revenue numbers for these accounts: for Seneca Cigars, the revenue in 2012 was $90,935, and the 2012 revenue for the Hillview Cigars account was $49,564. (Trial Tr. 878:16-879:1.) PX-157 cannot be the basis of any alleged motive on the part of UPS or any UPS employee.

### g.    Mr. Christ's Testimony Was Not Credible

213.    Plaintiffs called Mr. Christ to testify. Mr. Christ is a cooperating witness who, in February 2015, pleaded guilty to engaging in a conspiracy to commit wire fraud and cigarette trafficking. (Trial Tr. 1016:17-24.) As part of Mr. Christ's plea agreement, he agreed to cooperate with law enforcement agents in the Western District of Missouri and "elsewhere." (DX-701; Trial Tr. 1019:21-1020:16.) Nine months after pleading guilty, Mr. Christ met with the City of New York in relation to the City's case against UPS. (Trial Tr. 1023:4-6.) Mr. Christ's conduct was alleged to have cost more than $1 million in lost tax damage, but he has not repaid any of those funds. (Trial Tr. 1024:17-1025:15.) Mr. Christ's sentencing has been postponed three times, at the request of the City of New York. (*Id*. 1026:4-1031:10; DX-702; DX-703;

DX-704.) Mr. Christ provided information to the City, and spoke to the City outside the presence of his attorney. (DX-719; DX-727.) Mr. Christ has never been prosecuted in relation to any of the work he did for the Arrowhawk companies. (Trial Tr. 1068:12-1069:16.)

214. Mr. Christ's testimony was not credible. Mr. Christ's demeanor, including lengthy pauses (Trial Tr. 982:16) and frequent confusion bear on his ability to testify with personal knowledge about these shippers, and his credibility. As the Court noted immediately following his first day of testimony, "I don't know if he has marginal intelligence or if he's just not firing on all cylinders, or if he is on Xanax or Valium or something else which is causing him to be slower and somewhat confused. But he does not have the demeanor of somebody is speaking with the kind of clarity that gives me any conviction as to what he's saying on these." (Trial Tr. 987:23-988:4.) The Court found it necessary to make these observations on the record regarding Mr. Christ's demeanor "because of the role this particular witness plays in this case, and because of the circumstances that were surrounding reliability issues that had to do in particular with the documents." (Trial Tr. 1091:4-8.)

215. Mr. Christ repeatedly told UPS employees, Mr. DelBello, Mr. Keith and Mr. Guarino that Arrowhawk, Seneca Cigars, Hillview Cigars, and Two Pine Enterprises were shipping cigars. Indeed, the Seneca Cigars had the word "cigar" in the title, a fact Mr. Christ claimed not to remember, but then admitted under cross-examination. (Trial Tr. 1007:10-13.) Mr. Keith's contemporaneous notes from October 2013 indicate that Mr. Christ told him that "everything he ships is considered a cigar." (DX-511, line 289 at UPS00000189.) In that same entry, Mr. Keith's notes indicate that Mr. Christ told him that his daughter had a gymnastics accident and suffered an injury. (*Id.*) Mr. Christ corroborated that his daughter had a gymnastics injury. (Trial Tr. 1107:3-15.)

216.     Mr. Christ's testimony that he informed UPS employees that Seneca Cigars, Hillview Cigars, Arrowhawk and Two Pine Enterprises were shipping cigarettes is not credible. Mr. Christ vacillated between claiming that he had one conversation with UPS employees to saying that there were multiple conversations with UPS employees regarding the alleged shipment of cigarettes, each time that he was sent Tobacco Agreements. (Trial Tr. 946:25-952:3.) The Tobacco Agreement Mr. Christ was referring to, and which he received from UPS, expressly states that UPS does not permit shipment of cigarettes to consumers. (PX-154.)

217.     Mr. Christ's testimony that Mr. Guarino brought open returns to the warehouse is not credible. (Trial Tr. 944:8-16.) Mr. Guarino never delivered open boxes, and never saw any cigarettes in any of the boxes he delivered. (DX-607 ¶ 12.) It is also implausible that packages could travel through the UPS system in an opened condition, without the contents falling out.

218.     Mr. Christ's testimony that Mr. Guarino came into the warehouse three times a week when he picked up packages, and that he could see the interior of the warehouse when he picked up packages, is not credible. (Trial Tr. 939:7-17). Mr. Guarino did not have time to wait around for packages to be boxed or labeled, and the packages he picked up from these accounts were boxed sealed and labeled for shipment. (DX-607 ¶ 11.) Mr. Guarino could not see inside the warehouse from where he picked up packages. (Trial Tr. 1345:14-22.)

219.     Mr. Christ testified that boxes shipped by Seneca Cigars and the other Arrowhawk accounts had PACT Act labels. (Trial Tr. 924:18-24.) This testimony is not credible. Mr. Christ did not provide any examples of labels from Seneca Cigars, or any Arrowhawk company, that contained PACT Act labels. Mr. Christ was shown two boxes that were shipped by Seneca Cigars and received by the City as part of a controlled buy in 2012. (DX-900A and

DX-900B.) Mr. Christ acknowledged that neither of the labels on these boxes shipped by Seneca Cigars included PACT Act language. (Trial Tr. 1079:12-1081:9.)

220.    Mr. Christ gave inconsistent testimony regarding the size of boxes shipped by the Arrowhawk companies. Mr. Christ testified at trial that the boxes came in three sizes: six cartons, twelve cartons and a box for more than twelve cartons. (Trial Tr. 929:7-19, 1113:1-7.) This was in direct contradiction to the declaration he signed on December 29, 2015, which stated that the shipping boxes contained three cartons, six cartons or twelve cartons. (Trial Tr. 1114:25-1115:5; DX-700 ¶ 7.) At his deposition in this matter, Mr. Christ testified that the boxes would indicate six cartons, twelve cartons or two cartons (Trial Tr. 1115:6-18), and then testified that the boxes would contain 10-12 cartons, six or less cartons, and three or less cartons (Trial Tr. 1117:23-1118:3.)

221.    Mr. Christ was asked to lay a foundation for PX-8, which was not admitted into evidence, a large document purportedly coming from the files of Arrowhawk. Mr. Christ was not familiar with these documents. He had not been at the Arrowhawk premises for two years at the time of the trial and never reviewed the full exhibit. (Tr. 1011:1-12, 1013:10-25, 1067:22-1068:4.)

222.    On October 4, 2016, the Court ordered Plaintiffs to create a truncated version of PX-8, which would create a new exhibit, PX-8B. (ECF No. 462.) Plaintiffs did not provide UPS with PX-8B until October 18, 2016, less than one week before the deadline for the filing of post-trial submissions of proposed findings of fact and conclusions of law. UPS objected to the late submission of PX-8B and the improper inclusion of documents that fall outside the parameters of the Court's October 4, 2016 Order.

223. On October 21, 2016, the Court denied Plaintiffs' motion to admit PX-8B and ordered Plaintiffs to "significantly revise" the exhibit, in compliance with the Court's October 4, 2016 Order. (ECF No. 489.)

224. Neither UPS nor the Court has received the revised exhibit, and thus no part of PX-8B is currently admitted. UPS reserves its right to object to any post trial admission of a to-be-revised PX-8B as untimely, in violation of UPS's due process rights, and not properly authenticated by Mr. Christ, nor offered with a proper business record foundation.

225. To the extent that any of the Arrowhawk accounts were shipping cigarettes rather than cigars, Mr. Christ deliberately deceived UPS. Only after being confronted by his deposition testimony did Mr. Christ admit at trial that he has described the procedure of opening several UPS shipping accounts as playing a "cat and mouse" game, "trying to be underneath the radar" of "law enforcement" and "UPS" because the conduct is "illegal." (Trial Tr. 1110:4-1112:21.)

**D.      UPS Earned Minimal Profit From The Shippers.**

226. Between 2010 and 2014, the shippers at issue accounted for $5.2 million in revenue in total—that is, for accounting for nationwide shipments, not just shipments to New York addresses. That $5.2 million made up .003% of UPS's total domestic small package revenue and .05% of the total revenue received from all New York-based accounts during that time. UPS's total profit from the shippers at issue (again on a nationwide basis), between 2010 and 2014, was approximately $475,000. (DX-601 ¶¶ 18-20.)

### E. Plaintiffs Presented No Evidence That UPS Failed To Heed Signs Of Possible Illegal Shipping.

#### 1. The PACT Act Lists Did Not Provide UPS With Any Warning Of Possible Illegal Shipments.

227.    Plaintiffs allege that UPS should have been aware that three shippers (Indian Smokes, Elliot Enterprises, and Smokes & Spirits) were shipping cigarettes due to those shippers' purported inclusion on the PACT Act's list of non-compliant shippers, a list prepared by the Department of Justice pursuant to the PACT Act. 15 U.S.C. § 376a(e). Plaintiffs argue that Elliot Enterprises appeared on a PACT Act List on November 10, 2010 (PX-472-73, PX-577); that Indian Smokes appeared on the July 16, 2012 PACT Act List (PX-474-76, PX-579); and that Smokes & Spirits appeared on the same July 16, 2012 List as Indian Smokes (*see id.*).

228.    But UPS did not receive any of these PACT Act Lists pursuant to the PACT Act. Neither the U.S. Department of Justice, nor any other law enforcement agency, properly served UPS's Legal Department or agent for service of process with the List, or even sent the List to anyone at UPS's corporate headquarters. Instead, at most, individuals in UPS's Customs Brokerage Group in Louisville, Kentucky received the PACT Act List sporadically. (DX-600 ¶ 101.)

229.    Yet plaintiffs offered no evidence that anyone in UPS's domestic operations received the PACT Act Lists before August 2013. (*See, e.g.*, DX-600 at ¶ 100.) As Mr. Cook explained, UPS's counsel was forced to ask Assistant Attorney General Marc Konowitz for assistance in getting the ATF to direct the PACT Act Lists to the correct employees at UPS—Mr. Cook, as the Director of Dangerous Goods, and Jill Termini, UPS's in-house counsel. Only through those efforts did UPS ultimately receive the August 26, 2013 version of the PACT Act List. (DX-200-201; *see also* DX-808.) Ms. Termini then asked that she and Mr. Cook be placed

on the distribution list, which took place effective with the first list circulated after the August 26, 2013 version. (DX-600 ¶ 103; DX-205.)

230.     There is a simple explanation for why the individuals responsible for enforcing UPS's tobacco policy were not receiving the PACT Act Lists before August 2013: Congress expressly exempted UPS from the provisions of the PACT Act—including any requirement to deny service to shippers identified on a PACT Act List. 15 U.S.C. § 376a(e)(3)(A). Because the exemption Congress extended UPS was based on its AOD, both Congress and the parties to the AOD (the NY AG and UPS) understood that the AOD did not require UPS to use the PACT Act List as an enforcement tool; any contrary understanding would have mooted the exemption that Congress enacted in the PACT Act.

231.     Instead, while UPS was not receiving the PACT Act Lists, UPS continued to rely on the State, using the cooperative framework established under the AOD, to notify UPS of shippers that might be violating UPS policy, whether by virtue of a shipper's inclusion on the PACT Act List or otherwise. That process worked, as the testimony of Carl H. Loewenson, Jr. showed. Mr. Loewenson testified that after an August 2011 meeting between UPS and the NY AG, the NY AG notified UPS about American Thrust Tobacco, a shipper that was on the PACT Act List, unbeknownst to UPS. (DX-109.) In response to the notice from the NY AG, UPS audited American Thrust, discovered that the shipper was not shipping cigarettes, and explained as much to the NY AG. (Trial Tr. at 1057:10-1060:3; DX-109; DX-110; DX-125.) Thus, while UPS was not receiving the PACT Act List at the time (as the State understood), the State recognized its obligation to bring to UPS's attention any shipper that the State was aware (through the PACT Act List or otherwise) might be violating UPS policy. The evidence is

undisputed that each time the State did so, UPS promptly took action to determine whether the shipper was, in fact, violating UPS policy. (*See, e.g.*, DX-605 ¶¶ 8-17.)

232.    In addition, even on the Lists that UPS ultimately received, the PACT Act Lists contained incorrect information for Smokes & Spirits. The List provided its address as 6665 Route 417 in Kill Buck (PX-475.) But when UPS searched its records after first receiving the PACT Act List, no account for Smokes & Spirits was found at that address. (Trial Tr. 363:24-364:5.)

### 2.    Claims And Tracers Concerning Lost Or Damaged Packages Did Not Provide UPS With Any Warning Of Possible Illegal Shipments.

233.    Plaintiffs argue that UPS had a "reasonable basis to believe" that several shippers were shipping cigarettes to consumers based on some shippers' submission of loss or damage claims for merchandise described as cigarettes. But the actual evidence shows that there was only one claim submitted by any of the shippers at issue in the case for the shipment of cigarettes to a consumer. This was a claim submitted by Smokes & Spirits, on September 14, 2012, and denied September 26, 2012. (DX-600 ¶ 148; DX-500, line 77.) The other entries on which plaintiffs rely consist of "tracers" that were entered into UPS's system for packages, tracers that never resulted in an actual claim.

234.    In any event, the tracers and claims information for the shippers at issue overwhelmingly reflect the shipment of little cigars, other tobacco products, and non-tobacco products such as candles, promotional materials, and office products. Shipping Services, for example—the highest volume shipper plaintiffs identify—had 29 different tracers/claims, almost all of which identify the package contents as little cigars. (DX-500.)

235.    Moreover, the AOD did not provide for training of UPS claims employees about UPS's tobacco policy. The AOD required training of drivers, pre-loaders, account executives and

those employees involved in the "compliance measures agreed to" in the AOD. (DX-23 at ¶¶ 34-37.) The AOD did not require specific procedures regarding customer claims. As Mr. Cook testified, the use of customer claims to identify potential cigarette shippers was incorporated into UPS's compliance procedures as soon as UPS realized that it could be a useful tool. (Trial Tr. 294:13-295:7.) Until that time, however, it had never been suggested—and the AOD did not require—that UPS use claims data to identify potential cigarette shippers.

### 3. A Letter From The Anonymous "Tobacco Watchdog Group" Did Not Provide UPS With Any Warning Of Possible Illegal Shipments.

236.     On November 10, 2010, UPS received a one-page letter via fax to its center in Jamestown, New York, from an entity that called itself the "Tobacco Watchdog Group." (DX-62 at 3.) The letter asserted without any supporting documentation or other information that the following six companies were illegally shipping cigarettes to consumers: Big Joe's Smoke Shop, Smokes & Spirits, Post Smokes, Elliott Industries, Native Express, and All of our Butts. (*Id*.) UPS had never heard of the Tobacco Watchdog Group. (*See* DX-602 ¶ 34.)

237.     The next day, November 11, 2010, Scott Winkley, a business manager at the Jamestown center, forwarded by email a PDF copy of the Tobacco Watchdog Group letter to Gerry Fink, one of the account executives in the relevant area. (DX-62 at 1-2.) As noted above, in late 2010, UPS was in the process of transitioning to its geographic "patch-of-land" system for assigning account executives to accounts. (Trial Tr. 644:9-18.) Before the patch-of-land system, Mr. Fink had handled 100-200 accounts, but after the transition to the patch-of-land system was complete in late 2011 and early 2012, he became responsible for more than 4,000 accounts, almost all of which were new to him. (Trial Tr. 644:19-645:25.) After receiving the letter, Mr. Fink replied that he only recognized one of the companies listed on the letter, Smokes & Spirits. (DX-62 at 1.) Other evidence at trial supported that assertion, as the documentary evidence

demonstrated that other companies identified in the letter with UPS accounts had been handled by a different sales person, Tina Mahon. (*See e.g.*, DX-62 at 1; DX-602 ¶¶ 59-60; DX-526 'In Person Details' tab, line 3194); Trial Tr. 640:4-9.)

238.  Although plaintiffs contend that Mr. Fink's receipt of the Tobacco Watchdog Group letter indicates knowledge of illegal shipping by the shippers named therein (*see* ECF No. 399 at ¶ 372), the evidence at trial demonstrated that Mr. Fink did not recognize five of the six names and believed that the company he did recognize, Smokes & Spirits, was shipping legally; Mr. Fink testified that he then took steps to confirm that fact. (DX-602 ¶ 35.) Mr. Fink's testimony is corroborated by his contemporaneous email response to Mr. Winkley in which Mr. Fink wrote that Smokes & Spirits was "ONLY SHIPPING CIGARS." (DX-62 at 1 (emphasis in the original).) Also corroborating Mr. Fink's testimony about his general policy in handling tobacco accounts, Mr. Fink also wrote in that email to Mr. Winkley that "I make very sure that any smoke shops that I deal with fully understand that we will not ship cigarettes." (*Id.*) Later in the email communication, Mr. Fink wrote that "I only have the one account, and I'm certain that they're only shipping cigars." (*Id.*)

239.  Demonstrating Mr. Fink's good faith belief and attention to tobacco accounts, Mr. Fink followed up on the letter by visiting Smokes & Spirits in person and also speaking to its owner Bob Oldro to confirm that the company was only shipping little cigars through UPS. (DX-602 ¶ 35.) In both such conversations, Mr. Fink reiterated UPS's tobacco policy and was assured Smokes & Spirits was in compliance with the tobacco policy and shipping only little cigars through UPS. (*Id.* ¶ 36.) Plaintiffs presented no evidence to the contrary.

240. Indeed, the invoices that Smokes & Spirits itself produced to the City in this case, and introduced at trial, confirmed that they were only shipping little cigars or other tobacco products at the time of the Tobacco Watchdog Letter, just as they had assured Mr. Fink. (PX-54.)

241. Mr. Fink also testified that he believed the sender of the letter, whoever that may have been, was confused between permissible little cigars and cigarettes due to the language in the letter. (Trial Tr. 627:12-15, 630:7-8.) Indeed, that reading is supported by the letter itself, which asserted that some shippers were listing cigarettes on their websites as little cigars. Yet there is no evidence in the record that any of the shippers' websites inaccurately listed cigarettes as little cigars. To the contrary, at least one of the shippers named in the letter, Post Smokes, was found to have only shipped little cigars and empty cigarette tubes when UPS audited the shipper. (DX-600 ¶ 79; DX-221; DX-222.)

242. Elliot Enterprises had just been assigned to Mr. Fink at the time he received the Tobacco Watchdog Group letter; as Mr. Fink testified, therefore, he did not make the connection between the name Elliott Industries, as it appeared in that letter, and Elliot Enterprises, even though they had the same address. (DX-62 at 3; Trial Tr. 624:10-20.) While Mr. Fink had visited Elliot Enterprises one month before receiving the Tobacco Watchdog Group letter, he was not able to speak with anyone at the location; it is thus understandable that the letter's reference to Elliot Industries did not remind him of the actual account, especially since he recently had approximately 4,000 new accounts added to his account base. (Trial Tr. 610:5-14.) Mr. Fink's contemporaneous email to Mr. Winkley that he recognized only Smokes & Spirits on the letter corroborates this testimony. (Trial Tr. 649:6-9.)

**F. Plaintiffs Failed To Cooperate With UPS To Identify And Terminate Unlawful Shippers.**

243.	Had plaintiffs shared more information with UPS, UPS could have done even more in identifying and terminating service to other shippers. While UPS had no reason to know or suspect the shippers at issue of violating UPS policy, the City and State have investigative resources unavailable to UPS (such as the subpoena power and trained investigators from law enforcement agencies). As a result, the City and State learned that some of the shippers at issue may have been violating UPS policy, but plaintiffs chose not to share that information with UPS.

244.	**AJ's Cigars:** The City claims it became aware of illegal shipments sometime after July 2010. (DX-383 at 4.) It did not share the information with UPS until October 2013, as it was preparing to file this litigation. (DX-216.)

245.	**Elliot Enterprises:** The State claims it became aware of illegal shipments in November 2010. (Jerry Tr. 45:13-24.) It never shared the information with UPS. (*See id.* at 67:3-19.)

246.	**EExpress:** The State claims it became aware of illegal shipments in April 2014. (Jerry Tr. 47:7-12.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City claims it became aware of illegal shipments at the same time (DX-383 at 4), but did not inform UPS. (*See id.* at 5-6.)

247.	**Indian Smokes:** The State claims it became aware of illegal shipments in July 2011. (Jerry Tr. 49:7-14.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City also claims it became aware of illegal shipments in July 2011. (DX-383 at 4.) It did not share the information with UPS until October 2013, as it was preparing to file this litigation. (DX-216.)

248.    **Seneca Cigars:** The City conducted a "controlled buy" from Seneca Cigars in May or June of 2012, supposedly resulting in three cartons of unstamped cigarettes being delivered by UPS. (*See* DX-147 at 1 (evidence card showing delivery of unstamped cigarettes).) Yet the City did nothing to halt Seneca Cigars' shipments, or to inform UPS of the alleged illegal trafficking.

249.    **Smokes & Spirits:** The State claims it became aware of illegal shipments in February of 2012. (Jerry Tr. 52:16-23.) It never shared the information with UPS. (*See id.* at 67:3-19.) The City claims it "was generally aware of Smokes & Spirits' shipments of untaxed cigarettes through other litigation prior to the relevant time period" (DX-383 at 4), but did not inform UPS. (*See id*. at 5-6.)

<u>**PROPOSED CONCLUSIONS OF LAW**</u>

The Court previously rejected UPS's argument that until September 27, 2013, the City and the Attorney General had no standing to enforce § 1399-*ll*, and they therefore cannot recover civil penalties based on any alleged delivery made before that date, *see* ECF No. 252. The Court also previously struck UPS's affirmative defenses based on plaintiffs' failure to collect taxes from the parties that owe them (Defense 6), the State's forbearance policy (Defense 16), lack of enforceability of the AOD (Defenses 10-11), and lack of consideration of the AOD (Defense 9), *see* ECF No. 177. The Court also struck UPS's affirmative defenses based on plaintiffs' failure to mitigate damages (Defense 5) and equitable defenses (Defense 17) as applied to plaintiffs' claims under the CCTA, the PACT Act, and N.Y. PHL § 1399-*ll*. *See id*. UPS continues to assert its previous positions on all these motions and defenses, as well as its positions with respect to all other rulings adverse to UPS, and preserves them for appeal. Given this Court's legal rulings, however, UPS explains here why it prevails under those rulings, as well.

**I. THE STATE FAILED TO ESTABLISH ANY BREACH OF THE AOD.**

250. As this Court has ruled, "the AOD is a contract between the State and UPS. … [T]he State's position in asserting the AOD claim is akin to that of a private contracting party." (ECF No. 177 at 34.) The Court later reaffirmed its "conclu[sion] that the AOD functions as a contract." (ECF No. 355 at 11.)

251. The State's claim under the AOD asserts that UPS failed to comply with the AOD's requirements that UPS: (1) comply with N.Y. PHL § 1399-*ll*, which prohibits delivery of cigarettes except to specific authorized persons, by ceasing all such deliveries; (2) audit any shipper it had a "reasonable basis to believe…may [have been] tendering Cigarettes for delivery to Individual Consumers"; (3) maintain a "Tobacco Shipper Database" with specified components; and (4) provide continuing compliance training, with specified components, to

various types of its employees." (ECF No. 189 ¶ 188; *id*. ¶¶ 189-94.) Only the State could have asserted a claim under the AOD; the City has conceded that it has no standing to enforce the AOD. (ECF No. 45 at 3 n.4 (conceding the AOD "[does] not grant any rights or privileges to any person or entity who is not a party to this [Assurance]").)

252.    The AOD balances UPS's duties as a common carrier against the State's interest in restricting delivery of untaxed cigarettes to individual consumers. The AOD was the product of negotiation not only between these two parties but among other State Attorneys General, through their representatives at the National Association of Attorneys General (DX-11; DX-15); the procedures it lays out take into account the realities of shipping as a common carrier. The sheer volume of packages and UPS's obligations of common carriage make it impossible to eliminate shipment of cigarettes completely, and accordingly, the AOD does not require it.

253.    Instead, the AOD requires UPS to take specifically identified prophylactic steps—such as training its personnel and maintaining proper records—and otherwise focuses on remedial steps. (*See, e.g.,* DX-23 ¶¶ 21-23 (notification to retailers); ¶ 24 (audits); ¶ 25 (database and record keeping); ¶¶ 26-33 (progressive discipline of shippers); ¶¶ 34-37 (training).) These steps include auditing shippers once UPS has reason to know they are violating the law (DX-23 ¶ 24), ceasing service to shippers it finds violating the law (DX-23 ¶¶ 26-33), and cooperating with law enforcement personnel who bring such shippers to its attention (DX-23 ¶¶ 39-40). This balance of interests was further ratified by Congress in the PACT Act, which explicitly carved out UPS from both federal and state liability so long as the AOD remained in force. (*See infra*, ¶¶ 370-372.) Reading new obligations and standards of conduct into the AOD would disrupt the balance struck by the parties and blessed by Congress.

254.     As a negotiated contract, the AOD is governed by important principles of contract law. UPS gave its cooperation to the State in restricting delivery sales of cigarettes in exchange for a release of claims, and the parties agreed to the specific requirements of the AOD. It is "an essential requirement for a breach of contract claim" that the defendant violated "a specific provision of the [a]greement." *Orange Cty. Choppers, Inc. v. Olaes Enters.*, 497 F. Supp. 2d 541, 554 (S.D.N.Y. 2007); *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) ("a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue"), *aff'd*, 65 F. App'x 736 (2d Cir. 2003). To prove a breach of the AOD, therefore, the State must show that UPS departed from the actual terms of the AOD. *Lanier v. Bats Exch., Inc.*, No. 15-1683, __ F.3d __, 2016 WL 5335022, at *12-13 (2d Cir. Sept. 23, 2016) (finding no breach of agreement that incorporated terms of regulations where defendant violated neither regulations themselves nor any terms in the agreement independent of the regulations). If the State cannot show that UPS breached a specific provision of the AOD, its claim fails: "[t]he Court cannot supply a specific obligation the parties themselves did not spell out." *Spinelli v. NFL*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) (inner quotes and citation omitted); *UMB Bank, N.A. v. Sanofi*, No. 15 Civ. 8725(GDB), 2016 U.S. Dist. LEXIS 128324, at *19 (S.D.N.Y. Sep.8,  2016) (a party's "obligations [cannot] go beyond those intended and stated in the language of the contract").

255.     Here, however, New York's entire case rests upon implying duties of care and conduct into the AOD that are nowhere reflected in its terms. As the most egregious example, the State contends that it is entitled to a $1,000 penalty for each alleged instance of UPS's failure to comply with the AOD requirements at issue (ECF No. 189 ¶ 195), even though the AOD limits the availability of such a penalty to violations of the AOD's delivery restrictions where there is

no available exception. (*See infra*, ¶¶ 258-262.) And UPS complied with the delivery restrictions, in all events, as the State cannot prove that UPS knowingly delivered cigarettes to unauthorized recipients in violation of that statute. (*See infra*, ¶¶ 264-272). Beyond that, the State's arguments regarding the AOD's training provision, its database provision, and its audit provision, are all based on requirements that are not found in any of those provisions of the AOD. As detailed below, UPS complied with the plain terms of each of those provisions. (*See infra*, COL, §§ I(C), (D), (E).)

258. In essence, New York is asking the Court to rewrite the contract on terms more favorable to New York and to impose substantial liability on UPS for not complying with those as-yet-nonexistent terms. Contract law precludes the Court from doing so. And indeed, the punitive nature of the State's effort implicates constitutional due process guarantees, and provides an even more compelling reason why the Court may not legally re-write the AOD as the State requests.

## A. The Term "Violation" In The AOD Refers Only To Deliveries Of Cigarettes To Consumers.

257. The State characterizes each alleged instance of UPS's failure to comply with the AOD requirements at issue as a "violation" of the AOD that is subject to a $1,000 penalty. (ECF No. 189 ¶ 195.) However, a "violation" of the AOD that could subject UPS to penalties is limited to a shipment of cigarettes to an individual consumer, which the State has not proved.

258. As detailed below, the agreement's plain language and underlying policy and purpose demonstrate that a "violation" of the AOD is a shipment of cigarettes to an individual consumer—*i.e.*, a failure to comply with the AOD's delivery restrictions, which require UPS to comply with PHL § 1399-*ll* and the UPS Cigarette Policy.

259. First, the overarching purpose of the AOD was to prevent shipments of cigarettes to individual consumers both within New York (by requiring UPS to comply with PHL § 1399-*ll*, which prohibits a carrier from "knowingly transport[ing] cigarettes to any person in this state reasonably believed by such carrier to be other than" a person authorized to receive cigarettes, N.Y. PHL § 1399-*ll*(2)), and throughout the United States (by requiring UPS to comply with the UPS Cigarette Policy (which states in part that "UPS does not provide service for shipments of cigarettes to consumers")) (DX-23 ¶ 15).

260. Consistent with the AOD's overarching purpose, when referring to UPS's conduct, the AOD uses the word "violation" to address shipments of cigarettes to individual consumers.

    a. The initial paragraphs of the AOD address the NY AG's findings from his investigation into whether UPS may have "transported cigarettes . . . in violation" of PHL § 1399-*ll*(2). (DX-23 ¶ 6.). Those findings include UPS's "Alleged Past Violations" of the statute, which are defined in terms of § 1399-*ll*. (*Id*. ¶¶ 8, 11, 14.)

    b. The findings also state UPS's position that its actions did not violate § 1399-*ll* and set forth UPS's Cigarette Policy and UPS's implementation of procedures to ensure that it does not knowingly deliver cigarettes to unauthorized recipients in violation of § 1399-*ll* and other state laws. (*Id*. ¶¶ 9-15.)

    c. The AOD states that the NY AG entered into the AOD in lieu of initiating a civil action for the Alleged Past Violations of § 1399-*ll*. (*Id*. ¶ 15.)

261.    Second, the text and structure of the AOD as a whole compel reading a "violation" that could subject UPS to penalties as limited to a shipment of cigarettes to an individual consumer.

      a.   The AOD defines a "Prohibited Shipment" to mean "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate [PHL] § 1399-*ll*." (*Id.* ¶ 16(H).)

      b.   The AOD's substantive restrictions require UPS to "comply with PHL § 1399-*ll*(2), and adhere to the UPS Cigarette Policy . . . prohibiting the shipment of Cigarettes to Individual Consumers in the United States." (*Id.* ¶ 17.)

      c.   The AOD's provisions regarding "Enforcement, Penalties and Costs" reflect the two restrictions on UPS's deliveries of cigarettes as the only possible meaning of the term "violation" in the AOD. Paragraph 42 calls for UPS to pay a stipulated penalty for any "violation" of the AOD except if "(a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." (*Id.* ¶ 42.) The first exception means that no penalty attaches to a violation of the delivery restriction outside of New York. The second exception, which references Prohibited Shipments (specifically defined as violations of § 1399-*ll*), provides that no penalty attaches to an in-state

delivery of cigarettes to an individual consumer if the NY AG concludes that UPS did not knowingly commit the violation.

d. Paragraph 43 further ties an AOD violation to deliveries of cigarettes. It provides that a "violation of this [AOD] that involves the shipment of Cigarettes to an Individual Consumer within the State of New York shall also constitute *prima facie* proof of a violation of PHL § 1399-*ll*(2) in any civil action or proceeding that the Attorney General hereafter commences against UPS for violation of PHL § 1399-*ll*(2)." (*Id*. ¶ 43.)

e. Apart from using the word "violation" to address UPS's conduct in delivering cigarettes to individual consumers, the AOD sometimes uses "violation" in the context of shippers' conduct in violating UPS's Cigarette Policy. (*E.g.*, DX-23 ¶¶ 27-28.) In addition, in a section addressing the "Effect of Settlement," paragraph 47 provides that, in certain circumstances, UPS's termination of the AOD will allow the NY AG to seek relief for violations of the AOD and any applicable laws that occurred when the AOD was in effect, but clarifies that in other circumstances, UPS's termination of the AOD will not constitute a violation of the AOD. (*Id*. ¶ 47.)

262. Thus, the plain terms of the AOD and the agreement's overarching purpose show that the $1,000 penalty is available only for a specific instance of UPS's knowing shipment of cigarettes to individual consumers in New York. The State's contrary suggestion that "violation" should be construed to mean any breach of the AOD would lead to aberrational results. Under the State's view, the AOD could result in penalties for record-keeping errors that cause no harm, while not imposing any liability, through its safe harbor provision, on an actual shipment of

cigarettes, so long as the shipment was delivered outside of New York or UPS did not know the shipment was prohibited. The only way to read the AOD harmoniously is to treat breaches of provisions other than the core restriction on knowing delivery of cigarettes to individual consumers (DX-23 ¶ 17) as subject to ordinary contractual remedies, including actual damages (if any) caused by the breach, while limiting the extraordinary penalty provision to specified "violations" of the delivery restrictions.

**B.     The State Failed To Prove That UPS Violated The AOD's Requirement Concerning Deliveries Of Cigarettes To Consumers.**

263.    While the AOD's penalty provision is thus limited to violations of the AOD's delivery restrictions, plaintiffs failed to prove any violation of the delivery restrictions. Just as PHL § 1399-*ll*(2) requires UPS's knowledge that a package contains cigarettes and a reasonable belief that a package containing cigarettes was destined for an unauthorized recipient, the AOD incorporates the same *mens rea* requirements, in defining the delivery restrictions strictly, using defined terms such as Prohibited Shipment (which is limited to a shipment that violates PHL § 1399-*ll*(2)). Because plaintiffs failed to prove that UPS knowingly delivered cigarettes to unauthorized recipients, they failed to prove that UPS violated the only provision of the AOD that supports the $1,000 per-violation penalty they seek.

**1.     "Know Or Reason To Know" Must Be Defined Within The Context Of The AOD As A Whole, Which Requires A Knowledge Standard.**

264.    In plaintiffs' Third Amended Complaint, the State alleges that "Pursuant to the AOD, UPS agreed not to violate N.Y. PHL § 1399-*ll*" (ECF No. 189 ¶ 100), and that "UPS violated N.Y. PHL § 1399-*ll* tens of thousands of times subsequent to the AOD" (*id.* ¶ 105). The State did not provide evidence at trial satisfying their burden of proving that allegation, for the following reasons.

