UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

THE STATE OF NEW YORK and THE CITY
OF NEW YORK,

                               Plaintiffs,       Case No. 1:15-CV-01136-KBF

              -against-

UNITED PARCEL SERVICE, INC.,

                              Defendant.

------------------------------------------------------------- x


### PLAINTIFFS STATE OF NEW YORK AND CITY OF NEW YORK'S REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' SECOND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
120 Broadway, 3rd Floor
New York, New York 10271
Tel.: 212-416-6389


ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street, Room 20-99
New York, New York 10007
Tel.: 212-356-2032

# TABLE OF CONTENTS

PAGES

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ........................................................................iii

INTRODUCTION .........................................................................................1

ARGUMENT ................................................................................................1

    I.     THE EVIDENCE DEMONSTRATES UPS'S CONTINUED
          VIOLATION OF THE LAW AND THE AOD, AND UPS
          ARGUMENTS FAIL TO REFUTE THIS CONCLUSION1

        A.   UPS's Efforts to Escape Liability Under the AOD
            should be Denied. ............................................................1

           1.  UPS Cannot Disclaim the Objective Negligence
               Standard Agree to in the AOD........................................2

           2.  UPS Cannot Limit the Reach of AOD Penalties to Instances Where
               it Was Caught Actually and Knowingly Shipping Cigarettes ........3

        B.   UPS's Knowledge Has Been Established.........................................4

           1.  UPS's Knowledge as to Certain Shipper Groups ..........................4

            a.  The Native Wholesale Supply Group............................................4

            b.  The Arrowhawk Group ................................................................5

           2.  UPS is Bound By Its Employees' Knowledge...............................10

        C.   UPS's Approach to Audits Demonstrates its Indifference
            to Compliance.................................................................................11

        D.   UPS's Belief That Little Cigars Exploded In Popularity As
            Compared To Cigarettes Is Unsupported By The Evidence...........13

        E.   UPS'S Interpretation of the CCTA Has No Merit.........................14

        F.   UPS's PACT Act Arguments Also Fail.........................................14

           1.  UPS is Not Entitled to the PACT Act Exemption .........................14

2.   UPS Violated The PACT Act ........................................................15

3.   There Is No Impermissible Retroactivity In The Loss Of The PACT Act Exemption ..............................................................................16

4.   The PACT Act permits the City to Enforce PHL 1399-*ll*...............*17*

5.   UPS's Potsdam Shipments Violate PHL § 1399-*ll*.........................*18*

II.   PLAINTIFFS' REQUESTED DAMAGES AND PENALTIES ARE APPROPRIATELY IMPOSED ON UPS. ....................................................19

A.   UPS's Damages Arguments are Meritless .......................................19

B.   UPS's Penalties Arguments Are Also Meritless .............................19

1.   Employee Acts and Knowledge Are Appropriate Bases for Civil Penalties .................................................................................19

2.   UPS's Conduct Was Reprehensible and the Penalties Are Proportional to the Harm ............................................................*20*

3.   UPS's Due Process Argument Fails ...........................................23

4.   Penalties May be Assessed Under Each Statute Independently and Awarded Cumulatively ........................................................23

III.   UPS'S Statute of Limitations Arguments Fails.............................................24

A.   CCTA and PACT Act ..................................................................24

B.   PHL§1399-*ll* ...............................................................................24

C.   AOD ..............................................................................................25

CONCLUSION   ....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Advance Pharm., Inc. v. United States,*
    391 F.3d 377 (2d Cir. 2004)...............................................................21

*Apollo Fuel Oil v. United States,*
    195 F.3d 74 (2d Cir. 1999)...............................................................20

*Bates v. United States,*
    522 U.S. 23 (1997)...............................................................18

*BMW of N. Am. v. Gore,*
    517 U.S. 559 (1996)...............................................................22

*Cedar Bluff 24-Hour Towing, Inc. v. City of Knoxville,*
    78 F. Supp. 2d 725 (E.D. Tenn. 1999)...............................................................18

*City of New York v. Chavez,*
    944 F. Supp. 2d 260 (S.D.N.Y. 2013) (Forrest, J.)...............................................................14

*City of New York v. Gordon,*
    155 F. Supp. 3d 411 (S.D.N.Y. 2015)...............................................................14

*City v. Golden Feather Smoke Shop, Inc.,*
    2009 U.S. Dist. LEXIS 76306 (E.D.N.Y. Aug. 25, 2009)...............................................................20

*Consol. Edison Co. of N.Y., Inc. v. United States,*
    221 F.3d (2d Cir. 2000)...............................................................20

*Ellett Bros. v. U.S. Fid. & Guar. Co.,*
    275, F.3d 384, 388 (4th Cir. 2001)...............................................................19

*Environmental Encapsulating Corp. v. City of New York,*
    855 F.2d 48 (2d Cir. 1988), ECF. No. 492...............................................................18

*In re Methyl Tertiary Butyl Ether "MTBE" Products Liab. Litig.,*
    2013 U.S. Dist. LEXIS 181837 (S.D.N.Y. Dec. 30, 2013)...............................................................5

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1994)...............................................................17

*New York v. UPS,*
    160 F. Supp. 3d 629 (S.D.N.Y. 2016)...............................................................25

iii

*New York v. UPS*,
    2016 U.S. Dist. LEXIS 52289 (S.D.N.Y. Apr. 19, 2016)......................................21

*New York v. UPS*,
    2016 U.S. Dist. LEXIS 77217 (S.D.N.Y. June 10, 2016)......................................16

*Ohio Mfrs' Ass'n v. Akron*,
    801 F.2d 824 (6th Cir.1986) ......................................................................................18

*People v Trump*,
    137 A.D.3d 409 (1st Dep't 2016) ............................................................................25

*Riss & Co. v. United States*,
    262 F.2d 245 (8th Cir. 1958) ....................................................................................20

*S.E.C. v. Symbol Tech.*,
    Case No. CV-04-2276 (SJF)(WDW) (E.D.N.Y. Mar. 11, 2010)
    (Order, ECF No. 204) ................................................................................................19

*Sash v. Zenk*,
    439 F.3d 61 (2d Cir. 2006)........................................................................................23

*SEC v. Invest Better 2001*,
    2005 U.S. Dist. LEXIS 34654 (S.D.N.Y. Apr. 29, 2005)..................................21, 22

*Stampf v. Long Island R.R.*,
    761 F.3d 192 (2d Cir. 2014)......................................................................................21

*Steere Tank Lines, Inc. v. United States*,
    330 F.2d 719 (5th Cir. 1964) ....................................................................................20

*United States v. Bank of New England*,
    821 F.2d 844 (1st Cir. 1987)................................................................................15, 16

*United States v. Domino Sugar Corp.*,
    349 F.3d 84 (2d Cir. 2003)........................................................................................24

*United States v. Elshenawy*,
    801 F.2d 856 (6th Cir. 1986) ....................................................................................14

*United States v. Int'l Minerals & Chem. Corp.*,
    402 U.S. 588 (1971)......................................................................................15, 18, 19

*United States v. Livecchi*,
    711 F.3d 345 (2d Cir. 2013)......................................................................................24

*United States v. Sawyer Transport, Inc.*,
    337 F. Supp. 29 (D. Minn.1971) ................................................................... 20-21

*United States v. T.I.M.E.-D.C., Inc.*,
    381 F. Supp. 730 (W.D. Va. 1974) ..............................................................16, 20

*United States v. Watts*,
    519 U.S. 148 (1997) ...............................................................................................22

**FEDERAL STATUTES**

15 U.S.C.
    § 376a....................................................................................................................17, 18
    § 377(B)(3)(ii)......................................................................................................20, 23

18 U.S.C.
    § 2346 (b)(1) ........................................................................................................20, 23

**STATE STATUTES**

New York Executive Law
    § 63(12)....................................................................................................................25

**RULES**

CPLR 213(1)...................................................................................................................25

CPLR 214(2)...................................................................................................................25

Fed. R. Civ. P. 26(a)(1)(A)(iii) .....................................................................................19

