UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

                                                            :

THE STATE OF NEW YORK and THE CITY          :
OF NEW YORK,                                                :

                                                            :

                                   Plaintiffs,              :

                                                            :

              -v-                                           :          15-cv-1136 (KBF)

                                                            :

UNITED PARCEL SERVICE, INC.,                  :          CORRECTED OPINION
                                                            :          & ORDER[1]

                                   Defendant.               :

                                                            :

-------------------------------------------------------------- X

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____              │
│ DATE FILED: May 25, 2017             │
└─────────────────────────────────────┘

KATHERINE B. FORREST, District Judge:

## Table of Contents

I.    INTRODUCTION ................................................................... 1
II.   PROCEDURAL HISTORY ....................................................... 3
      A.   Pre-Trial Proceedings ................................................. 3
      B.   The Trial ................................................................... 8
III.  FINDINGS OF FACT ............................................................ 9
      A.   Public Health Issues Associated with Cigarettes.................. 9
      B.   Plaintiffs' Investigations of UPS .................................... 10
      C.   UPS's Business ......................................................... 13
      D.   UPS's Business and Specific Conduct............................... 19
           1.   UPS's Tobacco Policy............................................ 19
           2.   UPS's Training Efforts .......................................... 21
           3.   The Role of Account Executives ............................... 24
           4.   The Role of UPS Drivers ........................................ 27
           5.   UPS's Interactions with Shippers.............................. 29
           6.   UPS's Information Systems and Information Sharing......... 31
      E.   UPS's Asserted Reliance on Governmental Action/Inaction ...... 32
           1.   Governmental Action ............................................ 33
           2.   Governmental Inaction ......................................... 35
      F.   UPS's Audits ............................................................ 37
IV.   CURRENT STATUS OF UPS'S COMPLIANCE EFFORTS ............................ 40

---

[1] This Corrected Opinion & Order replaces the Opinion & Order issued by the Court on March 24, 2017 (ECF No. 526.)  This Corrected Opinion & Order corrects certain limited issues identified by the parties as well as certain limited issues identified by the Court.  By separate order at ECF No. 533, the Court has provided a comparison (or "blackline") showing all of the changes made that are now reflected in this Corrected Opinion & Order.

V.     BACKGROUND CONCERNING THE TAXATION OF CIGARETTES AND
       LITTLE CIGARS ................................................................................... 43
VI.    THE PACT ACT ................................................................................... 45
VII.   CONSUMPTION OF TOBACCO PRODUCTS ................................................. 46
   A.    Cigarettes ....................................................................................... 46
   B.    Little Cigars ................................................................................... 48
VIII. CERTAIN COMMON EVIDENCE ............................................................... 51
   A.    The Fink Accounts .......................................................................... 51
   B.    The Non-Compliant Lists ................................................................. 53
   C.    The "Tobacco Watchdog Group" Letter ........................................... 56
   D.    Inquiries Regarding Lost or Damaged Packages .............................. 58
      1.    Smokes & Spirits ...................................................................... 59
      2.    RJESS ...................................................................................... 59
      3.    Sweet Seneca Smokes ............................................................... 60
      4.    Elliott Enterprises/EExpress ...................................................... 60
      5.    Bearclaw Unlimited ................................................................... 60
      6.    Shipping Services ...................................................................... 61
      7.    Native Wholesale Supply ........................................................... 61
      8.    Seneca Promotions .................................................................... 61
      9.    Native Gifts .............................................................................. 61
      10.   Jacobs Manufacturing/Tobacco .................................................. 61
   E.    The Cigarettes Shipped Were Unstamped ........................................ 62
IX.    SHIPPERS AT ISSUE ........................................................................... 63
   A.    Overview of the Shippers and the Court's Findings .......................... 63
   B.    Liability Shippers ............................................................................ 67
      1.    Elliott Enterprises ..................................................................... 67
      2.    EExpress .................................................................................. 73
      3.    Bearclaw/AFIA .......................................................................... 77
      4.    Shipping Services/Seneca Ojibwas/Morningstar Crafts & Gifts ..... 80
      5.    Indian Smokes ........................................................................... 85
      6.    Smokes & Spirits ....................................................................... 88
      7.    Arrowhawk/Seneca Cigars/Hillview Cigars/Two Pine Enterprises ......... 92
      8.    Mohawk Spring Water ................................................................ 99
      9.    Jacobs Tobacco Group .............................................................. 102
      10.   Action Race Parts ..................................................................... 104
      11.   Native Wholesale Supply ........................................................... 105
      12.   Seneca Promotions .................................................................... 107
   C.    Shippers as to Which There Is Only AOD Liability ........................... 109
      1.    Native Outlet ............................................................................ 110
      2.    A.J.'s Cigars ............................................................................ 112
      3.    RJESS ...................................................................................... 114
   D.    Shipper as to Which There Is No Liability ....................................... 116
      1.    Sweet Seneca Smokes ............................................................... 116
X.     CONCLUSIONS OF LAW ....................................................................... 119

A.   The AOD.............................................................................................. 120
   1.   Background Described in the AOD........................................... 121
   2.   The Terms of the AOD ............................................................ 123
B.   Interpretation of the AOD ............................................................ 129
C.   Violations of the AOD................................................................... 130
D.   Violations of the Audit Obligation Under the AOD .................... 135
   1.   Proof to the Reasonable Satisfaction of the State Attorney General ...... 136
   2.   Implied Covenant of Good Faith and Fair Dealing.................. 138
E.   Whether the AOD Was "Honored" ............................................... 141
XI.   KNOWLEDGE.................................................................................. 145
A.   Knowledge..................................................................................... 146
B.   Imputation of Knowledge ............................................................. 151
C.   Presumptions of Knowledge for Common Carriers...................... 155
D.   Knowledge as to Each Shipper ..................................................... 156
XII.  LIMITATIONS PERIOD ................................................................... 156
XIII. THE PACT ACT................................................................................ 159
XIV. PHL 1399-LL .................................................................................... 163
XV.  THE CCTA ........................................................................................ 166
XVI. PREEMPTION.................................................................................... 172
XVII. UPS'S REMAINING DEFENSES ................................................... 176
A.   Unclean Hands/In Pari Delicto ................................................... 176
B.   Waiver ........................................................................................... 178
C.   Public Authority and Estoppel ..................................................... 179
XVIII. DAMAGES ...................................................................................... 183
A.   UPS's Pre-Trial Damage Disclosure ........................................... 184
B.   Legal Principles Regarding Damages .......................................... 190
   1.   Compensatory Damages........................................................... 190
   2.   Penalties ................................................................................... 193
C.   Constitutional/Conscionability Issues with Penalties ................. 198
D.   The Penalty Provisions at Issue Here .......................................... 206
E.   Calculation of Penalties................................................................ 207
   1.   Defining a Package .................................................................. 207
   2.   Package Contents ..................................................................... 209
   3.   Reasonable Approximation of Contents .................................. 210
   4.   Defining a Carton .................................................................... 212
   5.   The AOD ................................................................................... 213
   6.   The PACT Act and PHL § 1399-ll........................................... 214
   7.   The CCTA ................................................................................. 215
XXI. INJUNCTIVE RELIEF ..................................................................... 216
XXII. CONCLUSION................................................................................. 219

## I.      INTRODUCTION

Issues surrounding the appropriate taxation and collection scheme for cigarettes sold on Indian reservations in the State of New York have presented persistent and complex challenges.  Cigarettes sold on reservations to tribal members for personal use are exempt from tax; those sold to non-tribal members are not.  The tracking and collection of appropriate taxes has proceeded in fits and starts—including a lengthy period of forbearance by the State of New York from enforcing existing tax laws on reservations, which continued until June 2011.

This lawsuit concerns a non-tribal member, United Parcel Service, Inc. ("UPS"), which allegedly transported, _inter alia_, cigarettes from and between New York State Indian reservations for a number of shippers ("Relevant Shippers"). Plaintiffs, the State of New York and the City of New York (collectively, "plaintiffs," and, respectively, the "State" and/or the "City"), assert that in transporting unstamped (and therefore untaxed) cigarettes,[2] UPS has violated an Assurance of Discontinuance ("AOD") it signed with the State in 2005, as well as New York Executive Law ("N.Y. Exec. Law") § 63(12); New York Public Health Law ("PHL") § 1399-ll;[3] the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. §§ 375-

---

[2] Throughout this Opinion & Order, unless otherwise specified or clear from context, the word "cigarettes" refers to unstamped cigarettes for which no taxes were paid.  The Court makes a number of factual findings below supporting the use of the term in this manner.

[3] Plaintiffs' PHL § 1399-ll and N.Y. Exec. Law § 63(12) claims entirely overlap: According to plaintiffs, violations of the former led to a violation of the latter.

78; the Contraband Cigarettes Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341-46; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.[4]

UPS has denied plaintiffs' assertions from the commencement of this action, and it vigorously defended itself through trial.  While UPS pursued a number of defenses discussed in more detail below, a few are worth additional focus at the outset.  First and foremost, UPS has disputed that it ever violated its obligations under the AOD or knowingly transported unstamped cigarettes from or between Indian reservations to unauthorized recipients.

Second, UPS argues that even if it had violated the statutes or the AOD, plaintiffs have failed to carry their burden with regard to establishing damages.[5]  UPS's primary legal arguments in support of this contention are that plaintiffs failed to adequately disclose their damages computation prior to trial and then made a separate error at trial by attempting to introduce the details of their damages claim through a demonstrative when it should have been presented by an expert.  According to UPS, these legal issues provide two independent bases for the Court to preclude plaintiffs' damages claim altogether.  UPS has also made factual arguments in furtherance of preclusion.  UPS argues that plaintiffs improperly and without sufficient factual support seek damages for every package transported by

---

[4] By Opinion & Order dated August 9, 2016, this Court dismissed plaintiffs' RICO claims.  (ECF No. 322, <u>New York v. United Parcel Serv., Inc.</u>, No. 15-cv-1136, 2016 WL 4203547 (S.D.N.Y. Aug. 9, 2016).)

[5] Plaintiffs seek both compensatory damages (relating to lost tax revenue) and penalties.  For ease of reference, the Court refers to these together as "damages."

UPS after a certain point in time.  UPS also asserts that, in all events, neither UPS nor plaintiffs can possibly know the contents of any particular package, rendering assessment of damages on a per-package basis impossible.

Upon careful review and consideration of the entire trial record, the Court finds that UPS violated its obligations under the AOD in a number of respects and, in addition, knowingly[6] transported cigarettes from and between Indian reservations for all but one of the shippers (the "Liability Shippers").[7]  For this reason and others detailed below, UPS's arguments against any liability fail.  The more complicated issue, however, relates to damages.  Plaintiffs left their damages case open to severe attack; such exposure could and should have been avoided. However, the Court finds that plaintiffs are entitled to compensatory damages as well as monetary penalties in amounts yet to be determined, but not injunctive relief or the appointment of a monitor.

II.    PROCEDURAL HISTORY

    A.    Pre-Trial Proceedings

The State and City initiated this action by filing a complaint against UPS on February 18, 2015.  (ECF No. 1.)  They filed an amended complaint ("Amended Complaint") on May 1, 2015, a second amended complaint ("Second Amended

---

[6] Throughout this Opinion & Order, when the Court refers to UPS's "knowledge" it is incorporating its legal conclusions on this topic set forth at length below, and is including direct knowledge, knowledge based on willful blindness and/or conscious avoidance, and knowledge acquired by way of imputation.

[7] The Liability Shippers comprise all but one of the Relevant Shippers.  That is, plaintiffs' claims relate to all of the Relevant Shippers, but the Court has concluded that UPS has liability for at least one or more claims only as to the Liability Shippers.

3

Complaint") on November 30, 2015, and a third amended complaint ("Third Amended Complaint") on February 24, 2016.  (ECF Nos. 14, 86, 189.)  The Second Amended Complaint contains fourteen causes of action seeking various forms of relief under the AOD,[8] N.Y. Exec. Law § 63(12),[9] PHL § 1399-<u>ll</u>;[10] the PACT Act;[11] the CCTA;[12] and RICO.[13]

The parties agreed that the affirmative defenses asserted by UPS in its answer to the Amended Complaint, (ECF No. 110), were deemed asserted as to the Second Amended Complaint.  On December 4, 2015, plaintiffs moved to strike UPS's Fifth through Seventeenth Affirmative Defenses.  (ECF No. 89.)  In an Opinion & Order dated February 8, 2016, the Court granted the motion in part and denied it in part.  (ECF No. 177, <u>New York v. United Parcel Serv., Inc.</u>, 160 F. Supp. 3d 629 (S.D.N.Y. 2016).)  UPS moved for reconsideration with regard to the portion of the decision that struck its Seventh Affirmative Defense.  (ECF No. 187.)

There has been significant motion practice regarding UPS's Seventh Affirmative Defense.  (<u>See, e.g.</u>, ECF Nos. 91, 111, 122, 188, 198, 201, 287, 345,

---

[8] Thirteenth claim for relief.

[9] Eleventh claim for relief.

[10] Twelfth claim for relief.

[11] Seventh through tenth claims for relief.

[12] First and second claims for relief.

[13] Third through sixth claims for relief.  Plaintiffs' fourteenth claim is labeled as a claim for "injunctive relief and appointment of a monitor."  However, the alleged legal basis for this claim relief derives from the aforementioned causes of action.  Thus, the claim is not a liability claim but rather a request for relief.

384.)  Although the Court granted UPS's motion for reconsideration, (ECF No. 258),[14] and vacated certain portions of its prior decision, the Court ultimately granted plaintiffs' renewed motion for summary judgment on the Seventh Affirmative Defense.  (ECF No. 406.)  The Court refers the reader to the Court's prior decisions for its full analysis.  (ECF Nos. 177, 258, 406.)

In summary, UPS's Seventh Affirmative Defense asserts that plaintiffs' claims are barred, at least in part, by orders issued by various courts between 2008 and 2011 pertaining to enforcement and/or implementation of N.Y. Tax Law §§ 471 and 471-e.[15]  In its briefing, UPS has asserted that this defense encompasses its argument that the State's policy of "forbearance," regarding enforcement of New York's cigarette taxation scheme on Indian reservations to June 2011, bars any recovery for a significant portion of the relevant time period.  According to UPS, New York's forbearance policy rendered § 471 not "in effect"—and therefore unenforceable—during the period of forbearance.  In addition, UPS has argued that under constitutional principles and § 471, the State and City were without power to tax cigarettes UPS delivered to Indian reservations;[16] such shipments constitute a

---

[14] Procedurally, "granting" a motion for reconsideration does not necessarily mean the movant's position has been vindicated.  It means, instead, that there is a sufficient "basis to reconsider" the correctness of the Court's prior decision.  See Salveson v. JP Morgan Chase & Co., 663 F. App'x 71, 78, 2016 WL 6078616, at *2 (2d Cir. 2016); see also Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

[15] N.Y. Tax Law §§ 471 et seq. sets forth the New York taxation and stamping requirements for cigarettes as well as the New York enforcement scheme.

[16] As a factual matter, the evidence at trial supported deliveries of cigarettes to non-reservation retailers or consumers for all but one of the shippers as to which the Court had found liability (i.e., Jacobs Manufacturing/Tobacco).

significant portion of those at issue.  This Court disagreed.  It determined, in part, that § 471 has been "in effect" continuously since its inception, even during the period of forbearance.  The Court found that the "forbearance policy" was directed at Indian tribal members and not at private actors such as UPS.  Finally, the Court further held that neither constitutional principles nor the forbearance policy directed at Indian reservations immunized or excused UPS's actions.  (ECF No. 406, New York v. United Parcel Serv., Inc., No. 15-cv-1136, 2016 WL 4747236 (S.D.N.Y. Sept. 10, 2016).)

The parties also engaged in significant motion practice regarding whether the Court should strike certain of UPS's other defenses.  In its Opinion & Order dated February 8, 2016, the Court struck UPS's Sixth, Eighth, Ninth, Tenth, Eleventh, and Sixteenth Affirmative Defenses.  (ECF No. 177, New York v. United Parcel Serv., Inc., 160 F. Supp. 3d 629, 665 (S.D.N.Y. 2016).)  UPS's remaining defenses are:

- Second Defense: To the extent plaintiffs have suffered any damages alleged in the Third Amended Complaint, such damages were not caused by UPS.  (ECF No. 199 at 18.)

- Third Defense: Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.  (Id.)

- Fourth Defense: Plaintiffs lack standing to assert the claims set forth in their Third Amended Complaint.  (Id.)

- Twelfth Defense: The State's claim for violation of the AOD is barred, in whole or in part, by its breach or nonperformance with respect to the AOD, including but not limited to any covenants implied therein, such as the implied covenant of good faith and fair dealing.  (Id. at 22.)

6

- <u>Thirteenth Defense</u>: The State's own inactivity under the AOD, and with respect to cigarette tax laws more generally, bars, estops, or otherwise precludes it from complaining of, or seeking relief based on, UPS's alleged performance and/or nonperformance under the AOD, including, but not limited to, under principles of laches, waiver, estoppel, and similar doctrines.  (<u>Id.</u>)

- <u>Fourteenth Defense</u>: UPS was excused from performance under the AOD on grounds of impracticability and frustration, including such grounds created by the conduct of the State of New York or its agents, employees, or representatives.  (<u>Id.</u>)

- <u>Fifteenth Defense</u>: Plaintiffs' claims are barred and/or preempted, in whole or in part, by federal law pertaining to the transportation industry, including the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 14501, 41713, and any other applicable provisions of Title 49 of the United States Code, Title 49 of the Code of Federal Regulations, and related provisions, federal common law, or other federal law pertaining to the industry or the duties of common carriers.  (<u>Id.</u>)

- <u>Seventeenth Defense</u>: Plaintiffs' claims, including their request for civil penalties, are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, unclean hands, <u>in pari delicto</u>, and/or other equitable doctrines, in that, among other things, plaintiffs had reason to know about unlawful cigarette sales by the shippers named in the Third Amended Complaint, yet failed to take appropriate steps as to them or their customers, or to notify UPS. (<u>Id.</u>)

- <u>Eighteenth Defense</u>: Plaintiffs' claims are barred, in whole or in part, under the doctrine of estoppel by entrapment.  (<u>Id.</u> at 23.)

- <u>Nineteenth Defense</u>: Plaintiffs' claims are barred, in whole or in part, under the public authority defense.  (<u>Id.</u>)

- <u>Twentieth Defense</u>: Plaintiffs' claims are barred, in whole or in part, by judicial estoppel or similar doctrines.  (<u>Id.</u>)

- <u>Twenty-First Defense</u>: Plaintiffs' claims for civil penalties are barred to the extent that an award of such penalties does not comport with principles of substantive and procedural due process under the U.S. Constitution and other federal and state law.  (<u>Id.</u>)

- <u>Twenty-Second Defense</u>: The State is barred from seeking penalties under the AOD in circumstances where the State declined to pursue

penalties after requiring UPS to make a showing to the State's "reasonable satisfaction" under ¶ 42(b) of the AOD.  (Id.)

- <u>Twenty-Third Defense</u>: The PACT Act exempts UPS from liability under the PACT Act or PHL § 1399-<u>ll</u>, either because UPS is subject to the AOD, or because UPS had an AOD and continues to administer and enforce policies and practices throughout the United States that are at least as stringent as the AOD.  15 U.S.C. § 376a(e)(3)(A)(i), (ii).  (Id.)

- <u>Twenty-Fourth Defense</u>: The PACT Act exempts UPS from civil penalties under 15 U.S.C. § 377(b)(3)(B).  (Id.)

- <u>Twenty-Fifth Defense</u>: Plaintiffs' claims pursuant to the PACT Act are barred or limited by their own conduct, including their failure to comply with the PACT Act's provisions requiring state and local governments to provide the U.S. Attorney General with certain information used to create the PACT Act's list of unregistered or noncompliant delivery sellers.  15 U.S.C. § 376a(e)(1)(D), (6)(A). (Id.)

- <u>Twenty-Sixth Defense</u>: Plaintiffs' claims pursuant to the New York Public Health Law are barred, in whole or in part, because they lack standing to enforce PHL § 1399-<u>ll</u> against UPS based on any alleged delivery occurring before September 27, 2013.  (Id. at 24.)

B.    <u>The Trial</u>

This case was tried to the bench on September 19, 2016, through September 29, 2016.  The parties called thirty-eight witnesses in total—twenty-two live[17] and sixteen by way of deposition designation.[18]  The Court also received into evidence more than 1,000 documents, amounting to thousands of pages.[19]

---

[17] Plaintiffs called many of defendant's witnesses as hostile witnesses in their case.

[18] The Court made a number of rulings on objections to deposition designations.  (See ECF Nos. 407, 409.)

[19] The Court made a number of evidentiary rulings regarding documents that the parties sought to introduce.  Those rulings are contained primarily in the following orders: ECF Nos. 408, 422, 462, 463, 490, 502, and 511.  Following trial, the parties were ordered to meet and confer regarding a list of admitted documents.  They filed their lists at ECF No. 461.  (See also ECF No. 471.)

Following post-trial submissions, the Court held closing arguments on November 2, 2016.  The instant Opinion & Order constitutes the Court's findings of fact and conclusions of law.

In sum, and for the reasons set forth below, the Court finds that plaintiffs are entitled to a liability determination with regard to all but one of the Relevant Shippers.[20]  The Court further finds that compensatory damages and penalties are appropriate, but declines to award injunctive relief or to appoint an independent monitor.  In accordance with the rulings below, the Court directs the parties to submit calculations of the number of "Packages" (a term the Court defines below) and "Cartons" of cigarettes (also defined below) to enable this Court to make a final determination as to the quantum of compensatory damages and penalties.

## III.   FINDINGS OF FACT[21]

### A.   Public Health Issues Associated with Cigarettes

The facts concerning the public health issues associated with cigarette usage were largely uncontested.  Plaintiffs called Dr. Sonia Angell, Deputy Commissioner of the Division of Prevention and Primary Care, New York City Department of Health and Mental Hygiene.  (Affidavit of Sonia Angell ("Angell Aff."), PX 628; Trial Tr. 1353:24-1370:22 (Angell).)  Dr. Angell testified that tobacco use kills approximately 28,200 New Yorkers each year.  (Angell Aff., PX 628 ¶ 5.)  This

---

[20] As discussed below, the Court finds that plaintiffs have proven liability as to each claim for a number of shippers, as to only the AOD claim for certain others, and not at all for one.

[21] The Court's findings of fact are based on its assessment of the preponderance of the credible evidence.  See, e.g., Diesel Props S.R.L. v. Greystone Bus. Credit II, LLC, 631 F.3d 42, 52 (2d Cir. 2011).

exceeds the number of deaths caused by alcohol, motor vehicle accidents, firearms, toxic agents, and unsafe sexual behaviors combined.  (Id.)  Dr. Angell also testified that each year, tobacco-related healthcare costs New Yorkers $10.4 billion.  (Id. ¶ 7.) The CCTA, PACT Act, and PHL § 1399-ll are each intended to address serious public health issues and other costs associated with cigarettes.  See, e.g., Prevent All Cigarette Trafficking Act of 2009, Pub. L. No. 111-154 § 1, 124 Stat. 1087, 1088 (2010) ("It is the purpose of this Act to[, inter alia,] . . . prevent and reduce youth access to inexpensive cigarettes . . . through illegal Internet or contraband sales."); H.R. Conf. Rep. No. 95-1778 at 8 (1978) (stating that "the purpose of [the CCTA is] to provide a timely solution to [the] organized crime problem" of trafficking in contraband cigarettes); 2000 N.Y. Sess. Laws Ch. 262 (S. 8177) § 1 (McKinney) ("The legislature finds and declares that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety, and welfare, to the funding of health care pursuant to the health care reform act of 2000, and to the economy of the state.")

The State and City of New York also impose taxes on the sale and use of tobacco products, such as cigarettes, to combat these harms and to protect public health.  The revenue generated by such taxes is, however, dwarfed by actual healthcare costs spent by New Yorkers.  (Angell Aff., PX 628 ¶ 28.)

    B.    Plaintiffs' Investigations of UPS

This lawsuit by the State and City followed prior investigations into UPS's transport of unstamped cigarettes; the first such investigation commenced in

approximately 2003.[22]  As discussed further below, UPS eventually resolved this investigation by entering into a settlement agreement in the form of an AOD with the State.  The AOD was executed in October 2005 and became effective approximately one month later.

During the summer/fall of 2011, UPS and the State (in particular, Dana Biberman, Chief of the Tobacco Compliance Bureau at the New York State Office of the Attorney General, who is also counsel in the instant action) engaged in a series of communications regarding a group of shippers referred to as the "Potsdam Shippers" (based on their common geographic location near Potsdam, New York). As relevant to plaintiffs' claims herein, these shippers include Action Race Parts, Jacobs Manufacturing (also referred to as "Jacobs Tobacco"), and Mohawk Spring Water.

On June 24, 2011, Biberman wrote to counsel for UPS concerning packages containing cigarettes that had been seized at the UPS Potsdam facility on June 22, 2011.  The letter requested that UPS pay a stipulated penalty of $1,000 for each and every violation of the AOD, unless UPS established that it "did not know and had no reason to know that the shipment was a Prohibited Shipment."  (DX 89.)

On August 9, 2011, counsel for UPS met with Biberman and others regarding the seized packages.  At that meeting, UPS told Biberman of a conversation

---

[22] Plaintiffs separate the prior investigations into two groups: one in 2003, and one beginning in 2011 and continuing to this lawsuit.  UPS breaks the investigations into three groups: one in 2003, one in 2011, and one beginning in 2013 and continuing to this lawsuit.  Whether plaintiffs' or UPS's grouping are deemed a correct characterization has implications for UPS's argument (discussed below) that it had resolved the 2011 investigation "to the reasonable satisfaction of the Attorney General."  This is relevant to arguments regarding ¶ 42 of the AOD.  (AOD, DX 23.)

between one of its security department employees, Jim Terranova, and a New York state trooper, Alfonse Nitti, that occurred in April 2011.  Terranova had told Nitti that UPS was concerned that certain of the Potsdam Shippers were shipping cigarettes.  Nitti informed Terranova that there was an ongoing investigation.  Terranova asked whether UPS should continue to pick up packages from these shippers, and Officer Nitti responded affirmatively.

Following the August 9, 2011, meeting between UPS and the State, UPS provided the State with delivery information with regard to the Potsdam Shippers through July or August 2011.  (Trial Declaration of Carl H. Loewenson, Jr. ("Loewenson Decl."), DX 605 ¶ 21; DX 125; DX 126.)  The State Attorney General's office took no further action as to these shippers until the events in connection with this lawsuit.  The Potsdam Shippers were eventually included in the amended complaint filed herein.  As discussed below, UPS points to these circumstances as evidence that, pursuant to the AOD, it had "establish[ed] to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know the shipment[s] [were] Prohibited Shipment[s]."  (AOD, DX 23 ¶ 42).  In addition, UPS uses these events to support its laches, waiver, estoppel, estoppel-by-entrapment, and "public authority" defenses.  As discussed below, the Court disagrees with inferences and conclusions UPS asserts based on these events.

Approximately two years later, on July 29, 2013, the New York City Department of Finance ("City Finance") served a subpoena on UPS seeking delivery records for a number of shippers, including the Relevant Shippers.  (Affidavit of

Maureen Kokeas ("Kokeas Aff."), ECF No. 389-8 ¶ 6.)[23]  Between the time UPS

received the subpoena in July 2013 and February 18, 2015 (when this lawsuit was

commenced), the parties engaged in a number of communications.  Plaintiffs

provided UPS with, inter alia, a draft complaint.  The parties were unable to resolve

their differences, and this lawsuit was filed on February 18, 2015.

C.   UPS's Business

The size and conduct of UPS's business operations are relevant to a number

of issues in this case, including what constitute reasonable operating procedures,

the extent to which UPS can be expected to know the contents of packages, the

scope of employees' job responsibilities, and whether UPS bears legal responsibility

for acts and knowledge of certain employees.  The facts regarding UPS's size and

operations were largely uncontested.  The legal conclusions drawn from those facts

were vigorously contested.

UPS is a global company with very substantial U.S. operations.  It is a

massive employer, with over 350,000 employees in the United States alone.  Its

employees are responsible for establishing and maintaining account relationships

and for the pickup, processing, and delivery of millions of packages each day.  To

perform its operations, UPS uses over 1,800 separate physical facilities, 104,926

vehicles, and 237 aircraft.  (Trial Declaration of Bradley J. Cook ("Cook Decl."), DX

---

[23] As part of its investigation, City Finance conducted a number of controlled buys of untaxed cigarettes from two of the Relevant Shippers, Seneca Cigars and Smokes & Spirits.  (Kokeas Aff., ECF No. 389-8 ¶ 9; see also PXs 40, 43, 44, 45, 50.)  The packages, which had been shipped via UPS, arrived containing unstamped cigarettes.  (PX 40, 43, 44, 45, 50.)  Maureen Kokeas, First Deputy Sheriff of City Finance, targeted Seneca Cigars because she had received an email from them advertising untaxed cigarettes shipped via UPS.  (PX 592.)

600 ¶ 24.)  The vast majority of shipments UPS receives for transport (well over 90%) are processed on electronic shipping systems such as UPS Worldship.  (Id. ¶ 29.)  The shipper itself inputs certain information—not including package contents—and prints a bar-coded label that is affixed to the exterior of the package. (Id.)  The package-level detail is then electronically transmitted to UPS.  (Id.)

At trial, the primary witness who described UPS's business operations was Bradley J. Cook, UPS's Director of Dangerous Goods and Director of Package Solutions.  The Court found Cook generally credible and found that, from the fall of 2013 onwards, Cook dedicated himself to "righting the ship" with regards to UPS's compliance efforts.  With that said, he is an interested witness insofar as much of the conduct at issue occurred in an area for which he had (and has) significant oversight responsibilities.  As Director of Dangerous Goods, Cook had primary responsibility, along with legal counsel, for overseeing issues relating to UPS's shipment of tobacco products and compliance with the AOD.

As described throughout this decision, UPS's efforts to comply with the AOD were inadequate until the commencement of this lawsuit; its efforts fell woefully short until the fall of 2013, after which it increased it proactive efforts.  But it was not until this lawsuit was filed that UPS's efforts became adequate.  The persistent inadequacies are surprising in light of UPS's clear awareness when it signed the AOD that it had assumed a number of explicit obligations.  Indeed, the AOD required affirmative efforts, including particular and, when appropriate, directed vigilance to ensure compliance with its terms.  The AOD precluded UPS from

14

conducting "business as usual;" the AOD precluded UPS from ignoring red flags, and it precluded UPS from relying on self-serving statements by shippers in the face of red flags.

Throughout the relevant period, Cook was aware of the AOD and its requirements. He also demonstrated in-depth knowledge of UPS's business. He knew, for instance, that customers located on or near Indian reservations were at a higher risk of shipping unstamped cigarettes (as others within UPS also knew); he knew that UPS did not require customers to declare the contents of their packages (as others within UPS also knew); and he knew that short of a package inadvertently breaking open or being subject to an audit, UPS had no clear, routine method to determine a package's contents (as others within UPS also knew). Cook, and others in positions of responsibility at UPS, knew that in many respects, UPS was "flying blind" regarding whether Indian-reservation-based customers were shipping cigarettes. But UPS was in a special position: It had assumed particular obligations under the AOD, and all that stood between UPS and penalties under the PACT Act and PHL § 1399-ll was honoring the AOD. The stakes were high. Yet, UPS failed to do what was necessary to ensure sufficient compliance. Perfection was never required, but more should and could have been done. That UPS could have done more is demonstrated by the material improvements it has implemented in its procedures since this lawsuit was filed. UPS has now—too late to avoid liability, but in sufficient time to avoid imposition of an injunction or independent

15

monitor—transformed itself from a willfully blind actor to one actively doing far more.

The Court finds that Cook was by no means incompetent or acting inconsistently with corporate expectations.  By all accounts, UPS's lack of commitment to true, active AOD compliance pervaded its corporate culture.  As discussed below, when tools were available to assist UPS (and Cook) in their efforts—for example, lists of shippers deemed to be tendering cigarettes in violation of, inter alia, the PACT Act (and, thereby, likely a variety of other statutory schemes) created and disseminated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") (referred to as "non-compliant lists" or "NCLs")—UPS failed to distribute them broadly, including to the one person who certainly should have had them, Cook.  Once Cook had the lists of non-compliant shippers in the fall of 2013, he used them.

In addition, as a corporate entity, UPS had information available to it in various places that provided certain employees insight into the contents of packages.  For instance, UPS received inquiries regarding lost or damaged packages (so called "tracers") of cigarettes shipped by the very shippers at issue here.  But this information remained largely compartmentalized.  Contrary to UPS's argument at trial, such compartmentalization does not explain, justify, support, or excuse lack of knowledge of package contents by those managing the Relevant Shippers' accounts.  UPS had, after all, undertaken (and was separately legally obligated) to do what it could to prevent transport of cigarettes.  UPS therefore bears

responsibility for a serious failure of process and procedures.  UPS's size is not an excuse to shift responsibility for its business failings to taxpayers who ultimately cover the investigative, healthcare, and other costs associated with unlawful transport (and, ultimately, use) of cigarettes.

Moreover, UPS understood that all of the Relevant Shippers were located on or closely proximate to an Indian reservation known previously to have one or more smoke shops and/or cigarette shippers.  The UPS drivers and sales account personnel who met with customers saw signage on or near shippers' businesses indicating that cigarettes or tobacco were among their wares.  From time to time during in-person visits, UPS personnel saw cigarettes on display racks; and UPS of course knew that even the names of certain shippers contained the words "cigar(s)" or "tobacco."  UPS knew that certain shippers were shipping hundreds of packages a day from residential addresses; it knew that certain shippers opened multiple accounts, sometimes under different names.  These and other signs described below were nothing short of blinking red lights—lights that flashed, "PROCEED WITH EXTREME CAUTION!"—yet no particular instructions from Cook or others at a high level were directed at such accounts, nor were personnel given particular instructions as to how to proceed under such circumstances.  The Court finds that such facts support, in part, the existence of a "reasonable basis to believe" a shipper may have been tendering cigarettes, thereby triggering an audit obligation under the AOD.  (See AOD, DX 23 ¶ 42.)

In March 2010 Congress passed the PACT Act, which went into effect in late June 2010.  UPS was mentioned explicitly in the text of the statute as one of the common carriers subject to an AOD.  There is no doubt that UPS was aware of this statute.  UPS knew that national attention was directed at preventing transport of cigarettes; it should have understood that the NCLs generated as a result of this statutory scheme contained information indisputably relevant—and, at the very least, that the NCLS were useful tools to ensure that its AOD was being "honored."[24]  The NCLs were also useful tools to assist compliance with the CCTA.  And yet, inexplicably, UPS ignored the NCLs, deeming them irrelevant.  Until the fall of 2013, it never used them to identify at-risk shippers.  UPS's position vis-à-vis the NCLs confused a required usage with a rational and reasonable usage.  Had UPS actively created and used its own list equivalent to the NCLs, its position that the NCLs were irrelevant might be more compelling.  Given UPS's general lack of proactive efforts to identify at-risk shippers, ignoring the relevance and utility of the NCLs made no sense.

Finally, the evidence at trial showed a notable increase in UPS's business and customer acquisitions following the effective date of the PACT Act—when the U.S. Postal Service ("USPS") and other carriers were prohibited from transporting unstamped cigarettes without serious penalty.  Yet UPS argued at trial that it did not "put two and two together," and that it did not associate this increased business with any particular event.  For a company with UPS's sophistication, and its

---

[24] "Honored" is the PACT Act's term to describe a prerequisite for entitlement to an exemption.

evident commercial interests, this also makes no sense.  Frankly, the Court does not buy it.  Nor, apparently, did at least one UPS employee who noted in an email that "UPS has gained a lot of tobacco business from the USPS this year due to PACT Act taking effect at the end of June[.]"  (PX 198.)

In sum, UPS had a legal obligation to comply with the AOD and the law, but it failed to take basic and reasonable steps to do so.  Its size alone meant that proper procedures were all the more important—ad hoc measures could not be trusted or relied upon to ensure compliance in such a large organization.

D.    UPS's Business and Specific Conduct

The Court makes the following additional findings regarding UPS's business and specific conduct.

1.    UPS's Tobacco Policy

UPS is a commercial entity that has rules and a price structure relating to its transportation services; these are contained in, inter alia, UPS's Tariff/Terms and Conditions of Service ("Tariff").  At all relevant times, UPS's Tariff has been posted on its website.  (Cook Decl., DX 600 ¶ 33.)  This document sets forth restrictions on shipping with UPS, including a prohibition on the shipment of regulated goods. (Id.)  Cigarettes are among such regulated goods.  Prior to 2004, UPS did not have a specific policy regarding shipment of tobacco products.  (Id. ¶ 34.)  However, a guide then available to customers (the "UPS Rate and Service Guide") did advise shippers that "[n]o service shall be rendered by UPS in the transportation of any shipment

19

that is prohibited by law or regulation of any federal, state, provincial, or local government in the origin or destination country." (Id.)

In 2003, Cook led an effort to create a program to address various states' increasing concerns regarding the sale and shipment of cigarettes to consumers. (Id. ¶ 35.) This effort included identifying likely shippers of tobacco products and cigarettes. (Id. ¶ 36.) As part of this effort, UPS examined its central customer database using search terms such as "cigarette," "smoke," and "tobacco;" reached out to employees in the field; and examined industry codes associated with a shipper. (Id.) These efforts resulted in the identification of approximately 400 at-risk shippers. (Id.)[25] Cook's team then oversaw an effort to inform these shippers of PHL § 1399-ll and advised them that UPS would no longer accept packages containing cigarettes for delivery to unauthorized recipients in New York. (Cook Decl., DX 600 ¶ 37.)

In January 2004, UPS introduced revisions to its Tariff, including a new provision prohibiting shipments of tobacco in violation of state or federal law. (Id. ¶ 39.) In January 2005, UPS updated its Tariff again to include a requirement for a shipper to execute a "Tobacco Agreement" if it sought to ship tobacco products of any kind to consumers. (Id. ¶ 39.) Later in 2005, UPS instituted a policy of

---

[25] Notably, this type of proactive effort was not repeated until late in 2013. As discussed below, a number of the Relevant Shippers had "cigar" or "tobacco" in their name, or a "cigarette" reference on a website advertisement, exterior signage, or email address, yet UPS took no specific additional steps based on such information (including audits) to determine if these customers were shipping cigarettes. Audits and other actions (when they occurred) generally followed UPS's development of additional information.

prohibiting shipments of cigarettes to consumers anywhere in the country.  (Id. ¶ 40.)[26]

As previewed above, on October 21, 2005, UPS entered into the AOD with the State of New York.  (AOD, DX 23.)  The City of New York is not a party to the AOD.  The AOD reflected UPS's agreement not to ship cigarettes to any consumers and to only ship such products to recipients that had appropriate state and federal licenses.  (Id.; Cook Decl., DX 600 ¶ 41.)  To comply with the AOD, UPS updated its Tariff again, reflecting a new "Tobacco Policy."  (DX 35; AOD, DX 23, Ex. A, B.)  The new Tobacco Policy specifically prohibited shipments of cigarettes to consumers on a nationwide basis.  (Cook Decl., DX 600 ¶ 42.)  UPS posted its policy on its website.  (Id. ¶ 43.)

In addition, and to comply with the AOD, UPS created a database to track activity with its tobacco shippers.  (Id. ¶ 63.)  The database contains fields for shipper name, account number, and relevant activity; it presently contains entries for 4,000 shippers from forty-nine states.[27]  (Id. ¶ 63; DX 371.)

### 2.   UPS's Training Efforts

The AOD requires that UPS train relevant personnel about its "Cigarette Policy" and various compliance measures.  (AOD, DX 23 ¶¶ 34-37.)  Plaintiffs assert

---

[26] The AOD and statutory schemes separately prohibit shipments to consumers, unlicensed retailers, or commercial businesses.

[27] As part of its AOD compliance efforts, for a period of time UPS was required to, and did, perform internet searches to identify potential cigarette shippers.  (Cook Decl., DX 600 ¶ 65.)  These searches were intended to identify shippers who advertised shipment of cigarettes through UPS.  As an AOD requirement, this obligation terminated in July 2010.

that UPS has failed to fulfill this obligation.  The Court agrees.  Paragraph 34 of the

AOD contains a very broad requirement:

> UPS shall continue periodically to train its drivers and pre-loaders and
> other relevant UPS employees about UPS's Cigarette Policy and the
> compliance measures agreed to in this Assurance of Discontinuance.

(Id. ¶ 34.)  There was substantial evidence at trial that until shortly before this

lawsuit was filed, apart from a once-yearly "Pre-Work Communication Message"

("PCM"), little actual training in UPS's "Cigarette Policy" or compliance measures

required by the AOD, occurred.  In addition, there was little more than a broad

overview of the Tobacco Policy provided to UPS employees.  Several UPS witnesses

testified to lacking specific knowledge regarding the "compliance measures agreed

to in [the AOD]."  (See, e.g., Trial Tr. 665:24-666:25, 667:20-24 (McDowell); id.

1516:18-1519:4 (Terranova).)

This case has no doubt demonstrated to UPS that its existing training was

inadequate.  Prior to receiving the subpoena from City Finance in July 2013, UPS's

training consisted primarily of the above-mentioned annual PCMs.[28]  PCMs are a

general method of communication with UPS personnel.  They are intended to

provide personnel with specific information on a variety of topics in a format of

longer than three minutes.  While drivers and employees at UPS's processing

---

[28] In addition, UPS has information regarding its Tobacco Policy in its Tobacco Transportation
Procedures Manual; it trains its sales force in its Tariff and Service Guide (both of which contain
restrictions on tobacco shipments), as well as on its Tobacco Policy.  (Cook Decl., DX 600 ¶¶ 55-58.)
UPS also provides training regarding its Tobacco Policy to its customer-service staff.  (Id. ¶¶ 59-62.)
While Cook stated that UPS communicated every change in its Tobacco Policy to sales staff, and that
UPS's "workforce is very well aware of [its] policy against the shipment of cigarettes to consumers"
and has been for years, (id. at ¶¶58-59), these claims are belied by the testimony of UPS employees
who lacked knowledge of AOD compliance requirements.

centers were provided with a PCM that discussed its Tobacco Policy once a year, historically there was no procedure for an employee to "make up" a PCM that he or she has missed (for instance, due to absence on the day a PCM was shown or due to a start date at UPS after the yearly PCM had been shown). Several UPS witnesses testified to recalling the Tobacco Policy PCM, certain recalled the existence of the PCM but not its content, and others did not recall the PCM at all. Clearly, the Tobacco Policy PCM was itself inadequate to properly train employees on UPS's Tobacco Policy and was inadequate to train employees on AOD compliance measures or on how to recognize signs that shippers may have been tendering packages with cigarettes.

Throughout the trial, UPS took the position that requiring personnel to approach certain accounts with questions or skepticism would be inappropriate. The insinuation was that vigilance directed at accounts located on or proximate to Indian reservations was some sort of inappropriate profiling. But this ignores the known reality that particular legal issues applicable to reservations (and to Native Americans making on-reservation purchases) did make reservations different. Moreover, the evidence revealed that UPS did not know whether on-reservation shippers from smoke shops were tribal members and, in fact, those operating smoke shops were not always tribal members. (Trial Tr. 192:14-16 (Cook); id. 904:6-9 (Christ).) In addition, Cook testified that UPS does not expect its drivers to be "investigators;" rather, it expects them to be alert for signs of cigarette shipments and to notify supervisors if they have suspicions. (Cook Decl., DX 600 ¶ 53.) In the

context of the federal, state, and local attention paid to the unlawful transport of cigarettes, and UPS's statutory and AOD obligations, this was an incorrect perspective that unreasonably underestimated UPS's affirmative obligations.  While drivers need not be "investigators" in a law-enforcement sense, they should have been proactive vis-à-vis high-risk accounts.  As the AOD recites, training should have been designed to ensure personnel were/are "<u>actually looking for</u> indications that a package contains cigarettes . . . ."  (AOD, DX 23 ¶ 35 (emphasis added).)

Prior to the commencement of this lawsuit, UPS's training was not effective in preparing its employees to identify cigarette shippers on Indian reservations in New York or to ensure that its personnel were "actively looking" for indications that a package contained cigarettes.  UPS's training on tobacco issues was designed to "check the box."

UPS's tobacco-related training has improved recently.  For instance, PCMs on tobacco training are now delivered in person, UPS has trained personnel in data analytics, it has posted a "red flag" poster at its service centers, and in 2016, UPS added device-based training for its drivers via "DIADs," which are handheld devices that function as computers.  Additional relevant facts are set forth below in the section titled "Current Status of UPS Compliance Efforts."

3.   <u>The Role of Account Executives</u>

As relevant here, UPS's customers are "shippers" of packages.  Sales and account management are handled by a UPS Account Executive (as well as other

24

support personnel).  UPS assigns an Account Executive to every shipper/customer.[29]

UPS's Account Executives are responsible for capturing and maintaining accounts

as well as addressing issues that might arise with regard to those accounts.  In

order to effectively market and support UPS's transport services, Account

Executives are expected to understand their customers' businesses.  To gain such

understanding, Account Executives are expected to communicate with their larger

customers on a regular basis.  Evidence at trial supported that Account Executives

regularly communicated with the Relevant Shippers both in person as well as by

telephone or email.  UPS expected that its Account Executives would enter notes

regarding communications with clients in databases maintained for that purpose.

Such databases were accessible to and used by others who might have an interest in

a particular account or area.  While the evidence made clear that there was spotty

compliance with this expectation (and seemingly no enforcement mechanism),

certain UPS Account Executives (most notably Gerard Fink) nevertheless entered

details of meetings and communications with some of the Relevant Shippers into

---

[29] Over the time period relevant to this lawsuit, the number of customers for which an Account Executive had responsibility varied significantly.  For example, at one point in time, a UPS Account Executive, Gerard Fink, was responsible for 150 to 200 customers; by 2010 he was given responsibility for several thousand more.  (Trial Tr. 507:4-13 (Fink).)  UPS has argued that the number of accounts assigned to Fink illustrates why it is reasonable to believe that he did not know many of his accounts were shipping cigarettes.  The Court rejects this argument.  First, for the reasons discussed at length throughout this opinion, the Court found Fink not credible when he denied knowing that certain of his largest clients were shipping cigarettes.  In addition, UPS assumed obligations under the AOD, and it had separate statutory obligations not to ship cigarettes. UPS's failure to achieve adequate compliance is not excused by an organizational structure that it now argues impeded compliance.  To the extent structural changes were necessary to ensure adequate compliance, it had a responsibility to make them.

those databases.  Various entries include evidence supporting liability, seriously impacting arguments that Fink's or any other Account Executive's actions were outside the scope of employment.

Account Executives were also responsible for obtaining a Tobacco Agreement from those customers who were or would be shipping tobacco products.  Such agreements were supposed to be an important part of UPS's already thin compliance efforts.  The Account Executive was to record the receipt of the Tobacco Agreement in UPS's Tobacco Database.  In theory, this was to assist in monitoring such an account.  As relevant here, there were numerous instances in which the Account Executive either did not obtain a Tobacco Agreement when appropriate, did not retain a copy of an allegedly executed agreement, failed to enter it into the Tobacco Database, or all three.

Account Executives would receive a variety of information relating to their accounts on a regular basis.  For instance, they would receive periodic reports that set forth the amount of revenue attributable to particular customers.  Multiple documents received into evidence support that a number of the Relevant Shippers on or near Indian reservations were among the largest customers for Account Executives.  (See, e.g., PX 568; PX 102, row 9; PX 104.)[30]  Account Executives—

---

[30] Starting in 2010, each shipper is assigned a "patch-of-land" Account Executive or an inside sales representative based on the geographic territory in which the shipper is located.  Patch-of-Land Account Executives are assigned to UPS Centers and become responsible for lower-volume accounts (those with under $300,000 in annual revenue) located in the geographical areas served by those UPS Centers.  Patch-of-Land Account Executives are typically assigned a large number of accounts because of the relatively low volume of each individual account.  Some of the accounts are also assigned to inside sales representatives.  Inside sales representatives operate out of centralized locations and typically provide support to their customers by phone, and they also provide support to

including Fink and others at UPS responsible for the Relevant Shippers—actively reported on account activity to others within the UPS organization. Multiple documents and databases support generally diffuse knowledge and access to information regarding the Relevant Shippers. Put otherwise, the Account Executives—including Fink—took or failed to take actions within a UPS organizational structure that was monitoring account activity.

4. The Role of UPS Drivers

Packages are typically picked up by UPS drivers at a customer's location or are dropped off by a customer at a designated facility. The packages are then brought to a UPS Processing Center. (Cook Decl., DX 600 ¶ 25.)

In all but a handful of instances relating to the Relevant Shippers, UPS drivers would pick up packages at the customer's location. Some of the locations were commercial storefronts (e.g., Arrowhawk Cigars, Morningstar Crafts & Gifts) and others (e.g., EExpress, Bearclaw) were residential locations. In certain instances, UPS drivers would pick up dozens or even hundreds of packages a week from a residential address. For instance, during October 2012, EExpress shipped approximately 2,500 packages with UPS. (PX 559.)

An issue that pervaded the trial was the extent to which UPS, as a corporate entity, knew or should have known of the contents of customer shipments. Typical practice included drivers and Processing Center personnel working with packages;

the Patch-of-Land Account Executives. (Cook Decl., DX 600 ¶ 32; Trial Declaration of Gerard Fink ("Fink Decl."), DX 602 ¶ 5.)

the account team performed sales and service roles that did not include package handling but did include learning about a customer's business and monitoring his or her account activity.  While drivers had limited opportunities (or time) to learn the contents of particular packages, there was ample evidence that they generally understood what a shipper was shipping and, from time to time, had quite specific information about package contents.

UPS policy requires customers to have packages sealed and ready for pickup when the UPS driver arrives.  With regard to the Relevant Shippers, this practice appears to have been followed most of the time.  However, plaintiffs presented evidence that there were occasions when customers were still packing and sealing boxes at the time the UPS driver arrived or when UPS personnel were on site, and that UPS employees were therefore in a position to observe the contents of the packages.[31]  (See, e.g., Jarvis Dep. Tr. 55:22-56:6.)  In addition, there were instances where the type of goods a Relevant Shipper sold, including cigarettes, were prominently advertised on signage and within the premises.  (See, e.g., PX 574 (signage for Morningstar Crafts & Gifts); DX 490 (signage for Arrowhawk Smoke Shop).)  Moreover, UPS personnel, including drivers, did from time to time enter a

---

[31] UPS argued that the similarity between cigarette packaging and little-cigar packaging rendered this view of the packages meaningless.  This is not a helpful argument for UPS.  Under such circumstances, ambiguity of product type suggests at least a possibility as high as 50% that cigarettes were in the box.  In light of UPS's affirmative AOD and statutory obligations, such a possibility required UPS to take further steps.  Put differently, even if UPS thought a package might contain little cigars, it knew that it might instead contain cigarettes.  Given this information, and given the statutory restrictions on transporting cigarettes and the AOD requirements, UPS was obligated be "actively looking for indications" as to whether the customer was shipping a lawful versus an unlawful product.  (AOD, DX 23 ¶ 35.)

Relevant Shipper's premises, providing the opportunity to observe cigarettes available for purchase or in inventory.  These facts should have, but did not, cause UPS to alter its approach to and vigilance of a shipper; such facts formed pieces of the foundation for a "reasonable basis to believe" that a shipper may have been tendering cigarettes for delivery (the standard that triggered an audit obligation under the AOD).  (See AOD, DX 23 ¶ 24.)

      5.     UPS's Interactions with Shippers

As discussed above, a customer using UPS's pickup and delivery services is referred to as a "shipper," and shippers do not typically declare or provide UPS with information regarding the contents of packages.  (Cook Decl., DX 600 ¶ 29.)  On most occasions, the boxes in which a customer packs its goods are plain, corrugated cardboard, and the exterior of the boxes provides no indication as to whether the contents include cigarettes, cigars, spring water, coffee, or something else.[32]  UPS's terms and conditions reserve its right to inspect package contents.  Given the volume of packages processed daily, UPS tended to conduct audits only in very rare circumstances when there was a compelling reason to do so.  The evidence at trial supported audits generally being conducted on those occasions when UPS had specific information regarding likely cigarette shipments.  UPS did not, for instance, routinely or, even once as a matter of course, audit shippers known to ship tobacco

---

[32] However, at least one shipper, Jacobs Manufacturing/Tobacco, regularly used boxes that had the words "cigarettes" stamped on the outside.  (Trial Tr. 1680:5-14 (Jacobs).)

products or whose inventory was also known to include cigarettes.  Audits are discussed in further detail below.

As a matter of UPS policy, when a customer seeks to ship certain regulated goods, including tobacco, he or she is required to disclose that fact to UPS.  In the case of tobacco-related shipments (other than cigarettes), UPS policy requires that a customer execute a Tobacco Agreement.[33]  This agreement is intended to represent an acknowledgment by the shipper that he or she understands UPS's Tobacco Policy, including its prohibition on shipping cigarettes.

Despite the statutes regulating transport of cigarettes, UPS's obligations under the AOD, the passage of the PACT Act that reduced courier options, the profit motive of shippers, the conflicted position of UPS's own sales personnel (who had an interest in acquiring and maintaining business), and obvious signs in conflict with customer statements, UPS allowed its personnel to rely heavily (and often exclusively) on what their shippers claimed to be shipping.  UPS often accepted the fact of a Tobacco Agreement with a customer, or a single conversation with a customer about its business, as sufficient to confirm that a tobacco shipper who advertised or displayed cigarettes was not using UPS to ship them.  As one would expect, cigarette shippers acting contrary to law and UPS policy were rarely inclined to "confess" prohibited package contents (though, as discussed below, there

---

[33] At some point during their relationship with UPS (not always at the outset), several of the Relevant Shippers, including Smokes & Spirits, Shipping Services, Morningstar Crafts & Gifts, Indian Smokes, Seneca Cigars, A.J.'s Cigars, and Native Outlets, had an executed Tobacco Agreements on file with UPS at various points in time.

was at least one instance in which the customer did so explicitly).  And, given the volume incentive agreements UPS offered, there was an economic motive to use UPS.  For a UPS customer shipping cigarettes during this time, being "caught" was a risk worth taking because the penalty was sometimes nonexistent or was, at most, termination.  And sometimes termination was not the end of UPS service.  The record reveals instances in which UPS personnel assisted in establishing a new, replacement account for a customer whose account had been terminated for cigarette shipments.  In many instances, as described below, there were sufficient red flags to alert UPS to the need for additional measures—including random audits.

### 6.   UPS's Information Systems and Information Sharing

As previewed above, one of UPS's consistent themes at trial was its claim that information known to one part of UPS was not known to another, and that it would be improper or at the very least unfair to attribute such compartmentalized knowledge to UPS more broadly.  The facts support such compartmentalization—but not the conclusion UPS draws from it.[34]

At the time of the events at issue, UPS did not have a centralized information system that collected and/or synthesized all of the information it might have regarding packages sent by a particular shipper.  To the extent some part of UPS learned of the specific contents of packages, it was typically when packages broke

---

[34] Elsewhere in this Opinion & Order, the Court addresses how compartmentalized information impacts UPS's knowledge of shipments of cigarettes or actions required pursuant to the AOD.

open during processing, when UPS received inquiries ("tracers") regarding lost or damaged packages, or through audits.  There was no evidence that UPS implemented or followed formal procedures to share the "broken open" packages or tracer information with all members of the account team, with Cook, or with legal counsel.  In addition, there was no ongoing, formal mechanism within UPS to routinely review an at-risk shipper's sales materials or websites (some of which prominently indicated cigarette sales).[35]  Nor was there any centralized practice of ensuring that email addresses with clues as to the likely focus of sales efforts (for instance, the word "cigarettes" appearing in a customer's email address) were further investigated.  Had such information been routinely reviewed and shared with the appropriate personnel, it is highly likely that UPS would have identified certain shippers of cigarettes.

    E.    <u>UPS's Asserted Reliance on Governmental Action/Inaction</u>

UPS has vigorously argued that it took certain actions (or failed to take certain actions) in reliance upon interactions with law enforcement, and, in addition, that it relied on New York State's forbearance policy.  UPS has urged that such facts regarding this governmental action/inaction support its laches, waiver, estoppel (including "estoppel by entrapment"), and public-authority defenses.  These defenses have both factual and legal aspects.  The Court deals with the former here, and with the latter in its legal conclusions below.

---

[35] As described above, the AOD obligated UPS to conduct certain internet searches for a limited time. That obligation expired in 2010.

1.     <u>Governmental Action</u>

Some of the relevant facts regarding such interactions (such as the "Terranova/Nitti" communications) are briefly described above in the section "Plaintiffs' Investigations of UPS."  Throughout the pretrial process, UPS repeatedly referred to instructions to stand down with regard to compliance measures due to an "ongoing investigation."  As it turned out at trial, the facts in this regard were far less robust than previewed and not at all compelling.

The evidence can be briefly summarized: In April 2011, UPS driver Donald Jarvis, who was associated with UPS's Potsdam Processing Center, learned and believed that certain packages from the Potsdam Shippers contained cigarettes. Jarvis informed a UPS supervisor, Steve Talbot.  Talbot contacted the UPS security representative assigned to the Potsdam Center, Jim Terranova, to ask for guidance (Terranova was not a high-ranking UPS employee).  Terranova had apparently had undisclosed (and irrelevant) other dealings with members of the New York State Police, including state trooper Alfonse Nitti.  In April 2011, Terranova contacted Nitti and told him there was a suspicion that certain accounts on the Mohawk/St. Regis reservation were shipping cigarettes.  (Trial Declaration of James Terranova ("Terranova Decl."), DX 612.)  Terranova did not tell Nitti where shipments (including bulk shipments) were being delivered.  (Terranova Decl., DX 612 ¶¶ 1-2, 7; Trial Tr. 1529:20-1530:24, 1532:20-25 (Terranova).)  Nitti informed Terranova that there was an active investigation into those shippers.  Terranova then posed the question to Nitti as to whether UPS should continue picking up packages from

33

those shippers; Nitti responded that UPS should.  Nitti was not a representative from the State Attorney General's office; there was no evidence that Nitti was made aware of the AOD or knew about UPS's legal obligations with regard to it or any other statutory scheme.  Subsequently, Terranova and others conveyed Nitti's comment down the chain to UPS drivers responsible for the Potsdam Shipper accounts.  For a period of two months thereafter, UPS followed its own forbearance practice.  This ended when, on June 22, 2011, the New York State Department of Taxation and Finance ("DTF") Chief Investigator, John Connolly, visited the UPS Potsdam Center.  (Trial Declaration of Steven Talbot ("Talbot Decl."), DX 606 ¶ 10; Terranova Decl., DX 612 ¶ 10.)  Connolly seized packages tendered by certain Potsdam Shippers.  Connolly also informed UPS that New York State's forbearance policy vis-à-vis Indian reservations had ended and that UPS should not be shipping cigarettes "to their Native American customers."  (DX 389; see also Ernst Dep. Tr. 86:23-87:4.)[36]

These facts do not support UPS's characterization of this interaction as a formal instruction by law enforcement—upon which it could reasonably rely—to stand down on AOD obligations or other statutory requirements.  As is evident from the above, such a portrayal overinflates a rather limited, non-senior contact between one lower-level UPS employee and one state trooper.  Indeed, there was no

---

[36] UPS argues that this communication is evidence of its basis for believing that shipments prior to this date were authorized.  As discussed below, there is, however, insufficient evidence to support that UPS had ever taken actions, or failed to take actions, in reliance on the "forbearance policy."

independent evidence as to the basis for this trooper's purported statements to Terranova or his authorization to convey any instructions to UPS.[37]  There is insufficient evidence to support Nitti's authority to provide the official position of the New York State Police, let alone provide an exemption from the AOD and statutory obligations.

But in all events, the facts do not support widespread reliance on these Terranova/Nitti communications.  At most, the evidence supports unreasonable reliance by a small handful of people within the Potsdam Center for a two-month period only, and by no one at a high level.  For instance, there is no evidence that Cook was informed about this communication at the time.  In sum, the Court rejects any reasonable reliance on the Terranova/Nitti communication.

### 2.   Governmental Inaction

In addition, UPS has argued that prior to June 22, 2011, "UPS believed" that transporting shipments of packages containing cigarettes originating with the Potsdam Shippers (including Action Race Parts, Jacobs Manufacturing/Tobacco, and Mohawk Spring Water) and destined for tobacco retailers on other Indian reservations, was authorized by the State's forbearance policy or was otherwise lawful.  The "otherwise lawful" portion of this position is the heart of what has been referred to in this litigation as UPS's "§ 471" argument.  Putting aside the Court's

---

[37] In light of UPS's affirmative obligations under the AOD and federal and state statutes, UPS should have sought written or other high-level confirmation, informed the State personnel responsible for the AOD, and sought legal advice.  There is no evidence that this was done.  The AOD can only be modified in a writing signed by both parties, (AOD, DX 23 ¶ 54); the oral Nitti/Terranova conversation could not effect a modification.

legal determination regarding the viability of UPS's Seventh Defense (relating to, inter alia, the forbearance policy), there is a separate factual question as to whether, before June 22, 2011, personnel within UPS in fact believed that it could lawfully transport shipments from the Potsdam Shippers to reservation retailers or other Indian reservations (that is, based on some misunderstanding that § 471 or other legal principles allowed such transport), and acted in reliance on such a belief. The Court determines that factual question against UPS.  There is simply insufficient credible evidence to support UPS's factual claim that this was a widely held view in the organization.

As a result of the lack of sufficient factual support, UPS's arguments as to its reliance on governmental authority or inaction fail.  There is also no indication that relevant personnel received legal advice that they could rely on a New York State policy of forbearance as to Indian reservations applied to its actions as a private, non-tribal entity.  Nor is there sufficient evidence that UPS personnel had any other reasonable basis for such an understanding.  In addition, such a position is in conflict with UPS's overall story that it consistently trained its personnel in its Tobacco Policy; no evidence suggests that its training was modified to allow for a distinction between shipments going to reservation retailers (i.e., the shipments UPS argues were protected by constitutional principles) and all other recipients.[38] For instance, there was no credible testimony that UPS drivers were instructed to

---

[38] Indeed, UPS has argued that, to the contrary, an inability to monitor addresses given the given the volume of shipments handled, it would be unreasonable to expect it to monitor addresses.

allow certain shipments to reservation retailers but not to residential consumers. UPS did present anecdotal evidence that certain witnesses had heard or thought such reservation-to-reservation retailer shipments were allowed—but it was never clear where this came from, and it is in conflict with other evidence.

Finally, of course, it is clear that the AOD did not exempt shipments from or between reservations; that is, there is no basis for "§ 471" or "forbearance policy" arguments with respect to UPS's obligations.

F.   UPS's Audits

UPS presented evidence that it conducted at least twenty-eight audits between 2011 and 2016, several of which were of certain Relevant Shippers.[39]  (See, e.g., Cook Decl., DX 600 ¶ 18; DXs 161, 165, 194, 219, 221, 222, 244, 257, 263, 264, 265, 303, 311, & 363.)  The facts show that audits were conducted relatively infrequently and were inadequate to comply with UPS's audit or other obligations under the AOD.

As discussed below, ¶ 24 of the AOD requires that UPS audit shipments where "there is a reasonable basis to believe that such shipper may be tendering cigarettes for delivery to Individual Consumers, in order to determine whether the shipper is in fact doing so."[40]  (AOD, DX 23 ¶ 24.)  An audit obligation is therefore

---

[39] Plaintiffs initially commenced this case and sought discovery with regard to fifty or so shippers. Over the course of the litigation, that number was reduced.  At trial, UPS's evidence with regard to its audits included all of the shippers who have ever been at issue in the case.  Thus, the "twenty-eight" audits that UPS cites includes shippers who are not among the Relevant Shippers.

[40] "Individual Consumer" is defined in the AOD as a person "other than an Authorized Recipient." (AOD, DX 23 ¶ 16(G).)  "Authorized Recipient" is, in turn, defined as "any person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which

triggered when there is a "reasonable basis to believe," and the audit serves a particular purpose: "to determine" whether a shipper may be tendering cigarettes.

The vast majority of audits to which UPS points occurred in 2013 and 2016—that is, after UPS had already received a subpoena and was thus aware this lawsuit was likely or that UPS had already been sued. Of the twenty-eight audits, twenty-six fall into this category. The remaining two audits took place on September 21, 2012.[41] (See DXs 161, 165.) Cigarettes were found during these audits and both accounts were terminated.

UPS points to the audits it conducted as evidence of compliance with the AOD and evidence that it acted responsibly vis-à-vis likely cigarette shippers. The Court disagrees. Cigarettes should not have had to fall out of a broken box, more or less, for UPS to have initiated an audit. As discussed in specific detail below, the Court finds that there was a reasonable basis to believe that a number of the Relevant Shippers may have been tendering cigarettes well before they were audited.

---

delivery is made." (Id. ¶ 16(A).) Apart from its legal argument regarding § 471 (that all shipments "to" reservations were authorized), an argument this Court rejected, New York v. United Parcel Serv., Inc., No. 15-cv-1135, 2016 WL 4747236 (S.D.N.Y. Sept. 10, 2016)), in the face of plaintiffs' extensive proof of lack authorization, UPS did not attempt to demonstrate that any recipient was, in fact, an "Authorized Recipient." The Court finds as a matter of fact that all addresses of shipments at issue were to unauthorized recipients or "Individual Consumers." Thus, the fact that certain shippers (such as Jacobs Manufacturing/Tobacco) shipped exclusively to retailers on Indian reservations does not remove such shipments from the classification of shipments to "Individual Consumers." This is important to the Court's factual determination of when, inter alia, the audit obligation attached; such obligation being defined in terms of a reasonable basis to believe the shipper may be tendering cigarettes to "Individual Consumers."

[41] UPS lists Indian Smokes as an audited entity in the chart at ¶ 30(e) in its Proposed Findings of Fact and cites DX 161 for this proposition. The Court notes, however, that DX 161 does not support an inference that Indian Smokes was audited, and Cook's declaration supports an inference that Indian Smokes was terminated without an audit. (Cook Decl., DX 600 ¶¶ 75, 82.)

Certain facts should have led to more frequent and broader audits.  As an initial matter, UPS had a right to audit packages, it had the personnel to do so, and it had an affirmative obligation under the AOD to do so when facts supported a "reasonable basis to believe" that a shipper "may" be tendering cigarettes. Certainty or even a high degree of likelihood was not required to trigger this obligation.  Facts "on the ground" should have pushed UPS toward more proactive audits.  For instance: It knew that certain shippers had names that included the words "tobacco," "cigar," or "smokes," indicating a certainty of tobacco shipments and a reasonable possibility of cigarette shipments; it knew that a number of others (without eponymous names) sold cigarettes, making shipments all the more likely; it knew that certain shippers on Indian reservations refused to disclose (allegedly) what they were shipping; it knew that others had opened multiple accounts or that a new account was opened at the same address as one recently terminated for cigarette shipments; and, of course, all of this was against the backdrop of such shippers being located on Indian reservations that had for years been associated with sales and shipments of unstamped cigarettes.  For instance, in an email sent June 23, 2011, a UPS security employee stated that New York Indian reservation retailers have been "selling cigarette[s] without paying taxes . . . .  This has been an ongoing situation over the years throughout the state with several different reservations doing the same thing."  (PX 460.)

As discussed with regard to certain shippers below, the presence of some numbers of these (and other) facts supported the existence of a reasonable basis to

39

believe that such shippers may have been tendering packages containing cigarettes. UPS gave too much weight to seemingly innocuous explanations given by shippers for the goods they claimed to be tendering, and it did so when many of the above facts were present.  Such self-serving explanations were inherently unreliable and did not eliminate the reasonable basis to believe that a shipper "may" be tendering cigarettes.

Audits that were conducted did, however, serve an additional purpose: They provided UPS, and now provide this Court, data regarding package contents as well as a basis for estimating the percentage of a shipper's packages that contained cigarettes.  A corollary is that the failure to conduct audits despite an audit obligation reduced the amount of information available regarding the contents of the Relevant Shippers' packages.  Had UPS conducted more audits (as it was obligated to do under these facts), it would have greater detail on the percentage of shipments containing cigarettes versus other goods.  As discussed in the legal conclusions below, UPS—not plaintiffs—therefore bears the responsibility for this lack of information.

## IV.   CURRENT STATUS OF UPS'S COMPLIANCE EFFORTS

As discussed throughout this Opinion, there is no doubt that UPS could have and should have done more to identify shippers likely to be tendering cigarettes. However, there is strong evidence that UPS has taken a number of steps in the past three years to dramatically improve its compliance efforts.

After UPS received the subpoena from City Finance in late July 2013, UPS requested outside counsel to conduct an investigation (using available information) into 540 active shippers listed in UPS's Tobacco Database.  (Cook Decl., DX 600 ¶¶ 83-84.)  That investigation yielded a group of thirty shippers as to whom additional investigative steps were taken.  (Id. ¶ 84.)  This list was then further reduced to six shippers, including three that are among the Relevant Shippers in this case.  (Id. ¶ 84.)  Cook required audits of each of these three shippers.[42]  (Id. ¶ 85.)

Commencing in the fall of 2013, UPS also began to utilize the NCLs prepared and updated quarterly by the ATF.  (Id. ¶¶ 102-03.)  In early 2014, UPS added personnel to its compliance efforts, including Derrick Niemi.  Niemi testified live at trial and the Court found him credible.  His demeanor was sincere and his answers were thoughtful and careful.  Niemi has made specific trips to visit UPS Processing Centers and reservations with shippers; Niemi has also performed data analysis to identify other shippers who pose a risk of non-compliance.

Cook has taken more immediate action to terminate shippers for which audits revealed cigarettes.  For instance, on January 8, 2014, UPS received the results of an audit for Shipping Services; three of five packages opened contained filtered cigars, and two packages contained cigarettes.  (Cook Decl., DX 600 ¶ 93.)  UPS terminated this account.  In 2014, UPS also investigated a shipper known as

---

[42] An audit of Native Outlet conducted on January 2, 2014, revealed only filtered cigars; additional audits were conducted of this entity and no cigarettes were found.  (Cook Decl., DX 600 ¶¶ 87-88.)

Cloud & Co. located in Salamanca, New York, and terminated this shipper after the investigation revealed it had been sued by the City for alleged shipment of cigarettes.  (Id. ¶ 138.)

On January 22, 2014, UPS received the results of an audit of Smokes & Spirits, processed through its Olean, New York Center.  (Id. ¶ 97.)  Out of fifteen packages opened, nine contained cigarettes; the remainder contained chewing tobacco and filtered cigars.  (Id.; see also DX 257.)  Immediately upon receiving these results, UPS terminated this account.  (Cook Decl., DX 600 ¶ 98.)

In September 2014, UPS changed its account-opening process to increase screening of tobacco shippers in New York State.  (Id. ¶ 144.)  Each account opened on an Indian reservation is investigated to determine if it might be shipping tobacco products.  (Id.)  Additionally, UPS monitors the volume of shipments from reservation-based shippers on a weekly basis to identify red flags in volume patterns.  (Id. ¶ 145.)  (This is the use of "data analytics" to support UPS's compliance efforts).

In addition, on April 27, 2016, Cook traveled to upstate New York and personally participated in audits of all packages shipped out of the Dunkirk, New York, Processing Center (the Center that processes Native Outlet, among others).  Ten of the packages opened were shipped by Native Outlet, and all contained little cigars.[43]  Cook also personally delivered UPS's Tobacco Policy PCM at the Dunkirk,

---

[43] Cook's testimony regarding the Native Outlet audits was corroborated by a number of photographs of the opened packages.  (See, e.g., DXs 194, 375, 421.)

Olean, and Jamestown Centers; interviewed each center manager; participated in a "ride along" with each center driver; conducted audits of the packages picked up by each Center; and documented any packages of tobacco picked up by each Center. (Cook Decl., DX 600 ¶ 143.)  Three other members of UPS's Corporate Compliance Group conducted similar audits in other centers in New York serving reservations. (Id.)

The Court view UPS's compliance efforts as increasing in rigor since the fall of 2013 and achieving actual compliance as of the date this lawsuit was filed on February 18, 2015.  Prior to February 18, 2015, the efforts were in what the Court views as a "ramping up" process; throughout 2014, for instance, audits that should have been conducted long before were still only just being done.  Determining the date when efforts coalesced to a point of compliance is therefore not a precise exercise.  But the Court views the filing of the lawsuit as marking a time when UPS had put its non-compliance largely behind it.[44]

## V.   BACKGROUND CONCERNING THE TAXATION OF CIGARETTES AND LITTLE CIGARS

New York imposes a tax on all cigarettes for sale in the State, except where the State "is without power to impose such tax."  N.Y. Tax Law § 471.  Taxes are paid by purchasing and affixing a tax stamp.  See N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii) ("§ 74.3").  New York's cigarette excise taxes increased significantly in the 2000s.  (Trial Declaration of Farrell Delman ("Delman Decl."),

---

[44] As discussed below, the Court views Seneca Promotions, a current client, as presenting an ongoing compliance issue.  But this is the only one of which the Court is aware.

DX 611 ¶ 17.)  On March 3, 2000, New York increased its cigarette tax to $1.11 per pack from $0.56 per pack.  (Id. ¶ 18.)  On April 3, 2002, the State increased the excise tax on cigarettes again, this time to $1.50 per pack, where it remained until June 3, 2008, at which time it was increased to $2.75 per pack.  (Id. ¶ 19.)  On July 1, 2010, the State's excise tax on cigarettes was raised to $4.35 per pack, where the tax remains today.  (Id. ¶ 20 (citing N.Y. Tax Law § 471).)  By 2015, New York's cigarette excise tax was $2.72 more than the national average for state cigarette excise taxes.  (Delman Decl., DX 611 ¶ 20.)

For its part, New York City imposed an eight-cents-per-pack tax on cigarettes until July 2002, at which time the City's excise tax was raised to $1.50 per pack, where it remains today.  (Id. ¶ 21 (citing N.Y.C. Admin. Code § 11-1302(e)).) Federal excise taxes on cigarettes also increased significantly during the 2000s, leading to a significant increase in the cost of cigarettes for consumers.  (Delman Decl., DX 611 ¶ 14.)  The federal excise tax on cigarettes increased from $0.24 per pack to $0.34 per pack on January 1, 2000, and then to $0.39 per pack on January 1, 2002.  (Id. ¶ 15.)  Following passage of the Children's Health Insurance Program Reauthorization Act ("CHIPRA") in 2009, the federal excise tax on cigarettes increased from $0.39 to $1.01 per pack, where the tax remains today.  (Id. ¶ 16 (citing Pub. L. 111-3, ¶ 703(b)).)

These increases in State, City, and federal cigarette taxes meant that by July 2010, the combined taxes on a pack of cigarettes were $6.86 in New York City and were $5.36 in the rest of New York State.  The taxes in New York City were $5.23

more than the taxes in a majority of locations across the United States that have neither city nor county taxes. (Delman Decl., DX 611 ¶ 22.) Only cigarette consumers in Chicago face a higher tax rate. (Id.)

Revenue generated by taxes imposed by the State and City of New York are substantially less than the amounts needed to cover tobacco-related healthcare costs incurred by New Yorkers. (Angell Aff., PX 628 ¶ 18.)

## VI.  THE PACT ACT

The PACT Act was enacted on March 31, 2010, and took effect on June 29, 2010. Pub. L. No. 111-154, 124 Stat. 1087 (2010). As pertinent here, for common carriers other than those who had entered into an AOD (and otherwise met the exemption requirements)—primarily the USPS and smaller carriers—the PACT Act sets forth an extensive regulatory scheme.

Plaintiffs pointed to various pieces of evidence supporting UPS's view that the passage and implementation of the PACT Act provided a business opportunity. That is, as other couriers were required to terminate cigarette shippers as a result of the PACT Act, UPS picked up the business. This is borne out by the facts. The evidence supports an increase in shipments via UPS by the Relevant Shippers in the months immediately following the effective date of the PACT Act. Account personnel and others within UPS understood that this surge was likely due, in part, to capturing business lost by the USPS.[45]  For instance, in an email dated

---

[45] It is certainly true that New York State and City cigarette tax rates jumped considerably at nearly the same time as the PACT Act's enactment, leading to some increase in the demand for little cigars. However, there is limited evidence that UPS associated its increase in business with a growth in this

September 23, 2010, a UPS Senior Account Manager noted that "UPS has gained a lot of tobacco business from the USPS this year due to the PACT Act taking effect at the end of June."  (PX 198.)

## VII.   CONSUMPTION OF TOBACCO PRODUCTS

Cigarettes are one of a number of consumable tobacco products.  Tobacco products are many and varied; they include "little cigars" and "big" or "regular" cigars, flavored cigars and cigarettes, loose tobacco, and chewing tobacco.  The evidence at trial supported UPS's claim that all but one of the Relevant Shippers (Jacobs Manufacturing/Tobacco) sold a variety of tobacco products and, in certain instances, other items as well.[46]  For instance, there was both testimony and documentary evidence of shipments of cigars as well as cigarettes.  (See, e.g., PX 72; PX 113; PX 211; Trial Tr. 384:8-16 (Cook).)

### A.   Cigarettes

The characteristics of cigarettes are well known: Filtered sticks of tobacco, about the length of a finger, are rolled in paper and typically sold in small boxes. Each box contains twenty cigarettes; each carton contains ten boxes.  A carton of cigarettes, irrespective of brand, weighs approximately one pound.  It is well known that cigarettes are highly addictive.  The market for sales of cigarettes is far larger than those for other tobacco products, including little cigars.  (See generally PX 11.)

---

area of the tobacco business versus another.  Moreover, market data supports a finding of consistent dominance of cigarettes versus other tobacco products throughout this period.  (See PX 11.)

[46] For instance, Mohawk Spring Water also sold spring water; a number of shippers also sold Native American craft items.

The manner in which consumer demand correlates with price and brand is subject to debate.  Testimony at trial supported strong brand loyalty, but testimony similarly supported price sensitivity for cigarette consumers and tobacco users generally.  Among the evidence received at trial were cartons of cigarettes marketed by the Relevant Shippers.  The Court was able to evaluate the size, shape, and weight of the packaging as well as the packaging's characteristics.  In addition, plaintiffs introduced evidence of the size of boxes used to ship cigarette cartons.  Boxes containing cigarette cartons had the capacity to hold anywhere from a pound of goods to more than twenty pounds; this equates with a capacity of between one and twenty cartons of cigarettes.[47]

Not all boxes were shipped at full capacity; that is, a box with twenty pounds of capacity might have fewer than twenty cartons of cigarettes inside (or a box of some other capacity might not be full).  UPS's databases included a field for "actual weight."  The Court draws the fair inference from the fact of such documents that this phrase reflected a package's measured weight.  UPS's shipment records indicate that there was frequently a difference between a package's "actual weight" and "billed weight."  Billed weight was typically a number rounded up from actual weight.  Based upon UPS records, rounding occurred when any increment of a package's weight was above a whole number.  (See, e.g., PX 74; PX 75; PX 227.)  For instance, a package weighing 19.1 pounds in actual weight would be increased to

---

[47] Jacobs Manufacturing/Tobacco would ship multiple boxes on a pallet.  (See Jarvis Dep. Tr. 54:1-6.)

twenty pounds for billed weight.  (Id.)  Thus, any aggregation of "billed" weight for a number of packages would inflate their actual weight.

In addition, cigarettes were generally shipped in boxes.  There was some evidence at trial of shippers sending letter-sized envelopes.  (See, e.g., Trial Tr. 511:5-512:17 (Fink); id. 769:23-770:12 (Keith).)  The evidence that cigarettes were shipped in letter-sized envelopes was extremely thin and not particularly credible (apparently, from time to time, loose cigarettes might be sent in envelopes); the economics of sending a handful of loose cigarettes via UPS makes no sense.  Indeed, it is hard to imagine that it would have been cost effective to have sent loose cigarettes—presumably in an amount of less than one box—in a letter-sized package via UPS.  The Court finds that no appreciable volume of cigarettes was sent via letter-sized packages and that packages of such size more likely than not contained something other than cigarettes.

B.    Little Cigars

Little cigars account for under 10% of the tobacco market.  (See PX 11.)  They are rolls of tobacco, wrapped in leaf tobacco with an integrated filter, that resemble cigarettes in size, shape, and packaging.  (Delman Decl., DX 611 ¶ 24; see also Trial Tr. 1584:16-25 (Delman).)  While UPS's tobacco expert, Delman, testified that little cigars are "total substitutes" for cigarettes, the evidence was in fact far more equivocal.  First, even Delman conceded that little cigars are made up of "lesser quality" tobacco.  (Trial Tr. 1573:2-24 (Delman); id. 1568:12-1569:18 (Delman).)  Little cigars are made from reconstituted tobacco floor sweepings.  (Id. 1569:19-

1570:12 (Delman).)  Second, based on her experience, Dr. Angell testified that little cigars are in fact distinguishable from cigarettes.  (Trial Tr. 1369:2-7 (Angell).)

Like cigarettes, little cigars may be sold twenty to a pack and ten packs to a carton.  (Delman Decl., DX 611 ¶ 25.)  Also like cigarettes, little cigars may be sold in cartons weighing approximately one pound.  All but one of the Relevant Shippers (Jacobs Manufacturing/Tobacco) sold little cigars and shipped them via UPS.  The boxes in which they were shipped were the same as those used to ship cigarettes.

The exterior packaging of little-cigar packs and cartons is similar in size, shape, and color to those of cigarettes.  Moreover, the brand names of the little cigars sold by the Relevant Shippers were often quite similar to those of cigarettes—and the Court at least found it very difficult to distinguish between packs of little cigars and those of cigarettes without examining the exterior of a carton with care.

At the relevant times, little cigars were considerably cheaper than taxed cigarettes.  (Id. ¶ 35.)  For instance, as of August 2016, the average base price of little cigars was $12 per carton versus $33 per carton for discount/non-premium cigarettes and $55 per carton for premium-brand cigarettes.  (Id.)  However, cartons of little cigars can be more expensive than cartons of Native brand cigarettes.  (Trial Tr. 1564:13-1565:22 (Delman).)

The evidence supports significant growth in the demand for little cigars throughout the 2000s, though the demand for little cigars never came close to that for cigarettes.  (Delman Decl., DX 611 ¶¶ 40, 41; PX 11.)  The increase in demand

was due, in part, to the higher cost of cigarettes compared to little cigars combined with a willingness by at least some consumers to substitute one for the other.  (Id. ¶¶ 40-42 (citing DX 43 at 11).)  Tobacco users are price sensitive, and higher taxes on tobacco products decrease the demand for the affected products.  (Angell Aff., PX 628 ¶ 10.)  The evidence fell far short of supporting a total substitution of little cigars for cigarettes.

UPS dedicated a considerable amount of time and evidence at trial to the factual proposition that increases in cigarette taxes drove an increase in the demand for little cigars, and that this is all the more reason for the Court not to accept that packages shipped by the Relevant Shippers were cigarettes.  According to UPS, the increased demand for little cigars increased the likelihood that such packages did not contain cigarettes at all.  There is some force to this argument— but not to the extent UPS asserts.

Several studies confirm the link between increased taxes and the possibility of increased demand for little cigars and other alternative tobacco products, even as cigarette consumption has declined.  In fact, the decision by the Food and Drug Administration to bring cigars under the regulation of the Family Smoking Prevention and Tobacco Control Act by its Center for Tobacco Products on May 5, 2016,[48] (DX 425), was based on research showing that various demographic groups continued to use cigars even when there was a broader migration away from

---

[48] The decision was formally published in the Federal Register of May 10, 2016: Deeming Tobacco Products To Be Subject to the Federal Food Drug, and Cosmetic Act, 81 Fed. Reg. 28,974 (May 10, 2016).

cigarettes, especially during the period from 2010-2014.  (Delman Decl., DX 611

¶ 44.)  Dr. Angell also testified that if little cigars cost less than cigarettes, they are

one product that cigarette consumers might turn to as an alternative.  (Trial Tr.

1363:1-4 (Angell); see also Trial Declaration of Aviv Nevo ("Nevo Decl."), DX 613

¶¶ 76-84 (concluding that diversion to "non-cigarette products," including little

cigars, would be "substantial").)

VIII.   CERTAIN COMMON EVIDENCE

    A.   The Fink Accounts

As discussed in detail below, one UPS Account Executive—Gerard Fink—was

assigned to a number of the Relevant Shippers.  He testified both live at trial and

by trial declaration.  Because his testimony impacts a number of issues in the case,

the Court provides an overview here.

During the period relevant to this suit, UPS first employed Fink as a part-

time loader, then promoted him to External Technician, and then promoted him to

Account Executive in 2005, a position in which he remains today.  (Fink Decl., DX

602 ¶ 2.)  Fink manages UPS's "small customer accounts" (defined as accounts

which generate package revenue of up to $300,000 per year) in what is his

designated "Patch of Land;" he is also part of the Buffalo-area sales team.  Fink's

Patch of Land includes the UPS Centers in Dunkirk, Jamestown, Olean, and

Hornell, New York.  (Id. ¶ 9.)  UPS's Dunkirk and Olean Centers serve two Seneca

Nation reservations.  (Id. ¶ 10.)

As discussed below, a number of Fink's accounts in fact shipped unstamped cigarettes through UPS.  These accounts included Elliott Enterprises, Elliott Express (or EExpress), Bearclaw Unlimited/AFIA, Shipping Services, Seneca Ojibwas, Morningstar Crafts & Gifts, Indian Smokes, and Smokes & Spirits.  Each of these shippers tended to ship in volume and were, at some point in the relationship, among Fink's largest accounts.

Fink, like other Account Executives, is paid a salary and has the opportunity to earn a bonus; the bonus is based in part on sales.  An Account Executive's bonus does not play a significant role in his or her overall compensation.  Nevertheless, it plays some role.  The evidence at trial supported a desire by Account Executives to grow, and not lose, business.  Emails exchanged between Fink and other UPS employees regarding certain Relevant Shipper accounts demonstrated a shared interest in protecting the accounts.  For example, after an audit of EExpress revealed only coffee being shipped, Fink sent an email to Michael Zelasko, a UPS sales manager, stating that the audit revealed only packages containing coffee, and concluding with a "smiley face" emoticon.  (PX 569.)  Zelasko forwarded this email to Brian Weber of UPS Customer Solutions, telling Weber, "The audit for EExpress came back as coffee!!  Dodged a bullet."  (Id.)  For instance, emails reflected Fink's reporting on account activity to supervisors, databases reflected certain of his contacts, and sales data was widely shared.  Fink, in short, was not a rogue employee hiding his activities from others at UPS.  While he may not have informed others at UPS of everything he knew or suspected, he was not hiding (and did not

52

personally have the ability to hide) many obvious facts (such as the name of a shipper, its location, its address, or its client contact; the inventory that drivers saw; the smell emitted by certain packages; tracer inquiries; etc.). The Court concludes that with regard to the Relevant Shippers, Fink was acting within the scope of his employment. Fink's testimony along with other evidence also convinced the Court that he was not a lone wolf and that his conduct was known and supported by certain other individuals within UPS.

The Court did not find Fink a generally credible witness. He struck the Court as an intelligent man who understood a great deal about UPS's business and about the accounts for which he was responsible. He also appeared evasive and as attempting to find the "right answer," sometimes at the expense of the truth. The Court does not credit testimony that he did not know what a number of his largest accounts were shipping; this finding is based on Fink's demeanor as well as the totality of facts regarding his knowledge of, and interactions with, the accounts. Indeed, his testimony convinced the Court that he generally understood that certain of his clients were shipping cigarettes and that there was a reasonable basis to believe that those accounts and others may have been tendering cigarettes.

B.   The Non-Compliant Lists

One important component of the PACT Act is the creation of "non-compliant lists" or NCLs. Specifically, the PACT act directs the Attorney General to compile and distribute a list of cigarette and smokeless tobacco delivery sellers that have not registered with the Attorney General or "are otherwise not in compliance with

[the] Act." 15 U.S.C. § 376a(e)(1)(A).  <u>Inter alia</u>, the PACT Act prohibits deliveries to any person named on the NCLs, unless certain exceptions are met.  <u>Id.</u> § 376a(e)(2)(A).

After the PACT Act went into effect on June 29, 2010, entities that had shipped cigarettes through the USPS, and had a continued desire to ship cigarettes, sought alternative arrangements.  There was substantial evidence at trial that the timing of new UPS customer acquisitions during 2010 was more likely than not related to the effective date of the PACT Act.  (<u>See, e.g.</u>, PX 198.)  Evidence demonstrated that at least certain of the new accounts were recognized as "competitive conversions" from other carriers at the time.  (<u>See, e.g.</u>, (PX 198.))

UPS has argued that the same time period also correlates with an increase in the cigarette tax and an increase in the demand for little cigars (and thus, that new customers were simply responding to increased mail order demand for little cigars.) That may be so, but there is insufficient evidence to support this theory.  While the evidence does support increased taxes and consumer demand for little cigars, it does not support that the contents of the packages shipped by the new customers were therefore little cigars, or reasonably believed to be such.  Instead, the evidence supports a reasonable inference that many customer acquisitions (particularly in 2010), including competitive conversions, were the result of the passage of the PACT Act, and thus a switch away from another carrier to UPS.

As discussed, the PACT Act required the periodic creation of NCLs.  The PACT Act's mandate in this regard was, of course, public knowledge.  But in

addition, commencing in November 2010, the ATF distributed the NCLs to UPS. Several of the Liability Shippers, or individuals associated with them, were on one or more NCLs. For instance, Elliott Enterprises appeared on the first NCL distributed by the ATF in November 2010, (PX 514); Indian Smokes was added on May 6, 2011, (PX 524); and Smokes & Spirits was added on February 15, 2012, (PX 514).

Plaintiffs argue that UPS's receipt of the NCLs put them on notice of cigarette shippers but that UPS failed to take remedial action (such as conducting audits). According to plaintiffs, the NCLs also provide evidence of UPS's knowledge of shipper violations to support plaintiffs' claims.

For its part, UPS argues that because it was exempt from the PACT Act due to the AOD, the NCLs were irrelevant to its business. This position is misguided. The NCLs were plainly relevant and should have been used by UPS to identify cigarette shippers. As discussed below in the Court's legal conclusions, UPS's argument fails to fully grasp the conditional nature of the relevant PACT Act exemption, and that the NCLs plainly provided relevant information to meet the necessary conditions. UPS ignored the NCLs at its peril. While the NCLs may not have obligated UPS to take action with regard to certain shippers, UPS had separate obligations with regard to those same (and other) shippers under the AOD.[49]

---

[49] A number of UPS's defenses (including, for instance, unclean hands, in pari delicto, and breach of the covenant of good faith and fair dealing) are based in part on an assertion that the government kept information regarding non-compliant shippers from UPS. However, the distribution of NCLs to

UPS further argues that in any event, the NCLs were sent to one part of UPS while the domestic client accounts and courier service operations were performed out of another.  Thus, UPS claims it was operationally unaware of the NCLs and that certain shippers were on the NCLs.  While factually true, the conclusion that UPS draws from this—that it was justified in ignoring the NCLs—is unpersuasive.  The point remains that UPS received the NCLs.[50]  It should have provided information it received regarding known cigarette shippers to others within UPS.[51]  As the Court has found, the NCLs were, as a factual matter, relevant information regarding the shipping practices of certain entities.

In sum, the Court finds that the NCLs did put UPS on notice, and provided some knowledge, of shippers who tendered cigarettes.

C.     The "Tobacco Watchdog Group" Letter

On November 10, 2010, an entity referring to itself as the "Tobacco Watchdog Group" sent a letter addressed to the "UPS Service Center Managers" in which it identified a number of known or suspected shippers of unstamped cigarettes.

---

UPS represented an instance in which a governmental entity (albeit a federal one) provided UPS with "what it knew" about non-compliant shippers.  UPS's dismissal of the NCLs as irrelevant until the fall of 2013 undermines its assertion that if only the State had given it information, it would have taken action.  Instead, UPS's actions with regard to the NCLs provide some evidence that had any State entity provided it with information, it would have ignored that information—at least until the fall of 2013.  Increased attention in the fall of 2013 was driven by the fact that as of late July 2013, UPS realized it was under new scrutiny from plaintiffs.

[50] Cook testified that he personally did not receive an NCL until the third quarter of 2013 and that upon receipt he immediately used it to identify possibly non-compliant shippers.  (Cook Decl., DX 600 ¶¶ 100, 103.)  UPS's inside counsel had been receiving the NCLs prior to this time; counsel added Cook to the distribution list in August 2013.  (Id. ¶ 103.)

[51] Notably, this compartmentalization contrasts with evidence of coordination between different parts of UPS to provide a seamless and integrated package-delivery service for its customers.

(DX 62.)  Various UPS employees received copies of this letter, including Gerard
Fink, Steve Kinney, Scott Winkley, Rich Kincade, and Tina Mahon.  (Id.)  The letter
was emailed to Fink by Winkley, the Business Manager for the Jamestown and
Olean Centers.  (Id.)  Winkley instructed Fink, "Please read."  (Id.)  At trial, Fink
testified that he recalled receiving the letter at or about the time it was issued.  (See
Trial Tr. 601:14-17 (Fink); see also Fink Decl., DX 602 ¶ 33.)  Six entities were
identified in the letter—all of which were located in Salamanca, New York.  Among
them were the following shippers: Smokes & Spirits at 270 Rochester Street, Elliott
Enterprises at 38 Main Street, and Native Express, also at 38 Main Street.  (Id.)
Smokes & Spirits and Elliott Enterprises are both Relevant (and Liability)
Shippers.

Fink's reply to Winkley's email stated that he had only "one account" on the
list and was "certain" they were only shipping cigars.  The account to which Fink
was referring was Smokes & Spirits.  In fact, Elliott Enterprises, located at 38 Main
Street in Salamanca, was also one of Fink's largest accounts at that time.  Fink did
not state his basis for his "certain[ty]," and there is no evidence that he was further
probed by any of the other letter recipients.  In light of UPS's affirmative
obligations under the AOD and statutory schemes, it should have done more in
response to this letter.

UPS argues that the Court should give no weight to the letter because it was
of unknown origin and veracity.  The Court disagrees.  The emails among UPS
personnel discussing the contents of the letter establish that UPS recipients read

the letter and discussed it.  It was properly viewed by UPS employees as relevant.
The letter provided some notice of a possible issue; the Court agrees, however, that
the letter did not itself "prove" anything.

### D. Inquiries Regarding Lost or Damaged Packages

Plaintiffs introduced evidence showing that at various times UPS customers
inquired about lost or damaged packages.  (PXs 72, 113, 190-91, 208, 211-215, 403,
405-06, 468-70.)  As described above, UPS refers to these inquiries as "tracers."
Tracers captured various methods of inquiry, such as calls to a 1-800 customer
service line or an online report entered into UPS's system.  Tracers typically include
information regarding the reported contents of the package(s) at issue.[52]

It is clear that until recently (as described above), UPS did not use tracers as
tools to identify cigarette shippers.  Nevertheless, tracers put UPS on notice that
some shippers were likely tendering cigarettes.[53]  The tracers also provided UPS

---

[52] Both plaintiffs and defendant have placed in evidence spreadsheets of tracer data, (see, e.g., PX
191, PX 211, DX 499, DX 500), and both have used the tracer documents for the truth of customers'
statements of package contents.  (See, e.g., Pl. Proposed Findings of Fact, ECF No. 491 ¶¶ 382, 383;
Def. Proposed Findings of Fact, ECF No. 492 ¶ 110.)  However, no party has asserted a hearsay
objection to the use of tracers for the truth of the matter asserted, i.e., customers' statements of
packages' contents, and both parties have relied on this use in their arguments.  (See ECF No. 420 at
4 (" . . . UPS has made no objection as to admissibility other than citing Rule 602.  It is not, for
instance, arguing relevance or hearsay.").  Therefore, any objection to the tracer documents on the
basis of hearsay is waived.  See Fed. R. Evid. 103(a); United States v. Del Llano, 354 F.2d 844, 847
(2d Cir. 1965).  In all events, even if not considered for the truth, tracers nonetheless put UPS on
notice of what a customer claimed a package contained.  See United States v. Dupree, 706 F.3d
131,136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay.").
Such notice, along with other circumstances described below, should have informed UPS's state of
mind (and should have led to an audit).

[53] Under the AOD, UPS was obligated to train its personnel in its Tobacco Policy.  (AOD, DX 23
¶ 34.)  Customer service personnel are reasonably included in the "relevant UPS employees" who
should have been so trained.  Moreover, the AOD also broadly required "UPS" to comply with PHL
§ 1399-ll.  The Court finds that employment responsibilities of customer service personnel working

notice regarding other items being shipped by the Relevant Shippers (such as tobacco, flyers, and other items).

      1.   <u>Smokes & Spirits</u>

Several tracers in 2011 (in April, September, October, and November) for Smokes & Spirits were for packages containing "nectar filled cigars full flavor 100's," "1 of 3 box of 6 pouches of tabacco [<u>sic</u>]," "2 of 5 tobacco product," and "1 of 10; 1 pack out of a carton of 10 was crushed." (PX 191, rows 260, 262-63.)

Tracers relating to packages shipped by Smokes & Spirits in April, September, and December of 2012 indicated package contents as an unidentified good, seven cartons of "Menthol Box 100s" (cigarettes), and Timber Wolf Long (tobacco), respectively. (PX 190, rows 293-95; <u>see also</u> PX 214, rows 293-95.)

A tracer in September 2012 for a package shipped by Smokes & Spirits contained the UPS remark in all caps: "PROHIBITED ITEM SENT TO CONSUMER." (PX 72.) Additional inquiries relating to packages shipped by Smokes & Spirits occurred on May 15, 2013; September 12, 2013; and October 17, 2013. (PX 113, rows 970-72.) Of these, two (the May and October inquiries) were for non-cigarette tobacco products, while the September inquiry was for cigarettes. (<u>Id.</u>)

      2.   <u>RJESS</u>

A tracer for RJESS in July 2013 was for "8 of 20 Cigars." (PX 113, row 968.)

---

with tracers should have included reporting packages containing cigarettes within UPS, to supervisors, to Cook, or to those working with him or fulfilling similar roles.

3.    Sweet Seneca Smokes

A tracer for Sweet Seneca Smokes in November 2014 indicated package contents of "8 Nectar Filtered Cigars Full Flavor 100's."  (PX 211, row 627.)

4.    Elliott Enterprises/EExpress

In 2011, tracers for Elliott Enterprises (in March, April, May, and December) were for one empty box and three packages of cigarettes.  (PX 191, rows 267-70; PX 470, row 2865.)  Tracers in March, April, May, and December of 2011 for packages shipped by Elliott Enterprises were for an empty box, "cigarettes/pdmm," "cartons of cigarettes," and "cartons of Kent ULL King Soft."  (PX 213, rows 267-70.)

A tracer in March 2012 for packages shipped by Elliott Enterprises was for "5 of 5 Seneca Ultra Light 100" and "606 Seneca Light 120 Carton."  (PX 190, row 303.)

Tracers in April 2013 and June 2013 for EExpress indicated the following package contents: "1 of 1 box of cigarettes;" "1 of 1 box of cigarettes;" "1 of 1 box of cigarettes;" "1 of 1 box of cigarettes;" "4 of 4 Seneca Menthol Light 100 Soft 4pks;" and "1 of 1 box of cigarettes."  (PX 405, rows 61-66.)

Tracers in December 2013, January 2014, and May 2014 for packages shipped by EExpress were described as "1 quantity of cigarettes," "10 of 10 Seneca Ultra Light 100 soft" (cigarettes), and "4 carton cigarettes."  (PX 211, rows 588-90.)

5.    Bearclaw Unlimited

A January 18, 2011 tracer for a package shipped by Bearclaw Unlimited described the package contents as "Marlboro Cigarette Cartons."  (PX 191, row 204; PX 213, row 204.)  Several months later, in August 2011, another tracer for

Bearclaw related to a package containing scented candles.  (PX 191, row 250; PX 213, row 250.)

   6. <u>Shipping Services</u>

Tracers on August 26, 2011, September 8, 2011, September 15, 2011, and August 17, 2010, for Shipping Services indicated package contents of "3 Seneca Lt cigars," "4 Seneca FF box," "6 Vendetta Full Flavor," and "Cigars."  (PX 212, rows 354-57.)

   7. <u>Native Wholesale Supply</u>

A tracer in March 2013 for Native Wholesale Supply indicated package contents as "Flyers."  (PX 405, row 81.)

   8. <u>Seneca Promotions</u>

Tracers in July 2014 for Seneca Promotions indicated one empty package and "1 Banner Rick Youngblood Smoke Shop."  (PX 211, rows 624-25.)

   9. <u>Native Gifts</u>

A tracer in June 2013 for Native Gifts indicated the package contained "8 cartons of cigarettes, Seneca Ultralights."  (PX 211, row 622.)

   10. <u>Jacobs Manufacturing/Tobacco</u>

Two tracers on February 22, 2011, for Jacobs Manufacturing/Tobacco (rows 39, 40) indicated package contents of "Carton, Nation's Best American Full, 100 Softpack/EA" and "Nations Best Full Flavor Cigarettes."  (PX 468, rows 39-40; PX 469, rows 39-40.)

E.    The Cigarettes Shipped Were Unstamped

As the Court stated in footnote 1 above, it uses the term "cigarette" throughout this Opinion as synonymous with "unstamped cigarette." There is substantial evidence supporting the Court's determination that all cigarettes shipped by the Relevant Shippers were unstamped. First, UPS drivers, Account Executives, and sales representative knew that cigarettes sold on Indian reservations were virtually always sold without tax stamps. (Bankoski Dep. Tr. 69:10-70:16; Haseley Dep. Tr. 16:3-20; id. 16:25-17:21; Potter Dep. Tr. 48:15-49:2; Sheridan Dep. Tr. 34:4-25, 35:17-21; Wheaton Dep. Tr. 15:8-17; Trial Tr. 179:23-180:24 (Cook); Trial Tr. 434:9-436:10 (Niemi); Trial Tr. 1342:2-22 (Guarino); Trial Tr. 1392:15-1394:1 (Puleo).) Rosalie Jacobs and Robert Oliver both testified credibly that the cigarettes she shipped via UPS did not bear stamps. (Trial Tr. 1661:15-17 (Jacobs); Trial Tr. 1132:5-1134:20 (Oliver).) In addition, the cigarettes seized at the Potsdam Center in June 2011 did not bear stamps. (Trial Tr. 1148:1-7 (Oliver).) Philip Christ testified credibly that the cigarettes sold by Arrowhawk did not bear tax stamps. (Trial Tr. 912:20-23, 913:17-914:6 (Christ).) Smokes & Spirits data regarding sale prices further support a lack of tax stamps. (PX 54; PX 55.) Finally, cigarettes purchase as part of controlled buys and introduced at trial were unstamped. (PX 40; PX 43.)[54]

---

[54] The packages involved in the controlled buys were shipped to addresses in New York City. (PX 40; PX 43.) Additionally, the Court has reviewed the delivery spreadsheets and has determined that there are numerous instances where deliveries by the Relevant Shippers were made to addresses with New York City zip codes. (See, e.g., PX 191, line 204.)

IX.    SHIPPERS AT ISSUE

A.    <u>Overview of the Shippers and the Court's Findings</u>

This case concerns UPS's shipments on behalf of a discrete group of shippers located on the following Indian reservations within the State of New York: the Seneca Cattaraugus Reservation, the Seneca Allegany Reservation, the Tonawanda Reservation, and the Mohawk/St. Regis Reservation.  UPS serviced accounts on these reservations from its Dunkirk, Olean, Batavia, and Potsdam Centers, respectively.

Plaintiffs' claims in this case are directed at UPS's conduct with regard to the following twenty-two entities (referred to as the "Relevant Shippers" or "Shippers") (plaintiffs combine certain entities into "groups"):[55]

- Elliott Enterprise(s), Elliott Express (or "EExpress"), Bearclaw Unlimited/AFIA (together, the "Elliott Enterprise Group");

- Seneca Ojibwas Trading Post, Shipping Services, and Morningstar Crafts & Gifts (together, the "Shipping Services Group");

- Indian Smokes;

- Smokes & Spirits, Native Outlet, A.J.'s Cigar, Sweet Seneca Smokes, and RJESS (together, the "Smokes & Spirits Group");

- Native Wholesale Supply and Seneca Promotions (together, the "Native Wholesale Supply Group");

---

[55] As noted above, plaintiffs have separated certain companies into "groups."  The Court only uses such designations in its factual findings in certain instances when the facts support an inference that the grouped entities are properly considered each other's alter egos.  However, even in each such instance, the Court has also made a separate liability determination for each entity on a stand-alone basis.

- Seneca Cigarettes/Cigars, Hillview Cigars, Two Pine Enterprises, Arrowhawk Smoke Shop (together, the "Arrowhawk Group");

- Mohawk Spring Water and Action Race Parts (together, the "Mohawk Spring Water Group"); and

- Jacobs Manufacturing/Tobacco.

The parties submitted thousands of pages of exhibits with regard to the Relevant Shippers, and there were several days of testimony.  The Court's findings are based on its review of the totality of the evidence and consideration of the parties' various arguments regarding the reasonable inferences the Court should draw.  The Court does not attempt to set forth each fact in the trial record supportive of its findings.  Rather, it provides exemplar facts.  As to each shipper as to which the Court has found liability ("Liability Shipper"), the Court has made specific factual findings regarding: (1) the date not later than which there was a reasonable basis to believe that such shipper may have been tendering cigarettes to Individual Consumers, (2) (if applicable) the date not later than which the shipper was in fact shipping cigarettes, and (3) (if applicable) the date not later than which UPS knew that it was shipping cigarettes.[56]  The answer to question (1) establishes the date of UPS's initial liability for an audit violation of the AOD.  In each instance in which the Court has found a violation of the audit obligation, the Court has further found that once such an obligation attached, UPS remained under an audit

---

[56] The questions of whether UPS "knew" packages included cigarettes and, if so, when, are mixed questions of law and fact.  The legal principles the Court applies to such determinations are set forth in its Conclusions of Law below.  When the Court uses the term "knowledge" in its findings of fact, it is specifically incorporating and applying these legal principles and its conclusions with regard thereto.

obligation each day thereafter until an audit occurred or UPS terminated the account.  The answer to questions (2) and (3) provide the predicate facts for findings of violations of ¶ 42 of the AOD as well as the various statutory schemes.

The Court finds that plaintiffs have proven liability under the AOD and each statutory scheme at issue with respect to the following shippers:

(1) Elliott Enterprise(s);

(2) Elliott Express/EExpress;

(3) Bearclaw Unlimited/AFIA;

(4) Seneca Ojibwas Trading Post;

(5) Shipping Services;

(6) Morningstar Crafts & Gifts;

(7) Indian Smokes;

(8) Smokes & Spirits;

(9) Seneca Cigarettes/Cigars;

(10) Hillview Cigars;

(11) Two Pine Enterprises;

(12) Arrowhawk Smoke Shop;

(13) Mohawk Spring Water;

(14) Jacobs Manufacturing/Tobacco;

(15) Native Wholesale Supply;

(16) Seneca Promotions; and

(17) Action Race Parts.

The Court finds that plaintiffs have proven only violations of UPS's audit obligations for:

(18)  A.J.'s Cigars;

(19)  Native Outlet; and

(20)  RJESS.

As to the remaining shipper, Sweet Seneca Smokes, plaintiffs have not proven that there was a violation of the audit obligation, or that the shipper in fact shipped cigarettes through UPS, and/or that UPS possessed the requisite knowledge of such facts.

Below, the Court sets forth its specific findings with regard to each of the Relevant Shippers.  The Court has considered the often obvious methods used by cigarette shippers to reduce their risk of losing UPS service.[57]  For instance, certain shippers would open (or UPS opened for them) successive accounts (e.g., Elliott Enterprises became EExpress; Seneca Ojibwas became Shipping Services, which became Morningstar Crafts & Gifts).  In some instances, these shippers continued to have UPS pick up from the same physical address (e.g., Shipping Services and Morningstar Crafts & Gifts) or a shared billing address; in others, a different address might have been used but the personnel overlapped (e.g., Elliott

---

[57] Notably, and as discussed below, the use of such methods does not eliminate UPS's liability; UPS personnel were sometimes complicit in such conduct—in an effort to maintain the accounts—and in other instances the methods were so obvious that failure to recognize them as indications of likely cigarette shipping amounted to conscious avoidance.

Enterprises and EExpress).  It is the Court's view that in all events, these techniques were so basic that they should not have prevented detection if UPS had undertaken modest efforts to link accounts.[58]

There is also credible evidence that UPS personnel were sometimes complicit in this avoidance technique.  For instance, as described below, Fink assisted Seneca Ojibwas in opening two separate accounts (with regard to the second, he recommended using a different address than the first), and then opened an account under Morningstar Crafts & Gifts when Shipping Services was terminated for shipping cigarettes—at the same address as the second Shipping Services account.

### B.   Liability Shippers

The Court finds that plaintiffs have proven liability under the AOD and each statutory scheme at issue with respect to the following Liability Shippers.

#### 1.   Elliott Enterprises[59]

Elliott Enterprises operated from a retail storefront on 38 Main Street, Salamanca, New York, on the Seneca Allegany reservation.  (Fink Decl., DX 602 ¶ 58; DX 490 at 2.)  Gerard Fink was its Account Executive and opened its first

---

[58] Using duplicate accounts and alter egos were known tactics of cigarette shippers attempting to evade the law.  The AOD specifically provided that "[t]he violations found to have occurred pursuant to this [AOD] . . . shall be applied both to the shipper committing the violation, and to any other shipper . . . that UPS has a reasonable basis to believe is shipping or seeking to ship Cigarettes (a) from the same location as the suspended shipper, (b) on behalf of a suspended shipper, or (c) with the same account number as the suspended shipper."  (AOD, DX 23 ¶ 31 (emphasis added).)

[59] The Court's discussion of its analysis of the facts with regard to this entity is more extensive than for others.  This is intended to lay out the way in which the Court has considered certain types of evidence.

account on September 28, 2010.[60]  (PX 174, row 60.)  This was shortly after passage of the PACT Act.  Aaron Elliott was the principal of Elliott Enterprises and, while Fink denied making the connection, there was credible evidence that Fink understood that Aaron Elliott was associated with this account as early as 2010.  (See, e.g., PX 559, col. DL; PX 439, rows 127-28, col. DL.)  This fact is relevant to whether—in light of Aaron Elliott's subsequent history of shipping cigarettes with UPS through another entity (Elliott Express or EExpress)—Fink knew or should have known of, or was complicit in, Elliott's attempt to circumvent UPS policy by opening other accounts.  The Court finds that not only should Fink have known, but that he did know.

UPS began shipping for Elliott Enterprises on October 1, 2010.  This account was part of the business UPS acquired following passage of the PACT Act.  A month later, Elliott Enterprises, 38 Main Street, Salamanca, New York, was listed on the NCL issued by the ATF and sent to UPS; it was also listed in the Tobacco Watchdog Group letter issued on November 10, 2010, that Fink received.  (DX 62.)[61]  As discussed above, the Tobacco Watchdog Group letter and the November 10, 2010

---

[60] The principal of Elliott Enterprises, Aaron Elliott, had a prior account with UPS for another entity named "Rock Bottom Tobacco."  That company had executed a Tobacco Agreement and was also listed in UPS's Tobacco Database.  (See DX 371, line 472.)  The account was canceled as part of the broader plan implemented by UPS in connection with the AOD to require all smoke shops in the area to establish new accounts with new Tobacco Agreements.  (See AOD, DX 23 ¶ 21; Trial Tr. 200:6-14 (Cook); id. 499:22-500:3 (Fink).)  Notably, not all accounts changed their names.  Here, the name change (by the same owner) away from one that used the word "tobacco" was more likely than not an attempt to obscure the goods shipped.

[61] In the email exchange among UPS personnel regarding the Tobacco Watchdog Group letter, Fink states that he only has one account on the list, Smokes & Spirits.  He does not acknowledge his new account for Elliott Enterprises (also listed with an address of 38 Main Street, Salamanca, New York).

NCL were both distributed to others within UPS.  The account was terminated on or about September 18, 2012, after a UPS driver discovered a shipment of cigarettes.  (PX 172; Cook Decl., DX 600 ¶ 76.)

It is quite clear from these facts alone that, from the date on which its account was opened, Elliott Enterprises was, at best, a very high-risk account and more than likely a cigarette shipper.  While the fact that it was located on an Indian reservation was alone insufficient to support a reasonable basis to believe it was shipping cigarettes, when that fact was combined with its presence on the November 2010 NCL and its presence in the Tobacco Watchdog Group letter, the question was not close.  These facts—even before addressing others—support that not later than November 11, 2010 (the day after the November 10, 2010 NCL and the Tobacco Watchdog Group letter), there was a reasonable factual basis to believe Elliott Enterprises may have been tendering cigarettes via UPS.  Under the AOD, not later than November 11, 2010, UPS thus had an obligation to audit Elliott Enterprises.

There is more, however.  UPS's failure to audit when obligated to do so does not mean that Elliott Enterprises was in fact tendering cigarettes or that UPS knew that it was.  The audit obligation attaches only upon a reasonable belief that a shipper may be tendering cigarettes.  Additional facts are required to support a finding of actual tendering and UPS's knowledge.

In this regard, the NCLs constitute some evidence of cigarette shipping.  They are lists of shippers known by a federal agency to ship cigarettes.  In addition,

UPS received additional notice by way of tracers that particular shippers were likely tendering cigarettes. The number of such tracers and consistency of their package descriptions adds to their impact. On March 8, May 26, and December 15, 2011, UPS received inquiries for lost or damaged packages of cigarettes shipped by Elliott Enterprises. (PX 191, rows 267-70.) Additional tracers for cigarettes shipped by Elliott Enterprises were made on March 22, 2012. (PX 190, row 303; see also PX 213, rows 267-70.)

The Court now turns to UPS's knowledge. First, the NCLs provided UPS with factual information. The Tobacco Watchdog Group letter was distributed within UPS, and UPS's emails reflect that it was taken seriously; while the letter's source and reliability were unknown, it should have at least raised further questions. Together, these two sources of information were significant; UPS ignored them and failed to take action at its peril.

But further, the Court finds that various facts taken together support circumstantial evidence of UPS's knowledge that Elliott Enterprises was tendering cigarettes. First, it was clear that Elliott Enterprises was a smoke shop. Fink testified at trial that he assumed Elliott Enterprises was shipping "little cigars" because it was located in Salamanca, where "[a] lot of the smoke shops sold everything from Native American gifts to cigarettes, to cigars, to pipe tobacco." However, he could not explain why, given this explanation, he did not also assume (or simply suspect) that Elliott Enterprises sold cigarettes. (Trial Tr. 589:12-591:23

70

(Fink).)  Despite knowing that Elliott Enterprises shipped tobacco products, Fink never required that they execute a Tobacco Agreement.

The absence of a Tobacco Agreement under such circumstances was equivalent to an affirmative act of conscious avoidance and supports an inference of Fink's knowledge that Elliott Enterprises was shipping cigarettes.  In addition, despite its presence on the NCL, in the Tobacco Watchdog Group letter, and in the tracers for cigarettes, and despite the fact that Fink knew it was a smoke shop, Elliott Enterprises was never audited.  Based on known facts, the Court views the lack of audits as additional affirmative acts.  UPS, in effect, "stood down" on its Tobacco Policy with regard to this account.  Fink was UPS's first line of defense against Elliott Enterprises: He had more than enough information to request an audit but did not.  The Court finds that had Elliott Enterprises been audited, most shipments would have been discovered to contain cigarettes.  Together, this circumstantial evidence supports an inference of knowledge.

UPS argues that it is unfair to attribute knowledge to Fink, or through him to UPS, because the sheer volume of Fink's accounts supports his assertion that he did not have specific knowledge as to this one.  This argument is unavailing.  First, as discussed above, the Court did not find Fink credible as a general matter or here, specifically.  Additionally, the argument ignores the context of UPS's position at the time: If Fink had so many accounts that he could not possibly know what any one of them was shipping—including those located on Indian reservations at higher risk of

71

shipping cigarettes and that he himself referred to as "smoke shops"—then UPS bears direct responsibility for this failure.

But the Court believes Fink did know.  During the time Elliott Enterprises was shipping with UPS, it was among his largest accounts.  In March 2012, it was his highest gross-revenue account; by the end of 2012 it was his sixth-highest gross-revenue account.  (PX 568; PX 102, row 9.)  Evidence indicates he was compensated at least in part based on commissions.  Only a very small handful of accounts were as large as Elliott Enterprises—it was in the top group on his list.  (PX 568.) Moreover, documentary evidence shows that Fink received regular information regarding his accounts and whether they were meeting specified revenue targets.  It is reasonable to infer that Fink understood exactly how much business Elliott Enterprises brought in and what their business was.

In sum, the Court finds that (1) not later than November 11, 2010, there was a reasonable basis to believe Elliott Enterprises may have been shipping cigarettes (this date is based on receipt of the November 10, 2010 NCL and Tobacco Watchdog Group letter, along with the accumulated other facts discussed above); (2) from November 11, 2010, onward Elliott Enterprises was in fact shipping cigarettes via UPS (based on the same information); and (3) from November 11, 2010, onward UPS knew that Elliott Enterprises was shipping cigarettes (based on the same information).

The Court further finds that 95% is a reasonable approximation of the percentage of packages shipped by Elliott Enterprises that contained cigarettes.[62]

### 2.   EExpress

EExpress was another Fink account.  He opened it on September 20, 2012, only days after Elliott Enterprises's account was terminated.[63]  The account was located at a residential address on 11074 Indian Hill Road, Perrysburg, New York, on the Seneca Cattaraugus reservation.  (Logan Dep. Tr. 82:4-19.)  There was significant customer overlap between the consignees for Elliott Enterprises and EExpress.  EExpress was also a high-volume account, shipping hundreds of packages a week from its residential address; the day it opened, it immediately became one of Fink's largest accounts.  (See PX 102; PX 143.)  The timing could not have escaped Fink's notice: One of his largest accounts was terminated, and, just a few days later, another account opened that happened to largely fill the revenue hole.  These facts alone should have raised red flags.

Fink's trial testimony regarding what he knew about EExpress's shipments with UPS was particularly lacking in credibility.  He testified that shortly after the account was opened, he allegedly called EExpress and spoke to a woman named

---

[62] This approximation is based on the Court's assessment, given the totality of the evidence, that most, but not all, of Elliott Enterprises's shipments contained cigarettes.  The evidence supports that Elliott Enterprises sold a full array of tobacco products at its commercial storefront, and it is reasonable to assume that from time to time customers ordered some to be shipped (rather than purchasing the products in person).  Moreover, the Court credits Farrell Delman's testimony that cigarettes are most likely to have been shipped because of the greater consumer demand and lesser tax imposed.  (Delman Decl., DX 611 ¶¶ 24-34.)

[63] As described below, based on the totality of the evidence, the Court finds that EExpress was shipping on behalf of Elliott Enterprises and used a different name/address to avoid detection as a cigarette shipper

Adrian; he said he remembered her from her prior employment at LouAnn's Smoke Shop, an entity with which he was familiar.  (Fink Decl., DX 602 ¶¶ 66, 67; DX 511, line 40.)  According to Fink, Adrian informed him that EExpress was not shipping tobacco, but she refused to disclose exactly what they were shipping; she said that EExpress wanted to maintain the confidentiality of its business model in order to avoid competition from others on the reservation.  (Fink Decl., DX 602 ¶ 67.)  Fink then stated, "[a]s Adrian promised me EExpress was not shipping tobacco products and there was no indication from the name of the business or its location at a residence that it sold tobacco products, I had no reason to require EExpress to sign a Tobacco Agreement."  (Id.)  Yet, despite this professed belief, Fink referred to EExpress as a "cigar shop" in an email to Senior Sales Manager Mike Zelasko in April 2013.  (DX 184.)  According to Fink, this reference was simply a mistake. (Trial Tr. 637:5-15 (Fink); Fink Decl., DX 602 ¶ 68.)[64]  The Court also does not find this testimony credible.  At the very least, given the accumulation of facts already mentioned, trusting the self-serving statement of "Adrian" was unreasonable.  More than that, it was an affirmative act of "standing down" on the account and allowing the obvious to occur.

But, in addition, there were clear connections between Aaron Elliott—the principal of Elliott Enterprises and by then a known cigarette shipper—and

---

[64] In this same email, he also stated that EExpress was not a tobacco shipper or shipping cigarettes. Fink refers to other statements he made reflecting that EExpress was not a smoke shop.  The Court views the statement in PX 115 as reflecting his knowledge that EExpress was a smoke shop.  The Court further views his dissembling as covering the more damaging truth that he knew EExpress to be a cigarette shipper.

EExpress.  On September 26, 2012, Aaron Elliott executed the Carrier Agreement on behalf of EExpress.  (PX 128.)  Fink testified that he did not recognize the name and made no connection to the prior, terminated account.  (See Fink Decl., DX 602 ¶¶ 67, 75.)  The Court does not credit this testimony.

In the first full month that the EExpress account was open, it shipped approximately 2,100 packages with UPS from a residential address; that is, an average of 105 packages per day.  (See PX 552; PX 559.)  With one exception, monthly volume for EExpress averaged about 2,000 packages, or 100 packages a day.  (PX 559.)  On January 11, 2013, EExpress's cover was blown: The driver assigned to EExpress reported that it was shipping cigarettes.  (PX 172.)  However, despite this information, UPS continued to ship for EExpress and failed to take any remedial action as required by the AOD.

Commencing in April 2013, UPS received a number of inquiries regarding lost or damaged packages shipped by EExpress.  There were five tracers on April 25, 2013, each of which referenced packages containing cigarettes.  (PX 405, rows 61-64, 66.)  A tracer on June 6, 2013, also referenced a package containing cigarettes.  (Id., row 65.)  On December 26, 2013, a tracer referenced a package of cigarettes.  (PX 211, row 588.)  Two tracers, in January and May of 2014, referenced package containing cigarettes.  (Id., rows 589-90.)

Next, in May 2014, attorneys for the City and State identified a shipper named "Native Express," located at the same address as EExpress, as shipping cigarettes.  (Cook Decl., DX 600 ¶¶ 121, 122.)  UPS identified EExpress as being

75

located at the address in question and requested an audit.  (Id. ¶ 122.)  In a first

audit, conducted on May 5, 2014, UPS opened a package and found only coffee.[65]

(DX 549.)  As described above, Fink sent an email to Michael Zelasko, a UPS sales

manager, stating that the audit revealed only packages containing coffee, and

concluding with a "smiley face" emoticon.  (PX 569.)  Zelasko forwarded this email

to Brian Weber of UPS Customer Solutions.  (Id.)  Zelasko stated, "The audit for

EExpress came back as coffee!!  Dodged a bullet."  (Id.)  Weber responded, assuming

the issue was cigarettes, "Why did you assume they shipped cigarettes; Gerry said

he didn't know what they shipped."  (Id.)

However, approximately one month later, on June 11, 2014, three boxes

shipped by EExpress broke open in UPS's Dunkirk Center, revealing cigarettes.

(PX 358.)  A second audit was conducted June 13, 2014, on packages consigned by

the shipper to UPS on June 13, 2014.  All ninety-nine packages opened revealed

cigarettes; UPS terminated the account.  (PX 358.)  When EExpress was

terminated, Zelasko asked Mike Piazza of UPS: "This is Gerry[ Fink's] top account

worth almost $200,000.  Is there anything we can [do] for relief?"  (PX 370.)

In sum, the Court finds (1) that as of the date Aaron Elliott (who was the

principal of the terminated Elliott Enterprise account) signed the Carrier

---

[65] An email about an unrelated shipper sent two years after this audit indicates a view by some at
UPS that this audit may have been compromised by a tip to EExpress.  (PX 536.)  At trial, the
author of that email stated that he and others at UPS ultimately concluded that the audit had not
been compromised.  The Court views the weight of the evidence as supporting a compromised
audit—that someone within UPS, Fink or another, alerted EExpress to the upcoming audit.  This is
particularly so in light of the subsequent events.  This supports both knowledge of what was being
shipped and intent to assist the customer in continued shipping.

Agreement on September 26, 2012, there was a reasonable basis to believe that EExpress may have been tendering cigarettes; (2) that EExpress was tendering cigarettes throughout the entire time that it shipped with UPS; and (3) that UPS knew EExpress was shipping cigarettes throughout that period.

The Court further finds that 100% constitutes a reasonable approximation of the percentage of packages shipped by EExpress that contained cigarettes.[66]

### 3.   Bearclaw/AFIA

In early October 2010, Bearclaw Unlimited opened the first of what would turn out to be eighteen separate UPS accounts.[67]  (See Fink Decl., DX 602 ¶ 142.) The first account was opened on October 2, 2010, not long after the effective date of the PACT Act; and fourteen other accounts were opened between October 12 and December 27, 2010.  (See PX 606-PX 619.)  Bearclaw was located at 4888 Klawitter Road, Great Valley, New York (3.5 miles from the Seneca Allegany Reservation). This is a residential address.  On January 8, 2011, UPS opened a sixteenth account for Bearclaw, also at the same address.  (See PX 620.)  A seventeenth account was opened on February 24, 2011, and an eighteenth and final account was opened on

---

[66] This approximation is based on the Court's view of the totality of the evidence, including that the tracers overwhelmingly indicated cigarettes and only some other unidentified "paper products."  (DX 500.)  It is further based on the fact that, unlike Elliott Enterprises, EExpress was not a retail shop, and there is no indication that it sold anything other than cigarettes.  The Court views the "paper products" as referring, in fact, to cigarettes.

[67] While there is nothing inherently unlawful or violative of UPS policy about a shipper having multiple accounts, in the context of UPS's AOD and statutory obligations, UPS should have closely monitored such activity occurring on reservations that have had active tobacco shippers.  As discussed in footnote 57 above, "multiple accounts" was recognized as a red flag in the AOD itself. (AOD, DX 23 ¶ 31.)

May 8, 2012, under the name "AFIA," but at the Bearclaw address.[68]  (See PX 174,

row 899.)  Fink was the Account Executive for all of the accounts.  (See, e.g., DX

371.)  Notably, Bearclaw/AFIA and Elliott Enterprises shared a telephone number.

(Compare DX 371, row 2902, with PX 472.)  It was Fink's responsibility to maintain

contact with this larger accounts, and it is reasonable to infer that he was aware of

the relationship among these entities.[69]  The fact of such a large number of

accounts, with the first opening in the months following the effective date of the

PACT Act, with a location at a residential address proximate to an Indian

reservation, with a name suggesting possible affiliation with a cigarette shipper,

should have raised red flags.

There were several early indications that Bearclaw was shipping cigarettes.

First, Bearclaw/AFIA was a relatively high-volume shipper proximate to an Indian

reservation.[70]  Further, as early as January 24, 2011, UPS received an inquiry

regarding a damaged package of cigarettes shipped by Bearclaw/AFIA.  (PX 213,

row 204.)  Then, on August 26, 2011, UPS discovered twelve cartons of cigarettes in

a shipment tendered by Bearclaw and addressed to a private residence in Arizona.

---

[68] At least one UPS document (relating to an audit that occurred in September 2012) used "AFIA" and "Bearclaw" interchangeably.  (PX 531; see also PX 174.)  UPS did not rebut this evidence.  The Court finds no basis to consider Bearclaw and AFIA as separate entities.  In all events, the fact that UPS linked these accounts and addresses, together with other commonalities between the entities, provides a sufficient basis for the Court's findings for Bearclaw to apply to AFIA.  It appears that AFIA's business was the same as Bearclaw's.

[69] Based on the totality of the evidence, the Court finds that Bearclaw was shipping on behalf of Elliott Enterprises and used different names/addresses to avoid detection as a cigarette shipper.

[70] When Bearclaw's initial accounts were first opened, it was in the top 2% of Fink's highest revenue-generating accounts.  (See PX 104.)  Over time it dropped to the top 11%.  (See PX 102.)

(PX 333.)  Despite this blatant violation of UPS's Tobacco Policy, UPS did not terminate the account or take remedial action apart from having Fink review UPS's Tobacco Policy with Bearclaw/AFIA; Fink claimed that he reviewed the policy with them in September 2011.  (DX 119; see PX 333.)  Cook was aware of this incident and that Bearclaw had not executed a Tobacco Agreement.  (See, e.g., PX 200; Trial Tr. 618:18-619:21 (Fink).)  Despite these events, Fink did not request that Bearclaw sign a Tobacco Agreement—and no supervisor within UPS followed up to find out why.  Also, despite these events, UPS did not conduct an audit of Bearclaw/AFIA until September 21, 2012.  When it did, it found cigarettes.  (Cook Decl., DX 600 ¶ 75.).  The Court views this series of omissions and failures to respond as UPS affirmatively "standing down" on this account.

It took a month from the time UPS's discovered cigarettes in the audit to suspend the account: UPS suspended Bearclaw's account on or about October 23, 2012.  (See PX 174, row 832.)  The Court views this delayed timing as suspect and as reflecting corporate concern about the financial impact such suspension would have.[71]

In sum, the Court finds that (1) not later than December 27, 2010, there was a reasonable basis to believe Bearclaw/AFIA may have been tendering cigarettes (this date is based on the series of red flags described above by then in existence); (2) Bearclaw/AFIA was in fact shipping cigarettes from the inception of its first

---

[71] While the impact would have been insignificant in the overall context of UPS's business, the evidence supported greater attention within UPS to keep even modest revenues.

account; and (3) UPS knew that Bearclaw/AFIA was shipping cigarettes not later than January 24, 2011.[72]

The Court further finds that 100% is a reasonable approximation of the percentage of packages shipped by Bearclaw/AFIA that contained cigarettes.[73]

### 4.   Shipping Services/Seneca Ojibwas/Morningstar Crafts & Gifts

The Seneca Ojibwas Trading Post, Shipping Services, and Morningstar Crafts & Gifts were referred to by plaintiffs as the "Shipping Services Group."  For these companies, combined consideration of the facts and circumstances relating to their accounts is appropriate.  As explained below, there is significant evidence that the entities were in fact one and the same.[74]  Nevertheless, the Court has analyzed

---

[72] These latter findings are based on the fair inference drawn from the totality of the evidence and the number of red flags, including the tracers.  By not auditing and not requiring a Tobacco Agreement, UPS took affirmative steps supporting a finding of—at least—willful blindness.

[73] This approximation is based on the Court's view of the totality of the evidence, including the tracers for cigarettes, the August 2011 discovery of cigarettes, and the fact that the audit found cigarettes.  It is also based on the fact that Bearclaw and AFIA shipped out of a residential address, which reduces the likelihood that they carried the broad array of goods a storefront retailer might offer.  There was no storefront displaying other goods.

[74] Courts generally evaluate the totality of the circumstances to determine if formally separate entities are identical in substance, and if it is fair and equitable to regard them as alter egos.  Cf. N.Y. Pattern Jury Instr., Civil 2:266, Liab. for Conduct of Another (2016) ("The corporate veil or shield may be pierced when (1) the [entity's] owner(s) completely controlled the [entity] and did not treat it as a separate business entity and (2) the [entity's] owner(s) used [their] complete control to commit a fraud or a dishonest or an unjust act . . . ."); Newspaper Guild of N.Y., Local No. 3 of Newspaper Guild, AFL-CIO v. NLRB, 261 F.3d 291, 294 (2d Cir. 2001) (explaining that the determination of whether subsidiaries are alter egos "focuses on commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership"); OOO v. Empire United Lines Co., 557 F. App'x 40, 45-46 (2d Cir. 2014) ("'In deciding whether to pierce the corporate veil, 'courts look to a variety of factors, including the intermingling of corporate and [shareholder] funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors.'" (quoting Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 195 (2d Cir. 2010)).  While the evidence at trial did not allow for findings as to each factor set forth in the case law, the evidence presented plainly supported the factors set forth in the pattern jury instruction.

the facts with regard to each of the entities separately, and its findings below take such individualized consideration into account.

Shipping Services was a successor entity to a company called the Seneca Ojibwas Trading Post ("Seneca Ojibwas"). Seneca Ojibwas opened an account with UPS in April 2002. (PX 299, row 3; PX 309, row 14.) Fink knew that Seneca Ojibwas shipped tobacco products. (See PX 306, row 4 ("Smokes").) A spreadsheet sent to Fink lists Seneca Ojibwas as a "smoke shop." (PX 306.) After UPS entered into the AOD, Fink informed the owner of the Seneca Ojibwas that his account would be cancelled and reopened. (PX 452.)

On November 22, 2005, Fink opened a new account for Seneca Ojibwas under the name "Shipping Services." (Fink Decl., DX 602 ¶ 46; Trial Tr. 579:7-9, 630:21-23 (Fink).) The Court views the name change as an attempt to obscure the affiliation between these companies, and specifically to obscure that Shipping Services was a smoke shop. The Court further finds that the UPS account team nonetheless understood the affiliation. Thus, from the outset, Shipping Services was known by UPS to be a tobacco shipper. The new "Shipping Services" account began shipping on November 22, 2005. The account was located at 13113 Route 438, Gowanda, New York on the Seneca Allegany reservation, and it operated out of a storefront. (See Fink Decl., DX 602 ¶ 45.) Cigarettes were among its wares.

Responsibility for the account was initially assigned to a UPS Sales Support Representative, Tina Mahon. (Trial Tr. 493:25-494:3 (Fink); Fink Decl., DX 602 ¶ 47.) In August 2010, Mahon obtained a Tobacco Agreement from Shipping

81

Services.  (DX 51.)  Fink took over responsibility for the account in late 2010, after he was promoted to Account Executive.  Fink personally visited the storefront out of which Shipping Services operated in 2010, and he spoke with a representative of the company quarterly thereafter.  (Fink Decl., DX 602, ¶ 50.)  He testified that he only saw little cigars during his visit, not cigarettes.  (Id.)  The Court did not believe this testimony.  The testimony conflicts with the rational business incentive of a smoke shop to display wares corresponding to the highest consumer demand, i.e., cigarettes.  (See, e.g., PX 11.)

Until passage of the PACT Act, Shipping Services shipped insignificant volume through UPS.  Its volume began to increase in 2010 after the PACT Act became effective.  (Id. ¶ 49.)  Given that it was a tobacco shipper, this was a serious red flag.  Today, UPS's data analytics would likely flag this shift.  Fink opened a second Shipping Services account in January 2011.  In a spreadsheet maintained by UPS to record in-person visit details, Fink noted on January 11, 2011, "Rock-N-Roll . . . Still retaining same customer base, and not even allowing new people to place orders.  Locked-in majority to keep the reships rolling[.]"  (PX 235, row 3275).  The Court views this use of the term "reships" as indicating knowledge of a customer base in need of a consistent supply, such as customers addicted to tobacco products, including possibly cigarettes.  Following a March 2011 in-person visit, Fink noted that business was so strong that Shipping Services was "[s]till reluctant to go after new [business] (CRAZY), way over the top."  (PX 235, row 3276.)

During the period from July 28, 2011, to November 30, 2011, customers made three inquiries to UPS relating to lost or damaged shipments of cigarettes from Shipping Services.  (DX 500, lines 15, 17, 20.)  Customers also made inquiries regarding lost or damaged packages of non-cigarette products (including non-tobacco products).  (DX 500; see also DX 499, Package Details Tab for Account 03E04E.)

In January 2012, Shipping Services was referred to as one of Fink's "must keep accounts."  (PX 137; PX 138.)  As of March 5, 2012, it was second in revenue for Fink only to Elliott Enterprises.  (PX 568.)  In 2012, Shipping Services's volume began to decline.  (DX 511, row 181.)  UPS noted that this decline related to regulatory issues.  (Id.)  For instance, a UPS document noted, "Still considering [a] move out of NY due to state issues."  (Id.)  And that there were "changing rules for Native Americans."  (Id. row 179.)  Additionally, at trial, Fink lacked credibility when he testified that he believed Shipping Services only shipped little cigars.  He provided no credible basis for this belief.

On January 2, 2014, UPS conducted an audit of five packages sent by Shipping Services.  Three of the five contained little cigars and two contained cigarettes; put otherwise, 40% contained cigarettes.  UPS terminated Shipping Services's account on January 13, 2014.  (See PX 360; PX 373; PX 363; PX 374.)  At the time it was terminated, Shipping Services still accounted for $80,000 in annual net revenue with UPS.  (PX 363; DX 250.)

Shortly after the Shipping Services account was closed, on January 21, 2014, Fink opened an account for Morningstar Crafts & Gifts. (Fink Decl., DX 602 ¶ 138.) He did not indicate that this was a "new" opportunity. (PX 226.) It operated out of a storefront located at 13113 Route 438, Gowanda, New York—the same address as Shipping Services. (PX 226; Fink Decl., DX 602 ¶ 138.) This was not only a red flag, but indicative of knowledge by Fink that this entity was Shipping Services, redux. A sign located in front of the store featured "Discount Cigarettes" among its wares. (PX 574.) However, the store also sold Native American crafts, gifts, and little cigars. (Fink Decl., DX 602 ¶ 139; Logan Dep. Tr. 85:5.) Morningstar Crafts & Gifts executed a Tobacco Agreement on January 27, 2014. (DX 262; DX 310; Fink Decl., DX 602 ¶ 139.) By October 2014, Morningstar Crafts & Gifts had been suspended by UPS. (See PX 226.)

In sum, the Court concludes that (1) from the inception of each account there was a reasonable basis to believe that Seneca Ojibwas, Shipping Services, and Morningstar Crafts & Gifts may have been tendering cigarettes; (2) Shipping Services and Morningstar Crafts & Gifts were in fact shipping cigarettes throughout the entirety of their relationship with UPS; and (3) UPS knew Shipping Services was shipping cigarettes not later than November 1, 2010, and it knew that Morningstar Crafts & Gifts was shipping cigarettes from the date on which its account was opened.[75]

---

[75] These three findings are based on the totality of the evidence. The Court views November 1, 2010, as the date not later than which UPS knew of its cigarette shipments because the increase in volume

The Court further finds that 40% is a reasonable approximation of the percentage of packages shipped by this group with UPS that contained cigarettes.[76]

### 5.    Indian Smokes

Indian Smokes opened an account with UPS on May 14, 2001.  The company was located at 21 Race Street, Salamanca, New York.  As of October 27, 2005, UPS considered Indian Smokes to be a suspected cigarette shipper.  (See PX 299; see also Trial Tr. 304:13-22 (Cook) (Indian Smokes identified as smoke shop in December 20, 2005 UPS report); DX 35.)  On November 23, 2005, UPS canceled its account.  (See PX 318, row 169.)  Thereafter, the company did not ship with UPS for several years. Following a sales lead from a UPS driver, Louis Potter, UPS began discussing an account with them in March 2011.  (See DX 510.)

On April 27, 2011, Indian Smokes opened a new account.  (PX 216.)  There was no credible evidence that UPS had any basis to believe this entity had changed its business model between 2005 and 2011, and it certainly had not changed its name.  At the very least, its prior business as a smoke shop (and suspected cigarette shipper) should have raised a red flag.  Indian Smokes was immediately a significant account for the area, generating over $55,000 in annualized revenue in the first year.  (Id.)  Fink oversaw the account.  He knew from the outset—and

---

closely followed on the effective date of the PACT Act.  At the very least, continuing to make pickups without auditing is evidence of standing down on the account and of willful blindness.

[76] This percentage is based on the Court's consideration of data points indicating that 25% of customer inquiries related to cigarettes, that the audit revealed that 40% of shipments were for cigarettes, and that it operated out of a storefront that sold other items, along with the totality of the evidence.

continuously until May 2012, when Indian Smokes was terminated—that it shipped tobacco products. (<u>See</u> PX 301, line 4; PX 306, line 11.)

A month after the account was opened, on May 6, 2011, it appeared on the NCL. (<u>See</u> PX 514; PX 518; PX 524 (referencing date first "entered on NCL"); <u>see also</u> DX 510.) However, evidence also supports that Indian Smokes shipped some non-cigarette products. For instance, tracers regarding lost or damages packages in January and April 2012 were for cigars only. (DX 500.)

On January 11, 2013, the UPS Center processing Indian Smokes packages determined that they were shipping cigarettes and refused to process their packages. (<u>See</u> PX 172.) On the same day, Fink asked Brian Weber of UPS, "shouldn't smoke shops get removed from my plan?" (<u>Id.</u>) The Court views this statement as acknowledgement by Fink and others within UPS that smoke shops were generally known to be likely cigarette shippers at risk of account termination. Here, however, in lieu of termination or other action, UPS responded by only requiring Indian Smokes to sign a Tobacco Agreement; it executed one on February 1, 2013, and service was restored. (DX 510, rows 6, 9.)

Despite the restoration of service, the volume of shipments from Indian Smokes declined. On February 26, 2013, Fink asked McDowell, UPS's "bid contract manager" for this account, whether Indian Smokes was still using UPS to ship. (PX 162; PX 274, row 689.) McDowell told Fink that Indian Smokes was "concerned that we [UPS] are going to open all of their packages." (<u>Id.</u>) In fact, there is no evidence that UPS tested Indian Smokes's commitment to its Tobacco Policy. UPS's

McDowell must have understood Indian Smokes's concern with audits as some evidence that it was shipping contraband. Fink asked whether the account should be closed, and McDowell responded, "Not if it were up to me. At least, not yet anyway." (Id.) However, by April 18, 2013, McDowell noted that Indian Smokes would not be using the account any longer. (DX 510, row 5.)

In May 2013, UPS canceled the account. (Id., row 3; PX 150.) On July 5, 2013, McDowell noted the "customer diverted due to a cigarette issue." (DX 510, row 2.)

In sum, the evidence supports that (1) not later than the time the account was opened on April 27, 2011, there was a reasonable basis to believe Indian Smokes may have been tendering cigarettes for delivery; (2) it was in fact shipping cigarettes throughout the entire period from account inception to termination (this is based on the fact that only a month elapsed between the account opening and its appearance on the NCL); and (3) not later than May 6, 2011 (when it appeared on the NCL), UPS knew that it was shipping cigarettes.

The Court further finds that 50% represents a reasonable approximation of the percentages of packages by Indian Smokes shipped with UPS that contained cigarettes.[77]

---

[77] The finding of 50% is based on the fact that Indian Smokes was listed on the NCL as a cigarette shipper, and the Court therefore credits that they were shipping cigarettes; this is also confirmed by the driver report on January 11, 2013. However, DX 500 and other evidence supports that Indian Smokes might have had a broader product line. In the absence of precise evidence, the Court uses 50% as a conservative view of an even split between cigarette and non-cigarette products.

6.     Smokes & Spirits[78]

Smokes & Spirits opened an account with UPS in late August 2010, shortly after implementation of the PACT Act.  (See PX 70.)  It was located at a commercial address at 270 Rochester Street in Salamanca, New York, on the Seneca Allegany reservation; UPS also associated this entity with the address 6665 Route 417, Kill Buck, New York.  (See id.; Cook Decl., DX 600 ¶ 97.)  Fink was Smokes & Spirits's Account Executive; Fink testified that he knew Salamanca had a number of tobacco shippers.  (Trial Tr. 589:23-590:15 (Fink); Fink Decl., DX 602 ¶¶ 31, 32; PX 326.)  Smokes & Spirits immediately began shipping in volume—with 1,300 packages to residential addresses in the first month of its relationship with UPS.  (PX 433.)  These facts alone should have raised red flags.  On October 11, 2010, it executed a Tobacco Agreement.  (DX 55.)

On November 10, 2010, Fink received a copy of the Tobacco Watchdog Group letter, which indicated that Smokes & Spirits, located at 270 Rochester Street, Salamanca, New York, was making "illegal contraband cigarette shipments to residential consumers."  (DX 62.)  This was another, major red flag.

According to Fink, there were a number of reasons he did not view Smokes & Spirits as a cigarette shipper.  First, Bob Oldro, the principal of Smokes & Spirits, informed Fink that Oldro was moving to New York from another state to take advantage of the growth in New York's little cigar market by opening up a new

---

[78] Smokes & Spirits is part of the "Smokes & Spirits Group" designated by plaintiffs as including this entity along with Native Outlet, A.J.'s Cigars, Sweet Seneca Smokes, and RJESS.

business to ship little cigars.  (Fink Decl., DX 602 ¶ 37; Trial Tr. 626:23-627:4 (Fink).)  Fink's notes following an in-person visit with the Smokes & Spirits on March 4, 2011, indicated that the customer had expressed a concern regarding proposed changes to the New York tax law regarding little cigars.  (DX 526, line 3257; DX 47; DX 553.)  Fink further testified that over the life of the account, Oldro or his colleagues continued to assure Fink that the business was only shipping cigars or other tobacco products, not cigarettes.  (Fink Decl., DX 602 ¶¶ 32, 36; DX 55.)  The Court did not believe Fink's testimony—at the very least, if those statements were made by Oldro and others, the Court does not believe <u>Fink</u> believed them.  In all events, given the numerous red flags, it was unreasonable for Fink to have relied on these self-serving statements.

The red flags accumulated further.  In the fall of 2010, UPS received its first inquiries regarding lost or damaged packages containing cigarettes shipped by Smokes & Spirits.  The first tracer regarding packages containing cigarettes occurred on October 29, 2010.  (DX 500, row 8; <u>see also</u> PX 470, row 2865.)  A second tracer concerning a cigarette shipment occurred on December 27, 2010; a third on December 27, 2011; a fourth on September 14, 2012; and a fifth on September 17, 2013.  (DX 500, rows 13, 38, 55, 84.)  Nineteen other tracers related to packaging containing filtered cigars and other tobacco products.  (DX 500, Package Details Tab for Account W9476E.)

Smokes & Spirits, with an address listed as 6665 Route 417, Kill Buck, New York, appeared on the NCL as of February 15, 2012.  "Smokes_Spirits.com LCC," at

that same address, appeared on the NCL as of July 16, 2012.  (See PX 514; PX 518; PX 524.)[79]  On July 29, 2013, the subpoena UPS received from City Finance specifically identified the address "6665 Route 417, Kill Buck, NY."  (PX 248.)  Kill Buck also is less than two miles from Salamanca, New York.  Still, UPS did not audit the company.

In June 2012, the First Deputy Sheriff of City Finance made several controlled buys of packages containing cigarettes from Smokes & Spirits.  (Kokeas Aff. ¶ 9; PX 40; PX 43; PX 44; PX 45.)  In addition, on July 29, 2013, City Finance issued a subpoena to UPS that sought delivery records of a number of shippers, including Smokes & Spirits.  (Kokeas Aff. ¶ 6; PX 428.)

In the fall of 2013, UPS's Cook received a copy of the NCL; he noticed that Smokes & Spirits was listed.  Notably, he did not immediately require an audit.  On December 20, 2013, the City sent an email to UPS that, inter alia, identified Smokes & Spirits as a cigarette shipper.  On January 2, 2014, Cook finally ordered an audit; for reasons that were unclear, this audit was still not conducted for another three weeks.  On January 21, 2014, UPS audited a total of fifteen packages; nine of these packages—i.e., 60%—contained cigarettes.  (Cook Decl., DX 600 ¶ 97; DX 257; Fink Decl., DX 602 ¶ 39.)  UPS terminated service to Smokes & Spirits on January 22, 2014.  (Cook Decl., DX 600 Attachment A; Fink Decl., DX 602 ¶ 40; DX 260; DX 256.)

---

[79] As the Court has found, UPS knew that UPS knew Smokes & Spirits was operating out of multiple locations, including 6665 Route 417, Kill Buck, New York.  Among other evidence, UPS's records for Smokes & Spirits shipments in 2011 listed this address.  (See PX 70.)  This is relevant for UPS's PACT Act liability, as discussed by the Court in its conclusions of law.

Bergal Mitchell, who had been a consultant for Smokes & Spirits, testified at trial. The Court found him generally credible. He testified that Smokes & Spirits shipped cigarettes since before he and his brother purchased the business in August 2004. (Trial Tr. 1190:23-1191:-16 (Mitchell).) He also testified that they shipped candy, flowers, and other tobacco products in addition to cigarettes. (Id. 1191:6-16 (Mitchell).) From 2010 onward, Mitchell testified, 99% of all of Smokes & Spirits's orders were placed online. (Id. 1196:1-6 (Mitchell).)

Plaintiffs introduced a number of invoices from Smokes & Spirits to its customers. While those invoices reflect cigarette shipments, those invoices also demonstrate that a significant volume of Smokes & Spirits's sales consisted of little cigars and other tobacco products. (See, e.g., PX 54; PX 55; PX 191; DX 500.) These same invoices further show that sales of little cigars were particularly prevalent when the account was first opened. (Id.)

In sum, the Court finds that (1) not later than October 11, 2010, the date on which UPS had it sign a Tobacco Agreement and when a number of red flags were already evident, there was a reasonable basis to believe Smokes & Spirits may have been tendering cigarettes; (2) from at least October 29, 2010 (the date of the first cigarette tracer), Smokes & Spirits was in fact shipping cigarettes; and (3) UPS knew it was shipping cigarettes not later than October 29, 2010, the date of the first cigarette tracer.

91

The Court further finds that 60% is a reasonable approximation of the percentage of Smokes & Spirits shipments via UPS that contained cigarettes.[80]

### 7. Arrowhawk/Seneca Cigars/Hillview Cigars/Two Pine Enterprises[81]

Plaintiffs refer to the Arrowhawk Smoke Shop, Seneca Cigars/Cigarettes, Hillview Cigars, and Two Pine Enterprises as the "Arrowhawk" group. The evidence supports that they functioned as a single entity and were alter egos of one another. Philip Christ, a former consultant for the Arrowhawk Group, testified as much.[82] UPS treated the accounts as related. The UPS processing system showed all of the accounts were related; UPS Account Executive Richard DelBello acknowledged the connection between Hillview and Two Pine Cigars. (PX 340.) These entities had the same address: 852 Bloomingdale Road, Basom, New York. (See PX 232; PX 95; PX 340; DX 234; PX 154; PX 344; Trial Declaration of Richard

---

[80] The Court's finding of 60% is based on the totality of the evidence, considering in particular the fact that Smokes & Spirits operated from a commercial address and sold an array of goods, and the Court's weighing of invoices and tracer evidence. Further, the audit likely reflected the approximate portion of this entity's business involving cigarettes.

[81] In certain submissions, an entity referred to as "Native Gifts" is included in this group. The evidence is insufficient to determine if plaintiffs intended to include them in this group or not. For instance, apart from including them in their damage analysis as one group, plaintiffs' final proposed findings of fact keep them separate. The Court finds there is insufficient evidence with respect to Native Gifts to find liability or even discuss them as a Relevant Shipper.

[82] Philip Christ, a witness cooperating with the plaintiffs, worked for the Arrowhawk Group of companies throughout the relevant time period. He testified credibly (and there was no significant contrary evidence offered by UPS) that the group of companies that plaintiffs have designated as the "Arrowhawk" group did in fact operate as a single entity. The Court found portions of Christ's testimony not credible. His demeanor conveyed a lack of full mental acuity. His answers were often halting, as if he was either searching for the correct answer or confused. (Indeed, the Court raised with counsel whether he was on any medications that could account for his presentation.) Nevertheless, upon careful reflection and after assuring itself other corroborating evidence exists for many points covered in his testimony, the Court finds that there are a number of facts as to which he testified credibly, as set forth below.

DelBello ("DelBello Decl."), DX 604 ¶¶ 19-21, 31, 45.)  That same address had previously been used by an entity named "Hootysapperticker.com." Hootysapperticker had been a UPS shipper and, at the time UPS entered into the AOD, UPS believed it might be a cigarette shipper.[83]  (DX 35 at 109.)  Despite this evidence of these entities being one and the same, the Court has considered the facts as to liability separately for each.  Its findings below reflect this individualized consideration.

The first account for this group was opened under the name Seneca Cigars on January 9, 2012.  It was located at 852 Bloomingdale Road, Basom, New York— along with each of the other Arrowhawk Group shippers (except for Native Gifts). Accounts for the other entities in the group were opened thereafter.

UPS had a daily pickup at 852 Bloomingdale Road.  DelBello, the UPS Account Executive for Arrowhawk Smoke Shop, Seneca Cigarettes/Cigars, Hillview Cigars, and Two Pine Enterprises, knew there were three accounts located at this address.[84]  (DelBello Decl., DX 604 ¶¶ 18, 20.)  Given the signage at the address, it was impossible for him (or any other driver picking up from that account) not to know that there was a significant cigarette seller located at that address.  Christ was the primary contact for these accounts.  DelBello testified that he knew Christ had "a lot" of businesses that shipped cigarettes.  (Trial Tr. 901:14-18 (DelBello).)

---

[83] In addition, Hootysapperticker had been identified by UPS's outside counsel as a suspected cigarette shipper.  (See PX 292.)  The Court credits Christ's testimony that it was in fact a cigarette shipper.  (Trial Tr. 915: 8-12, 921:18-21, 947:22-948:3 (Christ).)

[84] Ryan Keith of UPS was listed as part of the UPS team along with Richard DelBello.  (PX 95.)

Christ had expressed to one UPS account representative that he was interested in shipping cigarettes.  (Id. 843:15-17, 844:8-11, 848:24-849:11, 851:1-6 (DelBello).)

UPS knew that "Seneca Cigars and Hillview Cigars" used the URL "www.senecacigarettes.com."  (PX 95; Trial Tr. 737:22-738:5 (Keith).)  The UPS "Account Strategy Planning Tool" for this account noted that the customer intended to ship tobacco products to residential customers and that one of its business challenges was "complete compliance with all applicable state and federal mandates."  (PX 95.)

Almost immediately after the account was opened, in February 2012, UPS received its first indication that Seneca Cigars was actively seeking to ship cigarettes.  On March 9, 2012, DelBello and Christ met in person.  (Trial Tr. 839:15-23 (DelBello); DX 128.)  According to DelBello, Christ and two other people involved with the company assured him that Seneca Cigars would be shipping cigars.  (Trial Tr. 837:23-838:14 (DelBello).)  Christ claims, to the contrary, that during the two years in which Christ worked for Seneca Cigars/Arrowhawk, he specifically informed UPS that they would be shipping cigarettes when the account was opened and in later conversations.  (Id. 946:25-952:3 (Christ).)  Christ also testified that 99% of its walk-in sales and 99.5% of its mail-order sales were of cigarettes.  (Id. 914:4-915:2 (Christ).)  Following the effective date of the PACT Act, volumes increased many fold.  (See PXs 67, 70, 80, 220, 221, 222, 227, 413, 420, 422, 433, 435, 436.)  UPS notes from July 2012 indicated that "100% of outbound shipments

[for the accounts] go via UPS." (PX 95.) UPS representatives also understood that the Arrowhawk group were high-volume shippers. (See, e.g., PX 491.)

At various times, Christ attempted to mislead UPS as to what these entities were in fact shipping. For instance, he told Keith that they were shipping cigars. (Trial Declaration of Ryan Keith ("Keith Decl."), DX 603 ¶ 26.) The Court does not find UPS believed him; instead, UPS viewed Keith as understanding these statements to provide UPS with "plausible deniability" of violations when Keith in fact believed otherwise.

Keith also had several telephone conversations with Christ, beginning in January 2013, about Seneca Cigars and Hillview Cigars. According to Keith, during these conversations, Christ discussed his interest in complying with regulations and laws. (Trial Tr. 765:21-766:3 (Keith).) In October 2013, Keith's contemporaneous notes in his UPS TEAMS report states that Christ had told him that "everything he ships is considered a cigar," that his only question was a product called Swisher Sweets, and that he would check with his lawyer on the legality to ship that product. (Trial Tr. 789:13-790:4 (Keith); DX 511, line 289 at UPS00000189.) Shining through Keith's testimony are his continued skepticism and his concern that these entities were in fact shipping cigarettes.

Vincent Guarino was the assigned UPS driver for these accounts. He made daily pickups for these entities; he must have seen the signage on the front of 852 Bloomingdale Road. Guarino testified that when he picked up packages from the Seneca Cigars and Arrowhawk/Hillview Cigars/Two Pine location, he could not

always see inside the warehouse.  (Trial Tr. 1345:14-22 (Guarino).)  However, on one occasion, Guarino observed Christ taping up a box that appeared to have cartons inside.  (Id. 1348:1-3 (Guarino).)  Guarino asked Christ what he was shipping; Christ told him that he was shipping little cigars.  (Id. 1348:4-6, 1348:24-1349:16 (Guarino).)  Guarino checked with his supervisor to make sure that little cigars were permitted to be shipped, and he was told that little cigars were permitted.  (Id. 1351:15-25 (Guarino).)  Neither Guarino nor his supervisor should have accepted this self-serving statement from an obvious tobacco shop.  They should have requested an audit.

While negotiating the pricing for Seneca Cigars and Hillview Cigars in June 2013, Christ informed Keith that the owners of the companies were planning to purchase a new company, which had been shipping with a competing carrier but would move its business to UPS.  (Keith Decl., DX 603 ¶ 31; DX 511, line 266 at UPS00000187.)  This was Two Pine Enterprises.  It opened an account with UPS on July 9, 2013.  Both DelBello and Keith testified that customers told them that Two Pine, as an affiliate of the other shippers, was also not shipping cigarettes, but only cigars or other tobacco products.  (DelBello Decl., DX 604 ¶ 42; Keith Decl., DX 603 ¶¶ 54, 56.)  Given the accumulated red flags, UPS should not have accepted this self-serving statement without an audit.

In June 2012, Sheriff Kokeas made controlled buys of packages containing cigarettes from Seneca Cigars.  (Kokeas Aff. ¶ 9; PX 40.)  She did this because she had received an email from them advertising untaxed cigarettes shipped via UPS.

96

(PX 592.)  On July 29, 2013, City Finance served a subpoena on UPS seeking delivery records for a number of shippers, including Seneca Cigars.  (Kokeas Aff. ¶ 6; PX 248.)  Guarino was also the assigned driver for Two Pine Enterprises. While Two Pines Enterprises shared the same account address with Seneca/Hillview, it shipped from a different location.  (See Trial Declaration of Vincent Guarino ("Guarino Decl."), DX 607 ¶ 14.)  In March 2014, UPS learned that Two Pine Enterprises was dropping packages at a location that was not its regular pickup location.  When DelBello asked Dolores Uebelhoer, the owner of Two Pine Enterprises, why this was occurring, she responded that it was due to the time of UPS's daily pick-up for the account.  (DX 529.)  DelBello noted that he did not believe Uebelhoer's explanation.  However, he testified at trial that he had no suspicion that Two Pine Enterprises might be shipping cigarettes; instead, he believed that Uebelhoer may have been dropping the packages at the UPS Store as a matter of convenience.[85]  (Trial Tr. 882:18-883:18 (DelBello); DX 529.)  DelBello informed Uebelhoer that she had to resume pick-up service for her account. (DelBello Decl., DX 604 ¶ 37.)  The Court finds that DelBello strongly suspected the truth—that Two Pines was shipping cigarettes—but he turned a blind eye.  Given the accumulated red flags, UPS acted affirmatively by not requiring an audit and "standing down" on this account.

---

[85] Two emails from DelBello refer to Christ and Uebelhoer as "liars."  Both of these emails are dated after the April 17, 2014 audit of Two Pine Enterprises; DX 335 is dated June 26, 2014, and PX 336 is dated April 23, 2014.  DelBello testified that after the audit revealed cigarettes, he realized that Christ and Uebelhoer had lied to him about shipping cigars, but he maintained that prior to the audit he had no reason to believe that they were lying about shipping cigars.  (Trial Tr. 860:25-861:11, 887:20-889:10 (DelBello).)

Finally, on April 15, 2014, the game was up: A clerk in a UPS Center in Philadelphia reported that a package from Two Pine Enterprises had broken open on a conveyor belt, revealing cigarettes.  Corporate Dangerous Goods requested an audit of Two Pine Enterprises, which took place two days later, on April 17, 2014. The audit revealed cigarettes, and UPS terminated the account.  (Cook Decl., DX 600 ¶¶ 116-17; DelBello Decl., DX 604 ¶¶ 38-40; Guarino Decl., DX 607 ¶ 21; DX 299; DX 528.)

Despite the fact that some of the Arrowhawk entities had names suggesting a focus on tobacco products (e.g., Seneca Cigars, Hillview Cigars, Arrowhawk Smoke Shop (or Cigars)), UPS did not have a Tobacco Agreement with any of these entities until September 2013.  (See DX 210.)  UPS had Twin Pines sign an agreement only after plaintiffs sent UPS a draft complaint on October 21, 2013.  (DX 234.)  When Seneca Cigars and Hillview Cigars sent UPS a Tobacco Agreement, it was from "seneca cigarette" with the email address "senecacigarette@gmail.com." (Id.)

In sum, the Court finds that (1) from the date the first account was opened at 852 Bloomingdale Road, January 9, 2012, and for each day and with regard to each of these entities thereafter, there was a reasonable basis to believe each of Arrowhawk, Seneca Cigars/Cigarettes, Hillview Cigars, and Two Pine Enterprises may have been tendering cigarettes; (2) the companies were in fact shipping cigarettes from that date or the date of the specific account opening onwards; and (3) UPS knew that Arrowhawk Smoke Shop, Seneca Cigars/Cigarettes, and Hillview Cigars were shipping cigarettes not later than March 9, 2012, when DelBello met

with Christ and was told they would be shipping cigarettes.  Given the accumulated circumstantial evidence, UPS knew that Two Pine Enterprises was shipping cigarettes from the inception of its account on July 9, 2013.

Finally, the Court finds 90% to be a reasonable approximation of how much of each of the separate entities' shipments contained cigarettes.[86]

### 8.   Mohawk Spring Water

Robert Oliver opened an account with UPS on November 1, 2010, at 263 Frogtown Road, Hogansburg, New York, on the St. Regis Mohawk Reservation.  (PX 281, row 72; PX 329.)  This was shortly after the passage of the PACT Act.  In the first month the account was opened, UPS picked up 569 packages.  (PX 281, sheet 2, row 2.)

Oliver testified credibly at trial that when the account was opened, he personally told Carmine Della Serra, the UPS sales support representative, "you know, some of these boxes will contain cigarettes."  (Trial Tr. 1131:2-9 (Oliver).)  In response, Della Serra threw up his hands and said, "I don't want to hear that," and proceeded to open the account.  (Id. 1131:2-9 (Oliver).)  The Court credits Oliver's testimony in that regard.  Oliver testified at trial that Mohawk Spring Water manufactured cigarettes on the Akwesasne Reservation between June 2010 and mid-October 2011.  (PX 49; Oliver Trial Tr. 1128:9-11.)  Mohawk Spring Water did not manufacture little cigars.

---

[86] The Court's finding of 90% is based on the totality of the evidence and on its weighing of Christ's testimony that these entities shipped almost exclusively cigarettes with the fact that, based on the testimony regarding other tobacco products, they sold other products, as well.

Oliver testified that UPS driver Donald Jarvis made pickups from this account.  (Trial Tr. 1134:21-1135:1 (Oliver).)  On one occasion, when Jarvis was picking up packages from Mohawk Spring Water, Oliver saw boxes of cigarettes inside UPS's vehicle, including "Chiefs," and "222s."  (Id. 1141:22-1142:22 (Oliver).)

During the period in which its account with UPS was active, Mohawk Spring Water made "scores" of shipments of cigarettes in lots of 10,000.  (PX 49 ¶ 6(b).)  In total, this entity shipped at least 2,556 cases of cigarettes, totaling 76,680 cartons (each case consisting of 30 cartons).  (PX 49 ¶ 6(c) and (d).)  Oliver also testified that the cigarettes were unstamped.  (Trial Tr. 1132:5-1134:20 (Oliver).)

At his deposition, Jarvis testified that he knew that Mohawk Spring Water had been shipping cheap cigarettes to Long Island (most of which were being shipped to another Indian reservation there).  (Jarvis Dep. Tr. 54:18-55:12, 56:7-11.).  On multiple occasions, packages that Mohawk was shipping broke open at the UPS Potsdam Center and Jarvis saw that they contained cigarettes.  (Id. 70:3-20.)

In the fall of 2010, another UPS driver, Candace Sheridan, also concluded that Mohawk Spring Water was shipping cigarettes.  (Sheridan Dep. Tr. 66:21-68:3.)  This caused Sheridan to inform her supervisor, Terry Foster, that she no longer wanted to make pickups from Mohawk Spring Water.  (Id. 39:5-40:1.)  Sheridan also informed her union representative about the pickups at Mohawk Spring Water and said she would not pick up untaxed cigarettes.  (Id. 42:2-44:1.)  The union representative reported back that UPS employees at the highest levels of the Potsdam Center (Roger Bousquet) instructed that drivers were to continue

100

making pickups.  (Id. 43:19-44:1.)  As a result, Sheridan continued to make pickups.

(Id. 46:1-47:3, 49:12-24, 68:14-25.)  Sheridan testified, "[t]he more I covered the

routes, you know, the more suspicious I became, the more questions I started to

ask."  (Id. 67:18-19.)  And, "[t]he more I covered the area, the more I didn't want to."

(Id. 58:8-9; see also id. 39:5-40:1.)[87]

        As discussed in detail in other sections of this Opinion, on April 26, 2011,

UPS's Potsdam facility supervisor, Steve Talbot, indicated to a UPS Account

Executive that there was a potential issue with pickups of cigarettes.  (DX 74.)

Shortly thereafter, Talbot called UPS security employee James Terranova.  (DX

389.)  As discussed above, Terranova told Talbot that his State Police contact in

Syracuse told UPS to keep picking up cigarettes.  (DX 389.)  Talbot relayed this

information to his drivers but otherwise did not make a record of the calls(s).  (DX

389; Trial Tr. 1268:16-20 (Talbot).)  On June 22, 2011, the DTF Chief Investigator,

John Connolly, visited the Potsdam Center to discuss the possibility of shipments

from the Mohawk Reservation.  (DX 389.)  Connolly made arrangements for a

seizure of cigarette shipments.  (Id.)  On June 28, 2011, UPS closed the account.

(PX 330.)

        In sum, the Court finds that (1) there was a reasonable basis to believe

Mohawk Spring Water may have been tendering cigarettes the day the account was

---

[87] The Court finds Sheridan's testimony supports the obvious red flags other drivers would have seen with regard to other accounts, as well.

opened on November 1, 2010;[88] (2) Mohawk Spring Water was in fact shipping cigarettes from the inception of the account on November 1, 2010, until the account was closed on June 28, 2011 (based on the same facts); and (3) UPS knew that Mohawk Spring Water was shipping cigarettes throughout the entire period (based on the same facts).

The Court further finds that 90% is a reasonable approximation of the percentage of packages that contained cigarettes.[89]

### 9. Jacobs Tobacco Group

Rosalie Jacobs was the owner of Jacobs Manufacturing/Tobacco.  She testified live at trial and the Court found her to be a highly credible witness.  She testified that her entire business consisted of the shipment of unstamped cigarettes to other Indian reservations.[90]  Jacobs further testified that the majority of her shipments were by the case and that cases included fifty cartons, which amount to 10,000 cigarettes.  (Trial Tr. 1680:20-22 (Jacobs).)  The account was opened on July 26, 2006, and the number of packages shipped by Jacobs Manufacturing/Tobacco increased significantly in June and July 2010, the same timeframe as the June 29, 2010, effective date of the PACT Act.  (PX 281; PX 410; PX 434.)

---

[88] This date is based on the red flags along with the Court's crediting Oliver's testimony that he informed UPS of package contents.

[89] The Court's finding of 90% is based on the testimony discussed above, but also takes into consideration that, based on this testimony, this entity shipped other products as well.

[90] Jacobs testified further that her company did not engage in sales of any type of cigar.

By the end of 2010, UPS had picked up more than 2,200 packages from Jacobs Tobacco.  The UPS driver assigned to the account was Donald Jarvis.  Jacobs testified that her warehouse contained "piles" of cigarette inventory.  (Trial Tr. 1662:7-18 (Jacobs).)  Jarvis confirmed that when he made pickups at Jacobs Manufacturing/Tobacco he saw pallets of cigarettes.  (Jarvis Dep. Tr. 55:1-6.)  In addition, another UPS driver, Candace Sheridan, testified that she also made pickups for this account and saw packages from Jacobs on the conveyor belt at the UPS Potsdam Center and that she knew the packages contained cigarettes because of the smell and because they were "picked up by cigarette factories."  (See PX 410, row 6223; Sheridan Dep. Tr. 50:20-52:6.)

In addition, in February 2011, customer inquiries regarding lost or damaged packages shipped by Jacobs Tobacco indicated cigarettes, including "Canton, Nation's Best American Full, 100 Softpk/EA" and "Nation's Best Full Flavor Cigarettes."  (PX 468, rows 38-40.)  In June 2011, the ATF seized a number of such cases of cigarettes.  (DX 89.)

In sum, the Court finds that (1) there was a reasonable basis to believe Jacobs Manufacturing/Tobacco may have been tendering cigarettes from the inception of its account until it was terminated on June 22, 2011; [91] (2) based on Jacobs's testimony, her company was in fact shipping cigarettes throughout this period; and (3) based on Jarvis's and Sheridan's testimony, UPS knew this.  The

---

[91] As discussed above, the term "Individual Consumer" as used in the AOD encompasses the unauthorized commercial entities to whom Jacobs shipped cigarettes.

Court further finds that, based on the uncontroverted evidence, 100% of all Jacobs Manufacturing/Tobacco shipments were cigarettes from the UPS Potsdam Center. (DX 389.) [92]

> 10.   Action Race Parts

UPS opened an account for Action Race Parts on May 11, 2009.  (PX 281.)  It was located at 1552 State Road 37, Hogansburg, New York.  UPS began regular pickups for this account in February 2011.  (PX 75.)

Between February and June 2011, Action Race Parts shipped 2,368 packages with UPS.  (PX 281.)  Most of these packages were addressed to smoke shops, including Rez Smoke Shop and Poospatuck Smoke Shop.  (PX 75.)  Three UPS drivers primary shared responsibility for the account: Donald Jarvis, Amanda Donaldson, and Gregory Labtake.[93]  (PX 590.)  These drivers had to have known that Action Race Parts was shipping primarily to smoke shops.  These facts alone should have raised red flags.

On June 22, 2011, DTF Investigator Connolly visited the Potsdam Cacility, which processed the Action Race Parts packages.  Connolly inquired about accounts located on reservations.  UPS's Steve Talbot identified four accounts: Mohawk Spring Water, Jacobs Manufacturing/Tobacco, Tarbell/Mohawk Distribution, and Action Race Parts.  (See DX 389.)  Packages that were picked up from Action Race Parts were opened and revealed cigarettes; those packages were seized.  (See DX

---

[92] This finding is based on the totality of the evidence, including the fact that the evidence regarding shipments was exclusively as to shipments of cigarettes.

[93] Among Action Race Parts's cigarette brands was "Chicos," located in Donald Jarvis's UPS vehicle.

389.)  On June 28, 2011, UPS told Action Race Parts that it would no longer accept its packages.  (PX 331.)

In sum, the Court finds (1) that not later than February 1, 2011, there was a reasonable basis to believe Action Race Parts may have been tendering cigarettes;[94] (2) that it was in fact shipping cigarettes from February 2011 to the termination of its accounts (based on the same facts as well as confirmed through the audit); and (3) that UPS knew that (based on the fact that UPS drivers saw sufficient red flags that they would have had to turn a blind eye to the truth).

The Court further finds that 100% is a reasonable approximation of the percentage of its packages that contained cigarettes.[95]

### 11.   Native Wholesale Supply

In 2002, UPS opened an account for Native Wholesale Supply, located at 11037 Old Logan Road, Perrysburg, New York on the Seneca Cattaraugus reservation.  This was a residential address.  On or about April 4, 2007, UPS Operations Supervisor for UPS Supply Chain Solutions in Catoosa, Oklahoma, asked its customer Native Wholesale Supply whether it wished to authorize destruction of the company's "cigarettes in the Catoosa Warehouse."  (DX 41 at UPS92311-12.)  Native Wholesale Supply agreed (the destroyed inventory consisted of "156 cases of Opals [cigarettes] and 412 cases of cigars").  (Id. at UPS92358, UPS92360-61.)

---

[94] This date is based on the volume of shipments from the location addressed to smoke shops.

[95] This finding is based on the totality of the evidence, including the fact that the evidence regarding shipments was exclusively as to shipments of cigarettes.

Fink was Native Wholesale Supply's Account Executive.  Native Wholesale Supply was Fink's fifth-highest revenue-generating account in 2011, generating $215,382 in net revenue for UPS that year.  (PX 104, line 7.)  On or about October 17, 2012, UPS closed the Native Wholesale Supply account numbered RA0610 due to a "bankruptcy issue."  (Fink Decl., DX 602 ¶ 79.)  Fink then opened another account for Native Wholesale Supply under the number A590X8.  (Id. ¶ 79.)

On April 18, 2013, UPS picked up pallets that were to be delivered to HCI Distribution; HCI (located in Nebraska) was one of the largest tribal cigarette and tobacco distributors.  (See PX 425, line 4; PX 182.)  The payment for these shipments was made by Seneca Promotions (another relevant shipper, discussed below).  (PX 425, line 4.)  On October 2, 2013, Cook directed certain employees not to deal with HCI.  (PX 182.)  Cook further directed such account managers to "stay clear of any and all businesses associated with" HCI Distribution.  (Id.)  Despite this instruction, on October 31, 2014, UPS picked up another large shipment (weighing 540 pounds) for this account, again paid for by Seneca Promotions.  (PX 425, row 7.)

On October 16, 2015, a UPS Regulated Goods Coordinator, Matthew Szelagowski, contacted Fink about an attempted audit for this account.  (PX 467.)  Szelagowski stated UPS was looking for "cigarettes going to consumers" and considered this account (along with Seneca Promotions) to be "Potential High Risk."  (Id.)

Fink told Szelagowski that Native Wholesale Supply shipped advertising material.  (DX 381.)  When Fink's area Sales Manager, Michael Zelasko, asked Fink

whether he had "advised" Szelagowski, Fink responded "of course."  Zelasko in turn responded, "[n]ever a doubt!"  (PX 467.)  UPS did not audit Native Wholesale Supply.  (See Cook Decl., DX 600 ¶ 139.)

In sum, the Court finds that (1) from April 4, 2007, there was a reasonable basis to believe Native Wholesale Supply may have been tendering cigarettes;[96] (2) in light of the absence of information that it had altered its business model since 2007, the Court also finds that it was in fact tendering cigarettes throughout this period; (3) the Court further finds that given its prior business model, high-volume shipments, and shipments to HCI on April 18, 2013, not later than April 18, 2013, UPS knew it was shipping cigarettes.

The Court finds that 27% is a reasonable approximation of the percentage of Native Wholesale Supply's packages that contained cigarettes.[97]

12.    Seneca Promotions

UPS opened an account for Seneca Promotions on May 31, 2013.  (See PX 553.)  The account was located at 10955 Logan Road, Perrysburg, New York, on the Seneca Cattaraugus reservation.  (Fink Decl., DX 602 ¶ 80.)  While Seneca Promotions has a corporate address at 464 Franklin Street, Buffalo, New York,

---

[96] The Court's finding as to this date is based on the communication from UPS to Native Wholesale Supply asking whether it wished to authorize destruction of the company's "cigarettes in the Catoosa Warehouse."  Native Wholesale Supply acknowledged (and then destroyed) the cigarettes in the warehouse.

[97] This finding is based on the totality of the evidence, including that 156 of the 568 cases (or 27%) in Native Wholesale Supply's inventory at the Catoosa Warehouse consisted of cases of cigarettes.  In addition, as the Court has noted, there is no evidence that Native Wholesale Supply altered its business model subsequent to 2007.

UPS's pickups were from the residential address located in Perrysburg.  (Id.)

Seneca Promotions remains a UPS account.

The location for Seneca Promotions is the same as that for Native Wholesale Supply (11037 Old Logan Road and 10955 Logan Road are geographically the same).  (Logan Dep. Tr. 103:16-108:3; PX 400.)  The account contacts were also the same for both accounts.  (Fink Decl., DX 602 ¶ 81.)  Even Fink conceded that he believed there was some affiliation.  (Id.)

Seneca Promotions paid for certain of Native Wholesale Supply's shipments, including the April 18, 2013 shipment of pallets to HCI, one of the largest tribal cigarette and tobacco distributors.  According to Cook, Seneca Promotions was, itself, a low-volume shipper.  However, between July 2013 and October 2014, it used UPS to ship over 12,800 pounds of freight to entities such as "Blue Ridge Tobacco Co.," "Tobaccoville," "Tobacco Town," "Arrowhead Tobacco," and HCI Distribution. (PX 424.)  Seneca Promotions also used UPS to ship over 30,000 pounds of freight between September 2013 and February 2015 (under the name "ERW Enterprises," to companies identified as "Tobaccoville," "Seneca Direct," and "Tobacco Town"). (PX 546.)  UPS in fact shipped packages from Seneca Promotion to HCI Distribution—ten months after Cook had instructed UPS personnel to "stay clear of any and all businesses associated" with "tobacco shipper" HCI Distribution.  (PX 182.)

In sum, the Court finds (1) that from the inception of the account on May 21, 2013, there was a reasonable basis to believe Seneca Promotions may have been

108

tendering cigarettes;[98] but (2) the circumstantial evidence supports that they were shipping cigarettes from May 31, 2013 (based on the same evidence) and thus UPS's knowledge thereof (based on the same evidence); and (3) that UPS's failure to audit them evinces an affirmative act of conscious avoidance and demonstrates knowledge.

The Court finds that 27% is a reasonable approximation of the percentage of Seneca Promotions's packages that contained cigarettes.[99]

C.    Shippers as to Which There Is Only AOD Liability

As the Court previewed above, there are certain entities as to which the Court finds that there is sufficient evidence to support a finding that there was a reasonable basis to believe the account may have been tendering cigarettes— triggering an audit obligation—but insufficient evidence to indicate whether they were in fact shipping cigarettes and/or that UPS knew that.

---

[98] The Court's finding as to this date is based on the totality of the evidence, including the fact that Seneca Promotions was known to have already paid for a shipment of pallets for Native Outlet to HCI, a known cigarette shipper, and that the two companies shared the same address.

[99] This finding is based on the totality of the evidence, including that Seneca Promotions paid for certain of Native Wholesale Supply's shipments; operated at the same location as Native Wholesale Supply; and had the same account contacts as Native Wholesale Supply.  In short, the evidence supports that Seneca Promotions had a principal/agent relationship with Native Wholesale Supply and acted in concert with Native Wholesale Supply.  Based on the facts described and this relationship between the entities, the Court's finding that approximately 27% of Native Wholesale Supply's packages contained cigarettes also appropriately approximates the percentage of Seneca Promotion's packages that contained cigarettes.

1.    <u>Native Outlet</u>

UPS opened an account for Native Outlet on October 18, 2010, not long after

the implementation of the PACT Act.[100]  It was located at 11157 Lakeshore Road,

Irving, New York, and also used an address at 1525 Cayuga Road, Irving, New

York, both on the Seneca Allegany reservation.  (Fink Decl., DX 602 ¶ 129.)  The

1525 Cayuga Road address was associated with Pierce Trading Company and

"SenecaDirect.com," a known cigarette shipper.  (<u>See</u> PX 174, row 659.)  The contact

person for the account was John Waterman.  (PX 86, row 2183.)  Its operations were

housed in a large commercial warehouse.  (DX 490; Fink Decl., DX 602 ¶ 129.)

Fink was also Native Outlet's Account Executive.  In 2011, Native Outlet

generated over $190,000 in net revenue and was Fink's eighth-largest account.  (PX

104, row 10.)  In 2012, account revenue remained strong at $148,593.  (PX 102, row

14.)  Native Outlet was a high-grossing, "must keep" account.  (<u>See</u> PX 104, row 10;

PX 137; PX 138, row 3; PX 168; PX 169, row 30.)  The fact that this was a high-

volume shipper, on an Indian reservation known to be high risk, that acquired

significant business shortly after the effective date of the PACT Act, provided

sufficient red flags to have triggered an audit obligation.  But there was more.

Fink testified that when the account was opened, he was told that Native

Outlet intended to ship cigars; the company then executed a Tobacco Agreement.

---

[100] Plaintiffs describe Native Outlet as belonging within the "Smokes & Spirits Group."  However, plaintiffs have not put forth sufficient evidence to establish that that Native Outlet was an alter ego or was shipping on behalf of Smokes & Spirits.

(Fink Decl., DX 602 ¶ 131.)  The agreement was returned signed by John Waterman at 1525 Cayuga Road.  (See id.; DX 58; DX 371, row 3062.)

On March 21, 2013, UPS received a communication from the ATF requesting that it investigate possible bulk shipments of cigarettes from "John Waterman." (PX 530.)  Waterman was the listed customer contact for Native Outlets.  (PX 86, row 2183.)

On July 29, 2013, UPS received a subpoena from City Finance regarding potential cigarette shippers.  That subpoena requested information associated with "Seneca Direct" or the address 1525 Cayuga Road, Irving, New York.  UPS did not audit Native Outlet until July 2013.  Thereafter, it conducted five audits: On or about July 10, 2013; January 2, 2014; October 6, 2015; January 14, 2016; and April 27, 2016.  Each time it found only little cigars.  (Cook Decl., DX 600 ¶¶ 86-91; DX 194; DX 244; DX 421; DX 363; DX 375.)

In sum, the Court finds that from the inception of the account on October 18, 2010, there was a reasonable basis to believe Native Outlet may have been tendering cigarettes.  This date is based on the Court's assessment of the red flags discussed above; inter alia, that the combination of high-volume business from the same address as a known cigarette shipper, business acquisition so closely correlated with the PACT Act, and association with John Waterman.  The Court further finds the audit obligation continued to July 9, 2013—the day before the first

of several audits.  However, there is insufficient evidence that it was in fact shipping cigarettes.[101]

### 2.   A.J.'s Cigars

A.J.'s Cigars opened an account with UPS in September of 2010—shortly following implementation of the PACT Act.[102]  It was a relatively high-grossing account assigned to Fink, with more than $100,000 in gross revenue per year.  From the outset, Fink knew that A.J.'s would be shipping tobacco products.  He testified that he had them execute a Tobacco Agreement in September 2010, but could not locate the original when later asked to do so (he testified that he thought he left it in the trunk of his car).  (Fink Decl., DX 602 ¶¶ 87-89; DX 230.)  The Court does not credit this testimony and finds it more likely that he did not have A.J.'s execute a Tobacco Agreement until the audit described below.

But in addition, as with other shippers, there were a number of tracer inquiries made with regard to shipments originating with A.J.'s.  In A.J.'s case, there were a total of nine between August 2010 and August 2013.  Each of those inquiries concerned little or full-sized cigars.  (DX 499, rows 106, 114, 115, 138, 145, 197, 199, 209, 221.)

---

[101] While there is circumstantial evidence of the possibility that Native Outlet was shipping cigarettes (that Waterman was suspected of making bulk shipments, the subpoena for documents relating to this address), there is an insufficient basis to find actual shipments of cigarettes or UPS's knowledge thereof.

[102] Plaintiffs also describe A.J.'s Cigars as belonging within the "Smokes & Spirits Group."  However, plaintiffs have not put forth sufficient evidence to establish that that A.J.'s Cigars was an alter ego or was shipping on behalf of Smokes & Spirits.

On June 4, 2013, A.J.'s informed UPS that it would like to ship cigarettes, and the UPS representative responded that he would check to see if that was allowed and get back to them. The result of this inquiry is unknown.

UPS audited A.J.'s on October 2, 2013. The packages it opened contained filtered cigars and other tobacco products. (Cook Decl., DX 600 ¶ 80; DX 219.) No cigarettes were found in the audited packages. Thereafter, on October 24, 2013, Fink had A.J.'s execute a Tobacco Agreement. (Fink Decl., DX 602 ¶¶ 92-93; DX 230; DX 357; DX 371, line 3030.)

In early February 2014, UPS learned from a news report that an entity known as AJ's Candy had plead guilty to cigarette trafficking. (Cook Decl., DX 600 ¶ 81; DX 270.) UPS terminated A.J.'s Cigars on February 10, 2014. (Cook Decl., DX 600 ¶ 81; DX 272; PX 160.)

In sum, the Court finds that not later than June 4, 2013, there was a reasonable basis to believe A.J.'s Cigars may have been tendering cigarettes.[103] However, there is insufficient evidence in the record to support a finding that A.J.'s was shipping cigarettes through UPS. The request by the customer "to ship" cigarettes falls short of proving that they "did" make such shipments.

---

[103] The audit obligation continued to October 1, 2013 (A.J.'s Cigars was audited on October 2, 2013). Before this date, tracers indicated only non-cigarette goods being shipped. But, once A.J.'s Cigars notified UPS that it would like to ship cigarettes (on June 4, 2013), that fact combined with its status as a known tobacco shipper should have triggered an audit. This finding is therefore based on the totality of the evidence, including the fact that A.J.'s informed UPS that it would like to ship cigarettes.

3.    <u>RJESS</u>[104]

RJESS first opened an account with UPS before 2005, under the name Ross

John Enterprises - Iroquois Tobacco Direct ("RJE-ITD").  (Fink Decl., DX 602 ¶ 107;

DX 371, line 1344.)  Its most notable fact is that it shared an address with Smokes

& Spirits.[105]

In 2005, RJE-ITD signed a Tobacco Agreement.  (DX 371, row 1344.)  In

November 2005, as part of what UPS has characterized as a "broader plan"

requiring all smoke shops in the area to open new accounts with Tobacco

Agreements, the RJE-ITD account was canceled.  (Fink Decl., DX 602 ¶¶ 106-07;

Trial Tr. 200:6-14 (Cook); <u>id.</u> 499:22-500:3 (Fink).)

On April 7, 2005, Ross John, the owner of RJE-ITD and a college professor,

opened a new account under the name Ross John Enterprises Smoke Shop

("RJESS").  (Fink Decl., DX 602 ¶¶ 106, 108.)  Both RJE-ITD and RJESS were

located in a warehouse behind a gas station at 6665 Route 417, Kill Buck, New

York.  (Fink Decl., DX 602 ¶ 106; DX 490 at 4; DX 371, lines 1344, 3619.)  Fink was

assigned account responsibility for RJESS.  (DX 313; DX 520, lines 167-71; DX 542;

<u>see</u> Trial Tr. 640:16-21. (Fink).)

---

[104] In their final proposed findings of fact, plaintiffs did not attempt to support their prior assertions
of UPS's liability for RJESS (though they did include them within their damage request).  (ECF No.
491.)

[105] Again, plaintiffs describe RJESS as belonging within the "Smokes & Spirits Group."  While
plaintiffs did demonstrate that RJESS and Smokes & Spirits shared an address for some purposes,
considering all the facts and circumstances, plaintiffs have not put forth sufficient evidence to
establish that that RJESS was an alter ego or was shipping on behalf of Smokes & Spirits.

RJESS's address (which was also the address for Smokes & Spirits) was included on the NCL in association with Smokes & Spirits as of February 15, 2012. (PX 450; Cook Decl., DX 600 ¶ 111.)  This red flag should have triggered an audit. In addition, the RJESS address—6665 Route 417, Kill Buck, New York—was included in the subpoena issued by City Finance on July 29, 2013.  (PX 248.)

On January 28 and 30, 2014, UPS subsequently conducted two audits of RJESS, which revealed only little cigars.  (Cook Decl., DX 600 ¶ 111; Trial Declaration of Debra Blauvelt ("Blauvelt Decl."), DX 609 ¶ 17(b); DX 264; DX 265.) Additional spot audits of RJESS packages never revealed cigarettes.  (Id. ¶ 12.)

RJESS and Smokes & Spirits had separate accounts and separate owners. Plaintiffs did not introduce evidence that Ross John had involvement in Smokes & Spirits.  (DX 371, lines 3619, 1285; Fink Decl., DX 602 ¶¶ 38, 109; Trial Tr. 1190:20-1191:3 (Mitchell).)  And RJESS was an active account of its own the entire time Smokes & Spirits was in operation.  Lastly, both RJE-ITD and RJESS were located at 6665 Route 417, Kill Buck, New York, while Smokes & Spirits shipped from 270 Rochester Street, Salamanca, New York 14779.  (Fink Decl., DX 602 ¶¶ 31, 106; DX 490; DX 371, lines 1344, 3619.)  In other words, nothing in UPS's records provides any basis to connect the two accounts.

In sum, the Court finds that as of February 15, 2012, when RJESS's address was listed in the NCL, there was a reasonable basis to believe it may have been tendering cigarettes; this lasted until the day prior to the first audit on January 28,

2014.  However, there is insufficient evidence that RJESS was in fact shipping cigarettes.

    D.    <u>Shipper as to Which There Is No Liability</u>

        1.    <u>Sweet Seneca Smokes</u>

Sweet Seneca Smokes opened its UPS account on February 14, 2014, and it remains an active account.[106]  (Fink Decl., DX 602 ¶ 122.)  It is located at 14411 Route 439, Gowanda, New York on the Seneca Cattaraugus reservation.  Fink was and is the Account Executive.  He has always known that they shipped tobacco products.  (<u>Id.</u> ¶¶ 122, 123.)  Indeed, that much is evident from the name alone.

UPS has approached the account with skepticism from the beginning, and it has taken affirmative steps to investigate whether it was a terminated shipper trying to obscure its identity (in this instance, A.J.'s Cigars) or was otherwise shipping cigarettes.  In light of various red flags, this was entirely appropriate.  In this regard, immediately after the account was first opened, Timothy McDowell, a UPS sales representative, sent an email to Fink questioning whether this account was merely "A.J.'s" trying to "get back in."  He then communicated with Jim Phillips of Sweet Seneca Smokes.  During that conversation, Phillips informed McDowell that the company intended to ship only little cigars through UPS.  UPS informed Phillips of its Tobacco Policy.  (Trial Tr. 667:1-17 (McDowell); Fink Decl.,

---

[106] Plaintiffs place Sweet Seneca Smokes within what they identify as the "Smokes & Spirits Group." However, plaintiffs have not put forth sufficient evidence to establish that that Sweet Seneca Smokes was an alter ego or was shipping on behalf of Smokes & Spirits.

DX 602 ¶ 123; DX 371, line 3650.)  McDowell's investigation did not stop there, however.

　　To ensure that Sweet Seneca Smokes was not shipping on behalf of the Shipping Services or A.J.'s Cigars terminated accounts, McDowell contacted Fink. (DX 274; DX 276; Fink Decl., DX 602 ¶ 124.)  None of the three shippers shipped from the same address, had the same contacts, or shared any other overlapping information.  (DX 371, rows 3024, 3030, 3650.)  McDowell considered whether one of the company's contact names, "Bob Oldrow/Oldsdrow," could be the same person as an individual by the name of "Oldro," Fink's contact, at Smokes & Spirits.  (DX 276; Fink Decl., DX 602 ¶ 32; cf. DX 371, row 1285.)  McDowell ultimately found no evidence connecting Sweet Seneca Smokes to either shipper.  McDowell then investigated the Sweet Seneca Smokes website and product line, and he requested photos of their cigars to satisfy himself that they marketed the products they claimed.  (DX 274.)

　　Plaintiffs have pointed to evidence that 62% of Sweet Seneca Smokes customers were those of Smokes & Spirits but not to evidence that this percentage concerned buyers of cigarettes versus other tobacco products.  Comparing the customer names and purchases on PX 54, a shipment inventory from Smokes & Spirits, to the customer names in PX 557, a Sweet Seneca Smokes delivery spreadsheet, supports a finding that Sweet Seneca Smokes shipped a significant amount of non-cigarette tobacco products, in general, and to former Smokes & Spirits customers, specifically.

An audit of Sweet Seneca Smokes's packages over a three-day period revealed cigars, chew, or other tobacco products, but no cigarettes.  Another audit was performed on April 27, 2016, by Cook.  Cook personally audited all of the packages shipped out of the Dunkirk Center, including seventy-one packages shipped by Sweet Seneca Smokes.  (Trial Tr. 359:23-360:16 (Cook); Cook Decl., DX 600 ¶¶ 90, 135-36; DX 327; DX 422; DX 550; DX 551; Trial Declaration of Jennifer Puleo ("Puleo Decl."), DX 608 ¶ 23(c).)  None contained cigarettes.  (Cook Decl., DX 600 ¶¶ 136-37.)

UPS audited Sweet Seneca Smokes a third time on July 10, 2016, when the "Designated Responders" for hazardous materials segregated and inspected the contents of these Sweet Seneca Smokes packages because an unknown substance— later identified as chocolate syrup—had leaked onto each package in the load. (Cook Decl., DX 600 ¶ 137; DX 429.)  Consistent with prior audits, the packages contained filtered cigars, loose tobacco, and chewing tobacco.  (Id.)

In sum, based upon UPS's proactive efforts with regard to this account and the lack of evidence of cigarette shipments, the Court declines to find that there was a reasonable basis to believe Sweet Seneca Smokes may have been tendering cigarettes at any point in time prior to the first audit, or that it was shipping cigarettes.

X.     CONCLUSIONS OF LAW

Plaintiffs allege violations of the PACT Act, 15 U.S.C. §§ 375-78; the AOD, PHL § 1399-ll;[107] and the CCTA, 18 U.S.C. §§ 2341-46.  Set forth below are the Court's conclusions of law.  Analysis and interpretation of the AOD is the logical starting point.  As previewed above and discussed in detail below, if the AOD was "honored" throughout the United States, UPS is statutorily exempt from the PACT Act and PHL §1399-ll; if it was not, UPS is exposed to liability under the AOD, the PACT Act, and PHL § 1399-ll, along with the CCTA.  The Court therefore resolves the question of AOD liability at the outset.

The Court next turns to the common issue of what it means to act "knowingly."  Certain violations of the AOD and the PACT Act, and all violations of PHL § 1399-ll and the CCTA, require that UPS have shipped cigarettes knowingly.  The Court addresses the legal standard for a finding of actual knowledge, including conscious avoidance, or willful blindness, as well as the legal and factual requirements regarding imputation of an employee's knowledge to a large corporate entity such as UPS.  As part of this discussion, the Court discusses presumptions that common carriers of regulated goods have knowledge of various regulatory requirements.  The Court then turns to each of the alleged violations, along with specific arguments and defenses that UPS has asserted.

---

[107] Plaintiffs' alleged violations of N.Y. Exec. Law § 63(12) are co-extensive with their PHL § 1399-ll claims.

A.    The AOD

The AOD, executed in October 2005, was a negotiated resolution to an investigation commenced by the State of New York into whether UPS was violating PHL § 1399-ll [108] and N.Y. Exec. Law § 63(12).[109]

Plaintiffs claim that UPS repeatedly violated a number of separate provisions of the AOD.  However, they seek penalties with regard to only one type of violation: the audit requirement set forth in ¶ 24.  Plaintiffs define such audit violations as commencing as of the date there was a reasonable basis to believe that a shipper may have been tendering packages containing cigarettes, and continuing with regard to each and every package tendered thereafter.  While plaintiffs do not seek damages for other violations of the AOD, they nonetheless seek to prove that UPS knowingly shipped cigarettes.  Proof of knowing shipments provides for the presumption of a PHL § 1399-ll violation; such presumption is found in AOD ¶ 43: A violation involving the knowing shipment of cigarettes "to an Individual Consumer within the State of New York" constitutes "prima facie proof of a violation of PHL § 1399-ll(2)[.]"  (AOD, DX 23 ¶ 43.)  For its part, UPS asserts that it has complied with its AOD obligations and that the AOD is honored throughout the United States.  Thus, according to UPS, no penalties may properly be assessed under the AOD, and UPS is exempt from both the PACT Act and PHL § 1399-ll.

---

[108] PHL § 1399-ll is titled "Unlawful Shipment or Transport of Cigarettes."

[109] N.Y. Exec. Law § 63(12) is the means by which the New York Attorney General commences an enforcement action for violation of cigarette transport such as PHL § 1399-ll.

The Court disagrees with UPS.  The Court therefore proceeds to resolve the parties' positions with regard to whether calculating penalties in the manner plaintiffs suggest would result in an excessive award.

      1.    <u>Background Described in the AOD</u>

The AOD was the product of extensive negotiations.  This is evident throughout the text of the agreement.  In particular, multiple pages describing the parties' respective positions precede the particular obligations UPS agreed to assume.  (<u>See</u> AOD ¶¶ 1-15.)  These preliminary statements do not themselves create binding commitments, but they do provide useful background for understanding the intent of the parties.

In this regard, the AOD commences with a description of the parties' respective views on UPS's conduct prior to its effective date of October 21, 2005.  The State asserted that, based upon its investigation, it believed that UPS "ha[d] delivered many packages containing cigarettes to persons who were not authorized to receive them pursuant to PHL § 1399-<u>ll</u> in violation of PHL § 1300-<u>ll</u>(2) and thereby engaged in repeated illegal acts and business activities in violation of EL § 63(12)[.]"  (AOD, DX 23 ¶ 8.)  UPS responded that even before the Attorney General had initiated an investigation into its business practices in 2004, UPS had "adopted revised policies governing the transportation of tobacco products, and that UPS policies, among other things, are meant to insure that UPS does not knowingly deliver cigarettes to unauthorized recipients in violation of various state laws, including PHL § 1399-<u>ll</u>(2)."  (<u>Id.</u> ¶ 9.)

In the AOD, UPS also described various actions it had taken following the April 10, 2013 effective date of PHL § 1399-ll, including changing to its Tariff and Terms and Conditions to add a provision that "Shippers are prohibited from shipping, and no service shall be rendered in the transportation of, any tobacco products that shippers are not authorized to ship under applicable state law or that are addressed to recipients not authorized to receive such shipments under applicable law."  (Id. ¶ 10.)  UPS further asserted that since the implementation of the PHL § 1399-ll, it had provided formal training to its employees, and that it had written to approximately 400 UPS shippers to notify them of PHL § 1399-ll and advising them that UPS would no longer accept packages containing cigarettes for delivery to unauthorized recipients in New York.  (Id. ¶¶ 11, 12.)  UPS also referred to its decision to adopt a formal Cigarette Policy, which stated:

1. UPS does not provide service for shipments of cigarettes to consumers.

2. UPS only accepts shipments of cigarettes for delivery to recipients who are licensed or otherwise authorized by applicable federal, state, provincial or local law or regulation to receive deliveries of cigarettes.

(Id. ¶ 15.)

The following "WHEREAS" clause recites that "UPS offers this Assurance of Discontinuance" in settlement of alleged past violations, and "intending that this [AOD] will promote further and ongoing cooperation between UPS and the Attorney General concerning UPS's compliance with PHL § 1399-ll[.]"  (Id.)  The AOD"s final WHEREAS clauses states that New York's Attorney General "accepts the following

assurances from UPS pursuant to Executive Law § 63(12)" in lieu of commencing a civil actions for past violation.  (AOD, DX 23.)

### 2.   The Terms of the AOD

Paragraph 17 of the AOD contains a broad commitment by UPS to "comply with PHL § 1399-ll(2), and adhere to the UPS Cigarette Policy[.]"  (AOD, DX 23 ¶ 17.)  In ¶ 20, UPS agreed to "revise, to the extent that it has not yet done so already, and maintain its delivery policies and procedures for Cigarettes in accordance with this [AOD]."  (Id. ¶ 20.)

In ¶ 21, UPS agreed to identify and compile a list of its customers that UPS believes may be "Cigarette Retailers."  (Id. ¶ 21.)  The list was to be compiled from a number of sources, including UPS's search of its own customer database for words such as "cigarette," "smoke," and "tobacco," as well as "UPS's knowledge of known Cigarette Retailers."  (Id.)  When the list was completed, UPS was required to provide it to the New York Attorney General.  (Id.)  The AOD also required UPS to use an internet search engine on a periodic basis to investigate shippers who use the "Cigarette Websites"[110] to determine whether they ship via UPS (and to conduct audits if so).  (Id. ¶ 22.)  However, if internet searches during any consecutive twelve-month period do not uncover shippers who had tendered cigarettes to UPS for delivery, this obligation ceases.  (Id.)[111]

---

[110] Defined as an internet website through or at which a person sells Cigarettes.  (AOD, DX 23 ¶ 16(D).)

[111] This obligation in fact expired according to these terms in July 2010.

Paragraphs 24 to 33 of the AOD relate to audits and remedial action for shippers found to have shipped cigarettes. The audit provision states:

> 24. UPS shall audit shippers where there is a reasonable basis to believe that such shipper may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so.

(<u>Id.</u> ¶ 24.)[112] It is worth pausing on the standard for identifying shippers that should be audited: As set forth in this provision, the standard is objective. There must be a "reasonable basis to believe" that the shipper may be tendering cigarettes.

UPS has a separate obligation under the AOD to maintain a database that includes information regarding Cigarette Retailers. (<u>Id.</u> ¶ 25.) This is referred to as the "Tobacco Shipper Database." (<u>Id.</u>) Such database must include various identifying information along with a shipper's record of non-compliance with the UPS Cigarette Policy, down to the level of tracking number for individual packages. (<u>Id.</u> ¶ 25 A, B.) The database must also include the results of any audits and a record of any discipline imposed by UPS. (<u>Id.</u> ¶ 25 C, D.)

The AOD requires that UPS undertake "progressive" discipline for shippers its determines to have tendered a package of cigarettes for delivery. (<u>Id.</u> ¶¶ 26-33.) That is, the discipline is organized into escalating steps. UPS's obligation to impose discipline commences when it discovers that a shipper has tendered "a shipment of

---

[112] The AOD defines "Individual Consumer" as any person or entity other than an "Authorized Recipient," which in turn is defined as "tobacco manufacturers; licensed wholesalers, tax agents, retailers, and export warehouses; government employees acting in accordance with their official duties; or any other person or entity to whom cigarettes may be lawfully transported pursuant to federal law and the law of the state in which delivery is made, including those persons described in PHL § 1399-<u>ll</u>(1) with respect to the State of New York."  (AOD, DX 23 ¶ 16(G), (A).)

Cigarettes to Individual Consumers." (Id. ¶ 26.) A single shipment therefore triggers the progressive discipline measures set forth in ¶¶ 26 to 33.

The first step requires that UPS create and maintain a record of the offending shipper and packages or shipments. (Id.) This information would be available to the New York Attorney General in response to a subpoena at a later date. (Id.) Paragraph 27 provides for suspension of service to that shipper altogether:

> 27. If UPS has a reasonable basis to believe that a shipper has willfully or intentionally violated UPS's Cigarette Policy, UPS shall immediately and permanently suspend all Delivery Services for such shipper. For other violations of UPS's Cigarette Policy, which UPS has a reasonable basis to believe are not willful or intentional, UPS shall apply the discipline procedures established in Paragraphs 28 through 33 of this [AOD].

(AOD, DX 23 ¶ 27.) If triggered, the progressive discipline scheme requires UPS to notify the shipper of the violation within five days after discovery; two days later UPS must suspend delivery for ten days unless a reasonable and verifiable written action plan for compliance is provided to UPS by the shipper. (Id. ¶ 28.) If a second violation occurs within 180 days of the first, UPS must again immediately provide notice to the shipper, but this time UPS must deliver a warning of a possible suspension of service for up to three years for a third non-compliant shipment. (Id. ¶ 29.) A third violation within 180 days of the contact for the second violation requires notice, as well as an in-person meeting with management-level personnel; two days following such notice, UPS is required to suspend delivery for three years (there are provisions to restore service after six months for non-cigarette products). (Id. ¶ 30.)

Paragraph 31 of the AOD contains an explicit acknowledgement that shippers of cigarettes are known to try to persist in unlawful shipping by using the same location under a different account name or having another person or entity ship from a different address on the suspended shipper's behalf.  This provision states in full:

> 31.  The violations found to have occurred pursuant to this [AOD], as well as the periods of suspension that are imposed, shall be applied both to the shipper committing the violation, and to any other shipper, whether an existing UPS customer or a new UPS customer, that UPS has a reasonable basis to believe is shipping or seeking to ship Cigarettes (a) from the same location as the suspended shipper, (b) on behalf of a suspended shipper, or (c) with the same account number as the suspended shipper.

(Id. ¶ 31.)

Paragraph 32 recognizes that if a violation is inadvertent or immaterial, and made by a shipper of products that are not predominantly cigarettes, UPS can reasonably deviate from the procedures "for the limited purpose of affirmatively assisting such shippers to implement safeguards intended to eliminate future inadvertent and immaterial shipments of Cigarettes to Individual Consumers."  (Id. ¶ 32.)  In order to avail itself of this provision, it is of course the case that UPS must know (or have processes to verify) certain facts about the contents of the shippers' packages; otherwise, it would be impossible to establish that 90% of packages (for the previous year) contained goods other than cigarettes.  (Id.)  UPS has not attempted to argue that any of its actions are based on this paragraph (indeed, it must take this position to be consistent with its primary position that it lacks the means to determine the contents of a customer's packages).

126

The AOD also requires UPS to provide ongoing training to its personnel to ensure compliance with its Cigarette Policy.  (Id. ¶ 34.)  On at least an annual basis, UPS is required to issue a PCM to UPS drivers, pre-loaders, and other personnel involved in compliance measures to "help ensure that these personnel are actively looking for indications that a package contains Cigarettes being shipped to an Individual Consumer, alerting UPS management of such packages and attempting to intercept such packages."  (Id. ¶ 35.)

The AOD also requires UPS to periodically train Account Executives handling tobacco accounts on its Cigarette Policy, PHL § 1399-ll, and the compliance measures agreed to in the AOD.  (Id. ¶ 37.)

Additional provisions in the AOD outline the further actions UPS must take in response to notice it may receive from the New York Attorney General or any other governmental authority of evidence that a UPS customer is tendering cigarettes.  (Id. ¶ 39.)  There is no obligation imposed on the New York Attorney General or any other entity to provide such notice.

The AOD also contains two paragraphs that set forth terms relating to enforcement of UPS's obligations and to the imposition of penalties imposed for violations thereof.  (Id. ¶¶ 42-43.)  In light of the importance of these provisions to assessment of damages in this case, the Court sets them out in full:

> 42.  UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every violation of this [AOD] occurring after the Effective Date; provided, however, that no penalty shall be imposed if (a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes

to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment.[113]

(Id. ¶ 42.)  The AOD further provides:

> 43. Pursuant to EL § 63(15), evidence of a violation of this [AOD] that involves the shipment of Cigarettes to an Individual Consumer within the State of New York shall also constitute prima facie proof of a violation of PHL § 1399-ll(2) in any civil action or proceeding that the Attorney General hereafter commences against UPS for violation of PHL § 1399-ll(2).

(Id. ¶ 43.)  Paragraph 51 explicitly provides that the "rights and remedies in this [AOD] are cumulative and in addition to any other statutory or other right that the New York Attorney General may have at law or equity, including but not limited to any rights and remedies under PHL § 1399-ll."  (Id. ¶ 51.)

Finally, the AOD's sole termination provision is contained in ¶ 47.  It provides that a legislative repeal or amendment of PHL § 1399-ll to allow common carriers to deliver cigarettes to consumers, or a judicial determination of that statute's invalidity, would trigger a right to terminate by UPS upon thirty days written notice.  (Id. ¶ 47.)[114]

---

[113] "Prohibited Shipment" is defined as "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate Public Health Law § 1399-ll." (AOD, DX 23 ¶ 16(H).)

[114] The presence of this termination provision satisfies the rule against perpetuities.  See Nicholas Labs. Ltd. v. Almay, Inc., 723 F. Supp. 1015, 1018 (S.D.N.Y. 1989) ("A perpetual contract runs without end or without provision for its termination.  An indefinite contract runs without a fixed end but contains provisions under which the contract might terminate at any time. . . .  Thus where termination has been provided for in the contract, even if continuous performance is a possibility, courts should not refuse to enforce such contracts or read into them different conditions of termination.").

B.   Interpretation of the AOD

The AOD is a settlement agreement between UPS and the State of New York.  As such, its interpretation is governed by general principles of contract law.[115]  See United States v. Sforza, 326 F.3d 107, 116 (2d Cir. 2003) (stating that settlement are agreements construed in accordance with principles of contract law) (citing Janus Films, Inc. v. Miller, 801 F.2d 578, 583 (2d Cir. 1986)).  To be sure, the AOD is a special type of contract—one entered into with the Attorney General for the State of New York, who is presumed to act in the public interest.  However, similar to a consent decree entered into by the Department of Justice or other government agency, once an AOD has been executed by the parties, it is a species of contract governed by principles of contract construction.  See People v. Condor Pontiac, Cadillac, Buick & GMC Trucks, Inc., No. 02-1020, 2003 WL 21649689, at *5 (N.Y. Sup. Ct. July 2, 2003) (An AOD "is a stipulation of settlement, which binds the parties [and] will not be set aside or departed from absent a showing of such good cause as would invalidate a contract."); EEOC v. Fed. Express Corp., 268 F. Supp. 2d 192, 206 (E.D.N.Y. 2003) ("It is well settled that consent decrees are construed primarily as contracts and derive their legal force largely from the parties' voluntary agreement.").

Several principles of contract interpretation are particularly relevant here.  First, it is black-letter law that "[w]hen an agreement is unambiguous on its face, it

---

[115] Paragraph 44 acknowledges the AOD's contractual status: "This [AOD] represents a voluntary agreement, and is a settlement of the parties' claims and defenses . . . ."  (AOD, DX 23 ¶ 44.)

must be enforced according to the plain meaning of its terms." <u>Lockheed Martin Corp. v. Retail Holdings, N.V.</u>, 639 F.3d 63, 69 (2d Cir. 2011) (citing <u>South Rd. Assocs., LLC v. IBM</u>, 826 N.E.2d 806, 809 (N.Y. 2005)).  In addition, "well-established principles of contract interpretation . . . require that all provisions of a contract be read together as a harmonious whole[.]" <u>Schlaifer Nance & Co. v. Estate of Warhol</u>, 119 F.3d 91, 100 (2d Cir. 1997).  Finally, a basic tenet of contract law provides that "[c]ourts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing[.]'" <u>Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.</u>, 920 N.E.2d 359, 363 (N.Y. 2009) (quoting <u>Reiss v. Fin. Performance Corp.</u>, 764 N.E.2d 958, 961 (N.Y. 2001)).

The Court finds the relevant provisions of the AOD to be unambiguous and therefore applies the well-known principles of contract construction without resort to parol evidence.

### C.   Violations of the AOD

An initial interpretive question concerns the definition of a "violation" under ¶ 42 of the AOD which, if met, triggers the imposition of penalties.  A second question concerns whether AOD penalties are calculated on a per-violation basis; if so, a third question is whether, textually or under principles of conscionability, there are limits to the number of violations for which such penalties may or should be assessed.

The Court turns first to the proper interpretation of the term "violation." As used in ¶ 42, the term expressly equates a "violation" to a failure by UPS to fulfill its obligations under the AOD.  These obligations are many and varied, as set forth in detail above.  On its face, ¶ 42 does not limit "violations" for which penalties may be imposed solely to any one type of obligation—that is, a failure to audit a shipper or a failure to comply with PHL § 1399-ll (in "violation" of ¶ 17) by knowingly transporting cigarettes to consumers.

Read in its entirety, the AOD is an attempt to establish a comprehensive and interdependent set of obligations that collectively reduce the likelihood that UPS accepts packages containing cigarettes or transports such packages.  A failure to abide by any one obligation—for instance, employee training—places at risk other aspects of the overall compliance scheme.  A failure to audit prevents implementation of the discipline procedures designed to place shippers on notice of possible suspension, and to give UPS and the shipper the opportunity to work together to avoid such a result.  In other words, failure to audit prevents that mutual compliance effort, and failure to discipline diminishes the chances that a shipper will alter its conduct.  In sum, there is no reason for this Court to separate one type of contractual obligation that UPS assumed in the AOD from another when determining what constitutes a "violation" under ¶ 42.  Any failure to comply with a contractual obligation constitutes a separate violation of the AOD.

One argument that this Court has considered is whether the term "violation" is used in ¶ 42 to mean only UPS's knowing shipment of cigarettes.  It is

certainly the case that ¶ 42 refers to exclusions from the penalty provision in terms of a "shipment."  It might therefore be reasonable to conclude that the entire provision must be read in terms of shipments of cigarettes.  However, after considering this argument carefully, the Court is not persuaded.  This argument fails to take into account the interdependent obligations UPS assumed in the AOD. The overall intent of the parties was to use the penalty provision as a method to ensure compliance with all of the AOD obligations, which are of course ultimately directed at preventing shipments of cigarettes.  This ultimate goal, however, does not limit the particular obligations.  To read the term "violation" as limited to a shipment of cigarettes (and one that UPS would then presumably have to have known about) would mean that UPS could fail to comply with any of the host of other obligations without consequence.  This, frankly, makes no sense and is an unreasonable reading.

The facts set forth earlier in this Opinion establish a number of separate violations by UPS of its obligations under the AOD:

1. On numerous occasions, UPS failed to comply with PHL § 1399-ll(2), in violation of ¶ 17;

2. On numerous occasions, UPS failed to audit a shipper where there was a reasonable basis to believe that such shipper may have been tendering cigarettes for delivery to Individual Consumers, in violation of ¶ 24;

3. On numerous occasions, UPS failed to input required information into the Tobacco Database, in violation of ¶ 25;

4. On numerous occasions, UPS failed to implement the discipline of shippers, in violation of ¶¶ 26-33;

5. UPS provided inadequate compliance training and PCMs; such training failed to help "ensure that [] personnel are actively looking for indications that a package contains Cigarettes being shipped to an Individual Consumer, alerting UPS management of such packages and attempting to intercept such packages," in violation of ¶ 35; and

6. On numerous occasions, UPS knowingly transported shipments containing cigarettes to Individual Consumers, in violation of ¶ 42.

The Court turns, now, to the second and third questions concerning the interpretation of the AOD. The factual findings already made by this Court support numerous violations of the AOD. Did the parties really intend that each and every such violation would carry a separate $1,000 penalty? If so, are there conscionability or constitutional limits to the aggregate amount of such penalties?

It is clear that at the time the parties entered into the AOD, they were wiping the slate clean: Although UPS did not agree that it had previously violated PHL § 1399-ll, it nevertheless assumed clear obligations under the AOD to resolve those concerns, and the State of New York agreed to settle any claims for past violations that it might have. It is possible that, as so often occurs at the outset of an agreement, the parties hoped the penalty provision would never become an issue. If such a hope existed, it was long ago extinguished.

Of course, all parties were aware that the stakes were high: The State of New York was specifically attempting to ensure compliance with a public health law that recognized the enormous destructive power of cigarette use, and the particular issues surrounding traffic in unstamped cigarettes.

Insofar as trafficking related to Indian reservations, historical difficulties and restrictions with regard to enforcing state and federal cigarette laws on

shippers directly rendered the AOD with a non-tribal courier all the more important.  UPS was—in 2005 as today—a large, highly sophisticated corporation. It already had many thousands of employees in the United States and vast pickup and delivery operations using local service centers.  Both UPS and the State knew then that many smoke shops on Indian reservations in New York had shipped and would likely try to ship cigarettes.  It is more than reasonable for this Court to assume that the well-counseled UPS understood the obligations it assumed in the AOD and the risks inherent in breaching those obligations.

It is therefore important that these sophisticated counterparties did not negotiate a top end of penalties that could be imposed, or other limitations on penalties, apart from the "$1,000 for each and every violation."  For instance, the parties could have limited monetary penalties to only shipments of cigarettes by agreeing that violations of certain AOD obligations would be treated differently from violations of other AOD obligations.  But they did not.  The Court also finds the language "each and every" violation, as used in ¶ 42, applies not only to the potential number of violations (e.g., an instruction to count them all) but also to the type of violations.  That is, the AOD clearly provides that UPS shall pay penalties for each and every violation, of whatever type.  Conscionability issues are discussed further below.

D.   <u>Violations of the Audit Obligation Under the AOD</u>

Plaintiffs seek penalties only for violations of the AOD's audit obligation. In other words, plaintiffs seek penalties only for violations of ¶ 24 and not ¶¶ 17, 25, 26-33, 35, or 42.

With that in mind, the Court must determine the date(s) on which the audit obligation was first violated, and how to count violations.  Plaintiffs assert that a reasonable interpretation of the AOD supports determining damages by establishing the date when UPS first failed to audit a shipper in compliance with its obligations, and then assessing each and every package tendered to UPS thereafter as a separate violation of that audit obligation.  In other words, according to plaintiffs, once UPS was obligated to audit a shipper, every package that was not audited thereafter constituted a separate violation.

UPS, on the other hand, argues that the audit provision should be interpreted at the "shipper" level versus at the "shipment" level.  UPS focuses on the obligation in ¶ 24 to audit "shippers."  According to UPS, if there is a reasonable belief that a <u>shipper</u> may be tendering cigarettes for delivery, and UPS fails to audit that shipper, such failure results in a single violation.  Thus, no matter how long that violation continues and no matter how many packages are tendered to UPS by a shipper, the total number of violations per shipper would be "one."

This is an unreasonable interpretation.  The trigger for ¶ 24 is a reasonable basis to believe the shipper <u>may</u> be tendering cigarettes.  Audits are conducted with regard to packages.  Under UPS's interpretation, if it allowed such tendering to go

135

on day in and day out, without an audit, the penalty UPS would incur would be the same on day one as on day 300 ($1,000). This would create a perverse counter-incentive: The longer UPS failed to audit and thereby discover cigarettes (triggering discipline), the longer a shipper could use UPS's services for cigarette delivery. Under this theory, once an audit obligation attached UPS would be financially incented <u>not</u> to audit until at least the revenues associated with that shipper exceeded the penalty. This makes no sense in light of the other provisions and intent of the parties expressed in the AOD.

    1.   <u>Proof to the Reasonable Satisfaction of the State Attorney General</u>

UPS also argues that the penalty provision contained in ¶ 42 allows it to avoid penalties when it has demonstrated "to the reasonable satisfaction of the New York Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." (AOD, DX 23 ¶ 42.) As discussed above, in 2011 the New York Attorney General communicated with UPS regarding penalties for unspecified violations of the AOD in connection with only three shippers—the so-called Potsdam Shippers (Action Race Parts, Mohawk Spring Water, and Jacobs Manufacturing/Tobacco). Based on the fact that these communications followed the seizure of cigarettes, it is reasonable to infer that the obligations specifically at issue were those set forth in ¶¶ 17 and 43(a) ("knowing shipments"). Plaintiffs are not seeking penalties for such violations here—they seek penalties only for violations of the audit obligation in ¶ 24.

Nevertheless, defendant points out that after some back and forth, including a proffer by UPS of its position, the State did not take any action.  UPS points to this series of events as supportive of a finding that it had established "to the reasonable satisfaction" of the Attorney General that it had not violated the AOD in any regard.  UPS points to the absence of any claims relating to the Potsdam Shippers in plaintiffs' original complaint as further evidence of the Attorney General's satisfaction.  (See ECF No. 1.)[116]

UPS's argument fails.  As stated, plaintiffs are not seeking the imposition of AOD penalties for knowing shipments.  As a result, even if the Court were to find that UPS had proven to the satisfaction of the New York Attorney General that it had not knowingly transported cigarettes, such a finding does not eliminate liability for separate violations of the audit obligation.[117]

UPS also argues that these same events support its waiver or laches defenses with regard to the three Potsdam Shippers.  These arguments are similarly unavailing.  The basic elements of laches are well established: "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998).  A waiver requires an intentional

---

[116] UPS also makes a spoliation argument that was not raised before trial: that plaintiffs failed to preserve certain 2011 documents, thereby prejudicing UPS.  UPS waived this argument by failing to raise it during the discovery period.

[117] The Court does, however, take these considerations into account when assessing whether UPS honored the AOD.

relinquishment of a known right, based on full information.  <u>Capitol Records, Inc. v. Naxos of Am., Inc.</u>, 372 F.3d 471, 482 (2d Cir. 2004).

The parties debate whether either of these defenses are applicable to the governmental-entity plaintiffs.  The Court need not resolve that question because, as a factual matter, UPS has failed to carry its burden to establish the requisite elements.  Plaintiffs simply never had full information to support either defense.[118]  As for waiver, there is certainly insufficient evidence to support intentional relinquishment of any rights.

### 2. <u>Implied Covenant of Good Faith and Fair Dealing</u>[119]

UPS counters any purported violations of the AOD with an assertion that plaintiffs may not recover for such violations if they have themselves breached the covenant of good faith and fair dealing implicit in the AOD.  Specifically, UPS argues that the AOD implicitly obligated the State to provide UPS with information the State had regarding particular shippers.  Instead, according to UPS, plaintiffs accumulated information regarding non-compliant shippers and then sued UPS at a point when there was no longer any opportunity to remediate.  This argument is without merit.

---

[118] The Court need look no further than UPS's own response to the inquiries by the New York Attorney General: UPS denied any violations of the AOD.  While it is true that UPS provided the State with information at that time, there is no doubt that additional information came to light much later.

[119] In its answer, UPS also asserted "impracticability and frustration" as separate defenses.  These were abandoned in its final proposed findings of fact and conclusions of law.  In any event, for all of the many reasons discussed throughout this Opinion, such defenses lack adequate factual support with regard to the AOD or any other claim.

Every contract is subject to an implied covenant of good faith and fair dealing, which comprises "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included'" in the contract. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (quoting Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995)) (alteration omitted). This covenant applies both in the context of an assurance of discontinuance and where the party at issue is a governmental entity. C.f. Handschu v. Special Servs. Div., No. 71-cv-2203, 2007 WL 1711775, at *10 n.10 (S.D.N.Y. June 13, 2007) (noting that the NYPD was subject to the covenant of good faith and fair dealing where it was party to a consent decree).

This defense fails here for the simple reason that the State had (and has) neither an implicit nor an explicit obligation to provide UPS with any information.[120] The AOD does not contain a contractual provision requiring any such sharing of information, and to require the State to assume such an obligation would add a significant term to the agreement. The law is clear that a court should not, under the guise of the covenant of good faith and fair dealing, rewrite a contract. Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012) ("'The duty of good faith and fair dealing is a tool of

---

[120] UPS attempts to ground the State's alleged breach in a statement in the AOD that the agreement is intended to "promote further and ongoing cooperation between UPS and the Attorney General concerning UPS's compliance with [State law]." (AOD, DX 23 ¶ 15.) But this statement is contained in a "whereas clause" recital which, as a matter of law, does not create a contractual obligation. See Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985) (noting that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the contract" (internal quotation marks omitted)).

interpretation that cannot be used to rewrite a contract and impose new terms. Thus, courts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a new term or when alleged misconduct is expressly allowed by the contract.'" (quoting In re Musicland Holding Corp., 386 B.R. 428, 438-39 (Bankr. S.D.N.Y. 2008)); see also, e.g., Filner v. Shapiro, 633 F.3d 129, 141 n.1 (2d Cir. 1980) ("Under the guise of interpreting a contract, a court should not rewrite it."); Reiss, 764 N.E.2d at 961 ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (quotation marks omitted)).

UPS next argues that even if the State's cooperation with UPS is discretionary, the implied covenant of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally in exercising that discretion," TIG Ins. Co. v. Newmont Mining Corp., 413 F. Supp. 2d 273, 281 (S.D.N.Y. 2005) (quoting Dalton, 87 N.Y.2d at 389), aff'd, 226 F. App'x 49 (2d Cir. 2007). Thus, UPS argues, even if the State were not required to share information, good faith precludes it from withholding all cooperation, permitting damages to mount over a period of years, and then suing UPS under the contract the State decided not to implement.

This defense fails for a clear factual reason: There is insufficient evidence to support it. First, there is no evidence that the State acted arbitrarily or irrationally in exercising its discretion. But second, the proven facts demonstrate that when UPS actually was provided with certain information from other governmental

authorities—namely, the NCLs from the ATF—it ignored them.  For instance, Cook

noticed Smokes & Spirits on the NCL in August 2013, and in December 2013 New

York City warned UPS by email that Smokes & Spirits was a possible cigarette

shipper.  (Cook Decl., DX 600 ¶¶ 109, 110, 96.)  Yet UPS did not audit Smokes &

Spirits until late January 2014.  (Id. ¶ 97.)  The Court has no reason to believe that

such information (other than in a form indicating a formal investigation had begun)

would have resulted in prompt, compliant action by UPS.

      E.   <u>Whether the AOD Was "Honored"</u>

As discussed above, the PACT Act specifically exempts common carriers

with AODs (or similar agreements) relating to "tobacco product deliveries to

consumers" if those AODs are "honored" throughout the United States.

 <u>New York v. United Parcel Serv.</u>, 179 F. Supp. 3d 282, 294 (S.D.N.Y. 2016).  This

includes:

> (I)  . . . the [AOD] entered into by the Attorney General of New York and
> United Parcel Service, Inc., on or about October 21, 2005 . . . if each
> of those agreements is honored throughout the United States to block
> illegal deliveries of cigarettes . . . to consumers; and
>
> (II) any other active agreement between a common carrier and a State
> that operates throughout the United States to ensure that no
> deliveries of cigarettes . . . shall be made to consumers[.]

15 U.S.C. § 376a(e)(3)(B)(ii)(I), (II).

Thus, if UPS's AOD is "honored throughout the United States to block

illegal delivery of cigarettes," it is exempt from the PACT Act.  If the AOD is not so

honored, the exemption is eliminated.[121]   This Court has issued two rulings on the appropriate interpretation of what to be "honored" throughout the United States means.  (ECF Nos. 49, 206.)  In short, the Court has previously held that if UPS itself implements the AOD and honors its contractual obligations on a nationwide basis, then the AOD has been honored by UPS.  (See ECF No. 49 at 15-17, New York v. United Parcel Serv., 131 F. Supp. 3d 132, 140-41 (S.D.N.Y. 2015).)  As the Court previewed in its April 19, 2016 Opinion on this topic, a common carrier's entitlement to the benefits of the PACT Act's exemption would be lost if "the effectiveness of UPS's [compliance] policies [were] so compromised that the[] policies are not in fact in place."  179 F. Supp. 3d at 306.  That conclusion of law is proven by evidence of "a sufficiently large number of instances of shipments of contraband cigarettes" as to establish that "UPS is, overall, turning a blind eye towards such unlawful shipments" or that "UPS policymakers have in fact turned a blind eye to shipments of contraband cigarettes."  Id.

It is, of course, of no moment if the violations here at issue originate only in New York.  Persistent or widespread violations wherever located can indicate that the AOD is not being honored by UPS.[122]   Nothing in the PACT Act suggests the contrary.  Indeed, it would be odd to find that an AOD was not honored in its home state (here, New York) due to flagrant and repeated violations, but that because the home-state Attorney General did not prove violations in other states, the AOD was

[121] Once the exemption is eliminated, as it is here, the Court must further determine "as of when."

[122] The evidence at trial, including addresses on cigarette tracers, supports UPS transporting cigarettes to individuals outside of New York.

nonetheless "honored" nationally.  In all events, the mere fact of a single violation—

or even several—in any state (including New York) is insufficient to demonstrate

that UPS is not honoring its AOD.  Thus, an audit violation regarding a single

shipper would be insufficient.  The Court also considers the presence of procedures

to ensure compliance.  As discussed above, the Court has found that until this

lawsuit was filed in February 2015, UPS's procedures were inadequate.

Because UPS has violated so many different AOD obligations as to so many

shippers, this Court easily finds that, up to the date this lawsuit was filed, UPS was

not honoring the AOD.

In this regard, the Court observes that while plaintiffs seek penalties only

with regard to the audit provision in ¶ 24 of the AOD, there is ample evidence to

find numerous violations of ¶¶ 17, 25, 26-33, 35, and 42 as well.  In addition, these

violations were in connection with accounts for a number of different shippers

overseen by different Account Executives and serviced by different UPS drivers and

Processing Centers.  Moreover, these violations were not isolated in time but

occurred over a period of years.  Together, these facts support a finding of UPS's

widespread and persistent failure to honor the AOD.

The Court next turns to the further question of timing: When did UPS's

conduct reach the point of failure to honor the AOD?  That is, when was UPS's

conduct persistent enough and widespread enough?  As to that question, the Court

refers back to the findings of fact with regard to the Relevant Shippers.  It is

apparent that at least as of the fall of 2010—when the PACT Act became effective

and UPS began picking up business from other carriers as a result—UPS should have "put two and two together;" when it received cigarette tracers for the Relevant Shippers in the summer and fall of 2010, the scales tipped further.  By November 1, 2010, there were already a number of instances when UPS had a reasonable basis to believe shippers may have been tendering cigarettes, and it looked the other way.  Thus, the Court finds that not later than December 1, 2010 (a month later), it was evident that UPS was not taking appropriate action and that UPS was no longer honoring the AOD.

The next question is what, precisely, the lack of a PACT Act exemption means.  UPS's violations continued until the filing of this lawsuit.[123]  The Court finds that by the time of the lawsuit's filing, UPS's determined and serious actions reached a point at which its compliance efforts to comply brought it back into a position of honoring its obligations under the AOD.  Thus, as of February 18, 2015, UPS was again honoring the AOD.

In sum, the Court finds that UPS was exempt from the PACT Act until December 1, 2010.  It lost its exemption for the period between December 1, 2010 and February 18, 2015, but acquired it again after that point.

UPS argues that as late as 2013 the State conceded that UPS was entitled to the PACT Act exemption.  Its support for this rather surprising proposition are

---

[123] As stated above, UPS remains in breach with regard to Seneca Promotions.  However, as mentioned, one ongoing audit obligation for one shipper is insufficient to support a finding that the AOD is not being honored.  Nevertheless, the Court strongly suggests UPS conduct random audits of Seneca Promotion to resolve whether they are tendering cigarettes.

the discussions between the State and UPS during the late summer and fall of 2013 regarding whether UPS would voluntarily agree to prohibit service to shippers identified on the NCLs.  (See Trial Tr. 269:23-270:20.)  UPS draws an overbroad conclusion from these discussions.  While the discussions may lead to an inference that the State did not have sufficient information at that time to suggest that the AOD was not being honored, it does not prove that the AOD was actually being honored.  Until the State had access to the variety of materials it sought in discovery in this case and in response to subpoenas, it did not possess full information.  The State did not knowingly and intentionally waive any claim to violations of the AOD.

## XI.    KNOWLEDGE

As previewed at the outset of this opinion, plaintiffs' claims for violations of the PACT Act, PHL § 1399-ll, CCTA, and ¶¶ 17 and 42 of the AOD require UPS's "knowing" transport of cigarettes.  For instance, the PACT Act provides that, subject to certain exceptions, "no person who delivers cigarettes . . . to consumers, shall knowingly complete, cause to be completed, or complete its portion of a delivery of any package for any person whose name and address are on" a list of non-compliant shippers maintained by the U.S. Attorney General (the NCLs).  15 U.S.C. § 376a(e)(2)(A) (emphasis added).[124]  PHL § 1399-ll requires that plaintiffs prove that UPS "knowingly transport[ed] cigarettes to any person in this state

---

[124] The PACT Act also provides that it does not require or obligate "[a]ny common carrier . . . making a delivery subject to this subsection" to "(iii) open or inspect, pursuant to this chapter, any package being delivered to determine its contents."  15 U.S.C. § 376a(e)(9)(A).

reasonably believed by such carrier to be" anyone other than an authorized

recipient, as defined in PHL § 1399-ll(1).  Paragraphs 17 and 42 of the AOD

incorporate the liability standard from PHL § 1399-ll.  Thus, a violation of the AOD

occurs if UPS knowingly delivered cigarettes.[125]  Paragraph 17 of the AOD

incorporates the provisions of PHL § 1399-ll(2).  And finally, to establish a CCTA

violation, plaintiffs must prove that UPS knowingly shipped, transported, received,

possessed, sold, distributed, or purchased "contraband" cigarettes.  18 U.S.C.

§§ 2342(a), 2341(2).

The Court discusses the legal principles underpinning its findings of

knowledge below.

A.     Knowledge

In 1969, the Supreme Court adopted the use of the word "knowledge" as set

forth in the then-current draft Model Penal Code (which remains in the Model

Penal Code today): "When knowledge of the existence of a particular fact is an

element of an offense, such knowledge is established if a person is aware of a high

probability of its existence, unless he actually believes that it does not exist."  Leary

v. United States, 395 U.S. 6, 46 n.93 (1969) (quoting Model Penal Code § 2.02 (Am.

Law Inst., Proposed Official Draft 1962)); Model Penal Code § 2.02(7) (2015).  A

party acts knowingly when he/she proceeds intentionally with knowledge and "not

because of ignorance, mistake, accident or carelessness."  See United States v.

Kelly, 147 F.3d 172, 177 (2d Cir. 1998).  While there are different ways one may

---

[125] These are entirely separate breaches from the audit obligation set forth in AOD ¶ 24.

acquire knowledge—for instance, directly, or through willful blindness/conscious avoidance—the law does not privilege one over the other.  See United States v. Ferguson, 676 F.3d 260, 278 (2d Cir. 2011).  Direct knowledge is most frequently acquired by way of one's own senses, e.g., one comes to know a fact by seeing it, hearing it, touching it, otherwise sensing it.  But one can "know" a fact without direct sensory input.  In this regard, the law deems a person to have "knowledge" when he or she has a strong suspicion that a fact exists, but intentionally avoids confirmation.  Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011); Viacom Int'l v. YouTube, Inc., 676 F.3d 19, 34 (2d Cir. 2012); Tiffany (NJ) v. eBay, Inc., 600 F.3d 93, 109-10 (2d Cir. 2010) ("[W]illful blindness is equivalent to actual knowledge[.]" (citation and quotation marks omitted))

Intentionally avoiding confirmation of a fact is willful blindness or conscious avoidance.[126]  See Global-Tech Appliances, 563 U.S. at 766; United States v. Fofanah, 765 F.3d 141, 144 (2d Cir. 2014).  These doctrines are materially similar. Fofanah, 765 F.3d at 144.  A finding of either requires proof that (1) the defendant subjectively believe that there is a high probability that a fact exists, and (2) he/she must have taken deliberate action to avoid learning of that fact.  Global-Tech, 563 U.S. at 766; United States v. Svoboda, 347 F.3d 471, 477-78 (2d Cir. 2003).  The requirement of deliberate action gives willful blindness a scope that goes beyond

---

[126] "Deliberate indifference" was once a third way in which courts described such avoidance.  See, e.g., United States v. Reyes, 302 F.3d 48, 54 (2d Cir. 2002).  However, in 2011, the Supreme Court held that the "deliberate indifference" standard fails to require sufficient active efforts to avoid knowledge (though, in that case, the underlying facts were sufficient to support a finding of willful blindness).  Global-Tech, 563 U.S. at 769.

recklessness or negligence.  <u>Global-Tech</u>, 563 U.S. at 769.  "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  <u>Id.</u>  As a result, a defendant may not escape a finding of "knowing" a fact if he/she deliberately shields him/herself from clear evidence  of critical facts strongly suggested by the circumstances.  <u>Id.</u>; <u>see also</u> <u>Fofanah</u>, 765 F.3d at 144; <u>Svoboda</u>, 347 F.3d at 477-78.

While <u>Global-Tech</u> requires proof of deliberate actions, the standard does not require proof of an identifiable "affirmative act[]."  <u>Fofanah</u>, 765 F.3d at 150 (Leval, J., concurring) ("Our statements that the evidence must support a finding that the defendant "consciously" or "deliberately" avoided referred to a requisite state of mind, not to a need for affirmative acts. . . .  A finding that a defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.  It does not depend, for example, on the defendant having said 'I don't want you to tell me how you obtained these stacks of neatly bound $100 bills, packed in bags labeled 'Brink's'"").  Courts look to the totality of the circumstances.  "There must be evidence capable of supporting a finding that the defendant was aware of a high probability of the [incriminating] fact in dispute and consciously avoided confirmation of that fact."  <u>Id.</u> (quotation marks omitted).  From time to time, defendants have argued that while they may have believed a fact, they did not "know" the fact to be true; binding case law has found that the difference between

148

belief and knowledge is "a distinction without a difference." United States v. Nektalov, 461 F.3d 309, 315 (2d Cir. 2006). "The rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil.'" United States v. Adeniji, 31 F.3d 58, 62 (2d Cir. 1994) (internal quotation marks omitted); see also Nektalov, 461 F.3d at 315. The Second Circuit has found that the presence of "red flags" can support a finding of actual knowledge and conscious avoidance. Ferguson, 676 F.3d at 278 ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance."); see also Nektalov, 461 F.3d at 312, 317. In Ferguson, the Second Circuit found that red flags—such as secret side agreements, a fake offer letter, and an insistence on strict confidentiality—supported knowledge in the context of an allegedly fraudulent reinsurance transaction. 676 F.3d at 278.

    The Court has set forth its findings of fact with regard to the Relevant Shippers above. It previewed its legal conclusions by separating the shippers into three groups. The first group comprises those shippers as to whom the Court has found sufficient facts to support finding violations of the audit obligation, as well as facts supportive of actual shipments of cigarettes and UPS's knowledge of such shipments. A subgroup comprises those shippers as to whom this Court has found sufficient evidence to support the violations of the audit obligation, but not the fact of shipments and/or UPS's knowledge thereof. The second group therefore corresponds to the Liability Shippers as to whom the Court found plaintiffs have

carried their burden as to AOD audit violations, but finds they have failed to carry their burden with respect to statutory violations requiring knowledge.  The Court now turns to the basis for its legal conclusion that the facts support a finding of UPS's knowledge.

The knowledge at issue in this case concerns UPS's knowledge that certain shippers were tendering packages containing cigarettes, and that in the face of such knowledge, UPS nonetheless stood down in various ways, including by not probing further, not conducting audits, and ultimately agreeing to transport such packages. As to each shipper, the Court made its ultimate finding based on a preponderance of the evidence and based upon the legal principles recited herein.

Without reviewing each shipper again, the evidence supportive of the Court's finding of knowledge included, inter alia, the past history with the shipper; knowledge of activity from its address; the tracers; the NCLs; the Tobacco Watchdog Group letter; the wares a shipper sold; signage; visible inventory in a warehouse; the use of the terms "cigar," "tobacco," or "cigarette" in a name or URL; the use of multiple accounts; business acquisition or significant increase after the passage of the PACT Act; proximity to a reservation with a prior history of cigarette shipping; and high-volume shipments from residential addresses.  There are additional facts recited with regard to each shipper set forth above.

UPS's knowledge of these facts was based on what different personnel knew—individually and collectively.  The question naturally arises as to whether facts known to certain UPS employees, including an Account Executive, a driver, a

customer service representative, the legal department, and the security group,
among others, establishes sufficient knowledge and whether that knowledge may be
imputed to UPS.[127]

B.   Imputation of Knowledge[128]

It is true that certain facts upon which the Court has relied for its finding of
knowledge were known only to one or a limited number of employees within UPS.
The question next arises whether such knowledge may properly be imputed to UPS
as a corporate entity.  On the facts in the trial record, the answer is yes.

As a corporate defendant, UPS acts only through its employees and agents.
Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir.
2001).  Principles of agency law provide that a corporation can be held liable for the
acts of employees or agents when they are acting within the scope of their authority.
Reino de España v. Am. Bureau of Shipping, 691 F.3d 461, 473 (2d Cir. 2012).
Knowledge that an agent acquires during the course of performing his or her job

---

[127] In all instances in which this Court has found a sufficient basis for a violation of the audit obligation or statutory provision at issue, there was sufficient evidence to support such conclusion based solely on the knowledge of assigned Account Executive and driver.  The evidence supports an interdependent working relationship between those two categories of personnel to support a client. Nonetheless, the Court notes that the record contains additional evidence (supporting knowledge) from the customer service representatives and legal groups (who had direct knowledge of the tracers and NCLs).  These individuals also played a role, though less direct, in supporting the client relationship.  As the Court describes, most information was distributed among various personnel.

[128] The related doctrine of respondeat superior similarly provides that a corporation may be held liable for the torts of its employees.  E.g., Holmes v. Gary Goldberg & Co., 838 N.Y.S.2d 105 (N.Y. App. Div. 2d Dep't 2007) ("Pursuant to the doctrine of respondeat superior, liability for an employee's tortious acts may be imputed to the employer when they were committed 'in furtherance of the employer's business and within the scope of employment.'" (quoting N.X., v. Cabrini Med. Ctr., 765 N.E.2d 844, 847 (N.Y. 2002)).  It is certainly true that certain facts upon which the Court has relied for its finding of knowledge were known only to one or a limited number of employees within UPS. The question next arises whether such knowledge may properly be imputed to UPS.  The answer in all instances is yes.

responsibilities may be imputed to an employer.  Id. (For knowledge of an agent to be imputed to a principal, "the information at issue . . . [must go] to matters within the scope of the agency."); Apollo Fuel Oil v. United States, 195 F.3d 74, 76 (2d Cir. 1999) ("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal.").  Under Apollo Fuel Oil, employees' knowledge acquired within the scope of their employment is imputed to the corporation.  195 F.3d at 76 (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958)); accord Consol. Edison Co. of N.Y., Inc. v. United States, 221 F.3d at 364, 370 (2d Cir. 2000) (discussing imputation of an employee's knowledge to an employer); Steere Tank Lines, Inc. v. United States, 330 F.2d 719, 722 (5th Cir. 1964) (same); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 437 (E.D.N.Y. 1995) ("An agent's acts are within the scope of his actual authority if it . . . is actuated, at least in part, by a purpose to serve the master." (internal quotation marks omitted)).

An act is deemed to be within the scope of employment if it is performed while an employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment.  Harisch v. Goldberg, No. 14-cv-9503, 2016 WL 1181711 at *14 (S.D.N.Y. Mar. 25, 2016).  In addition, the presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors.  N.Y. Univ. v. First Fin. Ins. Co., 322 F.3d 750, 753 n.2 (2d Cir. 2002) (citing Center v. Hampton Affiliates, 488 N.E.2d 898, 899 (N.Y. 1985)).

Thus, "a corporation may be charged with the collective knowledge of its employees[.]" First Equity Corp. of Fla. v. Standard & Poor's Corp., 690 F. Supp. 256, 260 (S.D.N.Y. 1988), aff'd, 869 F.2d 175 (2d Cir. 1989). Corporations often compartmentalize information, whether for efficiency, practicality, or both. But such compartmentalization does not shield a company from knowledge maintained by employees in such a structure.

United State v. Bank of New England is instructive. There, the court stated:

> Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation: [A] corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import.

821 F.2d 844, 856 (1st Cir. 1987) (internal quotation marks omitted); see also id. ("Since the Bank had the compartmentalized structure common to all large corporations, the court's collective knowledge instruction was not only proper but necessary.")). A corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly. Id. at 856 (internal citations omitted); see also In re Worldcom, Inc. Secs. Litig., 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs . . . need not prove that any one

individual employee of a corporate defendant also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient.").

Imputation does not, however, apply to facts hidden from an employer.  If an employee has failed to disclose all material facts relating to performance of his or her agency, such undisclosed facts may not be imputed to the principal, i.e., the employer.  Hampton Affiliates, 488 N.E.2d at 829-30.  "However, 'this [is the] most narrow of exceptions,' 'reserve[d] . . . for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed against a [principal] rather than on its behalf."  Republic of Iraq v. ABB AG, 768 F.3d 145, 166 (2d Cir. 2014) (quoting Kirschner v. KPMG LLP, 937 N.E.2d 941, 952 (N.Y. 2010)).  "To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes."  Id. (quoting Center, 488 N.E.2d at 830).  Here, the Court has already found that the acts of UPS employees (including Fink) vis-à-vis the Liability Shippers were within the scope of their job responsibilities.

The Court also finds imputation appropriate because the employees did not hide or otherwise fail to disclose material facts necessary to its finding of knowledge.  Instead, the Court finds that information obvious to drivers and to account personnel (much of which could not be or was not hidden), along with information contained in UPS internal documents accessible to others within the organization, are sufficient to support UPS's liability.  But in addition, the Court

finds a corporate culture that broadly accepted non-compliance.  Accordingly, while the record does not indicate affirmatively that every fact was shared widely, the evidence reasonably supports an inference that material facts were not withheld. That the record does not contain direct evidence of explicit disclosure does not erase the circumstantial evidence supporting widespread knowledge of material facts relating to each account.

      C.   <u>Presumptions of Knowledge for Common Carriers</u>

Another way in which UPS may be deemed to have knowledge is through "regulatory" imputation.  As a regulated common carrier, UPS is presumed to possess knowledge of all laws and regulations pertaining to its business, including specifically as they relate to the transport of dangerous goods:

> [I]nterstate motor carriers are members of a regulated industry, and their officers, agents, and employees are required by law to be conversant with the regulations in question.  As a practical matter, therefore, they are under a species of absolute liability for violation of the regulations despite the 'knowingly' requirement.  This, no doubt, is as Congress intended it to be.  Likewise, prosecution of regular shippers for violations of the regulations could hardly be impeded by the "knowingly" requirement, for triers of fact would have no difficulty whatever in inferring knowledge on the part of those whose business it is to know, despite their protestations to the contrary.

<u>U.S. v. Int'l Minerals & Chem. Corp.</u>, 402 U.S. 558, 569 (1971) (Stewart, J. dissenting) (citations and footnote omitted).  "[A] corporate defendant is deemed to have had knowledge of a regulatory violation if the means were present by which the company could have detected the infractions."  <u>United States v. T.I.M.E.-D.C.</u>, 381 F. Supp. 730, 739 (W.D. W. Va. 1974).

Here, UPS personnel are deemed broadly to be aware of the PACT Act, CCTA, and PHL § 1399-ll.  In addition, UPS certainly had the means to understand that certain of its clients were shipping cigarettes.  For instance, UPS had an audit right, and it could open packages.  And in the course of providing its services, it learned information about a customer's business.  Of course, it would know a customer's location, its name, whether it was located in a storefront (or located at a residential address), the goods it sold, the signage it used for advertisement; UPS had its Tobacco Policy, which acknowledged tobacco shipments (and yet there were instances in which even that was not enforced appropriately).  UPS knew that certain customers were high risk—indeed, at times it said so; it had access to the NCLs.  UPS had the means to monitor and discover regulatory violations, and there were red flags aplenty.

> D.   Knowledge as to Each Shipper

Based upon the facts discussed in the Court's findings of fact, and based upon the application of the legal standard, the Court has made its determinations with regard to UPS's knowledge of facts relating to each Relevant Shipper's shipments as set forth above.

## XII.   LIMITATIONS PERIOD

One of UPS's defenses is that the applicable statutes of limitations bar certain claims.  According to UPS, the applicable statutes of limitations preclude CCTA and PACT Act claims for violations prior to September 18, 2010; and

preclude PHL § 1399-ll and AOD claims for violations prior to September 18, 2011.
(Def. Proposed Findings of Fact, ECF No. 492 at 264.)

 The Court does not find violations of the CCTA or PACT Act prior to
September 18, 2010, and therefore need not address defendant's statute-of-
limitations arguments as to these bases for liability.  Additionally, the Court agrees
that the statute of limitations for violations of PHL § 1399-ll is three years plus the
five months of a voluntary tolling agreed to by the parties.  The Court's rationale is
as follows: Under New York law, the applicable limitations period for an action to
recover upon a liability, penalty, or forfeiture created or imposed by statute is three
years.  N.Y. C.P.L.R. § 214(2).  For a claim to fall within the confines of C.P.L.R.
§ 214(2), the statute must impose liability "'for wrongs not recognized in the
common or decisional law.'"  Banca Commerciale Italiana v. N. Tr. Int'l Banking
Corp., 160 F.3d 90, 94 (2d Cir. 1998) (quoting State v. Stewart's Ice Cream Co., 64
N.Y.2d 83, 88 (1984)).  Here, plaintiffs' claims against UPS for "knowingly
transport[ing] cigarettes" would not exist but for the statute and, therefore, are
governed under the three-year limitations period set forth in C.P.L.R. § 214(2).  See,
e.g., Motor Vehicle Acc. Indem. Corp. v. Aetna Cas. & Sur. Co., 674 N.E.2d 1349,
1352 (N.Y. 1996) ("No-Fault Law does not codify common-law principles; it creates
new and independent statutory rights and obligations" and thus is governed by N.Y.
C.P.L.R. § 214(2). (quotation marks omitted)); Zeides v. Hebrew Home for the Aged
at Riverdale, Inc., 753 N.Y.S.2d 450, 452 (N.Y. App. Div. 1st Dep't 2002) (plaintiff's
cause of action under P.H.L. § 1801-d, which confers a private right of action on a

patient in a nursing home for injuries sustained as the result of the deprivation of statutorily specified rights, is governed by the three-year period of limitations of C.P.L.R. § 214(2)).  The parties also entered into a tolling agreement for a period of five months, from July 24, 2014, through December 24, 2014.  Accordingly, any violations of PHL § 1399-ll are cognizable only if they occurred no earlier than three years and five months prior to the filing of this suit, i.e., no earlier than September 18, 2011.

Defendant also seeks to limit recovery for AOD violations to the same three-year statute of limitations.  That is incorrect.  The AOD is a contract, and under New York law the statute of limitations for contract claims is six years.  C.P.L.R. § 213(2); Town of Oyster Bay v. Lizza Indus., Inc., 4 N.E.3d 1024, 1030 (N.Y. 2013) ("A breach of contract action must be commenced within six years from the accrual of the cause of action." (citations omitted)).  Not only is the contractual nature of the AOD clear from its form, its terms, and consideration provided by the parties, its obligations are different from and in addition to statutory requirements.  For instance, the AOD's audit requirement is an obligation that exists nowhere in state or federal statutes and for which the AOD provides its own, independent remedy.  Therefore, the six-year statute of limitations applies to all claims arising from breaches of UPS's AOD obligations, including its audit obligation.

As discussed below, when the parties provide the number of defined "Packages" and "Cartons" for the Liability Shippers, they should do so according to these time frames.

XIII.  THE PACT ACT

As explained above, the PACT act directs the Attorney General to compile a list of cigarette and smokeless tobacco delivery sellers that have not registered with the Attorney General or "are otherwise not in compliance with [the] Act" (i.e. the "non-compliant list" or "NCL").  15 U.S.C. § 376a(e)(1)(A).  Sixty days after the Attorney General distributes the NCL, "no person who receives the list . . . and no person who delivers cigarettes or smokeless tobacco to consumers, shall knowingly complete its portion of a delivery of any package for any person whose name and address are on the list . . . ."[129]  Id. § 376a(e)(2)(A).  Importantly, the PACT Act also prohibits a carrier such as UPS from making deliveries on behalf of a known seller identified on the NCL when the carrier knows that such seller "is using a different name or address to evade the delivery restrictions."  Id. § 376a(e)(9)(B)(ii).   All recipients and common carriers are also subject to the prohibitions on delivery described above with regards to any updates to the NCL thirty days after such updates have been distributed or made available.  Id. § 376a(e)(2)(B).

Plaintiffs allege that UPS violated the PACT Act by delivering packages from sellers that UPS knew were identified on the NCLs (or were affiliated with entities identified on the NCLs).  Specifically, plaintiffs seek penalties under the PACT Act

---

[129] There are certain exceptions that are not relevant here.

for deliveries made by UPS to the "Elliott Enterprises Group,"[130] Indian Smokes,

and the "Smokes and Spirits Group."[131]

As the Court has already explained, UPS is not exempt from the PACT Act;

the Court finds that UPS violated the PACT Act by knowingly delivering packages

from sellers identified on the NCLs, which UPS received.  However, the Court also

finds that plaintiffs are not entitled to PACT Act penalties relating to all of the

shippers for which they seek such penalties.  The Court's conclusions are as follows:

- Elliott Enterprises first appeared on the NCL dated November 10, 2010.  (PX 472.)  UPS received the first NCL on November 11, 2010.  UPS lost its PACT ACT exemption by December 1, 2010.  Because this was the first NCL, UPS had sixty days to comply; its delivery of any packages for Elliott Enterprises after January 10, 2011, was thus a violation of the PACT Act.

- Indian Smokes first appeared on the NCL dated May 6, 2011.  (PX 450).  This NCL was distributed by the ATF that day.  As noted, UPS had already lost its PACT Act exemption, and was therefore in violation of the PACT Act for all shipments UPS delivered for Indian Smokes starting thirty days thereafter, or as of June 6, 2011.

- Smokes & Spirits first appeared on the NCL dated February 15, 2012.  (PX 450)  The ATF distributed this NCL that day.  Accordingly, UPS became liable for PACT Act penalties for all shipments UPS delivered for Smokes-Spirits on and after March 15, 2012.[132]

---

[130] As discussed above, plaintiffs include Elliott Enterprises, Elliott Express (or EExpress), and Bearclaw Unlimited/AFIA in this "group."

[131] As discussed above, plaintiffs include Smokes & Spirits, Native Outlet, A.J.'s Cigar, Sweet Seneca Smokes, and RJESS in the "group."

[132] UPS argues that it cannot be liable under the PACT Act for deliveries made to Smokes & Spirits because the PACT Act NCL identified Smokes & Spirits as being located at 6665 Route 417, Kill Buck, New York, while UPS provided service to Smokes & Spirits at 137 Main Street, Salamanca, New York 14779.  This argument lacks merit.  As the Court has already found in its findings of fact, UPS knew, before the NCL was disseminated, that Smokes & Spirits was operating at 6665 Route 417, Kill Buck, New York (UPS provided service to Smokes & Spirits at that address).  In all events, plaintiffs have put forth sufficient evidence that UPS knew the Smokes & Spirits on the NCL was the same Smokes & Spirits that UPS was servicing.

UPS's liability under the PACT Act regarding Elliott Enterprises, Indian Smokes, and Smokes & Spirits is clear.  As the Court has described, however, plaintiffs seek PACT Act penalties not only with regard to these entities (which were explicitly identified on the NCLs), but also for other entities that plaintiffs claim were affiliated in the same "groups."  UPS argues that even if they are subject to PACT Act liability for Elliott Enterprises, Indian Smokes, and Smokes & Spirits, they cannot be subject to PACT Act liability for other affiliated entities that were not explicitly mentioned by "name and address" on the NCLs.

The Court finds that UPS is also subject to PACT Act liability for a subset— but not all—of the additional shippers within the "groups" that plaintiffs identify. Specifically, UPS is also subject to PACT Act liability for shipments made to Bearclaw/AFIA and EExpress during the relevant time period identified above,[133] but is not subject to PACT Act liability for Native Outlet, A.J.'s Cigars, Sweet Seneca Smokes, or RJESS.

The PACT Act prohibits UPS from making deliveries on behalf of entities known to be "using a different name or address [as those entities on the NCLs] to evade the delivery restrictions."  15 U.S.C. § 376a(e)(9)(B)(ii).  The purpose of this provision is clear from its text—to prevent cigarette shippers from using alternate

---

[133] I.e. after January 10, 2011.

identities to evade delivery restrictions. The evidence in this case illustrates that shippers did in fact use alternate identities to attempt to evade the law.

The facts here demonstrate that EExpress had a sufficiently close relationship with Elliott Enterprises and that UPS Knew EExpress was in fact an alter ego of Elliott Enterprises's intended, <u>inter alia</u>, to evade the PACT Act's delivery restrictions.[134]  <u>See</u> <u>Newspaper Guild of N.Y.</u>, 261 F.3d at 294; <u>Empire United Lines Co.</u>, 557 F. App'x at 45-46.  EExpress was opened by Fink only days after Elliott Enterprises's account was terminated, and there was significant customer overlap between the consignees of the two.  There were clear connections between Aaron Elliott, the principal of Elliott Enterprises—a known cigarette shipper—and EExpress.  These entities had significant overlap in customers, business purpose, and operations.  <u>Cf.</u> N.Y. Pattern Jury Instr., Civil 2:266, Liab. for Conduct of Another (2016).

Similarly, there was a sufficiently close relationship such that UPS knew Bearclaw was making shipments on behalf of Elliott Enterprises.  As the Court has already described, these entities shared a telephone number and Fink knew this fact.  Bearclaw was a mail-order business and its telephone number was therefore a main point of contact (serving a similar function as a physical address would serve for a non-mail-order entity).  The Court has found that, based on the totality of the evidence, UPS knew Bearclaw was shipping on behalf of Elliott Enterprises and

---

[134] The Court has already described in detail the relevant legal principles concerning alter egos.

used different names/addresses to avoid detection as a cigarette shipper.  UPS is thus liable for shipments to Bearclaw under the PACT Act.

UPS accurately points out that under the PACT Act it is "not . . . required to make any inquiries or otherwise determine whether a person ordering a delivery is a delivery seller on the list . . . who is using a different name or address in order to evade the related delivery restriction . . . ."  15 U.S.C. § 376a(e)(9)(B)(i). Significantly, however, UPS did have such an obligation under the AOD.  In other words, UPS is liable for the deliveries made to alter egos of known shippers on the NCLs (i.e. Bearclaw/AFIA and EExpress"), even though the PACT Act does not require UPS to acquire alias information.

The Court does not find, however, that there was a sufficiently close relationship between Smokes & Spirits and the other entities plaintiffs included within the "Smokes & Spirits Group" to warrant PACT Act liability for shipments to those entities (Native Outlet, A.J.'s Cigar, Sweet Seneca Smokes, and RJESS).  As the Court has noted in its factual findings above, plaintiffs did not put forth sufficient evidence that these additional entities were alter egos or were shipping on behalf of Smokes & Spirits.

XIV.    PHL 1399-LL

PHL § 1399-ll prohibits common carriers from "knowingly transport[ing] cigarettes" to any person in New York State "reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this

section."  PHL § 1399-ll(2).[135]  UPS also assumed a separate, contractual obligation to comply with PHL § 1399-ll in ¶ 17 of the AOD.

In enacting PHL 1399-ll the State legislature "declare[d] the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of [New York] state to be a serious threat to public health, safety, and welfare, to the funding of health care . . . , and to the economy of the state."  2000 Sess. Laws of N.Y., Ch. 262 (S.8177) § 1.

The PACT Act contains a provision that preempts state laws such as PHL § 1399-ll with regard to common carriers who have entered into an AOD and when such AOD "is honored" throughout the United States.  See 15 U.S.C. §§ 376a(e)(5)(C)(ii), 376a(e)(3)(B)(ii)(I).  The Court's determination, set forth above, that UPS's AOD is not so honored eliminates this protection for UPS.  The AOD separately provides that a violation of its terms shall "also constitute prima facie proof of a violation of PHL § 1399-ll(2), in any civil action or proceeding that the Attorney General later commences."  (AOD, DX 23 ¶ 43.)  Accordingly, in addition to the violations of PHL § 1399-ll for knowing shipments of cigarettes described below, the Court has separately found that UPS breached ¶ 42 of the AOD, and that this

---

[135] There are exemptions of certain persons from PHL § 1399-ll that are not relevant here, including "(a) a person licensed as a cigarette tax agent or wholesale dealer under article twenty of the tax law or registered retail dealer under section four hundred eighty-a of the tax law; (b) an export warehouse proprietor pursuant to chapter 52 of the internal revenue code or an operator of a customs bonded warehouse pursuant to section 1311 or 1555 of title 19 of the United States Code; or (c) a person who is an officer, employee or agent of the United States government, this state or a department, agency, instrumentality or political subdivision of the United States or this state and presents himself or herself as such, when such person is acting in accordance with his or her official duties."  PHL § 1399-ll(2).

breach involved the shipment of cigarettes.  Thus, ¶ 43 of the AOD also provides a basis for a violation of PHL § 1399-ll.

The facts as set forth above demonstrate that UPS in fact delivered shipments of unstamped cigarettes to individuals who were not authorized to receive them.  The final issue is whether it did so with the requisite level of knowledge.

As discussed above, as a common carrier of regulated goods, UPS is deemed to have knowledge of whether the recipients of the packages it delivers "appear on a list of licensed or registered agents or dealers published by the department of taxation and finance, or . . . [are] licensed or registered as an agent or dealer under article twenty of the tax law."  PHL § 1399-ll(1); see Int'l Minerals, 402 U.S. at 569; Elshenawy, 801 F.2d at 859.  Moreover, pursuant to PHL § 1399-ll(2), if a common or contract carrier knowingly transports cigarettes "to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section."  PHL § 1399-ll(2).  UPS has offered no evidence that the persons to whom it shipped cigarettes were persons described in paragraph (a), (b), or (c) of subdivision one of PHL § 1399-ll(2), i.e., were licensed tobacco dealers.

Moreover, UPS recorded in its delivery records the instances where it delivered packages from Relevant Shippers to residential addresses; UPS is therefore presumed to have actual knowledge that the recipients were unauthorized for purposes of PHL § 1399-ll as to all of those deliveries.

165

However, even as to its deliveries to commercial addresses, UPS could only have believed that the recipients were authorized to receive cigarettes if it confirmed that addresses were appropriately licensed.  See N.Y. Comp. Codes R. & Regs. tit. 20, § 74.3(a)(1).  UPS has introduced no evidence that it performed such a confirmation.  In all events, as discussed at length above, the Court has already and separately found sufficient knowledge to support a violation of this statute, as described above.

XV.    THE CCTA

Plaintiffs' final claim is for violations of the CCTA.  The CCTA is a federal statute designed to address "the flow of contraband cigarettes between jurisdictions with differing tax obligations, and the resulting deleterious effects on state and local tax collection."  City of New York v. Golden Feather Smoke Shop, Inc., No. 08-cv-03966, 2013 WL 3187049, at *20 (E.D.N.Y. June 10, 2013).  The statute makes it unlawful for any person knowingly to ship, transport, sell, or distribute "contraband cigarettes."  18 U.S.C. § 2342(a); City of New York v. FedEx Ground Package Sys., 91 F. Supp. 3d 512, 519 (S.D.N.Y. 2015).

"Contraband cigarettes" are defined as:

[A] quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable State . . . cigarette taxes in the State . . . where such cigarettes are found, if the State . . . requires a stamp, impression, or other indication to be placed on the packages . . . of cigarettes to evidence of cigarette taxes, and which are in the possession of any person other than [exceptions not relevant here]."

18 U.S.C. § 2341(2); FedEx, 91 F. Supp. 3d at 519-20 (footnote omitted).

A CCTA violation therefore consists of four elements: A party must (1) knowingly ship, transport, receive, possess, sell, distribute or purchase, (2) more than 10,000 cigarettes, (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps. FedEx, 91 F. Supp. 3d at 520.

In New York, the cigarette tax law referred to in the fourth element of a CCTA claim is set forth in N.Y. Tax Law §§ 471 and 471-e.  When it was first passed in 1939, § 471 imposed a tax "'on all cigarettes possessed in the state by any person for sale' except when the 'state is without power to impose such tax.'"  City of N.Y. v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 122 (2d Cir. 2010) ("Golden Feather II") (quoting N.Y. Tax Law § 471).  Section 471 has been amended numerous times but has been continuously in place in some form.  During the period relevant to plaintiffs' claims herein, § 471 has always required the affixation of tax stamps on cigarettes sold by Indian reservation retailers to non-tribal members.  City of New York v. Milhelm Attea & Bros., No. 06-v-3620, 2012 WL 3579568, at *5-6 (E.D.N.Y. Aug. 17, 2012).

In June 2010, the State amended both N.Y. Tax Law §§ 471 and 471-e, with an effective date of September 1, 2010.  Milhelm Attea, 2012 WL 3579568, at *2.  The pre- and post-amendment versions of § 471 both contain the same initial language broadly imposing a taxation requirement.  As amended, § 471 requires the affixation of tax stamps to all cigarettes sold on reservations to non-tribe members.  See id., 2012 WL 3579568, at *3.

As set forth in its factual findings, the Court has found that plaintiffs have met their burden with regard to each element of the CCTA.  First, all cigarettes possessed for sale or use within the State are presumed to be taxable, and hence must bear a tax stamp, until the contrary is established.  The person asserting exemption from taxation bears the burden of proving non-taxability.  See N.Y. Tax Law § 471; N.Y.C. Admin. Code § 11-1302(d).  "Whether taxable or tax-free, all [packs of] cigarettes must bear a tax stamp."  Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 160 n.8 (2d Cir. 2011).  To indicate that the tax has been pre-paid on cigarettes to which the tax applies, a stamping agent must purchase and affix a cigarette tax stamp to each pack of cigarettes possessed by the agent for sale in the State and/or City, as the case may be.  N.Y. Tax Law § 471; 20 N.Y. Codes R. & Regs. § 76.1(a)(1); Ad. Code § 11-1302(e).  All cigarettes possessed for sale or use in New York State and City, with exceptions not relevant to this action, must bear tax stamps.  N.Y. Tax Law § 471; 20 N.Y. Codes R. & Regs. § 76.1(a)(1); N.Y.C. Admin. Code § 11-1302(g).

To comply with the foregoing requirements, stamping agents purchase tax stamps from the State and City, the cost of which is nearly equal in cost to the amount of the cigarette tax on a pack of cigarettes.  20 N.Y. Codes R. & Regs. § 74.2.  By purchasing the tax stamps, the tax is paid.  Id.  By law, stamping agents must incorporate the amount of the tax into the price of the cigarettes, thereby passing the tax along to each subsequent purchaser in the distribution chain, and

ultimately the consumer, as required by N.Y. Tax Law § 471 and N.Y.C. Admin. Code § 11-1302(e) and (h).

At all relevant times (i.e., January 1, 2010, to the present), the State excise tax has been either $2.75 or $4.35 per pack of cigarettes.  See N.Y. Tax Law § 471(1) (noting the July 1, 2010 change in the applicable tax from $2.75 to $4.35); Angell Aff., PX 62 ¶ 16; Trial Tr. 1360:15-19.  Accordingly, for each carton of cigarettes (which typically contains ten packs of cigarettes), the State excise tax rate is $27.50 or $43.50 per carton.  (See Angell Aff., PX 628 ¶ 16.)  During the same time period, the New York City excise tax has been $1.50 per pack or $15.00 per carton.  (Angell Aff., PX 628 ¶ 17.)  Each pack of cigarettes in New York City, furthermore, it must bear a joint New York State/New York City tax stamp.  20 N.Y. Codes R. & Regs. § 74.3.

New York law creates a presumption that all cigarettes are taxable, and are all therefore required to be stamped, unless the person on possession of the cigarettes rebuts the presumption.  N.Y. Tax Law § 471 et seq.; Oneida, 645 F.3d at 159; New York v. United Parcel Serv., No. 15-cv-1136, 2016 WL 4747236, at *6 (S.D.N.Y. Sept. 10, 2016).

This Court has already found that the cigarettes transported by UPS, whether to consumers or reservation-to-reservation, were required to bear tax stamps.  2016 WL 4747236 at *4-5, *11-12.   This Court has also already held that UPS bears the burden of rebutting that presumption.  Id. at *6.  UPS has introduced no evidence doing so, and hence all of the cigarettes transported by UPS

to or from Indian reservations were required by law to have been stamped.  The preponderance of the evidence proves that the packs of cigarettes delivered by UPS were unstamped.  The evidence proving this element is summarized as follows: Rosalie Jacobs and Robert Oliver both testified that the cigarettes they shipped via UPS did not bear tax stamps.  (Trial Tr. 1661:15-17 (Jacobs); Id. 1132:5-1134:20 (Oliver)); the cigarettes seized at UPS's Potsdam Center did not bear tax stamps (id. 1148:1-7 (Oliver)); Phil Christ testified that the cigarettes sold by Arrowhawk did not bear tax stamps (id. 912:20-23, 913:17-914:6 (Christ)); it can be inferred from the prices at which Smokes & Spirits and Arrowhawk sold cigarettes that the price could not have included either or both State and City taxes (see PX 54; PX 55); and the cigarettes delivered by UPS to the Office of the New York City Sheriff from Seneca Cigars or www.senecacigarettes.com were unstamped (PX 40; PX 43).  In addition, there is no evidence in the record that any of the shippers at issue sold any cigarettes with stamps.

Plaintiffs have also proven that the "10,000 cigarette" quantity requirement for a CCTA violation.  Rosalie Jacobs of Jacobs Manufacturing/Tobacco testified that her company regularly shipped unstamped cigarettes in lots of 10,000 cigarettes.  (Trial Tr. 1680:8-22 (Jacobs).)  This is alone sufficient to establish this element of a CCTA violation.  But secondly, Robert Oliver of Mohawk Spring Water also testified that he shipped pallets of cigarettes via UPS in an amount greater than 10,000.  (Trial Tr. 1152:23-1153:11 (Oliver)); PX 49.)

Finally, as this Court and others have previously found, the CCTA permits the aggregation of separate deliveries to satisfy the statutory quantity of 10,000 cigarettes.  See 131 F. Supp. 3d at 139 (citing cases).  The total number of packages containing cigarettes delivered by UPS, and the average weights of those packages, when applied to the known weight of a packaged carton of cigarettes (assumed here to be one pound based in part on PX 40, PX 43, and the testimony elicited at trial), demonstrates that the total volume of cigarettes underlying plaintiffs' claims far exceeds 10,000 cigarettes (fifty cartons).[136]

UPS asserts several defenses to plaintiffs' CCTA claims.  They first assert that the forbearance policy followed by the State of New York prevents enforcement of the law against UPS for deliveries during at least the first seven months of claimed violations: December 2010 (which the Court found to be the first date on which UPS had the requisite knowledge) and June 2011 (when forbearance ended).  UPS next argues that it reasonably believed that N.Y. Tax Law § 471 could be interpreted to allow common carrier transport of unstamped cigarettes between Indian reservations.

---

[136] A common carrier "transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source, and destination of such cigarettes" is not subject to CCTA liability. 18 U.S.C. § 2341(2).  UPS has produced no bills of lading or freight bills for the cigarettes at issue in this action and accordingly is not entitled to this exemption.

Moreover, for a common carrier to be entitled to the exemption provided by 18 U.S.C. § 2341(2), the cigarettes in question must be picked up from and delivered to persons legally entitled to possess unstamped cigarettes.  City of New York v. Gordon, 1 F. Supp. 3d 94 (S.D.N.Y. 2013); City of New York v. LaserShip, Inc., 33 F. Supp. 3d 303 (S.D.N.Y. 2014).  UPS has produced no evidence that any person from which UPS picked up or delivered was entitled to receive, possess, distribute, or sell unstamped cigarettes and accordingly cannot establish entitlement to this exemption.

171

As to forbearance, the Court notes that it has addressed this defense extensively in prior Opinions.  (ECF Nos. 177, 406.)

UPS also argues that even if the State may assert a CCTA violation, the City lacks standing with regard to the Potsdam Shippers and cannot.  According to UPS, this is because the Potsdam Shippers sent packages only to other reservations in New York State—none of which were located in New York City.  However, as there is ample evidence to establish UPS's knowing transport of cigarettes to consignees in New York City, therefore establishing a CCTA violation, there is no standing issue.  Other issues are addressed in the damage discussion set forth below.

As to § 471, the Court has found as a matter of <u>fact</u> that UPS presented insufficient evidence to support a reasonable—or even widely held—belief in its asserted statutory interpretation.  At long last, despite the ink spilt, this is an ex post lawyer argument.

XVI.   PREEMPTION

UPS argues that plaintiffs' interpretation of the AOD expands UPS's audit obligations beyond the contract terms and thereby regulates a common carrier in contravention of the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which explicitly preempts state laws related to a "price, route, or service" of carriers that transport property.  49 U.S.C. §§ 14501(c)(1); 41713(b)(4).  UPS cites <u>American Airlines, Inc. v. Wolens</u>, in which the U.S. Supreme Court held that private contractual obligations of an airline are not preempted by federal law

in the same manner as state statutes, to conclude that plaintiffs' interpretation of the AOD is federally preempted.  <u>See</u> 513 U.S. 219, 222 (1995).

This argument is flawed in at least two respects.  First, it is premised on an incorrect, overly narrow interpretation of the AOD's audit provision.  As discussed above, plaintiffs are correct that a violation of the audit provision occurs on the date when UPS first fails to audit a shipper in compliance with its obligations, and that each and every package tendered to UPS thereafter effects a separate a violation.  This interpretation of the audit obligation is therefore within the terms of the AOD contract.  <u>See</u> <u>Wolens</u>, 513 U.S. at 222 ("We hold that the [Airline Deregulation Act's] preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves.").

Second, the Court views this as an effort by UPS to shoehorn a federal preemption challenge to § 471 and PHL § 1399-<u>ll</u> into an argument about interpretation of the AOD.  This reflects an incorrect understanding of the FAAAA.  Indeed, UPS's argument was tried and lost in 2003 by parties in another cigarette contraband case in New York.  <u>See</u> <u>Ward v. New York</u>, 291 F. Supp. 2d 188, 207-19 (W.D.N.Y. 2003).  In <u>Ward</u>, plaintiff smoke shops raised the FAAAA preemption argument as a reason why PHL § 1399-<u>ll</u> was inapplicable.  The court there reviewed the argument in detail and correctly rejected it.

Federal preemption may be express or implied; whether it is one or the other is determined by the language of the statute.  <u>Ace Auto Body & Towing, Ltd. v. City of New York</u>, 171 F.3d 765, 771 (2d Cir. 1999) (citing <u>Morales v. TransWorld</u>

Airlines, Inc., 504 U.S. 374, 382 (1992)).  Accordingly, analysis of preemption must begin with analysis of the statutory text.  Ace Auto, 171 F.3d at 771.  In addition, courts must "start with the assumption that the historic policy powers of the States [are] not to be superseded . . . unless that is the clear and manifest purpose of Congress."  Id.; Ward, 291 F. Supp. 2d at 209.

Here, the FAAAA expressly preempts state and local laws.  It provides that a state "may not" enact/enforce a law related to, inter alia, price, route, or service of any motor carrier with respect to transportation of property.  49 U.S.C. § 14501(c)(1).  As in Ward, the question here is what it means for a statute to be "related to" price, route, or service of a motor carrier.  Ward, 291 F. Supp. 2d at 208.

The FAAAA was designed to "even the playing field between motor and air carriers."  Id. at 209 (citing Californians for Safe & Competitive Dump Truck Transp. v. Mendoza, 152 F.3d 1184, 1187 (9th Cir. 1998)).  In Mendoza, the court observed that state law would not be preempted if it affects carriers in too tenuous or remote a manner.  Mendoza, 152 F.3d at 1188; see also Morales, 504 U.S. at 390.  State laws that only have indirect, peripheral effects on the subject matter of the FAAAA are not sufficiently "related to" it.  Cf. N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661-62 (1995).

Here, PHL § 1399-ll is a public health law.  It has been enacted pursuant to the State's historic police powers.  See Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 216-17 (2d Cir. 2003).  There is therefore a presumption against preemption at the outset.

The question is next whether Congress expressed a purpose to preempt this type of state regulation.  It did not.  The FAAAA's preemption provision was designed to override economic regulation of interstate carriers, "not local safety regulation."  Ace Auto, 171 F.3d at 776; see also Ward, 291 F. Supp. 2d at 209.  On its face and throughout the text, PHL § 1399-ll is designed and intended to address public health issues associated with smoking.  It is only one of a number of similar New York laws that regulate transport of items implicating public health and safety (e.g., fur, skin, hair, meat, alcoholic beverages, invasive species).  See Ward, 291 F. Supp. 2d at 210 (citing N.Y. Agric. & Mkts. Law § 96-h, N.Y. Alco. Bev. Cont. Law § 152, and N.Y Envt'l Conserv. Law. § 11-0507(4)).  These and other similar laws may have a peripheral impact on the business of carriage but are not preempted by the FAAAA because of Congress's intent to preserve state control over such items.  In short, PHL § 1399-ll is first and foremost a public safety regulation—not a carriage regulation.

The fact that PHL § 1399-ll places special burdens on carriers does not change this result.  In this regard, the statute presumes that if cigarettes are transported to a home or residence, the carrier knew that the person was not authorized to receive them.  This "home delivery" presumption does not alter the primary character of the statute as concerning public safety.  But in any event, it is a presumption concerning the status (i.e., "unauthorized") of the package's recipient, not its contents.  See Ward, 291 F. Supp. 2d at 210.

The CCTA and § 471 are analyzed similarly.  Both are directed at public safety.  In addition, the CCTA in fact carves out of its definition of contraband "a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source and destination of such cigarettes."  18 U.S.C. § 2341(2)(B).

## XVII.  UPS'S REMAINING DEFENSES

### A.    Unclean Hands/In Pari Delicto

UPS has argued that plaintiffs may not recover for any of the asserted violations based on their own unclean hands or fault.  The offending conduct to which UPS points includes the State's forbearance policy, the fact that one state trooper apparently responded to one inquiry from UPS by stating that it should proceed with "business as usual," and plaintiffs' failure to provide UPS with information regarding cigarette shippers in plaintiffs' possession.

To support its "unclean hands" defense, UPS must show "egregious" misconduct by plaintiffs.  See, e.g., SEC v. Durante, 641 F. App'x 73, 78 (2d Cir. Mar. 8, 2016); Republic of Iraq, 768 F.3d at 168 (noting that such egregious misconduct "must 'shock the moral sensibilities'" (quoting Art Metal Works, Inc. v. Abraham & Straus, Inc., 70 F.2d 641, 646 (2d Cir. 1934) (L. Hand, J., dissenting))); Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 214 N.E.2d 361, 362-63 (N.Y. 1966) (holding that the doctrine of unclean hands "is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking

to invoke the doctrine was injured by such conduct" (internal quotation marks omitted)); <u>SEC v. Am. Growth Funding II, LLC</u>, No. 16-cv-828, 2016 WL 8314623, at *3 (S.D.N.Y. Dec. 30, 2016) ("[W]here courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." (quotation marks and citations omitted)).

The doctrine of <u>in pari delicto</u> reflects similar principles.  To establish this defense, UPS must show that plaintiffs "participated in wrongdoing equally with" UPS; if it meets this burden, then plaintiffs may not recover damages.  <u>Republic of Iraq</u>, 768 F.3d at 160.  This defense amounts to a showing that "as a direct result of the plaintiff's affirmative wrongdoing, the plaintiff bears at least substantially equal responsibility, for the [same] violations of which it complains."  <u>Id.</u> at 167-68 (citations and internal quotations omitted).  In other words, "[n]ot only must the plaintiff 'be an active, voluntary participant in the unlawful activity that is the subject of the suit,' but it is necessary that 'the degrees of fault [be] essentially indistinguishable or the plaintiff's responsibility [be] clearly greater.'"  <u>Id.</u> at 162 (quoting <u>Pinter v. Dahl</u>, 486 U.S. 622, 636 (1988)).  This is because "[p]laintiffs who are truly <u>in pari delicto</u> are those who have themselves violated the law in cooperation with the defendant."  <u>Pinter</u>, 486 U.S. at 636 (quotation marks omitted); <u>see also</u> <u>Republic of Iraq</u>, 768 F.3d at 168.

UPS bears the burden of proof on this affirmative defense.  <u>See</u> <u>Kirschner</u>, 938 N.E.2d at 513 n.3.  As a factual matter, it has failed to carry it.  Thus, the Court

need not address whether plaintiffs' status as government entities eliminate or limit the availability of these defenses.

First, the State's forbearance policy suggests only "rational" government conduct. <u>N.Y. Ass'n of Convenience Stores v. Urbach</u>, 712 N.Y.S.2d 220, 222 (N.Y. App. Div. 3d Dep't 2000). And the State's asserted withholding of information fails to suggest any constitutional prejudice to UPS. See <u>SEC v. Durante</u>, No. 01-cv-9056, 2013 WL 6800226, at *12 (S.D.N.Y. Dec. 19, 2013) (noting that a 10-year "delay" in enforcement is not "egregious"). The facts do not support anything approaching egregious misconduct or wrongdoing equal with that of UPS.

B.    <u>Waiver</u>

UPS also asserts that plaintiffs have waived their claims. This is based on the circumstances relating, <u>inter alia</u>, to forbearance and, separately, to the Attorney General's 2011 investigation.

Waiver is the intentional relinquishment of a known right. <u>U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.</u>, 775 F.3d 128, 136 (2d Cir. 2014). Conduct said to constitute a waiver "must be clear and unequivocal, as waivers are never to be lightly inferred." <u>Id.</u>; <u>Gilbert Frank Corp. v. Fed. Ins. Co.</u>, 520 N.E.2d 512, 514 (N.Y. 1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed."). Courts will only infer a waiver "where the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them. Mere negligence, oversight, or thoughtlessness does not create a waiver." <u>Windstream</u>, 775 F.3d at 136 (internal citations and quotation marks omitted).

178

Generally, delay in government enforcement in the public interest does not constitute a waiver or justify the application of laches. See United States v. Angell, 292 F.3d 333, 338 (2d Cir. 2002) ("[L]aches is not available against the [sovereign] when it undertakes to enforce a public right or protect the public interest.").

Putting aside that the plaintiffs here are governmental entities, the facts here fail to support a waiver. Plaintiffs did not know all relevant facts until discovery in this matter, and, as a factual matter, there is insufficient evidence of an intentional relinquishment of a known right. Thus, this defense fails. Again, therefore, the Court need not reach the question of whether plaintiffs' status as governmental entities eliminates or limits the availability of this defense.

C.    Public Authority and Estoppel

UPS has also asserted public-authority, entrapment-by-estoppel, general estoppel defenses. These defenses fail as a matter of fact. UPS bases these defenses principally on the forbearance policy and purported instructions by Officer Nitti to UPS employee Terranova. As stated above, there is no evidence that anyone at UPS relied upon the State's forbearance policy when agreeing to transport cigarettes. In addition, as a factual matter, and for the reasons also stated above, the Nitti/Terranova conversations cannot ground this defense. Even if UPS had relied on the Nitti/Terranova communications, it would have been unreasonable to do so.

The public-authority defense and the related entrapment-by-estoppel defense have only been applied within the limited confines of a criminal action,

which this case is not.  See, e.g., Cox v. Louisiana, 379 U.S. 559, 569-71 (1965)

(addressing estoppel defense to a criminal conviction under Louisiana state law);

United States v. Giffen, 473 F.3d 30 (2d Cir. 2006) (addressing, inter alia, Federal

Rule of Criminal Procedure 12.3, which governs the notice requirement for a

defendant's assertion of a public authority-defense, and defendant's criminal

indictment for violations of several federal statutes); United States v. Schwartz, 924

F.2d 410, 421-22 (2d Cir. 1991) (addressing defendants' appeal of their convictions

from criminal violations of RICO, among other federal statutes).

Even assuming, arguendo, that these criminal-law defenses could be

imported into a civil-law dispute, UPS's evidence at trial fails to support such

defenses.  In order for a defendant to succeed in raising these defenses, he or she

must have revealed the full extent of his or her criminal acts or illegal conduct—

simply raising a "reasonable suspicion" is insufficient.  Giffen, 473 F.3d 30, 40 n.9

(noting that "[b]ecause neither Giffen nor the defendants in Schwartz revealed their

criminal acts, in neither case could governmental authorization to do the acts

revealed constitute authorization to do the illegal acts that were not revealed"); id.

41 n.10 (noting that "in order to establish authorization of criminal conduct through

the approval by government officials of the acts he described, Giffen must have

reasonably clearly revealed the criminal aspect of those acts—not merely raised a

suspicion about it").

Here, Terranova never disclosed to Nitti the unlawful nature of UPS's

deliveries—i.e., that UPS's bulk shipments were being delivered by UPS to persons

that were not licensed or authorized pursuant to federal or state law to possess such cigarettes.  (See Terranova Decl., DX 612 ¶¶ 1-2, 7 (failing to identify where such bulk shipments of cigarettes were being delivered); Trial Tr. 1529:20-1530:24 (Terranova) (failing to identify where the cigarettes were being delivered to); id. 1532:20-25 (Terranova) (testifying that he did not reveal to Nitti the names of the shipper accounts and that he no idea where the cigarettes being picked up by UPS were being delivered).)

Indeed, the source of Terranova's information—Steve Talbot, former UPS Potsdam dispatch/preload supervisor—never told Terranova where or to whom the "bulk shipments" of cigarettes were being delivered.  (Talbot Decl., DX 606 ¶¶ 1, 7-9; see also id. 1267:1-14 (Talbot) (Talbot testifying that he did not recall where the cigarettes were being sent to, and did not recall the details of his conversation with Terranova); id. 1254:23-25 (Talbot) (Talbot testifying that he suffered a head injury roughly five or six years ago—i.e., around the time of his conversation with Terranova); id. 1255:1-3 (Talbot) (Talbot testifying his head injury affected his short-term memory).)  Terranova, moreover, took no steps to determine where, or to whom, such cigarettes were being shipped.  (See, e.g., Trial Tr. 1528:9-11 (Terranova) (Terranova testifying that he did not ask Talbot any questions during his phone conversation with him); id. 1533:23-25 (Terranova testifying that he did not contact any other UPS Centers regarding his conversation with Nitti); id. 1274:23-25 (Talbot) (Talbot testifying that he and Terranova never discussed conducting an audit).)

UPS's records are furthermore devoid of any such phone conversation between Terranova and Nitti.  (See Trial Tr. 1528:12-1529:7 (Terranova) (Terranova testifying that UPS policy required him to document all investigations in UPS's IRS system); id. 1534:20-22 (Terranova) (Terranova testifying that he could not recall documenting his conversation with Nitti); see also id. 1268:16-20 (Talbot) (Talbot testifying that he did not record his phone conversation with Terranova); id. 1268:23-25 (Talbot) (Talbot testifying that he did not make a practice of recording his phone calls with UPS Security); id. 1269:15-18 (same)).

Given such evidence (or the lack thereof), in terms of the "public authority" defense, Nitti could not have "authorized" UPS's illegal or criminal conduct because, as shown above, Terranova had no idea whether such deliveries were unlawful, much less failed to disclose any facts that would suggest UPS's delivery of cigarettes to individual consumers or persons otherwise not authorized to possess such cigarettes.  As a result, UPS cannot take advantage of the actual public-authority defense.

Similarly, UPS's entrapment-by-estoppel defense fails.  For this defense, a defendant must show that "he reasonably relied on the statement or conduct of a government official when he engaged in the conduct with which he is charged." United States v. Tonawanda Coke Corp., No. 10-cr-219, 2013 WL 672280, at *3 (W.D.N.Y. Feb. 22, 2013); see also United States v. Miles, No. 11-cr-581, 2012 WL 4178274, at *4 (S.D.N.Y. Sept. 20, 2012).  There must also be "'an affirmative representation' that the proscribed conduct 'was or would be legal,' not an

affirmative representation that the proscribed conduct was against the law." Miles, 2012 WL 4178274, at *4.

Perhaps most importantly, the defendant must similarly show "that he reasonably disclosed the conduct alleged in the indictment to the government before or at the time of authorization.  That is, the disclosure and authorization must be linked." Tonawanda Coke, 2013 U.S. Dist. LEXIS 25398, at *9 (internal citations omitted) (citing cases); see also Giffen, 473 F.3d at 42 (rejecting a defendant's entrapment-by-estoppel defense where "[he] failed to apprise the government officials that he was engaged in bribery and fraud, [accordingly,] we do not see how [he] could have reasonably understood the officials' response as authorization to engage in bribery and fraud").

Here, as shown above, at no point did Terranova reveal the illegal or criminal nature of UPS's actions, because Terranova himself did not know (and did not take any steps to determine) who the intended recipients of UPS's delivered cigarettes were.  Given such evidence, UPS's entrapment-by-estoppel defense is unsupported and fails as a matter of law.

XVIII.   DAMAGES

The Court has found that UPS violated its obligations under the AOD, the PACT Act, PHL § 1399-ll,[137] and the CCTA.  The Court turns now to the related questions of compensatory damages and penalties.

---

[137] Damages under N.Y. Exec. Law § 63(12) are the same as damages under PHL § 1399-ll.

This is not the first case, nor will it be the last, where plaintiffs focused their energies so intensely on questions of liability that they shortchanged their damages case.  UPS has made serious motions to strike plaintiffs' damages altogether based on two separate and self-inflicted wounds: (1) plaintiffs' failure to provide a robust pre-trial damage computation pursuant to Federal Rule of Civil Procedure 26, and (2) their failure to anticipate evidentiary issues with the trial presentation of their damages claim.[138]  The Court addresses the pre-trial issues first, and then proceeds to damages issues that arose during the trial.  Ultimately, the Court finds that admitted evidence supports reasonable inferences regarding damages and penalties, and that the methodology the Court applies here does not require the use of an expert.

A.   UPS's Pre-Trial Damage Disclosure

The original complaint in this case contained a prayer for relief seeking damages, penalties, injunctive relief, and the appointment of a monitor.  (ECF No. 1 at 39.)  Those requests are contained in the operative complaint as well.  (ECF No. 189 at 48.)  There was never any doubt that the case was significant—the acknowledged reality of that fact was evident in the robust staffing and vigorous litigation by both sides.  Nevertheless, a defendant may know that a case is big—even very big—and yet not understand how big, or how the plaintiffs intend to

---

[138] It would have been far easier, and safer, to have retained a damages expert.  Perhaps cost informed plaintiffs' decision not to do so—the Court cannot know.  Plaintiffs should understand that, while the Court ultimately determines that they are entitled to certain damages, the motion to preclude all damages was quite a serious one.

prove their particular claims.  The Federal Rules of Civil Procedure are designed,
inter alia, to prevent trial by ambush.  This applies to liability and damages issues
equally.  Defendant asserts that it was not provided with disclosures to which it was
entitled under Rule 26(a)(1)(A)(iii), and that this Court should preclude plaintiffs'
damage claim on this basis.  The Court declines to do so.  While plaintiffs could
have had a more robust Rule 26 disclosure—and indeed, should have—the Court
finds that, under all of the relevant circumstances, preclusion of damages is
unwarranted.

The Court's conclusion is based on a number of factors.  To start, the Court
agrees with defendant's basic premise that Rule 26(a)(1)(A)(iii) is designed to
prevent undue surprise regarding damages.  It requires every plaintiff to provide its
opponent with "a computation of each category of damages claimed" and requires
disclosure of "the documents or other evidentiary material, unless privileged or
protected from disclosure, on which each computation is based, including materials
bearing on the nature and extent of injuries suffered."  Fed. R. Civ. P.
26(a)(1)(A)(iii).

The case law contains a number of examples of defendants seeking
preclusion of damages for failure to comply with Rule 26.  This Court has itself, on
the facts of particular cases, granted such motions.  While Rule 26(a)(1)(A)(iii)
provides for mandatory—not discretionary—obligations on the parties, a Court's
determination to impose preclusion as a penalty for failure to comply is
discretionary.  See Design Strategy, Inc. v. Davis, 469 F.3d 284, 294 (2d Cir. 2006).

The Court has previously concluded that the principles underpinning Rule 26(a)(1)(A)(iii) apply to penalties as well as compensatory damages.  (See ECF No. 413.)

It is not uncommon for plaintiffs to seek to delay the time that they must commit to a damages calculation, and it is common for a defendant to press the issue.  That occurred here.  By Order dated February 1, 2016 (ECF No. 169), this Court required plaintiffs to provide UPS with information regarding the nature of plaintiffs' expected proof regarding an exemplar shipper.  Plaintiffs complied with that order with a disclosure dated March 3, 2016.  (See ECF No. 396-3.)

Plaintiffs' March 3, 2016 disclosure provided detailed information, in chart form, for the "Arrowhawk Group" of shippers (which then, as now, included Arrowhawk Cigars, Seneca Cigars, Two Pine Enterprises, and Hillview Cigars).  Citing documents identified by Bates number from UPS's production, the March 3, 2016 disclosure referenced the total number of packages transported by UPS.  Plaintiffs stated that they expected to prove that these shipments all contained cigarettes based on, inter alia, witness testimony (which they described) and shipping invoices.  Plaintiffs further outlined that they intended to prove UPS's knowledge that these shipments contained cigarettes based on circumstantial evidence of the pickup location, signage, and inventory.  In addition, plaintiffs indicated that testimony from and relating to UPS drivers would be used to support their claims.  This is, in fact, what plaintiffs did.

Based on this evidence (which plaintiffs detailed in three single-spaced pages), plaintiffs set forth a chart that indicated that plaintiffs would each seek damages relating to separate violations of the CCTA, RICO, PACT Act, PHL § 1399-ll, and the AOD.[139]  The chart further indicated the amounts for each claim for the exemplar shipper group.

Following the chart, plaintiffs disclosed the methodology they intended to use to arrive at their particular calculation for compensatory damages under the CCTA, including a computation of cartons of cigarettes based on the number of packages, the average weight of the packages, and the average weight of a carton of cigarettes.  In total, plaintiffs' disclosure revealed that they would be seeking over $100 million dollars for this shipper group alone.  The other shipper groups at issue were well known by this point in the litigation (and, as defendant itself has noted, the initial list of shippers at issue shrunk between the time the case was filed and trial).

Plaintiffs' March 3, 2016 disclosure complied with this Court's Order of February 1, 2016, which required only an exemplar calculation.  Defendant did not seek reconsideration of that limitation.  There is no doubt that UPS possessed the information to replicate this same calculation for each shipper at issue: It knew the shippers, it could easily locate the same types of documents for each, and it knew plaintiffs' general methodology.  But more than that, the calculations were ultimately based on known data points: penalty ranges generally set forth in the

---

[139] The RICO claims were dismissed by Opinion & Order dated August 9, 2016.  (ECF No. 322.)

AOD and statutory schemes at issue, and compensatory damages based on the statutory tax rate imposed on a carton of cigarettes.

While this was a "big" case—insofar as it was anticipated from the outset that the number would be big as it concerns a number of shippers—it was not a particularly complicated one. In addition, several weeks prior to trial, plaintiffs offered to provide defendant with a full calculation for each shipper. To the extent there was any remaining mystery, agreeing to accept this calculation would have eliminated it. For reasons never explained but assumed to be tactical, defendant declined that offer. Had defendant agreed to receive the calculation, it would have been able to review it, assess prejudice based on late disclosure, and, if necessary, seek an adjournment. This Court is left with the distinct impression that UPS's refusal to accept the calculation was a considered move designed to retain a "cleaner" position on the very motion now under consideration. This Court is, however, also left with the distinct impression that UPS had sufficient information about the methodology to prepare for trial.

The key question is whether there is any real prejudice to UPS from the incomplete March 3, 2016 disclosure combined with the trial disclosure of damages sought. From the opening statement onward UPS expressed outrage that plaintiffs could seek such a significant sum—over $800 million—without a full Rule 26 disclosure. But the Court's February 1, 2016 order had allowed just that, and in any event defendant turned down a full calculation several weeks before trial. UPS ignored the fact that plaintiffs' March 3, 2016 disclosure had left them in no

suspense as to the magnitude of the case—it disclosed over $100 million in damages; one could easily assume that the addition of the remaining shipper groups would add significantly to that figure.

But UPS also had some specific complaints as to plaintiffs' pre-trial disclosure compared to their trial disclosure. Notably, certain assumptions plaintiffs included in their March 3, 2016 disclosure changed. For instance, in calculating compensatory damages (based on lost tax revenue), plaintiffs attempted to estimate how many cartons were at issue. This requires calculation of how many cartons are in a package. It is certainly true that plaintiffs' position on the appropriate weight assumption (per package or per box) changed—but of course, that is only one input, and one which defendant itself could counter at trial with the information it easily had at its disposal. Changes in such facts alone would rarely form a basis for preclusion.

UPS asserts that it was prejudiced in other ways, as well. It argues that plaintiffs' failure to make adequate pre-trial disclosures prevented it from identifying appropriate rebuttal witnesses and testimony. This argument rings hollow. UPS had a detailed disclosure regarding the Arrowhawk Group yet did not identify any rebuttal witnesses or seek to counter even that disclosure with an expert. Had UPS done that, its argument that it was prejudiced by a lack of information regarding other shippers would carry more weight. And in all events, as to one main source of proof—the delivery spreadsheets—UPS knew as of March 3, 2016, that these spreadsheets would be used in connection with the calculations

189

for all shippers.  If UPS believed the spreadsheets were unreliable or were being relied upon in an inappropriate manner, it could have called a witness to explain why.  It did not do so.

As discussed further below, the Court views UPS as having made deliberate, tactical choices as to how it would approach plaintiffs' damages case: It drew careful lines to position this preclusion argument as best it could.  In the end, the Court is not convinced that UPS lacked adequate pre-trial notice to counter plaintiffs' damages claim, nor is it convinced that UPS suffered any real prejudice. Defendant's motion to preclude based on inadequate Rule 26 damages disclosure is therefore DENIED.

> B.        Legal Principles Regarding Damages

Plaintiffs seek compensatory damages in connection with their CCTA and PACT Act claims, as well as penalties for violations of the AOD, the PACT Act, and PHL § 1399-ll.

> 1.      Compensatory Damages

Plaintiffs seek compensatory damages under the Pact Act and CCTA for lost tax revenues associated with non-tribal members' receipt of unstamped cigarettes.  The facts make it clear that unstamped cigarettes were delivered to such consumers.  However, how much lost tax revenues is properly associated with such shipments is open to serious debate.

Defendants argue that to prove entitlement to such damages, plaintiffs bear the burden of proving a causal connection between UPS's transport of cigarettes

and lost tax revenues.  Plaintiffs argue that such a causal connection is not required but that, in any event, they have shown one.

Plaintiffs are incorrect; a causal connection is required.  As described above, lost tax revenues are a type of compensatory damages.  Compensatory damages are intended to put a plaintiff back into "a position substantially equivalent to the one that he or she would have enjoyed had no tort been committed." Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 52 (2d Cir. 2015).  Plaintiffs "bear[] the burden of proving damages with reasonable certainty[.]" Raishevich v. Foster, 9 F. Supp. 2d 415, 417 (S.D.N.Y. 1998); see also Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013).  Courts "will not permit recovery when the connection between the claimed loss and the tortious act is speculative or uncertain." Anderson, 805 F.3d at 52.  This means plaintiffs "bear[] the burden of showing that the[ir] claimed damages are the 'certain result of the wrong.'" Id. at 52-53.  That said, when uncertainty in proving damages is caused by the defendant's own wrongful act, "justice and sound public policy alike require" that the defendant "bear the risk of the uncertainty thus produced." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 565 (1931); see also Whitney v. Citibank, N.A., 782 F.2d 1106, 1118 (2d Cir. 1986) ("When a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated.").

As discussed above, this Court has found that UPS is responsible for transporting cigarettes to unauthorized recipients.  But the determination of

191

compensatory damages is complex: Had UPS not transported such cigarettes, would the recipients of such shipments have purchased stamped cigarettes in New York City and New York State?  In other words, have plaintiffs demonstrated that UPS's transport of unstamped cigarettes more likely than not led to a quantifiable loss in tax revenues?

As an initial matter, the evidence strongly supports consumer motivation to purchase unstamped cigarettes as a method of acquiring lower-cost cigarettes. However, the evidence supports that when prices of cigarettes increase, a non-trivial number of consumers switch to lower-cost tobacco products (such as little cigars); the evidence also supports consumers seeking lower-cost cigarettes going to other states with lower tax rates; and the evidence further supports some consumers faced with higher-cost cigarettes ceasing use altogether.[140]

On the other hand, even Dr. Nevo agrees that up to 5.4% of package recipients might have purchased stamped/taxed cigarettes instead.  This percentage

---

[140] Dr. Nevo opined that—in a "but-for world" where the untaxed cigarettes allegedly shipped by UPS were not available—very few purchasers of unstamped cigarettes would instead have purchased New York-tax-paid cigarettes.  (Nevo Decl., DX 613 ¶¶ 11, 12.)  Dr. Nevo concluded that the purchasers would have diverted to other untaxed cigarettes and non-cigarette alternatives (such as little cigars, cigars, and smokeless tobacco) while some would also have simply quit altogether.  (Id. ¶¶ 38-40.) Dr. Nevo concluded that buyers of the cigarettes at issue have revealed that they are less brand loyal and more price sensitive, and, therefore, are far more likely to purchase untaxed or low-taxed cigarettes or other, lower-cost non-cigarette tobacco products and nicotine products than an average consumer.  (Id. ¶ 39.)  Dr. Nevo's testimony relied, in part, on the New York Adult Tobacco Survey. This survey was not representative of the consumer base at issue, and the Court considers it to be weak evidence.  However, based on this flawed survey, Dr. Nevo opined that mail-order purchasers of cigarettes, such as those here, are 76% more likely than all other smokers to make a special effort to obtain low-priced cigarettes, 308% more likely to report that cigarette prices influenced their use of other non-cigarette tobacco products, 132% more likely to purchase cigarettes from an out-of-state or out-of-country supplier, and 28% more likely to purchase cigarettes from a Native American reservation.  (Id. ¶ 55 Table 5.)

Dr. Nevo ultimately estimated that diversion in the but-for world from the untaxed cigarettes at issue to NY-tax-paid cigarettes would be between zero and 5.4%.  (Id. ¶ 63.)

is unduly low.  First, it ignores that seizures of packages occur without prior notice—thus, consumers relying on the delivery of unstamped cigarettes to satisfy their addiction would not be able to quickly take the various actions necessary to immediately replace them (for instance, driving to another state or placing an order with another company using a different courier).  Dr. Nevo does not consider this issue.  Nor does he consider the transportation limitations of New York City dwellers in accessing cars to drive out of state.  These timing and location issues are two serious flaws with Dr. Nevo's 5.4% number.

On balance, the Court cannot arrive at a precise number of cigarette cartons consumers would have purchased, but 50% is a reasonable number based on the totality of facts.  The Court therefore finds plaintiffs are entitled to compensatory damages in the amount of 50% of Cartons (defined below) shipped by the Liability Shippers.  Plaintiffs shall submit to the Court for its review separate compensatory damages calculations for plaintiffs successful claims under the PACT Act and CCTA, in accordance with the findings and timeframes detailed by the Court in this Opinion.

2.   Penalties

The AOD and each of the statutory schemes provide for the assessment of penalties.  In general, civil penalties are designed in some measure "to punish culpable individuals" and not "simply to extract compensation or restore the status quo."  Tull v. United States, 481 U.S. 412, 422 (1987); accord Johnson v. SEC, 87 F.3d 484, 492 (D.C. Cir. 1996) ("[T]he ordinary, contemporary, common meaning of

the word 'penalty,' [is] a sanction imposed by the government for unlawful or proscribed conduct which goes beyond remedying the damage caused to the harmed party.").  Penalties are also designed to "deter future violations" and "prevent[] [the conduct's] recurrence."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185-86, 188 (2000); see also id. (explaining that remedies, such as civil penalties, encourage defendants to discontinue violations that were ongoing at the time of the complaint and to deter defendants from committing future violations even if they can afford to compensate injured plaintiffs).

There is an "enormous range of penalties available to the district court in the usual civil penalty case."  United States v. J.B. Williams Co., Inc., 498 F.2d 414, 439 (2d Cir. 1974); see also id. at 438 (A district court may properly consider "a number of factors" in determining the size of a civil penalty, "including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay.")  The Second Circuit has articulated the factors a court should consider as follows: (1) the level of the defendant's culpability, (2) the public harm caused by the violations, (3) the defendant's profits from the violations, and (4) the defendant's ability to pay a fine.  Advance Pharm., Inc. v. United States, 391 F.3d 377, 399 (2d Cir. 2004).[141]  In Advance Pharmaceuticals, the United States brought a civil

---

[141] Courts also have recognized that it is appropriate to consider the actions of plaintiffs when assessing penalties.  See Milhelm Attea, 2012 WL 3579568, at *33 ("[T]he Court believes that a penalty award in this case should take some account of the fact that state tax authorities actively acquiesced in the defendants' business model for years, despite actual knowledge that large amounts of untaxed cigarettes were being sold and distributed to non-Native Americans as a result of the forbearance regime."); United States v. White-Sun Cleaners Corp., No. 09-cv-2484, 2011 WL 1322266, at *9 (E.D.N.Y. Mar. 9, 2011) (one of the factors a court looks at when determining the amount of damages under the Resource Conservation and Recovery Act is "the government's

enforcement action for statutory violations against defendants, a pharmaceutical manufacturer of pseudoephedrine tablets, and its principals, for failure to report shipments as required by statute.  Failure to comply carried a statutory fine of up to $10,000 per violation.  Id. at 383.  The alleged violations related to nine customers and 159 shipments.  Id. at 385.  Testimony at trial supported gross profits on such shipments in the amount of between $2,918,361 and $5,076,000.  Id. at 389, 400.  The district court imposed a monetary penalty of $2 million; this exceeded the amount sought by the government by $250,000.  The Second Circuit noted that the evidence supported a fine (based on the number of proven violations and the maximum per penalty amount) of $2,490,000.  Id. at 399.  The Second Circuit considered the four factors discussed above and affirmed the award despite defendants' argument that the business could not support the amount.  Id. at 400.

In Tull, the defendant was accused of violating the Clean Water Act.  481 U.S. at 414-15.  Violations of that statute carried penalties of up to $10,000 per day during the period of violation.  Id. at 414.  Despite the fact that the defendant demonstrated that he had realized no profits from his actions, the district court imposed a fine of $35,000.  Id. at 415.  The district court stated that the purpose of such a penalty was not simply disgorgement of profits, but also punishment.  Id. at

conduct"); United States ex rel. Bunk v. Birkart Globistics GMBH & Co., Nos. 02-cv-1168, 07-cv-1198, 2010 WL 4688977, at *8 n.14 (E.D. Va. Nov. 10, 2010) ("[T]he extent of the government's knowledge and its conduct in light of what it knew remains relevant considerations to the Court in considering an appropriate civil penalty.").  The Court takes plaintiffs' conduct into account when assessing appropriate penalties here.  However, the Court notes that UPS is not in the position of the plaintiffs in Milhelm Attea.  UPS is a carriage service that should never have expected forbearance to apply to its actions.

423.  Tull argued on appeal that the district court had inappropriately denied him the right to a jury trial on liability as well as the amount of penalty.  The U.S. Supreme Court found that while he was entitled to a jury trial on liability, Congress had fixed the amount of penalty and delegated that determination to trial judges. Id. at 426.  "In this case," the Court explained, "highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act.  These are the kind of calculations traditionally performed by judges."  Id. (citing Albermarle Paper Co. v. Moody, 422 U.S. 405, 442-43 (1975) (Rehnquist, J., concurring)).

      In Laidlaw, the Supreme Court reiterated the basic principle that the district court has wide discretion to fashion appropriate relief.  See 528 U.S. at 192. It further stated that when choosing an appropriate penalty—whether a fine, injunctive relief, both, or neither—a court "should aim to ensure 'the framing of relief no broader than required by the precise facts.'"  Id. at 193 (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 (1974)).

      The facts before this Court indicate that significant penalties are appropriate. While the precise amount shall be calculated and considered against constitutional principles (as discussed below) in a separate order, the Court discusses the basic factors supporting the imposition of penalties here.

      First, the Court considers the facts above to demonstrate a high level of culpability by UPS.  Numerous separate acts by numerous UPS employees allowed vast quantities of unstamped cigarette shipments to be delivered to unauthorized

196

recipients in New York.  The New York Executive Branch and legislature, along with Congress, had specifically attempted to prevent this with the AOD, the PACT Act (which should have incented compliance with the AOD), the CCTA, and PHL § 1399-ll.  UPS largely relied on its size and weak internal procedures to excuse blatantly culpable conduct.  But there were many, many people within UPS who consciously avoided the truth, for years.  Even so, the Court also recognizes that UPS has now—since the lawsuit was filed—regained its footing.  UPS now approaches compliance with the AOD and the various statutory schemes with renewed vigor and additional processes and procedures.

The second factor is the public harm caused by the conduct.  The State and federal legislatures have deemed transport of cigarettes as a public health issue, and the effects of cigarette usage are well known.  However, it is also the case that UPS is not the cigarette manufacturer or seller—it is a transporter.  Thus, it bears a lower level of culpability for the impact on public health than other entities.  In addition, it is unclear whether, in the absence of UPS's transport of cigarettes, the same public health effects would still be felt.  The Court cannot speculate as to this.  The Court focuses UPS's unlawful enablement of a public health impact that the political branches have proscribed and the costs of which New Yorkers must bear.

The third factor—defendant's profits from the violations—suggests a low amount of penalties.  UPS has focused on its limited revenues and profits from its transport of the shipments at issue.  But these are not the only relevant metrics.  It is also the case that maintaining customers helps UPS's overall competitive

position; if there are many UPS routes in an area, it is reasonable to infer that this assists with the acquisition of business through network effects and economies of scale.

Finally, the Court weighs UPS's ability to pay a fine.  UPS is a large company with significant assets.  Its financial statements are public record.  Not only can it handle a hefty fine, only a hefty fine will have the impact on such a large entity to capture the attention of the highest executives in the company—executives who then, in a rational economic move, will cause changes in practice and procedures to be strictly maintained.  A fine that is in line with only the profits and revenues associated with the conduct would not have this deterrent impact.

C.     Constitutional/Conscionability Issues with Penalties

One of UPS's principal arguments against the penalties plaintiffs seek concerns the aggregate amount.  According to UPS, the total amount in penalties sought by plaintiffs—amounting to some $800 million—significantly exceeds revenue from the shipments at issue and, therefore, its imposition would violate constitutional prohibitions on excessive fines as well as case law limiting civil penalties.  UPS cites United States v. Bajakajian, 524 U.S. 321, 334 (1998), and BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574, 581-83 (1996), for its arguments that the Eighth Amendment's requirement of proportionality and the Fifth Amendment's due process guarantee prohibit this Court from imposing the amount plaintiffs seek.  However, neither these nor other cases regarding penalties impose per se limits on the amount a court may impose.

198

The Eighth Amendment provides, in relevant part, that "[e]xcessive bail shall not be required, nor excessive fines imposed[.]"  U.S. Const. amend. VIII; Bajakajian, 524 U.S. at 327.  In Bajakajian, the Supreme Court observed that it had never before applied the Excessive Fines Clause.  Id.  It had, however, previously determined that the word "fine" as used in this clause means "'payment to a sovereign as punishment for some offense.'"  Id. at 327-28 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989)).  "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense."  Id. at 328 (quoting Austin v. United States, 509 U.S. 602, 609-10 (1993)).  The "touchstone" of the constitutional inquiry is proportionality.  Id. at 335.  "The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish."  Id. at 334.  The Court held that a punitive fine "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."  Id.

In Bajakajian, the defendant was charged with transporting more than $10,000 in currency and violating a reporting requirement when the defendant attempted to board a flight with $357,144.  Id. at 324.  The defendant pleaded guilty, and the government sought forfeiture of the entire amount.  At sentencing, the district court found that while the entire amount was subject to forfeiture under the applicable statute, to impose forfeiture would constitute an excessive fine (it was important to the court's decision in this regard that the amounts at issue were not alleged to be proceeds of criminal activity).  The court imposed forfeiture in the

amount of $15,000, the government appealed, and the Ninth Circuit affirmed.  Id. at 326.

The U.S. Supreme Court first reasoned that forfeitures were a penalty and constituted a fine, bringing them under the Excessive Fine Clause of the Eighth Amendment.  It then turned to the analysis of proportionality.  The Court held that a proportional fine is one that bears "some relationship to the gravity of the offense that it is designed to punish."  Id. at 354.  The Court set forth the standard courts should apply to fines to determine proportionality.  It determined that "[e]xcessive means surpassing the usual, the proper, or a normal measure of proportion."  Id. at 335.

The Court further held that to determine whether a fine is proper or normal, courts should look first to any legislative pronouncement on the issue because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."  Id. at 336 (citing Solem v. Helm, 463 U.S. 277, 290 (1983) ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."), and Gore v. United States, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, . . . these are peculiarly questions of legislative policy.")).  Second, the Court held that judicial determinations regarding the gravity of a particular offense will be "inherently imprecise."  Bajakajian, 524 U.S. at 336.  In light of these two principles, the Court cautioned "against requiring strict proportionality between the amount of the

200

punitive [fine] and the gravity of a criminal offense[.]" Id.  The Court therefore "adopt[ed] the standard of gross disproportionality articulated in [its] Cruel and Unusual Punishment clause precedents." Id. (citing Solem, 463 U.S. at 288, and Rummel v. Estelle, 445 U.S. 263, 271 (1980)).

Precedent therefore instructs courts to look at the amount of the fine compared to the gravity of the offense, a deeply factual question.  In Bajakajian, the Supreme Court found that forfeiture of the entire $357,144 would violate the Excessive Fines Clause because the defendant's crime was solely a reporting offense and unrelated to any other illegal activities.  Bajakajian, 524 U.S. at 337.  The Court further noted that under the Sentencing Guidelines, the maximum fine for such an offense was $5,000.  Id. at 338.  The Court next examined the harm caused by the offense and found that in the case before it, the harm was minimal.  Id. at 339.  Finally, the Court turned to whether any applicable statutes provided guidance; it traced the history of early forfeiture statutes for similar crimes and determined that their original remedial purpose was reimbursement of the government's losses due to evasion of custom duties.  Id. at 341-43.  In the end, the Supreme Court agreed that forfeiture of the entire amount was unwarranted and affirmed forfeiture in the lower amount.  Id. at 344.

Bajakajian guides this Court's analysis.  The Supreme Court instructs that the aggregate penalties imposed by the various statutory schemes are properly analyzed according to the Eighth Amendment proportionality standard.  In this regard, the Court observes the following here: (1) The AOD as well as each of the

statutory schemes at issue are directed to maintaining and furthering important social interests, namely the health of the public and preventing the costs associated with cigarette-related disease; and (2) taxation schemes are designed to further these interests and to raise revenue to offset associated costs. Thus, the basic rationale underpinning the AOD and statutes points to serious and important public interests. The Court further observes that, as discussed in more detail below, the AOD and statutory schemes anticipated the possibility of imposing multiple layers of penalties. For instance, the PACT Act provides an exemption that is contingent: If the AOD is not honored, then the exemption is eliminated. It was understood by Congress that this would expose an entity to AOD penalties, PACT Act penalties, and PHL § 1399-ll penalties. This was a legislative judgment. See Bajakajian, 524 U.S. at 335. Thus, layering penalties reflects congressional intent regarding appropriate punishment. Bajakajian dictates serious consideration of this fact.

Nonetheless, the Court must examine whether, in the aggregate, the penalties become grossly disproportionate to remediation or deterrence under the Eighth Amendment. In this regard, the Court turns to the record evidence regarding the societal interests in preventing contraband cigarette trafficking, and the associated health costs of cigarette use. The trial declaration and testimony of Dr. Angell is instructive. As discussed above, Dr. Angell testified that tobacco use kills approximately 28,200 New Yorkers each year, which exceeds the number of deaths caused by alcohol, motor vehicle accidents, firearms, toxic agents, and unsafe

sexual behaviors combined.  (Angell Aff., PX 628 ¶ 5.)  Dr. Angell also testified that

each year, tobacco-related healthcare costs New Yorkers $10.4 billion.  (Id. ¶ 7.)  Dr.

Angell further testified that "tobacco users are price sensitive, and higher taxes on

tobacco products decrease the demand for the affected products."  (Id. ¶ 10.)

Thus far, the Court has focused on the defendant's Eighth Amendment

argument.  As mentioned, defendant also relies on BMW for the proposition that

imposition of the amount of penalties plaintiffs seek would violate their rights

under the Fifth Amendment.  BMW involved punitive damages—it did not concern

the imposition of contractually agreed-upon or statutory penalties.  517 U.S. at 562.

This ground alone distinguishes the case from that before this Court.  But the facts

of BMW are also instructive.  In that case, the plaintiff—Gore—had purchased what

he believed to be a new BMW; he later learned that it had been repainted.  Id. at

563.  At trial, BMW acknowledged that it did not advise its dealers (and hence their

customers) of pre-delivery damage to new cars when the cost of repairs was less

than 3% of the suggested retail price.  Id. at 563-64.  The jury awarded $4,000 in

compensatory damages and $4 million in punitive damages.  Id. at 565.  Defendant

challenged the punitive damage award as grossly excessive and in violation of the

Due Process Clause.  Id.  The state supreme court reduced the award to $2 million

but found no due process violation.  Id. at 567.  The Supreme Court granted

certiorari to review if and when a punitive damages award could violate

constitutional due process.  BMW of N. Am., Inc. v. Gore, 513 U.S. 1125 (1995).

The Supreme Court based its analysis on the "[e]lementary notion[] of fairness enshrined in our constitutional jurisprudence" that a defendant must receive fair notice "not only of conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW, 517 U.S. at 574 (footnote omitted). Three factors led the Court to conclude that the award was grossly excessive and violated due process: the degree of reprehensibility of non-disclosure; the ratio of the punitive damage award to the harm or potential harm suffered by the plaintiff; and the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. Id. at 575-85. The Court noted that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of a defendant's conduct." Id. at 575. The Court cited its statement in an 1852 decision that "exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" Id. (quoting Day v. Woodworth, 13 How. 363, 371 (1852)). "This principle reflects the accepted view that some wrongs are more blameworthy than others." Id. In analyzing this factor, the Court found that "none of the aggravating factors associated with particularly reprehensible conduct is present." Id. at 576.

The Court then turned to the most commonly cited "indicium of an unreasonable excessive punitive damages award:" its ratio to the actual harm inflicted on the plaintiff. Id. at 580. Based on its determination regarding the degree of harm suffered, the Court noted that the award of $2 million was more than 500 times the amount of compensatory damages determined by the jury. Id. at

582. The Court stated that "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula[.]" Id. Finally, the Court turned to statutory schemes that provided for civil penalties for comparable conduct. Id. at 585. The Court noted that the equivalent statutory violation would be for a deceptive trade practice, carrying a maximum fine of $2,000 in the state in which the action was commenced—and penalties ranging from maximums of $5,000 to $10,000 in other states. Based on the totality of specific facts before the Court, it held that the award was in fact constitutionally excessive, and it reversed and remanded the case.

The BMW case is distinguishable from the case before this Court on a number of bases. First, unlike BMW, this case does not present any real notice issues. While defendant has asserted a lack of notice by virtue of a failure to comply with Rule 26, as discussed above the Court has found that argument unpersuasive. Here, the face of the AOD and the statutes themselves set forth quite clearly the penalties that may be imposed for violations. But in addition, the harm in BMW was of a very different nature. BMW was not a class action; it was a single suit by a single plaintiff. The harm that he suffered does not compare to the public interests harmed by assisting in transporting contraband cigarettes on the scale at issue here. See BMW, 517 U.S. at 585-86. In short, while the principles of BMW are useful to bear in mind, the outcome of that case does not dictate the Court's determination as to the appropriate amount of penalties here.

As discussed below, the Court will see the quantum of penalties once it receives the information it directs at the conclusion of this Opinion.

D.     The Penalty Provisions at Issue Here

As stated, each of the AOD, the PACT Act, PHL § 1399-ll, and the CCTA provide for the imposition of penalties.  In this regard, ¶ 42 of the AOD provides for a $1,000 penalty per violation; and the PACT Act provides that a common carrier that violates the statute is subject to a penalty not to exceed $2,500 for a "first violation," and $5,000 for "any violation within 1 year of a prior violation."  15 U.S.C. § 377(b)(1)(B).  The PACT Act explicitly provides for the imposition of a civil penalty that is "in addition to . . . any other damages, equitable relief, or injunctive relief awarded by the court . . . ."  Id. § 377(b)(2).

PHL § 1399-ll provides for penalties in an amount not to exceed the greater of (a) $5,000 for "each such violation;" or $100 for "each pack of cigarettes shipped, caused to be shipped or transported in violation[.]"  PHL § 1399-ll(5).[142]  While both the State and the City may recover civil penalties under this provision, "no person shall be required to pay civil penalties to both the state and a political subdivision with respect to the same violation of this section."  Id. § 1399-ll(6).  That is, PHL § 1399-ll prohibits duplicative damages.

The CCTA provides that a State or local government may bring an action to obtain appropriate relief, including civil penalties.  The CCTA does not specify the

---

[142] The State and City seek penalties only at the rate provided for prior to the amendment of the statute in 2013.  See New York v. United Parcel Serv., No. 15-cv-1136, 2016 WL 4094707, at *2 n.2. (S.D.N.Y. June 10, 2016).

amount of penalties, nor whether they are to be assessed on a per-violation basis or otherwise.  The CCTA does, however, provide that such remedy is in addition to those also available under federal, State or local law.  18 U.S.C. § 2346(b)(1)-(3).[143]

E.    Calculation of Penalties[144]

The Court turns to the complicated question of determining the appropriate penalties to be imposed for the violations of the AOD and various statutory schemes.  The facts and case law indicate a number of considerations.

1.    Defining a Package

With respect to the AOD and each of the statutes, plaintiffs seek the imposition of penalties on a "per package" basis.  To determine what packages are counted with regard to each shipper, plaintiffs referred at trial—as they did in their March 3, 2016 disclosure—to UPS's delivery spreadsheets: They sort these spreadsheets by account number and add up the packages shipped.  Neither the plaintiffs nor UPS presented witness testimony with regard to the delivery spreadsheets.  Rather, they each seek to have the Court draw inferences from information on the face of the spreadsheets themselves.  For plaintiffs, the exercise

---

[143] Certain cases have suggested that that the Court may look to the analogous penalty provisions of the PACT Act.  See, e.g., Cnty. of Suffolk v. Golden Feather Smoke Shop, Inc., No. 09-cv-162, 2016 U.S. Dist. LEXIS 109176 (E.D.N.Y. Aug. 16, 2016); City of New York v. Golden Feather Smoke Shop, Inc., No. 08-cv-3966, 2013 WL 5502954 (E.D.N.Y. Oct. 1, 2013).

[144] UPS has vigorously argued that the Court should not consider what has been marked for identification as "Court Ex. 1."  That exhibit was presented by plaintiffs during opening arguments and sets forth a calculation by claim of penalties sought.  The Court has not relied on Court Ex. 1.  Therefore, the arguments made to preclude its admission into evidence are irrelevant.  As discussed herein, the Court ultimately determines that the appropriate methodology is to simply add up the packages at issue consistent with the instructions provided by the Court herein.

is straightforward: All packages are summed and duplications are eliminated.  The

Court views this approach as generally sensible, with the caveats described below.

For its part, UPS argues that simply counting packages captures many

categories of packages that should be excluded.  According to UPS, because

plaintiffs are only entitled to count packages containing cigarettes, counting letter-

sized envelopes makes no sense (Native Wholesale, for instance, shipped a number

of these).  Similarly, according to UPS, since the evidence at trial supports a carton

(of cigarettes or little cigars) as weighing approximately one pound, packages

weighing less than a pound should also not be included.  The Court agrees with both

of these arguments.  The spreadsheets are in Excel format and are searchable, and

it is straightforward to exclude both of these categories from the penalties assessed

below (along with duplicative entries).

UPS further argues that packages billed to third parties or billed "collect"

should be excluded.  The Court disagrees.  There is no evidence in the record that

the identity of the billed party made it less likely that cigarettes would be included

in the package.  Indeed, in certain instances involving Seneca Promotions and

Native Wholesale Supply, for instance, the billed third party made it more likely

that cigarettes would contain cigarettes.  The Court does not require such packages

to be excluded.

UPS also argues that plaintiffs have included packages that have been

shipped "to" the shipper, rather than those tendered by the shipper.  From the

Court's review of the spreadsheets, it appears that there may be instances of this.

208

As the penalties in this matter are assessed based on what shippers tendered to UPS, only packages tendered by the Liability Shippers should be included.

UPS next argues that plaintiffs have inappropriately included packages returned to the shipper as undeliverable; the Court does not view that fact as reducing UPS's liability for having transported the package in the first instance. Once a package containing cigarettes is on its way to an unauthorized recipient— and UPS knows that—UPS has violated the AOD and statutes at issue.  Whether that package is ultimately returned or not is irrelevant.  Finally, UPS argues that "voided" packages should also be excluded.  There is no evidence in the record as to what a "voided" package is—it could be a package tendered for shipment and sent out for delivery, or not.  Plaintiffs have proffered the spreadsheets as evidence of shipments, and certainly the weight of the evidence supports that the packages contained on such spreadsheets were tendered for delivery.  UPS has not countered this with specific evidence.  Accordingly, the Court finds that the reasonable inference to be drawn from the "voided" packages is that they were tendered for delivery and therefore are countable.

The Court's determinations above define what constitutes a "Package" for purposes of the imposition of penalties.  Having determined what constitutes a Package, the Court now turns to its method for determining the contents therein.

### 2.   Package Contents

The Court next turns to the rather thorny question regarding package contents.  Throughout this matter, UPS has argued that neither it—nor plaintiffs—

can know the contents of a shipper's package.  The Court makes its findings based on a reasonable approximation based on the preponderance of the evidence.  There is ample evidence as to each Liability Shipper—either direct or circumstantial—to support the fact that packages contained cigarettes.  The Court has further set forth the reasonable approximation as to the particular percentage of its shipments that contained cigarettes versus something else.  Additionally, the Court has set forth its factual and legal findings regarding UPS's knowledge above.

The Court has considered what constitutes a reasonable percentage of package contents that included cigarettes separately for each shipper, based on the facts and circumstances relevant to that shipper.

### 3.   Reasonable Approximation of Contents

It is well established that once the existence of damages is determined, a fact-finder may make a reasonable approximation of their amount.  Tractebel Energy Mktg. v. AEP Power Mktg., Inc., 487 F3d 89, 110 (2d Cir. 2007).  The reasonable approximation of package contents here is done for this purpose.

Under New York law, "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach."  Id.  While a fact-finder "may not base its award on speculation or guesswork," Raishevich v. Foster, 247 F.3d 337, 343 (2d Cir. 2001), a plaintiff "need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach," Tractebel, 487 F.3d at 110 (internal quotation marks omitted).

A reasonable approximation of uncertain data assisting in calculating damages is especially appropriate when a defendant's wrongdoing contributed significantly to that uncertainty. "'Any other rule would enable the wrongdoer to profit by his wrongdoing . . . . It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.'" J. Truett Payne Co. v. Chrysler Motor Corp., 451 U.S. 557, 566 (1981) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946)). In these circumstances, a plaintiff has "no obligation to offer a mathematically precise formula as to the amount of damages." Raishevich, 247 F.3d at 343. Rather, the fact-finder may determine the amount of damages "within a certain range," and when damages are "at some ascertainable amount below an upper limit," that upper limit "will be taken as the proper amount." Id. (citing Gratz v. Claughton, 187 F.2d 46, 51-52 (2d Cir. 1951)).

UPS's failure to conduct audits in compliance with its AOD obligations prevents precise knowledge of the proportion of packages containing cigarettes and, as a result, precludes a more certain quantification of damages. The Court's existing authority to make a reasonable approximation of damages is therefore bolstered by the fact that UPS's own wrongdoing contributed substantially to any uncertainty regarding the specific amount of damages in this case. Thus, the Court relies upon, inter alia, evidence of tracer inquiries, driver reports, witness testimony, and the audits that were conducted to make reasonable approximations of damages arising from UPS's violations as to each Liability Shipper.

4.   Defining a Carton

In order to determine compensatory damages under the PACT Act and CCTA, this Court must determine how many cartons of unstamped cigarettes UPS delivered.  The Court has already found that 50% of this number, multiplied by State and City taxes, constitutes the amount of lost tax revenues.

Based upon the evidence, the Court defines the term "Cartons" as follows: A carton of cigarettes weighs approximately one pound.  The Court may infer the actual weight of a Package based on information evident from the face of the delivery spreadsheets—under the column "actual weight."  In the instances where UPS did not provide "actual weight" information, one pound should be subtracted from a Package's "billed weight."[145]  As the Court has noted, a Package's "billed weight" was typically the Package's actual weight rounded up to the nearest whole number.  Any Packages weighing less than a pound should not be included because, according to the Court's factual determinations, such Packages could not have included cigarettes and therefore could not constitute lost tax revenues.

The total actual weight for all Packages should be summed and divided by one (based on the Court's finding that a Carton of cigarettes weights approximately one pound).  The resulting number is the number of Cartons.  The assessment of 50% of lost tax revenues should be based on this number.

---

[145] Subtracting a pound from the Package's "billed weight" eliminates the effect of rounding up, and provides a close (and, if anything, underestimated) approximation of the Package's "actual weight."

5.    <u>The AOD</u>

The violations of the AOD for which plaintiffs seek the imposition of penalties are different from the violations of the statutory schemes.  The AOD violations at issue with regard to penalties concern the failure to audit (while plaintiffs have proven other violations, as mentioned above, they seek penalties only for violations of the audit obligation).  This necessarily means that the amount imposed with respect to the AOD violations is not duplicative of other penalties.

In terms of the AOD audit violations, the Court relies on its findings of fact. As to each shipper, the Court has found the date not later than which there was a reasonable basis to believe that a shipper was tendering cigarettes.  This is the "start date" for the imposition of penalties.  The next issue relates to whether the violations are as to each package tendered for transport that was not audited, or something else.  As the Court has also indicated above, it is reasonable to interpret a violation of the audit obligation as each instance in which a Package (as the Court has defined that term above) was tendered to UPS following the specified start date.

The AOD provides for an assessment of $1,000 per violation; this is referred to in the AOD as a "stipulated" penalty.  The aggregate penalty for which UPS is liable under the AOD is the total number of Packages tendered.  The parties shall jointly confer on the number of such Packages based on the date ranges set forth in the Court's findings.

6.    <u>The PACT Act and PHL § 1399-ll</u>

Plaintiffs also seek the imposition of penalties for violations of the PACT Act and PHL § 1399-<u>ll</u>.  The Court has already determined as a factual matter that as of December 1, 2010, UPS was no longer exempt from the PACT Act, and therefore no longer exempt from PHL § 1399-<u>ll</u>; this lasted until February 18, 2015.

Both the PACT Act and PHL § 1399-<u>ll</u> limit penalties to amounts "[n]ot to exceed" specified "per violation" amounts.  For the PACT Act, that amount is $2,500 for the first violation and $5,000 for any violation within a year of another violation; for PHL § 1399-<u>ll</u>, the amount shall not exceed $5,000 for each violation or $100 per pack of cigarettes.  Thus, while the statutes plainly allow for the imposition of penalties on a per-violation basis, penalties need not be assessed on such a basis. The Court may not impose more than such a calculation allows, but it is not required to simply mechanically apply such a methodology.  This is sensible, as the principles outlined above require the Court to assess whether the aggregate penalty imposed on a defendant appropriately balances the various punitive, remedial, deterrence, and proportionality concerns.  Such balancing cannot be done simply by taking the appropriate number of Packages and multiplying them by the possible number.

Using the Court's definition of Package above, as well as the applicable date range, the Court directs the parties to determine the number of Packages that fall within those parameters.  The Court shall then, in a separate order, assess what

the amount of an appropriate penalty is (using that calculation as the outside parameters allowed by statute and considering any constitutional concerns).[146]

### 7. The CCTA

The CCTA is a separate statutory scheme from those discussed above. It contains a mandatory provision that one who knowingly transports contraband cigarettes "shall be fined."[147]  18 U.S.C. § 2344.  The statute does not define the amount of any such fine, but in assessing the amount of any fine, the Court is mindful of the proportionality limitations set forth in <u>Bajakajian</u> as well as the other penalties already imposed.  The Court has already stated its intention to impose penalties on a per-violation basis pursuant the PACT Act and PHL § 1399-<u>ll</u>. The amount of such penalties shall be determined once the parties have provided the Court with the directed information.  Under these circumstances, there does not seem to be any particular advantage to assessing a CCTA <u>penalty</u> based on the same "per Package metric."  Certainly, the number of Packages plays a role in the assessment of any penalties.  But in connection with the CCTA, the Court balances the mandatory requirement that some penalty be imposed (the statute dictates that

---

[146] PHL § 1399-<u>ll</u> refers to "to ship[ping] or caus[ing] to be shipped any cigarettes . . . ."  <u>See</u> § 1399-<u>ll</u>(1), (2).  The AOD defines "Prohibited Shipment" as "any package containing Cigarettes tendered to UPS where the shipment, delivery or packaging of such Cigarettes would violate Public Health Law § 1399-<u>ll</u>."  (AOD, DX 23 ¶ 16(H)).

[147] The term "contraband cigarettes" is defined to include a quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable taxes.  18 U.S.C. § 2341(2).  In its findings of fact above, the Court has found that UPS transported more than 10,000 cigarettes.  This occurred in single shipments transported on behalf of Jacob Manufacturing/Tobacco, as well as through aggregation of the thousands of packages shipped that contained cigarettes.

a violator "shall be fined," 18 U.S.C. § 2344), against the purpose of an additional penalty.

There are, of course, statutory differences.  The CCTA is its own statutory scheme with its own history and purpose.  It is the statute that would allow for compensatory damages.  That leaves the Court with the question of whether an additional fine would serve any additional and separate remedial purpose.  If not, it would be hard to justify its imposition.  The fact that a statute allows for a fine, and indeed requires one, does not dictate that it need be as large as the others.  The CCTA more or less seeks to punish the same conduct, for the same reasons, as the other statutes.

The Court has directed the parties to provide certain information in order to issue its order on penalties.  When that information is provided, the Court will be able to assess the appropriate amount of a separate fine, if any, for violations of the CCTA.

XXI.    INJUNCTIVE RELIEF

In addition to compensatory damages and penalties, plaintiffs seek the imposition of injunctive relief.  Injunctive relief is available for violations of the CCTA, the PACT Act, and PHL § 1399-ll (and N.Y. Exec. Law § 63(12)).

The PACT Act provides that "[a] State, through its attorney general, or a local government or Indian tribe that levies a tax subject to [15 U.S.C.] § 376a(a)(3)[,] through its chief law enforcement officer, may bring an action in a United States district court to prevent and restrain violations of this chapter [15

216

USCS §§ 375 <u>et seq.</u>] by any person or to obtain any other appropriate relief from any person for violations of this chapter, including civil penalties, money damages, and injunctive or other equitable relief."  15 U.S.C. § 378(c).

PHL § 1399-<u>ll</u>(6) provides that "[t]he attorney general [and corporation counsel of a locality imposing a cigarette tax] may bring an action to recover the civil penalties provided by subdivision five of this section and for such other relief as may be deemed necessary."

N.Y. Exec. Law § 63(12) provides that the State Attorney General may seek to hold accountable any person engaging in "repeated fraudulent or illegal acts" or who "otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business[.]"  Upon finding a violation of § 63(12), the Attorney General may seek, <u>inter alia</u>, an "order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages[.]"  <u>Id.</u>

The CCTA provides that a State or local government may bring an action "to prevent and restrain violations of this chapter by any person (or by any person controlling such person)" and may obtain "any other appropriate relief for violations of this chapter . . . including . . . injunctive or other equitable relief."  18 U.S.C. § 2346(b).  These remedies provide State and local governments with "broad remedial provisions."  <u>Golden Feather</u>, 2013 WL 318709 at *22.

An injunction prohibiting a statutory violation is warranted only when there is a likelihood that, unless enjoined, the violations will continue.  <u>S.E.C. v.</u>

<u>First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1477 (2d Cir. 1996); <u>United States v. Carson</u>, 52 F.3d 1173, 1184 (2d Cir. 1995) (A permanent injunction requires a "reasonable likelihood that the wrong will be repeated.").

Plaintiffs have persuasively shown that UPS engaged in repeated violations of the AOD and various statutes by failing to audit and knowingly transporting cigarettes.  However, there was significant evidence presented by UPS that, in particular, over the past two years, UPS has implemented oversight processes that should prevent repetition.  UPS has demonstrated that it is more likely than not that it is far more capable today of affirmatively working to identify and take action to ensure it honors the AOD, and with regard to non-compliant shippers.  It has shown by a preponderance of the evidence that a sufficient number of future violations are unlikely to support the rather harsh imposition of injunctive relief or a monitor.  In addition, it is likely that this lawsuit, including the resulting reputational and financial costs, provide standalone economic motivation for UPS to proceed more carefully in the future.

On the facts before the Court, injunctive relief and appointment of a monitor are unwarranted.[148]

---

[148] The Court notes that this is not a situation in which a private plaintiff would remain in the dark regarding future violations.  Plaintiffs here are armed with various enforcement powers that allow them to obtain information from UPS and others to identify compliance issues.  Should UPS be found to have again violated the AOD and various statutory schemes, imposition of injunctive relief could be imposed at that time.

XXII.  CONCLUSION

For the reasons set forth above, the Court finds liability on each of plaintiffs' causes of action.  The Court requires the parties to submit the numbers of Packages and Cartons as defined above and according to the Court's findings and rulings.  Following receipt of such information, the Court shall issue a final order as to damages and penalty.  The parties shall submit the above information not later than two weeks from the date of this Opinion & Order, i.e., **Friday, April 7, 2017**.

SO ORDERED.

Dated:        New York, New York
              May 25, 2017

                                          _____
                                                KATHERINE B. FORREST
                                              United States District Judge

219