265.    Section 1399-*ll* prohibits a carrier from "knowingly transport[ing] cigarettes to any person in this state reasonably believed by such carrier to be other than" a person authorized by the statute to receive cigarettes. N.Y. PHL § 1399-ll(2). Thus, to hold UPS liable for violating the AOD by making deliveries prohibited by N.Y. PHL § 1399-*ll*, the State must have proved that:

a.    UPS knowingly;

b.    Delivered cigarettes;

c.    To individual consumers. (The AOD defines "individual consumer" as any person or entity other than an "Authorized Recipient," which in turn is defined as "tobacco manufacturers; licensed wholesalers, tax agents, retailers, and export warehouses; government employees acting in accordance with their official duties; or any other person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which delivery is made, including those persons described in PHL § 1399-*ll*(1) with respect to the State of New York.") (DX-23 ¶ 16A.)

266.    The State argues that UPS violates the AOD (and is subject to an attendant penalty) by delivering any shipment of cigarettes to an unauthorized recipient unless UPS establishes that it had no "reason to know" that "the shipment contained cigarettes for delivery to unauthorized recipients." (*See* ECF No. 414-1 ¶ 805.) But the AOD imposes no such requirement. To the contrary, the AOD incorporates the knowledge standard from § 1399-*ll*, which makes it unlawful for carriers to "knowingly" deliver cigarettes to unauthorized recipients. N.Y. PHL § 1399-*ll*(2) (making it unlawful for carriers to "knowingly" deliver cigarettes to unauthorized recipients).

267.     The AOD provides: "UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every violation of this Assurance of Discontinuance occurring after the Effective Date; provided, however, that no penalty shall be imposed if (a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that *UPS did not know and had no reason to know that the shipment was a Prohibited Shipment*." (DX-23 ¶ 42 (emphasis added).)

268.     In other words, to avoid being penalized for a violation involving a Prohibited Shipment to New York, the AOD requires UPS to establish that it had no "reason to know that the shipment was a Prohibited Shipment." (DX-23 ¶ 42.) The AOD defines "Prohibited Shipment" as "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate Public Health Law § 1399-*ll*." (DX-23 ¶ 16(H).) And a shipment or delivery only violates § 1399-*ll* if UPS "knowingly" delivered it to an unauthorized recipient. *See* N.Y. PHL § 1399-*ll*(2) (making it unlawful for carriers to "knowingly" deliver cigarettes to unauthorized recipients). By using the defined term Prohibited Shipment, the provision, read as a whole, incorporates the knowledge standard from § 1399-*ll*.

269.     Because the State failed to prove that UPS knowingly delivered cigarettes to unauthorized recipients, as detailed below, the State also failed to prove its claims under the AOD based on allegations that UPS delivered cigarettes in violation of the AOD.

## 2. Even Under The State's Erroneous Interpretation of the AOD, UPS Had No Reason To Know That It Was Delivering Cigarettes To Consumers.

270.    Even if the Court were to interpret the AOD as imposing penalties upon UPS based on a less stringent "reason to know" standard, the State failed to prove that UPS had reason to know that shippers were violating UPS policy. As detailed above, the shippers at issue represented to UPS that they were not shipping cigarettes or that they were not shipping tobacco products at all. (*See supra*, FOF, § V(C).) Those who did represent that they were shipping tobacco products other than cigarettes signed a Tobacco Agreement, agreeing to abide by UPS's tobacco policy; the Agreements clearly informed the shippers that UPS does not accept packages containing cigarettes for delivery to consumers. (*See supra*, ¶ 43(b).)

271.    UPS had no reason to doubt the word of its customers. But every time a shipper gave UPS any reason to doubt the shipper's representations, UPS audited the shipper. As detailed above, UPS's audits were prompt, taking place within one or two days after UPS ever learned facts that might suggest a shipper was shipping cigarettes. (*See supra*, ¶ 44, *see also* ¶¶ 81-225.) Again, while plaintiffs want to use the benefit of hindsight, informed by 18 months of litigation and investigation, they have not identified any shipper for which UPS had any reasonable basis to conduct an audit sooner than it did.

## C. The State Failed To Prove That UPS Breached The AOD's Training Requirement.

272.    Plaintiffs did not prove that UPS failed to provide training to relevant employees as required under the AOD. The AOD requires UPS to provide training to drivers and sorters on an annual basis in the form of a "Pre-Work Communication Meeting" or "PCM." (DX-23 ¶¶ 35-36.) The evidence establishes that UPS provided that annual training. (DX-600 ¶¶ 32-54; DX-35 at Ex. H.; DX-110; DX-157; DX-208-209; DX-348; DX-601 ¶¶ 13-16; DX-609 ¶ 15; DX-608

¶ 12; Trial Tr. 1281:23-1283:8; Bankoski Tr. 38:5-14; Logan Tr. 75:17-76:2; Potter Tr. 8:23-9:24; Sheridan Tr. 33:1-10; DX-602 ¶ 25; DX-604 ¶ 14; DX-111; DX-603 ¶ 13; Trial Tr. 733:23-734:6.)

273.    UPS also enhanced its driver training in 2016, to provide training through the driver hand-held computer, or DIAD.[15] (DX-600 ¶ 54.)

274.    UPS has also provided specific training to account executives, particularly in the State of New York, in satisfaction of the AOD's requirements. (DX-23 ¶ 37; DX-600 ¶ 58.)

275.    Plaintiffs seem to take issue with the length of the PCM (typically three minutes), but the AOD did not specify a minimum time requirement. (DX-23 at ¶ 36; *see also* DX-35; DX-600 ¶ 45.) If the specific timing or content of the PCM was a concern to the State, it could have attempted to add such specifics during the AOD negotiations. But no such terms are included in the AOD and the State may not hold UPS liable for not complying with requirements that are not set forth in the AOD.

276.    Plaintiffs have not provided evidence that any UPS employee involved in this case was unaware of UPS's policy against the shipment of cigarettes to consumers. To the contrary, the evidence at trial demonstrated that UPS drivers and account executives understood UPS's tobacco policy. All of the drivers understood that UPS could not accept cigarettes, even if

_____

[15] While UPS offered evidence of enhanced compliance measures at trial to show that no injunctive relief was appropriate, the Federal Rules of Evidence preclude plaintiffs from using such evidence to show liability: "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." Fed. R. Evid. 407. The purpose of Rule 407 is to (1) encourage defendants to take precautions to prevent future harms and (2) prevent the admission of evidence that is often prejudicial and of little probative value in proving prior culpable conduct. *See Cann v. Ford Motor Co.*, 658 F.2d 54, 60 (2d Cir. 1981) (Rule 407 motivated largely "by the fear that people will be less likely to take subsequent remedial measures if evidence of their repairs or improvements may be used against them in lawsuits arising out of" activity prior to implementation of the measures). UPS's post-2014 compliance enhancement actions fall squarely within Rule 407. UPS acted after the requisite "earlier injury or harm," *i.e.*, the provision of service to shippers from 2010 to 2014, which plaintiffs allege violated federal and state law, as well as the AOD. Fed. R. Evid. 407. Accordingly, plaintiffs may not use these enhancements to prove UPS's liability.

not every one of them could recite UPS's policy verbatim or remember exactly when they received the PCM. (Potter Tr. 9:13-10:3; Cintron Tr. 43:21-25; Haseley Tr. 34:4-6; Logan Tr. 67:14-17; Sheridan Tr. 33:5-10.) Drivers' terminations of service to Indian Smokes and Elliot Enterprises (*see supra*, ¶¶ 150, 158) confirm that drivers understood the policy. Likewise, testimony from UPS account executives and Inside Sales Representations demonstrates that UPS's training was effective. (DX-603 ¶¶ 13-14; DX-602 ¶¶ 16-25, 30; DX-604 ¶¶ 13-17.) The sales team understood UPS's policy and explained UPS's policy to their customers. (DX-600 ¶¶ 57, 58, 60.)

     **D.**     **The State Failed To Prove That UPS Breached The AOD's Record-Keeping Requirements.**

277.     Nor have plaintiffs proved that UPS failed to maintain a Tobacco Shipper Database as required by the AOD. (DX-23 ¶ 25.)

278.     The evidence establishes that UPS created a database with all fields required by the AOD. (DX-371.) UPS has entered shippers into its Tobacco Shipper Database on a continuous basis since the database was created in 2005. (DX-600 ¶¶ 63-64). The database now has entries from over 4,000 shippers located in 49 different states. (*Id.*; *see also* DX-371.)

279.     While plaintiffs claim the database failed to include some audits and shipper information, plaintiffs can point to only a single instance, in a database with more than 4,000 shippers, in which known information about a violating shipper was not included; they argue that UPS did not include information concerning the termination of Elliot Enterprises. (Trial Tr. 339:9-12.) Even if plaintiffs are correct about this isolated instance, there was no consequence to the omission of Elliot Enterprises from the database because UPS had terminated the account. Plaintiffs argue that UPS should have used information about Elliot Enterprises to draw connections to another shipper, but the AOD did not require UPS to mine the database to search

for such possible connections (*see infra*, COL, § I(E)(3)). No such connections would have been made in any event: plaintiffs failed to show that any information that would have been included in the database regarding Elliot Enterprises would have tied the two shippers together. In particular, although plaintiffs point to Aaron Elliot's affiliation with the other shipper, they fail to show that he would have been listed in the database as the contact person for Elliot Enterprises.

**E.     The State Failed To Prove That UPS Breached The AOD's Audit Requirement.**

280.     Plaintiffs have failed to prove any breach of the AOD's audit provision, which provides, in full:

> UPS shall audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so.

(DX-23 ¶ 24.)

281.     The AOD's audit provision thus contains none of the standards against which the State seeks to judge UPS. The audit provision does not define what constitutes a "reasonable basis" for UPS to believe that "shippers may be tendering Cigarettes for delivery to Individual Consumers," thereby triggering a required shipper audit. The provision requires UPS to audit "shippers," not "packages." And the provision does not identify any specific procedures UPS must follow in order to perform such audits; it merely states that the audit's purpose is to "determine whether the shippers are in fact doing so [tendering Cigarettes for delivery to Individual Consumers]." In particular, the audit provision does not require UPS to open every package tendered by a shipper in connection with an audit. (*Id.*)

282.     The State does not dispute that UPS conducted 28 audits of shippers, the vast majority of which found that the shipper was not in fact shipping cigarettes. (*See supra*, ¶ 44.) Instead, the State contends that UPS should have conducted audits sooner, or that it failed to

adhere to certain procedures in conducting the audits, or that UPS violated this audit provision every time UPS transported a package (even one that could not possibly have contained cigarettes, such as an envelope) for a shipper that UPS purportedly should have audited. The State seeks more than $100 million in penalties based on its theory that UPS should have audited every package tendered by every shipper at issue.

283.    As detailed below, there is no basis for the State's argument, in either the facts or the AOD, as the law requires this Court to construe it.

### 1. UPS Audited All Shippers It Had A Reason To Believe Were Violating UPS Policy.

284.    Plaintiffs have not identified any shipper for which UPS should have conducted a shipper audit sooner based on its reasonable beliefs about the shippers.

285.    **Potsdam Shippers**:  The AOD requires UPS to audit shippers only where there is a reasonable basis to believe *both* that (a) the shipper may be tendering cigarettes *and* (b) the cigarettes are for delivery to an Individual Consumer, which the AOD defines as "any person or entity other than an Authorized Recipient." (DX-23 ¶¶ 16(G), 24.) As the Court noted in denying plaintiffs' motion for summary judgment regarding the Potsdam Shippers, UPS introduced "a litany of evidence suggesting that the recipients it was shipping to were authorized by the State." (ECF No. 355 at 7.) This was particularly true as of April 2011, when UPS contacted New York State Police and was told to continue picking up packages for the Potsdam Shippers pending the ongoing criminal investigation of those shippers. (*See supra*, ¶¶ 84-96.)

286.    **Shipping Services**:  As far as UPS was aware, Shipping Services primarily shipped little cigars and other legal tobacco products (not cigarettes) via UPS (DX-51; DX-602 ¶ 50.) UPS had no reason to believe that Shipping Services was shipping cigarettes. (DX-600 ¶ 83.) Even though UPS had no reason to suspect that Shipping Services was violating UPS's

policy, it nevertheless audited Shipping Services as part of an expanded due diligence effort to audit additional tobacco shippers. (DX-600 ¶¶ 83-85.) It was only at this time that UPS discovered that Shipping Services had tendered two packages containing cigarettes for shipment. UPS immediately terminated Shipping Services upon discovering those two packages. (DX-600 ¶¶ 92-94.)

287. **Smokes & Spirits**: Smokes & Spirits represented to UPS that it was shipping only little cigars and other legal tobacco products to consumers, not cigarettes. (DX-602 ¶¶ 32, 36, 37; DX-55.) And in fact Smokes & Spirits did ship large quantities of little cigars and other tobacco products—and no cigarettes—until at least February 2011. (PX-54.) In approximately February 2011, Smokes & Spirits apparently began to ship some cigarettes via UPS, but UPS had no reason to know that it had begun to do so. (*Id*.) UPS audited Smokes & Spirits in January 2014, even though it had no reason to believe that Smokes & Spirits was shipping cigarettes in addition to little cigars at that time. (Potter Tr. 34:20-35:16; DX-609 ¶ 12; Trial Tr. 1419:23-1420:1.) UPS did not have reason to believe Smokes & Spirits may have been shipping cigarettes before the results of the audit in January 2014. (DX-600 ¶¶ 83-85.)

288. **Indian Smokes**: Uncontroverted evidence demonstrated that a UPS driver (Lou Potter) discovered in September 2012 that Indian Smokes was tendering to UPS cigarettes for shipment to consumers, and that UPS immediately terminated all service to Indian Smokes. (DX-609 ¶ 11; Potter Tr. 10:7-21.) UPS also audited Indian Smokes at that time, and confirmed the shipment of cigarettes. (DX-600 ¶¶ 15-17, 75, 82.) Plaintiffs have not established that UPS had a duty to audit Indian Smokes earlier than it did.

289. **Elliot Enterprises**: Uncontroverted evidence establishes that a UPS driver discovered in approximately September 2012 that Elliot Enterprises was tendering cigarettes for

shipment to consumers, and that UPS then terminated service to Elliot Enterprises at that time. (DX-600 ¶ 76; DX-602 ¶ 63; PX-172.) Plaintiffs have not offered evidence to establish that UPS had an obligation to audit Elliot Enterprises at an earlier point in time.

290. **EExpress**: UPS audited EExpress in May 2014, within days after learning from the City and State that they suspected that a shipper named "Native Express," located at 11074 Indian Hill Rd in Perrysburg, New York, was shipping cigarettes to consumers via UPS. (DX-600 ¶¶ 121-123.) Before then, UPS was not aware that an entity at this location might be shipping cigarettes. (*Id.* at 122) The results from two audits performed on EExpress packages on May 5, 2014 and May 6, 2014 revealed no cigarettes, only packages containing Tim Horton's brand coffee. (DX-600 ¶ 122; DX-549; DX-608 ¶ 23(b).) The UPS account executive, Mr. Fink, testified that he did not believe EExpress was shipping tobacco, and that the discovery of Tim Horton's coffee was consistent with his understanding that EExpress was shipping a niche product other than tobacco products. (Trial Tr. 628:23-629:17.) When EExpress packages broke open in the UPS Dunkirk center the next month revealing cigarettes, Center Supervisor Jennifer Puleo immediately notified UPS Corporate Dangerous Goods, and an audit of all packages was then conducted, this time identifying cigarettes in the packages shipped by EExpress that day. (DX-608 ¶ 19.) The evidence therefore demonstrated that UPS promptly audited EExpress packages each time it had reason to believe that EExpress may be shipping cigarettes.

291. **Bearclaw Unlimited**: UPS audited Bearclaw Unlimited in September 2012, and terminated service immediately after identifying the shipment of cigarettes to consumers. (DX-600 ¶ 75.) UPS had previously identified a single shipment of cigarettes by Bearclaw to a non-New York destination, on August 30, 2011. (*Id.* ¶ 73.) But this shipment appeared to be an isolated error, and UPS placed that shipper on a "corrective action plan" on September 9, 2011.

(*Id.*) UPS did not thereafter have reason to believe Bearclaw may be shipping cigarettes to consumers until it conducted the later audit in September 2012.

292. **Seneca Cigars/Hillview Cigars/Two Pine**: UPS had no reason to believe that Seneca Cigars or Hillview Cigars were shipping cigarettes before the shippers closed their accounts in September 2013. UPS's primary customer contact on those accounts, Philip Christ, repeatedly lied to UPS account executives, and to UPS driver Vince Guarino, about the type of products being shipped by those shippers. (Trial Tr. 837:23-838:14; Trial Tr. 886:13-17; DX-603 ¶ 26; Trial Tr. 789:13-790:4; DX-607 ¶¶ 11-12; Trial Tr. 1348:4-6; 1349:8-16; DX-604 ¶ 45-46; DX-603 ¶¶ 40-41.) Although the City made controlled purchases of cigarettes from Seneca Cigars in May 2012 and June 2012 that were delivered by UPS, the City did not advise UPS about these purchases until October 2013, which was after the accounts were already closed. (DX-147 at 1.) In October 2013, Two Pine was not tendering packages to UPS for pick-up; instead, it "drop shipped" packages until March 2014, such that they could not be audited. (Trial Tr. 882:18-883:11; DX-529.) UPS audited Two Pine in April 2014, when an employee at a different UPS center found cigarettes in a Two Pine package. (DX-600 ¶ 116-117; DX-290.)

293. **Remaining shippers**: Plaintiffs have not carried their burden of proving that UPS had reason to believe that any of the remaining shippers were shipping cigarettes to unauthorized recipients at any time prior to the date that UPS audited or terminated those accounts. For example, the audits UPS conducted of AJ's Cigar, Native Outlet, Sweet Seneca Smokes, RJESS and Wholesale Direct found only little cigars, other non-cigarette tobacco products or non-tobacco products. (*See supra*, ¶ 44.) Plaintiffs did not prove that UPS had reason to believe these entities were shipping cigarettes prior to their audit dates.

## 2. The Audit Provision Does Not Require UPS To Use The PACT Act List To Investigate Shippers.

294. While plaintiffs fault UPS for not using the PACT Act List as a tool to complement its program for complying with the AOD, the AOD itself did not require UPS to do so. Indeed, the AOD could not possibly have imposed any requirements based on the PACT Act because the statute did not yet exist when the AOD was executed. Of course, the subsequent enactment of the PACT Act did not modify the AOD, which is an agreement between the State and UPS.

295. Nor did the PACT Act itself require UPS to use the PACT Act List. To the contrary, because UPS had entered into the AOD, Congress exempted UPS from the Act's requirements. The Act provides that "any requirements or restrictions placed directly on common carriers under this subsection [which includes the requirement not to knowingly provide service to shippers on the PACT Act List] . . . shall not apply to a common carrier" that "(i) is subject to a settlement agreement described in subparagraph (B)." 15 U.S.C. § 376a(e)(3)(A). The Act defines such settlement agreements to include "the Assurance of Discontinuance entered into by the Attorney General of New York and United Parcel Service, Inc. on or about October 21, 2005 . . . if [the agreement] is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." *Id*. § 376a(e)(3)(B).

296. As this Court has recognized, Congress thereby codified the status quo as to common carriers that had entered into settlement agreements. (ECF No. 206 at 20 ("In defining a sub-category of enumerated qualifying agreements in § 376a(e)(3)(B)(ii)(I), the PACT Act sought to preserve the status quo as to UPS and two other carriers by exempting them from the PACT Act's requirements as of the date of enactment.").) That is, Congress exempted a carrier from the PACT Act's requirements if the carrier is subject to a qualifying settlement agreement,

such as UPS's AOD, or if such a settlement agreement is no longer in effect and the carrier is still following practices and practices as stringent as its settlement agreement. As Senator Kohl, a sponsor of the Act, explained: "[i]n recognition of UPS and other common carriers' agreements to not deliver cigarettes to individual consumers on a nationwide basis, pursuant to agreements with the State of New York, *we have exempted them from the bill provided this agreement remains in effect*." 155 Cong. Rec. S5822-01, 2009 WL 1423723, at *55853 (May 21, 2009) (statement by Sen. Kohl) (emphasis added).

297.    When Congress enacted the PACT Act, then, it was obviously aware of the provisions of the AOD. Had the parties to the AOD (or Congress) understood the AOD to require UPS to follow the PACT Act List, the exemption Congress granted carriers such as UPS in § 376a(e)(3)(B)(ii)(I) would have been dead on arrival. That cannot be what Congress intended. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (courts "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof").

298.    Aside from running afoul of the PACT Act itself, plaintiffs' effort to rewrite the AOD to impose on UPS a requirement to follow the PACT Act is inconsistent with the parties' own course of performance under the AOD. The record at trial conclusively showed that in the years after the AOD was signed, and after the PACT Act was enacted, the AG understood that UPS was not following the PACT Act. (*See* DX-800-810.) Indeed, the AG explicitly conceded that "*section 376a(e)(3) exempts UPS from the provisions of section 376a(e) only insofar as it relates to shipments of 'cigarettes' as that term is defined in the AOD (not as defined in the PACT Act)."* (DX-804 at 2.) (In other words, the parties were debating whether UPS was exempt from the requirements of the PACT Act as they relate to roll-your-own tobacco, but *the parties agreed that UPS was exempt from the PACT Act with respect to "cigarette" shippers and*

*shipments*. And the AG understood that UPS was not even receiving the PACT Act List, as UPS asked the AG to send the List to them as late as 2013. (DX-808.) The AG even approached UPS about amending the AOD to cover a gap arguably left open by the PACT Act—a gap in restrictions on roll-your-own tobacco, which the AOD does not cover—but did not ask UPS at the time to amend the AOD to require UPS to follow the PACT Act List in evaluating its shippers. (DX-804.) Instead, it was UPS that first suggested to the AG that it voluntarily use the PACT Act List as another compliance measure (DX-805-06), and UPS began doing so in September 2013 (DX-810).

299.    Moreover, evidence at trial demonstrated that the AG contacted UPS about a shipper on the PACT Act List and asked UPS to investigate the shipper. (DX-109.) UPS did so: it audited the shipper and found that the shipper was not shipping cigarettes. (Trial Tr. 1058:20-1060:3; DX-109; DX-110.) That the AG brought to UPS's attention a shipper that was on the PACT Act List further underscores the point that the parties did not understand the AOD to require UPS to independently use the PACT Act List as a means of determining whether to audit a shipper.

300.    Because the parties' course of performance under the AOD shows conclusively that neither the AG nor UPS understood the AOD to require UPS to follow the PACT Act List as a means of determining whether to audit a shipper, the Court cannot accept the State's effort to now read into the AOD such a requirement. *Croce v. Kurnit*, 737 F.2d 229, 235 (2d Cir. 1984) ("The courts in determining the obligations of a contract should, when possible, apply the same measure as the parties have applied in performing their obligations."); *IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("There is no surer way to find out what parties meant, than to see what they have done.").

### 3. The Audit Provision Does Not Require UPS To Investigate Possible Connections Between Shippers.

301. While the State faults UPS for failing to make connections between shippers—connections plaintiffs were only able to make through their own investigation after extensive discovery and more than 18 months of litigation—the AOD imposes no obligation upon UPS to conduct the kinds of investigations of its shippers that would be required to make such connections. The AOD requires only that UPS act on known information, contained in the Tobacco Database, to extend the discipline of a violating shipper to other accounts shipping from the same location, with the same account number, or on behalf of the disciplined shipper. It does not require UPS to research external sources for connections, or to investigate connections between non-violating shippers. This limited obligation is founded in paragraphs 25 and 31 of the AOD.

302. Paragraph 25 of the AOD provides that UPS shall include the "Shipper Information" for any account UPS "identified" to be a "Cigarette Retailer" through the mechanisms set forth in paragraphs 21-23. (Those paragraphs required UPS to search for Cigarette Retailers using various sources, and there is no dispute that UPS did so. (*See, e.g.,* DX-600 ¶¶ 65-67.) The Shipper Information required for each identified Cigarette Retailer includes:

a. "the shipper's name"

b. "*known* business address(es)"

c. "*known* website address(es)"

d. "*known* pick-up location(s)"

e. "UPS account number(s)"

f.   "the name of the contact person for the shipper"[16]

(DX-23 ¶ 25 (emphases added).)

303.   The Shipper Information includes only information within UPS's possession. The use of the word "*known*" before the Business Address, Website, and Pick-Up Location fields indicates that UPS is only required to use that information already within its possession. The provision cannot be read to require UPS to *learn* or research additional information.

304.   Paragraph 25 further provides that where UPS discovers a shipper has violated the tobacco policy, the Tobacco Database must include the violation and the discipline issued. (DX-23 ¶ 25.) This requirement lays the foundation for paragraph 31, which requires UPS to extend the same discipline to any shipper "UPS has a reasonable basis to believe is shipping or seeking to ship Cigarettes (a) from the same location as the suspended shipper, (b) on behalf of a suspended shipper, or (c) with the same account number as the suspended shipper." (DX-23 ¶ 32.) The use of the word "has"—in the present tense—again indicates that UPS must *already have* the reasonable basis to believe the prescribed connection exists. As with paragraph 25, the provision cannot be read to require UPS to research additional information or connections. And the provision applies only to shippers who have violated the tobacco policy.

305.   Despite the absence of any such requirement in the text of the AOD, plaintiffs attempt to connect shippers through (a) non-violating accounts and (b) information not contained within the Tobacco Database. For example, plaintiffs claim UPS should have connected DeerPathCigs to both Bearclaw Unlimited and Elliot Enterprises (and thus the two accounts to each other) based on information contained only in the PACT Act List. (ECF No. 399 ¶¶ 223, 245, 263.) The attenuated connection is not evident from any measure that would have been

---

[16] Paragraph 25 also requires the database to contain "the UPS account executive responsible for the shipper, if any."

required under the AOD. DeerPathCigs never violated the tobacco policy and thus UPS had no reason, under paragraph 31, to connect it to any other shipper. (DX-371, line 261.) Further, none of the information in paragraph 25 would have established the alleged connection: DeerPathCigs' information does not overlap with any *known* information regarding Bearclaw Unlimited or Elliot Enterprises. (*Compare* DX-371, line 261 *with* line 2902 *and* PX-408.).[17]

306. In short, the AOD's requirement that UPS extend the discipline of a violating account to other shippers based on known information contained within the Tobacco Database cannot be rewritten to create an overarching duty to investigate connections between any and all shippers or to obligate UPS to research outside sources of information not contained within the parameters of the Tobacco Database.

> **4.** **Even If UPS Had Failed To Audit A Shipper Where A Reasonable Belief Existed, The Audit Provision Would Not Have Required UPS To Audit Every Package Thereafter Tendered By That Shipper.**

307. By its plain terms, the audit provision imposes a single obligation on UPS: to audit a shipper where there is a reasonable basis to believe the shipper is tendering cigarettes to consumers. Because that is the only obligation the audit provision imposes, UPS could only be liable for breaching the audit provision as to any shipper if the Court found that there was a reasonable basis to believe that the shipper might have been tendering cigarettes to consumers but UPS failed to conduct an audit of the shipper. Thus, in the event the Court finds that UPS failed to audit a shipper where a reasonable basis existed to believe that the shipper was tendering cigarettes to consumers—and for the reasons detailed above, no such finding is warranted here—UPS would be liable for a single breach of the AOD.

---

[17] Indeed, as addressed below (*see infra*, COL, § VI(B)) connecting the disparate information contained PACT Act List is only possible through hindsight.

308. Because the State's argument to the contrary is so divorced from the language of the actual provision in the AOD, it bears repeating the audit provision, in full:

> UPS shall audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so.

(DX-23 ¶ 24.)

309. Despite this plain language, the State contends that, if UPS fails to audit a shipper once there is a reasonable basis to believe the shipper may be tendering cigarettes to consumers, UPS commits a violation of the AOD every time it thereafter accepts a package for that shipper without auditing that package, and regardless of whether the packages contained cigarettes. (Court Ex. 1 at 3; ECF No. 399 ¶¶ 620, 629.) Plaintiffs asserted in their opening statement that "the audit provision says that [UPS] should audit *every time* [UPS has] reasonable basis to believe." (Trial Tr. 65:3-4 (emphasis added).) According to plaintiffs, this purported "every time" requirement means that UPS first violated the audit provision "when they shipped one package after having reasonable basis to believe, without auditing it, and then they violated [the audit provision] again *every day* after that that they continued to ship those packages despite not having audited it," so long as the reasonable basis did not "evaporate." (Trial Tr. 65:6-9 (emphasis added).)

310. The State is forced to ask the Court to re-write the audit provision in this manner, because at trial plaintiffs failed to provide evidence that the vast majority of the package deliveries on which they base their claims even contained cigarettes. To cover that critical failure of proof, the State argues that the audit provision supports liability even as to packages that may not have contained cigarettes (or, indeed, could not possibly have contained cigarettes, such as envelopes). The Court should reject the State's interpretation of the audit provision because it

(1) impermissibly requires rewriting the AOD's audit provision, (2) is inconsistent with the delivery restrictions provision, which is the provision that specifically addresses UPS's delivery obligations, and impermissibly renders that provision superfluous, and (3) is contrary to the AOD's overarching purpose to address violations of § 1399-*ll*.[18]

### a. The State's Theory Impermissibly Requires Rewriting The AOD Audit Provision, In Violation Of Federal Preemption And Contract Principles.

311.    The State has not pointed to any language in the audit provision that supports its theory that, if UPS fails to audit a shipper once there is a reasonable basis to believe the shipper may be tendering cigarettes to consumers, UPS commits a violation of the AOD every time it thereafter accepts a package for that shipper without auditing that package, and regardless of whether the packages contained cigarettes. Plaintiffs did not identify such language in their Third Amended Complaint, in their pre-trial Proposed Findings of Fact and Conclusions of Law, or in plaintiffs' opening statement. That is because there is no such language.

312.    The audit provision does not state that UPS must audit a shipper "every time" or "every day" after UPS first has a reasonable basis to believe but fails to audit the shipper. But even assuming that the audit provision did require UPS to audit a shipper "every time" or "every day" that UPS picked up packages from that shipper after a reasonable basis arose, there is nothing in the audit provision that would require UPS to conduct such subsequent audits by conducting a separate audit of each *package*, as the State erroneously contends. The State has

---

[18] To be sure, UPS is not saying that there is no consequence to a failure to abide the audit provision, if proven. As noted, if the State proved that UPS failed to comply with the audit provision, then they could pursue a claim for breach of the AOD. (*See* ¶ 307.) UPS is merely saying that in any such claim for breach, the State would be limited to the usual contractual remedies for which the law allows, rather than the $1,000 penalty provision; by the terms of the AOD, such a penalty is limited to violations of the delivery restriction provisions (*see supra*, COL, § I(A)), and there is nothing in the AOD that suggests that the penalty provision would apply to every package that UPS accepts for a shipper after an alleged failure to audit the shipper, as the State now contends (*see infra*, § X(E)(1)). Because the State relied on its ungrounded reading of the AOD, moreover, the State failed to prove any damages resulting from an alleged breach of the AOD's audit provision.

invented this per-package audit obligation in order to inflate its claim for a monetary remedy in the event that UPS fails to conduct an audit once a reasonable basis exists.

313. The State's interpretation of the audit provision as imposing continuing, multiple audit requirements on UPS in the event a reasonable basis exists but UPS does not honor the audit obligation, and to define such audits as an audit of each individual package, would require substantially rewriting the provision, along the following lines:

> UPS shall audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so. *If UPS fails to audit a shipper immediately once there is a reasonable basis to believe that the shipper may be tendering Cigarettes to Individual Consumers, UPS shall have an independent obligation to conduct an audit of each package that UPS thereafter picks up from that shipper, so long as the reasonable basis continues to exist. UPS shall conduct its audit of each package that UPS picks up from a shipper by opening and inspecting the contents of that package. UPS shall be liable for a violation of this AOD for each package that UPS does not audit by opening and inspecting the package contents, regardless of whether the package contains cigarettes, after a reasonable basis arises.* (Italicized text added to existing text of DX-23 ¶ 24.)

Spelling out the language that would have to be added to the audit provision to encompass the State's theory of multiple audits—of a very specific type—demonstrates that their interpretation bears no reality to the actual terms of the provision.

314. Rewriting the AOD as needed to implement the State's principles is plainly impermissible. As a threshold matter, the Court's interpretation of the AOD is restricted by the preemption provision of the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which precludes the enforcement of state law related to UPS's "price, route or service." 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A). The Supreme Court has held that the only claims that survive preemption are "routine" breach of contract claims that are "confine[d] . . . to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995) (interpreting

identical preemption provision governing air carriers); *see Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) (applying precedents interpreting air carrier preemption provision to FAAAA). The Court should, therefore, reject the State's efforts to rewrite the AOD provisions to impose obligations and penalties beyond those explicitly set forth in the AOD's plain terms.

315.    Even under ordinary contract interpretation principles, the State's effort to re-write the audit provision is plainly barred. "When an agreement is unambiguous on its face"—as the AOD is—"it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005)). Furthermore, it is a basic tenet of contract law that "[c]ourts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing,'" as plaintiffs seek to do here. *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 403 (2009) (quoting *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (2001)). The State's interpretation of the AOD's audit provisions violates these principles and, accordingly, must be rejected.

316.    The State's theory that the audit provision requires UPS to audit each package also contradicts the plain language of the audit provision, which requires UPS to audit shippers, not packages. (DX-23 ¶ 24.) In addition to the audit provision itself, other AOD provisions that reference audits likewise address audits of shippers, not packages. (DX-23 ¶¶ 13 (UPS "conducted an unannounced audit of the ten shippers"), ¶ 22 ("UPS will . . . conduct audits of such shippers"), ¶ 28 ("UPS shall maintain a copy of the action plan, and conduct an audit of such shipper"), ¶ 29 ("UPS shall maintain a copy of any assurances received pursuant to this Paragraph, and conduct an audit of such shipper"), ¶ 30 (same), ¶ 37 ("UPS's right to conduct

unannounced audits of shippers' packages"), ¶ 40 ("UPS shall conduct an audit of that shipper"). As noted above, the AOD does not define the procedures UPS must use in auditing a shipper and it does not require UPS to open every package when conducting a shipper audit—much less packages, such as letter envelopes, that could not possibly contain cigarettes. But even if the AOD contemplated that UPS must open every package, any failure by UPS to do so would have been a breach of the AOD's requirement that UPS audit the shipper, not a breach of a non-existent obligation to audit individual packages.