**MISCELLANEOUS AUTHORITIES**

http://www.smokes-spirits.com/discount/Opal_Cigarettes.html;
    http://www.smokes-
    spirits.com/StoreDetails.aspx/Cigarettes/Opal+Cigarettes/opt/store/2/category/
    1382.........................................................................................................................5

https://web.archive.org/web/20070418060645/http://www.nativewholesalesupply.
    com/nws.htm (Apr. 18, 2007 website capture, identifying Native Wholesale
    Supply as "the exclusive importer / distributor of the Seneca brand
    cigarettes") ............................................................................................................5

Internet Archive, Wayback Machine, last visited Oct. 30, 2016,
    https://web.archive.org/web/20070330183214/http://www.nativewholesalesup
    ply.com/opal.htm ...................................................................................................5

Website capture, identifying "Opal brand cigarettes from
www.nativewholesalesupply.com);
https://web.archive.org/web/20070418060841/http://www.nativewholesalesup
ply.com/contact.htm (Apr. 18, 2007 website capture, identifying contact
information and address as being Native Wholesale Supply, Seneca Nation
Territory, VIA PO Box 214, Gowanda, NY 14070—the same address as
identified by UPS's files, *see DX* 41, at UPS 92359) ............................................................5

# INTRODUCTION[1]

The strongest argument in favor of the substantial penalties, damages and injunctive relief sought here is United Parcel Service, Inc.'s Post-Trial Brief (ECF No. 492), which displays the same willful blindness to the compliance failures and harms that were the original basis for this action. UPS continues to defend a compliance program that delivered 300 tons of contraband cigarettes to New York consumers, and untold amounts nationwide. To again leave the public health and tax bases of the State and City in the hands of corporate policy-makers more intent on squeezing a dime out of a trivial tobacco market than on genuine compliance efforts would be to "fool me twice." UPS must be required to pay in full for the significant injuries it caused, and remain under a monitor's eye to assure that conduct is not repeated.

## ARGUMENT

## I. THE EVIDENCE DEMONSTRATES UPS'S CONTINUED VIOLATION OF THE LAW AND THE AOD, AND UPS'S ARGUMENTS FAIL TO REFUTE THIS CONCLUSION.

### A. UPS's Efforts to Escape Liability Under the AOD Should Be Denied.

UPS's attempt to escape its obligations under the AOD through legal argument fails for two broad reasons.  First, UPS contends that despite the AOD's plain language, the agreement does not impose an objective negligence test for liability resulting from shipments for suspected cigarette shippers, an interpretation that would render the AOD as nothing more than a superfluous restatement of PHL§ 1399-*ll*.  Second, and again despite the plain language of the agreement ruling out such an interpretation, UPS contends that the State can only recover penalties with respect to cigarette shipments for which UPS is actually caught in-the-act, and that

---

[1] United Parcel Service, Inc.'s Post-Trial Brief of Proposed Findings of Fact and Conclusions of Law is cited as "ECF No. 492." Plaintiffs' Second Proposed Findings of Fact and Conclusions of Law is cited as "ECF No. 491." The trial transcript is cited as "Tr."

all of the other detailed and logically-interconnected requirements of the AOD cannot give rise to penalties.  In both instances, UPS's vision of the AOD requires the Court to ignore the overall purpose of the agreement and treat numerous provisions as nonsensical surplusage.

### 1.  UPS Cannot Disclaim the Objective Negligence Standard Agreed to in the AOD.

UPS's primary argument against AOD liability would neuter the agreement by eliminating the objective negligence standard imposed by its plain language.  UPS contends that instead of lowering the State's burden of proof, the AOD merely restates UPS's obligations to avoid "knowing" shipments of cigarettes on behalf of cigarette dealers under PHL § 1399-*ll*.  But the interpretive gymnastics required to present this argument demonstrate its incoherence, and a step back from the violence UPS does to individual AOD provisions reveals that this view, if adopted, would render the agreement effectively meaningless.

The touchstone, and also the undoing, of UPS's argument is the penalty provision in Paragraph 42 of the AOD.  UPS argues that because this provision references "Prohibited Shipments," and because Prohibited Shipments are defined as those that would violate PHL § 1399-*ll*, the only shipments that can be held to be violations of the AOD are those the State can prove UPS actually knew contained cigarettes.  ECF No. 492, ¶¶ 265-269.[2]  But this nullifies the language in Paragraph 42 of the AOD, imposing liability on UPS where it had "reason to know" shipments contained cigarettes, transforming that paragraph into a prohibition against UPS shipping only when it had a "reason to know" that it "actually knew" of the shipments' contents, an unsustainable contradiction in terms.  It would also read out of the agreement the separate

---

[2]When interpreted in light of the contents of PHL § 1399-*ll* and the other provisions of the AOD reviewed below, it is obvious that the reference in the definition of "Prohibited Shipment" to that statute is to the characteristics of illegal shipments described in PHL § 1399-*ll* (1), *not* to the knowledge standard of PHL § 1399-*ll* (2), which is expressly replaced by the objective negligence standard imposed by the AOD.

imposition of the objective-negligence standard imposed in other provisions of the AOD, such as the audit requirement (*DX* 23, ¶ 24) and the successor-entity discipline requirement (*DX* 23, ¶ 31).  In the end, UPS's interpretation of the AOD would transform that agreement – for which the State gave up civil enforcement of alleged past violations – into a useless and independently-unenforceable restatement of PHL § 1399-*ll*, not the comprehensive mandatory compliance program and strict liability regime the AOD facially imposes.

### 2. UPS Cannot Limit the Reach of AOD Penalties to Instances Where it Was Caught Actually and Knowingly Shipping Cigarettes.

UPS separately contends that the AOD does not impose any penalties at all for any violations of its terms other than instances where UPS is actually caught knowingly shipping cigarettes, and that for any other breaches, the State is limited to money damages based on contract principles.  ECF No. 492, ¶¶ 257-262. This argument makes even less sense than UPS's attempt to escape the AOD's objective negligence standard.

For one thing, there is no basis in the text for such a distinction, and indeed, Paragraph 42 expressly states that penalties apply to "each and every" violation of the AOD's terms, and then includes an objective-negligence-based savings clause for the specific subset of violations in which UPS is caught in the act shipping cigarettes. There is no language in the AOD even hinting at the idea that "each and every" really means "only these," or establishing the two-tiered system of remedies UPS now invents to escape the consequences of its total compliance failure.

Moreover, as established in Plaintiffs' proposed findings of fact and conclusions of law, the AOD's comprehensive compliance system, which relies heavily for practical effect on its various audit requirements, was intended to provide the State with an effective remedy in the eventuality—fully realized in this case—that UPS failed in its additional compliance obligations

on a large scale, and allowed massive volumes of shipments to be made for entities UPS had "reason to believe" may have been shipping cigarettes.   The AOD, when viewed as a whole, did provide the State with some additional benefit in connection with cases where UPS was caught in the act.   But the bulk of its provisions, and the mechanism it created, are directed at ensuring that UPS's *unseen* shipments do not contain cigarettes bound for unauthorized recipients.   The penalty provision, likewise, is primarily aimed at compensating the State and penalizing UPS when it turns out, as here, that UPS's negligence in *not* inspecting a large volume of shipments from suspected cigarette dealers, and properly recording the results, hinders the State from later obtaining the evidence of the shipments' contents. UPS's contrary interpretation limiting the reach of penalties, like its attempted elimination of the objective-negligence standard, flies in the face of the agreement as a whole and its self-evident purpose, and must be rejected.

**B.  UPS's Knowledge Has Been Established.**

UPS relies so heavily on misrepresentations of the evidence that Plaintiffs can capture only some exemplars of the distortions.[3]

**1.  UPS's Knowledge as to Certain Shipper Groups.**

**a.  The Native Wholesale Supply Group**

---

[3] For example, UPS driver Candace Sheridan did not testify that she was informed of "ongoing ***criminal*** investigation" (ECF No. 492, ¶ 91) (emphasis added), only that certain shipments were under investigation. *Sheridan Dep. Tr.* 44: 16 – 21.  Nor was Sheridan assured that UPS had appropriately escalated the issue (ECF No. 492, ¶ 91)—when told to "continue picking up at these locations," she expressed discomfort and asked not to work the Indian Reservation Routes. *Sheridan Dep. Tr.* 45:2 – 25.   UPS's describes her as testifying that the Potsdam shippers Mohawk Spring Water and Jacobs Tobacco shipped only to "retailers on other Indian reservations, which was permissible at the time of the shipments" (ECF No. 492, ¶ 354), but she in fact testified that boxes went "to different states, like New York, Wisconsin, Illinois, … " and that she did not believe shipments went to reservations only.  *Sheridan Dep. Tr.* 46:20-47:15.   UPS's cited evidence to support an assertion that Smokes & Spirits Bob Oldro had an interest in New York's little cigar market (ECF No. 492, ¶ 135), makes no mention of "cigars," let alone "little cigars."  *See id.* (citing *DX* 526, "In Person Visit Details" sheet, line 3257).   UPS contends that it "informed the City about packages that contained cigarettes, ECF No. 492, ¶ 51.a, but in reality it did so only when packages broke open in UPS stores.  *Grayson Dep. Tr.* 33:8–16; 52:6–21.