317.    By creating inconsistencies within the AOD and rendering superfluous the AOD's references to auditing "shippers," the State's theory contravenes "[t]he cardinal doctrines of contract interpretation instruct[ing] courts to read a contractual document in a manner that confers meaning upon all of its terms and renders the term consistent with one another." *Energy Transp., Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 203 (S.D.N.Y. 2004) (citation omitted). "'[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" *Id.* (citation omitted). Furthermore, "well established principles" of contract construction "require that all provisions of a contract be read together as a harmonious whole, if possible." *Kinek v. Paramount Commc'n, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994). Pursuant to these principles, the only plausible reading of the AOD's audit requirement is that UPS would be deemed to have committed a single breach of the AOD if the Court finds that UPS failed to audit any shipper where a reasonable basis existed to believe that the shipper was tendering cigarettes for delivery to consumers.

> b. **The State's Interpretation Of The Audit Provision Is Inconsistent With The AOD's Provision Governing Discipline Of Shippers.**

318. The State's theory that UPS violates the AOD with every package picked up from a shipper immediately after a reasonable basis arises also is inconsistent with the "Discipline of Shippers" provisions that address UPS's obligation upon discovering a violation of UPS's tobacco policy. The discipline provisions require UPS to notify a shipper of the shipper's first violation (or subsequent violations within a 180-day period), "no later than five (5) business days after UPS discovers the violation" and to suspend delivery services for the shipper "[w]ithin two (2) business days of such contact." (DX-23 ¶¶ 28-30.)

319. Moreover, the "Discipline of Shippers" provisions set forth deadlines for when UPS shall audit a shipper after UPS discovers the shipper has violated UPS's tobacco policy. (E.g. DX-23 ¶ 28 (UPS shall "conduct an audit" of a shipper "within ninety (90) days" after a suspended shipper is reinstated). These deadlines demonstrate that the parties knew how to and did set forth multiple or seriatim audit obligations when they intended to do so.

> c. **The State's Interpretation Of The Audit Provision Is Inconsistent With The Delivery Restriction Provision.**

320. As detailed above, there is only one provision in the AOD that specifically restricts UPS's deliveries: the requirement that UPS comply with PHL § 1399-*ll* by not knowingly delivering cigarettes to persons in New York reasonably believed not to be authorized to receive them and adhere to the UPS Cigarette Policy "prohibiting the shipment of Cigarettes to Individual Consumers in the United States." (DX-23 ¶ 17.)

321. The State's theory about the audit provision attempts to circumvent the delivery restriction by converting the audit provision into a wholesale prohibition on accepting any packages from a shipper that UPS failed to audit after a reasonable basis arose to believe that the

shipper may have been tendering cigarettes to consumers. Plaintiffs' theory would relieve them of the requirements of proving contents of packages, as required to prove violations of the delivery restriction provision, and instead make every package unlawful regardless of its contents. Their theory fails as a matter of law because "[i]t is axiomatic that 'specific terms and exact terms [in a contract] are given greater weight than general language.'" *Uniwire Trading LLC v. M/V Wladslaw Orkan*, 622 F. Supp. 2d 15, 19 (S.D.N.Y. 2008) (quoting Restatement (Second) of Contracts § 203(c)); *see also J. Aron & Co. v. The Askvin*, 267 F.2d 276, 277 (2d Cir. 1959) ("[T]he specific controls the general.").

322.     The audit provision's general language cannot negate the parties' specific agreement that the AOD's delivery restriction would apply exclusively to UPS's knowing delivery of cigarettes to persons not reasonably believed to be authorized to receive them—and to no other deliveries. Moreover, "an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000). The only construction of the AOD that gives effect to the language restricting UPS's deliveries (DX-23 ¶ 17) is one in which a breach of the audit clause is understood solely as a failure to conduct an audit of a shipper where there is a reasonable basis to believe the shipper is tendering cigarettes to consumer.

### d.     The State's Interpretation Of The Audit Provision Is Inconsistent With The AOD's Purpose.

323.     The State contends that UPS would be liable under the audit provision for delivering *all* packages from an unaudited shipper after a reasonable belief had arisen, regardless of package contents. Its position is squarely at odds with the AOD's focus on shipments of cigarettes to consumers in violation of § 1399-*ll* and the UPS Cigarette Policy. As such, the

State's position violates the well-established principle of contractual interpretation that "[a] contract should be construed in light of its objective, and should not be read in a fashion that defeats its purpose." *Allen v. WestPoint-Pepperell, Inc.*, No. 89 CIV. 2016 (SAS), 1996 WL 2004, at *6 (S.D.N.Y. Jan. 3, 1996) (citing *Cromwell Towers Redev. Co. v. City of Yonkers*, 41 N.Y.2d 1, 6 (1976)).

324.    As discussed, PHL § 1399-*ll* is central to the AOD—the State and UPS entered into the AOD to resolve the AG's inquiry into UPS's alleged violation of the statute, the primary restriction in the AOD requires UPS to comply with the statute, and the AOD's stated intent is to "promote further and ongoing cooperation between UPS and the Attorney General concerning UPS's compliance with PHL § 1399-*ll*." (DX-23 ¶ 15.) The audit provision is consistent with the AOD's stated intent, as it is tied to the AOD provisions that require UPS to discipline a shipper in the event that an audit reveals that the shipper has tendered cigarettes for consumers. (*Id*. ¶¶ 27-32; *see id*. ¶ 40 (upon notice from the Attorney General of suspected improper cigarette shipments from a shipper, UPS "shall conduct an audit of that shipper" and "discipline, pursuant to the process set forth in [DX-23 ¶¶ 27-32], shippers found to be shipping Cigarettes to Individual Consumers").)

325.    The AOD penalty provisions likewise are consistent with the AOD's overall focus on shipments of cigarettes to consumers, rather than shipments of other, unregulated items. (*Id*. ¶¶ 42-43.) One penalty provision provides two exceptions to the stipulated penalties that attend AOD violations, both of which are for violations involving "the shipment of Cigarettes to an Individual Consumer." (*Id*. ¶ 42.) The other penalty provision states that evidence of an AOD violation "involv[ing] the shipment of Cigarettes to an Individual Consumer . . . [is] prima facie proof of violation of PHL § 1399-*ll*(2)." Because the penalty provisions are both related to the

AOD's restrictions on deliveries to consumers, the provisions reinforce the AOD's focus on cigarette shipments (*id.* ¶ 43.)

326.    The State's theory would lead to irrational results. Although the penalty provision explicitly exempts from penalties only certain cigarette shipments to consumers (*id.* ¶ 42), plaintiffs' argument requires the unreasonable conclusion that the AOD nevertheless implicitly subjects certain non-cigarette shipments to penalties. Similarly, the State's theory could result in UPS's being liable for delivering packages on behalf of a shipper that never tendered any cigarettes to consumers. For example, the State could contend that a reasonable basis existed to believe that a shipper who sold both cigarettes and little cigars was tendering cigarettes to consumers. If UPS did not audit that shipper, under the State's theory, UPS would be liable for every package that it delivered for that shipper even if the shipper had only tendered packages with little cigars to UPS. Basic principles of contract interpretation preclude such irrational results: a contractual provision "'may not be interpreted in a manner which would render it an absurdity'" and "unfair and anomalous results are to be avoided." *Lee v. Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005) (citation omitted); *see also C.P. Apparel Mfg. Corp. v. Microfibres, Inc.*, 210 F. Supp. 2d 272, 275 (S.D.N.Y. 2000) ("'[W]here a particular interpretation would lead to an absurd result, courts can reject such a construction in favor of one which would better accord with the reasonable expectations of the parties.'") (citation omitted).

327.    In support of this theory, the State has argued that the actual contents of packages are irrelevant because the AOD audit provision is "self-evidently intended to relieve the State of any responsibility for proving anything about the contents of the packages after the fact." (ECF No. 441, at 4.) There is simply no support in the AOD for that position.

328.     As shown, the audit provision is tied to the discipline provisions in the AOD that set forth progressive discipline procedures when an audit reveals that a shipper has tendered cigarettes to consumers. (DX-23 ¶¶ 27-32; *see id*. ¶ 40 (upon notice from the Attorney General of suspected improper cigarette shipments from a shipper, UPS "shall conduct an audit of that shipper" and "discipline, pursuant to the process set forth in [DX-23 ¶¶ 27-32], shippers found to be shipping Cigarettes to Individual Consumers").) The State's insistence that the audit provision is actually designed to help the State collect penalties from UPS is untethered to any actual provision in the AOD.

        **e.**      **Even If The Court Concludes That The AOD Required UPS To Conduct Multiple Audits, The Court Should Limit The Requirement To Changed Circumstances.**

329.     Even if the Court concludes that the audit provision should be interpreted to impose obligations on UPS to conduct multiple audits of the same shipper where UPS does not audit the shipper after a reasonable basis first arises—which UPS vigorously disputes—the Court should interpret the provision as at most imposing additional audit requirements only in the event that changes in circumstances created an additional reasonable basis to believe that shipper was tendering cigarettes to consumers. This interpretation would be consistent with plaintiffs' motion for partial summary judgment on the Potsdam Shippers, which argued that certain alleged facts for the Jacobs Manufacturing and Mohawk Spring Water shipper "groups" gave additional grounds for reasonable basis over time. (ECF No. 268 at 19-21.) For example, plaintiffs argued that UPS should have been alerted that Jacobs Manufacturing may have been shipping cigarettes from the time the account opened, but listed five additional events over time (such as the shipper's move to a larger warehouse in 2007 and UPS's intermittent reference to the shipper as "Jacobs Tobacco" in shipping records beginning in June 2010) as providing notice to UPS. (*Id*. at 19-20.)

330.     Under this interpretation, if the Court made findings that the State proved all six facts that plaintiffs' summary judgment motion identified for Jacobs Manufacturing and all five facts identified for Mohawk Spring Water, UPS would be liable for six and five independent breaches of the AOD, respectively, for those shippers.

331.     In no event should the Court accept the State's theory that the audit provision required UPS to audit every package once a reasonable basis arose and subjected UPS to liability for independent breaches of the AOD based on the number package deliveries, even ones that did not contain cigarettes at all. For all the reasons discussed above, the State's theory that UPS was somehow obligated to audit every package tendered by a shipper after a reasonable basis exists is untenable and must be rejected.

## II.     PLAINTIFFS FAILED TO PROVE THAT UPS KNOWINGLY DELIVERED CIGARETTES ON BEHALF OF THE SHIPPERS AT ISSUE.

332.     As detailed below, each of plaintiffs' claims requires proof that UPS knowingly delivered cigarettes. Plaintiffs presented no proof that UPS had direct knowledge that any package it delivered contained cigarettes—much less that all of them did, as plaintiffs just assume. Rather than attempting to prove knowledge, plaintiffs' theory rests on conscious avoidance, but the Second Circuit has squarely held that conscious avoidance cannot be shown by evidence that a defendant did not try hard enough to learn incriminating facts, or that circumstances should have apprised a defendant of the facts. Plaintiffs seek to hold UPS liable based on theories of liability that are more akin to negligence, which is insufficient to prove knowledge.

**A.** **All Of Plaintiffs' Claims Require Proof That UPS Knowingly Shipped Cigarettes To Unauthorized Recipients.**

333. **CCTA**. To recover under Claims 1-2, asserting claims under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 et seq. ("CCTA"), plaintiffs must have proved that UPS "*knowingly*" shipped, transported, received, possessed, sold, distributed, or purchased "contraband" cigarettes. 18 U.S.C. § 2342(a), 18 U.S.C. § 2341(2) (emphasis added).

334. **PACT Act**. The PACT Act provides that, subject to certain exceptions: "no person who delivers cigarettes or smokeless tobacco to consumers, shall *knowingly* complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on" a list of non-compliant shippers maintained by the U.S. Attorney General (the "PACT Act List"). 15 U.S.C. § 376a(e)(2)(A) (emphasis added). The PACT Act explicitly provides that it does not require or obligate "[a]ny common carrier … making a delivery subject to this subsection" to "(iii) open or inspect, pursuant to this chapter, any package being delivered to determine its contents." 15 U.S.C. § 376a(e)(9)(A). Accordingly, to recover under Claims 7-10, UPS must not be exempt from the PACT Act (but it is exempt), and plaintiffs must have proved that UPS knew it was delivering cigarettes or smokeless tobacco to delivery sellers that were included on the PACT Act List.

335. **New York Law**. To recover under Claims 11-12, asserting violations of N.Y. PHL § 1399-*ll*, plaintiffs must have proved UPS "*knowingly* transport[ed] cigarettes to any person in this state reasonably believed by such carrier to be" anyone other than an authorized recipient, as defined in Section 1399-*ll*(1). *See Ward v. New York*, 291 F. Supp. 2d 188, 194 n.3 & 210 (W.D.N.Y. 2003) ("Because Subdivision Two only applies to persons who 'knowingly' transport cigarettes, *transporters cannot violate the Statute unless they know that they are*

*transporting cigarettes*.") (emphasis added). "Nothing in the plain language of the Statute requires carriers to open packages and verify the contents." *Id.* at 211.

336.    **AOD**. While the State contends that the AOD permits liability based on constructive knowledge, as detailed above, the AOD incorporates the liability standard from N.Y. PHL § 1399-*ll*. Thus, to recover under Claim 13, the State likewise must have proved that UPS knowingly delivered cigarettes for liability to attach. (*See supra*, COL, § I(B)(1).)

B.    **A Showing Of Constructive Knowledge Is Not Sufficient To Hold UPS Liable For Any Of Plaintiffs' Claims.**

337.    The term "knowingly" generally means actual knowledge or conscious avoidance. *See* 1-3A Modern Federal Jury Instructions-Criminal P 3A.01(hereinafter "JI") 3A-1 and 3A-2 (2016); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) (knowledge for purposes of 18 U.S.C. § 2339B(a)(1) can be established "if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity").

338.    "A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness." JI 3A-1. A lower scienter standard is inappropriate. *See* JI 3A-1 (excluding "ignorance, mistake, accident, or carelessness" from definition of "knowingly"); JI 3A-2 ("guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken"); *accord Global-Tech*, 563 U.S. at 769 (standard for willful blindness "surpasses recklessness and negligence").

339.    While plaintiffs argue that UPS can be liable based on the notion of conscious avoidance, they can only establish conscious avoidance by showing that UPS was aware of a high probability of a fact and acted with deliberate disregard of the facts. JI 3A-2; *see also*

*Global-Tech*, 563 U.S. at 769 (willful blindness has "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact"); *Weiss*, 768 F.3d at 208 ("A defendant exhibits deliberate indifference if it 'knows there is a substantial probability that the organization engages in terrorism but … does not care.'"). Conscious avoidance cannot be established if UPS actually believed that the fact did not exist, JI 3A-2, nor can it be established based on plaintiffs' theories that UPS employees could have learned about shippers' unlawful shipments if they had conducted more diligence, *see, e.g.*, *United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1449 (2015) ("Conviction on a conscious avoidance theory cannot be justified either by the defendant's failure to try hard enough to learn the incriminating facts or by the fact that the defendant's circumstances '*should have apprised* [the defendant] of the unlawful nature of [his] conduct.'" (alterations and emphasis in original) (quoting *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000)).

### C. Knowledge Cannot Be Imputed From Employees In UPS's Claims Group Or Customs Brokerage Group.

340.     As a general rule, because "[c]orporations can only act through their officers and employees, … in a proper case the acts and knowledge of the employee are imputed to the corporation." *Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003). To be imputed to the corporation, however, an employee's knowledge must be acquired "within the actual or apparent scope of [the employee's] authority and … concern[] a matter to which [his or her] authority extends." 81 N.Y. JUR. 2d Notice and Notices § 2. An agent has a duty to disclose "to his principal 'all the material facts coming to his knowledge with reference to the subject of his agency.'" *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985); *accord Apollo Fuel Oil v. United States*,

195 F.3d 74, 76 (2d Cir. 1999) (*per curiam*) ("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal."); *see also United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) ("The acts of a corporation are, after all, simply the acts of all of its employees operating within the scope of their employment.").

341.    Accordingly, knowledge that is not material to an employee's duties cannot be imputed to the employer. *See U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05 Civ. 8176 (LAP), 2008 WL 2073928, at *3 (S.D.N.Y. May 8, 2008) (refusing to impute employee's knowledge of defendant's infringing activity to plaintiff-employer because employee was an engineer and had no "duties relating to the enforcement or licensing of [plaintiff's] patent rights"); *AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*, No. 01 Civ. 11448 (JGK)(HPB), 2006 WL 1206333, at *2-3 (S.D.N.Y. May 2, 2006) (citing cases); *Reino de España v. Am. Bureau of Shipping, Inc.*, 691 F.3d 461, 473 (2d Cir. 2012) (for knowledge of an agent to be imputed to principal, "the information at issue . . . went to matters within the scope of the agency"); *Apollo Fuel Oil*, 195 F.3d at 76 ("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal").

342.    Plaintiffs seek to establish UPS's knowledge based on claims/tracers submitted by three shippers (Elliot Enterprises, Shipping Services, and Smokes & Spirits). As UPS has shown, however, any employees who would have reviewed the claims or tracers submitted by a shipper would not have had a duty to use any knowledge gained in the course of such a review to enforce UPS's tobacco policy. (*See supra*, FOF, § V(E)(2).) Accordingly, such knowledge cannot be imputed to UPS as a whole.

343. Plaintiffs also seek to establish UPS's knowledge based on shippers' appearance on the PACT Act Lists (Indian Smokes, Elliot Enterprises, and Smokes & Spirits). But the Customs Brokerage Group, the only employees at UPS who received a PACT Act List before August 2013, had no duties concerning domestic shipments whatsoever, and therefore had no duty to use any knowledge gained in the course of reviewing a PACT Act List to enforce UPS's tobacco policy. (*See supra*, FOF, § V(E)(1).)

**D. UPS Did Not Knowingly Deliver Cigarettes For The Shippers At Issue.**

344. Here, plaintiffs failed to prove that UPS knew, or consciously avoided knowing, that any of the shippers for which there is evidence of cigarette shipments were shipping cigarettes via UPS.

345. **Shipping Services:** Shipping Services' representative informed UPS that they were shipping only cigars or other tobacco products, not cigarettes. (DX-51; DX-602 ¶ 51.) UPS employees actually believed that Shipping Services was not shipping cigarettes. Plaintiffs' only evidence of knowledge appears to be the fact that Shipping Services opened a UPS account in 2005, after its alleged predecessor was identified as a potential "Cigarette Retailer" under the AOD. But the AOD explicitly contemplated that UPS would continue to ship for tobacco shippers, such as Shipping Services, who had never violated the tobacco policy. (DX-23 ¶¶ 11, 21-23; PX-452; Trial Tr. 200:6-14; 499:22-500:3; Trial Tr. 207:3-7; DX-371, line 1324.) Plaintiffs point to no facts that UPS employees consciously avoided knowing. To the contrary, after UPS audited Shipping Services and found a mix of cigars and cigarettes in its packages, UPS terminated service to the shipper. (DX-600 ¶¶ 92-98; DX-602 ¶¶ 45, 50, 55; DX-250.)

346. **Smokes & Spirits:** The evidence shows that Smokes & Spirits' representative informed UPS that they were shipping only cigars or other tobacco products, not cigarettes. (DX-602 ¶ 37; DX-526, lines 3257-59; Trial Tr. 626:23-627:4.) UPS employees actually

believed that Smokes & Spirits was not shipping cigarettes. Plaintiffs point to the Tobacco Watchdog letter that claimed Smokes & Spirits shipped cigarettes, but Mr. Fink contacted the account, discussed the letter, and confirmed Smokes & Spirits was not shipping cigarettes. (DX-602 ¶¶ 35, 36, 38.) After UPS audited Smokes & Spirits and found a mix of cigarettes and other tobacco products in its packages, UPS terminated service to the shipper. (DX-600 ¶¶ 96-99; DX-602 ¶¶ 31, 36, 39-41; DX-260; DX-511.)

347. **Indian Smokes:** The evidence shows that Indian Smokes' representatives informed UPS that they were shipping only cigars, not cigarettes. (DX-68; DX-510, line 30; Trial Tr. 666:19-667:17.) UPS employees actually believed that Indian Smokes was shipping cigars, not cigarettes. Plaintiffs' only evidence of knowledge appears to be the fact that UPS reopened Indian Smokes in 2005 after identifying them as a potential "Cigarette Retailer" under the AOD. But, again, the AOD explicitly contemplated that UPS would continue to ship for tobacco shippers, such as Indian Smokes, who had never violated the tobacco policy (DX-23 ¶¶ 11, 21-23; Trial Tr. 633:4-11; PX-347, line 29.) Plaintiffs point to no other facts indicating Indian Smokes' shipping activity that UPS employees knew or consciously avoided knowing. To the contrary, as soon as a UPS driver became suspicious that Indian Smokes was shipping cigarettes, UPS terminated service to the shipper. (Potter Tr. 10:7-21; DX-609 ¶ 11.)

348. **Elliot Enterprises:** UPS employees actually believed that Elliot Enterprises was not shipping cigarettes. Plaintiffs point to the fact that Mr. Fink did not confirm what Elliot Enterprises was shipping or obtain a Tobacco Agreement, but they point to no facts that Mr. Fink consciously avoided knowing that would have led him to believe Elliot Enterprises would violate the law and ship cigarettes to consumers. Plaintiffs also point to the fact that Mr. Fink did not obtain a Tobacco Agreement, but the AOD does not require Tobacco Agreements for shippers

who ship tobacco products other than cigarettes. (DX-23 at ¶ 18.) That Mr. Fink did not obtain a Tobacco Agreements is thus not a breach of the AOD nor is it proof that he consciously avoided knowing that Elliot Enterprises was shipping cigarettes; Mr. Fink simply lost track of Elliot Enterprises in the over 4,000 new accounts he was assigned at that time. (Trial Tr. 610:5-14; 644:11-21.)

349.    Plaintiffs point to the Tobacco Watchdog letter that claimed "Elliot Industries" shipped cigarettes, but the unknown origin of the letter makes it unreliable. And in any event, Mr. Fink had no account by that name and did not connect it to Elliot Enterprises. (DX-602 ¶ 62; Trial Tr. 624:10-20.)

350.    As soon as a UPS driver became suspicious that Elliot Enterprises was shipping cigarettes, UPS terminated service to the shipper. (DX-600 ¶ 76; DX-602 ¶ 63.)

351.    **EExpress:** EExpress's representative informed UPS that it was not shipping tobacco. UPS employees actually believed that EExpress was not shipping tobacco. Mr. Fink had no basis to connect EExpress to Elliot Enterprises: the two accounts were 30 miles apart, on different reservations, and had different business models—a retail smoke shop compared to a private residence. (DX-602 ¶ 75.) Further, there is no evidence indicating Mr. Fink's contact, Adrian, had been affiliated with Elliot Enterprises, or that Mr. Fink met Aaron Elliot at either location. (DX-602 ¶ 67.) Plaintiffs insinuate that UPS's audit of EExpress revealing coffee was compromised, but the only two UPS employees at the Dunkirk Center to have known about the audit themselves reported EExpress the next month for shipping cigarettes when a box broke open in the Center. (Trial Tr. 716:5-18; DX-22, page 29-30; DX-300.) After discovering the cigarettes, UPS terminated service to the shipper. (DX-600 ¶¶ 121-124; DX-602 ¶¶ 58, 63, 65, 72; DX-330.)

352.     **Bearclaw**: The evidence shows that Bearclaw's representative informed UPS that they were not shipping any tobacco products at all. (DX-602 ¶ 144.) Later, after a single package was found to violate UPS policy, the shipper agreed to a corrective action plan, assuring UPS that they would not tender packages containing cigarettes in violation of UPS policy. (DX-600 ¶ 73; DX-115; DX-119.) UPS therefore actually believed that Bearclaw was not shipping cigarettes. Plaintiffs point to no facts concerning Bearclaw that UPS employees consciously avoided knowing. To the contrary, after UPS audited Bearclaw and found cigarettes in its packages, UPS terminated service to the shipper. (DX-600 ¶ 75; DX-161.)

353.     **Arrowhawk/Hillview Cigars/Native Gifts/Seneca Cigars/Two Pines Enterprises:** The evidence shows that Philip Christ, a consultant for Arrowhawk/Hillview Cigars/Seneca Cigars, repeatedly informed UPS that they were shipping only cigars, not cigarettes. UPS employees actually believed that Arrowhawk/Hillview Cigars/Seneca Cigars were not shipping cigarettes.

>   a.  Plaintiffs point to no facts concerning **Arrowhawk/Hillview Cigars/Seneca Cigars** that UPS employees consciously avoided knowing. Those shippers were closed by September 2013 or earlier, and UPS had no reason to believe that any of those accounts were shipping cigarettes while they were actively shipping packages with UPS. (DX-604 ¶¶ 23, 48; Trial Tr. 837:23-838:2-14; Trial Tr. 789:13-790:4; DX-511, line 289; DX-607 ¶¶ 9-12.)

>   b.  Likewise, UPS employees believed that **Native Gifts** was shipping cigars, and plaintiffs introduced no evidence to the contrary. Mr. Christ, who opened Native Gifts in 2013, did not mention Native Gifts in his testimony at trial, and there is no testimony or documents regarding the contents of the Native

Gifts packages. Plaintiffs point to a single tracer for Native Gifts, which was filed in July 2014, *after* Native Gifts had stopped shipping with UPS. (PX-406 at line 9601.) This single tracer cannot form the basis of any knowledge during the time Native Gifts was shipping with UPS. (DX-604 ¶ 45-46; DX-603 ¶¶ 40-41.)

c. Similarly, **Two Pine Enterprises**' representative informed UPS that they were shipping only cigars, not cigarettes. UPS employees actually believed that Two Pines was shipping cigars, not cigarettes. Plaintiffs point to no facts concerning Two Pines that UPS employees consciously avoided knowing. To the contrary, after UPS audited Two Pines and found cigarettes in its packages, UPS terminated service to the shipper. (DX-604 ¶ 42; DX-603 ¶¶ 54, 56; DX-600 ¶¶ 115-117; DX-607 ¶ 15.)

d. Plaintiffs fail in their attempt to convert snippets from emails, taken out of context, into proof of knowledge. UPS account executive Mr. DelBello referred to Mr. Christ as a "liar" only *after* the Two Pine audit revealed that Mr. Christ had been lying about not shipping cigarettes. (Trial Tr. 860:25-861:11; Trial Tr. 887:20-889:11; DX-335; PX-336.) Mr. DelBello's emails related to the creation of the Native Gifts account—mentioning the phrases "odd" and "fishy"—are insufficient to show knowledge, as Mr. DelBello explained that he was curious about the ownership structure of the companies and did not suspect that they were shipping cigarettes. (Trial Tr. 855:18-22; Trial Tr. 890:15-892:10; DX-531; DX-215.)

e. The AOD does not require Tobacco Agreements for shippers who ship tobacco products other than cigarettes, and UPS believed that these shippers were shipping non-cigarette tobacco products. (DX-23 ¶ 18.) Any delay in obtaining Tobacco Agreements is not a violation of the AOD or any law.

f. Plaintiffs may not rely on the not yet admitted document, PX-8B. On October 21, 2016, the Court denied plaintiffs' motion to admit PX-8B and ordered plaintiffs to "significantly revise" the exhibit, in compliance with the Court's October 4, 2016 Order. (ECF No. 489.) Neither UPS nor the Court has received the revised exhibit, and no part of PX-8B is currently admitted. In any event, nothing in what plaintiffs previously proposed to include within PX-8B could have shown UPS's knowledge of the contents of the packages. There is no evidence that UPS employees ever saw the invoices plaintiffs sought to introduce as PX-8B.

g. Mr. Christ's testimony that UPS employees knew that he was shipping cigarettes was not credible. To the extent that any of these shippers were shipping cigarettes, Mr. Christ deliberately deceived UPS, as he explained when he testified that smoke shops play a "cat and mouse" game with UPS to cover up illegal activities. (Trial Tr. 1110:4-1112:21.)

354. **Potsdam Shippers (Mohawk Spring Water, Action Race Parts, Jacobs Manufacturing/Jacobs Tobacco Company):** As detailed above (*see supra*, ¶¶ 82-96), UPS drivers believed that the Potsdam Shippers were shipping cigarettes, but they believed that they were doing so only to retailers on other Indian reservations, which was permissible at the time of the shipments. As explained further below (*see infra*, COL, § VII), plaintiffs cannot establish

liability based on shipments from the Potsdam Shippers given the unique facts and legal issues associated with the Potsdam Shippers. Beyond those unique legal issues, the evidence presented at trial failed to show that UPS knowingly delivered cigarettes for the Potsdam Shippers to unauthorized recipients.

a. There is no evidence that UPS knew **Action Race Parts** was shipping cigarettes prior to the Potsdam seizure. The only evidence regarding UPS's knowledge before the Potsdam seizure is the testimony of UPS drivers, Candice Sheridan and Donald Jarvis, who both believed Action Race Parts shipped only race-car parts. (Sheridan Tr. 108:8-11; Jarvis Tr. 45:22-46:7.)

b. The only testimony concerning **Mohawk Spring Water** that plaintiffs offered at trial, from cooperating witness Robert Oliver, was not credible. Mr. Oliver pleaded guilty to federal charges related to cigarette manufacturing and record-keeping. (Trial Tr. 1150:19-1151:6.) Mr. Oliver has not been prosecuted by the State of New York. (Trial Tr. 1160:19-21.) Mr. Oliver previously attempted to withdraw his plea agreement, arguing that he was actually manufacturing cigars and not cigarettes. (Trial Tr. 1161:9-12.) Mr. Oliver also objected to the authority of the federal judge and claimed he was not the defendant in the action. (DX-741; Trial Tr. 1183:7-9.) Part of Mr. Oliver's sentence, his period of supervised release, was reduced in part because he wrote a letter to the sentencing Judge that referenced the assistance he was providing to the City of New York. (Trial Tr. 1163:2-17; PX-627.)

c. And Mr. Oliver's testimony failed to establish crucial facts concerning Mohawk Spring Water. Mr. Oliver provided no testimony based on personal

knowledge or otherwise concerning the proportion of Mohawk Spring Water's packages that contained cigarettes rather than hay or water. Although he signed a plea agreement alleging that Mohawk Spring Water shipped a specific quantity of cigarettes through UPS, he admitted that he did not personally observe shipments of cigarettes via UPS in those shipments and he "had to agree" to the plea agreement. (Trial Tr. 1154:18-22.) In his own words, he "looked the UPS shipping sheets over" when signing the plea agreement, and it listed a total number of cases shipped by UPS for Mohawk Spring water, but "was it all cigarettes? Was it all water? Was it all hay? I don't know. I was not there all the time for the shipments that were sent out." (Trial Tr. 1168:10-16.) Although Mr. Oliver testified that some of the shipments were going to smoke shops, he testified that Mohawk Spring Water shipped water to smoke shops, and did not know the percentage of boxes containing water versus other products. (Trial Tr. 1180:17-22.)

d.  The only testimony concerning **Jacobs Manufacturing** that plaintiffs offered at trial, from cooperating witness Rosalie Jacobs, was not credible. Ms. Jacobs was convicted of structuring 396 cash transactions to evade money laundering restrictions (PX-629, PX-630; Trial Tr. 1701:13-23.) Ms. Jacobs originally denied signing a declaration at the request of the City of New York before being freed from federal probation (Trial Tr. 1696:14-1697:2.) When shown the declaration, she testified that she signed it in March 2016, before she was freed from federal probation. (Trial Tr. 1697:9-20.)

e. And even crediting Ms. Jacobs' testimony, it is consistent with the facts, detailed below (*see infra*, COL, § VII(C)(1)) that the Potsdam Shippers were shipping cigarettes to authorized recipients. The customers for Jacobs Tobacco Company were retailers on the St. Regis Reservation, as well as "tribes" both within New York and outside New York. (Trial Tr. 1658:5-17.) Jacobs Tobacco never shipped to residential consumers, only to retailers. (Trial Tr. 1678:7-13.)

## III. PLAINTIFFS FAILED TO PROVE ADDITIONAL ELEMENTS UNIQUE TO THEIR CCTA CLAIMS.

355. As demonstrated above, plaintiffs failed to prove that UPS knowingly transported cigarettes for the shippers at issue, much less that UPS knew that it was transporting unstamped cigarettes. In addition, plaintiffs failed to prove additional elements unique to their CCTA claims. First, plaintiffs failed to prove that UPS shipped more than 10,000 unstamped cigarettes in any shipment for any shipper. Plaintiffs attempt to satisfy the quantity requirement by aggregating shipments, but the CCTA does not permit aggregation. Even under plaintiffs' aggregation theory, plaintiffs offered proof that UPS transported more than 10,000 unstamped cigarettes in total only for three shippers or shipper "groups." Second, regardless of whether or not aggregation is applied, plaintiffs failed to prove that UPS *knew* that it was transporting more than 10,000 unstamped cigarettes for any shipper. Each of these elements is required under the CCTA, which requires proof that UPS:

a. Knowingly;

b. Ships, transports, receives, possesses, sells, distributes, or purchases;

c. Contraband cigarettes. 18 U.S.C. § 2342.

d. Contraband cigarettes are defined as cigarettes that do not bear a tax stamp and both exceed a quantity of 10,000 and are "in the possession" of a non-exempt person. 18 U.S.C. § 2341(2).

**A.     The CCTA Requires A Single Transaction In Which A Carrier Transported More Than 10,000 Cigarettes.**

356.     First, plaintiffs failed to prove that UPS transported any single shipment of more than 10,000 unstamped cigarettes, as the CCTA requires for such a shipment to constitute a shipment of "contraband cigarettes." 18 U.S.C. § 2341(2).

357.     UPS previously argued that the CCTA does not permit aggregation of shipments (ECF No. 22 at 23-24.) In its September 16, 2015 Order (ECF No. 49), the Court rejected UPS's argument, concluding that "the plain language of the CCTA … imposes no single transaction requirement." (ECF No. 49 at 12.) UPS reasserts its position here and will argue in an appeal, if any, its legal argument that the CCTA's definition of "contraband cigarettes" requires a single transaction in which a carrier shipped more than 10,000 unstamped cigarettes and that plaintiffs CCTA claims failed because they lacked proof of any such transaction.