UPS contends that its destruction of 156 cases of "Opals" were not cigarettes. ECF No. 492, ¶ 145; *but see* ECF No. 491, at ¶¶ 523–26 (identifying UPS documents confirming the requested destruction of "cigarettes"), but website captures from the Internet Archive show Opals to be cigarettes distributed by Native Wholesale Supply.[4] *In re Methyl Tertiary Butyl Ether "MTBE" Products Liab. Litig.*, 2013 U.S. Dist. LEXIS 181837, at *16–17 n.65 (S.D.N.Y. Dec. 30, 2013) (judicial notice of Internet archive is appropriate, citing cases).

### b.  The Arrowhawk Group

UPS's assertions concerning Arrowhawk are untethered to the record. ECF No. 492, ¶¶ 292, 353.a.  UPS had reason to believe from inception that these accounts were cigarette shippers: Mr. Christ, who Mr. DelBello knew had connections to cigarette businesses, asked to ship cigarettes. *PX* 335; ECF No. 491, ¶ 575.  DelBello spoke with Mr. Fink about Christ's request to ship cigarettes. One month later, DelBello then met with Mr. Christ about an account DelBello says shipped cigars. *See generally* ECF No. 491, ¶¶ 574-91. Two Pine dropped packages off at a UPS store. *DX* 529; *Delbello Direct Test.* ¶ 36, *DX* 604. UPS claims that Two Pine's "drop shipping made it such that the account "could not be audited."  ECF No. 492, ¶ 292. None of the cites following that statement support it, and not only does UPS offer no reason that the packages could not be audited, but UPS center supervisor Debra Blauvelt testified that she *did* conduct such audits.  *DX* 609, ¶¶ 18-20.

---

[4]    *See* Internet Archive, Wayback Machine, last visited Oct. 30, 2016, https://web.archive.org/web/20070330183214/http://www.nativewholesalesupply.com/opal.htm (Apr. 18, 2007 website capture, identifying "Opal brand cigarettes" from www.nativewholesalesupply.com); https://web.archive.org/web/20070418060841/http://www.nativewholesalesupply.com/contact.htm (Apr. 18, 2007 website capture, identifying contact information and address as being Native Wholesale Supply, Seneca Nation Territory, VIA PO Box 214, Gowanda, NY 14070—the same address as identified by UPS's files, *see DX* 41, at UPS 92359); https://web.archive.org/web/20070418060645/http://www.nativewholesalesupply.com/nws.htm (Apr. 18, 2007 website capture, identifying Native Wholesale Supply as "the exclusive importer / distributor of the Seneca brand cigarettes").   *See also* http://www.smokes-spirits.com/discount/Opal_Cigarettes.html; http://www.smokes-spirits.com/StoreDetails.aspx/Cigarettes/Opal+Cigarettes/opt/store/2/category/1382.

UPS asserts its employees were told that the Arrowhawk group shipped cigars, ECF No. 492, ¶ 180, 353, but none of the cited testimony supports the point that these employees were told that Arrowhawk only or even primarily shipped cigars. Despite arguing that drivers cannot provide corporate knowledge, *see, e.g.*, ECF No. 492, ¶ 369, UPS relies on driver knowledge when it suits its purposes, *i.e.*, "Christ told Guarino of little cigar shipments." ECF No. 492, ¶ 193. Despite his initial assertion to the Court, *Tr.* 1349:14-16, Guarino admitted knowing that the Arrowhawk entities did not ship exclusively little cigars. *Guarino Direct Test.* ¶ 10, *DX* 607; *Tr.* 1349:11:23. Implementing UPS's willful blindness policy, Guarino supposedly never asked Christ or Ubelhoer if they also shipped cigarettes, *Tr.* 1349:21-1350:3, 1350:8-10.

After Christ told DelBello he wanted to ship cigarettes, DelBello checked with his supervisor and another "account representative" to "confirm[]" UPS's Tobacco Policy. ECF No. 492, ¶ 183. That "account representative" was Fink. *Tr.* 884:10-885:16. One month later, DelBello met with and purportedly told Christ that UPS could only ship cigars, ECF No. 492, ¶ 184, but did not ask Christ to sign a tobacco agreement, which would have served as evidence of what he actually told Mr. Christ. *Tr.* 837:23-840:1, 840:5-841:1.

Although UPS asserts that Christ told Keith that he shipped cigars, ECF No. 492, ¶188, Mr. Keith's declaration provides no date for that conversation, *see id.* (citing *Keith Direct Test.* ¶ 26, *DX* 603), and the "contemporaneous notes" UPS cites are not from the inception of any account, but are from October 2013, *see* ECF No. 492, ¶¶ 190, 215, *after the City sent UPS the draft complaint for this matter identifying Seneca Cigars as a cigarette shipper. Cook Direct Test.* ¶ 113, *DX* 600; *DX* 511 ("I also let him know that I needed to speak with him about the product clarification we discussed yesterday."). This October 2013 "product clarification," after

UPS was facing litigation, *was the first time Keith ever asked Phil Christ if he shipped cigarettes*. *Tr.* 751:7-752:8 (Keith).

UPS states that "Mr. Keith was aware that the company *sold* cigarettes but was assured by Mr. Christ, and believed, that the companies would only use UPS to *ship* cigars." ECF No. 492, ¶ 189.  This position is untenable on its face.  Keith visited a mail order tobacco website, indicating that all of the products on that site, including the cigarettes, would be shipped to consumers.  Keith's notes for the Seneca Cigarettes/Cigars and Hillview Cigars accounts indicated that "100% of outbound shipments go via UPS. The majority of shipments go to Residential customers via ground service." *PX* 95; *Tr.* 738:13-15 (Keith). Keith's noted that UPS was Seneca/Hillview's "sole carrier." *DX* 511. UPS knew that "100%" of the outbound shipments for a website that sold cigarettes went via UPS. *PX* 95; *Tr.* 738:13-15 (Keith).  UPS knew that it was the "sole carrier" for a website that sold cigarettes.  *DX* 511.  These facts alone show that UPS's contention that it did not know it was shipping cigarettes is not credible, but more significantly, that UPS had a reasonable basis to believe the Arrowhawk group "may" have been shipping cigarettes and should have been audited.

UPS never challenges the credibility of Mr. Christ's testimony that the Arrowhawk entities shipped unstamped cigarettes through UPS, *see, e.g.*, *Tr.* 912:20-915:12, no doubt because the controlled buys by the Sheriff's Office, the invoices admitted in *PX* 8, and the results when UPS finally conducted an audit all corroborate Mr. Christ. *Cook Direct Test.* ¶116, *DX* 600; *Kokeas Direct Test.* ¶¶ 9-11, *PX* 702; *PX* 8-B; *PX* 40; *PX* 43; *Monell Dep. Tr.* 35:16-25; 10:4-14 (Seneca Cigars shipped cigarettes via UPS).  UPS argues that Mr. Christ never testified as to Native Gifts.  ECF No. 492, ¶¶ 202, 353.b.  Christ was asked, however "Did you ever help another business set up a UPS account <u>to ship cigarettes</u>?"  He answered yes and provided the

name as "Seneca Gift, I believe it was." *Tr.* 953:15-19. UPS account information shows that account was Native Gifts. *Delbello Direct Test.* ¶¶ 44-49, *DX* 604; *Keith Direct Test.* ¶¶ 40-47, *DX* 603; *DX* 215; *PX* 154.