**B.     Even Assuming Aggregation Is Permissible To Satisfy The CCTA's 10,000 Cigarettes Threshold, Plaintiffs Failed To Prove That UPS Shipped 10,000 Cigarettes For All But Two Shippers Or Shipper "Groups."**

358.     Even assuming aggregation is permissible, however, plaintiffs failed in their proof in other respects. Plaintiffs failed to prove that UPS delivered more than 10,000 unstamped cigarettes for the following shippers: Elliot Enterprise(s), Rock Bottom Tobacco, Deerpathcigs.com, Bearclaw Unlimited, Shipping Services, Seneca Ojibwas Trading Post, Morningstar Crafts & Gifts, Sweet Seneca Smokes, Wholesale Direct, AJ's Cigar, Native Outlet, Big Indian Smoke Shop, Pierce Trading, Seneca Commerce, Seneca Direct, Iroquois Tobacco Direct, R J E S S, Native Distribution & Sales, Bear Track Tobacco, RJE-Seneca Smoke, RJE-

Ltd., Two Pine Enterprises, Native Gifts, Hooty Sapper Ticker, Native Wholesale Supply/Seneca Promotions, Indian Smokes, and Action Race Parts.

359. As detailed above, for each of those shippers, plaintiffs presented only evidence that UPS delivered some packages for the shippers. Plaintiffs failed to present any evidence of the contents of packages that UPS delivered, much less evidence that the contents of the packages included more than 10,000 cigarettes. (*See supra*, ¶¶ 78-79 (summarizing failure of proof as to Rock Bottom Tobacco, Deerpathcigs.com, Seneca Ojibwas Trading Post, Big Indian Smoke Shop, Pierce Trading, Seneca Commerce, Seneca Direct, Iroquois Tobacco Direct, Native Distribution & Sales, Bear Track Tobacco, RJE-Seneca Smoke, RJE-Ltd, and Hooty Sapper Ticker, AJ's Cigar, Morningstar Crafts & Gifts, Native Gifts, Native Outlet, Native Wholesale Supply, RJESS, Seneca Promotions, Sweet Seneca Smokes, Wholesale Direct, and Action Race Parts).) Even for shippers that UPS terminated for violating UPS policy (Shipping Services, Indian Smokes, Elliot Enterprises, Two Pine Enterprises), plaintiffs cannot prove that UPS transported more than 10,000 cigarettes for those shippers because, as noted, UPS did not complete any deliveries in which cigarettes were found, and UPS immediately terminated the shippers. (*See supra*, FOF, §§ V(C)(2), (V(C)(5), V(C)(6)(a), V(C)(7(c).)

360. Only as to Smokes & Spirits (for which plaintiffs introduced invoices showing more than 10,000 cigarettes shipped) or as to Mohawk Spring Water and Jacobs Manufacturing (for which plaintiffs presented testimony from witnesses affiliated with the shippers that more than 10,000 cigarettes were shipped) did plaintiffs satisfy the CCTA's threshold requirement, assuming aggregation were permitted. Even as to those shippers, plaintiffs failed to present evidence that UPS *knew* these shippers were tendering packages containing these quantities of cigarettes (or indeed any cigarettes).

## C. For *All* Of The Shippers, Plaintiffs Failed To Prove That UPS Knowingly Transported More Than 10,000 Cigarettes.

361.    And for *all* shippers—including Smokes & Spirits, Mohawk Spring Water, and Jacobs Manufacturing—plaintiffs failed to prove an additional element of a CCTA claim: that UPS knowingly transported more than 10,000 cigarettes. Scienter must apply to the element that converts innocent conduct into criminal conduct. *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) (requiring proof that shipper knew package contained child pornography); *Staples v. United States*, 511 U.S. 600 (1994) (applying a scienter standard to the features of a firearm that put it under the registration statute); *Liparota v. United States*, 471 U.S. 419 (1985) (requiring proof that the defendant knew his use of food stamps was "unauthorized"); *Morrissette v. United States*, 342 U.S. 246 (1952) (requiring proof that defendant knew his act constituted conversion of United States property).[19] Here, the CCTA requires proof that UPS "knowingly" transported or possessed "*contraband* cigarettes," 18 U.S.C. § 2342 (emphasis added), and "contraband" cigarettes are defined as those that do not bear a tax stamp and that both exceed a quantity of 10,000 and are "in the possession" of a non-exempt person, 18 U.S.C. § 2341(2). As such, the quantity of the cigarettes is a conduct element to which the "knowingly" *mens rea* should attach.

362.    Because plaintiffs failed to offer any proof that UPS knowingly transported or possessed more than 10,000 cigarettes, they failed to satisfy an element of their CCTA claims.

---

[19] *United States v. Morrison*, 686 F.3d 94, 107 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 955 (2013), is not to the contrary. *Morrison* stated in passing that the CCTA does not require the shipper to know that the cigarettes are "contraband"—i.e., not in compliance with the tax laws of the jurisdiction. *Morrison*'s one-sentence statement, without explanation, may be in conflict with the cases cited above. But even if *Morrison* controls, holding that a defendant need not know the *law* is not the same as holding that the defendant need not know the *facts* that convert innocent conduct into criminal conduct, as the cases cited above hold is required to satisfy a statute requiring "knowledge" as the *mens rea*.

## IV. EVEN WERE THE COURT TO FIND THAT INDIVIDUAL EMPLOYEES AT UPS KNEW ABOUT SOME SHIPPERS' ILLEGAL ACTIVITY, UPS WOULD NOT BE BOUND BY THEIR KNOWLEDGE.

363. Plaintiffs have failed to prove that UPS as a company—the only defendant in this case—knew or consciously avoided knowing that any shipper was shipping cigarettes via UPS. UPS employees testified at trial that they did not knowingly provide service to shippers that were shipping cigarettes to unauthorized recipients—testimony that was all corroborated by contemporaneous evidence and other witnesses. Even if the Court were to find that any UPS employee knew that a shipper was tendering packages containing cigarettes to UPS for delivery to an unauthorized recipient, the necessary corollary of such a finding would be that the employee would have been acting outside the scope of UPS policy. Consequently, any such knowledge could not be imputed to UPS.

364. As a corporate defendant, UPS can only be held liable for the acts of employees or agents acting within the scope of their authority and for the benefit of the employer. *Reino de Espana*, 691 F.3d at 473 (for knowledge of an agent to be imputed to principal, "the information at issue . . . went to matters within the scope of the agency"); *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419, 437 (E.D.N.Y. 1995) ("An agent's acts are within the scope of his actual authority if it . . . is actuated, at least in part, by a purpose to serve the master.") (Quotation and citation omitted.)

365. Any UPS employee who knowingly violated UPS policy was not acting within the scope of his employment, and was not acting for the benefit of UPS. UPS made clear to its employees that it was not in UPS's interest to ship cigarettes, and never authorized any employee to allow any shipper to ship cigarettes via UPS. *See United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 192 n.33 (D. Mass. 2004) (refusing to impute to Harvard

the knowledge of two rogue employees because the employees "were not acting with an intent to benefit Harvard in engaging in the acts that gave rise to the false claims").

366.    UPS is not responsible for acts by employees that it tried to prevent through its policies and procedures. *See, e.g.,* Third Circuit Model Criminal Jury Instructions § 7.06 (2014). ("A corporate defendant is not responsible for acts which it tries to prevent."). UPS's carefully enforced policies and procedures designed to prevent the shipment of cigarettes to consumers must be considered when determining the scope any UPS employee's authority, and whether that employee was acting to benefit UPS. *See, e.g.,* Seventh Circuit Pattern Criminal Jury Instructions § 5.03 (2012) (instructing jurors to take into account corporate "policies and instructions" and how "carefully" the defendant attempted to enforce them when determining whether the "agent … was acting with intent to benefit [corporate defendant] or was acting within [corporate defendant's] authority.").

367.    At most, plaintiffs may have shown that a non-managerial employee, such as a driver or account executive, had knowledge or consciously avoided knowing that certain shippers may have been shipping cigarettes during specific periods of time. The Court alluded to this on the penultimate day of trial, when it informed the parties that they "should assume that the Court believes that Mr. Fink knew that there were shipments of cigarettes to some extent." (Trial Tr. 1718:3-12.)

368.    For the reasons detailed above, UPS stands by Mr. Fink's testimony that he did not know, and did not even suspect, that shippers within his area were shipping cigarettes to consumers. As detailed, Mr. Fink's testimony is corroborated by contemporaneous evidence and (in the case of Smokes & Spirits) testimony or documents from the shippers themselves.

369. But if the Court were to find that Mr. Fink—or any other UPS employee—knew that a shipper was tendering packages containing cigarettes to UPS for delivery to an unauthorized recipient, the necessary corollary of such a finding would be that the employee would have been acting outside the scope of UPS policy. If an employee violated UPS policy and knowingly permitted the unlawful shipment of cigarettes, such employee would have been acting outside the scope of his or her employment or without an intention to benefit UPS. Consequently, any such knowledge could not be imputed to UPS, based on the legal principles set out above.

## V. UPS IS ENTITLED TO THE PACT ACT EXEMPTION BASED ON ITS AOD.

370. By its express terms, the PACT Act insulates UPS from any claim under either the PACT Act itself or state laws such as PHL § 1399-*ll*. The Act exempts from its requirements carriers that are "subject to a settlement agreement described in subparagraph (B)," 15 U.S.C. § 376a(e)(3)(A), and the Act precludes a State or local government from "enforc[ing] against a common carrier a law prohibiting the delivery of cigarettes or other tobacco products to individual consumers or personal residences without proof that the common carrier is not exempt under paragraph (3) of this subsection," 15 U.S.C. § 376a(e)(5)(C)(ii). The PACT Act specifically names UPS's AOD with the NY AG as a "settlement agreement" triggering UPS's exemption in 15 U.S.C. § 376a(e)(3)(B)(ii)(I). The only qualification to UPS's exemption is that the AOD "is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers," 15 U.S.C. § 376a(e)(3)(B)(ii)(I).

371. As UPS has argued, UPS's recognition of its obligations under the AOD suffices to exempt it from the PACT Act. (*See, e.g.*, ECF No. 173 at 20-22; ECF No. 44 at 2-3.) By exempting UPS from the PACT Act, Congress unequivocally expressed its intent to subject UPS to a single liability regime: the AOD. Even if UPS has breached the AOD wholesale (which it

has not), the AOD itself provides the framework for proving such breaches and constitutes the sole mechanism of recovery for those breaches. Nowhere did Congress indicate an intent to subject UPS to an *ex post facto* determination that it had lost the exemption and suddenly possessed additional burdens of compliance without notice.

372. The text of the PACT Act compels this result. The use of the word "to" in the phrase "is honored … to block the illegal delivery of cigarettes" shows that the AOD need only be directed or aimed at the problem it is trying to address, not that it need be one-hundred percent effective in curtailing all allegedly unlawful shipments by third-party shippers. Thus, UPS's "honoring" of the AOD need only take the form of it maintaining the policies the AOD requires it to maintain; even if plaintiffs' allegations of illegal shipments by third-party shippers, in violation of UPS's policies, were proven (and the discussion above demonstrates that they were not), that would not be enough to disqualify the AOD from the scope of the PACT Act's Exemption Provision.

373. UPS recognizes that the Court read the PACT Act differently. In its decision on UPS's motion for partial summary judgment (ECF No. 206), the Court interpreted § 376a(e)(3)(B)(ii)(I) to mean that UPS is exempt if the AOD has appropriate breadth (i.e. nationwide effect). The Court concluded that "Congress intended that UPS be exempt from PACT Act claims as of the date of statutory enactment and based on facts then in existence." (ECF No. 206 at 4.) "It follows that the conditions in existence at the time the statute was passed were sufficient to make UPS exempt." (*Id*. at 21.) As a result, the Court ruled that to prove that UPS is not entitled to the PACT Act exemption—and thus subject to the requirements of the PACT Act and of PHL § 1399-*ll*—plaintiffs must prove that the "factual basis for the exemption has changed, thereby altering UPS's entitlement to the exemption." (*Id*. at 4.) "UPS could lose its

exemption based on a material change in circumstances, either by UPS no longer giving nationwide effect to the AOD or states no longer recognizing its active existence." (*Id*. at 22.)

374.    The Court has also ruled that the AOD Exemption Provision "does not require that a carrier's policies be 100% effective at preventing the shipment of cigarettes to consumers." (*Id*. at 44.) The Court reiterated that the exemption "does not itself reach questions of compliance or non-compliance with obligations assumed under any particular agreement," i.e., "[the] provision does not mean that if the AOD is, on a shipment-by-shipment (or incident-based) review, not fully and always in fact complied with, that UPS loses its exemption." (*Id*. at 20.)

375.    Yet the Court ruled that "UPS may not retain the exemption simply by maintaining the requisite policies nationwide *in name only*. Put otherwise, if plaintiffs could present evidence creating an inference that the effectiveness of UPS's policies is so compromised that these policies are not in fact in place, that would be sufficient to raise a genuine issue of fact for trial." (*Id*. at 44-45, emphasis in original.) The Court suggested two ways plaintiffs might satisfy that standard:

a. "[P]laintiffs could present evidence of a sufficiently large number of instances of shipments of contraband cigarettes that it suggests that UPS is, overall, turning a blind eye towards such unlawful shipments." (*Id*. at 45.)

b. "[P]laintiffs could present a triable issue by submitting evidence showing that UPS policymakers have in fact turned a blind eye to shipments of contraband cigarettes." (*Id*.)

376.    UPS reasserts its position that UPS's recognition of its obligations under the AOD suffices to exempt it from the PACT Act (*see, e.g.*, ECF No. 173 at 20-22; ECF No. 44 at 2-3) as a matter of law, and will press that position on any appeal, if necessary.

377. Nonetheless, even under the Court's interpretation of the PACT Act exemption, plaintiffs failed to show that UPS lost its PACT Act exemption; they failed to prove that "the effectiveness of UPS's policies is so compromised that these policies [for complying with the AOD] are not in fact in place" (ECF No. 206 at 44-45). That is because, as detailed below, plaintiffs failed to show a "sufficiently large number of instances of shipments of contraband cigarettes," that would support any notion "that UPS is, overall, turning a blind eye towards such unlawful shipments" (*id*. at 45), or that "[UPS policymakers have in fact turned a blind eye to shipments of contraband cigarettes" (*id*.).

### A. UPS Has Always Honored The AOD Throughout The United States.

378. At trial, plaintiffs offered no evidence whatsoever concerning UPS policymakers, focusing instead on how the policies, which they concede UPS adopted, were implemented by the employees responsible for policy execution (as opposed to policy-making). Consequently, plaintiffs failed to show that UPS policymakers turned a blind eye to shipments of contraband cigarettes. Instead, plaintiffs' focus on the implementation of UPS's policies only reinforces that plaintiffs question the effectiveness of UPS policy, not UPS's overall commitment to the AOD and its policies.

379. And plaintiffs' challenge to the effectiveness of UPS policies failed to prove that UPS turned a blind eye to its obligations under the AOD. An analogy to the doctrine of substantial performance demonstrates the point. Under the doctrine, a party that substantially performs its obligations under a contract cannot be deemed to have materially breached the agreement such that the agreement is no longer in force. 14 Williston on Contracts § 44:52 (4th ed.) ("The question whether performance is 'substantial' … usually arises from the perspective of the breaching party—that is, whether the performance, although deficient, is nevertheless sufficient to trigger the other party's counterperformance *or prevent the other party from*

*declaring the contract at an end for breach … .*") (emphasis added). "Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 311-12 (2d Cir. 2016) (quoting *Cramer v. Esswein*, 220 A.D. 10, 11 (2d Dep't 1927)). The New York Court of Appeals has described how to determine whether a party has rendered substantial performance as follows:

> There is no simple test for determining whether substantial performance has been rendered and several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance.

*Hadden v. Consol. Edison Co. of. N.Y.*, 34 N.Y.2d 88, 96 (1974); *accord Merrill Lynch & Co. v. Alleghany Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

380.    At the very least, UPS has substantially performed the AOD. That is true even if plaintiffs are deemed to have proven some isolated violations of the AOD—and no such finding is warranted, for the reasons detailed above. Plaintiffs failed to show that UPS delivered cigarettes for all but three shippers or alleged shipper "groups" (the Potsdam Shippers, Smokes & Spirits, and the Arrowhawk shippers), and they failed to show that UPS knowingly delivered cigarettes for any shipper. But even accepting that UPS delivered some packages containing cigarettes to unauthorized recipients, the overwhelming evidence remains that UPS has the nationwide policies initiated by the AOD. At most, plaintiffs have shown noncompliance with UPS's policy by a handful of shippers out of 1.6 million daily pick-up accounts nationwide. Even judging by the number of tobacco shippers nationwide (more than 4,000 (*see* DX-600 ¶ 22)), the fact that plaintiffs focus on only a handful of shippers shows that UPS has

substantially complied with the AOD. And the fact that UPS has continually enhanced its policies as new issues have come to light (DX-600 ¶¶ 13-14, 125-45) is wholly inconsistent with the notion that UPS turned a blind eye to its obligations under the AOD.

381.    As a result, UPS is exempt both from plaintiffs' claims under the PACT Act and from plaintiffs' claims under PHL § 1399-*ll*.

**B.      The PACT Act Cannot Be Read To Apply To UPS Retroactively, As Plaintiffs Seek To Do.**

382.    In this case, plaintiffs seek to apply the PACT Act to UPS, despite UPS's express exemption from the statute, by arguing that UPS at some point lost its exemption by abandoning the AOD. But plaintiffs do not identify precisely when UPS supposedly lost the exemption, based on what conduct. More importantly, plaintiffs ignore that the State was conceding UPS's exemption as late as 2013, as the parties were discussing UPS's decision to voluntarily prohibit service to shippers identified on the PACT Act List. (*See supra*, ¶ 298; *see also* ¶¶ 229-231.) Interpreting the PACT Act to permit a claim against UPS based on conduct that occurred when UPS had no reason to doubt its exemption would raise serious constitutional questions about violations of UPS's due process rights. For that reason alone, the Act must be interpreted to require some notice that a carrier is no longer protected by a qualifying settlement agreement, before the carrier can be held to the standards of the Act. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) (court should interpret statute to avoid raising constitutional question).

383.    Two Supreme Court decisions—*F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), and *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012)—make clear that, where a criminal or civil defendant faces punishment (including in the form of civil penalties), the standards of conduct giving rise to such punishment must be reasonably discernible *before* punishment is imposed.

384.     In *Fox*, the Court held that the Federal Communications Commission violated due process by imposing civil penalties on Fox and ABC for three discrete broadcasts involving brief profanity or nudity. *Fox*, 132 S. Ct. at 2320. At the time the broadcasts occurred, the FCC had published no regulations or guidance that ABC and Fox could have consulted in determining whether the broadcasts were punishable. Rather, the FCC relied on guidelines enacted *after* the broadcasts had aired. *Id.* at 2318. The Court noted that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," *Id.* at 2317 (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)), thus reaffirming the constitutional mandate "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Court concluded that the FCC's "lack of notice to Fox and ABC that its interpretation had changed . . . 'fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Fox*, 132 S. Ct. at 2318 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

385.     Similarly, in *Christopher*, the Court refused to uphold the Department of Labor's interpretation of the Fair Labor Standards Act that pharmaceutical sales representatives are not overtime-exempt "outside salesmen." *Christopher*, 132 S. Ct. at 2169. While the Court's decision came in the context of an issue concerning the proper scope of agency deference, its holding confirms that a party cannot be expected to comply with a regulation of which it has not been given fair warning. *Id.* at 2167.

386.     The D.C. Circuit recently reaffirmed these "bedrock principles of due process," in the context of a challenge to an enforcement action brought by the Consumer Financial Protection Bureau. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, No. 15-1177, 2016 WL

5898801, at *5 (D.C. Cir. Oct. 11, 2016). There, the court vacated the CFPB's order against a mortgage lender based on the CFPB's attempt to retroactively apply a new interpretation of a federal law to the lender. The court ruled that the CFPB's effort to apply retroactively its changed interpretation of the law violated the lender's due process rights: "change becomes a problem—a fatal one—when the Government decides to turn around and retroactively apply that new interpretation to proscribe conduct that occurred before the new interpretation was issued." *Id*. at *33.

387. Plaintiffs' interpretation of the PACT Act would impermissibly hold UPS accountable for complying with a law (here, the PACT Act and N.Y. PHL § 1399-*ll*) without fair warning, by subjecting UPS to liability for violations during a time when UPS supposedly lost its exemption even though the State failed to notify UPS of that possibility—indeed, even though the State took the exact opposite position in the parties' course of performance of the AOD (*see supra*, ¶ 298). That interpretation cannot be squared with the Due Process Clause's guarantee of fair notice. UPS and other carriers with enumerated agreements have relied on the Exemption Provision, and UPS had no reason to believe that it did not apply until plaintiffs brought this lawsuit in 2015, and later claimed in an amended complaint that UPS was no longer honoring the AOD.

### C. The City Is Not Entitled To Pursue Claims Under Section 1399-*ll*, Any More Than The State Is Entitled To Do.

388. Plaintiffs argued in their opening statement that the City could pursue claims under N.Y. Pub. Health L. § 1399-*ll*, even if the State is barred from pressing such a claim due to UPS's exemption from the PACT Act. (*See* Trial Tr. 72:3-10.)[20] Although the City did not

---

[20] In determining UPS's motion to dismiss plaintiffs' initial Complaint, the Court previously ruled that the statutory exemption in the PACT act "preempts enforcement of § 1399-*ll* against UPS." *New York v. United Parcel Serv., Inc.*, 131 F. Supp. 3d 132, 143 (S.D.N.Y. 2015). The City did not advance its new

explain the legal basis for its new argument, UPS expects that it will point to the language of 15 U.S.C. § 376a(e)(5)(C)(2), the subsection establishing that UPS is exempt from state laws such as § 1399-*ll*, which says that "[n]o State may enforce" such a law. But there is no support for the City's position. The statute explicitly preempts local enforcement powers, because they are derivative of the power of the State, or, in the alternative, the City's claim is implicitly preempted because a contrary interpretation would frustrate congressional purpose.

389.    "'The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.'" *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 433 (2002) (quoting *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991)). Plaintiffs' interpretation of the PACT Act would turn this principle on its head, as it would interpret § 1399-*ll* as granting municipalities a power to regulate common carriers that the State itself lacks. The Second Circuit rejected such an argument from the City in *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 54-55 (2d Cir. 1988), interpreting federal preemption under OSHA to cover local as well as state regulation, even though the statute "refers solely to preemption of 'state' standards and plans." The court noted that "it would be anomalous to construe [OSHA] as granting a local government greater power than that possessed by its state government." *Id.* at 55. For this reason, courts interpreting statutes preempting action by a "State" extend the preemption to localities as well. *See Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 612 (1991) (Scalia, J., concurring) ("The term 'State' is not self-limiting since political subdivisions are merely subordinate components of the whole."); *see, e.g., Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010)

---

argument at that time. *See id.* (noting that "plaintiffs have not raised any argument disputing that N.Y. PHL § 1399-*ll* is preempted if UPS qualifies for exemption under the PACT Act").

(Interstate Commerce Commission Termination Act preempted local ordinance even though text of statute said "preempt the remedies provided under Federal and State law."); *Rockwood v. City of Burlington*, 21 F. Supp. 2d 411, 416-17, 420 (D. Vt. 1998) (finding preemption of local Youth Access to Tobacco ordinance where it conflicted with Federal Cigarette Labeling and Advertising Act, even though the federal law only preempted requirements or prohibitions "imposed under state law").[21]

390.    In addition to being at odds with federal case law, permitting localities to enforce state and local laws otherwise preempted by the PACT Act would frustrate the purpose of the Act, by subjecting common carriers such as UPS to different regulatory schemes in each of the innumerable local communities in which they provide service. *See City of New York v. Fedex Ground Package Sys., Inc.*, No. 14 Civ. 9895, 2016 WL 1322454, at *6 (S.D.N.Y. Mar. 31, 2016) ("In passing the PACT Act, Congress generally sought to enact a uniform, nationwide scheme to regulate the delivery of cigarettes."); *see also Mortier*, 501 U.S. at 616 (Scalia, J., concurring) (noting that where a statute is restricting certain types of state regulation, "it makes little sense to restrict States but not their subdivisions"). As a result, even if the Court holds that the text of the PACT Act exemption applies only to State enforcement, it would impermissibly interfere with the congressional scheme—designed to subject UPS to one liability regime—to permit local government enforcement. *Arizona v. United States*, 132 S. Ct. 2492, 2500–01 (2012).

---

[21] Courts interpret the term "State" to include localities even where localities are specifically referred to elsewhere in the same statute. *Cf. Ours Garage*, 536 U.S. at 428 (extending exception from federal preemption that "specifies only 'State[s]'" to municipalities as well, even though another subsection of the same statute provided for preemption of "'State[s]' and their 'political subdivisions'").

## VI.   EVEN ASSUMING UPS WERE SUBJECT TO THE PACT ACT, PLAINTIFFS FAILED TO PROVE THAT UPS VIOLATED THE ACT.

391.   Even if plaintiffs could prove that UPS was subject to the PACT Act, UPS did not violate the Act. The Act contains only one restriction that plaintiffs claim UPS violated: "no person who receives the list [compiled by the U.S. Attorney General, of non-compliant delivery sellers] under paragraph (1) … shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on the list," subject to certain exceptions. 15 U.S.C. § 376a(e)(2)(A). But plaintiffs failed to prove that UPS "received the list under paragraph (1)"—meaning, from the Attorney General, in a legally sufficient manner; and they cannot prove that UPS knowingly completed a delivery for a person "whose name *and* address are on the list." *Id.* (emphasis added).

### A.   Plaintiffs Failed To Prove That UPS Received The PACT Act List, As Required By The Act, And That UPS Knowingly Provided Service To Shippers On The List.

392.   UPS cannot be deemed to have effectively received the PACT Act List for two reasons: because the Attorney General of the United States did not distribute the List to UPS as required by the PACT Act, and because when some employees in UPS's customs brokerage group received the list, they could not legally bind the company, given their complete absence of responsibility for ensuring compliance with regulations by UPS's domestic operations.

393.   The PACT Act prohibits certain deliveries by a "person who receives the list [compiled by the U.S. Attorney General, of non-compliant delivery sellers] under paragraph (1)." 15 U.S.C. § 376a(e)(2)(A). Paragraph (1)(D) requires the "Attorney general of the United States" to "distribute the list [of non-compliant delivery sellers] … to any common carriers or other persons who deliver small packages to consumers identified by any government pursuant to paragraph (6)." 15 U.S.C. § 376a(e)(1)(D). Paragraph 6, in turn, requires all States, local, and

tribal governments to "provide the Attorney General of the United States with … a list of common carriers and other persons who deliver small packages to consumers in or into the State, locality, or tribal land." 15 U.S.C. § 376a(e)(6)(A).

394.    Yet plaintiffs did not prove that either the State or the City provided the Attorney General of the United States with UPS's name or contact information, despite the fact that the AOD identified UPS's designated "point of contact" for government regulators to "make the notifications contemplated by this Assurance of Discontinuance or address any concerns about Cigarette sellers and shippers using UPS to deliver Cigarettes to persons located in New York." (DX-23 at ¶ 38.)

395.    As a result, plaintiffs failed to prove that the Attorney General of the United States sent the PACT Act List to the correct person at UPS to receive and act upon the List. At best, plaintiffs proved that the List was sent to employees in UPS's customs brokerage division in Louisville, Kentucky—often not even by anyone associated with the Attorney General of the United States, as required by the PACT Act. (*See, e.g.*, PX-475; PX-482.) Consequently, UPS cannot be deemed to have received the List as required by the PACT Act, 15 U.S.C. § 376a(e)(2)(A), and UPS was therefore not subject to the Act's delivery restriction.

396.    Independently, under general principles of agency, "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal." Restatement (Third) of Agency § 5.03. "The nature and scope of the duties assigned to an agent are key to imputation within an organization." *Id*. at 8.

397.    Therefore, even in the few instances in which someone in the U.S. Department of Justice sent the PACT Act List to employees in UPS's customs brokerage division (*see, e.g.*, PX-476; PX-488), receipt by such employees does not constitute receipt within the meaning of

the PACT Act, because those employees did not have responsibility for compliance with laws regarding domestic tobacco shipments.

398.    The employees at UPS who did have responsibility for domestic tobacco compliance did not receive the PACT Act List until September 2013, when UPS started following the list on a voluntary basis. (*See* DX-810; DX-205.)

399.    Lack of notice to UPS of the contents of the PACT Act List is bolstered by the fact that UPS would not reasonably have been expecting to receive the List. Nor would it expect the Attorney General to have provided the PACT Act List to it, since UPS was exempt from the subsection of the PACT Act that instructed the Attorney General to provide notice to common carriers and imposed duties on carriers not to deliver for entities with names and addresses on the list. 15 U.S.C. § 376a(e)(3)(B) ("[s]ubsection (b)(2) and any requirements or restrictions placed directly on common carriers under this subsection, including subparagraphs (A) and (B) of paragraph (2), shall not apply to a common carrier that" is exempt).

**B.    Deliveries For Smokes & Spirits Or For Alleged Affiliates Of Shippers On the PACT Act List Did Not Violate The PACT Act, Even Were UPS Deemed To Have Properly Received The List.**

400.    Carriers subject to the PACT Act List restrictions cannot "knowingly complete … a delivery of any package for any person whose name and address are on the list," 15 U.S.C. § 376a(e)(2)(A). By its explicit terms, the PACT Act applies only where the "name *and* address" of a person appears on the PACT Act List. *Id.* (emphasis added).

401.    Congress recognized that it was easy for internet cigarette sellers to "quickly shut down operations and reappear under a new name and website." But Congress chose not to burden carriers with the obligation of determining whether an entity at a new address, or even an entity at the same address with a different name, was the same as an entity listed on the PACT Act List. The PACT Act provides that carriers "shall not be required to make *any inquiries or*

168

*otherwise determine* whether a person ordering a delivery is a delivery seller on the list described in paragraph (1)(A) who is using a different name *or* address in order to evade the related delivery restrictions." 15 U.S.C. § 376a(e)(9)(B)(i) (emphasis added.) Liability can only attach under that circumstance if the carrier "knows [the shipper] is a delivery seller who is on the list and is using a different name or address to evade the delivery restrictions of paragraph (2)." 15 U.S.C. § 376a(e)(9)(B)(ii).

402.    Until it terminated service in January 2014, UPS provided service to Smokes & Spirits at 137 Main Street, Salamanca, New York 14779. (DX-602 ¶ 31.) Plaintiffs have not identified any PACT Act List that included a Smokes & Spirits at that address, or even in the city of Salamanca, New York. Plaintiffs have pointed to several PACT Act Lists that identify a Smokes & Spirits at an address in Killbuck, New York. (*See, e.g.*, PX-109.) But plaintiffs have offered no evidence that this was the same entity as the same-named entity on the PACT Act List, let alone that UPS knew that the shipper located in Salamanca, New York, was the same entity as the entity list on the PACT Act List, but adopted a different address to evade the delivery restrictions in the PACT Act.

403.    Furthermore, to the extent plaintiffs contend that UPS should have made an inquiry concerning Smokes & Spirits, that argument is specifically precluded by the PACT Act, which relieves carriers of any such duty. *See* 15 U.S.C. § 376a(9)(B).

404.    In any event, pursuant to 15 U.S.C. § 376a(2), a carrier is not liable under the PACT Act for performing deliveries for persons whose name and address is on the PACT Act List if the carrier "knows or believes in good faith that the item does not include cigarettes or smokeless tobacco." As explained above, UPS believed in good faith that Smokes & Spirits was shipping little cigars and other tobacco products, not cigarettes.

405.     Plaintiffs failed to prove that UPS violated the PACT Act by providing service to shippers that never appeared on any PACT Act List, such as EExpress, Bearclaw Unlimited, AJ's Cigar, Sweet Seneca Smokes, RJESS, and Native Outlet. (In Court Exhibit 1, plaintiffs seek PACT Act penalties based on alleged deliveries for those shippers. *See* Court Ex. 1, at 4.) Because not a single one of those shippers were ever identified on a PACT Act List (even with a different address), the PACT Act does not impose liability for providing service to those shippers. As noted, the PACT Act restricts liability to carriers that "knowingly complete … a delivery of any package for any person whose name and address are on the list …," 15 U.S.C. § 376a(e)(2)(A), and the Act specifically provides that carriers "shall not be required to make *any inquiries or otherwise determine* whether a person ordering a delivery is a delivery seller on the list described in paragraph (1)(A) who is using a different name *or* address in order to evade the related delivery restrictions." 15 U.S.C. § 376a(e)(9)(B)(i).

## VII.     PLAINTIFFS FAILED TO PROVE CLAIMS BASED ON SHIPMENTS FROM THE POTSDAM SHIPPERS FOR ADDITIONAL REASONS.

406.     Deliveries for the Potsdam Shippers present unique factual and legal issues: plaintiffs presented no evidence that any of the Shippers shipped any packages to New York City; and while plaintiffs presented evidence that two drivers suspected that two of the Potsdam Shippers (Mohawk Spring Water and Jacobs Manufacturing) were shipping cigarettes, they ignore the evidence that UPS understood the consignees of the Shippers' packages to be authorized to receive cigarettes, and that UPS reached out to law enforcement, who instructed UPS to continue providing service to the Shippers. Based on these unique facts, claims based on the Potsdam Shippers' shipments fail for a number of legal reasons:

          a.   The City lacks standing to assert any claims based on the Potsdam Shippers.

b.  None of the Potsdam Shippers' shipments violated the CCTA or the AOD based on the New York Tax Law in effect at the time.

c.  Transportation of shipments from the Potsdam Shippers did not violate the AOD, because UPS reasonably believed the consignees of the shipments to be authorized.

d.  Transportation of shipments from the Potsdam Shippers did not violate N.Y. PHL § 1399-*ll*, because UPS reasonably believed the consignees of the shipments to be authorized.

e.  UPS cannot be held liable for shipments made in good faith reliance on instructions from New York State police.

## A.   The City Lacks Standing To Assert Any Claims Based On The Potsdam Shippers.

407.    To have standing under Article III to recover for UPS's alleged deliveries that are the subject of its Seventh Defense—alleged deliveries of unstamped cigarettes to reservation retailers—the City must be able to prove a concrete, injury-in-fact from those deliveries. *See, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008). To show harm from cigarette deliveries, the City must show that "those cigarettes actually entered and harmed the City in the ordinary course." *City of New York v. Milhelm Attea & Bros., Inc.*, No. 06-CV-3620 (CBA), 2012 WL 3579568, at *18 (E.D.N.Y. Aug. 17, 2012) (City lacked standing to pursue CCTA and Cigarette Marketing Standards Act claims based merely on evidence that "cigarettes were capable of entering the City" and evidence of post-litigation controlled purchases).