UPS implies that Mr. Christ was being deceptive by opening companies "with the word 'cigars' in the title." ECF No. 492, ¶ 185. But Ryan Keith visited the website for "Hillview Cigars" and "Seneca Cigars" at www.seneca**cigarettes**.com, *PX* 95 (emphasis added); *Tr.* 737:20-26, and communicated with these purported "cigar" accounts through seneca**cigarettes**@gmail.com. *PX* 149 (emphasis added); *Tr.* 757:13-22. Nothing UPS offers to impugn Mr. Christ's credibility justifies that conclusion. Furthermore—

- UPS is hardly in a position to refer to Mr. Christ's indictment for cigarette trafficking, when it continued to service his accounts <u>after</u> this indictment. ECF No. 492, ¶ 213. *Compare Tr.* 1016:3-5, *with Cook Direct Test.* ¶¶ 113-17, *DX* 600. Christ received a recommendation of probation on September 8, 2015, *PX* 625; *Tr.* 1119:1-11, 1120:1-5, a month before Christ first met with the City and learned about this lawsuit, *Tr.* 1026:12-15, 1034:12-21, 1072:22-25, and neither the City nor the State have promised Christ anything in exchange for testifying in this case.

- UPS cites the Court's observations about Mr. Christ for precisely the purpose the Court said they were inapplicable to—his credibility as a truthteller. ECF No. 492, ¶ 214. The Court followed the statements that UPS quotes by saying, "[t]hat does not mean that he's not attempting to tell the truth, it does not mean that his testimony is untruthful." *Tr.* 982:20-22.

- UPS states that Mr. Christ should not be believed because he forgot the whole name of "Seneca Cigars." ECF No. 492, ¶ 215. The first time anyone mentioned the name, however, Mr. Christ said that it was correct. *Tr.* 1007:10-13. This is also consistent with the fact that Mr. Christ incorrectly identified Native Gifts' whole name. *Compare Tr.* 953:15-19 (stating that Christ believed it was "Seneca Gifts"), *with Delbello Direct Test.* ¶¶ 44-49, *DX* 604; *Keith Direct Test.* ¶¶ 40-47, *DX* 603; *DX* 215; *PX* 154 (showing that it was "Native Gifts").

- UPS argues that Mr. Christ knew that he could not ship cigarettes through UPS because he received tobacco agreements. ECF No. 492, ¶ 216. That is hardly the point, and

exemplifies UPS's attempt to foist compliance on shippers. The AOD requires more than "Trust, But Don't Verify."[5]

- UPS states without any citation that it is implausible that packages could travel through the UPS system while open.  ECF No. 492, ¶ 217.  Christ testified, however, not that the packages were open, but rather that the way they were resealed, the contents were "exposed."  *Tr.* 944:10-19 (Christ).

- UPS asserts that purported inconsistencies between Mr. Christ's testimony and Mr. Guarino's testimony indicate that Mr. Christ's testimony is not credible. ECF No. 492, ¶ 218; *see also* ¶ 192.  This is inaccurate for several reasons.  First, the fact that Guarino came into the warehouse to pick up packages is corroborated by Guarino's testimony. *Tr.* 939:7-17 (Christ); 1345:14-22 (Guarino).  Second, the fact that Guarino could see the interior of the warehouse is corroborated by Guarino's testimony that he could see at least pallets of packages to be loaded and the table that Phil Christ used to pack boxes. *Tr.* 1347:5-8; 18-23 (Guarino).  Third, UPS cites Guarino's direct testimony, *Guarino Direct Test.* ¶ 11, *DX* 607, for the proposition that he did not have time to wait for boxes to be packed or labeled.  Guarino admitted on the stand, however, that he sometimes arrived before all of the packages were packed and began loading those that were. *Tr.* 1343:11-16 (Guarino).  The only actual differences in this testimony are that Phil Christ said that the boxes that Guarino could see were clearly boxes of cigarettes and that the boxes that Guarino saw him packing were the same. *Tr.* 940:3-14; 944:14-19 (Christ); *Tr.* 944:4-7; 944:7-10 (Christ).

- UPS infers that because Mr. Christ did not retain any of the labels that were shipped with PACT Act labels and that two boxes shipped did not have them, none of the boxes could have had such labels.  ECF No. 492, ¶ 219.   In reality, Christ testified that the Arrowhawk entities also printed the PACT Act warning on "[a] portion of the labels." *Tr.* 924:2-925:1; 1073:1-7, 10 (Christ).

- UPS contends that Christ's testimony is incredible because he testified inconsistently about the box sizes Arrowhawk used.  ECF No. 492, ¶ 220.  However, Christ only testified inconsistently about one box size.  Christ consistently testified that there was a box for six cartons or less of cigarettes, *Tr.* 929:3-20, 930:11-25, 1114:25-1115:18, 1117:10-1118:3, and Christ consistently testified that there was a box for 10-12 cartons. *Tr.* 929:3-20, 930:11-25, 1114:25-1115:18, 1117:10-1118:3. A purported inconsistency over a detail is not a reflection on truth-telling.

- UPS again challenges the admission of *PX* 8, ECF No. 492, ¶¶ 221-24; *see also* ¶ 353.f, which has already been admitted into evidence even if certain pages of it were not.  As the Court stated, Mr. Christ's testimony "was credible with regard to how the sub-

---

[5] The tobacco agreement itself is two pages of single-spaced verbiage that does not mention the word "cigarette," which is listed separately in Addendum A.  *PX* 154. UPS did not dispute Christ's testimony that no one from UPS reviewed the tobacco agreement with him.  *Tr.* 954:11-13.

categories of documents were created and maintained at Arrowhawk." Order of October 4, 2016, ECF No. 462, at 4. The Court has already overruled UPS's objection to the admissibility of particular types of documents contained in *PX* 8. *Id.* at 5.

- UPS asserts without support that Phil Christ was deceiving UPS to cover his illegal activity. ECF No. 492, ¶ 225; *see also* ¶ 353.g. What UPS has established is that Phil Christ knew that shipping cigarettes from the reservation was illegal at the time of his deposition. *Tr.* 1111:4-21 ("right now, because it's illegal"). UPS never asked Mr. Christ when he learned that it was illegal to ship cigarettes from the reservation, and DelBello knew that at the time period relevant to this case, Mr. Christ believed doing so was legal. *Tr.* 884:3-18 (DelBello).

In sum, UPS repeatedly attacks Plaintiffs' witnesses' credibility, but the greatest credibility concern in this case, already noted by the Court, *Tr.* 1717:7-1718:14, arises because every single UPS witness appearing in this case has a powerful motive to dissemble. Just as a UPS employee "would risk his job and his pension by allowing … accounts to ship cigarettes in violation of UPS policy," ECF No. 492, ¶¶ 73, 209, those same employees can realistically believe that the same fate will befall them by testifying truthfully about those violations now. [6]

### 2. UPS is Bound By Its Employees' Knowledge.

UPS recognizes that it can "be held liable for the acts of employees or agents acting within the scope of their authority and for the benefit of the employer," (ECF No. 492, ¶ 364) but then seeks blanket immunity from *respondeat superior* by positing the false syllogism that an act

---

[6] By contrast none of Plaintiffs' witnesses had anything to gain by their testimony. Certainly none are "cooperating witnesses" in the usual sense of that term. Jacobs and Oliver were sentenced long ago, and have even completed probation. *Tr.* 1156:17 – 1157:1, *Tr.* 1158: 4 – 9 (Oliver). *Tr.* 1688:2 – 25; 1689:22 – 1690:10 (Jacobs); *PX* 633; *Tr.* 1691:12-17; *Tr.* 1689:22 – 1690:10. Mr. Christ knows his sentence, of probation. They all benefitted from whatever cooperation they provided long before Plaintiffs approached them. Jacobs made no reference to her assistance in this case when she requested early release from probation. *PX* 632.