408.    The City lacks the required evidence to establish standing for any claims based on shipments from the Potsdam Shippers. At trial, the evidence indicated that the Potsdam Shippers

were shipping solely to retailers on Indian reservations in New York and other states. (Trial Tr. 1179:19—1180:16; 1678:12-13; PX-591; PX-075; PX-410.) Plaintiffs presented no evidence that the reservations that allegedly received deliveries of unstamped cigarettes from UPS are located in New York City (and none are). Nor have they even attempted to produce evidence about what happened to those cigarettes, including that any entered the City in the ordinary course. As a result, the City cannot establish that it has standing to assert claims; indeed, this Court lacks jurisdiction over those claims by the City.

**B.** **None Of The Potsdam Shippers' Shipments Violated The CCTA Or The AOD Based On The New York Tax Law In Effect At The Time.**

409. UPS has previously detailed why plaintiffs' claims under the CCTA and the AOD, based on shipments from the Potsdam Shippers, fail due to the state of the law on whether cigarettes destined for retailers on Indian reservations both were taxable and required to bear tax stamps. (*See, e.g.,* ECF Nos. 300, 385.) The CCTA imposes liability only for the carriage of unstamped cigarettes that are *both* subject to "applicable taxes" under state law *and* required to bear a stamp. 18 U.S.C. § 2341(2). Section 471 imposes no tax on cigarettes destined for sale on-reservation to enrolled Tribal members because federal law prohibits the imposition of a tax on such consumers. *Dep't of Taxation & Fin. of of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994). In addition, under pre-amendment § 471, because the State had no power to tax cigarettes destined for on-reservation sales to Tribal consumers, such cigarettes were not required to bear stamps. *Id.* at 64; *Morrison*, 686 F.3d at 99. Moreover, given pre-amendment § 471's lack of any mechanism to distinguish between taxable and non-taxable sales made on reservations, the New York Court of Appeals had held that *no* cigarettes sold on-reservation to consumers were required to bear stamps. *Cayuga Indian Nation of New York v. Gould*, 14 N.Y.3d 614, 653 (2010). And because implementation of the amended version of § 471—which

172

imposed a stamping requirement on *all* cigarettes, even those not subject to an applicable tax—was stayed during the relevant period, pre-amendment § 471 governed the alleged shipments in question. *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 160 (2d Cir. 2011).

410.    Accordingly, to hold UPS liable under the CCTA based on shipments from the Potsdam Shippers, plaintiffs were required to prove that UPS transported cigarettes that were both subject to an applicable tax and required to bear a stamp. Because the applicability of both New York's tax and its stamping requirement depend on the circumstances of the consumer sale, that means plaintiffs were required to submit evidence regarding the ultimate sales of the cigarettes UPS allegedly carried. Specifically, plaintiffs were required to show that the cigarettes were sold to consumers off-reservation. But plaintiffs readily acknowledge that "[a]s *a factual matter* the taxable status of the Retail Sales in this case is . . . unknown. Neither is there evidence of sales to tribe members, or of any sales at all." (ECF No. 343 at 22 (citations omitted); *see also id.* at 2; ECF No. 344 at 6.) That concession alone shows that, as a matter of law, UPS cannot be liable under the CCTA for any shipments from the Potsdam Shippers.

411.    UPS recognizes that the Court rejected this argument in its September 10, 2016 Order. (ECF No. 406 at 2 (answering question "whether unstamped cigarettes transported by UPS to and from Indian reservation retailers constituted contraband under the CCTA during the period when New York State followed a forbearance policy vis-à-vis tax collection from such entities, and when certain injunctions and stays were in place with respect to an amended § 471 and a tax collection scheme under § 471(e)": "Yes.").) UPS nevertheless restates that position here, and will press the argument in any appeal.

412.    Independently, whether cigarettes destined for retailers on Indian reservations both were taxable and required to bear tax stamps at the time of the Potsdam Shippers' shipments

is relevant as background to plaintiffs' claims under the AOD based on those shipments: that is, as demonstrated below, even if the Court concluded that shipments of untaxed cigarettes to Indian reservations could constitute contraband under the CCTA, the stays and injunctions, as well as the State's public positions on those stays and injunctions, supported UPS's reasonable belief at the time that any such shipments were authorized by the State. (*See supra*, ¶¶ 82-83 (summarizing facts concerning Potsdam Shippers); *see infra*, COL, §§ VII(C)-(E) (explaining why facts preclude liability under the AOD for shipments from the Potsdam Shippers).)

### C. Transportation Of Shipments From The Potsdam Shippers Did Not Violate the AOD.

#### 1. UPS Had No Reason To Believe That The Consignees Of The Potsdam Shippers' Shipments Were Not Authorized Recipients Of Cigarettes.

413.   As detailed above, at the time of the shipments from the Potsdam Shippers, through official guidance issued by the Department of Taxation and Finance, through discussions with DTF representatives, and through its awareness of various stays and injunctions barring New York State from enforcing its amended tax laws against Native American reservations until June 22, 2011, UPS understood that shipments from the Potsdam Shippers to retailers on other Native American reservations were authorized by the State. (*See supra*, ¶¶ 82-83.)

414.   Based on that understanding, UPS had no reasonable basis to believe that the Potsdam Shippers were shipping cigarettes to Individual Consumers, such that it had an obligation to audit the shippers under the AOD. The AOD requires UPS to "audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes *for delivery to Individual Consumer*s." (DX-23 ¶ 24.) (emphasis added). By its plain language, then, the provision requires UPS to audit shippers only where there is a reasonable basis to believe *both*

that (a) the shipper may be tendering cigarettes *and* (b) the cigarettes are for delivery to an Individual Consumer.

415.    The AOD defines "Individual Consumers" as "any person or entity other than an Authorized Recipient." (DX-23 ¶ 16(G).) "Authorized Recipient," in turn, is defined as "tobacco manufacturers; licensed wholesalers, tax agents, retailers, and export warehouses; government employees acting in accordance with their official duties; or any other person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which delivery is made, including those persons described in PHL § 1399-*ll*(1) with respect to the State of New York." (*Id*. ¶ 16(A).) Thus, the term Authorized Recipient in the AOD encompasses more categories of recipients than PHL § 1399-*ll*; it includes the "persons described in PHL § 1399-*ll*(1)," *plus* "any other person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which delivery is made." And while PHL § 1399-*ll* imposes a presumption that a carrier that delivers a shipment "to a home or residence" knows that the recipient is not authorized (PHL § 1399-*ll*(2)), no such presumption applies to commercial consignees. Thus, read with the AOD as a whole and together with PHL § 1399-*ll*, the AOD's use of the phrase "Individual Consumers" means persons or entities UPS reasonably believed were unauthorized to receive cigarettes.

416.    In its decision denying plaintiffs' motion for summary judgment concerning the Potsdam Shippers, the Court agreed that regardless of how the Court resolved the questions concerning whether unstamped cigarettes from the Potsdam Shippers could be considered contraband under the CCTA, UPS need not have audited the Potsdam Shippers if it had a reasonable basis to believe that they were not shipping to Individual Consumers, as the term is defined in the AOD. (ECF No. 355 at 4-5.) The Court ruled that the AOD's audit requirement—

when read together with the definitions of "Individual Consumers" and "Authorized Recipient"—"requires, in relevant part, that UPS audit shippers 'where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to any person or entity other than … [those] to whom cigarettes may be lawfully transported pursuant to federal law and the law of [New York].'" (*Id*.) Based on that interpretation of the AOD requirement, the Court ruled that "UPS has raised a triable issue" on "whether UPS had a reasonable basis to believe it was transporting cigarettes from shippers to unlawful recipients." (*Id*. at 6.) The Court's conclusion was based on its determination that "Because the AOD is a contractual agreement, its scope may differ from the statutory interpretation of the effect of § 471 standing alone." (*Id*. at 7.)

417.     The Court then proceeded to interpret what the parties to the AOD meant by the term "lawful"; the Court ruled that "lawful recipients generally include those who are 'authorized or sanctioned.'" (*Id*. at 6-7 (citation omitted).) And because UPS submitted "a litany of evidence suggesting that the recipients it was shipping to were authorized by the State" (*id*. at 7)—evidence that the Court found undisputed (*id*.)—the Court ruled that the State was not entitled to summary judgment on its AOD claim.

418.     At trial, plaintiffs did not counter any of this evidence. They did not dispute that DTF publicly announced that it permitted untaxed cigarettes to be sold to Native American retailers until the stays and injunctions were lifted. (DX-82.) They did not dispute that the DTF announced that it would begin enforcing the amended tax law only after the stays and injunctions against tax laws were lifted on June 22, 2011. (DX-285.) They did not dispute that their own witness, the Former Deputy Commissioner of the DTF, explained that DTF permitted shipment of unstamped cigarettes to Native American retailers while the injunctions and stays were in

place. (Ernst Tr. at 48:15.) And they did not dispute that, on the day after the stays and injunctions were lifted, DTF visited common carriers, including UPS, to instruct them that they "should not be shipping untaxed cigarettes to their Native American customers in NYS *from this point on*." (DX-389 (emphasis added).)

419.     Based on that undisputed evidence, it was reasonable for UPS to have believed that it need not have audited the Potsdam Shippers because at the time of the shipments, they were shipping to authorized recipients. (ECF No. 355 at 6-7.)

420.     Plaintiffs' last argument against this conclusion came in its reply brief in support of its motion for reconsideration of the Court's August 23 Order; in their reply, plaintiffs argue for the first time that the Court erred by accepting UPS's interpretation of the audit requirement, because both the Court's conclusion and UPS's argument purportedly ignore that under the AOD, recipients must be authorized by federal law as well as state law. (ECF No. 450 at 5-6.) But this argument fares no better than any of plaintiffs' previous efforts to escape the admissions of the State's own officials that they had authorized retailers on Indian reservations to receive unstamped cigarettes.

421.     First, plaintiffs' new argument once again ignores key language in the AOD's audit requirement. The AOD defines "Authorized Recipient" as "tobacco manufacturers; licensed wholesalers, tax agents, retailers, and export warehouses; government employees acting in accordance with their official duties; or *any other person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which delivery is made*, including those persons described in PHL § 1399-*ll*(1) with respect to the State of New York." (DX-23 ¶ 16(A).) Plaintiffs' new argument stops after the phrase "federal law" (ECF No. 450 at

5-6); they ignore the rest of the definition, which acknowledges that State law can also authorize a recipient to receive cigarettes.[22]

422.    Second, in any event, federal law here (the CCTA) rests on State law to define which cigarettes must be stamped and which categories of recipients are authorized to receive cigarettes that are not stamped. 18 U.S.C.A. § 2341(2) (defining "contraband cigarettes" by reference to state stamping requirements and state authorization of recipients).

### 2. UPS Has Already Satisfied The Attorney General That No Penalties Under The AOD Are Appropriate Based On Shipments From The Potsdam Shippers.

423.    The AOD provides that "no penalty shall be imposed" on UPS if "UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." (DX-23 ¶ 42.)

424.    As detailed above (*see supra*, ¶¶ 97-101), the AG sought penalties under the AOD in connection with the Potsdam Shippers in 2011, but dropped its request after UPS explained its position and provided information about the shipments. The State did not even seek penalties under the AOD for the Potsdam Shippers in its original complaint in this case. (ECF No. 1.) It added a request for penalties as to Potsdam shipments only in the Amended Complaint filed in May 2015—nearly four years after UPS met with the AG's Office and showed that UPS had no reason to know that the Potsdam Shippers were shipping to unauthorized recipients.

---

[22] While plaintiffs argue that UPS's interpretation moots the phrase "federal law," they are also guilty of mooting the remaining phrase of the AOD. One way to resolve this kind of competing interpretation is to read "and" to mean "or" in the definition of "Authorized Recipients," as courts often do when it is obvious that that is how the parties meant an operative phrase to be read. *See, e.g., Dumont v. United States*, 98 U.S. 142, 143 (1878) ("It is an established principal that "[t]he word 'or' is frequently construed to mean 'and,' and vice versa, in order to carry out the evident intent of the parties.") *see also State Mut. Life Assur. Co. v. Heine*, 49 F. Supp. 786, 788 (W.D. Ky. 1943), *aff'd*, 141 F.2d 741 (6th Cir. 1944) ("[C]ases show that the word 'and' or 'or' will not be given its literal meaning when such meaning would do violence to the evident intent and purpose of the contracting parties, and the other meaning would give effect of such intent.").

425.     The State cannot now reverse that decision, and seek penalties for the Potsdam Shippers under the AOD. That is so based on both basic contract principles and equitable principles.

426.     First, under the plain language of the AOD, UPS has satisfied the contractual obligation: it "establishe[d] to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment[s]" from the Potsdam Shippers were "Prohibited Shipment[s]." (*See* DX-23 ¶ 42.) The State's failure to pursue any penalties for nearly four years after the August 2011 meeting concerning the Potsdam Shippers shows that UPS did so. If there were any doubt about that, it is removed by the fact that neither the AG's Office nor the DTF preserved documents concerning their 2011 communications with UPS concerning the Potsdam Shippers. (Trial Tr. at 1854:13-19.) In the absence of a final determination not to pursue penalties, lawyers for the AG and the State would have been obligated to preserve those documents in anticipation of litigation. The State's failure to do so confirms that UPS had, in fact, satisfied the AG that no penalties were appropriate in 2011.

427.     Second, permitting the State now to reverse course and seek penalties based on the Potsdam Shippers would prejudice UPS. The fact that neither the AG's Office nor the DTF preserved documents concerning their 2011 communications with UPS regarding the Potsdam Shippers (Trial Tr. at 1854:13-19) deprived UPS of the ability to adequately defend itself, as it cannot obtain documents establishing that UPS had satisfied the AG that no penalties were appropriate in 2011 (among other relevant facts).

428.     The prejudice to UPS supports UPS's defense of laches to any effort by the State to seek penalties based on the Potsdam Shippers. *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 622 (S.D.N.Y. 2014) (elements of laches defense are "(1) the plaintiff knew, or should have

known, of his claim; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendants were prejudiced as a result."). Here, the State knew about any claim based on the Potsdam Shippers as early as August 2011, when UPS gave the State all of the information concerning the shipments. (DX-605 ¶¶ 14-18, 21-22; DX-125; DX-126.) Yet the State delayed in pursuing any claims based on the Potsdam Shippers for nearly four years. The State compounded the prejudice that this delay naturally caused UPS by failing to retain documents concerning the Shippers or their claims based on such shipments. (Trial Tr. at 1854:13-19.)

### D. Transportation Of Shipments From The Potsdam Shippers Did Not Violate N.Y. PHL § 1399-*ll*.

429.     N.Y. PHL § 1399-*ll*(2) makes it unlawful for any carrier "to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than" a person authorized to receive cigarettes. Section 1399-*ll* thus contains required two mental states: (a) knowledge of the cigarettes ***and*** (b) a reasonable belief that the recipient is unauthorized. The latter "reasonable belief" standard requires both subjective and objective components—that is, UPS had to actually believe a recipient was unauthorized. *See, e.g.*, *People v. Goetz*, 68 N.Y.2d 96, 110–11 (1986) (construing penal statute's use of reasonable belief to require both subjective and objective components).

430.     Plaintiffs failed to show that UPS reasonably believed that the consignees of the Potsdam Shippers' packages were not authorized. They offered no evidence whatsoever on that issue at trial. To the contrary, while it was plaintiffs' burden to prove that UPS reasonably believed that the consignees of the Potsdam Shippers' packages were not authorized, the only evidence at trial showed that UPS believed they were. As detailed above, at the time of the shipments from the Potsdam Shippers, through official guidance issued by the Department of Taxation and Finance, through discussions with DTF representatives, and through its awareness

180

of various stays and injunctions barring New York State from enforcing its amended tax laws against Native American reservations until June 22, 2011, UPS understood that shipments from the Potsdam Shippers to retailers on other Native American reservations were authorized by the State. (*See supra*, ¶¶ 82-83.)

431.    To the extent that plaintiffs contend that UPS failed to verify whether the consignees of the Potsdam Shippers' packages were authorized, any such requirement would be preempted by the Federal Aviation Administration Authorization Act, which provides that States and their subdivisions "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1); *see also* 49 U.S.C. § 41713(b)(4)(A); 15 U.S.C. § 376a(e)(5)(A)-(B). In *Rowe*, the Supreme Court held preempted a Maine law that "impose[d] civil liability upon the carrier, not simply for its knowing transport of (unlicensed) tobacco, but for the carrier's failure sufficiently to examine every package," which "thus require[d] the carrier to check each shipment for certain markings and to compare it against the Maine attorney general's list of proscribed shippers." 552 U.S. at 372–73. The Court found such regulation to "directly regulate[] a significant aspect of the motor carrier's package pick-up and delivery service," which "creates the kind of state-mandated regulation that the federal Act pre-empts." *Id*. at 373.

432.    The PACT Act also precludes carriers from any obligation to assume the functions assigned to sellers, such as verification of compliance with excise tax, licensing, or tax-stamping requirements, recipient-verification, or any other compliance functions regarding cigarettes. *See* 15 U.S.C. §§ 376a(a)(3), (e)(9)(D).

433.    While the PACT Act includes a savings clause, protecting certain state laws from the preemptive force of the PACT Act or other federal laws, nothing in that savings provision, 15

181

U.S.C. § 376a(e)(5)(C)(ii), applies to plaintiffs' claims based on shipments from the Potsdam Shippers. Section (e)(5)(C)(ii) does not save from preemption state laws regulating deliveries of cigarettes to businesses. Instead, it pertains only to laws restricting deliveries to "individual consumers or personal residences." *Id*. Because plaintiffs concede that shipments from the Potsdam Shippers were delivered exclusively to retail businesses, any claim against UPS based on N.Y. PHL § 1399-*ll*.

> **E.**     **UPS Cannot Be Held Liable For Shipments Made In Good Faith Reliance On Instructions From New York State Police.**

434.     The State seeks recovery from UPS even for shipments made by the Potsdam Shippers after Trooper Nitti instructed UPS to continue making pick-ups in order not to interfere with an ongoing criminal investigation (*see supra*, ¶¶ 84-96). But UPS cannot be held liable for such shipments under any theory. Finding UPS liable on these facts would ignore UPS's two public authority defenses, "actual public authority" and "entrapment by estoppel"—either of which precludes any claim against UPS based on shipments accepted in reliance on a request from New York State Police. Indeed, finding UPS liable on these facts would violate UPS's due process rights.

435.     The D.C. Circuit's recent ruling in *PHH Corp., v. Consumer Financial Protection Bureau*, 2016 WL 5898801, highlights precisely the way in which plaintiffs' theory of liability would violate UPS's due process rights. There, the D.C. Circuit refused to allow a federal agency to collect over $100 million from a company because it would violate due process to hold the company liable for actions it took in reliance on government pronouncements authorizing its conduct. The court noted, "When a government agency officially and expressly tells you that you are legally allowed to do something, but later tells you 'just kidding' and enforces the law *retroactively* against you and sanctions you for actions you took in reliance on the government's

assurances, that amounts to a serious due process violation." *PHH Corp.,* 2016 WL 5898801, at *35.

436.    The D.C. Circuit used the following analogy to highlight the unfairness of a government agency seeking penalties for conduct that it previously authorized, just as the State seeks to do in this case:

> "Put aside all the legalese for a moment. Imagine that a police officer tells a pedestrian that the pedestrian can lawfully cross the street at a certain place. The pedestrian carefully and precisely follows the officer's direction. After the pedestrian arrives at the other side of the street, however, the officer hands the pedestrian a $1,000 jaywalking ticket. No one would seriously contend that the officer had acted fairly or in a manner consistent with basic due process in that situation."

*Id*. at 88. That is precisely the case here. UPS acted in accordance with law enforcement instructions when it continued delivering for the Potsdam Shippers, and cannot now be held liable for damages and penalties related to those authorized shipments.

437.    Beyond basic notions of due process, two public authority defenses preclude any claim against UPS based on shipments accepted in reliance on a request from New York State Police: "actual public authority" and "entrapment by estoppel." The first is a defense "where a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity." *United States v. Giffen*, 473 F.3d 30, 39 (2d Cir. 2006). The second is a defense "when the government, by its own actions, induced [the defendant] to do those acts and led him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization." *Id*. at 41 (emphasis in original). The Second Circuit has held that "[t]he reasonableness of the defendant's belief that he was authorized and of his reliance are pertinent to the estoppel-based form of the defense, which can protect the defendant regardless of whether the government in fact authorized his conduct." *Id*. at 39.

438.    UPS's public authority defenses thus turn on the common-sense notion that the State cannot recover penalties for packages the State itself instructed UPS to deliver, or if UPS reasonably believed that the State requested that UPS continue to pick-up up packages from the Potsdam Shippers. Both are true here.

439.    For either public authority defense to apply, "the defendant's conduct must remain within the general scope of the solicitation or assurance of authorization." *United States v. Abcasis*, 45 F.3d 39, 43-44 (2d Cir. 1995). That is the case here. Security Supervisor Terranova disclosed to Trooper Nitti that "large amounts of cigarettes … were moving through the UPS facility at Potsdam coming from the Akwesasne Mohawk reservation." (*See* DX-612 ¶ 7; Connolly Tr. 129:21-24, 130:14-23.) The shipments for which plaintiffs seek recovery in this action all fall directly within that scope.

440.    Furthermore, the State did, in fact, authorize UPS to continue providing service to the Potsdam Shippers. After hearing the information provided by Terranova, Trooper Nitti told Terranova that there was an "ongoing investigation" regarding cigarette shipments from the Mohawk/St. Regis reservation and that UPS should remain "business as usual" for the time being. (DX-612 ¶ 7.) Nitti's position as a State Trooper establishes his instruction as actual authorization, and his active assistance to both the DTF and the ATF in the investigation— relaying the exact information provided by UPS—underscores the legitimacy of his instruction. (*See* Connolly Tr. 129:21-24 (crediting a State law enforcement officer with supplying information on the Potsdam Shippers); Ernst Tr. 78:3-6 (testifying DTF worked with Trooper Nitti).)

441.    The State's authorization establishes a complete defense to plaintiffs' claims based on the Potsdam Shippers. *Giffen*, 473 F.3d at 39; *United States v. Burt*, 410 F.3d 1100,

1104 (9th Cir. 2005) (assurance that actions would not be illegal while gathering information, even with "no instruction on how [the defendant should] conduct herself," was sufficient to establish public authority defense to the defendant's conspiracy to transport illegal aliens).

442.    The defense of estoppel by entrapment provides an independent defense. It immunizes UPS's conduct if the State "led [UPS] to rely reasonably on [its] belief that [its] actions would be lawful by reason of the government's *seeming* authorization." *Giffen*, 473 F.3d at 41 (emphasis in original). "[F]or a defendant's reliance to be reasonable, the jury must conclude that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries." *Abcasis*, 45 F.3d at 44 (internal quotations and citation omitted).

443.    Again, the defense applies here. UPS reasonably relied on its belief that Trooper Nitti had authorized it to continue providing service to the Potsdam Shippers. Terranova contacted Trooper Nitti with the express purpose of determining what should be done about the shipments. (DX-612 ¶ 6.) Trooper Nitti was a New York State Trooper actively working with both ATF and DTF on the investigation (*see* Connolly Tr. at 128:21-129:13, 129:21-24) and his instruction was given with DTF's knowledge (*id.*). Terranova had no reason distrust Trooper Nitti, not only because of Trooper Nitti's position but also because they had worked together in the past. (DX-612 ¶ 4.) At no point did Trooper Nitti, DTF, or ATF give UPS any indication that Trooper Nitti's instruction was in error or unauthorized. To the contrary, when DTF visited the Potsdam terminal on June 21, 2011, it notified UPS of changed circumstances that would effectively revoke the instruction going forward.

444.    Trooper Nitti's instruction also was consistent with prior directives given to UPS by DTF. For example, in 2008, on at least 14 different occasions UPS made shipments of

"Arrow Brand" cigarettes to Long Island under direct DTF instruction. In other instances, where no such instruction was made, UPS terminated the shipper. (*See* DX-285 (DTF Activity Report stating UPS discovered, reported, and refused to deliver cigarettes).)

445.     UPS's previous cooperation with the State confirms that UPS was "sincerely desirous of obeying the law." *Abcasis*, 45 F.3d at 44. Had the State not instructed UPS to continue providing service to the Potsdam Shippers, it would have simply terminated them, as it terminated other shippers before. Only because it reasonably believed it had been instructed to do so, did UPS continue to provide the service for which the State is now seeking recovery.

## VIII.   UPS'S AFFIRMATIVE DEFENSES BAR PLAINTIFFS' CLAIMS.

### A.      UPS's Equitable Defenses Bar The State's AOD Claim.

446.     Apart from defenses unique to the Potsdam Shippers, UPS's Thirteenth and Seventeenth Defenses contend that plaintiffs are barred from recovery, in whole or in part, based on several equitable defenses, including estoppel, unclean hands/*in pari delicto*, and waiver. UPS's defenses are based on the fact that plaintiffs knew about many of the shippers at issue but failed to notify UPS about the shippers, as well as on the State's forbearance policy. While plaintiffs contend that equitable defenses are subject to special standards based on their status as governmental entities, as the Court has already found, "plaintiffs are acting in a role akin to that of a private actor" in pursing their RICO and AOD claims. (ECF No. 177 at 35.) For that reason, UPS's equitable defenses are not subject to any heightened standards.

447.     For example, the standards applicable to the State's AOD claim are derived from state, not federal, law. *See, e.g., Petroleum Traders Corp. v. Balt. Cty.*, 413 F. App'x 588, 593 (4th Cir. 2011) (applying Maryland's standard for equitable estoppel in a contract case). Under New York law, no heightened requirements for estoppel are required where, as here, a government entity is acting in a private or proprietary capacity. "While laches cannot generally

be imputed to the sovereignty, the defense is available in cases where the government acts in its private or proprietary capacity. A similar rule applies [] to estoppel against a governmental body." *Carney v. Newburgh Park Motors*, 84 A.D.2d 599 (N.Y. App. Div. 3d Dep't 1981) (citations omitted); *accord Fowler v. City of Saratoga Springs*, 215 A.D.2d 819, 820 (N.Y. App. Div. 3d Dep't 1995); *see also Royal Ins. Co. of Am. v. Comm'rs of State Ins. Fund*, 289 A.D.2d 807, 808 (N.Y. App. Div. 3d Dep't 2001) (estopping state insurance fund from denying the existence of an implied contract). No egregious act or constitutional issue is required. *See id.* Because this Court has already ruled that "plaintiffs are acting in a role akin to that of a private actor," these defenses are available to UPS here. (*See* ECF No. 177 at 35.)

448. Likewise, relevant New York state case law, which governs the State's AOD claim, indicates that no higher standard is required for UPS's unclean hands defense. *Cf. In re New York State Urban Dev. Corp.*, 907 N.Y.S.2d 438 (Sup. Ct. Kings Cty. 2010) (finding that unclean hands was not a valid defense in "limited and circumscribed" proceeding regarding review of eminent domain scheme, but failing to note any heightened standard when the defense is raised against the government). As detailed above, plaintiffs were aware, by their own admission, of several shippers illegally trafficking in untaxed cigarettes via UPS, but took no steps to inform UPS so that UPS could investigate the shipments and discipline the shippers under paragraphs 39 and 40 of the AOD. (*See* Jerry Tr. 44:3-15, 45:2-56:12 (discussing when the State became aware of individual shippers); *id.* at 67:3-19 (explaining that the State was unaware of ever informing UPS about illegal shipments, with the exception of three incidents mentioned in interrogatory responses); DX-383 at 3-5 (discussing when the City became aware of individual shippers); *id.* at 5-6 (refusing to answer whether the City ever shared that information with UPS).) UPS meanwhile acted in good faith, implementing a tobacco policy to combat

illegal cigarette trafficking (*see generally* DX-600 ¶¶ 39-45), and repeatedly informing State and City authorities when it discovered illegal shipments. (*See supra*, ¶ 51.) Because UPS's failure to stop alleged shipments of untaxed cigarettes was the result of plaintiffs' own negligence or intentional action, the *in pari delicto* defense should apply. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2836 (2015).

449. Plaintiffs do not address UPS's waiver defense, which is based on the State's forbearance policy. In the past they have argued that, to constitute a waiver, the action at issue "must be clear and unequivocal" rather than the product of "[m]ere negligence, oversight, or thoughtlessness." (ECF No. 274 at 18 (quoting *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000).) The State's forbearance policy meets this standard: DTF's public announcement that it would permit untaxed cigarettes to be sold by reservation retailers was both clear and unequivocal. *See City of New York v. Milhelm Attea & Bros., Inc.,* 550 F. Supp. 2d 332, 338 (E.D.N.Y. 2008).

## B. The State's Breach Of The Covenant Of Good Faith And Fair Dealing Bars Its AOD Claim.

450. New York law establishes that every contract is subject to an implied covenant of good faith and fair dealing, which comprises "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (quotation marks and citation omitted). This covenant applies both in the context of an assurance of discontinuance and where the party at issue is a governmental entity. *See Handschu v. Special Servs. Div.*, No. 71 Civ. 2203(CSH), 2007 WL 1711775, at *10 n.10 (S.D.N.Y. June 13, 2007) (noting that the NYPD was subject to the covenant of good faith and fair dealing where it was party to a consent decree).

451.    While UPS has previously argued—and the Court has previously ruled (*see* ECF Nos. 177 at 34; 355 at 7, 11)—that the AOD is essentially a private agreement, the Court asked the parties to consider the implications for UPS's good faith and fair dealing defense if the AOD were construed as akin to a deferred prosecution agreement. (Trial Tr. 513:15-514:9.) UPS does not agree with any characterization of the AOD as a deferred prosecution agreement. (*See* ECF No. 431 at 10-11.) A deferred prosecution agreement is an agreement between the government and a company or an individual, under which the government agrees not to criminally prosecute the company or individual if they agree to abide by certain terms for a finite time period. Unlike such an agreement, the AOD represented the NY AG's choice not to accept the terms of the AOD "in lieu of commencing a civil action against UPS." (DX-23 at 5.) Congress, too, called the specific AOD at issue in this case a "settlement agreement." 15 U.S.C. § 376a(3)(B)(ii)(I).

452.    But even if the Court construed the AOD as a deferred prosecution agreement, the State's duty of good faith and fair dealing would only be more strictly enforced. A "deferred prosecution agreement is analogous to a plea bargaining agreement" and "principles [used to enforce plea agreements] are fully applicable to . . . deferred prosecution agreement[s] between the Government and [a defendant]." *United States v. Garcia*, 519 F.2d 1343, 1345 & n. 2 (9th Cir. 1975). When interpreting plea agreements, the Second Circuit "do[es] not '*hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness.*'" *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005) (emphasis added, citation omitted).

453.    Viewing the AOD through either lens—as a private agreement or as a deferred prosecution agreement—the evidence at trial proved that the State breached the covenant when it allegedly discovered certain shippers sending untaxed cigarettes via UPS, decided not to inform

UPS, allowed the shipments to proceed for years, and then sued UPS for damages and penalties based on the shipments of which the State was aware but did nothing to stop. Two provisions of the AOD define the State's duty of good faith and fair dealing.

454.    First, paragraphs 39 and 40 lay out a specific procedure by which UPS and the State are to deal with suspected illegal shipments:

> 39. If the Attorney General or any other governmental authority provides UPS with evidence that a UPS customer is shipping Cigarettes to Individual Consumers, UPS shall discipline such shipper pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance.
>
> 40. If the Attorney General or any other governmental authority represents to UPS that a UPS customer is shipping Cigarettes to Individual Consumers, but does not provide evidence of such shipments, UPS shall conduct an audit of that shipper. UPS shall discipline, pursuant to the process set forth in Paragraphs 27 through 32 of this Assurance of Discontinuance, shippers found to be shipping Cigarettes to Individual Consumers.

(DX-23 at ¶¶ 39, 40.)

455.    Implicit in this language, setting out the process by which UPS will investigate and punish shippers after receiving information from the State, is the expectation that the State will actually share such information. *Cf. Hexagon Sec. LLC v. Leawood Bancshares, Inc.*, No. 13 Civ. 907(JSR), 2014 WL 1303516, at *5 (S.D.N.Y. Mar. 14, 2014) (finding that good faith and fair dealing covenant gave rise to a duty to share information to avoid injuring the contracting party's "right to receive 'the fruits of the contract'").

456.    Plaintiffs argue that paragraphs 39 and 40 use permissive language, applicable only "if" the Attorney General shares information, and conclude that they therefore do not impose a "mandatory obligation on the Attorney General." (ECF No. 274 at 22.) But even if the State's cooperation with UPS is discretionary, the implied covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion."

*TIG Ins. Co. v. Newmont Mining Corp.*, 413 F. Supp. 2d 273, 281 (S.D.N.Y. 2005) (quoting

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)), *aff'd*, 226 F. App'x 49 (2d Cir.

2007). Thus, even if the State were not required to share with UPS information regarding *every*

illegal shipment, good faith precludes it from withholding *all* cooperation, permitting damages to

mount over a period of years, and then suing UPS under the contract the State decided not to

implement. *See id.* ("One party's discretion cannot go so far as to enable the party to eviscerate a

term of the contract and frustrate a fundamental purpose underlying the agreement." (quotation

marks and citation omitted)).

457.     Second, the AOD expressly provides that the agreement is intended to "promote

further and ongoing cooperation between UPS and the Attorney General concerning UPS's

compliance with [State law]." (DX-23 ¶ 15.) Plaintiffs dismiss that clause by denigrating it as a

meaningless "whereas clause," but such clauses cannot be ignored. Preliminary clauses are

"useful interpretational aids," which may help a reviewing court understand the parties' intent in

agreeing on the specific contractual provisions that follow. *Zamierowski v. Nat'l R.R. Passenger

Corp*, No. 05 Civ. 9309(WCC), 2006 WL 1816377, at *5 (S.D.N.Y. June 28, 2006) (using

whereas clauses to "reveal an underlying assumption" that Metro-North would in fact install

safety devices); *see also Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985) (noting

that "a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative

clause in a contract"). Thus, any ambiguity in paragraphs 39 and 40, calling for cooperation in

dealing with illegal shipments, is resolved by language in the whereas clause regarding "ongoing

cooperation between UPS and the Attorney General."