Phil Christ, Rosalie Jacobs, and Robert Oliver, none of whom knew one another, corroborate one another in that they each shipped cigarettes through UPS, unimpeded by any compliance measures. *PX* 49; ECF. No. 491, ¶¶ 794, 925, 926. Each of them testified that UPS knew that cigarettes were being shipped, *Tr.* 1138:17-1139:6, 1141:4-21, 1143:17-1145:4 (Oliver); *Tr.* 1680:5-22, 1681:8- 20 (Jacobs); *PX* 57; *Tr.* 936:19-938:15, 938:25-939:17, 940:3-14, 944:2-19 (Christ). and at least for Jacobs and Oliver, UPS witnesses corroborated that testimony, ECF. No. 491, ¶¶ 98-100, 104-06, 111, 112, as do UPS shipping records produced to federal prosecutors.

contrary to corporate policy cannot be for the benefit of the corporation. UPS in any event then hoists itself on its own petard by noting "[a]n agent's acts are within the scope of his actual authority if it [sic] . . . is actuated, at least in part, by a purpose to serve the master." ECF No. 492, ¶ 364. The employee acts at issue here were certainly *in part* to serve UPS's purposes, *e.g.*, in serving the little cigar market, and gained UPS revenue and hence knowledge. Some employees even acted in conformity with UPS policy and informed the corporation of its cigarette shipments cigarettes. ECF No. 491, at 28-30. Surely that knowledge, at least, is UPS's knowledge, even if UPS chose not to act on it.

### C.  UPS's Approach to Audits Demonstrates its Indifference to Compliance.

The UPS attitude toward audits exemplifies its failure to embrace its obligations agreed to under the AOD and its disregard for the continued risk of sustained violation of the law. UPS had at its fingertips a simple, accurate (when not compromised), and inexpensive means of dispelling all of the above-described uncertainty as to package contents.  Knowing that tobacco customers were untrustworthy, but audits were not (if properly handled), UPS nonetheless flipped the conclusion that should emerge from this knowledge by trusting its customers and treating audit opportunities with deep suspicion and flawed execution. A key example is UPS's compilations of reasons that the Tobacco Watchdog letter, *DX* 62, was either unreliable or that Fink was otherwise justified in his response to it, ECF No. 492, ¶¶ 236–42, 349, when instead of fighting it, UPS should have recognized the Tobacco Watchdog e-mail as the golden opportunity for UPS to demonstrate its adherence to the AOD's principles.[7]

---

[7] An equally telling observation is UPS's willingness to investigate Rosalie Jacobs <u>now</u>, *Tr.* 1700:25 – 1701:12, not when an investigation of her cigarette business would have been of use to the AOD.

UPS's proud display of its tobacco-related audits (ECF No. 492 at 27) also backfires, demonstrating not compliance but a grudging willingness to act only when prodded by law enforcement. The audit dates shown illustrate that the vast majority occurred *after* the City's suggestion via a July 29, 2013 subpoena that UPS's AOD compliance efforts were flawed, with fully 24 of the 28 audits listed undertaken only after that subpoena, a conclusion visible to the eye at ECF. No 491, ¶ 900.[8] Even two of the four audits conducted prior to the City's threat of litigation were prompted by law enforcement. *Cook Direct Test.* ¶ 71, *DX* 600; *DX* 194.[9]  Little wonder that UPS complains that Plaintiffs did not feed it a steady stream of intelligence, ECF No. 492, ¶ 446, since virtually no audits would occur otherwise.[10]   Even when notice was provided, in a draft complaint identifying Seneca Cigars as a cigarette seller, UPS did not audit the account, but instead rushed to obtain missing tobacco agreements, *Cook Direct Test.* ¶ 113, *DX* 600;  *PX*  232; *DX* 234, delaying another six months to audit any Arrowhawk account, and

---

[8] *PX* 248; *see also* ECF No. 491 at 149 (¶ 899) (October 2, 2013 letter and draft Complaint); ECF No. 492 at 27; *see also Cook Direct Test.* ¶¶ 17, 78, 113, *DX* 600; *DX* 216.

[9] American Thrust was audited in September 2011, as a result of information provided by the State (DX 600). Native Outlet was audited in July 10, 2013, as a result of information from the New Hampshire Liquor Commission. *DX* 194.  Only one audit was conducted independently of law enforcement before the City's notice, when a driver refused to pick up from Indian smokes.  *Potter Dep. Tr.* 12:22-24; *DX* 510 (row 11, col. I) (Indian Smokes audited in September 2012).

UPS also inflates the audit table. An "audit" is defined as opening all packages from a particular shipper over a three-day period. *Tr.* 683:19-684:14 (Szelagowski); *DX* 300. UPS counts two audits for Fow – one on April 2, 2014, and one on April 3, 2014, but this was in fact, just one audit. The same applies for Big Buffalo and RJESS.

[10] UPS offers no evidence that the State, and especially the City, a non-party to the AOD, had any obligation to provide UPS with information related to ongoing investigations. ECF No. 492, ¶ 549. The AOD does not obligate the State to share information with UPS. *See* ECF No. 491, ¶¶ 1188–1203. Generally, law enforcement strategy counsels against providing notice while investigations are in progress, and the State was operating under the assumption that UPS would comply with the AOD and take action to interdict shippers it had reason to believe were shipping cigarettes, like all of those at issue here. In any event, UPS's history of notifying shippers and/or allowing closed shippers to reopen under different names makes it clear that even if Plaintiffs had possessed relevant information and tipped UPS off, there is no basis to believe UPS would have taken any meaningful action that would have made a long-term difference in its overall compliance performance.

only then after cigarette shipment broke open in a UPS facility. *Cook Direct Test.* ¶116, *DX* 600; *Guarino Direct Test.* ¶ 20, *DX* 607; *DelBello Direct Test.* ¶ 38, *DX* 604.

### D.  UPS's Belief That Little Cigars Exploded In Popularity As Compared To Cigarettes Is Not Unsupported By The Evidence.

UPS's contention that the cigarette market on New York Indian reservations has been overtaken by little cigars, ECF No. 492, ¶¶ 10–28, is not grounded in any record evidence and in fact is demolished by UPS's experts, whose evidence shows that hardly anyone smokes little cigars. *PX* 11 (TTB report shows that all cigars have consistently been less than five percent of the tobacco market over the past 11 years); *Nevo Direct Test.*, ¶ 79, *DX* 613 (consumption of loose tobacco and cigars is 10.4% of total combustible tobacco consumption). The minuscule size of that market is not surprising given that little cigars are not always cheaper than cigarettes, *Tr.* 1362:11-19; 1369:10-21 (Dr. Angell) and that the tobacco in a little cigar is of "much less" quality than the tobacco in a cigarette, *Tr.* 1573:2–4 (Delman), consisting of "floor sweepings" "emulsified … to create a slurry." *Id*. at 1570:1–12.

UPS's theory that reservation smoke shops supplying primarily little cigars by mail order, ECF No. 492, ¶¶ 15, 27, in the end defies reason because little cigars are not subject to State or City cigarette taxes no matter where in the State they are purchased. ECF No. 491, ¶¶ 170-71; ECF No. 492, ¶¶ 20-22. During the time of UPS's deliveries, tax free little cigars were sold in everywhere without the newly imposed price floor. ECF No. 492, ¶ 22, 24, 532 (review of studies of "sales of little cigars in convenience stores and food drug mass market stores.") ECF No. 492, ¶¶ 24, 532. UPS's theory thus fails to explain why anyone would buy little cigars by mail order when they can be purchased in stores at about the same price as an

untaxed cigarette,   but without either the shipping costs and the inevitable wait for delivery. *See* ECF No. 492, ¶ 530.

### E.  UPS'S Interpretation of the CCTA Has No Merit.

As UPS recognizes, the Court, along with virtually every other court in New York, has held that off-reservation cigarette shipments like the Potsdam shipments require a tax stamp. UPS again threatens the Court with an appeal, but the Court's ruling governs. None of UPS's other legal challenges to CCTA liability square with the now-settled law.[11]

UPS misunderstands the CCTA's knowledge element.   ECF No. 492, ¶¶ 361-62. **A** CCTA violation requires only knowledge of the physical nature of the product transported – more than 10,000 cigarettes that do not bear stamps. *United States v. Elshenawy*, 801 F.2d 856, 857-59 (6th Cir. 1986); *City of New York v. Gordon*, 155 F. Supp. 3d 411 (S.D.N.Y. 2015). "In the context of the CCTA, 'knowingly' requires that defendants 'knew ... what they were selling [or transporting, or distributing, etc],'" *City of New York v. Chavez*, 944 F. Supp. 2d 260 (S.D.N.Y. 2013) (Forrest, J.). There is ample evidence of that UPS employees possessed that knowledge. *See, e.g.*, ECF No. 491 ¶¶103-108.