458.     At a bare minimum, the whereas clause demonstrates that UPS expected the State

to cooperate with it, and that the State was aware of UPS's expectation. That knowledge is

relevant to the question of the "promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract," *National Market Share*, 392 F.3d at 525, and thus to the scope of the AOD's covenant of good faith and fair dealing.

459.    For these reasons, even if the State could demonstrate that UPS violated or breached the AOD in any way, the State's own breach of the covenant of good faith and fair dealing would preclude any finding of liability by UPS.

## IX.    PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.

460.    Plaintiffs' Fourteenth Claim for Relief asks the Court to "i) enjoin UPS pursuant to 18 U.S.C. § 2346(b)(1) from knowingly shipping, transporting, receiving, possessing, or distributing contraband cigarettes as that term is defined in the CCTA; ii) enjoin UPS pursuant to 15 U.S.C. § 378(c)(1)(A) from shipping any cigarettes that do not comply with the PACT Act's labeling requirement and from shipping for any shipper listed on the ATF's list of non-compliant delivery-sellers; iii) enjoin UPS pursuant to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-*ll* from delivering any cigarettes to any unauthorized recipient within the State of New York; and iv) appoint a Special Master to assure UPS's compliance with each of the above statutes, and with the AOD entered into by UPS with the Attorney General, and to provide training and monitoring to UPS to ensure compliance." (ECF No. 189 ¶ 199.) No injunction is appropriate here.

461.    To begin, the PACT Act's Exemption Provision exempts UPS from both the PACT Act and N.Y. PHL § 1399-*ll* (*see supra*, COL, § V); thus, no injunctive relief is appropriate under either the PACT Act or N.Y. Exec. L. § 63(12) (which is the vehicle through which the Attorney General seeks redress for its claims under N.Y. PHL § 1399-*ll*).

462.     Even if plaintiffs could establish a CCTA violation, no injunctive relief, much less the extreme remedy of appointing a special master, would be warranted. "An injunction prohibiting a party from violating statutory provisions" is only "appropriate where there is a likelihood that, unless enjoined, the violations will continue." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996); *United States v. Carson*, 52 F.3d 1173, 1184 (2d Cir. 1995) (a permanent injunction requires "a reasonable likelihood that the wrong will be repeated").

463.     Even assuming the Court were to find a violation of the CCTA (which it should not), plaintiffs did not prove any reasonable likelihood that any violation would be repeated. UPS has repeatedly enhanced its compliance program in substantial ways, going well above the requirements of federal law, New York law, and the AOD. Among other steps toward enhanced compliance, UPS has strengthened its due diligence of shippers before and after a shipper opens a UPS account, strengthened its training of its sales force and its other employees that play any role in providing service to potential tobacco shippers, and completes weekly and monthly data analytics to find and weed out potential high-risk tobacco shippers. (*See supra*, ¶¶ 35-51.) On an annual basis, representatives from UPS's Dangerous Goods group and Compliance Department personally visit each of the four UPS centers that provide service to Native American reservations in New York to conduct extensive due diligence (including package audits) to ensure that illegal cigarettes are not tendered to UPS from such reservations. Plaintiffs have failed to establish that these steps have been ineffective. There is literally no evidence of any current (or even recent) illegal cigarette shipments from Native American reservations in the State of New York (or elsewhere) to justify injunctive relief.

464.     Plaintiffs' request for the extreme remedy of appointment of a special master has even less justification. "The appointment of a special master is the exception, not the rule." *Idan*

*Computer, LTD v. Intelepix, LLC*, No. CV-09-4849(SJF)(ARL), 2010 U.S. Dist. LEXIS 90658, at *8 (E.D.N.Y. Aug. 27, 2010). Indeed, "external monitors have been found to be appropriate" only where other "remedial orders are unreliable or where a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question." *United States v. Apple*, 992 F. Supp. 2d 263, 280 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) (citing, *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994)). Even where such circumstances exist, the court still "must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense." Fed. R. Civ. P. 53(a)(3). Here there is no justification for an injunction, let alone the appointment of a special master.

## X.     NO DAMAGES OR PENALTIES SHOULD BE AWARDED AT ALL.

### A.     The Court Should Not Even Reach The Issue Of Damages And Penalties, Due To Plaintiffs' Failure To Satisfy Rule 26 Obligations.

465.    For the reasons set forth in UPS's motion *in limine* and its renewal of the motion to exclude plaintiffs' damages and penalties evidence as sanctions for violating Federal Rule of Civil Procedure 26(a)(1)(A)(iii) (ECF No. Nos. 366, 403 and 437), the Court should preclude plaintiffs from obtaining any damages and penalties because they conducted a trial by ambush.

466.    As the Supreme Court has recognized, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).

467.    Towards that end, Rule 26(a)(1)(A)(iii) requires every plaintiff to provide its opponent with "a computation of each category of damages claimed" and disclosure of "the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries

suffered." The rule requires plaintiffs to make these disclosures voluntarily, "without awaiting a discovery request," Fed. R. Civ. P. 26(a)(1)(A)(iii), or court order, *Design Strategy*, 469 F.3d at 295 (plaintiff violated Rule 26 even though "there was no direct order to the Plaintiff to calculate damages"); *Agence France Presse v. Morel*, 293 F.R.D. 682, 684-85 (S.D.N.Y. 2013) (rejecting argument that failure to update Rule 26 disclosures was excused by provision of information during discovery and declaring that "[p]ut simply, damages computations and the documents supporting those computations are two different things, and Rule 26 obliges parties to disclose and update the former as well as the latter").

468.    The Second Circuit has recognized that Rule 26(a)(1)(A)(iii) mandates that parties disclose the calculation of "damages or other monetary relief.'" *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (quoting Fed. R. Civ. P. 26 Advisory Committee Notes to 1993 Amendments). Rule 26 therefore applies to both damages and penalties. (*See* ECF No. 445.)[23] Indeed, the bedrock policy rationale for Rule 26(a)(1)(A)(iii) is to "avoid surprise or trial by ambush" and to allow defendants to fully discover, test and prepare a defense to plaintiffs' claims. *Lopez v. City of New York*, No. 11-CV-2607 (CBA)(RER), 2012 WL 2250713, at *1 (E.D.N.Y. June 15, 2012). As this Court has recognized, the damages computation requirement "is designed to provide defendants with fair notice of the damages they may be facing." *Estate of Jaquez v. Flores*, No. 10 Civ. 2881 (KBF), 2016 WL 1060841, at *7 (S.D.N.Y. Mar. 17, 2016) (Forrest, J.). Consequently, Rule 26 requires that plaintiffs disclose not only their claimed

---

[23] Several courts have indicated that "monetary relief" encompasses civil penalties. *See S.E.C. v. Misner*, No. 07-CV-01640-REB-MEH, 2007 WL 3232132, at *1 (D. Colo. Oct. 30, 2007) (stating that regulator sought "*monetary relief in the form of a civil penalty* and disgorgement" (emphasis added)); *S.E.C. v. Pardue*, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) ("Two types of monetary relief are available to the Commission in an enforcement action: the equitable remedy of disgorgement of profits and *civil penalties as authorized by statute*." (emphasis added)).

compensatory damages but also any other form of "monetary relief," whether in the form of punitive damages, penalties or disgorgement. *See, e.g., Design Strategy*, 469 F.3d at 293, 296.

469. The disclosure requirement of Rule 26 is all the more important in this case because plaintiffs disclosed during trial for the first time that they seek over $830 million in penalties, or disproportionately *more than twenty-one times* the amount of plaintiffs' claimed damages (also not disclosed until trial commenced). Under plaintiffs' view that Rule 26 applies solely to damages, they would have license to disclose under 5% of the total "monetary relief" they seek, and surprise UPS with the other 95+% at trial. Plaintiffs' position is the very definition of "surprise or trial by ambush" from which Rule 26(a)(1)(A)(iii) was enacted to protect defendants.

470. Applying *Design Strategy*, other district courts in this Circuit have explained that Rule 26(a)(1)(A)(iii) requires plaintiffs to provide "more than merely setting forth the figure demanded; there must be some amount of explanation into how those figures were generated." *Thompson v. Jamaica Hosp. Med. Ctr.*, 13 Civ. 1896, 2015 WL 7430806, at *2 (S.D.N.Y. Nov. 20, 2015). The rule "contemplates an estimate of damages and some analysis. In other words, the disclosures must be sufficiently specific that the opposing party has some basis to calculate the damages claimed against it." *Max Impact, LLC v. Sherwood Grp., Inc.*, No. 09 Civ. 902 (JGK)(HPB), 2014 WL 902649, at *5 (S.D.N.Y. Mar. 7, 2014) (internal quotation marks and citation omitted); *accord XChange Telecom Corp. v. Sprint Spectrum L.P.*, No. 14-cv-54 (GLS/CFH), 2015 WL 773752, at *19 (N.D.N.Y. Feb. 24, 2015) (plaintiffs' invoices and underlying data were insufficient because parties must "provide their damages figure with some level of specificity besides just a global number").

471.     Plaintiffs should have disclosed their computation of claimed damages and penalties, along with the documents supporting their computation, no later than August 22, 2016. *See* Fed. R. Civ. P. 26(a)(3)(B); *see id.* 6(a)(1)(C). With no explanation whatsoever, plaintiffs failed to do so.

472.     As this Court explained in *Estate of Jaquez*, in determining whether to exclude evidence as a sanction for a Rule 26(a) violation, a court considers four factors: "'(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'"  2016 WL 1060841, at *7 (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)). The prejudice in this case, as discussed below, along with plaintiffs' inability to provide any explanation for their non-disclosure, weighs heavily in favor of preclusion of damages and penalties evidence here.

473.     During discovery, plaintiffs never asked questions of UPS witnesses to understand UPS's data regarding package volume, weight, dimensions, billings, the UPS data dictionary, or similar topics.

474.     Plaintiffs also chose not to engage or disclose a damages expert. UPS is unaware of any case in which plaintiffs sought nearly a billion dollars in damages and penalties, based entirely on statistical evidence and arithmetical calculations, and yet retained no one qualified to conduct the damages and penalties analysis or to defend that analysis and its methodology and assumptions on cross-examination. Of course, had plaintiffs done so here the purported expert would have been subject to discovery and a challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as their purported survey expert was, and even if

their expert's opinions were admitted, that expert would have been subject to intense cross-examination at trial. Plaintiffs avoided all that by the expedient of forgoing a damages and penalties expert altogether. That approach is exactly backwards. The Court is entitled to more reliable information, not less, with respect to claims for monetary relief, particularly of this magnitude and complexity.

475.     Instead, what disclosures plaintiffs did make, often belatedly, regarding underlying assumptions in their damages and penalties assertions were thin and changing. They used inconsistent measures for key inputs like cartons per package and average weight and never provided support for their minimal disclosures. For example:

- Plaintiffs' Initial Disclosures, dated April 6, 2015, stated the tax amounts plaintiffs would seek without stating the number of cigarette packs to which the tax applied or how that number would be derived, and without reference to carton numbers, average package weight, or ratio of weight to number of cartons. (ECF No. 367-1 at 5; ECF No. 367-2 at 4.)

- The Third Amended Complaint ("TAC"), filed February 24, 2016, alleged that UPS shipped 683,000 cartons of cigarettes, based on an average package weight of 6 pounds, and that a ratio of 1 pound of package is equal to about 1.4 cartons of cigarettes. (ECF No. 189 ¶ 35.) This works out to **8.4 cartons per package**

- Eight days later, in their March 3, 2016 letter, plaintiffs estimated that Arrowhawk Smoke Shop shipped 8,000 packages, at 5 cartons per package. (ECF No. 367-4 at 3.) Using **5 cartons per package rather 8.4 cartons per package** as in the TAC resulted in at least $147 less in lost State taxes owed per package. Plaintiffs provided no information to explain this discrepancy.

- Plaintiffs' August 8, 2016 final Supplemental Disclosures, *which should have been the definitive statement as to plaintiffs' final damages computations*, said nothing whatsoever about the number of packages UPS delivered or how plaintiffs would calculate the number of cartons per package. Indeed, although the final disclosures incorporated more than 100 paragraphs of the TAC, they did *not* incorporate the paragraph setting forth the number of cigarette cartons, average package weight, and 1.4 carton per pound formula. (*Compare* ECF No. 367-3 at 16-17, *with* ECF No. 189 ¶ 35.)

- In their September 1, 2016 motion for reconsideration of this Court's denial of their summary judgment motion on their AOD claims, plaintiffs asserted that UPS "delivered over 330,000 packages (weighing collectively over 1,100 tons in billed weight) to persons located throughout the United States, including the State and City of New York." (ECF No. 381, at 1 n.1.) These figures yield an average package weight of 6.67 pounds. Plaintiffs did not provide the number of cartons per package, but the 1.4 cartons per pound ratio from the TAC results in **9.3 cartons per package**.

- *Just eight days later*, in their September 9, 2016 Proposed Findings of Fact, plaintiffs stated that UPS shipped 109,470 packages into New York with an average package weight of 7.3 pounds. (ECF No. 399 ¶ 180.) Plaintiffs did not provide the number of cartons per package, but using the 1.4 cartons per pound ratio from the TAC results in 1,118,783 cartons, or **10.22 cartons per package**.

476.    In plaintiffs' corrected Proposed Findings of Fact, filed on September 13, 2016, plaintiffs included no citation for their damages and penalties claims at paragraphs 664, 692,

699, 704, 710, 715, 807, 811, 815-17 and 820-21. (ECF No. 414-1.) Instead, plaintiffs simply referenced a non-existent "table." (*See id*.) When the Court brought this deficiency to plaintiffs' attention (ECF No. 425), plaintiffs cited to their table of packages and average weights in paragraph 180 of their pre-trial brief which, aside from being incorrect and not evidence, provides *no* information about damages and penalties. (ECF No. 426.)

477.    On the first day of trial, after the Court again noted plaintiffs' failure to provide any evidence demonstrating their monetary claims, plaintiffs admitted they would present their damages and penalties (for the first time) in their opening statement. (ECF No. 437-1 at 5:2-12.) Only then did plaintiffs reveal—for the very first time—their claim for more than $872 million in damages and penalties. (Trial Tr. 73:24-74:3.)

478.    On day two of trial, plaintiffs submitted a chart with no foundation that purported to summarize their damages and penalties calculations. (Court Ex. 1.) Court Exhibit 1 assumed (also for the first time and inconsistent with all prior disclosures) that a carton of cigarettes weighed one pound and, thus, estimated that each package contained **seven cartons of cigarettes**. (*See id.* at 5.) As shown below (*see infra*, § X(B)), *infra*, Court Exhibit 1 is inadmissible and inaccurate.

479.    On day three of trial, plaintiffs submitted an "attorney proffer" purporting to decipher the calculations in Court Exhibit 1. (ECF No. 441.) Plaintiffs' proffer continued to deprive UPS of its right to conduct a detailed analysis *during discovery and before trial* of plaintiffs' claimed damages and penalties (including analyzing the underlying data, assumptions, calculations and methodology). As shown below (*see infra*, § X(B)), this belated proffer did not correct, but rather compounded, the prejudice to UPS created by their non-disclosure under Rule 26, by providing for the first time at trial a misleading and incomplete methodology for

ascertaining package numbers and weights along with several incorrect legal and factual arguments.

480. Plaintiffs' inconsistent and meager pre-trial disclosures—along with their deliberate choice to withhold from UPS their calculations and methodologies for both damages and penalties, and the bases for those calculations, until their opening argument and beyond—falls far short of their Rule 26 obligations. (*See supra*, ¶¶ 466-471.)

481. Plaintiffs' belated disclosures prejudiced UPS in a manner that is not reparable, and fundamentally deprived UPS of the ability to defend itself against plaintiffs' damages claims in several ways:

- Plaintiffs' damages and penalties calculations were a moving target against which UPS could not fairly and effectively take aim.

- UPS could not fully vet plaintiffs' calculations and assumptions before trial in order to sufficiently challenge them and defend itself once trial began, thereby depriving UPS of due process.

- UPS was not permitted the opportunity to cross-examine a witness at trial to challenge plaintiffs' calculations and assumptions.

- UPS could not reasonably prepare its witnesses to respond to plaintiffs' delayed disclosures, nearly all of which were made for the first time in plaintiffs' opening presentation and beyond and without foundation or other evidentiary support.

- It was too late by the first day of trial for UPS to seek out additional witnesses that it might have called to respond to plaintiffs' computations had they been timely disclosed.

482.     In other words, plaintiffs' unjustified violation of Rule 26(a)(1)(A)(iii) caused precisely the type of significant prejudice to UPS that the rule was intended to prevent. *Kodak Graphic Commc'ns Can. Co. v. E.I. Du Pont de Nemours & Co.*, No. 08-CV-6553-FPG, 2013 WL 5739041, at *1-2,*5 (W.D.N.Y. Oct. 22, 2013) (precluding counterclaimant from pursuing additional $6.3 million in claimed damages that were never "listed in a Rule 26 disclosure" and were raised for the first time "several weeks before trial" in submission required by pretrial order); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at *7 (E.D.N.C. May 7, 2012) ("[T]he prejudice to [the defendant] is manifest if [the plaintiff] were allowed to present at trial a damages computation never revealed . . . before it came from the witnesses' lips at trial.").[24]

483.     Because plaintiffs' non-disclosure of their claimed damages and penalties until the start of trial caused UPS incurable prejudice and created a fundamentally flawed process, the Court should not even reach the question of whether damages and penalties can be awarded.

### B.     In Any Event, Plaintiffs Failed To Satisfy Their Burden Of Proving Any Damages Or The Basis For Any Penalties.

484.     Even if the Court were to conclude that plaintiffs did not violate Rule 26, plaintiffs have failed to provide the Court with legally sufficient evidence to prove any damages. Plaintiffs "bear[] the burden of proving damages with reasonable certainty." *Raishevich v. Foster*, 9 F. Supp. 2d 415, 417 (S.D.N.Y. 1998); *see also Norcia v. Dieber's Castle Tavern, Ltd.*,

---

[24] *See also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 366, 368-69 (6th Cir. 2010) (holding that "one page spreadsheet did not satisfy Rule 26," and affirming order excluding evidence of lost profits damages, because spreadsheet calculated only gross revenue and did not disclose claimed loss of business from key customer); *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 279-80 (5th Cir. 2009) (finding that plaintiff "failed to properly disclose the 'computations'" for certain categories of damages that could not be determined from "invoice for work performed"); *Hoffman v. Const. Protective Servs., Inc.*, 541 F.3d 1175, 1177-78 (9th Cir. 2008) (affirming order excluding damages evidence regarding opt-in plaintiffs where lead plaintiffs had failed to "disclose damage calculations either for each individual Opt-In Plaintiff other than themselves or for the group as a whole").

980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013). The only damages plaintiffs seek are compensatory damages under the CCTA, which are "intended to redress the *concrete loss* that the plaintiff has suffered *by reason of* the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (emphasis added).

485.     Plaintiffs are only entitled to damages that would place them "in a position substantially equivalent to the one that [they] would have enjoyed had no tort been committed." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015). Courts "will not permit recovery when the connection between the claimed loss and the tortious act is speculative or uncertain." *Id.* This means plaintiffs "bear[] the burden of showing that the[ir] claimed damages are the 'certain result of the wrong.'" *Id.* at 52-53.

486.     Not only have plaintiffs failed to prove (i) that UPS knowingly shipped cigarettes in violation of the law or (ii) the contents of packages, plaintiffs have not come close to meeting their burden of proving actual, "concrete loss" suffered "by reason of the defendant's wrongful conduct." *Cooper Indus.*, 532 U.S. at 432.

487.     Plaintiffs disclosed for the *first time* in their opening statement that they were seeking approximately $38 million in damages for allegedly lost cigarette excise tax revenues. (Trial Tr. 73:2-4.) Plaintiffs based this number on the 109,470 packages that they allege UPS shipped and the supposed average weight of those packages—both of which plaintiffs disclosed for the first time in their Proposed Findings of Fact and both of which are factually incorrect. (ECF No. 399 ¶ 180.) It was not until the second day of trial that plaintiffs provided the Court and UPS with a document that attempted to summarize, without any foundation or witness that UPS could cross examine, the amount of damages and penalties plaintiffs are seeking and the bases for them. (Court Ex. 1; Trial Tr. 268:8-22.) On the third day of trial, plaintiffs provided the

Court and UPS with an attorney proffer purporting to decipher those calculations. (ECF No. 441.) But none of plaintiffs' belated disclosures provide competent, admissible, and reliable evidence of plaintiffs' claimed damages. (ECF No. 446 at 2-8.) Plaintiffs' damages claim is, at best, hypothetical, and their failure of proof on damages is complete.

### 1. Court Exhibit 1 Lacks Foundation And Is Inadmissible.

488.    Court Exhibit 1 (and paragraph 180 of plaintiffs' Proposed Findings of Fact, from which Court Exhibit 1 is drawn, as well as any similar chart that might appear in or with plaintiffs' post-trial Proposed Findings of Fact) is not in evidence and cannot properly be admitted into evidence. Controlling decisions from the Second Circuit hold that "[s]ummary charts should not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986); *see also Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir. 1990) ("A summary must of course be *based on foundation testimony connecting it with the underlying evidence summarized*, and must be 'based upon and fairly represent competent evidence already before the [trier of fact].'" (citations omitted) (emphasis added)).

489.    In *Citron*, a tax evasion case, plaintiff sought to show that defendant underreported income as of a particular date. 783 F.2d at 316. Plaintiff prepared a summary chart of defendant's cash on hand as of a certain date and identified exhibits that plaintiff claimed were the source. *Id.* At trial, plaintiff sought to introduce the chart "without providing testimony explaining how cash on hand was calculated from the grab-bag" of exhibits cited by plaintiff. *Id.* The defense objected for lack of foundation, and although the court agreed that foundation was lacking and the chart was "playing with numbers" and was "doubletalk and triple talk, which no one understands," the court admitted the chart. *Id.* On appeal, the Second Circuit reversed, observing that the "summary chart contained a figure for cash on hand that was obviously the

product of calculation. Yet [plaintiff] provided no explanation, either in the form of worksheets, testimony, or other methods of elucidation, showing how it derived the figure." *Id.* at 316-17. The court recognized that "[c]ourts have long required that district courts ascertain that summary charts 'fairly represent and summarize the evidence upon which they are based,'" and that summary charts "should not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *Id.* at 316 (citation omitted).

490.    *Citron* applies here. Plaintiffs provided the Court and UPS with a chart, which has *not* been and cannot be admitted as evidence, of alleged package shipments and average weights in their Proposed Findings of Fact, and will likely do so again in their post-trial Findings of Fact, citing to 65 exhibits that supposedly supported plaintiffs' calculations, two of which (PX-194 and PX-195) were never moved into evidence. And then plaintiffs purported to base Court Exhibit 1 off that chart, without admissible evidence to explain how they arrived at the figures. It was three days into trial when plaintiffs supplied their "attorney proffer," also not in evidence and inadmissible, to attempt to explain how Court Exhibit 1 was prepared. But plaintiffs failed in that proffer as well.

## 2.    UPS Was Denied Its Rights to Confrontation and Cross-Examination.

### a.    The Due Process Clause Guarantees UPS The Right To Confront And Rebut Plaintiffs' Evidence.

491.    Fundamentally, UPS has a right to "receive fair notice . . . of the severity of the penalty that a State may impose." *State Farm*, 538 U.S. at 417. Although the Sixth Amendment Confrontation Clause applies only in criminal proceedings, the Supreme Court has recognized that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). This includes civil cases. *See id.*; *S.E.C. v. Alan F. Hughes, Inc.*, 461

F.2d 974, 979 n.8 (2d Cir. 1972) ("'[A]n opportunity to confront and cross-examine adverse witnesses' is almost always required." (citation omitted)); *accord Carter v. Morehouse Parish Sch. Bd.*, 441 F.2d 380, 382 (5th Cir. 1971) ("A ruling based on evidence which a party has not been allowed to confront or rebut is one which denies due process."). Where, as here, "the reasonableness" of a governmental action for damages and penalties "depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959).

492.    Plaintiffs rely on Court Exhibit 1 to attempt to prove package numbers, average weights and, ultimately, their claimed damages and penalties. UPS objected and continues to object to Court Exhibit 1 for all the reasons set forth in its September 25, 2016 letter (ECF No. 446) and below herein. Court Exhibit 1 was supposedly prepared by "[a] technical research employee" of the State who reviewed data contained in UPS delivery spreadsheets. (Trial Tr. 519:19-520:4.) But plaintiffs chose not to disclose the existence of Court Exhibit 1 or the "technical research employee" until trial, preventing UPS from deposing that employee and cross-examining him or her on the stand about, among other important matters, how Court Exhibit 1 was created, what information it contains, how any calculations were made, and what assumptions were employed.

493.    Plaintiffs failed to make necessary disclosures and thereby deprived UPS of its right to challenge Court Exhibit 1 through confrontation and cross-examination. Indeed, plaintiffs have sought to avoid the ordinary incidents of the adversarial process at every turn, even going so far as to tell the Court that no foundation witness was necessary for Court Exhibit 1 to be admitted—despite Second Circuit authority to the contrary—and seeking a special master to calculate damages and penalties. (*See* ECF No. 441.) The Court, by not

admitting Court Exhibit 1 or any similar chart to prove plaintiffs' claimed damages and

penalties, has so far properly refused to endorse plaintiffs' proposed end-runs around due

process. It should continue to do so.

> **b.** **Federal Rule Of Evidence 1006 Also Bars Admission of Court Exhibit 1 And Consideration of Plaintiffs' Attorney Proffer.**

494.    In addition to violating UPS's due process rights, Court Exhibit 1 and plaintiffs'

attorney proffer also do not satisfy the requirement of *Citron* and *Fagiola* that plaintiffs provide

a *witness* who can give "foundation testimony connecting [plaintiffs' summary charts] with the

underlying evidence summarized." *Fagiola*, 906 F.2d at 57. *See also United States ex rel.*

*Feldman v. van Gorp*, No. 03 Civ. 8135 (WHP), 2010 WL 2911606, at *6 (S.D.N.Y. July 8,

2010) ("A summary must 'be based on foundation testimony connecting it with the underlying

evidence summarized . . . .'" (citation omitted)). *See also United States v. Chase*, No. 2:04-CR-

135, 2005 WL 6733654, at *5 (D. Vt. Sept. 16, 2005) ("A witness is necessary to authenticate a

summary and lay the foundation that the summary is an accurate representation of the underlying

evidence." (citing *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004)); *State Office Sys.,*

*Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845 (10th Cir. 1985) (allowing summary evidence of

damages based on plaintiffs' business records where plaintiffs' president and treasurer "testified

that he had helped prepare the summary, and that the figures represented a summary of

information obtained from the company's business records").

495.    In addition, courts have recognized that summary charts must "*fairly represent*

competent evidence already before the [trier of fact]." *Fagiola,* 906 F.2d at 57 (emphasis added).

Where, as here, such charts do not fairly represent competent evidence from which the Court

may determine damages, it was vital that UPS be permitted to conduct "cross-examination of the

summary witness [and] present[] . . . contrary evidence." *Feldman*, 2010 WL 2911606, at *6. *See*

*also Fagiola*, 906 F.2d at 58 (noting "ample cross-examination" helped ensure court did not give summary "undue weight"); *United States v. Whitfield*, 590 F.3d 325, 365 (5th Cir. 2009) ("Full cross-examination . . . minimize[s] the risk of prejudice.").

496.     Plaintiffs' refusal to even identify the witness who purportedly prepared Court Exhibit 1 thus deprived UPS of its rights to depose before trial and to cross examine at trial a foundational witness, and to prepare before trial contrary evidence, to counter plaintiffs' inaccurate and unreliable presentation of data in their charts. *See Goldberg*, 397 U.S. at 269. Had UPS been able to cross-examine plaintiffs' "technical research employee," it would have undermined the employee's expertise and the reliability of his or her conclusions. Among other things, UPS would have been able to demonstrate the numerous errors plaintiffs made with respect to the number of packages shipped and the weights of those packages, including the complete lack of understanding plaintiffs have about what UPS's shipping records actually show. UPS could have challenged the research employee's assumption of cartons per package and percent of packages that contained cigarettes. UPS also could have reiterated the complete lack of evidence as to package contents for most shipments, which is highly relevant to determining the damages and penalties based on the number of cartons or packages. This cross-examination, to which UPS was entitled and denied, would have allowed the Court to see the degree to which the numbers in Court Exhibit 1 are incorrect and unreliable.

497.     Court Exhibit 1 is effectively plaintiffs' entire damages and penalties case. Plaintiffs' litigation choices left them without evidence of damages while severely prejudicing UPS. They denied UPS its right to notice of, and an ability to test and challenge, plaintiffs' summary damages charts before and during trial. Court Exhibit 1 and any similar damages chart plaintiffs may provide should be excluded for this reason alone.

### 3. Court Exhibit 1 Should Be Excluded As An Untimely Expert Report, Prepared By An Undisclosed Expert.

498. Court Exhibit 1 also is an improper, undisclosed expert report drafted by someone who was not disclosed by plaintiffs until the second day of trial. Rule 26(a)(2) of the Federal Rules of Civil Procedure requires parties to disclose, during discovery, "the identity of any witness it may use at trial to present [expert] evidence" and mandates that experts retained for the purposes of litigation produce a written report containing, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them." Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."

499. Here, plaintiffs acknowledged that Court Exhibit 1, which falls well short of the requirements of Rule 26(a)(2), was prepared by "[a] technical research employee" of the State who purportedly had "expertise" in reviewing the data contained in the UPS delivery spreadsheets, from which plaintiffs derived their alleged package numbers, average weights and, ultimately, their claimed damages and penalties. (Trial Tr. 519:19-520:4.) As the Court noted, however, "the data guy at the A.G.'s Office may be fantastic but he may be a quasiexpert who's not here in court. That's my concern." (*Id.* 526:8-10.)

500. UPS should have had the opportunity, under Rule 702 and *Daubert*, to investigate (i) "the qualifications of the proposed expert," (ii) "whether the proposed testimony would be helpful to the trier of fact," and (iii) "whether each proposed opinion is based upon reliable data and reliable methodology." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (Forrest, J.). By failing to disclose their expert and his or her analysis before trial, plaintiffs prejudiced

UPS by preventing UPS from deposing that expert and challenging that expert's qualifications, usefulness and methodology in a *Daubert* motion. UPS was also foreclosed from retaining a rebuttal expert or conducting a cross-examination at trial.

501. Given plaintiffs' failure to disclose Court Exhibit 1 and the expert who prepared it under Rule 26(a)(2), plaintiffs should not be permitted to rely on Court Exhibit 1. *See Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474 (JGK), 2008 WL 857492, at *13 (S.D.N.Y. Mar. 31, 2008) ("The defendant did not have an opportunity to depose [plaintiffs' expert] or to consult an expert of its own. If that report had any significance . . . the defendant would have the opportunity to depose [plaintiffs' expert], employ its own expert, and submit additional briefing on the motion or file an additional motion. . . . This is the type of 'sandbagging' of adversaries that Rule 37(c)(1) was designed to prevent, and therefore [plaintiffs' expert's] affidavit will be excluded from consideration."); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181-82 (S.D.N.Y. 2008) (striking expert declaration that was filed after discovery was closed); *Rizzo v. Edison, Inc.*, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005), *aff'd,* 172 Fed. App'x. 391 (2d Cir. 2006) ("[P]laintiff's purported expert . . . was never disclosed by plaintiff as an expert witness, and accordingly his affidavit may not be considered by the court."); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 n.5 (9th Cir. 2006) ("It is not an abuse of discretion to exclude a party's expert testimony when that party failed to disclose the expert report by the scheduling deadline and that party reasonably could have anticipated the necessity of the witness at the time of the deadline.... P[laintiff] failed to file and serve the expert report by the deadline set forth in the scheduling order even though she clearly anticipated the need for that report." (citation omitted)). Court Exhibit 1, an undisclosed and

untested expert report prepared by an undisclosed and untested expert, should therefore be excluded.

### 4. Court Exhibit 1 Is Also Inadmissible Because It Lacks Authenticity.

502. Plaintiffs were required, but failed, to provide a foundational witness to satisfy the requirement of Federal Rule of Evidence 901. That Rule requires the proponent of evidence to "produce sufficient evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Although this Court has held that plaintiffs "need not have a sponsoring witness for the purpose of seeking admission of documents as to which authenticity is established, relevance assumed, and no other objection has been lodged" (ECF No. 420 at 5), that is not the case here. UPS *did not* stipulate to the authenticity or accuracy of plaintiffs' summary charts in paragraph 180 of their Proposed Findings of Fact or to Court Exhibit 1. (*See* ECF No. 389 at 3 (explaining that the parties agreed that "all *bates-stamped documents produced by Plaintiffs in discovery* . . . are authentic within the meaning of Federal Rule of Evidence 901" (emphasis added)).)

503. Nor can plaintiffs' proffer, which is a statement of plaintiffs' trial attorney and was not made under penalty of perjury, satisfy the requirements of Rule 901. *See S.E.C. v. Competitive Techs., Inc.*, No. 3:04-cv-1331 (JCH), 2006 WL 3346210, at *2 n.2 (D. Conn. Nov. 6, 2006) (explaining that attorney declaration concerning, *inter alia*, a summary chart had limited "probative value" and explaining that "[a]s lead attorney in this case, [counsel] certainly could not testify at trial about any of the matters set forth in his declaration. Only those staff members not directly prosecuting this case would be competent in this regard.") (citation omitted).

504. Plaintiffs represented to the Court at trial that "between [UPS witnesses] Mr. Cook, Mr. Azam and Mr. Niemi, we are going to be able to get explanations of what UPS purports" its spreadsheets mean. (Trial Tr. 140:24-141:1.) But that questioning never occurred.

In any event, UPS's witnesses cannot lay foundation concerning the preparation of plaintiffs' summary chart. Instead, with no foundation and no witnesses and only an inadequate and inadmissible attorney proffer (ECF No. 441), Court Exhibit 1 is not in evidence and cannot be properly admitted.