### F.  UPS's PACT Act Arguments Also Fail.

### 1.  UPS is Not Entitled to the PACT Act Exemption.

UPS understands that proof of a "sufficiently large number of instances of shipments of contraband cigarettes" eliminates UPS's PACT Act exemption, for failure to honor the AOD. ECF No. 492, ¶ 375. Three hundred tons (at least) of cigarettes delivered to New York *alone*

---

[11] UPS also asserts without citation that the 50 carton jurisdictional requirement of CCTA "does not permit aggregation." ECF No. 492, ¶¶ 356-60.  This Court and five others have ruled that the statute calls for aggregation, and UPS's documentation of at least 300 tons of cigarette deliveries is ample proof that the threshold has been met. Nothing in the CCTA provides for the 50 carton limit to be met on a "by-shipper" basis, which simply re-phrases the uniformly rejected "per-transaction" requirement. *See* Order at 12-13, ECF No. 49.

meets the Court's criterion, and if more is required, there is ample evidence in the record of deliveries to other states. *E.g.*, *PX* 434; *PX* 555.  UPS accordingly is not exempt from the PACT Act.

### 2.  UPS Violated The PACT Act.

UPS supplies its own language to the PACT Act requirement that the Attorney General forward a list of non-compliant shippers (the "NCL") to package delivery companies, adding the requirement that the Attorney General forward the list "in a legally sufficient manner," so that UPS can be deemed to have "effectively received" the NCL. ECF No. 492, ¶¶ 391-392. But the language of the statute, which after all is the touchstone here, only requires the Attorney General to compile a list of non-compliant cigarette delivery sellers, distribute the list to common carriers, and "publicize and make the list available" to persons making interstate deliveries. 15 U.S.C. § (e)(1)(A)(i)and (ii). Persisting in its strategy of willful blindness, UPS asserts that it cannot be charged with knowledge of the NCL until the list was delivered to the particular company division that UPS (without notice to anyone outside the company) at some time secretly designated as the proper recipient. But "[a] corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import." *United States v. Bank of New England*, 821 F.2d 844, 856 (1st Cir. 1987).[12]

UPS also asserts it cannot be required to inquire as to whether a shipper on the NCL is operating under a different name, citing 15 U.S.C. § 376a(e)(9)(B)(ii).[13] But UPS does recognize

---

[12] UPS is charged with knowledge of the contents of NCL in any event because a carrier is deemed to know of all rules and regulations that affect its business. *Int'l. Minerals,* 402 U.S. at 569.

[13] UPS does not explain why it is able to invoke certain provisions of the PACT Act while at the same time asserting it is exempt from the Act's requirements.

that "[l]iability can only attach under that circumstance if the carrier 'knows [the shipper] is a delivery seller who is on the list and is using a different name or address to evade the delivery restrictions of paragraph (2),'" *Id.*   But that concedes liability for deliveries to the alter egos of shippers on the NCL. UPS may have had no obligation to acquire alias information <u>under the PACT Act</u>, but it surely had that obligation under the AOD. ECF No. 491, ¶¶52-63. UPS thus possessed that knowledge, either in fact, through Gerard Fink's closing-re-opening program and the overlapping contact, telephone and address information in UPS files which that program generated, *see* ECF No. 491, ¶¶ 120-147, 280-555, or constructively, by failing to acquire that knowledge as required under the AOD. *United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 739 (W.D. Va. 1974) ("A corporate defendant is deemed to have had knowledge of a regulatory violation if the means were present by which the company could have detected the infractions.").

### 3. There Is No Impermissible Retroactivity In The Loss Of The PACT Act Exemption.

There is no impermissible retroactivity arising out of UPS's loss of its PACT Act exemption, (ECF No. 492, ¶¶ 370-381) and UPS can be subject to PACT Act liability from the effective date of the Act. The presumption against retroactivity is based in "[e]lementary considerations of fairness," which "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *New York v. UPS*, 2016 U.S. Dist. LEXIS 77217 (S.D.N.Y. June 10, 2016) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). UPS has been on notice of the consequences of not honoring the AOD since the effective date of the PACT Act. There can be no unfairness in any loss of the exemption because that loss will be a result of UPS own conduct, an origin that necessarily provided the company with advance notice and fair warning of a possible loss of the exemption.

In any event, the presumption against retroactivity is simply a presumption that disappears if the legislature has stated that retroactive application is intended. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." *Landgraf*, 511 U.S. 244, 280. By providing for a revocation of immunity in the PACT Act itself, Congress provided, if not in fact an express message of intent to apply the Act retroactively, certainly sufficient of that intent. Any other view would create an enforcement vacuum: UPS, after engaging in years of AOD non-compliance would escape PACT Act penalties for shipments into those States that cannot enforce the AOD. Congress would not have granted common carriers full PACT Act immunity in exchange for lip-service to an AOD, but more reasonably would provide for PACT Act penalties for past failures to comply with an AOD

### 4. The PACT Act permits the City to enforce PHL 1399-*ll*.

The language and structure of the PACT Act provide the City with authority to enforce PHL § 1399-ll even if UPS were to retain its PACT Act exemption. Congress acted intentionally in specifying that "No <u>State</u> may enforce against a common carrier a law prohibiting the delivery of cigarettes …." unless the common carrier is "not exempt" under paragraph (3) of this subsection. 15 U.S.C. § 376a(e)(5)(C)(2). This is clearly established by the fact that, in complete contrast with § 376a(e)(5)(C)(2), virtually every other provision of PACT Act § 376a that refers to governments does so by referring to "State or local governments." *See* §376a(a)(1) and (3), §376a(c)(3), §376a(d)(2), §376a(e)(1)(D); §376a(e)(1)(E)(iv) and (v), §376a(e)(3)(B)(ii)(II), §376a(e)(4)(A)(II), §376a(e)(4)(B), §376a(e)(5)(A), §376a(e)(5)(A)(ii) and (ii), §376a(e)(6)(A)(I)(i) and (ii), §376a(e)(7)(A). In the only instance other than § 376a(e)(5)(C)(2)

of a discrete sub-section that refers only of a "State," the provision is accompanied by a parallel sub-section that applies to a "local government." *See* 15 U.S.C. § 376a(d)(1)(A) and (B). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 30 (1997).[14]

### G.  UPS's Potsdam Shipments Violate PHL § 1399-*ll*.[15]

UPS's contention that liability PHL § 1399-*ll* depends on its reasonable belief that a cigarette recipient was unauthorized, ECF No. 492, ¶ 429, should first be rejected on the common sense ground that no statute intended for a highly regulated industry would be written to impose the exceedingly difficult proof of an actor's subjective state of mind as an element of liability. *See, e.g.*, *Int'l. Minerals*, 402 U.S. at 569 (common carriers "are under a species of absolute liability for violation of the regulations despite the 'knowingly' requirement")(Stewart, J. dissenting). But more importantly, UPS's argument completely ignores the two presumptions of knowledge in PHL § 1399-*ll*: first, that a person is a licensed or registered agent or dealer when identified as such on a list published by DTF or when licensed under Article 20 of the Tax

---

[14] *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 54-55 (2d Cir. 1988), ECF. No. 492, ¶ 389, is distinguishable because the statute at issue did not contain the varying uses of state and local government described above, and still more compellingly, the agency charged with applying the statute had interpreted "state" to include local governments, a decision to which the court gave deference. By contrast, where statutes in which some sections refer to "states" and others refer to "states and their political subdivisions" the courts hold that the statute should apply separately to states and localities, as the case may be. *See  Ohio Mfrs' Ass'n  v. Akron*, 801 F.2d 824 (6th Cir.1986)(court found that Congress' practice of preempting political subdivisions explicitly and the fact that political subdivisions are referred to in other sections of the OSH Act, indicated that Congress did not overlook or implicitly include political subdivisions in the word "state."); *Cedar Bluff 24-Hour Towing, Inc. v. City of Knoxville*, 78 F. Supp. 2d 725, 728 (E.D. Tenn. 1999) (omission of a reference to political subdivisions statutes subsection unlikely to be inadvertent given the seven other specific references to both states and political subdivisions in other subsections of the same statute.).