### 5. Court Exhibit 1 Is Inaccurate And Unreliable And Thus Inadmissible, As It Could Be Given No Weight.

505. As noted above, plaintiffs' untested and unproven assertions concerning package numbers and weights in Court Exhibit 1 are wrong in every material respect. Thus, that exhibit cannot be properly admitted because, even if it were, there is no way that the Court could use that it to arrive at a "reasonable basis upon which to calculate the amount of damages"— at least not without improper resort to "speculation or guesswork." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F. 2d 1033, 1038 (2d Cir. 1992).

506. During discovery, plaintiffs never asked questions to understand UPS's data regarding package volume, weight, dimensions, billings, the UPS data dictionary, or similar topics. Plaintiffs also never offered an expert on damages to show the Court and UPS how plaintiffs believe damages should be calculated, instead relying on a summary chart revealed for the first time at trial and belatedly supported by a woefully insufficient attorney proffer.

507. The calculations reflected in Court Exhibit 1 are not just a "mathematical exercise." (ECF No. 441, at 2.) Plaintiffs themselves implicitly acknowledged this when they advised the Court that their summary chart was prepared by an unnamed "technical research employee who has that expertise." (Trial Tr. 520:3-4.) But their "technical research employee" and his or her work product were never disclosed so that they could be tested through deposition and cross examination.

508.     There can be no doubt that such adversarial testing would have revealed fundamental flaws in Court Exhibit 1. Plaintiffs erred in making even the simplest of calculations based on the underlying data provided by UPS. For example, the City contends that Jacobs Manufacturing shipped *one* package to an address in the City, weighing 18 lbs. (ECF No. 440-2, at 2.) Jacobs Manufacturing did ship one package, but it was billed at 9 lbs. (PX-434 at Row 3750.) And plaintiffs have admitted they made a "mathematical error" in their opening statement and that the amount of damages they disclosed on day two of trial was $100,170 more than on day one, further reflecting the unreliability of plaintiffs' calculations. (*See* Court Ex. 1, at 5 n.5.) A vigorous cross-examination by UPS would have revealed the flaws in and the unreliability of Court Exhibit 1.

509.     Plaintiffs offered no admissible evidence at trial to reconcile any of the package numbers or weights contained in Court Exhibit 1 with any of the various documents they contend support their calculations. To the contrary, plaintiffs simply "group cited" each of the alleged shipper "groups" to numerous excel spreadsheets (between eight and 21 for each purported "group" of shippers) that the Court has recognized are not clear on their face (ECF No. 462 at 6 (*citing* Trial Tr. 1473:25-1474:02) and that do not tie to any individual shipper, let alone any of the specific numbers plaintiffs have advanced.

510.     And plaintiffs did not even attempt to introduce evidence to determine the average actual weight of the packages. Plaintiffs used "billed weight" rather than actual weight to calculate average package weights because, they said, "numerous entries in the 'actual weight' columns include negative numbers, which is impossible as a practical matter." (ECF No. 441 at 3.) But this merely confirms the depth of plaintiffs' confusion, because the "billed weight" columns on which plaintiffs relied contain the same type of negative numbers. (*See, e.g.*,

PX-433, Column U.) Had plaintiffs taken discovery or questioned witnesses at trial they would have learned that "Billed" or "Billable" weight is an industry term that they do not understand, and which cannot be relied upon across the board to establish the actual weight of a package. And negative numbers relate to billing adjustments, which plaintiffs do not seem to have factored into their calculations. Plaintiffs' calculations are not only unexplained and unsupported; they are inaccurate in substantial respects. In any event, they are not in evidence, cannot be properly admitted, and thus cannot support any finding of damages.

511. As one example of plaintiffs' many inaccuracies, Court Exhibit 1 claims that the largest "billable weight" shipper in the case is Action Race Parts (shipper number 299E05). Plaintiffs have calculated a total of 2,425 packages averaging 63.2 lbs., driving a total billable weight of 153,244 lbs. (ECF No. 440-2, at 1.) In support of this calculation, plaintiffs' Proposed Findings of Fact cite ten different UPS spreadsheets. (ECF No. 414-3 ¶ 180 & n.29.) But a review of those documents demonstrates that Action Race Parts *did not ship a single package that was billed at a weight as high as 63 lbs*. (*See, e.g.,* PX-434 at Column U, Rows 4241-6826.) Plaintiffs offered no evidence to explain how they calculated an average billable weight that significantly exceeds the highest weight of any one package shipped by Action Race Parts. In fact, the average billable weight of Action Race Parts packages was less than half of what plaintiffs contend, with most packages billed at 22 pounds.

512. Plaintiffs' calculation as to the purported second highest billable weight shipper in the case (Shipping Services) is also plainly wrong. Plaintiffs claim Shipping Services shipped 150,790 pounds of packages between July 1, 2010 and February 17, 2014, based on an average billed weight of 4.8 pounds per package. (ECF No. 440-2 at 1.) Plaintiffs' Proposed Findings of Fact stated that this shipment information "was compiled from" twelve different spreadsheets.

(ECF No. 414-3 ¶ 180 & n.22.) But their average billed weight estimate cannot be tied to any of the multiple spreadsheets identified by plaintiffs, either individually or in combination. Preliminary "back of the envelope" excel analysis suggests plaintiffs overstated average billed weight for Shipping Services by at least a pound, an error that is greatly magnified because plaintiffs claim Shipping Services shipped 31,253 packages (a number that is itself significantly overstated).

513.    There are other obvious errors in plaintiffs' inadmissible figures. Plaintiffs claim, for example, that Native Wholesale Supply (shipper number RA0610) shipped 2,006 packages to locations in the State of New York from July 1, 2010 to May 22, 2014. (ECF No. 440-2 at 1.) But the actual number is far lower, even if one were to include the *hundreds* of UPS letter envelopes shipped by Native Wholesale addressed to, for example, unnamed "line tellers" at the M&T Bank and Upstate Bank, both located in Rochester, New York. (*See, e.g.*, PX-414 and PX-555.) Plaintiffs never provided evidence as to whether they included such letter envelopes in their calculations (or other very small weight packages that would almost certainly not have contained cigarettes), an error that would only compound the obvious overstatement they have already made.

514.    In sum, although as shown above, UPS asserts that plaintiffs have not proved liability and therefore have no entitlement to damages, plaintiffs did not, in any event, introduce admissible evidence of their claimed damages. Their late disclosures during trial are neither admissible nor reliable and do not nearly suffice to prove damages. Indeed, plaintiffs' failure to provide a foundation witness for Court Exhibit 1 denied UPS its right to challenge the accuracy and reliability of Court Exhibit 1 through cross examination. *See Fagiola*, 906 F.2d at 58, *Feldman*, 2010 WL 2911606, at *6. Plaintiffs have therefore failed entirely to meet their burden

of proving "that the[ir] claimed damages are the 'certain result of the wrong'" alleged. *Anderson Grp.*, 805 F.3d at 53.

### 6. Plaintiffs Have Not Proved Actual Damages.

515. Even were the Court to admit Court Exhibit 1 (which it should not do), plaintiffs still would not have carried their burden of proving actual damages.

516. Plaintiffs have adduced almost no evidence as to the contents of the packages. Without such evidence, it is impossible to know whether the packages listed in Court Exhibit 1 contained any cigarettes at all. Nonetheless, plaintiffs would have the Court find that all of the packages contained 100% cigarettes for damages purposes. (*See* Court Ex. 1 at 5.)

517. Plaintiffs' assumption is plainly insufficient, both because "the connection between the claimed loss and the tortious act is speculative or uncertain," *Anderson Grp.*, 805 F.3d at 52, and the Court may not resort to "speculation or guesswork" to arrive at a "reasonable basis upon which to calculate the amount of damages." *Sir Speedy*, 957 F. 2d at 1038.

518. Plaintiffs also fail to show—and, indeed, cannot show—that the purchasers of the cigarettes at issue would have purchased New York-taxed cigarettes had UPS never shipped the cigarettes at issue. In fact, as shown below, the overwhelming majority of the purchasers of the cigarettes at issue would have purchased other untaxed cigarettes or non-cigarette alternatives. Thus, plaintiffs' damages case is merely hypothetical and provides no basis for recovery.

### 7. Plaintiffs Failed To Prove Any Damages Based On Shipments From The Potsdam Shippers, In Particular.

519. Plaintiffs cannot recover damages for any cigarettes they fail to show were sold in taxable transactions: unless the cigarettes were sold in a manner that allowed for the imposition of a tax, the plaintiffs suffered no loss of revenue (even putting aside the diversion issue discussed below, *see infra*, § X(C)). And because all of packages shipped from the Potsdam

Shippers were delivered to retailers on Indian reservations (*see, e.g.* Trial Tr. 1658:5-17), some or all of the cigarettes allegedly in those packages may have been sold on-reservation to tribal consumers. Consequently, plaintiffs have failed to demonstrate that UPS's shipments caused it any harm for which it may now recover compensatory damages.

520.    Plaintiffs may assert that, given § 471's presumption of taxability, it can be presumed that *all* cigarettes were sold in such transactions. (*See* ECF No. 406.) But the presumption cannot be applied in this manner.

521.    That is true, first, because the presumption of taxability is not applicable to UPS at all as a matter of state law, as UPS has argued (ECF No. 300 at 18). The Court has already rejected that argument (ECF No. 406 at 14 n.7), but UPS continues to maintain it is a correct statement of the law and will present it on appeal, if necessary.

522.    Second, even assuming the presumption of taxability applies to UPS, it does not relieve plaintiffs of the burden of demonstrating the full extent of their damages that resulted from UPS's transport of supposedly "contraband" cigarettes. In its order, the Court concluded that cigarettes are "contraband" as defined by the CCTA when they are required to bear a stamp but in fact bear no stamp. (ECF No. 406 at 16.) The Court further concluded that the presumption of taxability established the "factual status" of the cigarettes that UPS transported at the time it transported them:  "stamps were required [and] taxability was presumed." (*Id*. at 25.)

523.    But whether these cigarettes were "contraband" within the meaning of the CCTA, and whether the plaintiffs sustained *damage* as a result of their transport, are two distinct questions. Separate from its definition of "contraband" contained in § 2341(2), the CCTA authorizes state and local governments to recover "money damages" in § 2346(b)(2). Unlike its definition of "contraband," the statute's reference to "money damages" does not incorporate any

state law defining when a cigarette will be deemed taxable or required to bear a stamp. Instead, it refers to the general principles governing compensatory damages. Among the most important of those principles is that "[w]hen there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied" absent the complained-of violation. Restatement (Second) Torts § 903. Allowing the plaintiffs to invoke the presumption of taxability and recover damages corresponding to *all* "contraband" cigarettes—even though some number of these cigarettes may well have been sold in nontaxable on-reservation transactions for which the plaintiffs could never have recovered any revenues—would plainly violate this principle.

### 8. Plaintiffs Have Not Proved The Basis For Any Penalties.

524. Plaintiffs' demand for penalties, which is based on the number of packages UPS allegedly transported for the shippers in violation of the AOD or federal or state law, also turns on their inaccurate package count in Court Exhibit 1. Because of all of the deficiencies in Court Exhibit 1 detailed above (*see supra*, COL, § X(B)(1)-(5)), plaintiffs have failed to provide the Court with competent, admissible, and reliable evidence of the number of packages UPS transported. But that is the metric by which plaintiffs seek to measure penalties. They therefore have failed to prove any entitlement to penalties.

### C. Plaintiffs Cannot Recover More Than Zero-to-Five Percent Of Tax Losses, Assuming Any Such Losses Are Proven.

525. The CCTA provides that plaintiffs may obtain "appropriate relief for violations of [the CCTA] from any person (or by any person controlling such person), including civil penalties, money damages, and injunctive or other equitable relief." 18 U.S.C. § 2346(b)(2) (2006). Under general damages principles, which plaintiffs have recognized apply here (*see* ECF

No. 91 at 12 n.8), "compensatory damages are designed to place the plaintiff in a position substantially equivalent to the one that he would have enjoyed had no tort been committed." *Anderson Grp.*, 805 F.3d at 52; *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) ("The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." (emphasis added)). It is universally recognized that "[t]he sole object of compensatory damages is to make the injured party whole for losses actually suffered. They may not exceed the amount that will make the injured party whole." 22 Am. Jur. 2d Damages § 31 (2016) (collecting cases). "That is, damages are not intended to place a plaintiff in a position better than he/she would have been in the absence of the alleged conduct." *State of New York v. United Parcel Serv., Inc.*, No. 15-cv-1136 (KBF), 2016 WL 4735368, at *10 (S.D.N.Y. Sept. 10, 2016) (Forrest, J.).

526. Compensatory damages are "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *Cooper Indus.*, 532 U.S. at 432, and courts "will not permit recovery when the connection between the claimed loss and the tortious act is speculative or uncertain." *Anderson Grp.*, 805 F.3d at 52. This means that plaintiffs "bear[] the burden of showing that the[ir] claimed damages are the 'certain result of the wrong.'" *Id.* at 52-53 (*quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

527. The unrebutted testimony of UPS's economics expert, Dr. Aviv Nevo, establishes that UPS's alleged conduct (even assuming *arguendo* it is proven) did not cause plaintiffs to lose the full amount of the taxes owed. Dr. Nevo is the George A. Weiss and Lydia Bravo Weiss University Professor of economics at the University of Pennsylvania. He explained that very few

of the purchasers of the cigarettes allegedly at issue, if any, would have purchased New York-tax-paid cigarettes in a "but-for world" where the untaxed cigarettes allegedly shipped by UPS were not available. (DX-613 ¶ 12.) Instead, Dr. Nevo concluded that, in his expert opinion, the purchasers at issue would have diverted to other untaxed cigarettes and non-cigarette alternatives, such as little cigars, cigars and smokeless tobacco, while some would also have simply quit altogether. (*Id.* ¶¶ 39-40.)

528.    This Court has explicitly recognized that "[i]t is certainly clear that the use of but-for worlds is commonplace in assessing damages in many different scenarios," including where, as here, "the appropriate measure of damages is the difference between the loss a plaintiff would have suffered (if any) in the absence of offending conduct versus what he/she in fact suffered." *United Parcel Serv.*, 2016 WL 4735368, at *10. "The rationale for basing damages on a but-for world analysis is that in most cases . . . plaintiffs are not entitled to recoup windfalls, i.e., damages beyond the harm suffered." *Id.*

529.    Dr. Nevo began his analysis with the "overly conservative assumption" that consumers would divert from the cigarettes at issue to NY-tax-paid cigarettes in proportion to the share of NY-tax-paid cigarettes comprising total cigarette consumption from 2010 to 2015. (DX-613 ¶ 38.) Based on "a widely used method to compute the untaxed share of cigarette consumption," Dr. Nevo estimated that sales of untaxed cigarettes accounted for an average of 44% of total cigarette consumption in New York from 2010 to 2014 and more than 50% of consumption in 2011, meaning that, at most, 56% of sales of the cigarettes at issue would be diverted to sales of NY-tax-paid cigarettes in the but-for world. (*Id.* ¶¶ 38, 44.)

530.    Dr. Nevo concluded, however, that applying so-called diversion by share is unreasonable here because the buyers of the cigarettes at issue have revealed that they are less

brand loyal and more price sensitive, and, therefore, far more likely to purchase untaxed or low taxed cigarettes or other, lower cost non-cigarette tobacco products and nicotine products than an average consumer. (*Id*. ¶ 39.) In particular, based on the New York Adult Tobacco Survey ("NYATS"), Dr. Nevo explained that mail order purchasers of cigarettes, such as those here, are 76% more likely than all other smokers to make a special effort to obtain low-priced cigarettes, 308% more likely to report that cigarette prices influenced their use of other non-cigarette tobacco products, 132% more likely to purchase cigarettes from an out-of-state or out-of-country supplier, and 28% more likely to purchase cigarettes from a Native American reservation. (*Id*. ¶ 55 Table 5.) The "revealed preference" of the consumers of the cigarettes at issue for low-cost cigarettes is "the most important factor" that Dr. Nevo considered in his analysis. (Trial Tr. 1794:18-20.)

531.    Based on his decades of experience studying consumer behavior and his review of peer-reviewed academic studies, including a study reviewing cigarette purchasing habits in the Bronx after unstamped, untaxed New York cigarettes were no longer available for purchase due to a tax law change, Dr. Nevo estimated that diversion in the but-for world from the untaxed cigarettes at issue to NY-tax-paid cigarettes would be between zero and 5.4%. (*Id*. ¶ 63.) Dr. Nevo further concluded that diversion from the cigarettes at issue to NY-tax-paid cigarettes would be even lower because demand would also be diverted outside the cigarette category in response to tax increases. (*Id*. ¶ 75.) This diversion would include buyers of the alleged cigarettes at issue who would (i) substitute cigarettes in the but-for world with non-cigarette tobacco products such as cigars, little cigars, roll your own tobacco and snuff; (ii) substitute non-tobacco products such as nicotine gum, patches, and e-cigarettes; or (iii) quit using all such products. (*Id*.) Although Dr. Nevo did not have sufficient evidence from academic studies to provide an

exact diversion ratio to these alternative products, Dr. Nevo concluded that there will be a potentially substantial diversion to this category of cigarette substitutes. (*Id*. ¶ 76.)

532. Dr. Nevo based his determination of substantial diversion to non-cigarette products on a number of academic studies suggesting that, in the but-for world, buyers of the cigarettes at issue would divert to little cigars. (*Id.* ¶ 81.) These studies show that some consumers use both cigarettes and little cigars and that an increase in the price of cigarettes is directly associated with an increase in sales of little cigars. Dr. Nevo referenced a study by Doris Gammon, et al., from 2015 that found that sales of little cigars in convenience stores and food drug mass market stores increased by 27% following a 10% increase in cigarette prices. (*Id.* (*citing* DX-466 at 3).) In particular, Dr. Nevo noted that Gammon explained that "'during 2000–2011, cigarette consumption decreased by 32.8%, while large cigar consumption increased by 233% and little cigar consumption decreased by 65%,'" but "'[t]he decrease in little cigar sales and increase in large cigar sales following [passage of the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), Pub. L. 111-3, in 2009] was most likely not because consumers changed preferences, but rather the result of manufacturers manipulating the weight of little cigars so they would qualify as large cigars for tax purposes.'" (DX-613¶ 82 (*quoting* DX-466 at 1).)

533. CDC data reviewed by Dr. Nevo also shows that cigarette usage declined from about 435 billion units in 2000 to about 293 billion units in 2011, or almost 33%. (DX-434 at 567, Table 1.) Over the same period, little cigar consumption increased from about 2.2 billion units in 2000 to about 5.9 units in 2008, or by 159%, before dropping off precipitously after CHIPRA. (*Id*. at 567, Table 2.) Starting in 2009, consumption of large cigars, most of which were really just reformulated slightly heavier little cigars, jumped from about 5.6 billion units in

2008 to about 9.8 billion units in 2009, the year CHIPRA was enacted, to about 13 billion units in 2011. (*Id.*) In total, the consumption of little cigars and large cigars (many of which were reformulated little cigars after 2008) increased from 2.2 billion in 2000 to 13.7 billion in 2011, a 522 % rise, as consumption of cigarettes correspondingly decreased. (*Id.*)

534.     Dr. Nevo also referenced the 2012-2013 National Adult Tobacco Survey and found usage patterns entirely consistent with diversion from cigarettes to little cigars. (DX-613 ¶ 83 (*citing* DX-454).) This study found that more than 80% of survey respondents who report smoking "little filtered cigars" are current or former cigarette smokers. (DX-613 ¶ 83.)

535.     Other sources relied on by Dr. Nevo, including the NYATS and deposition testimony from the New York City Department of Health witness, Dr. Sonia Angell, also confirmed that some smokers switch to little cigars in response to increases in the price of cigarettes. (*Id.* ¶ 84.) Dr. Nevo further supported his conclusion by citing legislation proposed (but not passed) by the New York State Assembly in 2009 that sought to tax little cigars at the same rate as cigarettes, noting that "little cigars are practically indistinguishable from cigarettes and are often consumed as less expensive cigarette alternatives." (DX-613 ¶ 85 (*citing* DX-47).)

536.     Thus, even assuming *arguendo* the Court were to find that plaintiffs have proved some tax loss damages, any damages determination must be reduced to reflect the actual amount of taxes plaintiffs would have been able to recover had UPS not allegedly shipped the cigarettes at issue. *See United Parcel Serv.*, 2016 WL 4735368, at *10. Dr. Nevo's testimony on diversion is unrebutted and based on a reliable methodology, peer-reviewed academic articles, government analysis, and his decades of consumer research and experience. Thus, even were the Court to find UPS liable and award plaintiffs monetary damages, plaintiffs are only entitled to, at most, 5.4% of any such damages.

**D. Given UPS's Good Faith Attempt To Prevent The Shipment Of Cigarettes, No Penalties Should Be Awarded.**

537. As shown above (*see* FOF, § V(C), COL, § II), plaintiffs have failed to prove that UPS knowingly shipped cigarettes in violation of the AOD or any federal or state law. Plaintiffs have also failed to prove the contents of the packages that UPS shipped. (*See supra*, COL, § X(B).) For these reasons alone, no penalties should be awarded.

538. But even if the Court determines that UPS is liable for certain shipments of cigarettes and that plaintiffs have somehow provided evidence from which the Court can calculate penalties, the Court should not award civil penalties given UPS's good faith steps to comply with the AOD and with relevant law and to prevent the shipment of cigarettes. Furthermore, although the Court struck UPS's affirmative defense to *liability* based on the State's policy of forbearance, the fact remains that plaintiffs' own inaction and forbearance from enforcing tax laws as to certain shipments to and from Indian reservations weighs against awarding them penalties against a common carrier that merely transported any such shipments. There is also no proof that UPS's conduct *caused* harm to the public, given that it did not manufacture or sell the cigarettes that consumers chose to purchase. And, finally, the actions of low-level drivers and/or account executives are not a basis for assessing civil penalties against UPS.

**1. Relevant Penalty Provisions.**

539. Based on plaintiffs' March 3, 2016 letter containing a damages and penalties illustration for one purported "group" of shippers and the chart plaintiffs offered as Court Exhibit 1, plaintiffs seek penalties under the PACT Act, N.Y. P.H.L. § 1399-*ll* and the AOD. Plaintiffs do not seek any penalties under the CCTA.

540.    **PACT Act.** As UPS notes above, it is exempt from both the PACT Act and from claims under N.Y. P.H.L. § 1399-*ll*. But if the PACT Act were to be applied to UPS, it provides for a range of potential penalties for violations, providing that "in the case of a common carrier or other delivery service," the penalty can be up to "$2,500 in the case of a first violation, or $5,000 for any violation within 1 year of a prior violation." 15 U.S.C. § 377(b)(1)(B).

541.    **N.Y. P.H.L. § 1399-*ll*.** As UPS notes above, it is exempt from both the PACT Act and from claims under N.Y. P.H.L. § 1399-*ll*. But if UPS were subject to a claim under N.Y. P.H.L. § 1399-*ll*, the statute provides that "any person who violates the provisions of subdivision one, two or three of this section shall be subject to a civil penalty not to exceed the greater of (a) five thousand dollars for each such violation; or (b) one hundred dollars for each pack of cigarettes shipped, caused to be shipped or transported in violation of such subdivision." § 1399-*ll*(5). Plaintiffs seek a penalty up to $5,000 per violation. (*See* Trial Tr. 26:4-6 ("THE COURT:  Are you folks seeking the per pack or delivery?  MS. TOSON:  We're seeking the delivery[.]").

542.    In Court Exhibit 1, plaintiffs provide a range of penalties under § 1399-*ll* based on plaintiffs unsupported assumption that 90, 95 or 100% of the packages contained cigarettes. (Court Ex. 1 at 3.) During opening statement, plaintiffs said they were seeking penalties under § 1399-*ll* based on the assumption that 90% of the packages contained cigarettes. (Trial Tr. 76:8-10.) But there is no evidence in the record that supports plaintiffs' assumption that 90% (or indeed any percent) of the packages contained cigarettes. Plaintiffs simply plucked that number out of the air without any justification or support, based entirely on unfounded speculation.

543.     **AOD.** The AOD provides that UPS shall pay "a stipulated penalty of $1,000 for each and every violation of this [AOD]." (DX-23 ¶ 42.) As explained above, what constitutes a "violation" is limited. (*See supra*, COL, § I(A).)

2.     **The Court Should Consider UPS's Good Faith And Plaintiffs' Own Conduct In Assessing Whether Penalties Should Be Awarded.**

544.     Although there may be an "enormous range of penalties available to the district court in the usual civil penalty case," *United States v. J.B. Williams Co.*, 498 F.2d 414, 439 (2d Cir. 1974), "the Second Circuit has directed that, where the statute does not mandate consideration of any particular factors, '[a] district court may properly consider a number of factors in determining the size of a civil penalty, including the [1] good or bad faith of the defendants, [2] the injury to the public, and the [3] defendants' ability to pay.'" *City of New York v. Milhem Attea & Bros., Inc.*, No. 06-CV-3620 (CBA), 2012 WL 3579568, at *30 (S.D.N.Y. Aug. 17, 2012) (quoting *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399 (2d Cir. 2004)).

545.     Courts also have recognized that it is appropriate to consider the actions of plaintiffs when assessing penalties. *See Milhem*, 2012 WL 3579568, at *33 ("[T]he Court believes that a penalty award in this case should take some account of the fact that state tax authorities actively acquiesced in the defendants' business model for years, despite actual knowledge that large amounts of untaxed cigarettes were being sold and distributed to non-Native Americans as a result of the forbearance regime."); *United States v. White-Sun Cleaners Corp.*, No. 09-CV-2484 (ARR)(JO), 2011 WL 1322266, at *9 (E.D.N.Y. Mar. 9, 2011) (one of the factors a court looks at when determining the amount of damages under the Resource Conservation and Recovery Act is "the government's conduct"); *United States ex rel. Bunk v. Birkart Globistics GMBH & Co.*, Nos. 1:02cv1168 (AJJ/TRJ), 1:07cv1198 (AJT/TRJ), 2010 WL

4688977, at *8 n.14 (E.D. Va. Nov. 10, 2010) ("[T]he extent of the [g]overnment's knowledge and its conduct in light of what it knew remains relevant considerations to the Court in considering an appropriate civil penalty.").

### a. UPS's Good Faith Compliance With The AOD And Other Laws.

546. UPS has never questioned the importance of plaintiffs' effort to curb cigarette smoking, including through the use of significant excise taxes, and it has shared plaintiffs' goal of stopping cigarette shipments and preventing future shipments. (Trial Tr. 79:6-8.) UPS voluntarily entered into the AOD with the New York Attorney General despite UPS's position that federal law preempted N.Y. P.H.L. § 1399-*ll*. (DX-23.) Thereafter, UPS acted in good faith by implementing a compliance policy to combat illegal cigarette trafficking (*see* DX-600 ¶¶ 46-77 (outlining UPS's tobacco policy and compliance with the AOD)), and repeatedly informing State and City authorities when it discovered illegal shipments. (*See id.* ¶ 33.)

547. For example, among other measures (*see supra*, ¶ 44), beginning in 2011, UPS conducted 28 audits of the 50 or so shippers that plaintiffs have claimed in this case were shipping cigarettes with UPS. (DX-600 ¶ 18.) UPS regularly trained its drivers on UPS's tobacco policy and compliance measures agreed to under the AOD. (*Id.* ¶ 52; *see also* DX-110; DX-157; DX-208-209; DX-348.) UPS created a database application to track the activity of some 4,000 tobacco shippers from 49 states, which it has maintained on a continuous basis since 2005. (DX-600 ¶¶ 63-64; *see also* DX-8.) And, from 2005 to 2010, UPS engaged outside counsel to conduct internet searches to identify additional shippers who list UPS as a carrier for cigarettes. (DX-600 ¶¶65-66; DX-44.)

548. UPS also continually cooperated with law enforcement to terminate service to shippers when law enforcement informed UPS of potential violators, even in circumstances in

which the AOD did not require termination. For instance, at least six times since 2010, UPS informed the City about suspicious packages that turned out to be unstamped cigarettes. (*See* Grayson Tr. 99:6-19.) Between 2008 and 2011, UPS security personnel met with investigators from New York State's Department of Taxation and Finance concerning cigarette shipments— including Arrow brand cigarettes, which plaintiffs claim the shipper Mohawk Spring Water was shipping. (DX-392.) UPS contacted DTF about these shipments, and DTF instructed UPS to complete the shipments. (*See* DX-612 ¶¶ 5-7.)

### b. Plaintiffs' Failure To Cooperate With UPS In Enforcing The AOD.

549. Plaintiffs, however, did not reciprocate. Plaintiffs failed to notify UPS when they discovered certain shippers sending cigarettes via UPS and then allowed the shipments to proceed for years before suing UPS for damages. This inaction and lack of cooperation should be taken into account in assessing whether penalties are appropriate. *See Milhelm*, 2012 WL 3579568, at *33. For example, the City claims it became aware of illegal shipments by AJ's Cigars in approximately July 2010 (DX-383 at 4), yet it did not share the information with UPS until October 2013, as it was preparing to file this litigation. (DX-216.) The State also was aware of illegal shipments from Elliott Enterprises and EExpress, but never informed UPS. (Jerry Tr. 45:3-24, 47:7-12, 67:3-19.) And the City conducted a "controlled buy" from Seneca Cigars in May or June of 2012, supposedly resulting in three cartons of unstamped cigarettes being delivered by UPS (*see* DX-147 at 1), but the City sat on this information for 17 months and did nothing to halt Seneca Cigars' shipments or to inform UPS of the alleged illegal trafficking until its draft complaint in October 2013. (DX-147 at 1; *see also supra*, ¶ 248.)

### c. UPS's Enhanced Compliance Measures Also Weigh Against Awarding Any Penalties.

550. Civil penalties "serve the purposes of 'encourag[ing] defendants to discontinue current violations and deter[ring] them from committing future ones.'" *Milhelm*, 2012 WL 3579568, at *28 (citation omitted). In addition to UPS's vigorous compliance with the AOD since 2005, UPS enhanced its Tobacco Compliance Program in 2014 by, among other things, adding a requirement to Tobacco Agreements that shippers develop, implement, and maintain their own compliance programs, introducing a poster of "red flags" that employees at shipping facilities could review, and analyzing shipments from "high risk" zip codes to determine if shippers potentially were shipping tobacco. (DX-355.) That UPS has acted in good faith since entering into the AOD, enhancing compliance continually—even as plaintiffs have withheld useful information from UPS that could have assisted UPS in further complying with its obligations under the AOD and other applicable laws—shows that UPS has both discontinued any violations of the AOD and other laws and will not commit any such future violations. No penalties are necessary or justified here.

### 3. The Actions Of Drivers And/Or Account Executives Are Not A Basis For Civil Penalties Against UPS.

551. Civil penalties are not warranted against UPS as a corporate defendant, even if the Court were to find that some low-level employees knew or suspected illegal activity on the part of some shippers.

552. As plaintiffs have conceded, the civil penalties they seek are akin to punitive damages. (ECF No. 397 at 20.) The Supreme Court held in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 541 (1999), that "the common law has long recognized that agency principles limit vicarious liability for punitive awards." (internal citations omitted). The common law, the Court explained, is codified in the Restatement of Agency, which permits punitive damages for a

principal for the acts of an agent only in the following specific circumstances: "(a) the principal authorized the doing and the manner of the act; (b) the agent was unfit and the principal was reckless in employing him; (c) the agent was employed in a managerial capacity and was acting in the scope of employment; (d) the principal or a managerial agent ratified or approved the act." *Id.* at 542-543 (quoting Restatement (Second) of Agency, § 217C (1957)).

553.    The Supreme Court, in *Kolstad*, also discussed the "perverse incentives" created by the scope of employment rules, which might discourage employers from establishing robust prevention policies. *Id.* at 545. The Court therefore felt "compelled" to modify the scope of employment rules to "avoid undermining the objective[]" of the federal law (there Title VII). *Id.* Because Title VII is aimed at prevention, the Court held that an employer could not be held vicariously liable for punitive damages if the actions of its employees were "contrary to the employer's 'good faith efforts to comply with Title VII.'" *Id.* Here, the federal laws at issue, the PACT Act and the CCTA, are likewise aimed at prevention (indeed the word "prevent" is in the title of the PACT Act), and corporations should be encouraged to create and enforce procedures to prevent the unlawful shipment of cigarettes.

554.    New York law has similar limitations on vicarious liability for punitive damages. As the Court of Appeals explained, "the question has long been settled: an employer is not punished for malicious acts in which it was not implicated." *Loughry v Lincoln First Bank, N.A.*, 67 N.Y.2d 369, 378 (1986). In other words, employers are liable for punitive damages "only when a superior officer in the course of employment orders, participates in, or ratifies outrageous conduct." *Gardner v. Federated Dep't Stores, Inc.,* 907 F.2d 1348, 1351-52 (2d Cir. 1990) (reversing award of punitive damages against employer because of lack of evidence that any employee in a "managerial capacity participated in, authorized, consented to or ratified the

misconduct"); *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 934 (1999) (affirming dismissal of punitive damages against employer where there was no evidence that management authorized, consented to, or ratified employee conduct). Superior officer is defined as a person possessing "a high level of general managerial authority in relation to the nature and operation of the employer's business." *Loughry*, 67 N.Y.2d at 380; *Pellegrini v. Duane Reade Inc.*, 137 A.D.3d 651, 652 (N.Y. App. Div. 1st Dep't 2016) (affirming dismissal of claim for punitive damages because shift leader and a de facto evening store manager were found to not be superior officers).

555.　New York courts consider the policies, procedures, and corporate culture when determining whether punitive damages are warranted. *See Melfi v. Mount Sinai Hosp.*, 64 A.D.3d 26, 43 (N.Y. App. Div. 1st Dep't 2009) (refusing to award punitive damages against hospital for actions of assistant professor and attending physician, because the doctor was not a superior officer and extensive policies of hospital belied the inference that he was acting in accordance with hospital culture). Civil penalties are not warranted for plaintiffs' state law claim under the Public Health Law, 1399-*ll*.

556.　Under federal and New York state law, UPS may not be held vicariously liable for penalties that are akin to punitive damages. UPS did not authorize the knowing illegal shipment of cigarettes. Plaintiffs provided no evidence that UPS recklessly employed any employees or that managerial level employees had knowledge of any unlawful shipment of cigarettes. Even if the Court were to find that some drivers or account executives had some knowledge, or consciously avoided knowing, that some shippers may have shipped some cigarettes, drivers and account executives are not managerial employees and do not have

managerial authority over UPS's business operations. The actions of low-level drivers and/or account executives are not a basis for punitive penalties against UPS.