[15] UPS contends that the City has no standing to pursue claims for shipments made by the Potsdam Shippers, ECF No. 492, ¶¶ 406-412, but as a glance at the New York City packages table shows, ECF No. 491 at 154, the City seeks to recover for the single Jacobs Tobacco shipment delivered by UPS into the City, not for any other Potsdam shipments. This issue need not detain the Court.

Law; and second, that a common carrier is presumed to know that a delivery is to an unauthorized recipient if the delivery is to a home or residence. *See* PHL §1399-*ll* (1) and (2). By reason of its constructive knowledge of pertinent regulations, *Int'l. Minerals,* 402 U.S. at 569, UPS has knowledge of who is on the list of authorized persons. UPS has not met its burden of rebutting the presumption that the Potsdam shipments were not residentially addressed, and so is presumed to know the deliveries were unauthorized.

## II. PLAINTIFFS' REQUESTED DAMAGES AND PENALTIES ARE APPROPRIATELY IMPOSED ON UPS.

### A.  UPS's Damages Arguments are Meritless.

UPS quibbles with Plaintiffs' damages, citing the difference in amounts identified during the first two days of trial, caused by the inadvertent omission of a spreadsheet for a single shipper, as evidence that plaintiffs' counting methodology is unreliable. ECF No. 492, ¶ 508.[16] UPS's assertion that letter envelopes "could not possibly contain cigarettes," is unsupported by any evidence.   *See* ECF No. 492, ¶ 316. The evidence in fact showed at least one shipper shipping its cigarettes loose—*i.e.*, not in packages or cartons.  *Jarvis Dep. Tr.* 55:22–56:6.[17]

### B.  UPS's Penalties Arguments Are Also Meritless.

### 1.  Employee Acts and Knowledge Are Appropriate Bases for Civil Penalties.

---

[16] Plaintiffs have since *reduced* the number of relied-on spreadsheets to calculate damages. ECF No. 491, ¶¶ 907–13), to UPS's benefit.

[17] The Court has already rejected UPS's contention that Rule 26's initial disclosures requirement includes the disclosure and calculation of civil penalties, ECF No. 413, and Plaintiffs fully briefed the matter. ECF No. 397 at 18-22.  The Rule's plain literal language only refers to "damages."  Fed. R. Civ. P. 26(a)(1)(A)(iii). Civil penalties "are not 'damages' payable to the victim, but [rather] fines or assessments payable to the government."  *Ellett Bros. v. U.S. Fid. & Guar. Co.*, 275, F.3d 384, 388 (4th Cir. 2001).*See also S.E.C. v. Symbol Tech.*, Case No. CV-04-2276 (SJF)(WDW) (E.D.N.Y. Mar. 11, 2010) (Order, ECF No. 204) (rejecting the characterization of "civil penalties as 'monetary relief' falling within the ambit of Rule 26(a)(1)(A)(iii)"; ECF No. 397 at 18-22.

UPS inappositely seeks to apply punitive damages principles to argue against attribution to the company of its employees' acts and knowledge. ECF No. 492, ¶¶ 551-56. But courts routinely impose *penalties* on corporation for regulatory violations by "low-level" (ECF No. 492, ¶ 229) employees. *See Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) (truck drivers' knowledge that fuel was untaxed imputed to corporation for purposes of imposing penalty); *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d at 364, 370 (2d Cir. 2000) (same).[18] The CCTA expressly contemplates imposition of liability for employee acts. *See* 18 U.S.C. § 2346 (b)(1) (an action may be brought for violations by any person (*or by any person controlling such person*"…)(emphasis added); *id.*, at (b)(1). The PACT Act also contemplates vicarious liability for the acts of "low level" employees, evidenced by the narrow exclusion limited to "actions that are outside the scope of employment of the employee, or that violate the implemented *and enforced* policies of the common carrier." 15 U.S.C. § 377(B)(3)(ii) (emphasis added).

### 2. UPS's Conduct Was Reprehensible and the Penalties Are Proportional to the Harm.

UPS grossly minimizes the true amount of the City and State's injury, ECF. No. 492, ¶¶ 576-579, looking only to tax loss while ignoring the injury to the public health, an injury reflected not only in dollars, but in misery. *See City v. Golden Feather Smoke Shop, Inc.*, 2009 U.S. Dist. LEXIS 76306, at *65 (E.D.N.Y. Aug. 25, 2009) (the availability of cheap cigarettes from the Poospatuck Reservation leads to approximately 450 premature deaths in New York City *each year*). These of course are the very cigarettes delivered by UPS. *See PX* 93, *PX* 96

---

[18] *Accord Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc*., 821 F.3d 297, 318 (2d Cir. 2016) (dissent)(citing *N.Y. Univ. v. First Fin Ins. Co*., 322 F.3d 750, 753 & n.2 (2d Cir. 2002)); *Steere Tank Lines, Inc. v. United States*, 330 F.2d 719, 722 (5th Cir. 1964); *Riss & Co. v. United States*, 262 F.2d 245 (8th Cir. 1958); *United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 739 (W.D. Va. 1974); *United States v. Sawyer Transport, Inc.*, 337 F. Supp. 29 (D. Minn.1971)).

(deliveries to a *Golden Feather* defendant). "Conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages." *Stampf v. Long Island R.R.*, 761 F.3d 192, 209 (2d Cir. 2014). UPS disingenuously remarks that Plaintiffs "made no serious effort to tie UPS's alleged conduct to any tangible harms beyond lost tax revenue" (ECF No. 492, ¶ 584), as if the health effects are not so well established that the Court effectively took judicial notice of them. *Tr.* 1335:8-14.[19]

UPS's attempted minimization of its conduct – that it merely delivered, but did not sell or manufacture cigarettes – backfires badly. Operating a nationwide consumer delivery system for cigarettes that serviced dozens of manufacturers and sellers is vastly more injurious than the acts of a single retailer.  Delivery was sufficiently reprehensible as to lead to enactment of a statute intended to block deliveries. *See New York v. UPS*, 2016 U.S. Dist. LEXIS 52289, at *42 (S.D.N.Y. Apr. 19, 2016) (PACT Act "aimed primarily at eliminating deliveries of illegal, untaxed cigarettes by the U.S. Postal Service…").

Because tobacco-related health costs on New Yorkers are $10.4 billion *annually,* (*Angell Direct Test.* ¶ 7, PX 628), the penalties sought are thus not excessive in light of Plaintiffs' true damages. Although revenue or profit can be one factors considered by a court, *see Advance Pharm., Inc. v. United States*, 391 F.3d 377 (2d Cir. 2004) (imposing a penalty greater than that proposed by the government), it is only one of several, and never the *sole* factor, as UPS's calculations contemplate. ECF No. 492, ¶ 549. Revenue and profit have been deemed inadequate as a mean to deter wrongful behavior and hence require penalties to be added. *SEC v. Invest Better 2001*, 2005 U.S. Dist. LEXIS 34654 (S.D.N.Y. Apr. 29, 2005) ("Congress enacted the

---

[19] "The Court believes that the public record would support a finding that cigarettes cause various health issues, increases health costs and costs communities with diseases resulting from cigarettes "a lot of money." *Id.*

civil penalties because disgorgement alone did not provide an adequate "financial disincentive to engage in securities fraud.") (quoting *H.R. Rep. No.* 101-616 (1990)).[20]

UPS's conduct has caused vastly more injury than Plaintiffs have standing to pursue in this action, based on the evidence of UPS's massive out-of-state deliveries. *See, e.g. PX* 434. In sentencing criminal defendants, courts are permitted to consider conduct for which the defendant was not convicted.[21]  That principle is even more appropriate here, where UPS delivered contraband nationwide. *See, e.g.*, *SEC v. Invest Better 2001*, 2005 U.S. Dist. LEXIS 34654, *14 (S.D.N.Y. Apr. 29, 2005) (for penalty determination, courts will consider conduct not before the court, involving different laws, and for which punishment cannot be imposed).   UPS, for example, discovered numerous little cigars during the course of its audits, yet took no action to determine whether such regulated tobacco products complied with the various state law requirements regulating such products.[22]  The PACT Act furthermore encompasses little cigars (15 U.S.C. § 375(2)(A)(i)), while the AOD's terms do not.  Thus, because UPS had no policies in place to block such illegal deliveries, UPS enjoys no exemption on such deliveries.