### E. Any Penalties Awarded Under The AOD Must Be Strictly Limited To The Text Of The AOD; The State Is Not Entitled To $1,000 Per Package.

557. As show above, no penalties are warranted. But even if the Court is inclined to award penalties, plaintiffs cannot recover penalties under the PACT Act or N.Y. P.H.L. § 1399-*ll* because UPS is exempt from the PACT Act, as discussed above (*see supra*, COL, § V). Accordingly, the only penalty that could arguably be awarded (and even then only to the State, not the City) is the one provided for in the AOD. For the reasons detailed below, any such penalties must be limited strictly to the text of the AOD; the State is not permitted to recover $1,000 for every package shipped from the shippers it has identified, as the State seeks to do.

### 1. The Audit Provision, On Which Plaintiffs Rely, Does Not Support The Per-Package Penalty The State Seeks.

558. The AOD provides that UPS pay the State "a stipulated penalty of $1,000 for each and every violation" of the AOD, unless exceptions apply. (DX-23 ¶ 42.)

559. Plaintiffs contend they are entitled to a $1,000 penalty for every package they assert is at issue based on their theory that the audit provision required UPS to audit every package that a shipper tendered after UPS had a reasonable basis to believe that shipper might be tendering cigarettes to consumers. As shown above, however, the audit provision does not impose the per-package audit obligation on which plaintiffs rely. (*See supra*, COL, § I(E)(4).)

560. In the absence of a per-package audit *obligation*, there can be no per-package audit *violation*; plaintiffs are therefore not entitled to the per-package penalty they seek. Plaintiffs could only obtain such a penalty by rewriting the AOD penalty provision to add a new penalty for audit violations to the effect that: *In the event that the violation involves UPS's failure to audit a shipper where there was a reasonable basis to believe that the shipper may*

*have been tendering Cigarettes to Individual Consumers, UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every package that UPS thereafter picks up from that shipper, regardless of whether a package contained Cigarettes destined for Individual Consumers, until the reasonable basis to audit no longer exists.* Rewriting the penalty provision to create a per-package audit penalty is, of course, impermissible, for the same reasons it would be impermissible to rewrite the audit provision. (*See supra*, COL, § I(E)(4).)

561.    As discussed, there is an AOD provision that could provide for a per-package penalty, but that penalty only applies if UPS fails to "comply with PHL § l399-*ll*(2)," and even that penalty is subject to important exceptions (DX-23 ¶ 17.) Should UPS fail to comply with § 1399-*ll* by "knowingly transport[ing] cigarettes to any person in this state reasonably believed by such carrier to be other than" a person authorized to receive cigarettes," N.Y. PHL § 1399-*ll*(2), such a delivery would constitute a violation of the AOD. And the State would be entitled to a $1,000 penalty for each such delivery (unless an exception applied). (DX-23 ¶ 42.) Thus, to the extent that the State could be entitled to a per-package penalty for UPS's deliveries, that penalty would be available only upon proof that UPS's delivery of that package violated § 1399-*ll*.

562.    As shown, however, the State did not even attempt to prove the contents of the overwhelming majority of packages that the State has placed at issue; the State therefore cannot prove that UPS did not comply with § 1399-*ll* for delivering those packages. And without proof that UPS's delivery of a specific package violated § 1399-*ll*, the State cannot prove a violation of the AOD delivery restrictions that would subject UPS to a $1,000 penalty for that Prohibited Shipment.

### 2. Principles Of Construction Preclude The State's Attempt To Re-Write The Audit Provision To Include A Per-Package Penalty.

563. As noted, UPS has previously argued—and the Court previously ruled (*see* ECF Nos. 177 at 34; 355 at 11)—that the AOD is essentially a private agreement. At trial, however, the Court asked the parties to consider the implications if the AOD were construed as akin to a deferred prosecution agreement. (Trial Tr. 513:15—514:9.) Familiar principles of construction—either of a private agreement or of a deferred prosecution agreement—bar the State from attempting to interpret the audit and penalty provisions of the AOD to impose to a $1,000 penalty for every package shipped from the shippers at issue, regardless of package contents, based on the theory that UPS should have audited every one of those packages.

### a. Interpreted As A Private Agreement, The AOD's Penalty Cannot Be Applied As The State Seeks To Impose It.

564. If the Court rules that the audit provision supports the per-package penalty the State seeks, then the AOD's stipulated damages clause should be stricken because it would constitute an unenforceable penalty under principles governing liquidated damages. The AOD's clause (DX-23 ¶ 42) requiring UPS to pay $1,000 per violation of the AOD is akin to a liquidated damages clause. Under New York law, "[w]here [a] contract containing [a] liquidated damages clause for its breach contains numerous covenants of varying degrees of importance, if the loss which might be anticipated as resulting from a breach of even the least of them is disproportionate to the amount of liquidated damages, or if the loss which might result from a breach of any one of the covenants is readily ascertainable, then the clause will be held to be a penalty and unenforceable." *Vernitron Corp. v. CF 48 Assocs.*, 104 A.D.2d 409, 410 (2d Dep't 1984) (emphasis added); *see also Bradford v. New York Times Co.*, 501 F.2d 51, 57 (2d Cir. 1974) ("[S]etting a fixed amount for any breach irrespective of its gravity or the probable damage to be contemplated might well classify the clause as an unenforceable penalty"); *Lake*

*River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985) (Posner, J.) ("When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable."). Here, all of these conditions are met.

565.    First, the AOD's penalty provision, as interpreted by the State, would indiscriminately punish a breach of the agreement without regard to the breach's "degree[] of importance" and "gravity." *Vernitron Corp.*, 104 A.D.2d at 410; *Lake River Corp.*, 769 F.2d at 1290. Specifically, the $1,000 penalty would apply to every package shipped by UPS from a shipper whom UPS failed to audit where there was a reasonable basis to believe the shipper was shipping cigarettes to consumers, even when the packages contained no cigarettes. As such, the AOD's damages provision would epitomize an impermissible scheme "insensitive to the magnitude of the defendant['s] breach," given that it would apply with full (and disproportionate)force even where the State has not proved the harm the AOD was intended to prevent—the delivery of cigarettes to unauthorized consumers. *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F. 3d 558, 562 (7th Cir. 2001) (invalidating contractual clause imposing same $150,000 fee for any late installment payment "[r]egardless of whether the defendants were a day late in making the last payment or had refused to perform at all"); *see also Howard Johnson Int'l Inc. v. HBS Family, Inc.*, No. 96 Civ. 7687 (SS), 1998 U.S. Dist. LEXIS 11040, at *20 (S.D.N.Y. July 22, 1998) (Sotomayor, J.) (where hotel franchisee failed to timely pay franchisor, stipulated recovery of $2,000 per room deemed impermissible penalty because franchisor would receive it "'regardless of the nature and extent of the breach of contract'" and was therefore "not

a reasonable estimate of the potential loss likely to be suffered" and "not proportional to the probable loss") (citation omitted); *Seidlitz v. Auerbach*, 230 N.Y. 167, 174 (1920) (sum of $7,500 should not "be treated alike as liquidated damages for the breach of a covenant involving the payment of many thousand dollars of rent and of a covenant involving the payment of an insurance premium of $17").

566.    Second, "the loss which might result from a breach of any one of the covenants [of the AOD] is readily ascertainable." *Vernitron*, 104 A.D.2d at 410 (emphasis added). Indeed, it is not difficult at all to determine the loss endured in the context of the AOD when UPS ships a package that contains no cigarettes from a shipper that UPS should have audited: the loss is zero. The $1,000 per-package clause, therefore, is unenforceable if plaintiffs' audit-based, per-package interpretation prevails. *See Howard Johnson Int'l Inc.*, 1998 U.S. Dist. LEXIS 11040, at *13-14 (liquidated damages enforceable only when "actual damages are difficult to determine, or are not readily ascertainable").

567.    UPS recognizes that in its previous ruling on plaintiffs' motion to strike many of UPS's affirmative defenses, the Court struck UPS's defense arguing that the AOD's $1,000 per-violation penalty was an unenforceable liquidated damages clause. (ECF No. 177 at 45 n. 14.) In so ruling, the Court noted that "[d]amages would have been difficult to ascertain in light of UPS's various agreements contained in the AOD, and UPS cannot show that the stipulated per-violation damages amount is disproportionate to the possible loss to the extent that would be required to render this provision unenforceable under New York law." (*Id.*) But the Court's ruling applied only to UPS's contention that the penalty provision of the AOD *as a whole* was unenforceable. (*See* ECF No. 52 at 21 (Defense 11).) Here, UPS is both preserving its argument that the AOD's penalty provision *as a whole* is unenforceable, and is making an alternative

argument: if the Court accepts the State's new and unwarranted interpretation of the audit provision, the penalty provision can now be shown to be disproportionate; as a result, either the penalty provision must be deemed unenforceable, or the audit provision must be interpreted as UPS suggests (*see supra*, COL, § I(E)(4)), to ensure that the AOD conforms to the law governing such liquidated damages penalties.

      **b.**     **If The AOD Were Interpreted As A Deferred Prosecution Agreement, The Rule Of Lenity Would Preclude The AOD's Penalty From Being Applied As The State Seeks To Impose It.**

568.     Alternatively, if the Court were to consider the AOD as a deferred prosecution agreement (and again, UPS does not believe such consideration is warranted, as the Court has already ruled (*see* ECF Nos. 177 at 34; 355 at 11)), the potentially severe consequences of the State's position provide an additional basis to reject their theory. The State's per-package penalty would potentially subject UPS to penalties far greater than the penalties that would apply if UPS was subject to a single penalty for failing to audit a shipper where a reasonable basis existed.

569.     In light of the potential consequences of finding an AOD violation, the rule of lenity requires that the Court interpret the AOD in UPS's favor, in the event the Court finds the AOD's "per violation" provision ambiguous. The rule, a canon of interpretation, provides that ambiguity concerning the meaning of contractual provisions such as those in a deferred prosecution agreement "should be resolved in favor of lenity" and against the government. *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)); *see also United States v. Bass*, 404 U.S. 336, 348 (1971) (construing ambiguous criminal sanctions in favor of accused ensures that "'fair warning [is] given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed'") (citation omitted); *see United States v. Chandler*, 388 F.3d 796, 805 (11th Cir. 2004) (applying rule of lenity to reverse mail fraud convictions in connection with

defendants' participation in McDonald's monopoly sweepstakes game because "[t]he rule of lenity requires that a criminal conviction not be predicated upon a problematic interpretation . . . of the rules of a private game"); *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980) (under rule of lenity, prosecution for making false payment requests by billing in excess of amounts authorized under contract could not be premised on ambiguous contract); *United States v. Hartec Enters., Inc.*, 967 F.2d 130, 133 (5th Cir. 1992) (under rule of lenity, unjust to convict defendants of stealing government property they thought was discarded scrap because "no person's liberty" should hinge on the subtleties of "title vesting provision[s]" in federal contracts); *Cliff Berry, Inc. v. State*, 116 So. 3d 394, 413 (Fla. Dist. Ct. App. 2012) ("Where, as here, the interpretation of an ambiguous contract involves the possibility of criminal conviction, the rule of lenity requires that any doubt [regarding the contract's proper interpretation] be resolved in favor of the accused."). The same result should follow here.

### F. Penalties, If Any, Cannot Be Disproportionate To The Alleged Harm.

570. In the event that the Court assesses civil penalties, the amount of those penalties must comport with the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fifth Amendment. Under either standard, plaintiffs' claimed penalties are excessive and disproportionate to UPS's alleged conduct. Plaintiffs seek more than $830 million in penalties, or almost twenty-two times the amount of actual damages they claim to have suffered, and 160 times the amount of revenue that UPS made on the shipments at issue.

1. **Plaintiffs' Claimed Penalties Are Excessive Under The Eighth Amendment.**

   a. **Penalties Are Excessive When They Are Disproportionate To The Harm Suffered.**

571.    The Eighth Amendment bars excessive fines, including "excessive civil fines." *Hudson v. United States*, 522 U.S. 93, 103 (1997).[25] "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

572.    The Second Circuit has held that under *Bajakajian* there are five factors to be considered when determining excessiveness: (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, (4) the nature of the harm caused by the defendant's conduct, and (5) whether the forfeiture would deprive the defendant of his livelihood. *United States v. Viloski*, 814 F. 3d 104 (2d Cir. 2016). These factors have been applied to civil penalties. *See Sanders v. Szubin*, 828 F. Supp. 2d 542, 553 (E.D.N.Y. 2011) (applying the factors to a civil penalty imposed under the Trade with the Enemy Act).

573.    Here, if the Court were to hold UPS liable, the relevant inquiry under *Viloski* would be whether plaintiffs' requested penalties—$833,577,500 or a similar number—is proportionate to the harm, if any, caused by the conduct for which the Court were to hold UPS liable. The harm plaintiffs claim is $38,049,900, which, as set forth above, is inflated based both on faulty arithmetic and diversion. Penalties dozens of times more than claimed damages are clearly disproportionate.

---

[25] Article I, § 5 of the New York state constitution also prohibits "excessive fines."

574.    Where, as here, the amount of civil penalties vastly outweighs the amount of any actual damages, courts have deemed such penalties excessive. In *In re Zyprexa Products Liability Litigation*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009), an action brought by Mississippi alleging that an antipsychotic drug was defective, the court rejected Mississippi's efforts to obtain statutory penalties on a per violation basis in addition to actual damages sought, because the result would be a "multibillion dollar cumulative penalty grossly disproportionate to both the injury Mississippi has suffered and the seriousness of [defendant drug company]'s alleged misconduct." *Id.* at 463. *See also U.S. ex rel. Smith v. Gilbert Realty Co.,* 840 F. Supp. 71, 74 (E.D. Mich. 1993) (holding that a civil penalty of $290,000 was excessive for actual damages under the false claims act of $1,630, reducing the civil penalty to $35,000).

575.    The City previously has recognized, in the CCTA context, that it cannot reasonably seek civil penalties far in excess of the CCTA damages it claims. In *Milhelm*, the City "concede[d]" that there would be "an excessive penalty amount if the per violation measure [of the PACT Act] were used" to calculate penalties. 2012 WL 3579568, at *32. Instead, the City was willing to seek penalties based on 2% of defendants' gross sales of unstamped cigarettes, and sought penalties of around $7.4 million, which was essentially equivalent to the City's lost taxes on those sales. *Id.* at *33. Likewise, in *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-cv-03966 (CBA) (JMA), 2013 WL 3187049, at *38 (E.D.N.Y. June 20, 2013), the City again "concede[d] that the enormous number of individual [] violations" would have led to an "excessive penalty amount if the per violation measure were used," and again agreed to a penalty of 2% of defendants' gross sales of unstamped cigarettes. For one defendant, the court awarded the City a penalty of $475,000, even as the City claimed $29 million in lost taxes as its damages from the smoke shop the defendant operated. *City of New York v. Golden Feather*

*Smoke Shop, Inc.*, No. 08-CV-03966 (CBA) (JMA), 2013 WL 5502954, at *5 (E.D.N.Y. Oct. 1, 2013). *See also United States v. Bickel*, No. 02-3144, 2006 WL 1120439, at *4 (N.D. Ill. Feb. 22, 2006) (government agreed that $180 million penalty would be excessive given actual damages of $184,422; court approved penalty of $11,000 plus treble damages as "not grossly disproportionate to the gravity of the offense").

> **b.** **Plaintiffs' Requested Penalties Far Exceed Any Harm**
> **They Have Suffered Or Any Benefit To UPS.**

576.    By any measure, $833,577,500 in penalties is disproportionate to the harm allegedly caused by UPS.

577.    **Disproportionate to Plaintiffs' Claimed Damages:** Even if plaintiffs' damages calculation of $38,049,900 were correct (it is not), plaintiffs' requested penalties are almost *twenty-two times* greater than their claimed damages.

578.    **Disproportionate to Revenue and Profit Earned by UPS:** The disproportionate nature of plaintiffs' penalties request is even more astonishing when compared to the revenue UPS made on the shipments at issue:  UPS received only about $5.2 million in revenue from transporting the shipments at issue (DX-601 ¶ 18), but plaintiffs seek penalties in excess of *160 times* that amount. Moreover, UPS's profit from this $5.2 million in revenue was only about $475,000 (*Id.* ¶ 20), or *1,753 times* less than the penalties plaintiffs seek. This plainly "implicate[s] the constitutional limitations on excessive fines." *Zyprexa*, 671 F. Supp. 2d at 462.

579.    Were the Court to follow *Milhem* and *Golden Feather* and award damages based on 2% of UPS's gross revenue, the penalty should not exceed $104,000. Such a penalty would be consistent with the approach courts have taken in the securities context, where the penalty awarded often is equivalent to, or even less than, the amount of ill-gotten gains. *See, e.g., S.E.C. v. Invest Better 2001*, No. 01 Civ. 11427 (BSJ), 2005 WL 2385452, at *4-5 (S.D.N.Y. May 4,

2004) (ordering disgorgement of $1,273,731 and a "flat" civil penalty of $1,273,731 for

violations of §§ 5(a), 5(c) and 17(a) of the Securities Act and § 10(b) of the Exchange Act);

*S.E.C. v. Kane*, No. 97-Civ. 2931 (CBM), 2003 WL 1741293, at *5 (S.D.N.Y. April 1, 2003)

(imposing civil penalties of $200,000 where ill-gotten gains were $575,000). Although the

PACT Act does not have a 2% of revenue penalty option for carriers, nothing prevents the Court

from considering that metric when assessing penalties here, especially since it makes no sense

that UPS should be penalized more harshly than sellers of untaxed cigarettes who are directly

engaged in the sale of cigarettes and from whom the cigarette excise tax can be collected.

### 2. Plaintiffs' Requested Penalties Also Are "Grossly Excessive" Under The Due Process Clause Of The Fifth Amendment.

580.   "Due process prohibits the imposition of a 'grossly excessive' punishment on a

tortfeasor." *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 727-28 (S.D.N.Y.

2014) (quoting *TXO Prods. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454 (1993)); *see also*

*Payne v. Jones*, 711 F.3d 85, 97 (2d Cir. 2013) ("Federal judges may, and should, insist that the

award be sensible and justified by a sound theory of deterrence." (citation omitted)).

581.   Plaintiffs have conceded that punitive damages "are substantively little different

from a penalty claim." (ECF No. 397 at 20.) Courts also view punitive damages and penalties as

being substantively similar. *Compare Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991)

("[P]unitive damages are imposed for purposes of retribution and deterrence") *with Milhelm*,

2012 WL 3579568, at *28 ("Civil penalties also serve the purposes of 'encourag[ing] defendants

to discontinue current violations and deter[ring] them from committing future ones.'").

582.   "Large punitive damages awards . . . implicate constitutional due process

principles." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 164 (2d Cir. 2014). The Supreme

Court has recognized, when analyzing excessiveness under the Due Process Clause, that it makes

sense to consider the "the degree of reprehensibility of the defendant's conduct" and to compare the size of the punitive damages award to the "harm inflicted" and to the civil or criminal penalties that could be imposed for comparable misconduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574, 581, 583 (1996).

583. **_Degree of Reprehensibility._** The Supreme Court has stated that the size of a punitive damages award should reflect "the enormity of [the defendant's] offense." *Day v. Woodworth*, 54 U.S. 363, 371 (1851). Thus, the Court has opined that "some wrongs are more blameworthy than others," such that "trickery and deceit . . . are more reprehensible than negligence." *BMW*, 517 U.S. at 575 (citations and internal quotation marks omitted). None of these "aggravating factors associated with particularly reprehensible conduct is present" here. *Id.*

584. As in *BMW*—which involved allegations that a car maker failed to disclose that cars had been damaged and repainted prior to delivery—the harm allegedly inflicted by UPS on plaintiffs here is "purely economic in nature." *Id.* Unlike in *Milhelm* or *Golden Feather*, UPS did not manufacture, sell, or advertise the cigarettes at issue. Plaintiffs made no serious effort to tie UPS's alleged conduct to any tangible harms beyond lost tax revenue, nor have plaintiffs sought *any* portion of the cost of those supposed harms as compensatory damages here. The *only* harm for which plaintiffs actually have sought compensation is the alleged economic harm caused through non-payment of cigarette excise taxes which, even if proven, is actually quite small, as shown above (*see supra*, COL, § X(C)). As "the record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive," *BMW*, 517 U.S. at 579, plaintiffs cannot show the degree of reprehensibility necessary to award penalties akin to punitive damages.

585.	**_Relationship to Alleged Harm._** In _State Farm_, the Supreme Court vacated an award of $145 million in punitive damages where compensatory damages totaled $1 million. 538 U.S. at 412. In concluding that the punitive damages award was excessive, the Court opined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." _Id._ at 425. The Court noted that it had previously suggested that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," _id._ (citing _Haslip_, 499 U.S. at 23-24), and although this ratio is not binding, the Court stated that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." _Id._ at 425; _see also Turley_, 774 F.3d at 166 (finding that a two-to-one ratio of punitive damages to compensatory damages "constitutes the maximum allowable" punitive damages in that case).

586.	The _State Farm_ Court also opined that "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." _Id._ at 419. Thus, "[w]hen compensatory damages are substantial, then a lesser ratio, _perhaps only equal to compensatory damages_, can reach the outermost limit of the due process guarantee." _Id._ at 425 (emphasis added).

587.	Here, plaintiffs seek $833,577,500 in civil penalties, or almost twenty-two times plaintiffs' claimed compensatory damages of $38,049,900. (Court Ex. 1.) There can be no question that plaintiffs' claimed compensatory damages are substantial and would be so even if the Court adopts the full extent of Dr. Nevo's zero to 5.4% diversion estimate. _See State Farm_,

538 U.S. at 426 (noting that $1 million compensatory award was "substantial"). Plaintiffs'
requested civil penalties are therefore far in excess of an amount that would satisfy constitutional
due process and must be rejected.

588. ***Comparison to Other Similar Cases.*** The final factor to be considered is the
difference between the penalties sought in this case "and the penalties imposed in comparable
cases." *Turley*, 774 F.3d at 165 (citing *BMW*, 517 U.S. at 575).

589. The most comparable cases are *Milhelm* and *Golden Feather*, which, although
they involved actions against smoke shops and not a common carrier, actually awarded penalties.
As shown above (*see supra*, ¶ 575), the courts in *Golden Feather* and *Milhelm* awarded penalties
based on 2% of defendants' gross sales of unstamped cigarettes because the City had
"concede[d]" that there would be "an excessive penalty amount if the per violation measure [of
the PACT Act] were used" to calculate penalties. *Milhelm*, 2012 WL 3579568, at *32; *see also*
*Golden Feather*, 2013 WL 3187049, at *38 (same).

590. A penalty equivalent to 2% of UPS's gross revenue from the transport of the
cigarettes at issue would be $104,000. The $834 million in penalties plaintiffs seek is "excessive
by comparison," *Turley*, 774 F.3d at 166, as it is 8,000 times the comparable penalty implied by
*Milhelm* and *Golden Feather* and, respectively, 160 and 1,753 times the amount of UPS's
revenue and profit on the shipments at issue.

591. In *City of New York v. Gordon*, 155 F. Supp. 3d 411 (S.D.N.Y. 2015), which this
Court recognized was an unopposed motion for summary judgment, *State of New York v. United*
*Parcel Serv., Inc.*, No. 15-cv-1136 (KBF), 2016 WL 4203547, at *7 n.5 (S.D.N.Y. Aug. 9,
2016), the City did not even request penalties from a common carrier that allegedly shipped
cigarettes illegally.

592.     Although UPS does not believe that civil penalties are warranted here, in the

event that the Court decides to award them, plaintiffs' request would have to be drastically

reduced to conform with the requirements of the United States Constitution.

### 3.     The Court Should Also Reject Plaintiffs' Effort To "Stack" Penalties On The Same Alleged Deliveries.

593.     In addition to seeking excessive penalties, plaintiffs also seek to stack penalties

from the PACT Act, N.Y. P.H.L. § 1399-*ll* and the AOD on, by and large, each individual

delivery plaintiffs allege was knowingly made by UPS. The Court should not impose multiple

penalties from different statutes and the AOD on the same package.

594.     New York's appellate courts have repeatedly prevented the State from obtaining

penalties for multiple statutory violations based on the same alleged conduct. In *Matter of L.I.K.*

*Bus. Ventures v. Axelrod, Inc.*, 151 A.D.2d 369 (N.Y. App. Div. 1st Dep't 1989), the First

Department vacated as "arbitrary and capricious" penalties for violations of two different

provisions of the Public Health Law that were based on the same conduct—dispensing a

controlled substance in bad faith. The First Department explained that "[i]n effect, a violation of

any of the provisions of [one section of the statute] constitutes a violation of [the other section of

the statute]. It is clear that there were a total of 397 violations, notwithstanding the fact that each

incident may have violated two sections of the statute, and, therefore, it is arbitrary and

capricious for respondent to, in effect, double the fine by imposing a separate penalty under both

sections." *Id.* at 370. Similarly, in *Matter of Memorial Hospital v. Axelrod*, 118 A.D.2d 938, 941-

42 (N.Y. App. Div. 3d Dep't 1986), the Third Department vacated four penalties assessed under

two sections of the Public Health Law based on two instances of the hospital denying patients

access to a Department of Health representative. *See also Osher v. Univ. of the State of N.Y.*, 162

A.D.2d 849, 850 (N.Y. App. Div. 3d Dep't 1990) ("[S]ince both charges arise out of a single incident, it was improper to impose a penalty on each finding of guilt.").

595.    Plaintiffs should only be able to recover penalties, if at all, once for each delivery under the PACT Act, N.Y. P.H.L. § 1399-*ll*, or the AOD, as applicable, but not under all three.

**G.    Damages And Penalties, If Any, Must Be Limited To Applicable Statutory Limitations Periods.**

596.    Plaintiffs may not recover outside the applicable statutes of limitation for the CCTA, PACT Act, and N.Y. P.H.L. § 1399-*ll* claims. Accordingly, plaintiffs are barred from recovering for any shipments before September 18, 2010, as to their CCTA and PACT Act claims, and before September 18, 2011, as to their N.Y. P.H.L. 1399-*ll* and AOD claims.

597.    **CCTA.** The CCTA does not specify a statute of limitations. However, on December 1, 1990, Congress enacted a four year statute of limitations for civil actions "arising under an Act of Congress enacted" after that date for those civil actions that do not specify a statute of limitations. 28 U.S.C. § 1658 (1990). Although the CCTA was enacted in 1978, it was amended in 2006, which triggers application of 28 U.S.C. § 1658. In *Jones v. R.R. Donnelley & Sons Co.*, the Supreme Court held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990—and therefore is governed" by the four-year limitations period "if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." 541 U.S. 369, 382 (2004). In other words, if an existing law was amended after 1990 giving rise to the claim in question, that claim is governed by the four year statute of limitations set forth in 28 U.S.C. § 1658.

598.    Prior to 2006, neither a state nor a municipality had standing to enforce the provisions of the CCTA; only the United States Attorney General could bring an action under the statute. *See* 18 U.S.C. § 2346(a) (2002) ("The Attorney General . . . shall enforce the provisions

of this chapter"). In 2006, in amending the Patriot Act, Congress amended § 2346 to allow, "[a] state, through its attorney general, a local government, through its chief law enforcement officer" to bring an action in a United States district court under the CCTA. 18 U.S.C. § 2346(b)(1) and (2) (2006). Thus, plaintiffs' CCTA claims are covered by the four year statute of limitations set out under 28 U.S.C. § 1658, because such claims were made possible only by post-1990 amendments to the CCTA. *See Jones*, 541 U.S. at 382.

599.    Where a federal statute "is silent on the issue" of when a cause of action accrues, courts in the Second Circuit have typically applied a "discovery accrual rule" wherein "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148-149 (2d Cir. 2012)). Plaintiffs' CCTA claims thus began to accrue from the date they discovered, or should have discovered, the alleged harm. Since the parties consented to a tolling agreement on July 24, 2014, which was thereafter extended through December 24, 2014, and plaintiffs filed suit on February 18, 2015, plaintiffs may only seek damages under the CCTA for alleged harms that have occurred since September 18, 2010.

600.    **PACT Act.** The PACT Act was enacted in March 2010. Because the PACT Act was enacted after December 1, 1990, it is also governed by the four year statute of limitations provided for by 28 U.S.C. § 1658. Like the CCTA, the PACT Act does not contain an accrual rule and therefore the "discovery accrual rule" applies, whereby "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 125 n. 5 (2d Cir. 2014); *see also LIBOR*, 935 F. Supp. 2d at 697. Therefore, plaintiffs' PACT Act claims began to accrue from the date they discovered, or should

have discovered, the alleged harm, and runs for four years. Since the parties consented to a tolling agreement on July 24, 2014, which was thereafter extended through December 24, 2014, and plaintiffs filed suit on February 18, 2015, plaintiffs may only seek damages and civil penalties for harms that have occurred since September 18, 2010.

601. **N.Y. P.H.L. § 1399-*ll.*** Under New York law, the applicable limitations period for an action to recover upon a liability, penalty, or forfeiture created or imposed by statute is three years. N.Y. C.P.L.R. 214(2). For a claim to fall within the confines of C.P.L.R. 214(2), the statute must impose a liability "'for wrongs not recognized in the common or decisional law.'" *Banca Commerciale Italiana v. N. Tr. Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998) (quoting S*tate v. Stewart's Ice Cream Co.,* 64 N.Y.2d 83, 88 (1984)). Here, plaintiffs' claims against UPS for "knowingly transport[ing] cigarettes" would not exist but for the statute and, therefore, are governed under the three-year limitations period set forth in C.P.L.R. 214(2). *See e.g.*, *Motor Vehicle Acc. Indemnification Corp. v. Aetna Cas. & Sur. Co.*, 89 N.Y.2d 214, 221(1996) ("No-Fault Law does not codify common-law principles; it creates new and independent statutory rights and obligations" and thus is governed by N.Y. C.P.L.R. 214(2)); *Zeides v. Hebrew Home for the Aged at Riverdale, Inc.*, 300 A.D.2d 178, 179 (N.Y. App. Div. 1st Dep't 2002) (plaintiff's cause of action under P.H.L. § 1801-d which confers a private right of action on a patient in a nursing home for injuries sustained as the result of the deprivation of statutorily specified rights, is governed by the three-year period of limitations of N.Y. C.P.L.R. 214(2)).

602. Under New York law, a cause of action accrues for statute of limitations' purposes "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court." *Motor Vehicle Accident Indemnification Corp.*, 89

N.Y.2d at 221 (quoting *Aetna Life & Cas. Co. v. Nelson*, 67 N.Y.2d 169, 175, 492 N.E.2d 386

(1986)). Therefore, the statute of limitations for N.Y. P.H.L. §1399-*ll* began to run after each

alleged delivery was completed. Since the parties consented to a tolling agreement on July 24,

2014, which was thereafter extended through December 24, 2014, and filed suit on February 18,

2015, plaintiffs may only bring a cause of action under N.Y. P.H.L. § 1399-*ll* for deliveries that

occurred after September 18, 2011.

603.    **AOD:**  The AOD does not specify an applicable statute of limitations. The

relevant provision of New York Executive Law authorizing the attorney general to enter into

assurances of discontinuance also does not specify an applicable statute of limitations. N.Y.

Exec. L. § 63(15). Because a violation of the AOD is synonymous with a violation of the

underlying laws—N.Y. P.H.L. § 1399-*ll* and N.Y. Exec. L. § 63(12)—the three-year statute of

limitations for those underlying laws applies to the AOD.

604.    N.Y. Exec. L. § 63(15) provides that "[e]vidence of a violation of such assurance

shall constitute prima facie proof of violation of the applicable law in any civil action or

proceeding thereafter commenced by the attorney general." This language has also been

incorporated into the AOD itself, which provides:

> Pursuant to EL § 63(15), evidence of a violation of this Assurance
> of Discontinuance that involves the shipment of Cigarettes to an
> Individual Consumer within the State of New York shall also
> constitute *prima facie* proof of a violation of PHL § 1399-*ll*(2) in
> any civil action or proceeding that the Attorney General hereafter
> commences against UPS for violation of PHL § 1399-*ll*(2).

(DX-23 ¶ 43.)

605.    As noted above, the applicable limitations period for an action to recover upon a

liability, penalty, or forfeiture created or imposed by statute is three years. N.Y. C.P.L.R. 214(2).

The parties consented to a tolling agreement on July 24, 2014, which was thereafter extended

through December 24, 2014. Plaintiffs then filed suit on February 18, 2015. Thus, plaintiffs are

barred from recovering under the AOD for any shipments before September 18, 2011.

## **CONCLUSION**

Thus, based on the facts introduced at trial, and the legal principles governing plaintiffs'

claims, plaintiffs failed to satisfy their burden of proof on any of their claims. Judgment should

be issued for UPS on all of plaintiffs' claims.

At the very least, even if the Court finds that UPS is liable under some theory of relief,

plaintiffs failed to present any evidence showing that they are entitled to any damages, penalties,

or injunctive relief..

Dated: New York, New York        By: ___/s/ Carrie H. Cohen___
       October 24, 2016


Paul T. Friedman (Admitted *Pro Hac Vice*)      Carrie H. Cohen
Ruth N. Borenstein (Admitted *Pro Hac Vice*)    Jamie A. Levitt
MORRISON & FOERSTER LLP           Mark David McPherson
425 Market Street                          MORRISON & FOERSTER LLP
San Francisco, CA 94105              250 West 55th Street
Telephone: (415) 268-7000          New York, NY 10019
PFriedman@mofo.com                Telephone: (212) 468-8000
RBorenstein@mofo.com             CCohen@mofo.com
                                     JLevitt@mofo.com
                                     MMcPherson@mofo.com


Gregory B. Koltun (Admitted *Pro Hac Vice*)    Deanne E. Maynard (Admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP           MORRISON & FOERSTER LLP
707 Wilshire Boulevard               2000 Pennsylvania Avenue, NW
Los Angeles, CA 90017-3543         Suite 6000
Telephone: (213) 892-5200          Washington, DC 20006-1888
GKoltun@mofo.com                  Telephone: (202) 887-1500
                                     DMaynard@mofo.com

                                     *Attorneys for Defendant*
                                     United Parcel Service, Inc.