---

[20] *Milhelm Attea* and *Golden Feather*, cited by UPS for their penalty analyses, ECF. No. 492, ¶¶ 588-592 are wholly inapposite: i) no defendant in those cases had agreed to halt illegal conduct and to take affirmative steps to do so; ii) the forbearance policy had been in effect for most of the period at issue; iii) the defendants were small businesses and sole proprietorships without significant assets, not a Fortune 500 company; iv) the smoke shops closed once enjoined and unlike UPS were not in a position to continue their violations; v) the defendants' conduct was of limited scope, affecting principally New York City and Long Island. UPS's conduct caused injury *nationwide*.  The PACT Act's 2% of gross sales penalty is self-evidently designed for a seller of cigarettes, and is not economically suited to a transporter. ECF No. 492, ¶ 579 (PACT Act has no 2% revenue penalty for shippers).

[21] District courts are permitted to consider uncharged conduct for sentencing purposes.  *United States v. Watts*, 519 U.S. 148, 154-55, 157 (1997) (conduct underlying acquitted charges may be taken into account in sentencing if that conduct is established by a preponderance of the evidence).

[22] *See, e.g.*, N.Y. Tax Law § 474(2), (3) (requiring identification of person responsible for imposed tax, or else applying such tax to person in possession), § 470 (defining cigars to include little cigars), § 481 (imposing penalties); Vt. Stat. tit. 7, § 1010 (2012) (regulating sale and distribution of "roll-your-own" tobacco and little cigars, prohibiting those products to be shipped to "anyone other than a licensed wholesale dealer or retail dealer in th[e] State"); Md. Code Business Regulation, § 16.5-216 (2016) (prohibiting shipment and sale of "other tobacco products," such as certain cigars or "roll for smoking" tobacco to consumers and others); Wash. Rev. Code § 70.155.140 (2009) (prohibiting transport of any tobacco product other than to a licensed wholesaler or retailer).

### 3.  UPS's Due Process Argument Fails.

UPS's reliance on punitive damages case law, ECF No. 492, ¶¶ 580-582 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)) is misplaced. *BMW* addresses punitive damage awards by a jury, not a statutory penalty with congressionally set maxima, applied by a judge.  *BMW* in fact expressly holds that the amount of a statutory penalty is an appropriate standard to measure whether a punitive award is reasonable. *BMW*, 517 U.S. at 583-584 ("Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct …. accord[s] substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.").

UPS's reliance on the rule of lenity, ECF No. 492, ¶¶ 568–69, is also misplaced because the rule is inapplicable in a civil action. *Sash v. Zenk*, 439 F.3d 61, 65 (2d Cir. 2006). UPS agreed to and had fair notice of the AOD's "stipulated penalty," and cannot complain of a lack of notice of the scope of punishment by reason of "a grievous ambiguity or uncertainty in the language and structure of the [statute]." *Id.* at 64, which is the basis for applying the rule of lenity. The AOD penalty provision is not ambiguous (*DX* 23, at ¶ 42), and the "stipulated penalty" applies to "each and every violation" of the AOD except in defined circumstances not present here. UPS's understanding of the AOD penalties is evident in its July 2011 analysis (*PX* 281) that calculated the AOD penalties for the Potsdam shippers, on a $1,000 per-shipment basis. *PX* 281 ("249VY7" sheet; "Total All 4 shippers" and "$1000 per package"), thereby rebutting its "penalties-per-shipper" argument. Before any litigation arose, UPS's own methodology for calculating penalties was nearly identical to the methodology used by plaintiffs.

### 4.  Penalties May Be Assessed Under Each Statute Independently and Awarded Cumulatively.

Each statutory penalty at issue here addresses distinct conduct: the CCTA, unstamped cigarettes, the PACT Act, shipments by identified shippers not compliant with cigarette shipment rules; PHL § 1399-*ll*, deliveries to unauthorized persons. Accordingly, each statute may be the subject of a non-exclusive penalty, as each in fact statute expressly provides. *See* 18 U.S.C. § 2346(b)(3) ("remedies  ….  are in addition to any other remedies under Federal, State, local, or other law"); 15 U.S.C. § 377(b)(2) (civil penalty "shall be imposed in addition to … any other damages, equitable relief, or injunctive relief … including the payment of any unpaid taxes to the appropriate Federal, State, local, or tribal governments"); AOD (rights and remedies "are cumulative and in addition to" any other rights or remedies, including PHL § 1399-*ll*); PHL § 1399-*ll*(6) (The attorney general [and corporation counsel]may bring an action to recover civil penalties … "and for such other relief as may be deemed necessary.").

## III.  UPS'S STATUTE OF LIMITATIONS ARGUMENTS FAIL.

The statute of limitations is an affirmative defense for which UPS bears the burden of proof. That burden is especially high here: when a statute of limitations is to be applied to bar rights of a government, the statute must receive strict construction in favor of the government. *United States v. Domino Sugar Corp.*, 349 F.3d 84, 88 (2d Cir. 2003); *accord United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013).

**A. CCTA and PACT Act.** UPS correctly observes that CCTA and PACT Act claims accrue from the date Plaintiffs' discovered, or should have discovered, an alleged injury. The date of injury for the CCTA is the date unstamped cigarettes arrived into the State or City. The earliest discoverable injury to the City was the date UPS delivered unstamped cigarettes to the Sheriff, May 30, 2012. *PX* 43.  And for the State, the earliest date of discovery is June 23, 2011, when UPS shipments for the Potsdam shippers were revealed. *PX* 49; *PX* 69; *DX* 389. For the

PACT Act, the date of injury is the date that UPS shipped packages for a shipper on the NCL, but Plaintiffs could not have with reasonable diligence discovered that injury until UPS revealed them in the course of this action.

**B. PHL §1399-*ll*.**   The statute of limitations under PHL under PHL § 1399-*ll* begins to run "when all of the facts necessary to the cause of action have occurred *so that the party would be entitled to obtain relief in court*." ECF. No. 492 ¶ 602 (emphasis added). The City was not entitled to obtain relief in court under PHL § 1399-*ll* until September 27, 2013, and the statute of limitations on the City's PHL 1399-ll claims could not have begun to run until that date at the earliest.   The State is subject to the residual six-year statute of limitations in CPLR § 213(1) applicable to Exec. L. § 63(12). *People v Trump*, 137 A.D.3d 409, 418 (1st Dep't 2016) (Executive Law not subject to the three-year statute of limitations imposed by CPLR § 214(2), but the residual six-year statute of limitations in CPLR § 213(1)).

**C. AOD.**   "The AOD is a contract between the State and UPS." *New York v. UPS*, 160 F. Supp. 3d 629 (S.D.N.Y. 2016).   To the extent the AOD is subject to any statute of limitations, it is to the six (6) year contract statute of limitations, running from the date of the breach.

## IV. CONCLUSION

For all these reasons, plaintiffs request a judgment in their favor, an award for damages and penalties, injunctive relief, and all other relief this Court deems just and proper.

Dated: New York, New York
October 31, 2016

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: ____/s/ Dana Biberman_____

Dana Biberman (DB 9878)
  Chief, Tobacco Compliance Bureau
Christopher K. Leung (CL 6030)
John Oleske (JO 0995)
Kevin Lynch (*pro hace vice*)
  Assistant Attorneys General
120 Broadway, 3rd Floor
New York, New York 10271
Tel.: 212-416-6343

*Attorneys for Plaintiff State of New York*


ZACHARY W. CARTER
Corporation Counsel of the City of New York

By: ___/s/ Eric Proshansky_____

Eric Proshansky (EP 1777)
Lilia Toson (LT 4727)
Tonya Jenerette (TJ 7276)
  Assistant Corporation Counsel
100 Church Street, Room 20-99
New York, New York 10007
Tel.:  (212) 356-2032

*Attorneys for Plaintiff the City of New York*

32